# APPENDIX TO JOINT CLAIM CONSTRUCTION CHART

*Microchip Technology Inc. v. Aptiv Services US, LLC*, Case No. 17-01194-LPS-CJB

**Contents:**

U.S. Patent No. 7,478,191 ("the '191 Patent") .................................................................Appx_1

File History Excerpts for the '191 Patent .........................................................................Appx_22

Patent Owner's Preliminary Response in *inter partes* review of the '191 Patent .............Appx_44

Decision Denying Institution in *inter partes* review of the '191 Patent ..........................Appx_113

U.S. Patent No. 7,523,243 ("the '243 Patent") ................................................................Appx_156

File History Excerpts for the '243 Patent .........................................................................Appx_165

Patent Owner's Preliminary Response in *inter partes* review of the '243 Patent ...........Appx_223

Patent Owner's Response in *inter partes* review of the '243 Patent ................................Appx_296

Exhibit 2007 in *inter partes* review of the '243 Patent....................................................Appx_362

Patent Owner's Sur-Reply in *inter partes* review of the '243 Patent ...............................Appx_408

Final Written Decision in *inter partes* review of the '243 Patent....................................Appx_425

U.S. Patent No. 7,627,708 ("the '708 Patent") ................................................................Appx_508

File History Excerpts for the '708 Patent .........................................................................Appx_516

Patent Owner's Preliminary Response in *inter partes* review of the '708 Patent ...........Appx_526

Patent Owner's Response in *inter partes* review of the '708 Patent ................................Appx_600

Exhibit 2007 in *inter partes* review of the '708 Patent....................................................Appx_657

Patent Owner's Sur-Reply in *inter partes* review of the '708 Patent ...............................Appx_703

Oral Hearing Transcript in *inter partes* review of the '243 Patent and the '708 Patent...Appx_719

Final Written Decision in *inter partes* review of the '708 Patent....................................Appx_779

USB 2.0 Specification, Chapters 1–5 ...............................................................................Appx_852

U.S. Patent Application Pub. No. 2006/0059293 ("Wurzburg Application")..................Appx_964



US007478191B2

(12) **United States Patent**
Wurzburg et al.

(10) Patent No.: **US 7,478,191 B2**
(45) Date of Patent: **Jan. 13, 2009**

(54) **METHOD FOR AUTOMATICALLY SWITCHING USB PERIPHERALS BETWEEN USB HOSTS**

(75) Inventors: **Henry Wurzburg**, Austin, TX (US);
**Steve Nelson**, Miller Place, NY (US);
**Mark Y. Fu**, Newark, CA (US); **Hans Magnusson**, Austin, TX (US)

(73) Assignee: **Standard Microsystems Corporation**,
Hauppauge, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 117 days.

(21) Appl. No.: **11/457,389**

(22) Filed: **Jul. 13, 2006**

(65) **Prior Publication Data**
US 2007/0245058 A1     Oct. 18, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/792,247, filed on Apr. 14, 2006.

(51) **Int. Cl.**
*G06F 13/00*     (2006.01)
(52) **U.S. Cl.** .......................... **710/316**; 710/17; 710/305
(58) **Field of Classification Search** .................. 710/17, 710/18, 62, 63, 110, 305, 316, 317
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,784,581 A * | 7/1998 | Hannah | ...................... | 710/110 |
| 5,978,389 A | 11/1999 | Chen | | |
| 6,282,601 B1 * | 8/2001 | Goodman et al. | ........... | 710/260 |
| 6,308,223 B1 | 10/2001 | Osakada et al. | | |
| 6,516,205 B1 * | 2/2003 | Oguma | ...................... | 455/557 |
| 6,532,512 B1 | 3/2003 | Torii et al. | | |
| 6,732,218 B2 | 5/2004 | Overtoom et al. | | |

| | | | |
|---|---|---|---|
| 6,750,569 B2 | 6/2004 | Liao | |

(Continued)

FOREIGN PATENT DOCUMENTS

DE     298 06 131 U     7/1998

(Continued)

OTHER PUBLICATIONS

"USB2.0 Compatible 4-Port Switching Hub with Two Upstream Host Ports"; SMSC Datasheet; Nov. 8, 2005; 26 pages; Standard Microsystems Corp., Hauppauge, NY.

(Continued)

*Primary Examiner*—Khanh Dang
(74) *Attorney, Agent, or Firm*—Meyertons Hood Kivlin Kowert & Goetzel, P.C.; Jeffrey C. Hood

(57) **ABSTRACT**

A system for automatically switching peripheral connectivity between two host devices based on respective connectivity of the hosts. The method may be used where peripherals are usually attached to one host and are automatically switched to a second host when the second host is attached to the system. A USB switching hub may be operable to automatically switch connectivity of the peripheral device(s) from the first host device to the second host device when the second host device is connected to the USB device. This automates the process for the end user when normally all peripherals are attached to one host, and some or all peripherals are shared with a second host when the second host is attached.

**21 Claims, 12 Drawing Sheets**



## US 7,478,191 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,874,055 | B2 | 3/2005 | Chiang et al. |
| 6,920,569 | B1 * | 7/2005 | Wauters et al. .............. 713/300 |
| 7,093,057 | B2 * | 8/2006 | Choi .......................... 710/313 |
| 2001/0032280 | A1 | 10/2001 | Osakada et al. |
| 2003/0093599 | A1 * | 5/2003 | Lou et al. .................... 710/72 |
| 2003/0142683 | A1 | 7/2003 | Lam et al. |
| 2004/0088449 | A1 * | 5/2004 | Sakaki ......................... 710/15 |
| 2004/0111544 | A1 | 6/2004 | Bennett et al. |
| 2006/0056401 | A1 | 3/2006 | Bohm et al. |
| 2006/0059293 | A1 | 3/2006 | Wurzburg et al. |
| 2006/0179144 | A1 | 8/2006 | Nagase |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 982 663 A2 | 3/2000 |
| GB | 2 352 540 A | 1/2001 |
| JP | 2000-242377 | 9/2000 |
| JP | 2001-043178 | 2/2001 |
| JP | 2001229119 | 8/2001 |
| JP | 2003-195991 | 7/2003 |
| KR | 10-2004-000836 A | 1/2004 |
| KR | 10-0490068 B1 | 5/2005 |

### OTHER PUBLICATIONS

"Programmable Multi-Host Device Sharing USB Hub"; Research Disclosure, IBM Corp.; Feb. 1, 1999; 1 page; Mason Publications; Hampshire, GB.

"On-The-Go Supplement to the USB 2.0 Specification—Revision 1.0"; Dec. 18, 2001; 74 pages.

Fred Zlotnick; "AND8158/D NLAS4717 Analog Switch Permits USB 1.1 Switching"; ON Semiconductor; 4 pages.

"FSUSB11 Low Power Full Speed USB (12Mbps) Switch"; Apr. 2004 (revised Jul. 2005); 9 pages; Fairchild Semiconductor.

"FSUSB22 Low Power 2 Port Hi-Speed USB 2.0 (480 Mbps) Switch"; 3 pages; Fairchild Semiconductor.

"USB 1.1 Switch Offers Low Power And Bandwidth"; Jul./Aug. 2004; 3 pages; Fairchild Semiconductor Corp.

International search report and written opinion for application No. PCT/US2007/066612, mailed Aug. 6, 2007.

Computer-generated translation of JP2001229119A Publication, "Device Selection Hubbox By Plural Computers", by Hitachi Ltd., published Aug. 24, 2001, 21 pages.

Human-generated translation of JP2001229119A Publication, "Device Selection Hubbox By Plural Computers", by Hitachi Ltd., published Aug. 24, 2001, 2 pages.

Korean Office Action for Application 10-2007-7005961, entitled "Universal Serial Bus Switching Hub", dated Apr. 18, 2008, 5 pages.

Human translation of previously cited reference JP 2001229119A Publication, "Device Selection Hubbox By Plural Computers" obtained on Jun. 23, 2008, (12 pages).

* cited by examiner

**U.S. Patent**     Jan. 13, 2009     Sheet 1 of 12     US 7,478,191 B2



*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*

Case 1:17-cv-01194-JDW   Document 76-1   Filed 11/02/18   Page 6 of 981 PageID #: 1811



*FIG. 5*

Up-stream port 117b
Down-stream port 121d
Down-stream port 121c
Down-stream port 121b
Down-stream port 121a
USB Switching Hub 119
Up-stream port 117a
Interface 123c
Device 125c
Interface 123b
Device 125b
Interface 123a
Device 125a
Port 115
Host Controller 111
South Bridge 113
Computer System 101
PCI Bus 109
System Memory 107
North Bridge 105
CPU 103

FIG. 6



FIG. 7



*FIG. 8a*



FIG. 8b



Host Controller 409
Port 470
Mode 411
Interface 413
Printer 407
Host Controller 459
Port 473
Mode 461
Interface 463
DVD Read/Write 467
Up-stream port 417c
Up-stream port 417b
Up-stream port 417a
Hub Controller 403c
Hub Controller 403b
Hub Controller 403a
Transaction Translator 405c
Transaction Translator 405b
Transaction Translator 405a
USB Switching Hub 419
Down-stream port 421f
Down-stream port 421e
Down-stream port 421d
Down-stream port 421c
Down-stream port 421b
Down-stream port 421a
Device 425c
Device 425b
Device 425a
Host Controller 111
Port 115
Computer System 101
Downstream Switching Logic 401

FIG. 9a



Host Controller 409
Port 470
Mode 411
Interface 413
Printer 407
Host Controller 459
Port 473
Mode 461
Interface 463
DVD Read/Write 467
Up-stream port 417c
Up-stream port 417b
Up-stream port 417a
USB Switching Hub 419
Hub Controller 403c
Hub Controller 403b
Hub Controller 403a
Transaction Translator 405c
Transaction Translator 405b
Transaction Translator 405a
Down-stream port 421f
Down-stream port 421e
Down-stream port 421d
Down-stream port 421c
Down-stream port 421b
Down-stream port 421a
Device 425c
Device 425b
Device 425a
Host Controller 111
Port 115
Computer System 101
Downstream Switching Logic 401

*FIG. 9b*



Host Controller 409
Port 470
Mode 411
Interface 413
Printer 407
Host Controller 459
Port 473
Mode 461
Interface 463
DVD Read/Write 467
Up-stream port 417c
Up-stream port 417b
Up-stream port 417a
USB Switching Hub 419
Hub Controller 403c
Hub Controller 403b
Hub Controller 403a
Transaction Translator 405c
Transaction Translator 405b
Transaction Translator 405a
Downstream Switching Logic 401
Down-stream port 421f
Down-stream port 421e
Down-stream port 421d
Down-stream port 421c
Down-stream port 421b
Down-stream port 421a
Device 425c
Device 425b
Device 425a
Host Controller 111
Port 115
Computer System 101

FIG. 9c



Host Controller 209
Port 210
Mode 211
Interface 213
Dual Role Device 207
USB Switching Hub 119
Up-stream port 117b
Up-stream port 117a
Status Registers 811a
Status Registers 811b
Hub Controller 203b
Hub Controller 203a
IPRS 821
Transaction Translator 205b
Transaction Translator 205a
Downstream Switching Logic 201
Down-stream port 121d
Down-stream port 121c
Down-stream port 121b
Down-stream port 121a
Device 125b
Device 125a
External Signal 813
Host Controller 111
Port 115
Computer System 101

FIG. 10



*FIG. 11*

US 7,478,191 B2

**1**

## METHOD FOR AUTOMATICALLY SWITCHING USB PERIPHERALS BETWEEN USB HOSTS

### PRIORITY CLAIM

This application claims benefit of priority of provisional application Ser. No. 60/792,247 titled "Method for Automatically Switching USB Peripherals Between USB Hosts", filed on Apr. 14, 2006, whose inventors are Henry Wurzburg, Steve Nelson, Mark Y. Fu, Hans Magnusson and Douglas L. Smith, and which is hereby incorporated by reference as though fully and completely set forth herein.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to peripheral device hubs and, more specifically, to Universal Serial Bus (USB) switching hubs.

2. Description of the Related Art

The Universal Serial Bus (USB) allows coupling of peripheral devices to a computer system. USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices. The bus allows peripherals to be attached, configured, used, and detached while the host is in operation. For example, USB printers, scanners, digital cameras, storage devices, card readers, etc. may communicate with a host computer system over USB. USB based systems may require that a USB host controller be present in the host system, and that the operating system (OS) of the host system support USB and USB Mass Storage Class Devices.

USB devices may communicate over the USB bus at low-speed (LS), full-speed (FS), or high-speed (HS). A connection between the USB device and the host may be established via digital interconnect such as Interchip USB, ULPI, UTMI, etc., or via a four wire interface that includes a power line, a ground line, and a pair of data lines D+ and D–. When a USB device connects to the host, the USB device may first pull a D+ line high (the D– line if the device is a low speed device) using a pull up resistor on the D+ line. The host may respond by resetting the USB device. If the USB device is a high-speed USB device, the USB device may "chirp" by driving the D– line high during the reset. The host may respond to the "chirp" by alternately driving the D+ and D– lines high. The USB device may then electronically remove the pull up resistor and continue communicating at high speed. When disconnecting, full-speed devices may remove the pull up resistor from the D+ line (i.e., "tri-state" the line), while high-speed USB devices may tri-state both the D+ and D– lines.

A USB hub may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller. In addition, other USB hubs may be coupled to the USB hub to provide additional USB device connections to the USB host controller.

Some dual role peripheral devices may include a slave controller and be capable of communicating with other peripheral devices coupled to them. For example, a dual role USB printer may be able to communicate directly with a USB camera to print pictures from the USB camera. The dual role USB printer may also be accessible (e.g., by a computer system) as a slave peripheral device. If a computer system and dual role peripheral device need to alternately access a peripheral device, the peripheral device may need to be unplugged from one device and coupled to the other. Prior art device switches may not work for high-speed peripheral devices. For example, mechanical switches may introduce

**2**

too much capacitance or inductance to work with high-speed peripheral devices. High-speed peripheral devices also typically require smooth impedance to prevent ringing (mechanical switches introduce irregularities in the impedance that may cause ringing).

U.S. Patent Application Publication No. 20060059293 (application Ser. No. 10/940,406) and U.S. Patent Application Publication No. 20060056401 (application Ser. No. 11/100, 299) describe a USB switching hub that can switch between upstream ports and downstream ports. A USB switching hub may be used in a system having a first host device (e.g., a computer system), wherein the switching hub may initially couple a plurality of peripheral devices to the first host device, and where it is desired to switch the peripheral devices to couple to a second host device when the second host device is attached to the system. In this instance, an easy, intuitive method for the end user to actuate the switching of peripherals between two hosts is desired. In other words, a method is desired that allows the switching of peripherals between two hosts, where peripherals are usually attached to one host and are switched to a second host when the second host is attached to the system.

Other corresponding issues related to the prior art will become apparent to one skilled in the art after comparing such prior art with the present invention as described herein.

### SUMMARY OF THE INVENTION

One embodiment of the invention provides an easy, intuitive system and method for automatically switching peripheral connectivity between two host devices based on respective connectivity of the hosts. For example, the method may be used where peripherals are usually attached to one host and are automatically switched to a second host when the second host is attached to the system.

An exemplary system may comprise a USB device, a first host device (e.g., a computer system) coupled to the USB device, a plurality of peripheral devices coupled to the USB device, and a second host device that may be selectively coupled to the USB device. The second host device may be a display device, computer docking station, multimedia player docking station, camera docking station, or any other type of USB device. The USB device may include a USB switching hub which may operate to automatically switch connectivity of the peripheral devices between the first host device and the second host device. More specifically, the USB switching hub may operate to automatically switch connectivity of the peripheral devices from the first host device to the second host device when the second host device is connected to the USB device. This automates the process for the end user when normally all peripherals are attached to one host, and then some or all of the peripherals are shared with a second host when the second host is attached. Thus, the user is not required to manually press a switch or button or change cables or otherwise manually effect the switching.

In one embodiment, the USB switching hub has electrical inputs that select how peripherals are assigned to its upstream hosts. Automatic switching may be accomplished by using the VBUS signal from the second host connector to select between two configurations. This can be done in a level sensitive mode or by selecting one of a plurality of possible configurations. In one set of embodiments, 1 of 8 possible configurations may be selected when operating in configuration selection mode. Thus when the second host device is connected to the USB device comprising the switching hub, the VBUS signal is provided from the second host device and received at the USB switching hub. The USB switching hub

US 7,478,191 B2

**3**

senses the VBUS signal and automatically switches some or all of the attached peripherals from the first host device to the second host device.

As one example, the USB device may be display (monitor) comprising a hub and coupled to peripherals that normally operate with the computer (PC). When a user attaches a second host device, such as a PDA or media player, via cable to the display device (connecting to the switching hubs second host port), some or all of the peripherals are switched from the PC to the second host device. The peripherals are then switched back to the PC when the second host device (PDA or media player) is detached. As another example, a laptop docking station would normally couple attached peripherals to a desktop PC when the laptop PC is not docked to the docking station. The switching hub in the laptop docking station would automatically switch the peripherals from the users desktop computer to the laptop when the laptop is inserted into the docking station.

In various embodiments, the USB switching hub may control access between a plurality of upstream ports on the USB switching hub and at least a subset of a plurality of downstream ports on the USB switching hub. The USB switching hub may automatically electronically switch between different configurations (e.g., hardwired or software implemented configurations) for access between the two or more upstream ports and the downstream ports.

In a second embodiment of the invention, the secondary host may be automatically connected to the display device when attached or docked and the primary host disconnected, thereby reducing or eliminating a manual procedure. This embodiment allows, for example, a semi-permanently attached notebook PC docking station that automatically switches from the desktop PC to the docked notebook when the notebook is inserted into the dock. Alternatively, a video media player's video is automatically displayed on a monitor when the media player is attached, instead of the semi-permanently attached desktop PCs video, without detaching the PC's video cable or manually actuating a switch on the monitor.

### BRIEF DESCRIPTION OF THE DRAWINGS

A better understanding of the present invention may be obtained when the following detailed description is considered in conjunction with the following drawings, in which:

FIG. **1** is a block diagram of a system comprising a USB device that automatically selectively couples either a first host device or second host device to various peripheral devices;

FIG. **2** illustrates a display device that implements an embodiment of the invention;

FIG. **3** is a block diagram of a display device including a USB switching hub that operates by selecting one of a number of connecting configurations, according to one embodiment of the invention;

FIG. **4** is a block diagram of a display device including a USB switching hub that operates by selecting connectivity based on a level mode, according to another embodiment of the invention;

FIG. **5** illustrates a USB switching hub, according to an embodiment;

FIG. **6** illustrates a USB switching hub coupled to a computer system and to various peripheral devices according to an embodiment;

FIG. **7** illustrates a computer system and a dual role peripheral device coupled to a USB switching hub, according to one embodiment;

**4**

FIGS. **8***a* and **8***b* illustrate two communication configurations of the USB switching hub, according to one embodiment;

FIGS. **9***a*, **9***b*, and **9***c* illustrate additional communication configurations of the USB switching hub, according to one embodiment;

FIG. **10** illustrates a USB switching hub with multiple status registers, according to one embodiment; and

FIG. **11** illustrates an alternate embodiment of a system comprising a USB switching hub coupled to a computer system, a peripheral device, and a dual role device.

While the invention is susceptible to various modifications and alternative forms, specific embodiments thereof are shown by way of example in the drawings and will herein be described in detail. It should be understood, however, that the drawings and detailed description thereto are not intended to limit the invention to the particular form disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present invention as defined by the appended claims. Note, the headings are for organizational purposes only and are not meant to be used to limit or interpret the description or claims. Furthermore, note that the word "may" is used throughout this application in a permissive sense (e.g., having the potential to or being able to in some embodiments), not a mandatory sense (i.e., must). The term "include", and derivations thereof, mean "including, but not limited to". The term "coupled" means "directly or indirectly connected".

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Incorporation by Reference

U.S. Patent Application Publication No. 20060059293 (application Ser. No. 10/940,406) titled "Universal Serial Bus Switching Hub" and filed on Sep. 14, 2004, whose inventors are Henry Wurzburg, James E. Bowles, Robert E. Hollingsworth, Mark R. Bohm, and Drew J. Dutton, is hereby incorporated by reference in its entirety as though fully and completely set forth herein.

U.S. Patent Application Publication No. 20060056401 (application Ser. No. 11/100,299) titled "Peripheral Sharing USB Hub" and filed on Nov. 4, 2004, whose inventors are Mark R. Bohm, Mark Y. Fu, Henry Wurzburg, James E. Bowles, Robert E. Hollingsworth and Drew J. Dutton, is hereby incorporated by reference in its entirety as though fully and completely set forth herein.

U.S. patent application Ser. No. 11/424,179 titled "Peripheral Sharing USB Hub" and filed on Jun. 14, 2006, whose inventors are Mark R. Bohm, Mark Y. Fu, Henry Wurzburg, James E. Bowles, Robert E. Hollingsworth, Drew J. Dutton, and Akhlesh Nigam, is hereby incorporated by reference in its entirety as though fully and completely set forth herein.

FIG. **1** illustrates a block diagram of an exemplary system. As shown, the system may comprise a USB hub device **106** that may include a USB switching hub **119**. A first host device **102** may be coupled to USB hub device **106**. A plurality of peripheral devices (not shown) may also be coupled to USB hub device **106**, and USB hub device **106** may itself be a peripheral device coupling to first host device **102**. A second host device **104** may also be coupled (e.g., selectively coupled) to USB hub device **106**.

When second host device **104** is not connected to USB hub device **106**, USB switching hub **119** may operate to provide connectivity between first host device **102** and USB hub device **106**, and/or between first host device **102** and the

US 7,478,191 B2

5

plurality of peripheral devices coupled to USB hub device **106**. When the second host device **108** is coupled to USB hub device **106**, USB switching hub **119** is operable to detect this connection and automatically switch to provide connectivity between the second host device **104** and USB hub device **106**, and/or between second host device **104** and the plurality of peripheral devices coupled to USB hub device **106**. In so doing, USB switching hub **119** may discontinue providing connectivity between the first host device **102** and USB hub device **106**, and/or between first host device **102** and the plurality of peripheral devices coupled to USB hub device **106**. The "automatic" switching performed herein means that the user is not required to manually press buttons, change cables, etc. to initiate the switching, but rather merely connects second host device **104** to USB hub device **106**.

FIG. **2** illustrates an exemplary system that may include an embodiment of the invention. As shown, in this exemplary embodiment, USB hub device **106** may be a display device **151**. Display device **151** may include USB switching hub **119**. A first host device, such as a computer system **153**, may be connected to a first host port of USB switching hub **119**. A plurality of peripherals (e.g. printer **157**, keyboard **159**, and mouse **161**) may also connect to USB switching hub **119** by coupling to display device **151**. Other peripheral devices (not shown) may also be similarly coupled, and any one or more of all the peripheral devices (including those shown) may be an embodiment of USB hub device **106**. A second host device, in this case a personal digital assistant (PDA) **155** may also be selectively coupled to USB switching hub **119** by coupling to display device **151**.

FIGS. **3** and **4** illustrate two possible embodiments of USB hub device **106**. In each embodiment, USB hub device **106** is a display monitor that comprises USB switching hub **119**. USB switching hub **119** may have electrical inputs that select how peripherals are assigned to its upstream hosts. Automatic switching is accomplished by using the VBUS signal from the second host connector **128** to select between two configurations. This can be done by selecting one from a number of possible connectivity configurations (e.g. selecting 1 out of 8 configurations as shown in FIG. **3**) or the level sensitive mode (as shown FIG. **4**).

FIG. **3** illustrates an embodiment of USB hub device **106** comprising USB switching hub **119**, which selects one of multiple connectivity combinations (in this case 1 of 8) to facilitate automatic switching between first and second host devices through first host connector **126** and second host connector **128**, respectively. In this embodiment, USB hub device **106** is a display device or monitor. As mentioned, USB hub device **106** may comprise USB switching hub **119**. USB switching hub **119** may comprise three control input lines Ctl **0**, Ctl **1**, and Ctl **2**. An EEPROM (Electrically Erasable Programmable Read Only Memory) **124** may be coupled to USB switching hub **119**, which may be coupled to a first host device port **126** through a first USB connection **130** (which may be a USB data line). USB switching hub **119** may also be coupled to a second host device port **128** through a second USB connection **132**, (which may also be a USB data line). As shown, each of the host device ports **126** and **128** may receive a VBUS signal when a host device is attached to the respective port.

In the embodiment shown in FIG. **3**, EEPROM is configured to store 8 different configurations for connectivity, from which USB switching hub **119** may determine how peripherals **140-146** are to be attached to the two hosts through ports **126** and **128**, respectively. In the embodiment shown in FIG. **3**, one of the three control lines (in this case ctl**0**) may be tied to the second host device's VBUS port, which may operate to

6

select between two connectivity configurations in EEPROM **124**. Thus, when the second host device (e.g., a PDA or portable PC) is connected to second host connector **128** and drives the respective VBUS line high (e.g. to 5 volts in this embodiment), peripherals **140-146** may effectively be switched to be coupled to the second host device. The levels set on the other control lines (Ctl **1** and Ctl **2**, in this case) may be used to determine and/or modify which ones of peripherals **140-146** may switch to the second host when the second host device is attached to port **128** and drives VBUS to 5 v.

FIG. **4** illustrates Level Mode, which may be another method to perform switching connectivity of peripheral devices **140-146** from the first host to the second host. In this mode, the monitor/display device (i.e. an embodiment of USB hub device **106**) may be configured with 4 control lines (only 3 are shown in FIG. **4** for simplicity). Each control line may be associated with a respective one of peripheral devices **140-146**. The control lines may be configured such that a logic low value (0V in this embodiment) on a respective control line forces its associated peripheral device (of peripheral devices **140-146**) to be attached to the first host device (e.g., the PC), and a logic high value (5V in this embodiment) on a respective control line forces its associated peripheral to be attached to the second host. Pull down resistors **171-175** may be configured to make the first host device the default or normal selection for each of peripherals **140-146**. In alternate embodiments, the default selection may be host device **2**. Furthermore, alternate embodiments may include additional ports for additional host devices, and other configurations with additional control lines may be possible to similarly establish default connectivity and switching connectivity between the various host devices, using USB switching hub **119**. When the second host device attaches to second host connector **128** and VBUS goes high, if one or more of switches **177-181**, each of which may be associated with a respective peripheral, are closed, then each peripheral corresponding to a closed switch may be electrically coupled to the second host device.

Thus the embodiments described herein provide for automatic switching of peripherals from a first host device to a second host device when the second host device is connected to the system. This provides a significant improvement over the manual selection required in the prior art. Further minimal (or no) additional components are required. In addition, the described embodiments provide an intuitive operation to the end user.

FIG. **5** illustrates an embodiment of a USB switching hub **119**. In various embodiments, USB switching hub **119** may control access between a plurality of upstream ports **117** (e.g., **117***a* and **117***b*) on USB switching hub **119** and at least a subset of a plurality of downstream ports **121** (e.g., **121***a***-121***d*) on USB switching hub **119**.

In some embodiments, upstream devices coupled to upstream ports **117** may enumerate USB switching hub **119** according to the total number (N) of downstream ports **121**. For example, USB switching hub **119** may be enumerated as a 4-port hub (corresponding to the four downstream ports **121**). In some embodiments, communications between each of downstream ports **121** and upstream ports **117** may be controlled by USB switching hub **119**. In some embodiments, when first upstream port **117***a* is communicating with first downstream port **121***a*, second downstream port **121***b* may communicate with second downstream port **121***c*. Second upstream port **117***b* may register first downstream port **121***a* as disconnected. For example, status registers coupled to second upstream port **117***b* may indicate first downstream port **121***a* is disconnected (i.e., to appear that no device is

US 7,478,191 B2

7

electrically connected to first downstream port 121a. The disconnect status may prevent second upstream device 117b from attempting to reset and connect to first peripheral device 121a coupled to first downstream device 121a while a separate upstream device is communicating through first upstream port 117a with first downstream device 125a. By enumerating USB switching hub 119 as a 4-port hub, the upstream devices may not have to re-enumerate USB switching hub 119 (and correspondingly each downstream and/or upstream device coupled to the USB switching hub) each time a downstream device is switched.

In some embodiments, only one upstream device may access any one downstream device at a time. In some embodiments, multiple upstream devices may access separate downstream devices at the same time. In some embodiments, different communication configurations may be implemented. For example, first upstream port 117a may be allowed access to the first three downstream ports (121a, 121b, and 121c) and second upstream port 117b may be allowed access to fourth downstream port 121d. Devices coupled to first upstream port 117a and second upstream port 117b may have enumerated USB switching hub 119 as a 4-port hub, but in this example, a device coupled to first upstream port 117a may register fourth downstream port 121d as disconnected while a device coupled to second upstream port 117b may register the first three downstream ports (121a, 121b, and 121c) as disconnected.

In a second communication configuration, first upstream port 117a may be allowed to access fourth downstream port 121d while second upstream port 117b may be allowed to access the first three downstream ports (121a, 121b, and 121c). Other communication configurations are also possible (e.g., in one communication configuration neither upstream port 117 may be allowed to access any downstream port 121). In some embodiments, USB switching hub 119, after receiving a control signal (e.g., from a computer, a different attached device, a person, a sensor, a logic internal to USB switching hub 119, etc.), may switch between the first communication configuration and the second communication configuration (or another communication configuration). In some embodiments, USB switching hub 119 may not receive a control signal before switching communication configurations (e.g., switching access for first downstream device 125a from first upstream port 117a to second upstream port 117b).

FIG. 6 illustrates an embodiment of USB switching hub 119 coupled to computer system 101. In some embodiments, computer system 101 (e.g., a personal computer (PC), laptop, server, etc.) may access multiple peripheral devices 125 coupled to USB switching hub 119. Computer system 101 may couple to USB switching hub 119 through upstream port 117. Computer system 101 may receive and transmit signals, e.g., USB signals, through host controller 111 coupled to device port 115. While various embodiments may include computer system 101, it is to be understood that other devices that have a host controller may also access USB switching hub 119. Host controller 111, coupled to south bridge 113, may be coupled to other computer components (e.g., north bridge 105, central processing unit (CPU) 103, and system memory 107) through peripheral component interconnect (PCI) bus 109.

In some embodiments, USB switching hub 119 may have multiple downstream ports 121 for coupling to multiple peripheral devices 125. Peripheral devices 125 may include USB printers, scanners, digital cameras, digital camera docks, consumer audio/video, storage devices, and card readers, among others. In some embodiments, peripheral devices 125 may couple to USB switching hub 119 through interface

8

123. In some embodiments, interface 123 may be a PHY interface. Other interfaces may also be used (e.g., UTMI or ULPI). Upstream ports 117 and downstream ports 121 may also have interfaces.

FIG. 7 illustrates an embodiment in which two upstream devices (e.g., computer system 101 and dual role peripheral device 207) are coupled to USB switching hub 119. In some embodiments, USB switching hub 119 may include respective transaction translator circuitry 205a and 205b for each upstream port 117a and 117b, coupled to corresponding hub controller 203a and 203b, respectively. Transaction translator circuitry 205a and 205b may also be coupled to downstream switching logic 201, which may be electronically coupled to downstream ports 121. In some embodiments, downstream switching logic 201 may switch between two or more communication configurations. Communication configurations may be implemented by downstream switching logic 201 routing communications between upstream ports 117 and downstream ports 121 while the communications are in the digital domain (as a result of the interfaces to/from USB switching hub 119). In some embodiments, communication configurations (e.g., hardwired in the USB switching hub) may be switched as determined by logic on the USB switching hub. Other communication configuration implementations are also contemplated.

In some embodiments, dual role peripheral device 207 may include a dual role USB printer or dual role USB Digital Versatile Disc (DVD) read/write drive, among others. In some embodiments, dual role peripheral device 207 may be coupled to an upstream port (e.g., upstream port 117b) of USB switching hub 119 through device port 210. Dual role peripheral device 207 may interface through upstream port 117b with other peripheral devices (downstream peripheral devices) coupled to USB switching hub 119 (e.g., using host controller 209 on dual role peripheral device 207). Dual role peripheral device 207 may also interface with other upstream devices (such as computer system 101) through a slave controller. For example, dual role peripheral device 207 may be coupled to USB switching hub 119 as a slave peripheral device (e.g., through downstream port 121c). In some embodiments, dual role peripheral device 207, coupled to the USB switching hub, may simultaneously act as a host to one or more peripheral devices and/or as slave peripheral device to a separate host.

In some embodiments, dual role peripheral device 207 may have an embedded host controller application to operate as a standalone system (e.g., to communicate with another peripheral device, such as a digital camera, without PC intervention). For example, a dual role USB printer may print pictures directly from a digital camera, coupled to a downstream port 121 on USB switching hub 119, without PC intervention. In some embodiments, USB switching hub 119 may alternately allow the computer system 101 or dual role peripheral device 207 to access one or more downstream devices (e.g., by switching between one or more communication configurations).

FIGS. 8a and 8b illustrate a computer system electronically coupled to multiple peripheral devices. In some embodiments, USB switching hub 119 may act like a switch coupling multiple internal "hubs" that may share one or more downstream ports. For example, each potential communication configuration of the USB switching hub may represent an internal "hub". In some embodiments, when computer system 101 is accessing peripheral device 125 (e.g., peripheral device 125a) coupled to USB switching hub 119, communications to/from the peripheral device may be processed through a first "hub" comprised of first upstream port 117a,

US 7,478,191 B2

9

hub controller 203a, transaction translator 205a, and at least a subset of the downstream ports 121. A second "hub" may be comprised of second upstream port 117b, hub controller 203b, transaction translator 205b, and at least a subset of the downstream ports 121. In one communication configuration, computer system 101 may connect to downstream ports 121a and 121c (through the first "hub"), and dual role peripheral device 207 may connect to downstream ports 121b and 121d (through the second "hub") (as seen in FIG. 14b). Other communication configurations are also contemplated. In some embodiments, communication configuration profiles designating which downstream devices to couple to each upstream port may be hardwired or implemented by software. For example, if implemented by software, communication configuration profiles for each upstream port (and/or upstream device) may be stored on a memory accessible to USB switching hub 119.

In some embodiments, computer system 101 and dual role peripheral device 125 may communicate through USB switching hub 119 simultaneously with separate downstream devices. For example, while computer system 101 communicates with device 125a (e.g., through the first "hub"), dual role peripheral device 207 may communicate with device 125b (e.g., through the second "hub"). In some embodiments, while peripheral device 125a is being accessed through the first "hub", a different upstream device may not be able to access peripheral device 125a (e.g., dual role peripheral device 207 may not be able to access peripheral device 125a while peripheral device 125a is being used by computer system 101). In some embodiments, a signal (e.g., from an external control block) may trigger downstream switching logic 201 to switch access for a subset of downstream ports 121 (e.g., downstream port 121a and/or 121c) on the first "hub" to the second "hub" (i.e., switch communication configurations). In some embodiments, dual role peripheral device 207 may send a control signal to USB switching hub 119. USB switching hub 119 may then switch communication configurations to connect one or more downstream ports to the dual role peripheral device. For example, when a user presses a button on dual role peripheral device 207 (e.g., a dual role printer), a signal may be sent through mode 211 to downstream switching logic 201 to switch access for device 125a from computer system 101 to dual role peripheral device 207 (i.e., to switch to a communication configuration as seen in FIG. 8b). Computer system 101 may continue to communicate with downstream port 121c (and/or other downstream ports as determined by the second communication configuration).

In some embodiments, when activity is no longer detected between dual role peripheral device 207 and a downstream port (e.g., if dual role peripheral device 207 is turned off), downstream switching logic 201 may switch access of the downstream port to computer system 101 (i.e., switch to a different communication configuration). In some embodiments, downstream switching logic 201 may switch access of the downstream port to a different upstream device. In some embodiments, instead of detecting inactivity, a signal from dual role peripheral device 207 may signal USB switching hub 119 to switch. Other signals and/or logic may also be used in determining when to switch communication configurations.

In some embodiments, communication configurations may be software implemented. In some embodiments, a microprocessor coupled to or comprised in downstream switching logic 201 may dynamically determine, e.g., using a dynamic communication configuration profile, which downstream ports to electrically couple to each upstream port. For

10

example, the microprocessor may read a stored communication configuration profile and attempt to connect upstream ports to downstream ports according to the communication configuration profile. The communication configuration profiles may be stored on a memory (e.g., an Electronically Erasable Programmable Read-Only Memory (EEPROM)) coupled to USB switching hub 119. In some embodiments, hub controllers 203 on USB switching hub 119 may have access to the communication configuration profiles.

In some embodiments, a priority logic may be used to switch communication configurations. Priority logic, or other logic used to grant access, may be internal or external to USB switching hub 119. In some embodiments, computer system 101 may be given priority over all of downstream ports 121 until an external control signal is sent from dual role peripheral device 207 to switch access of one or more downstream ports 121 to dual role peripheral device 207. In some embodiments, different control signals may be sent to trigger different communication configurations (i.e., to switch access of different downstream ports to dual role peripheral device 207).

In some embodiments, host negotiation logic may be used to determine which communication configuration to use. In some embodiments, a default communication configuration may be used until multiple upstream devices "request" access to the same downstream port. Host negotiation logic may be used to determine which communication configuration to use (i.e., which communication configuration gives a particular upstream port access to the "requested" downstream port).

In some embodiments, a microprocessor in USB switching hub 119 may include a built in algorithm that auto detects downstream peripheral devices and determines how to connect the downstream peripheral devices. For example, instead of assigning a specific downstream port to an upstream port, a communication configuration profile may specify that the upstream port should have access to a digital camera if one is attached. The built in algorithm may auto-detect the digital camera when it is attached to one of the downstream ports and attach it to the appropriate upstream port (i.e., by switching to an appropriate communication configuration).

In some embodiments, when downstream switching logic 201 switches communication configurations, and control of a downstream port is switched from computer system 101 to dual role peripheral device 207, a connection between computer system 101 and respective peripheral device 125 (coupled to the downstream port to be switched) may be terminated by computer system 101. In some embodiments, communications between the downstream port to be switched and computer system 101 may be terminated by USB switching hub 119. Dual role peripheral device 207 may then connect to, enumerate, and communicate with the respective peripheral device 125 coupled to the switched downstream port.

Upstream devices may see downstream ports that they are not configured to attach to as unattached ports (i.e., active, but with no device connected). In some embodiments, if only a predetermined number of downstream ports is ever going to be attached to a particular upstream port (e.g., a number "x" ports), the upstream device may be signaled that the hub only has x ports. For example, if upstream port 117b is only going to be configured to attach to downstream ports 121c and 121d, a device attached to upstream port 117b may be signaled that USB switching hub 119 is only a two port hub.

FIGS. 9a, 9b, and 9c illustrate various alternate embodiments of a computer system 101 and two dual role peripheral devices coupled to USB switching hub 419. In some embodiments, multiple dual role peripheral devices may be coupled

US 7,478,191 B2

**11**

to USB switching hub **419**. For example, dual role printer **407** may be coupled to USB switching hub **419** through upstream port **417**b and dual role DVD read/write drive **467** may be coupled to USB switching hub **419** through upstream port **417**c. Computer system **101** may be coupled to USB switching hub **419** through upstream port **417**a. Each of the upstream devices may be coupled to a respective hub controller **403** (**403**a, **403**b and **403**c, as shown), a respective transaction translator **405** (**405**a, **405**b, and **405**c, as shown), and downstream switching logic **401**. Downstream switching logic **401** may configure communications between each of the upstream devices (i.e., computer system **101**, dual role printer **407**, or dual role DVD read/write drive **467**) and at least a subset of the peripheral devices **425**.

As seen in FIG. **9**a, in one communication configuration profile, the computer system **101** may be connected to downstream ports **421**a, **421**b, **421**e, and **421**f. In an embodiment, dual role printer **407** may be configured to access downstream port **421**c, and DVD read/write drive **467** may be configured not to access any downstream port **421**. Dual role printer **407** may gain access (i.e., have the communication configuration switched to give it access) to downstream port **421**b through several different methods. For example, a user may press a button on dual role printer **407**. A signal may then be sent through mode **411** to downstream switching logic **401** in USB switching hub **419**. Downstream switching logic **401** may switch to the communication configuration seen in FIG. **15**b (which allows dual role printer **407** to access downstream port **421**b). In some embodiments, if dual role printer **407** is turned off or becomes inactive, downstream switching logic **401** may switch access of downstream port **421**b back to computer system **101** (i.e., switch back to the previous communication configuration). As seen in FIG. **9**c, in one communication configuration, none of the upstream ports may be allowed to access any of the downstream ports.

FIG. **10** illustrates an embodiment of the USB switching hub with multiple status registers. In this embodiment, each hub controller (**203**a and **203**b) is coupled to corresponding transaction translator circuitry (**205**a and **205**b, respectively). Translator circuitry **205**a and **205**b may be coupled to downstream switching logic **201**, which may be electrically coupled to downstream ports **121**a, **121**b, **121**c, and **121**d.

FIG. **11** illustrates another embodiment of the configuration shown in FIG. **7**, in which two upstream devices (e.g., computer system **101** and dual role peripheral device **207**) are coupled to USB switching hub **119**. While in the embodiment of FIG. **7** the downstream control of USB switching hub **119** is linked with dual role device **207**, alternate embodiments may be configured with other switching control means. For example, as illustrated in FIG. **11**, switching control of USB switching hub **119** may be performed using a dedicated downstream device, for example HID class device **125**e, coupled to a dedicated downstream port, for example dedicated downstream port **121**e. Another control mechanism may comprise an additional HID device (not shown) configured at the hub controller level within the hierarchy of the configuration shown in FIG. **11**. (for example at hub controller **203**a or **203**b). However, operating the additional HID device for controlling the switching of USB switching hub **119** may require custom drivers and a USB-IF class extension to the hub class, which may be covered under a vendor-specific implementation. Mechanisms other than an HID may also be possible with a semi-custom hub driver. Alternatively, a composite device comprising a hub controller and HID controller may be configured to control switching of USB switching hub **119**, shown in FIG. **11** as HID controller/HUB controller composite devices **204**a and **204**b. While FIG. **11**

**12**

illustrates a variety of configurations associated with possible control mechanisms for controlling switching of USB switching hub **119**, various embodiments may include only one of, or any combination of these configurations and/or mechanisms.

In a second embodiment of the invention, the secondary host may be automatically connected to the display device when attached or docked, and the primary host is disconnected from the display device, thereby reducing or eliminating a manual procedure. This embodiment allows, for example, a semi-permanently attached notebook PC docking station that automatically switches from the desktop PC to the docked notebook when the notebook is inserted into the dock. Alternatively, a video media player's video is automatically displayed on a monitor when the media player is attached, instead of the semi-permanently attached desktop PCs video, without detaching the PC's video cable or manually actuating a switch on the monitor.

Further modifications and alternative embodiments of various aspects of the invention may be apparent to those skilled in the art in view of this description. Accordingly, this description is to be construed as illustrative only and is for the purpose of teaching those skilled in the art the general manner of carrying out the invention. It is to be understood that the forms of the invention shown and described herein are to be taken as embodiments. Elements and materials may be substituted for those illustrated and described herein, parts and processes may be reversed, and certain features of the invention may be utilized independently, all as would be apparent to one skilled in the art after having the benefit of this description of the invention. Changes may be made in the elements described herein without departing from the spirit and scope of the invention as described in the following claims.

We claim:

**1**. A system, comprising:

a USB hub;

a first host device coupled to the USB hub;

a plurality of peripheral devices coupled to the USB hub;

a second host device operable to be coupled to the USB hub;

wherein the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB device;

wherein the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub, wherein the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device.

**2**. The system of claim **1**,

wherein the USB hub is operable to automatically remove connectivity between the first host device and the one or more of the plurality of peripheral devices when the second host device is connected to the USB hub.

**3**. The system of claim **1**,

wherein the USB hub is included in a display device.

**4**. The system of claim **1**,

wherein the first host device is a computer system.

**5**. The system of claim **1**, wherein the USB hub comprises:

a plurality of upstream ports;

a plurality N of downstream ports; and

downstream switching logic coupled between the plurality of upstream ports and the plurality of downstream ports;

US 7,478,191 B2

**13**

wherein the downstream switching logic is configured to electronically switch communications between:

    a) a downstream port of the plurality of downstream ports and a first upstream port of the plurality of upstream ports to

    b) the downstream port of the plurality of downstream ports and a second upstream port of the plurality of upstream ports.

**6**. The system of claim **5**,

wherein the USB hub is configured to be enumerated with a substantially similar hub configuration through each of the plurality of upstream ports;

wherein the hub configuration includes N downstream ports.

**7**. A USB hub comprising:

a first input for coupling to a first USB host device;

a second input for coupling to a second USB host device;

a plurality of peripheral device inputs for coupling to respective ones of a plurality of peripheral USB devices;

switching logic that is operable to provide connectivity between the first input and the plurality of peripheral device inputs when the first USB host device is connected to the first input and the second USB host device is not connected to the second input;

wherein the switching logic is operable to automatically provide connectivity between the second input and one or more of the plurality of peripheral device inputs when the second USB host device is connected to the second input, wherein the switching logic is configured to maintain connectivity between the first input and remaining ones of the plurality of peripheral device inputs that were not provided connectivity to the second input;

**8**. The USB hub of claim **7**,

wherein the USB hub is operable to select from a plurality of connectivity configurations to determine how each of the plurality of peripheral USB devices is coupled to the first input and/or the second input.

**9**. The USB hub of claim **8**, further comprising a memory element coupled to the USB hub, wherein the memory element is configured to store the plurality of connectivity configurations.

**10**. The USB hub of claim **8**, wherein the USB hub comprises a plurality of control input signals, wherein a combination of a state of each of the plurality of control input signals determines which of the plurality of connectivity configurations is selected.

**11**. The USB hub of claim **10**, wherein the second input comprises a power connection coupled to one of the plurality of control input signals, wherein the power connection changes states when the second USB host device is coupled to the second input;

    wherein one or more of the plurality of peripheral devices are coupled to the second input in response to the power connection changing states, according to a selected one of the plurality of connectivity configurations.

**12**. The USB hub of claim **11**, wherein a combination of a state of each of remaining ones of the plurality of control input signals determines the selected one of the plurality of connectivity configurations.

**13**. The USB hub of claim **8**, wherein the USB hub comprises a plurality of control lines, each one of the plurality of control lines corresponding to a respective one of the plurality of peripheral USB devices,

    wherein a respective state of each of the plurality of control lines determines whether its corresponding respective

**14**

one of the plurality of peripheral USB devices couples to the first input and/or the second input.

**14**. The USB hub of claim **13**, wherein a default state of each of the plurality of control lines is configured to couple its corresponding respective one of the plurality of peripheral USB devices to the first input.

**15**. The USB hub of claim **14**, wherein the second input comprises a power connection, wherein each of the plurality of control lines is coupled to the power connection through a respective switch;

    wherein the power connection changes states when the second USB host device is coupled to the second input; and

    wherein a position of each switch determines whether its corresponding respective one of the plurality of control lines changes states, in response to the power connection changing states.

**16**. The USB hub of claim **15**, wherein the default state is a low state, and wherein a high state of each of the plurality of control lines is configured to couple its corresponding respective one of the plurality of peripheral USB devices to the second input;

    wherein in changing states the power connection is driven to a high state from a low state.

**17**. A method for operating a USB device, the method comprising:

    coupling a plurality of peripheral device inputs of the USB device to respective ones of a plurality of peripheral USB devices;

    coupling a first input of the USB device to a first USB host device;

    providing connectivity between the first input and the plurality of peripheral device inputs when the first USB host device is connected to the first input and a second USB host device is not connected to a second input of the USB device;

    coupling the second input of the USB device to a second USB host device;

    automatically providing connectivity between the second input and one or more of the plurality of peripheral device inputs when the second USB host device is connected to the second input; and

    maintaining connectivity between the first input and remaining ones of the plurality of peripheral device inputs that were not provided connectivity to the second input.

**18**. The method of claim **17**, further comprising automatically removing connectivity between the first input and the one or more of the plurality of peripheral device inputs when the second USB host device is connected to the second input.

**19**. The method of claim **17**, further comprising selecting from a plurality of connectivity configurations to determine how each of the plurality of peripheral USB devices is coupled to the first input and/or the second input.

**20**. The method of claim **19**, further comprising storing the connectivity configurations, wherein said selecting from a plurality of connectivity configurations comprises selecting from the stored connectivity configurations.

**21**. The method of claim **19**, further comprising performing said selecting from a plurality of connectivity configurations according to a combination of a state of each of a plurality of control input signals.

\* \* \* \* \*



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/457,389 | 07/13/2006 | Henry Wurzburg | 5707-12301 | 7107 |

7590          03/18/2008

Jeffrey C. Hood
Meyertons Hood Kivlin Kowert & Goetzel PC
P.O. Box 398
Austin, TX 78767-0398

| EXAMINER |
|---|
| DANG, KHANH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2111 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/18/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 11/457,389 | WURZBURG ET AL. |
| | Examiner | Art Unit | |
| | Khanh Dang | 2111 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED  (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1)☐ Responsive to communication(s) filed on _____.
2a)☐ This action is **FINAL**.   2b)☒ This action is non-final.
3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-20* is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5)☐ Claim(s) _____ is/are allowed.
6)☒ Claim(s) *1-20* is/are rejected.
7)☐ Claim(s) _____ is/are objected to.
8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.
10)☒ The drawing(s) filed on *13 July 2006* is/are:  a)☒ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  a)☐ All   b)☐ Some * c)☐ None of:
    1. ☐ Certified copies of the priority documents have been received.
    2. ☐ Certified copies of the priority documents have been received in Application No. _____.
    3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
  * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.
4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

Application/Control Number: 11/457,389                                        Page 2
Art Unit: 2111

### DETAILED ACTION

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.   Determining the scope and contents of the prior art.
2.   Ascertaining the differences between the prior art and the claims at issue.
3.   Resolving the level of ordinary skill in the pertinent art.
4.   Considering objective evidence present in the application indicating
     obviousness or nonobviousness.

Claims 1-12, and 14-20 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Choi (7,093,057) in view of Oguma (6,516,205).

With regard to claim 1, Choi discloses a system, comprising: a USB device; a

first host device coupled to the USB device; a plurality of peripheral devices coupled to

the USB device; a second host device operable to be coupled to the USB device;

wherein the USB device is operable to provide connectivity between the first host device

and the plurality of peripheral devices when the first host device is connected to the

USB device and the second host device is not connected to the USB device (Choi, in

Fig. 1B, which is reproduced below for ease of reference and convenience, discloses

Application/Control Number: 11/457,389                                      Page 3
Art Unit: 2111



a USB device comprising input change over switch and USB hub 103, a first host
device 100b coupled to the USB device; a plurality of peripheral devices 104b and 105b
coupled to the USB device; a second host device 101b operable to be coupled to the
USB device, wherein it is clear that when the second host device 101b is not coupled to
the USB device, the USB device provides connectivity between the first host device
100b and the plurality of peripheral devices 104b and 105b; see at least column 1, lines
23-67).

Although Choi also disclose that the USB device can manually provide
connectivity between the second host device and the plurality of peripheral devices
when the second host device is connected to the USB device, Choi does not disclose
that the USB device is operable to automatically provide connectivity between the
second host device and the plurality of peripheral devices when the second host device
is connected to the USB device.

Application/Control Number: 11/457,389                                    Page 4
Art Unit: 2111

    Oguma, in Fig. 3, which is reproduced below for ease of reference and

convenience, discloses a USB device operable to automatically provide connectivity

between an upstream host when the upstream host is connected to the USB upstream

port; see at least Fig. 3, column 3, line 48 to column 6, line 22.



Fig. 3

    Since Choi and Oguma are both from the same field of endeavor, the purpose

disclosed by Oguma would have been recognized in the pertinent art of Choi.

    Thus, it would have been obvious to one of ordinary skill in the art at the time the

invention was made to provide the USB device of Choi with the capability of

automatically providing connectivity between the second host when the second host is

Application/Control Number: 11/457,389                                          Page 5
Art Unit: 2111

connected to the USB device, as taught by Oguma, for the purpose of providing the

USB device of Choi with an automatic switching function.

    With regard to claim 2, as taught by Oguma (see discussion above), it is clear

that the USB device of Choi automatically removes connectivity between the first host

device and the plurality of peripheral devices.

    With regard to claim 3, it is clear from Fig. 1b of Choi, the USB device is included

in a display device.

    With regard to claim 4, it is clear from Fig. 1 b of Choi that the first host device is

a computer system.

    With regard to claim 5, it is clear from Fig. 1 b of Choi and discussion above that

the USB device comprises a USB hub, wherein the USB hub provide connectivity

between the first host device and the peripherals when the second host is not

connected to the USB hub, and wherein the USB hub automatically provides

connectivity to the second host and the peripherals when the second host is connected

to the USB host.

    With regard to claims 6 and 7, see discussion above.

    With regard to claim 8, as taught by Oguma, it is clear that automatic switching

includes switching logic for electronically switching between the plurality of upstream

ports and the plurality of downstream ports.

    With regard to claim 9, it is clear from the combination above, it is clear that the

USB hub is enumerated with substantially similar hub configuration through each of the

plurality of upstream ports. It is also clear that the hub configuration includes a plurality

Application/Control Number: 11/457,389                                    Page 6
Art Unit: 2111

of downstream ports. It is important to note that every USB device must be in full

compliance with the USB specification.

     With regard to claims 10-12, see discussion above.

     With regard to claims 14-16, see particularly Fig. 3 of Oguma, column 3, line 48

to column 6, line 22.

     With regard to claim 17, it is clear that  each control line of each peripheral

device is connected the peripheral device to a respective host via an automatic switch,

wherein the state of the automatic electronic switch determines the connection state of

the respective peripheral device.

     With regard to claim 18, it is clear from Choi, particularly Fig. 1 b that each

control line of a respective peripheral device couples the peripheral device to the

respective input.

     With regard to claims 19 and 20, see particularly Fig. 3 of Oguma, column 3, line

48 to column 6, line 22.


     Claim 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over the Choi

in view of Oguma, as applied to claim 10-12 above, and further in view of Hannah (U.S.

Patent No. 5,784,581).

     As discussed above, Choi discloses the claimed invention including the use of an

automatic switching system for connection between a plurality of host devices and a

plurality of peripheral devices.

Application/Control Number: 11/457,389                                    Page 7
Art Unit: 2111

     Dickens does not disclose the use of a memory coupled to the USB device, wherein the memory stores the configurations.

     Hannah discloses a storage device coupled to the device controller (figures 4-6) in a dual role peripheral device setting. Hannah further discloses that the memory is coupled to a hub controller in the USB switching hub.  In addition, Hannah teaches one to properly implement the USB communication with particular types of USB slave devices by storing related information (column 5, lines 53-63) so that information related to correct "configuration" between USB hosts and USB can be established and stored for future use.

     It would have been obvious to one of ordinary skill in the art at the time the invention was made provide Choi with a memory to store different configurations, as taught by Hannah, for the purpose of reusing any selected configuration without having considering any necessary intervention and/or modification before a proper configuration can be selected, since all different configurations have already been pre-configured and stored in a memory for future use.

### *Relevant Art*

     US Patent Nos. 6920569, 6282601 are cited as relevant art.

     US PG Pub Nos. 2003/0093599 and 2004/0088449 are cited as relevant art.

Application/Control Number: 11/457,389                                                    Page 8
Art Unit: 2111

### *Contact Information*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Khanh Dang whose telephone number is 571-272-3626.

The examiner can normally be reached on Monday-Friday from 9:AM to 5:PM.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Mark Rinehart, can be reached on 571-272-3632.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

/Khanh  Dang/

Primary Examiner, Art Unit 2111

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Application No.:    11/457,389 §<br>Filed:    July 13, 2006 §<br>Inventor(s): §<br>  Henry Wurzburg, Steve Nelson, §<br>  Mark Y. Fu, Hans Magnusson §<br> §<br>Title:    METHOD FOR §<br>    AUTOMATICALLY §<br>    SWITCHING USB §<br>    PERIPHERALS §<br>    BETWEEN USB HOSTS § | Examiner:    Dang, Khanh<br>Group/Art Unit:    2111<br>Atty. Dkt. No:    5707-12301 |

### RESPONSE TO OFFICE ACTION OF
### MARCH 18, 2008

Dear Sir or Madam:

This paper is submitted in response to the Office Action of March 18, 2008, to further highlight why the application is in condition for allowance.

Please amend the case as listed below.

1

**IN THE CLAIMS:**

The following listing of claims will replace all prior versions, and listings, of claims in the application.

1.  (Currently Amended) A system, comprising:

a USB ~~device~~ hub;

a first host device coupled to the USB ~~device~~ hub;

a plurality of peripheral devices coupled to the USB ~~device~~ hub;

a second host device operable to be coupled to the USB ~~device~~ hub;

wherein the USB ~~device~~ hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB ~~device~~ hub and the second host device is not connected to the USB device;

wherein the USB ~~device~~ hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB ~~device~~ hub, wherein the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device.

2.  (Currently Amended) The system of claim 1,

wherein the USB ~~device~~ hub is operable to automatically remove connectivity between the first host device and the one or more of the plurality of peripheral devices when the second host device is connected to the USB ~~device~~ hub.

3.  (Currently Amended) The system of claim 1,

wherein the USB ~~device~~ hub is included in a display device.

4.  (Original) The system of claim 1,

wherein the first host device is a computer system.

2

5.  (Cancelled)

6.  (Cancelled)

7.  (Cancelled)

8.    (Currently Amended) The system of claim ~~6~~ 1, wherein the USB hub comprises:

        a plurality of upstream ports;

        a plurality N of downstream ports; and

        downstream switching logic coupled between the plurality of upstream ports and the plurality of downstream ports;

        wherein the downstream switching logic is configured to electronically switch communications between:

        a) a downstream port of the plurality of downstream ports and a first upstream port of the plurality of upstream ports to

        b) the downstream port of the plurality of downstream ports and a second upstream port of the plurality of upstream ports.

9.  (Original) The system of claim 8,

        wherein the USB hub is configured to be enumerated with a substantially similar hub configuration through each of the plurality of upstream ports;

        wherein the hub configuration includes N downstream ports.

10.  (Currently Amended) A USB ~~device~~ hub comprising:

a first input for coupling to a first USB host device;

a second input for coupling to a second USB host device;

3

Appx_33

~~at least one~~ a plurality of peripheral device input~~s~~ for coupling to ~~at least one~~ respective ones of a plurality of peripheral USB device~~s~~;

switching logic that is operable to provide connectivity between the first input and the ~~at least one~~ plurality of peripheral device input~~s~~ when the first USB host device is connected to the first input and the second USB host device is not connected to the second input;

wherein the switching logic is operable to automatically provide connectivity between the second input and ~~the at least~~ one or more of the plurality of peripheral device input~~s~~ when the second USB host device is connected to the second input, wherein the switching logic is configured to maintain connectivity between the first input and remaining ones of the plurality of peripheral device inputs that were not provided connectivity to the second input.

11.   (Cancelled)

12.   (Currently Amended) The USB ~~device~~ hub of claim ~~11~~ 10, ~~wherein the system further comprises:~~

~~one or more additional peripheral device inputs for coupling to respective one or more additional peripheral USB devices, wherein the at least one peripheral device input and the one or more additional peripheral device inputs form a plurality of peripheral device inputs, and the at least one peripheral USB device and the respective one or more additional peripheral USB devices form a plurality of peripheral USB devices;~~

wherein the USB ~~switching~~ hub is operable to select from a plurality of connectivity configurations to determine how each of the plurality of peripheral USB devices is coupled to the first input and/or the second input.

13.   (Currently Amended) The USB ~~device~~ hub of claim 12, further comprising a memory element coupled to the USB hub, wherein the memory element is configured to store the plurality of connectivity configurations.

4

14.  (Currently Amended) The USB ~~device~~ hub of claim 12, wherein the USB hub comprises a plurality of control input signals, wherein a combination of a state of each of the plurality of control input signals determines which of the plurality of connectivity configurations is selected.

15.  (Currently Amended) The USB ~~device~~ hub of claim 14, wherein the second input comprises a power connection coupled to one of the plurality of control input signals, wherein the power connection changes states when the second USB host device is coupled to the second input;

wherein one or more of the plurality of peripheral devices are coupled to the second input in response to the power connection changing states, according to a selected one of the plurality of connectivity configurations.

16.  (Currently Amended) The USB ~~device~~ hub of claim 15, wherein a combination of a state of each of remaining ones of the plurality of control input signals determines the selected one of the plurality of connectivity configurations.

17.  (Currently Amended) The USB ~~device~~ hub of claim 12, wherein the USB hub comprises a plurality of control lines, each one of the plurality of control lines corresponding to a respective one of the plurality of peripheral USB devices,

wherein a respective state of each of the plurality of control lines determines whether its corresponding respective one of the plurality of peripheral USB devices couples to the first input and/or the second input.

18.  (Currently Amended) The USB ~~device~~ hub of claim 17, wherein a default state of each of the plurality of control lines is configured to couple its corresponding respective one of the plurality of peripheral USB devices to the first input.

19.  (Currently Amended)  The USB ~~device~~ hub of claim 18, wherein the second input comprises a power connection, wherein each of the plurality of control lines is coupled to the power connection through a respective switch;

5

wherein the power connection changes states when the second USB host device is coupled to the second input; and

wherein a position of each switch determines whether its corresponding respective one of the plurality of control lines changes states, in response to the power connection changing states.

20.   (Currently Amended) The USB ~~device~~ hub of claim 19, wherein the default state is a low state, and wherein a high state of each of the plurality of control lines is configured to couple its corresponding respective one of the plurality of peripheral USB devices to the second input;

wherein in changing states the power connection is driven to a high state from a low state.

21 (New) A method for operating a USB device, the method comprising:

coupling a plurality of peripheral device inputs of the USB device to respective ones of a plurality of peripheral USB devices;

coupling a first input of the USB device to a first USB host device;

providing connectivity between the first input and the plurality of peripheral device inputs when the first USB host device is connected to the first input and a second USB host device is not connected to a second input of the USB device;

coupling the second input of the USB device to a second USB host device;

automatically providing connectivity between the second input and one or more of the plurality of peripheral device inputs when the second USB host device is connected to the second input; and

maintaining connectivity between the first input and remaining ones of the plurality of peripheral device inputs that were not provided connectivity to the second input.

22. (New)  The method of claim 21, further comprising automatically removing connectivity between the first input and the one or more of the plurality of peripheral device inputs when the second USB host device is connected to the second input.

6

23. (New) The method of claim 21, further comprising selecting from a plurality of connectivity configurations to determine how each of the plurality of peripheral USB devices is coupled to the first input and/or the second input.

24. (New) The method of claim 23, further comprising storing the connectivity configurations, wherein said selecting from a plurality of connectivity configurations comprises selecting from the stored connectivity configurations.

25. (New) The method of claim 23, further comprising performing said selecting from a plurality of connectivity configurations according to a combination of a state of each of a plurality of control input signals.

Appx_37

**REMARKS**

Applicant is in receipt of the Office Action mailed March 18, 2008.  Claims 1-3, 8, 10, and 12-20 have been amended to more clearly and distinctly claim the subject matter, which the Applicant regards as the invention.  Claims 5-7 and 11 have been cancelled.  New claims 21-25 have been added.  Applicant respectfully submits that no new subject matter has been entered and/or introduced in the new claims and the amendments.  Reconsideration of the present case is earnestly requested in light of the following remarks.

**35 U.S.C. § 103 Rejection:**

Claims 1-12, and 14-20 were rejected under 35 U.S.C. 103(a) as being unpatentable over Choi (7,093,057) in view of Oguma (6,516,205).  Claim 13 was rejected under 35 U.S.C. 103(a) as being unpatentable over the Choi in view of Oguma, as applied to claim 10-12 above, and further in view of Hannah (U.S. Patent No. 5,784,581).

Applicant has cancelled claims 5-7 and 11.  Therefore, the rejection of these claims has been rendered moot.  Applicant has amended claims 1-3, 8, 10, and 12-20, and added new claims 21-25.  With regards to the amended and new claims, Applicant respectfully traverses these rejections.

Applicant submits that the references taken singly or in combination, fail to disclose, teach, or suggest automatically and selectively coupling various combinations of peripheral USB devices to different USB hosts.  In other words, the references taken singly or in combination, fail to disclose, teach, or suggest <u>a USB hub operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub, where the USB hub is configured to maintain connectivity between the first host</u>

8

<u>device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device</u>.

The Office Action acknowledges that Choi does not disclose that the USB device (USB hub) is operable to automatically provide connectivity between the second host device and the plurality of peripheral devices when the second host device is connected to the USB device.  Applicant also submits that Fig. 1 of Choi does not disclose that the USB hub is operable to provide connectivity between the second host and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub, while maintaining connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device.  It is clear from the referenced figure (Fig. 1) and corresponding description (at least column 1, lines 23-67 of Choi) that the input changeover switch switches all the peripheral devices (104b and 105b) to either the first PC (100b) or the second PC (101b).  For example, as stated in column 1, lines 62-64 of Choi, "In this case, the upstream port of the USB hub 103-2b is physically disconnected from or connected to the corresponding PC."   <u>Thus, Fig. 1 of Choi does not teach, suggest, or provide motivation for maintaining connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device</u>, since all the peripheral devices are provided connectivity to either the first PC or the second PC.

The Office Action argues that Oguma, in Fig. 3, discloses a USB device operable to automatically provide connectivity between an upstream host when the upstream host is connected to the USB upstream port.  Applicant submits that it is not clear what is meant by "provide connectivity between an upstream host when the upstream host is connected to the USB upstream port".  The argument fails to specifically point out what connectivity is automatically provided and between what system elements.  Applicant's claim clearly recites that the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub, and to <u>automatically provide connectivity between the second</u>

9

host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub.  No such teachings can be found in Oguma.

Applicant further submits that Oguma is directed to switching bus manager functionality of coupled devices, not switching connectivity between USB hosts and one or more of a plurality of (USB) devices.  Applicant's claim recites two features that are directed to connectivity.  First, the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB.  Second, the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub.  Oguma only discloses a first host device (host PC 1) being coupled to a device (portable terminal 5).  Oguma does not teach providing connectivity to a second host.  Although a USB hub is shown connected to the computer host, there is no indication of that USB host being connected to another device, or being disconnected from the computer host.

As clearly indicated in col. 4, lines 65-66 of Oguma, "First, it is supposed that the host personal computer 1 is not connected to the portable phone 5".  Portable terminal 5, and consequently third device 6 are therefore not connected to host personal computer 1.  Oguma subsequently discloses two possible scenarios according to which host personal computer 1 may connect to portable terminal 5.  These are disclosed in col. 5, lines 19-21, which state, "Next, it is supposed that the host personal computer 1 is connected to the portable phone 5 but the host is in the suspended state", and col. 5, lines 45-47, which state "Next, it is supposed that the host personal computer 1 is connected to the portable phone 5 and the host personal computer 1 is in the bus manager state".  Thus, in both cases host 1 is first in a disconnected state from terminal 5, then connected to terminal 5 (and subsequently to device 6).  The benefit gained from Oguma is clearly stated in col. 6, lines 14-17, which teach: "according to the present invention, two bus functions of a bus manager and a slave exist in the mobile terminal. Therefore, the mobile terminal can be used in various conditions".

As explained in col. 5, lines 32-34, "the level detecting circuit 61 does not generate the host state signal 13. Therefore, the bus manager circuit 62 determines that bus manger circuit 62 should be the bus manger", pertaining to the case when the host

10

Appx_40

personal computer 1 is connected to portable terminal 5 when the host personal computer is in the suspended state.  And, as it is further explained in col. 5, lines 59-61: "Thus, the bus manager circuit 62 determines that bus manger circuit 62 should be a bus slave", pertaining to the case when the host is connected to portable terminal 5 when the host personal computer 1 is in the bus manager state.  In both cases the host is connected to portable terminal 5, and consequently to bus manager circuit 62, the difference being the mode of operation of bus manager circuit 62 depending on the state of the connecting host.

There is no teaching, suggestion, or motivation in Oguma for a USB hub that is operable to provide connectivity between a first host device and a plurality of peripheral devices when the first host device is connected to the USB hub, and to automatically provide connectivity between a second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub.

Applicant therefore respectfully submits that combining Choi with Oguma would not result in the combination of features recited in the claims.  Also it follows from at least the reasons shown above that Choi and Oguma, whether taken singly or in combination, fail to teach, suggest, or provide motivation for the combination of features recited in the claims.  Applicant further submits that in addition to Choi and Oguma failing to teach the combination of features recited in the claims, there would be no motivation or any benefit gained from combining Choi with Oguma, since Oguma is directed at enabling a bus manager circuit within a portable terminal to operate as either a bus master or a bus slave depending on the state of a host that is coupled to the portable terminal, while Choi is directed at sharing USB devices between USB hosts.

For at least these reasons, Applicant submits Choi and Oguma, whether taken singly or in combination, do not anticipate, teach, suggest, provide motivation, or render obvious the combination of features recited in the independent claims.  Applicant also submits that since the independent claims have been shown to be patentably distinct, their respective dependent claims are also patentably distinct for at least the same reasons as

11

Appx_41

shown above.   Accordingly, Applicant respectfully requests removal of the 35 U.S.C. § 103(a) rejection.

**<u>New Claims:</u>**

New method claims 21-25 have been added.   Applicant submits that no new subject matter has been entered and/or introduced in the new claims, and further submits that new claims 21-25 are also allowable for at least the same reasons as provided above.

12

**CONCLUSION**

Applicant submits the application is in condition for allowance, and an early notice to that effect is requested.

If any extensions of time (under 37 C.F.R. § 1.136) are necessary to prevent the above-referenced application(s) from becoming abandoned, Applicant(s) hereby petition for such extensions. The Commissioner is hereby authorized to charge any fees which may be required or credit any overpayment to Meyertons, Hood, Kivlin, Kowert & Goetzel P.C., Deposit Account No. 50-1505/5707-12301/JCH.

Also filed herewith are the following items:

☐ Request for Continued Examination
☐ Terminal Disclaimer
☐ Power of Attorney By Assignee and Revocation of Previous Powers
☐ Notice of Change of Address
☐ Other:

Respectfully submitted,

/Jeffrey C. Hood/
Jeffrey C. Hood, Reg. #35198
ATTORNEY FOR APPLICANT(S)

Meyertons, Hood, Kivlin, Kowert & Goetzel PC
P.O. Box 398
Austin, TX 78767-0398
Phone: (512) 853-8800
Date: 2008-06-18      JCH/TAK

13

Appx_43

IPR2017-00970
Patent Owner's Preliminary Response

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————————

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

————————————————

U.S. Patent No. 7,478,191

————————————————

Case No. IPR2017-00970


**PATENT OWNER'S PRELIMINARY RESPONSE TO PETITION
PURSUANT TO 35 U.S.C. § 313 AND 37 C.F.R. § 42.107**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................1

II. THE '191 PATENT................................................................................4

    A. Background and Overview of Wurzburg's Invention .....................................4

    B. Prosecution History ...........................................................5

III. LEGAL STANDARD ..........................................................................10

IV. CLAIM CONSTRUCTION ................................................................12

    A. Petitioner's Claim Construction Requiring an Absence of
       "Switching" is Without Merit.......................................................12

        1.  Petitioner's Construction is Contrary to the '191 Patent
            Specification.........................................................14

        2.  Petitioner's Construction is Contrary to the '191 Patent
            Claim Language .....................................................14

    B. The Board Should Construe "When the Second [USB] Host
       Device is Connected" (Claims 1, 7, 17) .......................................18

V.  THE PETITION SHOULD BE DENIED BECAUSE IT
    RAISES THE SAME OR SUBSTANTIALLY SAME ART
    AND ARGUMENTS PREVIOUSLY CONSIDERED BY THE
    OFFICE ............................................................................27

VI. PETITIONER'S EXPERT TESTIMONY IS UNRELIABLE .....................28

VII. THE PETITION FAILS TO SHOW A REASONABLE
     LIKELIHOOD PETITIONER WILL PREVAIL AGAINST
     THE CHALLENGED CLAIMS ...............................................29

    A. Ground 1: Dickens Does Not Anticipate Claims 1, 4–8, 10–12,
       17, 19, or 21 .......................................................................29

        1.  Claim 1 .........................................................................30

        2.  Claims 7 & 17 ..............................................................33

        3.  Dependent Claims 4–6, 8, 10–12, 19, and 21 ....................33

i

B.  Ground 2: Adder Does Not Anticipate Claims 1, 4–13, 17, 19,
    or 21 ......................................................................................38

    1.  Claim 1 ...........................................................................39

    2.  Claims 7 & 17 ................................................................41

    3.  Dependent Claims 4–6, 8–13, 19, 21, and 25 .........................41

C.  Ground 3: Wurzburg '293 Does Not Anticipate Claims 1–2, 4–
    10, 12–14, or 17–21 ................................................................44

    1.  Claim 1 ...........................................................................45

    2.  Claim 7 & 17 ..................................................................47

    3.  Dependent Claims 2, 4–6, 8–10, 12–14, and 18–21 ................48

D.  Grounds 4–5: Dickens, Adder, or Wurzburg '293 in View of
    Silverbrook or Torii Does Not Render Obvious Claim 3 .........................49

E.  Ground 6: Dickens, Adder, or Wurzburg '293 in View of USB
    2.0, Holmdahl, and Kim Does Not Render Obvious Claims
    13–16 ...................................................................................51

F.  Ground 7: Adder in View of Hannah and any one or more of
    Dickens, Wurzburg '293, Choi, and Oguma Does Not Render
    Obvious Claims 1–21 ..............................................................52

G.  Ground 8: Choi in View of Oguma and Hannah, Further in
    View of any one or more of Dickens, Adder, and Wurzburg
    '293 Does not Render Obvious Claims 1–21 ............................54

H.  Ground 9: Dickens, Adder, or Wurzburg '293 in View of USB
    2.0, USB On-The-Go Supplement, Kim, Torii, and the "Other
    Prior Art" Does not Render Obvious Claims 1–21 ...................57

VIII. CONCLUSION ...............................................................59

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op.
(PTAB Mar. 15, 2017) (Paper 7) ........................................ 37, 48

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) ................ 16, 18

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254 (Fed. Cir.
2007)..........................................................................................28

*Fidelity National Information Services, Inc. v. Datatreasury Corp.*,
Case IPR2014-00489, slip op (PTAB Aug. 13, 2014) (Paper 9)...... 50, 51, 52, 56

*Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip
op. (PTAB June 5, 2017) (Paper 10)................................................. 49, 53, 56, 58

*Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods.,
Inc.*, 21 F.3d 1068 (Fed. Cir. 1994) ............................................. 57, 59

*In re Kollar*, 286 F.3d 1326 (Fed. Cir. 2002) ...................................... 15, 33, 41, 47

*In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016) .......... 3, 10, 11

*In re Ratti*, 270 F.2d 810 (CCPA 1959)..................................................................11

*In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ................................ 29, 38, 44

*Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363 (Fed. Cir. 2008)................. 55, 58

*Lavelle Industries, Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op.
(PTAB May 4, 2017) (Paper 18).....................................................................58

*Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111
(2014) ...................................................................................... 15, 33, 41, 47

*Mantech Env'l Corp. v. Hudson Env'l Servs., Inc.*, 152 F.3d 1368
(Fed. Cir. 1998) .........................................................................................15

*Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292 (Fed. Cir. 2015) ............. 13, 27

*Nassau Precision Casting Co., Inc. v. Acushnet Co., Inc.*, No. 2013-
1410, 566 Fed. Appx. 933 (Fed. Cir. June 6, 2014) ...........................................16

*Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-1860, slip op.
(PTAB Feb. 24, 2016) (Paper 11)................................................................. 11, 27

IPR2017-00970
Patent Owner's Preliminary Response

*Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644 (Fed. Cir. 1994) ................13

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985) ................28

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056 (Fed. Cir. 2016) ................................12

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317 (Fed. Cir. 2016) ...................................52

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356
    (Fed. Cir. 2012) ......................................................................................... 11, 29

## Statutes

35 U.S.C. § 102(a) ....................................................................................................53

35 U.S.C. § 102(e) ....................................................................................................54

35 U.S.C. § 103(a) ......................................................................................................6

35 U.S.C. § 103(c) ....................................................................................................54

35 U.S.C. § 314(a) ............................................................................................... 3, 10

35 U.S.C. § 316(e) ....................................................................................................10

35 U.S.C. § 325(d) ......................................................................................... 11, 27, 54

## Other Authorities

*Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.) (1988) ........19

## Rules

MPEP § 2143.01 .......................................................................................................11

## Regulations

37 C.F.R. § 42.100(b) ...............................................................................................12

37 C.F.R. § 42.24 ......................................................................................................56

37 C.F.R. § 42.6(a)(3) ................................................................................... 50, 52, 56

iv

IPR2017-00970
Patent Owner's Preliminary Response

# EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Declaration in Support of Motion for Pro Hac Vice Admission of Brian C. Banner Pursuant to 37 C.F.R. § 42.10(c) |
| 2002 | Declaration of Expert Geert Knapen in Support of Patent Owner's Preliminary Response to Petition |
| 2003 | Excerpts from Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc.) (1988) |

v

## I.    INTRODUCTION

Patent Owner Microchip Technology Inc. submits this preliminary response to Delphi Technologies, Inc.'s Petition seeking *inter partes* review of Claims 1–21 of U.S. Patent No. 7,478,191 to Wurzburg *et al.* ("the '191 Patent" or "Wurzburg"). Patent Owner requests the Board deny institution for each ground presented because Petitioner has failed to demonstrate a reasonable likelihood of prevailing with respect to the challenged claims.

The '191 Patent is directed to Universal Serial Bus ("USB") electronic devices that can be used in a wide range of applications including personal computer applications or other systems that use USB, including automobile infotainment systems. The patented USB switching hubs and methods automatically provide connectivity of USB peripherals (*e.g.*, printers, scanners, cameras, etc.) from one USB host device to another *when the second USB host device is connected to the system*. This latter requirement distinguishes the '191 Patent from Petitioner's cited art and is present in all challenged independent claims (Claims 1, 7, and 17).

None of Dickens, Adder, or Wurzburg '293—references Petitioner alleges anticipate the independent claims—disclose automatically providing this connectivity *when the second USB host device is connected*, as that phrase is properly construed. Recognizing these references do not disclose this limitation, Petitioner attempts to rewrite the claims to remove this limitation, asking the Board

1

to conclude through the guise of claim construction that the claims "are not directed to switching between [] two types of connectivity." Petition at 39.

Petitioner's "claim construction" argument is not tied to any specific claim term and ignores the plain language of claims and the entirety of the specification of the '191 Patent. Specifically, Petitioner's reliance on an "absence of switching" ignores the '191 Patent's stated purpose (repeated throughout the specification), is contrary to the express requirement of "automatically providing connectivity," ignores that independent Claim 17 is a method claim with steps that must be carried out, disregards the actual use of "switching logic" in the claim language, and renders entire phrases of the independent claims meaningless. Petitioner even goes so far as to unreasonably assert that certain express claim language "is irrelevant."

When the claim term "when the second [USB] host device is connected" is properly construed under its broadest reasonable, plain meaning construction of "just at the moment that the second [USB] host device is connected," Petitioner's prior art fails the anticipation standard under 35 U.S.C. § 102. Dickens, for example, teaches a manual switch or a keyboard hotkey that causes the connectivity to switch from one USB host device to another. Adder teaches using keyboard hotkeys, mechanical switches available to the user, or mouse buttons for this purpose. None of Dickens, Adder, or Wurzburg '293 disclose automatically providing connectivity to a second USB host device just at the moment the second USB host device is connected.

2

Additionally, none of these references disclose connectivity of a first host device when "the second USB host device is not connected," as required by all independent claims.

Petitioner's obviousness arguments fair no better. All of Grounds 4–8 are factually and legally deficient. Grounds 4–8 assert references that do not disclose— and Petitioner does not assert they disclose—automatically providing connectivity to a second USB host device just at the moment the second USB host device is connected. Grounds 4 and 5 are wholly conclusory, fail to provide the type of fact-based analysis required by binding precedent, and attempt to circumvent the word limit by incorporating over 10 pages of Petitioner's expert declaration. Ground 6 attempts to circumvent the word limit by incorporating 25 pages of the same declaration, and makes no mention of the *Graham* factor analysis required for obviousness. Grounds 7–9 are unsupported by Petitioner's own expert, are wholly conclusory, and fail to provide an explanation of how the cited references would be combined to achieve the challenged claims. Grounds 7 and 9 rely on art that is not even prior art. And Grounds 7–8 attempt to repackage—without justification—art and arguments already considered by the Patent Office.

For these reasons, Petitioner has failed to show a likelihood of success on any invalidity ground presented in the Petition. 35 U.S.C. §§ 314(a), 316(e); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380–81 (Fed. Cir. 2016) ("[T]he

3

Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."). The Board should therefore deny institution of the Petition on Grounds 1–9.

## II.   THE '191 PATENT

### A.   Background and Overview of Wurzburg's Invention

The '191 Patent was filed on July 13, 2006, and claims priority to a provisional application filed on April 14, 2006. The '191 Patent relates to "peripheral device hubs and, more specifically, to Universal Serial Bus (USB) switching hubs." '191 Patent, 1:18–20.

"USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices. The bus allows peripherals to be attached, configured, used, and detached while the host is in operation. For example, USB printers, scanners, digital cameras, storage devices, card readers, etc. may communicate with a host computer system over USB. USB based systems may require a USB host controller be present in the host system . . . ." *Id.*, 1:23–31. "A USB hub may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller." *Id.*, 1:51–53.

By 2006, USB was a mature standard that was used ubiquitously. Ex. 2002 ¶ 50 (Declaration of Expert Geert Knapen) ("Knapen"). The second version of the USB specification (USB 2.0), which provided for increased transfer rates compared

to the previous USB specification, had been released years earlier. *Id.* The USB protocol is based on the assumption / requirement that only one entity—a USB host—can initiate data transactions on a USB bus. *Id.* ¶ 51.

The USB standard defines USB hubs, which "may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller." '191 Patent, 1:51–53. According to the USB standard, a USB hub can only be connected to one host at a time (and multiple peripherals). Knapen ¶ 52. Thus, for two hosts (*e.g.*, personal computers) to share peripherals connected to a USB hub, a user could unplug the hub from the first host and plug it into the second host. Knapen ¶ 53. Alternatively, Wurzburg discloses other "manual selection required in the prior art" ('191 Patent, 6:42–43), such as "manually press[ing] a switch or button or chang[ing] cables or otherwise manually effect[ing] the switching." *Id.*, 2:53–55. Wurzburg successfully overcame the shortcomings of these prior art solutions by providing "automatic switching of peripherals from a first host device to a second host device when the second host device is connected to the system." *Id.*, 6:39–42. As Wurzburg discloses, "[t]his provides a significant improvement over the manual selection required in the prior art." *Id.*, 6:42–43.

### B.    Prosecution History

Wurzburg filed his application on July 13, 2006. Ex. 1001 at 1. The application included original Claims 1–20. Ex. 1015 at 26–31. On March 18, 2008,

IPR2017-00970
Patent Owner's Preliminary Response

the Examiner issued a non-final office action rejecting Claims 1–20. *Id.* at 15. Claims

1–12 and 14–20 were rejected as obvious under 35 U.S.C. § 103(a) in view of U.S.

Patent No. 7,093,057 ("Choi") in view of U.S. Patent No. 6,516,205 ("Oguma"). *Id.*

at 16. Claim 13 was rejected as obvious under 35 U.S.C. § 103(a) in view of Choi,

and Oguma, and further in view of U.S. Patent 5,784,581 ("Hannah"). *Id.* at 20. In

response to the non-final rejection, Wurzburg amended independent Claim 1 as

follows:

> 1. (Currently Amended) A system, comprising:
>
> a USB ~~device~~ **hub**;
>
> a first host device coupled to the USB ~~device~~ **hub**;
>
> a plurality of peripheral devices coupled to the USB ~~device~~ **hub**;
>
> a second host device operable to be coupled to the USB ~~device~~ **hub**;
>
> wherein the USB ~~device~~ **hub** is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB ~~device~~ **hub** and the second host device is not connected to the USB device;
>
> wherein the USB ~~device~~ **hub** is operable to automatically provide connectivity between the second host device and **one or more of** the plurality of peripheral devices when the second host device is connected to the USB ~~device~~ **hub, wherein the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device**.

6

Ex. 1015 at 3. Wurzburg amended independent Claim 10 in a similar fashion:

10. (Currently Amended) A USB ~~device~~ **hub** comprising:

a first input for coupling to a first USB host device;

a second input for coupling to a second USB host device;

~~at least one~~ **a plurality of** peripheral device input**s** for coupling to ~~at least one~~ **respective ones of a plurality** of peripheral USB device**s**;

switching logic that is operable to provide connectivity between the first input and the ~~at least one~~ **plurality of** peripheral device inputs when the first USB host device is connected to the first input and the second USB host device is not connected to the second input;

wherein the switching logic is operable to automatically provide connectivity between the second input and ~~the at least~~ one **or more of the plurality of** peripheral device input**s** when the second USB host device is connected to the second input**, wherein the switching logic is configured to maintain connectivity between the first input and remaining ones of the plurality of peripheral device inputs that were not provided connectivity to the second input**.

Ex. 1015 at 4–5. Wurzburg also added new independent Claim 21:

21. (New) A method for operating a USB device, the method comprising:

coupling a plurality of peripheral device inputs of the USB device to respective ones of a plurality of peripheral USB devices;

coupling a first input of the USB device to a first USB host device;

7

> providing connectivity between the first input and the plurality
> of peripheral device inputs when the first USB host device is connected
> to the first input and a second USB host device is not connected to a
> second input of the USB device;
>
> coupling the second input of the USB device to a second USB
> host device;
>
> automatically providing connectivity between the second input
> and one or more of the plurality of peripheral device inputs when the
> second USB host device is connected to the second input; and
>
> maintaining connectivity between the first input and remaining
> ones of the plurality of peripheral device inputs that were not provided
> connectivity to the second input.

Ex. 1015 at 7.

Wurzburg argued that "the references taken singly or in combination, fail to disclose, teach, or suggest <u>a USB hub operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub, where the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device</u>." Ex. 1015 at 9–10. Wurzburg properly pointed out "[t]he Office Action acknowledges that Choi does not disclose that the USB device (USB hub) is operable to automatically provide connectivity between the second host device and

8

the plurality of peripheral devices when the second host device is connected to the USB device." *Id.* at 10. Wurzburg further argued "Choi does not disclose that the USB hub is operable to provide connectivity between the second host and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub, while maintaining connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device." *Id.*

Wurzburg also argued that Oguma does not teach the limitations missing from Choi. *See* Ex. 1015 at 10–12. In particular, Wurzburg argued Oguma does not teach "the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub, and to <u>automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub</u>." *Id.* at 9–10. Further, Wurzburg argued that Oguma cannot disclose the claimed "connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB" and "automatically provid[ing] connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub" because "Oguma only discloses a first host device (host PC 1) being coupled to a device . . . and does not teach providing connectivity to a

9

second host." *Id.* at 11. Finally, Wurzburg argued a lack of motivation to combine Choi and Oguma "since Oguma is directed at enabling a bus manager circuit within a portable terminal to operate as either a bus master or a bus slave depending on the state of a host that is coupled to the portable terminal, while Choi is directed at sharing USB devices between USB hosts." *Id.* at 12.

In response to Wurzburg's amendments and arguments, the Examiner allowed all pending claims. Ex. 1015 at 1. Application Claims 1, 10, and 21 correspond to issued Claims 1, 7, and 17, respectively.

## III.  LEGAL STANDARD

An IPR should only be initiated if "the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Petitioner has the "burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e). Thus, a review should not be instituted unless Petitioner has shown a likelihood of success on the invalidity grounds as presented in the Petition. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380–81 (Fed. Cir. 2016) ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.").

IPR2017-00970
Patent Owner's Preliminary Response

"In determining whether to institute or order a proceeding . . . the Director may take into account whether, and reject the petition or request because, ***the same or substantially the same prior art or arguments*** previously were presented to the Office." 35 U.S.C. § 325(d) (emphasis added); *see also Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-1860, slip op. at 14 (PTAB Feb. 24, 2016) (Paper 11) (denying review because "we are unpersuaded that adjudicating such a dispute on an already-considered issue is an efficient use of Board resources").

"For a prior art reference to anticipate a claim, it must disclose all of the limitations of the claim, arranged or combined in the same way as in the claim." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (internal quotations and citation omitted). And "[t]o satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d at 1380. "If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims prima facie obvious." MPEP § 2143.01 (citing *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959)).

11

## IV.   CLAIM CONSTRUCTION

"In construing claim terms, the Board must determine the scope of the claims by giving them their broadest reasonable construction in light of the specification as they would be interpreted by one of ordinary skill in the art." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061–62 (Fed. Cir. 2016); *see also* 37 C.F.R. § 42.100(b). "While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description." *Trivascular*, 812 F.3d at 1062. "Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Id.*

### A. Petitioner's Claim Construction Requiring an Absence of "Switching" is Without Merit

Fundamental to Petitioner's position is the unsupported assertion that independent Claims 1, 7, and 17 "are not directed to switching between [] two types of connectivity." Petition at 39. "Instead, they express two states of connection, and two operabilities to cause their connectivity types in those two states." *Id.* Petitioner does not point to any specific claim term in this conclusion. *Id.* at 38–39. Instead, Petitioner argues that "operabilities," referring to actual recited claim terms, are somehow distinct from "switching," a word Petitioner imports into the claims only

12

to conclude that it does not belong in the claims. *Id.* In essence, Petitioner asks the Board to rewrite the claims so that Petitioner can invalidate the rewritten claims with prior art that would not invalidate the actual, properly construed claims. This approach invites legal error. *See Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed. Cir. 1994) (rejecting proposed claim construction that would, "in effect, rewrite [] patent claims to suit [party's] needs in this litigation").

The term Petitioner apparently attempts to construe is "wherein the USB hub is operable to automatically provide connectivity between the second host device and one or more [] peripheral devices when the second host device is connected to the USB hub." *E.g.*, '191 Patent, 12:46–49.[1] Petitioner's attempted construction of this term based on the strawman argument of "switching" is unreasonable, inconsistent with the full claim language and the written description, and should be rejected.[2] *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1300 (Fed. Cir. 2015) (vacating and remanding the Board's finding of unpatentability because the construction of key claim terms was unreasonably broad in light of the BRI standard).

---

[1]     As discussed in Part IV.B, independent Claims 7 and 17 recite similar terms.

[2]     Other constructions proposed by Petitioner are unreasonable but unrelated to the arguments made in this Preliminary Response. Patent Owner reserves the right to challenge any of Petitioner's proposed constructions in the event the Board institutes the requested *inter partes* review on any of Grounds 1–9.

13

### 1.    Petitioner's Construction is Contrary to the '191 Patent Specification

Petitioner's construction is contrary to the entirety of the '191 Patent specification, which consistently describes Wurzburg's inventive "switching hub" as automatically providing connectivity between the second host and one or more peripherals the moment the second host is connected. *See infra*, Part IV.B. Further, the terms "switch," "switching," and "switches" appear in the specification and claims over 200 times, casting doubt on any conclusion that the claims do not require switching. Petitioner's construction is also contrary to Wurzburg's objective of providing "an easy, intuitive method for the end user to actuate the switching of peripherals between two hosts." '191 Patent, 2:16–18. If there is no switching, the user would not "actuate the switching of peripherals" and would be unable to use the device as expected.

### 2.    Petitioner's Construction is Contrary to the '191 Patent Claim Language

Petitioner's construction is contrary to the express claim language—recited by each of the independent claims—requiring "automatic" connectivity. Petitioner provides no basis for its position that automatic connectivity does not express "'switching' between [] connectivity types." Petition at 39. Petitioner's construction is even more dubious in light of independent Claim 7, which expressly recites "switching logic" that is "operable to automatically provide connectivity." '191

14

Patent, 13:25–32. Claim 5, which depends from Claim 1, likewise recites "switching logic" that is "configured to electronically switch communications." *Id.*, 13:1–8. It is nonsensical to conclude "switching logic" does not actually perform switching.

Further, Petitioner's improper construction ignores that independent Claim 17 is a method claim with steps that must be "carried out." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014); *see also In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002) ("[A] process . . . consists of a series of acts or steps . . . . It consists of doing something, and therefore has to be carried out or performed."). These steps include "providing connectivity between the first input and the plurality of peripherals," "coupling the second input . . . to a second USB host device," and "automatically providing connectivity between the second input and one or more of the plurality of peripheral device inputs when the second USB host device is connected to the second input." '191 Patent, 14:32–43. These steps must be performed in the sequence recited because the later-recited steps cannot be performed without elements introduced in the previous steps. *See Mantech Env'l Corp. v. Hudson Env'l Servs., Inc.*, 152 F.3d 1368, 1375–76 (Fed. Cir. 1998) ("[T]he sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise.").

By its plain language, Claim 17 requires switching between the first state of connectivity (Petitioner's "first-host-plural-peripherals") and the second state of

15

connectivity    (Petitioner's    "two-host-distributed-peripherals").    Petitioner's

conclusion the claims "are not directed to switching between the two types of

connectivity" and merely require the operability to exist in the two states (Petition

at 39) improperly treats the method of Claim 17 as a product defined by the structural

operability to exist in the two states. This approach is legally unsound. *See Nassau*

*Precision Casting Co., Inc. v. Acushnet Co., Inc.*, No. 2013-1410, 566 Fed. Appx.

933, 940 (Fed. Cir. June 6, 2014) ("['Method'] is a patent-law term with a stable,

unambiguous meaning that distinguishes the subject matter from 'product' subject

matter. ***It would do unacceptable violence to that meaning to treat the claim here,***

***reciting a 'method,' as one to a product defined simply by structural features***."

(emphasis added)).

Finally, Petitioner's proposed construction is also unreasonable because it

renders entire phrases of the claims meaningless. *See Cat Tech LLC v. TubeMaster,*

*Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction

rendering a claim limitation meaningless). For example, according to Petitioner's

theory that Claim 1 only requires the existence or capability of "a first type of

connectivity, a 'first-host-plural-peripherals' type" and "a second type of

connectivity, a 'two-host-distributed peripherals' type" (Petition at 39), the struck-

through Claim 1 phrases below become meaningless:

16

wherein the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices ~~when the first host device is connected to the USB hub and the second host device is not connected to the USB device~~;

wherein the USB hub is operable to ~~automatically~~ provide connectivity between the second host device and one or more of the plurality of peripheral devices ~~when the second host device is connected to the USB hub~~, wherein the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device.

'191 Patent, 12:41–53. The phrase in the first wherein clause would be meaningless because the preceding text already requires Petitioner's "first type of connectivity," *i.e.*, connectivity between a first host and the plurality of peripherals. According to Petitioner, nothing more is needed. Petitioner even admits that its proposed construction renders at least the phrase "the second host device is not connected to the USB device" meaningless when it argues that Adder anticipates this limitation "in part because *the presence or absence of other hosts is irrelevant* to the interoperability of the first host and the peripherals . . . ." Petition at 50 (emphasis added); *see also* Ex. 1019 ¶ 125 (concluding claim language "is irrelevant"). But the claim language expressly requires a first state wherein the second host is not connected. Petitioner's admission that its proposed construction makes this claim

17

language "irrelevant" proves Petitioner's construction is incorrect. *See Cat Tech*, 528 F.3d at 885.

Petitioner's incorrect construction also renders meaningless the term "automatically" and the phrase "when the second host device is connected to the USB hub" in the second wherein clause of Claim 1 because the remaining text already requires Petitioner's "second type of connectivity," *i.e.*, connectivity between (1) a second host and one or more of the peripherals and (2) the first host and the remainder of the peripherals.

Claims 7 and 17 have similar limitations, and Petitioner's incorrect construction renders the similar phrases/terms meaningless in those claims. Accordingly, Petitioner's attempt to re-write the claims through an unreasonable claim construction should be rejected and the Petition denied. *See Cat Tech*, 528 F.3d at 885.

## B. The Board Should Construe "When the Second [USB] Host Device is Connected" (Claims 1, 7, 17)

The proper focus should be on construction of the phrase "when the second [USB][3] host device is connected" (*e.g.*, '191 Patent, 12:46–49) rather than on Petitioner's "absence of switching" strawman. This phrase determines *when*

---

[3]     Claim 1 recites "the second host device is connected," whereas Claims 7 and 17 recite "the second USB host device is connected."

connectivity is automatically provided according to the claim language. Under the broadest reasonable interpretation ("BRI") standard, this phrase has its plain meaning: "just at the moment that the second [USB] host device is connected." *See* Ex. 2003 at 1342, *Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.) (1988) ("[2]**when** *conj* . . . **1** . . . **b :** just at the moment that"); Knapen ¶ 40. This meaning is consistent with the specification where the phrase "when the second host device is connected" consistently refers to the moment the second host is connected to the USB switching hub:

- "The USB device may include a USB switching hub which may operate to automatically switch connectivity of the peripheral devices between the first host device and the second host device. More specifically, the USB switching hub may operate to automatically switch connectivity of the peripheral devices from the first host device to the second host device *when the second host device is connected* to the USB device. This automates the process for the end user when normally all peripherals are attached to one host, and then some or all of the peripherals are shared with a second host *when the second host is attached*. Thus, the user is not required to manually press a switch or button or change cables or otherwise manually effect *the switching*."

'191 Patent, 2:43–55 (emphasis added). One of ordinary skill in the art

19

would understand this passage as describing switching the connectivity of peripherals connected to the first host to the second host at the moment the second host is connected to the switching hub. Knapen ¶ 41. This is confirmed by the description of the automated process for the end user where all the peripherals are attached to one host and then some or all are shared with the second host when the second host is attached. *Id.* Because it happens at the moment the second host is attached, "the user is not required to manually press a switch or button or change cables or otherwise manually effect the switching." *Id.*

- "Thus ***when the second host device is connected*** to the USB device comprising the switching hub, the VBUS signal is provided from the second host device and received at the USB switching hub. The USB switching hub senses the VBUS signal and automatically ***switches*** some or all of the attached peripherals from the first host device to the second host device." '191 Patent, 2:64–3:3 (emphasis added). One of ordinary skill in the art would know that the VBUS signal is provided at the moment that the second host is connected to the switching hub. Knapen ¶ 42. This is because the VBUS signal is the signal by which a host supplies power to downstream devices. *Id.* The USB specification requires that hosts drive VBUS (i.e., provide power) on any of its

20

downstream ports. *Id.* Accordingly, when Wurzburg discloses "[t]he USB switching hub senses the VBUS signal and automatically switches some or all of the attached peripherals from the first host device to the second host device," one of ordinary skill would understand that this would occur at the moment the second host is connected. *Id.*

- "As one example, the USB device may be [a] display (monitor) comprising a hub and coupled to peripherals that normally operate with the computer (PC). ***When a user attaches a second host device***, such as a PDA or media player, via cable to the display device (connecting to the switching hubs second host port), some or all of the peripherals are ***switched*** from the PC to the second host device. The peripherals are then switched back to the PC when the second host device (PDA or media player) is detached." '191 Patent, 3:4–12 (emphasis added). One of ordinary skill in the art understands this passage to indicate the peripherals are switched from the PC to the second host device (*e.g.*, the PDA or media player) at the moment the user attaches the second host device because that is what the user would expect when attaching a PDA or media player to the hub. Knapen ¶ 43. If the connections were not switched at the moment the user attached the second host, the user

would not get the result of being able to use the PDA or media player as expected. *Id.*

- "As another example, a laptop docking station would normally couple attached peripherals to a desktop PC when the laptop PC is not docked to the docking station. The switching hub in the laptop docking station would automatically ***switch*** the peripherals from the user[']s desktop computer to the laptop ***when the laptop is inserted into the docking station***." '191 Patent, 3:12–18 (emphasis added). One of ordinary skill in the art understands this passage to indicate the peripherals are switched from the PC to the laptop (*e.g.*, a second host) at the moment the user attaches the laptop because that is what the user would expect when attaching a laptop to the docking station. Knapen ¶ 44. If the connections were not switched at the moment the user attached the laptop, the user would not be able to use the laptop as expected. *Id.*

- "When second host device 104 is not connected to USB hub device 106, USB switching hub 119 may operate to provide connectivity between first host device 102 and USB hub device 106, and/or between first host device 102 and the plurality of peripheral devices coupled to USB hub device 106. ***When the second host device 108 is coupled to USB hub device 106***, USB switching hub 119 is operable to detect this

22

connection and automatically *switch* to provide connectivity between the second host device 104 and USB hub device 106, and/or between second host device 104 and the plurality of peripheral devices coupled to USB hub device 106. In so doing, USB switching hub 119 may discontinue providing connectivity between the first host device 102 and USB hub device 106, and/or between first host device 102 and the plurality of peripheral devices coupled to USB hub device 106. The 'automatic' *switching* performed herein means that the user is not required to manually press buttons, change cables, etc. to initiate the switching, but rather merely connects second host device 104 to USB hub device 106." '191 Patent, 4:64–5:15 (emphasis added). One of ordinary skill in the art would understand this passage as describing switching the connectivity of peripherals connected to the first host to the second host at the moment the second host is coupled to the switching hub. Knapen ¶ 45. This is confirmed by the description of the "automatic" switching that keeps the user from having to manually press buttons, change cables, etc. *Id.* In other words, the user "merely connects [the] second host device," and the hub automatically "switch[es] to provide connectivity" between the second host and peripherals coupled to the USB hub. *Id.*

23

- "In the embodiment shown in FIG. 3, one of the three control lines (in this case ctl0) may be tied to the second host device's VBUS port, which may operate to select between two connectivity configurations in EEPROM 124. Thus, ***when the second host device*** (e.g., a PDA or portable PC) ***is connected*** to second host connector 128 and drives the respective VBUS line high (e.g. to 5 volts in this embodiment), peripherals 140-146 may effectively be ***switched*** to be coupled to the second host device." '191 Patent, 5:65–6:6 (emphasis added). One of ordinary skill in the art would understand this passage to indicate the peripherals are switched to be coupled to the second host at the moment the second host device is connected. Knapen ¶ 46. As mentioned above, the VBUS signal is the signal by which a host supplies power to downstream ports. *Id.* Wurzburg discloses in this passage that the second host's VBUS signal is used to select between two connectivity configurations, and one of ordinary skill in the art would know that, based on the connection of VBUS to the control lines shown in Figure 3, the selection would occur the moment the second host is connected to the USB switching hub. *Id.*

- "Thus the embodiments described herein provide for automatic ***switching*** of peripherals from a first host device to a second host device

24

*when the second host device is connected to the system*. This provides a significant improvement over the manual selection required in the prior art. Further minimal (or no) additional components are required. In addition, the described embodiments provide an intuitive operation to the end user." '191 Patent, 6:39–46 (emphasis added). One of ordinary skill in the art would understand this passage as describing switching the connectivity of peripherals from the first host to the second host at the moment the second host is coupled to the switching hub. Knapen ¶ 47. This is confirmed by the description of the "automatic switching" that "provides a significant improvement over the manual selection required in the prior art." *Id.* It is "an intuitive operation to the end user" because it occurs at the moment the user connects the second host. *Id.*

The plain meaning of the phrase "when the second [USB] host device is connected," *i.e.*, "just at the moment that the second [USB] host device is connected," is also consistent with the language of the claims. For example, Claim 1 recites "the USB hub is operable to automatically provide connectivity . . . when the second host device is connected to the USB hub." '191 Patent, 12:46–49. In this context, the phrase "when the second host device is connected to the USB hub" modifies the time at which the hub "automatically provide[s] connectivity." Knapen

25

¶ 48. One of ordinary skill in the art understands this time to be the moment the second USB host device is connected to the switching hub because the specification consistently describes this as the time the "automatic" connectivity is provided. *Id.* Claims 7 and 17 have similar claim language ("automatically provide/providing connectivity") which also confirms to one of skill in the art the phrase "when the second [USB] host device is connected" means "just at the moment that the second [USB] host device is connected." '191 Patent, 13:25–32, 14:40–44; Knapen ¶ 48.

Other claim language confirms the plain meaning of this phrase. For example, Claims 11 and 15 recite "the power connection changes states ***when the second USB host device is coupled to the second input***." '191 Patent, 13:49–51, 14:11–12. One of ordinary skill in the art would know the claimed "power connection" corresponds to the VBUS signal. Knapen ¶ 49. One of ordinary skill understands the VBUS signal changes state at the moment the second host is coupled to the switching hub's second input. *Id.* This is because the USB specification requires that hosts drive VBUS (*i.e.*, provide power) on any downstream port. *Id.* When the second host is not connected, VBUS is not driven. *Id.* At the moment the second host is connected, VBUS will be driven, that is, it will change state. *Id.*

Petitioner's proposed claim interpretations do not address this element of the independent claims. As discussed above, Petitioner attempt to construe the independent claims in the abstract without identifying any specific claim term

26

IPR2017-00970
Patent Owner's Preliminary Response

(Petition at 38–39) is unreasonable, inconsistent with the full claim language and the

written description, and should be rejected. *See Microsoft Corp.*, 789 F.3d at 1300.

## V.   THE PETITION SHOULD BE DENIED BECAUSE IT RAISES THE SAME OR SUBSTANTIALLY SAME ART AND ARGUMENTS PREVIOUSLY CONSIDERED BY THE OFFICE

The Board has discretion under 35 U.S.C. § 325(d) to reject a petition when

the same or substantially the same prior art or arguments were presented previously

in another proceeding before the Office. Petitioner's cited prior art—Wurzburg '293,

Adder (GB2352540), Torii, Hanna, Choi, Oguma, and the On-The-Go Supplement

to USB 2.0 Rev. 10 ("OTG")—were all considered by the Examiner during

prosecution, as reflected on the face of the '191 Patent. Ex. 1001 at 1–2. Petitioner

ignores this fact and asks the Board to revisit this already considered art.

Accordingly, Grounds 2–9, to the extent they rely on these references, should be

rejected as consisting of the same or substantially the same art previously presented

to the Office. *See, e.g., Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-1860,

slip op. at 14 (PTAB Feb. 24, 2016) (Paper 11) (denying review because "we are

unpersuaded that adjudicating such a dispute on an already-considered issue is an

efficient use of Board resources").

27

## VI.   PETITIONER'S EXPERT TESTIMONY IS UNRELIABLE

Petitioner's expert testimony is unreliable because it is based on a legally erroneous determination of the proper level of ordinary skill in the art. For the obviousness inquiry,

> [t]he statutory emphasis is on a person of *ordinary* skill. Inventors, as a class . . . possess something—call it what you will—which sets them apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (i.e., inventors) would have known or would likely have done . . . .

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). Contrary to this long-standing Federal Circuit precedent, Mr. Garney improperly uses the inventors of Wurzburg and other patents to determine the level of ordinary skill in the art. *See* Ex. 1019 ¶¶ 66–68. This leads Mr. Garney to the incorrect conclusion that the level of *ordinary* skill is "high," requiring a degree, "if not an advanced degree." *Id.* ¶ 68; *compare with* Knapen ¶ 47 (person of ordinary skill in the art does not have an advanced degree). Mr. Garney's testimony regarding claim construction and obviousness, both viewed from the perspective of one having ordinary skill, is unreliable and should not be considered. *See Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1258–59 (Fed. Cir. 2007) (reversing district court because expert testimony evidence of non-obviousness "was based on an improper determination of the level of skill in the art").

28

## VII.  THE PETITION FAILS TO SHOW A REASONABLE LIKELIHOOD PETITIONER WILL PREVAIL AGAINST THE CHALLENGED CLAIMS

### A. Ground 1: Dickens Does Not Anticipate Claims 1, 4–8, 10–12, 17, 19, or 21

Ground 1 asserts U.S. Patent No. 6,549,966 ("Dickens") anticipates Claims 1, 4–8, 10–12, 17, 19, and 21 of the '191 Patent. Petition at 40–48. The Board should deny institution with respect to Ground 1 because Petitioner has failed to demonstrate that Dickens discloses every limitation of the claimed invention. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (prior art "must disclose all of the limitations of the claim"); *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (anticipation requires each and every element to be found in a single prior art reference). Each of Wurzburg's independent claims—1, 7, and 17—require "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices ***when the second host device is connected to the USB hub***." Under the proper BRI construction of "when the second host device is connected to the USB hub" discussed above (*see supra,* Part IV.B), Dickens does not disclose this feature of the claims. Knapen ¶ 57. The independent claims also require "the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the

29

second host device is not connected to the USB hub." Dickens does not disclose this limitation because it does not disclose the second host device "not connected to the USB hub." *Id.* ¶ 61. Instead, every embodiment disclosed in Dickens has the second host connected to the data routing device. *Id.*

**1.    Claim 1**

Independent Claim 1 is directed to:

1. A system, comprising:

a USB hub;

a first host device coupled to the USB hub;

a plurality of peripheral devices coupled to the USB hub;

a second host device operable to be coupled to the USB hub;

wherein the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB device;

wherein the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub,

wherein the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device.

30

'191 Patent, 12:35–53. According to its express language, Claim 1 requires a USB hub "operable to ***automatically provide connectivity*** between the second host device and one or more of the plurality of peripheral devices ***when the second host device is connected to the USB hub***."

Petitioner's anticipation argument relies exclusively on its improper claim construction conclusion that "Claim 1 does not include switching . . . . Consequently, anticipation by Dickens does not require such switching." Petition at 42; *see also* Ex. 1019 ¶ 100 (Mr. Garney's anticipation analysis relies on claim interpretation that "does not include switching"). As discussed above, a proper BRI construction of "when the second host device is connected to the USB hub" requires automatically providing connectivity just at the moment the second host device is connected to the USB hub—in other words, switching. *See supra*, Part IV.B.

Petitioner does not identify the claimed switching in Dickens because no such switching exists. For example, Petitioner and Mr. Garney identify the switching of connections between Dickens' host computers and its (1) printer and (2) keyboard and mouse as corresponding to "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub" of Claim 1. Petition at 42–43; Ex. 1019 ¶¶ 100–03. The alleged switching related to the printer operation does not anticipate the claim because this switch occurs *when*

31

*Dickens' data routing device detects print data*, not at the moment the second host is connected. Knapen ¶ 59. Dickens expressly states that the printer connection is provided "[w]hen print data for either computer is detected." Dickens, 9:21–22. Thus, Dickens' switching connectivity of the printer peripheral between two host computers is not "automatically provide[d] . . . when the second host device is connected to the USB hub," as required by the claims. Knapen ¶ 59.

Similarly, Dickens' switching connections of the keyboard and mouse does not anticipate Claim 1 because it is based on a manual switch (element 167) or a keyboard hotkey, and not the moment the second host is connected to Dickens' data routing device. *Id.* ¶ 60. Dickens expressly states that the keyboard and mouse routing is "selected using a key switch 167 fitted to the control panel 164 on the data routing system or by pressing a hotkey sequence on the keyboard (ctrl, alt and tab pressed together)." Dickens, 8:59–62. Thus, Dickens' switching connectivity of the keyboard and mouse peripherals is not "automatically provide[d] . . . when the second host device is connected to the USB hub," as required by the claim. Knapen ¶ 60.

In addition to the above limitation, Dickens fails to disclose "the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB hub." Dickens does not disclose this

32

limitation because it does not disclose the second host device "not connected to the USB hub." Knapen ¶ 61. Instead, every embodiment disclosed in Dickens has the second host connected to the data routing device. *Id.*

### 2.    Claims 7 & 17

Claims 7 and 17 recite limitations similar to those discussed above for Claim 1. '191 Patent, 13:25–32, 14:39–42. For the same reasons, Dickens does not disclose these features of Claims 7 and 17. Knapen ¶ 62. In addition, method Claim 17 recites steps that must be "carried out." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014); *see also In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002) ("[A] process . . . consists of a series of acts or steps . . . . It consists of doing something, and therefore has to be carried out or performed."). Thus, even if the Board disagrees with Patent Owner's BRI construction of "when the second host device is connected to the USB hub," the Board should deny institution on Claim 17 because it expressly requires switching between the first state of connectivity (Petitioner's "first-host-plural-peripherals") and the second state of connectivity (Petitioner's "two-host-distributed-peripherals"), and Petitioner admits Dickens does not disclose this switching.

### 3.    Dependent Claims 4–6, 8, 10–12, 19, and 21

By virtue of their dependency, Claims 4–6, 8, 10–12, 19 and 21 of the '191 Patent include the same limitations as the independent claim from which they

depend. Therefore, for the same reasons discussed above with respect to the independent claims, Petitioner has also not demonstrated a reasonable likelihood it would prevail in showing Dickens anticipates these dependent claims. In addition, and as discussed below, Petitioner's analysis of the dependent claims is wholly deficient, as it merely recites the claim language and concludes—without any analysis—Dickens teaches the claimed features.

### a.   Claim 5

Petitioner fails to explain what features in Dickens correspond to the claimed "plurality of upstream ports," "plurality N of downstream ports," or "downstream switching logic." Petitioner cites to Dickens at 6:29-50 (Petition at 44), but does not explain which of the many components described in this passage allegedly corresponds to the claimed elements.

### b.   Claim 6

This claim requires "the USB hub is configured to be enumerated with a substantially similar hub configuration through each of the plurality of upstream ports; wherein the hub configuration includes N downstream ports." But the cited portion of Dickens 4:35–64 (Petition at 45) does not mention or disclose enumeration or hub configurations, and Petitioner fails to explain how it relates to or discloses any of the claimed features.

34

### c.    *Claim 8*

This claim, dependent on Claim 7, requires "the USB hub is operable to select from a plurality of connectivity configurations to determine how each of the plurality of peripheral USB devices is coupled to the first input and/or the second input." The cited portion of Dickens 9:20–30 (Petition at 45) does not mention or disclose "connectivity configurations" and Petitioner fails to explain how it relates to or discloses the claimed features.

### d.    *Claim 10*

This claim, dependent on Claims 8 and 7, requires "the USB hub comprises a plurality of control input signals, wherein a combination of a state of each of the plurality of control input signals determines which of the plurality of connectivity configurations [of Claim 8] is selected." Petitioner identifies the "plural host input signals for the printer" in Dickens as allegedly corresponding to the claimed "plurality of control input signals." Petition at 46. However, the cited portion of Dickens 9:20–30 (Petition at 46) does not mention "host input signals for the printer." Neither Petitioner nor Mr. Garney explain what the "host input signals for the printer" allegedly are or where they are to be found in Dickens, leaving the Board and Patent Owner in the dark as to Petitioner's theory.

### e. Claim 11

This claim, dependent on Claims 10, 8, and 7, requires "the second input comprises a power connection coupled to one of the plurality of control input signals, wherein the power connection changes states when the second USB host device is coupled to the second input; wherein one or more of the plurality of peripheral devices are coupled to the second input in response to the power connection changing states, according to a selected one of the plurality of connectivity configurations." Petitioner recites the claim language, and concludes without any explanation that Dickens discloses the limitations of Claim 11. But the cited portion of Dickens 9:20–30 (Petition at 47) does not support Petitioner's conclusion.

In addition to the deficiencies already mentioned related to Claims 10, 8, and 7, Dickens does not disclose "a power connection coupled to one of the plurality of control input signals." As best understood, Petitioner contends the actual USB connection between the host and the hub is the claimed "power connection." Petition at 47 ("[A] USB connection from a host to a hub is a power connection."). Petitioner does not explain nor does it make any sense that this alleged "power connection" is coupled to any of the "plural host input signals for the printer," *i.e.*, what Petitioner contends is the claimed "plurality of control input signals." *See* Petition at 46 (Claim 10 analysis).

36

Further, Dickens does not disclose "one or more of the plurality of peripheral devices are coupled to the second input in response to the power connection changing states." Petitioner states in conclusory fashion that "in Dickens, one or more of the peripheral devices are coupled to the second input, to the second host, in response to the power connection changing states." Petition at 47. Dickens does not disclose (in Petitioner's cited passage or elsewhere) any action taken "in response to the power connection changing states."

### f.   Claim 12

This claim, dependent on Claims 11, 10, 8, and 7, requires "a combination of a state of each remaining ones of the plurality of control input signals determines the selected one of the plurality of connectivity configurations." Petitioner's contention as to Claim 12 is unclear. Petitioner contends "[t]he 'remaining' ones are the hub control input signals that remain as compared to the one control input signal to which the second host is coupled." Petition at 47. This makes little sense in light of Petitioner's contention the "hub control input signals" are Dickens' "plural host input signals for the printer." Petition at 46 (Claim 10 analysis). Petitioner has failed to identify any "plural host input signals for the printer" or how these could "remain as compared to the one . . . to which the second host is coupled." Petitioner's conclusory allegations are insufficient. *See Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op. at 8–9 (PTAB Mar. 15, 2017) (Paper 7) (denying institution

37

where Petitioner failed to identify in sufficient detail portions of prior art allegedly anticipating the claim).

**B.      Ground 2: Adder Does Not Anticipate Claims 1, 4–13, 17, 19, or 21**

Ground 2 asserts U.K. Patent Application GB2352540 ("Adder") anticipates Claims 1, 4–13, 17, 19, and 21 of the '191 Patent. Petition at 48–58. The Board should deny institution with respect to Ground 2 because Petitioner has failed to demonstrate that Adder discloses every limitation of the claimed invention. *See In re Robertson*, 169 F.3d 742, 745 (Fed. Cir. 1999) (anticipation requires each and every element to be found, either expressly or inherently, in a single prior art reference). Each of Wurzburg's independent claims—1, 7, and 17—require "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices ***when the second host device is connected to the USB hub***." Under the proper BRI construction of "when the second host device is connected to the USB hub" discussed above (*see supra*, Part IV.B), Adder does not disclose this feature of the claims. Knapen ¶ 65. The independent claims also require "the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB hub." Adder does not disclose this limitation because it does not disclose a second host device "not connected to the USB hub." *Id.* ¶ 69. Instead, every

38

embodiment disclosed in Adder includes the second host connected to the data routing device. *Id.*

## 1. Claim 1

As discussed in Part VIII.A.1 above, Claim 1 expressly requires a USB hub "operable to ***automatically provide connectivity*** between the second host device and one or more of the plurality of peripheral devices ***when the second host device is connected to the USB hub***."

Petitioner's anticipation argument relies exclusively on its improper claim construction conclusion that "claim 1 does not include switching . . . . Consequently, the claims read on Adder." Petition at 51; *see also* Ex. 1019 ¶ 126 (Mr. Garney's anticipation analysis relies on claim interpretation that "does not include switching"). As discussed above, a proper BRI construction of "when the second host device is connected to the USB hub" requires automatically providing connectivity just at the moment the second host device is connected to the USB hub—in other words, switching. *See supra*, Part IV.B.

Petitioner does not identify the claimed switching in Adder because no such switching exists. It is unclear what portions of Adder Petitioner and Mr. Garney identify as corresponding to Claim 1's "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub."

*See generally*, Petition at 51–52; Ex. 1019 ¶¶ 126–29. Regardless, Adder switches connectivity between hosts and peripherals via USB switches 140, 142; this switching is controlled by switching controller 154. Adder, 16:28–17:7;[4] *see also* Knapen ¶ 67. Adder discloses that switching controller 154 switches connectivity of USB switches 140 and 142 only in response to (1) keyboard hotkeys (Adder, 18:19–33;[5] Adder, 19:6–8);[6] (2) mechanical switches available to the user (Adder, 19:31–20:3;[7] Adder, 22:33–23:3);[8] or (3) mouse buttons (Adder, 22:4–8).[9] *See also* Knapen ¶ 67. Because Adder's switching only occurs in response to the keyboard, mouse, or manual switches, it is not "automatically provide[d] . . . when [*i.e.*, at the moment that] the second host device is connected to the USB hub," as required by Claim 1. Knapen ¶ 68. Instead, the connectivity is provided using the aforementioned manual inputs. *Id.*

In addition to the above limitation, Adder fails to disclose "the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB hub." Adder does not disclose this

---

| | |
|---|---|
| 4 | PDF pages 21–22. |
| 5 | PDF page 23. |
| 6 | PDF page 24. |
| 7 | PDF pages 24–25. |
| 8 | PDF pages 27–28. |
| 9 | PDF page 27. |

40

limitation because it does not disclose a second host device "not connected to the USB hub." Knapen ¶ 69. Instead, every embodiment disclosed in Adder includes the second host connected to the switching device. *Id.*

### 2.    Claims 7 & 17

Claims 7 and 17 recite limitations similar to those discussed above with respect to Claim 1. For the same reasons, Adder does not disclose these features of Claims 7 and 17. Knapen ¶ 70. In addition, method Claim 17 recites steps that must be "carried out." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014); *see also In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002) ("[A] process . . . consists of a series of acts or steps . . . . It consists of doing something, and therefore has to be carried out or performed."). Thus, even if the Board disagrees with Patent Owner's BRI construction of "when the second host device is connected to the USB hub," the Board should deny institution on Claim 17 because it expressly requires switching between the first state of connectivity (Petitioner's "first-host-plural-peripherals") and the second state of connectivity (Petitioner's "two-host-distributed-peripherals"), and Petitioner admits Adder does not disclose this switching.

### 3.    Dependent Claims 4–6, 8–13, 19, 21, and 25

By virtue of their dependency, Claims 4–6, 8–13, 19, and 21, and 25 of the '191 Patent include the same limitations as the independent claim from which they

41

depend. Therefore, for the same reasons discussed above regarding the independent claims, Petitioner fails to demonstrate a reasonable likelihood it would prevail in showing Adder anticipates these dependent claims. In addition, and as discussed below, Petitioner's analysis of the dependent claims is wholly deficient, as it merely recites the claim language and concludes without any analysis that Adder discloses the claimed features.

### a. *Claim 5*

Petitioner fails to explain what features in Adder correspond to the claimed "plurality of upstream ports," "plurality N of downstream ports," or "downstream switching logic." Petitioner cites to Adder Figure 1 (Petition at 53), but does not explain which of the many components depicted in this figure allegedly corresponds to the claimed elements.

### b. *Claim 6*

This claim requires "the USB hub is configured to be enumerated with a substantially similar hub configuration through each of the plurality of upstream ports; wherein the hub configuration includes N downstream ports." But the cited portions of Adder Figure 1 and 15:1–2 (Petition at 54) do not mention or disclose enumeration or hub configurations, and Petitioner fails to explain how this relates to or discloses any of the claimed features.

42

### c.   Claim 8

This claim, dependent on Claim 7, requires "the USB hub is operable to select from a plurality of connectivity configurations to determine how each of the plurality of peripheral USB devices is coupled to the first input and/or the second input." The cited portion of Adder Figure 1 (Petition at 54 (referring to Illustration 2)) does not mention or disclose "connectivity configurations" and Petitioner fails to explain how it relates to or discloses the claimed features.

### d.   Claim 9

This claim, dependent on Claim 8, requires "a memory element coupled to the USB hub, wherein the memory element is configured to store the plurality of connectivity configurations." While the cited portion of Adder 20:13–21 (Petition at 54) does mention a memory element, it does not disclose a memory element "coupled to the USB hub" or "configured to store the plurality of connectivity configurations" as required by Claim 9. Petitioner's conclusory allegations and parroting of the claim language with no actual fact-based analysis is insufficient and should be rejected.

### e.   Claim 11

Claim 11, dependent on Claims 10, 8, and 7, requires "the second input comprises a power connection coupled to one of the plurality of control input signals." Petitioner identifies Adder's signals "from two keyboards with hot key

43

combinations and two control panel circuits" as the claimed "control input signals."
*See* Petition at 55 (discussing claim 10); Ex. 1019 ¶ 137. Petitioner further identifies
the VBUS power signal of a connected host as the claimed "power connection." *See*
Petition at 56; Ex. 1019 ¶ 139. However, Petitioner fails to identify any disclosure
in Adder where the alleged "power connection" (*i.e.*, VBUS of one of the computers)
is "coupled to one of the control input signals" (*i.e.*, the signals from the keyboards
or control panel circuits). In fact, Adder does not disclose the claimed coupling
between the power connection and the control input signals.

## C.   Ground 3: Wurzburg '293 Does Not Anticipate Claims 1–2, 4–10, 12–14, or 17–21

Ground 3 asserts U.S. Patent Publication 2006/0059293 ("Wurzburg '293")
anticipates Claims 1–2, 4–10, 12–14, and 17–21 of the '191 Patent. Petition at 58–
67. The Board should deny institution with respect to Ground 3 because Petitioner
has failed to demonstrate that Wurzburg '293 discloses every limitation of the
claimed invention. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)
(anticipation requires each and every element to be found, either expressly or
inherently, in a single prior art reference). Each of Wurzburg's independent claims—
1, 7, and 17—require "the USB hub is operable to automatically provide
connectivity between the second host device and one or more of the plurality of
peripheral devices **when the second host device is connected to the USB hub**."

44

Under the proper BRI construction of "when the second host device is connected to the USB hub" discussed above (*see supra*, Part IV.B), Wurzburg '293 does not disclose this feature of the claims. *See* Knapen ¶ 73. The independent claims also require "the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB hub." Wurzburg '293 does not disclose this limitation because it does not disclose a second host device "not connected to the USB hub." Knapen ¶ 76. Instead, every embodiment disclosed in Wurzburg '293 includes the second host connected to the data routing device. *Id.*

## 1. Claim 1

As discussed in Part VIII.A.1 above, Claim 1 expressly requires a USB hub "operable to ***automatically provide connectivity*** between the second host device and one or more of the plurality of peripheral devices ***when the second host device is connected to the USB hub***."

Petitioner's anticipation argument relies exclusively on its improper claim construction conclusion that the independent claims do not require switching. *See* Ex. 1019 ¶ 153 (Mr. Garney's anticipation analysis relies on claim interpretation that "does not include switching"). As discussed above, a proper BRI construction of "when the second host device is connected to the USB hub" requires automatically

providing connectivity just at the moment the second host device is connected to the USB hub—in other words, switching. *See supra*, Part IV.B.

Petitioner does not identify any switching in Wurzburg '293 because no such switching exists. Petitioner appears to rely on Figures 4a and 4b of Wurzburg '293 as disclosing "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub" of Claim 1. *See* Petition at 59–60 (relying on Illustration 6, which combines Figures 4a and 4b). These figures do not disclose "automatically provid[ing] connectivity . . . when the second host device is connected to the USB hub" because they do not disclose switching at the moment that the second host device is connected to the Wurzburg '293 switching hub. Knapen ¶ 74. Indeed, in both Figures 4a and 4b of Wurzburg '293, the dual role device is connected to the USB switching hub as a host. *Id.*

Because the Wurzburg '293 dual role device is connected in both Figures 4a and 4b, the transition from Figure 4a to 4b does not disclose "automatically provid[ing] connectivity" between the dual role device and peripheral device 125a at the moment the dual role device (*e.g.*, the second USB host device) is connected to the USB switching hub. Knapen ¶ 75. The dual role device is always connected in the Wurzburg '293 disclosure, so the change of connectivity illustrated in Figures 4a and 4b is not at the moment the dual role device is connected. *Id.*

46

In addition to the above limitation, Wurzburg '293 fails to disclose "the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB hub." Knapen ¶ 76. Wurzburg '293 does not disclose this limitation because it does not disclose the second host device "not connected to the USB hub." *Id.* Instead, every embodiment disclosed in Wurzburg '293 has the second host connected to the switching hub. *Id.*

### 2.   Claim 7 & 17

Claims 7 and 17 recite limitations similar to those discussed above for Claim 1. For the same reasons, Wurzburg '293 does not disclose these features of Claims 7 and 17. Knapen ¶ 77. In addition, method Claim 17 recites steps that must be "carried out." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014); *see also In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002) ("[A] process . . . consists of a series of acts or steps . . . . It consists of doing something, and therefore has to be carried out or performed."). Thus, even if the Board disagrees with Patent Owner's BRI construction of "when the second host device is connected to the USB hub," the Board should deny institution on Claim 17 because it expressly requires switching between the first state of connectivity (Petitioner's "first-host-plural-peripherals") and the second state of connectivity (Petitioner's "two-host-

distributed-peripherals"), and Petitioner admits Wurzburg '293 does not disclose this switching.

### 3.   Dependent Claims 2, 4–6, 8–10, 12–14, and 18–21

By virtue of their dependency, Claims 2, 4–6, 8–10, 12–14, and 18–21 of the '191 Patent include the same limitations as the independent claim from which they depend. Therefore, for the same reasons discussed above regarding the independent claims, Petitioner fails to demonstrate a reasonable likelihood it would prevail in showing Wurzburg '293 anticipates these dependent claims.

Further, Petitioner provides little, if any, analysis of the dependent claims, instead simply repeating the claim language and stating in conclusory fashion that the claim limitations are found in Wurzburg '293. These vague and conclusory statements are insufficient. *See Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op. at 8–9 (PTAB Mar. 15, 2017) (Paper 7) (denying institution where Petitioner failed to identify in sufficient detail portions of prior art allegedly anticipating the claim). This is the case at least with respect to Claims 5–6 and 8, and Claims 9–14 which depend from Claim 8. Additionally, Petitioner alleges Wurzburg '293 anticipates Claim 12 which depends from Claim 11, but fails to allege anticipation of Claim 11. Institution on Ground 3 should be denied.

48

IPR2017-00970
Patent Owner's Preliminary Response

### D. Grounds 4–5: Dickens, Adder, or Wurzburg '293 in View of Silverbrook or Torii Does Not Render Obvious Claim 3

Grounds 4 and 5 assert Claim 3 is rendered obvious by any of Dickens, Adder, or Wurzburg '293 in view U.S. Patent Publication No. 2004/0184856 ("Silverbrook") or U.S. Patent No. 6,532,512 ("Torii"). Petition at 67–69. As discussed above, none of Dickens, Adder, or Wurzburg '293 disclose "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices *when the second host device is connected to the USB hub*," as required by Claims 1, 7, and 17 of the '191 Patent. *See* Parts VII.A–C. Neither Silverbrook nor Torii teach or disclose this feature of the challenged independent claims.

Additionally, Petitioner's two-page, vague, and conclusory obviousness argument does not provide the type of persuasive, fact-based analysis required by binding precedent. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness."); *Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip op. at 19 (PTAB June 5, 2017) (Paper 10) (denying institution where "Petitioner does not provide a persuasive, fact-based analysis to support the proposed

49

combination of Narutaka and Logan" and where it was "not clear which features of Logan are to be incorporated into Narutaka's system, or how, or why").

Petitioner's reliance on its expert declaration to provide the detailed obviousness analysis is an improper attempt to avoid the 14,000-word limit for Petitions. *See, e.g., Fidelity National Information Services, Inc. v. Datatreasury Corp.*, Case IPR2014-00489, slip op. at 9 (PTAB Aug. 13, 2014) (Paper 9) ("Under our rules, the petition must contain a 'full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence . . . .' 37 C.F.R. § 42.22(a)(2). We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition."); 37 C.F.R. § 42.6(a)(3) (prohibiting incorporation by reference). Petitioner cites to ¶¶ 181–212 of Mr. Garney's declaration to support Grounds 4–5. Petition at 67–69. Mr. Garney's discussion includes 2,736 words, which causes the Petition, certified to contain 13,633 words, to far exceed the 14,000-word limit. Institution on Grounds 4 and 5 should be denied.

### E.   Ground 6: Dickens, Adder, or Wurzburg '293 in View of USB 2.0, Holmdahl, and Kim Does Not Render Obvious Claims 13–16

Ground 6 asserts Claims 13–16 are rendered obvious by any of Dickens, Adder, or Wurzburg '293 in view of USB 2.0, Holmdahl,[10] and Kim. Petition at 69–71. As discussed above, neither Dickens, Adder, nor Wurzburg '293 disclose "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices *when the second host device is connected to the USB hub*," as required by Claims 1, 7, and 17 of the '191 Patent. *See* Parts VII.A–C. USB 2.0, Holmdahl, and Kim likewise do not teach or disclose this feature of the challenged independent claims.

Further, Petitioner improperly relies on Mr. Garney's attached expert declaration to provide the requisite fact-based obviousness analysis, causing the Petition to exceed the word limit. Petitioner certifies the Petition contains 13,633 words. Mr. Garney's discussion of Ground 6 at ¶¶ 213–93 of Ex. 1019 contains 5,823 words. Petitioner's attempt to rely on this material via incorporation causes the Petition to exceed the 14,000-word limit, which is improper. *See Fidelity National Information Services*, Case IPR2014-00489, slip op. at 9 (Paper 9) ("[T]he petition must contain a 'full statement of the reasons for the relief requested,

---

[10]   Holmdahl is not actually listed in the Petitioner's "Identification of Challenges and Relief Requested" (Petition at 4–5), but is discussed. Out of an abundance of caution, Patent Owner assumes Petitioner is relying on Holmdahl.

including a detailed explanation of the significance of the evidence . . . .' 37 C.F.R.

§ 42.22(a)(2). We, therefore, decline to consider information presented in a

supporting declaration, but not discussed sufficiently in a petition.").

Petitioner also fails to discuss the *Graham* factors related to Ground 6, which

must be considered in any obviousness analysis. *See WBIP, LLC v. Kohler Co.*, 829

F.3d 1317, 1328 (Fed. Cir. 2016) ("[T]he ultimate question of obviousness is one of

law *which must consider all four Graham factors* . . . ." (emphasis added)). The

Board should deny institution on Ground 6.

## F.   Ground 7: Adder in View of Hannah and any one or more of Dickens, Wurzburg '293, Choi, and Oguma Does Not Render Obvious Claims 1–21

Ground 7 is not endorsed by Petitioner's own expert. It asserts that "Adder in

view of Hannah, as in the incorporated-by-reference prosecutions,[11] in view of any

one or more of Dickens, Wurzburg '293, Choi and Oguma" render Claims 1–21

obvious. Petition at 71. Petitioner fails to provide any explanation as to *how* the

particular teachings of Adder and Hannah would be combined with the teachings of

Dickens, Wurzburg '293, Choi, or Oguma to arrive at challenged Claims 1–21.

---

[11]   Although unclear, Petitioner may be attempting to rely on arguments made during prosecution without actually explaining those arguments here. Any such attempt should be rejected as improperly exceeding the 14,000-word limit for Petitions. *See, e.g., Fidelity National Information Services, Inc. v. Datatreasury Corp.*, Case IPR2014-00489, slip op. at 9 (PTAB Aug. 13, 2014) (Paper 9); 37 C.F.R. § 42.6(a)(3) (prohibiting incorporation by reference).

Petitioner's just-over-one-page, vague, and conclusory obviousness argument does not provide the type of persuasive, fact-based analysis required by binding precedent. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("[P]etitioner cannot employ mere conclusory statements . . . [and] must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness."); *Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip op. at 19 (PTAB June 5, 2017) (Paper 10) (denying institution where "Petitioner does not provide a persuasive, fact-based analysis to support the proposed [obviousness] combination"). Petitioner also fails to provide any rationale for combining any of these references.

Further, Petitioner's contention that "[t]he Examiner apparently did not appreciate [] that Adder and Hannah were applicable as prior art" is demonstrably false, as both Adder (GB 2352540) and Hannah (U.S. 5,784,581) are expressly listed in the "References Cited" section on the fact of the '191 Patent. *See* Ex. 1001 at 1–2.

Finally, Petitioner's reliance on "canceled Wurzburg '293 claim 80" (Petition at 72) invites legal error. Claim 80 of the Wurzburg '293 application was added during prosecution on July 17, 2008. *See* Ex. 1020 at 100 (adding new claim 80 at page 3 of Request for Continued Examination dated 2007-11-28). Claim 80 is not prior art under pre-AIA 35 U.S.C. § 102(a) because it was not "described in a printed

53

publication" before Wurzburg's patent application was filed (April 2006). Claim 80 is also not prior art under pre-AIA 35 U.S.C. § 102(e) because it is not "an application for patent . . . filed in the United States" before Wurzburg's patent application was filed. And even if it did qualify under § 102(e), it could not form the basis for an obviousness rejection because it was "made, owned by the same person or subject to an obligation of assignment to the same person." *See* pre-AIA 35 U.S.C. § 103(c). The Board should deny institution based on Ground 7.

**G.     Ground 8: Choi in View of Oguma and Hannah, Further in View of any one or more of Dickens, Adder, and Wurzburg '293 Does not Render Obvious Claims 1–21**

Like Ground 7, Ground 8 is not endorsed by Petitioner's own expert. It asserts all claims are obvious "over Choi, Oguma, and Hannah, as in prosecution in view of any one or more of Dickens, Adder, and Wurzburg '293." Petition at 73. Although vague and conclusory, Ground 8 is essentially a repackaging of the art and argument the Examiner considered during prosecution. As discussed previously, the Examiner already considered the combination of Choi, Oguma, and Hannah and determined these references did not anticipate or render obvious any of Claims 1–21 of the '191 Patent. Petitioner claims that "Prosecution mistakes were made" (*id.*), but fails to identify any specific mistake. The Board should exercise its discretion under 35 U.S.C. § 325(d) to reject this Ground because it raises the same or substantially the same prior art arguments previously presented to the Office.

Further, Petitioner intentionally omits portions of the prosecution history to incorrectly conclude that Choi, Oguma, and Hannah disclose all features of Claim 1 except for the "maintaining connectivity" limitation Wurzburg added to his claims during prosecution. Prior to allowance, Wurzburg not only amended the claims with the "maintaining connectivity" limitation, but also argued that Oguma did not disclose a USB hub "operable to . . . <u>automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub</u>." Ex. 1015 at 10–11 (pages 9–10 of Response to Office Action). The Examiner already concluded Choi did not disclose this feature of Wurzburg's claims. *See* Ex. 1015 at 17 (page 3 of Office Action). And as discussed above, neither Dickens, Adder, nor Wurzburg '293 disclose this feature of the claims. Thus, Petitioner's attempt to re-argue what the Examiner already considered is futile and institution should be denied.

Further, a petition must sufficiently explain how specific teachings of prior art would be modified or combined to arrive at the claimed invention. *See Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008). Petitioner fails to provide any explanation as to *how* the particular teachings of Choi, Oguma, and Hannah would be combined with the teachings of Dickens, Adder, or Wurzburg '293 to arrive at challenged Claims 1–21. Petitioner's one-page, vague, and conclusory obviousness argument does not provide the type of persuasive, fact-

55

based analysis required by binding precedent. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness."); *Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip op. at 19 (PTAB June 5, 2017) (Paper 10) (denying institution where "Petitioner does not provide a persuasive, fact-based analysis to support the proposed combination of Narutaka and Logan" and where it was "not clear which features of Logan are to be incorporated into Narutaka's system, or how, or why").

Petitioner appears to rely on abandoned arguments made by the Examiner during prosecution without explaining those positions in its Petition, effectively using the prosecution history to avoid the word count limits of 37 C.F.R. § 42.24. The Board has previously held that assertion of arguments by reference to documents outside of the Petition is improper. *See, e.g., Fidelity National Information Services, Inc. v. Datatreasury Corp.*, Case IPR2014-00489, slip op. at 9 (PTAB Aug. 13, 2014) (Paper 9) ("Under our rules, the petition must contain a 'full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence . . . .' 37 C.F.R. § 42.22(a)(2). We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition."); 37 C.F.R. § 42.6(a)(3) (prohibiting incorporation by reference).

56

Further, Petitioner's alleged motivation to combine, the "APA motivation to provide an easy, intuitive method for the end user to actuating [sic] switching of peripherals," uses Wurzburg's motivation as the motivation to combine. But "[t]he motivation to combine references can not [sic] come from the invention itself." *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994). The Board should deny institution on Ground 8.

**H.     Ground 9: Dickens, Adder, or Wurzburg '293 in View of USB 2.0, USB On-The-Go Supplement, Kim, Torii, and the "Other Prior Art" Does not Render Obvious Claims 1–21**

Like Grounds 7–8, Ground 9 is not endorsed by Petitioner's own expert. It asserts that "[a]ll of Dickens, Adder, and Wurzburg '293 . . . and then APA, USB 2.0, OTG, and all the other cited art . . . teach and/or make obvious the owner-referenced technology." Petition at 74. Although unclear, Petitioner appears to rely on either Dickens, Adder, or Wurzburg '293 as base references for Ground 9. As discussed above, none of these base references disclose "the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices ***when the second host device is connected to the USB hub***," as required by Claims 1, 7, and 17 of the '191 Patent. *See* Parts VII.A–C. APA, USB 2.0, OTG, and all the "other" unspecified cited art do not teach or disclose this feature of the challenged independent claims. Indeed, Wurzburg '293, Adder, OTG, APA (which is not prior art), and all the "other" cited art are

57

found on the face of the '191 Patent, were considered by the Examiner, and were found not to anticipate or render obvious the claims of the '191 Patent.

Further, a petition must sufficiently explain how specific teachings of prior art would be modified or combined to arrive at the claimed invention. *See Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008). Petitioner fails to provide any explanation as to *how* the particular teachings of Dickens, Adder, or Wurzburg '293 would be combined with the teachings of "APA, USB 2.0, OTG, and all the other cited art" to arrive at challenged Claims 1–21. Petitioner's one-page, vague, and conclusory obviousness argument does not provide the type of persuasive, fact-based analysis required by binding precedent. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness."); *Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip op. at 19 (PTAB June 5, 2017) (Paper 10) (denying institution where "Petitioner does not provide a persuasive, fact-based analysis to support the proposed combination of Narutaka and Logan" and where it was "not clear which features of Logan are to be incorporated into Narutaka's system, or how, or why"); *Lavelle Industries, Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op. at 22–23 (PTAB May 4, 2017) (Paper 18)

58

("unsupported, conclusory assertion[s]" do not "satisfy the burden of demonstrating obviousness").

Further, Petitioner's alleged motivation to combine, "what Wurzburg sought to provide, *i.e.,* access of USB hosts in plural to USB device(s) without disconnection switching that caused device reconfiguration, W-1:65-2:5" (Petition at 75), does not make any sense. The cited passage of Wurzburg says nothing about "disconnection switching" or "reconfiguration." Further, Petitioner's reliance on "what Wurzburg sought to provide" as the motivation to combine is legally improper because "[t]he motivation to combine references can not [sic] come from the invention itself." *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994).

Finally, to the extent Ground 9 relies on the disclosure of Wurzburg '293 Claim 80 (*see* Petition at 75), that claim is not prior art, as discussed above. The Board should deny institution on Ground 9.

## VIII. CONCLUSION

Petitioner has failed to show a likelihood it will prevail on any of Grounds 1–9. Accordingly, institution should be denied.

IPR2017-00970
Patent Owner's Preliminary Response

Dated: June 15, 2017

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

60

IPR2017-00970
Patent Owner's Preliminary Response

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies the above-captioned Patent Owner's Preliminary Response contains 13,976 words, excluding the parts of the document exempted by 37 C.F.R. 42.24(a).

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

61

IPR2017-00970
Patent Owner's Preliminary Response

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies the above-captioned Patent Owner's

Preliminary Response with accompanying exhibits (Exhibits 2002–03) was served

in its entirety on June 15, 2017, upon the following parties by sending a copy via

email to the following email addresses:

Charles W. Shifley (cshifley@bannerwitcoff.com)
Binal J. Patel (bpatel@bannerwitcoff.com)
Robert H. Resis (rresis@bannerwitcoff.com)
Jason S. Shull (jshull@bannerwitcoff.com)
Timothy J. Rechtien (trechtien@bannerwitcoff.com)
Mark A. Dalla Valle (mdallavalle@bannerwitcoff.com)
Zachary Getzelman (zgetzelman@bannerwitcoff.com)

Banner & Witcoff, Ltd.
10 South Wacker Drive, Suite 3000
Chicago, IL 60606

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC

62

IPR2017-00970
Patent Owner's Preliminary Response

401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

63

Trials@uspto.gov                                              Paper No. 12
571-272-7822                                          Entered: September 13, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

DELPHI TECHNOLOGIES, INC.,
Petitioner,

v.

MICROCHIP TECHNOLOGY INC.,
Patent Owner.
_____

Case IPR2017-00970
Patent 7,478,191 B2
_____

Before BRIAN J. McNAMARA, DANIEL N. FISHMAN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

FISHMAN, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

I.     INTRODUCTION

Delphi Technologies, Inc. ("Petitioner") filed a Petition (Paper 2,
"Pet.") requesting *inter partes* review of claims 1–21 (hereinafter the

IPR2017-00970
Patent 7,478,191 B2

"challenged claims") of U.S. Patent No. 7,478,191 B2 (Ex. 1001, "the '191 patent") pursuant to 35 U.S.C. §§ 311–319.  Microchip Technology Inc. ("Patent Owner") filed a Patent Owner Preliminary Response (Paper 10, "Prelim. Resp.").  We have authority to determine whether to institute a trial under 35 U.S.C. § 314 and 37 C.F.R. § 42.4(a).  An *inter partes* review may be instituted only if "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a).

Upon consideration of the Petition and the Preliminary Response, we conclude Petitioner has failed to establish a reasonable likelihood of prevailing in showing that any of the challenged claims are unpatentable. Accordingly, we deny institution of an *inter partes* review for all of the challenged claims of the '191 patent.

<div align="center">A.     <em>Real Parties in Interest and Related Matters</em></div>

Petitioner identifies Delphi Technologies, Inc. and Delphi Automotive Systems, LLC as real parties in interest. Pet. 2.  Both Petitioner and Patent Owner identify a related litigation matter captioned *Microchip Technology Inc. v. Delphi Automotive Systems, LLC.*, Case No. 2:16-cv-02817-DJH, filed in the U.S. District Court for the District of Arizona.  Pet. 2; Paper 8, 1. Petitioner also identifies related petitions for *Inter Partes* Review as IPR2017-00861 and IPR2017-00864.  Pet. 2.

<div align="center">B.     <em>The '191 Patent</em></div>

According to the '191 patent, the Universal Serial Bus ("USB") allows coupling of a variety of peripheral devices to a computer system.  Ex. 1001, 1:22–25.  USB hubs are USB devices that permit multiple other USB

<div align="center">2</div>

IPR2017-00970
Patent 7,478,191 B2

devices (e.g., peripheral devices) to be coupled to a USB host (e.g., a computer). *Id.* at 1:51–55. According to the '191 patent, if a USB peripheral device needs to be alternately coupled with a first USB host and a second USB host, the peripheral device may need to be disconnected from one USB host and connected to the other USB host. *Id.* at 1:62–65. Some USB devices may serve in two roles: serving as a slave device accessible to a USB host device and serving as a host device for communicating with other USB devices on the USB bus. *Id.* at 1:56–58. For example, a printer may be a dual role USB device serving as a slave USB device to print data received from a USB host (e.g., from a computer) and serving as a USB host device coupled with some other slave USB device (e.g., a camera) to print pictures retrieved from the slave device. *Id.* at 1:58–62. Thus, such a dual role device may be coupled to the USB bus as a slave device responding to requests from a USB host and may, at other times, be reconfigured so as to reconnect to the USB bus as a USB host to access other USB devices.

According to the '191 patent, known mechanical switches are capable of switching connections of peripheral devices between multiple USB host devices, but, may interfere with high-speed USB communications because such mechanical switches may introduce excessive capacitance and/or impedance beyond levels permitted in high-speed USB exchanges. *Id.* at 1:65–2:5. The '191 patent purports to resolve this problem by providing a USB switching hub "for automatically switching peripheral connectivity between two host devices based on respective connectivity of the hosts." *Id.* at 2:30–32.

One embodiment of the '191 patent provides a USB device coupled with a first USB host and a plurality of USB peripheral devices and coupled

3

IPR2017-00970
Patent 7,478,191 B2

selectively with a second USB host.  *Id.* at 2:36–40.  The USB device of the
'191 patent may include a USB switching hub operable to switch
automatically some or all of the USB peripheral devices from connectivity
with the first host to connectivity with the second host when the second host
is connected to the USB switching hub.  *Id.* at 2:43–55.

   Figure 1 of the '191 patent, reproduced below with annotations added
in red,[1] is a block diagram of a system embodying features of the invention.



*FIG. 1*

Figure 1 depicts a USB hub device 106 comprising USB switching hub 119.
*Id.* at 4:55–57.  First host device 102 is coupled to USB hub device 106 and
a plurality of USB peripheral devices (not shown) may be coupled with USB
hub device 106.  *Id.* at 4:58–60.  Second host device 104 may be coupled
selectively to USB hub device 106.  *Id.* at 4:62–64.  USB switching hub 119
within device 106 is operable to couple the plurality of peripheral devices
(not shown) to first host device 102 when second host device 104 is not
attached to device 106.  *Id.* at 4:64–5:2.  When second host device 104 is

_____

[1] The '191 patent describes Figure 1 using reference numbers that are not
present in the figure.  *See* Ex. 1001, 4:55–5:15.  Our annotations in red add
descriptions and reference numbers that appear to be consistent with that
descriptive material.

4

IPR2017-00970
Patent 7,478,191 B2

coupled to device 106, USB switching hub 119 is operable to detect that connection and automatically couple second host device with the some or all of a plurality of peripheral devices (not shown) and, thereby, disconnect first host device 102 from those peripherals.  *Id.* at 5:2–12.  According to the '191 patent, the change of connections is automatic in that "the user is not required to manually press buttons, change cables, etc. to initiate the switching, but rather merely connects second host device **104** to USB hub device **106**."  *Id.* at 5:12–15.

Figure 3 of the '191 patent, reproduced below, is a block diagram of an exemplary embodiment of the invention that automatically switches between two host connections.



## FIG. 3

Figure 3 depicts a USB device ("monitor") comprising USB switching hub 119.  *Id.* at 5:42–43.  A first host device may be coupled with switching hub 119 via first host connector 126 and a second host device may be coupled with switching hub 119 via second host connector 128.  *Id.* at 5:53–56.

5

IPR2017-00970
Patent 7,478,191 B2

Switching hub 119 selects a configuration among multiple connectivity configurations of the two host devices with peripheral devices ("Peripheral 1" through "Peripheral 4"). *Id.* at 5:45–47. Each host device connector (126 and 128) receives a "VBUS" signal from an attached host device. *Id.* at 5:57–60. When a second host device is attached (e.g., to connector 128), applying a signal to its VBUS connection, the peripheral devices may be switched from connectivity with the first host device to connectivity with the second host device. *Id.* at 6:2–6.

<div align="center">

*C.    Illustrative Claim*

</div>

Claims 1, 7, and 17 are the independent claims of the '191 patent. Independent claim 1, reproduced below, is exemplary of the challenged claims (with some formatting changes for readability):

> 1. A system, comprising:
> a USB hub;
> a first host device coupled to the USB hub;
> a plurality of peripheral devices coupled to the USB hub;
> a second host device operable to be coupled to the USB hub;
> wherein the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB device;
> wherein the USB hub is operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub,
> wherein the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device.

<div align="center">

6

</div>

IPR2017-00970
Patent 7,478,191 B2

### D.    Alleged Grounds of Unpatentability

The Petition sets forth the following asserted grounds of

unpatentability:

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Dickens[2] | 102(b) | 1, 4–8, 10–12, 17, 19, and 21 |
| Adder[3] | 102(b) | 1, 4–13, 17, 19, and 21 |
| Wurzburg,[4] | 102(a) | 1, 2, 4–10, 12–14, and 17–21 |
| (Dickens or Adder or Wurzburg) and Silverbrook[5] | 103(a) | 3 |
| (Dickens or Adder or Wurzburg) and Torii[6] | 103(a) | 3 |
| (Dickens or Adder or Wurzburg) and (USB 2.0[7] or Holmdahl[8] or Kim[9] or OTG[10] or Axelson[11])[12] | 103(a) | 13–16 |

---

[2] U.S. Patent No. 6,549,966 B1.  Ex. 1003 ("Dickens").

[3] U.K. Patent Application GB 2 352 540 A.  Ex. 1004 ("Adder").

[4] U.S. Patent Publication No. 2006/0059293 A1.  Ex. 1026 ("Wurzburg"). The Petition denotes this reference as "Wurzburg '293" as distinct from the subject patent of this *inter partes* review that the Petition denotes as "Wurzburg."  For this Decision, we refer to the patent at issue in this review as the '191 patent and denote this reference as "Wurzburg."

[5] U.S. Patent No. 7,040,823 B2.  Ex. 1006 ("Silverbrook").

[6] U.S. Patent No. 6,532,512 B1.  Ex. 1007 ("Torii").

[7] *Universal Serial Bus Specification Revision 2.0*.  Ex. 1008 ("USB 2.0").

[8] U.S. Patent No. 5,675,813.  Ex. 1031 ("Holmdahl").

[9] U.S. Patent No. 6,147,682.  Ex. 1009 ("Kim").

[10] *On-The-Go Supplement to the USB 2.0 Specification Revision 1.0*.  Ex. 1013 ("OTG").

[11] J. Axelson, *USB Complete Third Edition*.  Ex. 1028 ("Axelson").

[12] Petitioner provides a summary of this asserted ground ("Ground 6") on page 5 of the Petition that is different from the ground as actually set forth on pages 69–71 of the Petition.  We deem the seeming error to be harmless in our analysis.

IPR2017-00970
Patent 7,478,191 B2

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Adder, Hannah,[13] and (Dickens or Wurzburg or Choi[14] or Oguma[15]) | 103(a) | 1–21 |
| Choi, Oguma, Hannah, and (Dickens or Adder or Wurzburg) | 103(a) | 1–21 |
| (Dickens or Adder or Wurzburg) and (APA[16] or USB 2.0 or OTG) and "all other cited art" | 103(a) | 1–21 |

Petitioner also relies on the Declaration of Mr. John Garney (Ex. 1019) as support for the various contentions.  Patent Owner relies on the Declaration of Mr. Geert Knapen (Ex. 2002) in support of its contentions.


## II.     ANALYSIS

### A.     General Principles

#### 1.     Anticipation

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Each element of the challenged claim must be found, either expressly or inherently, in the single prior art reference.  *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).  While the elements must be arranged or combined in the same way as in the claim,

---

[13] U.S. Patent No. 5,784,581.  Ex. 1010 ("Hannah").
[14] U.S. Patent No. 7,093,057 B2.  Ex. 1011 ("Choi").
[15] U.S. Patent No. 6,516,205 B1.  Ex. 1012 ("Oguma").
[16] Petitioner defines Admitted Prior Art ("APA") as admissions in the '191 patent citing various portions of Exhibit 1001 as such admissions.

IPR2017-00970
Patent 7,478,191 B2

"the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

### 2.   *Obviousness*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter[,] as a whole[,] would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 3.   *Claim Construction*

As a step in our analysis for determining whether to institute a review, we determine the meaning of the claims for purposes of this Decision.  In an *inter partes* review, a claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears.  37 C.F.R. § 42.100(b); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–46 (2016) (upholding the use of the broadest reasonable interpretation standard).  Under the broadest reasonable interpretation standard, claim terms are generally given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504

IPR2017-00970
Patent 7,478,191 B2

F.3d 1249, 1257 (Fed. Cir. 2007). "[A] claim construction analysis must begin and remain centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). "Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy. *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

<div align="center">

*a.*     *"When"*

</div>

Independent claim 1 includes a USB hub operable to provide connectivity between the first host device and a plurality of peripheral devices "*when* the first host device is connected to the USB hub and the second host device is not connected to the USB device" (emphasis added). The claim further recites the USB hub is operable to "automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices *when* the second host device is connected to the USB hub" (emphasis added). Independent claims 7 and 17 include related recitations.

Petitioner argues these claims define two different types of connectivity: "a 'first-host-plural-peripherals' type, in the presence of a 'first-host-only' state of connections" where only the first host device is connected to the hub and "a 'two-host-distributed-peripherals' type, in the presence of a 'two host' state of connections" where both the first and

<div align="center">

10

</div>

IPR2017-00970
Patent 7,478,191 B2

second host devices are connected to the hub.  Pet. 39.  Petitioner, therefore, contends the claims "are not directed to switching between the two types of connectivity" because the claims do not express any action to switch between the two states of connectivity.  *Id.*  "There is no stated switching." *Id.*  Implied in Petitioner's argument is that the word "when," as recited in the claims, refers to any time that a corresponding type of connectivity is present—i.e., "while" the corresponding type of connectivity is present— and does not refer to a particular moment in time—i.e., when the hub detects a connection with the second host—at which the hub switches connectivity of the peripheral devices.

Patent Owner argues Petitioner's proposed interpretation is inconsistent with the Specification of the '191 patent and inconsistent with the claim language.  Prelim. Resp. 12–27.  Specifically, Patent Owner asserts the Specification of the '191 patent consistently describes its hub as a "switching hub" that automatically provides connectivity between the second host device and the peripherals at "the moment the second host is connected."  *Id.* at 14.  Supporting this assertion, Patent Owner contends the Specification uses the term "switch" and derivations thereof "over 200 times."  *Id.*  Patent Owner further contends Petitioner's argument is inconsistent with the claims' recitation of "automatic" connectivity of the peripheral devices to the second host device.  *Id.* at 14–15.  Patent Owner asserts Petitioner does not provide a basis for its position that automatic connectivity does not "switch" between connectivity types.  *Id.* at 14.  Patent Owner further contends Petitioner's arguments are inconsistent with dependent claim 5 and independent claim 7 that expressly recite "switching logic" that provides the automatic connectivity, asserting "it is nonsensical

11

IPR2017-00970
Patent 7,478,191 B2

to conclude 'switching logic' does not actually perform switching." *Id.* at 14–15.  In like manner, Patent Owner argues Petitioner's interpretation is inconsistent with the method steps of independent claim 17 that expressly recite a sequence of operations that ends with automatically providing connectivity between the second host and the peripheral devices "when the second USB host device is connected to the second input" of the USB switching hub." *Id.* at 15.

Patent Owner contends the phrase "*when* the second host is connected," as similarly recited in all claims, should be understood to mean "*just at the moment that* the second host is connected." *Id.* at 19.  Patent Owner asserts this interpretation is consistent with the plain meaning as evidenced by a dictionary (*id.* (citing Ex. 2003)) and is consistent with use of the term in the Specification of the '191 patent (*id.* at 19–25).  Patent Owner further contends its proposed interpretation of "when" is consistent with the claims' recitation of "automatically" providing the recited connectivity with the second host—i.e., the recited connections occur automatically at the moment the second host is connected.

Although the word "when" can have a variety of meanings depending on context (*see* Ex. 2003), in the context of the Specification and claims of the '191 patent, we agree with Patent Owner that the claims should be understood to mean the recited connectivity occurs (i.e., switches) just at the moment the second host is attached to the USB switching hub.  The Specification of the '191 patent specifically recites, "The 'automatic' switching performed herein means that the user is not required to manually press buttons, change cables, etc. to initiate the switching, but rather merely connects second host device 104 to USB hub device 106." Ex. 1001, 5:12–

12

IPR2017-00970
Patent 7,478,191 B2

15.  In other words, the mere connection of a second host device to the USB switching hub causes the automatic switching described in the patent to occur.  Although the word "switch" (and variants thereof) does not appear in every claim, "automatically" providing connectivity "when the second host device is connected" to the hub is broadly but reasonably understood to refer to the "automatic switching" disclosed by the Specification of the '191 patent.  Petitioner's implied interpretation of "when" appears to disregard the "automatic" features of the claims and, instead, suggests the phrase "when the second host device is connected" refers more broadly to a state or type of connection rather than an event that triggers automatic switching.

On this record and for purposes of this Decision, we find Petitioner's interpretation of "when" is unduly broad and inconsistent with the claims and Specification of the '191 patent.  Instead, we agree with and adopt Patent Owner's interpretation of "when," to mean "just at the moment that" and, thus, we interpret the phrase "when the second host device is connected" to mean "just at the moment that the second host is connected."

### b.    Other Terms

On this record and for the purposes of this Decision, we determine that it is unnecessary to construe any other claim terms.

### B.    Level of Ordinary Skill in the Art

Petitioner argues a person of ordinary skill in the art related to the '191 patent would have a Bachelor's Degree in electrical engineering, computer science, or the equivalent, and would also have "a few to many" years of experience in the design of USB devices as well as familiarity with the USB specifications and protocols.  Pet. 7 (citing Ex. 1019 ¶¶ 52–68).  Petitioner further argues (*id.* at 7–8) that Patent Owner admitted the level of

IPR2017-00970
Patent 7,478,191 B2

ordinary skill when, in prosecution of a companion case, this same Patent
Owner asserted "one skilled in the art to which the present application
pertains would be well informed and well aware of the USB 2.0
specification." *Id.* (quoting Ex. 1016, 9[17]).

> Patent Owner disputes Petitioner's proposed definition asserting:
>
> Mr. Garney improperly uses the inventors of Wurzburg and other
> patents to determine the level of ordinary skill in the art.  See Ex.
> 1019 ¶¶ 66–68.  This leads Mr. Garney to the incorrect
> conclusion that the level of ordinary skill is "high," requiring a
> degree, "if not an advanced degree."  *Id.* ¶ 68; compare with
> Knapen ¶ 47 (person of ordinary skill in the art does not have an
> advanced degree).

Prelim. Resp. 28.  Patent Owner does not offer an alternative definition of
the level of ordinary skill in the art.  However, Mr. Knapen, Patent Owner's
expert declarant, testifies:

> [I]t is my opinion that a person of ordinary skill in the art would
> be a person who has experience designing—either in the
> classroom or in a work endeavor—a standard USB hub.  The
> person of ordinary skill will have also been exposed to the
> various interconnect options for connecting USB hosts and USB
> devices to USB hubs.  This person would have a bachelor's
> degree in electrical or computer engineering (or similar), and at
> least five years of industry experience in computer peripheral
> device design.

Ex. 2002 ¶ 38.

> We are persuaded by Petitioner's definition of the level of ordinary
skill in the art finding that it is commensurate with the level of ordinary skill
in the art as reflected in the prior art.  *See Okajima v. Bourdeau*, 261 F.3d

---

[17] Petitioner erroneously cites Exhibit 1016 at page 41, lines 9–10 for this
quotation.  We find no page 41 in Exhibit 1016 but find the quotation at
page 9 thereof.  We determine this to be harmless error.

IPR2017-00970
Patent 7,478,191 B2

1350, 1355 (Fed. Cir. 2001) ("[T]he absence of specific findings on the level of skill in the art does not give rise to reversible error where the prior art itself reflects an appropriate level and a need for testimony is not shown.") (internal quotation marks omitted).  Furthermore, Patent Owner mischaracterizes Mr. Garney's testimony.  Mr. Garney testified, in context, that the person of ordinary skill would have had "*at least a degree in one of electrical engineering, computer engineering*, and the like, if not an advanced degree in these subjects."  Ex. 1019 ¶ 68 (emphasis added). Therefore, a Bachelor's degree in at least one of the listed fields would have sufficed for the person of ordinary skill even under Mr. Garney's definition. Thus, the parties' respective experts (Mr. Garney and Mr. Knapen) substantially agree regarding the education and experience of persons of ordinary skill at the time of the '191 patent.

On the record before us and for purposes of this Decision, we define the level of ordinary skill in the art, at the time of the '191 patent, to include at least a Bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent fields as well as familiarity with the USB 2.0 specifications to the extent of having designed a USB device.  This definition is reflected in the prior art of record and is consistent with the testimony of both parties' experts and consistent with Patent Owner's admissions during prosecution of the '191 patent.

*C.     35 U.S.C. § 325(d) Discretion*

Section 325(d) of Title 35, U.S. Code, provides, in pertinent part:

In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

15

IPR2017-00970
Patent 7,478,191 B2

Patent Owner argues that this Petition should be denied under § 325(d) because the same or substantially the same art and arguments were presented, and overcome, during prosecution of the '191 patent.  Prelim. Resp. 27.  Specifically, Patent Owner argues Wurzburg, Adder, Torii, Hannah, Choi, Oguma, and OTG "were all considered by the Examiner during prosecution, as reflected on the face of the '191 Patent."  *Id.* (citing Ex. 1001, 1–2).

We are not persuaded by Patent Owner's argument.  Other than being listed on the face of the '191 patent, we find no evidence in this record that the Examiner ever substantively considered these references in prosecution of the '191 patent in the proposed combinations of this Petition.  Some of the references (Dickens in view of either Hannah or Oguma) were substantively applied in various combinations during prosecution of Wurzburg, a related, abandoned, patent application having a common inventor with the '191 patent (Mr. Wurzburg) and commonly owned.  *See, e.g.*, Ex. 1020, 5, 63.  Furthermore, the combination of Choi and Oguma was applied in a rejection by the Examiner in prosecution of the '191 patent.  Ex. 1015, 16–17.  However, Patent Owner provides insufficient persuasive evidence that the specific combinations proposed in the Petition were applied to claims having similar scope to those at issue in this matter.

Accordingly, we are not persuaded that the same or substantially the same prior art or arguments were previously presented to the Office, and we, therefore, decline to exercise our discretion under 35 U.S.C. § 325(d) to deny any of the asserted grounds.

IPR2017-00970
Patent 7,478,191 B2

*D.     Anticipation by Dickens*

The Petition asserts claims 1, 4–8, 10–12, 17, 19, and 21 are
anticipated by Dickens.  Pet. 40–48.

*1.     Dickens (Ex. 1003)*

According to Dickens, prior techniques for sharing a USB peripheral
device include use of an Ethernet Local Area Network or switching devices
that utilize complex wiring.  Ex. 1003, 1:31–39.  Dickens discloses a data
routing device to share a USB peripheral device among a plurality of USB
hosts.  *Id.* at 1:45–49.  Figure 1, reproduced below in a more legible form,[18]
is a schematic illustration of a system using the inventive data routing
device.  *Id.* at 5:8–9.



FIG.   1

_____

[18] Figures in the Dickens U.S. Patent (Ex. 1003) are hand-drawn and,
although understandable, are difficult to view.  The same patent application
was filed in Great Britain (GB 2 350 212 A – Exhibit 3001) and Figures 1
and 2 therein are substantively identical but easier to view.  Thus, we
reproduce here the Dickens' Figures 1 and 2 from the substantively identical
patent application filed in Great Britain.

17

IPR2017-00970
Patent 7,478,191 B2

Figure 1 depicts a system 100 including data routing device 130 coupled with multiple USB host computers 105 through respective USB busses 106 and data converters 110. *Id.* at 5:26–37. Data routing device 130 also is coupled with a plurality of USB peripheral devices 108 through respective USB busses 109 and data converters 120. *Id.* at 5:66–6:11. Data converters 110 and 120 use USB protocols in exchanges with hosts 105 and devices 108, respectively. *Id.* at 5:33–37, 6:9–11. Data converters 110 include emulation functions to emulate the presence of each USB peripheral device 108 in system 100 so that each USB host 105 will detect the peripheral devices as present and configure themselves accordingly. *Id.* at 5:38–43. Data converters 120 include emulation functions to emulate the presence of a USB host on each USB bus 109 associated with each USB peripheral device 108 causing the peripheral devices to communicate with data router 130 through a corresponding converter 120 as though it is connected to a USB host. *Id.* at 6:12–17.

Figure 2 of Dickens, reproduced below[19], is a schematic illustration of elements within the data routing system of Figure 1. *Id.* at 5:9–11

---

[19] This Figure, like the version of Figure 1 reproduced above, is from GB 2 350 212 A.

IPR2017-00970
Patent 7,478,191 B2



FIG. 2

Figure 2 depicts data router 130 (the largest rectangle also labelled as system 100) comprising microprocessor-based controller 140 and PCI bus 132 for coupling to other components within data router 130. *See id.* at 6:29–50. Data router 130 is coupled to two USB host devices 105 through respective data converters each comprising USB device controller 150 and PCI bus interface 152. *Id.* at 6:51–54. Data router 130 also is coupled with USB peripheral devices 180, 182, 184, and 186 via USB busses 109 and corresponding USB host controllers 154, 156, and 158 coupled with PCI bus 132. *Id.* at 6:57–7:8. In particular, USB host controller 156 serves to couple router 130 to printer 182.

In operation, data router 130 of Dickens receives a request for exchange from any host 105 via corresponding data converter 150 and emulates operation of each of the peripheral devices (180, 182, 184, and 186) coupled with router 130. *See id.* at 7:36–45. Information to or from a peripheral device is moved between data router 130 and the peripheral

19

IPR2017-00970
Patent 7,478,191 B2

device via the emulated USB host provided by a corresponding USB host controller 154, 156, or 158.  *See id.* at 8:16–41.  In other words, data router 130 emulates each attached USB peripheral device for each attached USB host and emulates a requesting USB host for each attached peripheral device.

2.      *Independent Claims 1, 7, and 17*

Regarding independent claim 1, Petitioner identifies the structural elements of the claim as follows:

**1. "A system, comprising:"**
The preamble does not limit claim 1. Dickens discloses a system, nevertheless. *E.g.*, D-5:11 ("system"), G-¶92.

**1a. "a USB hub;" – a hub**
Dickens discloses a USB hub. D-1:5-10, G-¶93.

**1b. "a first host device coupled to the USB hub;" – a host**
Dickens discloses a first host device coupled to the Dickens USB hub. D1:5-10, G-¶94.

**1c. "a plurality of peripheral devices coupled to the USB hub;" – peripherals**
Dickens discloses a plurality of peripheral devices coupled to the USB hub. E.g., D-1:5-10, G-¶95.

**1d. "a second host device operable to be coupled to the USB hub;" – a second host**
Dickens discloses a second host device operable to be coupled to the Dickens USB hub. *E.g.*, D-1:5-10, G-¶96.

Pet. 40–41.

Initially, we determine Petitioner has improperly incorporated by reference argument from another document—Mr. Garney's Declaration. The Petition *per se* provides no analysis explaining which feature, briefly mentioned in lines 5 through 10 of column 1 of Exhibit 1003 (Dickens), is identified as the recited "USB hub."  Only by reference to Mr. Garney's Declaration at paragraph 93 do we understand that Petitioner is identifying

20

IPR2017-00970
Patent 7,478,191 B2

Dickens' "data routing device" as disclosing the claimed "USB hub."  In like manner, only by reference to paragraphs 94 and 96 of Mr. Garney's Declaration do we understand that Petitioner is reading the claimed first host device and second host device on the "number of computers" mentioned in the cited Dickens passage..

Our rules state, "*The petition must specify* where each element of the claim is found in the prior art patents or printed publications relied upon." 37 C.F.R. § 42.104(b)(4) (emphasis added).  Contrary to our rules, this ground of the Petition fails to specify sufficiently where the elements are found in Dickens and, instead, merely cites a brief overview of Dickens' invention and improperly incorporates by reference discussion from Mr. Garney's Declaration to specify in detail where each structural element is found in that cited portion of Dickens.  *See* 37 C.F.R. § 42.6(a)(3).  The totality of Petitioner's argument for independent claims 7 and 17 contends, "Dickens also anticipates claims 7 and 17.  G-¶104.  Claim 1 is representative of claims 7 and 17 relative to Dickens because they recite essentially the same elements as claim 1.  *Id.*"  Paragraph 104 of Mr. Garney's Declaration (Ex. 1019), incorporated by reference in the above-quoted passage, fails to provide any further detail specifying where in the prior art each element is found but instead merely notes the similarities between all three independent claims (1, 7, and 17).

For the above reasons alone, we could deny this ground for all independent claims (1, 7, and 17) and, thus, for all claims asserted in this ground.  Nevertheless, we turn next to the "wherein" clauses of claim 1 at the heart of the parties' disagreements.

21

IPR2017-00970
Patent 7,478,191 B2

The first "wherein" clause of claim 1 recites, "wherein the USB hub is operable to provide connectivity between the first host device and the plurality of peripheral devices when the first host device is connected to the USB hub and the second host device is not connected to the USB hub." Petitioner argues Dickens discloses the user may choose to connect a keyboard and mouse to the first computer (first host device) and connects the first computer to the shared printer if the first host sends data to the printer and the printer is available.  Pet. 41.  Petitioner concludes, "[t]hus, Dickens is operable with a first host to provide connectivity between the first host and the plurality of peripheral devices when the first host is connected to the Dickens device and the second host is connected or not connected." *Id.*

The second "wherein" clause of claim 1 recites that the hub is operable to "automatically provide" connectivity between the second host device and one or more of the peripheral device "when the second host is connected to the USB hub."  Petitioner argues claim 1 does not require any switch between two connectivity types—a first type with only the first host connected and a second type with both hosts connected.  *Id.* at 41.  Instead, Petitioner argues Dickens discloses a shared printer that is connected with either the first host device or the second host device when the either host device sends data to the printer and the printer is available.  *Id.* at 42–43.

We are not persuaded by Petitioner's arguments.  Petitioner's argument hinges on Petitioner's implied interpretation of the word *when* as discussed above.  In essence, Petitioner's position is that Dickens' hub (data routing device) may selectively connect either the first computer or the second computer to the shared printer at any time *while* both computers are

IPR2017-00970
Patent 7,478,191 B2

connected to the hub—i.e., at any time while the second computer is connected to the hub it may be connected to the shared printer to allow it to send data to the shared printer.  As discussed *supra*, we find Petitioner's implied interpretation of the word *when* unreasonably broad in the context of the claims and Specification of the '191 patent.  We interpret the word *when* in both the first and second "wherein" clauses to mean "just at the moment that" some event occurs.  In the first "wherein" clause of claim 1, the recited hub connects the first host device to the peripheral device just at the moment that (when) the first host device is connected to the hub.  In like manner, in the second "wherein" clause of claim 1, the recited hub automatically connects one or more of the peripheral devices to the second host just at the moment that (when) the second host is connected to the hub.  Thus, in claim 1, the connectivity of the one or more peripheral devices is "switched" from the first host device to the second host device, automatically by detecting the connection of the second host to the hub.  Petitioner has not persuasively shown, nor do we discern, that Dickens teaches such an automatic switch of the connectivity just at the moment that the second host in connected to the hub.

Accordingly, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claim 1 is anticipated by Dickens.  As noted *supra*, independent claims 7 and 17 include similar recitations and Petitioner relies on the same arguments as those presented for claim 1.  Pet. 44.  Thus, for the same reasons as claim 1, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claims 7 and 17 are anticipated by Dickens.

IPR2017-00970
Patent 7,478,191 B2

> 3.    *Dependent Claims 4–6, 8, 10–12, 19, and 21*

Dependent claims 4–6, 8, 10–12, 19, and 21 each depend, directly or indirectly, from one of independent claims 1, 7, and 17. Thus, for the same reasons as claims 1, 7, and 17, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claims 4–6, 8, 10–12, 19, and 21 are anticipated by Dickens.

> E.    *Anticipation by Adder*

The Petition asserts claims 1, 4–13, 17, 19, and 21 are anticipated by Adder. Pet. 48–58.

> 1.    *Adder (Ex. 1004)*

Adder, like Dickens, discloses the desirability of sharing peripheral devices among a plurality of computers. Ex. 1004, 6:26–27. Adder further suggests advantages of wiring simplicity if USB connections are used for sharing peripheral devices among multiple computers. *Id.* at 7:15–19. Adder discloses a USB switching device for connecting a peripheral device to any one of a plurality of computers. *Id.* at 21–23. Adder's Figure 1 is a block diagram split over two pages of the document. The two portions of Adder's Figure 1 are reproduced below.

IPR2017-00970
Patent 7,478,191 B2



FIG. 1

FIG. 1

Figure 1 of Adder is a block diagram showing a plurality of computers 112 and a plurality of peripherals (keyboard 120, mouse 116, and other peripherals 118) all coupled with switching device 100.  *Id.* at 20:22–21:5. Each computer 112 is coupled with switching device 100 through a corresponding USB computer interface circuit 122 of device 100.  *Id.* at 21:6–10.  The plurality of peripherals are coupled with switching device 100 through first and second peripheral interfaces 160 and 162, respectively, of device 100.  *See id.* at 21:29–30.  Switching device 100 further comprises switching means 140 and 142 coupled with peripheral interfaces 160 and 162, respectively and each coupled with all computer interface circuits 122 to couple selectively one of computer interface circuits 122 with one of

25

IPR2017-00970
Patent 7,478,191 B2

peripheral interfaces 160 or 162 under control of switching controller 154.
*See id.* at 21:28–22:13

 In operation, switching controller 154 of device 100 receives control signal 180 requesting a switch of connectivity between the peripheral devices and a computer. *See id.* at 23:28–24:5. The control signal represents a switching event requested by a user by entering a "hotkey" sequence on a keyboard peripheral device coupled with switching device 100. *See id.* at 24:7–11. Responsive to the control signal, switching controller 154 reconfigures switching means 140 and/or 142 to connect USB signals between a selected computer and the peripheral devices. *See id.* at 22:3–14.

<center>2.   *Independent Claims 1, 7, and 17*</center>

 Petitioner argues the structural elements of the system of independent claim 1 are taught by Adder. Pet. 49.[20,21] Specifically, Petitioner identifies the claimed hub as Adder's hub functions operable within the computer

---

[20] As discussed above regarding Dickens, Petitioner provides scant analysis or explanation to identify the claimed structural elements in specific teachings of Adder. Instead, Petitioner merely cites portions of Adder purported to teach the corresponding structural element of the recited system. As above, we could deny this ground solely for lack of compliance with the requirements of our rules. *See* 37 C.F.R. § 42.104(b)(4). Nevertheless, we look to the substance of Petitioner's arguments.
[21] Petitioner identifies the "system" recited in the preamble of claim 1 as reading on Adder, citing page 5, line 3. Pet. 49 (citing "A-5:3"). Page 5 of Exhibit 1004 is a drawing and, thus, we find no line number 3. If we rely on the page numbers of the underlying patent publication, line 3 appears to be a blank line. *See* Ex. 1004, 10. In any event, we agree with Petitioner that the preamble of claim 1 ("A system") does not limit the scope of the claim. Thus, we deem Petitioner's erroneous citation to be harmless error in our analysis.

<center>26</center>

IPR2017-00970
Patent 7,478,191 B2

interfaces (122) and within peripheral interfaces (160 and 162) of switching device 100. *Id.* (citing Ex. 1004, 13:29–31, 14:25). The claimed first and second hosts are identified as computers (112) of Adder and the peripheral devices are identified as mouse 116, keyboard 120, and other peripheral devices 118 of Adder. *Id.* (citing Ex. 1004, 9:9–14).

Regarding the first "wherein" clause of claim 1 (in which all peripheral devices are connected to the first host when the second host is not connected to the hub), Petitioner argues "[t]he Adder switching device allows control of a single host computer with two sets of keyboard and mouse." Pet. 50. Petitioner provides a modified version of Adder's Figure 1, reproduced below, to demonstrate this proposed configuration.



27

IPR2017-00970
Patent 7,478,191 B2

Petitioner's above drawing highlights in yellow a proposed path from host 112 (the leftmost such host computer) through switching means 140 to all peripherals coupled through peripheral interface 160 ("User A Peripherals") and a similar path highlighted in yellow from the same host computer through switching means 142 to all peripherals coupled through peripheral interface 162 ("User B Peripherals"). *Id.* ("all peripherals are connected to one host, as in the annotated Fig. 1 . . . in Illustration 2, reproduced here"). Petitioner's modifications to Adder's Figure 1 include "blanking" out the connection of right-most host computer 112 and over-writing its corresponding, right-most, host interface 122 with the words "HOST INTERFACE."  Presumably, Petitioner intends this modification to suggest a second host has been disconnected from switching device 100.  Petitioner then contends that Adder meets the first "wherein" clause "in part because the presence or absence of other hosts is irrelevant to the interoperability of the first host and the peripherals in the depicted configuration." *Id.*

Petitioner further argues Adder's switching device meets the requirements of the second "wherein" clause ("operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub") because "either set of peripherals may be connected to any of the host computers."  Pet. 51 (citing Ex. 1004[22]).  Petitioner provides a

---

[22] Petitioner's citation is to "*Id*-p15-last ¶."  The "*Id*" portion of this citation is apparently referring to the Adder reference (Ex. 1004).  The portion of the citation reading "p15-last ¶" uses a different form than the citation elsewhere throughout the Petition.  Consistent with Petitioner's other citations, we would presume this to be a reference to the last paragraph on page number

IPR2017-00970
Patent 7,478,191 B2

second modified version of Adder's Figure 1, reproduced below, to

demonstrate this proposed configuration.



_____

15 of Exhibit 1014, but that paragraph is not related to connectivity between hosts and peripherals.  It is also possible Petitioner intended to refer to the last paragraph on page number 15 as marked in the original Adder patent publication (page number 20 of Exhibit 1004).  Further adding to the confusion, although this portion of the Petition does not refer to Mr. Garney's Declaration, we observe an apparently related portion of that Declaration references Exhibit 1004 page 14, line 25 through page 15, line 4 in which Mr. Garney repeats the assertion that, in Adder, "either set of peripherals may be connected to any of the three host computers."  Ex. 1019 ¶ 127.

IPR2017-00970
Patent 7,478,191 B2

Petitioner's above drawing highlights in yellow a proposed path from host 112 (the left-most such host computer) through switching means 140 to all peripherals coupled through peripheral interface 160 ("User A Peripherals") and a similar path highlighted in orange from a second host computer 112 (the right-most such host computer) through switching means 142 to all peripherals coupled through peripheral interface 162 ("User B Peripherals"). *Id.* at 51.  Petitioner argues,

> In this setting of the switch control, the User B peripherals connect with or await a host computer if one is not present for them or if the host is removed to be re-attached.  The device is operable such that when the host for the User B peripherals is connected, the device provides connectivity between them and the host.  Remaining ones of the plurality of peripheral devices, the User A peripherals, are not provided connectivity to the second host device and have their connectivity maintained with the first host, again as in the illustration excerpt reproduced here.

*Id.* at 51–51.

Patent Owner argues Petitioner's position regarding the second "wherein" clause relies on its overly broad interpretation of "when."  Prelim. Resp. 39.  Patent Owner contends, when properly construed, the second "wherein" clause requires switching connectivity of some peripherals to the second host device "just at the moment the second host device is connected to the USB hub."  *Id.*  Instead, Patent Owner argues, "Adder discloses that switching controller 154 switches connectivity of USB switches 140 and 142 only in response to (1) keyboard hotkeys (Adder, 18:19–33; Adder, 19:6–8); (2) mechanical switches available to the user (Adder, 19:31–20:3; Adder, 22:33–23:3); or (3) mouse buttons (Adder, 22:4–8)."  *Id.* at 40.  Patent Owner further contends Adder fails to disclose the first "wherein" clause

30

IPR2017-00970
Patent 7,478,191 B2

because Adder never discloses any of its depicted host computers being disconnected from the switching device.  *Id.* at 40–41.

We are not persuaded by Petitioner's argument.  Regarding the first "wherein" clause, Petitioner does not identify any express or inherent teaching of Adder that all peripherals are connected with a first host *when* the first host is connected to the hub and the second host is not connected to the hub.  Instead, Petitioner constructs a modified, hypothetical version of Adder's Figure 1 in which a host computer of Adder's Figure 1 is disconnected.  Such speculation is not the standard for anticipation.  Anticipation requires each claim element must be found, either expressly or inherently, in the single prior art reference.  *Verdegaal*, 814 F.2d at 631.  Petitioner does not identify, nor do we discern, any express or inherent teaching in Adder of such a configuration in which a second host device is disconnected from the switching device.  In like manner, Petitioner does not identify, nor do we discern, an express or inherent teaching in Adder that any peripherals are connected to the second host *when* (just at the moment that) the second host is connected to the switching device.  Instead, as Patent Owner points out, Petitioner relies on its overly broad, implied, interpretation of "when" as equivalent to *while*, or *any time*, the second host is connected with the hub.

Furthermore, as discussed *supra*, the *automatic* switching of claim 1 is clearly defined as excluding manual intervention such as pressing a button to initiate the desired change of connectivity.  Ex. 1001, 5:12–15.  As noted by Patent Owner, Adder appears to disclose switching connectivity of peripheral devices only in response to such manual interventions (keyboard hotkeys, manual switches, and mouse buttons).  Prelim. Resp. 40.  Petitioner

31

IPR2017-00970
Patent 7,478,191 B2

does not identify any actions of Adder that "automatically" change the configuration.

Accordingly, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claim 1 is anticipated by Adder.  As noted *supra*, independent claims 7 and 17 include similar recitations and the Petitioner relies on the same arguments as those presented for claim 1.  Pet. 52.  Thus, for the same reasons as claim 1, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claims 7 and 17 are anticipated by Adder.

### 3. *Dependent Claims 4–6, 8–13, 19, and 21*

Dependent claims 4–6, 8–13, 19, and 21 each depend, directly or indirectly, from one of independent claims 1, 7, and 17.  Thus, for the same reasons as claims 1, 7, and 17, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claims 4–6, 8–13, 19, and 21 are anticipated by Adder.

### F. *Anticipation by Wurzburg*

The Petition asserts claims 1, 2, 4–10, 12, 14, and 17–21 are anticipated by Wurzburg.  Pet. 58–67.

### 1. *Wurzburg (Ex. 1005)*

Wurzburg is a publication for a patent application related to the '191 patent.  Mr. Wurzburg is the first named inventor on this patent as well as the '191 patent at issue here.  Both patent applications pursued similar protection for a USB switching hub to switch connectivity of USB peripheral devices between multiple USB host devices.  *See* Ex. 1005, 1 (Abstract); *see also* Ex. 1001, 1 (Abstract).  Several of the figures of Wurzburg are similar or identical to figures of the '191 patent.  For example,

32

IPR2017-00970
Patent 7,478,191 B2

Figures 1 and 2 of Wurzburg (Ex. 1005, 2–3) are identical to Figures 5 and 6 of the '191 patent (Ex. 1001, 5–6). Figures 3–6 or Wurzburg (Ex. 1005, 4–10) are very similar to Figures 7–11 of the '191 patent (Ex. 1001, 7–14).

Similar to the '191 patent, Wurzburg discloses that in some USB configurations, some USB devices may serve in two roles (a dual role device): serving as a slave device accessible to a USB host device and serving as a host device for communicating with other USB devices on the USB bus. Ex. 1005 ¶ 7. For example, a printer may be a dual role USB device serving as a slave USB device to print data received from a USB host (e.g., from a computer) and serving as a USB host device coupled with some other slave USB device (e.g., a camera) to print pictures retrieved from the other device. *Id.* Thus, such a dual role device may be coupled to the USB bus as a slave device responding to requests from a USB host and may, at other times, be reconfigured so as to reconnect to the USB bus as a USB host to access other USB devices.

Wurzburg suggests prior mechanical switches that allow a device to be selectively coupled to multiple USB host devices may not work for high-speed USB communications due to increased capacitance and impedance introduced by the switching devices. *Id.* Wurzburg, like the '191 patent, purports to resolve this problem by providing a switching hub device that electronically switches connectivity between multiple configurations of USB connectivity. *Id.* ¶ 8.

IPR2017-00970
Patent 7,478,191 B2

Figures 4a and 4b of Wurzburg are reproduced below, with our red highlighting added for emphasis, illustrating two exemplary USB connectivity configurations.[23]



FIG. 4a



FIG. 4b

---

[23] Petitioner reproduces Figures 4a and 4b as "Illustration 6" with yellow and orange highlighting for similar emphasis.  Pet. 23.

34

IPR2017-00970
Patent 7,478,191 B2

Figure 4a depicts USB switching hub 119 coupled with two host devices: computer system 101 and dual role device 207, each coupled via a corresponding upstream port 117a and 117b, respectively.  *Id.* ¶ 23–25.  Hub 119 is also coupled with peripheral devices 125a and 125b via corresponding downstream ports 121a and 121b, respectively.  *Id.*  All USB connections are routed between upstream and downstream ports by downstream routing controller 201.  *Id.*  In the first configuration of Figure 4a, downstream routing controller 201 couples upstream port 117a with downstream ports 121a and 121c and couples upstream port 117b with downstream ports 121b and 121d.  *Id.* ¶ 26.

Figure 4b depicts a second configuration in switch connectivity of downstream port 121a is switched from upstream ports 117a to upstream ports 117b thereby switching connectivity of peripheral device 125a from a first host (computer system 101) to a second host (dual role device 207).  *Id.* ¶ 28.

### 2.    *Independent Claims 1, 7, and 17*

Petitioner argues the structural elements of the system of independent claim 1 are taught by Wurzburg.  Pet. 58–59.[24]  Specifically, Petitioner identifies the claimed hub as Wurzburg's switching hub 119.  *Id.*  The

---

[24] As discussed above regarding Dickens and Adder, Petitioner provides scant analysis or explanation to identify the claimed structural elements in specific teachings of Wurzburg.  Instead, Petitioner merely refers to its "Illustration 6" in which Petitioner reproduced Wurzburg's Figures 4a and 4b and added yellow and orange highlighting to emphasize two different configurations for connectivity.  As above, we could deny this ground solely for lack of compliance with the requirements of our rules.  *See* 37 C.F.R. § 42.104(b)(4).  Nevertheless, we look to the substance of Petitioner's argument.

IPR2017-00970
Patent 7,478,191 B2

claimed first and second hosts are identified as computer 101 and dual role device 207 of Wurzburg and the recited peripheral devices are identified as peripheral devices 125a and 125b of Wurzburg. *Id.*

Regarding the first "wherein" clause of claim 1 (in which all peripheral devices are connected to the first host when the second host is not connected to the hub), Petitioner argues computer system 101 is connected with "a device 125a and the dual role device 207 acting as a peripheral device, when the first host device is connected to the USB hub and a second host device is not connected to the USB hub because the dual role device is not acting as a hub." Pet. 59 (citing Ex. 1005 ¶ 9). Petitioner further argues Wurzburg's switching hub meets the requirements of the second "wherein" clause ("operable to automatically provide connectivity between the second host device and one or more of the plurality of peripheral devices when the second host device is connected to the USB hub") when Wurzburg's dual mode device 207 is acting in the role of a host device and connectivity of peripheral device 125a is switched from its connection with computer system 101 to connectivity with dual mode device 207. *Id.* at 59–60. Petitioner contends in this configuration Wurzburg "maintains the connectivity of the first host to its other connection as in the same illustration" (referring to Petitioner's Illustration 6). *Id.* at 59–60. In other words, Petitioner refers to Wurzburg maintaining connectivity between computer system 101 and any device that may be connected with downstream port 121c as shown in downstream routing controller 201 in Wurzburg's Figures 4a and 4b.

Patent Owner responds that Petitioner's argument regarding the second "wherein" clause hinges on its assertion that the claims do not

IPR2017-00970
Patent 7,478,191 B2

require "switching"—i.e., on Petitioner's implied interpretation of "when" to mean *while* or *at any time* rather than "just at the moment that." Prelim. Resp. 45–46. Furthermore, Patent Owner argues Wurzburg fails to meet the requirement of the first "wherein" clause because Wurzburg never discloses a second host being disconnected from the hub. *Id.* at 47.

We agree with Patent Owner. Petitioner has not persuaded us that Wurzburg meets the requirements of the first and second "wherein" clauses of claim 1. Specifically, Petitioner has not shown connectivity as recited in the first "wherein" clause in which all peripherals are connected to the first host device when the second host is disconnected. We agree with Patent Owner that Wurzburg does not disclose any configuration in which the second host (dual role device 207) is disconnected from the hub (switching hub 119). In the first configuration of connectivity, depicted in Wurzburg's Figure 4a, reproduced above, peripheral device 125b is coupled with dual mode device 207. Thus, this configuration does not meet the requirement of the first "wherein" clause of claim 1 in which all peripheral devices are connected with the first host device (e.g., computer system 101 of Wurzburg). Regarding the second "wherein" clause of claim 1, the Petition fails to persuade us that the connectivity is changed "automatically" (i.e., without human intervention) "when" the second host (dual mode device 207) is connected to the hub—i.e., just at the time of such connection. To the contrary, we note Wurzburg discloses switching between connectivity configurations in response to a signal applied by an external device (Ex. 1005 ¶ 27), in response to a user pressing a button on the dual mode device (*id.* ¶ 28), in response to sensing an idle period on the present connectivity configuration (*id.* ¶ 29), or in response to "other signals and/or logic" (*id.*

37

IPR2017-00970
Patent 7,478,191 B2

¶ 29).  Petitioner has not shown, nor do we discern, any express or inherent teaching in Wurzburg that the connectivity configuration of hub 119 is changed just at the moment that the second host (dual mode device 207) is connected to hub 119.

Accordingly, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claim 1 is anticipated by Wurzburg.  As noted *supra*, independent claims 7 and 17 include similar recitations and the Petitioner relies on the same arguments as those presented for claim 1. Pet. 60.  Thus, for the same reasons as claim 1, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claims 7 and 17 are anticipated by Wurzburg.

    *3.      Dependent Claims 2, 4–6, 8–10, 12–14, and 18–21*

Dependent claims 2, 4–6, 8–10, 12–14, and 18–21 each depend, directly or indirectly, from one of independent claims 1, 7, and 17.  Thus, for the same reasons as claims 1, 7, and 17, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing claims 2, 4–6, 8–10, 12–14, and 18–21 are anticipated by Wurzburg.

    *4.      Conclusion Regarding Anticipation by Wurzburg*

For the above reasons, we deny Petitioner's ground asserting anticipation of claims 1, 2, 4–10, 12–14, and 17–21 by Wurzburg.

    *G.      Obviousness Grounds*

Petitioner proposes six additional grounds of unpatentability under 35 U.S.C. § 103(a) asserting some or all claims are obvious over various combinations.

IPR2017-00970
Patent 7,478,191 B2

    *1.    Dickens or Adder or Wurzburg and Other Art*

    Petitioner proposes three grounds based on Dickens or Adder or Wurzburg (hereinafter "D/A/W") in combination with other references.  Pet. 67–71.  Specifically, Petitioner argues claim 3 would have been obvious over the combination of D/A/W and Silverbrook or Torii.  Pet. 67–69.  Claim 3 depends from claim 1 and further recites the "the USB hub is included in a display device."  Petitioner's argument identifying the features of claim 3 in Silverbrook simply state "Silverbrook has the limitation of claim 3" and "the known method of putting the hub in a display device as disclosed by Silverbrook and Torii."  Pet. 67–68.  The Petitioner provides no further detail regarding which portion/portions of Silverbrook or Torii teaches the limitation of claim 3—i.e., there are no citations or quotations from the references provided in Petitioner's analysis.  To the extent Petitioner relies on Mr. Garney's Declaration to fill this void in its analysis, such reliance is improper incorporation by reference.  The Petition *per se* must identify where the features are found in the prior art references.  37 C.F.R. § 42.104(b)(4).  Regardless, the Petition does not indicate that the proposed combination of D/A/W/ with either Silverbrook or Torii cures the above identified deficiencies of D/A/W regarding, at least, the second "wherein" clause of Dickens, Adder, or Wurzburg.

    Petitioner further proposes a ground of unpatentability for claims 13–16 based on the combination of D/A/W with any one of USB 2.0, OTG, Holmdahl, and Kim.  Pet. 69–71.  As above, the Petition, *per se*, fails to identify specifically where each element of claims 13–16 is found in any of the combined references and, instead, improperly incorporates by reference Mr. Garney's Declaration to provide these details.  Pet. 69 (citing Ex. 1019

39

IPR2017-00970
Patent 7,478,191 B2

¶¶ 213–293).  Furthermore, as above, Petitioner does not rely on these secondary references to cure the above identified deficiencies of D/A/W regarding, at least, the second "wherein" clause.

Petitioner further argues all claims (1–21) would have been obvious over D/A/W in combination with any other art of record contending,

> To any extent the ['191] patent owner disagrees in any detail as to any of the independent and dependent claims, the disagreement will surely be as to routine or otherwise known ("known") USB system structures and functionalities ("technology"), and then APA, USB 2.0, OTG, and all the other cited art overcome the disagreement and teach and/or make obvious the owner-referenced technology.  USB 2.0 and OTG are especially thorough in explaining known USB system technology in all details of the ['191] patent claims.

Pet. 74.  As above, this asserted ground fails to identify specifically what may be lacking in the D/A/W references and where those missing features are found in the secondary references.

Accordingly, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing any of claims 1–21 would have been obvious over D/A/W in combination with any one of Silverbrook, Torii, USB 2.0, OTG, Holmdahl, Kim or any other art of record.

2.    *Adder, Hannah, and (Dickens, Wurzburg, Choi, or Oguma)*

Petitioner asserts all claims (1–21) would have been obvious over the combination of Adder, Hannah, and any one or more of Dickens, Wurzburg, Choi, and Oguma.  Pet. 71–72.  As above, this ground of the Petition fails to specify what features of each claim are missing in Adder that are cured by some teaching of the other references or what features are lacking in Adder and Hannah that are cured by any of the other secondary references.  37 C.F.R. § 42.104(b)(4).

40

IPR2017-00970
Patent 7,478,191 B2

Accordingly, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing any of claim 1–21 would have been obvious over Adder and Hannah in combination with Dickens, Wurzburg, Choi, or Oguma.

### 3. Choi, Oguma, Hannah and D/A/W

Petitioner argues all claims (1–21) would have been obvious over the combination of Choi, Oguma, Hannah, and any one or more of D/A/W. Pet. 73–74. Petitioner asserts, "Prosecution mistakes were made; the claims were allowed. The ['191 patent] prosecution mistakes should be corrected, and the claims canceled." Pet. 73. Specifically, Petitioner argues, in prosecution of the '191 patent, the Examiner found Choi disclosed all features of (then pending) claim 1 except did not disclose automatically reconfiguring connectivity in response to the second host being attached and, thus, the Examiner found Oguma's disclosure of automatic connection of peripherals when a host device is attached to a hub, in combination with Choi, taught the recited automatic reconfiguration. Pet. 73, 25 (citing Ex. 1015, 17). Petitioner further argues Patent Owner overcame that rejection, and obtained allowance of all claims (renumbered as the present claims 1–21), by adding the final "wherein" clause reciting "wherein the USB hub is configured to maintain connectivity between the first host device and remaining ones of the plurality of peripheral devices that were not provided connectivity to the second host device." Pet. 73, 25. The Petitioner contends any of D/A/W provides this missing feature. Pet. 73–74.

Patent Owner responds this ground "is essentially a repackaging of the art and argument the Examiner considered during prosecution" and, therefore, we should exercise our discretion under 35 U.S.C. § 325(d) to

41

IPR2017-00970
Patent 7,478,191 B2

deny this ground on the basis that it is substantially similar to arguments previously presented the Patent Office.  Prelim. Resp. 54.  Patent Owner further argues the Petition omits other aspects of the prosecution history in which Patent Owner argued Oguma fails to disclose the recited automatic reconfiguration feature.  *Id.* at 55 (citing Ex. 1015, 10–11).  Lastly, Patent Owner argues, "Petitioner fails to provide any explanation as to *how* the particular teachings of Choi, Oguma, and Hannah would be combined with the teachings of Dickens, Adder, or Wurzburg '293 to arrive at challenged Claims 1–21."  *Id.* at 55.

Once again, the Petitioner fails to identify, persuasively and specifically, where each element of each claim is found in the proposed combination of references.  *See* 37 C.F.R. § 42.104(b)(4).

Accordingly, we are not persuaded the Petition has demonstrated a reasonable likelihood of prevailing in showing any of claims 1–21 would have been obvious over Choi, Oguma, Hannah and any one of Dickens, Adder, or Wurzburg.

## III.   CONCLUSION

For the foregoing reasons, the information presented in the Petition and accompanying evidence does not establish a reasonable likelihood that Petitioner would prevail in showing the unpatentability of any challenged claim of the '191 patent.

## IV.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Petition is *denied* and no *inter partes* review is instituted.

42

IPR2017-00970
Patent 7,478,191 B2

PETITIONER:

Charles W. Shifley
Binal J. Patel
Robert H. Resis
Jason S. Shull
Timothy J. Rechtien
Mark A. Dalla Valle
Zachary Getzelman
BANNER & WITCOFF, LTD.
cshifley@bannerwitcoff.com
bpatel@bannerwitcoff.com
rresis@bannerwitcoff.com
jshull@bannerwitcoff.com
trechtien@bannerwitcoff.com
mdallavalle@bannerwitcoff.com
zgetzelman@bannerwitcoff.com


PATENT OWNER:

Bruce W. Slayden II
Brian C. Banner
R. William Beard, Jr.
Truman H. Fenton
Jerry F. Suva
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
bbanner@sgbfirm.com
wbeard@sgbfirm.com
tfenton@sgbfirm.com
jsuva@sgbfirm.com



US007523243B2

(12) **United States Patent**  
    Bohm et al.

(10) **Patent No.:** **US 7,523,243 B2**  
(45) **Date of Patent:** **Apr. 21, 2009**

(54) **MULTI-HOST USB DEVICE CONTROLLER**

(75) Inventors: **Mark R. Bohm**, Village of Bear Creek, TX (US); **Atish Ghosh**, Austin, TX (US)

(73) Assignee: **Standard Microsystems Corporation**, Hauppauge, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/425,613**

(22) Filed: **Jun. 21, 2006**

(65) **Prior Publication Data**

US 2007/0245057 A1      Oct. 18, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/792,178, filed on Apr. 14, 2006.

(51) **Int. Cl.**  
    *G06F 13/00*    (2006.01)  
    *G06F 13/14*    (2006.01)  
    *G06F 13/36*    (2006.01)

(52) **U.S. Cl.** ...................... **710/305**; 710/104; 710/110; 710/309

(58) **Field of Classification Search** ................. 710/305, 710/104, 110, 309  
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,784,581 | A | 7/1998 | Hannah |
| 5,815,167 | A | 9/1998 | Muthal et al. |
| 5,890,015 | A | 3/1999 | Garney et al. |
| 5,953,511 | A | 9/1999 | Sescila, III et al. |
| 5,978,389 | A | 11/1999 | Chen |
| 6,119,196 | A | 9/2000 | Muller et al. |
| 6,141,719 | A | 10/2000 | Rafferty et al. |
| 6,145,045 | A | 11/2000 | Falik et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2298783 | 9/2000 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

"USB2.0 Compatible 4-Port Switching Hub with Two Upstream Host Ports"; SMSC Datasheet; Nov. 8, 2005; 26 pages; Standard Microsystems Corp., Hauppauge, NY.

(Continued)

*Primary Examiner*—Mark Rinehart  
*Assistant Examiner*—Jeremy S Cerullo  
(74) *Attorney, Agent, or Firm*—Meyertons Hood Kivlin Kowert & Goetzel, P.C.; Jeffrey C. Hood

(57) **ABSTRACT**

A shared USB device may be simultaneously configured and accessed by two or more USB hosts by using a multi-host capable device controller. The multi-host capable device may include separate upstream ports and buffers for each host, and may be configured with the capability to respond to USB requests from more than one host. The multi-host capable device may maintain a dedicated address, configuration, and response information for each host. Each host may therefore establish a dedicated USB connection with the sharing device without the sharing device having to be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device.

**25 Claims, 2 Drawing Sheets**



US 7,523,243 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,185,641 B1 | 2/2001 | Dunnihoo | |
| 6,205,501 B1 | 3/2001 | Brief et al. | |
| 6,279,060 B1 | 8/2001 | Luke et al. | |
| 6,304,995 B1 | 10/2001 | Smith et al. | |
| 6,308,239 B1 | 10/2001 | Osakada et al. | |
| 6,324,605 B1 | 11/2001 | Rafferty et al. | |
| 6,435,904 B1 | 8/2002 | Herbst et al. | |
| 6,480,927 B1 | 11/2002 | Bauman | |
| 6,505,267 B2 | 1/2003 | Luke et al. | |
| 6,516,205 B1 | 2/2003 | Oguma | |
| 6,532,512 B1 | 3/2003 | Torii et al. | |
| 6,546,450 B1 | 4/2003 | Liu | |
| 6,564,275 B1 | 5/2003 | Chen | |
| 6,600,739 B1 | 7/2003 | Evans et al. | |
| 6,601,146 B2 | 7/2003 | Auslander et al. | |
| 6,618,776 B1 | 9/2003 | Zimmermann et al. | |
| 6,622,195 B2 * | 9/2003 | Osakada et al. | 710/316 |
| 6,671,765 B1 | 12/2003 | Karlsson et al. | |
| 6,678,760 B2 | 1/2004 | Brief | |
| 6,725,362 B2 | 4/2004 | Benayoun et al. | |
| 6,732,218 B2 | 5/2004 | Overtoom et al. | |
| 6,775,733 B2 | 8/2004 | Chang et al. | |
| 6,816,929 B2 | 11/2004 | Ueda | |
| 6,850,998 B2 * | 2/2005 | Inoue et al. | 710/38 |
| 6,901,471 B2 | 5/2005 | Govindaraman | |
| 6,959,355 B2 | 10/2005 | Szabelski | |
| 6,973,078 B2 | 12/2005 | Ma | |
| 6,993,620 B2 | 1/2006 | Ferguson | |
| 7,024,501 B1 | 4/2006 | Wright | |
| 7,028,114 B1 | 4/2006 | Milan et al. | |
| 7,028,133 B1 | 4/2006 | Jackson | |
| 7,185,126 B2 | 2/2007 | Szabelski | |
| 7,246,189 B2 * | 7/2007 | Ulenas | 710/305 |
| 2004/0153597 A1 | 8/2004 | Kanai et al. | |
| 2005/0005045 A1 * | 1/2005 | Kim et al. | 710/74 |
| 2005/0060490 A1 * | 3/2005 | Lu | 711/115 |
| 2005/0060636 A1 | 3/2005 | Mathe | |
| 2005/0216620 A1 | 9/2005 | Sandulescu et al. | |
| 2006/0020737 A1 | 1/2006 | Szabelski | |
| 2006/0056401 A1 | 3/2006 | Bohm et al. | |
| 2006/0059293 A1 | 3/2006 | Wurzburg et al. | |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 982 663 A2 | 3/2000 |
| GB | 2352540 | 1/2001 |
| JP | 2000-242377 | 9/2000 |
| JP | 2001-043178 | 2/2001 |
| JP | 2001229119 | 8/2001 |
| JP | 2003-195991 | 7/2003 |
| JP | 2003195991 | 7/2003 |
| KR | 10-2004-0008365 A | 1/2004 |
| KR | 10-0490068 B1 | 5/2005 |
| WO | 2006031776 | 3/2006 |

## OTHER PUBLICATIONS

"Programming Multi-Host Device Sharing USB Hub"; Research Disclosure, IBM Corp.; Feb. 1, 1999; Mason Publications; Hampshire, GB.

"On-The-Go Supplement to the USB 2.0 Specification—Revision 1.0"; Dec. 18, 2001.

Cypress Semiconductor Corporation, "TetraHubTM High-speed Hub Controller," Publication No. CY7C6540, Dec. 5, 2002, 25 pages.

"USB Hub in a Nutshell"; Beyond Logic; Jun. 15, 2005 (Copyright 2001-2005); 5 pages; Chapter 1.

Fred Zlotnick; "NLAS4717 Analog Switch Permits USB 1.1 Switching"; ON Semiconductor; May 2004; 4 pages.

"FSUSB11 Low Power High Bandwidth USB Switch Dual SPDT Multiplexer/Demultiplexer"; Fairchild Semiconductor; Apr. 2004 (revised Jul. 2004); 7 pages.

"FSUSB11 Low Power Full Speed USB (12 Mbps) Switch"; Fairchild Semiconductor; Apr. 2004 (revised Jul. 2005); 9 pages.

"USB 1.1 Switch Offers Low Power and Bandwith"; Electronic Design; Jul./Aug. 2004; 3 pages.

"Universal Serial Bus Specification Revision 2.0", Compaq Computer Corporation, Hewlett-Packard Company, Intel Corporation, Lucent Technologies Inc., Microsoft Corporation, NEC Corporation, Koninklijke Philips Electronics N.V., Apr. 27, 2000, 650 pages.

USB2524 USB MultiSwitch Hub, http://www.smsc.com/main/catalog/usb2524.html, accessed Nov. 26, 2007 (4 pages).

"SMSC Introduces Industry's First USB Sharing Hub," networking news, http://home.nestor.minsk.by/networks/news/2006/04/1706.html, accessed Nov. 26, 2007 (2 pages).

Miller, Matthew, "USB hub chip accepts hospitality of two hosts" http://www.edn.com/index.asp?         layout=article &articleid=CA6325520&industryid=2573, Apr. 17, 2006, accessed Nov. 26, 2007 (5 pages).

"USB hub"; from WIKIPEDIA, the free encyclopedia (http://en.wikipedia.org?wiki/USB_hub); 2 pages.

Computer-generated translation of JP2001229119A Publication, "Device Selection Hubbox By Plural Computers", published Aug. 24, 2001, 21 pages.

Human-generated translation of JP2001229119A Publication, "Device Selection Hubbox By Plural Computers", by Hitachi Ltd., published Aug. 24, 2001, 2 pages.

Korean Office Action for Application 10-2007-7005961, entitled "Universal Serial Bus Switching Hub," dated Apr. 18, 2008, 5 pages.

Human translation of previously cited reference JP 2001229119A Publication, "Device Selection Hubbox By Plural Computers" obtained on Jun. 23, 2008, (12 pages).

Australian Patent Office Written Opinion for application No. SG 200702711-3, mailed May 21, 2008.

Belkin, "4x4 USB Peripheral Switch Review", Feb. 25, 2004, retrieved from Internet: http://www.everythingusb.com/hardware/index/Belkin_4x4_USB_Peripheral_Switch.htm, 4 pages.

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 3*

US 7,523,243 B2

**1**

**MULTI-HOST USB DEVICE CONTROLLER**

PRIORITY CLAIM

This application claims benefit of priority of provisional application Ser. No. 60/792,178 titled "Multi-Host USB Device Controller", filed on Apr. 14, 2006, whose inventors are Mark. R Bohm and Atish Ghosh, and which is hereby incorporated by reference as though fully and completely set forth herein.

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to computer hardware and, more specifically, to Universal Serial Bus (USB) controllers.

2. Description of the Related Art

The Universal Serial Bus (USB) allows coupling of peripheral devices to a computer system. USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices. The bus allows peripherals to be attached, configured, used, and detached while the host is in operation. For example, USB printers, scanners, digital cameras, storage devices, card readers, etc. may communicate with a host computer system over USB. USB based systems may require that a USB host controller be present in the host system, and that the operating system (OS) of the host system support USB and USB Mass Storage Class Devices.

USB devices may communicate over the USB bus at low-speed (LS), full-speed (FS), or high-speed (HS). A connection between the USB device and the host may be established via digital interconnect such as Interchip USB, ULPI, UTMI, etc., or via a four wire interface that includes a power line, a ground line, and a pair of data lines D+ and D−. When a USB device connects to the host, the USB device may first pull a D+ line high—or the D− line if the device is a low speed device—using a pull up resistor on the D+ line. The host may respond by resetting the USB device. If the USB device is a high-speed USB device, the USB device may "chirp" by driving the D− line high during the reset. The host may respond to the "chirp" by alternately driving the D+ and D− lines high. The USB device may then electronically remove the pull up resistor and continue communicating at high speed. When disconnecting, full-speed devices may remove the pull up resistor from the D+ line (i.e., "tri-state" the line), while high-speed USB devices may tri-state both the D+ and D− lines.

A USB hub may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller. In addition, other USB hubs may be coupled to the USB hub to provide additional USB device connections to the USB host controller. In general, the USB specification is structured so that every device is configured and accessed by a single host controller. Consumers typically desire maximum flexibility, and may want to have a simple means by which to cheaply share devices. There are several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time. There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch. The USB device is typically accessed by one single host at a time, and

**2**

when access to the USB device is switched, the device must be re-configured, thereby losing internal state information.

Other corresponding issues related to the prior art will become apparent to one skilled in the art after comparing such prior art with the present invention as described herein.

SUMMARY OF THE INVENTION

In one set of embodiments, a single USB device may be shared across multiple USB hosts without needing to be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device. Since each host has simultaneously enumerated the device, there may be no need to detach and reconfigure the device on the fly. Multiple USB hosts may simultaneously share a single device/function, for example a Gigabit Ethernet controller. While in most present day implementations each host that is configured to have Ethernet access is implemented with its own Ethernet controller and Ethernet switch, in various embodiments of the present invention the Ethernet switch may be replaced by a less expensive and more compact multi-host USB controller, allowing each host to access the USB device directly. In another set of embodiments, storage media devices may be configured with a multi-host USB controller to provide a USB based Network Attached Storage (NAS) device that can handle storage requests from multiple USB hosts.

In various embodiments, by using a multi-host capable device controller, a shared USB device may be simultaneously configured and accessed by two or more USB hosts. The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host. The device may maintain a dedicated address, configuration and response information for each host. Each host may therefore establish a dedicated USB connection with the sharing device.

A USB device may be divided into three segments or blocks. The first block may comprise a USB interface that includes the physical (PHY) or digital link, USB Link layer (SIE), and other circuitry necessary to send and/or receive data over the USB. The second block may comprise an Endpoint Buffer Block, which may include the endpoint buffers that are used by the first and third blocks to buffer data and control reads and writes to/from the USB—transferred through the first block—and/or the Peripheral Function—transferred through the third block. The third block may comprise the "Peripheral Function" itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc.

In one set of embodiments, the first block may be replicated for each upstream host port, and some, or all, of the second block may be replicated for each upstream host port as well. In each case, the extent to which blocks and/or portions of the blocks are replicated may vary based on USB device type. The third block may correspond to the USB device that will be shared by multiple USB hosts, and may therefore not need to be duplicated. A fourth block may be added—typically between the first and second blocks, or as part of either the second or third blocks—configured as an arbitration block. The internal arbitration mechanism may enable each host to access the shared Peripheral Function by either interleaving host accesses, or by using a common request/grant structure, which may hold-off one host while another host completes a data transfer to/from the shared device. The selection of the specific mechanism used may be determined according to the specific USB device type that is being shared.

US 7,523,243 B2

3

In some embodiments, the bandwidth from the shared peripheral function to each host may be reduced in order to allow each host equal access. In other embodiments, the bandwidth may not be reduced because the bandwidth of the Peripheral Function may exceed the bandwidth of the host. Other aspects of the present invention will become apparent with reference to the drawings and detailed description of the drawings that follow.

BRIEF DESCRIPTION OF THE DRAWINGS

A better understanding of the present invention may be obtained when the following detailed description is considered in conjunction with the following drawings, in which:

FIG. 1 shows a system diagram of a multi-host capable USB device coupled to multiple hosts according to one embodiment;

FIG. 2 shows multi-host capable devices coupling to multiple hosts according to one embodiment; and

FIG. 3 shows a logic diagram of a USB multi-host device according to one embodiment.

While the invention is susceptible to various modifications and alternative forms, specific embodiments thereof are shown by way of example in the drawings and will herein be described in detail. It should be understood, however, that the drawings and detailed description thereto are not intended to limit the invention to the particular form disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present invention as defined by the appended claims. Note, the headings are for organizational purposes only and are not meant to be used to limit or interpret the description or claims. Furthermore, note that the word "may" is used throughout this application in a permissive sense (e.g., having the potential to or being able to in some embodiments), not a mandatory sense (i.e., must). The term "include", and derivations thereof, mean "including, but not limited to". The term "coupled" means "directly or indirectly connected".

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In one set of embodiments, a multi-host USB device may provide maximum flexibility and a simple means by which to cheaply share devices with multiple hosts, by providing a separate configuration and access interface for each upstream host. FIG. 1 illustrates a block diagram of a multi-host device 106 configured with a USB multi-host device controller 108, with multi-host device 106 coupled to first host 102 and second host 104, which may both establish control with multi-host device 106. As shown in FIG. 2, by way of examples, multi-host device 106—configured with USB multi-host device controller 108—may be a personal digital assistant (PDA) 130, a keyboard 126, and/or a printer 124 shared by personal computer (PC) 122 and PC 123. Many other devices may be similarly configured as multi-host devices that include a multi-host device controller 108, and the number and type of such devices is not limited to those show in FIG. 2.

In one embodiment of multi-host (or USB sharing) device 106, shown in FIG. 3, an upstream port or PHY is configured for each host to be connected. In this case upstream port 302 is configured to interface/couple to the first host (for example first host 102 shown in FIG. 1), and upstream port 304 is configured to interface/couple to the second host (for example second host 104 shown in FIG. 1). Multi-host device 106 may be addressed separately by each host, and may respond to

4

each host within USB specified limits. Multi-host device controller 108 may internally determine which host request to fully service immediately, and may either send not-ready packets in a USB specific manner to the other host, or may interleave the host requests. Peripheral Device/Function 312—which may comprise the main consumer component, such as a Ethernet Controller, Mass-Storage drive, etc.—may not be aware of the multi-host capability of the USB component, and may be a standard off-the-shelf item.

Multi-host device 106 may also be configured with Endpoint and status buffers 306 and 308, coupling USB multi-host device controller 108 to PHY 302 and PHY 304, respectively. Endpoint buffers 306 and 308 may be used by upstream ports 302 and 304, and USB multi-host device controller 108 to buffer data and control reads and writes to/from each respective host corresponding to PHY 302 and PHY 304, and/or peripheral device/function 312 coupled to USB multi-host device controller 108.

In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312. The selection of the specific mechanism used may be configured according to the specific USB device type that is being shared. In one set of embodiments, the bandwidth from shared peripheral device/function 312 to each host may be reduced in order to allow each host equal access. In other embodiments, the bandwidth may not be reduced if the bandwidth of the peripheral function exceeds the bandwidth of the host.

It should be noted that while FIG. 3 shows 2 upstream ports coupling to two hosts, alternate embodiments may be configured with more than two upstream ports, (and correspondingly with possibly more than two endpoint and status buffers), and while those embodiments are not shown, they are possible and are contemplated. For example, a multi-host device (e.g. a keyboard) may be configured with a multi-host device controller to couple to three or four hosts, and so forth.

Although the embodiments above have been described in considerable detail, other versions are possible. Numerous variations and modifications will become apparent to those skilled in the art once the above disclosure is fully appreciated. It is intended that the following claims be interpreted to embrace all such variations and modifications. Note the section headings used herein are for organizational purposes only and are not meant to limit the description provided herein or the claims attached hereto.

We claim:

1. A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding first and second hosts;

a USB device/function block; and

a multi-host device controller coupling the USB device/function block to the first and second upstream ports, wherein the multi-host device controller is configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously request access to the USB device; and

alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block

US 7,523,243 B2

5

each time a different one of the first and second hosts is given access to the USB device block to use the at least one function.

**2**. The USB multi-host device of claim **1**, further comprising a first endpoint buffer coupled between the first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

**3**. A USB multi-host device comprising:

a USB device block corresponding to at least one function; and

a multi-host device controller coupling the USB device block to a first and second host, wherein the multi-host device controller is configured to establish a first dedicated USB connection between the first host and the USB device block and a second dedicated USB connection between the second host and the USB device block, wherein the first dedicated USB connection and the second dedicated USB connection are concurrent, to allow the first host and the second host to:

simultaneously request access to the USB device; and alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block each time a different one of the first host and the second host is given access to the USB device block.

**4**. The USB multi-host device of claim **3**, wherein the USB device block is not re-enumerated each time the first host and the second host alternate accessing the USB device block to access the at least one function.

**5**. The USB multi-host device of claim **3**, further comprising a first upstream port coupled between the first host and the multi-host device controller, and a second upstream port coupled between the second host and the multi-host device controller.

**6**. The USB multi-host device of claim **5**, further comprising a first endpoint buffer coupled between first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

**7**. A device comprising:

a USB device block corresponding to at least one function; and

a multi-host device controller configured to couple the USB device block to a plurality of hosts, wherein the multi-host device controller is operable to establish concurrent respective dedicated USB connections between the USB device block and the plurality of hosts, to allow the plurality of hosts to:

simultaneously request access to the USB device and alternately access the USB device block to use the at least one function without any of the plurality of hosts reconfiguring the USB device each time a different one of the plurality of hosts is given access to the USB device block.

**8**. The device of claim **7**, wherein the multi-host device controller is operable to receive respective host requests from the plurality of hosts, wherein the multi-host device controller is operable to internally determine which of the respective host requests to service immediately.

**9**. The device of claim **8**, wherein the multi-host device controller is operable to interleave the respective host requests.

**10**. The device of claim **8**, wherein the multi-host device controller is operable to send not-ready packets in a USB specific manner to hosts whose request was not immediately serviced.

6

**11**. The device of claim **7**, wherein the multi-host device controller comprises an internal arbitration mechanism configured to permit the plurality of hosts to simultaneously request access to the USB device block by interleaving host access requests and/or by using a common request/grant structure;

wherein the common request/grant structure comprises one of the plurality of hosts being granted access to the USB device block while remaining ones of the plurality of hosts are not considered for access to the USB device block until the one of the plurality of hosts has completed accessing the USB device block.

**12**. The device of claim **11**, wherein the arbitration mechanism is configured according to a specific USB device type comprised in the USB device block.

**13**. The device of claim **7**, wherein a bandwidth from the USB device block to each respective one of the plurality of hosts is reduced to allow each respective one of the plurality of hosts equal access to the USB device block.

**14**. The device of claim **13**, wherein the bandwidth is not reduced if it exceeds a bandwidth of the respective one of the plurality of hosts.

**15**. The device of claim **7**, further comprising a respective upstream port coupled between the multi-host device controller and each of the plurality of hosts.

**16**. The device of claim **15**, further comprising a respective buffer coupled between each respective upstream port and the multi-host device controller.

**17**. The device of claim **7**, wherein the multi-host device controller is configured to maintain respective dedicated address, configuration, and response information for each of the plurality of hosts.

**18**. A method for sharing a device between multiple hosts, the method comprising:

establishing concurrent respective dedicated USB connections between a shared USB device and a plurality of hosts, wherein the USB device corresponds to at least one function;

receiving respective access requests to the shared USB device from two or more of the plurality of hosts; and

processing the respective access requests, to allow the two or more of the plurality of hosts to alternately access the shared USB device to use the at least one function without any of the two or more of the plurality of hosts reconfiguring the USB device each time the USB device is accessed in response to a respective access request from a different one of the two or more of the plurality of hosts.

**19**. The method of claim **18**, wherein said processing comprises determining which of the respective access requests to service immediately, and servicing that respective access request.

**20**. The method of claim **19**, wherein said processing comprises holding off access to the shared USB device by those respective access requests that are not immediately serviced, until the shared USB device is no longer accessed by a given one of the two or more of the plurality of hosts from which the serviced respective access request was received.

**21**. The method of claim **18**, wherein said processing comprises interleaving accesses requested by the respective access requests to the shared USB device/function.

**22**. The method of claim **18**, further comprising maintaining respective dedicated address, configuration, and response information for each of the plurality of hosts.

**23**. A USB multi-host device comprising:

a shared USB device block operable to be simultaneously configured by two or more USB hosts; and

US 7,523,243 B2

7

a controller configured to establish concurrent respective dedicated USB connections between the shared USB device block and the two or more USB hosts;

wherein the controller is operable to receive and respond to simultaneous respective USB access requests sent by the two or more USB hosts for accessing a function of the shared USB device block.

**24**. The USB multi-host device of claim **23**, wherein in establishing the concurrent respective dedicated USB connections between the shared USB device block and the two or more USB hosts, the controller is operable to maintain respective dedicated address, configuration and response information for each of the two or more USB hosts.

8

**25**. The USB multi-host device of claim **23**, wherein the controller comprises:

a respective USB interface circuit for each of the two or more USB hosts, wherein each respective USB interface circuit enables the USB multi-host device to transmit and/or receive data over a USB bus; and

a respective endpoint buffer for each of the two or more USB hosts for storing respective dedicated address, configuration and response information for each of the two or more USB hosts.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,523,243 B2                                   Page 1 of  1
APPLICATION NO.  : 11/425613
DATED               : April 21, 2009
INVENTOR(S)       : Bohm et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

**In the Claims:**

Column 4
Line 56, please delete "a USB device/function block; and" and substitute -- a USB device block corresponding to at least one function --.

Column 4
Line 57, please delete "coupling the USB device/function block" and substitute -- coupling the USB device block --.

Signed and Sealed this

Fifth Day of October, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/425,613 | 06/21/2006 | Mark R. Bohm | 5707-12701 | 9526 |

7590          10/02/2007
Jeffrey C. Hood
Meyertons Hood Kivlin Kowert & Goetzel PC
P.O. Box 398
Austin, TX 78767-0398

| EXAMINER |
|---|
| CERULLO, JEREMY S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2111 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/02/2007 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| ***Office Action Summary*** | Application No. | Applicant(s) |
| | 11/425,613 | BOHM ET AL. |
| | Examiner | Art Unit | |
| | Jeremy S. Cerullo | 2111 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>21 June 2006</u>.

2a)☐ This action is **FINAL**.   2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-22</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-22</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>21 June 2006</u> is/are: a)☐ accepted or b)☒ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____.

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
Paper No(s)/Mail Date <u>20060921 and 20070709</u>.

4)☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____.

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

U.S. Patent and Trademark Office
PTOL-326 (Rev. 08-06)          Office Action Summary          Part of Paper No./Mail Date 20070928

Application/Control Number: 11/425,613                                   Page 2
Art Unit: 2111

## DETAILED ACTION

1.      Claims 1-22 are pending in the following action.

### *Drawings*

2.      The drawings are objected to under 37 CFR 1.83(a).  The drawings must show every feature of the invention specified in the claims.  Therefore, the functional features of the device, including how the device/function block is not reconfigured, must be shown or the feature(s) canceled from the claim(s).  No new matter should be entered.

Corrected drawing sheets in compliance with 37 CFR 1.121(d) are required in reply to the Office action to avoid abandonment of the application. Any amended replacement drawing sheet should include all of the figures appearing on the immediate prior version of the sheet, even if only one figure is being amended. The figure or figure number of an amended drawing should not be labeled as "amended." If a drawing figure is to be canceled, the appropriate figure must be removed from the replacement sheet, and where necessary, the remaining figures must be renumbered and appropriate changes made to the brief description of the several views of the drawings for consistency. Additional replacement sheets may be necessary to show the renumbering of the remaining figures. Each drawing sheet submitted after the filing date of an application must be labeled in the top margin as either "Replacement Sheet" or "New Sheet" pursuant to 37 CFR 1.121(d). If the changes are not accepted by the examiner,

Application/Control Number: 11/425,613                                        Page 3
Art Unit: 2111

the applicant will be notified and informed of any required corrective action in the next

Office action. The objection to the drawings will not be held in abeyance.


### *Claim Rejections - 35 USC § 112*


3.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of
> making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the
> art to which it pertains, or with which it is most nearly connected, to make and use the same and shall
> set forth the best mode contemplated by the inventor of carrying out his invention.


4.      Claims 1-22 are rejected under 35 U.S.C. 112, first paragraph, as failing to

comply with the enablement requirement.  The claim(s) contains subject matter which

was not described in the specification in such a way as to enable one skilled in the art to

which it pertains, or with which it is most nearly connected, to make and/or use the

invention.

5.      As for Claims 1, 3, 7, and 18, there is no support in the specification for the

limitation that USB device/function block is not reconfigured after the hosts alternate

accessing the block.  Without a description of the functionality either in the specification

or in the figures, one of ordinary skill would not be able to make/use the invention.

6.      As for Claim 4, there is no support in the specification for the limitation that USB

device/function block is not re-enumerated after the hosts alternate accessing the block.

Without a description of the functionality either in the specification or in the figures, one

of ordinary skill would not be able to make/use the invention.

Application/Control Number: 11/425,613                                    Page 4
Art Unit: 2111

7.      Claims 2, 4-5, 8-17, and 19-22 inherit the non-enabled subject matter from their

parent claims.

8.      The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly
> claiming the subject matter which the applicant regards as his invention.

9.      Claim 6 is rejected under 35 U.S.C. 112, second paragraph, as being indefinite

for failing to particularly point out and distinctly claim the subject matter which applicant

regards as the invention.

10.     Claim 6 recites the limitations "the first upstream port" in the second line of the

claim and "the second upstream port" in the third line of the claim.  There is insufficient

antecedent basis for these limitations in the claim.


### Claim Rejections - 35 USC § 102


11.     The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public
> use or on sale in this country, more than one year prior to the date of application for patent in the United
> States.

12.     Claims 1- are rejected under 35 U.S.C. 102(b) as being anticipated by U.S.

Patent No. 6,308,239 ("Osakada" et al.).

Application/Control Number: 11/425,613                                    Page 5
Art Unit: 2111

13.     As for Claim 1, Osakada discloses a USB multi-host device (Figure 1) comprising

first and second upstream ports (Figure 1, Items 101a and 101b) configured to couple to

corresponding first and second hosts (Figure 1, Items 103a and 103b), a USB

device/function block (Figure 1, USB Hub 105 connected to USB devices 104), and a

multi-host device controller coupling the device/function block to the upstream ports

(Figure 1, Item 108) capable of establishing connections between the block and the

ports.  Osakada also discloses that the device/function block is not reconfigured each

time the hosts alternated accessing the block (Column 9, Line 56 – Column 10, Line

60).


14.     As for Claim 3, Osakada discloses a USB multi-host device (Figure 1) comprising

a USB device/function block (Figure 1, USB Hub 105 connected to USB devices 104),

and a multi-host device controller (Figure 1, Item 108) coupling the device/function block

to first and second hosts (Figure 1, Items 103a and 103b) and capable of establishing

connections between the block and the hosts.  Osakada also discloses that the

device/function block is not reconfigured each time the hosts alternated accessing the

block (Column 9, Line 56 – Column 10, Line 60).

15.     As for Claim 4, Osakada discloses that no reconfiguring occurs on the USB

device/function block each time the hosts alternated accessing the block (Column 9,

Line 56 – Column 10, Line 60).

Application/Control Number: 11/425,613                                     Page 6
Art Unit: 2111

16.     As for Claim 5, Osakada discloses that the device comprises first and second

upstream ports (Figure 1, Items 101a and 101b) configured to couple to corresponding

first and second hosts (Figure 1, Items 103a and 103b).


17.     As for Claim 7, Osakada discloses a device (Figure 1) comprising a USB

device/function block (Figure 1, USB Hub 105 connected to USB devices 104), and a

multi-host device controller (Figure 1, Item 108) coupling the device/function block to a

plurality hosts (Figure 1, Items 103) and capable of establishing connections between

the block and the hosts.  Osakada also discloses that the device/function block is not

reconfigured each time the hosts alternated accessing the block (Column 9, Line 56 –

Column 10, Line 60).

18.     As for Claim 8, Osakada discloses that the multi-host device controller can

receive requests from the plurality of hosts and determine which host to service (Figure

1, Items 110 and 113).

19.     As for Claim 9, Osakada discloses a switching section (Figure 1, Item 109) that is

capable of interleaving host communications.

20.     As for Claim 11, Osakada discloses that the multi-host device controller

comprises a mechanism for internally arbitrating which host gets access to the

device/function block based on receiving requests from the such that one host is

granted access and the others wait until its actions are completed ((Figure 1, Items 110

and 113; Figure 2).

Application/Control Number: 11/425,613                                    Page 7
Art Unit: 2111

21.     As for Claim 12, it is inherent that the arbitration mechanism is configured (at

manufacture) according to the USB device/function block (USB Hub).

22.     As for Claim 15, Osakada discloses that the device comprises an upstream port

coupled between the multi-host device controller and each of the hosts (Figure 1, Items

101).

23.     As for Claim 17, Osakada discloses a section of the device for maintaining

information pertaining to the host devices (Figure 10, Item A00).


24.     As for Claims 18-22, they are drawn to a method of using the device of Claims 7-

9, 11, and 17, and are therefore rejected on the same grounds.


### *Claim Rejections - 35 USC § 103*


25.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

26.     This application currently names joint inventors.  In considering patentability of

the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of

the various claims was commonly owned at the time any inventions covered therein

were made absent any evidence to the contrary.  Applicant is advised of the obligation

under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was

Application/Control Number: 11/425,613                                    Page 8
Art Unit: 2111

not commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).


27.     Claims 2, are rejected under 35 U.S.C. 103(a) as being unpatentable over

Osakada as applied to claims 1- above, and further in view of what is old and well

known in the art.

28.     As for Claim 2, Osakada teaches all of the limitations inherited from Claim 1, but

does not teach the use of buffers between the ports and the device/function block.

However, the examiner takes OFFICIAL NOTICE that it is old and well known to

incorporate buffers into data ports.  It would have been obvious to one of ordinary skill in

the art at the time of the invention to have buffered the upstream data ports to stabilize

the signal coming into the device, as well as prevent inadvertent feedback on the signal

lines.

29.     As for Claim 6, Osakada teaches all of the limitations inherited from Claim 3, but

does not teach the use of buffers between the ports and the device/function block.

However, the examiner takes OFFICIAL NOTICE that it is old and well known to

incorporate buffers into data ports.  It would have been obvious to one of ordinary skill in

the art at the time of the invention to have buffered the upstream data ports to stabilize

the signal coming into the device, as well as prevent inadvertent feedback on the signal

lines.

Application/Control Number: 11/425,613                              Page 9
Art Unit: 2111

30.      As for Claim 16, Osakada teaches all of the limitations inherited from Claim 15,

but does not teach the use of buffers between the ports and the device/function block.

However, the examiner takes OFFICIAL NOTICE that it is old and well known to

incorporate buffers into data ports.  It would have been obvious to one of ordinary skill in

the art at the time of the invention to have buffered the upstream data ports to stabilize

the signal coming into the device, as well as prevent inadvertent feedback on the signal

lines.


                                        *Conclusion*


31.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure: U.S. Patent No. 6,622,195; U.S. Patent No. 6,850,998, U.S.

Patent No. 7,246,189; U.S. Patent Application Publication No. 2005/0005045; and U.S.

Patent Application Publication No. 2005/0060490.


         Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Jeremy S. Cerullo whose telephone number is (571)

272-3634.  The examiner can normally be reached on Monday - Thursday, 8:00-4:00;

Alternate Fridays.

         If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Mark Rinehart can be reached on (571) 272-3632.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 11/425,613                                    Page 10
Art Unit: 2111

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

JSC

MARK H. RINEHART
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2100

Appx_175

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| Application No.:   11/425,613 | § | Examiner:        Cerullo, Jeremy S. |
| Filed:     June 21, 2006 | § | Group/Art Unit:  2111 |
| Inventor(s): | § | Atty. Dkt. No:    5707-12701 |
|   Mark R. Bohm, Atish Ghosh | § | |
| | § | |
| | § | |
| Title:    MULTI-HOST USB | § | |
|            DEVICE CONTROLLER | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**RESPONSE TO OFFICE ACTION OF**
**OCTOBER 2, 2007**

Dear Sir or Madam:

This paper is submitted in response to the Office Action of October 2, 2007, to further highlight why the application is in condition for allowance.

Please amend the case as listed below.

1

**IN THE CLAIMS:**

The following listing of claims will replace all prior versions, and listings, of claims in the application.

1. (Currently Amended) A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding first and second hosts;

a USB device/function block corresponding to at least one function; and

a multi-host device controller coupling the USB device/function block to the first and second upstream ports, wherein the multi-host device controller is operable to establish a respective dedicated USB connection between the USB device/function block and each of the first and second upstream ports, allowing the corresponding first and second hosts to alternately access the USB device block[[,]] without wherein the USB device/function block is not having to be reconfigured each time a different one of the first and second hosts alternate accessing is given access to the USB device/function block to use the at least one function.

2. (Original) The USB multi-host device of claim 1, further comprising a first endpoint buffer coupled between the first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

3. (Currently Amended) A USB multi-host device comprising:

a USB device/function block corresponding to at least one function; and

a multi-host device controller coupling the USB device/function block to a first host and a second host, wherein the multi-host device controller is operable to establish a first dedicated USB connection between the first host and the USB device/function block and a second dedicated USB connection between the second host and the USB device/function block, allowing the first host and the second host to alternately access the USB device block wherein without the USB device/function block is not having to be

2

Appx_177

reconfigured each time the first host and the second host ~~alternate accessing~~ is given access to the USB device~~/function~~ block to use the at least one function.

4. (Currently Amended) The USB multi-host device of claim 3, wherein the USB device~~/function~~ ~~is~~ block does not have to be re-enumerated each time the first host and the second host alternate accessing the USB device~~/function~~ block to access the at least one function.

5. (Original) The USB multi-host device of claim 3, further comprising a first upstream port coupled between the first host and the multi-host device controller, and a second upstream port coupled between the second host and the multi-host device controller.

6. (Currently Amended) The USB multi-host device of claim ~~3~~5, further comprising a first endpoint buffer coupled between first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

7. (Currently Amended) A device comprising:
a USB device~~/function~~ block corresponding to at least one function; and
a multi-host device controller configured to couple the USB device~~/function~~ block to a plurality of hosts, wherein the multi-host device controller is operable to establish a respective dedicated USB connection between the USB device~~/function~~ block and each of the plurality of hosts, allowing the plurality of hosts to alternately access the USB device block ~~wherein~~ without the USB device~~/function is not~~ having to be reconfigured each time a different one of the plurality of hosts ~~alternate accessing~~ is given access to the USB device~~/function~~ block to use the at least one function.

8. (Original) The device of claim 7, wherein the multi-host device controller is operable to receive respective host requests from the plurality of hosts, wherein the multi-

3

Appx_178

host device controller is operable to internally determine which of the respective host requests to service immediately.

9.  (Original) The device of claim 8, wherein the multi-host device controller is operable to interleave the respective host requests.

10.  (Original) The device of claim 8, wherein the multi-host device controller is operable to send not-ready packets in a USB specific manner to hosts whose request was not immediately serviced.

11.  (Currently Amended) The device of claim 7, wherein the multi-host device controller comprises an internal arbitration mechanism configured to permit each of the plurality of hosts to simultaneously request access to the USB device/function block by interleaving host accesses requests and/or by using a common request/grant structure;

wherein the common request/grant structure comprises one of the plurality of hosts being granted access to the USB device/function block while remaining ones of the plurality of hosts are held off not considered for access to the USB device block until the one of the plurality of hosts is done has completed accessing the USB device/function block.

12.  (Currently Amended) The device of claim 11, wherein the arbitration mechanism is configured according to a specific USB device type comprised in the USB device/function block.

13.  (Currently Amended) The device of claim 7, wherein a bandwidth from the USB device/function block to each respective one of the plurality of hosts is reduced to allow each respective one of the plurality of hosts equal access to the USB device/function block.

14.  (Original) The device of claim 13, wherein the bandwidth is not reduced if it exceeds a bandwidth of the respective one of the plurality of hosts.

4

Appx_179

15.   (Original) The device of claim 7, further comprising a respective upstream port coupled between the multi-host device controller and each of the plurality of hosts.

16.   (Original) The device of claim 15, further comprising a respective buffer coupled between each respective upstream port and the multi-host device controller.

17.   (Currently Amended) The device of claim 7, wherein the multi-host device controller is configured to maintain a̶ respective dedicated address, configuration, and response information for each of the plurality of hosts.

18.   (Currently Amended) A method for sharing a device between multiple hosts, the method comprising:

establishing a respective dedicated USB connection between a shared USB device/̶f̶u̶n̶c̶t̶i̶o̶n̶ and each of a plurality of hosts, wherein the USB device corresponds to at least one function;

receiving alternating respective access requests to the shared USB device/̶f̶u̶n̶c̶t̶i̶o̶n̶ from two or more of the plurality of hosts; and

processing the alternating respective access requests, allowing the two or more of the plurality of hosts to alternately access the shared USB device/̶f̶u̶n̶c̶t̶i̶o̶n̶;

wherein the USB device/̶f̶u̶n̶c̶t̶i̶o̶n̶ ̶i̶s̶ does not have to be reconfigured each time the USB device/̶f̶u̶n̶c̶t̶i̶o̶n̶ is accessed to use the at least one function in response to a respective access request from a different one of the two or more of the plurality of hosts.

19.   (Original) The method of claim 18, wherein said processing comprises determining which of the alternating respective access requests to service immediately, and servicing that respective access request.

20.   (Currently Amended) The method of claim 19, wherein said processing comprises holding off access to the shared USB device/̶f̶u̶n̶c̶t̶i̶o̶n̶ by those alternating respective access requests that are not immediately serviced, until the shared USB

5

Appx_180

device/function is no longer accessed by <u>a given one of the two or more of the plurality of hosts from which</u> the serviced respective access request <u>was received</u>.

21.    (Original) The method of claim 18, wherein said processing comprises interleaving accesses requested by the alternating respective access requests to the shared USB device/function.

22.    (Currently Amended) The method of claim 18, further comprising maintaining a <u>respective</u> dedicated address, configuration, and response information for each of the plurality of hosts.

23.    (New) A USB multi-host device comprising:
a shared USB device block operable to be simultaneously configured by two or more USB hosts; and
a controller configured to establish a respective dedicated USB connection between the shared USB device block and each of the two or more USB hosts;
wherein the controller is operable to receive and respond to simultaneous respective USB access requests sent by the two or more USB hosts.

24.    (New) The USB multi-host device of claim 23, wherein in establishing the respective dedicated USB connection between the shared USB device block and each of the two or more USB hosts, the controller is operable to maintain respective dedicated address, configuration and response information for each of the two or more USB hosts.

25.    (New) The USB multi-host device of claim 23, wherein the controller comprises:
a respective USB interface circuit for each of the two or more USB hosts, wherein each respective USB interface circuit enables the USB multi-host device to transmit and/or receive data over a USB bus; and

a respective endpoint buffer for each of the two or more USB hosts for storing respective dedicated address, configuration and response information for each of the two or more USB hosts.

**REMARKS**

Applicant is in receipt of the Office Action mailed October 2, 2007.  Claims 1, 3, 4, 6-7, 11-13, 17-18, 20, and 22 have been amended.  New claims 23-25 have been added.  Claims 1-25 are pending in the Application.

**Objection to Drawings:**

The drawings were objected to under 37 CFR 1.83(a), as being required to show every feature of the invention specified in the claims.  More specifically, the Office Action argues that the drawings have to show the feature of the device block not having to be reconfigured each time a different one of the first and second hosts accesses the USB device block.

Applicant respectfully submits that the process/concept of USB devices being configured/reconfigured when physically and/or electronically coupling to a new or different host is well known to those skilled in the art, and requires no special and/or additional explanation than what is provided in, for example, the USB 2.0 specification. It is equally well known to those skilled in the art what specific actions and procedures take place during the configuring/reconfiguring of a USB device/function, both in hardware and in software, and why the configuring/reconfiguring is performed in view of the USB structure and protocol.

For example, Chapter 9 of the USB 2.0 specification describes the USB framework, and discloses configuration of USB functions/devices (section 9.1). Table 9-1 indicates the various visible device states that a USB device/function may have, clearly indicating the progression of device states during and following hardware and software reset.   Section 9.2.3 describes why device configuration takes place.  As stated in sec. 9.2.3, a USB device must be configured before its function(s) may be used, and the host is responsible for configuring a USB device.  Various sections within chapter 9 describe how and when configuring is performed, including descriptions of the address assignment, and other settings required before a USB device/function may be used. Applicant therefore submits, that the concept of configuring/reconfiguring a USB

8

device/function each time a different host accesses that USB device/function, is well understood by one skilled in the art.

Accordingly, a USB device block not having to be reconfigured refers to, once the USB device block has been configured – a procedure well known in the art – the USB device block does not have to be configured again. More specifically in this case, once the USB device block has been configured, it does not have to be (re)configured each time a different host accesses the USB device block. Applicant submits that the embodiment disclosed in Fig. 3 clearly shows respective dedicated connections established between USB multi-host device controller 108 and upstream ports 302 and 304 through buffers 306 and 308, respectively, allowing the corresponding respective first and second hosts to alternately access USB device block 312 without USB device block 312 having to be reconfigured each time a different host (host 1 or host 2) accesses USB device block 312. Applicant submits that paragraphs 0008-0010, and 0018-0020 of the specification provide a clear explanation of why the reconfiguration is not required in view of at least the disclosed embodiment of Fig. 3. Applicant therefore respectfully submits that the particular feature (i.e. the device block not having to be reconfigured) has been represented in the most meaningful and substantive way possible in the drawings (logic figure/diagram) provided by Applicant, and there is no need/requirement to represent such a limitation in any additional ways in any of the figures in view of the limitation being clearly explained in the specification in view of at least the disclosed embodiment shown in Fig. 3.

Applicant therefore respectfully requests removal of the objection to the drawings.

**35 U.S.C. §112 Rejection:**

Claims 1-22 were rejected under 35 U.S.C. §112, first paragraph, as failing to comply with the enablement requirement. Applicant respectfully traverses this rejection. According to the Office Action, the claims contain subject matter that is not described in the specification in such a way as to enable one skilled in the art to which it pertains, or

9

with which it is most nearly connected, to make and/or use the invention. More specifically, the Office Action argues that the limitation of the USB device block not having to be reconfigured, recited in claims 1, 3, 7, and 18, and the limitation of the USB device block not having to be re-enumerated, recited in claim 4, are not supported in the specification. Applicant respectfully disagrees.

Paragraph 0002 of Applicant's specification clearly states that the present application is directed to USB controllers. Accordingly, the present application clearly pertains to designing for USB (Universal Serial Bus), and one skilled in the art to which the present application pertains would be well informed and well aware of the USB 2.0 specification. Consequently, as also previously argued, one skilled in the art would be familiar with the concepts of configuring and enumerating (and hence with the concepts of reconfiguring and re-enumerating) a USB device as disclosed in at least the USB 2.0 specification. Applicant again submits that a USB device block not having to be reconfigured and/or re-enumerated refers to, once the USB device block has been configured and/or enumerated – both procedures well known to those practicing design for USB – the USB device block does not have to be configured and/or enumerated again. (See USB 2.0 specification, section 9.1.2 on enumeration, for example). More specifically in this case, once the USB device block has been configured and/or enumerated, it does not have to be (re)configured and/or (re)enumerated each time a different host accesses the USB device block.

Applicant explains in at least paragraph 0005 that (in prior art) a USB device is typically accessed by one single host at a time, and when access to the USB device is switched (to another, different host), the device must be re-configured, thereby losing internal state information. In contrast, Applicant teaches a system and method for hosts simultaneously trying to access the same USB device, with a multi-host device handling these requests and allowing access to the shared USB device (see paragraph 0020 of Applicant's specification, for example). Accordingly, Applicant submits that Fig. 3 clearly shows one embodiment in which respective dedicated connections established between USB multi-host device controller 108 and upstream ports 302 and 304 through buffers 306 and 308, respectively, allow the corresponding respective first and second hosts to alternately access USB device block 312 without USB device block 312 having

10

to be reconfigured each time a different host (host 1 or host 2) accesses USB device block 312. Applicant further submits that paragraphs 0008-0010, and 0018-0020 of the specification provide a clear overall explanation of why the reconfiguration and/or re-enumeration is not required in view of at least the disclosed embodiment of Fig. 3. For example, paragraph 0008 clearly states that various embodiments may include a multi-host capable device controller, which enables a shared USB device to be simultaneously configured and accessed by two or more USB hosts. Paragraph 0008 also discloses that the multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host, and maintain a dedicated address, configuration and response information for each host, therefore establishing a dedicated USB connection with the sharing device. Paragraph 0007 also clearly teaches that because each host has simultaneously enumerated the device, there may be no need to detach and reconfigure the device on the fly. One skilled in the art (i.e. having appropriate understanding of basic USB design principles as set forth in at least the USB 2.0 specification) would therefore be enabled by Applicant's specification as detailed above, to build a USB device controller that enables multiple hosts to access the USB device function without the USB device having to be reconfigured and/or re-enumerated each time a different host accesses the USB device function.

Claim 6 was rejected under 35 U.S.C. §112 as being indefinite for failing to particularly point out and distinctly claim the subject matter which Applicant regards as the invention. Applicant has amended the claim to correct a typographical error. Claim 6 now depends on claim 5, instead of claim 3.

For at least the reasons provided above, Applicant submits that there is enabling support in the specification, in both the figures and the description, and that all claims are definite and distinctly claim the subject matter which Applicant regards as the invention. Applicant therefore respectfully requests removal of the 35 U.S.C. §112 rejection.

11

**35 U.S.C. §102(b) Rejection:**

Claims 1, 3-5, 7-9, 11-12, 15, 17, and 18-22 were rejected under 35 U.S.C. §102(b) as being anticipated by Osakada et al. (U.S. Patent No. 6,308,239). Applicant respectfully traverses this rejection.

**The cited reference does not teach or suggest all of the elements of the independent claims.**

For example, independent claim 1 recites:

> A USB multi-host device comprising:
> first and second upstream ports configured to couple to corresponding first and second hosts;
> a USB device block corresponding to at least one function; and
> a multi-host device controller coupling the USB device block to the first and second upstream ports, wherein the multi-host device controller is operable to establish a respective dedicated USB connection between the USB device block and each of the first and second upstream ports, allowing the corresponding first and second hosts to alternately access the USB device block without the USB device block having to be reconfigured each time a different one of the first and second hosts is given access to the USB device block to use the at least one function.

Osakada does not disclose a USB multi-host device that comprises a USB device block corresponding to at least one function, and which is alternately accessed by first and second hosts without the USB device block having to be reconfigured each time a different one of the first and second hosts is given access to the USB device block to use the at least one function. Rather, the Osakada reference <u>requires</u> reconfiguration of the USB device each time a different host desires to access the (shared) USB device. The Osakada reference does not require that the host perform a power reset (hardware reset), but does require a host software reset, and hence a reconfiguration of the USB device.

12

Thus, at best, the Osakada reference teaches the prior art methods disclosed in the background section of the present application.

The USB 2.0 specification clearly specifies that a USB device is required to be reconfigured after a host software reset (wherein configuration and/or reconfiguration of a USB device is clearly described in the USB 2.0 specification as noted above).

The USB 2.0 specification clearly teaches that there is a distinction between a hardware and software reset of a USB device, and describes a particular sequence in which a USB device is generally reset and configured.  Table 9-1 in the USB 2.0 specification clearly indicates the various visible device states that a USB device/function may have, also indicating the progression of device states during and following hardware and software reset.  As also stated in sec. 9.2.3 of the USB 2.0 specification, a USB device must be configured before its function(s) may be used, and the host is responsible for configuring a USB device.

Table 9-1 of the USB 2.0 specification illustrates the sequence of events that must take place in order for the function of a USB device to become accessible to a given host.  First, the USB device is attached, then powered, then reset, then assigned an address, and then configured.  Thus, it is clear from at least Table 9-1 and section 9.2.3 of the USB 2.0 specification that every time a USB device is reset, it must be configured following the reset, before the host that configured the USB device may access its function.  Applicant submits that because the system of Osakada uses physical switches when alternately physically coupling a different USB host to the same USB device, each time a different USB host is coupled to the USB device, the USB device has to be reset, and therefore subsequently reconfigured (as per the USB 2.0 specification), each time a different USB host accesses the same USB device.

The Office Action argues that column 9, line 56 – column 10, line 60 teach that the device block is not reconfigured each time a different host is given access to the device block.  This, however, is incorrect.  What Osakada in fact teaches is that the USB device does not have to be powered down (in other words, does not have to be hardware reset) each time a different USB host is switched to couple to the same USB device.  Osakada states in column 10, lines 17-20 "if the USB device is subjected to the software

13

Appx_188

resetting, the hardware resetting is not necessarily required at the time of switching the USB hosts 103", and in column 10, lines 38-40, "power is kept supplied regardless of the switching control operation, and therefore the USB device is not subjected to hardware resetting" (emphasis added).    Software reset still has to be performed, however, a consequence of which is the need to also reconfigure the USB device.

In column 10, line 66 – column 11, line 18, Osakada describes how a different USB host is switched to couple to the same USB device.  As clearly taught by Osakada, when switching from USB host A 103a to USB host B 103b, USB host A 103a of FIG. 9 issues a control command to the switching control section 901 for switching to the connection route B.  USB host B 103b then sends a software reset command signal to the USB device 104.  The reset signal from the USB host B 103b is applied through the hub D 105d to the USB device 104, and USB device 104 is initialized and the intermediate result of the internal process as a result of switching the host is cleared.  After that, the connection between the USB device 104 completely reset and the new USB host B 103b is established.  Therefore, it is clear from at least these passages from Osakada, that when switching from one USB host to another, the shared USB device is indeed completely reset and initialized, and hence reconfigured, each and every time, because an entirely new connection has been established between the new USB host and the shared USB device.  Furthermore, in the system disclosed by Osakada, no physical connection simultaneously exists between the shared USB device and two or more USB hosts.  Therefore, the various hosts cannot simultaneously request access to the USB device, since the USB hosts are not simultaneously coupled to the USB device.

Applicant therefore submits that for at least these reasons the independent claims are not anticipated or suggested by Osakada, and are therefore allowable.  Applicant further submits that since the independent claims have been shown to be patentably distinct, all respective dependent claims are also patentably distinct for at least the same reasons.  Accordingly, Applicant respectfully requests removal of the 35 U.S.C. § 102(b) rejection.

**35 U.S.C. §103(a) Rejection:**

Claims 2, 6, and 16 were rejected under 35 U.S.C. §103(a) as being unpatentable over Osakada et al. (U.S. Patent No. 6,308,239) as applied to claims 1, 3-5, and 7 above, and further in view of what is old and well known in the art.  Applicant respectfully traverses this rejection.

Applicant submits that since the independent claims have been shown to be patentably distinct, all respective dependent claims are also patentably distinct for at least the same reasons.  Since claims 2, 6, and 16 depend on allowable claims 1, 3, and 7, respectively, they are also allowable for at least the same reasons claims 1, 3, and 7 are allowable.  Accordingly, Applicant respectfully requests removal of the 35 U.S.C. §103(a) rejection.

Applicant also submits that claims 10 and 13-14, which have not been addressed by the Office Action, and new claims 23-25 are all allowable for at least the same reasons as shown above.

15

**<u>CONCLUSION</u>**

Applicant submits the application is in condition for allowance, and an early notice to that effect is requested.

If any extensions of time (under 37 C.F.R. § 1.136) are necessary to prevent the above-referenced application(s) from becoming abandoned, Applicant(s) hereby petition for such extensions.  The Commissioner is hereby authorized to charge any fees which may be required or credit any overpayment to Meyertons, Hood, Kivlin, Kowert & Goetzel P.C., Deposit Account No. 50-1505/5707-12701/JCH.

Also filed herewith are the following items:

☐ Request for Continued Examination
☐ Terminal Disclaimer
☐ Power of Attorney By Assignee and Revocation of Previous Powers
☐ Notice of Change of Address
☐ Other:

Respectfully submitted,

/Jeffrey C. Hood/
Jeffrey C. Hood, Reg. #35198
ATTORNEY FOR APPLICANT(S)

Meyertons, Hood, Kivlin, Kowert & Goetzel PC
P.O. Box 398
Austin, TX  78767-0398
Phone: (512) 853-8800
Date: <u>2008-01-31</u>      JCH/TAK

16

Appx_191

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/425,613 | 06/21/2006 | Mark R. Bohm | 5707-12701 | 9526 |

7590          06/27/2008

Jeffrey C. Hood
Meyertons Hood Kivlin Kowert & Goetzel PC
P.O. Box 398
Austin, TX 78767-0398

| EXAMINER |
|---|
| CERULLO, JEREMY S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2111 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/27/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 11/425,613 | BOHM ET AL. |
| | **Examiner** | **Art Unit** | |
| | Jeremy S. Cerullo | 2111 | |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>*31 January 2008*</u>.
2a)☒ This action is **FINAL**.  2b)☐ This action is non-final.
3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>*1-25*</u> is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5)☐ Claim(s) _____ is/are allowed.
6)☒ Claim(s) <u>*1-25*</u> is/are rejected.
7)☐ Claim(s) _____ is/are objected to.
8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.
10)☒ The drawing(s) filed on <u>*21 June 2006*</u> is/are:  a)☐ accepted or b)☒ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All   b)☐ Some * c)☐ None of:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>*20080131, 20080214, 20080610*</u>.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5)☐ Notice of Informal Patent Application
6)☐ Other: _____ .

U.S. Patent and Trademark Office
PTOL-326 (Rev. 08-06)            **Office Action Summary**            Part of Paper No./Mail Date 20080623

Application/Control Number: 11/425,613                                    Page 2
Art Unit: 2111

**DETAILED ACTION**

1.      Claims 1-25 are pending in the following action.

*Response to Arguments*

2.      Applicant's arguments filed 31 January 2008, regarding the objections to the

drawings and the rejections under 35 USC 112 have been fully considered but they are

not persuasive. The applicant argues that it is not necessary that the disclosure teaches

how the device is able to switch without having to be reconfigured/re-enumerated

because it is well known that when USB devices disconnect and reconnect they are

reconfigured/re-enumerated.  Precisely because it is well known that when USB devices

disconnect and reconnect they are reconfigured/re-enumerated is why it is required that

the disclosure of the instant invention must teach how the device can switch WITHOUT

reconfiguration/re-enumeration.  Therefore the objection to the drawings and the

rejections under 35 USC 112 are maintained.

3.      Applicant's arguments with respect to the prior art rejections under 35 USC 102

and 35 USC 103 have been considered but are moot in view of the new ground(s) of

rejection.

*Drawings*

Application/Control Number: 11/425,613                                    Page 3
Art Unit: 2111

4.      The drawings are objected to under 37 CFR 1.83(a).  The drawings must show

every feature of the invention specified in the claims.  Therefore, the functional features

of the device, including how the device/function block is not reconfigured, must be

shown or the feature(s) canceled from the claim(s).  No new matter should be entered.

        Corrected drawing sheets in compliance with 37 CFR 1.121(d) are required in

reply to the Office action to avoid abandonment of the application. Any amended

replacement drawing sheet should include all of the figures appearing on the immediate

prior version of the sheet, even if only one figure is being amended. The figure or figure

number of an amended drawing should not be labeled as "amended." If a drawing figure

is to be canceled, the appropriate figure must be removed from the replacement sheet,

and where necessary, the remaining figures must be renumbered and appropriate

changes made to the brief description of the several views of the drawings for

consistency. Additional replacement sheets may be necessary to show the renumbering

of the remaining figures. Each drawing sheet submitted after the filing date of an

application must be labeled in the top margin as either "Replacement Sheet" or "New

Sheet" pursuant to 37 CFR 1.121(d). If the changes are not accepted by the examiner,

the applicant will be notified and informed of any required corrective action in the next

Office action. The objection to the drawings will not be held in abeyance.


### *Claim Rejections - 35 USC § 112*


5.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

Application/Control Number: 11/425,613                                    Page 4
Art Unit: 2111

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

6.      Claims 1-22 are rejected under 35 U.S.C. 112, first paragraph, as failing to comply with the enablement requirement.  The claim(s) contains subject matter which was not described in the specification in such a way as to enable one skilled in the art to which it pertains, or with which it is most nearly connected, to make and/or use the invention.

7.      As for Claims 1, 3, 7, and 18, there is no support in the specification for the limitation that USB device/function block is not reconfigured after the hosts alternate accessing the block.  Without a description of the functionality either in the specification or in the figures, one of ordinary skill would not be able to make/use the invention.

8.      As for Claim 4, there is no support in the specification for the limitation that USB device/function block is not re-enumerated after the hosts alternate accessing the block. Without a description of the functionality either in the specification or in the figures, one of ordinary skill would not be able to make/use the invention.

9.      Claims 2, 4-5, 8-17, and 19-22 inherit the non-enabled subject matter from their parent claims.

### Claim Rejections - 35 USC § 102

Application/Control Number: 11/425,613                                    Page 5
Art Unit: 2111

10.     The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

11.     Claims 1, 3-5, 7-9, 11-12, 15, and 17-22 are rejected under 35 U.S.C. 102(e) as

being anticipated by U.S. Patent Application Publication No. 2006/0059293 ("Wurzburg"

et al.)

12.     As for Claim 1, Wurzburg discloses a USB multi-host device (Figure 3, Item 119)

comprising first and second upstream ports (Figure3, Items 117a and 117b) configured

to couple to corresponding first and second hosts (Figure 3, 101 and 207), a USB

device block corresponding to USB functions (Figure 3, Items 125), and a multi-host

device controller coupling the device/function block to the upstream ports (Figure 3,

Item 201) capable of establishing connections between the block and the ports.

Wurzburg also discloses that the device/function block is not reconfigured each time the

hosts alternated accessing the block (Page 1, Paragraphs [0008]-[0010]).


13.     As for Claim 3, Wurzburg discloses a USB multi-host device (Figure 3, Item 119)

comprising a USB device block corresponding to USB functions (Figure 3, Items 125),

and a multi-host device controller (Figure 3, Item 201) coupling the device/function block

Application/Control Number: 11/425,613                                    Page 6
Art Unit: 2111

to first and second hosts (Figure 3, 101 and 207) and capable of establishing
connections between the block and the hosts.  Wurzburg also discloses that the
device/function block is not reconfigured each time the hosts alternated accessing the
block (Page 1, Paragraphs [0008]-[0010]).

14.     As for Claim 4, Wurzburg discloses that no reconfiguring occurs on the USB
device/function block each time the hosts alternated accessing the block (Page 1,
Paragraphs [0008]-[0010]).

15.     As for Claim 5, Wurzburg discloses that the device comprises first and second
upstream ports (Figure3, Items 117a and 117b) configured to couple to corresponding
first and second hosts (Figure 3, 101 and 207).


16.     As for Claim 7, Wurzburg discloses a device Figure 3, Item 119) comprising a
USB device block corresponding to USB functions (Figure 3, Items 125), and a multi-
host device controller (Figure 3, Item 201) coupling the device/function block to a
plurality hosts (Figure 3, 101 and 207) and capable of establishing connections between
the block and the hosts Wurzburg also discloses that the device/function block is not
reconfigured each time the hosts alternated accessing the block (Page 1, Paragraphs
[0008]-[0010]).

17.     As for Claim 8, Wurzburg discloses that the multi-host device controller can
receive requests from the plurality of hosts and determine which host to service (Page
1, Paragraphs [0008]-[0010]).

Application/Control Number: 11/425,613                                    Page 7
Art Unit: 2111

18.     As for Claim 9, Wurzburg discloses a switching section (Figure 1, Item 109) that
is capable of interleaving host communications.

19.     As for Claim 11, Wurzburg discloses that the multi-host device controller
comprises a mechanism for internally arbitrating which host gets access to the
device/function block based on receiving requests from the such that one host is
granted access and the others wait until its actions are completed (Figure 3, Item 201;
Page 1, Paragraphs [0008]-[0010]).

20.     As for Claim 12, it is inherent that the arbitration mechanism is configured (at
manufacture) according to the USB device/function block (USB Hub).

21.     As for Claim 15, Wurzburg discloses that the device comprises an upstream port
coupled between the multi-host device controller and each of the hosts (Figure 3, Items
117).

22.     As for Claim 17, Wurzburg discloses a section of the device for maintaining
information pertaining to the host devices (Figure 3, Item 201).


23.     As for Claims 18-22, they are drawn to a method of using the device of Claims 7-
9, 11, and 17, and are therefore rejected on the same grounds.


24.     As for Claim 23, Wurzburg discloses a USB multi-host device (Figure 3, Item
119) comprising a USB device block (Figure 3, Items 125) operable to be configured by
multiple hosts (Figure 3, Items 101 and 207), a controller (Figure 3, Item 201)for

Application/Control Number: 11/425,613                                                    Page 8
Art Unit: 2111

establishing USB connections between the device block and the hosts wherein the

controller can receive simultaneous requests (Page 1, Paragraphs [0008]-[0010]).

25.      As for Claim 24, Wurzburg discloses a section of the device for maintaining

information pertaining to the host devices (Figure 3, Item 201).


### *Claim Rejections - 35 USC § 103*


26.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

>      (a) A patent may not be obtained though the invention is not identically disclosed or described as set
>      forth in section 102 of this title, if the differences between the subject matter sought to be patented and
>      the prior art are such that the subject matter as a whole would have been obvious at the time the
>      invention was made to a person having ordinary skill in the art to which said subject matter pertains.
>      Patentability shall not be negatived by the manner in which the invention was made.

27.      This application currently names joint inventors.  In considering patentability of

the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of

the various claims was commonly owned at the time any inventions covered therein

were made absent any evidence to the contrary.  Applicant is advised of the obligation

under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was

not commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).

Application/Control Number: 11/425,613                                      Page 9
Art Unit: 2111

28.     Claims 2, 6, 16, and 25 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Osakada as applied to claims 1- above, and further in view of what is

old and well known in the art.

29.     As for Claim 2, Wurzburg teaches all of the limitations inherited from Claim 1, but

does not teach the use of buffers between the ports and the device/function block.

However, the examiner takes OFFICIAL NOTICE that it is old and well known to

incorporate buffers into data ports.  It would have been obvious to one of ordinary skill in

the art at the time of the invention to have buffered the upstream data ports to stabilize

the signal coming into the device, as well as prevent inadvertent feedback on the signal

lines.

30.     As for Claim 6, Wurzburg teaches all of the limitations inherited from Claim 5, but

does not teach the use of buffers between the ports and the device/function block.

However, the examiner takes OFFICIAL NOTICE that it is old and well known to

incorporate buffers into data ports.  It would have been obvious to one of ordinary skill in

the art at the time of the invention to have buffered the upstream data ports to stabilize

the signal coming into the device, as well as prevent inadvertent feedback on the signal

lines.

31.     As for Claim 16, Wurzburg teaches all of the limitations inherited from Claim 15,

but does not teach the use of buffers between the ports and the device/function block.

However, the examiner takes OFFICIAL NOTICE that it is old and well known to

incorporate buffers into data ports.  It would have been obvious to one of ordinary skill in

the art at the time of the invention to have buffered the upstream data ports to stabilize

Application/Control Number: 11/425,613                                              Page 10
Art Unit: 2111

the signal coming into the device, as well as prevent inadvertent feedback on the signal

lines.

32.     As for Claim 25, Wurzburg teaches all of the limitations inherited from Claim 23,

but does not teach the use of buffers between the ports and the device/function block.

However, the examiner takes OFFICIAL NOTICE that it is old and well known to

incorporate buffers into data ports.  It would have been obvious to one of ordinary skill in

the art at the time of the invention to have buffered the upstream data ports to stabilize

the signal coming into the device, as well as prevent inadvertent feedback on the signal

lines.

### *Conclusion*

33.     Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

        A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

Application/Control Number: 11/425,613                                      Page 11
Art Unit: 2111

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Jeremy S. Cerullo whose telephone number is

(571)272-3634.  The examiner can normally be reached on Monday - Thursday, 8:00-

4:00; Alternate Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Mark Rinehart can be reached on (571) 272-3632.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/J. S. C./
Examiner, Art Unit 2111

/Paul R. Myers/
Primary Examiner, Art Unit 2111

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (03/08)
Approved for use through 07/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
### (Submitted Only via EFS-Web)

| Application Number | 11/425,613 | Filing Date | 2006-06-21 | Docket Number (if applicable) | 5707-12701 | Art Unit | 2111 |
|---|---|---|---|---|---|---|---|
| First Named Inventor | Mark R. Bohm | | | Examiner Name | Cerullo, Jeremy S. | | |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

### SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

- [ ] Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

  - [ ] Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

  - [ ] Other _____

- [x] Enclosed

  - [x] Amendment/Reply

  - [x] Information Disclosure Statement (IDS)

  - [ ] Affidavit(s)/ Declaration(s)

  - [ ] Other _____

### MISCELLANEOUS

- [ ] Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months _____
  (Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

- [ ] Other _____

### FEES

**The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
- [x] The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No  501505

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

- [x] Patent Practitioner Signature
- [ ] Applicant Signature

EFS - Web 2.1.2

Doc code: RCEX
Doc description:  Request for Continued Examination (RCE)

PTO/SB/30EFS (03/08)
Approved for use through 07/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Martin R. Wojcik/ | Date (YYYY-MM-DD) | 2008-07-23 |
| Name | Martin R. Wojcik | Registration Number | 57577 |

This collection of information is required by 37 CFR 1.114.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

EFS - Web 2.1.2

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS - Web 2.1.2

RESPONSE UNDER 37 C.F.R. § 1.116
EXPEDITED PROCEDURE
GROUP ART UNIT 2111

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| Application. No:   11/425,613 | § | Examiner:       Cerullo, Jeremy S. |
| Filed:     June 21, 2006 | § | Group/Art Unit:  2111 |
| Inventor(s): | § | Atty. Dkt. No:   5707-12701 |
| Mark R. Bohm, Atish Ghosh | § | |
| | § | |
| | § | |
| Title:  MULTI-HOST USB | § | |
| DEVICE CONTROLLER | § | |
| | § | |
| | § | |
| | § | |

**REQUEST FOR CONTINUED EXAMINATION**
**AMENDMENT AFTER FINAL REJECTION**
**RESPONSE TO OFFICE ACTION OF JUNE 27, 2008**

Dear Sir or Madam:

        This paper is submitted in response to the Office Action of June 27, 2008, to further highlight why the application is in condition for allowance.   A Request for Continued Examination is submitted herewith.

        Please amend the case as listed below.

1

**IN THE CLAIMS:**

The following listing of claims will replace all prior versions, and listings, of claims in the application.

1.   (Currently Amended) A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding first and second hosts;

a USB device block corresponding to at least one function; and

a multi-host device controller coupling the USB device block to the first and second upstream ports, wherein the multi-host device controller is ~~operable~~ configured to establish [[a]] concurrent respective dedicated USB connections between the USB device block and ~~each of~~ the first and second upstream ports, to allow~~ing~~ the corresponding first and second hosts to:

simultaneously request access to the USB device; and

alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block ~~having to be reconfigured~~ each time a different one of the first and second hosts is given access to the USB device block to use the at least one function.

2.   (Original) The USB multi-host device of claim 1, further comprising a first endpoint buffer coupled between the first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

3.   (Currently Amended) A USB multi-host device comprising:

a USB device block corresponding to at least one function; and

a multi-host device controller coupling the USB device block to a first host and a second host, wherein the multi-host device controller is ~~operable~~ configured to establish a first dedicated USB connection between the first host and the USB device block and a second dedicated USB connection between the second host and the USB device block,

2

wherein the first dedicated USB connection and the second dedicated USB connection are concurrent, to allow~~ing~~ the first host and the second host to:

        simultaneously request access to the USB device; and

        alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block ~~having to be reconfigured~~ each time a different one of the first host and the second host is given access to the USB device block ~~to use the at least one function~~.

4.  (Currently Amended) The USB multi-host device of claim 3, wherein the USB device block ~~does not have to be~~ is not re-enumerated each time the first host and the second host alternate accessing the USB device block to access the at least one function.

5.  (Original) The USB multi-host device of claim 3, further comprising a first upstream port coupled between the first host and the multi-host device controller, and a second upstream port coupled between the second host and the multi-host device controller.

6.  (Previously Presented) The USB multi-host device of claim 5, further comprising a first endpoint buffer coupled between first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

7.  (Currently Amended) A device comprising:

a USB device block corresponding to at least one function; and

a multi-host device controller configured to couple the USB device block to a plurality of hosts, wherein the multi-host device controller is operable to establish [[a]] concurrent respective dedicated USB connections between the USB device block and ~~each of~~ the plurality of hosts, to allow~~ing~~ the plurality of hosts to:

        simultaneously request access to the USB device; and

        alternately access the USB device block to use the at least one function without any of the plurality of hosts reconfiguring the USB device ~~having to be~~

3

~~reconfigured~~ each time a different one of the plurality of hosts is given access to the USB device block ~~to use the at least one function~~.

8.   (Original) The device of claim 7, wherein the multi-host device controller is operable to receive respective host requests from the plurality of hosts, wherein the multi-host device controller is operable to internally determine which of the respective host requests to service immediately.

9.   (Original) The device of claim 8, wherein the multi-host device controller is operable to interleave the respective host requests.

10.   (Original) The device of claim 8, wherein the multi-host device controller is operable to send not-ready packets in a USB specific manner to hosts whose request was not immediately serviced.

11.   (Previously Presented) The device of claim 7, wherein the multi-host device controller comprises an internal arbitration mechanism configured to permit the plurality of hosts to simultaneously request access to the USB device block by interleaving host access requests and/or by using a common request/grant structure;

wherein the common request/grant structure comprises one of the plurality of hosts being granted access to the USB device block while remaining ones of the plurality of hosts are not considered for access to the USB device block until the one of the plurality of hosts has completed accessing the USB device block.

12.   (Previously Presented) The device of claim 11, wherein the arbitration mechanism is configured according to a specific USB device type comprised in the USB device block.

13.   (Previously Presented) The device of claim 7, wherein a bandwidth from the USB device block to each respective one of the plurality of hosts is reduced to allow each respective one of the plurality of hosts equal access to the USB device block.

4

14.  (Original) The device of claim 13, wherein the bandwidth is not reduced if it exceeds a bandwidth of the respective one of the plurality of hosts.

15.  (Original) The device of claim 7, further comprising a respective upstream port coupled between the multi-host device controller and each of the plurality of hosts.

16.  (Original) The device of claim 15, further comprising a respective buffer coupled between each respective upstream port and the multi-host device controller.

17.  (Previously Presented) The device of claim 7, wherein the multi-host device controller is configured to maintain a respective dedicated address, configuration, and response information for each of the plurality of hosts.

18.  (Currently Amended) A method for sharing a device between multiple hosts, the method comprising:

establishing [[a]] concurrent respective dedicated USB connections between a shared USB device and each of a plurality of hosts, wherein the USB device corresponds to at least one function;

receiving alternating respective access requests to the shared USB device from two or more of the plurality of hosts; and

processing the alternating respective access requests, to allowing the two or more of the plurality of hosts to alternately access the shared USB device to use the at least one function; wherein without any of the two or more of the plurality of hosts reconfiguring the USB device does not have to be reconfigured each time the USB device is accessed to use the at least one function in response to a respective access request from a different one of the two or more of the plurality of hosts.

19.  (Currently Amended) The method of claim 18, wherein said processing comprises determining which of the alternating respective access requests to service immediately, and servicing that respective access request.

5

Appx_211

20.   (Currently Amended) The method of claim 19, wherein said processing comprises holding off access to the shared USB device by those ~~alternating~~ respective access requests that are not immediately serviced, until the shared USB device is no longer accessed by a given one of the two or more of the plurality of hosts from which the serviced respective access request was received.

21.   (Currently Amended) The method of claim 18, wherein said processing comprises interleaving accesses requested by the ~~alternating~~ respective access requests to the shared USB device/function.

22.   (Previously Presented) The method of claim 18, further comprising maintaining respective dedicated address, configuration, and response information for each of the plurality of hosts.

23.   (Currently Amended) A USB multi-host device comprising:
a shared USB device block operable to be simultaneously configured by two or more USB hosts; and

a controller configured to establish [[a]] <u>concurrent</u> respective dedicated USB connection<u>s</u> between the shared USB device block and ~~each of~~ the two or more USB hosts;

wherein the controller is operable to receive and respond to simultaneous respective USB access requests sent by the two or more USB hosts <u>for accessing a function of the shared USB device block</u> .

24.   (Currently Amended) The USB multi-host device of claim 23, wherein in establishing the <u>concurrent</u> respective dedicated USB connection<u>s</u> between the shared USB device block and ~~each of~~ the two or more USB hosts, the controller is operable to maintain respective dedicated address, configuration and response information for each of the two or more USB hosts.

6

25.     (Previously Presented) The USB multi-host device of claim 23, wherein the controller comprises:

a respective USB interface circuit for each of the two or more USB hosts, wherein each respective USB interface circuit enables the USB multi-host device to transmit and/or receive data over a USB bus; and

a respective endpoint buffer for each of the two or more USB hosts for storing respective dedicated address, configuration and response information for each of the two or more USB hosts.

7

**REMARKS**

Applicant is in receipt of the Office Action mailed June 27, 2008.  Claims 1, 3, 4, 7, 18-21, and 23-24 have been amended to more clearly and distinctly claim the subject matter which Applicant regards as the invention.  Applicant submits that no new subject matter has been entered and/or introduced in the amendments.

**35 U.S.C. §112 Rejection and Objection to Drawings:**

The Office Action maintained the objection to the drawings and the rejections under 35 USC 112, stating that Applicant's arguments filed 31 January 2008, regarding the objections to the drawings and the rejections under 35 USC 112 had been fully considered but were not persuasive.  The Office Action argues that "*precisely because it is well known that when USB devices disconnect and reconnect they are reconfigured/re-enumerated*" is why "*it is required that the disclosure of the instant invention must teach how the device can switch WITHOUT reconfiguration/re-enumeration*".  However, the disclosure of the instant invention <u>does not teach that any of the hosts are disconnected from the USB device block once they have been connected to the USB device block</u>, i.e. after the concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports have been established.  Consequently, Applicant respectfully resubmits that the disclosure of the instant invention <u>does therefore teach how the device can operate without re-configuration/re-enumeration</u>.

The drawings were objected to under 37 CFR 1.83(a), as being required to show every feature of the invention specified in the claims.  More specifically, the Office Action argues that the functional features of the device, including how the device/function block is not reconfigured, must be shown or the feature(s) canceled from the claim(s).  Claims 1-22 were again rejected under 35 U.S.C. §112, first paragraph, as failing to comply with the enablement requirement because of the specification allegedly not supporting the limitation of the USB device block not having to be reconfigured,

recited in claims 1, 3, 7, and 18, and allegedly further not supporting the limitation of the USB device block not having to be re-enumerated, recited in claim 4.   Applicant respectfully disagrees.

Applicant respectfully submits that one skilled in the art will appreciate the reason (according to at least the USB 2.0 specification) why configuring of a USB device, regardless of USB device class, is required each time at least an electrical communication path is <u>first</u> established between a USB host and a USB device.  The Office Action argues that the disclosure of the instant invention must teach how the device can <u>switch</u> WITHOUT reconfiguration/re-enumeration.  Applicant submits that the claims and the disclosure of the present invention <u>are not directed to "switching between hosts"</u> in a manner commensurate with what is taught for example in the reference (U.S. Patent Application Publication No. 2006/0059293 ("Wurzburg" et al.) cited by the Office Action.  Instead, the disclosure of the present invention is directed to <u>arbitrating between access requests</u> received from multiple hosts, and is further directed to the concept that the hosts may actually simultaneously issue these access requests.  Therefore, one skilled in the art will recognize that because no host is disconnected from the USB device, the USB device may not have to be reconfigured or re-enumerated.

The difference between switching from one host to another (especially as present in the prior art) and the combination of features taught by Applicant are highlighted in various sections of the present application.  For example, in paragraph 0005 of the Description of the Related Art section of the disclosure, Applicant clearly states: "*There are several <u>switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time</u>.  There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers.  <u>These solutions, however, fail to permit simultaneous access to the USB device</u> that is downstream of the hub or switch.  The <u>USB device is typically accessed by one single host at a time, and when access to the USB device is switched, the device must be re-configured, thereby losing internal state information</u>*" [emphases added].  In contrast, for

9

Appx_215

example in paragraph 0007 of the disclosure, Applicant teaches, "*since each host has simultaneously enumerated the device, there may be no need to detach and reconfigure the device on the fly*".  One skilled in the art will appreciate from at least this teaching that it is precisely because of the <u>simultaneous enumeration</u> that there may be <u>no need to detach</u> and reconfigure the device.  In other words, since Applicant's specification discloses a system in which <u>each host may simultaneously enumerate the device, (and) neither host may need to be detached, there may be no need to reconfigure and/or re-enumerate the device</u>.  Applicant submits that, in view of this teaching and the USB 2.0 specification, one skilled in the art requires no further information as to why reconfiguration and/or re-enumeration may not be required.

Accordingly, Applicant respectfully resubmits that the embodiment disclosed in Fig. 3 clearly shows concurrent <u>respective dedicated connections established between USB multi-host device controller 108 and upstream ports 302 and 304</u> through buffers 306 and 308, respectively.  Applicant further submits that paragraphs 0008-0010, and 0018-0020 of the specification provide a clear explanation of why the reconfiguration is not required in view of at least the disclosed embodiment of Fig. 3.  Specifically, Fig. 3 shows individual upstream ports within the USB Device, each upstream port having a corresponding individual <u>USB endpoint and status register</u>.  Paragraph 0017 discloses that a multi-host USB device may provide "*a separate configuration and access interface for each upstream host*".  Paragraph 0019 then states: "*Endpoint buffers 306 and 308 may be used by upstream ports 302 and 304, and USB multi-host device controller 108 to buffer data and control reads and writes to/from each respective host corresponding to PHY 302 and PHY 304, and/or peripheral device/function 312 coupled to USB multi-host device controller 108*."  Finally, paragraph 0020 states: "*USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host – first host 102 and second host 104, for example – to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312*".

10

Applicant submits that it would be clear to one skilled in the art, from at least the above referenced descriptions, that the internal arbitration mechanism in device controller 108 (examples of which are disclosed as interleaving host accesses and using a common request/grant structure) and the separate configuration and access interface enable the multi-host device to couple to more than one host without either host having to be disconnected from the multi-host device, and hence not having to be reconfigured and/or re-enumerated  each time a different one of the hosts is given access (by the multi-host device controller) to the shared peripheral function.

Applicant therefore respectfully submits that the particular feature (i.e. the device block not having to be reconfigured) has been represented in the most meaningful and substantive way possible in the drawings (logic figure/diagram) provided by Applicant, and there is no need/requirement to represent such a limitation in any additional ways in any of the figures in view of the limitation being clearly explained in the specification in view of at least the disclosed embodiment shown in Fig. 3.  Applicant further submits that one skilled in the art (i.e. having appropriate understanding of basic USB design principles as set forth in at least the USB 2.0 specification) would therefore be enabled by Applicant's specification as detailed above, to build a USB multi-host device controller that enables multiple hosts to access the USB device function without the USB device having to be reconfigured and/or re-enumerated each time a different host accesses the USB device function.

For at least the reasons provided above, Applicant also submits that there is enabling support in the specification, in both the figures and the description, and that all claims are definite and distinctly claim the subject matter which Applicant regards as the invention.  Applicant therefore respectfully requests removal of the objection to the drawings and the removal of the 35 U.S.C. §112 rejection of claims 1-24.

11

**35 U.S.C. §102(e) and §103(a) Rejections:**

Claims 1, 3-5, 7-9, 11-12, 15, and 17-24 were rejected under 35 U.S.C. §102(e) as being anticipated by U.S. Patent Application Publication No. 2006/0059293 ("Wurzburg" et al.). Claims 2, 6, 16, and 25 were rejected under 35 U.S.C. 103(a) as being unpatentable over Osakada "as applied to claim 1 above, and further in view of what is old and well known in the art."

Applicant notes that the Office Action did not address claim 10, which Applicant will henceforth assume has also been rejected.

Applicant further notes that the Office Action in fact provides arguments for the 35 U.S.C. 103(a) rejections based on Wurzburg and not Osakada. Applicant therefore assumes that the 35 U.S.C. 103(a) rejections were over Wurzburg "as applied to claim 1, and further in view of what is old and well known in the art."

With respect to the claims, Applicant respectfully traverses these rejections.

**The cited reference does not teach or suggest all of the elements of the independent claims.**

For example, independent claim 1 recites:

> A USB multi-host device comprising:
> first and second upstream ports configured to couple to corresponding first and second hosts;
> a USB device block corresponding to at least one function; and
> a multi-host device controller coupling the USB device block to the first and second upstream ports, wherein the multi-host device controller is configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to:
> > simultaneously request access to the USB device; and
> > alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block each time a different one of the first and second hosts is given access to the USB device block to use the at least one function.

12

Wurzburg does not disclose the USB multi-host device that comprises a USB device block corresponding to at least one function and further comprises a multi-host device controller configured to establish <u>concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to simultaneously request access to the USB device</u> of claim 1. Rather, Wurzburg discloses a system in which a respective dedicated USB connection only exists between the device block and a single host at any one point in time, and thus only a single host can request access to the device block. Wurzburg clearly teaches a "switching hub", which may <u>electronically switch between different configurations</u> (e.g., hardwired or software implemented configurations) <u>for access between the two or more upstream ports and the downstream ports</u> (paragraph 0008). Accordingly, Wurzburg does not teach, suggest, or render obvious a multi-host device controller configured to establish <u>concurrent</u> respective dedicated USB connections between a USB device block and first and second upstream ports.

The Office Action also argues that Wurzburg discloses that the device/function block is not reconfigured each time the hosts alternate accessing the block (Page 1, Paragraphs [0008]-[0010]). Applicant can find no such teaching in the referenced paragraphs of Wurzburg. Instead, <u>Wurzburg teaches "configurations for access" within the switching hub, which is different and distinct from configuring a USB device</u>. Applicant has previously addressed the issue of configuring a USB device as explained in at least the USB 2.0 specification, which clearly teaches the hardware and software reset of a USB device, and describes a particular sequence in which a USB device is generally reset and configured. For example, Table 9-1 in the USB 2.0 specification clearly indicates the various visible device states that a USB device/function may have, also indicating the progression of device states during and following hardware and software reset. As also stated in sec. 9.2.3 of the USB 2.0 specification, a USB device must be configured before its function(s) may be used, and the <u>host is responsible for configuring a USB device</u>. Applicant again submits that the <u>configuring of a USB device by a host</u> is distinct and different from the <u>configurations for access</u> taught by Wurzburg, which pertain to the various different combinations in which upstream ports and downstream

13

ports in the switching hub disclosed by Wurzburg may be coupled to each other. Applicant finds no teaching, suggestion or mention in Wurzburg of USB devices not being reconfigured and/or re-enumerated when switching between configurations of access. (As a matter of fact, Wurzburg explicitly teaches embodiments in which re-enumeration takes place – see further below).

The Office Action identifies devices 125 in Fig. 1 of Wurzburg as corresponding to Applicant's recited "USB device block". It is clear from at least Fig. 3 of Wurzburg, that each device (125) is coupled to a respective downstream port of switching hub 119 (125a to 1212a, and 125b to 121b). In paragraph 0022, Wurzburg teaches that peripheral devices 125 may include USB printers, scanners, digital cameras, digital camera docks, consumer audio/video, storage devices, and card readers, among others. In paragraph 0023, Wurzburg discloses that configurations may be implemented by the downstream routing controller 201 routing communications between the upstream ports 117 and the downstream ports 121, and that in some embodiments, configurations (e.g., hardwired in the USB switching hub) may be switched as determined by logic on the USB switching hub. It is also clear from at least paragraph 0030 of Wurzburg, that switching between the different configurations for access refers to <u>which downstream ports to electrically couple to each upstream port</u>. For example, also in paragraph 0030, Wurzburg states "…*the microprocessor may read a stored configuration profile and attempt to <u>connect upstream ports to downstream ports according to the configuration profile</u>*" [emphasis added]. In contrast, claim 1 recites *concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports*. There is no teaching or suggestion in Wurzburg of any of devices 125 being thereby coupled to two or more hosts, as each configuration in Wurzburg only couples one device to one host at a time.

Finally, Wurzburg discloses in paragraph 0034 that "*when the downstream routing controller 201 switches configurations, and control of a downstream port is switched from the computer system 101 to the dual role peripheral device 207, <u>a connection between the computer system 101 and the respective peripheral device 125</u> (coupled to the downstream port to be switched) <u>may be terminated</u> by the computer system 101*", and further teaches that "*communications between the downstream port to*

14

*be switched and the computer system 101 <u>may be terminated</u> by the USB switching hub 119*", and "*the dual role peripheral device 207 may <u>then connect to, enumerate, and communicate with the respective peripheral device 125 coupled to the switched downstream port*" [emphasis added]. Therefore, it is also clear that Wurzburg also fails to at least teach a system in which at least two hosts are allowed to <u>simultaneously request access to the USB device</u>, and further fails to teach a system in which a controller is operable to receive and respond to <u>simultaneous respective USB access requests sent by the two or more USB hosts</u> for accessing a function of the shared USB device block.

Applicant submits that it is clear from at least the above descriptions that Wurzburg does not anticipate the combination of features recited in claim 1. Applicant further submits that the same arguments apply with equal force to claims 3, 7, 18, and 23, and that for at least the reasons shown above, the independent claims are not anticipated or suggested by Wurzburg, and are therefore allowable.

Applicant further submits that numerous ones of the dependent claims recite further distinctions over the prior art. However, since the independent claims have been shown to be patentably distinct, Applicant also submits that a further discussion of the dependent claims is not necessary at this time, and all respective dependent claims are also patentably distinct for at least the same reasons as the independent claims.

Accordingly, Applicant respectfully requests removal of the 35 U.S.C. § 102(e) and 35 U.S.C. § 103(a) rejections of claims 1-24.

15

**CONCLUSION**

In light of the foregoing amendments and remarks, Applicant submits the application is now in condition for allowance, and an early notice to that effect is requested.

If any extensions of time (under 37 C.F.R. § 1.136) are necessary to prevent the above-referenced application(s) from becoming abandoned, Applicant(s) hereby petition for such extensions.  The Commissioner is hereby authorized to charge any fees which may be required or credit any overpayment to Meyertons, Hood, Kivlin, Kowert & Goetzel P.C., Deposit Account No. 50-1505/5707-12701/JCH.

Also filed herewith are the following items:

☒ Request for Continued Examination
☐ Terminal Disclaimer
☐ Power of Attorney By Assignee and Revocation of Previous Powers
☐ Notice of Change of Address
☒ Information Disclosure Statement

Respectfully submitted,

_/Martin R. Wojcik/_
Martin R. Wojcik, Reg. #57,577
ATTORNEY FOR APPLICANT(S)

Meyertons, Hood, Kivlin, Kowert & Goetzel PC
P.O. Box 398
Austin, TX  78767-0398
Phone: (512) 853-8800
Date: <u>2008-07-23</u>      JCH/ MRW/TAK

16

Appx_222

IPR 2017-00864
Patent Owner's Preliminary Response

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

_____

U.S. Patent No. 7,523,243

_____

Case No. IPR2017-00864


**PATENT OWNER'S PRELIMINARY RESPONSE TO PETITION
PURSUANT TO 35 U.S.C. § 313 AND 37 C.F.R. § 42.107**

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................1

II.   THE '243 PATENT ............................................................6

  A. Background and Overview of Bohm's Invention ...........................6

  B. Prosecution History ....................................................7

III.  THE CITED PRIOR ART ....................................................10

  A. Furukawa ............................................................10

  B. Dickens .............................................................11

IV.  LEGAL STANDARD ..........................................................13

V.   CLAIM CONSTRUCTION .....................................................14

  A. "Simultaneously" (claims 1, 3, 7, 8, 11, 23) ...................15

  B. "Concurrent" (claims 1, 3, 7, 18, 23–24) ......................22

VI.  THE PETITION SHOULD BE DENIED BECAUSE IT
     RAISES THE SAME OR SUBSTANTIALLY SAME ART
     AND ARGUMENTS PREVIOUSLY CONSIDERED BY THE
     OFFICE ..............................................................28

VII.  PETITIONER'S EXPERT TESTIMONY IS UNRELIABLE ....................29

VIII. THE PETITION FAILS TO SHOW A REASONABLE
     LIKELIHOOD PETITIONER WOULD PREVAIL AGAINST
     THE CHALLENGED CLAIMS ...........................................30

  A. Ground 1: Furukawa Does Not Anticipate Claims 1–8, 10–11,
     15–20, or 22–25 ....................................................30

    1.  Claim 1 ........................................................32

    2.  Claims 3 & 7 ...................................................40

    3.  Claim 18 .......................................................41

    4.  Claim 23 .......................................................41

    5.  Dependent Claims ..............................................43

B.  Ground 2: Dickens Does Not Anticipate Claims 1–8, 11, 15–20,
    or 22–25 ................................................................................43

    1.  Claim 1 ....................................................................................45

    2.  Claims 3 & 7 ............................................................................52

    3.  Claim 18 ..................................................................................53

    4.  Claim 23 ..................................................................................54

    5.  Dependent Claims ...................................................................55

C.  Ground 3: Furukawa or Dickens in View of Chen Does Not
    Render Obvious Claims 9, 11–14, or 21 ...................................56

D.  Ground 4: Furukawa or Dickens in View of USB 2.0 Does Not
    Render Obvious Claims 9, 11–14, or 21 ...................................57

E.  Ground 5: Wurzburg in View of Osakada, Further in View of
    Either Furukawa or Dickens Does Not Render Obvious
    Claims 1–25 ...............................................................................60

F.  Ground 6: Furukawa or Dickens in View of Chen, Wurzburg,
    Osakada, APA, Adder, USB 2.0 and "Other Cited Art" Does
    Not Render Obvious Claims 1–25 .............................................62

IX.  CONCLUSION ................................................................................64

ii

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op.
(PTAB Mar. 15, 2017) (Paper 7) ........................................................ 42, 47, 55

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) ....... 3, 19, 27, 28

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254 ........................................ 30

*Fidelity National Information Services, Inc. v. Datatreasury Corp.*,
Case IPR2014-00489, slip op. (PTAB Aug. 13, 2014) (Paper 9) ... 4–5, 22, 57, 59

*Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip
op. (PTAB June 5, 2017) (Paper 10) ...................................................... 59, 61, 63

*In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) .............................................. 35

*In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016) ... 13, 14, 63–64

*In re Ratti*, 270 F.2d 810, 813 (CCPA 1959) .......................................................... 14

*In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ................................. 31, 35, 44

*Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir.
2008) ....................................................................................................... 5, 61, 63

*Lavelle Indus., Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op.
(PTAB May 4, 2017) (Paper 18) ................................................................. 62, 63

*Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-1860, slip op.
(PTAB Feb. 24, 2016) (Paper 11) ...................................................... 5, 13, 29, 60

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) ........................ 27

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985) ............... 30

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056 (Fed. Cir. 2016) ..................... 4, 14, 27

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) .................. 57, 59

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356,
    1361 (Fed. Cir. 2012) ............................................................... 13–14, 31

## Statutes

35 U.S.C. § 314(a) ..................................................................................13

35 U.S.C. § 316(e) ..................................................................................13

35 U.S.C. § 325(d) ............................................................................ 13, 28

## Other Authorities

*Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.)
    (1988) .......................................................................................... 15, 22

## Rules

MPEP § 2143.01 .....................................................................................14

## Regulations

37 C.F.R. § 42.100(b) .............................................................................14

37 C.F.R. § 42.22(a)(2) ...................................................................... 46–47

37 C.F.R. § 42.6(a)(3) .......................................................................... 5, 22

iv

# EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Declaration in Support of Motion for Pro Hac Vice Admission of Brian C. Banner Pursuant to 37 C.F.R. § 42.10(c) |
| 2002 | Declaration of Expert Geert Knapen in Support of Patent Owner's Preliminary Response to Petition |
| 2003 | Excerpts from Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc.) (1988) |

v

## I.    INTRODUCTION

Patent Owner Microchip Technology Inc. submits this preliminary response to the Petition filed by Delphi Technologies, Inc., which seeks *inter partes* review of Claims 1–25 of U.S. Patent No. 7,523,243 to Bohm *et al*. ("the '243 Patent" or "Bohm"). Patent Owner requests the Board deny institution for each ground presented because Petitioner has failed to demonstrate a reasonable likelihood of prevailing with respect to the challenged claims.

The '243 Patent is directed to advanced "multi-host" Universal Serial Bus ("USB") electronic devices that can be used in a wide range of applications including personal computer applications or other systems that use USB, including automobile infotainment systems. The patented multi-host USB devices provide two or more *concurrent USB connections* for allowing two or more USB hosts to access the device's function without the need to reconfigure the USB device each time a different host is given access. Challenged independent claims 1, 3, 7, 18, and 23 require establishing "concurrent" USB connections between the multi-host USB device's USB device block and (1) first and second upstream ports (claim 1) of the multi-host USB device or (2) at least two hosts (claims 3, 7, 18, and 23).

Neither Furukawa nor Dickens—references alleged to anticipate Bohm's independent claims—disclose **concurrent** USB connections. Furukawa does not disclose *concurrent* USB connections because Furakawa's system is only capable of

1

a "one-to-one connection between the host PC, the source of the request, and the peripheral device[1] that is the destination of the request." Ex. 1002 ¶ [0010]. Further confirming the lack of concurrent connections, Furukawa's controlling circuit "releas[es] the connection" between the host PC and the peripheral "after the data transfer has been completed" and before establishing a connection to a different host requesting access to the peripheral. *Id.* Furukawa discloses only one connection to a peripheral at a time, never two or more concurrent connections.

Like Furukawa, Dickens also fails to disclose concurrent USB connections because each peripheral[2] has only a single connection. *See* Ex. 1003, 5:2–4 ("Each peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). Dickens discloses his "invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off. In this way the peripheral can be shared between multiple USB host computers . . . ." *Id.* at 2:22–25. Dickens simply

---

[1]    As admitted in the Petition, Furukawa's peripheral devices (*e.g.*, printer, scanner, HD drive, and CD-ROM drive) correspond to the claimed "USB device block corresponding to at least one function." Petition at 39 (Part VIII.A.1c); *see also* Ex. 1023 ¶ 79.

[2]    As admitted in the Petition, Dickens' peripheral devices (*e.g.*, printer 182) correspond to the claimed "USB device block corresponding to at least one function." Petition at 55 (Part IX.A.1c); *see also* Ex. 1023 ¶ 104.

2

discloses a switch that connects a single peripheral device to one host at a time. There are no concurrent connections.

Dickens also fails to anticipate the claims because the non-concurrent connection between Dickens' peripheral and hosts are not "USB connections." Dickens discloses "a data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*." Ex. 1003, 2:16–19 (emphasis added). Dickens' data routing device converts USB data "into a converted peripheral data format that is *independent of the USB protocol*" before it is routed to/from hosts and a peripheral. *See, e.g.*, *id.* at 8:29–41 (emphasis added). The connection Dickens uses to route data is a PCI bus. *E.g.*, *id.* at 8:16–28. Because Dickens routes data in a non-USB format over a PCI bus, Dickens does not disclose concurrent *USB connections* between the USB device block (*e.g.*, peripheral) and two hosts (or upstream ports) as required by the independent claims of the '243 Patent.

Petitioner attempts to support its ill-founded anticipation arguments under the rubric of the broadest reasonable interpretation claim construction standard. But Petitioner's proposed constructions are unreasonable because they render the claim terms "simultaneously" and "concurrent / concurrent respective dedicated USB connections" meaningless. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction rendering a claim

3

limitation meaningless). "While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016).

Petitioner's obviousness arguments suffer from several deficiencies. First, Petitioner relies on Furukawa and Dickens as base references for each of its obviousness grounds (Grounds 3–6), but none of Petitioner's additional prior art combined with Furukawa or Dickens overcomes the above-described deficiencies of those base references—*i.e.*, none disclose a USB device having **concurrent USB connections** between a USB device block and multiple hosts or upstream ports. Further, Petitioner's expert relies on a legally flawed level of ordinary skill in the art.

Additionally, Petitioner's obviousness arguments are procedurally defective. For Grounds 3 and 4, Petitioner relies on expert testimony without corresponding explanations in the Petition, effectively using the expert declaration to avoid the word count limits of 37 C.F.R. § 42.24. The Board has previously held that assertion of arguments by reference to documents outside of the Petition is improper. *See, e.g.*, *Fidelity National Information Services, Inc. v. Datatreasury Corp.*, Case IPR2014-00489, slip op. at 9 (PTAB Aug. 13, 2014) (Paper 9) ("Under our rules, the petition must contain a 'full statement of the reasons for the relief requested, including a

4

detailed explanation of the significance of the evidence . . . .' 37 C.F.R. § 42.22(a)(2). We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition."); 37 C.F.R. § 42.6(a)(3) (prohibiting incorporation by reference).

For Ground 5, Petitioner vaguely attempts in one page to argue that all twenty-five (25) claims are invalid for obviousness based on arguments cumulative of those made by the Examiner during prosecution of the '243 Patent. *See Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-018160, slip op. at 12–14 (PTAB Feb. 24, 2016) (Paper 11) (denying institution "on an already-considered issue"). And for both Grounds 5 and 6 (both one-page arguments), Petitioner makes no effort to explain how the asserted references would be combined in a way that would arrive at Bohm's invention.[3] Consequently, institution on these grounds should be denied. *See Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008) (petition must sufficiently explain how one of skill would have combined the specific teachings of the prior art in a way that would arrive at the claimed invention).

---

[3]     Highlighting the frivolous nature of Grounds 5 and 6, they are not even endorsed by Petitioner's own expert. *See* Ex. 1023, *passim*.

## II.     THE '243 PATENT

### A.     Background and Overview of Bohm's Invention

The '243 Patent was filed on June 21, 2006, and claims priority to a provisional application filed on April 14, 2006. The '243 Patent relates to "computer hardware and, more specifically, to Universal Serial Bus (USB) controllers." '243 Patent, 1:15–17. By 2006, USB was a mature standard that was used ubiquitously. Ex. 2002 ¶ 59 (Declaration of Expert Geert Knapen) ("Knapen"). The second version of the USB specification (USB 2.0), which provided for increased transfer rates compared to the previous USB specification, had been released years earlier. *Id.* The USB protocol is based on the assumption / requirement that only one entity—a USB host—can initiate data transactions on a USB bus. *Id.* ¶ 61. As Bohm recognizes, "the USB specification is structured so that every device is configured and accessed by a single host controller." '243 Patent, 1:54–56.

To share a peripheral such as a printer between two hosts (*e.g.*, personal computers) a user could unplug the printer from the first host and plug it into the second host. Knapen ¶ 61. Alternatively, as Bohm describes, there were "several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time. There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These

6

solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch. The USB device is typically accessed by one single host at a time, and when access to the USB device is switched, the device must be re-configured, thereby losing internal state information." '243 Patent, 1:59–2:2.

Bohm successfully overcame the shortcomings of the prior art by providing a multi-host USB device with concurrent USB connections between the multi-host USB device's device block corresponding to at least one function and two or more hosts. Bohm explains that his inventive "shared USB device may be simultaneously configured and accessed by two or more USB hosts. The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host. The device may maintain a dedicated address, configuration and response information for each host. Each host may therefore establish a dedicated USB connection with the sharing device." '243 Patent, 2:29–37. Bohm's invention allows for sharing "a single USB device . . . across multiple USB hosts without needing to be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device." '243 Patent, 2:9–12.

**B.    Prosecution History**

During prosecution, Bohm's originally-filed claims were rejected over U.S. Patent Publication No. 2006/0059293 ("Wurzburg") and U.S. Patent No. 6,308,239

7

("Osakada"). *See* Ex. 1014 at 25–30, 51–56. In response, Bohm amended the independent claims, clarifying (1) the claims were to "concurrent" USB connections between the USB device block and two or more hosts[4] so that (2) his invention allowed the hosts to "simultaneously" request access to the USB device.[5] Ex. 1014 at 6–11. Bohm explained the significance of these amendments:

> Wurzburg does not disclose the USB multi-host device that comprises a USB device block corresponding to at least one function and further comprises a multi-host device controller configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to simultaneously request access to the USB device of claim 1. Rather, Wurzburg discloses a system in which a respective dedicated USB connection only exists between the device block and a single host at any one point in time, and thus only a single host can request access to the device block. Wurzburg teaches a "switching hub", which may electronically switch between different configurations (e.g., hardwired or software implemented configurations) for access between the two or more upstream ports and the downstream ports (paragraph 0008). Accordingly, Wurzburg does not teach, suggest, or render obvious a multi-host device controller configured to establish concurrent respective dedicated USB

---

[4]   The "concurrent" limitation was added to each independent claim.
[5]   The "simultaneous" limitation was added to independent claims 1, 3, and 7. Claim 23 included this limitation.

8

connections between a USB device block and first and second upstream ports.

* * *

Finally, Wurzburg discloses in paragraph 0034 that "*when the downstream routing controller 201 switches configurations, and control of a downstream port is switched from the computer system 101 to the dual role peripheral device 207, <u>a connection between the computer system 101 and the respective peripheral device 125</u> (coupled to the downstream port to be switched) <u>may be terminated</u> by the computer system 101*", and further teaches that "*communications between the downstream port to be switched and the computer system 101 <u>may be terminated</u> by the USB switching hub 119*", and "*the dual role peripheral device 207 may <u>then connect to, enumerate</u>, and communicate with the respective peripheral device 125 coupled to the switched downstream port*" [emphasis added]. Therefore, it is also clear that Wurzburg also fails to at least teach a system in which at least two hosts are allowed to <u>simultaneously requests access to the USB device</u>, and further fails to teach a system in which a controller is operable to receive and respond to <u>simultaneous respective USB access requests sent by the two or more USB hosts</u> for accessing a function of the shared USB device block.

Ex. 1014 at 17–19 (pages 13–15 of Applicant's Request for Continued Examination dated 2008-07-23). Bohm's explanation of the concurrent nature of the USB

connections and the simultaneous access requests of his invention overcame the Examiner's rejection, and all claims were allowed. Ex. 1014 at 3.

The '243 Patent issued on April 21, 2009. On October 5, 2010, the Patent Office issued a Certificate of Correction which corrected typographical errors appearing in Claim 1 of the issued patent. *See* Exhibit 1001 at 9.

## III.   THE CITED PRIOR ART

Petitioner relies on two base references for its alleged invalidity Grounds: (1) an English translation of Japanese Patent Application Publication 2003-256351 ("Furukawa") (Ex. 1002), and (2) U.S. Patent No. 6,549,966 ("Dickens") (Ex. 1003). Much like the Wurzburg reference cited during prosecution, Furukawa and Dickens disclose "switching hubs" that connect a USB function to one—and only one—host at a time.

### A. Furukawa

Furukawa is only capable of a "one-to-one connection between the host PC that is the source of the request and the peripheral device that is the destination of the request." Ex. 1002 ¶ [0010]. In other words, Furukawa's controlling circuit establishes a connection between one peripheral (*i.e.*, the USB device block) and only one upstream port. Furukawa explains: "In the present invention, . . . the controlling circuit establishes ***a connection between one of the host computers and the one peripheral device***, and holds temporarily, in the FIFO memory, the data

from another host computer until the transmission or reception of the data of ***the host computer that is connected*** is completed." Ex. 1002 ¶ [0006] (emphasis added). "[I]f there is a request from one or more of the host computers for transmission or reception of data to one peripheral device, the controlling circuit establishes ***a connection between one of the host computers and the one peripheral device*** . . . ." Ex. 1002 at [CLAIM 4] (emphasis added). "The hub repeater 13 is a part that has functions ***for setting up and releasing connections*** between the host PCs 21 through 24 and the peripheral devices 25 through 28." Ex. 1002 ¶ [0011] (emphasis added).

Thus, like Wurzburg's "switching hub," where two hosts request access to a peripheral (*e.g.*, printer 25), Furukawa establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in a FIFO memory and holding off that host request by responding with a NAK signal. Knapen ¶ 71. When the host connected to the peripheral completes its data transfer, the controlling circuit releases the first one-to-one connection and then establishes a new one-to-one connection between the peripheral and the second, waiting host (via its upstream port). Knapen ¶ 72. The second host then completes its access. *Id.*

## B. Dickens

Dickens is also only capable of a one-to-one connection between one host PC and a peripheral, such as the printer. *See, e.g.*, Ex. 1003, 5:2–4 ("Each peripheral

11

device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). Dickens explains "[b]ecause the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off. In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application." Ex. 1003, 2:21–26. "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." *Id.* at 2:48–52.

Thus, like Wurzburg's "switching hub," when two hosts request access to the same peripheral (*e.g.*, a printer), Dickens establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in memory. Knapen ¶ 88. When the host connected to the peripheral completes its data transfer, the data routing device switches the first one-to-one connection off and then switches a new one-to-one connection on between the peripheral and the second, waiting host (via its upstream port). Knapen ¶ 89. The second host then completes its access. *Id.*

12

## IV.   LEGAL STANDARD

An IPR should only be initiated if "the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Petitioner has the "burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e). Thus, a review should not be instituted unless Petitioner has shown a likelihood of success on the invalidity grounds as presented in the Petition. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380–81 (Fed. Cir. 2016) ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.").

"In determining whether to institute or order a proceeding . . . the Director may take into account whether, and reject the petition or request because, ***the same or substantially the same prior art or arguments*** previously were presented to the Office." 35 U.S.C. § 325(d) (emphasis added); *see also Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-1860, slip op. at 14 (PTAB Feb. 24, 2016) (Paper 11) (denying review because "we are unpersuaded that adjudicating such a dispute on an already-considered issue is an efficient use of Board resources").

"For a prior art reference to anticipate a claim, it must disclose all of the limitations of the claim, arranged or combined in the same way as in the claim." *Wm.*

13

*Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (internal quotations omitted). And "[t]o satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d at 1380. "If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims prima facie obvious." MPEP § 2143.01 (citing *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959)).

## V.     CLAIM CONSTRUCTION

"In construing claim terms, the Board must determine the scope of the claims by giving them their broadest reasonable construction in light of the specification as they would be interpreted by one of ordinary skill in the art." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061–62 (Fed. Cir. 2016); *see also* 37 C.F.R. § 42.100(b). "While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description." *Trivascular*, 812 F.3d at 1062. "Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Id.*

14

As shown below, Petitioner's purported broadest reasonable interpretation ("BRI") constructions of "simultaneous" and "concurrent" are unreasonable and are inconsistent with the full claim language and the written description.[6]

## A. "Simultaneously" (claims 1, 3, 7, 8, 11, 23)

The broadest reasonable interpretation of the term "simultaneously" is its plain meaning: "at the same time." Ex. 2003 at 1099, *Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.) (1988) (definition of "simultaneous"). This meaning is consistent with the specification where "simultaneously" is used to indicate things that exist or happen at the same time, including:

- Multiple USB hosts "simultaneously enumerat[ing]" the multi-host USB device. '243 Patent, 2:12–15. One of ordinary skill in the art would know the separate USB endpoint and status buffers in Bohm's multi-host USB device (*see* '243 Patent, Fig. 3, elements 306, 308) would allow two hosts to enumerate the multi-host USB device at the same time. Knapen ¶ 50. In other words, there would be no need to hold

---

[6]     Other constructions proposed by Petitioner are unreasonable but unrelated to the arguments made in this Preliminary Response. Patent Owner reserves the right to challenge any of Petitioner's proposed constructions in the event the Board institutes the requested *inter partes* review on any of Grounds 1–6.

15

off one host's attempt to enumerate the device while the other was also enumerating the device. *Id.*

- Multiple USB hosts "simultaneously shar[ing] a single device/function, for example a Gigabit Ethernet controller." '243 Patent, 2:15–16. The "sharing" in this context has an ordinary meaning and is not a term of art, as the USB specification does not allow for a device to be shared or used by more than one host at a time. Knapen ¶ 51. One of ordinary skill in the art would view Bohm's disclosure of simultaneous sharing as merely stating that a device such as a Gigabit Ethernet controller can be used by multiple hosts at the same time. *Id.*

- "[A] shared USB device may be "simultaneously configured and accessed by two or more USB hosts." '243 Patent, 2:28–30. One of ordinary skill in the art would know the separate USB endpoint and status buffers in Bohm's multi-host USB device (*see* '243 Patent, Fig. 3, elements 306, 308) would allow two hosts to configure the multi-host USB device at the same time. Knapen ¶ 52. In other words, there would be no need to hold off one host's attempt to configure the device while the other was also configuring. *Id.* One of ordinary skill in the art would view the simultaneous "access" stated here as allowing multiple hosts to issue access requests at the same time. *Id.* Indeed, this "access"

16

is made available "by providing a separate configuration and ***access***

***interface*** for each upstream host," *i.e.*, the aforementioned separate

USB endpoint and status buffers. '243 Patent, 3:45–47 (emphasis

added); *see also* Knapen ¶ 52.

- "USB is a serial cable bus for data exchange between a host computer

  and a wide range of simultaneously accessible devices." '243 Patent,

  1:21–23. One of ordinary skill in the art would view Bohm's disclosure

  of "simultaneously accessible devices" consistent with the plain

  meaning of "simultaneously," *i.e.*, the devices on a USB bus can be

  accessed at the same time. Knapen ¶ 53. This is not a technical

  statement meant to imply one USB host can issue simultaneous data

  transfers to separate devices; the USB standard does not allow for that.

  *Id.* This statement merely reflects the *accessibility* of the devices

  connected to the USB bus—they are all equally accessible at the same

  time. *Id.*

The plain meaning of "simultaneously" is further highlighted by Bohm's

disclosure that "[t]here are several switching devices that currently allow a device to

be switched between multiple USB Host controllers, but ***the device can generally***

***be configured and accessed by only a single host at any given time***. There also exist

stand-alone USB switches that provide the capability of switching a device between

17

upstream USB Host Controllers. These solutions, however, ***fail to permit simultaneous access*** to the USB device that is downstream of the hub or switch. ***The USB device is typically accessed by one single host at a time*** . . . ." '243 Patent, 1:58–67 (emphasis added). This passage makes clear there is no simultaneous access if the device is accessed by a single host at a time. One of ordinary skill in the art would understand that in order to have simultaneous access, both hosts must be able to access the device "at the same time." Knapen ¶ 54.

Petitioner offers a "broad meaning" of "simultaneous," but Petitioner's construction is unclear. *See* Petition at 37 (citing to Petition at Section V.E). As best understood, Petitioner contends "'simultaneous' access . . . does not require simultaneous data transfer from two or more computers . . . and includes data transfer one at a time." *Id.* at 18. In other words, Petitioner contends "simultaneous" does not require access from two hosts to happen at the same time, but can include access that happens one at a time. This is unreasonable as it contradicts the specification, in particular, those passages discussed above. *See supra*, pages 15–17. Petitioner's construction is also not reasonable because it renders the claim term "simultaneous" meaningless. For example, independent Claim 3 requires "allow[ing] the first host and the second host to: simultaneously request access to the USB device . . . ." '243 Patent, 5:20–21. If simultaneous requests can mean one request at a time as Petitioner suggests, this limitation would have the same meaning if "simultaneously"

18

were completely omitted: "allow[ing] the first host and the second host to ~~simultaneously~~ request access to the USB device . . . ." Thus, Petitioner's construction cannot be correct and is unreasonable. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction which would render a claim limitation meaningless).

Petitioner also appears to rely on Mr. Garney's conclusion that "'Simultaneous' in its usages does not require immediacy and equivalency in action." Ex. 1023 ¶ 71; *see also* Petition at 37 (citing Ex. 1023 ¶¶ 70–72). Mr. Garney's analysis and conclusion are flawed. For example, Mr. Garney appears to read "simultaneous" into the language of claim 8 despite no actual recitation of that word (or any derivative) in the claim. *See* Ex. 1023 ¶ 70 ("Concerning 'simultaneous,' claim 8 dependent on claim 7 states that the sharing device controller of claim 7 that allows simultaneous host access to the sharing device is ***operable to simultaneously receive host requests***. . . ." (emphasis added)).

Even assuming claim 8 requires a device controller "operable to simultaneously receive host requests" as Mr. Garney posits, this unnecessarily confuses receipt of host requests with service of such requests. Claim 8 expressly states the multi-host device controller is operable (1) "to receive respective host requests from the plurality of hosts" and (2) "to internally determine which of the respective host requests to service immediately." '243 Patent, 5:56–60. These are

19

two separate and distinct activities. Receipt of multiple hosts requests can happen at the same time because Bohm's multi-host device provides "a separate configuration and access interface for each upstream host." '243 Patent, 3:45–47; *see also* Knapen ¶ 55. The fact the controller may not service multiple host requests immediately or at the same time does not change the fact the controller is operable to allow multiple host access requests at the same time. *Id.*

Mr. Garney's analysis of the term "simultaneous" related to Claim 11 is similarly flawed. *See* Ex. 1023 ¶ 70. Claim 11 recites "the multi-host device controller comprises an internal arbitration mechanism configured to permit the plurality of hosts to simultaneously request access to the USB device block by interleaving host access requests and/or by using a common request/grant structure." '243 Patent, 6:1–6. One of ordinary skill in the art would understand "simultaneously" here refers to multiple hosts making access requests at the same time ("simultaneous access requests"). Knapen ¶ 55. One of ordinary skill in the art would understand the simultaneous access requests are possible because Bohm provides "a separate configuration and access interface for each upstream host," *i.e.*, the aforementioned separate USB endpoint and status buffers depicted in Bohm Figure 3. '243 Patent, 3:45–47; *see also* Knapen ¶ 55.

Contrary to Mr. Garney's conclusion, one of ordinary skill in the art would understand "interleaving host access requests and/or by using a common

20

request/grant structure" in Claim 11 as referring to the manner in which the multi-host device controller handles or services the simultaneous access requests. Knapen ¶ 56. In other words, after receiving simultaneous (*i.e.*, "at the same time") requests from multiple hosts, the multi-host device controller can service those requests by providing access to the USB device block "by interleaving host access requests and/or by using a common request/grant structure." *Id.* The specification confirms this understanding of Claim 11 by describing the actual access (*i.e.*, as compared to the request) of the function:

> USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.

'243 Patent, 4:19–26; *see also* Knapen ¶ 56.

Finally, Petitioner's attempt to incorporate Mr. Garney's discussion of "simultaneous" into the Petition without actually explaining this position in the Petition (*see* Petition at 37) is an improper attempt to exceed the word limit. Petitioner certifies the Petition contains 13,805 words. Mr. Garney's discussion of "simultaneous" at ¶¶ 70–71 of Ex. 1023 contains 554 words. These additional 554 words cause the Petition to exceed the 14,000-word limit. This is improper. *See, e.g.*,

21

*Fidelity National Information Services, Inc., v. Datatreasury Corp.*, Case IPR2014-00489, slip op. at 9 (PTAB Aug. 13, 2014) (Paper 9) ("We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition."); 37 C.F.R. § 42.6(a)(3) (prohibiting incorporation by reference).

## B.    "Concurrent" (claims 1, 3, 7, 18, 23–24)

The term "concurrent" has its plain meaning: "operating or occurring at the same time." Ex. 2003 at 273, *Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.) (1988) (definition of "concurrent"). Thus, in the context of the claims, "concurrent respective dedicated USB connections" (and other similar terms) means one or more USB connections operating or occurring at the same time.

This plain meaning construction is supported by the specification in which every one of the disclosed multi-host devices is connected to more than one host at the same time. Figure 1, depicted below, "shows a system diagram of a multi-host capable USB device coupled to multiple hosts according to one embodiment." '243 Patent, 3:15–17.

22



*FIG. 1*

As depicted, Host 1 (102) and Host 2 (104) are connected at the same time to multi-host device 106. *See* '243 Patent, 3:47–51. Figure 2 also "shows multi-host capable devices coupling to multiple hosts." '243 Patent, 3:18–19.



*FIG. 2*

23

As depicted, "multi-host device 106—configured with USB multi-host device controller 108—may be a personal digital assistant (PDA) 130, a keyboard 126, and/or a printer 120 shared by personal computer (PC) 122 and PC 123." '243 Patent, 3:52–55. Consistent with the plain meaning of "concurrent," the PDA, keyboard, and printer are each connected to the two PCs via USB connections operating or occurring at the same time. Figure 3, which depicts "a logic diagram of a USB multi-host device" further confirms the plain meaning construction of "concurrent." '243 Patent, 3:20.

24



*FIG. 3*

As depicted, multi-host device 106 includes a "Connection to first Host" and a "Connection to second Host" that exist or occur at the same time.

The plain meaning construction of "concurrent" is also confirmed by the prosecution history. Bohm responded to the Examiner's rejection of the claims under 35 U.S.C. § 112 and argued (successfully) "the disclosure of the instant invention

25

does not teach that any of the hosts are disconnected from the USB device block once they have been connected to the USB device block, i.e. after the ***concurrent*** respective dedicated USB connections between the USB device block and the first and second upstream ports have been established." Ex. 1014 at 12 (page 8 of Applicant's Request for Continued Examination dated 2008-07-23) (bold emphasis added). This statement confirms the "concurrent" USB connections operate or occur at the same time because they are not "disconnected from the USB device block once they have been connected." *Id.*

Petitioner incorrectly contends Bohm's "concurrent" USB connections "are concurrent to the extent that they 'allow … hosts to: [e.g.] simultaneously enumerate and configure the USB multi-host device; simultaneously access [it]; and alternately access the USB device block …'" Petition at 19. In other words, Petitioner contends multiple USB connections need not operate or occur at the same time as long as the other limitations of the claim are met.[7]

---

[7]    Petitioner's construction is in conflict with its proposed construction of "to allow the corresponding first and second host to." *See* Petition at 33. Petitioner claims the latter recitation renders all of the functions optional (*e.g.*, "simultaneously enumerate and configure," "simultaneously access," "alternately access"). *Id.* If the functions are optional and the recited "concurrent" connections need only allow these optional functions, then the "concurrent" connections do not have to allow anything at all. Under this unreasonable construction of the claim terms, any system with two hosts and a device, whether connected or not, would satisfy the claims.

26

Petitioner's construction is not reasonable and should be rejected. First, it is inconsistent with the specification and the prosecution history which, as explained above, show multiple concurrent USB connections operating or occurring at the same time. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016) (BRI is not "an unfettered license to interpret the words in a claim without regard for the full claim language and the written description.").

Petitioner's construction is also not reasonable because it is inconsistent with the express language of Claim 18. Independent Claim 18, a method claim, recites the step of "establishing concurrent respective USB connections between a shared USB device and a plurality of hosts, wherein the USB device corresponds to at least one function." '243 Patent, 6:35–38. Unlike the other independent claims, Claim 18 does not use the "to allow" language Petitioner uses to justify its improper construction. Thus, in the context of Claim 18, Petitioner's construction is unjustified and nonsensical. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

Petitioner's construction is also not reasonable because it renders the term "concurrent" meaningless. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction rendering a claim limitation meaningless). For example, Claim 1 recites a multi-host device controller

27

> configured to establish concurrent respective dedicated USB
> connections between the USB device block and the first and second
> upstream ports, to allow the corresponding first and second hosts to:
> simultaneously request access to the USB device

'243 Patent, 4:59–64. If concurrent connections can mean any type of connection

allowing for the functions that follow, this limitation would have the same meaning

if "concurrent" were completely omitted:

> configured to establish ~~concurrent~~ respective dedicated USB
> connections between the USB device block and the first and second
> upstream ports, to allow the corresponding first and second hosts to:
> simultaneously request access to the USB device

Because it renders the term "concurrent" meaningless, Petitioner's construction

cannot be correct. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d at 885 (Fed. Cir.

2008) (refusing to adopt a claim construction which would render a claim limitation

meaningless).

## VI.   THE PETITION SHOULD BE DENIED BECAUSE IT RAISES THE SAME OR SUBSTANTIALLY SAME ART AND ARGUMENTS PREVIOUSLY CONSIDERED BY THE OFFICE

The Board has discretion under 35 U.S.C. § 325(d) to reject a petition when

the same or substantially the same prior art or arguments were presented previously

in another proceeding before the Office. During prosecution, Bohm successfully

overcame the Examiner's novelty and obviousness rejections with respect to the

Wurzburg prior art, which is the base reference for Ground 5 of the Petition. As discussed above, Wurzburg discloses a USB switching hub in which a respective dedicated USB connection only exists between the device block and a single host at any one point in time. *See* Part II.B. Also as discussed above, the Furukawa and Dickens references (Grounds 1–4 and 6) disclose substantially the same system, *i.e.*, USB switching hubs in which a connection only exists between the device block and a single host at any one point in time. *See* Parts III.A–B. Petitioner ignores these similarities, and instead attempts to repackage substantially the same arguments as those previously considered—and rejected—by the Examiner during prosecution. Accordingly, Grounds 1–6 should be rejected as consisting of the same or substantially the same arguments previously presented to the Office. *See, e.g., Neil Ziegman*, Case IPR2015-1860, slip op. at 14 (PTAB Feb. 24, 2016) (Paper 11) (denying review because "we are unpersuaded that adjudicating such a dispute on an already-considered issue is an efficient use of Board resources").

## VII.  PETITIONER'S EXPERT TESTIMONY IS UNRELIABLE

Petitioner's expert testimony is unreliable because it is based on a legally erroneous determination of the proper level of ordinary skill in the art. For the obviousness inquiry,

> [t]he statutory emphasis is on a person of *ordinary* skill. Inventors, as a class . . . possess something—call it what you will—which sets them

29

apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (i.e., inventors) would have known or would likely have done . . . .

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). Contrary to this long-standing Federal Circuit precedent, Mr. Garney improperly uses the inventors of Bohm and other patents to determine the level of ordinary skill in the art. *See* Ex. 1023 ¶¶ 56–58. This leads Mr. Garney to the incorrect conclusion that the level of *ordinary* skill is "high," requiring a degree, "if not an advanced degree." *Id.* ¶ 58; *compare with* Knapen ¶ 47 (person of ordinary skill in the art does not have an advanced degree). Mr. Garney's testimony regarding claim construction and obviousness, both viewed from the perspective of one having ordinary skill, is unreliable and should not be considered. *See Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1258–59 (Fed. Cir. 2007) (reversing district court because expert testimony evidence of non-obviousness "was based on an improper determination of the level of skill in the art").

## VIII.  THE PETITION FAILS TO SHOW A REASONABLE LIKELIHOOD PETITIONER WOULD PREVAIL AGAINST THE CHALLENGED CLAIMS

### A.  Ground 1: Furukawa Does Not Anticipate Claims 1–8, 10–11, 15–20, or 22–25

Ground 1 asserts Japanese reference 2003-256351 ("Furukawa") anticipates Claims 1–8, 10–11, 15–20, and 22–25 of the '243 Patent. Petition at 37–53. The

30

Board should deny institution with respect to Ground 1 because Petitioner has failed to demonstrate that Furukawa discloses every limitation of the claimed invention. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (prior art "must disclose all of the limitations of the claim"); *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (anticipation requires each and every element to be found in a single prior art reference). Each of Bohm's independent claims—1, 3, 7, 18, and 23—require two or more concurrent USB connections between the USB device block[8] and two or more upstream ports or hosts. Furukawa does not disclose these concurrent USB connections because it is only capable of a "one-to-one connection between the host PC that is the source of the request and the peripheral device[9] that is the destination of the request." Ex. 1002 ¶ [0010]. The independent claims also require simultaneous access requests to (Claims 1, 3, 7, 23) and simultaneous configuration of (Claim 23) the USB device. Under the proper BRI construction of "simultaneously" discussed above (*see* Part V.A), Furukawa does not disclose these additional limitations of the independent claims. Because Furukawa only discloses a one-to-one connection for any peripheral device, two

---

[8]   Claim 18 uses the term "USB device" instead of "USB device block." The Petition appears to treat the different terms synonymously.

[9]   As admitted in the Petition, Furukawa's peripheral devices (*e.g.*, printer, scanner, HD drive, and CD-ROM drive) correspond to the claimed "USB device block." Petition at 39 (Part VII.A.1c); *see also* Ex. 1023 ¶ 79.

31

hosts cannot simultaneously configure or otherwise access the same peripheral at the same time.

## 1.   Claim 1

Independent Claim 1 is directed to:

1. A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding first and second hosts;

a USB device block corresponding to at least one function; and

a multi-host device controller coupling the USB device block to the first and second upstream ports, wherein the multi-host device controller is configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously request access to the USB device; and

alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block each time a different one-of the first and second hosts is given access to the USB device block to use the at least one function.

'243 Patent, 4:53–5:3. According to its express language, Claim 1 requires a USB multi-host device with (1) first and second upstream ports, (2) a USB device block corresponding to at least one function, and (3) a multi-host device controller

32

IPR 2017-00864
Patent Owner's Preliminary Response

"configured to establish **concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports**."

Petitioner alleges (1) Furukawa's "plurality of connecting ports 2" correspond to the claimed "first and second upstream ports" (Petition at 38); and (2) any of Furukawa's "USB peripheral devices including a printer, scanner, HD drive, [and] CD-ROM drive" correspond to the claimed "USB device block corresponding to at least one function" (*id.* at 39). Petitioner does not actually identify the "concurrent respective dedicated USB connections" required by Claim 1. *See* Petition at 40–42. Relying instead on its improper BRI construction of "concurrent," Petitioner identifies Furukawa's "controlling circuit," which "consists of hub repeater 13, hub controller 14, and CPU 15" as disclosing "concurrence." *Id.* Petitioner's allegations are depicted in the annotated figure below:

IPR 2017-00864
Patent Owner's Preliminary Response

FIG. 1



Ex. 1002 at 5 (annotated).

34

First, Petitioner's anticipation argument fails by not identifying "concurrent respective dedicated USB connections" required by Claim 1. "To prove anticipation, Petitioner must show that each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999). Rather than specifically identify the claimed "concurrent respective dedicated USB connections" of Claim 1, Petitioner states generally that "Furukawa discloses its controller [is] configured, *i.e.*, structured, or operable, for USB connections between function blocks and upstream ports." Petition at 40. While Petitioner's statement may be true, this general observation about Furukawa does nothing to support Petitioner's anticipation argument. Nor does Petitioner's equally general observation that "Furukawa discloses 'a controlling circuit for establishing connections between the host computers and the peripheral devices.'" *Id.* To prove anticipation, Petitioner must identify the specifically-claimed "concurrent" dedicated USB connections between the USB device block and the first and second upstream ports. *See In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (anticipatory prior art must disclose "each and every element of the claimed invention . . . arranged or combined in the same way as in the claim").

Petitioner does not identify the claimed concurrent dedicated USB connections because they do not exist in Furukawa. Rather, as Petitioner admits

35

(Petition at 41), Furukawa is only capable of a "one-to-one connection between the host PC that is the source of the request and the peripheral device that is the destination of the request." Ex. 1002 ¶ [0010]. In other words, Furukawa's controlling circuit cannot "establish concurrent respective dedicated USB connections between the USB device block [*i.e.*, the printer, scanner, HD Drive, or CD-ROM Drive] and the first and second upstream ports [*i.e.*, two of ports 2-1, 2-2, 2-3, or 2-4]." Instead, Furukawa's controlling circuit establishes a connection between one peripheral (*i.e.*, the USB device block) and only one upstream port. *See* Knapen ¶ 67. This "one-to-one connection" is repeatedly emphasized in Furukawa:

- "[I]f there is a request from one or more of the host computers for transmission or reception of data to one peripheral device, the controlling circuit establishes ***a connection between one of the host computers and the one peripheral device*** . . . ." Ex. 1002 at [CLAIM 4] (emphasis added).

- "In the present invention, . . . the controlling circuit establishes ***a connection between one of the host computers and the one peripheral device***, and holds temporarily, in the FIFO memory, the data from another host computer until the transmission or reception of the data of ***the host computer that is connected*** is completed." *Id.* ¶ [0006] (emphasis added).

36

- "The controlling circuit C has functions such as for checking the state of use of a peripheral device when there has been a request for transfer of data . . . [and] for setting up *a connection between the host PC and the peripheral device* if the peripheral device is available for use . . . ."

  *Id.* ¶ [0010] (emphasis added).

One of ordinary skill in the art understands the controlling circuit in Furukawa is limited to establishing only this type of one-to-one connection between the USB devices (Furukawa's peripherals) and the USB hosts. Knapen ¶¶ 67–69. This understanding is confirmed by Furukawa's "releasing [of] the connection after the data transfer has been completed." Ex. 1002 ¶ [0010]; *see also* Knapen ¶¶ 70–73; Ex. 1002 ¶ [0011] ("The hub repeater 13 is a part that has functions for setting up and releasing connections between the host PCs 21 through 24 and the peripheral devices 25 through 28."). As explained in Furukawa:

> [I]f, while a given host PC is accessing a peripheral device (for example, the printer 25), another host PC has requested access to that peripheral device, the data of the second host PC is held temporarily in the FIFO memory 11 until completion of the transmission or reception by the first host PC, through outputting of the NAK signal. Collisions between the data of the individual host PCs are avoided thereby.

Ex. 1002 ¶ [0017].

37

Based on these passages, one of ordinary skill in the art understands when two hosts request access to the same peripheral (*e.g.*, printer 25), Furukawa establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in a FIFO memory and holding off that host request by responding with the NAK signal. Knapen ¶ 71. When the host connected to the peripheral completes its data transfer, the controlling circuit releases the first one-to-one connection and then establishes a new one-to-one connection between the peripheral and the second, waiting host (via its upstream port). *Id.* ¶ 72. The second host then completes its access. *Id.* One of ordinary skill in the art understands Furukawa is not capable of establishing concurrent USB connections between a peripheral and two or more hosts or upstream ports because there are never two or more such USB connections at the same time. *Id.* ¶ 73. Furukawa's connections to peripherals are always one-to-one.

Petitioner relies on Furukawa's statement that "a plurality of host PCs can access the peripheral devices simultaneously" as disclosing the "concurrence" required by Claim 1. *See* Petition at 41–42. However, one of skill in the art understands this statement to disclose only that one host may access one peripheral while another host is accessing another peripheral. Knapen ¶ 74. While this may be a type of "concurrence," it is not the concurrence required by the claim—*i.e.*, two hosts connected to the same function at the same time or simultaneously.

38

Petitioner also appears to rely on the fact that Furukawa's "controlling circuit C (outlined in red) connects to Host PCs (outlined in blue) concurrently through bus 12, FIFO memories 11, and connecting ports 2" as disclosing the "concurrent" USB connections of Claim 1. *See* Petition at 40. Again, this "concurrence" is not the concurrence required by Claim 1 because it merely describes multiple hosts connected to the controlling circuit at the same time. As discussed above, multiple hosts are not concurrently connected to a USB device block (*e.g.*, peripherals 25–28); Furukawa provides only a one-to-one connection between any one host and any one peripheral.

Because Furukawa does not establish the concurrent USB connections of Claim 1, it also does not disclose a multi-host device controller allowing the first and second hosts to "simultaneously request access to the USB device," as required by Claim 1. As discussed above, the broadest reasonable interpretation of "simultaneously" means "at the same time." *See* Part V.A. One of ordinary skill in the art would understand that because Furukawa provides only a one-to-one connection between any one peripheral and any one host at any given time, there can be no simultaneous requesting access to the USB device by multiple hosts. Knapen ¶ 76. Instead, Furukawa would allow only one host to request access to a peripheral, and would buffer a second host's attempt to simultaneously request access to the

39

same peripheral, issuing a NAK signal to the second host. *Id.*; *see also* Ex. 1002 ¶ [0017].

## 2.    Claims 3 & 7

Like Claim 1, Claims 3 and 7 recite concurrent dedicated USB connections and simultaneous access requests to a USB device. *See* '243 Patent, 5:9–26, 5:41–55. The concurrent dedicated USB connections are between two or more hosts and the USB device block. *Id.* at 5:14–19 ("a first dedicated USB connection between the first host and the USB device block and a second dedicated USB connection between the second host and the USB device block, wherein the first dedicated USB connection and the second dedicated USB connection are concurrent"), 5:46–48 ("concurrent respective dedicated USB connections between the USB device block and the plurality of hosts"). Petitioner contends the anticipation analysis for Claim 1 applies to Claims 3 and 7. *See* Petition at 45–48.

As discussed above with respect to Claim 1, Furukawa fails to disclose "concurrent" USB connections between two hosts and the USB device block because Furukawa is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB device block). *See* Part VIII.A.1. Also as discussed above, without the claimed concurrent USB connections Furukawa does not allow the hosts to "simultaneously request access to the USB device." *Id.*

40

### 3.    Claim 18

Like Claim 1, Claim 18 recites concurrent USB connections. *See* '243 Patent, 6:33–48. The Claim 18 concurrent USB connections are between a plurality of hosts and a shared USB device corresponding to at least one function. *Id.* at 6:35–38 ("establishing concurrent respective dedicated USB connections between a shared USB device and a plurality of hosts, wherein the USB device corresponds to at least one function"). Petitioner contends the anticipation analysis for Claim 1 applies to Claim 18. *See* Petition at 48–49.

As an initial matter, Petitioner has failed to identify the claimed "shared USB device" in Furukawa. As best understood, it appears Petitioner is equating the "shared USB device" of Claim 18 with the "USB device block" in Claim 1. As discussed above with respect to Claim 1, Furukawa fails to disclose "concurrent" USB connections between a plurality of hosts and the USB device block because Furukawa is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, presumably the claimed shared USB device). *See* Part VIII.A.1.

### 4.    Claim 23

Claim 23 recites concurrent USB connections and simultaneous configuring of and requesting access to a USB device. *See* '243 Patent, 6:65–7:7. The Claim 23 concurrent USB connections are between the USB device block and two or more USB hosts. *Id.* at 7:1–3 ("concurrent respective dedicated USB connections between

41

the shared USB device block and the two or more USB hosts"). Petitioner's analysis of Claim 23 is unintelligible. *See* Petition at 49–50. Petitioner fails to identify any structure in Furukawa corresponding to a device block "operable to be simultaneously configured by two or more USB hosts," as required by Claim 23. For this reason alone, Petitioner has failed to show a reasonable likelihood of success in challenging Claim 23 as anticipated by Furukawa. *See Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op. at 8–9 (PTAB Mar. 15, 2017) (Paper 7) (denying institution where Petitioner failed to identify in sufficient detail portions of prior art allegedly anticipating the claim).

Petitioner's cryptic statement about the "broadening" in Claim 23 may intend to suggest the anticipation analysis for Claim 1 applies equally to Claim 23. *See* Petition at 49–50. As discussed above with respect to Claim 1, Furukawa fails to disclose "concurrent" USB connections between the USB device block and two or more hosts because Furukawa is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB device block). *See* Part VIII.A.1. And without the claimed concurrent USB connections, Furukawa's USB device block cannot be "simultaneously configured by two or more USB hosts." Knapen ¶¶ 78–79.

42

### 5.   Dependent Claims

By virtue of their dependency, Claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25 of the '243 Patent include the same limitations as the independent claim from which they depend. Therefore, for the same reasons discussed above with respect to the independent claims, Petitioner has also not demonstrated a reasonable likelihood it would prevail in showing Furukawa anticipates these dependent claims.

### B.   Ground 2: Dickens Does Not Anticipate Claims 1–8, 11, 15–20, or 22–25

Ground 2 asserts U.S. Patent No. 6,549,966 ("Dickens") anticipates Claims 1–8, 11, 15–20, and 22–25 of the '243 Patent. Petition at 54–62. The Board should deny institution with respect to Ground 2 because Petitioner has failed to demonstrate that Dickens discloses every limitation of the claimed invention. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (anticipation requires each and every element to be found, either expressly or inherently, in a single prior art reference). Each of Bohm's independent claims—1, 3, 7, 18, and 23—requires two or more concurrent USB connections between the USB device block[10] and two or more upstream ports or hosts. Dickens does not disclose these concurrent USB

---

[10]   Claim 18 uses the term "USB device" instead of "USB device block." The Petition appears to treat the different terms synonymously.

43

connections because "[e]ach peripheral device[11] can have a USB connection by which it is connected to *a respective one* of the plurality of peripheral data converters." Ex. 1003, 5:2–4 (emphasis added). Thus, like Furukawa (Ground 1), Dickens simply discloses a switch that connects a peripheral device to one host at a time. *See, e.g.*, *id.* at 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

The independent claims also require simultaneous access requests to (Claims 1, 3, 7, 23) and simultaneous configuration of (Claim 23) the USB device. Under the proper BRI construction of "simultaneously" discussed above, Dickens does not disclose these additional limitations of the independent claims. Because Dickens only discloses a one-to-one connection for any peripheral device, two hosts cannot simultaneously configure or otherwise access the same peripheral at the same time.

The Board should also deny the Petition as to Ground 2 because Dickens does not disclose "USB connections" between two or more hosts (or upstream ports) and its peripherals (*e.g.*, the claimed "USB device block"). Rather, Dickens

---

[11]      As admitted in the Petition, Dickens' "peripheral devices including a printer 182" correspond to the claimed "USB device block." Petition at 55 (Part IX.A.1c); *see also* Ex. 1023 ¶ 104.

44

unambiguously states his invention is "a data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*." Ex. 1003, 2:16–19 (emphasis added).

### 1.    Claim 1

As discussed in Part VIII.A.1 above, Claim 1 expressly requires a USB multi-host device with (1) first and second upstream ports, (2) a USB device block corresponding to at least one function, and (3) a multi-host device controller "configured to establish *concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports*." '243 Patent, 4:53–5:3.

As best understood, Petitioner alleges (1) Dickens' USB data routing device 100 has upstream USB ports corresponding to the claimed "first and second upstream ports" (Petition at 54–55 (discussing the connection between data routing device 100 and host computers 105)); and (2) Dickens' "peripheral devices including a printer 182" correspond to the claimed "USB device block corresponding to at least one function" (*id.* at 55).

Petitioner does not actually identify the "concurrent respective dedicated USB connections" required by Claim 1. *See* Petition at 56. Relying instead on its improper BRI construction of "concurrent," Petitioner appears to identify most of Dickens' data routing device 100, including "data router 130 and data routing controller 140

45

with microprocessor 142," "device controllers 150," "USB controllers 154, 156, the

bus 132, and USB connections 109" as disclosing the "multi-host controller

configured to establish concurrent respective USB connections between the USB

device block," which is according to Petitioner "the Dickens printer 182, and the

first and second upstream ports." *Id.* Putting aside the fact Petitioner is not even

reciting the actual language of Claim 1, Petitioner's allegations (as best understood)

are depicted in the annotated figure below:



Ex. 1003, Fig. 2 (annotated).

This vague and conclusory assertion does not provide sufficient detail as to

the grounds on which Petitioner challenges Claim 1. *See* 37 C.F.R. § 42.22(a)(2)

46

(petition must include "a detailed explanation of the significance of the evidence"). The Board and Patent Owner are left to guess what structure in Dickens the Petitioner believes corresponds to the "concurrent respective dedicated USB connections" required by Claim 1. For this reason alone, Petitioner has failed to show a reasonable likelihood of success in challenging Claim 1 as anticipated by Dickens. *See Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op. at 8–9 (PTAB Mar. 15, 2017) (Paper 7) (denying institution where Petitioner failed to identify in sufficient detail portions of prior art allegedly anticipating the claim).

### a.    *Dickens does not disclose the claimed "concurrent" USB connections*

Petitioner does not identify the claimed concurrent USB connections because they do not exist in Dickens. Rather, Dickens is only capable of a one-to-one connection between one host PC and a peripheral such as the printer. *See, e.g.*, Ex. 1003, 5:2–4 ("Each peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). In other words, Dickens' data routing device cannot "establish concurrent respective USB connections between the USB function block [*e.g.*, the printer] and the first and second upstream ports [*e.g.*, USB ports connected to USB connection 106]." Petition at 56. Instead, Dickens' data routing device establishes a connection between one peripheral (*e.g.*, the USB device block) and only one upstream port.

47

One of ordinary skill in the art understands the data routing device in Dickens is limited to establishing only this type of one-to-one connection between the USB function (Dickens' printer) and the USB host PCs. *See* Knapen ¶¶ 83–86. This understanding is confirmed by at least the following passages:

- "Because the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off. In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application." Ex. 1003, 2:21–26.

- "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." *Id.* at 2:48–52.

- "When print data from either computer is detected it is routed to the printer if the printer is currently free. Any subsequent print data from the other computer is buffered in memory until a break in transmission of the original print data stream equal to the timeout period has been detected. The[] buffered data is then sent to the printer. . . . The overall

48

effect is to allow the printer to be automatically shared between the computers." *Id.* at 9:21–30.

Based on these passages, one of one of ordinary skill in the art understands when two hosts request access to the same peripheral (*e.g.*, a printer), Dickens establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in memory. Knapen ¶¶ 87–88. When the host connected to the peripheral completes its data transfer, the data routing device switches the first one-to-one connection off and then switches a new one-to-one connection on between the peripheral and the second, waiting host (via its upstream port). *Id.* ¶ 89. The second host then completes its access. *Id.* One of ordinary skill in the art understands Dickens is not capable of establishing concurrent USB connections between a peripheral and two or more hosts or upstream ports because there are never two or more such USB connections at the same time. *Id.* ¶ 90. Dickens' connections to peripherals are always one-to-one.

> **b.    *Dickens does not disclose the claimed "simultaneously" configuring or requesting access***

Because Dickens does not establish the concurrent USB connections of Claim 1, it also does not disclose a multi-host device controller allowing the first and second hosts to "simultaneously request access to the USB device block," as

<div align="center">49</div>

required by Claim 1. As discussed above, the broadest reasonable interpretation of "simultaneously" means "at the same time." *See* Part V.A. One of ordinary skill in the art would understand that because Dickens provides only a one-to-one connection between any one peripheral and any one host at any given time, there can be no simultaneous requesting access to the USB device by multiple hosts. Knapen ¶ 92. Instead, Dickens would allow only one host to request access to a peripheral, and would buffer a second host's attempt to simultaneously request access to the same peripheral. *Id.*; *see also* Ex. 1003, 9:21–30.

### c. *Dickens does not disclose the claimed "USB connections"*

Claim 1 requires the concurrent connections "between the USB device block and the first and second upstream ports" to be "USB connections." Petitioner cannot show a likelihood of success Dickens anticipates Claim 1 because the connection between the printer (*i.e.*, according to Petitioner, the claimed "USB device block") and the first and second upstream ports is not a USB connection. Dickens repeatedly emphasizes this fact:

- "[A] data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*." Ex. 1003, 2:16–19 (emphasis added).

- "Signals under the USB protocol are received by the [data routing] device from the host computer and are converted into ***a non-USB protocol form***." *Id.* at 2:27–29 (emphasis added).

- "[T]he control of the data transmitted between [the host computer and peripheral devices] is achieved in ***a USB protocol independent manner***." *Id.* at 2:36–39 (emphasis added).

- "Preferably, the data router includes ***a non-USB bus*** in communication with the computer data converter, peripheral data converter and the microprocessor . . . . The converted computer data and peripheral data may be transferred through the data router by ***a non-USB bus***. The routing of the data on ***the non-USB bus*** is controlled by the microprocessor . . . ." *Id.* at 4:6–17 (emphasis added).

- "The microprocessor 142 converts incoming computer data from the USB host computers 105 into ***a format that is independent of the USB protocol*** and stores it in DRAM 144. It also performs the reverse task on data that is flowing in the opposite direction." *Id.* at 7:45–49 (emphasis added).

- "[A] format that is ***independent of the USB protocol***." *Id.* at 8:19–21, 8:24–26, 8:29–41 (emphasis added).

51

- "Any data received from the printer 180 and speakers 182 is converted by the peripheral data converters into a converted peripheral data *format that is independent of the USB protocol* and stored in the DRAM 144 ready for processing by the microprocessor 142 of the routing controller 140." *Id.* at 8:37–41 (emphasis added).

The connection Dickens uses to route data is a PCI bus. *E.g.*, *id.* at 8:16–28. Even Petitioner's own expert appears to acknowledge the lack of a "USB connection." *See* Ex. 1023 ¶ 54 (some prior art included "non-USB data exchanges internally"). Because Dickens routes data in a non-USB format over a PCI bus, one of ordinary skill in the art would not view Dickens as disclosing concurrent respective "USB connections" between Dickens' printer (*e.g.*, the claimed USB device block) and the two upstream ports on Dickens' data routing device. Knapen ¶¶ 93–94.

## 2. Claims 3 & 7

Like Claim 1, Claims 3 and 7 recite concurrent dedicated USB connections and simultaneous access requests to a USB device. *See* '243 Patent, 5:9–26, 5:41–55. The concurrent dedicated USB connections are between two or more hosts and the USB device block. *Id.* at 5:14–19 ("a first dedicated USB connection between the first host and the USB device block and a second dedicated USB connection between the second host and the USB device block, wherein the first dedicated USB

52

connection and the second dedicated USB connection are concurrent"), 5:46–48 ("concurrent respective dedicated USB connections between the USB device block and the plurality of hosts"). Petitioner contends its Claim 1 anticipation analysis applies to Claims 3 and 7. *See* Petition at 59.

As discussed above regarding Claim 1, Dickens fails to disclose "concurrent" USB connections between two hosts and the USB device block because (1) Dickens is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB device block) (*see* Part VIII.B.1.a), and (2) Dickens uses a PCI connection instead of a USB connection (*see* Part VIII.B.1.c). Also, as discussed above, without the claimed concurrent USB connections, Dickens does not allow the hosts to "simultaneously request access to the USB device." *See* Part VIII.B.1.b.

### 3. Claim 18

Like Claim 1, Claim 18 recites concurrent USB connections. *See* '243 Patent, 6:33–48. The Claim 18 concurrent USB connections are between a plurality of hosts and a shared USB device corresponding to at least one function. *Id.* at 6:35–38 ("establishing concurrent respective dedicated USB connections between a shared USB device and a plurality of hosts, wherein the USB device corresponds to at least one function"). Petitioner contends its Claim 1 anticipation analysis applies to Claim 18. *See* Petition at 59.

As an initial matter, Petitioner has failed to identify the claimed "shared USB device" in Dickens. As best understood, it appears Petitioner equates the "shared USB device" of Claim 18 with the "USB device block" in Claim 1. As discussed above regarding Claim 1, Dickens fails to disclose "concurrent" USB connections between a plurality of hosts and the USB device block because (1) Dickens is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, presumably according to Petitioner, the claimed USB device) (*see* Part VIII.B.1.a), and (2) Dickens uses a PCI connection instead of a USB connection (*see* Part VIII.B.1.c).

### 4.    Claim 23

Claim 23 recites concurrent USB connections and simultaneous configuring of and requesting access to a USB device. *See* '243 Patent, 6:65–7:7. The Claim 23 concurrent USB connections are between the USB device block and two or more USB hosts. *Id.* at 7:1–3 ("concurrent respective dedicated USB connections between the shared USB device block and the two or more USB hosts"). Petitioner contends the anticipation analysis for Claim 1 applies to Claim 23. *See* Petition at 59. Petitioner fails to identify any structure in Dickens corresponding to a device block "operable to be simultaneously configured by two or more USB hosts," as required by Claim 23. For this reason alone, Petitioner has failed to show a reasonable likelihood of success in challenging Claim 23 as anticipated by Dickens. *See*

54

*Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op. at 8–9 (PTAB Mar. 15, 2017) (Paper 7) (denying institution where Petitioner failed to identify in sufficient detail portions of prior art allegedly anticipating the claim).

Additionally as discussed above regarding Claim 1, Dickens fails to disclose "concurrent" USB connections between the USB device block and two or more hosts because (1) Dickens is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB device block) (*see* Part VIII.B.1.a), and (2) Dickens uses a PCI connection instead of a USB connection (*see* Part VIII.B.1.c). Also, as discussed above, without the claimed concurrent USB connections, Dickens' USB device block cannot be "simultaneously configured by two or more USB hosts." Knapen ¶¶ 91–92.

### 5.    Dependent Claims

By virtue of their dependency, Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 of the '243 Patent include the same limitations as the independent claim from which they depend. Therefore, for the same reasons discussed above regarding the independent claims, Petitioner fails to demonstrate a reasonable likelihood it would prevail in showing Dickens anticipates these dependent claims.

55

### C.  Ground 3: Furukawa or Dickens in View of Chen Does Not Render Obvious Claims 9, 11–14, or 21

Ground 3 asserts Claims 9, 11–14, and 21 are rendered obvious by either Furukawa or Dickens in view of Chen. Petition at 63. As discussed above, neither Furukawa nor Dickens disclose a USB device having *concurrent USB connections* between a USB device block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1. Chen does not teach or disclose the concurrent USB connections required by the independent claims, and Petitioner does not assert it does. Indeed, Chen cannot have concurrent USB connections between a USB device block and multiple hosts because Chen's system has only one host, as Petitioner admits. Petition at 63 ("Chen has one host."); *see also* Knapen ¶ 100.

The Board should also refuse to initiate review on proposed Ground 3 because Petitioner improperly exceeds the word limit by incorporating Mr. Garney's discussion of Ground 3 and not adequately explaining this position in the Petition. For example, Petitioner states the Ground 3 combination is justified "at least under the rationales (D)[12] and (G) of MPEP 2143. See Garney ¶¶123-41." Petition at 63. But Petitioner fails to adequately explain rationale (G) in the Petition. Petitioner similarly fails to discuss the *Graham* factors, which must be considered in any

---

[12]   The reference to rationale (D) appears to be a typo, as Mr. Garney's declaration discusses rationale's (C) and (G) for Ground 3.

obviousness analysis. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) ("[T]he ultimate question of obviousness is one of law *which must consider all four Graham factors . . . .*" (emphasis added)).

Under the PTAB rules, "the petition must contain a 'full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence . . . .' 37 C.F.R. § 42.22(a)(2). We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition." *Fidelity National Information Services*, Case IPR2014-00489, slip op. at 9 (Paper 9). Petitioner certifies the Petition contains 13,805 words. Mr. Garney's discussion of rational (G) at ¶¶ 138–40 of Ex. 1023 contains 334 words. Mr. Garney's discussion of the *Graham* factors at ¶¶ 124–29 of Ex. 1023 contains another 796 words. Together or separately, Petitioner's improper attempt to rely on this material via incorporation causes the Petition to exceed the 14,000-word limit. Ground 3 should also be rejected in its entirety because it does not analyze the *Graham* factors without exceeding the word limit. *WBIP*, 829 F.3d at 1328.

**D.    Ground 4: Furukawa or Dickens in View of USB 2.0 Does Not Render Obvious Claims 9, 11–14, or 21**

Ground 4 asserts Claims 9, 11–14, and 21 are rendered obvious by either Furukawa or Dickens in view of USB 2.0. Petition at 70. As discussed above, neither Furukawa nor Dickens disclose a USB device having ***concurrent USB connections***

57

between a USB device block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1. USB 2.0 does not teach or disclose this feature of the independent claims. Indeed, Petitioner does not argue that USB 2.0 discloses or teaches concurrent USB connections. This is because the USB standard does not allow more than one host to connect to one device at a time, so no system compliant with the USB 2.0 specification could have concurrent USB connections between a USB device block and multiple hosts. Knapen ¶ 102. Further confirmation that Wurzburg, Osakada, APA, Adder, and USB 2.0 do not disclose or teach the claimed concurrent USB connections is found on the face of the '243 Patent listing these prior art references.[13] The Examiner considered these references and allowed the claims of the '243 Patent in light of Bohm's amendment during prosecution clarifying the USB connections are "concurrent." *See* Part II.B.

The Board should also refuse to initiate review on proposed Ground 4 because Petitioner improperly exceeds the word limit by incorporating Mr. Garney's discussion of Ground 4 and not explaining this position in the Petition. Indeed, the entirety of Petitioner's Ground 4 explanation is two sentences long with citations to Mr. Garney's declaration at ¶¶ 20 and 142–148. *See* Petition at 70. Petitioner provides no explanation of the alleged "interleaving" found in USB 2.0, how it

---

[13]    The "Adder" reference is GB 2352540. The alleged "APA" is in Bohm's specification.

58

works, how it would be combined with either Furukawa or Dickens, how the cited

"MPEP rationales (D) and (G)" apply to the proposed combination, or whether one

of ordinary skill in the art would know that applying the alleged "interleaving" of

USB 2.0 would yield predictable results or have a reasonable chance of successfully

achieving the claimed invention. *See Google, Inc. v. Koninklijke Philips N.V.*, Case

IPR2017-00409, slip op. at 19 (PTAB June 5, 2017) (Paper 10) (denying institution

where "Petitioner does not provide a persuasive, fact-based analysis to support the

proposed combination of Narutaka and Logan" and where it was "not clear which

features of Logan are to be incorporated into Narutaka's system, or how, or why").

Additionally, the Petition is devoid of any discussion of the *Graham* factors, which

must be considered in any obviousness analysis. *See WBIP*, 829 F.3d at 1328 ("[T]he

ultimate question of obviousness is one of law *which must consider all four Graham

factors* . . . ." (emphasis added)).

Petitioner certifies the Petition contains 13,805 words. Mr. Garney's

discussion of Ground 4 at ¶¶ 142–48 of Ex. 1023 contains 1,236 words. Mr.

Garney's discussion of the *Graham* factors at ¶¶ 124–29 of Ex. 1023 contains

another 796 words. Together or separately, Petitioner's improper attempt to rely on

this material via incorporation causes the Petition to exceed the 14,000-word limit.

*See Fidelity National Information Services*, Case IPR2014-00489, slip op. at 9

59

(Paper 9) ("We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition.").

E.     **Ground 5: Wurzburg in View of Osakada, Further in View of Either Furukawa or Dickens Does Not Render Obvious Claims 1–25**

Ground 5—not even endorsed by Petitioner's own expert—asserts that Wurzburg in view of Osakada in view of either Furukawa or Dickens renders claims 1–25 obvious. *See* Petition at 70–71. Petitioner admits both Wurzburg and Osakada lack concurrent USB connections. *See* Petition at 70 ("Wurzburg and Osakada . . . lacked only concurrent connections . . . ."). Petitioner attempts to fill this gap with either Furukawa or Dickens. But as discussed above, neither Furukawa nor Dickens disclose a USB device having ***concurrent USB connections*** between a USB device block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1.

Further, Ground 5 merely rehashes the same argument made by the Examiner in the prosecution of the '243 Patent—an argument Bohm overcame. *See supra*, Part II.B. Ground 5 should be denied because it is cumulative of arguments made by the Examiner during prosecution. *See Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-018160, slip op. at 12–14 (PTAB Feb. 24, 2016) (Paper 11) (denying institution "on an already-considered issue").

Finally, to succeed in an obviousness challenge, a petition must sufficiently explain how one of skill would have combined the specific teachings of the prior art

60

in a way that would arrive at the claimed invention. *See Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008). Ground 5 fails because Petitioner makes no effort to explain how the asserted references would be combined in a way that would achieve the challenged claims.

Petitioner argues Wurzburg and Osakada teach every element of the claims except (1) concurrent connections, (2) simultaneous access, and (3) non-reconfiguring. *See* Petition at 70. With respect to these missing elements, Petitioner simply points to Furukawa; Petitioner does not provide any explanation as to what Dickens might contribute to the proposed combination. *Id.* However, Petitioner is silent regarding exactly how to combine the particular teachings of Furukawa or Dickens with the teachings of Wurzburg or Osakada. *See* Petition at 70–71. Without any such explanation, Petitioner is asking Patent Owner and the Board to guess how the components taught in the references could be combined and arranged to arrive at the claims. Because Petitioner has made no effort to explain how it proposes combining the teachings of the references, Petitioner cannot meet its burden of proving obviousness. *See Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip op. at 19 (PTAB June 5, 2017) (Paper 10) (denying institution where "Petitioner does not provide a persuasive, fact-based analysis to support the proposed combination of Narutaka and Logan" and where it was "not clear which features of Logan are to be incorporated into Narutaka's system, or how, or why");

61

*Lavelle Indus., Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op. at 18 (PTAB May 4, 2017) (Paper 18) (denying institution of obviousness grounds where petitioner did "not explain adequately" how the prior art references would be combined). The Board should deny institution on Ground 5.

### F.   Ground 6: Furukawa or Dickens in View of Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and "Other Cited Art" Does Not Render Obvious Claims 1–25

Like Ground 5, Ground 6 is not endorsed by Petitioner's own expert. It asserts that "Furukawa or Dickens, Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and all other cited art" render Claims 1–25 obvious. Petition at 71. Although unclear, Petitioner appears to rely on either Furukawa or Dickens as base references for Ground 6. As discussed above, neither Furukawa nor Dickens disclose a USB device having ***concurrent USB connections*** between a USB device block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1. Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and the "other" unspecified cited art do not teach or disclose this feature of the challenged independent claims. Indeed, Petitioner does not argue that any of these references disclose or teach concurrent USB connections and expressly admits that at least Wurzburg and Osakada do not. *See* Petition at 70 ("Wurzburg and Osakada . . . lacked only concurrent connections . . . ."). Further confirmation Wurzburg, Osakada, APA, Adder, and USB 2.0 do not disclose or teach the claimed concurrent USB connections is found on the face of the '243 Patent

62

which lists these prior art references. They were considered by the Examiner and found not to anticipate or render obvious the claims of the '243 Patent.

Further, a petition must sufficiently explain how specific teachings of prior art would be modified or combined to arrive at the claimed invention. *See Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008). Petitioner fails to provide any explanation as to *how* it proposes the particular teachings of Furukawa or Dickens would be combined with the teachings of "Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and all other cited art" to arrive at challenged Claims 1–25. *See Google, Inc. v. Koninklijke Philips N.V.*, Case IPR2017-00409, slip op. at 19 (PTAB June 5, 2017) (Paper 10) (denying institution where "Petitioner does not provide a persuasive, fact-based analysis to support the proposed combination of Narutaka and Logan" and where it was "not clear which features of Logan are to be incorporated into Narutaka's system, or how, or why"); *Lavelle Industries, Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op. at 22–23 (PTAB May 4, 2017) (Paper 18) ("unsupported, conclusory assertion[s]" do not "satisfy the burden of demonstrating obviousness") (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support

63

the legal conclusion of obviousness.")). The Board should deny institution on Ground 6.

## IX.   CONCLUSION

Petitioner has failed to show a likelihood it will prevail on any of Grounds 1–6. Accordingly, institution should be denied.


Dated: June 8, 2017                    Respectfully submitted,

                                       */s/ Brian C. Banner*

                                       Bruce W. Slayden II (Reg. No. 33,790)
                                       bslayden@sgbfirm.com
                                       Brian C. Banner (*pro hac vice*)
                                       bbanner@sgbfirm.com
                                       R. William Beard, Jr. (Reg. No. 39,903)
                                       wbeard@sgbfirm.com
                                       Truman H. Fenton (Reg. No. 64,766)
                                       tfenton@sgbfirm.com
                                       Jerry F. Suva (Reg. No. 67,902)
                                       jsuva@sgbfirm.com

                                       SLAYDEN GRUBERT BEARD PLLC
                                       401 Congress Avenue, Suite 1900
                                       Austin, TX 78701
                                       t: 512.402.3550
                                       f: 512.402.6865

IPR 2017-00864
Patent Owner's Preliminary Response

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies the above-captioned Patent Owner's Preliminary Response contains 13,730 words, excluding the parts of the document exempted by 37 C.F.R. 42.24(a).

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

65

IPR 2017-00864
Patent Owner's Preliminary Response

## CERTIFICATE OF SERVICE

The undersigned hereby certifies the above-captioned Patent Owner's Preliminary Response with accompanying exhibits (Exhibits 2002–03) was served in its entirety on June 8, 2017, upon the following parties by sending a copy via email to the following email addresses:

Charles W. Shifley (cshifley@bannerwitcoff.com)
Binal J. Patel (bpatel@bannerwitcoff.com)
Robert H. Resis (rresis@bannerwitcoff.com)
Jason S. Shull (jshull@bannerwitcoff.com)
Timothy J. Rechtien (trechtien@bannerwitcoff.com)
Mark A. Dalla Valle (mdallavalle@bannerwitcoff.com)
Zachary Getzelman (zgetzelman@bannerwitcoff.com)

Banner & Witcoff, Ltd.
10 South Wacker Drive, Suite 3000
Chicago, IL 60606

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

66

IPR 2017-00864
Patent Owner's Preliminary Response

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

67

IPR2017-00864
Patent Owner's Response

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

U.S. Patent No. 7,523,243

Case No. IPR2017-00864

**PATENT OWNER'S RESPONSE TO PETITION PURSUANT TO 35 U.S.C.
§ 316 AND 37 C.F.R. § 42.120**

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................1

II.  STATEMENT OF FACTS .........................................................6

  A. The '243 Patent.....................................................................6

    1.  Background and Overview of Bohm's Invention .....................6

    2.  Prosecution History ................................................................8

    3.  The Dickens Prior Art ...........................................................11

III.  LEGAL STANDARD ...............................................................16

IV.  CLAIM CONSTRUCTION .....................................................16

  A. "USB device block corresponding to at least one function"
    (Claims 1, 3, 7) ....................................................................17

  B. "shared USB device block" (Claim 23) ...............................19

  C. Other Terms Construed by the Board....................................20

V.  ARGUMENT.............................................................................21

  A. The Board's Decision on Institution Is Fatally Flawed Because
    It Relies On Claim Terms Not Found in the '243 Patent. .........................21

  B. Dickens Does Not Anticipate Claims 1–8, 11, 15–20, or 22–25 .................23

    1.  Dickens Does Not Disclose a Device Having a Function and
      a Controller (Claims 1, 3, 7, and 23) and Two Upstream
      Ports (Claim 1)....................................................................23

    2.  Dickens Does Not Disclose "Concurrent Respective
      Dedicated USB Connections" (Claims 1, 3, 7, 18, 23) ...................29

      a.  Dickens does not disclose "USB connections"—a PCI
        connection is not a USB connection ................................29

      b.  Dickens does not disclose "concurrent" USB connections—
        no two connections between the two hosts and the USB
        device block occur or operate at the same time .................35

c. Dickens does not disclose "dedicated" USB connections—a single, shared connection to Dickens' printer is not "dedicated" ........................................................................39

3. Dickens Does Not Disclose "A Shared USB Device Block Operable to be Simultaneously Configured by Two or More USB Hosts" (Claim 23) ............................................43

4. Dickens Does Not Disclose a "Shared USB Device" (Claim 18) ........................................................................................45

5. Dickens Does Not Disclose First and Second Endpoint Buffers "Coupled Between" Upstream Ports and the Controller (Claims 2, 6, 16)..................................................46

6. Dickens Does Not Disclose "USB Interface Circuit[s]" Located Within the Claimed "Controller" (Claim 25) ...........................47

7. Dickens Does Not Disclose a "Multi-Host Device Controller [That] is Configured to Maintain Respective Dedicated Address, Configuration, and Response Information for Each of the Plurality of Hosts" (Claims 17, 22, 24).........................48

8. Dependent Claims ................................................................49

C. Dickens in View of Chen Does Not Render Obvious Claims 9, 11–14 and 21 ........................................................................49

1. Dickens Expressly Teaches Away from Chen's Interleaving ................51

2. Combining Chen with Dickens Renders Dickens' System Inoperable and Further Teaches Away from the Proposed Combination ........................................................................52

3. Petitioner's Proposed Combination Does Not Improve Dickens, Does Not Apply Chen's "Improvement" Technique in the Same Way as it is Used in Chen, and Relies on Improper Hindsight to Modify Chen's Principle of Operation to Arrive at the Claimed Invention.........................54

VI. CONCLUSION ..................................................................57

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Beckton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d
   1249 (Fed. Cir. 2010)..................................................................................3

*Beldon Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015) ..............................23

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S.
   281, 95 S. Ct. 438, 42 L.Ed.2d 447 (1974).................................................22

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) ..........................3

*Grain Processing Corp. v. Am. MaizeProds. Co.*, 840 F.3d 902 (Fed.
   Cir. 1988) .................................................................................................56

*In re Gordon*, 733 F.2d 900 (Fed. Cir. 1984) ........................................................52

*In re Grasselli*, 713 F.2d 731 (Fed. Cir. 1983) ...............................................51, 52

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) ...........................................................50

*In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016) .....................16

*In re Ratti*, 270 F.2d 810 (C.C.P.A. 1959)......................................................16, 56

*In re Sponnoble*, 405 F.2d 578 (C.C.P.A. 1969) ..................................................52

*Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365 (Fed. Cir. 2015).........................2, 32

*KSR Int'l v. Teleflex Inc. KSR Int'l v. Teleflex Inc.*, 550 U.S. 398
   (2007)........................................................................................................50

*Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730
   F. 2d 1452 (Fed. Cir. 1984) .....................................................................2, 23

*Michael L McGinely v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir.
   2001) ....................................................................................................52, 54

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008)............. *passim*

*Oil States Energy Servs. LLC v. Greene's Energy Group, LLC.*, 639
   Fed. App'x 639 (Fed. Cir. 2016) ..................................................................1

*Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 110 S.
   Ct. 2668, 110 L.Ed.2d 579 (1990)...............................................................22

iii

IPR2017-00864
Patent Owner's Response

*Rodale Press, Inc. v. FTC*, 407 F.2d 1252 (D.C. Cir. 1968) ...................................23

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056 (Fed. Cir. 2016) ................... 16, 17, 31

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356
 (Fed. Cir. 2012).................................................................................................16

## **Statutes**

5 U.S.C. § 554(b)(3)................................................................................................22

## **Other Authorities**

M.P.E.P. § 2143 ...................................................................................... 16, 54, 55

M.P.E.P. § 2143.01 .............................................................................................16

## **Regulations**

37 C.F.R. § 104(b)(4)..............................................................................................43

37 C.F.R. § 42.100(b) .............................................................................................16

iv

# EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Declaration in Support of Motion for *Pro Hac Vice* Admission of Brian C. Banner Pursuant to 37 C.F.R. § 42.10(c) |
| 2002 | Declaration of Expert Geert Knapen in Support of Patent Owner's Preliminary Response to Petition |
| 2003 | Excerpts from Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc.) (1988) |
| 2004 | Exhibit 2004 to the Deposition of John Garney (Oct. 25, 2017) (annotated version of Petitioner's Exhibit 1003) |
| 2005 | Omitted |
| 2006 | John Garney Deposition Transcript (Oct. 25, 2017) |
| 2007 | Declaration of Expert Geert Knapen in Support of Patent Owner's Response to Petition |

## I.   INTRODUCTION

While the Supreme Court reviews the constitutionality of *inter partes* review proceedings,[1] Patent Owner Microchip defends its '243 Patent ("Bohm") against a Petition that ignores the law and seeks to find claims anticipated and obvious by references that have nothing to do with the claimed invention and in fact, were disclaimed by the Patent Owner. There are many serious problems with Petitioner's quest to cancel Patent Owner's claims.

First, the Board mistakenly construed and relied on the claim phrase "function block"—a phrase that does not exist in the '243 Patent.[2]  This error is highly prejudicial to Patent Owner, who must now guess how to respond to an Institution Decision that is premised on non-existent claim terms.

Second, the Petition ignores black letter law that requires an anticipating reference to disclose each element of the claimed invention "arranged as in the claim" without "treat[ing] the claims as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008)

---

[1]    *See Oil States Energy Servs. LLC v. Greene's Energy Group, LLC.*, 639 Fed. App'x 639 (Fed. Cir. 2016), *cert. granted*, 198 L. Ed. 2d 677 (U.S. Jun. 12, 2017) (No. 16-712).
[2]    Claim 1 as published included the phrase "device/function block," but that phrase was corrected in a certificate of correction that issued October 5, 2010.

1

(quoting *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452 (Fed. Cir. 1984)). In particular, the Petition ignores that the claimed features are all part of a single "multi-host USB device," and improperly seeks to combine hindsight-selected parts of separate devices of a single reference, *i.e.*, "Dickens," to find the '243 Patent claims anticipated. The law does not allow this. *Id.* (reversing district court's anticipation finding because "it is not enough that the prior art reference . . . includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention").

Third, Dickens fails to disclose each element of the claims:

- Dickens does not disclose "USB connections" (Claims 1, 3, 7, 18, 23) because a PCI connection is not a USB connection. The Board's conclusion that a "USB connection" can include any kind of non-USB connection is contrary to both parties' expert testimony (*see* Ex. 2006 at 90:4–10; Ex. 2007 ¶ 105 (Declaration of Expert Geert Knapen in Support of Patent Owner's Response to Petition) ("Knapen")) and renders the term "USB" in the claim phrase "USB connection" meaningless. This is legally improper. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1375 (Fed. Cir. 2015) ("Our precedent prohibits us from adopting such a construction" that would "read the word 'placed' out of the claims of the patent."); *Beckton, Dickinson & Co. v.*

*Tyco Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (refusing to adopt a claim construction which would render a claim limitation meaningless); *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (same).

- Even if a PCI bus can be a "USB connection," Dickens does not disclose the claimed "concurrent" USB connections (Claims 1, 3, 7, 18, 23) because no two connections between the two hosts and the USB device block occur or operate at the same time. Respectfully, it appears the Board was led to misinterpret the claims to require concurrent connections between "the multi-host device controller" and the first and second hosts. This is not what the claim requires and disregards "the part-to-part relationships set forth in the claims and that give the claims their meaning." *Net MoneyIN*, 545 F.3d at 1370.

- Even if a PCI bus can be a "USB connection," Dickens does not disclose "dedicated" USB connections (Claims 1, 3, 7, 18, 23) between the USB device block and each host. The single connection to Dickens' printer cannot read on, *e.g.*, the claimed "first dedicated USB connection" as well as the claimed "second dedicated USB connection" of Claim 3.

3

- Dickens does not disclose the "shared USB device block operable to be simultaneously configured by two or more USB hosts" of Claim 23. Contrary to the Board's finding, Petitioner's expert conceded there would be no configuration of Dickens' emulated printers. *See* John Garney Deposition Transcript, Ex. 2006 at 106:10–14 ("Q. . . . Do the host PCs 105, would they -- in Dickens, would one of ordinary skill in the art understand that they perform any configuration activities on the emulated printers?   A. I would expect not . . . ."). Moreover, the emulated printer devices are separate devices implemented in Dickens' data routing device—they are not the "shared USB device block" (*i.e.*, Dickens' printer 182). The emulated printers are configured (if at all) independently from printer 182.

- Dickens does not disclose the "shared USB device" of Claim 18 under the Board's construction of that phrase because it requires "[a] USB device that may be simultaneously configured by two or more hosts" and "corresponds to at least one function." As discussed above Dickens' emulated printers are not configured, and even if they are, they are separate devices from printer 182, which Petitioner and the Board have identified as the "at least one function." No single device in Dickens is simultaneously configured by two or more USB hosts.

4

- Dickens does not disclose first and second endpoint buffers "coupled between" upstream ports and the multi-host device controller (Claims 2, 6, 16) because the only identified buffers (DRAM 144) are inside Dickens' multi-host device controller (routing controller 140) and not between it and the upstream ports.

- Dickens does not disclose a controller with "USB interface circuits" (Claim 25) because the only identified circuits (device controllers 150) are outside of Dickens' controller (routing controller 140).

- Dickens does not disclose a controller that is "configured to maintain respective dedicated address, configuration, and response information for each of the plurality of hosts" (Claims 17, 22, 24). Neither Petitioner nor the Board have identified where in Dickens this limitation is found. The only cited passage of Dickens does not disclose this feature of Patent Owner's claims.

Finally, Dickens in view of Chen does not render obvious Claims 9, 11–14, or 21. Chen does not teach or disclose the limitations that are missing from Dickens (discussed above), and Petitioner does not contend otherwise. Moreover, a person of ordinary skill in the art would not combine Dickens with Chen because 1) Dickens expressly teaches away from a combination with Chen, 2) combining Chen with

5

Dickens would render Dickens inoperable, and 3) Petitioner's proposed combination does not improve Dickens, does not apply Chen's "improvement" technique in the same way as it is used in Chen, and does not result in predictable results as required by the law.

Bohm's invention provides "[a] shared USB device [that] may be simultaneously configured and accessed by two or more USB hosts by using a multi-host capable device controller." '243 Patent, Abstract. Bohm expressly acknowledged and disclaimed prior art "stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers" because they "fail[ed] to permit simultaneous access to the USB device that is downstream of the hub or switch." '243 Patent, 1:62–66. As summarized above and discussed more fully herein, Dickens does not come close to disclosing every feature of the '243 Patent claims because Dickens is the very type of stand-alone USB switch Bohm disclaimed. The Board should confirm the patentability of Claims 1–9 and 11–25.

## II.    STATEMENT OF FACTS

### A. The '243 Patent

#### 1.    Background and Overview of Bohm's Invention

The '243 Patent was filed on June 21, 2006, and claims priority to a provisional application filed on April 14, 2006. The '243 Patent relates to "computer

hardware and, more specifically, to Universal Serial Bus (USB) controllers." '243 Patent, 1:15–17. By 2006, USB was a mature standard that was used ubiquitously. Knapen ¶ 67. The second version of the USB specification (USB 2.0), which provided for increased transfer rates compared to the previous USB specification, had been released years earlier. *Id.* The USB protocol is based on the assumption / requirement that only one entity—a USB host—can initiate data transactions on a USB bus. Knapen ¶ 68. As Bohm recognizes, "the USB specification is structured so that every device is configured and accessed by a single host controller." '243 Patent, 1:54–56.

Before Bohm's inventions, to share a peripheral such as a printer between two hosts (*e.g.*, personal computers) a user could unplug the printer from the first host and plug it into the second host. Knapen ¶ 69. Alternatively, as Bohm describes, there existed "several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time. There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch. The USB device is typically accessed by one single host at a time, and when access to the USB device

7

is switched, the device must be re-configured, thereby losing internal state information." '243 Patent, 1:59–2:2.

Bohm successfully overcame the shortcomings of the prior art by providing a multi-host USB device with concurrent USB connections between the USB device block and two or more hosts. Knapen ¶ 70. Bohm explains that his inventive "shared USB device may be simultaneously configured and accessed by two or more USB hosts. The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host. The device may maintain a dedicated address, configuration and response information for each host. Each host may therefore establish a dedicated USB connection with the sharing device." '243 Patent, 2:29–37. Bohm's invention allows for sharing "a single USB device . . . across multiple USB hosts without needing to be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device." '243 Patent, 2:9–12.

### 2.    Prosecution History

During prosecution, Bohm's originally-filed claims were rejected over U.S. Patent Publication No. 2006/0059293 ("Wurzburg") and U.S. Patent No. 6,308,239 ("Osakada"). *See* Ex. 1014 at 25–30, 51–56. In response, Bohm amended the independent claims, clarifying (1) the claims were to "concurrent" "USB

8

connections" between the USB device block and two or more hosts[3] so that (2) his

invention allowed the hosts to "simultaneously" request access to the USB device.[4]

Ex. 1014 at 6–11. Bohm explained the significance of these amendments:

> Wurzburg does not disclose the USB multi-host device that comprises
> a USB device block corresponding to at least one function and further
> comprises a multi-host device controller configured to establish
> concurrent respective dedicated USB connections between the USB
> device block and the first and second upstream ports, to allow the
> corresponding first and second hosts to simultaneously request access
> to the USB device of claim 1. Rather, Wurzburg discloses a system in
> which a respective dedicated USB connection only exists between the
> device block and a single host at any one point in time, and thus only a
> single host can request access to the device block. Wurzburg teaches a
> "switching hub", which may electronically switch between different
> configurations (*e.g.*, hardwired or software implemented
> configurations) for access between the two or more upstream ports and
> the downstream ports (paragraph 0008). Accordingly, Wurzburg does
> not teach, suggest, or render obvious a multi-host device controller
> configured to establish concurrent respective dedicated USB
> connections between a USB device block and first and second upstream
> ports.

---

[3]     The "concurrent" limitation was added to each independent claim.
[4]     The "simultaneous" limitation was added to independent claims 1, 3, and 7.
Original Claim 23 included this limitation.

\* \* \*

Finally, Wurzburg discloses in paragraph 0034 that "*when the downstream routing controller 201 switches configurations, and control of a downstream port is switched from the computer system 101 to the dual role peripheral device 207, <u>a connection between the computer system 101 and the respective peripheral device 125</u> (coupled to the downstream port to be switched) <u>may be terminated</u> by the computer system 101*", and further teaches that "*communications between the downstream port to be switched and the computer system 101 <u>may be terminated</u> by the USB switching hub 119*", and "*the dual role peripheral device 207 may <u>then connect to, enumerate,</u> and communicate with the respective peripheral device 125 coupled to the switched downstream port*" [emphasis added]. Therefore, it is also clear that Wurzburg also fails to at least teach a system in which at least two hosts are allowed to <u>simultaneously requests access to the USB device,</u> and further fails to teach a system in which a controller is operable to receive and respond to <u>simultaneous respective USB access requests sent by the two or more USB hosts</u> for accessing a function of the shared USB device block.

Ex. 1014 at 17–19 (pages 13–15 of Applicant's Request for Continued Examination dated 2008-07-23). Bohm's explanation of the concurrent nature of the dedicated USB connections and the simultaneous access requests of his invention overcame the Examiner's rejection, and all claims were allowed. Ex. 1014 at 3.

The '243 Patent issued on April 21, 2009. On October 5, 2010, the Patent Office issued a Certificate of Correction which corrected typographical errors appearing in Claim 1 of the issued patent. *See* Ex. 1001 at 9.

### 3.      The Dickens Prior Art

U.S. Patent No. 6,549,966 ("Dickens") (Ex. 1003) discloses a "switching hub" that connects a USB function to one—and only one—host at a time. *See, e.g.*, Dickens, 5:2–4 ("Each peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). Dickens explains "[b]ecause the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off. In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application." Dickens, 2:21–26. "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." Dickens, 2:48–52.

Thus, like Wurzburg's "switching hub" cited during prosecution, when two hosts request access to the same peripheral (*e.g.*, a printer), Dickens establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in

memory. Knapen ¶ 97. When the host connected to the peripheral completes its data transfer, the data routing device switches the first one-to-one connection off and then switches a new one-to-one connection on between the peripheral and the second, waiting host (via its upstream port). *Id.* ¶ 99. The second host then completes its access. *Id.*

The manner in which Dickens' system performs this switching is very different from Bohm's elegant solution for sharing a USB device between two hosts. Dickens' "data routing device" uses a very powerful microprocessor to coordinate activities occurring on separate USB buses. Knapen ¶ 75. In fact, the Dickens' system uses five (5) separate USB buses:



FIG. 2

*Id.* Host computers 105 act as the USB host for USB Buses #1–2, *i.e.*, one computer/host for each USB bus. *Id.* ¶ 76; Dickens, 5:27–37. Host computers 105 are connected via USB connection 106 (and USB hub 107) to data converters 110 (not shown above—*see* Fig. 1), which include device controllers 150. Knapen ¶ 77; Dickens, 5:27–37, 6:51–54. Each USB device controller 150 is a unique USB device on its respective USB bus 106, making up a terminus or "leaf" of the USB bus. Knapen ¶ 78. In particular, Dickens discloses that the USB device controllers 150

13

implement emulation functions to emulate the presence of each USB peripheral device (*e.g.*, audio speakers 180, printer 182, keyboard 184, and mouse 186). Knapen ¶ 79; Dickens, 5:38–43. Thus, when a host computer 105 is connected to Dickens' data routing device 100, the host computer enumerates and configures each emulated device via its respective USB device controller 150. Knapen ¶ 80. During enumeration, each emulated device receives a unique address on its respective USB bus. *Id.* ¶ 81. This enumeration process relates to the emulated functions; host computer 105 does not enumerate any of the USB peripheral devices downstream from the data router (*e.g.*, audio speakers 180, printer 182, keyboard 184, and mouse 186). *Id.*

USB Buses #3–5 include peripheral data converters 120 (not shown above—*see* Fig. 1), which include USB host controllers (154, 156, 158). *Id.* ¶ 82. The USB host controllers (154, 156, 158) act as a host for each separate USB bus, *i.e.*, one host controller per bus. *Id.* ¶ 83.[5]  These host controllers are connected via USB connections 109 to the various separate downstream peripheral devices (audio speakers 180, printer 182, and keyboard 184 and mouse 186 through hub 107). *Id.* ¶ 85. The downstream devices are leaves of each respective USB bus. *Id.* Thus, when

---

[5]     Dickens states the USB host controllers include functions that emulate the presence of a host computer on USB connections 109. *See* Dickens, 6:12–17. The use of the word "emulate" may be confusing. These host controllers are actual USB hosts on their respective USB buses. Knapen ¶ 84.

a peripheral device is connected to Dickens' data routing device 100, the respective USB host controller (154, 156, 158) will enumerate and configure that peripheral device. *Id.* ¶ 87. During enumeration, the peripheral device will receive a unique address on its respective USB bus. *Id.* This enumeration process relates to the peripheral device; USB host controllers 154, 156, and 158 do not enumerate any of the emulated functions (USB device controllers 150) within Dickens' data routing device 100. *Id.*

In order to perform enumeration of the downstream peripheral devices—and to emulate those same devices, Dickens' data routing device 100 must have intimate knowledge of how each of the devices that can be plugged in work. Knapen ¶ 88. For example, Dickens' data routing device must have device drivers and emulation software that correspond to any downstream device that is plugged into USB host controllers 154, 156, and 158. *Id.* As a result, installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dickens' data routing device 100 without also upgrading the software running on data routing device 100. *Id.*

Dickens implements a PCI bus (132) between the various USB busses and its data routing controller 140, which includes microprocessor 142. *Id.* 89. Dickens' data routing controller 140 uses the PCI bus to establish connections between a host computer 105 and peripheral devices (*e.g.*, printer 182). *Id.* ¶ 90.

<div align="center">15</div>

## III.   LEGAL STANDARD

"For a prior art reference to anticipate a claim, it must disclose all of the limitations of the claim, arranged or combined in the same way as in the claim." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (internal quotations omitted). And "[t]o satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). "If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims prima facie obvious." M.P.E.P. § 2143.01 (citing *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959)).

## IV.   CLAIM CONSTRUCTION

"In construing claim terms, the Board must determine the scope of the claims by giving them their broadest reasonable construction in light of the specification as they would be interpreted by one of ordinary skill in the art." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061–62 (Fed. Cir. 2016); *see also* 37 C.F.R. § 42.100(b). "While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the

full claim language and the written description." *Trivascular*, 812 F.3d at 1062.

"Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Id.*

Patent Owner provides the proper broadest reasonable interpretation ("BRI") construction for a number of terms.[6]

## A.  "USB device block corresponding to at least one function" (Claims 1, 3, 7)

The broadest reasonable interpretation of the phrase "USB device block corresponding to at least one function" is its plain meaning, *i.e.*, a segment of a USB device that performs a USB function. Knapen ¶ 60. The '243 Patent uses the term "block" to refer to segments of a USB device (*see* '243 Patent, 2:47–50), and one of ordinary skill in the art would understand "USB device block" to broadly refer to a segment of a USB device. Knapen ¶ 61. One of ordinary skill would also understand the "at least one function" language to broadly refer to a USB function because the USB specification defines the term "function." Knapen ¶ 62 (citing Ex. 1004 at 34 (USB 2.0 Specification)).

---

[6]   Patent Owner provided constructions for other claim terms in its Patent Owner Preliminary Response. *See* Paper 11 at 14–28. Patent Owner maintains its positions on those construed claim terms.

Petitioner appears to agree with this plain meaning interpretation. *See* Petition at 30 ("'device block corresponding to at least one function' means a segment of a device that performs a function."). While Petitioner and Petitioner's expert appear to offer three different definitions of this phrase (*see* Ex. 1023 ¶ 62 (two definitions—one in first sentence and one in last sentence), ¶ 66 (last sentence)), Petitioner's expert confirmed on cross-examination that the construction used in his analysis (relied on in the Petition) is simply "a segment of a device that performs a function":

> **Q. All right, what definition of the term, quote, device block corresponding to at least one function did you use in your anticipation and obviousness analysis?**

> A. I believe I used "a segment of a device that performs a function".

Ex. 2006 at 55:5–9.

It is unclear if the Board's construction of the term "device block," which is found in the phrase "USB device block corresponding to at least one function," was intended to apply to the latter phrase. Specifically, the Board construed "device block" to mean "circuitry within a USB device necessary for the specific USB device function." Institution Decision at 11. Applying the Board's construction to the claim language, the claim would read "a USB [circuitry within a USB device necessary for the specific USB device function] corresponding to at least one function."

18

Respectfully, this construction is unclear and results in unhelpful/superfluous language.[7]

For the above reasons, Patent Owner respectfully submits the term "USB device block corresponding to at least one function" should be construed to have its plain meaning, *i.e.*, "a segment of a USB device that performs a USB function."

## B.    "shared USB device block" (Claim 23)

The broadest reasonable interpretation of the phrase "shared USB device block" is its plain meaning, *i.e.*, a segment of a USB device that is shared by two or more USB hosts. Knapen ¶ 65. The Petition does not offer a construction for this term and the Board likewise does not appear to have construed this term.[8]   As discussed above, a "block" is a segment of a device. *See supra*, Part IV.A; Knapen ¶ 66. Further, one of ordinary skill in the art would understand the word "shared" in the context of Bohm to broadly mean the device is shared or accessible by two or

---

[7]    Patent Owner assumes the Board intended its construction of "device block" to apply to the entire phrase "USB device block corresponding to at least one function." Even if that is an incorrect assumption, the difference between the construction Patent Owner advances and the Board's construction does not appear to be material. *See* Knapen ¶ 64.

[8]    The Board's construction of "a shared USB device" refers only to Claim 18. *See* Institution Decision at 11. Further, Claim 23 expressly indicates that the "shared USB device block" is "operable to be simultaneously configured by two or more USB hosts," which would be redundant if the Board's construction of "a shared USB device" of Claim 18 was meant to also apply to "a shared USB device block" of Claim 23.

more USB hosts (as opposed to a normal USB device that is accessible by only one host). Knapen ¶ 66 (citing '243 Patent, 2:9–12, 2:15–16, 2:56–58, 3:43–46, 3:51–55).

## C. Other Terms Construed by the Board

As discussed further below (*see infra*, Part V.A.), Patent Owner respectfully submits the Board's construction of "function block" (Institution Decision at 13) and "shared USB function comprised in the USB device" (*id.*) is mistaken, as those terms are not found in the '243 Patent. Similarly, the Board appears to construe "USB Device/Function Block," which is not a claim term. *Id.* at 10. It is unclear why these terms were included in the Board's Decision, and Patent Owner respectfully objects to the extent the Board relies on these terms or its construction of them.

Finally, the Board appears to have construed "USB device" as "a device that comprises three blocks, the third of which is a function block." *Id.* at 11. It is unclear what claims, if any, the Board applies this construction to, as the Board's Institution Decision does not appear to rely on this construction, for example, by identifying three blocks in any prior art reference. Because it is unclear how this construction is actually used—or if it is used at all, Patent Owner objects to the extent the Board relies on this construction without making such reliance explicit.

20

## V.    ARGUMENT

### A.    The Board's Decision on Institution Is Fatally Flawed Because It Relies On Claim Terms Not Found in the '243 Patent.

Patent Owner respectfully submits that the Board's Decision on Institution is fatally flawed, as it repeatedly relies on the term "function block" as if it were a phrase found in the claims or specification of the '243 Patent. Indeed, the Board construed the term "function block" (Institution Decision at 10–13) and then repeatedly relied on this term in concluding Dickens anticipates the independent claims of the '243 Patent (*see id.* at 27–32 (referring to "function block" and "device/function block" as if they are claim language)). The phrase "function block" does not appear in the '243 Patent. Claim 1 as published included the phrase "device/function block," but that phrase was corrected in a certificate of correction that issued October 5, 2010:

Column 4
Line 56, please delete "a USB device/function block; and" and substitute -- a USB device block corresponding to at least one function --.

Column 4
Line 57, please delete "coupling the USB device/function block" and substitute -- coupling the USB device block --.

Ex. 1001 at 9 (Certificate of Correction).[9]

Similarly, the Board construed the phrase "shared USB function comprised in the USB device," stating this phrase is found in Claim 18. *Id.* at 13. But this phrase is not recited in Claim 18.

Respectfully, these oversights are prejudicial to Patent Owner. Patent Owner must now defend its private property right through guesswork as to what the Board intended in its Institution Decision. Patent Owner is therefore deprived of due process in defending its intellectual property.

> [F]or a formal adjudication like the one at issue here, the Administrative Procedure Act requires the PTO to "timely inform[ ]" a patent owner of "the matters of fact and law asserted" in an *inter partes* review of its patent, 5 U.S.C. § 554(b)(3), to give "all interested parties opportunity for . . . the submission and consideration of facts [and] arguments . . . [and] hearing and decision on notice," § 554(c), and to permit a party "to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts," § 556(d). *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 288 n. 4, 95 S. Ct. 438, 42 L.Ed.2d 447 (1974); *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 655, 110 S. Ct. 2668, 110 L.Ed.2d 579 (1990). Section 554(b)(3) has been applied to mean that "an agency may not change theories in midstream without giving

---

[9]     Patent Owner discussed this certificate of correction at page 10 of its Preliminary Response.

respondents reasonable notice of the change" and "the opportunity to present argument under the new theory." *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256–57 (D.C. Cir. 1968).

*Beldon Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015).

Patent Owner responds herein based on the assumption the Board intended discussions of "function block" to refer to the "USB device block corresponding to at least one function."   Respectfully, that Patent Owner must make this assumption deprives Patent Owner of a meaningful opportunity to respond to any new theory the Board might present following submission of this Response.

**B.     Dickens Does Not Anticipate Claims 1–8, 11, 15–20, or 22–25**

**1.     Dickens Does Not Disclose a Device Having a Function and a Controller (Claims 1, 3, 7, and 23) and Two Upstream Ports (Claim 1)**

Petitioner improperly attempts to combine portions of separate USB devices to conclude the claims of the '243 Patent are anticipated. The law does not allow this. Anticipation requires a reference to disclose each element of the claimed invention "arranged as in the claim" without "treat[ing] the claims as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008) (quoting *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F. 2d 1452 (Fed. Cir. 1984)). It is "not enough that

the prior art . . . includes multiple distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Id.* at 1372 (reversing district court anticipation finding).

Eschewing this law, Petitioner improperly combines Dickens' data routing device 100 with Dickens' printer 182—two separate pieces of hardware—to read on the claimed "multi-host device." In so doing, Petitioner ignores that the '243 Patent claims are directed to the inventive concept of providing "a device" that can be simultaneously accessed by two hosts without using the "stand-alone USB switches" described in Bohm's specification that only provide access to a device for one host at a time. Knapen ¶ 71. Indeed, the '243 Patent distinguishes the use of switching hardware like the Dickens' data router:

> There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch.

'243 Patent, 1:62–66. Bohm thus acknowledged the existence of systems like Dickens that allow multi-host access to a device using separate switch hardware, but where only a single host can access a downstream device at any given time.

To overcome this limitation of the prior art, Bohm invented and claimed *a device* having a function and a controller (Claims 1, 3, 7, and 23) and two upstream ports (Claim 1) for interfacing with multiple hosts. Specifically:

- Claim 1 recites "[a] multi-host device" comprising, *inter alia*, "first and second upstream ports configured to couple to corresponding first and second hosts," "a USB device block corresponding to at least one function," and "a multi-host device controller coupling the USB device block to the first and second upstream ports." All of the recited elements are features of the claimed "multi-host device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

- Claim 3 recites "[a] multi-host device" comprising, *inter alia*, "a USB device block corresponding to at least one function" and "a multi-host device controller coupling the USB device block to a first and second host." All of the recited elements are features of the claimed "multi-host device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

- Claim 7 recites "[a] device" comprising, *inter alia*, "a USB device block corresponding to at least one function" and "a multi-host device controller configured to couple the USB device block to a plurality of

25

hosts." All of the recited elements are features of the claimed "device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

- Claim 23 recites "a USB multi-host device" comprising, *inter alia*, "a shared USB device block" that includes "a function" and "a controller configured to establish concurrent respective dedicated USB connections between the shared USB device block and the two or more USB hosts." All of the recited elements are features of the claimed "USB multi-host device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

As demonstrated by the express claim language, it is the claimed "multi-host device" (Claims 1 & 3), "device" (Claim 7), or "USB multi-host device" (Claim 23) that includes *both* the claimed function and controller. For Claim 1, it is the claimed "multi-host device" that also includes the first and second upstream ports. Contrary to law, Petitioner treats these limitations as a mere catalog of parts and improperly seeks to combine/modify the Dickens system by merging the printer 182[10] with the

---

[10]      Patent Owner assumes the printer is or contains the claimed "device block corresponding to at least one function" (Claims 1, 3, 7) and the "shared USB device block" (Claim 23). The Institution Decision does not discuss the "device block corresponding to at least one function" or the "shared USB device block" when discussing the Dickens reference. *See* Institution Decision at 30–34. Thus, Patent Owner is left to guess for a second time, this time as to what the Board considers to

26

data routing device 100 (which allegedly contains the claimed controller and first and second upstream ports).

The Federal Circuit's decision in *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008) is instructive. In *Net MoneyIN*, the district court erred by finding the "iKP reference" anticipated Claim 23 of the patent-in-suit. *See id.* at 1369–71. The claim at issue recited an internet payment system comprising five "links." *See id.* at 1369. The district court found that "[a]ll of the limitations of claim 23 can be found within the iKP reference. A simple combination would produce the system described in claim 23 of the '737 patent. That no specific example within iKP contains all five links does not preclude a finding of anticipation." *Id.* In reversing the district court's anticipation finding, the Federal Circuit held:

> [T]he iKP reference discloses two separate protocols for processing an Internet credit card transaction. Neither of these protocols contains all five links arranged or combined in the same way as claimed in the '737 patent. Thus, although the iKP reference might anticipate a claim directed to either of the two protocols disclosed, it cannot anticipate the system of claim 23. The district court was wrong to conclude otherwise.

---

be the corresponding structure in Dickens. This violates Patent Owner's due process rights.

The district court was also wrong to combine parts of the separate protocols shown in the iKP reference in concluding that claim 23 was anticipated. Granted, there may be only slight differences between the protocols disclosed in the iKP reference and the system of claim 23. . . . [I]t is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention. . . .

. . . [I]t was error for the district court to find anticipation by combining different parts of the separate protocols in the iKP reference simply because they were found within the four corners of the document . . . .

*Id.* at 1371.

Petitioner's anticipation theory runs afoul of the Federal Circuit's holding in *Net MoneyIn* because, as explained above, Petitioner attempts to combine parts of separate devices in Dickens to conclude that "device" Claims 1, 3, 7, and 23 are anticipated. Dickens' printer 182 and data routing device 100 are separate physical devices connected by USB connection 109, which are standard USB cables. Knapen ¶ 86; Dickens, 6:21–23. Thus, even if Dickens discloses a "controller," a "function," and "first and second upstream ports," these pieces are not all arranged within the claimed "device" or "shared USB device block." Accordingly, Dickens does not anticipate Claims 1, 3, 7, or 23. *See Net MoneyIN*, 545 F.3d at 1371 (error to combine

IPR2017-00864
Patent Owner's Response

different parts of separate protocols to find anticipation of a single, five-link protocol).

### 2. Dickens Does Not Disclose "Concurrent Respective Dedicated USB Connections" (Claims 1, 3, 7, 18, 23)

#### a. Dickens does not disclose "USB connections"—a PCI connection is not a USB connection

Dickens does not disclose "USB connections" between the USB device block and multiple hosts (or upstream ports). Dickens repeatedly emphasizes this fact. *E.g.*, Dickens, 2:16–19 ("[A] data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*."); 2:27–29 ("Signals under the USB protocol are received by the [data routing] device from the host computer and are converted into *a non-USB protocol form*."); 2:36–39 ("[T]he control of the data transmitted between [the host computer and peripheral devices] is achieved in *a USB protocol independent manner*."); 4:6–17 ("Preferably, the data router includes *a non-USB bus* in communication with the computer data converter, peripheral data converter and the microprocessor . . . . The converted computer data and peripheral data may be transferred through the data router by *a non-USB bus*. The routing of the data on *the non-USB bus* is controlled by the microprocessor . . . .") (all emphasis added).

29

The connection Dickens uses internally is a PCI bus. *E.g.*, *id.* at 8:16–28. Petitioner's own expert conceded during cross-examination that one of ordinary skill in the art would not understand this PCI bus to be a "USB connection":

> **Q. . . . So you highlighted in blue on Figure 2 of Exhibit 2004 the PCI bus in Dickens; is that correct?**
> A. Yes.
> **Q. Would one of ordinary skill in the art understand the highlighted blue section of this figure to be a USB connection?**
> A. No.

Ex. 2006 at 90:4–10.



Ex. 2004 at 3. Patent Owner's expert agrees: "Because Dickens routes data in a non-USB format over a PCI bus, one of ordinary skill in the art would not view Dickens as disclosing concurrent respective 'USB connections' between Dickens' printer

(*i.e.*, the claimed USB device block) and the two upstream ports on Dickens' data routing device." Knapen ¶ 106.

Further, installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dicken's data routing device 100 without also upgrading the software running on data routing device 100. Knapen ¶¶ 88, 107. This is further evidence that the connection between host 105 and printer 182 is not a "USB connection" as would be understood by one of ordinary skill in the art since installing a specific driver on host 105 directly connected via "USB connection" to a printer 182 would function as required by the USB specification. *Id.* ¶ 107.

In its Institution Decision, the Board incorrectly concluded Dickens' intervening PCI bus reads on the claimed "USB connection." *See* Institution Decision at 31. The Board suggested that by arguing a PCI connection is not a "USB connection," Patent Owner is attempting to import limitations from the specification into the claims. *Id.* Patent Owner respectfully disagrees. The claims themselves require "USB connections." And "[w]hile the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016).

31

The Board's conclusion that a "USB connection" can include any kind of non-USB connection is contrary to both parties' expert testimony that one of ordinary skill in the art would not understand a PCI bus to be a USB connection. *See* Ex. 2006 at 90:4–10; Knapen ¶¶ 105–06. Further, the Board's conclusion renders the term "USB" in "USB connection" meaningless, which is legally improper. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1375 (Fed. Cir. 2015) (refusing to adopt a claim construction that would read word "placed" out of the claims). Using the Board's reasoning, any non-USB connection would satisfy the claim because ultimately the USB exchanges would have to be made between the claimed USB hosts and the USB device block. By analogy, the Board would conclude that a claim to a "wired connection" between two network devices would be anticipated by a wireless network because, necessarily, there is a wired connection at either end of the wireless network. This reading of the claim ignores the actual claim language and written description, reads "USB" out of the claims, and is not reasonable.

Finally, the Board's conclusion that Dickens' PCI bus can make up a USB connection misunderstands the Dickens system. Dickens' data router includes multiple distinct USB buses. Knapen ¶ 75; *accord* Ex. 2006 at 87:16–88:5.

- USB Bus #1: This USB bus includes leftmost host computer 105, leftmost USB connection 106, and leftmost device controller 150.

32

- USB Bus #2: This USB bus includes rightmost host computer 105, rightmost USB connection 106, topmost USB hub 107, and rightmost device controller 150.

- USB Bus #3: Thus USB bus includes host controller 154, leftmost USB connection 109, and audio speaker device 180.

- USB Bus #4: This USB bus includes host controller 156, middle USB connection 109, and printer device 182.

- USB Bus #5: This USB bus includes host controller 158, rightmost three USB connections 109, bottom-most USB hub 107, keyboard device 184, and mouse device 186.



FIG.    2

Knapen ¶ 75.

Each host controller (154, 156, 158) acts as a host for each separate USB bus to which the various downstream USB peripherals are connected. *Id.* ¶ 83. As Petitioner's expert explained, a host is the "root" of the USB tree. Ex. 2006 at 38:3–7. Devices or functions are the "leaves." *Id.* at 38:8–16. Dickens' PCI bus (132) is in between the various USB busses. Knapen ¶ 89. Thus, when Dickens' data routing controller 140 establishes a connection between a host 105 and printer 182, it does

34

not do so with a "USB connection"—it is using the PCI bus, which is not a USB connection. *See* Ex. 2006 at 90:4–10 (Petitioner's expert testifying that one of ordinary skill in the art would not consider Dickens' PCI bus to be a USB connection); Knapen ¶¶ 105–06. Because Dickens does not disclose the "USB connections" of Claims 1, 3, 7, 18, and 23, Dickens cannot anticipate these claims.

**b. Dickens does not disclose "concurrent" USB connections—no two connections between the two hosts and the USB device block occur or operate at the same time**

The Board construed "concurrent" to mean "operating or occurring at the same time." Institution Decision at 15. Contrary to the Board's finding in the Institution Decision, Dickens cannot anticipate under this construction of "concurrent" because no two connections between Dickens' two hosts and the printer occur or operate at the same time.

Claim 3 is illustrative. It requires separate "first" and "second" concurrent connections between two hosts and the USB device block:

> a first dedicated USB connection between the first host and the USB device block and a second dedicated USB connection between the second host and the USB device block, wherein the first dedicated USB connection and the second dedicated USB connection are concurrent

'243 Patent, 5:14–19. Under the Board's construction of "concurrent," there must be (1) a first connection between the first host and the USB device block that

"operat[es] or occur[s] at the same time" as (2) a second connection between the second host and the USB device block. No such connections exist in Dickens. The only alleged concurrent USB connections identified by the Board are between (1) hosts 105, and (2) data router 130. *See* Institution Decision at 30 ("Dickens provides concurrent USB connections **between data router 130 and USB hosts 105** via corresponding 'upstream ports' . . . ." (emphasis added)).

Respectfully, it appears the Board has misinterpreted the claims to require concurrent connections between "the multi-host device controller" and the first and second hosts. This is not what the claim requires; the concurrent first and second USB connections must be between "the USB device block" (printer 182) and the first and second hosts (computers 105). These concurrent connections must operate or occur at the same time. In the context of Dickens' printer, Bohm illustrates in Figure 2 an embodiment of the claimed "concurrent" USB connections:



*FIG. 2*

'243 Patent, Fig. 2 (highlighting added). Printer 120 is connected to host PC 122 and host PC 123 via the highlighted "concurrent" USB connections—both connections between the hosts and the printer "occur or operate at the same time," as required by the claims (and the Board's construction of "concurrent").

The fact that there is only a single connection[11] to Dickens' printer (the claimed "USB device block") precludes a finding of anticipation. *See* Institution

---

[11]    The Board expressly recognizes there is only a single connection to printer 182. *See* Institution Decision at 30 ("Data router 130, therefore, maintains concurrent USB connections with multiple USB hosts (105) and ***a USB connection*** with a USB peripheral device (printer 182—a USB 'function block')—all such connections operable at the same time in accord with our interpretation of 'concurrent.'" (emphasis added)); *accord* Knapen ¶ 94; Ex. 2006 at 77:19–79:24; Dickens, 5:2–4 ("Each peripheral device can have ***a USB connection*** by which it is connected to ***a respective one*** of the plurality of peripheral data converters." (emphasis added)).

37

Decision at 30. Indeed, one of ordinary skill in the art would understand that the single USB connection to Dickens' printer 182 only allows print data from one host at a time. Knapen ¶ 95; *see also* '243 Patent, 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected."). Thus, Dickens fails to disclose first and second concurrent dedicated USB connections between the hosts and the printer that operate or occur at the same time as required by Claim 3.

Independent Claims 7, 18, and 23 use similar language, and require "concurrent respective[12] dedicated USB connections" between a plurality of hosts and

- the "USB device block" (Claim 7)

- the "shared USB device" (Claim 18)

- the "shared USB device block" (Claim 23)

Dickens' "printer 182" is presumably the "USB device block" of Claim 7, the "shared USB device" of Claim 18, and the "shared USB device block" of Claim 23.

---

[12]     The use of the term "respective" in these claims expressly requires multiple concurrent connections.

Thus, for the same reasons discussed with respect to Claim 3, Dickens does not disclose the claimed "concurrent" USB connections. The identified connections are not between printer 182 and hosts 105; they are between hosts 105 and data router 130 and there is only one connection 109 to printer 182.

Claim 1 requires "concurrent respective dedicated USB connections" between the USB device block and first and second upstream ports. The analysis above applies equally to this claim. The identified connections are not between printer 182 and the upstream ports; they are between the upstream ports and data router 130. Therefore, Dickens fails to anticipate Claim 1.

### c. Dickens does not disclose "dedicated" USB connections—a single, shared connection to Dickens' printer is not "dedicated"

Even assuming (without admitting) Dickens discloses "concurrent" connections between the USB device block and the first and second upstream ports (or plurality of hosts), those connections are not "dedicated." Indeed, the Petitioner and the Board appear to have overlooked that each independent Claim of the '243 Patent requires "dedicated" USB connections between the USB device block and the hosts/upstream ports:

- Claim 1: "the multi-host device controller is configured to establish concurrent respective *dedicated* USB connections between the USB device block and the first and second upstream ports"

- Claim 3: "the multi-host device controller is configured to establish a first *dedicated* USB connection between the first host and the USB device block and a second *dedicated* USB connection between the second host and the USB device block"

- Claim 7: "the multi-host device controller is operable to establish concurrent respective *dedicated* USB connections between the USB device block and the plurality of hosts"

- Claim 18: "establishing concurrent respective *dedicated* USB connections between a shared USB device and a plurality of hosts"

- Claim 23: "a controller configured to establish concurrent respective *dedicated* USB connections between the shared USB device block and the two or more USB hosts"

Petitioner identifies Dickens' printer 182 as the claimed "USB device block," but the printer only has one connection to the data router, *i.e.*, "USB connection 109." Dickens, 6:66–67; *see supra*, note 11.

IPR2017-00864
Patent Owner's Response



single, shared
USB connection

USB device
block

FIG. 2

Ex. 3001 at 3 (annotated). USB connection 109 is the only way data from the data routing device is transferred to/from printer 182. Knapen ¶ 95. Data transactions for printer 182 that are initiated at different hosts 105 must necessarily be communicated over this single USB connection. Knapen ¶ 98. Dickens fails to disclose another connection to printer 182. Again in the context of Dickens' printer, Bohm illustrates in Figure 2 a printer embodiment of the claimed concurrent "dedicated" USB connections:

41



*FIG. 2*

'243 Patent, Fig. 2 (highlighting added). Printer 120 is connected to host PC 122 and host PC 123 via the highlighted concurrent "dedicated" USB connections—each connection is dedicated to communication between the printer and the respective host.

Using Claim 3 as an example, it requires "the multi-host device controller is configured to establish ***a first dedicated USB connection*** between the first host and the USB device block ***and a second dedicated USB connection*** between the second host and the USB device block." In other words, the first connection must be dedicated to the first host's communication with the USB device block and the second connection must be dedicated to the second host's communication with the USB device block. There are no such "dedicated" connections in Dickens because

42

Dickens provides a single USB cable 109 connection to printer 182—this connection is used for data transactions to/from the first and second hosts. Knapen ¶ 102. Dickens cannot, therefore, anticipate any of the independent claims because Dickens' controller is not configured to establish "dedicated" USB connections between each host (or upstream port) and the USB device block. Knapen ¶ 102–04.

### 3. Dickens Does Not Disclose "A Shared USB Device Block Operable to be Simultaneously Configured by Two or More USB Hosts" (Claim 23)

Dickens does not disclose the "shared USB device block operable to be simultaneously configured by two or more USB hosts" of Claim 23. Petitioner failed to "specify where [this] element of the claim is found in the prior art" as required by 37 C.F.R. § 104(b)(4), and mischaracterized Claim 23 by asserting that "claim 1 is representative as to claims 3, 7, 18, and 23." Petition at 59.[13]  Unlike Claim 1, which recites "simultaneously request[ing] access to the USB device," Claim 23 recites "a shared USB device block operable to be simultaneously configured by two or more USB hosts."

As best understood from the Institution Decision, the Board concludes Dickens' printer 182 is the claimed "shared USB device block" of Claim 23. The

---

[13]   Likewise, the Board erroneously concluded in the Institution Decision that "claims 3, 7, 18, and 23 differ from claim 1 in only minor respects." Institution Decision at 34.

mere fact there is a single USB connection 109 to printer 182 means it is impossible for two hosts to simultaneously configure printer 182. Knapen ¶ 108. In other words, printer 182 is configured, if at all, by one and only one host—host controller 156. *Id.* ¶ 109. Moreover, the Board's reliance on the configuration of Dickens' emulated printers as disclosing the simultaneous configuration of Claim 23 (*see* Institution Decision at 31–32) is misplaced. The emulated printers are separate devices implemented in the data routing device 100—they are not the "shared USB device block" (*e.g.*, printer 182). The emulated printers are enumerated, thus configured,[14] independently from printer 182. Knapen ¶ 110. Indeed, during deposition, Petitioner's expert conceded that "there are three enumeration activities":

> **Q. What host enumerates printer 182?**
>
> A. So you need to – there's two ways to answer the question, because the emulation in Dickens environment again is equivalent to the printer for the hosts that are attached. So at a detailed level in this construction, with two hosts and a printer, essentially *there are three enumeration activities* that can take place. They're all enumerating the printer, two of them --
>
> **Q. Well, two of those are enumerating emulated printers and one of them is emulating a printer; would you agree with that?**

---

[14]   Configuration is part of the enumeration process. Ex. 1023 ¶ 30.

A.  And they're related, yes.

Ex. 2006 at 99:9–20 (emphasis added). Dickens does not disclose a "shared USB device block operable to be simultaneously configured by two or more USB hosts."

The Board apparently relies on the alleged configuration of the emulated printer devices as corresponding to the "shared USB device block operable to be simultaneously configured by two or more USB hosts" limitation. *See* Institution Decision at 32. But Petitioner's expert conceded at deposition that there would be no configuration of Dickens' emulated printers:

> **Q. . . . Do the host PCs 105, would they -- in Dickens,**
> **would one of ordinary skill in the art understand that**
> **they perform any configuration activities on the emulated**
> **printers?**
> A.  I would expect not, from -- from the description of
> Dickens. As an example of the printer case, since the
> emulations reflect the printer and a printer doesn't
> really require configuration, I would expect the
> emulations would equivalently not require configuration,
> set configuration specifically, for example**.**

Ex. 2006 at 106:10–19. Accordingly, Dickens does not anticipate Claim 23.

### 4.    Dickens Does Not Disclose a "Shared USB Device" (Claim 18)

The Board construed the "shared USB device" of Claim 18 as "a USB device that may be simultaneously configured and accessed by two or more USB hosts" and

the "USB device" must have "three blocks, the third of which is a function block." The only function block Petitioner identifies is Dickens' printer 182. The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously configure and access printer 182. Knapen ¶ 108. As discussed above, enumeration of the emulated printers are separate activities from the enumeration of printer 182. Finally, Petitioner's expert conceded that the printer would not be configured. *See* Ex. 2006 at 106:10–19. Accordingly, Dickens does not anticipate Claim 18 because Dickens does not have "a USB device that may be simultaneously configured and accessed by two or more USB hosts," as required by the Board's construction of "shared USB device."

### 5.   Dickens Does Not Disclose First and Second Endpoint Buffers "Coupled Between" Upstream Ports and the Controller (Claims 2, 6, 16)

Petitioner fails to show endpoint buffers "between" the upstream ports and the multi-host device controller as required by dependent Claims 2, 6, and 16. The Board identifies Dickens' routing controller 140 as the claimed "multi-host device controller" (Institution Decision at 28) and adopts Petitioner's reasoning as to dependent claims 2, 6, and 16 (Institution Decision at 34–35.) According to Petitioner, Dickens' DRAM memory 144 corresponds to the claimed "endpoint buffers" of Claims 2, 6, and 16. Petition at 59. This cannot satisfy the claim because DRAM 144 is not "between" the upstream ports and the multi-host device controller

as claimed. DRAM 144 is actually inside the multi-host device controller (*i.e.*, routing controller 140). Accordingly, Petitioner has failed to show Dickens anticipates Claims 2, 6, or 16. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008) (Anticipation requires a reference to disclose each element of the claimed invention "arranged as in the claim" without "treat[ing] the claims as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning.").

### 6.    Dickens Does Not Disclose "USB Interface Circuit[s]" Located Within the Claimed "Controller" (Claim 25)

Petitioner fails to show "USB interface circuit[s]" within the claimed "controller" of Claim 25. The Board identifies Dickens' routing controller 140 as the claimed "controller" (Institution Decision at 28) and adopts Petitioner's reasoning as to dependent Claim 25 (Institution Decision at 34–35). According to Petitioner, Dickens' items 150 and 158 are the claimed "USB interface circuit[s]." Petition at 59–60. This cannot satisfy Claim 25 because it requires the USB interface circuits to be part of the controller, but in Dickens they are outside of the controller (*i.e.*, routing controller 140). *See Net MoneyIn*, 545 F.3d at 1370. Therefore, Claim 25 has not been shown to be unpatentable as anticipated by Dickens.

### 7. Dickens Does Not Disclose a "Multi-Host Device Controller [That] is Configured to Maintain Respective Dedicated Address, Configuration, and Response Information for Each of the Plurality of Hosts" (Claims 17, 22, 24)

Claims 17, 22, and 24 require "multi-host device controller is configured to maintain respective dedicated address, configuration, and response information for each of the plurality of hosts." The Board identifies Dickens' routing controller 140 as the claimed "controller" (Institution Decision at 28) and adopts Petitioner's reasoning as to dependent claims 17, 22, and 24 (Institution Decision at 34–35). However, Petitioner fails to explain or identify any disclosure in Dickens where routing controller 140 "maintain[s] respective dedicated address, configuration, and response information for each of the plurality of hosts." Rather, Petitioner merely rehashes the "non-re-configuration and non-reenumerating" argument of Claim 1 without specifically identifying in Dickens where the additional limitations of these dependent claims are allegedly found. Petition at 60–61. The only Dickens passage Petitioner cites is column 9, lines 20–35. *See id.* Neither this passage—nor anything else in Dickens—expressly discloses the multi-host device controller (*i.e.*, routing controller 140) maintaining address, configuration, and response information for each of the hosts. And to the extent Dickens might maintain address, configuration, and response information, it might do so outside of the "multi-host device controller." Dickens does not, therefore, anticipate Claims 17, 22, and 24.

48

### 8.    Dependent Claims

By virtue of their dependency, Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 of the '243 Patent include the same limitations as the independent claim from which they depend. Therefore, for the same reasons discussed above with respect to the independent claims, Petitioner has also not demonstrated a reasonable likelihood it would prevail in showing Dickens anticipates these dependent claims.

### C.    Dickens in View of Chen Does Not Render Obvious Claims 9, 11–14 and 21

Petitioner asserts Claims 9, 11–14, and 21 are rendered obvious by Dickens in view of Chen. Petition at 63; Institution Decision at 29. As discussed above, Dickens does not anticipate any claim of the '243 Patent for numerous reasons. *See supra*, Part V.B. Chen does not teach or disclose the limitations that are missing from Dickens (discussed above), and Petitioner does not contend otherwise. Petitioner relies on Chen solely for its teaching of the "interleaving" limitation found in Claims 9, 11–14, and 21.

Patent Owner submits that Chen does not make up for the deficiencies in Dickens. Additionally, a person of ordinary skill in the art would not combine Dickens with Chen because 1) Dickens expressly teaches away from a combination with Chen, 2) combining Chen with Dickens would render Dickens inoperable, and 3) Petitioner's proposed combination does not improve Dickens, does not apply

Chen's "improvement" technique in the same way as it is used in Chen, and does not result in predictable results.

Moreover, Petitioner has not put forth a clear articulated reason why a person of ordinary skill in the art would combine these references to derive the claimed combination. Instead, Petitioner impermissibly uses hindsight to attempt to piece together the claimed invention of the '243 Patent, while using mere generalized vague conclusory statements, such as "[u]sing Chen's known interleaving technique with [Dickens] would have been using Chen's technique as it was known," "[u]sing Chen's known interleaving technique further would have improved [Dickens] by providing [it] interleaving," and "[the combination] would have improved data throughput, by interleaving, *i.e.*, by the improvement done the same way as in Chen." Petition at 67. The United States Supreme Court mandates that a finding of obviousness cannot be premised on these types of conclusory statements. *KSR Int'l v. Teleflex Inc. KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness") (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Consequently, Claims 9, 11–14, and 21 have not been shown to be unpatentable as obvious.

### 1.      Dickens Expressly Teaches Away from Chen's Interleaving

A person of ordinary skill in the art would not combine Dickens with Chen because Dickens teaches away from Chen's interleaving. *See In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983) (improper to combine references where the references teach away from their combination). In particular, "Chen interleaves USB transactions – where 'transactions' are made up of groups of packets that start transactions, continue them, and end them." Ex. 1023 ¶ 135 (citing Ex. 1005 at 3:66–4:2). A print job in Dickens, for example, may be made up of a number of USB transactions. Knapen ¶ 115. Multiple transactions make up a USB "transfer." *Id.* Dickens expressly teaches not to mix transfers from different hosts, let alone transactions (as in Chen). *Id.* Specifically, Dickens teaches "[w]hen print data from either computer is detected it is routed to the printer if the printer is currently free. Any subsequent print data from the other computer is buffered in memory until a break in transmission of the original print data stream equal to the timeout period has been detected." Dickens, 9:21–26; *id.* at 2:45–48 ("When utilized in printer sharing apparatus the invention can enable data from two or more USB host computers to contend for a USB connected printer on a timeout basis.").

In other words, Dickens expressly teaches a print sharing scheme that relies on a timeout period when more than one host attempts to access the printer. Knapen ¶ 116. One of ordinary skill in the art would understand that this timeout period is

required so that different transfers from different hosts do not get mixed together. *Id.* ¶ 116. This makes sense because mixing print data packets from two different hosts would result in garbled print-outs. *Id.* Because Dickens expressly teaches away from interleaving print data from multiple hosts, it is improper to combine Chen with Dickens. *See In re Grasselli*, 713 F.2d at 743 (improper to combine references where the references teach away from their combination).

### 2. Combining Chen with Dickens Renders Dickens' System Inoperable and Further Teaches Away from the Proposed Combination

Applying Chen's interleaving technique to Dickens' data routing device would result in an inoperable system. Knapen ¶¶ 121–27 Combining references that produce inoperative devices cannot serve as predicates for a *prima facie* case of obviousness. *Michael L McGinely v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) ("If references taken in combination would produce a 'seemingly inoperative device,' we have held that such references teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness."); *In re Sponnoble*, 405 F.2d 578, 587 (C.C.P.A. 1969) (references teach away from combination if combination produces seemingly inoperative device); *see also In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (inoperable modification teaches away).

Chen teaches interleaving of USB transactions. Ex. 1023 ¶ 135. "Chen interleaves transactions by interleaving the packets of multiple transactions." *Id.* This is possible because there are multiple devices downstream from the host. Knapen ¶ 122; *see, e.g.*, Ex. 1005, Fig. 5 ("DEVICE-1" and "DEVICE-2"). While Chen's smart switch is interleaving packets, each downstream device is still receiving packets in an order that complies with the USB specification. Knapen ¶ 123. If there was only one downstream memory device in Chen, it would be impossible to interleave the packets because it would violate the transaction rules of the USB specification. *Id.* ¶ 124. According to the example shown in Chen's Figure 5, Chen's smart switch transmits (on its downstream ports) "a first token packet of a first transaction, a second token packet of a second transaction, and a data-out packet of the first transaction" in the following order: "first token packet, second token packet, and data-out packet." Ex. 1023 ¶ 136. If there was only one downstream memory device in Chen, this ordering would not comply with the USB specification, which requires the data-out packet to immediately follow the token packet. Knapen ¶ 125. The single downstream memory device in this hypothetical would determine there was an error on the bus and would ignore the packets. *Id.*

Attempting to use Chen's interleaving technique with Dickens' printer would have the same problem because there is only one printer device. Interleaving packets destined for Dickens' single printer device would not comply with the USB

specification, and the printer would determine there was an error on the bus and ignore the out-of-order packets. *Id.* ¶ 126. This would be the case if Chen's interleaving technique was attempted with any single downstream device. *Id.* ¶ 127. This inoperability teaches away from the combination of Dickens and Chen. Thus, this combination cannot not render the claims of the '243 Patent obvious. *See McGinely*, 262 F.3d at 1354 (combination of references producing a 'seemingly inoperative device' teaches away from the combination and supports a finding of non-obviousness).

### 3. Petitioner's Proposed Combination Does Not Improve Dickens, Does Not Apply Chen's "Improvement" Technique in the Same Way as it is Used in Chen, and Relies on Improper Hindsight to Modify Chen's Principle of Operation to Arrive at the Claimed Invention

Petitioner's sole rationale for combining Chen with Dickens is based on M.P.E.P. § 2143 rationale (C).[15] Petitioner attempts to support the proposed combination with the conclusory statement that "[the combination] would have improved data throughput, by interleaving, *i.e.*, by the improvement done the same way as in Chen." Petition at 67. Similarly, the Board's sole stated justification in

---

[15] Petitioner's expert discussed M.P.E.P. rationale (G), but that discussion was not included in the Petition. The Board correctly found those arguments to be "incorporated improperly" and "decline[d] to consider them." Institution Decision at 37–38.

support of the combination is that it would "provide similar improvements in throughput for all attached USB hosts." Institution Decision at 39.

Petitioner does not actually explain how throughput would allegedly be improved. As discussed above, there would be no improvement in throughput because combining Chen's interleaving with Dickens would result in an inoperable printer. Chen's interleaving simply does not work—and does not increase throughput—when there is a single downstream device (as opposed to multiple devices, *e.g.*, multiple memory devices). Knapen ¶ 127.

Further, Chen's system is fundamentally different. M.P.E.P. rationale (C) requires "a finding that one of ordinary skill in the art could have applied the known 'improvement' technique in the same way to the 'base' device." M.P.E.P. § 2143.C.(3). Chen is a switch between a single host and multiple downstream devices whereas Dickens' is a switch between multiple hosts and a single device. This difference is significant because, as discussed above, applying Chen's technique in the same way as it is used in Chen renders the combination inoperable. Indeed, Petitioner's expert reluctantly conceded that the applied interleaving technique would only be "similar," not the same:

**Q. And why would someone of ordinary skill in the art take this teaching of Chen and apply it to Dickens?**

A. . . . It's a similar interleaving technique, although the sort of initiating agents and the targets feel like they're upside down, but it's a similar interleaving technique.

**Q. What does that mean, "initiating agents and the targets feel like they're upside down"?**

A. Well, as shown in the figure in Chen, there's a single host that's initiating to multiple devices; in Bohm, there's multiple hosts issuing to a single device, but there's still an interleaving that's taking place and essentially the interconnect in between, in both cases.

Ex. 2006 at 127:4–24.

To the extent one of ordinary skill could find some way to make the combination operable, it would have to be in some way other than as described in Chen. This is not sufficient to render the claims obvious. *See In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959) (prior art combination not proper ground for rejection where combination "would require a substantial reconstruction and redesign of the elements shown in [the prior art] as well as a change in the basic principles under which the [prior art] construction was designed to operate"). Petitioner's proposed modification of Chen to apply an interleaving technique in a different manner than taught by Chen is improper hindsight and should be rejected. *See Grain Processing Corp. v. Am. MaizeProds. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through

the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.").

## VI.   CONCLUSION

For at least the reasons state above, neither Dickens nor the combination of Dickens and Chen render any claims of the '243 Patent invalid. Accordingly, Patent Owner respectfully requests the Board deny Petitioner's request for cancellation of Claims 1–9 and 11–25 of the '243 Patent.

Dated: November 21, 2017          Respectfully submitted,

                                  */s/ Brian C. Banner*

                                  Bruce W. Slayden II (Reg. No. 33,790)
                                  bslayden@sgbfirm.com
                                  Brian C. Banner (*pro hac vice*)
                                  bbanner@sgbfirm.com
                                  R. William Beard, Jr. (Reg. No. 39,903)
                                  wbeard@sgbfirm.com
                                  Truman H. Fenton (Reg. No. 64,766)
                                  tfenton@sgbfirm.com
                                  Jerry F. Suva (Reg. No. 67,902)
                                  jsuva@sgbfirm.com

                                  SLAYDEN GRUBERT BEARD PLLC
                                  401 Congress Avenue, Suite 1900
                                  Austin, TX 78701
                                  t: 512.402.3550
                                  f: 512.402.6865

57

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies the above-captioned Patent Owner's Response contains 11,903 words, excluding the parts of the document exempted by 37 C.F.R. 42.24(a).


Respectfully submitted,

*/s/ Brian C. Banner* _____

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

58

IPR2017-00864
Patent Owner's Response

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies the above-captioned Patent Owner's Response with accompanying exhibits (Exhibits 2004–07) was served in its entirety on November 21, 2017, upon the following parties by sending a copy via email to the following email addresses:

Charles W. Shifley (cshifley@bannerwitcoff.com)
Binal J. Patel (bpatel@bannerwitcoff.com)
Robert H. Resis (rresis@bannerwitcoff.com)
Jason S. Shull (jshull@bannerwitcoff.com)
Timothy J. Rechtien (trechtien@bannerwitcoff.com)
Mark A. Dalla Valle (mdallavalle@bannerwitcoff.com)
Zachary Getzelman (zgetzelman@bannerwitcoff.com)

Banner & Witcoff, Ltd.
10 South Wacker Drive, Suite 3000
Chicago, IL 60606

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC

59

IPR2017-00864
Patent Owner's Response

401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

60

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――――

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

―――――――――――

U.S. Patent No. 7,523,243

―――――――――――

Case No. IPR2017-00864

**DECLARATION OF EXPERT GEERT KNAPEN IN SUPPORT OF
PATENT OWNER'S RESPONSE TO PETITION PURSUANT TO 35 U.S.C.
§ 316 AND 37 C.F.R. § 42.120**

Microchip Technology Inc.
Exhibit 2007
Delphi Technologies, Inc. v. Microchip Technology Inc.
Case No. IPR2017-00864

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................1

II.    QUALIFICATIONS ..............................................................1

III.   MATERIALS CONSIDERED AND PREPARED ......................6

IV.   SUMMARY OF OPINIONS ....................................................6

V.   LEGAL PRINCIPLES USED IN ANALYSIS .............................7

   A.   The Legal Principles Governing Patent Validity.......................7

VI.  LEVEL OF ORDINARY SKILL IN THE ART ........................12

VII.     CLAIM CONSTRUCTION .................................................14

   A.   "Simultaneously".................................................................15

   B.   "Concurrent" / "Concurrent USB Connections" .......................19

   C.   "USB Device Block Corresponding to at Least One Function"
      (Claims 1, 3, 7) .................................................................20

   D.   "Shared USB Device Block" (Claim 23) .................................22

VIII.     THE '243 PATENT IS NOT ANTICIPATED OR
    RENDERED OBVIOUS BY THE CITED PRIOR ART ...........23

   A.   State of the Art and Patented Invention....................................23

   B.   Dickens ..............................................................................25

     i.   Overview of Dickens.......................................................... 26

     ii.  Dickens Does Not Disclose Each and Every Element ............... 31

   C.   Dickens in View of Chen Does Not Render Claims 9, 11–14,
      and 21 Obvious.................................................................39

     i.   Dickens teaches away from a combination with Chen.............. 39

     ii.  Combining Chen with Dickens results in an inoperable system ............... 41

IX. SWORN TESTIMONY.............................................................43

i

Exhibit 2007

IPR2017-00864

ii

Exhibit 2007

I, Geert Knapen, hereby declare as follows

## I.    INTRODUCTION

1.    I am currently a Senior Principal Architect - DSP at Knowles

Intelligent Audio (formerly Audience, Inc.).

2.    I have been retained in this matter by Slayden Grubert Beard PLLC

("SGB") to provide various opinions regarding U.S. Patent No. 7,523,243 ("the

'243 Patent" or "Bohm").  I am being compensated for my work in this matter.

My compensation in no way depends upon the outcome of this proceeding.

3.    I have been advised that SGB represents Microchip Technology, Inc.

("Microchip") in this matter.  I have no financial interest in Microchip.

4.    I have been advised that Microchip owns the '243 Patent.  I have no

financial interest in the '243 Patent.

## II.   QUALIFICATIONS

5.    I received a Master of Science in Electrical Engineering in 1981 from

Vrije Universiteit Brussel (V.U.B.) (Brussels Free University) at the Department of

Applied Sciences.

6.    From 1981 to 1983, I was an Assistant Professor in the Department of

Electrical Engineering at Brussels Free University, where I was involved in the

field of non-destructive testing, such as through time-domain reflectometry.

Exhibit 2007

7.      From 1983-1985, I was responsible for Industrial Consulting and External Industrial Contacts at the Brussels Free University.

8.      In 1985, I co-founded the company Signal Processing Innovations N.V. (Spinnov) in Brussels. The company focused on development and sale of digital signal processing boards and complete measurement systems. My responsibilities included research and development and product management. I was also responsible for designing a high-end Fast Fourier Transform (FFT) Spectrum Analyzer for Sound and Vibration markets.

9.      In 1990, I started another company called Ling Dynamic Systems N.V. in Brussels. Ling was also focused on the signal processing market. From 1990 to 1991, I was a Director at Ling and was responsible for R&D and product management.

10.      In 1991, I started a company called Design & Advice C.V. in Belgium. While there, I began consulting for Philips International Technology Center Leuven (ITCL) in DSP hardware and software.

11.      In 1995, while still a consultant at Design & Advice C.V., I became involved in the creation of the Universal Serial Bus ("USB") standard. I represented Philips in the USB Device Working Group (DWG) and was elected

Exhibit 2007

chairman of the Audio Device Class Working Group of the DWG. I was an author of the USB Specification for audio devices.

12.     I also participated in the Hub Working Group and actively participated in the Common Class Specification Working Group.

13.     I have made various presentations on USB technology. These include presenting the world's first USB-based digital speaker at the February 1996 USB Developers Conference; giving a presentation on the Audio Device Class at the 1997 Windows Hardware Engineering Conference (WinHEC); presenting a lecture on USB synchronization at the Philadelphia USB Developers conference; and presenting a lecture about USB and USB audio before the San Francisco Audio Engineering Society (AES).

14.     I further participated in the development of USB-based audio products for Philips.

15.     In 1998, I founded a new company in San Jose, California called Design & Advice L.L.C. I represented Philips ITCL in different USB working groups. I also represented Philips as a Promoter team member during the development of the second generation USB specification, USB 2.0. During that time frame (1999), I was chairman of the Content Security Working Group, which created the framework to implement DTCP over USB.

Exhibit 2007

16.    In 2000, I was elected to the Board of Directors of the USB

Implementers Forum (USB-IF). I was further appointed to be Secretary of the

Board. From 2000 to 2002, I participated in the development and finalization of the

USB 2.0 Core Specification. In 2002, I was elected Vice President and Secretary of

the USB-Implementers Forum. I also continued my role as chairman of the Audio

Device Class Working Group, and started the revision of the USB Specification for

audio devices.

17.    During that time frame, I also participated in the standardization of the

Bluetooth Advanced Audio Distribution Profile Specification.

18.    Between 2002 and 2008, I became involved in UPnP standardization

efforts, co-chaired the UPnP Audio/Video Working Committee, and was active in

the Digital Home Working Group initiative.

19.    In 2008, I represented NXP Semiconductors as a USB 3.0 Promoter

Group member, and contributed to the creation of the USB 3.0 specification. My

work included co-designing the isochronous transfer model and the Service

Interval Synchronization mechanism.

20.    In 2009, I started work on the new Video Display DWG Working

Group, re-oriented the scope of this Working Group towards an integrated

Audio/Video Device Class. I carried out an editor role for the core specification of

Exhibit 2007

this new A/V Device Class and participated in providing a first version of the specification. During this time, I also contributed to the Content Security DWG Working Group, the Multimode DWG Working Group, and Power Delivery Control Promoter Working Group.

21.     In 2014, I joined the USB Newark Audio Working Group end of 2014 as NXP representative. As a result, the USB Audio Device Class Working Group was reactivated to generate the next generation Audio Device Class 3.0 specification. I acted as the Chair for this group. The Audio Device Class 3.0 specification was published on September 22, 2016.

22.     The USB Audio Device Class Working Group is looking into new extensions and improvements and will be restarted soon. I will most likely be acting as Chair for this group, but now representing Knowles Intelligent Audio.

23.     In 2016, I joined the MIPI Alliance as Knowles Intelligent Audio representative in the LML Working Group, creating new audio interconnect standards (SoundWire 2.0) for mobile applications.

24.     My over 35 years of professional experience with computer peripheral device interface design and with USB technology, as well as my educational background, are summarized in more detail in my C.V., which is attached as **Appendix A**.

## III.   MATERIALS CONSIDERED AND PREPARED

25.   In forming the opinions expressed below, I considered the following:

- the '243 Patent and the other patent in its family (U.S. Patent No. 7,627,708) (collectively the "USB Patents") and their file histories

- the Petition filed by Delphi Technologies, Inc. in this matter

- the prior art references and related documentation submitted with the Petition and discussed herein

- The Board's Institution Decision

- The deposition transcript of Mr. John Garney

- I have also relied upon my education, background, and experience.

## IV.   SUMMARY OF OPINIONS

26.   First, it is my opinion that a person having ordinary skill in the art in 2006, as it relates to the '243 Patent, would have a bachelor's degree in electrical or computer engineering (or similar), and at least five years of industry experience in computer peripheral device design.

27.   Second, it is my opinion that under the broadest reasonable interpretation standard for interpreting claim terms, the term "simultaneously," as used in the claims of the '243 Patent, has its plain meaning: "at the same time."

6                                    Exhibit 2007

28.     Third, it is my opinion that under the broadest reasonable interpretation standard for interpreting claim terms, the term "concurrent," as used in the claims of the '243 Patent, has its plain meaning: "operating or occurring at the same time."

29.     Fourth, I have been asked to consider the Petition filed by Delphi in this matter and the grounds of invalidity of the '243 Patent claims asserted in that Petition and adopted in the Board's Institution Decision.  Based on my investigation and analysis, it is my opinion Delphi's Petition and the Board's Institution Decision fails to demonstrate the invalidity of any claim of the '243 Patent.

## V.     LEGAL PRINCIPLES USED IN ANALYSIS

### A.     The Legal Principles Governing Patent Validity

30.     I have been asked to apply the following legal principles to my analysis of validity under § 102 (anticipation) and § 103 (obviousness). Where I rebut arguments made by Delphi's expert relating to other areas of the law, I will state my understanding of the applicable law separately.

31.     **Anticipation:**  Anticipation requires a single prior art reference to disclose each and every element of the claimed invention arranged as in the claim without treating the claims as mere catalogs of separate parts, in disregard of the

part-to-part relationships set forth in the claims and that give the claims their

meaning.  It is not enough that the prior art includes multiple distinct teachings that

the artisan might somehow combine to achieve the claimed invention.

32.    Inherent anticipation requires that any missing descriptive material is

"necessarily present," not merely probably or possibly present, in the prior art.

33.    **Obviousness:** A claim is invalid for obviousness if "differences

between the subject matter sought to be patented and the prior art are such that the

subject matter as a whole would have been obvious at the time the invention was

made to a person having ordinary skill in the art to which said subject matter

pertains." 35 U.S.C. § 103(a). In determining whether a claimed invention is

obvious, one must consider the level of ordinary skill in the field of the invention

that someone would have had at the time the claimed invention was made, the

scope and content of the prior art, and any differences between the prior art and the

claimed invention.

34.    The mere existence of each and every element of the claimed

invention in the prior art does not necessarily prove obviousness, since inventions

typically rely on building blocks of prior art. In considering whether a claimed

invention is obvious, one may consider whether there was a reason that would have

prompted a person having ordinary skill in the field of the invention to combine the

known elements in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and (6) whether the change resulted more from design incentives or other market forces. To find it rendered the invention obvious, one must find that the prior art provided a reasonable expectation of success. Obvious to try is not sufficient in unpredictable technologies.

35.    In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If one of ordinary skill in the art can implement a predictable variation prompted by market forces or design incentives, such a variation is obvious. If a technique has been used to improve one device, and one of ordinary skill in the art would recognize that it would improve

Exhibit 2007

similar devices in the same way, using the technique is obvious unless its actual application is beyond ordinary skill.

36.     Where there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, it is obvious to pursue the known options within the grasp of one of ordinary skill.

37.     Contemporaneous development of similar variations of a device or method by other parties is indicative of obviousness.

38.     In establishing obviousness, one must avoid the "temptation to read into the prior art the teachings of the invention in issue" and "guard against slipping into the use of hindsight."

39.     Art that is analogous to the subject matter of the patent may properly be used as an obviousness reference. "A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992).

40.     **Secondary considerations:** An obviousness assessment requires taking into account objective evidence (called "secondary considerations") that may have existed at the time of the invention and afterwards that may shed light on

the obviousness or not of the claimed invention, such as: (a) Whether the invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market pressure advertising or similar activities); (b) Whether the invention satisfied a long-felt need; (c) Whether others had tried and failed to make the invention; (d) Whether others invented the invention at roughly the same time; (e) Whether others copied the invention; (f) Whether there were changes or related technologies or market needs contemporaneous with the invention; (g) Whether the invention achieved unexpected results; (h) Whether others in the field praised the invention; (i) Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention; (j) Whether others sought or obtained rights to the patent from the patent holder; and (k) Whether the inventor proceeded contrary to accepted wisdom in the field.

41.    **Claim Construction:**  I have been instructed and understand that for purposes of this matter, claim terms in the '243 Patent should be given their broadest reasonable construction in light of the specification as they would be interpreted by one of ordinary skill in the art at the time the patent was filed (i.e., April 2006). *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061–62 (Fed. Cir. 2016).  I understand that under a broadest reasonable interpretation, words of a

claim should be given their plain meaning unless such meaning is inconsistent with the patent specification, claims, and/or prosecution history.  *Id.*

## VI.   LEVEL OF ORDINARY SKILL IN THE ART

42.    I have been instructed by counsel that the standard for obviousness is whether the claimed invention would have been obvious to a person having ordinary skill in the art at the time of the application leading to the '243 Patent was filed (i.e., around April 2006 when the provisional application listed on the face of the '243 Patent was filed).  An important part of determining the identity of this hypothetical person of ordinary skill resolves around framing the relevant field of art.

43.    The '243 Patent states that the field of art relates to "computer hardware and, more specifically, to Universal Serial Bus (USB) controllers."  '243 Patent, 1:15–17.

44.    In terms of knowledge and understanding, the person having ordinary skill in the art would, at minimum, be able to understand the terminology used in the '243 Patent and would be able to practice the art disclosed. For example, the '243 Patent discusses connections between host and device using "digital interconnect such as Interchip USB, ULPI, UTMI, etc.," which suggests one of

Exhibit 2007

ordinary skill in the art would be familiar with these industry-standard interconnect interfaces.

45.    Additionally, the inner-workings of the invention's USB multi-host device controller (e.g., element 108 of Figure 3) is not described at the circuit level, suggesting that one of ordinary skill in the art would be familiar with the circuit-level design and implementation of a standard USB device.

46.    Taking all of these considerations into account, it is my opinion that a person of ordinary skill in the art would be a person who has experience designing—either in the classroom or in a work endeavor—a standard USB device. The person of ordinary skill will have also been exposed to the various interconnect options for connecting USB hosts and USB devices.  This person would have a bachelor's degree in electrical or computer engineering (or similar), and at least five years of industry experience in computer peripheral device design.

47.    I understand the Board determined:

On the record before us and for purposes of this Decision, we define the level of ordinary skill in the art, at the time of the '243 patent, to include at least a Bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent fields as well as familiarity with the USB 2.0 specifications to the extent of having designed a USB device. This definition is reflected in the prior art of record and is consistent with the testimony of both parties' experts and

consistent with Patent Owner's admissions during prosecution of the '243 patent.

Institution Decision at 17. I agree the Board's determination of the level of ordinary skill in the art is consistent with my assessment, and my opinions consider the level of skill in the art as determined by the Board.

## VII.   CLAIM CONSTRUCTION

48.     I have reviewed the various claim construction positions advanced in the Petition by Delphi and its expert, Mr. Garney. I have also reviewed the various claim constructions advanced by the Board in its Institution Decision. For purposes of this report, I consider the proper interpretation of the following terms:

- "simultaneously"

- "concurrent / concurrent USB connections"

- "USB device block corresponding to at least one function" (Claims 1, 3, 7)

- "shared USB device block" (Claim 23)

49.     I reserve the right to further opine on these and other claim terms in future proceedings.

Exhibit 2007

## A. "Simultaneously"

50.     In my opinion, one of ordinary skill in the art in the 2006 timeframe

would understand the broadest reasonable interpretation of the term

"simultaneously" as having its plain meaning, i.e., "at the same time."

51.     One of ordinary skill in the art would find this broadest reasonable

interpretation to be consistent with the '243 Patent specification.  For example, the

'243 Patent discloses an embodiment where "a single USB device may be shared

across multiple USB hosts without needing to be reconfigured or re-enumerated

each and every time the upstream hosts alternate accessing the USB device.  Since

each host has simultaneously enumerated the device, there may be no need to

detach and reconfigure the device on the fly."  '243 Patent, 2:9–15.  One of

ordinary skill in the art would know that the existence of multiple banks of USB

endpoint and status buffers[1] in Bohm's inventive multi-host USB device would

allow two hosts to enumerate the multi-host USB device at the same time.  With

dedicated endpoint and status buffers for each upstream port, there would be no

need to hold off one host's attempt to enumerate the device while another host is

also enumerating the device.

---

[1]     These are depicted as elements 306 and 308 in Figure 3 of the '243 Patent.

52.    As another example, the '243 Patent specification discloses that

"Multiple USB hosts may simultaneously share a single device/function, for

example a Gigabit Ethernet controller." '243 Patent, 2:15–16.  One of ordinary

skill in the art would understand the "sharing" in this context as having an ordinary

meaning and not as a term of art.   This is because the USB specification does not

allow for a device to be shared or used by more than one host at a time.  One of

ordinary skill in the art would view Bohm's disclosure of "simultaneous" sharing

as merely stating that a device such as a Gigabit Ethernet controller can be used by

multiple hosts at the same time.

53.    A further example is Bohm's disclosure that "a shared USB device

may be simultaneously configured and accessed by two or more USB hosts." '243

Patent, 2:28–30.  First, one of ordinary skill in the art would know that the separate

USB endpoint and status buffers along with the device controller in Bohm's multi-

host USB device would allow two hosts to configure the multi-host USB device at

the same time.  There would be no need to hold off one host's attempt to configure

the device while the other was also configuring the device.  Second, one of

ordinary skill in the art would view the simultaneous "access" stated here as

allowing multiple hosts to issue access requests at the same time.  This "access" is

made available "by providing a separate configuration and access interface for

Exhibit 2007

each upstream host," i.e., the aforementioned separate USB endpoint and status buffers.  '243 Patent 3:45–47.

54.     Yet another example is Bohm's disclosure that "USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices."  '243 Patent, 1:21–23.  One of ordinary skill in the art would view Bohm's disclosure of "simultaneously accessible devices" consistent with the plain meaning of "simultaneously," i.e., that the devices on a USB bus can be accessed at the same time.  This is not a technical statement meant to imply that one USB host can issue simultaneous data transfers to separate devices; the USB standard does not allow for that.  One of ordinary skill in the art would understand this statement merely reflects the accessibility of the devices connected to the USB bus—they are all equally accessible at the same time.

55.     The plain meaning of "simultaneously" is further highlighted by the patent's disclosure that "[t]here are several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at a time.  There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers.  These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch.

Exhibit 2007

The USB device is typically accessed by one single host at a time . . . ." '243

Patent, 1:58–1:67.  This passage makes clear there is no simultaneous access if the

device is accessed by a single host at a time.  Thus, one of ordinary skill in the art

would understand that in order to have simultaneous access, both hosts must be

able to access the device "at the same time."

56.    One of ordinary skill in the art would find the broadest reasonable,

plain meaning interpretation of "simultaneously" to be consistent with the '243

Patent claims.  Claim 11, for example, recites "the multi-host device controller

comprises an internal arbitration mechanism configured to permit the plurality of

hosts to simultaneously request access to the USB device block by interleaving

host access requests and/or by using a common request/grant structure."  One of

ordinary skill in the art would understand "simultaneously" here refers to multiple

hosts making access requests at the same time.  One of ordinary skill in the art

would understand the simultaneous access requests are possible because Bohm

provides "a separate configuration and access interface for each upstream host,"

i.e., the aforementioned separate USB endpoint and status buffers depicted in

Bohm Figure 3.  '243 Patent 3:45–47.

57.    One of ordinary skill in the art would understand the Claim 11

mention of "interleaving host access requests and/or by using a common

18                          Exhibit 2007

request/grant structure" as referring to the manner in which the multi-host device controller services the simultaneous access requests.  In other words, after receiving simultaneous (i.e., "at the same time") requests from multiple hosts, the multi-host device controller can service those requests by providing access to the USB device block "by interleaving host access requests and/or by using a common request/grant structure."  The '243 Patent specification confirms this understanding of Claim 11 by describing the actual access (i.e., not the request) of the shared peripheral function performed either by interleaving or by the common request/grant structure:

> USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.  '243 Patent 4:19–26.

**B.**    **"Concurrent" / "Concurrent USB Connections"**

58.    In my opinion, one of ordinary skill in the art in the 2006 timeframe would understand the broadest reasonable interpretation of the term "concurrent" as having its plain meaning, i.e., "operating or occurring at the same time."

59.    One of ordinary skill in the art would find this broadest reasonable interpretation to be consistent with the '243 Patent specification.  For example, Figure 1 shows "Host 1" and "Host 2" connected at the same time to multi-host device 106.  *See* '243 Patent, 3:47–51 & Fig. 1.  Similarly, Figure 2 shows a PDA, keyboard, and printer each connected to the two PCs via USB connections that operate or occur at the same time.  '243 Patent, 3:52–55 & Fig. 2.  And Figure 3 shows a "Connection to first Host" and a "Connection to second Host," both existing or occurring at the same time.  '243 Patent, Fig. 3.

### C.    "USB Device Block Corresponding to at Least One Function" (Claims 1, 3, 7)

60.    In my opinion, one of ordinary skill in the art in the 2006 timeframe would understand the broadest reasonable interpretation of the term "USB device block corresponding to at least one function" to have its plain meaning, i.e., "a segment of a USB device that performs a USB function."

61.    The '243 Patent uses the term "block" to refer to segments of a USB device.  *See* '243 Patent at 2:47–50 ("A USB device may be divided into three segments or blocks.").  One of ordinary skill in the art would, therefore, understand "USB device block" to broadly refer to a segment of a USB device.

62.    One of ordinary skill in the art would also understand the "at least one function" language to broadly refer to a USB function.  This is because it is in the

context of a USB device, and one of ordinary skill in the art is familiar with USB functions because the USB specification defines USB functions.  *See* Ex. 1004 at 34 (USB 2.0 Specification) (defining "Function" as "A USB device that provides a capability to the host, such as an ISDN connection, a digital microphone, or speakers.").

63.    Accordingly, the plain meaning of "USB device block corresponding to at least one function" is readily apparent to one of ordinary skill in the art, and means "a segment of a USB device that performs a USB function."

64.    I understand the Board construed "device block" under the broadest reasonable interpretation standard to mean "circuitry within a USB device necessary for the specific USB device function."  Institution Decision at 11.  In the context of the phrase "USB device block corresponding to at least one function" of Claims 1, 3, and 7, the Board's construction of "device block" is consistent with the construction I provide for the phrase "USB device block corresponding to at least one function."  Thus, my opinions herein are the same using the Board's construction of "device block" and my construction of "USB device block corresponding to at least one function."

Exhibit 2007

**D.     "Shared USB Device Block" (Claim 23)**

65.    In my opinion, one of ordinary skill in the art in the 2006 timeframe would understand the broadest reasonable interpretation of the term "shared USB device block" to have its plain meaning, i.e., "a segment of a USB device that is shared by two or more USB hosts."

66.    As stated above, a "block" is a "segment" of a device.  One of ordinary skill in the art would understand the word "shared" in the context of Bohm to broadly mean the device is shared or accessible by two or more USB hosts (as opposed to a normal USB device that is accessible by only one host). Indeed, the '243 Patent uses the term "shared" and "share" consistently in the context of sharing a USB device between multiple hosts:

- "In one set of embodiments, a single USB device may be **shared** across multiple USB hosts without needing to be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device."  '243 Patent at 2:9–12.

- "Multiple USB hosts may simultaneously **share** a single device/function, for example a Gigabit Ethernet controller."  '243 Patent at 2:15–16.

Exhibit 2007

- "The third block may correspond to the USB device that will be **shared** by multiple USB hosts, and may therefore not need to be duplicated." '243 Patent at 2:56–58.

- "In one set of embodiments, a multi-host USB device may provide maximum flexibility and a simple means by which to cheaply **share** devices with multiple hosts, by providing a separate configuration and access interface for each upstream host." '243 Patent at 3:43–46.

- "As shown in FIG. 2, by way of examples, multi-host device 106— configured with USB multi-host device controller 108—may be a personal digital assistant (PDA) 130, a keyboard 126, and/or a printer 120 **shared** by personal computer (PC) 122 and PC 123." '243 Patent at 3:51–55.

## VIII.  THE '243 PATENT IS NOT ANTICIPATED OR RENDERED OBVIOUS BY THE CITED PRIOR ART

### A. State of the Art and Patented Invention

67.     By 2006, when Bohm filed the application that led to the '243 Patent, USB was a mature standard that was used ubiquitously.  The second version of the USB specification (USB 2.0), which provided for increased transfer rates compared to the previous version of the specification, had been released a number of years earlier.

23                              Exhibit 2007

68.     The USB protocol is based on the assumption / requirement that only one entity—a USB host—can initiate data transactions on the USB bus.  As Bohm recognizes, "the USB specification is structured so that every device is configured and accessed by a single host controller."  '243 Patent, 1:54–56.

69.     Thus, to share a peripheral such as a printer between two hosts (e.g., personal computers) a user could unplug the printer from the first host and plug it into the second host.  Alternatively, as Bohm describes, there were "several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time.  There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers.  These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch.  The USB device is typically accessed by one single host at a time, and when access to the USB device is switched, the device must be re-configured, thereby losing internal state information."  '243 Patent, 1:59–2:2.

70.     Bohm successfully overcame the shortcomings of these prior art solutions by providing a multi-host USB device with concurrent USB connections between the multi-host USB device block and two or more hosts.

71.     Bohm's inventive concept was to provide "a device" that can be simultaneously accessed by two hosts without using the "stand-alone USB switches" described in Bohm's specification that only provide access to a device one host at a time.  *See* '243 Patent 1:59–2:2.

## B.    Dickens

72.     Pages 54–62 of Delphi's Petition and paragraphs 100–122 of the supporting declaration of expert John Garney (Exhibit 1023) are devoted to a comparison of claims 1–8, 11, 15–20, and 22–25 of the '243 Patent with U.S. Patent No.  6,549,966 ("Dickens").

73.     Pages 24–35 of the Board's Institution Decision are devoted to a comparison of claims 1–8, 11, 15–20, and 22–25 of the '243 Patent with Dickens.

74.     I disagree with Delphi and Mr. Garney that Dickens anticipates these claims of the '243 Patent.  For the reasons stated below, it is my opinion that Dickens fails to disclose or reasonably suggest each and every element of independent claims 1, 3, 7, 18, and 23 of the '243 Patent and therefore does not anticipate these claims or the corresponding dependent claims.

25                          Exhibit 2007

### i.   Overview of Dickens

75.   Dickens' "data routing device" uses a very powerful microprocessor to coordinate activities occurring on separate USB buses.  In fact, Dickens' discloses five (5) separate USB buses:



Ex. 3001 at 3 (annotated).

   Exhibit 2007

76.    Host computers 105 act as the USB host for USB Buses #1–2.  There is one computer/host for each USB bus (the leftmost computer 105 as the host for USB Bus #1; the rightmost computer 105 as the host for USB Bus #2).  *See* Dickens at 5:27–37.

77.    Host computers 105 are connected via USB connection 106 (and USB hub 107) to the data converters 110 of Dickens' Fig. 1, which include device controllers 150.  *See* Dickens at 5:27–37, 6:51–54.  USB connections 106 are standard USB cables.  Dickens at 5:31–33.



FIG.   1

27                                              Exhibit 2007

Ex. 3001 at 2.

78.    Each USB device controller 150 (Dickens Fig. 2) is a unique USB device on its respective USB bus 106, making up a terminus or "leaf" of the USB bus.

79.    Dickens discloses that the USB device controllers 150 implement emulation functions to emulate the presence of each USB peripheral device (e.g., audio speakers 180, printer 182, keyboard 184, and mouse 186).  *See* Dickens at 5:38–43.

80.    When a host computer 105 is connected to Dickens' data routing device 100, the host computer enumerates and configures each emulated device via its respective USB device controller 150.

81.    During enumeration performed by a host computer 105, each emulated device on the host's respective USB bus receives a unique address. This enumeration process relates to the emulated functions; host computers 105 do not enumerate any of the USB peripheral devices downstream from the data router (e.g., audio speakers 180, printer 182, keyboard 184, and mouse 186).

82.    USB Buses #3–5 (annotated Fig. 2, above) include peripheral data converters 120 (Dickens Fig. 1), which include USB host controllers 154, 156, and 158.

Exhibit 2007

83.     The USB host controllers (154, 156, 158) each act as a host for each respective USB bus, i.e., one host controller per bus.

84.     Dickens states the USB host controllers (154, 156, 158) include functions that emulate the presence of a host computer on USB connections 109. *See* Dickens at 6:12–17.  Despite the use of the term "emulate" in this description, one of ordinary skill in the art would understand these host controllers (154, 156, 158) are actual USB hosts on their respective USB buses.  That is, they each individually operate according to the behavior defined for a USB host in the USB specification.

85.     Dickens' host controllers (154, 156, 158) are connected via USB connections 109 to the various separate downstream peripheral devices (audio speakers 180, printer 182, and keyboard 184 and mouse 186 through hub 107).  *See* Dickens at 6:64–7:8.  Each of these downstream devices is a terminus or leaf of each respective USB bus.

86.     Dickens' data routing device 100 and the downstream peripheral devices, such as Dickens' printer 182, are separate physical devices.  This is clear because they are connected by USB connections 109 that are described as standard "multi-conductor USB cables."  *See* Dickens at 6:21–23.

29                              Exhibit 2007

87.     When a peripheral device is connected to Dickens' data routing device 100, the respective USB host controller (154, 156, 158) will enumerate and configure that peripheral device. During this enumeration, the peripheral device will receive a unique address on its respective USB bus.  This enumeration process relates to the peripheral device; USB host controllers 154, 156, and 158 do not enumerate any of the emulated functions (i.e., USB device controllers 150) within Dickens' data routing device 100.

88.     In order to perform enumeration of the downstream peripheral devices—and to emulate those same devices, Dickens' data routing device 100 must have intimate knowledge of how each of the devices that can be plugged in work.  For example, Dickens' data routing device must have device drivers and emulation software that correspond to any downstream device that is plugged into USB host controllers 154, 156, and 158.  As a result, installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dickens' data routing device 100 without also upgrading the software running on data routing device 100.

89.     Dickens' implements a PCI bus (132) between the various USB busses and its data routing controller 140, which includes microprocessor 142.

Exhibit 2007

90.     Dickens' data routing controller 140 uses the PCI bus to establish connections between a host computer 105 and peripheral devices (e.g., printer 182).

### ii.   Dickens Does Not Disclose Each and Every Element

#### a.   No "concurrent" respective dedicated USB connections (Claims 1, 3, 7, 18, 23)

91.     In view of the broadest reasonable interpretation of "concurrent" USB connections discussed above, it is my opinion that Dickens fails to disclose "concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports," as required by Claim 1 of the '243 Patent.

92.     I understand the Board, Delphi, and Mr. Garney identify the ports connecting Dickens' data routing device to Host PCs 105 as corresponding to the claimed "first and second upstream ports" of Bohm's Claim 1.  These ports would be at the connection point between the Host PCs 105 and the USB device controllers 150 in Dickens' Figure 2 (highlighted in yellow):

31                                    Exhibit 2007



93.    I further understand the Board, Delphi, and Mr. Garney identify the

printer peripheral as corresponding to the claimed "USB device block" of Bohm's

Claim 1.

94.    Dickens does not disclose concurrent USB connections between two

of these ports and the printer.  Instead, Dickens discloses that "[e]ach peripheral

device can have a USB connection by which it is connected to a respective one of

the plurality of peripheral data converters."  Ex. 1003, 5:2–4.  This statement is

confirmed in Dickens' Figure 2, which depicts a single USB connection between a

downstream port on the data routing device and any of the peripherals.  For

example, Dickens' Figure 2 depicts a single USB connection between the data

routing device and the printer (highlighted in yellow):



95.     There is only a single connection to the printer.  One of ordinary skill in the art would understand that, in the context of Dickens' disclosure, this single connection only allows print data from one host at a time.  Indeed, USB connection 109 is the only way data from the data routing device is transferred to/from printer 182.  Thus, Dickens does not disclose concurrent dedicated USB connections between two of the data routing device's upstream ports (connected to Host PCs 105) and the USB device block (e.g., printer 182).

96.     Dickens discloses:

- "Because the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off.  In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application."  Ex. 1003 2:21–26.

33                              Exhibit 2007

- "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." Id. 2:48–52.

- "When print data from either computer is detected it is routed to the printer if the printer is currently free.  Any subsequent print data from the other computer is buffered in memory until a break in transmission of the original print data stream equal to the timeout period has been detected. The buffered data is then sent to the printer. . . .  The overall effect is to allow the printer to be automatically shared between the computers."  Id. 9:21–30.

97.    Based on the passages in the preceding paragraph of this declaration (paragraph 96), one of ordinary skill in the art understands when two hosts request access to the same peripheral (e.g., printer), Dickens establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral. For the host that is not connected, Dickens temporarily stores data in a memory.

34                              Exhibit 2007

98.     Any data transactions for printer 182, regardless of which host

initiated the transaction, are necessarily communicated to printer 182 via the single

USB connection 109 shown connected to printer 182 in Figure 2 of Dickens.

99.     Based on the passages in paragraph 96 above, one of ordinary skill in

the art understands when the host that is connected to the peripheral completes its

data transfer, the data routing device switches the first one-to-one connection off

and then switches a new one-to-one connection on between the peripheral and the

second, waiting host (via its upstream port).  The second host with the new one-to-

one connection then completes its access.

100.    Based on the passages in paragraph 96 above, one of ordinary skill in

the art understands Dickens is not capable of establishing concurrent dedicated

USB connections between a peripheral and two or more hosts or upstream ports

because there are never two or more such USB connections at the same time.

101.    I understand the Board, Delphi, and Mr. Garney advance the same

anticipation argument for Claims 3, 7, 18, and 23 as advanced for Claim 1.  These

claims differ from Claim 1 at a minimum because they require "concurrent"

respective dedicated USB connections to exist between the USB device block (e.g.,

Dickens' printer) and two hosts instead of two upstream ports as in Claim 1.  For

the same reasons discussed above with respect to Claim 1, Dickens does not

Exhibit 2007

disclose the "concurrent" respective dedicated USB connections of Claims 3, 7, 18, and 23.

### b. No concurrent respective "dedicated" USB connections (Claims 1, 3, 7, 18, 23)

102.   As discussed above, Dickens provides a single USB cable connection to printer 182—this connection is used for data transactions to and from the first and second hosts.  Thus, Dickens does not disclose a controller configured to establish "dedicated" USB connections between each host (computers 105) and the USB device block (printer 182) (Claims 3, 7, 18, and 23).  Dickens likewise does not disclose a controller configured to establish "dedicated" USB connections between a first and second upstream port and the USB device block (Claim 1).

103.   For example, one of ordinary skill in the art would understand the claims to require (1) a first connection dedicated to a first host's communication with the USB device block and (2) a second connection dedicated to a second host's communication with the USB device block.  *See, e.g.*, Claim 3 ("the multi-host device controller is configured to establish a first dedicated USB connection between the first host and the USB device block and a second dedicated USB connection between the second host and the USB device block").

104.   The single, USB connection 109 to Dickens' printer does not allow for respective "dedicated" connections.

### c.    No concurrent respective dedicated "USB connections" (Claims 1, 3, 7, 18, 23)

105.   It is my opinion that Dickens fails to disclose concurrent respective dedicated "USB connections" between the USB device block and the hosts because Dickens' data routing controller 140 uses the PCI bus to establish connections between a host computer 105 and peripheral devices (e.g., printer 182). *See* Dickens at 8:16–28.

106.   Because Dickens routes data in a non-USB format over a PCI bus, one of ordinary skill in the art would not view Dickens as disclosing concurrent respective "USB connections" between Dickens' printer (i.e., the claimed USB device block) and the two upstream ports on Dickens' data routing device (or the two hosts connected to the data routing device).

107.   Further, as previously described (paragraph 88 above), installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dickens' data routing device 100 without also upgrading the software running on data routing device 100.  This is further evidence that the connection between host 105 and printer 182 is not a "USB connection" as would be understood by one of ordinary skill in the art since installing a specific driver on a host 105 directly connected via "USB connection" to a printer 182 would function as required by the USB specification.

<center>37</center>

Exhibit 2007

Appx_401

### d.     No "shared USB device block operable to be simultaneously configured by two or more USB hosts" (Claim 23)

108.   As best understood from the Institution Decision, the Board concludes Dickens' printer 182 is the claimed "shared USB device block" of Claim 23.  The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously configure printer 182.

109.   Printer 182 is configured, if at all, by one and only one host—host controller 156.

110.   One of ordinary skill in the art would understand Dickens' emulated printers (referenced at pages 31–32 of the Board's Institution Decision) are separate (virtual) devices implemented in the data routing device 100 (compared with printer 182, which is a (physical) device connected to the data routing device via USB connection 109).  Thus, one of ordinary skill in the art would understand the emulated printers are enumerated independently from printer 182.

### e.     Dickens' other peripheral devices do not anticipate the '243 Patent claims

111.   Petitioner and the Board focus on Dickens' printer 182 as corresponding to the USB device block of the '243 Patent claims.  Dickens' other devices (speakers 180, keyboard 184, and mouse 186) also do not anticipate the '243 Patent claims.  Like printer 182, these devices are all connected to the data

router by a single USB connection—the speakers directly connected and the mouse/keyboard connected via the single USB connection 106 between the data routing device and hub 107.  Accordingly, these peripheral devices do not disclose the "concurrent respective dedicated USB connections" required by the claims.

## C.   Dickens in View of Chen Does Not Render Claims 9, 11–14, and 21 Obvious.

112.   I understand the Board, Delphi, and Mr. Garney contend Claims 9, 11–14, and 21 of the '243 Patent are rendered obvious by the combination of Dickens in view of U.S. Patent No. 7,073,010 ("Chen").

113.   Pages 35–39 of the Board's Institution Decision are devoted to a comparison of claims 9, 11–14, and 21 with the combination of Dickens and Chen.

### i.   Dickens teaches away from a combination with Chen

114.   Chen's interleaving technique relates to interleaving transactions on a USB bus.

115.   A print job in Dickens may be made up of a number of USB transactions.  Multiple transactions make up a USB "transfer." Dickens expressly teaches not to mix transfers from different hosts.  *See* Dickens at 9:21–26 ("[w]hen print data from either computer is detected it is routed to the printer if the printer is currently free.  Any subsequent print data from the other computer is buffered in memory until a break in transmission of the original print data stream equal to the

39                           Exhibit 2007

timeout period has been detected."); Dickens at 2:45–48 ("When utilized in printer sharing apparatus the invention can enable data from two or more USB host computers to contend for a USB connected printer on a timeout basis.").

116.   In other words, Dickens expressly teaches a print sharing scheme that relies on a timeout period when more than one host attempts to access the printer.

117.   One of ordinary skill in the art would understand that this timeout period is required so that different transfers from different hosts do not get mixed together.  This makes sense because mixing print data from two different hosts would result in garbled print-outs.

118.   Dickens' other devices (speakers 108, keyboard 184, and mouse 186) would also not allow interleaving transfers from different hosts.  Dickens expressly teaches the mouse/keyboard are used with only one host, for example, by the use of switches or hot-keys to determine which one single host is connected to the keyboard and mouse at any one time.  *See* Dickens at 8:55–9:9.  Thus, Dickens teaches away from interleaving transactions to/from the mouse and keyboard.  This makes sense because it is illogical to mix keyboard/mouse data to/from different computers.

119.   Similarly, Dickens teaches the speakers 180 are only connected to one host at a time.  *See* Dickens at 9:9–19.  Thus, Dickens teaches away from mixing

Exhibit 2007

transactions of audio data from two different hosts. This makes sense because the audio output from two separate audio channels would likely produce distorted results if the USB transactions from two different hosts would be interleaved.

120.   It is my opinion that one of ordinary skill in the art would not combine Chen with Dickens at least because Dickens teaches not to mix USB transfers, which teaches away from a combination with Chen's transaction interleaving.

### ii.    Combining Chen with Dickens results in an inoperable system

121.   It is my opinion that applying Chen's interleaving technique to Dickens' data routing device would result in an inoperable system.

122.   Chen's interleaving works because there are multiple devices downstream from the host. Specifically, Chen discloses multiple memory devices. *See, e.g.*, Ex. 1005, Fig. 5 ("DEVICE-1" and "DEVICE-2").

123.   While Chen's smart switch is interleaving packets, each downstream memory device is still receiving packets in an order that complies with the USB specification.

124.   If there was only one downstream memory device in Chen, it would be impossible to interleave the packets because it would violate the transaction rules of the USB specification.

125.   According to the example shown in Chen's Figure 5, Chen's smart switch transmits (on its downstream ports) "a first token packet of a first transaction, a second token packet of a second transaction, and a data-out packet of the first transaction" in the following order: "first token packet, second token packet, and data-out packet."  Ex. 1023 ¶ 136.  If there was only one downstream memory device in Chen, this ordering would not comply with the USB specification, which requires the data-out packet to immediately follow the token packet. The single downstream memory device would determine there was an error on the bus and would ignore the packets.

126.   Attempting to use Chen's interleaving technique with Dickens' printer would have the same problem because there is only one printer device.  In particular, interleaving packets destined for Dickens' single printer device would not comply with the USB specification, and the printer would determine there was an error on the bus and ignore the out-of-order packets.

127.   This problem would occur if Chen's interleaving technique is attempted with any single downstream device (e.g., printer 182, speakers 180, keyboard 184, mouse 186).  Accordingly, I disagree with the Board, Delphi, and Mr. Garney that applying Chen's interleaving to Dickens' system would increase

the throughput of Dickens' system.  The resulting system would be inoperable.

Thus, the throughput would decrease to nothing.

## IX.   SWORN TESTIMONY

128.   The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements and the like may jeopardize the validity of the application or document or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  November 20, 2017              Respectfully submitted,

Geert Knapen

IPR2017-00864
Patent Owner's Sur-Reply

UNITED STATES PATENT AND TRADEMARK OFFICE
—————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
—————————————

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

—————————————

U.S. Patent No. 7,523,243

—————————————

Case No. IPR2017-00864


**PATENT OWNER'S SUR-REPLY PURSUANT TO ORDER CONDUCT OF
THE PROCEEDINGS (PAPER 27)**

IPR2017-00864
Patent Owner's Sur-Reply

## TABLE OF CONTENTS

I.   "DEVICE" ...................................................................................1

II.  "USB CONNECTION" ...............................................................3

   A. Delphi's construction of "USB connection" incorrectly includes
      non-USB intervening elements and reads "USB" out of the
      claims. ..............................................................................................4

   B. Delphi's "USB connection" arguments are flawed. .......................6

III. "DEDICATED" CONNECTIONS ...............................................9

IV.  "COUPLED BETWEEN" ...........................................................11

V.   "CONTROLLER . . . COMPRISES . . . INTERFACE
    CIRCUITS" .................................................................................12

VI.  "CONTROLLER . . . TO MAINTAIN . . . ADDRESS,
    CONFIGURATION, AND RESPONSE INFORMATION" ......12

VII. CONCLUSION ...........................................................................13

i

## EXHIBIT LIST

| Exhibit No. | Description |
|:---:|:---|
| 2001 | Declaration in Support of Motion for *Pro Hac Vice* Admission of Brian C. Banner Pursuant to 37 C.F.R. § 42.10(c) |
| 2002 | Declaration of Expert Geert Knapen in Support of Patent Owner's Preliminary Response to Petition |
| 2003 | Excerpts from Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc.) (1988) |
| 2004 | Exhibit 2004 to the Deposition of John Garney (Oct. 25, 2017) (annotated version of Petitioner's Exhibit 1003) |
| 2005 | Omitted |
| 2006 | John Garney Deposition Transcript (Oct. 25, 2017) |
| 2007 | Declaration of Expert Geert Knapen in Support of Patent Owner's Response to Petition |

Pursuant to the Board's March 6, 2018 Order (Paper 27), Patent Owner Microchip ("PO") files this Sur-Reply to respond to claim construction arguments made for the first time in Petitioner Delphi's Reply brief.

## I.    "DEVICE"

The parties dispute whether the term "device" (and presumably other variants) in the preambles of Claims 1 ("USB multi-host device"), 3 ("USB multi-host device"), 7 ("device"), 18 ("device"), and 23 ("USB multi-host device") is limiting. PO submits the preamble is, in fact, limiting. A preamble is limiting if it "recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *NTP, Inc. v. Research In Motion*, 418 F.3d 1282, 1305 (Fed. Cir. 2005). The preamble may be construed as limiting when it recites particular structure that is highlighted as important by the specification. *Catalina Mktg. Int'l v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002). Further, "a preamble phrase that provides antecedent basis for a claim limitation generally limits the scope of the claim." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012).

Both considerations support the conclusion the preamble is limiting. For example, the SUMMARY OF THE INVENTION highlights the importance of "a single USB device [that] may be shared across multiple hosts without needing to be reconfigured or re-enumerated each and every time the upstream hosts alternate accessing the USB device." '243 Patent at 2:9–12. The specification further

highlights the "device" or "USB multi-host device" preamble structure by distinguishing prior art systems with "switching devices" and "stand-alone USB switches." *See* '243 Patent at 1:58–2:2. In other words, the claimed "device" is not a combination of a standalone switch and another USB device.

Additionally, the preamble phrase in each of the independent claims provides antecedent basis for further limitations. The "USB multi-host device" in the preamble of Claims 1 and 3 provides the antecedent basis for "the USB device" in each of those claims. The "device" in the preamble of Claim 7 likewise provides the antecedent basis for "the USB device" recited later in the claim. And the "USB multi-host device" in the preamble of Claim 23 provides the antecedent basis for "the USB multi-host device" in Claim 25 which depends from Claim 23. Accordingly, these preamble structures are limiting. *See Deere & Co.*, 703 F.3d at 1358 (preamble providing antecedent basis limits scope of claim).

Delphi incorrectly concludes the disclosure of an "off-the-shelf item" means the claims encompass an aggregation of separate devices, and thus, the preamble is not limiting. Reply at 4. The specification is merely stating the function may be standard—i.e., an "Ethernet Controller, Mass-Storage drive, etc." '243 Patent at 4:7. But the specification is clear the function is a "block" within "[a] USB device." '243 Patent at 2:38–50 ("A USB device may be divided into three segments or blocks. . . . The third block may comprise the 'Peripheral Function' itself, which may include

2

the circuitry necessary for the specific USB device function . . ."); *accord* Ex. 1023 ¶ 62 (Petitioner's expert: "a 'block' is a 'segment' of a 'device.'").

Delphi's argument that a device may be an aggregation of devices is unsupported. Reply at 4. A device is well known in the art—its definition does not include an aggregation of devices. *See* Ex. 2013 ¶ 13. Delphi unjustifiably conflates "a collection of hardware components" with "a collection of devices." The two are not the same. Dickens' "memory device" is not to the contrary. It is not a USB device. It is a DRAM connected to a Pentium processor. Chen's "USB multi-flash device 40" is also not to the contrary. The memory devices are separate devices on respective USB busses. Delphi cannot use extrinsic evidence (Dickens and Chen) to alter the meaning of "device" in derogation of the claims and the specification. *See Philips v. AWH Corp.*, 415 F.3d 1303, 1318–19 (Fed. Cir. 2005) (en banc).

## II.   "USB CONNECTION"

The phrase "USB connection" should be given its plain and ordinary meaning. One of ordinary skill would know that a "USB connection" is one that conforms to the requirements of the USB specification. This plain meaning is consistent with the '243 Patent specification: "A ***connection*** between the USB device and the host may be established via digital interconnect such as Interchip USB, ULPI, UTMI, etc., or via a four wire interface that includes a power line, a ground line, and a pair of data lines D+ and D-." '243 Patent at 1:32–36 (emphasis added). The first three "digital

3

interconnect" examples are interfaces defined by/for USB, and thus conform to the requirements of the USB specification.[1] The last, "four wire interface" is a USB cable defined by the USB specification. The '243 Patent specification also discloses "A USB hub may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller. In addition, other USB hubs may be coupled to the USB hub to provide additional USB device **connections** to the USB host controller." '243 Patent at 1:52–54 (emphasis added). The "USB device connections" here—through one or more USB hubs—conform to the requirements of the USB specification (e.g., USB signaling through a USB hub).

The specification's use of the word "connection" is consistent with the plain meaning of "USB connection" because it consistently refers to a connection that conforms to the requirements of the USB specification.

## A. Delphi's construction of "USB connection" incorrectly includes non-USB intervening elements and reads "USB" out of the claims.

Delphi incorrectly argues "USB connection" means "direct and indirect connection, both with and without intervening interconnect, using USB protocols." Reply at 4–11. The dispute is whether a "USB connection" includes intervening

---

[1]       *See, e.g.*, www.usb.org/developers/docs/usb20_docs/ ("Inter-Chip USB Supplement Revision 1.0 as of March 13, 2006" is a document provided with the USB 2.0 specification); https://www.design-reuse.com/news/11102/ulpi-interface-specification-publicly-available-standalone-hi-speed-usb-transceivers.html (describing "first public availability of the UTMI+ low-pin interface (UPLI) industry specification for Hi-Speed Universal Serial Bus (USB) . . ."); Ex. 1041 (the main block in UTMI is the "USB 2.0 Transceiver Macrocell," a block that "handles the low level USB protocol and signaling").

elements that do not conform to the requirements of the USB specification.

Delphi's proposed construction requiring only some "use" of "USB protocols" is unreasonably broad. Consider an inefficient office where a person prints a page of text to a first USB printer. An assistant takes the print-out and re-types the text into a second computer and prints to a second USB printer. Delphi's proposed construction of "USB connection" would encompass this USB-human-USB "connection" between the first computer and the second printer because it "uses USB protocols." But one of ordinary skill in the art would not understand this USB-human-USB connection to be a "USB connection" within the scope of the '243 Patent claims. Delphi's overly-broad construction should be rejected. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016) (BRI standard "does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description.").

Further, Delphi's proposed construction improperly renders the term "USB" meaningless. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1375 (Fed. Cir. 2015) (refusing to adopt a construction that would read word "placed" out of the claims). Using Delphi's reasoning, even a non-USB connection would satisfy the claim so long as a USB host makes a request that is eventually handled by a USB device block. By analogy, a claim to a "wired connection" between two network devices would be anticipated by a wireless network because the antennas are wires.

5

**B. Delphi's "USB connection" arguments are flawed.**

First, Delphi improperly twists the patentee's express definition of one term—"coupled"—to redefine a different term—"USB connections." Reply at 5 (citing Ex. 1001 3:37–38). No legal authority supports this approach.

Second, Delphi refers to the '243 Patent specification's disclosure of "Interchip USB, ULPI, UTMI, etc." (1:32–36) and incorrectly argues these "are not USB signals." Reply at 6. *See supra*, footnote 1 (Interchip USB, UPLI, and UTMI all conform to the requirements of the USB specification). Further, PO's expert did not testify these were not USB signals. *See* Reply at 6 ("PO's expert confirmed that these interface signals, which are not USB signals, . . ."). PO's expert merely stated that the signaling inside Figure 3 would likely be UPLI or UTMI and not a "USB Bus" or "USB signaling cable." Ex. 1049 at 76:16–78:7. Delphi's argument that "ULPI and UTMI were known interfaces to ***non-USB-2.0 compliant*** ASICs for devices" (Reply at 6 (emphasis added)) is incorrect because these interfaces specifically allow an ASIC to communicate in ***a USB-compliant manner***.

Third, Delphi's reliance on various non-USB (i.e., PCI) references to construe "USB connections" invites error. Reply at 6. Delphi is doing exactly what the *en banc* Federal Circuit *Philips* court forbids—using extrinsic references to alter the meaning of "USB connections" to mean any connection, including non-USB connections, in derogation of the claims and the specification. *See Philips v. AWH*

6

*Corp.*, 415 F.3d 1303, 1318–19 (Fed. Cir. 2005) (en banc). Moreover, the extrinsic PCI-related "evidence" does not even support Delphi's argument:

- Contrary to Delphi's assertion that USB "client software . . . may involve PCI and similar buses" (Reply at 6, citing Ex. 1004), the USB 2.0 specification says USB client software ***does not*** use other buses (such as PCI) to interact with USB functions:

> "Client software for USB functions **must use USB software programming interfaces** to manipulate their functions **as opposed to** directly manipulating their functions via memory or I/O accesses as with other buses (e.g., **PCI**, EISA, PCMCIA, etc.)." Ex. 1004 at 59 (Section 5.2.5) (emphasis added).

- Exhibit 1036, cited by Delphi at page 6 of its Reply, is not remotely related to "USB" or "Universal Serial Bus" as neither term is ever mentioned.

- The remaining exhibits cited at page 6 of Delphi's Reply (Ex. 1049 70:8–70:23, Ex. 1047 1:27–29, Ex. 1048, Ex. 1049 70:25–71:6) merely disclose either a host or a device with an internal PCI bus. None of these exhibits teach that the PCI bus is used to form any part of a "USB connection."

Fourth, Delphi's argument that "USB connections" can include "intervening elements" goes too far. Reply at 7. A USB connection can include USB hubs that may have buffers and transaction translators, but these all still conform to the requirements of the USB specification (in fact, the behavior is defined by it).

Fifth, just because the word "interconnect" (Reply at 7) appears in both the '243 Patent specification and the acronym "PCI" does not mean the phrase "USB connections" includes PCI connections.

Sixth, PCI is not "an 'interconnect' within 'etc.' of the '243 patent." Reply at 7–8. By Delphi's logic, the quoted passage ('243 Patent at 1:34–35) would read "[a] connection between the USB device and the host may be established via digital interconnect such as . . . [PCI]." One of ordinary skill would not use PCI to connect a USB device and a USB host, and none of the references support such a conclusion.

Seventh, PO's expert's concession (quoted at page 9 of the Reply) is not evidence of anything. What is ***not*** in the patent is neither intrinsic nor extrinsic evidence. The '243 Patent's silence as to carrier pigeons and the telegraph does not bring those communication systems within the scope of a "USB connection."

Eighth, PO's expert agreed there were two USB buses in Figure 3, but expressly disagreed the arrow labelled "Bus #3" in Delphi's Illustration 11 is a USB bus. Ex. 1049 at 78:8–14.

Ninth, the arrow at the bottom of Figure 3 is not described as a "shared connection." Reply at 11 (Illustration 12). No intrinsic evidence supports this conclusion, which is contrary to the claim language. Figure 3 is a "logic diagram" with arrows showing communication between logical blocks. '243 Patent at 3:20–21. Consistent with the claims, the bottom arrow is a logical depiction of multiple

dedicated, concurrent USB connections, e.g., illustrated in red and blue to the right. Indeed, "the drawings . . . are not intended to limit the invention to the particular form disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present invention *as defined by the appended claims*." '243 Patent at 3:25–30 (emphasis added).



*FIG. 3*

## III.   "DEDICATED" CONNECTIONS

"Dedicated" should be given its plain and ordinary meaning, for example, as depicted in Figure 2: Printer 120 is connected to host PC 122 and host PC 123 via two separate, "dedicated" USB connections—each respective host connects to the printer with a separate USB cable rather than somehow sharing a single USB cable.

The parties' dispute over this phrase appears to be whether a "dedicated" USB connection can mean the opposite: "a shared connection." Delphi's construction, which includes "a shared connection" (Reply at 12), is not reasonable as it conflicts with the express claim language. For example, Claim 3 recites "the multi-host device

controller is configured to establish *a first dedicated USB connection* between the first host and the USB device block and *a second dedicated USB connection* between the second host and the USB device block." The claim language clearly excludes a shared connection as each connection is dedicated for communication between the USB device block and each respective host.

Delphi's construction seeks to re-write the claims to recite, e.g., "the multi-host device controller is configured to establish a first dedicated *or shared* USB connection between the first host and the USB device block and a second dedicated *or shared* USB connection between the second host and the USB device block." This improper construction eviscerates the term "dedicated" from the claim and finds no support in the intrinsic or extrinsic record. Delphi's only alleged intrinsic support for its improper construction is the single arrow at the bottom of Figure 3. Reply at 12. However as discussed above, Figure 3 is a "logic diagram." '243 Patent at 3:20–21. Consistent with the claims, the bottom arrow is a logical view of multiple dedicated, concurrent USB connections, not a circuit diagram showing a "shared" wire connection. Further, the patentees used the word "shared" thirteen times in the specification and ten times in the claims. None are used to modify "USB connections." The patentees knew how to describe a feature as "shared" and could have claimed a "shared" connection if that was intended. Finally, Delphi's reliance on an extrinsic dictionary ("MCD," Reply at 12) is improper because it is a definition

10

of a different term, "dedicated line," that relates to a completely different art, i.e.,

telecommunications, and has nothing to do with USB systems. *See* Ex. 1050 at 150.

## IV.   "COUPLED BETWEEN"

The term "coupled" is defined in the specification as "directly or indirectly

connected." The term "between" should have its plain and ordinary meaning. In the

context of Claims 2, 6, and 16, one of ordinary skill would understand the endpoint

buffer "coupled between" the upstream port and the multi-host device controller is

directly or indirectly connected in the middle of those two structures. This is

consistent with the specification which, for example, depicts in Figure 3 the endpoint

buffers in the middle of the upstream port and the USB multi-host device controller.

Delphi's proposed construction (Reply at 13) rewrites the claim language by

merely requiring a direct or indirect connection. According to Delphi, as long the

endpoint buffer is coupled in any way to both the upstream port and the multi-host

device controller, it is "between" them. This improperly eviscerates the "between"

limitation because it makes the location of the endpoint buffer irrelevant. Finally,

Delphi improperly relies on *NTP, Inc. v. Research in Motion, Ltd.* to support its

construction. This case is inapposite. It deals with a different patent (i.e., is not

intrinsic evidence), and the Federal Circuit was not even construing the term

"between." *See* 418 F.3d 1282, 1310 (Fed. Cir. 2005). The claim language at issue

there is not even analogous to the claim language here.

11

## V.   "CONTROLLER . . . COMPRISES . . . INTERFACE CIRCUITS"

"Comprising is a term of art used in claim language which means that the named elements are essential." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003). "Comprising" and "including" are synonymous. *Id.* Thus, the phrase "the controller comprises: a respective interface circuit . . ." means the respective interface circuits are essential to or included in the controller. Delphi's proposed construction fails because it uses the extrinsic prior art reference alleged to invalidate Claim 25 of the '243 Patent to define this phrase of the claim. Further, nothing in the intrinsic record supports Delphi's addition of the phrase "whether located inside or outside a housing with the controller."

## VI.   "CONTROLLER . . . TO MAINTAIN . . . ADDRESS, CONFIGURATION, AND RESPONSE INFORMATION"

This phrase, representing the sole limitations of dependent Claims 17, 22, and 24, should be construed to have its plain meaning. Delphi's construction completely re-writes the claim and equates this phrase with a limitation within the respective independent claim (e.g., "without . . . reconfiguring the USB device"). But a dependent claim must "specify a further limitation of the subject matter claimed." 35 U.S.C. § 112/4 (Pre-AIA). To construe the claim as Delphi suggests would render these dependent claims invalid under § 112/4, an action beyond the Board's power. *See* 35 U.S.C. § 311(b) (grounds limited to §§ 102 and 103).

12

## VII.   CONCLUSION

Patent Owner respectfully requests the Board construe the disputed terms as

set forth above.

Dated: March 9, 2018                     Respectfully submitted,

                                         */s/ Brian C. Banner*

                                         Bruce W. Slayden II (Reg. No. 33,790)
                                         bslayden@sgbfirm.com
                                         Brian C. Banner (*pro hac vice*)
                                         bbanner@sgbfirm.com
                                         R. William Beard, Jr. (Reg. No. 39,903)
                                         wbeard@sgbfirm.com
                                         Truman H. Fenton (Reg. No. 64,766)
                                         tfenton@sgbfirm.com
                                         Jerry F. Suva (Reg. No. 67,902)
                                         jsuva@sgbfirm.com

                                         SLAYDEN GRUBERT BEARD PLLC
                                         401 Congress Avenue, Suite 1900
                                         Austin, TX 78701
                                         t: 512.402.3550
                                         f: 512.402.6865

### CERTIFICATE OF SERVICE

The undersigned hereby certifies the above-captioned Patent Owner's Sur-

Reply was served in its entirety on March 9, 2018, upon the following parties by

sending a copy via email to the following email addresses:

13

Charles W. Shifley (cshifley@bannerwitcoff.com)
Binal J. Patel (bpatel@bannerwitcoff.com)
Robert H. Resis (rresis@bannerwitcoff.com)
Jason S. Shull (jshull@bannerwitcoff.com)
Timothy J. Rechtien (trechtien@bannerwitcoff.com)
Mark A. Dalla Valle (mdallavalle@bannerwitcoff.com)
Zachary Getzelman (zgetzelman@bannerwitcoff.com)

Banner & Witcoff, Ltd.
10 South Wacker Drive, Suite 3000
Chicago, IL 60606

Respectfully submitted,

/s/ Brian C. Banner

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

14

Trials@uspto.gov
571-272-7822

Paper No. 59
Entered: August 28, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

DELPHI TECHNOLOGIES, LLC[1],
Petitioner,

v.

MICROCHIP TECHNOLOGY INC.,
Patent Owner.
————————

Case IPR2017-00864
Patent 7,523,243 B2
————————

Before BRIAN J. McNAMARA, DANIEL N. FISHMAN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

FISHMAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*
*and*
DECISION DENYING PATENT OWNER'S MOTION TO EXCLUDE
*37 C.F.R. § 42.64*

---

[1] Petitioner filed a notice of its name change from "Delphi Technologies,
Inc." to "Delphi Technologies, LLC." Paper 49, 1–2.

IPR2017-00864
Patent 7,523,243 B2

## I.     INTRODUCTION

Delphi Technologies, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–25 (hereinafter the "challenged claims") of U.S. Patent No. 7,523,243 B2 (Ex. 1001, "the '243 patent") pursuant to 35 U.S.C. §§ 311–319.  Microchip Technology Inc. ("Patent Owner") filed a Patent Owner Preliminary Response (Paper 11, "Prelim. Resp.").  On August 29, 2017, based on the record before us at that time, we instituted an *inter partes* review of *only* claims 1–8, 11, 15–20, and 22–25.  Paper 12 ("Decision" or "Dec."), 2, 43.

Patent Owner filed a Patent Owner Response[2] (Paper 21, "Response" or "PO Resp.") and Petitioner filed a Reply (Paper 25, "Reply").  The Petition relies on Declarations of John Garney (Exs. 1023, 1053) and Patent Owner relies on a Declaration of Geert Knapen (Ex. 2007).

In accordance with our authorizing order (Paper 27), Patent Owner filed a Sur-Reply addressing various claim construction issues (Paper 28, "PO Sur-Reply") and Petitioner filed a Sur-Sur-Reply responsive to Patent Owner's claim constructions (Paper 29, "Pet. Sur-Sur-Reply")

Responsive to the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018), we issued an Order modifying our Decision to institute review of all claims and all grounds.  Paper 33 ("*SAS* Order").  We authorized additional briefing to address issues relating to claims and grounds that were denied initially in our Decision on Institution.  Paper 36.  Petitioner filed an authorized Supplemental Reply (Paper 38, "Supp.

---

[2] Patent Owner improperly attempts to incorporate by reference portions of its Preliminary Response into its Response.  PO Resp. 17 n.5; *see also* 37 C.F.R. § 42.6(a)(3).  We disregard the improperly incorporated material.

IPR2017-00864
Patent 7,523,243 B2

Reply"), Patent Owner filed an authorized Supplemental Response (Paper 41, "Supp. Resp."), and Petitioner filed an authorized Sur-Reply (Paper 42).

Oral Argument was conducted on June 14, 2018, and a transcript of that hearing is of record.  Paper 53 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  The Petitioner has the burden of proving unpatentability by a preponderance of the evidence.  *See* 35 U.S.C. § 316(e); *see also* 37 C.F.R. § 42.1(d).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons expressed below, we conclude that Petitioner has shown by a preponderance of the evidence that claims 1, 3–5, 7–9, 11–15, and 18–21 are unpatentable.  Petitioner has not persuaded us by a preponderance of the evidence that claims 2, 6, 10, 16, 17, and 22–25 are unpatentable.

A.    *Real Parties in Interest and Related Matters*

The Petition identifies Delphi Technologies, Inc. and Delphi Automotive Systems, LLC as real parties in interest.  Pet. 1.  Petitioner filed a notice indicating that Delphi Technologies, Inc. had changed its name to Delphi Technologies, LLC and indicating that Delphi Automotive Systems, LLC had changed its name to Aptiv Services US, LLC.  Paper 49, 1–2.  Both Petitioner and Patent Owner identify a related litigation matter captioned *Microchip Technology Inc. v. Delphi Automotive Systems, LLC.*, Case No. 2:16-cv-02817-DJH, filed in the U.S. District Court for the District of Arizona.  Pet. 2; Paper 9, 1.  Petitioner also identifies another related litigation captioned *Microchip Technology Inc. v. Delphi Automotive Systems, LLC.*, Case No. 1:17-cv-01194-LPS, filed in the U.S. District Court

IPR2017-00864
Patent 7,523,243 B2

for the District of Delaware.  Paper 14, 1.  Petitioner also identifies a related petition for *Inter Partes* Review as IPR2017-00970.  Paper 3, 1.

### B.    The '243 Patent

According to the '243 patent, the Universal Serial Bus ("USB") allows coupling of a variety of peripheral devices to a computer system.  Ex. 1001, 1:19–21.  To satisfy consumers' desire to share peripheral devices, such as printers, scanners, etc., prior solutions provided switching devices that allow a peripheral device to be switchably shared among multiple USB host computer systems.  *Id.* at 1:56–60.  Each time a USB peripheral device is switched (disconnected and re-connected) from one USB host to another, the USB host must reconfigure the peripheral device before data exchanges may ensue.  *Id.* at 1:60–2:2.  Such configuration or reconfiguration includes bus enumeration—a step that, *inter alia*, assigns an address to each peripheral device on the bus used by the host on that bus to access each peripheral device.  *See* Ex. 1004, 47–48.[3]  This reconfiguration causes, among other problems, loss of state information relevant to the previously connected host.  Ex. 1001, 1:64–2:5.

The '243 patent purports to resolve this problem by allowing sharing of a USB device among multiple USB hosts without requiring such reconfiguration.  Ex. 1001, 2:9–12.  Specifically, according to the '243 patent, a multi-host capable device is disclosed and claimed that includes separate buffers for each of multiple host connections and maintains a dedicated address and configuration for each host.  *Id.* at 2:33–35.

---

[3] Citations are to Petitioner's page numbering added in the footer of the Exhibit, as opposed to the original page numbering of the document.

IPR2017-00864
Patent 7,523,243 B2

Figure 1, reproduced below, depicts an exemplary system according to the '243 patent.



FIG. 1

Figure 1 depicts a system including hosts 102 and 104, both coupled with multi-host device 106, which, in turn, includes USB multi-host device controller. *Id.* at 3:47–51.

Figure 3, reproduced below, depicts additional exemplary details of multi-host device 106 of Figure 1.

IPR2017-00864
Patent 7,523,243 B2



*FIG. 3*

Figure 3 depicts USB multi-host device 106 comprising upstream ports 302 and 304, each configured to couple with a corresponding host system. *Id.* at 3:60–66. Upstream ports 302 and 304 are coupled with USB endpoint & status buffers 306 and 308, respectively, "to buffer data and control reads and writes to/from each respective host corresponding to PHY 302 and PHY

IPR2017-00864
Patent 7,523,243 B2

304 and/or peripheral device/function 312 coupled to USB multi-host device

controller 108." *Id.* at 4:15–18.  The '243 patent further discloses:

> In one set of embodiments, USB multi-host device
> controller 108 may be configured with an internal arbitration
> mechanism that may permit each host-first host 102 and second
> host 104, for example-to access shared peripheral function 312
> by either interleaving host accesses, or by using a common
> request/grant structure that may hold-off one host while another
> host completes a data transfer to/from shared device/function
> 312.  The selection of the specific mechanism used may be
> configured according to the specific USB device type that is
> being shared.  In one set of embodiments, the bandwidth from
> shared peripheral device/function 312 to each host may be
> reduced in order to allow each host equal access.  In other
> embodiments, the bandwidth may not be reduced if the
> bandwidth of the peripheral function exceeds the bandwidth of
> the host.

*Id.* at 4:19–33.


### C.    *Illustrative Claim*

Claims 1, 3, 7, 18, and 23 are the independent claims of the '243

patent.  Independent claim 1, reproduced below, is exemplary of the

challenged claims (with some formatting changes for readability):

> 1. A USB multi-host device comprising:
>
> first and second upstream ports configured to couple to
> corresponding first and second hosts;
>
> a USB device block corresponding to at least one
> function[4]; and

---

[4] A Certificate of Correction issued for this patent changing two occurrences
in claim 1 of "USB device/function" to "USB device block corresponding to
at least one function."  Ex. 1001, 9.

IPR2017-00864
Patent 7,523,243 B2

a multi-host device controller coupling the USB device block corresponding to at least one function to the first and second upstream ports,

wherein the multi-host device controller is configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously request access to the USB device; and

alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block each time a different one-of the first and second hosts is given access to the USB device block to use the at least one function.

### D.   *Alleged Grounds of Unpatentability*

The Petition sets forth the following asserted grounds of

unpatentability:

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Furukawa[5] | 102(b) | 1–8, 10, 11, 15–20, and 22–25 |
| Dickens[6] | 102(b) | 1–8, 11, 15–20, and 22–25 |
| (Furukawa or Dickens) and Chen[7] | 103(a) | 9, 11–14, and 21 |

---

[5] Japanese Patent Application Publication P2003-256351A.  Ex. 1002 ("Furukawa").  Exhibit 1002 includes an English translation of the Japanese publication, a certification by the translator, and the original Japanese language version of the publication.
[6] U.S. Patent No. 6,549,966 B1.  Ex. 1003 ("Dickens").
[7] U.S. Patent No. 7,073,010 B2.  Ex. 1005 ("Chen").

IPR2017-00864
Patent 7,523,243 B2

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| (Furukawa or Dickens) and USB 2.0[8] | 103(a) | 9, 11–14, and 21 |
| Wurzburg,[9] Osakada,[10] and (Furukawa or Dickens)[11] | 103(a) | 1–25 |
| (Furukawa or Dickens), USB 2.0, APA[12], and "other art cited herein" (Pet. 5) | 103(a) | 1–25 |

II.    ANALYSIS

A.    *General Principles*

1.    *Anticipation*

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Each element of the challenged claim must be found, either expressly or inherently, in the single prior art reference.  *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).  While the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).  Furthermore, "a

---

[8] Universal Serial Bus Specification Rev. 2.0 April 27, 2000.  Ex. 1004 ("USB 2.0").
[9] U.S. Patent Publication No. 2006/0059293 A1.  Ex. 1026 ("Wurzburg").
[10] U.S. Patent No. 6,308,239 B1.  Ex. 1027 ("Osakada").
[11] We note Petitioner's harmless error in misidentifying the Osakada reference as Exhibit 1026 ("E1026").  Pet. 4.
[12] Petitioner identifies Admitted Prior Art ("APA") as disclosure at column 1, line 19 through column 2, line 2 of Exhibit 1001.  Pet. 7–9.

reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *In re Petering*, 301 F.2d 676, 681 (CCPA 1962)). Still further, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).

### 2. *Obviousness*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter[,] as a whole[,] would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 3. *Level of Ordinary Skill in the Art*

Petitioner argues a person of ordinary skill in the art related to the '243 patent would have a Bachelor's Degree in electrical engineering,

IPR2017-00864
Patent 7,523,243 B2

computer science, or the equivalent, and would also have "a few to many" years of experience in the design of USB devices as well as familiarity with the USB specifications and protocols.  Pet. 6 (citing Ex. 1023 ¶¶ 53–58). Petitioner further argues (*id.* at 7) that Patent Owner admitted the level of ordinary skill when, in prosecution, Patent Owner asserted:

> Applicant further submits that *one skilled in the art (i.e. having appropriate understanding of basic USB design principles as set forth in at least the USB 2.0 specification)* would therefore be enabled by Applicant's specification as detailed above, to build a USB multi-host device controller that enables multiple hosts to access the USB device function without the USB device having to be reconfigured and/or re-enumerated each time a different host accesses the USB device function.

Ex. 1014, 15 (emphasis added).  Patent Owner further asserted in prosecution that "one skilled in the art to which the present application pertains would be well informed and well aware of the USB 2.0 specification."  Ex. 1014, 41.

In its Response, Patent Owner does not address the level of ordinary skill in the art.  *See* PO Resp. *passim.*  However, Mr. Knapen testifies, one of ordinary skill at the time of the '243 patent (1) would be familiar with these industry-standard interconnect interfaces; (2) would be familiar with the circuit-level design and implementation of a standard USB device (because Figure 3 of the '243 patent does not disclose the internal structure of its various blocks); (3) will have also been exposed to the various interconnect options for connecting USB hosts and USB devices; and (4) would have a bachelor's degree in electrical or computer engineering (or similar), and at least five years of industry experience in computer peripheral device design. Ex. 2007 ¶¶ 44–46.  Mr. Knapen then concludes, "I agree the Board's

11

IPR2017-00864
Patent 7,523,243 B2

determination of the level of ordinary skill in the art is consistent with my assessment, and my opinions consider the level of skill in the art as determined by the Board." *Id.* ¶ 47.

We are persuaded by Petitioner's definition of the level of ordinary skill in the art and we find this definition is commensurate with the level of ordinary skill in the art as reflected in the prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("[T]he absence of specific findings on the level of skill in the art does not give rise to reversible error where the prior art itself reflects an appropriate level and a need for testimony is not shown.") (internal quotation marks omitted); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). The parties' respective experts (Mr. Garney and Mr. Knapen) substantially agree regarding the education and experience of persons of ordinary skill at the time of the '243 patent. The parties' experts specifically agree that the person of ordinary skill in the art would have had familiarity with the USB 2.0 specification and experience in the design of USB devices.

Based on the complete record of this trial, we discern no reason to alter our preliminary determination of the level of ordinary skill in the art. Therefore, we define the level of ordinary skill in the art, at the time of the '243 patent, to include at least a Bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent fields as well as familiarity with the USB 2.0 specifications to the extent of having designed a USB device. This definition is reflected in the prior art of record and is consistent with the testimony of both parties' experts and consistent with Patent Owner's admissions during prosecution of the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

### 4.    *Claim Construction*

As a step in our analysis of patentability, we determine the meaning of the claims for this Decision.  In an *inter partes* review, a claim in an unexpired patent, as is the case here, shall be given its broadest reasonable construction in light of the specification of the patent in which it appears. 37 C.F.R. § 42.100(b); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–46 (2016) (upholding the use of the broadest reasonable interpretation standard).

Under the broadest reasonable construction standard, claim terms are generally given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  "[A] claim construction analysis must begin and remain centered on the claim language itself."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  "Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim."  *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).  Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy.  *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Aside from the following terms we interpret, we determine that it is unnecessary to construe any other claim terms.

IPR2017-00864
Patent 7,523,243 B2

         *a.*     *Concurrent and Simultaneous*

     Independent claims, 1, 3, 18, and 23 (and their respective dependent claims) recite establishment of "concurrent" connections.  Independent claims 1, 3, 7, and 23 (and their respective dependent claims) recite "simultaneous" requests from hosts and claim 23 recites "simultaneous" configuration of the device by multiple hosts.  The Specification of the '243 patent does not provide an express definition of either term and "concurrent" does not appear in the '243 patent Specification other than in the claims.

     Petitioner does not provide a specific interpretation of either term but argues what is *not* meant by each term.  Specifically, Petitioner argues references to "simultaneous" in the claims do "not require simultaneous data transfer from two or more computers to a peripheral such as a printer" but instead encompasses transfer of data from one computer at a time to the peripheral—a mode Petitioner refers to as "data switching" as distinguished from "connection switching" in which a connection is established and disconnected to allow another computer to connect to a peripheral.  Pet. 18–19 (citing Ex. 1001, 2:28–37).  Petitioner asserts this requirement is consistent with the USB specification.  *Id.* at 19.

     Petitioner similarly argues connections are "concurrent" to the extent they allow the recited functionality, for example, in claim 1, to allow for simultaneous enumeration and configuration, allow for simultaneous access, and allow for alternating access without reconfiguring or re-enumerating.  *Id.* at 19.

     Patent Owner presented arguments regarding interpretation of these terms in its Preliminary Response.  Prelim Resp. 15–28.  Consistent with the

IPR2017-00864
Patent 7,523,243 B2

plain and ordinary meaning and consistent with the Specification, in our
Decision on Institution, we adopted Patent Owner's dictionary-based
definition of *concurrent* to mean "operating or occurring at the same time"
and adopted the dictionary-based definition of *simultaneous* to mean "at the
same time."  Dec. 15.

Patent Owner does not address the construction of these terms in its
Response.  Although we find merit in Petitioner's suggestions that there are
aspects of USB operations that are excluded when interpreting these terms in
the context of USB protocols, Petitioner has not provided a proposed
interpretation as to what *is* within the scope of a proper interpretation of
these terms.

Thus, we perceive no reason on the complete record to change this
construction.

> b.   *"USB Device Block Corresponding To At Least One
> Function"*

Independent apparatus claim 1, 3, 7, and 18 each include a recitation
of a device block "corresponding to at least one function."

Apart from the claims, the '243 patent Specification does not use the
phrase "device block corresponding to at least one function" or even the
phrase "device block" and, thus, does not expressly define the phrase.  To
whatever extent "function" is an element of the claims, neither party proffers
an express construction of "function" and we discern no express definition in
the '243 patent Specification.

The '243 patent Specification discloses a device is made up of blocks
or segments:

15

A USB device may be divided into three segments or blocks. The first block may comprise a USB interface that includes the physical (PHY) or digital link, USB Link layer (SIE), and other circuitry necessary to send and/or receive data over the USB. The second block may comprise an Endpoint Buffer Block, which may include the endpoint buffers that are used by the first and third blocks to buffer data and control reads and writes to/from the USB—transferred through the first block—and/or the Peripheral Function—transferred through the third block. The third block may comprise the "Peripheral Function" itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc.

Ex. 1001, 2:38–50. Nothing in this paragraph (or the rest of the Specification) identifies one of the three segments as a "device block."

The USB specification does not use or define the phrase "device block" but defines "function" broadly as "[a] USB device that provides a capability to the host, such as an ISDN connection, a digital microphone, or speakers." Ex. 1004, 34. Thus, according to the USB specification, a "function" is a type of "USB device."

The parties essentially agree to a construction of "USB device block corresponding to at least one function" as meaning "a segment of a device that performs a function." Pet. 30; PO Resp. 17–18.

Based on the parties' agreed upon construction and within the scope of the broader definition in the USB specification, we determine "USB device block corresponding to at least one function" is equivalent to the term "function" (*see* Pet. 30–31) and we construe these terms to mean "a USB device, or a segment of a USB device, that performs a USB function to provide a capability to a host."

IPR2017-00864
Patent 7,523,243 B2

         *c.*     *"Shared USB Device Block" / "Shared USB Device"*

    Claim 23 recites accessing a "function of the shared USB device block."

    Based on the above discussion, a "shared USB device block" is, therefore, a "shared" function.  As above, neither the phrase "shared USB device block" nor "device block" are used in the Specification of the '243 patent apart from the claims.  Patent Owner proffers a construction of this term to mean "a segment of a device . . . shared or accessible by two or more USB hosts."  PO Resp. 19–20.

    The Specification uses the term "share" (or derivatives thereof) as an or verb to describe a number of objects "shared USB device" (Ex. 1001, Abstract, 2:29); "share a single device/function" (*id.* at 2:15–16); "a single USB device may be shared" (*id.* at 2:9–10); "the USB device that will be shared" (*id.* at 2:56–57); "shared Peripheral Device" (*id.* at 2:62); "the shared device" (*id.* at 2:65); "USB device type that is being shared" (*id.* at 2:67); "shared peripheral function" (*id.* at 3:1); "share devices" (*id.* at 3:45); "printer 120 shared by personal computer (PC) 122 and PC 123" (*id.* at 3:54–55; "shared peripheral function 312" (*id.* at 4:22); "shared device/function 312" (*id.* at 4:25); "USB device type that is being shared" (*id.* at 4:28); and "shared peripheral device/function 312" (*id.* at 4:29).  In all cases, the things that are sharing the "shared" objects are multiple hosts (e.g., multiple PCs).  However, these various recitations refer to sharing of the "device" as a whole as well as sharing of some portion (e.g., a segment or block) of the device (e.g. "peripheral function," "peripheral function 312," "peripheral device/function 312").  As discussed above, we understand

17

IPR2017-00864
Patent 7,523,243 B2

"device block" to include a block or segment referred to as a "function" or "function block."

Of the above references to shared objects, those that refer to sharing of the "function" or "device/function," in particular block 312 of Figure 3, appear to be consistent with the references in claim 23 to a "shared USB device block." Thus, we construe "shared USB device block" means a "function" (as discussed above) that is "shared or accessible by two or more USB hosts."

Claim 18 recites "a shared USB device . . . wherein the USB device corresponds to at least one function." Thus, claim 18 does not refer to a block or segment that is shared but, rather, refers to the entire device as being shared. The entire device then "corresponds to at least one function," but it is not the "function" that is shared in claim 18—it is the entire device that is shared.

### d.  *"Device" / "USB Device" / "USB Multi-Host Device"*

The parties disagree as to the proper interpretation of the term *device*. The preambles of independent apparatus claims 1, 3, and 23 recite a "USB multi-host device." The preambles of independent apparatus claim 7 and independent method claim 18 each recite a "device." Subsequent references in these independent claims and in various dependent claims refer back to the claimed device as a "USB device," "Shared USB device," or simply "device." The '243 patent Specification similarly uses various of these terms interchangeably. We view these various terms as synonymous.

The parties disagreement, in essence, centers around packaging— specifically, whether a "device," as claimed, must be integral/unitary in that

18

IPR2017-00864
Patent 7,523,243 B2

the recited components are physically housed within the claimed device or can be a collection of physically separate, distinct components operating together to provide the recited functions.

Petitioner argues "device" means "both hubs and functions, in a single one or a collection of hardware components." Pet. 32 (citing Ex. 1023 ¶ 67); *see also* Ex. 1004, 32. Patent Owner's Response does not specifically construe the term "device." However, its Response argues Dickens does not disclose the devices of claims 1, 3, 7, and 23 because the Petition merely identifies separate elements disclosed in Dickens rather than *a* device (i.e., an integral device comprising recited components). PO Resp. 23–24. Implied in Patent Owner's Response regarding Dickens is a construction of "device" as a single, integral, device as distinct from a collection of separate, distinct, components.

The USB specification provides a definition of "device" as follows:

A logical or physical entity that performs a function. *The actual entity described depends on the context of the reference*. At the lowest level, device may refer to a single hardware component, as in a memory device. At a higher level, it may refer to a collection of hardware components that perform a particular function, such as a USB interface device. At an even higher level, device may refer to the function performed by an entity attached to the USB; for example, a data/FAX modem device. *Devices may be physical, electrical, addressable, and logical*.

When used as a non-specific reference, a USB device is either a hub or a function.

Ex. 1004, 32 (emphasis added). Thus, the USB specification defines "device" relative to the context of the reference—lowest level, higher level, even higher level. Furthermore, we understand that the broadest reasonable interpretation of a term must be consistent with the specification of the

19

IPR2017-00864
Patent 7,523,243 B2

patent.  *SuperGuide*, 358 F.3d at 875.  Therefore, for the reasons discussed below, the '243 patent Specification does not require a "device" to be a unitary, integral device.  The USB specification provides further evidence, consistent with the Specification, that a skilled artisan would have understood the term "device" to encompass either a "single hardware component" or "a collection of hardware components that perform a particular function."  Ex. 1004, 32.

Patent Owner presents arguments regarding construction of "device" as follows:

### 1.      Preamble Is Not Limiting

Patent Owner argues the preamble of the claims limits the understanding of "device" because it recites a "particular structure that is highlighted as important by the Specification" and because the preamble "provides antecedent basis for a claim limitation."  PO Sur-Reply 1 (citing *NTP, Inc. v. Research In Motion*, 418 F.3d 1282, 1305 (Fed. Cir. 2005); *Catalina Mktg. Int'l v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002); and *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012)).  Petitioner contends the preamble recitation of "device" supports an important highlight of the Specification because the '243 patent Specification discloses a "single USB device . . ." (Ex. 1001, 2:9–12) and distinguishes the invention over "a combination of a standalone switch and another USB device" (Ex. 1001, 1:58–2:2).  *Id.* at 1–2.

Petitioner argues the distinction over a prior art switch in combination with a USB device is a distinction based on the function of the switch requiring reconfiguration of the USB device for each switch between hosts

IPR2017-00864
Patent 7,523,243 B2

rather than the physical distinction of a combination of separate components. Pet. Sur-Sur-Reply 3 (quoting Ex. 1001, 1:60–62 ("the device can generally be configured and accessed by only a single host at any given time")).  We are persuaded by Petitioner's argument.  The '243 patent does not distinguish the prior art combination of a switch and a separate USB device based on its physical packaging.

Furthermore, the mere fact that "device" in the preamble provides an antecedent basis for the same recitation in the claim elements in no way further defines the proper construction of "device."  Patent Owner's reliance on *Deere* is inapposite.  *Deere* also holds "if the body of the claim describes a structurally complete invention, a preamble is not limiting where it 'merely gives a name' to the invention, extols its features or benefits, or describes a use for the invention").  *Deere*, 703 F.3d at 1358 (quoting *Catalina*, 289 F.3d at 809).  Here, use of the term "device" (or the various synonyms noted *supra*) provides no structural limitation but, instead, the body of the claim sufficiently defines a complete structure and the preambles merely provide a name for the claimed structures.

For the above reasons, we determine the preamble of the claims does not limit the claim elements to an integral, unitary, physical packaging of the device as Patent Owner alleges.

2.    *The Claimed Device May Encompass An "Off-The-Shelf Item"*

Petitioner argues Patent Owner's limiting definition of "device" would require the function block and the controller be located "within a single unitary housing."  Reply 4.  However, Petitioner argues, the '243 patent Specification discloses that "Peripheral Device/Function 312" "may

21

IPR2017-00864
Patent 7,523,243 B2

be a standard off-the-shelf item." *Id.* (quoting Ex. 1001, 4:8–12).  Petitioner contends that, if the "off-the-shelf" function 312 is, for example, a mass storage device, "[i]t could not be a standard off-the shelf item if the inventive multi-host device controller were already embedded inside." *Id.*

Patent Owner argues the disclosure of an "off-the-shelf" item merely refers to the function being a standard function such as an Ethernet controller or a mass storage device.  PO Sur-Reply 2.  Instead, Patent Owner emphasizes that the '243 patent Specification clearly refers to the function as one of three segments or blocks within a USB device as support for its contention that the claimed USB device is an integral, unitary structure.  *Id.*

We are persuaded by Petitioner's arguments.  Figure 3 of the '243 patent (reproduced above) depicts an embodiment of USB multi-host device 106 comprising, *inter alia*, USB multi-host device controller 108 and device/function 312.  The Specification's disclosure that device/function 312 may be a standard off-the-shelf item such as an Ethernet controller or mass storage device clearly describes a typical device that may be common and commercially available—not an item that is already physically integrated with the inventive features of the invention (the other elements shown within box 106 of Figure 3).

For the above reasons, we determine the Specification's exemplary embodiment incorporating an "off-the-shelf" item aids in understanding "device" to encompass a combination of hardware components (including "off-the-shelf" items) and, thus, would not limit the claim elements as to integral, unitary, physical packaging of the device as Patent Owner alleges.

22

IPR2017-00864
Patent 7,523,243 B2

    *3.      "Device" Encompasses "A Collection Of Hardware Components"*

    Patent Owner further argues the USB specification definition of a device as encompassing a "collection of hardware components" is not the same as encompassing a collection of separate devices.  PO Sur-Reply 3. We discern no support for Patent Owner's assertion that there is a difference between a collection of hardware components and a collection of devices. This assertion merely shifts the focus of the discussion to defining another term ("hardware components") as somehow distinct from "devices."

    Furthermore, Patent Owner's expert, Mr. Knapen, agrees with the definition of "device" as provided in the USB specification.  Ex. 1049, 40:9–16 ("Q. Do you agree or disagree that a person of ordinary skill in USB matters in 2006 would consider the word 'device' to potentially refer to a collection of hardware components that perform a particular function? A. Yes. . . .").  In addition, Patent Owner's counsel and Mr. Garney (Petitioner's expert) engage in a lengthy colloquy in which Mr. Garney explains a variety of types of devices defined by the USB specification all within the scope of "device," regardless of physical packaging constraints, as ordinary skilled artisans would understand the USB specification.  *See* Ex. 2006, 67:9–74:15.

    For the above reasons, we determine that an ordinarily skilled artisan would understand "device" in the context of the '243 patent Specification and in the context of the USB specification to encompass devices that comprise the recited "collection of hardware components" without imposing particular physical packaging constraints.

IPR2017-00864
Patent 7,523,243 B2

       *4.     Conclusion Regarding Construction of "Device"*

Accordingly, we construe "device," in accordance with the USB specification and in accordance with the '243 patent Specification discussion of Figure 3, to, at least, encompass any collection of hardware components that perform a USB function.

       *e.     "USB Connections"*

With slight variations in phrasing, all independent claims (1, 3, 7, 18, and 23) recite USB connections between the first host (or upstream port) and the function (claims 1, 3, 7, and 23 refer to the "USB device block corresponding to at least one function" and method claim 18 refers to USB connections between the "shared USB device" and a plurality of hosts). The parties disagree over the construction of "USB connection" and then further disagree regarding the construction of "concurrent" and "dedicated" as qualifiers of the "USB connections" (as discussed further below). First we address the construction of "USB connection."

The USB specification does not expressly define the term "USB connection" but uses the term only in reference to the electrical signaling standard (the type of cable) used in various speeds of connectivity. *See* Ex. 1004, 147, 152, 157. The '243 patent Specification does not expressly define the term "USB connection." The term appears in the Abstract and at column 2, lines 35–37 ("[e]ach host may therefore establish a dedicated USB connection with the sharing device"). These passages offer little aid in

24

IPR2017-00864
Patent 7,523,243 B2

understanding the term and only indicate that a "USB connection" is something established between hosts and a "sharing device[13]."

Neither the Petition nor the Patent Owner's Response provide a definition of "USB connection."  Patent Owner argues in its Response, in essence, that Dickens does not disclose the claimed USB connections because Dickens discloses that, internal to its routing device 100, all exchanges are performed over a PCI bus (or another non-USB bus).  PO Resp. 29–35.  Implied in Patent Owner's argument is that the claimed "USB connections" would be understood to exclude the use of any non-USB busses or protocols in the path between, e.g., a host and a peripheral—even intervening connections in the path between a USB host and a USB device.

In response to Patent Owner's argument, Petitioner proffers an express construction of "USB connection" in its Reply.  Specifically, Petitioner argues "'USB connection' means 'direct and indirect connection, both with and without intervening interconnect, using USB protocols.'" Reply 11.  Petitioner further argues the '243 patent Specification teaches that the USB connections may include digital interconnects such as "Interchip USB," "ULPI," and "UTMI" and contends Mr. Knapen (Patent Owner's expert) testified that connections within multi-host device 106 of the '243 patent are likely such digital interconnects, which Petitioner contends are not "USB signals."  *Id.* at 5–6 (citing Ex. 2007 ¶¶ 44–47; Ex. 1049, 62:13–

---

[13] "Sharing device" is not used again in the Specification.  We presume it may have been a typographic error that was intended to refer to a "shared device," a term that is somewhat consistent with the remainder of the Specification and the claims of the '243 patent.  Our analysis is not affected by the apparent error.

25

IPR2017-00864
Patent 7,523,243 B2

62:25). Thus, under Petitioner's proffered construction, a "USB connection" may include intervening digital interconnections that are not USB compliant.

Patent Owner responds, "The phrase 'USB connection' should be given its plain and ordinary meaning.  One of ordinary skill would know that a 'USB connection' is one that conforms to the requirements of the USB specification."  PO Sur-Reply 3.  Patent Owner argues its interpretation is consistent with the '243 patent Specification because the interconnects discussed in the Specification, including serial USB cables, Interchip USB, ULPI, and UTMI standards, *are* compliant with the USB specification.  *Id.* at 3–4.  Patent Owner further argues Petitioner's proffered construction includes non-USB intervening elements and, thus, does not conform to the USB specification.  *Id.* at 4–5.

We are persuaded by Petitioner's arguments that a "USB connection" need not be compliant with the USB specification throughout the entire physical signaling path between a USB host and a USB device and may include intervening, non-USB connections.

First, we disagree with Patent Owner that the disclosed digital interconnections of the '243 patent (Interchip USB, ULPI, and UTMI) are "compliant with the USB specification."  These standards may be useful in conjunction with USB circuit design applications for high speed parallel bus communications between integrated circuits,[14] but these interconnect standards appear nowhere in the USB specification of record and, thus,

---

[14] Patent Owner provides a footnote alleging these digital interconnects conform to the USB specification.  *See* PO Sur-Reply 4 n.1.  The cited websites, not of record as evidence in this case, suggest that these standards define parallel bus structures useful in implementing USB devices with inter-chip connections.

IPR2017-00864
Patent 7,523,243 B2

cannot be said to be "compliant" with the USB specification of record as
Exhibit 1004.

Furthermore, Mr. Knapen testifies, and we agree, "the inner-workings
of the invention's USB multi-host device controller (i.e., element 108 of
Figure 3) is not described at the circuit level." Ex. 2007 ¶ 45. Mr. Knapen
further testifies, in reference to internal connections within controller 108 of
the '243 patent, that connections within multi-host device 106 of the '243
patent are likely digital interconnects (e.g., Interchip USB, ULPI, UMTI)
rather than "USB signals" on a USB serial bus (i.e., a USB cable). Ex. 1049,
76:19–78:24. Thus, interconnections within multi-host device 106 are not
compliant with the USB specification of record (Ex. 1004) as alleged by
Patent Owner. Instead, Figure 3 of the '243 patent, in conjunction with the
disclosure of digital interconnects and Mr. Knapen's testimony, discloses a
"USB connection" that comprises a USB serial bus (i.e., a USB cable)
coupling a USB host with an upstream port (302/304) and digital
interconnects ("Host 1" and "Host 2") coupling the upstream port (302/304)
to a corresponding endpoint & status buffer (306/308) within device 106.[15]
Thus, according to Mr. Knapen, the above-described "USB connection"
between a host and function 312 in Figure 3 includes intervening digital
interconnections that are not compliant with the USB specification of record.

---

[15] Other un-labeled interconnects within device 106, such as between buffers
306/308 and controller 108, may also be digital interconnections that are not
compliant with the USB specification of record.

IPR2017-00864
Patent 7,523,243 B2

Furthermore, we observe that the '243 patent Specification, although sparse regarding any internal structure of controller 108,[16] discloses that controller 108 may include an arbitration mechanism:

> In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.

Ex. 1001, 4:19–26. Neither party identifies, nor do we discern, any disclosure in the USB specification describing a capability to arbitrate among multiple host requests—indeed adding such a feature is at the heart of the purported invention of the '243 patent (i.e., the "point of novelty"). Thus, controller 108 provides non-USB functionality (an arbitration mechanism), intervening within the USB connection between hosts and a function block, to arbitrate among multiple USB requests.

For the above reasons, we are persuaded by Petitioner's arguments that "USB connection," as used by the ordinarily skilled artisan in the '243 patent, does not require an end-to-end communication path that is, at all times and all points, compliant with the USB specification of record. Instead, we adopt Petitioner's proffered construction that a "USB connection" means "direct and indirect connection, both with and without intervening interconnect, using USB protocols."

---

[16] In general, we find the '243 patent Specification to be more sparse regarding design details than the prior art of record, in particular Dickens.

IPR2017-00864
Patent 7,523,243 B2

### f.     *"Dedicated" USB Connections*

All independent claims, with slight variations in phrasing, refer to the USB connections as "dedicated."  Initially, we determine a "dedicated" USB connection is first and foremost a "USB connection" as defined above ("direct and indirect connection, both with and without intervening interconnect, using USB protocols").  What structure makes the connections "dedicated" is a point of disagreement between the parties.

Neither the Petition nor the Patent Owner Response expressly define "dedicated USB connections."  Patent Owner's Response, in arguing that Dickens does not teach "dedicated USB connections," implies a construction that requires there must be two distinct, separate, physical communications paths from each of two hosts through to the function block (i.e., no segment of the communication path of the first "dedicated" USB connection is shared with the other "dedicated" USB connection).  PO Resp. 40–43.

Petitioner disagrees with Patent Owner's implied construction arguing that the '243 patent Specification supports a construction that allows for some shared physical communication segments in a "dedicated USB connection."  Reply 11–12.  Specifically, Petitioner proffers a construction of "dedicated USB connections" as meaning "a form of connection, with a communication channel that is assigned to two or more locations, and which may include a shared connection."  Reply 12.  In support of this interpretation, Petitioner points to Figure 3 of the '243 patent that shows a single arrow connecting controller 108 to function block 312 suggesting a single shared physical communication path.  *Id.*

In supplemental briefing, Patent Owner reiterates its position that the plain meaning of "dedicated" connections requires that there be two distinct,

IPR2017-00864
Patent 7,523,243 B2

separate, physical communication paths with no shared segments because an interpretation including a shared segment would eviscerate the term "dedicated" in the claims.  PO Sur-Reply 10.  Responsive to Petitioner, Patent Owner argues Figure 3 of the '243 patent is a "logic diagram" and, thus, the single arrow Petitioner points to connecting controller 108 with function block 312 is not a single shared physical communication link.  *Id.* (quoting Ex. 1001, 3:20–21).  Petitioner responds "[c]laim 3 also does not speak to the physical, but the schematic, *i.e.*, functional; the whole of the patent's disclosure is schematic."  Pet. Sur-Sur-Reply 10.  Petitioner contends "dedicated" does not mean physically separate and, therefore, does not preclude a shared segment in the "dedicated USB connection" path.  *Id.*

We are persuaded by Petitioner's position as supported by the disclosed embodiments of the '243 patent—specifically, the only embodiment disclosed in particular in Figure 3.  The '243 patent Specification provides some insight, disclosing:

> In various embodiments, by using a multi-host capable device controller, a shared USB device may be simultaneously configured and accessed by two or more USB hosts.  The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host.  The device may maintain a dedicated address, configuration and response information for each host.  Each host may therefore establish a dedicated USB connection with the sharing device.

Ex. 1001, 2:28–37.  Thus, in at least some embodiments, "dedicated USB connections" include USB connections in which the USB multi-host device "includes separate buffers for each host" and "maintains dedicated address, configuration and response information for each host."  Furthermore, in prosecution of the '243 patent, Patent Owner argued "the embodiment

IPR2017-00864
Patent 7,523,243 B2

disclosed in Fig. 3 clearly shows concurrent <u>respective dedicated</u>
<u>connections established between USB multi-host device controller 108 and</u>
<u>upstream ports 302 and 304</u> through buffers 306 and 308, respectively."  Ex.
1014, 10.  Figure 3 of the '243 patent is reproduced below with our red
annotation added to highlight the above-identified "dedicated" USB
connection.



*FIG. 3*

Figure 3 of the '243 patent, above, is annotated with a red box
highlighting two communication paths Patent Owner identified during
prosecution as "dedicated" USB connections—one from the first host
through upstream port 302 and USB endpoint & status 306 to controller 108
and a second from the second host through upstream port 304 and USB
endpoint & status 308 to controller 108.  These two communication paths,

IPR2017-00864
Patent 7,523,243 B2

according to the prosecution history (Ex. 1014, 10), establish two dedicated connections up to controller 108.  From those two dedicated connections from two hosts to controller 108, there is shown a single arrow (outside our annotated red box identifying the dedicated connections), suggesting a single connection from controller 108 to function block 312—a single connection shared by the two highlighted dedicated connections to extend the connections to function block 312.

The above-highlighted, exemplary, "dedicated" USB connections fit within the scope of Petitioner's proffered construction of "dedicated USB connections" in that they may include a shared segment or portion of the communication path that extends the dedicated connection to the function block.  These exemplary "dedicated" USB connections are also within the scope of the '243 patent Specification in that each of the two dedicated connections "includes separate buffers for each host" (endpoint buffers 306 and 308) and "maintains dedicated address, configuration and response information for each host" (within endpoint buffers 306 and 308).  *See* Ex. 1001, 4:10–18.[17]

Finally, independent claim 1 is the only claim that requires two physical ports.  Every other independent claim recites multiple "dedicated" connections, but does not recite multiple physical ports.  This suggests these claims are broad enough to encompass multiple "dedicated" connections over a single physical port and, therefore, provides further support for

---

[17] The '243 patent Specification does not expressly describe what information is stored in buffers 306 and 308.  However, we are persuaded the ordinarily skilled artisan with knowledge of the USB specification would likely presume the address, configuration, and response information is stored in these buffers.

IPR2017-00864
Patent 7,523,243 B2

Petitioner's position that "dedicated," as used in the '243 patent, does not require an entirely separate physical communication path.

For the above reasons, we construe a "dedicated USB connection" to mean "a USB connection that may include some shared physical communication path and includes a buffer for maintaining dedicated address, configuration and response information for the connection."

### g.   "Concurrent" USB Connections

All independent claims, with slight variations in phrasing, refer to the USB connections as "concurrent."  Initially, we determine each "concurrent" USB connection is first and foremost a "USB connection" as defined above ("direct and indirect connection, both with and without intervening interconnect, using USB protocols").  We have construed "concurrent" above to mean "operating or occurring at the same time."  Thus, we construe "concurrent USB connections" to be "USB connections that operate or occur at the same time."

### C.   Anticipation by Furukawa

The Petition asserts claims 1–8, 10, 11, 15–20, and 22–25 are anticipated by Furukawa.  Pet. 37–53.  For the reasons discussed below, we remain unpersuaded that Furukawa anticipates any of claims 1–8, 10, 11, 15–20, and 22–25.

### 1.   Furukawa (Ex. 1002)

According to Furukawa, sharing a USB peripheral device has been difficult because a USB interface permits only a single host to connect with

33

IPR2017-00864
Patent 7,523,243 B2

a peripheral device. Ex. 1002 ¶ 3. Prior solutions provided a switching circuit that allowed a different host to connect with the shared peripheral. *Id.* However, such switches required a series of operations each time the host on the USB was switched and, typically, required the host system to load or unload a device driver for the shared peripheral newly connected or re-connected to the host. *Id.*

Furukawa purports to have resolved the above problems by disclosing a USB hub providing dedicated ports for each of multiple USB hosts, dedicated ports for each of multiple USB peripheral devices, and a controlling circuit coupled between the host ports and the device ports such that overhead to load and unload devices drivers is obviated. *Id.* ¶ 4.

IPR2017-00864
Patent 7,523,243 B2

Figure 1 of Furukawa, reproduced below, depicts an exemplary embodiment of Furukawa's invention.



Figure 1 depicts a plurality of USB hosts 21–24 coupled to hub 1 via corresponding ports 2-1 through 2-4 (collectively ports 2) and depicts a plurality of USB peripheral devices 25–28 coupled to hub 1 via ports 3-1 through 3-4 (collectively ports 3). *Id.* ¶¶ 7–8. Hub 1 comprises FIFO memories 11-1 through 11-4 (collectively FIFO memories 11) and 17-1

IPR2017-00864
Patent 7,523,243 B2

through 17-4 (collectively FIFO memories 17) corresponding to ports 2 and 3, respectively. *Id.* Controlling circuit C of hub 1 controls transmissions between hosts 21–24 via bus 12 through FIFO memories 11 and peripheral devices 25–28 via bus 16 through FIFO memories 17. *Id.* ¶¶ 10–11. When an exchange is required between a host and a peripheral device, controlling circuit C sets up a connection between the host and the peripheral device and releases the connection when the exchange is completed. *Id.*

2.    *Independent Claims 1, 3, 7, 18, and 23*

Independent apparatus claims 1, 3, 7, and 23 generally recite a USB device comprising a controller that enables multiple hosts to share access to a USB device. Independent method claim 18 generally recites steps providing multiple hosts with shared access to a USB device.

Regarding claim 1, Petitioner argues the recited USB multi-host device reads on hub 1 of Furukawa and the claimed first and second upstream ports read on any two of ports 2-1 through 2-4 of Furukawa. *Id.* at 38–39.

Petitioner argues the recited "USB device block corresponding to at least one function" reads on any of Furukawa's peripheral devices. *Id.* at 39 (citing Ex. 1002 ¶ 9, Fig. 1). In further analysis we may refer to "USB device block corresponding to at least one function" as simply "function" or "function block."

Petitioner further argues the claimed multi-host device controller reads on Furukawa's controlling circuit C within hub 1. *Id.* at 39.

The "wherein" clause of claim 1 requires that the controller be configured to "establish concurrent respective dedicated USB connections

36

IPR2017-00864
Patent 7,523,243 B2

between the [function block] and the first and second upstream ports" to enable certain recited functions.  Petitioner argues controlling circuit C of Furukawa connects to multiple hosts concurrently "through bus 12, FIFO memories 11, and connecting ports 2."  Pet. 40 (citing Ex. 1002 ¶¶ 9–10).  Petitioner further argues elements 13–15 within controller circuit C allow the circuit "to simultaneously process data transmissions between the hosts and peripheral devices."  Pet. 40–42 (citing Ex. 1002 ¶ 11).  More specifically, Petitioner argues:

> As Furukawa explains, "The connection that is set up is a one-to-one connection between the host PC that is the source of the request and the peripheral device that is the destination of the request, and insofar as there is no redundancy in the request destination, a plurality of host PCs can access the peripheral devices simultaneously."  F-¶0010.  Furukawa's controlling circuit thereby discloses "concurrence."  Garney-¶¶81-82.

*Id.*[18]

Patent Owner' Preliminary Response disputed Petitioner's contentions arguing, in essence, that Furukawa does not disclose multiple hosts concurrently accessing the same peripheral device.  *See* Prelim. Resp. 35–40.

Based on the preliminary record at the time of our Decision on Institution, we were not persuaded Furukawa expressly discloses concurrent USB connections between a plurality of USB hosts and *one* USB peripheral device (a "USB device block . . ." as claimed).  Although identity of terminology is not required, the Petition had not presented sufficiently

---

[18] Petitioner's notation "F-¶0010" is a reference to Ex. 1002 ¶ 10 and the notation "Garney-¶¶81-82" is a reference to Ex. 1023 ¶¶ 81–82.  *See* Pet. 1 n.1.

IPR2017-00864
Patent 7,523,243 B2

persuasive argument and evidence that Furukawa expressly discloses such concurrency.  The Petition's reliance on Furukawa's disclosure that "a plurality of host PCs can access the peripheral devices simultaneously" (Ex. 1002 ¶ 10) does not sufficiently disclose concurrent connections between multiple USB hosts and *the same* shared USB peripheral device.  As we discussed in our Decision on Institution, this disclosure of Furukawa may reasonably be understood to disclose that one USB host is accessing a first USB peripheral device while simultaneously a second USB host is accessing a different USB peripheral device—e.g., Furukawa's host 21 may access device 25 while host 22, simultaneously, accesses device 26.  Thus, in our Decision on Institution, we were not persuaded that Furukawa expressly discloses establishing concurrent connections between multiple hosts and one shared peripheral device and we observed Petitioner had not presented any argument that the recited concurrent connections would have been inherent in the teachings of Furukawa.  Dec. 22–23.  For those reasons based on the preliminary record, we were not persuaded Furukawa discloses, expressly or inherently, the concurrent connections by multiple hosts to one peripheral device as recited in independent claim 1 and as similarly recited in each other independent claim (3, 7, 18, and 23) for which Petitioner presented similar arguments (*see* Pet. 45–53).

Petitioner filed a Request for Rehearing of our Decision on Institution.  Paper 15 ("Req." or "Request").  In that Request, Petitioner argued that Furukawa's disclosure that a peripheral device may be coupled to multiple hosts with "no switching operations" teaches that the connections are made without a need for reconfiguration or re-enumeration as required by the claims.  Req. 10 (quoting Ex. 1002 ¶ 3).  Petitioner argued that because

IPR2017-00864
Patent 7,523,243 B2

Furukawa shows switching between USB connections without any physical switches and still obviates the need to unload and reload drivers when switching connections, Furukawa must be using "data switching" rather than physical "disconnection switching" as the Petitioner defined those terms in its Petition.  *Id.*; *see also* Pet. 18–19.  We emphasized in our Decision Denying Petitioner's Request for Rehearing that our Decision on Institution was based on lack of *express* disclosure in Furukawa of establishing/maintaining multiple concurrent USB connections that enable alternate access to a shared function block without reconfiguring as required by the claims.  Paper 18, 5–6 (citing Dec. 23).

Following entry of our *SAS* Order (adding previously denied claims and grounds into the trial), the parties submitted supplemental briefs addressing the claims and grounds for which we had initially denied review.  We emphasize, as discussed above, that Petitioner does not argue that Furukawa inherently discloses any of the claimed features.  Instead, the Petition and Petitioner's Supplemental Reply argue only that Furukawa *expressly* teaches the features of claims 1–8, 10, 11, 15–20, and 22–25.  At oral argument, Petitioner's counsel confirmed that the Petition is not relying on inherent disclosures of Furukawa.

> JUDGE FISHMAN: The Patent Owner was asserting that Petitioner has never argued inherency, and still does not argue inherency.  Are you arguing inherency, or are you not arguing inherency?

> MR. McKEOWN: We did not present inherency in the petition.  The word inherency, I think first appeared in the rehearing decisions.  Our position is enumeration reconfiguration is disclosed in Furukawa for the same reasons it's disclosed in Bohm.  Going back to that prosecution history, when you're explaining enumeration and configuring is necessarily there,

39

IPR2017-00864
Patent 7,523,243 B2

because there's two hosts transmitting at once, and because they transmit at once, they don't have to be re-enumerated, we are entitled to that same technical basis as they are. That's what they argued.

In addition to that, and as I pointed out earlier, enumeration configuration relates to the loading of drivers, that's not in dispute, that's on the Petitioner page 34 th[r]ough 35; Furukawa explicitly explains that it's avoiding switching overhead. It's avoiding the loading the drivers, and even in the USB context, it's able to share a peripheral.

Based upon the testimonial evidence we have in the record, our declarant has taken the position that enumeration and all of the features of these claims are in the reference. We are not saying, by the way, if you enumerate, you have to do this other step that's nowhere discussed, and that's inherent, we are not arguing that. We are saying, it's in there. The word "enumeration" is just not used; instead, they describe it as switching drivers, et cetera.

Tr. 54:14–55:10.

In its Supplemental Reply, Petitioner argues Furukawa discloses that its FIFO buffers (11 and 17) temporarily store packet data "to prevent collisions of data from multiple hosts." Supp. Reply 4 (citing Ex. 1002 ¶¶ 6, 17). Petitioner then contends "collisions of data would not even be a concern if Furukawa disclosed that a peripheral could *only* be configured/enumerated with one host at a time." *Id.* Furthermore, Petitioner contends our Decision on Institution is inconsistent with the explicit disclosure in Furukawa of a "system in which multiple hosts simultaneously access a single peripheral." *Id.* Specifically Petitioner contends Furukawa discloses problems of prior art switches used to share a peripheral device among multiple hosts in that "the switching circuit must be operated in a series of operations" each time a different host is switchably connected. *Id.*

40

at 5 (quoting Ex. 1002 ¶ 3). Petitioner quotes a portion of paragraph 3 of Furukawa and summarizes these teachings as, "the prior art switching is undesirable because it involves a series of operations, and drivers for the one peripheral device must be loaded and unloaded each time the switching from one connected host to another connected host is performed." *Id.* at 5–6. Petitioner then contends that loading and unloading of drivers is a "conventional" operation of USB hubs and controllers and further contends enumeration of a USB device is similarly a conventional switching operation of USB hubs and controllers. *Id.* at 6. Petitioner further contends Furukawa's proposed solution is "to provide a USB hub that enables **a** peripheral device to be shared by a **plurality** of computers, and which requires **no [conventional USB] switching operations**." *Id.* (quoting Ex. 1002 ¶ 3 with the words "conventional USB" added by Petitioner). Based on the above disclosures, Petitioner contends:

> As noted above, switching operations include the loading and unloading of the drivers for the peripheral device and take extensive time. By eliminating switching operations, Furukawa's invention—described at the same level of detail as the '243 patent—results in persistent simultaneous connections between the peripheral device and a plurality of hosts (because the connections do not have to be setup each time), such that "there is **no overhead and having to load and unload the device driver** sequentially **each time** . . . a connection is established or released." (Ex. 1002 ¶ 5; emphasis added.) Thus, with the peripheral's drivers always loaded, the simultaneously connected hosts are always in a ready state to send data to, or receive data from, a given peripheral. Indeed, Furukawa's description of its FIFO memory exchanges is indisputable evidence of this simultaneous access.

*Id.* at 6–7.

IPR2017-00864
Patent 7,523,243 B2

In response, Patent Owner argues Furukawa discloses only a "one-to-one" connection between one host and one device and discloses that "simultaneous access to peripherals only occurs when two hosts request access to different 'request destination[s]' (i.e., two different peripherals)." Supp. Resp. 1–2.  Patent Owner further argues, "Furukawa's use of FIFOs does not change that it only establishes one-to-one connections."  *Id.* at 2.  Contrary to Petitioner's argument, Patent Owner contends collisions could arise even in such a one-to-one connection system in which one host at a time connects to the device and then another host can connect to the same device but only after the first connection is released.  *Id.* at 3.  Therefore, Patent Owner argues, by virtue of each connection being "released" before a next connection is allowed, enumeration and configuration would occur at each switch between hosts—contrary to the recitations of the claims.  *Id.* at 3–4.

We remain unpersuaded by Petitioner's supplemental arguments.  We agree with Petitioner that Furukawa is directed to solving the same problem as the '243 patent—eliminating overhead of switching between hosts sharing a USB device.  Supp. Reply 6 (citing Ex. 1002 ¶ 3 ("The present invention was created in contemplation of the problem areas described above, and the object is to provide a USB hub that *enables a peripheral device to be shared by a plurality of computers, and which requires no switching operation*.") (emphasis added)).  Furukawa discloses a problem of prior art switches in that "the switching circuit must be operated in a series of operations" for each switch between connected hosts.  Ex. 1002 ¶ 3.  Furthermore, Furukawa discloses one such operation asserting that in the prior art "the device driver for the peripheral device must be loaded and unloaded" for

42

IPR2017-00864
Patent 7,523,243 B2

each switch between connected hosts.  *Id.*  However, the only switching operation overhead expressly eliminated in Furukawa is the overhead of loading and unloading devices drivers on the hosts each time a switch is made between two hosts sharing a USB device.  *Id.* ¶ 5.  Furukawa never expressly discusses elimination of any other type of switching operation overhead by its invention.  In particular, we discern no express disclosure in Furukawa that reconfiguration of the peripheral device is eliminated when switching between hosts as required by the independent claims (1, 3, 7, 18, and 23).

Petitioner asserts that the ordinarily skilled artisan would recognize that Furukawa's disclosed "series of operations" or "switching operations" encompasses all overhead operations and, thus, would have understood these operations to include enumeration when a switch is made between connected hosts because such enumeration "is a conventional switching operation of USB hubs" as evidenced by another Japanese patent.  Supp. Reply 6 (citing Ex. 1052[19] ¶¶ 4, 17).  Mr. Garney testifies,

> Furukawa's entire invention is directed to avoiding the conventional USB switching operations of prior art USB hubs. In light of the whole technical disclosure of Furukawa, a [person of ordinary skill in the art] could not understand Furukawa to describe that "normal enumeration and configuration" still takes place when a host "connection" is released.  To take that position does great violence to the disclosure of Furukawa.  Significant portions of Furukawa's disclosure would be rendered superfluous, and the expressed design goals could not be met— e.g., the need to eliminate processing time and overhead each time a host is switched. Patent Owner's unsupported attorney arguments lack any technical basis and completely ignore the

---

[19] Exhibit 1052 is an English translation of Japanese Unexamined Application 2001-51939.

IPR2017-00864
Patent 7,523,243 B2

> functionality of Furukawa's controlling circuit, FIFOs, and NAK
> packets.

Ex. 1053 ¶ 23.

We remain unpersuaded by this argument.  Initially, we note Mr.
Garney's testimony in this regard is unsupported by any facts or data and,
thus, is deserving of little weight.[20]  37 C.F.R. § 42.65(a).  Like the Petition,
Mr. Garney's Reply Declaration (Ex. 1053) still fails to identify any express
disclosure in Furukawa of eliminating re-enumeration processing in
switching between connections.

As previously noted, there is no mention of reconfiguration anywhere
in Furukawa.  There may be reasons Furukawa is silent in this respect.  It
may be the case that Furukawa determined, for its purpose, elimination of
the overhead of loading and unloading drivers on the host was a sufficient
improvement over prior art switches and it need not address other elements
of overhead processing such as re-enumeration.  In fact, we find it notable
that Furukawa's use of its FIFO stores data *and an address* of the USB
device to which the data is destined and uses that address to determine what
host is presently connected to the device (i.e., what host presently has set the
address for the device—which as presently enumerated the device).  *See* Ex.
1002 ¶¶ 13–15.  In Furukawa's invention, it may be that controlling circuit C
(comprising hub repeater 13, hub controller 14, and CPU 15) uses the stored
address from the FIFO to perform a re-enumeration or reconfiguration on the
destination device because a prior connected host used a different address

---

[20] Mr. Garney's reliance on paragraphs 4 and 17 of Exhibit 1052 provide no
support for his assertion that enumeration is among the "conventional"
operations that must be performed for each switch between connected hosts.
The word "enumeration" never appears in Exhibit 1052.

IPR2017-00864
Patent 7,523,243 B2

and a different configuration. *See id.* ¶ 15. However, we do not speculate about how Furukawa deals with the overhead processing of re-enumeration. It suffices in this case that we are not persuaded that Furukawa expressly discloses that re-enumeration and reconfiguration processing is eliminated, and that Petitioner does not persuasively argue that such a disclosure is inherent in Furukawa.

Independent apparatus claims 3, 7, and 23 and independent method claim 18 include similar recitations to those of claim 1 and Petitioner presents similar arguments for these claims. Pet. 45–53.

Accordingly, we are not persuaded by a preponderance of the evidence that Furukawa anticipates any of independent claims 1, 3, 7, 18, and 23.

3.     *Dependent Claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25*

Dependent claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claim. Because we are not persuaded Furukawa discloses, expressly or inherently, concurrent connections by multiple hosts to one peripheral device, as recited in each independent base claim from which these dependent claims depend, we also are not persuaded by a preponderance of the evidence that Furukawa discloses every limitation of these claims.

### 4.    *Conclusion Regarding Anticipation by Furukawa*

For the above reasons, we are not persuaded Petitioner has established by a preponderance of the evidence that any of claims 1–8, 10, 11, 15–20, and 22–25 are unpatentable as anticipated by Furukawa.

### E.    *Anticipation by Dickens*

The Petition asserts claims 1–8, 11, 15–20, and 22–25 are anticipated by Dickens.  Pet. 54–62.  For the reasons discussed below, we are persuaded that Dickens anticipates claims 1, 3–5, 7, 8, 11, 15, and 18–20.  We are not persuaded claims 2, 6, 16, 17, and 22–25 are anticipated by Dickens.

### 1.    *Dickens (Ex. 1003)*

According to Dickens, prior techniques for sharing a USB peripheral device include use of an Ethernet local area network or switching devices that utilize complex wiring.  Ex. 1003, 1:31–39.  Dickens discloses a data routing device to share a USB peripheral device among a plurality of USB hosts.  *Id.* at 1:45–49.  Figure 1, a version of which is reproduced below,[21] is a schematic illustration of a system using the inventive data routing device.  *Id.* at 5:8–9.

---

[21] Figures in the Dickens US Patent (Ex. 1003) are hand-drawn and, although understandable, are difficult to view.  The same patent application was filed in Great Britain (GB 2 350 212 A – Exhibit 3001) and Figures 1 and 2 therein are substantively identical but easier to view.  Thus, we reproduce here the Dickens' Figures 1 and 2 from the substantively identical patent application filed in Great Britain.

IPR2017-00864
Patent 7,523,243 B2



**FIG. 1**

Figure 1 depicts a system 100 including data routing device 130 coupled
with multiple USB host computers 105 through respective USB busses 106
and data converters 110.  *Id.* at 5:26–37.  Data routing device 130 also is
coupled with a plurality of USB peripheral devices 108 through respective
USB busses 109 and data converters 120.  *Id.* at 5:66–6:11.  Data converters
110 and 120 use USB protocols in exchanges with hosts 105 and devices
108, respectively.  *Id.* at 5:33–37, 6:9–11.  Data converters 110 include
emulation functions to emulate the presence of each USB peripheral device
108 in system 100 so that each USB host 105 will detect the peripheral
devices as present and configure themselves accordingly.  *Id.* at 5:38–43.
Data converters 120 include emulation functions to emulate the presence of
a USB host on each USB bus 109 associated with each USB peripheral
device 108 causing the peripheral devices to communicate with data router

47

IPR2017-00864
Patent 7,523,243 B2

130 through a corresponding converter 120 as though it is connected to a
USB host.  *Id.* at 6:12–17.

　　Figure 2 of Dickens, reproduced below[22], is a schematic illustration of
elements within the data routing system of Figure 1.  *Id.* at 5:9–11



Figure 2 depicts data router 130 (the largest rectangle also labelled as system
100) comprising microprocessor-based controller 140 and PCI bus 132 for
coupling to other components within data router 130.  *See id.* at 6:29–50.
Data router 130 is coupled to two USB host devices 105 through respective
data converters each comprising USB device controller 150 and PCI bus
interface 152.  *Id.* at 6:51–54.  Data router 130 is also coupled with USB
peripheral devices 180, 182, 184, and 186 via USB busses 109 and
corresponding USB host controllers 154, 156, and 158 coupled with PCI bus

---

[22] This Figure, like the version of Figure 1 reproduced above, is from GB 2
350 212 A.

IPR2017-00864
Patent 7,523,243 B2

132. *Id.* at 6:57–7:8.  In particular, USB host controller 156 serves to couple router 130 to printer 182.

In operation, data router 130 of Dickens receives a request for exchange from any host 105 via corresponding data converter 150 and emulates operation of each of the peripheral devices (180, 182, 184, and 186) coupled with router 130.  *See id.* at 7:36–45.  Information to or from a peripheral device is moved between data router 130 and the peripheral device via the emulated USB host provided by a corresponding USB host controller 154, 156, or 158.  *See id.* at 8:16–41.  In other words, data router 130 emulates each attached USB peripheral device for each attached USB host and emulates a requesting USB host for each attached peripheral device.

2.    *Independent Claims 1, 3, and 7*

Petitioner identifies the recited USB multi-host device as reading on data router 130 of Dickens and the recited first and second upstream ports as reading on data converters 110 (or equivalently 150 of Fig. 2).  Pet. 54–55.[23] Petitioner further identifies the function block ("USB device corresponding . . .") as reading on any one of Dickens' USB peripheral devices including, for example, printer 182 and identifies the recited controller as reading on Dickens' routing controller 140 within data router 130—the routing controller being coupled with two upstream ports

---

[23] Petitioner quotes a disclosure of Dickens and erroneously cites column 2, lines 12–13 thereof for that quote.  The quoted text appears at column 5, lines 29–31 of Dickens.  We find the incorrect citation to be harmless error.

IPR2017-00864
Patent 7,523,243 B2

(converters 110/150 coupled with USB busses 106) and coupled with the function block (e.g., printer 182). *Id.* at 55.

The "wherein" clause of claim 1 requires that the controller be configured to "establish concurrent respective dedicated USB connections between the [function block] and the first and second upstream ports" to enable certain recited host functions be performed by the device. Petitioner argues Dickens meets this limitation in that controller 140 maintains USB connections with host computers 105 through respective device controllers 150 (upstream ports) and maintains USB connections with printer 182 (a function block) through USB controller 156. Pet. 57.

One of the recited host functions provided by the controller's concurrent dedicated USB connections is allowing hosts to "simultaneously request access to the USB device." Petitioner contends the recited simultaneous access by multiple USB hosts reads on Dickens' disclosure of simultaneous access by multiple USB hosts to emulated devices provided by each host's corresponding data converter 110 of data router 130, including simultaneous enumerating and configuring the emulated devices. Pet. 56–57 (citing Ex. 1003, 5:26–43; Ex. 1023 ¶ 107). Petitioner further argues Dickens provides simultaneous access by two hosts when the hosts simultaneously attempt to send data to a shared function block (e.g., printer 182) such that data to be printed may be received simultaneously by router 130 from any two USB hosts. *Id.* at 57–58.

The other recited host function provided by the controller's concurrent dedicated USB connections is allowing hosts to alternately access the function without reconfiguring the function on each switch between hosts. Petitioner contends data from the second USB host will be buffered while

50

IPR2017-00864
Patent 7,523,243 B2

the data from the first host is being transmitted from data router 130 to printer 182 (the recited alternating access).  *Id.* at 57–59 (citing Ex. 1003, 9:21–27).  In particular, Petitioner contends Dickens discloses that the hosts remain connected to their respective emulated devices (provided by corresponding data converters 110) and, thus, would not require reconfiguration as ordinarily skilled artisans with knowledge of the USB specification would have known.  *Id.* at 58–59 (citing Ex. 1003, 3:23–24, 9:20–30; Ex. 1023 ¶ 111).

Notwithstanding Patent Owner's arguments, which we have considered and which we address below, we are persuaded by Petitioner's showing, which we adopt as our own findings and conclusions, that independent claims 1, 3, and 7 are anticipated by Dickens.

### a.    Dickens Discloses the Claimed "Device"

Patent Owner argues Dickens does not anticipate claim 1 because "Petitioner improperly attempts to combine portions of separate USB devices to conclude the claims of the '243 Patent are anticipated" and, thus, the elements of Dickens are not arranged as in the claim.  PO Resp. 23.  Specifically, Patent Owner agues the Petition improperly combines two separate pieces of hardware in Dickens to read on the claimed multi-host device—namely data routing device 100 and printer 182.  *Id.* (citing *Net MoneyIN*, 545 F.3d at 1370.  By contrast, based on its proffered construction of "device" (Paper 28, 1–3), Patent Owner contends claim 1 is directed to **_a_** device—i.e., an integral device—that comprises the recited structures within the device and provides the recited functionality.  *Id.* at 24.

IPR2017-00864
Patent 7,523,243 B2

Petitioner argues that Patent Owner's arguments are based on an incorrect interpretation of "device," as claimed, as limited to an integral, unitary device comprising the recited elements.  Reply 17–18.

We agree with Petitioner.  Patent Owner's argument is not persuasive because it is based upon an overly narrow construction of "device," which we decline to adopt for the reasons discussed above.

Therefore, we are persuaded by Petitioner's arguments that the claimed "device" is disclosed by Dickens as the combination of routing device 100 (including controller 140 read as the recited multi-host controller) and printer 182 (read as the recited function block).

### b.    *"Concurrent Dedicated USB Connections"*

With slight variations in phrasing, all claims refer to concurrent dedicated USB connections.  Patent Owner argues Dickens does not teach "USB connections."  PO Resp. 29–35.  Patent Owner further argues Dickens fails to teach "concurrent" USB connections (*id.* at 35–39) and fails to teach "dedicated" USB connections (*id.* at 39–43).

### i.    *"USB Connection"*

We first address Arguments directed to "USB connections" in general.

Patent Owner argues Dickens does not disclose the claimed "USB connections" because, although Dickens' routing device 100 establishes a USB connection between it and the host computers and between it and the peripheral devices, all exchanges are converted to PCI bus exchanges within the routing device.  PO Resp. 29–31.  We agree that Dickens converts all USB exchanges between an attached USB host and an attached USB

52

IPR2017-00864
Patent 7,523,243 B2

peripheral from USB protocols to a PCI bus (or other non-USB processor
bus) and its associated non-USB protocols.  Patent Owner's argument is not
persuasive, however, because it is based upon an overly narrow construction
of "USB connection," which we decline to adopt for the reasons discussed
above.

As further evidence that Dickens fails to disclose the recited "USB
connection," Patent Owner argues that "installing a specific driver on any
host 105 for a specific device will not allow the user to plug that specific
device into a downstream port of Dicken's [sic] data routing device 100
without also upgrading the software running on data routing device 100."
PO Resp. 31 (citing Ex. 2007 ¶¶ 88, 107).  We are not persuaded because the
selection of a device driver is unrelated to the establishment of a "USB
connection" as we construe the term.  The claims are not limited to USB
connections that support particular devices or even particular types of
devices and their associated drivers.

Patent Owner contends "the Board's conclusion that Dickens' PCI bus
can make up a USB connection misunderstands the Dickens system"
because "Dickens' data router includes multiple distinct USB buses."  PPO
Resp. 32.  Patent Owner then redraws Dickens' Figure 2 with annotations
identifying five different USB busses—one each connected to each of two
hosts (105) and three more connected to each of three exemplary peripheral
devices (180, 182, and 184).  PO Resp. 32–35.  We are not persuaded by
Patent Owner's argument.  Our construction of "USB connection" does not
encompass a PCI bus alone as within the scope of "USB connection."
Instead, we interpret "USB connection" as including intervening segments
or portions that may be non-USB—such as Dickens' intervening PCI bus

IPR2017-00864
Patent 7,523,243 B2

132 or the digital interconnections described within the '243 patent's multi-host device 106. *See* section II.A.4.e. Furthermore, Petitioner argues, and we agree, that, similar to Dickens' device 100, multi-host device 106 of the '243 patent uses three USB busses—one each connected to two hosts and one connecting controller 108 to function block 312 (the third UBS bus may also be implemented as a digital interconnect). The structures of Dickens' device 100 and multi-host device 106 are essentially identical with respect the use of multiple USB serial busses.

Therefore, we are persuaded by Petitioner's arguments that the claimed "USB connections" are disclosed by Dickens in that, controller 140 maintains USB connections with host computers 105 through respective device controllers 150 (upstream ports) and maintains a USB connection with printer 182 (a function block) through USB controller 156. Pet. 56. Thus, all exchanges to and from an attached host 105 are over a USB bus 106 using USB protocols and all exchanges to and from an attached peripheral (printer 182) are over a USB bus 109 using USB protocols. Any intervening non-USB exchanges, such as over a PCI bus, are transparent to host 105 and printer 182 and, therefore, are within the scope of a "USB connection" as we have construed the term ("direct and indirect connection, both with and without intervening interconnect, using USB protocols.").

ii.     *"Concurrent USB Connections"*

All claims also require the USB connections be "concurrent." In accordance with our construction of "concurrent," the two USB connections must be "operating or occurring at the same time."

IPR2017-00864
Patent 7,523,243 B2

After considering the issue anew based on the parties' evidence submitted at trial, a preponderance of the evidence leads us to the same conclusion.  Patent Owner argues "[t]he fact that there is only a single connection to Dickens' printer (the claimed 'USB function block') precludes a finding of anticipation."  PO Resp. 33.  Patent Owner further argues,

> Indeed, one of ordinary skill in the art would understand that the single USB connection to Dickens' printer 182 only allows print data from one host at a time.  Knapen ¶ 95; *see also* [Ex. 1003], 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis.  Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

*Id.* at 34.

We are not persuaded by Patent Owner's argument.  Patent Owner's argument conflates the USB connections with the ability to transfer data concurrently or simultaneously.  Petitioner argues, and we agree, "Figure 3 of the '243 Patent is no different: one arrow between the '243 Patent controller and device/function is the only way data is transferred, and data must necessarily communicate over this depicted-as-single arrow from each of the illustrated hosts."  Reply 12.  There is only a single physical connection between Dickens' routing device 100 and any one peripheral device (e.g., printer 182) in exactly the same manner as in the '243 patent in which there is a single physical connection between multi-host controller 108 and device/function 312 in Figure 3.  Through that single physical connection in the '243 patent, data may be exchanged alternately (as clearly expressed in the claim and as discussed further below).  *See* Ex. 1001, 2:61–65 ("The internal arbitration mechanism may enable each host to access the

IPR2017-00864
Patent 7,523,243 B2

shared Peripheral Function by either interleaving host accesses, or by using a common request/grant structure, which may hold-off one host while another host completes a data transfer to/from the shared device.").  A switch of data transfer between two hosts is performed in Dickens in essentially the same manner (though potentially based on different switching criteria).  *See* Ex. 1003, 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

While the data transfers may switch between hosts in Dickens and in the '243 patent, the USB connections from any two USB hosts 105 in Dickens to printer 182 are established and remain established regardless of whether data is presently being transferred.  Each host 105 in Dickens remains connected to Dickens' routing controller 140 within data router 130 through its respective interface 150 and data converter 110.  Like multi-host controller 106 in the '243 patent, Dickens controller 140 switches (arbitrates or alternates) data transmissions to/from different hosts in accordance with a desired algorithm.  *See, e.g.,* Ex. 1003, 9:1–34 (audio alarms states from two computers are monitored and a printer is shared between established host connection based on a timeout period).

Patent Owner also argues Dickens' does not teach two concurrent USB connections because there is only a single connection between printer 182 (the claimed function block) and hosts 105.  PO Resp. 35–39.  Patent Owner reproduces an annotated version of Figure 2 of the '243 patent which is reproduced below.

IPR2017-00864
Patent 7,523,243 B2



*FIG. 2*

Figure 2 of the '243 patent, annotated by Patent Owner and reproduced above, shows two concurrent USB connections highlighted in yellow—one between PC 122 and printer 120 and a second between PC 123 and printer 120.  PO Resp. 37.

We are not persuaded by Patent Owner's argument.  The '243 patent discloses that printer 120 of Figure 2 is one example of multi-host device 106, including its controller 108.  *See* Ex. 1001, 2:51–59.  Figure 3 of the '243 patent further details the structure of multi-host device 108.  As discussed *supra*, device 106 in Figure 3 shows a single connection from its controller 106 to function block 312 essentially the same as Dickens' single USB bus 109 coupling device 100 to printer 182.  In other words, the concurrent USB connections of the '243 patent terminate at a single connection to the function block 312 just as the concurrent USB connections in Dickens terminate at a single connection to a peripheral device (e.g., printer 182).

IPR2017-00864
Patent 7,523,243 B2

Thus, USB connections in Dickens between both of two hosts 105 (or upstream ports) and the printer 182 are established and remain so as data exchanges may alternate among the two hosts and, hence, are "concurrent USB connections" because they "operate or occur at the same time once established."

> iii.    *"Concurrent Dedicated USB Connections"*

As discussed *supra*, we construe a "dedicated" USB connection to be "a USB connection that may include some shared physical communication path and includes a buffer for maintaining dedicated address, configuration and response information for the connection."  Patent Owner argues the Petition fails to show "dedicated" USB connections in Dickens because printer 182 (identified in the Petition as an exemplary function block) "has only one connection to the data router, i.e., 'USB connection 109.'"  PO Resp. 40 (citing Ex. 1003, 6:66–67).  By contrast, Patent Owner argues the "dedicated" connections of the '243 patent require two separate, distinct, physical connections from each of two hosts to the single function block. and again provides the same annotated version of its Figure 2, reproduced and discussed *supra*, to explain the difference.  *Id.* at 41–43.  Therefore, Patent Owner contends there are no "dedicated" connections in Dickens because the single path 109 is a shared portion of the connection used for both hosts to communicate with printer 182 and, thus, there is no dedicated USB connection between each host and the function block (e.g., printer 182).  *Id.* at 42–43.

IPR2017-00864
Patent 7,523,243 B2

We are persuaded by Petitioner's arguments.  Petitioner contends, and we agree, Patent Owner's arguments are based on an incorrect understanding of "dedicated" connection.  Reply. 17–18.

To clarify Petitioner's position, Petitioner provides two side-by-side annotated figures (Pet. Sur-Sur-Reply 10) that we reproduce below.[24]



The figure on the left is Figure 3 of the '243 patent with red and purple annotations added by Patent Owner showing two alleged "dedicated USB connections"—a first highlighted in red from the first host to device/function block 312 and a second highlighted in purple from the second host to block 312.  PO Sur-Reply 9.  On the right above, Petitioner

---

[24] Petitioner provided the annotated side-by-side figures in rebutting Patent Owner's arguments regarding "concurrency" of the USB connections.  See Sur-Sur-reply 9–10.  However, we find the figures instructive in helping to explain Petitioner's arguments regarding all aspects of "concurrent dedicated USB connections."

59

IPR2017-00864
Patent 7,523,243 B2

provides a similarly highlighted portion of Figure 2 from Dickens showing a first dedicated USB connection, highlighted in red, from a first host to printer 182 and a second dedicated USB connection, highlighted in purple, from a second host to printer 182.[25]  Pet. Sur-Sur-Reply 9–10.

The annotations highlight that both the '243 patent and Dickens provide two "dedicated" USB connections from corresponding two hosts to a function block both ending in a single shared communication path to the function block.  Thus, the USB connections of Dickens meet the first portion of our interpretation "a USB connection that may include some shared physical communication path."

Additionally, as discussed further below, Dickens' controller 140 include DRAM memory 144 used as a buffer for the connections in accordance with the second portion of our construction of a "dedicated" connection "includes a buffer for maintaining dedicated address, configuration and response information for the connection."

Accordingly, we are persuaded that Dickens teaches that its concurrent USB connections are "dedicated" concurrent USB connections within the scope of our interpretation of "dedicated" connections.

---

[25] We note the red and purple highlighted path move off the figure to the right to, and back from, Dickens' controller 140 in its Figure 2 but Petitioner has excerpted only the portion relevant to demonstrating dedicated connections similar to those of the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

    *c.*     *Conclusion Regarding Independent Claims 1, 3, and 7*

For the reasons discussed above, we are persuaded by a preponderance of the evidence that independent claims 1, 3, and 7 are anticipated by Dickens.

        *3.*     *Claim 23*

Claim 23 recites, "a shared USB device block operable to be simultaneously configured by two or more USB hosts." Patent Owner argues the Petition fails to identify where this element is taught in Dickens and, instead, merely treats claim 1 as representative of all the independent claims. PO Resp. 43 (citing Pet. 59). However, Patent Owner argues claim 23's recitation of "a shared USB device block operable to be simultaneously configured by two or more USB hosts" is a substantive difference over claim 1. *Id.* Each host 105 in Dickens is coupled with a corresponding converter 110 to emulate all peripheral device coupled to routing device 100. *See* Ex. 1003, 5:26–53. Patent Owner argues our reliance on the emulated printers as being configured simultaneously is misplaced. *Id.* at 44 (citing Dec. 31–32). Patent Owner contends the emulated devices are separate from the physical peripheral devices (e.g., printer 182 in Dickens) that are relied upon as the recited "shared device block" of claim 23. *Id.* Patent Owner further contends the emulated printers provided to each host 105 of Dickens by corresponding converters 110 are "enumerated, thus configured, independently from printer 182." *Id.* (citing Ex. 2007 ¶ 110).

Petitioner argues in its Reply that hosts 105 enumerate/configure emulated printers and "host controller" 156 enumerates/configures printer 182. Reply 18–19. Specifically, Petitioner contends, "[H]aving configured

IPR2017-00864
Patent 7,523,243 B2

the emulated printer, insofar as the host can sense, it has configured the printer, emulated and actual/physical.  Put another way permitted by 23's language, hosts have, by emulation, configured the printer." *Id.* at 19.

We are persuaded by Patent Owner's arguments.  Even if Petitioner's arguments in its Reply are persuasive, Patent Owner correctly observes that the Petition did not present any arguments specific to the substantive differences between claim 23 and claim 1—namely that the function block need be operable to be "simultaneously configured by two or more hosts." PO Resp. 43.

Furthermore, we are not persuaded by Petitioner's arguments in its Reply.  In essence, Petitioner appears to be arguing that hosts 105, configuring their respective emulated printers (through emulation by translators 110), are unaware whether they are configuring emulated printers or the actual/physical printer 182.  Accepting that as true, it is not the case that two such host are actually configuring the physical printer 182 (read as the shared function block) simultaneously.  They may configure the emulated printers simultaneously but we have insufficient persuasive evidence that that is the same as configuring the shared function block (physical printer 182) simultaneously.

Accordingly, we are not persuaded by a preponderance of the evidence that independent claim 23 is unpatentable as anticipated by Dickens.

### 4.    *Claim 18*

Patent Owner argues the "shared USB device" is construed in our Decision on Institution as "a USB device that may be simultaneously

62

IPR2017-00864
Patent 7,523,243 B2

configured and accessed by two or more USB hosts" and that further must have "three blocks, the third of which is a function block." PO Resp. 45–46; *see also* Dec. 11. Patent Owner further argues the only function block the Petition identified in Dickens is printer 182. *Id.* Patent Owner then contends, "The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously configure and access printer 182. Knapen ¶ 108. As discussed above, enumeration of the emulated printers are separate activities from the enumeration of printer 182." *Id.* Therefore, Patent Owner argues claim 18 is not anticipated "because Dickens does not have 'a USB device that may be simultaneously configured and accessed by two or more USB hosts,' as required by the Board's construction of 'shared USB device.'"

We are not persuaded by Patent Owner's argument. Initially, we observe that claim 18 does not require that the function block be simultaneously configured or enumerated, or even simultaneously accessed. Instead, it recites the step of receiving requests to the shared USB device (the "device" not the "function block" per se) and the step of processing those requests without any of the hosts needing to reconfigure the USB device each time (again referring to eh "device" rather than the function block). Other than the recitation that the shared USB device corresponds to a function, there is no reference to accessing the function. As discussed *supra*, we construe "shared USB device" in claim 18 to refer to the device rather than the function. *See* section II.A.4.c.

We are persuaded by a preponderance of the evidence that independent method claim 18 is unpatentable as anticipated by Dickens.

IPR2017-00864
Patent 7,523,243 B2

5.    *Dependent Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25*

Dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claims.  Petitioner identifies the further limitations of each of dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 in the disclosures of Dickens.  Pet. 60–63.

*a.    Claims 2, 6, 16, and 25*

Claims 2, 6, and 16, depend, directly or indirectly, from claims 1, 3, and 7, respectively, and each recites endpoint buffers positioned between respective upstream ports (or hosts) and the controller (e.g., endpoint & status 306 and 308 between upstream ports 302 and 304, respectively, and controller 108 in Figure 3 of the '243 patent).  Claim 25, dependent from claim 23, recites such buffers but does not recite their being positioned in any particular relationship to the hosts and controller.

The Petition contends, in Dickens, "DRAM memory 144 is coupled between the upstream ports and Dickens' device's data routing controller 140" thereby meeting the claim limitation.  Pet. 59.

As drawn in Dickens' Figure 2, DRAM memory 144 is not positioned physically between controller 140 and upstream ports (e.g., USB controllers 150).  Patent Owner argues precisely this physical difference contending DRAM memory 144 is not between controller 140 and the upstream ports, instead, "DRAM 144 is actually inside the multi-host device controller (i.e., routing controller 140)."  PO Resp. 46–47.

Petitioner argues "coupled between" should be construed to include "directly or indirectly connected" as coupled is defined in the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

Reply 13 (quoting Ex. 1001, 3:36–38).  Petitioner supports this assertion citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310–11 (Fed. Cir. 2005) (A "'connection' can occur between . . . two devices regardless of whether they are housed separately or together.  Indeed, the two components could be connected . . . and still be located in the same housing or even on the same circuit board.").  Reply 13.  Petitioner concludes that "coupled between" should be understood to mean "directly or indirectly connected with or without physical separation from what is connected."  *Id.*

Patent Owner argues that, although "coupled" is defined in the '243 patent as directly or indirectly connected, "between" should have its plain and ordinary meaning and, thus, "one of ordinary skill would understand the endpoint buffer 'coupled between' the upstream port and the multi-host device controller is directly or indirectly connected in the middle of those two structures."  PO Sur-Reply 11.

We are not persuaded by Petitioner's argument and we agree with Patent Owner that, based on the plain and ordinary meaning of "coupled between," Dickens DRAM memory 144 is not "coupled between" controller 140 and upstream ports.  "Between" provides a specific structural limitation in these claims that cannot be ignored.  Thus, we are not persuaded that claims 2, 6, and 16 are anticipated by Dickens.

Although claim 25 does not require the buffers be "coupled between" any other elements, for the reasons discussed *supra* regarding claim 23 from which claim 25 depends, we are not persuaded claim 25 is anticipated by Dickens.

IPR2017-00864
Patent 7,523,243 B2

> c.    *Claims 4, 17, 22, and 24*

Claims 4, 17, 22, and 24 depend, directly or indirectly, from claims 1, 7, 18, and 23, respectively.  Claim 4 generally recites that the function is not re-enumerated each time a switch is made between hosts.  Claims 17, 22, and 24 further recite that the controller maintains address, configuration, and response ("ACR") information for each connected host.

The Petition asserts claims 4, 17, 22, and 24 "repeat in various phrasings the non-re-configuring and non-reenumerating of claim 1." Although claim 4 may relate to this feature, claims 17, 22, and 24 include no such recitations.  The Petition argues, "Dickens thereby discloses that the multi-host device controller allows the hosts to alternately access the USB function block without reconfiguring and/or re-enumerating the USB multi-host device each time the hosts alternate accessing the USB function block that is the Dickens printer"  Pet. 61 (citing Ex. 1023 ¶ 118).

Patent Owner argues:

> Petitioner fails to explain or identify any disclosure in Dickens where routing controller 140 "maintain[s] respective dedicated address, configuration, and response information for each of the plurality of hosts."  Rather, Petitioner merely rehashes the "non-re-configuration and non-reenumerating" argument of Claim 1 without specifically identifying in Dickens where the additional limitations of these dependent claims are allegedly found. Petition at 60–61.  The only Dickens passage Petitioner cites is column 9, lines 20–35.  *See id.*  Neither this passage—nor anything else in Dickens—expressly discloses the multi-host device controller (i.e., routing controller 140) maintaining address, configuration, and response information for each of the hosts.  And to the extent, Dickens might maintain address, configuration, and response information, it might do so outside of the "multi-host device controller."  Dickens does not, therefore, anticipate Claims 17, 22, and 24.

66

PO Resp. 48.

Petitioner argues "maintaining" the recited ACR information equates with "establishing a dedicated connection 'without needing [the device] to be re-configured or re-enumerated . . . .'" Reply 15 (quoting Ex. 1001, 2:33–37).

We are not persuaded by Petitioner's argument. Regarding claims 17, 22, and 24, we agree with Patent Owner that the Petition fails to identify where Dickens teaches that the controller maintains the recited ACR information. Petitioner's argument in its Reply attempts to construe the recited element so as to coincide with the Petition's arguments directed to re-enumeration and reconfiguration. We discern no need for construction of the recited element beyond its plain meaning—namely that the control maintains the recited ACR information. Although the recitation may be inherent or suggested in Dickens, the Petition simply fails to identify an express teaching of this feature in Dickens. Thus, we are not persuaded by a preponderance of the evidence that claims 17, 22, and 24 are anticipated by Dickens.

Regarding claim 4, we are persuaded by a preponderance of the evidence that the claim is unpatentable as anticipated by Dickens.

### d. Claims 5, 8, 11, 15, 19, and 20

The Petition identifies the features of these dependent claims in Dickens (Pet. 61–62) and Patent Owner does not rebut these assertions (*see* PO Resp.). We are persuaded by a preponderance of the evidence that claims 5, 8, 11, 15, 19, and 20 are anticipated by Dickens.

IPR2017-00864
Patent 7,523,243 B2

F.    *Obviousness over Either Furukawa or Dickens, and Chen*

The Petition asserts dependent claims 9, 11–14, and 21 are
unpatentable as obvious over either Furukawa or Dickens, in combination
with Chen.  Pet. 63–69.  Claims 9 and 11–14 depend (directly or indirectly)
from claim 7, and claim 21 depends from claim 18.  Claims 9, 11, 12, and 21
recite limitations relating to interleaving processing of requests received
from USB hosts.  Claims 13 and 14 recite limitations relating to distribution
of bandwidth in processing of requests from multiple USB hosts.  Petitioner
relies on Chen, in combination with either Furukawa or Dickens, for
disclosing the interleaving and bandwidth related limitations.  *Id.*

In view of our findings *supra* regarding Furukawa, we do not further
consider the alternative of Furukawa in combination with Chen because the
Petition does not rely on Chen for any deficiency of Furukawa discussed
*supra*.

1.    *Chen (Ex. 1005)*

According to Chen, USB flash memory devices that operate as disk
drives to a personal computer ("PC") are each assigned a drive letter by the
PC operating system software.  Ex. 1005, 1:47–57.  Chen further discloses
that several such flash memory USB drives may be added to a PC using
USB hubs to expand the number of USB devices accessible to the PC.  *Id.* at
1:19–20.  However, according to Chen, the number of such flash memory
drives could exceed the number of possible drive letters in the PC operating
system.  *Id.* at 1:58–67.  Chen purports to resolve this problem by providing
an enhanced USB hub capable of operating as a standard USB hub or, in a
"single-endpoint mode" of operation, as an enhanced hub that aggregates

68

IPR2017-00864
Patent 7,523,243 B2

downstream USB flash memory disk drives into one logical USB endpoint
as detected by the PC operating system and hence as a single device or drive
letter.  *Id.* at 2:53–64.

Chen's Figure 2, reproduced below, is a block diagram of a USB
switch that aggregates multiple flash memory endpoints coupled thereto into
a single endpoint for the USB host (PC).  *Id.* at 2:13–14.



FIG. 2

Figure 2 depicts USB switch 30 coupled with USB host 10 through USB
controller 12 to receive and process requests over USB bus 18.  *Id.* at 2:53–

69

IPR2017-00864
Patent 7,523,243 B2

57.  Mode logic 26 controls switch 30 to selectively operate in the single-
endpoint mode.  *Id.* at 2:59–61.

> When operating in single-endpoint mode, USB switch **30**
> acts as the final USB endpoint for transactions on USB bus **18** to
> host **10**.  USB switch **30** generates USB transactions on hidden
> USB buses **28** to USB flash storage blocks **22, 23, 24**.  USB flash
> storage blocks **22, 23, 24** respond to USB switch **30** over hidden
> USB buses **28** with USB switch **30** acting as the USB host on
> hidden USB buses **28**.  USB switch **30** then forwards data to host
> **10** by acting as the endpoint.  Thus[,] USB flash storage blocks
> **22, 23, 24** are hidden from host **10** when mode logic **26** activates
> the single-endpoint mode.

*Id.* at 3:5–14.

Chen further discloses that, when operating in the single-endpoint
mode to aggregate multiple flash memory drives into a single endpoint,
transaction packets may be re-ordered.  *Id.* at 3:63–66.  For example,
"Rather than have all packets for a first transaction complete before the next
transaction begins, packets for the next transaction can be re-ordered by
USB switch **30** and sent to the memory devices before completion of the
first transaction."  *Id.* at 4:2–6.  Chen's Figure 5 shows exemplary re-
ordering of transaction packets and Chen discloses that "[d]ata throughput
can be improved using such packet re-ordering."  *Id.* at 5:49–50.

### 2.   *Motivation to Combine Dickens and Chen*

Petitioner identifies motivation for the proposed combination by
referring to "rationales (D) and (G) of MPEP 2143."  Pet. 63 (citing Ex.
1023 ¶¶ 123–141).  As discussed in our Decision on Institution, to the extent
that arguments are found only in the Declaration of Mr. Garney, we

IPR2017-00864
Patent 7,523,243 B2

determine those arguments are improperly incorporated by reference
(37 C.F.R. § 42.6(a)(3)), and we decline to consider them.

However, Petitioner also argues that the ordinarily skilled artisan
would have been motivated to combine Chen's interleaving with Dickens'
system because Chen's known techniques of interleaving USB host
transactions would improve throughput in the similar system of Dickens in a
similar manner and because Chen specifically teaches its interleaving
technique improves data throughput. Pet. 66–67. Specifically, Petitioner
contends it would have been obvious to improve throughput for any or all of
multiple USB hosts sending transactions to USB peripheral devices in
Dickens by adding Chen's interleaving features to Dickens' data router. *Id.*
Petitioner further contends the ordinarily skilled artisan would have
recognized that "interleaving transactions from two or more hosts is not
different than interleaving transactions from one host." *Id.* at 67.

Patent Owner argues the ordinarily skilled artisan would not have
been motivated to combine Dickens and Chen because "1) Dickens
expressly teaches away from a combination with Chen, 2) combining Chen
with Dickens would render Dickens inoperable, and 3) Petitioner's proposed
combination does not improve Dickens, does not apply Chen's
'improvement' technique in the same way as it is used in Chen, and does not
result in predictable results." PO Resp. 49–50. We address each argument
in turn.

 a. *Dickens Does Not Teach Away From Chen's Interleaving*
Patent Owner argues Dickens teaches sharing a printer among
multiple hosts relying on a timeout period to determine when to switch

71

IPR2017-00864
Patent 7,523,243 B2

between host requests and, thus, teaches away from Chen's interleaving of print data from multiple hosts.  PO Resp. 51–52.

Petitioner argues Dickens teaches connecting a plurality of hosts to any number of peripheral devices.  Reply 24.  Although a printer as an exemplary peripheral device is discussed with respect to other aspects of the Petition, Petitioner argues the combination with Chen was proposed based on a mass storage device, such as in Chen and as identified in the '243 patent, as the shared peripheral.  *Id.* (citing Ex. 1001, 2:23–24, 4:7).

Petitioner correctly argues that a teaching away must clearly discredit or discourage the proposed combination.  Reply 23; *see In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *see also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed . . . .").  Dickens does not clearly discredit Chen's interleaving approach.  The timeout features to switch between host print jobs is disclosed in Dickens only for sharing of a printer peripheral device. Other peripheral devices, such as speakers 180, need not use timeouts.  Mr. Garney, Petitioner's expert, testifies that Chen's interleaving may be beneficially used to interleave multiple hosts sending transactions to other types of peripheral devices such as Dickens' speakers 180.  Ex. 2006, 135:7–22.  Mr. Garney further testifies that Chen's interleaving may be beneficially applied to interleave print jobs for certain types of printer generating a small volume of printed output such as a label printer.  *Id.* at 136:16–25.

72

IPR2017-00864
Patent 7,523,243 B2

Thus, we are persuaded that Dickens' exemplary use of a printer as a shared peripheral device does not discredit or discourage use of Chen's interleaving and, thus, does not teach away from the proposed combination.

          b.     *Combination Does Not Render Dickens Inoperable*

Patent Owner argues combining Chen with Dickens renders Dickens inoperable because Chen teaches interleaving transactions (that comprise multiple packets) by interleaving the multiple packets of multiple transactions, each destined to different downstream device—i.e., a different downstream memory device. PO Resp. 53. Patent Owner argues this is only because, in Chen, each downstream memory device would receive packets destined to the device in the proper sequence. *Id.* By contrast, Patent Owner argues, where the destination is a single device, the interleaving of packets from different host transactions (such as multiple hosts sharing a single peripheral device as in Dickens) would risk packets arriving out of sequence, thus, violating USB protocols and rendering the combination inoperable. *Id.* at 53–54.

Petitioner argues Patent Owner's arguments are based on a hypothetical out of order sequence of interleaved packets but Chen does not disclose such a sequence. *See* Reply 25–26.

We are persuaded by Petitioner's arguments. Chen's Figure 5 depicts an exemplary sequence of re-ordering received packets for two transaction from one host. The description of Figure 5 explains a carefully designed sequence of operations to enable interleaving of packets of a transaction in a manner that precludes out of order packets. *See* Ex. 1005, 4:62–5:54. This specific sequence need not be applied by rote in the proposed combination

73

IPR2017-00864
Patent 7,523,243 B2

with Dickens and, thus, Patent Owner's hypothetical inoperability arises from rote bodily incorporation of the references. "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements. . . . Rather, the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." *In re Mouttet*, 686 F.3d 1322, 1332–33 (Fed. Cir. 2012); *see also MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 (Fed. Cir. 2015) ("[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference" (citation omitted)), *cert. denied*, 137 S. Ct. 292 (2016). We are persuaded by Petitioner's arguments that the ordinarily skilled artisan, with knowledge of the USB specification and experience in the design of USB devices, would have understood how to apply the suggestions of Chen to interleave transactions in the context of Dickens' multiple hosts accessing a shared peripheral device.

### c.   *Combining Chen With Dickens Improves Dickens*

Patent Owner argues the proposed combination does not improve Dickens because the combination renders Dicken inoperable. PO Resp. 55. For the reasons discussed *supra*, we disagree. The proposed combination does not render Dickens inoperable.

Patent Owner further argues the Petition fails to explain how Chen's interleaving improves Dickens because "Chen's system is fundamentally different." *Id.* Patent Owner argues, "Chen is a switch between a single host and multiple downstream devices whereas Dickens' is a switch between

IPR2017-00864
Patent 7,523,243 B2

multiple hosts and a single device." *Id.* Patent Owner contends, "[t]o the extent one of ordinary skill could find some way to make the combination operable, it would have to be in some way other than as described in Chen." *Id.* at 56.

Petitioner argues the alleged fundamental difference is incorrect because Chen discloses a single device made up of blocks. Reply 27.

We are persuaded by Petitioner's arguments. Figure 5 of Chen describes the interleaving of packets for multiple transactions when operating in its disclosed "single-endpoint" mode of operation in which the host sees the multiple memory devices as a single USB device. *See* Ex. 1005, 2:59–3:4. As above, an ordinarily skilled artisan, with knowledge of the USB specification and experience designing USB devices, would have understood that Chen's two interleaved transactions could be two transactions from two separate hosts as in Dickens. Thus, we are persuaded that the proposed combination would have been operable and that the improvements of Chen's interleaving would have been suggested to the ordinarily skilled artisan to improve throughput of multiple transactions from multiple hosts directed to a shared, single-endpoint, peripheral device.

> d.    *Conclusion Regarding Motivation to Combine Dickens and Chen*

For the reasons discussed below, we are persuaded Petitioner has provided a sufficient reason/motivation for the combination of Chen's interleaving with Dickens' device to improve throughput based on rational underpinnings.

IPR2017-00864
Patent 7,523,243 B2

> 3.      *Claims 9, 11–14, and 21 Obvious Over Dickens and Chen*

Patent Owner does not respond to Petitioner's substantive arguments regarding obviousness of claims 9, 11–14, and 21.  We are persuaded by a preponderance of the evidence that claims 9, 11–14, and 21 would have been obvious over the combination of Dickens and Chen.

> G.      *Obviousness over Either Furukawa or Dickens and USB 2.0*

In this asserted ground, Petitioner argues, in its entirety:

> Just as either Furukawa or Dickens in view of Chen invalidates claims 9, 11–14, and 21, as in ground 3, either Furukawa or Dickens in view of USB 2.0 invalidates claims 9, 11–14, and 21.  USB 2.0 also has interleaving, as does Chen. Garney-¶¶ 20, 142-148.  See also Garney '190 E1019-1:52-2:7.

Pet. 70.

Contrary to our rules, Petitioner's assertions in this ground improperly incorporate by reference discussion from Mr. Garney's Declaration.  37 C.F.R. § 42.6(a)(3).  We do not consider such improperly incorporated arguments from another document.  The arguments presented within the Petition are inadequate to identify where each element is taught or suggested in the prior art.  *See* 37 C.F.R. § 42.104(b)(4) ("[t]he petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon").

Thus, Petitioner has not shown, by a preponderance of the evidence, that claims 9, 11–14, and 21 are unpatentable as obvious over either Furukawa or Dickens in combination with USB 2.0

IPR2017-00864
Patent 7,523,243 B2

>    H.    *Obviousness over Wurzburg, Osakada, and*
>         *Either Furukawa or Dickens*

For this ground, the Petition asserts, "Bohm claims 1-25 are invalid for obviousness over *Wurzburg in view of Osakada, as in prosecution*, in view of either Furukawa or Dickens."  Pet. 70 (emphasis added).  We observe Wurzburg and Osakada were not asserted as a combination during prosecution of this patent application or in prosecution of the parent patent application.  In the last Office Action before allowance of the parent patent application, Wurzburg was applied as an anticipatory reference to claims 1, 3–5, 7–9, 11, 12, 15, and 17–24 and applied in a single reference obviousness rejection for dependent claims 2, 6, 16, and 25.[26]  *See* Ex. 1014, 12, 25–30.  In an earlier Office Action in the parent patent application's prosecution, Osakada was applied in both an anticipation rejection and a single reference obviousness rejection.  *Id.* at 51–56.  Even if such prior Office Actions were properly incorporated by reference, Petitioner has not identified, nor do we discern, anywhere in the record where Wurzburg and Osakada have been previously applied in combination for an obviousness rejection.  Thus, the Petition fails to "specify where each element of the claim is found in the prior art patents or printed publications relied upon" as required by our rules.  37 C.F.R. § 42.104(b)(4).

Petitioner further argues the combination of Wurzburg and Osakada "lacked only concurrent connections as opposed to non-concurrent connections, simultaneous access instead of non-simultaneous access, and non-reconfiguring during access, as opposed to configuring during access."

----

[26] As noted *supra*, the claims of the parent patent application are nearly identical to those of the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

Pet. 70.  Petitioner then asserts Furukawa teaches these missing features.  *Id.*
As discussed *supra*, we are not persuaded that Furukawa expressly or
inherently teaches these features.[27]  *Id.*

For at least the above reasons, Petitioner has not shown, by a
preponderance of the evidence that claims 1–25 are unpatentable as obvious
over Wurzburg in view of Osakada, and either Furukawa or Dickens.

### I.   *Obviousness over Either Furukawa or Dickens, Chen, and Other Art*

Petitioner's argument for this ground, in its entirety, reads:

> To any extent Bohm's owner asserts lack of anticipation
> of claims by Furukawa or Dickens, the claims are invalid for
> obviousness under 35 U.S.C. §103 from either Furukawa or
> Dickens, Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and
> all other cited art.  Both Furukawa and Dickens disclose a multi-
> host USB device with a USB multi-host device and controller,
> their structures, and associated connections and functionalities,
> that provide connections to USB devices by multiple hosts
> without re-enumeration and reconfiguration of the devices by the
> hosts.  To any extent the Bohm patent owner disagrees in any
> detail as to any of the independent and dependent claims, the
> disagreement will surely be as to known ("known") USB system
> structures and functionalities ("technology"), and then
> Furukawa, Dickens, Chen, Wuraburg [sic], Osakada, APA,
> Adder, USB 2.0, Lou, Fujita, and all the other cited art overcome
> the disagreement and teach and/or make obvious the owner-
> referenced technology.  USB 2.0 is especially thorough in
> explaining known USB system technology in all details of the
> Bohm claims.  It even states that it provides "architecture

---

[27] Petitioner is silent in this ground with respect to specific teaching in
Dickens to be added to the proposed combination of Wurzburg and Osakada.
Petitioner does not even attempt to incorporate by reference, however
improper, earlier arguments regarding teachings of Dickens to be added to
the proposed combination.

upgradeable to support multiple USB Host Controllers in a system," thereby suggesting multiple hosts. U-14-upgrade-path. Strong motivation to combine as necessary to provide what Bohm sought to provide, i.e., access of USB hosts in plural to USB device(s) without disconnection switching that caused device reconfiguration, B-1:65-2:5, was provided by Furukawa and Dickens, and also USB 2.0, Lou, and Fujita. Wurzburg and Adder disclosed devices just short of the Bohm claims by requiring switching, which was replaced in Furukawa and Dickens. Moving forward the next step as in all of Bohm, Furukawa and Dickens was strongly motivated by Furukawa, Dickens, Fujita, and Lou. No dependent claims of Bohm add patentable merit to any independent claim.

Pet. 71–72.

To the extent this ground is asserting obviousness over any combination with Furukawa, as discussed *supra*, we are not persuaded Furukawa expressly or inherently teaches the features of the '243 patent for which Petitioner relied on it earlier in the Petition.

To the extent this ground is asserting the combination of Dickens and Chen, that combination is addressed above.

To the extent this ground is asserting any combinations other than those addressed above, the analysis in this ground is inadequate to meet the requirements of our rules regarding the level of detail required. 37 C.F.R. § 104(b)(4).

Thus, Petitioner has not shown, by a preponderance of the evidence that claims 1–25 are unpatentable as obvious over the above-proposed combinations.

IPR2017-00864
Patent 7,523,243 B2

### *J.     Conclusion*

For the reasons discussed *supra*, we are persuaded by a preponderance of the evidence, that claims 1, 3–5, 7–9, 11–15, and 18–21 of the '243 patent are unpatentable.  Petitioner has not shown, by a preponderance of the evidence, that claims 2, 6, 10, 16, 17, and 22–25 are unpatentable.

### III.    MOTION TO EXCLUDE

Patent Owner timely objected (Paper 46) to Petitioner's Exhibit 1053 (Mr. Garney's Reply Declaration) and filed a Motion to Exclude (Paper 50, "Mot." or "Motion") moving to exclude Exhibit 1053 and Petitioner's Sur-Reply.  Patent Owner argues the Sur-Reply and Exhibit 1053 raise new arguments directed to inherency in the alleged anticipation of certain challenged claims by Furukawa. *See* Mot.

We are not persuaded by Patent Owner's argument.  As is discussed *supra*, we expressly found, and Petitioner confirmed, that it is not arguing inherency in its anticipation arguments but, instead, relies solely on what Petitioner argues are express disclosures of Furukawa.

Patent Owner further argues Petitioner's Sur-Reply should be excluded because, by incorporating portions of Exhibit 1053, the Sur-Reply attempts to circumvent the five-page limit as ordered when authorizing the Sur-Reply filing.

We remain unpersuaded by Patent Owner's argument.  The Sur-Reply cites to various portions of Mr. Garney's Reply Declaration (Ex. 1053) to support its arguments but does not attempt to incorporate the entirety of that declaration into its Sur-Reply.

IPR2017-00864
Patent 7,523,243 B2

For the above reasons, we are not persuaded that Petitioner's Sur-Reply or Exhibit 1053 should be excluded, and for the foregoing reasons, Patent Owner's Motion to Exclude is *denied*.

IPR2017-00864
Patent 7,523,243 B2

### III.   ORDER

After due consideration of the record before us, and for the foregoing reasons, it is:

ORDERED that claims 1, 3–5, 7–9, 11–15, and 18–21 of U.S. Patent No. 7,523,243 B2 are held *unpatentable*;

FURTHER ORDERED that claims 2, 6, 10, 16, 17, and 22–25 of U.S. Patent No. 7,523,243 B2 have *not* been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Petitioner's Sur-Reply (Paper 42) and Exhibit 1053 is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00864
Patent 7,523,243 B2

PETITIONER:

Scott A. McKeown
James L. Davis, Jr.
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
james.l.davis@ropesgray.com


PATENT OWNER:

Bruce W. Slayden II
Brian C. Banner
R. William Beard, Jr.
Truman H. Fenton
Jerry F. Suva
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
bbanner@sgbfirm.com
wbeard@sgbfirm.com
tfenton@sgbfirm.com
jsuva@sgbfirm.com

83



US007627708B2

(12) **United States Patent** (10) **Patent No.: US 7,627,708 B2**

Bohm et al. (45) **Date of Patent: *Dec. 1, 2009**

(54) **MULTI-HOST USB DEVICE**

(75) Inventors: **Mark R. Bohm**, Bear Creek, TX (US); **Atish Ghosh**, Austin, TX (US)

(73) Assignee: **Standard Microsystems Corporation**, Hauppauge, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/340,957**

(22) Filed: **Dec. 22, 2008**

(65) **Prior Publication Data**

US 2009/0106474 A1 Apr. 23, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/425,613, filed on Jun. 21, 2006, now Pat. No. 7,523,243.

(60) Provisional application No. 60/792,178, filed on Apr. 14, 2006.

(51) **Int. Cl.**
*G06F 13/00* (2006.01)
*G06F 13/14* (2006.01)
*G06F 13/36* (2006.01)

(52) **U.S. Cl.** ........................ **710/305**; 710/104; 710/110; 710/309

(58) **Field of Classification Search** ................. 710/104, 710/110, 305, 309
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,784,581 A 7/1998 Hannah

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2298783 9/2000

(Continued)

OTHER PUBLICATIONS

Belkin, "4×4 USB Peripheral Switch Review", Feb. 25, 2004, retrieved from Internet: http://www.everythingusb.com/hardware/index/Belkin_USB_Peripheral_Switch.htm, 4 pages.

(Continued)

*Primary Examiner*—Mark Rinehart
*Assistant Examiner*—Jeremy S Cerullo
(74) *Attorney, Agent, or Firm*—Meyertons Hood Kivlin Kowert & Goetzel, P.C.; Jeffrey C. Hood

(57) **ABSTRACT**

A USB device may be simultaneously configured and accessed by two or more USB hosts. The USB device may include separate upstream ports and buffers for each host, and a multi-host capable device controller configured to respond to simultaneous USB requests received from more than one host. The USB device may maintain a dedicated address, configuration, and response information for each host. The USB device may include a shared USB function block, and a multi-host controller configured to establish concurrent respective USB connections between the shared USB function block and two or more USB hosts, to allow the two or more USB hosts to simultaneously configure the USB device for the shared USB function. The multi-host controller may be configured to receive and respond to simultaneous respective USB access requests for the shared USB function sent by the two or more USB hosts.

**25 Claims, 2 Drawing Sheets**



**US 7,627,708 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,815,167 | A | 9/1998 | Muthal et al. |
| 5,890,015 | A | 3/1999 | Garney et al. |
| 5,953,511 | A | 9/1999 | Sescila, III et al. |
| 5,978,389 | A | 11/1999 | Chen |
| 6,119,196 | A | 9/2000 | Muller et al. |
| 6,141,719 | A | 10/2000 | Rafferty et al. |
| 6,145,045 | A | 11/2000 | Falik et al. |
| 6,185,641 | B1 | 2/2001 | Dunnihoo |
| 6,205,501 | B1 | 3/2001 | Brief et al. |
| 6,279,060 | B1 | 8/2001 | Luke et al. |
| 6,304,995 | B1 | 10/2001 | Smith et al. |
| 6,308,239 | B1 | 10/2001 | Osakada et al. |
| 6,324,605 | B1 | 11/2001 | Rafferty et al. |
| 6,435,904 | B1 | 8/2002 | Herbst et al. |
| 6,480,927 | B1 | 11/2002 | Bauman |
| 6,505,267 | B2 | 1/2003 | Luke et al. |
| 6,516,205 | B1 | 2/2003 | Oguma |
| 6,532,512 | B1 | 3/2003 | Torii et al. |
| 6,546,450 | B1 | 4/2003 | Liu |
| 6,564,275 | B1 | 5/2003 | Chen |
| 6,600,739 | B1 | 7/2003 | Evans et al. |
| 6,601,146 | B2 | 7/2003 | Auslander et al. |
| 6,618,776 | B1 | 9/2003 | Zimmermann et al. |
| 6,622,195 | B2 | 9/2003 | Osakada et al. |
| 6,671,765 | B1 | 12/2003 | Karlsson et al. |
| 6,678,760 | B2 | 1/2004 | Brief |
| 6,725,302 | B1 | 4/2004 | Benayoun et al. |
| 6,732,218 | B2 | 5/2004 | Overtoom et al. |
| 6,775,733 | B2 | 8/2004 | Chang et al. |
| 6,816,929 | B2 | 11/2004 | Ueda |
| 6,850,998 | B2 * | 2/2005 | Inoue et al. .................. 710/38 |
| 6,901,471 | B2 | 5/2005 | Govindaraman |
| 6,959,355 | B2 | 10/2005 | Szabelski |
| 6,973,078 | B2 | 12/2005 | Ma |
| 6,993,620 | B2 | 1/2006 | Ferguson |
| 7,024,501 | B1 | 4/2006 | Wright |
| 7,028,114 | B1 | 4/2006 | Milan et al. |
| 7,028,133 | B1 | 4/2006 | Jackson |
| 7,185,126 | B2 | 2/2007 | Szabelski |
| 7,246,189 | B2 * | 7/2007 | Ulenas ...................... 710/305 |
| 7,523,243 | B2 * | 4/2009 | Bohm et al. ................ 710/305 |
| 2004/0153597 | A1 | 8/2004 | Kanai et al. |
| 2005/0005045 | A1* | 1/2005 | Kim et al. .................... 710/74 |
| 2005/0060490 | A1* | 3/2005 | Lu ............................ 711/115 |
| 2005/0060636 | A1 | 3/2005 | Mathe |
| 2005/0216620 | A1 | 9/2005 | Sandulescu et al. |
| 2006/0020737 | A1 | 1/2006 | Szabelski |
| 2006/0056401 | A1 | 3/2006 | Bohm et al. |
| 2006/0059293 | A1 | 3/2006 | Wurzburg et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 982 663 A2 | 3/2000 |
| GB | 2352540 | 1/2001 |
| JP | 2000242377 | 9/2000 |
| JP | 2001043178 | 2/2001 |
| JP | 2001229119 | 8/2001 |
| JP | 2003195991 | 7/2003 |
| KR | 1020040008365 A | 1/2004 |
| KR | 100490068 B1 | 5/2005 |
| WO | WO 2006031776 | 3/2006 |

### OTHER PUBLICATIONS

Australian Patent Office Written Opinion for application No. SG 200702711-3, mailed May 21, 2008.

Human translation of JP 2001229119A Publication, "Device Selection Hubbox by Plural Computers" obtained on Jun. 23, 2008 (12 pages).

Programming Multi-Host Device Sharing USB Hub; Research Disclosure, IBM Corp.; Feb. 1, 1999; Mason Publications; Hampshire, GB.

"On-The-Go Supplement to the USB 2.0 Specification—Revision 1.0"; Dec. 18, 2001.

Cypress Semiconductor Corporation, "TetraHubTM High-speed USB Hub Controller," Publication No. CY7C6540, Dec. 5, 2002, 25 pages.

"USB Hub in a Nutshell"; Beyond Logic; Jun. 15, 2005 (Copyright 2001-2005); 5 Pages, Chapter 1.

Fred Zlotnick; "NLAS4717 Analog Switch Permits USB 1.1 Switching"; on Semiconductor; May 2004; 4 pages.

"FSUSB11 Low Power High Bandwidth USB Switch Dual SPDT Multiplexer/Demultiplexer"; Fairchild Semiconductor; Apr. 2004 (revised Jul. 2004); 7 pages.

"FSUSB11 Low Power Full Speed USB (12 Mbps) Switch"; Fairchild Semiconductor; Apr. 2004 (revised Jul. 2005); 9 pages.

"USB 1.1 Switch Offers Low Power and Bandwidth"; Electronic Design; Jul./Aug. 2004; 3 pages.

"Universal Serial Bus Specification Revision 2.0", Compaq Computer Corporation, Hewlett-Packard Company, Intel Corporation, Lucent Technologies Inc., Microsoft Corporation, NEC Corporation, Koninklijke Philips Electroncs N. V., Apr. 27, 2000, 650 pages.

USB2524 USB MultiSwitch Hub, http://www.smsc.com/main/catalog/usb2524.html, accessed Nov. 26, 2007 (4 pages).

"MSC Introduces Industry's First USB Sharing Hub," networking news, http://home.nestor.minsk.by/networks/news/2006/04/1706.html, accessed Nov. 26, 2007 (2 pages).

Miller, Matthew, "USB hub chip accepts hospitality of two hosts" http://www.edn.com/index.asp?layout=article &articleid=CA6325520&industryid=2573, Apr. 17, 2006, accessed Nov. 26, 2007 (5 pages).

"USB hub" from Wikipedia, the free encyclopedia (http://en.wikipedia.org?wiki/USB_hub); 2 pages.

"USB2.0 Compatible 4-Port Switching Hub with Two Upstream Host Ports"; SMSC Datasheet; Nov. 8, 2005; 26 pages; Standard Microsystems Corp.; Hauppauge, NY.

Computer-generated translation of JP2001229119A Publication, "Device Selection Hubbox by Plural Computers", by Hitachi Ltd., published Aug. 24, 2001, 21 pages.

Human-generated translation of JP20011229119A Publication, "Device Selection Hubbox by Plural Computers", by Hitachi Ltd., published Aug. 24, 2001, 2 pages.

Korean Office Action for Application 10-2007-7005961, entitled "Universal Serial Bus Switching Hub," dated Apr. 18, 2008, 5 pages.

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 3*

US 7,627,708 B2

**1**
**MULTI-HOST USB DEVICE**

PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 11/425,613 titled "Multi-Host USB Device Controller" filed Jun. 21, 2006, now U.S. Pat. No. 7,523,243 whose inventors are Mark R. Bohm and Atish Ghosh, which claims benefit of priority of provisional application Ser. No. 60/792,178 titled "Multi-Host USB Device Controller", filed on Apr. 14, 2006, whose inventors are Mark. R Bohm and Atish Ghosh, and which are all hereby incorporated by reference in their entirety as though fully and completely set forth herein.

BACKGROUND OF THE INVENTION

1. Field of the Invention
The present invention relates generally to computer hardware and, more specifically, to Universal Serial Bus (USB) controllers.
2. Description of the Related Art
The Universal Serial Bus (USB) allows coupling of peripheral devices to a computer system. USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices. The bus allows peripherals to be attached, configured, used, and detached while the host is in operation. For example, USB printers, scanners, digital cameras, storage devices, card readers, etc. may communicate with a host computer system over USB. USB based systems may require that a USB host controller be present in the host system, and that the operating system (OS) of the host system support USB and USB Mass Storage Class Devices.

USB devices may communicate over the USB bus at low-speed (LS), full-speed (FS), or high-speed (HS). A connection between the USB device and the host may be established via digital interconnect such as Interchip USB, ULPI, UTMI, etc., or via a four wire interface that includes a power line, a ground line, and a pair of data lines D+ and D−. When a USB device connects to the host, the USB device may first pull a D+ line high—or the D− line if the device is a low speed device—using a pull up resistor on the D+ line. The host may respond by resetting the USB device. If the USB device is a high-speed USB device, the USB device may "chirp" by driving the D− line high during the reset. The host may respond to the "chirp" by alternately driving the D+ and D− lines high. The USB device may then electronically remove the pull up resistor and continue communicating at high speed. When disconnecting, full-speed devices may remove the pull up resistor from the D+ line (i.e., "tri-state" the line), while high-speed USB devices may tri-state both the D+ and D− lines.

A USB hub may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller. In addition, other USB hubs may be coupled to the USB hub to provide additional USB device connections to the USB host controller. In general, the USB specification is structured so that every device is configured and accessed by a single host controller. Consumers typically desire maximum flexibility, and may want to have a simple means by which to cheaply share devices. There are several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time. There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solu-

tions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch. The USB device is typically accessed by one single host at a time, and when access to the USB device is switched, the device must be re-configured, thereby losing internal state information.

Other corresponding issues related to the prior art will become apparent to one skilled in the art after comparing such prior art with the present invention as described herein.

SUMMARY OF THE INVENTION

In one set of embodiments, a single USB device may be shared across multiple USB hosts without needing to be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device. Since each host has simultaneously enumerated the device, there may be no need to detach and reconfigure the device on the fly. Multiple USB hosts may simultaneously share a single device/function, for example a Gigabit Ethernet controller. While in most present day implementations each host that is configured to have Ethernet access is implemented with its own Ethernet controller and Ethernet switch, in various embodiments of the present invention the Ethernet switch may be replaced by a less expensive and more compact multi-host USB controller, allowing each host to access the USB device directly. In another set of embodiments, storage media devices may be configured with a multi-host USB controller to provide a USB based Network Attached Storage (NAS) device that can handle storage requests from multiple USB hosts.

In various embodiments, by using a multi-host capable device controller, a shared USB device may be simultaneously configured and accessed by two or more USB hosts. The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host. The device may maintain a dedicated address, configuration and response information for each host. Each host may therefore establish a dedicated USB connection with the sharing device.

A USB device may be divided into three segments or blocks. The first block may comprise a USB interface that includes the physical (PHY) or digital link, USB Link layer (SIE), and other circuitry necessary to send and/or receive data over the USB. The second block may comprise an End-point Buffer Block, which may include the endpoint buffers that are used by the first and third blocks to buffer data and control reads and writes to/from the USB—transferred through the first block—and/or the Peripheral Function—transferred through the third block. The third block may comprise the "Peripheral Function" itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc.

In one set of embodiments, the first block may be replicated for each upstream host port, and some, or all, of the second block may be replicated for each upstream host port as well. In each case, the extent to which blocks and/or portions of the blocks are replicated may vary based on USB device type. The third block may correspond to the USB device that will be shared by multiple USB hosts, and may therefore not need to be duplicated. A fourth block may be added—typically between the first and second blocks, or as part of either the second or third blocks—configured as an arbitration block. The internal arbitration mechanism may enable each host to access the shared Peripheral Function by either interleaving host accesses, or by using a common request/grant structure, which may hold-off one host while another host completes a

US 7,627,708 B2

**3**

data transfer to/from the shared device. The selection of the specific mechanism used may be determined according to the specific USB device type that is being shared.

In some embodiments, the bandwidth from the shared peripheral function to each host may be reduced in order to allow each host equal access. In other embodiments, the bandwidth may not be reduced because the bandwidth of the Peripheral Function may exceed the bandwidth of the host. Other aspects of the present invention will become apparent with reference to the drawings and detailed description of the drawings that follow.

BRIEF DESCRIPTION OF THE DRAWINGS

A better understanding of the present invention may be obtained when the following detailed description is considered in conjunction with the following drawings, in which:

FIG. 1 shows a system diagram of a multi-host capable USB device coupled to multiple hosts according to one embodiment;

FIG. 2 shows multi-host capable devices coupling to multiple hosts according to one embodiment; and

FIG. 3 shows a logic diagram of a USB multi-host device according to one embodiment.

While the invention is susceptible to various modifications and alternative forms, specific embodiments thereof are shown by way of example in the drawings and will herein be described in detail. It should be understood, however, that the drawings and detailed description thereto are not intended to limit the invention to the particular form disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present invention as defined by the appended claims. Note, the headings are for organizational purposes only and are not meant to be used to limit or interpret the description or claims. Furthermore, note that the word "may" is used throughout this application in a permissive sense (e.g., having the potential to or being able to in some embodiments), not a mandatory sense (i.e., must). The term "include", and derivations thereof, mean "including, but not limited to". The term "coupled" means "directly or indirectly connected".

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In one set of embodiments, a multi-host USB device may provide maximum flexibility and a simple means by which to cheaply share devices with multiple hosts, by providing a separate configuration and access interface for each upstream host. FIG. 1 illustrates a block diagram of a multi-host device 106 configured with a USB multi-host device controller 108, with multi-host device 106 coupled to first host 102 and second host 104, which may both establish control with multi-host device 106. As shown in FIG. 2, by way of examples, multi-host device 106—configured with USB multi-host device controller 108—may be a personal digital assistant (PDA) 130, a keyboard 126, and/or a printer 120 shared by personal computer (PC) 122 and PC 123. Many other devices may be similarly configured as multi-host devices that include a multi-host device controller 108, and the number and type of such devices is not limited to those show in FIG. 2.

In one embodiment of multi-host (or USB sharing) device 106, shown in FIG. 3, an upstream port or PHY is configured for each host to be connected. In this case upstream port 302 is configured to interface/couple to the first host (for example first host 102 shown in FIG. 1), and upstream port 304 is

**4**

configured to interface/couple to the second host (for example second host 104 shown in FIG. 1). Multi-host device 106 may be addressed separately by each host, and may respond to each host within USB specified limits. Multi-host device controller 108 may internally determine which host request to fully service immediately, and may either send not-ready packets in a USB specific manner to the other host, or may interleave the host requests. Peripheral Device/Function 312—which may comprise the main consumer component, such as a Ethernet Controller, Mass-Storage drive, etc.—may not be aware of the multi-host capability of the USB component, and may be a standard off-the-shelf item.

Multi-host device 106 may also be configured with endpoint and status buffers 306 and 308, coupling USB multi-host device controller 108 to PHY 302 and PHY 304, respectively. Endpoint buffers 306 and 308 may be used by upstream ports 302 and 304, and USB multi-host device controller 108 to buffer data and control reads and writes to/from each respective host corresponding to PHY 302 and PHY 304, and/or peripheral device/function 312 coupled to USB multi-host device controller 108.

In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312. The selection of the specific mechanism used may be configured according to the specific USB device type that is being shared. In one set of embodiments, the bandwidth from shared peripheral device/function 312 to each host may be reduced in order to allow each host equal access. In other embodiments, the bandwidth may not be reduced if the bandwidth of the peripheral function exceeds the bandwidth of the host.

It should be noted that while FIG. 3 shows 2 upstream ports coupling to two hosts, alternate embodiments may be configured with more than two upstream ports, (and correspondingly with possibly more than two endpoint and status buffers), and while those embodiments are not shown, they are possible and are contemplated. For example, a multi-host device (e.g. a keyboard) may be configured with a multi-host device controller to couple to three or four hosts, and so forth.

Although the embodiments above have been described in considerable detail, other versions are possible. Numerous variations and modifications will become apparent to those skilled in the art once the above disclosure is fully appreciated. It is intended that the following claims be interpreted to embrace all such variations and modifications. Note the section headings used herein are for organizational purposes only and are not meant to limit the description provided herein or the claims attached hereto.

We claim:

1. A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding first and second hosts;

a USB function block; and

a multi-host device controller coupling the USB function block to the first and second upstream ports, wherein the multi-host device controller is configured to establish concurrent respective USB connections between the USB function block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously enumerate and configure the USB multi-host device;

US 7,627,708 B2

**5**

simultaneously access the USB multi-host device; and
alternately access the USB function block without reconfiguring and/or re-enumerating the USB multi-host device before each access.

**2**. The USB multi-host device of claim **1**, further comprising a first endpoint buffer coupled between the first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

**3**. A USB multi-host device comprising:

a USB function block; and

a multi-host device controller coupling the USB function block to a first host and a second host, wherein the multi-host device controller is configured to establish a first USB connection between the first host and the USB function block and a second USB connection between the second host and the USB function block, wherein the first USB connection and the second USB connection are concurrent, to allow the first host and the second host to:

simultaneously access the USB multi-host device; and

alternately access the USB function block, without either one of the first and second hosts reconfiguring the USB multi-host device each time a different one of the first host and the second host is given access to the USB function block.

**4**. The USB multi-host device of claim **3**, wherein the multi-host USB device is not re-enumerated by either the first host or the second host each time the first host and the second host alternate accessing the USB function block.

**5**. The USB multi-host device of claim **3**, further comprising a first upstream port coupled between the first host and the multi-host device controller, and a second upstream port coupled between the second host and the multi-host device controller.

**6**. The USB multi-host device of claim **5**, further comprising a first endpoint buffer coupled between first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.

**7**. A USB device comprising:

a USB function block; and

a multi-host device controller configured to couple the USB function block to a plurality of hosts, wherein the multi-host device controller is operable to establish concurrent respective USB connections between the USB function block and the plurality of hosts, to allow the plurality of hosts to:

simultaneously enumerate and configure the USB device;

simultaneously access the USB device; and

alternately access the USB function block, without any of the plurality of hosts reconfiguring the USB device each time a different one of the plurality of hosts is given access to the USB function block.

**8**. The USB device of claim **7**, wherein the multi-host device controller is operable to simultaneously receive respective host requests from the plurality of hosts, wherein the multi-host device controller is operable to internally determine which of the respective host requests to service immediately.

**9**. The USB device of claim **8**, wherein the multi-host device controller is operable to interleave the respective host requests.

**6**

**10**. The USB device of claim **8**, wherein the multi-host device controller is operable to send not-ready packets in a USB specific manner to hosts whose request was not immediately serviced.

**11**. The USB device of claim **7**, wherein the multi-host device controller comprises an internal arbitration mechanism configured to permit the plurality of hosts to simultaneously request access to the USB function block by interleaving host access requests and/or by using a common request/grant structure;

wherein the common request/grant structure comprises one of the plurality of hosts being granted access to the USB function block while remaining ones of the plurality of hosts are not considered for access to the USB function block until the one of the plurality of hosts has completed accessing the USB function block.

**12**. The USB device of claim **11**, wherein the arbitration mechanism is configured according to a specific USB device type comprised in the USB function block.

**13**. The USB device of claim **7**, wherein a bandwidth from the USB function block to each respective one of the plurality of hosts is reduced to allow each respective one of the plurality of hosts equal access to the USB function block.

**14**. The USB device of claim **13**, wherein the bandwidth is not reduced if it exceeds a bandwidth of the respective one of the plurality of hosts.

**15**. The USB device of claim **7**, further comprising a respective upstream port coupled between the multi-host device controller and each of the plurality of hosts.

**16**. The USB device of claim **15**, further comprising a respective buffer coupled between each respective upstream port and the multi-host device controller.

**17**. The USB device of claim **7**, wherein the multi-host device controller is configured to maintain respective dedicated address, configuration, and response information for each of the plurality of hosts.

**18**. A method for sharing a USB device between multiple hosts, the method comprising:

establishing concurrent respective USB connections between a plurality of hosts and a shared USB function comprised in the USB device;

two or more of the multiple hosts simultaneously enumerating and configuring the USB device;

receiving respective access requests to the shared USB function from the two or more of the plurality of hosts; and

processing the respective access requests, to allow the two or more of the plurality of hosts to alternately access the shared USB function without any of the two or more of the plurality of hosts reconfiguring the USB device each time the USB function is accessed in response to a respective access request from a different one of the two or more of the plurality of hosts.

**19**. The method of claim **18**, wherein said processing comprises determining which of the respective access requests to service immediately, and servicing that respective access request.

**20**. The method of claim **19**, wherein said processing comprises holding off access to the shared USB function by those respective access requests that are not immediately serviced, until the shared USB function is no longer accessed by a given one of the two or more of the plurality of hosts from which the serviced respective access request was received.

**21**. The method of claim **18**, wherein said processing comprises interleaving accesses requested by the respective access requests to the shared USB function.

US 7,627,708 B2

7

**22**. The method of claim **18**, further comprising maintaining respective dedicated address, configuration, and response information for each of the plurality of hosts.

**23**. A USB device comprising:

a shared USB function block; and

a controller configured to establish concurrent respective USB connections between the shared USB function block and two or more USB hosts, to allow the two or more USB hosts to simultaneously configure the USB device for the shared USB function;

wherein the controller is configured to receive and respond to simultaneous respective USB access requests sent by the two or more USB hosts for accessing the shared USB function.

**24**. The USB device of claim **23**, wherein in establishing the concurrent respective USB connections between the

8

shared USB function block and the two or more USB hosts, the controller is operable to maintain respective dedicated address, configuration and response information for each of the two or more USB hosts.

**25**. The USB device of claim **23**, wherein the controller comprises:

a respective USB interface circuit for each of the two or more USB hosts, wherein each respective USB interface circuit enables the USB device to transmit and/or receive data over a USB bus; and

a respective endpoint buffer for each of the two or more USB hosts for storing respective dedicated address, configuration and response information for each of the two or more USB hosts.

*   *   *   *   *



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/340,957 | 12/22/2008 | Mark R. Bohm | 5707-12706 | 1046 |

7590          05/26/2009

Jeffrey C. Hood
Meyertons Hood Kivlin Kowert & Goetzel PC
P.O. Box 398
Austin, TX 78767-0398

| EXAMINER |
|---|
| CERULLO, JEREMY S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2111 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/26/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 12/340,957 | BOHM ET AL. |
| | Examiner | Art Unit | |
| | Jeremy S. Cerullo | 2111 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>22 December 2008</u>.
2a)☐ This action is **FINAL**.       2b)☒ This action is non-final.
3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-25</u> is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5)☐ Claim(s) _____ is/are allowed.
6)☒ Claim(s) <u>1-25</u> is/are rejected.
7)☐ Claim(s) _____ is/are objected to.
8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.
10)☒ The drawing(s) filed on <u>22 December 2008</u> is/are:  a)☒ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11)☐ The oath or declaration is objected to by the Examiner.  Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All   b)☐ Some * c)☐ None of:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. _____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>20090122</u>.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5)☐ Notice of Informal Patent Application
6)☐ Other: _____ .

Application/Control Number: 12/340,957                                    Page 2
Art Unit: 2111

## DETAILED ACTION

1.      Claims 1-25 are pending in the following action.


### *Information Disclosure Statement*


2.      The information disclosure statement filed 22 January 2009 fails to comply with

37 CFR 1.98(a)(2), which requires a legible copy of each cited foreign patent document;

each non-patent literature publication or that portion which caused it to be listed; and all

other information or that portion which caused it to be listed.  It has been placed in the

application file, but the information referred to therein has not been considered.


### *Double Patenting*


3.      The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees.   A nonstatutory
obviousness-type double patenting rejection is appropriate where the conflicting claims
are not identical, but at least one examined application claim is not patentably distinct
from the reference claim(s) because the examined application claim is either anticipated
by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140
F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29
USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir.
1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422
F.2d 438, 164 USPQ 619 (CCPA 1970); and  *In re Thorington*, 418 F.2d 528, 163
USPQ 644 (CCPA 1969).
        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)
may be used to overcome an actual or provisional rejection based on a nonstatutory
double patenting ground provided the conflicting application or patent either is shown to

Application/Control Number: 12/340,957                                             Page 3
Art Unit: 2111

be commonly owned with this application, or claims an invention made as a result of
activities undertaken within the scope of a joint research agreement.
        Effective January 1, 1994, a registered attorney or agent of record may sign a
terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with
37 CFR 3.73(b).


4.      Claims 1-25 rejected on the ground of nonstatutory obviousness-type double

patenting as being unpatentable over claims 1-25 of U.S. Patent No. 7,523,243.

Although the conflicting claims are not identical, they are not patentably distinct from

each other because the invention as claimed in the instant application is substantially

the same as the invention as claimed in 7,523,243, with only minor differences in

terminology regarding the class of invention.


                                        *Conclusion*


5.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure: U.S. Patent No. 6,850,998; U.S. Patent No. 7,246,189; U.S.

Patent Application Publication No. 2005/0005045; and U.S. Patent Application

Publication No. 20050060490.


        Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Jeremy S. Cerullo whose telephone number is

(571)272-3634.  The examiner can normally be reached on Tuesday - Friday, 8:00-4:00;

Alternate Mondays.

Application/Control Number: 12/340,957                                        Page 4
Art Unit: 2111

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Mark Rinehart can be reached on (571) 272-3632.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

     Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/J. S. C./
Examiner, Art Unit 2111

/MARK  RINEHART/
Supervisory Patent Examiner, Art Unit 2111

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Application No.: 12/340,957 | § | Examiner: Jeremy S. Cerullo |
| Filed: December 22, 2008 | § | Group/Art Unit: 2111 |
| Inventor(s): | § | Atty. Dkt. No: 5707-12706 |
| Mark R. Bohm, Atish Ghosh | § | |
| | § | |
| | § | |
| Title: MULTI-HOST USB | § | |
| DEVICE | § | |
| | § | |
| | § | |
| | § | |

**RESPONSE TO OFFICE ACTION OF**
**MAY 26, 2009**

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

This paper is submitted in response to the Office Action of May 26, 2009, to further highlight why the application is in condition for allowance.

Please amend the case as listed below.

1

**<u>REMARKS</u>**

Applicant is in receipt of the Office Action mailed May 26, 2009.

A nonstatutory double patenting rejection was made with respect to U.S. Patent No. 7,523,243.   Applicant is filing herewith a terminal disclaimer to obviate the nonstatutory double patenting rejection.

2

**CONCLUSION**

Applicant submits the application is in condition for allowance, and an early notice to that effect is requested.

If any extensions of time (under 37 C.F.R. § 1.136) are necessary to prevent the above referenced application(s) from becoming abandoned, Applicant(s) hereby petition for such extensions. If any fees are due, the Commissioner is authorized to charge said fees to Meyertons, Hood, Kivlin, Kowert & Goetzel PC Deposit Account No. 50-1505/5707-12706/JCH.

Also filed herewith are the following items:

☒ Terminal Disclaimer to Obviate a Double Patenting Rejection Over a Prior Patent

Respectfully submitted,

/Jeffrey C. Hood/

Jeffrey C. Hood, Reg. #35198
ATTORNEY FOR APPLICANT(S)

Meyertons, Hood, Kivlin, Kowert & Goetzel PC
P.O. Box 398
Austin, TX 78767-0398
Phone: (512) 853-8800
Date: 2009-07-01     JCH/JAM

3

Appx_523

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Application No.:    12/340,957 | § | |
| Filed:    December 22, 2008 | § | Examiner:    Jeremy S. Cerullo |
| Inventor(s): | § | Group/Art Unit:   2111 |
|    Mark R. Bohm, Atish Ghosh | § | Atty. Dkt. No.:    5707-12706 |
| | § | |
| Title:    MULTI-HOST USB | § | |
|    DEVICE | § | |
| | § | |
| | § | |

## TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A PRIOR PATENT

Dear Sir or Madam:

1.    Standard Microsystems Corporation is the owner of 100% of all rights and interest in the captioned application.

2.    As sole owner in the captioned application, Standard Microsystems Corporation hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the captioned application, which would extend beyond the expiration date of the full statutory term defined in 35 U.S.C. §154 to §156 and §173, as presently shortened by any terminal disclaimer, of prior U.S. Patent No. 7,523,243.

3.    Standard Microsystems Corporation hereby agrees that any patent so granted on the captioned application shall be enforceable only for and during such period that it and the prior patent are commonly owned.  This agreement runs with any patent granted on the captioned patent application and is binding upon the grantee of such patent, and its or his successors or assigns.

4.    In making the above disclaimer, Standard Microsystems Corporation does not disclaim the terminal part of any patent granted on the captioned patent application that would

1

Appx_524

extend to the expiration date of the full statutory term as defined in 35 U.S.C. §154 to §156 and §173 of U.S. Patent No. 7,523,243, as presently shortened by any terminal disclaimer, in the event that it later:  expires for failure to pay a maintenance fee, is held unenforceable, is found invalid by a court of competent jurisdiction, is statutorily disclaimed in whole or terminally disclaimed under 37 C.F.R. §1.321, has all claims canceled by a reexamination certificate, is reissued, or is in any manner terminated prior to the expiration of its full statutory term as shortened by any terminal disclaimer filed prior to its grant.  Furthermore, Standard Microsystems Corporation does not disclaim any extension or restoration of term to the patent granted on the captioned patent application, which extension or restoration is effected under any applicable statute.

5.     The undersigned is an attorney of record.

The Commissioner is authorized to charge any fees which may be required to Meyertons, Hood, Kivlin, Kowert & Goetzel PC Deposit Account No. 501505\5707-12706\JCH.

Date: <u>2009-07-01</u>          By:     <u>/Jeffrey C. Hood/</u>
                                        Jeffrey C. Hood, Reg. #35198
                                        Attorney of Record

2

Appx_525

IPR2017-00861
Patent Owner's Preliminary Response

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

————————————————

U.S. Patent No. 7,627,708

————————————————

Case No. IPR2017-00861

**PATENT OWNER'S PRELIMINARY RESPONSE TO PETITION
PURSUANT TO 35 U.S.C. § 313 AND 37 C.F.R. § 42.107**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     THE '708 PATENT ..............................................................................5

   A. Background and Overview of Bohm's Invention ...........................5

   B. Prosecution History ......................................................................7

III.    THE CITED PRIOR ART ..................................................................10

   A. Furukawa ....................................................................................10

   B. Dickens .......................................................................................12

IV.     LEGAL STANDARD .........................................................................13

V.      CLAIM CONSTRUCTION ................................................................14

   A. "Simultaneously" (claims 1, 3, 7, 8, 11, 18, 23) .........................15

   B. "Concurrent" / "Concurrent USB Connections" (claims 1, 3, 7,
      18, 23–24) ...................................................................................22

VI.     THE PETITION SHOULD BE DENIED BECAUSE IT
        RAISES THE SAME OR SUBSTANTIALLY SAME ART
        AND ARGUMENTS PREVIOUSLY CONSIDERED BY THE
        OFFICE ...............................................................................................28

VII.    PETITIONER'S EXPERT TESTIMONY IS UNRELIABLE .....................30

VIII.   THE PETITION FAILS TO SHOW A REASONABLE
        LIKELIHOOD THAT PETITIONER WOULD PREVAIL
        AGAINST THE CHALLENGED CLAIMS ..................................................31

   A. Ground 1:  Furukawa Does Not Anticipate Claims 1–8, 10–11,
      15–20, or 22–25 ...........................................................................31

      1. Claim 1 .....................................................................................32

      2. Claim 3 .....................................................................................40

      3. Claim 7 .....................................................................................41

      4. Claim 18 ...................................................................................41

      5. Claim 23 ...................................................................................42

6. Dependent Claims ..........................................................43

B.  Ground 2:  Dickens Does Not Anticipate Claims 1–8, 11, 15–20,
    or 22–25 ......................................................................44

1. Claim 1 .......................................................................45

2. Claim 3 .......................................................................53

3. Claim 7 .......................................................................54

4. Claim 18 .....................................................................54

5. Claim 23 .....................................................................55

6. Dependent Claims ........................................................57

C.  Ground 3:  Furukawa or Dickens in View of Chen Does Not
    Render Obvious Claims 9, 11–14, or 21 ....................................57

D.  Ground 4: Furukawa or Dickens in View of USB 2.0 Does Not
    Render Obvious Claims 9, 11–14, or 21 ....................................59

E.  Ground 5:  Wurzburg in View of Osakada, Further in View of
    Either Furukawa or Dickens Does Not Render Obvious
    Claims 1–25 ...............................................................61

F.  Ground 6: Furukawa or Dickens in View of Chen, Wurzburg,
    Osakada, APA, Adder, USB 2.0 and "Other Cited Art" Does
    Not Render Obvious Claims 1–25 ..........................................63

IX.    CONCLUSION ...........................................................64

IPR2017-00861
Patent Owner's Preliminary Response

## TABLE OF AUTHORITIES

### Cases

*Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op.
(PTAB Mar. 15, 2017) (Paper 7) .........................................................................48

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) ............. 3, 19, 27

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254........................................30

*Fidelity National Information Services, Inc. v. Datatreasury Corp.*,
Case IPR2014-00489, slip op. (PTAB Aug. 13, 2014) (Paper 9)....... 4, 22, 58, 61

*In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) .............................................35

*In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016) ......... 13, 14, 64

*In re Ratti*, 270 F.2d 810, 813 (CCPA 1959)..........................................................14

*In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ................................ 31, 35, 44

*Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir.
2008).................................................................................................. 5, 62, 64

*Lavelle Indus., Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op.
(PTAB May 4, 2017) (Paper 18)................................................................. 63, 64

*Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-1860, slip op.
(PTAB Feb. 24, 2016) (Paper 11)...................................................... 5, 13, 29, 62

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001)........................27

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985)................30

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056 (Fed. Cir. 2016) .................... 4, 14, 27

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016)............. 58, 59, 60

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356,
1361 (Fed. Cir. 2012) ...................................................................... 14, 31

## Statutes

35 U.S.C. § 314(a) ........................................................................13

35 U.S.C. § 316(e) ........................................................................13

35 U.S.C. § 325(d) .................................................................. 13, 28

## Other Authorities

*Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.)
   (1988) ................................................................................. 15, 22

## Rules

MPEP § 2143.01 ...........................................................................14

## Regulations

37 C.F.R. § 42.100(b) ...................................................................14

37 C.F.R. § 42.6(a)(3) .................................................................5, 22

IPR2017-00861
Patent Owner's Preliminary Response

**EXHIBIT LIST**

| Exhibit No. | Description |
|:---:|:---|
| 2001 | Declaration in Support of Motion for Pro Hac Vice Admission of Brian C. Banner Pursuant to 37 C.F.R. § 42.10(c) |
| 2002 | Declaration of Expert Geert Knapen in Support of Patent Owner's Preliminary Response to Petition |
| 2003 | Excerpts from *Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.) (1988) |

v

## I.    INTRODUCTION

Patent Owner Microchip Technology Inc. submits this preliminary response to the Petition filed by Delphi Technologies, Inc., which seeks *inter partes* review of Claims 1–25 of U.S. Patent No. 7,627,708 to Bohm *et al.* ("the '708 Patent" or "Bohm"). Patent Owner requests the Board deny institution for each ground presented because Petitioner has failed to demonstrate a reasonable likelihood of prevailing with respect to the challenged claims.

The '708 Patent is directed to advanced "multi-host" Universal Serial Bus ("USB") electronic devices that can be used in a wide range of applications including personal computer applications or other systems that use USB, including automobile infotainment systems. The patented multi-host USB devices provide two or more *concurrent USB connections* for allowing two or more USB hosts to access the device's function without the need to reconfigure the USB device each time a different host is given access. Challenged independent claims 1, 3, 7, 18, and 23 require establishing "concurrent" USB connections between the multi-host USB device's USB function block and (1) first and second upstream ports (claim 1) of the multi-host USB device or (2) at least two hosts (claims 3, 7, 18, and 23).

Neither Furukawa nor Dickens—references alleged to anticipate Bohm's independent claims—disclose **concurrent** USB connections. Furukawa does not disclose *concurrent* USB connections because Furakawa's system is only capable of

a "one-to-one connection between the host PC, the source of the request, and the peripheral device,[1] the destination of the request." Ex. 1002 ¶ [0010]. As further confirmation of a lack of concurrent connections, Furukawa's controlling circuit "releas[es] the connection" between the host PC and the peripheral "after the data transfer has been completed" and before establishing a connection to a different host requesting access to the peripheral. *Id.* Furukawa discloses only one connection to a peripheral at a time, never two or more concurrent connections.

Like Furukawa, Dickens also fails to disclose concurrent USB connections because each peripheral[2] has only a single connection. *See* Ex. 1003, 5:2–4 ("Each peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). Dickens discloses that his "invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off. In this way the peripheral can be shared between multiple USB host computers . . . ." *Id.* 2:22–25. Dickens simply discloses a switch that connects a single peripheral device to one host at a time. There are no concurrent connections.

---

[1]    As admitted in the Petition, Furukawa's peripheral devices (*e.g.*, printer, scanner, HD drive, and CD-ROM drive) correspond to the claimed "USB function block." Petition at 39 (Part VII.A.1c); *see also* Ex. 1023 ¶ 79.
[2]    As admitted in the Petition, Dickens' peripheral devices (printer 182) correspond to the claimed "USB function block." Petition at 56 (Part IX.A.1c); *see also* Ex. 1023 ¶ 105.

Dickens also fails to anticipate the claims because the non-concurrent connection between Dickens' peripheral and hosts are not "USB connections." Dickens discloses "a data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*." Ex. 1003, 2:16–19 (emphasis added). Dickens' data routing device converts USB data "into a format that is *independent of the USB protocol*" before it is routed to/from hosts and a peripheral. *See, e.g.*, *id.*, 8:29–41 (emphasis added). The connection Dickens uses to route data is a PCI bus. *E.g.*, *id.* 8:16–28. Because Dickens routes data in a non-USB format over a PCI bus, Dickens does not disclose concurrent *USB connections* between the USB function block (*e.g.*, peripheral) and two hosts (or upstream ports) as required by the independent claims of the '708 Patent.

Petitioner attempts to support its ill-founded anticipation arguments under the rubric of the broadest reasonable interpretation claim construction standard. But Petitioner's proposed constructions are unreasonable because they render the claim terms "simultaneously" and "concurrent / concurrent USB connections" meaningless. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction rendering a claim limitation meaningless). "While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without

regard for the full claim language and the written description." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016).

Petitioner's obviousness arguments suffer from several deficiencies. First, Petitioner relies on Furukawa and Dickens as base references for each of its obviousness grounds (Grounds 3–6), but none of Petitioner's additional prior art combined with Furukawa and Dickens overcomes the above-described deficiencies of those base references—*i.e.*, none disclose a USB device having ***concurrent USB connections*** between a USB function block and multiple hosts or upstream ports. Further, Petitioner's expert relies on a legally flawed level of ordinary skill in the art.

Additionally, Petitioner's obviousness arguments are procedurally defective. For Grounds 3 and 4, Petitioner relies on expert testimony without corresponding explanations in the Petition, effectively using the expert declaration to avoid the word count limits of 37 C.F.R. § 42.24. The Board has previously held that assertion of arguments by reference to documents outside of the Petition is improper. *See, e.g.*, *Fidelity National Information Services, Inc. v. Datatreasury Corp.*, Case IPR2014-00489, slip op. at 9 (PTAB Aug. 13, 2014) (Paper 9) ("Under our rules, the petition must contain a 'full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence . . . .' 37 C.F.R. § 42.22(a)(2). We, therefore, decline to consider information presented in a supporting declaration,

but not discussed sufficiently in a petition."); 37 C.F.R. § 42.6(a)(3) (prohibiting incorporation by reference).

For Ground 5, Petitioner vaguely attempts in one page to argue that all twenty-five (25) claims are invalid for obviousness based on arguments cumulative of those made by the Examiner during prosecution of Bohm's parent patent. *See Ziegman v. Stephens*, Case IPR2015-018160, slip op. at 12–14 (PTAB Feb. 24, 2016) (Paper 11) (denying institution "on an already-considered issue"). And for both Grounds 5 and 6 (both one-page arguments), Petitioner makes no effort to explain how the asserted references would be combined in a way that would arrive at Bohm's invention.[3] Consequently, institution on these grounds should be denied. *See Innogenetics N.V. v. Abbot Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008) (petition must sufficiently explain how one of skill would have combined the specific teachings of the prior art in a way that would arrive at the claimed invention).

## II.   THE '708 PATENT

### A.   Background and Overview of Bohm's Invention

The '708 Patent was filed on December 22, 2008, and claims priority to a provisional application filed on April 14, 2006. The '708 Patent is a continuation of

---

[3]     Highlighting the frivolous nature of Grounds 5 and 6, they are not even endorsed by Petitioner's own expert. *See* Ex. 1023, *passim*.

the U.S. application ("Parent Application") that issued as U.S. Patent No. 7,523,243 ("the '243 Patent").

The '708 Patent relates to "computer hardware and, more specifically, to Universal Serial Bus (USB) controllers." '708 Patent, 1:19–21. By 2006, when Bohm filed the Parent Application, USB was a mature standard that was used ubiquitously. Ex. 2002 ¶ 60 (Declaration of Expert Geert Knapen) ("Knapen"). The second version of the USB specification (USB 2.0), which provided for increased transfer rates compared to the previous USB specification, had been released years earlier. *Id.* The USB protocol is based on the assumption / requirement that only one entity—a USB host—can initiate data transactions on a USB bus. *Id.* ¶ 61. As Bohm recognizes, "the USB specification is structured so that every device is configured and accessed by a single host controller." '708 Patent, 1:57–59. Thus, to share a peripheral such as a printer between two hosts (*e.g.*, personal computers) a user could unplug the printer from the first host and plug it into the second host. Knapen ¶ 62. Alternatively, as Bohm describes, there were "several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time. There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solutions, however, fail to permit simultaneous access to the USB device that is downstream

of the hub or switch. The USB device is typically accessed by one single host at a time, and when access to the USB device is switched, the device must be re-configured, thereby losing internal state information." '708 Patent, 1:61–2:5.

Bohm successfully overcame the shortcomings of the prior art by providing a multi-host USB device with concurrent USB connections between the multi-host USB device's function block and two or more hosts. Bohm explains that his inventive "shared USB device may be simultaneously configured and accessed by two or more USB hosts. The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host. The device may maintain a dedicated address, configuration and response information for each host. Each host may therefore establish a dedicated USB connection with the sharing device." '708 Patent, 2:32–40. Bohm's invention allows for sharing "a single USB device . . . across multiple USB hosts without needing to be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device." '708 Patent, 2:12–15.

**B.**    **Prosecution History**

During prosecution, Bohm's '708 Patent application was rejected for double patenting over the '243 Patent. Ex. 1012 at 8–12 (Office Action dated 05/26/2009). All claims were allowed without amendment after Bohm filed a terminal disclaimer.

Ex. 1012 at 1–7 (Issue Notification, Notice of Allowability, Response to Office Action).

During prosecution of the Parent Application, the originally-filed claims were rejected over U.S. Patent Publication No. 2006/0059293 ("Wurzburg") and U.S. Patent No. 6,308,239 ("Osakada"). *See* Ex. 1014 at 25–30, 51–56. In response, Bohm amended the independent claims, clarifying (1) the claims were to "concurrent" USB connections between the USB device block and two or more hosts[4] so that (2) his invention allowed the hosts to "simultaneously" request access to the USB device.[5]   Ex. 1014 at 6–11. Bohm explained the significance of these amendments:

> Wurzburg does not disclose the USB multi-host device that comprises a USB device block corresponding to at least one function and further comprises a multi-host device controller configured to establish <u>concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to simultaneously request access to the USB device</u> of claim 1. Rather, Wurzburg discloses a system in which a respective dedicated USB connection only exists between the device block and a single host at any one point in time, and thus only a single host can request access to the device block. Wurzburg teaches a

---

[4]    The "concurrent" limitation was added to each independent claim.
[5]    The "simultaneous" limitation was added to independent claims 1, 3, and 7. Claim 23 included this limitation.

8

"switching hub", which may <u>electronically switch between different configurations</u> (e.g., hardwired or software implemented configurations) <u>for access between the two or more upstream ports and the downstream ports</u> (paragraph 0008). Accordingly, Wurzburg does not teach, suggest, or render obvious a multi-host device controller configured to establish <u>concurrent</u> respective dedicated USB connections between a USB device block and first and second upstream ports.

\* \* \*

Finally, Wurzburg discloses in paragraph 0034 that "*when the downstream routing controller 201 switches configurations, and control of a downstream port is switched from the computer system 101 to the dual role peripheral device 207, <u>a connection between the computer system 101 and the respective peripheral device 125</u> (coupled to the downstream port to be switched) <u>may be terminated</u> by the computer system 101*", and further teaches that "*communications between the downstream port to be switched and the computer system 101 <u>may be terminated</u> by the USB switching hub 119*", and "*the dual role peripheral device 207 may <u>then connect to, enumerate</u>, and communicate with the respective peripheral device 125 coupled to the switched downstream port*" [emphasis added]. Therefore, it is also clear that Wurzburg also fails to at least teach a system in which at least two hosts are allowed to <u>simultaneously requests access to the USB device</u>, and further fails to teach a system in which a controller is operable to receive and respond to <u>simultaneous respective USB access requests</u>

9

      <u>sent by the two or more USB hosts</u> for accessing a function of the shared

      USB device block.

Ex. 1014 at 17–19 (pages 13–15 of Applicant's Request for Continued Examination

dated 2008-07-23). Bohm's explanation of the concurrent nature of the USB

connections and the simultaneous access requests of his invention overcame the

Examiner's rejection and all claims of the Parent Application were allowed. Ex.

1014 at 3.

## III.   THE CITED PRIOR ART

      Petitioner relies on two base references for its alleged invalidity Grounds: (1)

an English translation of Japanese Patent Application Publication 2003-256351

("Furukawa") (Ex. 1002), and (2) U.S. Patent No. 6,549,966 ("Dickens") (Ex. 1003).

Much like the Wurzburg reference cited during prosecution of the Parent

Application, Furukawa and Dickens disclose "switching hubs" that connect a USB

function to one—and only one—host at a time.

### A. Furukawa

      Furukawa is only capable of a "one-to-one connection between the host PC

that is the source of the request and the peripheral device that is the destination of

the request." Ex. 1002 ¶ [0010]. In other words, Furukawa's controlling circuit

establishes a connection between one peripheral (*i.e.*, the USB function block) and

only one upstream port. Furukawa explains: "In the present invention, . . . the

controlling circuit establishes *a connection between one of the host computers and the one peripheral device*, and holds temporarily, in the FIFO memory, the data from another host computer until the transmission or reception of the data of *the host computer that is connected* is completed." Ex. 1002 ¶ [0006] (emphasis added). "[I]f there is a request from one or more of the host computers for transmission or reception of data to one peripheral device, the controlling circuit establishes *a connection between one of the host computers and the one peripheral device* . . . ." Ex. 1002 at [CLAIM 4] (emphasis added). "The hub repeater 13 is a part that has functions *for setting up and releasing connections* between the host PCs 21 through 24 and the peripheral devices 25 through 28." Ex. 1002 ¶ [0011].

Thus, like Wurzburg's "switching hub," where two hosts request access to a peripheral (*e.g.*, printer 25), Furukawa establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in a FIFO memory and holding off that host request by responding with a NAK signal. Knapen ¶ 72. When the host that is connected to the peripheral completes its data transfer, the controlling circuit releases the first one-to-one connection and then establishes a new one-to-one connection between the peripheral and the second, waiting host (via its upstream port). Knapen ¶ 73. The second host then completes its access. *Id.*

## B. Dickens

Dickens is also only capable of a one-to-one connection between one host PC and a peripheral, such as the printer. *See, e.g.*, Ex. 1003, 5:2–4 ("Each peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). Dickens explains that "[b]ecause the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off. In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application." Ex. 1003, 2:21–26. "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." *Id.* 2:48–52.

Thus, like Wurzburg's "switching hub," when two hosts request access to the same peripheral (*e.g.*, a printer), Dickens establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in memory. Knapen ¶ 89. When the host that is connected to the peripheral completes its data transfer, the data routing device switches the first one-to-one connection off and then switches a new one-to-

one connection on between the peripheral and the second, waiting host (via its upstream port). Knapen ¶ 90. The second host then completes its access. *Id.*

## IV.   LEGAL STANDARD

An IPR should only be initiated if "the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). "Petitioner has the "burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e). Thus, a review should not be instituted unless Petitioner has shown a likelihood of success on the invalidity grounds as presented in the Petition. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380-81 (Fed. Cir. 2016) ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.").

"In determining whether to institute or order a proceeding . . . the Director may take into account whether, and reject the petition or request because, ***the same or substantially the same prior art or arguments*** previously were presented to the Office." 35 U.S.C. § 325(d) (emphasis added); *see also Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-1860, slip op. at 14 (PTAB Feb. 24, 2016) (Paper 11) (denying review because "we are unpersuaded that adjudicating such a dispute on an already-considered issue is an efficient use of Board resources").

"For a prior art reference to anticipate a claim, it must disclose all of the limitations of the claim, 'arranged or combined in the same way as in the claim.'" *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012). And "[t]o satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d at 1380. "If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims prima facie obvious." MPEP § 2143.01 (citing *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959)).

## V.    CLAIM CONSTRUCTION

"In construing claim terms, the Board must determine the scope of the claims by giving them their broadest reasonable construction in light of the specification as they would be interpreted by one of ordinary skill in the art." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061–62 (Fed. Cir. 2016); *see also* 37 C.F.R. § 42.100(b) ("broadest reasonable construction in light of the specification of the patent"). "While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description." *Trivascular*, 812 F.3d at 1062.

"Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Id.*

As shown below, Petitioner's purported broadest reasonable interpretation ("BRI") constructions of "simultaneous" and "concurrent" are unreasonable and are inconsistent with the full claim language and the written description.[6]

### A. "Simultaneously" (claims 1, 3, 7, 8, 11, 18, 23)

The broadest reasonable interpretation of the term "simultaneously" is its plain meaning: "at the same time." Ex. 2003 at 1099, *Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.) (1988) (definition of "simultaneous"). This meaning is consistent with the specification where "simultaneously" is used to indicate things that exist or happen at the same time, including:

- Multiple USB hosts "simultaneously enumerat[ing]" the multi-host USB device. '708 Patent, 2:15–18. One of ordinary skill in the art would know that the separate USB endpoint and status buffers in Bohm's multi-host USB device (*see* '708 Patent, Fig. 3, elements 306,

---

[6] Other constructions proposed by Petitioner are unreasonable but unrelated to the arguments made in this Preliminary Response. Patent Owner reserves the right to challenge any of Petitioner's proposed constructions in the event the Board institutes the requested *inter partes* review on any of Grounds 1–6.

308) would allow two hosts to enumerate the multi-host USB device at the same time. Knapen ¶ 15. In other words, there would be no need to hold off one host's attempt to enumerate the device while the other was also enumerating the device. *Id.*

- Multiple USB hosts "simultaneously shar[ing] a single device/function, for example a Gigabit Ethernet controller." '708 Patent, 2:18–19. The "sharing" in this context has an ordinary meaning and is not a term of art, as the USB specification does not allow for a device to be shared or used by more than one host at a time. Knapen ¶ 51. One of ordinary skill in the art would view Bohm's disclosure of simultaneous sharing as merely stating that a device such as a Gigabit Ethernet controller can be used by multiple hosts at the same time. *Id.*

- "[A] shared USB device may be "simultaneously configured and accessed by two or more USB hosts." '708 Patent, 2:31–33. One of ordinary skill in the art would know that the separate USB endpoint and status buffers in Bohm's multi-host USB device (*see* '708 Patent, Fig. 3, elements 306, 308) would allow two hosts to configure the multi-host USB device at the same time. Knapen ¶ 52. In other words, there would be no need to hold off one host's attempt to configure the device while the other was also configuring. *Id.* One of ordinary skill in the art

16

would view the simultaneous "access" stated here as allowing multiple hosts to issue access requests at the same time. *Id.* Indeed, this "access" is made available "by providing a separate configuration and ***access interface*** for each upstream host," *i.e.*, the aforementioned separate USB endpoint and status buffers. '708 Patent, 3:48–50 (emphasis added); *see also* Knapen ¶ 52.

- "USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices." '708 Patent, 1:24–26. One of ordinary skill in the art would view Bohm's disclosure of "simultaneously accessible devices" consistent with the plain meaning of "simultaneously," *i.e.*, that the devices on a USB bus can be accessed at the same time. Knapen ¶ 53. This is not a technical statement meant to imply that one USB host can issue simultaneous data transfers to separate devices; the USB standard does not allow for that. *Id.* This statement merely reflects the *accessibility* of the devices connected to the USB bus—they are all equally accessible at the same time. *Id.*

The plain meaning of "simultaneously" is further highlighted by the patent's disclosure that "[t]here are several switching devices that currently allow a device to be switched between multiple USB Host controllers, but ***the device can generally***

17

***be configured and accessed by only a single host at a time***. There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solutions, however, ***fail to permit simultaneous access*** to the USB device that is downstream of the hub or switch. ***The USB device is typically accessed by one single host at a time*** . . . ." '708 Patent, 1:61–2:3 (emphasis added). This passage makes clear there is no simultaneous access if the device is accessed by a single host at a time. One of ordinary skill in the art would understand that in order to have simultaneous access, both hosts must be able to access the device "at the same time." Knapen ¶ 54.

Petitioner offers a "broad meaning" of "simultaneous," but Petitioner's construction is unclear. *See* Petition at 37 (citing to Petition at "Section V.E"). As best understood, Petitioner contends "simultaneous access . . . does not require simultaneous data transfer from two or more computers . . . and includes data transfers one at a time." *Id.* at 18–19.[7]  In other words, Petitioner contends that "simultaneous" does not require access from two hosts to happen at the same time, but can include access that happens one at a time. This is unreasonable as it

---

[7]     Petitioner also cites to its expert declaration in discussing the construction of "simultaneous." Petition at 37. Mr. Garney concludes: "'Simultaneous' in its usages does not require immediacy and equivalency in action." Ex. 1023 ¶ 71. Petitioner's attempt to incorporate Mr. Garney's declaration into the Petition is an improper attempt to exceed the 14,000-word count limit, incorporating 558 words (¶¶ 70–71 of Garney's declaration) into a Petition certified to contain 13,862 words.

contradicts the specification, in particular, those passages discussed above. *See supra*, pages 15–17. Petitioner's construction is also not reasonable because it renders the claim term "simultaneous" meaningless. For example, Claim 3 requires "allow[ing] the first and second host to: simultaneously access the USB multi-host device . . . ." '708 Patent, 5:20–22. If simultaneous access can mean one access at a time as Petitioner suggests, this limitation would have the same meaning if "simultaneously" were completely omitted: "allow[ing] the first and second host to ~~simultaneously~~ access the USB multi-host device . . . ." Thus, Petitioner's construction cannot be correct and is unreasonable. *See Cat Tech*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction which would render a claim limitation meaningless).

Petitioner also appears to rely on Mr. Garney's conclusion that "'Simultaneous' in its usages does not require immediacy and equivalency in action." Ex. 1023 ¶ 71; *see also* Petition at 37 (citing Ex. 1023 ¶¶ 71–72). Mr. Garney's analysis and conclusion are flawed. For example, Mr. Garney's discussion of claim 8 unnecessarily confuses receipt of device requests with service of such requests. *See* Ex. 1023 ¶ 71. The language of Claim 8 expressly states that the multi-host device controller is operable (1) "to simultaneously receive host requests from the plurality of hosts" and (2) "to internally determine which of the respective host requests to service immediately." '708 Patent, 5:59–64. These are two separate and

distinct activities. Knapen ¶ 55. Receipt of multiple hosts requests can happen at the same time because Bohm's multi-host device provides "a separate configuration and access interface for each upstream host." '708 Patent, 3:48–50 (emphasis added); *see also* Knapen ¶ 55. The fact that the controller may not service multiple host requests immediately or at the same time does not change the fact that the controller is operable to allow multiple host access requests at the same time. *Id.*

Mr. Garney's analysis of the term "simultaneous" related to Claim 11 is similarly flawed. *See* Ex. 1023 ¶ 70. Claim 11 recites "the multi-host device controller comprises an internal arbitration mechanism configured to permit the plurality of hosts to simultaneously request access to the USB function block by interleaving host access requests and/or by using a common request/grant structure." '708 Patent, 6:5–10. One of ordinary skill in the art would understand "simultaneously" here refers to multiple hosts making access requests at the same time ("simultaneous request access"). Knapen ¶ 56. One of ordinary skill in the art would understand the simultaneous access requests are possible because Bohm provides "a separate configuration and access interface for each upstream host," *i.e.*, the aforementioned separate USB endpoint and status buffers depicted in Bohm Figure 3. '708 Patent, 3:48–50; *see also* Knapen ¶ 56.

Contrary to Mr. Garney's conclusion, one of ordinary skill in the art would understand "interleaving host access requests and/or by using a common

request/grant structure" in Claim 11 as referring to the manner in which the multi-host device controller handles or services the simultaneous access requests. Knapen ¶ 57. In other words, after receiving simultaneous (*i.e.*, "at the same time") requests from multiple hosts, the multi-host device controller can service those requests by providing access to the USB function block "by interleaving host access requests and/or by using a common request/grant structure." *Id.* The specification confirms this understanding of Claim 11 by describing the actual access (*i.e.*, as compared to the request) of the function:

> USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.

'708 Patent, 4:22–29; *see also* Knapen ¶ 57.

Finally, Petitioner's attempt to incorporate Mr. Garney's discussion of "simultaneous" into the Petition without actually explaining this position in the Petition is an improper attempt to exceed the word limit. Petitioner certifies the Petition contains 13,862 words. Mr. Garney's discussion of "simultaneous" at ¶¶ 70–71 of Ex. 1023 contains 558 words. These additional 558 words cause the Petition to exceed the 14,000-word limit. This is improper. *See, e.g.*, *Fidelity*

*National Information Services, Inc., v. Datatreasury Corp.*, Case IPR2014-00489, slip op. at 9 (PTAB Aug. 13, 2014) (Paper 9) ("We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition."); 37 C.F.R. § 42.6(a)(3) (prohibiting incorporation by reference).

**B.     "Concurrent" / "Concurrent USB Connections" (claims 1, 3, 7, 18, 23–24)**

The term "concurrent" has its plain meaning: "operating or occurring at the same time." Ex. 2003 at 273, *Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.) (1988) (definition of "concurrent"). Thus, in the context of the claims, "concurrent USB connections" means one or more USB connections operating or occurring at the same time.

This plain meaning construction is supported by the specification in which every one of the disclosed multi-host devices is connected to more than one host at the same time. Figure 1, depicted below, "shows a system diagram of a multi-host capable USB device coupled to multiple hosts according to one embodiment." '708 Patent, 3:18–20.



*FIG. 1*

As depicted, Host 1 (102) and Host 2 (104) are connected at the same time to multi-host device 106. *See* '708 Patent, 3:50–54. Figure 2 also "shows multi-host devices coupling to multiple hosts." '708 Patent, 3:21–22.



*FIG. 2*

23

Case 1:17-cv-01194-JDW   Document 76-1   Filed 11/02/18   Page 556 of 981 PageID #: 2361

As depicted, "multi-host device 106—configured with USB multi-host device controller 108—may be a personal digital assistant (PDA) 130, a keyboard 126, and/or a printer 120 shared by personal computer (PC) 122 and PC 123." '708 Patent, 3:55–58. Consistent with the plain meaning of "concurrent," the PDA, keyboard, and printer are each connected to the two PCs via USB connections that operate or occur at the same time. Figure 3, which depicts "a logic diagram of a USB multi-host device" further confirms the plain meaning construction of "concurrent." '708 Patent, 3:23–24.



FIG. 3

As depicted, multi-host device 106 includes a "Connection to first Host" and a "Connection to second Host" that exist or occur at the same time.

The plain meaning construction of "concurrent" is also confirmed by the prosecution history. In the examination of the Parent Application, Bohm responded to the Examiner's rejection of the claims under 35 U.S.C. § 112 and argued

(successfully) that "the disclosure of the instant invention <u>does not teach that any of the hosts are disconnected from the USB device block once they have been connected to the USB device block</u>, i.e. after the ***concurrent*** respective dedicated USB connections between the USB device block and the first and second upstream ports have been established." Ex. 1014 at 12 (page 8 of Applicant's Request for Continued Examination dated 2008-07-23) (bold emphasis added). This statement confirms the "concurrent" USB connections operate or occur at the same time because they are not "disconnected from the USB device block once they have been connected." *Id.*

Petitioner incorrectly contends Bohm's "concurrent" USB connections "are concurrent to the extent that they 'allow … hosts to: [e.g.] simultaneously enumerate and configure the USB multi-host device; simultaneously access [it]; and alternately access the USB function block …'" Petition at 19. In other words, Petitioner contends multiple USB connections need not operate or occur at the same time as long as the other limitations of the claim are met.[8]

---

[8]   Petitioner's construction is in conflict with its proposed construction of "to allow the corresponding first and second host to." *See* Petition at 34. Petitioner claims the latter recitation renders all of the functions optional (*e.g.*, "simultaneously enumerate and configure," "simultaneously access," "alternately access"). *Id.* If the functions are optional and the recited "concurrent" connections need only allow these optional functions, then the "concurrent" connections do not have to allow anything at all. Under this unreasonable construction of the claim terms, any system with two hosts and a device, whether connected or not, would satisfy the claims.

Petitioner's construction is not reasonable and should be rejected. First, it is inconsistent with the specification and the prosecution history which, as explained above, show multiple concurrent USB connections operating or occurring at the same time. *See Trivascular*, 812 F.3d at 1062 (BRI is not "an unfettered license to interpret the words in a claim without regard for the full claim language and the written description.").

Petitioner's construction is also not reasonable because it is inconsistent with the express language of Claim 18. Independent Claim 18, a method claim, recites the step of "establishing concurrent respective USB connections between a plurality of hosts and a shared USB function comprised in the USB device." '708 Patent, 6:40–42. Unlike the other independent claims, Claim 18 does not use the "to allow" language Petitioner uses to justify its improper construction. Thus, in the context of Claim 18, Petitioner's construction is unjustified and nonsensical. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

Petitioner's construction is also not reasonable because it renders the term "concurrent" meaningless. *See Cat Tech LLC*, 528 F.3d at 885 (Fed. Cir. 2008) (refusing to adopt a claim construction rendering a claim limitation meaningless). For example, Claim 1 recites a multi-host device controller

27

> configured to establish concurrent respective USB connections between the USB function block and the first and second upstream ports, to allow the corresponding first and second hosts to: simultaneously enumerate and configure the USB multi-host device[ and] simultaneously access the USB multi-host device

'708 Patent, 4:61–5:1. If concurrent connections can mean any type of connection that allows for the functions that follow, this limitation would have the same meaning if "concurrent" were completely omitted:

> configured to establish ~~concurrent~~ respective USB connections between the USB function block and the first and second upstream ports, to allow the corresponding first and second hosts to: simultaneously enumerate and configure the USB multi-host device[ and] simultaneously access the USB multi-host device

Because it renders the term "concurrent" meaningless, Petitioner's construction cannot be correct. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction which would render a claim limitation meaningless).

## VI.   THE PETITION SHOULD BE DENIED BECAUSE IT RAISES THE SAME OR SUBSTANTIALLY SAME ART AND ARGUMENTS PREVIOUSLY CONSIDERED BY THE OFFICE

The Board has discretion under 35 U.S.C. § 325(d) to reject a petition when the same or substantially the same prior art or arguments were presented previously

in another proceeding before the Office. During prosecution of the '708 Patent's Parent Application, Bohm successfully overcame the Examiner's novelty and obviousness rejections with respect to the Wurzburg prior art, which is the base reference for Ground 5 of this petition. As discussed above, Wurzburg discloses a USB switching hub in which a respective dedicated USB connection only exists between the device block and a single host at any one point in time. *See* Part II.B. Also as discussed above, the Furukawa and Dickens references (Grounds 1–4 and 6) disclose substantially the same system, *i.e.*, USB switching hubs in which a connection only exists between the device block and a single host at any one point in time. *See* Parts III.A–B. Petitioner ignores these similarities, and instead attempts to repackage substantially the same arguments as those previously considered—and rejected—by the Examiner in the Parent Application. Accordingly, Grounds 1–6 should be rejected as consisting of the same or substantially the same arguments previously presented to the Office. *See, e.g.*, *Ziegman*, Case IPR2015-1860, slip op. at 14 (PTAB Feb. 24, 2016) (Paper 11) (denying review because "we are unpersuaded that adjudicating such a dispute on an already-considered issue is an efficient use of Board resources").

## VII.   PETITIONER'S EXPERT TESTIMONY IS UNRELIABLE

Petitioner's expert testimony is unreliable because it is based on a legally erroneous determination of the proper level of ordinary skill in the art. For the obviousness inquiry,

> [t]he statutory emphasis is on a person of *ordinary* skill. Inventors, as a class . . . possess something—call it what you will—which sets them apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (i.e., inventors) would have known or would likely have done . . . .

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). Contrary to this long-standing Federal Circuit precedent, Mr. Garney improperly uses the inventors of Bohm and other patents to determine the level of ordinary skill in the art. *See* Ex. 1023 ¶¶ 56–58. This leads Mr. Garney to the incorrect conclusion that the level of *ordinary* skill is "high," requiring a degree, "if not an advanced degree." *Id.* ¶ 58; *compare with* Knapen ¶ 47 (person of ordinary skill in the art does not have an advanced degree). Mr. Garney's testimony regarding claim construction and obviousness, both viewed from the perspective of one having ordinary skill, is unreliable and should not be considered. *See Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1258–59 (Fed. Cir. 2007) (reversing district court because expert testimony evidence of non-obviousness "was based on an improper determination of the level of skill in the art").

## VIII.  THE PETITION FAILS TO SHOW A REASONABLE LIKELIHOOD THAT PETITIONER WOULD PREVAIL AGAINST THE CHALLENGED CLAIMS

### A. Ground 1:  Furukawa Does Not Anticipate Claims 1–8, 10–11, 15–20, or 22–25

Ground 1 asserts Japanese reference 2003-256351 ("Furukawa") anticipates claims 1–8, 10–11, 15–20, and 22–25 of the '708 Patent. Petition at 38–54. The Board should deny institution with respect to Ground 1 because Petitioner has failed to demonstrate that Furukawa discloses every limitation of the claimed invention. *See Wm. Wrigley Jr.*, 683 F.3d at 1361 (prior art "must disclose all of the limitations of the claim"); *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (anticipation requires each and every element to be found in a single prior art reference).  Each of Bohm's independent claims—1, 3, 7, 18, and 23—requires two or more concurrent USB connections between the USB function block and two or more upstream ports or hosts. Furukawa does not disclose these concurrent USB connections because it is only capable of a "one-to-one connection between the host PC that is the source of the request and the peripheral device[9] that is the destination of the request." Ex. 1002 ¶ [0010]. The independent claims also require simultaneous enumeration, configuring, and/or access of the multi-host USB device. Under the proper BRI

---

[9]    As admitted in the Petition, Furukawa's peripheral devices (*e.g.*, printer, scanner, HD drive, and CD-ROM drive) correspond to the claimed "USB function block." Petition at 39 (Part VII.A.1c); *see also* Ex. 1023 ¶ 79.

31

construction of "simultaneously" discussed above (*see* Part V.A), Furukawa does not disclose these additional limitations of the independent claims. Because Furukawa only discloses a one-to-one connection for any peripheral device, two hosts cannot simultaneously enumerate, configure, or otherwise access the same peripheral at the same time.

**1.    Claim 1**

Independent Claim 1 is directed to:

1. A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding
        first and second hosts;

a USB function block; and

a multi-host device controller coupling the USB function block to the
        first and second upstream ports, wherein the multi-host device
        controller is configured to establish concurrent respective USB
        connections between the USB function block and the first and
        second upstream ports, to allow the corresponding first and
        second hosts to:
        simultaneously enumerate and configure the USB multi-host
                device;
        simultaneously access the USB multi-host device; and
        alternately access the USB function block without reconfiguring
                and/or re-enumerating the USB multi-host device before
                each access.

'708 Patent, 4:55–5:4. According to its express language, Claim 1 requires a USB

multi-host device with (1) first and second upstream ports, (2) a USB function

block, and (3) a multi-host device controller "configured to establish ***concurrent***

***respective USB connections between the USB function block and the first and***

***second upstream ports***."

Petitioner alleges (1) Furukawa's "plurality of connecting ports 2" correspond

to the claimed "first and second upstream ports" (Petition at 39); and (2) any of

Furukawa's "USB peripheral devices including a printer, scanner, HD drive, [and]

CD-ROM drive" correspond to the claimed "USB function block" (*id.*). Petitioner

does not actually identify the "concurrent respective USB connections" required by

claim 1. *See* Petition at 40–41. Relying instead on its improper BRI construction of

"concurrent," Petitioner identifies Furukawa's "controlling circuit," which "consists

of hub repeater 13, hub controller 14, and CPU 15" as disclosing "concurrence." *Id.*

Petitioner's allegations are depicted in the annotated figure below:

## FIG. 1



**"first and second upstream ports" (2-1, 2-2, 2-3, 2-4)**

**"concurrence" (13, 14, 15)**

**"USB function block" (25, 26, 27, 28)**

Ex. 1002 at 5 (annotated).

First, Petitioner's anticipation argument fails by not identifying "concurrent respective USB connections" required by Claim 1. "To prove anticipation, Petitioner must show that each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Robertson*, 169 F.3d at 745. Rather than specifically identify the claimed "concurrent respective USB connections" of claim 1, Petitioner states generally that "Furukawa discloses its controller is configured, *i.e.*, structured, or operable, for USB connections between function blocks and upstream ports." Petition at 40. While Petitioner's statement may be true, this general observation about Furukawa does nothing to support Petitioner's anticipation argument. Nor does Petitioner's equally general observation that "Furukawa discloses 'a controlling circuit for establishing connections between the host computers and the peripheral devices.'" *Id.* To prove anticipation, Petitioner must identify the specifically-claimed "concurrent" USB connections between the USB function block and the first and second upstream ports. *See In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (anticipatory prior art must disclose "each and every element of the claimed invention . . . arranged or combined in the same way as in the claim").

Petitioner does not identify the claimed concurrent USB connections because they do not exist in Furukawa. Rather, as Petitioner admits (Petition at 41), Furukawa is only capable of a "one-to-one connection between the host PC that is the source

of the request and the peripheral device that is the destination of the request." Ex. 1002 ¶ [0010]. In other words, Furukawa's controlling circuit cannot "establish concurrent respective USB connections between the USB function block [*i.e.*, the printer, scanner, HD Drive, or CD-ROM Drive] and the first and second upstream ports [*i.e.*, two of ports 2-1, 2-2, 2-3, or 2-4]." Instead, Furukawa's controlling circuit establishes a connection between one peripheral (*i.e.*, the USB function block) and only one upstream port. *See* Knapen ¶ 68. This "one-to-one connection" is repeatedly emphasized in Furukawa:

- "[I]f there is a request from one or more of the host computers for transmission or reception of data to one peripheral device, the controlling circuit establishes ***a connection between one of the host computers and the one peripheral device*** . . . ." Ex. 1002 at [CLAIM 4] (emphasis added).

- "In the present invention, . . . the controlling circuit establishes ***a connection between one of the host computers and the one peripheral device***, and holds temporarily, in the FIFO memory, the data from another host computer until the transmission or reception of the data of ***the host computer that is connected*** is completed." *Id.* ¶ [0006] (emphasis added).

- "The controlling circuit C has functions such as for checking the state of use of a peripheral device when there has been a request for transfer of data . . . [and] for setting up *a connection between the host PC and the peripheral device* if the peripheral device is available for use . . . ." *Id.* ¶ [0010] (emphasis added).

One of ordinary skill in the art understands the controlling circuit in Furukawa is limited to establishing only this type of one-to-one connection between the USB functions (Furukawa's peripherals) and the USB hosts. Knapen ¶¶ 68–70. This understanding is confirmed by Furukawa's "releasing [of] the connection after the data transfer has been completed." Ex. 1002 ¶ [0010]; *see also* Knapen ¶¶ 71–74; Ex. 1002 ¶ [0011] ("The hub repeater 13 is a part that has functions for setting up and releasing connections between the host PCs 21 through 24 and the peripheral devices 25 through 28."). As explained in Furukawa:

> [I]f, while a given host PC is accessing a peripheral device (for example, the printer 25), another host PC has requested access to that peripheral device, the data of the second host PC is held temporarily in the FIFO memory 11 until completion of the transmission or reception by the first host PC, through outputting of the NAK signal. Collisions between the data of the individual host PCs are avoided thereby.

Ex. 1002 ¶ [0017].

Based on these passages, one of ordinary skill in the art understands that when two hosts request access to the same peripheral (*e.g.*, printer 25), Furukawa establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in a FIFO memory and holding off that host request by responding with the NAK signal. Knapen ¶ 72. When the host that is connected to the peripheral completes its data transfer, the controlling circuit releases the first one-to-one connection and then establishes a new one-to-one connection between the peripheral and the second, waiting host (via its upstream port). *Id.* ¶ 73. The second host then completes its access. *Id.* One of ordinary skill in the art understands Furukawa is not capable of establishing concurrent USB connections between a peripheral and two or more hosts or upstream ports because there are never two or more such USB connections at the same time. *Id.* ¶ 74. Furukawa's connections to peripherals are always one-to-one.

Petitioner relies on Furukawa's statement that "a plurality of host PCs can access the peripheral devices simultaneously" as disclosing the "concurrence" required by Claim 1. *See* Petition at 41. However, one of skill in the art understands this statement to disclose only that one host may access one peripheral while another host is accessing another peripheral. Knapen ¶ 75. While this may be a type of

"concurrence," it is not the concurrence required by the claim—*i.e.*, two hosts connected to the same function at the same time or simultaneously.

Petitioner also appears to rely on the fact that Furukawa's "controlling circuit C (outlined in red) connects to Host PCs (outlined in blue) concurrently through bus 12, FIFO memories 11, and connecting ports 2" as disclosing the "concurrent" USB connections of claim 1. *See* Petition at 40. Again, this "concurrence" is not the concurrence required by claim 1 because it merely describes multiple hosts connected to the controlling circuit at the same time. As discussed above, multiple hosts are not concurrently connected to a USB function block (*e.g.*, peripherals 25–28); Furukawa provides only a one-to-one connection between any one host and any one peripheral.

Because Furukawa does not establish the concurrent USB connections of Claim 1, it also does not disclose a multi-host device controller that allows the first and second hosts to "simultaneously enumerate and configure the USB multi-host device" or "simultaneously access the USB multi-host device," as required by Claim 1. As discussed above, the broadest reasonable interpretation of "simultaneously" means "at the same time." *See* Part V.A. One of ordinary skill in the art would understand that because Furukawa provides only a one-to-one connection between any one peripheral and any one host at any given time, there can be no simultaneous enumeration, configuration, or access of the USB multi-host device by multiple

39

hosts. Knapen ¶ 77. Instead, Furukawa would allow only one host to enumerate, configure, or access a peripheral, and would buffer a second host's attempt to simultaneously enumerate, configure, or access the same peripheral, issuing a NAK signal to the second host. *Id.*; *see also* Ex. 1002 ¶ [0017].

### 2.  Claim 3

Like Claim 1, independent Claim 3 recites concurrent USB connections and simultaneous access of a USB multi-host device. *See* '708 Patent, 5:10–27. The Claim 3 concurrent USB connections are between (1) a first host and the USB function block and (2) a second host and the USB function block. *Id.* 5:10–20 ("a first USB connection between the first host and the USB function block and a second USB connection between the second host and the USB function block, wherein the first USB connection and the second USB connection are concurrent"). Petitioner contends that the anticipation analysis for Claim 1 applies to Claim 3. *See* Petition at 46–49.

As discussed above with respect to Claim 1, Furukawa fails to disclose "concurrent" USB connections between (1) a first host and the USB function block and (2) a second host and the USB function block because Furukawa is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB function block). *See* Part VIII.A.1. Also as discussed above, without

the claimed concurrent USB connections Furukawa does not allow "simultaneously access[ing] the USB multi-host device." *Id.*

### 3.    Claim 7

Like Claim 1, independent Claim 7 recites concurrent USB connections and simultaneous enumeration, configuring, and access of a USB device. *See* '708 Patent, 5:43–58. The Claim 7 concurrent USB connections are between the USB function block and a plurality of hosts. *Id.*, 5:43–50 ("concurrent respective USB connections between the USB function block and the plurality of hosts"). Petitioner contends that the anticipation analysis for Claim 1 applies to Claim 7. *See* Petition at 49.

As discussed above with respect to Claim 1, Furukawa fails to disclose "concurrent" USB connections between the USB function block and a plurality of hosts because Furukawa is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB function block). *See* Part VIII.A.1. Also as discussed above, without the claimed concurrent USB connections Furukawa does not allow "simultaneously enumerat[ing] and configur[ing]" or "simultaneously access[ing] the USB device." *Id.*

### 4.    Claim 18

Like Claim 1, independent Claim 18 recites concurrent USB connections and simultaneous enumeration and configuring of a USB device. *See* '708 Patent, 6:37–

54. The Claim 18 concurrent USB connections are between a plurality of hosts and a shared USB function. *Id.*, 6:37–41 ("establishing concurrent respective USB connections between a plurality of hosts and a shared USB function comprised in the USB device"). Petitioner contends that the anticipation analysis for Claim 1 applies to Claim 18. *See* Petition at 49–50.

As an initial matter, Petitioner has failed to identify the claimed "shared USB function" in Furukawa. As best understood, it appears Petitioner is equating the "shared USB function" of Claim 18 with the "USB function block" in Claim 1. As discussed above with respect to Claim 1, Furukawa fails to disclose "concurrent" USB connections between a plurality of hosts and the shared USB function because Furukawa is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, presumably the claimed shared USB function). *See* Part VIII.A.1. Also as discussed above, without the claimed concurrent USB connections Furukawa does not "simultaneously enumerat[e] and configur[e] the USB device." *Id.*

### 5. Claim 23

Like Claim 1, independent Claim 23 recites concurrent USB connections and simultaneous configuring and access of a USB device. *See* '708 Patent, 7:4–14. The Claim 23 concurrent USB connections are between the USB function block and two or more USB hosts. *Id.*, 7:4–10 ("concurrent respective USB connections between

the shared USB function block and two or more USB hosts"). Petitioner appears to contend that Claim 23 does not include concurrent USB connections. *See* Petition at 50 ("[C]laim 23 broadens . . . from the controller having ability to establish concurrent USB connections to the controller being able 'to receive and respond to simultaneous respective USB access requests' from the hosts for accessing the shared USB function."). Thus, it appears Petitioner does not identify concurrent USB connections for Claim 23. For this reason alone, the Board should deny institution on Claim 23.

Petitioner's cryptic statement about the "broadening" in Claim 23 may intend to suggest the anticipation analysis for Claim 1 applies equally to Claim 23. *See* Petition at 50–51. As discussed above with respect to Claim 1, Furukawa fails to disclose "concurrent" USB connections between the USB function block and two or more hosts because Furukawa is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB function block). *See* Part VIII.A.1. Also as discussed above, without the claimed concurrent USB connections Furukawa does not allow "simultaneously configur[ing]" or "access[ing]" the USB device. *Id.*

### 6.   Dependent Claims

By virtue of their dependency, Claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25 of the '708 Patent include the same limitations as the independent claim from

which they depend. Therefore, for the same reasons discussed above with respect to the independent claims, Petitioner has also not demonstrated a reasonable likelihood that it would prevail in showing that Furukawa anticipates these dependent claims.

**B.     Ground 2:  Dickens Does Not Anticipate Claims 1–8, 11, 15–20, or 22–25**

Ground 2 asserts U.S. Patent No. 6,549,966 ("Dickens") anticipates claims 1–8, 11, 15–20, and 22–25 of the '708 Patent. Petition at 55–63. The Board should deny institution with respect to Ground 2 because Petitioner has failed to demonstrate that Dickens discloses every limitation of the claimed invention. *See Robertson*, 169 F.3d at 745 (anticipation requires each and every element to be found, either expressly or inherently, in a single prior art reference).  Each of Bohm's independent claims—1, 3, 7, 18, and 23—requires two or more concurrent USB connections between the USB function block and two or more upstream ports or hosts. Dickens does not disclose these concurrent USB connections because "[e]ach peripheral device[10] can have a USB connection by which it is connected to *a respective one* of the plurality of peripheral data converters." Ex. 1003, 5:2–4 (emphasis added). Thus, like Furukawa (Ground 1), Dickens simply discloses a switch that connects a peripheral device to one host at a time. *See, e.g.*, *id.*, 2:48–52

---

[10]     As admitted in the Petition, Dickens' "peripheral devices including a printer 182" correspond to the claimed "USB function block." Petition at 56 (Part IX.A.1c); *see also* Ex. 1023 ¶ 105.

("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

The independent claims also require simultaneous enumeration, configuring, and/or access of the multi-host USB device. Under the proper BRI construction of "simultaneously" discussed above, Dickens does not disclose these additional limitations of the independent claims. Because Dickens only discloses a one-to-one connection for any peripheral device, two hosts cannot simultaneously enumerate, configure, or otherwise access the same peripheral at the same time.

The Board should also deny the Petition as to Ground 2 because Dickens does not disclose "USB connections" between two or more hosts (or upstream ports) and its peripherals (*e.g.*, the claimed "USB function block"). Rather, Dickens unambiguously states that his invention is "a data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*." Ex. 1003, 2:16–19 (emphasis added).

### 1.    Claim 1

As discussed in Part VIII.A.1 above, Claim 1 expressly requires a USB multi-host device with (1) first and second upstream ports, (2) a USB function block, and (3) a multi-host device controller "configured to establish *concurrent respective*

***USB connections between the USB function block and the first and second upstream ports*."**

As best understood, Petitioner alleges (1) Dickens' USB data routing device 100 has upstream USB ports corresponding to the claimed "first and second upstream ports" (Petition at 55–56 (discussing the connection between data routing device 100 and host computers 105)); and (2) Dickens' "peripheral devices including a printer 182" correspond to the claimed "USB function block" (*id.* at 56).

Petitioner does not actually identify the "concurrent respective USB connections" required by Claim 1. *See* Petition at 57. Relying instead on its improper BRI construction of "concurrent," Petitioner appears to identify most of Dickens' data routing device 100, including "data router 130 and data routing controller 140 with microprocessor 142," "device controllers 150," "USB controllers 154, 156, the bus 132, and USB connections 109" as disclosing the "multi-host controller configured to establish concurrent respective USB connections between the USB function block," which is according to Petitioner "the Dickens printer 182, and the first and second upstream ports." *Id.* Petitioner's allegations (as best understood) are depicted in the annotated figure below:



Ex. 1003, Fig. 2 (annotated).

This vague and conclusory assertion does not provide sufficient detail as to the grounds on which Petitioner challenges Claim 1. *See* 37 C.F.R. § 42.22(b) (petition must include "a detailed explanation of the significance of the evidence"). The Board and Patent Owner are left to guess what structure in Dickens the Petitioner corresponds to the "concurrent respective USB connections" required by Claim 1. For this reason alone, Petitioner has failed to show a reasonable likelihood of success in challenging Claim 1 as anticipated by Dickens. *See Broadcom Ltd. v. Invensas Corp.*, Case IPR2017-00107, slip op. at 8–9 (PTAB Mar. 15, 2017) (Paper

7) (denying institution where Petitioner failed to identify in sufficient detail portions of prior art allegedly anticipating the claim).

> **a.    *Dickens does not disclose the claimed "concurrent" USB connections***

Petitioner does not identify the claimed concurrent USB connections because they do not exist in Dickens. Rather, Dickens is only capable of a one-to-one connection between one host PC and a peripheral such as the printer. *See, e.g.*, Ex. 1003, 5:2–4 ("Each peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). In other words, Dickens' data routing device cannot "establish concurrent respective USB connections between the USB function block [*e.g.*, the printer] and the first and second upstream ports [*e.g.*, USB ports connected to USB connection 106]." Instead, Dickens' data routing device establishes a connection between one peripheral (*e.g.*, the USB function block) and only one upstream port.

One of ordinary skill in the art understands the data routing device in Dickens is limited to establishing only this type of one-to-one connection between the USB function (Dickens' printer) and the USB host PCs. *See* Knapen ¶¶ 84–87. This understanding is confirmed by at least the following passages:

- "Because the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the

data flow between them on and off. In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application." Ex. 1003, 2:21–26.

- "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." *Id.*, 2:48–52.

- "When print data from either computer is detected it is routed to the printer if the printer is currently free. Any subsequent print data from the other computer is buffered in memory until a break in transmission of the original print data stream equal to the timeout period has been detected. The[] buffered data is then sent to the printer. . . . The overall effect is to allow the printer to be automatically shared between the computers." *Id.*, 9:21–30.

Based on these passages, one of one of ordinary skill in the art understands that when two hosts request access to the same peripheral (*e.g.*, a printer), Dickens establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in memory. Knapen ¶¶ 88–89. When the host that is connected to the peripheral completes its data transfer, the data routing device switches the first one-to-one

49

connection off and then switches a new one-to-one connection on between the peripheral and the second, waiting host (via its upstream port). *Id.* ¶ 90. The second host then completes its access. *Id.* One of ordinary skill in the art understands Dickens is not capable of establishing concurrent USB connections between a peripheral and two or more hosts or upstream ports because there are never two or more such USB connections at the same time. *Id.* ¶ 91. Dickens' connections to peripherals are always one-to-one.

### b. Dickens does not disclose the claimed "simultaneously" enumerating, configuring, and/or accessing

Because Dickens does not establish the concurrent USB connections of Claim 1, it also does not disclose a multi-host device controller that allows the first and second hosts to "simultaneously enumerate and configure the USB multi-host device" or "simultaneously access the USB multi-host device," as required by Claim 1. As discussed above, the broadest reasonable interpretation of "simultaneously" means "at the same time." *See* Part V.A. One of ordinary skill in the art would understand that because Dickens provides only a one-to-one connection between any one peripheral and any one host at any given time, there can be no simultaneous enumeration, configuration, or access of the USB multi-host device by multiple hosts. Knapen ¶ 93. Instead, Dickens would allow only one host to enumerate, configure, or access a peripheral, and would buffer a second host's attempt to

simultaneously enumerate, configure, or access the same peripheral. *Id.*; *see also* Ex. 1003 9:21–30.

### c.     *Dickens does not disclose the claimed "USB connections"*

Claim 1 requires the concurrent connections "between the USB function block and the first and second upstream ports" to be "USB connections." Petitioner cannot show a likelihood of success that Dickens anticipates Claim 1 because the connection between the printer (*i.e.*, according to Petitioner, the claimed "USB function block") and the first and second upstream ports is not a USB connection. Dickens repeatedly emphasizes this fact:

- "[A] data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*." Ex. 1003, 2:16–19 (emphasis added).

- "Signals under the USB protocol are received by the [data routing] device from the host computer and are converted into *a non-USB protocol form*." *Id.*, 2:27–29 (emphasis added).

- "[T]he control of the data transmitted between [the host computer and peripheral devices] is achieved in *a USB protocol independent manner*." *Id.*, 2:36–39 (emphasis added).

- "Preferably, the data router includes *a non-USB bus* in communication with the computer data converter, peripheral data converter and the

microprocessor . . . . The converted computer data and peripheral data may be transferred through the data router by ***a non-USB bus***. The routing of the data on ***the non-USB bus*** is controlled by the microprocessor . . . ." *Id.*, 4:6–17 (emphasis added).

- "The microprocessor 142 converts incoming computer data from the USB host computers 105 into ***a format that is independent of the USB protocol*** and stores it in DRAM 144. It also performs the reverse task on data that is flowing in the opposite direction." *Id.*, 7:45–49 (emphasis added).

- "[A] format that is ***independent of the USB protocol***." *Id.*, 8:19–21, 8:24–26, 8:29–41 (emphasis added).

- "Any data received from the printer 180 and speakers 182 is converted by the peripheral data converters into a converted peripheral data ***format that is independent of the USB protocol*** and stored in the DRAM 144 ready for processing by the microprocessor 142 of the routing controller 140." *Id.*, 8:37–41 (emphasis added).

The connection Dickens uses to route data is a PCI bus. *E.g.*, *id.*, 8:16–28. Even Petitioner's own expert appears to acknowledge the lack of a "USB connection." *See* Ex. 1023 ¶ 54 (some prior art included "non-USB data exchanges

internally"). Because Dickens routes data in a non-USB format over a PCI bus, one of ordinary skill in the art would not view Dickens as disclosing concurrent respective "USB connections" between Dickens' printer (*e.g.*, the claimed USB function block) and the two upstream ports on Dickens' data routing device. Knapen ¶¶ 94–95.

## 2.    Claim 3

Like Claim 1, independent Claim 3 recites concurrent USB connections and simultaneous access of a USB multi-host device. *See* '708 Patent, 5:10–27. The Claim 3 concurrent USB connections are between (1) a first host and the USB function block and (2) a second host and the USB function block. *Id.*, 5:10–20 ("a first USB connection between the first host and the USB function block and a second USB connection between the second host and the USB function block, wherein the first USB connection and the second USB connection are concurrent"). Petitioner contends its Claim 1 anticipation analysis applies to Claim 3. *See* Petition at 60.

As discussed above regarding Claim 1, Dickens fails to disclose "concurrent" USB connections between: (1) a first host and the USB function block and (2) a second host and the USB function block because (1) Dickens is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB function block) (*see* Part VIII.B.1.a), and (2) Dickens uses a PCI connection instead of a USB connection (*see* Part VIII.B.1.c). Also, as discussed above, without the

53

claimed concurrent USB connections, Dickens does not allow "simultaneously access[ing] the USB multi-host device." *See* Part VIII.B.1.b.

### 3.     Claim 7

Like Claim 1, independent Claim 7 recites concurrent USB connections and simultaneous enumeration, configuring, and access of a USB device. *See* '708 Patent, 5:43–58. The Claim 7 concurrent USB connections are between the USB function block and a plurality of hosts. *Id.*, 5:43–50 ("concurrent respective USB connections between the USB function block and the plurality of hosts"). Petitioner contends its Claim 1 anticipation analysis applies to Claim 7. *See* Petition at 60.

As discussed above regarding Claim 1, Dickens fails to disclose "concurrent" USB connections between the USB function block and a plurality of hosts because (1) Dickens is limited to a one-to-one connection between any one host and any one peripheral (i.e., the claimed USB function block) (*see* Part VIII.B.1.a), and (2) Dickens uses a PCI connection instead of a USB connection (*see* Part VIII.B.1.c). Also, as discussed above, without the claimed concurrent USB connections, Dickens does not allow "simultaneously enumerat[ing] and configur[ing]" or "simultaneously access[ing] the USB device." *See* Part VIII.B.1.b.

### 4.     Claim 18

Like Claim 1, independent Claim 18 recites concurrent USB connections and simultaneous enumeration and configuring of a USB device. *See* '708 Patent, 6:37–

54. The Claim 18 concurrent USB connections are between a plurality of hosts and a shared USB function. *Id.*, 6:37–41 ("establishing concurrent respective USB connections between a plurality of hosts and a shared USB function comprised in the USB device"). Petitioner contends its Claim 1 anticipation analysis applies to Claim 18. *See* Petition at 49–50.

As an initial matter, Petitioner has failed to identify the claimed "shared USB function" in Dickens. As best understood, it appears Petitioner equates the "shared USB function" of Claim 18 with the "USB function block" in Claim 1. As discussed above regarding Claim 1, Dickens fails to disclose "concurrent" USB connections between a plurality of hosts and the shared USB function because (1) Dickens is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, according to Petitioner, the claimed USB function block) (*see* Part VIII.B.1.a), and (2) Dickens uses a PCI connection instead of a USB connection (*see* Part VIII.B.1.c). Also, as discussed above, without the claimed concurrent USB connections, Dickens does not "simultaneously enumerat[e] and configur[e] the USB device." *See* Part VIII.B.1.b.

### 5.    Claim 23

Like Claim 1, independent Claim 23 recites concurrent USB connections and simultaneous configuring and access of a USB device. *See* '708 Patent, 7:4–14. The Claim 23 concurrent USB connections are between the USB function block and two

or more USB hosts. *Id.*, 7:4–10 ("concurrent respective USB connections between the shared USB function block and two or more USB hosts"). Petitioner appears to contend that Claim 23 does not include concurrent USB connections. *See* Petition at 50 ("[C]laim 23 broadens . . . from the controller having ability to establish concurrent USB connections to the controller being able 'to receive and respond to simultaneous respective USB access requests' from the hosts for accessing the shared USB function."). Thus, it appears Petitioner does not identify concurrent USB connections for Claim 23. For this reason alone, the Board should deny institution of Claim 23.

Petitioner's cryptic statement about the "broadening" in Claim 23 may intend to suggest its Claim 1 anticipation analysis applies to Claim 23. *See* Petition at 60, 50–51. As discussed above regarding Claim 1, Dickens fails to disclose "concurrent" USB connections between the USB function block and two or more hosts because (1) Dickens is limited to a one-to-one connection between any one host and any one peripheral (*e.g.*, the claimed USB function block) (*see* Part VIII.B.1.a), and (2) Dickens uses a PCI connection instead of a USB connection (*see* Part VIII.B.1.c). Also, as discussed above, without the claimed concurrent USB connections, Dickens does not allow "simultaneously configur[ing]" or "access[ing]" the USB device. *See* Part VIII.B.1.b.

### 6.     Dependent Claims

By virtue of their dependency, Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 of the '708 Patent include the same limitations as the independent claim from which they depend. Therefore, for the same reasons discussed above regarding the independent claims, Petitioner fails to demonstrate a reasonable likelihood that it would prevail in showing that Dickens anticipates these dependent claims.

### C.     Ground 3:  Furukawa or Dickens in View of Chen Does Not Render Obvious Claims 9, 11–14, or 21

Ground 3 asserts that Claims 9, 11–14, and 21 are rendered obvious by either Furukawa or Dickens in view of Chen. Petition at 64. As discussed above, neither Furukawa nor Dickens disclose a USB device having ***concurrent USB connections*** between a USB function block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1. Chen does not teach or disclose the concurrent USB connections required by the independent claims, and Petitioner does not assert it does. Indeed, Chen cannot have concurrent USB connections between a USB function block and multiple hosts because Chen's system has only one host, as Petitioner admits. Petition at 64 ("Chen has one host."); *see also* Knapen ¶ 101.

The Board should also refuse to initiate review on proposed Ground 3 because Petitioner improperly exceeds the word limit by incorporating Mr. Garney's discussion of Ground 3 and not adequately explaining this position in the Petition.

For example, Petitioner states that the Ground 3 combination is justified "at least under the rationales (D)[11] and (G) of MPEP 2143. See Garney ¶¶124-42." Petition at 64. But Petitioner fails to adequately explain rationale (G) in the Petition. Petitioner similarly fails to discuss the *Graham* factors, which must be considered in any obviousness analysis. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) ("[T]he ultimate question of obviousness is one of law *which must consider all four Graham factors* . . . ." (emphasis added)).

Under the PTAB rules, "the petition must contain a 'full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence . . . .' 37 C.F.R. § 42.22(a)(2). We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition." *Fidelity National Information Services*, Case IPR2014-00489, slip op. at 9 (Paper 9). Petitioner certifies the Petition contains 13,862 words. Mr. Garney's discussion of rational (G) at ¶¶ 139–41 of Ex. 1023 contains 334 words. Mr. Garney's discussion of the *Graham* factors at ¶¶ 125–30 of Ex. 1023 contains another 796 words. Together or separately, Petitioner's improper attempt to rely on this material via incorporation causes the Petition to exceed the 14,000-word limit.

---

[11]   The reference to rationale (D) appears to be a typo, as Mr. Garney's declaration discusses rationale's (C) and (G) for Ground 3.

Ground 3 should also be rejected in its entirety because it does not analyze the *Graham* factors without exceeding the word limit. *WBIP*, 829 F.3d at 1328.

**D.      Ground 4: Furukawa or Dickens in View of USB 2.0 Does Not Render Obvious Claims 9, 11–14, or 21**

Ground 4 asserts that Claims 9, 11–14, and 21 are rendered obvious by either Furukawa or Dickens in view of USB 2.0. Petition at 71. As discussed above, neither Furukawa nor Dickens disclose a USB device having ***concurrent USB connections*** between a USB function block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1. USB 2.0 does not teach or disclose this feature of the independent claims. Indeed, Petitioner does not argue that USB 2.0 discloses or teaches concurrent USB connections. This is because the USB standard does not allow more than one host to connect to one device at a time, so no system compliant with the USB 2.0 specification could have concurrent USB connections between a USB function block and multiple hosts. Knapen ¶ 103. Further confirmation that Wurzburg, Osakada, APA, Adder, and USB 2.0 do not disclose or teach the claimed concurrent USB connections is found on the face of the '708 Patent listing these prior art references.[12]   The Examiner considered these references and allowed the claims of the '708 Patent (and the Parent Application) in light of Bohm's amendment

---

[12]      The "Adder" reference is GB 2352540. The alleged "APA" is in Bohm's specification.

during prosecution of the Parent Application clarifying the USB connections are "concurrent." *See* Part II.B.

The Board should also refuse to initiate review on proposed Ground 4 because Petitioner improperly exceeds the word limit by incorporating Mr. Garney's discussion of Ground 4 and not explaining this position in the Petition. Indeed, the entirety of Petitioner's Ground 4 explanation is two sentences long with citations to Mr. Garney's declaration at ¶¶ 20 and 143–149. *See* Petition at 71. Petitioner provides no explanation of the alleged "interleaving" found in USB 2.0, how it works, how it would be combined with either Furukawa or Dickens, how the cited "MPEP rationales (D) and (G)" apply to the proposed combination, or whether one of ordinary skill in the art would know that applying the alleged "interleaving" of USB 2.0 would yield predictable results or have a reasonable chance of successfully achieving the claimed invention. Additionally, the Petition is devoid of any discussion of the *Graham* factors, which must be considered in any obviousness analysis. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) ("[T]he ultimate question of obviousness is one of law *which must consider all four Graham factors . . . .*" (emphasis added)).

Petitioner certifies the Petition contains 13,862 words. Mr. Garney's discussion of Ground 4 at ¶¶ 143–49 of Ex. 1023 contains 1,237 words. Mr. Garney's discussion of the *Graham* factors at ¶¶ 125–30 of Ex. 1023 contains

60

another 796 words. Together or separately, Petitioner's improper attempt to rely on this material via incorporation causes the Petition to exceed the 14,000-word limit. *See Fidelity National Information Services*, Case IPR2014-00489, slip op. at 9 (Paper 9) ("We, therefore, decline to consider information presented in a supporting declaration, but not discussed sufficiently in a petition.").

## E. Ground 5:  Wurzburg in View of Osakada, Further in View of Either Furukawa or Dickens Does Not Render Obvious Claims 1–25

Ground 5—not even endorsed by Petitioner's own expert—asserts that Wurzburg in view of Osakada in view of either Furukawa or Dickens renders claims 1–25 obvious. *See* Petition at 71. Petitioner admits that both Wurzburg and Osakada lack concurrent USB connections. *See* Petition at 71 ("Wurzburg and Osakada . . . lacked only concurrent connections . . . ."). Petitioner attempts to fill this gap with either Furukawa or Dickens. But as discussed above, neither Furukawa nor Dickens disclose a USB device having ***concurrent USB connections*** between a USB function block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1.

Further, Ground 5 merely rehashes the same argument made by the Examiner in the prosecution of the '708 Patent's Parent Application—an argument the Bohm overcame to achieve allowance of similar claims requiring concurrent USB connections. *See supra*, Part II.B. Ground 5 should be denied because it is cumulative of arguments made by the Examiner during prosecution of Bohm's

parent application. *See Ziegman v. Stephens*, Case IPR2015-018160, slip op. at 12–14 (PTAB Feb. 24, 2016) (Paper 11) (denying institution "on an already-considered issue").

Finally, to succeed in an obviousness challenge, a petition must sufficiently explain how one of skill would have combined the specific teachings of the prior art in a way that would arrive at the claimed invention. *See Innogenetics*, 512 F.3d at 1374 n.3. Ground 5 fails because Petitioner makes no effort to explain how the asserted references would be combined in a way that would achieve the challenged claims.

Petitioner argues that Wurzburg and Osakada teach every element of the claims except (1) concurrent connections, (2) simultaneous access, and (3) non-reconfiguring. *See* Petition at 71. With respect to these missing elements, Petitioner simply points to Furukawa; Petitioner does not provide any explanation as to what Dickens might contribute to the proposed combination. *Id.* However, Petitioner is silent regarding exactly how to combine the particular teachings of Furukawa or Dickens with the teachings of Wurzburg or Osakada. *See* Petition at 71–72. Without any such explanation, Petitioner is asking Patent Owner and the Board to guess how the components taught in the references could be combined and arranged to arrive at the claims. Because Petitioner has made no effort to explain how it proposes combining the teachings of the references, Petitioner cannot meet its burden of

proving obviousness. *See Lavelle Indus., Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op. at 18 (PTAB May 4, 2017) (Paper 18) (denying institution of obviousness grounds where petitioner did "not explain adequately" how the prior art references would be combined). The Board should deny institution on Ground 5.

**F.      Ground 6: Furukawa or Dickens in View of Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and "Other Cited Art" Does Not Render Obvious Claims 1–25**

Like Ground 5, Ground 6 is not endorsed by Petitioner's own expert. It asserts that "Furukawa or Dickens, Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and all other cited art" render Claims 1–25 obvious. Petition at 72. Although unclear, Petitioner appears to rely on either Furukawa or Dickens as base references for Ground 6. As discussed above, neither Furukawa nor Dickens disclose a USB device having ***concurrent USB connections*** between a USB function block and multiple hosts or upstream ports. *See* Parts VIII.A.1, VIII.B.1. Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and the "other" unspecified cited art do not teach or disclose this feature of the challenged independent claims. Indeed, Petitioner does not argue that any of these references disclose or teach concurrent USB connections and expressly admits that at least Wurzburg and Osakada do not. *See* Petition at 71 ("Wurzburg and Osakada . . . lacked only concurrent connections . . . ."). Further confirmation that Wurzburg, Osakada, APA, Adder, and USB 2.0 do not disclose or teach the claimed concurrent USB connections is found on the face of the '708 Patent

63

listing these prior art references. They were considered by the Examiner and found not to anticipate or render obvious the claims of the '708 Patent.

Further, a petition must sufficiently explain how specific teachings of prior art would be modified or combined to arrive at the claimed invention. *See Innogenetics*, 512 F.3d at 1374 n.3. Petitioner fails to provide any explanation as to *how* it proposes the particular teachings of Furukawa or Dickens would be combined with the teachings of "Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and all other cited art" to arrive at challenged Claims 1–25. *See Lavelle Industries, Inc. v. Danco, Inc.*, Case IPR2017-00159, slip op. at 22–23 (PTAB May 4, 2017) (Paper 18) ("unsupported, conclusory assertion[s]" do not "satisfy the burden of demonstrating obviousness") (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness.")). The Board should deny institution on Ground 6.

## IX.   CONCLUSION

Petitioner has failed to show a likelihood that it will prevail on any of Grounds 1–6. Accordingly, institution should be denied.

Dated:  May 30, 2017                    Respectfully submitted,

                                        */s/ Bruce W. Slayden II*

                                        Bruce W. Slayden II (Reg. No. 33,790)
                                        bslayden@sgbfirm.com
                                        Brian C. Banner (*pro hac vice*)
                                        bbanner@sgbfirm.com
                                        R. William Beard, Jr. (Reg. No. 39,903)
                                        wbeard@sgbfirm.com
                                        Truman H. Fenton (Reg. No. 64,766)
                                        tfenton@sgbfirm.com
                                        Jerry F. Suva (Reg. No. 67,902)
                                        jsuva@sgbfirm.com

                                        SLAYDEN GRUBERT BEARD PLLC
                                        401 Congress Avenue, Suite 1900
                                        Austin, TX 78701
                                        t: 512.402.3550
                                        f: 512.402.6865

IPR2017-00861
Patent Owner's Preliminary Response

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the above-captioned Patent Owner's Preliminary Response contains 13,799 words, excluding the parts of the document that are exempted by 37 C.F.R. 42.24(a).

Respectfully submitted,

*/s/ Bruce W. Slayden II*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

66

IPR2017-00861
Patent Owner's Preliminary Response

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above-captioned Patent Owner's Preliminary Response with accompanying exhibits (Exhibits 2002–03) was served in its entirety on May 30, 2017, upon the following parties by sending a copy via email to the following email addresses:

Charles W. Shifley (cshifley@bannerwitcoff.com)
Binal J. Patel (bpatel@bannerwitcoff.com)
Robert H. Resis (rresis@bannerwitcoff.com)
Jason S. Shull (jshull@bannerwitcoff.com)
Timothy J. Rechtien (trechtien@bannerwitcoff.com)
Mark A. Dalla Valle (mdallavalle@bannerwitcoff.com)
Zachary Getzelman (zgetzelman@bannerwitcoff.com)

Banner & Witcoff, Ltd.
10 South Wacker Drive, Suite 3000
Chicago, IL 60606

Respectfully submitted,

*/s/ Bruce W. Slayden II*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC

67

IPR2017-00861
Patent Owner's Preliminary Response

401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

68

IPR2017-00861
Patent Owner's Response

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————————

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

—————————————

U.S. Patent No. 7,627,708

—————————————

Case No. IPR2017-00861

**PATENT OWNER'S RESPONSE TO PETITION PURSUANT TO 35 U.S.C.
§ 316 AND 37 C.F.R. § 42.120**

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................1

II.    STATEMENT OF FACTS ........................................................................6

   A. The '708 Patent...................................................................................6

     1.   Background and Overview of Bohm's Invention .....................6

     2.   Prosecution History ................................................................8

     3.   The Dickens Prior Art ..........................................................10

III.   LEGAL STANDARD ............................................................................15

IV.   CLAIM CONSTRUCTION ..................................................................15

   A. "USB function block" (Claims 1, 3, 7, 23) ....................................16

   B. "shared USB function comprised in the USB device" (Claim 18) ...............18

V.    ARGUMENT.........................................................................................19

   A. Dickens Does Not Anticipate Claims 1–8, 11, 15–20, or 22–25 ..................19

     1.   Dickens Does Not Disclose a Device Having a Function and a Controller (Claims 1, 3, 7, and 23) and Two Upstream Ports (Claim 1)..........................................................................19

     2.   Dickens Does Not Disclose "Concurrent Respective USB Connections" (Claims 1, 3, 7, 18, 23) ....................................25

      a.   Dickens does not disclose "USB Connections"—a PCI connection is not a USB connection ................................25

      b.   Dickens does not disclose "concurrent" USB connections— no two connections between the two hosts and the USB function block occur or operate at the same time ............................31

     3.   Dickens Does Not Disclose "Simultaneously Enumerat[ing] and Configur[ing]" (Claims 1, 7, 18) or "Simultaneously Configur[ing]" (Claim 23).........................................................35

4.     Dickens Does Not Disclose First and Second Endpoint Buffers "Coupled Between" Upstream Ports and the Controller (Claims 2, 6, 16) ..........................................37

5.     Dickens Does Not Disclose "USB Interface Circuit[s]" Located Within the Claimed "Controller" (Claim 25) ...........................38

6.     Dickens Does Not Disclose a "Multi-Host Device Controller [That] is Configured to Maintain Respective Dedicated Address, Configuration, and Response Information for Each of the Plurality of Hosts" (Claims 17, 22, 24) .........................................39

7.     Dependent Claims ..........................................................40

B.  Dickens in View of Chen Does Not Render Obvious Claims 9, 11–14 and 21 ...................................................................40

1.     Dickens Expressly Teaches Away from Chen's Interleaving ................42

2.     Combining Chen with Dickens Renders Dickens' System Inoperable and Further Teaches Away from the Proposed Combination ..........................................................43

3.     Petitioner's Proposed Combination does not Improve Dickens, does not Apply Chen's "Improvement" Technique in the Same Way as it is Used in Chen, and Relies on Improper Hindsight to Modify Chen's Principle of Operation to Arrive at the Claimed Invention .........................................45

VI.    CONCLUSION ..............................................................48

ii

## TABLE OF AUTHORITIES

**Cases**

*Beckton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249 (Fed. Cir. 2010)..................................................................2

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) .........................2

*Grain Processing Corp. v. Am. MaizeProds. Co.*, 840 F.2d 902 (Fed. Cir. 1988) ................................................................... 47–48

*In re Gordon*, 733 F.2d 900 (Fed. Cir. 1984) ........................................................43

*In re Grasselli*, 713 F.2d 731 (Fed. Cir. 1983) ................................................ 42, 43

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) ...........................................................41

*In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016) .....................15

*In re Ratti*, 270 F.2d 810 (C.C.P.A. 1959).................................................... 15, 47

*In re Sponnoble*, 405 F.2d 578 (C.C.P.A. 1969) ...................................................43

*Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365 (Fed. Cir. 2015)........................2, 28

*KSR Int'l v. Teleflex Inc. KSR Int'l v. Teleflex Inc.*, 550 U.S. 398 (2007)..............................................................................................................41

*Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F. 2d 1452 (Fed. Cir. 1984) ....................................................................1, 20

*Michael L McGinely v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) ................................................................................................. 43, 45

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008)............. *passim*

*Oil States Energy Servs. LLC v. Greene's Energy Group, LLC.*, 639 Fed. App'x 639 (Fed. Cir. 2016) ....................................................................1

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056 (Fed. Cir. 2016) ................... 15, 16, 27

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356 (Fed. Cir. 2012)...............................................................................................15

## Other Authorities

M.P.E.P. § 2143 ................................................................................. 15, 45, 46

M.P.E.P. § 2143.01 ...................................................................................15

## Regulations

37 C.F.R. § 42.100(b) ...............................................................................15

IPR2017-00861
Patent Owner's Response

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Declaration in Support of Motion for *Pro Hac Vice* Admission of Brian C. Banner Pursuant to 37 C.F.R. § 42.10(c) |
| 2002 | Declaration of Expert Geert Knapen in Support of Patent Owner's Preliminary Response to Petition |
| 2003 | Excerpts from Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc.) (1988) |
| 2004 | Exhibit 2004 to the Deposition of John Garney (Oct. 25, 2017) (annotated version of Petitioner's Exhibit 1003) |
| 2005 | Omitted |
| 2006 | John Garney Deposition Transcript (Oct. 25, 2017) |
| 2007 | Declaration of Expert Geert Knapen in Support of Patent Owner's Response to Petition |

## I.    INTRODUCTION

While the Supreme Court reviews the constitutionality of *inter partes* review proceedings,[1] Patent Owner Microchip defends its '708 Patent ("Bohm") against a Petition that ignores the law and seeks to find claims anticipated and obvious by references that have nothing to do with the claimed invention and in fact, were disclaimed by the Patent Owner. There are many serious problems with Petitioner's quest to cancel Patent Owner's claims.

First, the Petition ignores black letter law that requires an anticipating reference to disclose each element of the claimed invention "arranged as in the claim" without "treat[ing] the claims as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008) (quoting *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F. 2d 1452 (Fed. Cir. 1984)). In particular, the Petition ignores that the claimed features are all part of a single "USB multi-host device," and improperly seeks to combine hindsight-selected parts of separate devices of a single reference, *i.e.*, "Dickens," to find the '708 Patent claims anticipated. The law does not allow this. *Id.* (reversing

---

[1]     *See Oil States Energy Servs. LLC v. Greene's Energy Group, LLC.*, 639 Fed. App'x 639 (Fed. Cir. 2016), cert. granted, 198 L. Ed. 2d 677 (U.S. Jun. 12, 2017) (No. 16-712).

district court's anticipation finding because "it is not enough that the prior art reference . . . includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention").

Second, Dickens fails to disclose each element of the claims:

- Dickens does not disclose "USB connections" (Claims 1, 3, 7, 18, 23) because a PCI connection is not a USB connection. The Board's conclusion that a "USB connection" can include any kind of non-USB connection is contrary to both parties' expert testimony (*see* Ex. 2006 at 90:4–10 (John Garney Deposition Transcript); Ex. 2007 ¶ 106 (Declaration of Expert Geert Knapen in Support of Patent Owner's Response to Petition) ("Knapen")) and renders the term "USB" in the claim phrase "USB connection" meaningless. This is legally improper. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1375 (Fed. Cir. 2015) ("Our precedent prohibits us from adopting such a construction" that would "read the word 'placed' out of the claims of the patent."); *Beckton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (refusing to adopt a claim construction which would render a claim limitation meaningless); *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (same).

2

- Even if a PCI bus can be a "USB connection," Dickens does not disclose the claimed "concurrent" "USB connections" (Claims 1, 3, 7, 18, 23) because no two connections between the two hosts and the USB function block occur or operate at the same time. Respectfully, it appears the Board was led to misinterpret the claims to require concurrent connections between "the multi-host device controller" and the first and second hosts. This is not what the claim requires and disregards "the part-to-part relationships set forth in the claims and that give the claims their meaning." *Net MoneyIN*, 545 F.3d at 1370.

- Dickens does not disclose "simultaneously enumerat[ing] and configur[ing]" the USB device, as required by Claims 1, 7, and 18; or "simultaneously configur[ing] the USB device for the shared USB function" of Claim 23. Contrary to the Board's finding, Petitioner's expert conceded there would be no configuration of Dickens' emulated printers. *See* Ex. 2006 at 106:10–14 ("Q. . . . Do the host PCs 105, would they -- in Dickens, would one of ordinary skill in the art understand that they perform any configuration activities on the emulated printers?   A. I would expect not . . . ."). Moreover, the emulated printer devices are separate devices implemented in Dickens' data routing device—they are not the "USB device" (*i.e.*, Dickens'

3

printer 182). The emulated printers are configured (if at all) independently from printer 182.

- Dickens does not disclose first and second endpoint buffers "coupled between" upstream ports and the multi-host device controller (Claims 2, 6, 16) because the only identified buffers (DRAM 144) are inside the multi-host device controller (routing controller 140) and not between it and the upstream ports.

- Dickens does not disclose a controller with "USB interface circuits" (Claim 25) because the only identified USB interface circuits (device controllers 150) are outside of the controller (routing controller 140).

- Dickens does not disclose a controller that is "configured to maintain respective dedicated address, configuration, and response information for each of the plurality of hosts" (Claims 17, 22, 24). Neither Petitioner nor the Board have identified where in Dickens this limitation is found. The only cited passage of Dickens does not disclose this feature of Patent Owner's claims.

Finally, Dickens in view of Chen does not render obvious claims 9, 11–14, or 21. Chen does not teach or disclose the limitations that are missing from Dickens (discussed above), and Petitioner does not contend otherwise. Moreover, a person of

ordinary skill in the art would not combine Dickens with Chen because 1) Dickens expressly teaches away from a combination with Chen, 2) combining Chen with Dickens would render Dickens inoperable, and 3) Petitioner's proposed combination does not improve Dickens, does not apply Chen's "improvement" technique in the same way as it is used in Chen, and does not result in predictable results as required by the law.

Bohm's invention provides "[a] USB device [that] may be simultaneously configured and accessed by two or more USB hosts" with "a multi-host capable device controller." '708 Patent, Abstract. Bohm expressly acknowledged and disclaimed prior art "stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers" because they "fail[ed] to permit simultaneous access to the USB device that is downstream of the hub or switch." '708 Patent, 1:65–2:2. As summarized above and discussed more fully herein, Dickens does not come close to disclosing every feature of the '708 Patent claims because Dickens is the very type of stand-alone USB switch Bohm disclaimed. The Board should confirm the patentability of Claims 1–9 and 11–25.

## II.   STATEMENT OF FACTS

### A. The '708 Patent

#### 1.   Background and Overview of Bohm's Invention

The '708 Patent was filed on December 22, 2008, and claims priority to a provisional application filed on April 14, 2006. The '708 Patent is a continuation of the U.S. application ("Parent Application") that issued as U.S. Patent No. 7,523,243 ("the '243 Patent").

The '708 Patent relates to "computer hardware and, more specifically, to Universal Serial Bus (USB) controllers." '708 Patent, 1:19–21. By 2006, when Bohm filed the Parent Application, USB was a mature standard that was used ubiquitously. Knapen ¶ 70. The second version of the USB specification (USB 2.0), which provided for increased transfer rates compared to the previous USB specification, had been released years earlier. *Id.* The USB protocol is based on the assumption / requirement that only one entity—a USB host—can initiate data transactions on a USB bus. *Id.* ¶ 71. As Bohm recognizes, "the USB specification is structured so that every device is configured and accessed by a single host controller." '708 Patent, 1:57–59.

Before Bohm's inventions, to share a peripheral such as a printer between two hosts (*e.g.*, personal computers) a user could unplug the printer from the first host and plug it into the second host. Knapen ¶ 72. Alternatively, as Bohm describes,

there were "several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at any given time. There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch. The USB device is typically accessed by one single host at a time, and when access to the USB device is switched, the device must be re-configured, thereby losing internal state information." '708 Patent, 1:61–2:5.

Bohm successfully overcame the shortcomings of the prior art by providing a multi-host USB device with concurrent USB connections between the USB function block and two or more hosts. Knapen ¶ 73. Bohm explains that his inventive "shared USB device may be simultaneously configured and accessed by two or more USB hosts. The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host. The device may maintain a dedicated address, configuration and response information for each host. Each host may therefore establish a dedicated USB connection with the sharing device." '708 Patent, 2:32–40. Bohm's invention allows for sharing "a single USB device . . . across multiple USB hosts without needing to

7

be re-configured or re-enumerated each and every time the upstream hosts alternate accessing the USB device." '708 Patent, 2:12–15.

## 2.   Prosecution History

During prosecution, Bohm's '708 Patent application was rejected for double patenting over the '243 Patent. Ex. 1012 at 8–12 (Office Action dated 05/26/2009). All claims were allowed without amendment after Bohm filed a terminal disclaimer. Ex. 1012 at 1–7 (Issue Notification, Notice of Allowability, Response to Office Action).

During prosecution of the Parent Application, the originally-filed claims were rejected over U.S. Patent Publication No. 2006/0059293 ("Wurzburg") and U.S. Patent No. 6,308,239 ("Osakada"). *See* Ex. 1014 at 25–30, 51–56. In response, Bohm amended the independent claims, clarifying (1) the claims were to "concurrent" USB connections between the USB device block and two or more hosts[2] so that (2) his invention allowed the hosts to "simultaneously" request access to the USB device.[3]  Ex. 1014 at 6–11. Bohm explained the significance of these amendments:

> Wurzburg does not disclose the USB multi-host device that comprises
> a USB device block corresponding to at least one function and further

---

[2]    The "concurrent" limitation was added to each independent claim.
[3]    The "simultaneous" limitation was added to independent claims 1, 3, and 7. Original Claim 23 included this limitation.

8

comprises a multi-host device controller configured to establish <u>concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to simultaneously request access to the USB device</u> of claim 1. Rather, Wurzburg discloses a system in which a respective dedicated USB connection only exists between the device block and a single host at any one point in time, and thus only a single host can request access to the device block. Wurzburg teaches a "switching hub", which may <u>electronically switch between different configurations</u> (e.g., hardwired or software implemented configurations) <u>for access between the two or more upstream ports and the downstream ports</u> (paragraph 0008). Accordingly, Wurzburg does not teach, suggest, or render obvious a multi-host device controller configured to establish <u>concurrent</u> respective dedicated USB connections between a USB device block and first and second upstream ports.

\* \* \*

Finally, Wurzburg discloses in paragraph 0034 that "*when the downstream routing controller 201 switches configurations, and control of a downstream port is switched from the computer system 101 to the dual role peripheral device 207, <u>a connection between the computer system 101 and the respective peripheral device 125</u> (coupled to the downstream port to be switched) <u>may be terminated</u> by the computer system 101*", and further teaches that "*communications between the downstream port to be switched and the computer system*

*101 may be terminated by the USB switching hub 119*", and "*the dual role peripheral device 207 may then connect to, enumerate, and communicate with the respective peripheral device 125 coupled to the switched downstream port*" [emphasis added]. Therefore, it is also clear that Wurzburg also fails to at least teach a system in which at least two hosts are allowed to simultaneously requests access to the USB device, and further fails to teach a system in which a controller is operable to receive and respond to simultaneous respective USB access requests sent by the two or more USB hosts for accessing a function of the shared USB device block.

Ex. 1014 at 17–19 (pages 13–15 of Applicant's Request for Continued Examination dated 2008-07-23). Bohm's explanation of the concurrent nature of the USB connections and the simultaneous access requests of his invention overcame the Examiner's rejection and all claims of the Parent Application were allowed. Ex. 1014 at 3.

**3.      The Dickens Prior Art**

U.S. Patent No. 6,549,966 ("Dickens") (Ex. 1003) discloses a "switching hub" that connects a USB function to one—and only one—host at a time. *See, e.g.*, Dickens, 5:2–4 ("Each peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."). Dickens explains "[b]ecause the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the data

10

flow between them on and off. In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application." Dickens, 2:21–26. "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." *Id.* at 2:48–52.

Thus, like Wurzburg's "switching hub" cited during prosecution, when two hosts request access to the same peripheral (*e.g.*, a printer), Dickens establishes a one-to-one connection between one of the hosts (via its upstream port) and the peripheral while temporarily storing data from the other unconnected host in memory. Knapen ¶ 100. When the host connected to the peripheral completes its data transfer, the data routing device switches the first one-to-one connection off and then switches a new one-to-one connection on between the peripheral and the second, waiting host (via its upstream port). *Id.* ¶ 102. The second host then completes its access. *Id.*

The manner in which Dickens' system performs this switching is very different from Bohm's elegant solution for sharing a USB device between two hosts. Dickens' "data routing device" uses a very powerful microprocessor to coordinate activities occurring on separate USB buses. Knapen ¶ 78. In fact, the Dickens' system uses five (5) separate USB buses:

11

IPR2017-00861
Patent Owner's Response



FIG.  2

*Id.* Host computers 105 act as the USB host for USB Buses #1–2, *i.e.*, one computer/host for each USB bus. *Id.* ¶ 79; Dickens, 5:27–37. Host computers 105 are connected via USB connection 106 (and USB hub 107) to data converters 110 (not shown above—*see* Fig. 1), which include device controllers 150. Knapen ¶ 80; Dickens, 5:27–37, 6:51–54. Each USB device controller 150 is a unique USB device on its respective USB bus 106, making up a terminus or "leaf" of the USB bus. Knapen ¶ 81. In particular, Dickens discloses that the USB device controllers 150

implement emulation functions to emulate the presence of each USB peripheral device (*e.g.*, audio speakers 180, printer 182, keyboard 184, and mouse 186). Knapen ¶ 82; Dickens, 5:38–43. Thus, when a host computer 105 is connected to Dickens' data routing device 100, the host computer enumerates and configures each emulated device via its respective USB device controller 150. Knapen ¶ 83. During enumeration, each emulated device receives a unique address on its respective USB bus. *Id.* ¶ 84. This enumeration process relates to the emulated functions; host computer 105 does not enumerate any of the USB peripheral devices downstream from the data router (*e.g.*, audio speakers 180, printer 182, keyboard 184, and mouse 186). *Id.*

USB Buses #3–5 include peripheral data converters 120 (not shown above— *see* Fig. 1), which include USB host controllers (154, 156, 158). *Id.* ¶ 85. The USB host controllers (154, 156, 158) act as a host for each separate USB bus, *i.e.*, one host controller per bus. *Id.* ¶ 86.[4]  These host controllers are connected via USB connections 109 to the various separate downstream peripheral devices (audio speakers 180, printer 182, and keyboard 184 and mouse 186 through hub 107). *Id.* ¶ 88. The downstream devices are leaves of each respective USB bus. *Id.* Thus, when

---

[4]      Dickens states the USB host controllers include functions that emulate the presence of a host computer on USB connections 109. *See* Dickens, 6:12–17. The use of the word "emulate" may be confusing. These host controllers are actual USB hosts on their respective USB buses. Knapen ¶ 87.

13

a peripheral device is connected to Dickens' data routing device 100, the respective USB host controller (154, 156, 158) will enumerate and configure that peripheral device. *Id.* ¶ 90. During enumeration, the peripheral device will receive a unique address on its respective USB bus. *Id.* This enumeration process relates to the peripheral device; USB host controllers 154, 156, and 158 do not enumerate any of the emulated functions (USB device controller 150) within Dickens' data routing device 100. *Id.*

In order to perform enumeration of the downstream peripheral devices—and to emulate those same devices, Dickens' data routing device 100 must have intimate knowledge of how each of the devices that can be plugged in work. Knapen ¶ 91. For example, Dickens' data routing device must have device drivers and emulation software that correspond to any downstream device that is plugged into USB host controllers 154, 156, and 158. *Id.* As a result, installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dickens' data routing device 100 without also upgrading the software running on data routing device 100. *Id.*

Dickens implements a PCI bus (132) between the various USB busses and its data routing controller 140, which includes microprocessor 142. *Id.* ¶ 92. Dickens' data routing controller 140 uses the PCI bus to establish connections between a host computer 105 and peripheral devices (*e.g.*, printer 182). *Id.* ¶ 93.

14

## III.   LEGAL STANDARD

"For a prior art reference to anticipate a claim, it must disclose all of the limitations of the claim, arranged or combined in the same way as in the claim." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (internal quotations omitted). And "[t]o satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). "If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims prima facie obvious." M.P.E.P. § 2143.01 (citing *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959)).

## IV.   CLAIM CONSTRUCTION

"In construing claim terms, the Board must determine the scope of the claims by giving them their broadest reasonable construction in light of the specification as they would be interpreted by one of ordinary skill in the art." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061–62 (Fed. Cir. 2016); *see also* 37 C.F.R. § 42.100(b). "While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the

full claim language and the written description." *Trivascular*, 812 F.3d at 1062. "Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Id.*

Patent Owner provides the proper broadest reasonable interpretation ("BRI") construction for a number of terms.[5]

### A.    "USB function block" (Claims 1, 3, 7, 23)

The broadest reasonable interpretation of the phrase "USB function block" is its plain meaning, *i.e.*, a segment of a USB device that performs a USB function. Knapen ¶ 61. The '708 Patent uses the term "block" to refer to segments of a USB device (*see* '708 Patent, 2:41–42), and one of ordinary skill in the art would understand "USB function block" to broadly refer to a segment of a USB device. Knapen ¶ 62. One of ordinary skill would also understand the "USB function" language to broadly refer to a USB function because the USB specification defines the term "function." Knapen ¶ 63 (citing Ex. 1004 at 34 (USB 2.0 Specification)).

Petitioner appears to agree with this plain meaning interpretation. *See* Petition at 31 ("'function block' means a segment of a device that performs a function.").

---

[5]    Patent Owner provided constructions for other claim terms in its Patent Owner Preliminary Response. *See* Paper 11 at 14–28. Patent Owner maintains its positions on those construed claim terms.

While Petitioner and Petitioner's expert appear to offer three different definitions of this phrase (*see* Ex. 1023 ¶ 62 (two definitions—one in first sentence and one in last sentence), ¶ 66 (last sentence)), Petitioner's expert confirmed on cross-examination that the construction used in his analysis (relied on in the Petition) is simply "a segment of a device that performs a function":

> **Q. So if we can go to Paragraph 62 of your 708 declaration, Page 27. And again, this Paragraph 62 to 66 and the way in which you discuss the meaning of the term, quote, function block in the 708 patent?**
>
> A. Yes.
>
> **Q. Do you see that?**
>
> A. Yes.
>
> **Q. I have the same sort of question for you that I asked with respect to the 243 patent, . . . and I'm curious, again, if you can tell me which definition you used in performing your anticipation and obviousness analysis in this case.**
>
> A. I believe I used the -- it may be important it's said in all three places, so -- "a segment of a device that performs a function", and the other text is more elaborative.

Ex. 2006 at 143:18–144:14.

The Board construed "function block" to mean "a segment of a device that performs a function whether the function is a peripheral function or not." Institution Decision at 11. The Board relied on Petitioner's assertion that "block," "peripheral,"

17

and "device" were used inconsistently in the '708 Patent specification to arrive at the additional "whether the function is a peripheral function or not" language. Patent Owner respectfully submits this additional language is both unwarranted and unhelpful. It is unwarranted because 1) Petitioner's own expert did not rely on this additional language, 2) the term "block" is used consistently in the patent to refer simply to a segment of a device; 3) the term "function" is well known in the USB art and is actually defined in the USB specification (Ex. 1023 ¶ 14); and 4) the terms "peripheral" and "device" are not found in "USB function block," so whether those terms are used inconsistently has no bearing on the phrase "USB function block." The Board's additional language is unhelpful because "whether the function is a peripheral function or not" does not provide any further guidance as to what a "USB function block" is or is not.

For the above reasons, Patent Owner respectfully submits the term "USB function block" should be construed to have its plain meaning, *i.e.*, "a segment of a USB device that performs a USB function."

**B.    "shared USB function comprised in the USB device" (Claim 18)**

The broadest reasonable interpretation of the phrase "shared USB function comprised in the USB device" is its plain meaning, *i.e.*, a USB function that is in a USB device and shared by two or more USB hosts. Knapen ¶ 66. The Petition does not offer a construction for this term. The Board concluded without any explanation

that this term "is synonymous with 'function block.'" Institution Decision at 11. However, when different words are used in separate claims, they are presumed to have different meanings. *Aspex Eyewear, Inc. v. Marchon Eyeware, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (citing *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). Here, the plain meaning of this phrase is self-evident, especially because the term "function" is well known in the USB art and is actually defined in the USB specification. Knapen ¶ 67; Ex. 1023 ¶ 14. Further, one of ordinary skill in the art would understand the word "shared" in the context of Bohm to broadly mean the device is shared or accessible by two or more USB hosts (as opposed to a normal USB device that is accessible by only one host). Knapen ¶ 68 (citing '708 Patent, 2:12–15, 2:18–19, 2:59–61, 3:46–50, 3:54–58).

## V.   ARGUMENT

### A. Dickens Does Not Anticipate Claims 1–8, 11, 15–20, or 22–25

#### 1.   Dickens Does Not Disclose a Device Having a Function and a Controller (Claims 1, 3, 7, and 23) and Two Upstream Ports (Claim 1)

Petitioner improperly attempts to combine portions of separate USB devices to conclude the claims of the '708 Patent are anticipated. The law does not allow this. Anticipation requires a reference to disclose each element of the claimed invention "arranged as in the claim" without "treat[ing] the claims as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims

19

and that give the claims their meaning." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008) (quoting *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F. 2d 1452 (Fed. Cir. 1984)). It is "not enough that the prior art . . . includes multiple distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Id.* at 1372 (reversing district court anticipation finding).

Eschewing this law, Petitioner improperly combines Dickens' data routing device 100 with Dickens' printer 182—two separate pieces of hardware—to read on the claimed "multi-host device." In so doing, Petitioner ignores that the '708 Patent claims are directed to the inventive concept of providing "a device" that can be simultaneously accessed by two hosts without using the "stand-alone USB switches" described in Bohm's specification that only provide access to a device for one host at a time. Knapen ¶ 74. Indeed, the '708 Patent distinguishes the use of switching hardware like the Dickens' data router:

> There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers. These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch.

'708 Patent, 1:65–2:2. Bohm thus acknowledged the existence of systems like Dickens that allow multi-host access to a device using separate switch hardware, but where only a single host can access a downstream device at any given time.

To overcome this limitation of the prior art, Bohm invented and claimed *a device* having a function and a controller (Claims 1, 3, 7, and 23) and two upstream ports (Claim 1) for interfacing with multiple hosts. Specifically:

- Claim 1 recites "[a] USB multi-host device" comprising, *inter alia*, "first and second upstream ports configured to couple to corresponding first and second hosts," "a USB function block," and "a multi-host device controller coupling the USB function block to the first and second upstream ports." All of the recited elements are features of the claimed "USB multi-host device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

- Claim 3 recites "[a] USB multi-host device" comprising, *inter alia*, "a USB function block" and "a multi-host device controller coupling the USB function block to a first and second host." All of the recited elements are features of the claimed "USB multi-host device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

- Claim 7 recites "[a] USB device" comprising, *inter alia*, "a USB function block" and "a multi-host device controller configured to couple the USB function block to a plurality of hosts." All of the recited elements are features of the claimed "USB device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

- Claim 23 recites "[a] USB device" comprising, *inter alia*, "a shared USB function block" and "a controller configured to establish concurrent respective USB connections between the shared USB function block and two or more USB hosts." All of the recited elements are features of the claimed "USB device"—not merely catalogs of separate parts of a larger system such as the Dickens' switching system.

As demonstrated by the express claim language, it is the claimed "USB multi-host device" (Claims 1 & 3) or "USB device" (Claims 7 & 23) that includes *both* the claimed function block and controller. For Claim 1, it is the claimed "USB multi-host device" that also includes the first and second upstream ports. Contrary to law, Petitioner treats these limitations as a mere catalog of parts and improperly seeks to combine/modify the Dickens system by merging the printer 182 with the data routing device 100 (which allegedly contains the claimed controller and first and second upstream ports).

22

The Federal Circuit's decision in *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008) is instructive. In *Net MoneyIN*, the district court erred by finding the "iKP reference" anticipated Claim 23 of the patent-in-suit. *See id.* at 1369–71. The claim at issue recited an internet payment system comprising five "links." *See id.* at 1369. The district court found that "[a]ll of the limitations of claim 23 can be found within the iKP reference. A simple combination would produce the system described in claim 23 of the '737 patent. That no specific example within iKP contains all five links does not preclude a finding of anticipation." *Id.* In reversing the district court's anticipation finding, the Federal Circuit held:

> [T]he iKP reference discloses two separate protocols for processing an Internet credit card transaction. Neither of these protocols contains all five links arranged or combined in the same way as claimed in the '737 patent. Thus, although the iKP reference might anticipate a claim directed to either of the two protocols disclosed, it cannot anticipate the system of claim 23. The district court was wrong to conclude otherwise.
>
> The district court was also wrong to combine parts of the separate protocols shown in the iKP reference in concluding that claim 23 was anticipated. Granted, there may be only slight differences between the protocols disclosed in the iKP reference and the system of claim 23. . . . [I]t is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make

23

the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention. . . .

. . . [I]t was error for the district court to find anticipation by combining different parts of the separate protocols in the iKP reference simply because they were found within the four corners of the document . . . .

*Id.* at 1371.

Petitioner's anticipation theory runs afoul of the Federal Circuit's holding in *Net MoneyIn* because, as explained above, Petitioner attempts to combine parts of separate devices in Dickens to conclude that "device" Claims 1, 3, 7, and 23 are anticipated. Dickens' printer 182 and data routing device 100 are separate physical devices connected by USB connection 109, which are standard USB cables. Knapen ¶ 89; Dickens, 6:21–23. Thus, even if Dickens discloses a "controller," a "function," and "first and second upstream ports," these pieces are not all arranged within the claimed "device." Accordingly, Dickens does not anticipate Claims 1, 3, 7, or 23. *See Net MoneyIN*, 545 F.3d at 1371 (error to combine different parts of separate protocols to find anticipation of a single, five-link protocol).

**2.    Dickens Does Not Disclose "Concurrent Respective USB Connections" (Claims 1, 3, 7, 18, 23)**

    **a.    Dickens does not disclose "USB Connections"—a PCI connection is not a USB connection**

Dickens does not disclose "USB connections" between the USB function block and multiple hosts (or upstream ports). Dickens repeatedly emphasizes this fact. *E.g.*, Dickens, 2:16–19 ("[A] data routing device that routes data streams between a host computer and a peripheral *in a manner that does not rely on the USB protocol*."); 2:27–29 ("Signals under the USB protocol are received by the [data routing] device from the host computer and are converted into *a non-USB protocol form*."); 2:36–39 ("[T]he control of the data transmitted between [the host computer and peripheral devices] is achieved in *a USB protocol independent manner*."); 4:6–17 ("Preferably, the data router includes *a non-USB bus* in communication with the computer data converter, peripheral data converter and the microprocessor . . . . The converted computer data and peripheral data may be transferred through the data router by *a non-USB bus*. The routing of the data on *the non-USB bus* is controlled by the microprocessor . . . .") (all emphasis added).

The connection Dickens uses internally is a PCI bus. *E.g.*, *id.* at 8:16–28. Petitioner's own expert conceded during cross-examination that one of ordinary skill in the art would not understand this PCI bus to be a "USB connection":

**Q. . . . So you highlighted in blue on Figure 2 of Exhibit 2004 the PCI bus in Dickens; is that correct?**

A. Yes.

**Q. Would one of ordinary skill in the art understand the highlighted blue section of this figure to be a USB connection?**

A. No.

Ex. 2006 at 90:4–10.



Ex. 2004 at 3. Patent Owner's expert agrees: "Because Dickens routes data in a non-USB format over a PCI bus, one of ordinary skill in the art would not view Dickens as disclosing concurrent respective "USB connections" between Dickens' printer (*i.e.*, the claimed USB function block) and the two upstream ports on Dickens' data routing device." Knapen ¶ 106.

26

Further, installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dicken's data routing device 100 without also upgrading the software running on data routing device 100. *Id.* ¶ 107. This is further evidence that the connection between host 105 and printer 182 is not a "USB connection" as would be understood by one of ordinary skill in the art since installing a specific driver on host 105 directly connected via "USB connection" to a printer 182 would function as required by the USB specification. *Id.*

In its Institution Decision, the Board incorrectly concluded Dickens' intervening PCI bus reads on the claimed "USB connection." *See* Institution Decision at 29–30. The Board suggested that by arguing a PCI connection is not a "USB connection," Patent Owner is attempting to import limitations from the specification into the claims. *Id.* Patent Owner respectfully disagrees. The claims themselves require "USB connections." And "[w]hile the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016).

The Board's conclusion that a "USB connection" can include any kind of non-USB connection is contrary to both parties' expert testimony that one of ordinary

skill in the art would not understand a PCI bus to be a USB connection. *See* Ex. 2006 at 90:4–10; Knapen ¶ 106. Further, the Board's conclusion renders the term "USB" in "USB connection" meaningless, which is legally improper. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1375 (Fed. Cir. 2015) (refusing to adopt a claim construction that would read word "placed" out of the claims). Using the Board's reasoning, any non-USB connection would satisfy the claim because ultimately the USB exchanges would have to be made between the claimed USB hosts and the USB function block. By analogy, the Board would conclude that a claim to a "wired connection" between two network devices would be anticipated by a wireless network because, necessarily, there is a wired connection at either end of the wireless network. This reading of the claim ignores the actual claim language and written description, reads "USB" out of the claims, and is not reasonable.

Finally, the Board's conclusion that Dickens' PCI bus can make up a USB connection misunderstands the Dickens system. Dickens' data router includes multiple distinct USB buses. Knapen ¶ 78; *accord* Ex. 2006 at 87:16–88:5.

- USB Bus #1: This USB bus includes leftmost host computer 105, leftmost USB connection 106, and leftmost device controller 150.

- USB Bus #2: This USB bus includes rightmost host computer 105, rightmost USB connection 106, topmost USB hub 107, and rightmost device controller 150.

28

- USB Bus #3:  Thus USB bus includes host controller 154, leftmost USB connection 109, and audio speaker device 180.

- USB Bus #4:  This USB bus includes host controller 156, middle USB connection 109, and printer device 182.

- USB Bus #5: This USB bus includes host controller 158, rightmost three USB connections 109, bottom-most USB hub 107, keyboard device 184, and mouse device 186.

29



FIG. 2

Knapen ¶ 78.

Each host controller (154, 156, 158) acts as a host for each separate USB bus to which the various downstream USB peripherals are connected. *Id.* ¶ 86. As Petitioner's expert explained, a host is the "root" of the USB tree. Ex. 2006 at 38:3–7. Devices or functions are the "leaves." *Id.* at 38:8–16. Dickens' PCI bus (132) is in between the various USB busses. Knapen ¶ 92. Thus, when Dickens' data routing controller 140 establishes a connection between a host 105 and printer 182, it does

30

not do so with a "USB connection"—it is using the PCI bus, which is not a USB

connection. *See* Ex. 2006 at 90:4–10 (Petitioner's expert testifying that one of

ordinary skill in the art would not consider Dickens' PCI bus to be a USB

connection); Knapen ¶ 93. Because Dickens does not disclose the "USB

connections" of Claims 1, 3, 7, 18, and 23, Dickens cannot anticipate these claims.

> **b. Dickens does not disclose "concurrent" USB connections—no two connections between the two hosts and the USB function block occur or operate at the same time**

The Board construed "concurrent" to mean "operating or occurring at the

same time." Institution Decision at 13. Contrary to the Board's finding in the

Institution Decision, Dickens cannot anticipate under this construction of

"concurrent" because no two connections between Dickens' two hosts and the

printer occur or operate at the same time.

Claim 3 is illustrative. It requires separate "first" and "second" concurrent

connections between two hosts and the USB function block:

> a first USB connection between the first host and the USB function
> block and a second USB connection between the second host and the
> USB function block, wherein the first USB connection and the second
> USB connection are concurrent

'708 Patent, 5:15–20. Under the Board's construction of "concurrent," there must be

(1) a first connection between the first host and the USB function block that

"operat[es] or occur[s] at the same time" as (2) a second connection between the second host and the USB function block. No such connections exist in Dickens. The only alleged concurrent USB connections identified by the Board are between (1) hosts 105, and (2) data router 130. *See* Institution Decision at 30 ("Dickens provides concurrent USB connections **between data router 130 and USB hosts 105** via corresponding 'upstream ports' . . . ." (emphasis added)).

Respectfully, it appears the Board has misinterpreted the claims to require concurrent connections between "the multi-host device controller" and the first and second hosts. This is not what the claim requires; the concurrent first and second USB connections must be between "the USB function block" (printer 182) and the first and second hosts (computers 105). These concurrent connections must operate or occur at the same time. In the context of Dickens' printer, Bohm illustrates in Figure 2 an embodiment of the claimed "concurrent" USB connections:



FIG. 2

'708 Patent, Fig. 2 (highlighting added). Printer 120 is connected to host PC 122 and host PC 123 via the highlighted "concurrent" USB connections—both connections between the hosts and the printer "occur or operate at the same time," as required by the claims (and the Board's construction of "concurrent").

The fact that there is only a single connection[6] to Dickens' printer (the claimed "USB function block") precludes a finding of anticipation. *See* Institution Decision

---

[6]     The Board expressly recognizes there is only a single connection to printer 182. *See* Institution Decision at 29 ("Data router 130, therefore, maintains concurrent USB connections with multiple USB hosts (105) and *__a USB connection__* with a USB peripheral device (printer 182—a USB 'function block')—all such connections operable at the same time in accord with our interpretation of 'concurrent.'" (emphasis added)); *accord* Knapen ¶ 98; Ex. 2006 at 77:19–79:24; Dickens, 5:2–4 ("Each peripheral device can have *__a USB connection__* by which it is connected to *__a respective one__* of the plurality of peripheral data converters." (emphasis added)).

33

at 29. Indeed, one of ordinary skill in the art would understand that the single USB connection to Dickens' printer 182 only allows print data from one host at a time. Knapen ¶ 98; *see also* '708 Patent, 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected."). Thus, Dickens fails to disclose first and second concurrent USB connections between the hosts and the printer that operate or occur at the same time as required by Claim 3.

Independent Claims 7, 18, and 23 use similar language, and require "concurrent respective[7] USB connections" between a plurality of hosts and

- the "USB function block" (Claims 7 & 23)

- the "shared USB function" (Claim 18)

Dickens' "printer 182" is presumably the "USB function block" of Claims 7 and 23 and the "shared USB function" of Claim 18. Thus, for the same reasons discussed with respect to Claim 3, Dickens does not disclose the claimed "concurrent" USB connections. The identified connections are not between printer 182 and hosts 105; they are between hosts 105 and data router 130.

---

[7]    The use of the term "respective" in these claims expressly requires multiple concurrent connections.

Claim 1 requires "concurrent respective USB connections" between the USB function block and first and second upstream ports. The analysis above applies equally to this claim. The identified connections are not between printer 182 and the upstream ports; they are between the upstream ports and data router 130. Therefore, Dickens fails to anticipate Claim 1.

### 3. Dickens Does Not Disclose "Simultaneously Enumerat[ing] and Configur[ing]" (Claims 1, 7, 18) or "Simultaneously Configur[ing]" (Claim 23)

Dickens does not disclose "simultaneously enumerat[ing] and configur[ing]" the USB device, as required by Claims 1, 7, and 18; or "simultaneously configur[ing] the USB device for the shared USB function" of Claim 23. Petitioner and the Board conclude the enumeration of Dickens' printer 182 discloses these features of Bohm's claims. *See* Petition at 57–58; Institution Decision at 30–31. The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously enumerate or configure printer 182. Knapen ¶ 108. In other words, printer 182 is enumerated and configured, if at all, by one and only one host—host controller 156. *Id.* ¶ 109.

Petitioner's reliance on the enumeration or configuration of Dickens' emulated printers is misplaced. *See* Institution Decision at 30–31. First, Petitioner's expert conceded at deposition that there would be no configuration of Dickens' emulated printers:

> **Q. . . . Do the host PCs 105, would they -- in Dickens,**
> **would one of ordinary skill in the art understand that**
> **they perform any configuration activities on the emulated**
> **printers?**
>
> A.  I would expect not, from -- from the description of
> Dickens. As an example of the printer case, since the
> emulations reflect the printer and a printer doesn't
> really require configuration, I would expect the
> emulations would equivalently not require configuration,
> set configuration specifically, for example**.**

Ex. 2006 at 106:10–19.

Further, emulated printers are separate devices implemented in the data routing device 100—they are not the "USB multi-host device" (Claim 1) or "USB device" (Claims 7, 18, 23) because the "USB multi-host device" of Claim 1 and "USB device" of Claims 7, 18, and 13 must comprise the "USB function block" (*e.g.*, printer 182).  The emulated printers are enumerated independently from printer 182, the device that includes the "USB function block." Knapen ¶ 110. Indeed, during deposition, Petitioner's expert conceded that "there are three enumeration activities":

> **Q. What host enumerates printer 182?**
>
> A. So you need to – there's two ways to answer the
> question, because the emulation in Dickens environment

again is equivalent to the printer for the hosts that are

attached. So at a detailed level in this construction,

with two hosts and a printer, essentially *there are three*

*enumeration activities* that can take place. They're all

enumerating the printer, two of them --

**Q. Well, two of those are enumerating emulated printers**

**and one of them is emulating a printer; would you agree**

**with that?**

A.  And they're related, yes.

Ex. 2006 at 99:9–20 (emphasis added). Dickens does not disclose "simultaneously

enumerat[ing] and configur[ing]" the USB device, as required by Claims 1, 7, and

18; or "simultaneously configur[ing] the USB device for the shared USB function"

of Claim 23. Accordingly, Dickens does not anticipate Claims 1, 7, 18, or 23.

## 4.  Dickens Does Not Disclose First and Second Endpoint Buffers "Coupled Between" Upstream Ports and the Controller (Claims 2, 6, 16)

Petitioner fails to show endpoint buffers "between" the upstream ports and the

multi-host device controller as required by dependent Claims 2, 6, and 16. The Board

identifies Dickens' routing controller 140 as the claimed "multi-host device

controller" (Institution Decision at 27) and adopts Petitioner's reasoning as to

dependent claims 2, 6, and 16 (Institution Decision at 33.) According to Petitioner,

Dickens' DRAM memory 144 corresponds to the claimed "endpoint buffers" of

Claims 2, 6, and 16. Petition at 60–61. This cannot satisfy the claim because DRAM

37

144 is not "between" the upstream ports and the multi-host device controller as claimed. DRAM 144 is actually inside the multi-host device controller (*i.e.*, routing controller 140). Accordingly, Petitioner has failed to show Dickens anticipates Claims 2, 6, or 16. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008) (Anticipation requires a reference to disclose each element of the claimed invention "arranged as in the claim" without "treat[ing] the claims as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning.").

### 5.   Dickens Does Not Disclose "USB Interface Circuit[s]" Located Within the Claimed "Controller" (Claim 25)

Petitioner fails to show "USB interface circuit[s]" within the claimed "controller" of Claim 25. The Board identifies Dickens' routing controller 140 as the claimed "controller" (Institution Decision at 27) and adopts Petitioner's reasoning as to dependent Claim 25 (Institution Decision at 33). According to Petitioner, Dickens' items 150 and 158 are the claimed "USB interface circuit[s]." Petition at 61. This cannot satisfy Claim 25 because it requires the USB interface circuits to be part of the controller, but in Dickens they are outside of the controller (*i.e.*, routing controller 140). *See Net MoneyIn*, 545 F.3d at 1370. Therefore, Claim 25 has not been shown to be unpatentable as anticipated by Dickens.

### 6. Dickens Does Not Disclose a "Multi-Host Device Controller [That] is Configured to Maintain Respective Dedicated Address, Configuration, and Response Information for Each of the Plurality of Hosts" (Claims 17, 22, 24)

Claims 17, 22, and 24 require "multi-host device controller is configured to maintain respective dedicated address, configuration, and response information for each of the plurality of hosts." The Board identifies Dickens' routing controller 140 as the claimed "controller" (Institution Decision at 27) and adopts Petitioner's reasoning as to dependent claims 17, 22, and 24 (Institution Decision at 33). However, Petitioner fails to explain or identify any disclosure in Dickens where routing controller 140 "maintain[s] respective dedicated address, configuration, and response information for each of the plurality of hosts." Rather, Petitioner merely rehashes the "non-re-configuration and non-reenumerating" argument of Claim 1 without specifically identifying in Dickens where the additional limitations of these dependent claims are allegedly found. Petition at 61–62. The only Dickens passage Petitioner cites is column 9, lines 20–35. *See id.* Neither this passage—nor anything else in Dickens—expressly discloses the multi-host device controller (*i.e.*, routing controller 140) maintaining address, configuration, and response information for each of the hosts. And to the extent Dickens might maintain address, configuration, and response information, it might do so outside of the "multi-host device controller." Dickens does not, therefore, anticipate Claims 17, 22, and 24.

39

### 7.     Dependent Claims

By virtue of their dependency, Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 of the '708 Patent include the same limitations as the independent claim from which they depend. Therefore, for the same reasons discussed above regarding the independent claims, Petitioner fails to demonstrate a reasonable likelihood that it would prevail in showing that Dickens anticipates these dependent claims.

### B.     Dickens in View of Chen Does Not Render Obvious Claims 9, 11–14 and 21

Petitioner asserts Claims 9, 11–14, and 21 are rendered obvious by Dickens in view of Chen. Petition at 63; Institution Decision at 29. As discussed above, Dickens does not anticipate any claim of the '708 Patent for numerous reasons. *See supra*, Part V.B. Chen does not teach or disclose the limitations that are missing from Dickens (discussed above), and Petitioner does not contend otherwise. Petitioner relies on Chen solely for its teaching of the "interleaving" limitation found in Claims 9, 11–14, and 21.

Patent Owner submits that Chen does not make up for the deficiencies in Dickens. Additionally, a person of ordinary skill in the art would not combine Dickens with Chen because 1) Dickens expressly teaches away from a combination with Chen, 2) combining Chen with Dickens would render Dickens inoperable, and 3) Petitioner's proposed combination does not improve Dickens, does not apply

Chen's "improvement" technique in the same way as it is used in Chen, and does not result in predictable results.

Moreover, Petitioner has not put forth a clear articulated reason why a person of ordinary skill in the art would combine these references to derive the claimed combination. Instead, Petitioner impermissibly uses hindsight to attempt to piece together the claimed invention of the '708 Patent, while using mere generalized vague conclusory statements, such as "[u]sing Chen's known interleaving technique with [Dickens] would have been using Chen's technique as it was known," "[u]sing Chen's known interleaving technique further would have improved [Dickens] by providing [it] interleaving," and "[the combination] would have improved data throughput, by interleaving, *i.e.*, by the improvement done the same way as in Chen." Petition at 68. The United States Supreme Court mandates that a finding of obviousness cannot be premised on these types of conclusory statements. *KSR Int'l v. Teleflex Inc. KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness") (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Consequently, Claims 9, 11–14, and 21 have not been shown to be unpatentable as obvious.

### 1. Dickens Expressly Teaches Away from Chen's Interleaving

A person of ordinary skill in the art would not combine Dickens with Chen because Dickens teaches away from Chen's interleaving. *See In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983) (improper to combine references where the references teach away from their combination). In particular, "Chen interleaves USB transactions – where 'transactions' are made up of groups of packets that start transactions, continue them, and end them." Ex. 1023 ¶ 135 (citing Ex. 1005 at 3:66–4:2). A print job in Dickens, for example, may be made up of a number of USB transactions. Knapen ¶ 115. Multiple transactions make up a USB "transfer." *Id.* Dickens expressly teaches not to mix transfers from different hosts, let alone transactions (as in Chen). *Id.* Specifically, Dickens teaches "[w]hen print data from either computer is detected it is routed to the printer if the printer is currently free. Any subsequent print data from the other computer is buffered in memory until a break in transmission of the original print data stream equal to the timeout period has been detected." Dickens, 9:21–26; *id.* at 2:45–48 ("When utilized in printer sharing apparatus the invention can enable data from two or more USB host computers to contend for a USB connected printer on a timeout basis.").

In other words, Dickens expressly teaches a print sharing scheme that relies on a timeout period when more than one host attempts to access the printer. Knapen ¶ 116. One of ordinary skill in the art would understand that this timeout period is

required so that different transfers from different hosts do not get mixed together. *Id.* ¶ 117. This makes sense because mixing print data packets from two different hosts would result in garbled print-outs. *Id.* Because Dickens expressly teaches away from interleaving print data from multiple hosts, it is improper to combine Chen with Dickens. *See In re Grasselli*, 713 F.2d at 743 (improper to combine references where the references teach away from their combination).

## 2. Combining Chen with Dickens Renders Dickens' System Inoperable and Further Teaches Away from the Proposed Combination

Applying Chen's interleaving technique to Dickens' data routing device would result in an inoperable system. Knapen ¶ 121. Combining references that produce inoperative devices cannot serve as predicates for a *prima facie* case of obviousness. *Michael L McGinely v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed Cir. 2001) ("If references taken in combination would produce a 'seemingly inoperative device,' we have held that such references teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness."); *In re Sponnoble*, 405 F.2d 578, 587 (C.C.P.A. 1969) (references teach away from combination if combination produces seemingly inoperative device); *see also In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (inoperable modification teaches away).

Chen teaches interleaving of USB transactions. Ex. 1023 ¶ 135. "Chen interleaves transactions by interleaving the packets of multiple transactions." *Id.* This is possible because there are multiple devices downstream from the host. Knapen ¶ 122; *see, e.g.*, Ex. 1005, Fig. 5 ("DEVICE-1" and "DEVICE-2"). While Chen's smart switch is interleaving packets, each downstream device is still receiving packets in an order that complies with the USB specification. Knapen ¶ 123. If there was only one downstream memory device in Chen, it would be impossible to interleave the packets because it would violate the transaction rules of the USB specification. *Id.* ¶ 124. According to the example shown in Chen's Figure 5, Chen's smart switch transmits (on its downstream ports) "a first token packet of a first transaction, a second token packet of a second transaction, and a data-out packet of the first transaction" in the following order: "first token packet, second token packet, and data-out packet." Ex. 1023 ¶ 136. If there was only one downstream memory device in Chen, this ordering would not comply with the USB specification, which requires the data-out packet to immediately follow the token packet. Knapen ¶ 125. The single downstream memory device in this hypothetical would determine there was an error on the bus and would ignore the packets. *Id.*

Attempting to use Chen's interleaving technique with Dickens' printer would have the same problem because there is only one printer device. Interleaving packets destined for Dickens' single printer device would not comply with the USB

specification, and the printer would determine there was an error on the bus and ignore the out-of-order packets. *Id.* ¶ 126. This would be the case if Chen's interleaving technique was attempted with any single downstream device. *Id.* ¶ 127. This inoperability teaches away from the combination of Dickens and Chen. Thus, this combination cannot not render the claims of the '708 Patent obvious. *See McGinely*, 262 F.3d at 1354 (combination of references producing a 'seemingly inoperative device' teaches away from the combination and supports a finding of non-obviousness).

> **3.    Petitioner's Proposed Combination does not Improve Dickens, does not Apply Chen's "Improvement" Technique in the Same Way as it is Used in Chen, and Relies on Improper Hindsight to Modify Chen's Principle of Operation to Arrive at the Claimed Invention**

Petitioner's sole rationale for combining Chen with Dickens is based on M.P.E.P. § 2143 rationale (C).[8]   Petitioner attempts to support the proposed combination with the conclusory statement that "[the combination] would have improved data throughput, by interleaving, *i.e.*, by the improvement done the same way as in Chen." Petition at 68. Similarly, the Board's sole stated justification in

---

[8]    Petitioner's expert discussed M.P.E.P. rationale (G), but that discussion was not included in the Petition. The Board correctly found those arguments to be "incorporated improperly" and "decline[d] to consider them." Institution Decision at 36.

45

support of the combination is that it would "provide similar improvements in throughput for all attached USB hosts." Institution Decision at 37.

Petitioner does not actually explain how throughput would allegedly be improved. As discussed above, there would be no improvement in throughput because combining Chen's interleaving with Dickens would result in an inoperable printer. Chen's interleaving simply does not work—and does not increase throughput—when there is a single downstream device (as opposed to multiple devices, *e.g.*, multiple memory devices). Knapen ¶ 127.

Further, Chen's system is fundamentally different. M.P.E.P. rationale (C) requires "a finding that one of ordinary skill in the art could have applied the known 'improvement' technique in the same way to the 'base' device." M.P.E.P. § 2143.C.(3). Chen is a switch between a single host and multiple downstream devices whereas Dickens' is a switch between multiple hosts and a single device. This difference is significant because, as discussed above, applying Chen's technique in the same way as it is used in Chen renders the combination inoperable. Indeed, Petitioner's expert reluctantly conceded that the applied interleaving technique would only be "similar," not the same:

**Q. And why would someone of ordinary skill in the art take this teaching of Chen and apply it to Dickens?**

46

A. . . . It's a similar interleaving technique, although the sort of initiating agents and the targets feel like they're upside down, but it's a similar interleaving technique.

**Q. What does that mean, "initiating agents and the targets feel like they're upside down"?**

A. Well, as shown in the figure in Chen, there's a single host that's initiating to multiple devices; in Bohm, there's multiple hosts issuing to a single device, but there's still an interleaving that's taking place and essentially the interconnect in between, in both cases.

Ex. 2006 at 127:4–24.

To the extent one of ordinary skill could find some way to make the combination operable, it would have to be in some way other than as described in Chen. This is not sufficient to render the claims obvious. *See In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959) (prior art combination not proper ground for rejection where combination "would require a substantial reconstruction and redesign of the elements shown in [the prior art] as well as a change in the basic principles under which the [prior art] construction was designed to operate"). Petitioner's proposed modification of Chen to apply an interleaving technique in a different manner than taught by Chen is improper hindsight and should be rejected. *See Grain Processing Corp. v. Am. MaizeProds. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through

47

the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.").

## VI.   CONCLUSION

For at least the reasons state above, neither Dickens nor the combination of Dickens and Chen render any claims of the '708 Patent invalid. Accordingly, Patent Owner respectfully requests the Board deny Petitioner's request for cancellation of Claims 1–9 and 11–25 of the '708 Patent.

Dated: November 21, 2017            Respectfully submitted,

                                    */s/ Brian C. Banner*

                                    Bruce W. Slayden II (Reg. No. 33,790)
                                    bslayden@sgbfirm.com
                                    Brian C. Banner (*pro hac vice*)
                                    bbanner@sgbfirm.com
                                    R. William Beard, Jr. (Reg. No. 39,903)
                                    wbeard@sgbfirm.com
                                    Truman H. Fenton (Reg. No. 64,766)
                                    tfenton@sgbfirm.com
                                    Jerry F. Suva (Reg. No. 67,902)
                                    jsuva@sgbfirm.com

                                    SLAYDEN GRUBERT BEARD PLLC
                                    401 Congress Avenue, Suite 1900
                                    Austin, TX 78701
                                    t: 512.402.3550
                                    f: 512.402.6865

IPR2017-00861
Patent Owner's Response

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies the above-captioned Patent Owner's Response contains 10,165 words, excluding the parts of the document exempted by 37 C.F.R. 42.24(a).

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

49

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies the above-captioned Patent Owner's Response with accompanying exhibits (Exhibits 2004–07) was served in its entirety on November 21, 2017, upon the following parties by sending a copy via email to the following email addresses:

Charles W. Shifley (cshifley@bannerwitcoff.com)
Binal J. Patel (bpatel@bannerwitcoff.com)
Robert H. Resis (rresis@bannerwitcoff.com)
Jason S. Shull (jshull@bannerwitcoff.com)
Timothy J. Rechtien (trechtien@bannerwitcoff.com)
Mark A. Dalla Valle (mdallavalle@bannerwitcoff.com)
Zachary Getzelman (zgetzelman@bannerwitcoff.com)

Banner & Witcoff, Ltd.
10 South Wacker Drive, Suite 3000
Chicago, IL 60606

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com
Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC

50

IPR2017-00861
Patent Owner's Response

401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

51

UNITED STATES PATENT AND TRADEMARK OFFICE

––––––––––––––––––––––

BEFORE THE PATENT TRIAL AND APPEAL BOARD

––––––––––––––––––––––

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

––––––––––––––––––––––

U.S. Patent No. 7,627,708

––––––––––––––––––––––

Case No. IPR2017-00861


**DECLARATION OF EXPERT GEERT KNAPEN IN SUPPORT OF
PATENT OWNER'S RESPONSE TO PETITION PURSUANT TO 35 U.S.C.
§ 316 AND 37 C.F.R. § 42.120**


Microchip Technology Inc.
Exhibit 2007
Delphi Technologies, Inc. v. Microchip Technology Inc.
Case No. IPR2017-00861

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................1

II.   QUALIFICATIONS ...............................................................1

III.  MATERIALS CONSIDERED AND PREPARED ....................6

IV.   SUMMARY OF OPINIONS ..................................................6

V.    LEGAL PRINCIPLES USED IN ANALYSIS ............................7

    A.  The Legal Principles Governing Patent Validity........................7

VI.   LEVEL OF ORDINARY SKILL IN THE ART ........................12

VII.      CLAIM CONSTRUCTION ...............................................14

    A.  "Simultaneously"....................................................................15

    B.  "Concurrent" / "Concurrent USB Connections" .......................20

    C.  "USB Function Block" (Claims 1, 3, 7, 23)..............................21

    D.  "Shared USB Function Comprised in the USB Device" (Claim 18)................................................................................22

VIII.      THE '708 PATENT IS NOT ANTICIPATED OR RENDERED OBVIOUS BY THE CITED PRIOR ART ...........24

    A.  State of the Art and Patented Invention....................................24

    B.  Dickens .................................................................................25

       i.  Overview of Dickens........................................................... 26

      ii.  Dickens Does Not Disclose Each and Every Element ............... 32

    C.  Dickens in View of Chen Does Not Render Claims 9, 11–14, and 21 Obvious....................................................................39

       i.  Dickens teaches away from a combination with Chen.............. 39

      ii.  Combining Chen with Dickens results in an inoperable system ............... 41

IX.   SWORN TESTIMONY ...............................................................42

Exhibit 2007

IPR2017-00864

ii                                          Exhibit 2007

I, Geert Knapen, hereby declare as follows

## I.     INTRODUCTION

1.      I am currently a Senior Principal Architect - DSP at Knowles

Intelligent Audio (formerly Audience, Inc.).

2.      I have been retained in this matter by Slayden Grubert Beard PLLC

("SGB") to provide various opinions regarding U.S. Patent No. 7,627,708 ("the

'708 Patent" or "Bohm").  I am being compensated for my work in this matter.

My compensation in no way depends upon the outcome of this proceeding.

3.      I have been advised that SGB represents Microchip Technology, Inc.

("Microchip") in this matter.  I have no financial interest in Microchip.

4.      I have been advised that Microchip owns the '708 Patent.  I have no

financial interest in the '708 Patent.

## II.    QUALIFICATIONS

5.      I received a Master of Science in Electrical Engineering in 1981 from

Vrije Universiteit Brussel (V.U.B.) (Brussels Free University) at the Department of

Applied Sciences.

6.      From 1981 to 1983, I was an Assistant Professor in the Department of

Electrical Engineering at Brussels Free University, where I was involved in the

field of non-destructive testing, such as through time-domain reflectometry.

Exhibit 2007

7.      From 1983-1985, I was responsible for Industrial Consulting and External Industrial Contacts at the Brussels Free University.

8.      In 1985, I co-founded the company Signal Processing Innovations N.V. (Spinnov) in Brussels. The company focused on development and sale of digital signal processing boards and complete measurement systems. My responsibilities included research and development and product management. I was also responsible for designing a high-end Fast Fourier Transform (FFT) Spectrum Analyzer for Sound and Vibration markets.

9.      In 1990, I started another company called Ling Dynamic Systems N.V. in Brussels. Ling was also focused on the signal processing market. From 1990 to 1991, I was a Director at Ling and was responsible for R&D and product management.

10.      In 1991, I started a company called Design & Advice C.V. in Belgium. While there, I began consulting for Philips International Technology Center Leuven (ITCL) in DSP hardware and software.

11.      In 1995, while still a consultant at Design & Advice C.V., I became involved in the creation of the Universal Serial Bus ("USB") standard. I represented Philips in the USB Device Working Group (DWG) and was elected

Exhibit 2007

chairman of the Audio Device Class Working Group of the DWG. I was an author of the USB Specification for audio devices.

12.     I also participated in the Hub Working Group and actively participated in the Common Class Specification Working Group.

13.     I have made various presentations on USB technology. These include presenting the world's first USB-based digital speaker at the February 1996 USB Developers Conference; giving a presentation on the Audio Device Class at the 1997 Windows Hardware Engineering Conference (WinHEC); presenting a lecture on USB synchronization at the Philadelphia USB Developers conference; and presenting a lecture about USB and USB audio before the San Francisco Audio Engineering Society (AES).

14.     I further participated in the development of USB-based audio products for Philips.

15.     In 1998, I founded a new company in San Jose, California called Design & Advice L.L.C. I represented Philips ITCL in different USB working groups. I also represented Philips as a Promoter team member during the development of the second generation USB specification, USB 2.0. During that time frame (1999), I was chairman of the Content Security Working Group, which created the framework to implement DTCP over USB.

3                            Exhibit 2007

16.     In 2000, I was elected to the Board of Directors of the USB

Implementers Forum (USB-IF). I was further appointed to be Secretary of the

Board. From 2000 to 2002, I participated in the development and finalization of the

USB 2.0 Core Specification. In 2002, I was elected Vice President and Secretary of

the USB-Implementers Forum. I also continued my role as chairman of the Audio

Device Class Working Group, and started the revision of the USB Specification for

audio devices.

17.     During that time frame, I also participated in the standardization of the

Bluetooth Advanced Audio Distribution Profile Specification.

18.     Between 2002 and 2008, I became involved in UPnP standardization

efforts, co-chaired the UPnP Audio/Video Working Committee, and was active in

the Digital Home Working Group initiative.

19.     In 2008, I represented NXP Semiconductors as a USB 3.0 Promoter

Group member, and contributed to the creation of the USB 3.0 specification. My

work included co-designing the isochronous transfer model and the Service

Interval Synchronization mechanism.

20.     In 2009, I started work on the new Video Display DWG Working

Group, re-oriented the scope of this Working Group towards an integrated

Audio/Video Device Class. I carried out an editor role for the core specification of

this new A/V Device Class and participated in providing a first version of the specification. During this time, I also contributed to the Content Security DWG Working Group, the Multimode DWG Working Group, and Power Delivery Control Promoter Working Group.

21. In 2014, I joined the USB Newark Audio Working Group end of 2014 as NXP representative. As a result, the USB Audio Device Class Working Group was reactivated to generate the next generation Audio Device Class 3.0 specification. I acted as the Chair for this group. The Audio Device Class 3.0 specification was published on September 22, 2016.

22. The USB Audio Device Class Working Group is looking into new extensions and improvements and will be restarted soon. I will most likely be acting as Chair for this group, but now representing Knowles Intelligent Audio.

23. In 2016, I joined the MIPI Alliance as Knowles Intelligent Audio representative in the LML Working Group, creating new audio interconnect standards (SoundWire 2.0) for mobile applications.

24. My over 35 years of professional experience with computer peripheral device interface design and with USB technology, as well as my educational background, are summarized in more detail in my C.V., which is attached as **Appendix A**.

Exhibit 2007

## III.   MATERIALS CONSIDERED AND PREPARED

25.   In forming the opinions expressed below, I considered the following:

- the '708 Patent and the other patent in its family (U.S. Patent No. 7,523,243) (collectively the "USB Patents") and their file histories

- the Petition filed by Delphi Technologies, Inc. in this matter

- the prior art references and related documentation submitted with the Petition and discussed herein

- The Board's Institution Decision

- The deposition transcript of Mr. John Garney

- I have also relied upon my education, background, and experience.

## IV.   SUMMARY OF OPINIONS

26.   First, it is my opinion that a person having ordinary skill in the art in 2006, as it relates to the '708 Patent, would have a bachelor's degree in electrical or computer engineering (or similar), and at least five years of industry experience in computer peripheral device design.

27.   Second, it is my opinion that under the broadest reasonable interpretation standard for interpreting claim terms, the term "simultaneously," as used in the claims of the '708 Patent, has its plain meaning: "at the same time."

6                                    Exhibit 2007

28.    Third, it is my opinion that under the broadest reasonable interpretation standard for interpreting claim terms, the term "concurrent," as used in the claims of the '708 Patent, has its plain meaning: "operating or occurring at the same time."

29.    Fourth, I have been asked to consider the Petition filed by Delphi in this matter and the grounds of invalidity of the '708 Patent claims asserted in that Petition and adopted in the Board's Institution Decision.  Based on my investigation and analysis, it is my opinion Delphi's Petition and the Board's Institution Decision fails to demonstrate the invalidity of any claim of the '708 Patent.

## V.    LEGAL PRINCIPLES USED IN ANALYSIS

### A.    The Legal Principles Governing Patent Validity

30.    I have been asked to apply the following legal principles to my analysis of validity under § 102 (anticipation) and § 103 (obviousness). Where I rebut arguments made by Delphi's expert relating to other areas of the law, I will state my understanding of the applicable law separately.

31.    **Anticipation:**  Anticipation requires a single prior art reference to disclose each and every element of the claimed invention arranged as in the claim without treating the claims as mere catalogs of separate parts, in disregard of the

part-to-part relationships set forth in the claims and that give the claims their meaning.  It is not enough that the prior art includes multiple distinct teachings that the artisan might somehow combine to achieve the claimed invention.

32.     Inherent anticipation requires that any missing descriptive material is "necessarily present," not merely probably or possibly present, in the prior art.

33.     **Obviousness:** A claim is invalid for obviousness if "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). In determining whether a claimed invention is obvious, one must consider the level of ordinary skill in the field of the invention that someone would have had at the time the claimed invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

34.     The mere existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness, since inventions typically rely on building blocks of prior art. In considering whether a claimed invention is obvious, one may consider whether there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the

known elements in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and (6) whether the change resulted more from design incentives or other market forces. To find it rendered the invention obvious, one must find that the prior art provided a reasonable expectation of success. Obvious to try is not sufficient in unpredictable technologies.

35.     In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If one of ordinary skill in the art can implement a predictable variation prompted by market forces or design incentives, such a variation is obvious. If a technique has been used to improve one device, and one of ordinary skill in the art would recognize that it would improve

Exhibit 2007

similar devices in the same way, using the technique is obvious unless its actual application is beyond ordinary skill.

36.     Where there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, it is obvious to pursue the known options within the grasp of one of ordinary skill.

37.     Contemporaneous development of similar variations of a device or method by other parties is indicative of obviousness.

38.     In establishing obviousness, one must avoid the "temptation to read into the prior art the teachings of the invention in issue" and "guard against slipping into the use of hindsight."

39.     Art that is analogous to the subject matter of the patent may properly be used as an obviousness reference. "A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992).

40.     **Secondary considerations:** An obviousness assessment requires taking into account objective evidence (called "secondary considerations") that may have existed at the time of the invention and afterwards that may shed light on

the obviousness or not of the claimed invention, such as: (a) Whether the invention

was commercially successful as a result of the merits of the claimed invention

(rather than the result of design needs or market pressure advertising or similar

activities); (b) Whether the invention satisfied a long-felt need; (c) Whether others

had tried and failed to make the invention; (d) Whether others invented the

invention at roughly the same time; (e) Whether others copied the invention; (f)

Whether there were changes or related technologies or market needs

contemporaneous with the invention; (g) Whether the invention achieved

unexpected results; (h) Whether others in the field praised the invention; (i)

Whether persons having ordinary skill in the art of the invention expressed surprise

or disbelief regarding the invention; (j) Whether others sought or obtained rights to

the patent from the patent holder; and (k) Whether the inventor proceeded contrary

to accepted wisdom in the field.

41.    **Claim Construction:**  I have been instructed and understand that for

purposes of this matter, claim terms in the '708 Patent should be given their

broadest reasonable construction in light of the specification as they would be

interpreted by one of ordinary skill in the art at the time the patent was filed (i.e.,

April 2006).  *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061–62 (Fed. Cir.

2016).  I understand that under a broadest reasonable interpretation, words of a

claim should be given their plain meaning unless such meaning is inconsistent with the patent specification, claims, and/or prosecution history.   *Id.*

## VI.   LEVEL OF ORDINARY SKILL IN THE ART

42.     I have been instructed by counsel that the standard for obviousness is whether the claimed invention would have been obvious to a person having ordinary skill in the art at the time of the application leading to the '708 Patent was filed (i.e., around April 2006 when the provisional application listed on the face of the '708 Patent was filed).  An important part of determining the identity of this hypothetical person of ordinary skill resolves around framing the relevant field of art.

43.     The '708 Patent states that the field of art relates to "computer hardware and, more specifically, to Universal Serial Bus (USB) controllers."  '708 Patent, 1:19–21.

44.     In terms of knowledge and understanding, the person having ordinary skill in the art would, at minimum, be able to understand the terminology used in the '708 Patent and would be able to practice the art disclosed. For example, the '708 Patent discusses connections between host and device using "digital interconnect such as Interchip USB, ULPI, UTMI, etc.," which suggests one of

Exhibit 2007

ordinary skill in the art would be familiar with these industry-standard interconnect interfaces.

45.    Additionally, the inner-workings of the invention's USB multi-host device controller (e.g., element 108 of Figure 3) is not described at the circuit level, suggesting that one of ordinary skill in the art would be familiar with the circuit-level design and implementation of a standard USB device.

46.    Taking all of these considerations into account, it is my opinion that a person of ordinary skill in the art would be a person who has experience designing—either in the classroom or in a work endeavor—a standard USB device. The person of ordinary skill will have also been exposed to the various interconnect options for connecting USB hosts and USB devices.  This person would have a bachelor's degree in electrical or computer engineering (or similar), and at least five years of industry experience in computer peripheral device design.

47.    I understand the Board determined:

On the record before us and for purposes of this Decision, we define the level of ordinary skill in the art, at the time of the '708 patent, to include at least a Bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent fields as well as familiarity with the USB 2.0 specifications to the extent of having designed a USB device. This definition is reflected in the prior art of record and is consistent with the testimony of both parties' experts and

Exhibit 2007

consistent with Patent Owner's admissions during prosecution of the
'708 patent.

Institution Decision at 16.  I agree the Board's determination of the level of

ordinary skill in the art is consistent with my assessment, and my opinions consider

the level of skill in the art as determined by the Board.

## VII.  CLAIM CONSTRUCTION

48.     I have reviewed the various claim construction positions advanced in

the Petition by Delphi and its expert, Mr. Garney.  I have also reviewed the various

claim constructions advanced by the Board in its Institution Decision.  For

purposes of this report, I consider the proper interpretation of the following terms:

- "simultaneously"

- "concurrent / concurrent USB connections"

- "USB function block" (Claims 1, 3, 7, 23)

- "shared USB function comprised in the USB device" (Claim 18)

49.     I reserve the right to further opine on these and other claim terms in

future proceedings.

14                                Exhibit 2007

## A. "Simultaneously"

50.     In my opinion, one of ordinary skill in the art in the 2006 timeframe would understand the broadest reasonable interpretation of the term "simultaneously" as having its plain meaning, i.e., "at the same time."

51.     One of ordinary skill in the art would find this broadest reasonable interpretation to be consistent with the '708 Patent specification.  For example, the '708 Patent discloses an embodiment where "a single USB device may be shared across multiple USB hosts without needing to be reconfigured or re-enumerated each and every time the upstream hosts alternate accessing the USB device.  Since each host has simultaneously enumerated the device, there may be no need to detach and reconfigure the device on the fly."  '708 Patent, 2:12–18.  One of ordinary skill in the art would know that the existence of multiple banks of USB endpoint and status buffers[1] in Bohm's inventive multi-host USB device would allow two hosts to enumerate the multi-host USB device at the same time.  With dedicated endpoint and status buffers for each upstream port, there would be no need to hold off one host's attempt to enumerate the device while another host is also enumerating the device.

---

[1]     These are depicted as elements 306 and 308 in Figure 3 of the '708 Patent.

Exhibit 2007

52.     As another example, the '708 Patent specification discloses that "Multiple USB hosts may "simultaneously share a single device/function, for example a Gigabit Ethernet controller." '708 Patent, 2:18–19.  One of ordinary skill in the art would understand the "sharing" in this context as having an ordinary meaning and not as a term of art.   This is because the USB specification does not allow for a device to be shared or used by more than one host at a time.  One of ordinary skill in the art would view Bohm's disclosure of "simultaneous" sharing as merely stating that a device such as a Gigabit Ethernet controller can be used by multiple hosts at the same time.

53.     A further example is Bohm's disclosure that "a shared USB device may be simultaneously configured and accessed by two or more USB hosts." '708 Patent, 2:31–33.  First, one of ordinary skill in the art would know that the separate USB endpoint and status buffers along with the device controller in Bohm's multi-host USB device would allow two hosts to configure the multi-host USB device at the same time.  There would be no need to hold off one host's attempt to configure the device while the other was also configuring the device.  Second, one of ordinary skill in the art would view the simultaneous "access" stated here as allowing multiple hosts to issue access requests at the same time.  This "access" is made available "by providing a separate configuration and access interface for

each upstream host," i.e., the aforementioned separate USB endpoint and status buffers.  '708 Patent 3:48–50.

54.     Yet another example is Bohm's disclosure that "USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices."  '708 Patent, 1:24–26.  One of ordinary skill in the art would view Bohm's disclosure of "simultaneously accessible devices" consistent with the plain meaning of "simultaneously," i.e., that the devices on a USB bus can be accessed at the same time.  This is not a technical statement meant to imply that one USB host can issue simultaneous data transfers to separate devices; the USB standard does not allow for that.  One of ordinary skill in the art would understand this statement merely reflects the accessibility of the devices connected to the USB bus—they are all equally accessible at the same time.

55.     The plain meaning of "simultaneously" is further highlighted by the patent's disclosure that "[t]here are several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by only a single host at a time.  There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers.  These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch.

The USB device is typically accessed by one single host at a time . . . ." '708 Patent, 1:61–2:3.  This passage makes clear there is no simultaneous access if the device is accessed by a single host at a time.  Thus, one of ordinary skill in the art would understand that in order to have simultaneous access, both hosts must be able to access the device "at the same time."

56.     One of ordinary skill in the art would find the broadest reasonable, plain meaning interpretation of "simultaneously" to be consistent with the '708 Patent claims.  For example, the language of Claim 8 expressly states that the multi-host device controller is operable (1) "to simultaneously receive host requests from the plurality of hosts" and (2) "to internally determine which of the respective host requests to service immediately."  '708 Patent, 5:59–64.  The two activities recited in claim 8 are two separate and distinct activities.  As discussed above, receipt of multiple hosts requests can happen at the same time because Bohm's multi-host device provides "a separate configuration and access interface for each upstream host."  '708 Patent, 3:48–50.  One of ordinary skill in the art would understand that even though the controller may not service multiple host requests immediately or at the same time, the controller is still operable to receive multiple host requests at the same time.  One does not depend on the other.

Exhibit 2007

57.     The plain meaning interpretation of "simultaneously" is also consistent with its use in other claims.  Claim 11, for example, recites "the multi-host device controller comprises an internal arbitration mechanism configured to permit the plurality of hosts to simultaneously request access to the USB function block by interleaving host access requests and/or by using a common request/grant structure."  One of ordinary skill in the art would understand "simultaneously" here refers to multiple hosts making access requests at the same time.  One of ordinary skill in the art would understand the simultaneous access requests are possible because Bohm provides "a separate configuration and access interface for each upstream host," i.e., the aforementioned separate USB endpoint and status buffers depicted in Bohm Figure 3.  '708 Patent 3:48–50.

58.     One of ordinary skill in the art would understand the Claim 11 mention of "interleaving host access requests and/or by using a common request/grant structure" as referring to the manner in which the multi-host device controller services the simultaneous access requests.  In other words, after receiving simultaneous (i.e., "at the same time") requests from multiple hosts, the multi-host device controller can service those requests by providing access to the USB function block "by interleaving host access requests and/or by using a common request/grant structure."  The '708 Patent specification confirms this

understanding of Claim 11 by describing the actual access (i.e., not the request) of the shared peripheral function performed either by interleaving or by the common request/grant structure:

> USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312. '708 Patent 4:22–29.

### B.    "Concurrent" / "Concurrent USB Connections"

59.    In my opinion, one of ordinary skill in the art in the 2006 timeframe would understand the broadest reasonable interpretation of the term "concurrent" as having its plain meaning, i.e., "operating or occurring at the same time."

60.    One of ordinary skill in the art would find this broadest reasonable interpretation to be consistent with the '708 Patent specification.  For example, Figure 1 shows "Host 1" and "Host 2" connected at the same time to multi-host device 106.  *See* '708 Patent, 3:50–54 & Fig. 1.  Similarly, Figure 2 shows a PDA, keyboard, and printer each connected to the two PCs via USB connections that operate or occur at the same time.  '708 Patent, 3:55–38 & Fig. 2.  And Figure 3

shows a "Connection to first Host" and a "Connection to second Host," both existing or occurring at the same time.  '708 Patent, Fig. 3.

C.    **"USB Function Block" (Claims 1, 3, 7, 23)**

61.    In my opinion, one of ordinary skill in the art in the 2006 timeframe would understand the broadest reasonable interpretation of the term "USB function block" to have its plain meaning, i.e., "a segment of a USB device that performs a USB function."

62.    The '708 Patent uses the term "block" to refer to segments of a USB device.  *See* '708 Patent at 2:41–42 ("A USB device may be divided into three segments or blocks.").  One of ordinary skill in the art would, therefore, understand "USB function block" to broadly refer to a segment of a USB device.

63.    In the context of a USB device, one of ordinary skill in the art is familiar with USB "functions" because the USB specification defines USB functions.  *See* Ex. 1004 at 34 (USB 2.0 Specification) (defining "Function" as "A USB device that provides a capability to the host, such as an ISDN connection, a digital microphone, or speakers.").

64.    Accordingly, the plain meaning of "USB function block" is readily apparent to one of ordinary skill in the art, and means "a segment of a USB device that performs a USB function."

65.     I understand the Board construed "function block" under the broadest reasonable interpretation standard to mean "a segment of a device that performs a function whether the function is a peripheral function or not."  Institution Decision at 11.  My opinions herein are the same whether under the plain meaning of "USB function block" (above) or the Board's construction of "function block."

**D.     "Shared USB Function Comprised in the USB Device" (Claim 18)**

66.     In my opinion, one of ordinary skill in the art in the 2006 timeframe would understand the broadest reasonable interpretation of the term "shared USB function comprised in the USB device" to have its plain meaning, i.e., "a USB function that is in a USB device and shared by two or more USB hosts."

67.     As stated above, one of ordinary skill in the art is familiar with USB "functions" because the USB specification defines USB functions.  *See* Ex. 1004 at 34 (USB 2.0 Specification) (defining "Function" as "A USB device that provides a capability to the host, such as an ISDN connection, a digital microphone, or speakers.").

68.     The '708 Patent uses the term "shared" and "share" consistently in the context of sharing a USB device between multiple hosts:

- "In one set of embodiments, a single USB device may be **shared** across multiple USB hosts without needing to be re-configured or re-

enumerated each and every time the upstream hosts alternate accessing the USB device." '708 Patent at 2:12–15.

- "Multiple USB hosts may simultaneously **share** a single device/function, for example a Gigabit Ethernet controller." '708 Patent at 2:18–19.

- "The third block may correspond to the USB device that will be **shared** by multiple USB hosts, and may therefore not need to be duplicated." '708 Patent at 2:59–61.

- "In one set of embodiments, a multi-host USB device may provide maximum flexibility and a simple means by which to cheaply **share** devices with multiple hosts, by providing a separate configuration and access interface for each upstream host." '708 Patent at 3:46–50.

- "As shown in FIG. 2, by way of examples, multi-host device 106— configured with USB multi-host device controller 108—may be a personal digital assistant (PDA) 130, a keyboard 126, and/or a printer 120 **shared** by personal computer (PC) 122 and PC 123." '708 Patent at 3:54–58.

69.     Accordingly, the plain meaning of "shared USB function comprised in the USB device" is readily apparent to one of ordinary skill in the art, and means "a USB function that is in a USB device and shared by two or more USB hosts."

## VIII.  THE '708 PATENT IS NOT ANTICIPATED OR RENDERED OBVIOUS BY THE CITED PRIOR ART

### A. State of the Art and Patented Invention

70.     By 2006, when Bohm filed the application that led to the '708 Patent, USB was a mature standard that was used ubiquitously.  The second version of the USB specification (USB 2.0), which provided for increased transfer rates compared to the previous version of the specification, had been released a number of years earlier.

71.     The USB protocol is based on the assumption / requirement that only one entity—a USB host—can initiate data transactions on the USB bus.  As Bohm recognizes, "the USB specification is structured so that every device is configured and accessed by a single host controller."  '708 Patent, 1:57–59.

72.     Thus, to share a peripheral such as a printer between two hosts (e.g., personal computers) a user could unplug the printer from the first host and plug it into the second host.  Alternatively, as Bohm describes, there were "several switching devices that currently allow a device to be switched between multiple USB Host controllers, but the device can generally be configured and accessed by

only a single host at any given time.  There also exist stand-alone USB switches that provide the capability of switching a device between upstream USB Host Controllers.  These solutions, however, fail to permit simultaneous access to the USB device that is downstream of the hub or switch.  The USB device is typically accessed by one single host at a time, and when access to the USB device is switched, the device must be re-configured, thereby losing internal state information." '708 Patent, 1:62–2:5.

73.    Bohm successfully overcame the shortcomings of these prior art solutions by providing a multi-host USB device with concurrent USB connections between the multi-host USB function block and two or more hosts.

74.    Bohm's inventive concept was to provide "a device" that can be simultaneously accessed by two hosts without using the "stand-alone USB switches" described in Bohm's specification that only provide access to a device one host at a time.  *See* '708 Patent 1:62–2:5.

**B.    Dickens**

75.    Pages 54–64 of Delphi's Petition and paragraphs 101–123 of the supporting declaration of expert John Garney (Exhibit 1023) are devoted to a comparison of claims 1–8, 11, 15–20, and 22–25 of the '708 Patent with U.S. Patent No.  6,549,966 ("Dickens").

76.     Pages 23–33 of the Board's Institution Decision are devoted to a comparison of claims 1–8, 11, 15–20, and 22–25 of the '708 Patent with Dickens.

77.     I disagree with Delphi and Mr. Garney that Dickens anticipates these claims of the '708 Patent.  For the reasons stated below, it is my opinion that Dickens fails to disclose or reasonably suggest each and every element of independent claims 1, 3, 7, 18, and 23 of the '708 Patent and therefore does not anticipate these claims or the corresponding dependent claims.

### i.     Overview of Dickens

78.     Dickens' "data routing device" uses a very powerful microprocessor to coordinate activities occurring on separate USB buses.  In fact, Dickens' discloses five (5) separate USB buses:

26                              Exhibit 2007

IPR2017-00864



FIG. 2

Ex. 3001 at 3 (annotated).

79.    Host computers 105 act as the USB host for USB Buses #1–2.  There is one computer/host for each USB bus (the leftmost computer 105 as the host for USB Bus #1; the rightmost computer 105 as the host for USB Bus #2).  *See* Dickens at 5:27–37.

27                                      Exhibit 2007

80.    Host computers 105 are connected via USB connection 106 (and USB hub 107) to the data converters 110 of Dickens' Fig. 1, which include device controllers 150.  *See* Dickens at 5:27–37, 6:51–54.  USB connections 106 are standard USB cables.  Dickens at 5:31–33.



FIG.   1

Ex. 3001 at 2.

81.    Each USB device controller 150 (Dickens Fig. 2) is a unique USB device on its respective USB bus 106, making up a terminus or "leaf" of the USB bus.

28                          Exhibit 2007

82.     Dickens discloses that the USB device controllers 150 implement

emulation functions to emulate the presence of each USB peripheral device (e.g.,

audio speakers 180, printer 182, keyboard 184, and mouse 186).  *See* Dickens at

5:38–43.

83.     When a host computer 105 is connected to Dickens' data routing

device 100, the host computer enumerates and configures each emulated device via

its respective USB device controller 150.

84.     During enumeration performed by a host computer 105, each

emulated device on the host's respective USB bus receives a unique address. This

enumeration process relates to the emulated functions; host computers 105 do not

enumerate any of the USB peripheral devices downstream from the data router

(e.g., audio speakers 180, printer 182, keyboard 184, and mouse 186).

85.     USB Buses #3–5 (annotated Fig. 2, above) include peripheral data

converters 120 (Dickens Fig. 1), which include USB host controllers 154, 156, and

158.

86.     The USB host controllers (154, 156, 158) each act as a host for each

respective USB bus, i.e., one host controller per bus.

87.     Dickens states the USB host controllers (154, 156, 158) include

functions that emulate the presence of a host computer on USB connections 109.

*See* Dickens at 6:12–17.  Despite the use of the term "emulate" in this description, one of ordinary skill in the art would understand these host controllers (154, 156, 158) are actual USB hosts on their respective USB buses.  That is, they each individually operate according to the behavior defined for a USB host in the USB specification.

88.     Dickens' host controllers (154, 156, 158) are connected via USB connections 109 to the various separate downstream peripheral devices (audio speakers 180, printer 182, and keyboard 184 and mouse 186 through hub 107).  *See* Dickens at 6:64–7:8.  Each of these downstream devices is a terminus or leaf of each respective USB bus.

89.     Dickens' data routing device 100 and the downstream peripheral devices, such as Dickens' printer 182, are separate physical devices.  This is clear because they are connected by USB connections 109 that are described as standard "multi-conductor USB cables."  *See* Dickens at 6:21–23.

90.     When a peripheral device is connected to Dickens' data routing device 100, the respective USB host controller (154, 156, 158) will enumerate and configure that peripheral device. During this enumeration, the peripheral device will receive a unique address on its respective USB bus.  This enumeration process relates to the peripheral device; USB host controllers 154, 156, and 158 do not

enumerate any of the emulated functions (i.e., USB device controllers 150) within Dickens' data routing device 100.

91.     In order to perform enumeration of the downstream peripheral devices—and to emulate those same devices, Dickens' data routing device 100 must have intimate knowledge of how each of the devices that can be plugged in work.  For example, Dickens' data routing device must have device drivers and emulation software that correspond to any downstream device that is plugged into USB host controllers 154, 156, and 158.  As a result, installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dickens' data routing device 100 without also upgrading the software running on data routing device 100.

92.     Dickens' implements a PCI bus (132) between the various USB busses and its data routing controller 140, which includes microprocessor 142.

93.     Dickens' data routing controller 140 uses the PCI bus to establish connections between a host computer 105 and peripheral devices (e.g., printer 182).

Exhibit 2007

### ii.   Dickens Does Not Disclose Each and Every Element

#### a.   *No "concurrent" respective USB connections (Claims 1, 3, 7, 18, 23)*

94.   In view of the broadest reasonable interpretation of "concurrent" USB connections discussed above, it is my opinion that Dickens fails to disclose "concurrent respective USB connections between the USB function block and the first and second upstream ports," as required by Claim 1 of the '708 Patent.

95.   I understand the Board, Delphi, and Mr. Garney identify the ports connecting Dickens' data routing device to Host PCs 105 as corresponding to the claimed "first and second upstream ports" of Bohm's Claim 1.  These ports would be at the connection point between the Host PCs 105 and the USB device controllers 150 in Dickens' Figure 2 (highlighted in yellow):



Exhibit 2007

96.     I further understand the Board, Delphi, and Mr. Garney identify the printer peripheral as corresponding to the claimed "USB function block" of Bohm's Claim 1.

97.     Dickens does not disclose concurrent USB connections between two of these ports and the printer.  Instead, Dickens discloses that "[e]ach peripheral device can have a USB connection by which it is connected to a respective one of the plurality of peripheral data converters."  Ex. 1003, 5:2–4.  This statement is confirmed in Dickens' Figure 2, which depicts a single USB connection between a downstream port on the data routing device and any of the peripherals.  For example, Dickens' Figure 2 depicts a single USB connection between the data routing device and the printer (highlighted in yellow):



98.     There is only a single connection to the printer.  One of ordinary skill in the art would understand that, in the context of Dickens' disclosure, this single

connection only allows print data from one host at a time.  Indeed, USB connection 109 is the only way data from the data routing device is transferred to/from printer 182.  Thus, Dickens does not disclose concurrent USB connections between two of the data routing device's upstream ports (connected to Host PCs 105) and the USB function block (e.g., printer 182).

99.   Dickens discloses:

- "Because the data routing is controllable the invention is able to allocate USB peripherals to particular USB host computers by switching the data flow between them on and off.  In this way, the peripheral can be shared between multiple USB host computers on a basis that is appropriate for the application."  Ex. 1003 2:21–26.

- "Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected." Id. 2:48–52.

- "When print data from either computer is detected it is routed to the printer if the printer is currently free.  Any subsequent print data from the other computer is buffered in memory until a break in

transmission of the original print data stream equal to the timeout

period has been detected. The buffered data is then sent to the printer.

. . . The overall effect is to allow the printer to be automatically

shared between the computers." Id. 9:21–30.

100.   Based on the passages in the preceding paragraph of this declaration

(paragraph 99), one of ordinary skill in the art understands when two hosts request

access to the same peripheral (e.g., printer), Dickens establishes a one-to-one

connection between one of the hosts (via its upstream port) and the peripheral. For

the host that is not connected, Dickens temporarily stores data in a memory.

101.   Any data transactions for printer 182, regardless of which host

initiated the transaction, are necessarily communicated to printer 182 via the single

USB connection 109 shown connected to printer 182 in Figure 2 of Dickens.

102.   Based on the passages in paragraph 99 above, one of ordinary skill in

the art understands when the host that is connected to the peripheral completes its

data transfer, the data routing device switches the first one-to-one connection off

and then switches a new one-to-one connection on between the peripheral and the

second, waiting host (via its upstream port).  The second host with the new one-to-

one connection then completes its access.

103.   Based on the passages in paragraph 99 above, one of ordinary skill in the art understands Dickens is not capable of establishing concurrent USB connections between a peripheral and two or more hosts or upstream ports because there are never two or more such USB connections at the same time.

104.   I understand the Board, Delphi, and Mr. Garney advance the same anticipation argument for Claims 3, 7, 18, and 23 as advanced for Claim 1.  These claims differ from Claim 1 at a minimum because they require "concurrent" respective USB connections to exist between the USB function block (e.g., Dickens' printer) and two hosts instead of two upstream ports as in Claim 1.  For the same reasons discussed above with respect to Claim 1, Dickens does not disclose the "concurrent" respective USB connections of Claims 3, 7, 18, and 23.

### b. *No concurrent respective "USB connections" (Claims 1, 3, 7, 18, 23)*

105.   It is my opinion that Dickens fails to disclose concurrent respective "USB connections" between the USB function block and the hosts because Dickens' data routing controller 140 uses the PCI bus to establish connections between a host computer 105 and peripheral devices (e.g., printer 182).  *See* Dickens at 8:16–28.

106.   Because Dickens routes data in a non-USB format over a PCI bus, one of ordinary skill in the art would not view Dickens as disclosing concurrent

respective "USB connections" between Dickens' printer (i.e., the claimed USB function block) and the two upstream ports on Dickens' data routing device (or the two hosts connected to the data routing device).

107.   Further, as previously described (paragraph 91 above), installing a specific driver on any host 105 for a specific device will not allow the user to plug that specific device into a downstream port of Dickens' data routing device 100 without also upgrading the software running on data routing device 100.  This is further evidence that the connection between host 105 and printer 182 is not a "USB connection" as would be understood by one of ordinary skill in the art since installing a specific driver on a host 105 directly connected via "USB connection" to a printer 182 would function as required by the USB specification.

> c.     *No "simultaneously enumerat[ing] and configur[ing]" (Claims 1, 7, 18) or "simultaneously configur[ing]" (Claim 23)*

108.   Petitioner and the Board conclude the enumeration of Dickens' printer 182 discloses the "simultaneously enumerat[ing] and configur[ing]" of Claims 1, 7, and 18; and the "simultaneously configur[ing]" of Claim 23.  *See* Petition at 57–58; Institution Decision at 30–31.  The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously enumerate or configure printer 182.

Exhibit 2007

109.   Printer 182 is enumerated and configured, if at all, by one and only one host—host controller 156.

110.   One of ordinary skill in the art would understand Dickens' emulated printers (referenced at pages 30–31 of the Board's Institution Decision) are separate (virtual) devices implemented in the data routing device 100 (compared with printer 182, which is a (physical) device connected to the data routing device via USB connection 109).  Thus, one of ordinary skill in the art would understand the emulated printers are enumerated independently from printer 182.

### d.   *Dickens' other peripheral devices do not anticipate the '708 Patent claims*

111.   Petitioner and the Board focus on Dickens' printer 182 as corresponding to the USB function block of the '708 Patent claims.  Dickens' other devices (speakers 180, keyboard 184, and mouse 186) also do not anticipate the '708 Patent claims.  Like printer 182, these devices are all connected to the data router by a single USB connection—the speakers directly connected and the mouse/keyboard connected via the single USB connection 106 between the data routing device and hub 107.  Accordingly, these peripheral devices do not disclose the "concurrent respective USB connections" required by the claims.

38                                     Exhibit 2007

C.     **Dickens in View of Chen Does Not Render Claims 9, 11–14, and 21 Obvious.**

112.   I understand the Board, Delphi, and Mr. Garney contend Claims 9, 11–14, and 21 of the '708 Patent are rendered obvious by the combination of Dickens in view of U.S. Patent No. 7,073,010 ("Chen").

113.   Pages 34–38 of the Board's Institution Decision are devoted to a comparison of claims 9, 11–14, and 21 with the combination of Dickens and Chen.

i.     **Dickens teaches away from a combination with Chen**

114.   Chen's interleaving technique relates to interleaving transactions on a USB bus.

115.   A print job in Dickens may be made up of a number of USB transactions.  Multiple transactions make up a USB "transfer." Dickens expressly teaches not to mix transfers from different hosts.  *See* Dickens at 9:21–26 ("[w]hen print data from either computer is detected it is routed to the printer if the printer is currently free.  Any subsequent print data from the other computer is buffered in memory until a break in transmission of the original print data stream equal to the timeout period has been detected."); Dickens at 2:45–48 ("When utilized in printer sharing apparatus the invention can enable data from two or more USB host computers to contend for a USB connected printer on a timeout basis.").

116.   In other words, Dickens expressly teaches a print sharing scheme that relies on a timeout period when more than one host attempts to access the printer.

117.   One of ordinary skill in the art would understand that this timeout period is required so that different transfers from different hosts do not get mixed together.  This makes sense because mixing print data from two different hosts would result in garbled print-outs.

118.   Dickens' other devices (speakers 108, keyboard 184, and mouse 186) would also not allow interleaving transfers from different hosts.  Dickens expressly teaches the mouse/keyboard are used with only one host, for example, by the use of switches or hot-keys to determine which one single host is connected to the keyboard and mouse at any one time.  *See* Dickens at 8:55–9:9.  Thus, Dickens teaches away from interleaving transactions to/from the mouse and keyboard.  This makes sense because it is illogical to mix keyboard/mouse data to/from different computers.

119.   Similarly, Dickens teaches the speakers 180 are only connected to one host at a time.  *See* Dickens at 9:9–19.  Thus, Dickens teaches away from mixing transactions of audio data from two different hosts.  This makes sense because the audio output from two separate audio channels would likely produce distorted results if the USB transactions from two different hosts would be interleaved.

Exhibit 2007

120.   It is my opinion that one of ordinary skill in the art would not combine Chen with Dickens at least because Dickens teaches not to mix USB transfers, which teaches away from a combination with Chen's transaction interleaving.

### ii.   Combining Chen with Dickens results in an inoperable system

121.   It is my opinion that applying Chen's interleaving technique to Dickens' data routing device would result in an inoperable system.

122.   Chen's interleaving works because there are multiple devices downstream from the host.  Specifically, Chen discloses multiple memory devices. *See, e.g.*, Ex. 1005, Fig. 5 ("DEVICE-1" and "DEVICE-2").

123.   While Chen's smart switch is interleaving packets, each downstream memory device is still receiving packets in an order that complies with the USB specification.

124.   If there was only one downstream memory device in Chen, it would be impossible to interleave the packets because it would violate the transaction rules of the USB specification.

125.   According to the example shown in Chen's Figure 5, Chen's smart switch transmits (on its downstream ports) "a first token packet of a first transaction, a second token packet of a second transaction, and a data-out packet of the first transaction" in the following order: "first token packet, second token

41

Exhibit 2007

packet, and data-out packet." Ex. 1023 ¶ 136. If there was only one downstream memory device in Chen, this ordering would not comply with the USB specification, which requires the data-out packet to immediately follow the token packet. The single downstream memory device would determine there was an error on the bus and would ignore the packets.

126.   Attempting to use Chen's interleaving technique with Dickens' printer would have the same problem because there is only one printer device.  In particular, interleaving packets destined for Dickens' single printer device would not comply with the USB specification, and the printer would determine there was an error on the bus and ignore the out-of-order packets.

127.   This problem would occur if Chen's interleaving technique is attempted with any single downstream device (e.g., printer 182, speakers 180, keyboard 184, mouse 186).  Accordingly, I disagree with the Board, Delphi, and Mr. Garney that applying Chen's interleaving to Dickens' system would increase the throughput of Dickens' system.  The resulting system would be inoperable. Thus, the throughput would decrease to nothing.

## IX.   SWORN TESTIMONY

128.   The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and

that such willful false statements and the like may jeopardize the validity of the

application or document or any registration resulting therefrom, declares that all

statements made of his/her own knowledge are true; and all statements made on

information and belief are believed to be true.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on:  November 20, 2017          Respectfully submitted,

                                         Geert Knapen


Exhibit 2007

IPR2017-00861
Patent Owner's Sur-Reply

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————————

Delphi Technologies, Inc.,
Petitioner

v.

Microchip Technology Inc.,
Patent Owner.

—————————————

U.S. Patent No. 7,627,708

—————————————

Case No. IPR2017-00861

**PATENT OWNER'S SUR-REPLY PURSUANT TO ORDER CONDUCT OF THE PROCEEDINGS (PAPER 29)**

## TABLE OF CONTENTS

I.  "DEVICE" ........................................................................................1

II.  "USB CONNECTION" .....................................................................3

  A.  Delphi's construction of "USB connection" incorrectly includes
     non-USB intervening elements and reads "USB" out of the
     claims. ........................................................................................4

  B.  Delphi's "USB connection" arguments are flawed. .......................6

III.  "COUPLED BETWEEN" .................................................................9

IV.  "CONTROLLER . . . COMPRISES . . . INTERFACE
    CIRCUITS" ....................................................................................10

V.  "CONTROLLER . . . TO MAINTAIN . . . ADDRESS,
    CONFIGURATION, AND RESPONSE INFORMATION" ........................11

VI.  CONCLUSION ..............................................................................11

i

IPR2017-00861
Patent Owner's Sur-Reply

# EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Declaration in Support of Motion for *Pro Hac Vice* Admission of Brian C. Banner Pursuant to 37 C.F.R. § 42.10(c) |
| 2002 | Declaration of Expert Geert Knapen in Support of Patent Owner's Preliminary Response to Petition |
| 2003 | Excerpts from Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc.) (1988) |
| 2004 | Exhibit 2004 to the Deposition of John Garney (Oct. 25, 2017) (annotated version of Petitioner's Exhibit 1003) |
| 2005 | Omitted |
| 2006 | John Garney Deposition Transcript (Oct. 25, 2017) |
| 2007 | Declaration of Expert Geert Knapen in Support of Patent Owner's Response to Petition |

Pursuant to the Board's March 6, 2018 Order (Paper 29), Patent Owner Microchip ("PO") files this Sur-Reply to respond to claim construction arguments made for the first time in Petitioner Delphi's Reply brief.

## I.    "DEVICE"

The parties dispute whether the term "device" (and presumably other variants) in the preambles of Claims 1 ("USB multi-host device"), 3 ("USB multi-host device"), 7 ("USB device"), 18 ("USB device"), and 23 ("USB device") is limiting. PO submits the preamble is, in fact, limiting. A preamble is limiting if it "recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *NTP, Inc. v. Research In Motion*, 418 F.3d 1282, 1305 (Fed. Cir. 2005). The preamble may be construed as limiting when it recites particular structure that is highlighted as important by the specification. *Catalina Mktg. Int'l v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002). Further, "a preamble phrase that provides antecedent basis for a claim limitation generally limits the scope of the claim." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012).

Both considerations support the conclusion the preamble is limiting. For example, the SUMMARY OF THE INVENTION highlights the importance of "a single USB device [that] may be shared across multiple hosts without needing to be reconfigured or re-enumerated each and every time the upstream hosts alternate accessing the USB device." '708 Patent at 2:12–15. The specification further

1

highlights the "device" or "USB multi-host device" preamble structure by distinguishing prior art systems with "switching devices" and "stand-alone USB switches." *See* '708 Patent at 1:61–2:5. In other words, the claimed "device" is not a combination of a standalone switch and another USB device.

Additionally, the preamble phrase in each of the independent claims provides antecedent basis for further limitations. The "USB multi-host device" in the preamble of Claims 1 and 3 provides the antecedent basis for "the USB multi-host device" in each of those claims. The "USB device" in the preamble of Claims 7, 18, and 23 likewise provides the antecedent basis for "the USB device" recited later in those claims (and inn dependent Claim 25). Accordingly, these preamble structures are limiting. *See Deere & Co.*, 703 F.3d at 1358 (preamble providing antecedent basis limits scope of claim).

Delphi incorrectly concludes the disclosure of an "off-the-shelf item" means the claims encompass an aggregation of separate devices, and thus, the preamble is not limiting. Reply at 4. The specification is merely stating the function may be standard—i.e., an "Ethernet Controller, Mass-Storage drive, etc." '708 Patent at 4:10. But the specification is clear the function is a "block" within "[a] USB device." '708 Patent at 2:41–53 ("A USB device may be divided into three segments or blocks. . . . The third block may comprise the 'Peripheral Function' itself, which

2

may include the circuitry necessary for the specific USB device function . . ."); *accord* Ex. 1023 ¶ 62 (Petitioner's expert: "a 'block' is a 'segment' of a 'device.'").

Delphi's argument that a device may be an aggregation of devices is unsupported. Reply at 4. A device is well known in the art—its definition does not include an aggregation of devices. *See* Ex. 2013 ¶ 13. Delphi unjustifiably conflates "a collection of hardware components" with "a collection of devices." The two are not the same. Dickens' "memory device" is not to the contrary. It is not a USB device. It is a DRAM connected to a Pentium processor. Chen's "USB multi-flash device 40" is also not to the contrary. The memory devices are separate devices on respective USB busses. Delphi cannot use extrinsic evidence (Dickens and Chen) to alter the meaning of "device" in derogation of the claims and the specification. *See Philips v. AWH Corp.*, 415 F.3d 1303, 1318–19 (Fed. Cir. 2005) (en banc).

## II.    "USB CONNECTION"

The phrase "USB connection" should be given its plain and ordinary meaning. One of ordinary skill would know that a "USB connection" is one that conforms to the requirements of the USB specification. This plain meaning is consistent with the '708 Patent specification: "A *connection* between the USB device and the host may be established via digital interconnect such as Interchip USB, ULPI, UTMI, etc., or via a four wire interface that includes a power line, a ground line, and a pair of data lines D+ and D-." '708 Patent at 1:35–39 (emphasis added). The first three "digital

interconnect" examples are interfaces defined by/for USB, and thus conform to the requirements of the USB specification.[1] The last, "four wire interface" is a USB cable defined by the USB specification. The '708 Patent specification also discloses "A USB hub may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller. In addition, other USB hubs may be coupled to the USB hub to provide additional USB device **connections** to the USB host controller." '708 Patent at 1:53–57 (emphasis added). The "USB device connections" here—through one or more USB hubs—conform to the requirements of the USB specification (e.g., USB signaling through a USB hub).

The specification's use of the word "connection" is consistent with the plain meaning of "USB connection" because it consistently refers to a connection that conforms to the requirements of the USB specification.

## A. Delphi's construction of "USB connection" incorrectly includes non-USB intervening elements and reads "USB" out of the claims.

Delphi incorrectly argues "USB connection" means "direct and indirect connection, both with and without intervening interconnect, using USB protocols." Reply at 4–11. The dispute is whether a "USB connection" includes intervening

---

[1]    *See, e.g.*, www.usb.org/developers/docs/usb20_docs/ ("Inter-Chip USB Supplement Revision 1.0 as of March 13, 2006" is a document provided with the USB 2.0 specification); https://www.design-reuse.com/news/11102/ulpi-interface-specification-publicly-available-standalone-hi-speed-usb-transceivers.html (describing "first public availability of the UTMI+ low-pin interface (UPLI) industry specification for Hi-Speed Universal Serial Bus (USB) . . ."); Ex. 1041 (the main block in UTMI is the "USB 2.0 Transceiver Macrocell," a block that "handles the low level USB protocol and signaling").

4

elements that do not conform to the requirements of the USB specification.

Delphi's proposed construction requiring only some "use" of "USB protocols" is unreasonably broad. Consider an inefficient office where a person prints a page of text to a first USB printer. An assistant takes the print-out and re-types the text into a second computer and prints to a second USB printer. Delphi's proposed construction of "USB connection" would encompass this USB-human-USB "connection" between the first computer and the second printer because it "uses USB protocols." But one of ordinary skill in the art would not understand this USB-human-USB connection to be a "USB connection" within the scope of the '708 Patent claims. Delphi's overly-broad construction should be rejected. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016) (BRI standard "does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description.").

Further, Delphi's proposed construction improperly renders the term "USB" meaningless. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1375 (Fed. Cir. 2015) (refusing to adopt a construction that would read word "placed" out of the claims). Using Delphi's reasoning, even a non-USB connection would satisfy the claim so long as a USB host makes a request that is eventually handled by a USB device block. By analogy, a claim to a "wired connection" between two network devices would be anticipated by a wireless network because the antennas are wires.

5

## B. Delphi's "USB connection" arguments are flawed.

First, Delphi improperly twists the patentee's express definition of one term—"coupled"—to redefine a different term—"USB connections." Reply at 5 (citing Ex. 1001 3:37–38). No legal authority supports this approach.

Second, Delphi refers to the '708 Patent specification's disclosure of "Interchip USB, ULPI, UTMI, etc." (1:35–39) and incorrectly argues these "are not USB signals." Reply at 5–6. *See supra*, footnote 1 (Interchip USB, UPLI, and UTMI all conform to the requirements of the USB specification). Further, PO's expert did not testify these were not USB signals. *See* Reply at 6 ("PO's expert confirmed that these interface signals, which are not USB signals, . . ."). PO's expert merely stated that the signaling inside Figure 3 would likely be UPLI or UTMI and not a "USB Bus" or "USB signaling cable." Ex. 1049 at 76:16–78:7. Delphi's argument that "ULPI and UTMI were known interfaces to ***non-USB-2.0 compliant*** ASICs for devices" (Reply at 6 (emphasis added)) is incorrect because these interfaces specifically allow an ASIC to communicate in ***a USB-compliant manner***.

Third, Delphi's reliance on various non-USB (i.e., PCI) references to construe "USB connections" invites error. Reply at 6. Delphi is doing exactly what the *en banc* Federal Circuit *Philips* court forbids—using extrinsic references to alter the meaning of "USB connections" to mean any connection, including non-USB connections, in derogation of the claims and the specification. *See Philips v. AWH*

6

*Corp.*, 415 F.3d 1303, 1318–19 (Fed. Cir. 2005) (en banc). Moreover, the extrinsic PCI-related "evidence" does not even support Delphi's argument:

- Contrary to Delphi's assertion that USB "client software . . . may involve PCI and similar buses" (Reply at 6, citing Ex. 1004), the USB 2.0 specification says USB client software ***does not*** use other buses (such as PCI) to interact with USB functions:

> "Client software for USB functions **must use USB software programming interfaces** to manipulate their functions **as opposed to** directly manipulating their functions via memory or I/O accesses as with other buses (e.g., **PCI**, EISA, PCMCIA, etc.)." Ex. 1004 at 59 (Section 5.2.5) (emphasis added).

- Exhibit 1036, cited by Delphi at page 6 of its Reply, is not remotely related to "USB" or "Universal Serial Bus" as neither term is ever mentioned.

- The remaining exhibits cited at page 6 of Delphi's Reply (Ex. 1049 70:8–70:23, Ex. 1047 1:27–29, Ex. 1048, Ex. 1049 70:25–71:6) merely disclose either a host or a device with an internal PCI bus. None of these exhibits teach that the PCI bus is used to form any part of a "USB connection."

Fourth, Delphi's argument that "USB connections" can include "intervening elements" goes too far. Reply at 7. A USB connection can include USB hubs that may have buffers and transaction translators, but these all still conform to the requirements of the USB specification (in fact, the behavior is defined by it).

Fifth, just because the word "interconnect" (Reply at 7) appears in both the '708 Patent specification and the acronym "PCI" does not mean the phrase "USB connections" includes PCI connections.

Sixth, PCI is not "an 'interconnect' within 'etc.' of the '708 patent." Reply at 7–8. By Delphi's logic, the quoted passage ('708 Patent at 1:35–38) would read "[a] connection between the USB device and the host may be established via digital interconnect such as . . . [PCI]." One of ordinary skill would not use PCI to connect a USB device and a USB host, and none of the references support such a conclusion.

Seventh, PO's expert's concession (quoted at page 9 of the Reply) is not evidence of anything. What is ***not*** in the patent is neither intrinsic nor extrinsic evidence. The '708 Patent's silence as to carrier pigeons and the telegraph does not bring those communication systems within the scope of a "USB connection."

Eighth, PO's expert agreed there were two USB buses in Figure 3, but expressly disagreed the arrow labelled "Bus #3" in Delphi's Illustration 11 is a USB bus. Ex. 1049 at 78:8–14.

Ninth, the arrow at the bottom of Figure 3 is not described as a "shared connection." Reply at 11 (Illustration 12). No intrinsic evidence supports this conclusion, which is contrary to the claim language. Figure 3 is a "logic diagram" with arrows showing communication between logical blocks. '708 Patent at 3:23–24. Consistent with the claims, the bottom arrow is a logical depiction of multiple

8

dedicated, concurrent USB connections, e.g., illustrated in red and blue to the right. Indeed, "the drawings . . . are not intended to limit the invention to the particular form disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present invention *as defined by the appended claims*." '708 Patent at 3:28–33 (emphasis added).



FIG. 3

## III. "COUPLED BETWEEN"

The term "coupled" is defined in the specification as "directly or indirectly connected." The term "between" should have its plain and ordinary meaning. In the context of Claims 2, 6, and 16, one of ordinary skill would understand the endpoint buffer "coupled between" the upstream port and the multi-host device controller is directly or indirectly connected in the middle of those two structures. This is consistent with the specification which, for example, depicts in Figure 3 the endpoint buffers in the middle of the upstream port and the USB multi-host device controller.

9

Delphi's proposed construction (Reply at 12) rewrites the claim language by merely requiring a direct or indirect connection. According to Delphi, as long the endpoint buffer is coupled in any way to both the upstream port and the multi-host device controller, it is "between" them. This improperly eviscerates the "between" limitation because it makes the location of the endpoint buffer irrelevant. Finally, Delphi improperly relies on *NTP, Inc. v. Research in Motion, Ltd.* to support its construction. This case is inapposite. It deals with a different patent (i.e., is not intrinsic evidence), and the Federal Circuit was not even construing the term "between." *See* 418 F.3d 1282, 1310 (Fed. Cir. 2005). The claim language at issue there is not even analogous to the claim language here.

## IV.  "CONTROLLER . . . COMPRISES . . . INTERFACE CIRCUITS"

"Comprising is a term of art used in claim language which means that the named elements are essential." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003). "Comprising" and "including" are synonymous. *Id.* Thus, the phrase "the controller comprises: a respective interface circuit . . ." means the respective interface circuits are essential to or included in the controller. Delphi's proposed construction fails because it uses the extrinsic prior art reference alleged to invalidate Claim 25 of the '708 Patent to define this phrase of the claim. Further, nothing in the intrinsic record supports Delphi's addition of the phrase "whether located inside or outside a housing with the controller."

10

IPR2017-00861
Patent Owner's Sur-Reply

## V.   "CONTROLLER . . . TO MAINTAIN . . . ADDRESS, CONFIGURATION, AND RESPONSE INFORMATION"

This phrase, representing the sole limitations of dependent Claims 17, 22, and 24, should be construed to have its plain meaning. Delphi's construction completely re-writes the claim and equates this phrase with a limitation within the respective independent claim (e.g., "without . . . reconfiguring the USB device"). But a dependent claim must "specify a further limitation of the subject matter claimed." 35 U.S.C. § 112/4 (Pre-AIA). To construe the claim as Delphi suggests would render these dependent claims invalid under § 112/4, an action beyond the Board's power. *See* 35 U.S.C. § 311(b) (grounds limited to §§ 102 and 103).

## VI.   CONCLUSION

Patent Owner respectfully requests the Board construe the disputed terms as set forth above.

Dated: March 9, 2018                     Respectfully submitted,

                                          */s/ Brian C. Banner*

                                          Bruce W. Slayden II (Reg. No. 33,790)
                                          bslayden@sgbfirm.com
                                          Brian C. Banner (*pro hac vice*)
                                          bbanner@sgbfirm.com
                                          R. William Beard, Jr. (Reg. No. 39,903)
                                          wbeard@sgbfirm.com
                                          Truman H. Fenton (Reg. No. 64,766)
                                          tfenton@sgbfirm.com

11

IPR2017-00861
Patent Owner's Sur-Reply

Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

## CERTIFICATE OF SERVICE

The undersigned hereby certifies the above-captioned Patent Owner's Sur-Reply was served in its entirety on March 9, 2018, upon the following parties by sending a copy via email to the following email addresses:

Charles W. Shifley (cshifley@bannerwitcoff.com)
Binal J. Patel (bpatel@bannerwitcoff.com)
Robert H. Resis (rresis@bannerwitcoff.com)
Jason S. Shull (jshull@bannerwitcoff.com)
Timothy J. Rechtien (trechtien@bannerwitcoff.com)
Mark A. Dalla Valle (mdallavalle@bannerwitcoff.com)
Zachary Getzelman (zgetzelman@bannerwitcoff.com)

Banner & Witcoff, Ltd.
10 South Wacker Drive, Suite 3000
Chicago, IL 60606

Respectfully submitted,

*/s/ Brian C. Banner*

Bruce W. Slayden II (Reg. No. 33,790)
bslayden@sgbfirm.com

12

IPR2017-00861
Patent Owner's Sur-Reply

Brian C. Banner (*pro hac vice*)
bbanner@sgbfirm.com
R. William Beard, Jr. (Reg. No. 39,903)
wbeard@sgbfirm.com
Truman H. Fenton (Reg. No. 64,766)
tfenton@sgbfirm.com
Jerry F. Suva (Reg. No. 67,902)
jsuva@sgbfirm.com

SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1900
Austin, TX 78701
t: 512.402.3550
f: 512.402.6865

13

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DELPHI TECHNOLOGIES, INC.,
Petitioner,

v.

MICROCHIP TECHNOLOGY, INC.,
Patent Owner.

_____

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)[1]

_____

Record of Oral Hearing
Held:  June 14, 2018

_____

Before BRIAN J. McNAMARA, DANIEL N. FISHMAN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

APPEARANCES:

ON BEHALF OF THE PETITIONER:

      SCOTT A. MCKEOWN, ESQUIRE
      Ropes & Gray, LLP
      2099 Pennsylvania Avenue N.W.
      Washington, DC 20006-6807
      202-508-4600
      Scott.mckeown@ropesgray.com

ON BEHALF OF THE PATENT OWNER:

      BRIAN C. BANNER, ESQUIRE
      BRUCE W. SLAYDEN II, ESQUIRE
      Slayden Grubert Beard,
      401 Congress Avenue, Suite 1900
      Austin, Texas 78701
      512-402-3552
      bbanner@sgbfirm.com & bslayden@sgbfirm.com

      The above-entitled matter came on for hearing on Thursday, June 14, 2018, commencing at 1:00 p.m., at the U.S. Patent and Trademark Office, 600 Dulany Street, Alexandria, Virginia.

2

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1          P R O C E E D I N G S

2          MR. DILL:  All rise.

3          JUDGE McNAMARA:  Please be seated.  Okay.   Good afternoon,

4    everyone.  This is the oral hearing in -- it's a consolidated oral hearing for

5    cases IPR2017-00861 and 00864.

6          And we have, Counsel for Petitioner, introduce yourself first.

7          MR. McKEOWN:  Scott McKeown of Ropes & Gray for Petitioner.

8    I'm joined today by Brandan McLaughlin who is a Summer Associate

9    controlling the technology.

10          JUDGE McNAMARA:  All right.  Thank you very much.  Patent

11    Owner?

12          MR. BANNER:  Thank you, Your Honor.  Brian Banner with Slayden

13    Grubert Beard, on behalf of the Patent Owner Microchip Technology

14    Incorporated; and with me today is Bruce Slayden, who is the lead Counsel

15    in the case.

16          JUDGE McNAMARA:  Thank you very much.  As you can tell, I am

17    Judge McNamara.  And Judges Fishman and Clements are participating

18    remotely.  So, to the extent that you can, make sure that you identify any

19    demonstrative or other document that you might be referring to during your

20    arguments so that they can access that remotely.

21          Let me see.  Each party in this case will have 60 minutes for

22    argument, and so the Petitioner will go first.  Present its case on the

23    challenged claims, and then he can preserve some -- Petitioner may reserve

24    time for rebuttal.  Patent Owner will then proceed to present its argument.

25    And lastly, the Petitioner can make use of any time that's reserved to rebut

26    the Patent Owner's opposition.

3

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    Oh.  I forgot to mention.  Also, we have with us, attending in Denver,

2    a detailee Examiner by the name of Ryan Coyer, and so he will be present at

3    the hearing as well.

4    Before we begin I also want to talk about the Patent Owner's request

5    for a rehearing of the Panel's post-SAS decision to institute on all claims of

6    all grounds.  Just so you know, the Panel will request additional briefing on

7    this issue, and we'll enter an order shortly as to what kind of briefing, and

8    how extensive that briefing will be.

9    To the extent that either party wants to comment on the matter today,

10   they are welcome to do so, it will be treated as part of your arguments, so it

11   will count against whatever time limitations are in the 60 minutes.

12   Are there any questions?  And is every one ready to proceed?  All

13   right; then let's begin with the Petitioner.

14   MR. McKEOWN:  Good morning.  And may it please the Board.  I

15   would like to --

16   JUDGE McNAMARA:  Oh.  How much -- did you want to reserve

17   for rebuttal?

18   MR. McKEOWN:  I reserve 30 minutes for rebuttal.

19   JUDGE McNAMARA:  Thirty minutes, so I will let you know then

20   when 30 minutes is up.  Okay.

21   MR. McKEOWN:  Good morning.  May it please the Board.  Scott

22   McKeown of Ropes & Gray, for Petitioner; as I said, I'm joined today by

23   Brandan McLaughlin, a Summer Associate.

24   So, we've reserved time for rebuttal.  I did want to briefly comment on

25   the re-hearing issue, as I believe I can greatly simplify that.  Petitioner

26   expressly withdraws grounds 4 through 6, so that will leave, at least

4

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    according to the demonstratives of the Patent Owner here today, they believe

2    that this issue still impacts ground 3.  I don't believe that's the case.  Ground

3    3 has been instituted, so in our view that rehearing request has been mooted,

4    but we'll look to the Board's order for any clarification in that regard.

5          Next, we have one other housekeeping issue.  As the Panel may recall,

6    we had a call last Thursday I believe it was, on that call Patent Owner

7    represented that they were recording the call and transcribing it, and

8    committed to upload a transcript of that call.  That transcript was not

9    uploaded with the objections filed last Friday.

10         I contacted the Patent Owner and indicated that I was hoping to see

11   that uploaded by Monday, or we would need to contact the Board.  At that

12   point Patent Owner indicated that they were unable to record the call, they

13   had technical difficulties.  They were unable to record any of it.

14         So, that was the first I've heard of that on Monday.  As a compromise,

15   they proposed a generic stipulation which their proposed language was little

16   more than the description of why they requested the call, and that the Board

17   denied their request.  Petitioner did not agree with that, because obviously it

18   left out the basis for the Board's decision.

19         I think from the Board's perspective, the ship has sailed on this

20   dispute, but what I would like to request is authorization to upload the email

21   correspondence that was discussed on that call.

22         From the Petitioner's perspective, the additional briefing was denied

23   for two reasons, one of which was the Patent Owner waived the opportunity

24   to submit evidence that was provided by the Board on its May 10th order.

25         And then secondarily, when the Petitioner submitted declaration

26   evidence, and offered the deposition of that declarant to the Patent Owner,

5

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    the Patent Owner declined.  So, the Patent Owner waived evidence on two

2    separate occasions.

3         Our concern here is that on appeal, with the record incomplete as to

4    the deposition, that there may be some mischaracterization.  So, we request

5    that we upload exhibits just limited to the email correspondence without

6    commentary just so that the record is complete, and the Board can rule on

7    that today, or issue that in the same order that it's contemplating for the

8    rehearing request.

9         JUDGE McNAMARA:  Okay.  Let me ask you a quick question on

10   the -- what you refer to as the withdrawal of grounds 4 through 6.  Are you

11   requesting adverse judgment on them?

12        MR. McKEOWN:  We are -- we did not want -- I should take a step

13   back.  In our supplemental briefing we did not brief those grounds, so the

14   Patent Owner didn't waste any resources; the Board hasn't wasted any

15   resources.  So as to those grounds, yes, I believe that's accurate that --

16        JUDGE McNAMARA:  So basically, you're abandoning the contest

17   as to those grounds.  Is that right?

18        MR. McKEOWN:  Exactly.

19        JUDGE McNAMARA:  Okay.

20        MR. McKEOWN:  Just as to those grounds.  Grounds 1 through 3, so

21   just so the record is clear, ground 1 being the Furukawa 102 ground, ground

22   2 being the Dickens 102 ground, and ground 3 being Furukawa and Dickens

23   -- excuse me -- Furukawa and Chen, and Dickens and Chen.  So, those are

24   the grounds that will remain active.  As to the other grounds which depend

25   upon the USB reference and some others, we waive, or expressly withdraw

26   those grounds.

6

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1      JUDGE McNAMARA:  Okay.  And be careful about the terminology

2   here, you can't just withdraw, the question is now, it's are you requesting

3   adverse judgment on those?

4      MR. McKEOWN:  Well, my understanding from other cases is that's

5   the language that's been used, I'm expressly withdrawing them.  I haven't

6   looked to those cases to see how the Board has treated those expressed

7   withdrawals, but I understand that that's been authorized in other cases.  I

8   don't know that there's a distinction there.

9      JUDGE McNAMARA:  Well, there may be.  I don't know, and I'm

10   not ready -- as to the law what the estoppel effect of that might be.  There's

11   clearly an estoppel effect as to adverse judgment.

12      MR. McKEOWN:  Right, exactly.  So, had we waived briefing, I

13   would expect those grounds to show up in the final written decision as

14   losses.  So, by expressly withdrawing them we, you know -- where the

15   estoppel impact is, I'm not trying to be clever here, I'm just trying to simplify

16   this rehearing issue, we just don't see it as important, and brief these issues

17   in whatever way we can do to simplify that, we are open to doing that.

18      JUDGE McNAMARA:  Well, okay.  I guess what I'm saying is, we

19   might accept the joint motion to withdraw grounds, okay, but the unilateral

20   motion to withdraw is not something that, I think our Board has really

21   provided for.  On the other hand, we can accept a motion for adverse

22   judgment on the grounds that you've abandoned the contest with respect to

23   those particular grounds; and if that that's how you want to proceed, that's

24   fine.

25      MR. McKEOWN:  Yeah.  That's how I want to proceed, Your Honor.

7

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    JUDGE McNAMARA:  Okay.  All right then, we'll take that then as

2    oral motion for adverse judgment on grounds 4 through 6, and as

3    abandoning the contest, on grounds 4 though 6.

4        MR. McKEOWN:  Exactly, Judge.  As I mentioned before this would

5    be -- grounds 1 through 3 would remain in the case.

6        JUDGE McNAMARA:  All right.  Thank you.  And then the other

7    issue, I guess we'll take that up and issue some kind of ruling on that.

8        MR. McKEOWN:  Okay.  Thank you, Your Honor.  So, let's start at

9    the beginning.  I think it's helpful to look at the claim itself.  And so for the

10   remote Judges' benefit, I'm looking at pages 6 through 7 of the 708 patent

11   which is just -- I'm just pulling it up here because it has a large version of the

12   claim language in the 708 patent.  And there's been a couple issues that have

13   been briefed in this case, all of which, frankly, refer to the top of page 7.  So,

14   this is the idea of a device as claimed doing a couple things here.

15       So, simultaneously enumerating and configuring the USB multi-host

16   device, and simultaneous access of the USB multi-host device -- excuse me -

17   - and then providing alternate access of the USB function block without

18   reconfiguring or re-enumerating.

19       So, what this is referring to, just sort of in more general terms, and

20   this is in the petition at pages 14 through 23, is some concepts known in the

21   USB art.  So, you know, what is enumeration and configuration?  Well,

22   when you plug your USB device into a host, that host will discover that

23   device, exchange some messages with that device, and in that way

24   enumerate that device and then configure that device, so provide it with the

25   drivers and addressing, et cetera, to communicate.

8

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1        So, I don't think there's any dispute in the record as to what

2    enumeration is, and how it relates to these claims.

3        And so then we have the next portion of the claim, which is the

4    access, which refers to the ability, once these connections are set up, to

5    essentially use them, or access the device that's been connected to them, and

6    in the case of this patent, there's redundant connections that are provided.

7        And so then the last portion of the claim relates to this concept of

8    alternately accessing without remuneration, which gets to a distinction

9    between what typically happens in the USB connection, which is, you can

10   actually -- the USB device you configure it, you enumerate it, you

11   communicate your data, and then another device will come along, maybe,

12   and use that connection, and then every time, that original device wants to

13   connect again, it has to go through that enumeration process, that

14   configuration.

15       So these are sort of the key concepts of this claim, and what's been

16   briefed.  Now, there is some confusion that's been introduced into the record,

17   and I would submit that this is confusion that the Patent Owner has

18   submitted, or argued at least, this idea of connections in the sense of the

19   USB connection, and a connection to transfer data.

20       The latter connection, the connection to actually transfer data is

21   always a one-to-one connection, at least in the Bohm patents, and as well in

22   the prior art.  So, the way the system works, you've got two hosts that are

23   connected in the USB sense, they have access in the USB sense, and then the

24   question becomes, it's time to communicate.

25       So, how do we communicate?  Well, at that point some requests are

26   sent, an arbitration function is done, and there's a one-to-connection made

9

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   with the peripheral, whatever it is, the other connection may go into a

2   memory, while the first device is communicated, so in this way, there is

3   simultaneous USB connections, but the connection for the data transfer is

4   distinct from the connections that are claimed.

5          And so what you see in this record, and this happened particularly

6   with the Furukawa grounds, is that there was this identification of aspects of

7   Furukawa that's described in the data transfer, this one-to-one connection,

8   and they said, ah-ah, our claims are to simultaneous connections, this is one-

9   to-one, it doesn't meet the claim terms.

10         So, in the supplemental briefing on Furukawa in particular what we

11  explained is, to the extent there's any difference between the Bohm patents

12  and Furukawa, it's that Furukawa has more description of the data transfer

13  process.  It doesn't describe anything differently.

14         If you look through the Bohm patents you'll find the same, exact

15  discussion of how data is transferred, so if you look at, for example, column

16  4, line 22 through 29 of this reference, you'll see this language in that section

17  of, "to access shared peripheral function," this is about four sentences down

18  in that paragraph, "either interleaving host accesses, or by using a common

19  request/grant structure that may hold-off one host while another host

20  competes a data transfer to/from shared device."

21         So, again, this is describing the actual transfer of data, and that is a

22  one-to-one connection.  That's the way it's described in the Bohm patents.

23  That's the way it's described in the Furukawa patent.  And so the

24  supplemental briefing on Furukawa points that out.

10

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1      So, as to this language in the claims, I think it's also helpful to walk

2   through the prosecution history, because the applicant made this perfectly

3   clear in their arguments to the Patent Office as well, so if we could go to --

4      JUDGE FISHMAN:  Counsel, this is Judge Fishman.  Can you hear

5   me?

6      MR. McKEOWN:  Yes, Your Honor.

7      JUDGE FISHMAN:  Before you move on.  Patent Owner has made

8   an argument that essentially what you're presenting now, which was in your

9   supplemental reply, essentially that's a new argument.  Can you help us

10   understand why that is or is not a new argument?  Can you help us

11   understand where that is in the underlying petition?

12      MR. McKEOWN:  Sure.  So, as we presented in the petition of

13   Furukawa's 102 ground, we identified the various features that I just

14   discussed in that petition, post-SAS we were granted an opportunity to

15   supplement the record, at least with respect to rebuttal evidence and

16   arguments that were in response to the institution decision.  So, what we

17   were -- what we argued in that supplemental briefing is, if you look at what

18   is disclosed in Furukawa, the full disclosure which was cited in the petition,

19   not just the truncated sentences, argued by the Patent Owner, these features

20   are disclosed.

21      So, one of ordinary skill in the art reading this description of loading

22   drivers and connecting in a USB sense in Furukawa, and sharing the

23   peripheral, and putting some data in a FIFO while you're allowing another

24   host to communicate to that peripheral, is exactly what the claims describe.

25      So, it's not a new argument. It's just a continuation of what's in the

26   petition.  These features are in Furukawa. They are described that way. One

11

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    of ordinary skill in the art recognizes them as such, and so that's what we

2    filed in the supplemental briefing.  It's still a 102 argument, we are still

3    pointing to the very same features.  They tried to argue that, no, now this is

4    an inherency argument.  This is not an inherency argument.  Inherency was

5    raised in the Board's rehearing decision.

6         What we are saying is these features are there.  When you talk about

7    loading a driver, you're talking about enumerating.  There's no dispute that

8    that's part of this enumerating and configuration process, and that was also

9    presented in the petition in the definition of enumerating.  So, when we point

10   to things, like loading drivers, that's enumeration.  It's just another way of

11   saying it.  We are not saying something isn't there that should be described,

12   we are saying it's described, but there's not a one-for-one word

13   correspondence.

14        So, it's not a different argument.  It's just a rebuttal of the Board's

15   position after seeing the Patent Owner argue this connection distinction,

16   which I'll go through in a minute, this idea of sort of plucking out one half-

17   sentence of the reference and saying: ah-ah, it talks about one-to-one

18   connections, therefore, there's no shared USB connections.

19        Again, the only difference between Furukawa and these patents; is

20   Furukawa has more description on the data transfer, where these patents

21   mention it in passing, in a sentence or two to say, well, we have an

22   arbitration block, and as requests come in we can figure out which one we

23   want to service first.  So, it's not a new argument.

24        Let me walk through the prosecution history a little bit, just sort of

25   following up on the definitions of some of these features that appear in the

26   claim.  So, in the prosecution the Examiner came back and said, well, you

12

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   know, wait a minute, you've claimed this idea of not re-enumerating, and

2   not disconnecting but, you know, where is that in your figures?  And so this

3   is Exhibit 1014 at page 12, we start to see the explanation.

4        So, what the Office Action argued: so because it's well known, that

5   when a USB device is disconnect, and reconnect, they are reconfigured re-

6   enumerated, so why is it required -- so why is -- but there isn't much to --

7   anyway, so without, basically they're saying -- I may have garbled that -- but

8   you know, where is this in the figures, where is this idea that you can

9   provide this communication without reconfiguration or re-enumeration.

10       So the Patent Owner explained, starting on page 13, sort of in the

11   middle paragraph here, so it's talking about the Würzburg reference which

12   the Patent Owner also describes in its briefing, and it's distinguishing over

13   Würzburg, which was more of a traditional disconnect and re-enumerate,

14   and so towards the end of that paragraph there's a sentence that begins

15   "instead" so: "Instead, the disclosure of the present invention is directed to

16   arbitrating between access requests received from multiple hosts, and is

17   further directed to the concept that hosts may actually simultaneously issue

18   these access requests."

19       Therefore one skilled in the art would recognize, because no host is

20   disconnected from the USB device, the USB device may not have to be

21   reconfigured or re-enumerated.  So, the takeaway from this paragraph is that

22   arbitrating between access requests means two devices are simultaneously

23   re-enumerated, that's essentially the argument that was made."

24       And so then we continue on to the top of page 14, a little bit more, and

25   it quotes from the specification, it says, "*each host has simultaneously*

13

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   *enumerated the device, there may be no need to detach and reconfigure the*

2   *device on the fly.*"

3        So, again, we are talking about simultaneously enumerated means no

4   reason to attach.  There's no dispute that all of the art in this case does

5   exactly that, it simultaneously enumerated.

6        A little bit further down we have a discussion on page 14, in that

7   paragraph that begins, "Accordingly, Applicant respectfully resubmits that

8   the embodiment disclosed in Figure 3 clearly shows concurrent respective

9   dedicated connections established between USB multi-host device controller

10  108, and the upstream ports 302 and 304 through buffers 306 and 308,

11  respectively."  So, that's the USB connections.

12       And then we go down to the bottom of that paragraph and it talks

13  about, "Finally --" and this is a direct quote from the specification, " USB

14  multi-host device controller 108 may be configured with an *internal*

15  *arbitration mechanism that may permit each host – first host 102 and second*

16  *host 104, for example – to access shared peripheral function 312* by either

17  *interleaving host accesses, or by using a common request/grant structure*

18  *that may hold-off one host while another host completes a data transfer.*"

19       So, you see in this paragraph the distinction between USB

20  connections being, I've connected to the two hosts with the multi-host

21  device, so I've established the connections, they are available for access, and

22  when I want to communicate data, I can arbitrate and decide which one-to-

23  one connection that I want to actually connect to the destination.  That's

24  exactly what the prior art shows.

25       And pointing to that last sentence that's in your own patent, as a point

26  of distinction, it just doesn't work.

14

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    So, these claims require the simple concept of enumerating two hosts

2    to one peripheral so that there is simultaneous access, and then later when

3    the request comes along to transmit the data, arbitrating those requests so

4    that there can be a sharing of the peripheral.  The fact that the prior art shows

5    data connections, one-to-one for transmitting data, just like these patents, is

6    not a point of distinction.

7    So, with that on the claims, let me jump into Furukawa.  So, this is --

8    let me just shrink that down a little bit -- so, just for the benefit of the remote

9    judges, I'm looking at Figure 3 of Furukawa.  And so you see at the top of

10   that figure we have connections to two hosts through ports 302, 304, and

11   then we have a designation in that square, that square in the middle, USB

12   endpoint and status.  So, this is what is described as the USB connection,

13   and then the multi-host controller provides a connection to the device

14   function which is the logical element Figure 3 is a logical diagram, that's

15   how it's described.

16   So, again, you've got two enumerated connections, they are both

17   accessible to the host simultaneously as those request to transmit come in,

18   there's an arbitration, there's a connection at the end.  This is exactly what --

19   sorry, so this is Bohm; if I said Furukawa, I take that back.  But you'll see

20   why I confused the two, as we get to the Furukawa figure, you'll see that this

21   is almost the exact same schematic.

22   So, the reason why Furukawa was denied this institution as I said was

23   this idea that Furukawa was a one-to-one connection, so let's get into that a

24   little bit.  And so, yes, sorry, Furukawa was a little bit hard to see in this

25   figure, and again, for the remote Judges, I'm looking at Figure 1 of

15

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    Furukawa, and this appears on, I think it's page 3 of the Petitioner's

2    supplemental brief, if you need to find it.

3        So, just like that figure from the Bohm patents you see some PCs at

4    the top, you see individual connections to the ports, that's the sort of little --

5    tiny little white rectangles on top of the red box there, and we've got a

6    controller in there, which has FIFO memories from managing dual

7    transmissions from two different hosts to go to a single device.

8        That's exactly what Furukawa describes, it's exactly what's in these

9    patents.  And we can start reviewing Furukawa just by reading the abstract.

10   So, the abstract, to provide the USB hub when the plurality of host

11   computers -- are able to share a peripheral device -- and wherein no

12   switching operating is required; we've explained in the supplemental

13   briefing, as laid out in Furukawa, this no switching operation refers to the

14   typical USB enumeration, and there's direct testimony in the record on that

15   that stands unrebutted.

16       We next move to paragraph 3 of Furukawa, which talks about this

17   explicitly the problem -- so the paragraph 3 of Furukawa explains the

18   problem of switching overhead in a conventional USB environment, this

19   includes loading of drivers, as I pointed out, at pages 34 through 35 of -- this

20   is at least in the 708 petition, and the page numbers may be slightly different

21   on the other.  But we explained that loading of drivers is part of this process

22   that nobody wants to do when they are switching between these devises and

23   trying to share them.

24       So, then we go on to paragraph 5, "Thus enabling the existence of a

25   plurality of host computers even under the USB interface."  So, again,

26   avoiding the conventional switching operations even under the USB

16

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    interface, that paragraph continues, "Moreover, there was no overhead in

2    having to -- in having to load and unload the device driver sequentially each

3    time a connection is established or released."  So, we are avoiding all of that,

4    just like the Bohm patents.

5        And then we get to paragraph 6, which talks about the use for the

6    FIFO memory in Furukawa.  And it explains,

7        Furthermore, if there is a request from one or more of the host

8        computers for transmission or reception of data to one peripheral

9        device, preferably the controlling circuit establishes a connection

10       between one of the host computers and the one peripheral device, and

11       holds temporarily, in the FIFO memory, the data from another host

12       computer until the transmission or reception of the data of the host

13       computer that is connected is completed. Doing so avoids the collision

14       of data from a plurality of host computers.

15       So, what it's saying is, we have two hosts communicating to a

16   peripheral simultaneously, we have a one-to-one connection, we put the rest

17   in memory until the other connection is done.  That's exactly like the Bohm

18   patents.

19       So, the distinction again that has been made to Furukawa has been one

20   of how the data is transmitted, the claims of this patent; at least independent

21   claims don't get to that step.  And these patents don't describe this

22   communication in the same detail as Furukawa.

23       But let's go to Patent Owner's slide 12, which is essentially the

24   entirety of their argument against Furukawa.  They say, well, Furukawa at

25   paragraph 10, states: that insofar as there is no redundancy in the request

26   destination, a plurality of host pieces can access the peripheral device

17

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   simultaneously.  And according to the Patent Owner this confirms that

2   simultaneous access to peripherals only occurs when the two hosts request

3   access to different request destinations.

4         But this is incorrect, and you sort of have to ask yourself, well, why is

5   it that the Patent Owner has cited half of a sentence out of paragraph 10 of

6   Furukawa?  And the reason is fairly simple, is the rest of that paragraph

7   doesn't support what they are arguing.  Indeed the rest of the sentence

8   doesn't support -- excuse me -- doesn't mean what they're arguing.

9         So, looking at paragraph 10, you'll see the very first sentence: "The

10  bus 12 is the communication path for transmitting data."  We are talking

11  about one-to-one connections that are established to transmit the data.  This

12  is completely independent of the concept of simultaneous enumeration and

13  having USB connections available for two different hosts to the same

14  peripheral.

15        And I won't go through reading that paragraph, but you can go

16  through that paragraph, we are talking about a controlling circuit.  We are

17  talking about the peripheral, and that in so far at the bottom, is the last half

18  of a sentence that explicitly states the connection that is set up as a one-to-

19  one connection, and that is for transmitting data.

20        So, this is not a point of distinction, it's one half sentence out of this

21  reference, we've explained going to the abstract, the paragraphs that I just

22  mentioned, that the full and fair reading of Furukawa is it operates just like

23  these inventions.

24        But let's look at some additional paragraphs of Furukawa which

25  explain this in explicit detail.

26        JUDGE FISHMAN:  Counselor, this is Judge Fishman.

18

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1        MR. McKEOWN:  Mm-hmm, yes.

2        JUDGE FISHMAN:  In that same paragraph it refers to the

3    connection being released, what does it mean in your mind, that the

4    connection is released?

5        MR. McKEOWN:  So, this gets back to what the Bohm patents

6    describe as arbitration, so Furukawa and Bohm operate the same exact way,

7    and connection is used sort of loosely throughout these patents, but the idea

8    is you are providing complete access from the USB connection to the

9    peripheral, and then you release that at -- you sort of release that connection,

10   and you can switch over to the other.

11       So, this is just a concept of, at some point in time, there was this

12   temporary path that's complete that goes all the way through to the

13   peripheral.  And you have to switch that connection to allow different hosts

14   to provide data to that peripheral.

15       So, connection in this sense, is the full data path as opposed to what's

16   clamed in the patent which is a USB connection, which, if I could backtrack

17   a little bit, the patent describes at -- so in the 708 patent, column 2, lines 31

18   or 40, or there about, "The device may maintain a dedicated address,

19   configuration and response information for each host. Each host may

20   therefore establish a dedicated USB connection with the sharing device."

21       So what that portion of the specification is describing, and this was

22   also reiterated in the prosecution history, is the dedicated paths are ports,

23   addressable ports, those are the USB connections.  The data path on the

24   other hand, the way that you get data from the source to the destination, that

25   connection has to be signaled internal to the -- internal to the device.  In

19

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   Bohm it's called arbitration, in Furukawa it's called, I believe it's a grant and

2   request -- or acknowledged not acknowledged system.

3       So that's the distinction.  Connection is used to describe both, but in

4   the context of the claim, disconnection for the full data transfer is described

5   separately in Furukawa, it's described separately in the patents.

6       So, that's the distinction, Your Honor, if I've answered your question.

7       So, going back to Furukawa at paragraphs 14 through 15, so let's

8   zoom out a little bit here, just for the benefit of the remote Judges, I'm still

9   on, in Furukawa reference, paragraphs 14 through 15.  And so this is

10  describing, again, just getting back to Judge Fishman's question about this

11  releasing, and signaling of the connection, paragraph 14 describes that in

12  detail, as to sending back an acknowledgement, or a not acknowledged

13  ("NAK").

14      So, you either get one of two options, you can get a direct path to the

15  printer if it's available, and in this example we are talking about a printer, or

16  if the printer is busy with another host, then you send your data to FIFO.

17      So, again, this is sharing.  You wouldn't be able to transmit data to a

18  FIFO and to a printer simultaneously if two hosts didn't have access to the

19  device exactly as claimed through separately enumerated USB connections.

20  So, the distinction that's been argued throughout the briefing here is one

21  that's not a distinction at all, both the prior art and the patent operate the

22  exact same way in this regard.

23      JUDGE McNAMARA:  I just wanted to let you know, Counsel,

24  you're entering rebuttal time.

25      MR. McKEOWN:  Thank you, Your Honor.  I may go another five

26  minutes.

20

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    JUDGE McNAMARA:  Sure.

2    MR. McKEOWN:  So, just closing out Furukawa.  The record is now

3    fully developed.  These same citations appeared in the petition, these same

4    positions of what was shown appeared in the petition, we were able to rebut

5    that decision and the mischaracterization of the Patent Owner's, so that now

6    this is fully understood.  As I pointed out, we have testimony from our

7    declarant in the record that agrees with all of these positions.  This is indeed

8    how this reference works, and it is indeed exactly how these patents work,

9    and exactly how they are claimed.

10    So, that's ground 1 on Furukawa.  Ground 3 on Furukawa and Chen

11    which also came back into the case after the SAS decision, the only

12    distinction in the record over the ground was that, well, since Furukawa

13    failed on this incorrect one-to-one connection theory that ground failed as

14    well.  So, there's no other dispute in the record as to that.

15    And since that distinction for ground 3, necessarily fails with the

16    distinction of ground 1, the Furukawa grounds cover all of these claims and

17    render these claims unpatentable.

18    Unless there are any additional questions on Furukawa, I'll switch to

19    the Dickens grounds.  So, to the extent the Board feels it necessary to reach

20    the Dickens grounds as I said; the Furukawa grounds cover all of the claims.

21    The Dickens grounds are a separate and independent basis for

22    unpatentability, and this is the page, I believe it's page 25, out of the decision

23    to institute in the 708 patent, I'm just pulling it up here for the benefit of the

24    remote Judges.  This is just the general figure out of Dickens to describe

25    how it works.  So, we've got this internal controller, and Figure 1 is

21

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1  probably, maybe even a little more helpful, but the general ideas is we have

2  a router that is emulating devices on both sides of it.

3       So it's emulating peripherals on the host side, on the peripheral side

4  it's emulating a host.  And so these devices are able to connect to these

5  emulation points just as if they were connecting to the peripherals

6  themselves, and through this arrangement, for example, if I emulate the

7  printer multiple times to a host, I can have multiple hosts attached to the

8  printer.

9       And so just like the claims I have separately enumerated and

10  configured USB connections, I'm able to share access to a printer by

11  utilizing these connections, and the router will manage the data paths, and

12  the data sent over those connections so that the peripherals can be utilized

13  and it's -- doesn't go into the same details for Furukawa on the methodology

14  for arbitration, it's more of a first-come-first-serve basis as described in

15  Dickens.  And you can see that at the end, the very end of the description of

16  Dickens where it talks about the use of the printer as a peripheral.

17       One thing to note, for Dickens, it's not limited to a printer, it certainly

18  applies to all kinds of peripheral devices, a lot of the briefing from Patent

19  Owner is focused on, well, a printer wouldn't do this, a printer wouldn't do

20  that, it could just as easily be a mass storage device, or any kind of other

21  peripheral.

22       So, a lot of the distinctions that had been argued relative to Dickens,

23  don't get to these main points that I discussed in the claims, this idea of

24  enumeration access.  All of that is there, so what we've seen in the briefing,

25  is more narrow arguments about, well, the claim is to a multi-USB device,

22

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    therefore it's a single package, everything has to be in one integrated

2    location.

3         You know, we think that's incorrect for a lot of reasons, not the least

4    of which is that the patent itself at column 4, lines 5 through 9, and this is in

5    the 243 patent, for example, makes clear that the patent is directed to multi-

6    component inventions.  So, a lot of the arguments with respect to Dickens

7    sort of hinge on this everything has to be in one box argument.  But let's hit a

8    couple of them here, and then I'm going to sit down and reserve the rest of

9    my time.

10        So, let's go to the next slide.  There's also an argument that the 243

11   patent has a Certificate of Correction and the decision to Institute sort of

12   reference the old version of the claims, and so the old version of the claims

13   used this language: USB device/function block, so that was the language that

14   was quoted in the Institution decision.

15        By certificate of correction, that language changed, the word function

16   was just moved, the slash was taken  out, so you had a USB device block,

17   having at least one function, doesn't really seem to be a big difference, or

18   there doesn't seem to be a briefing that this matters, other than the fact that

19   the Patent Owner is confused.  I'm not aware of the Patent Owner seeking

20   any clarification, prior to today, from the Board, so we don't know that this

21   is necessarily important for the Board's decision.

22        There was an additional argument made that the shared, I believe it

23   was -- there's some language about a shared USB connection, so shared USB

24   function is that third bullet point there.  The Board referenced that in relation

25   to claim 18. That language actually appears in claim 23, so that appears to be

23

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    a typo but, you know, just wanted to make you aware of that argument from

2    the Petitioner's perspective.

3         This is much ado about nothing, and the Patent Owner could have

4    sought clarification or additional briefing on this issue but it hasn't.

5         The next slide; and I'm just going to hit a couple of these quickly.

6    Those arguments that Dickens does not disclose concurrent connections, a

7    lot of this has to do with the Patent Owner's position that all of this has to be

8    in one box, so I don't know that there's a reason to hit these other than to

9    explain that the basis for these arguments, they don't seem to comport with

10   the record here, or the claim's.

11        The next slide: Dickens does not anticipate, this is again the -- excuse

12   me -- so this is again, trying to limit the claims to Figure 3 of the patent.

13   Figure 3 of the patent is not a circuit diagram, it's a logic diagram, it's

14   explained in the brief description of drawings and logic diagram, so we can't

15   just read limitations from Figure 3 into the claims that aren't there to begin

16   with, that this is not a single package.

17        And with that, I reserve -- unless there's questions -- I reserve the last

18   23 minutes for rebuttal.

19        JUDGE McNAMARA:  All right.  Thank you, Counsel.

20        MR. McKEOWN:  Thank you.

21        JUDGE McNAMARA:  Go ahead.  You can proceed.

22        MR. BANNER:  May it please the Board.  Again, I'm Brian Banner,

23   for Patent Owner, Microchip Technology Incorporated.  I'd like to start

24   today to address Patent Owner's statutory challenge, which was mentioned at

25   the beginning of this hearing.  It's a challenge raised in the request for a

26   rehearing dated May 17, 2018.

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    Now, I understand, the Board is going to request additional briefing

2  on this issue, and despite Petitioner's representation today that they are

3  seeing an adverse judgment on grounds 3, or 4 through 6, I believe that

4  additional briefing would still be necessary.  It's my understanding that this -

5  - that what the Petitioner is trying to do with an adverse judgment, it doesn't

6  actually take those grounds out of the petition, but what it does, is it just

7  seeks an adverse judgment.

8    And so to the extent we have a petition that is guiding this proceeding,

9  as the SAS Court, Supreme Court had said needs to be the case, those

10  grounds are still in the proceeding, and the reasons addressed in our Patent

11  Owner's request for rehearing, for termination of this proceeding are still

12  present.

13    Let's go to slide 3 of the demonstratives that I've circulated.  We

14  shouldn't even be here today, because this proceeding is not authorized by

15  statute.

16    Slide 4: 35 U.S.C. 312(a), limits the Director's (and the Board's)

17  ability to consider an IPR petition.  That section says, "A petition filed under

18  section 311 may be considered only if," and that's only if certain

19  requirements are met.  For example, 312(a)(1) talks about the petition must

20  be accompanied by payment of the fee established by the Director, and in

21  this case, pertinent to this case, Section 312 (a)(4), "the petition provides

22  such other information as the Director may require by regulation."

23    Also with 312 (a)(4): the Board may not consider an inter partes

24  review petition that does not provide the information that's required by the

25  Director's regulations.  Now, in the pre-SAS world, the Board, and that was

26  the case here in the institution decision, the Board did not consider those

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    portions of Delphi's petition that did not provide the information required by

2    regulation.

3        In essence, those sections of the petition were excised, and the Board

4    proceeded with a partial institution decision for those grounds that were

5    properly pled, if you will.

6        But the Supreme Court and SAS held that this partial institution

7    practice was unlawful, it's the petition, the Supreme Court said, not the

8    Director's discretion that is supposed to guide the life of the inter partes

9    review litigation.

10       Let's go to slide 6.  In this case we have expressed holdings from the

11   Board in the institution decision that the petition did not provide the

12   information required by the regulations.  Ground 5 for both IPRs, the Board

13   found that the petition failed to provide the information required by 37 CFR

14   42.104(b)(4).

15       The same problem with the petition on ground 6 in both IPRs.

16   Petition did not provide the information required.  Grounds 3 and 4, on both

17   IPRs, the Board found that these grounds; and the petition failed to provide

18   the information required to be in the petition by improperly incorporating

19   other documents by reference.

20       Slide 7: plus, 312 (a)(4) prohibits the Board from considering the

21   petition in its entirety.  That's because the Board held the petition did not

22   provide the information required by regulation, and the Supreme Court in

23   SAS held the Board's authority to institute review is limited to a binary

24   choice.

25       So, just like if Petitioner didn't pay a fee as required by 312(a)(1), the

26   choice would have to be no, there's no discretion to institute that review.

26

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   The same thing goes here.  Where there's a finding that the petition didn't

2   provide the information required by regulation under 312(a)(4), the binary

3   choice has to be no.  Therefore, the Board should terminate this proceeding

4   in its entirety.

5        If there are no questions on that, I'd like to move to more of the merits

6   discussions of this case.

7        JUDGE CLEMENTS:  Counsel, just to be clear.  So, it's your position

8   that if there are multiple grounds in the petition, some of which, under our

9   rules, have the correct necessary information under 104(b)(4), and meet the

10   reasonable likelihood standard, we should still, nevertheless, or we're

11   required nevertheless, to deny institution because there is some other ground

12   in the petition that doesn't satisfy rule 104(b)(4)?

13        MR. BANNER:  Yes, Your Honor.  I believe that in a case such as

14   this case, which admittedly, maybe a case that doesn't occur in the future,

15   but there is a holding that 312(a)(4) was not satisfied, and when that is the

16   case, regardless of how good the other grounds are presented, it's our

17   position that the Director has no choice but to deny institution.

18        And I think this makes sense from a policy perspective, in that it

19   encourages Petitioners to come forward with their best arguments, to comply

20   with the rules, and to do what needs to be done when they choose this forum

21   as the forum of choice for adjudicating their invalidity claims.

22        And so going forward, after SAS, it makes sense to have this binary

23   choice.  If you don't comply with the rules, if you don't provide the

24   information that's required as a Patent Office policy, we are going to say, no,

25   because we are required, because that's what the statute said.

27

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    So, I think that makes sense.  Regardless of how good some of the

2    other grounds may have been pled, you can't -- you know, Petitioner should

3    not be allowed and it looks -- you know, this is what Congress decided; to

4    disobey whatever regulations the Director has in force at the time.

5    JUDGE CLEMENTS:  And what would you say if, for example, look,

6    there is ground 1, it clearly satisfies 104(b)(4), it satisfies the reasonable

7    likelihood standard, but we can't go forward, notwithstanding that we think

8    that ground or even 5 or 6 grounds will satisfy 104(b)(4), but one bad ground

9    would preclude us from instituting?

10    MR. BANNER:  I think what precludes that is the text of 312(a),

11    which says the petition may be considered only if the requirements of 312(a)

12    are met.  And so by determining that the regulations weren't met, the

13    required information was not submitted as to grounds, you know, 3 or 4, in

14    your hypothetical, you're left with a binary choice.  That requirement of

15    312(a) is not met, just like if the Petitioner didn't pay a fee, the choice would

16    have to be, no, we cannot institute this review.

17    JUDGE CLEMENTS:  Well, hypothetically they are met, with respect

18    to ground 1.  Why isn't that sufficient?

19    MR. BANNER:  Because SAS says the petition controls the entire

20    proceeding, and it's the entire petition, and that's what SAS was all about.

21    It's not about picking and choosing which parts of the petition, you know,

22    are good, and which parts are bad, when the Petitioner files the petition it's

23    the entire petition that has to control the proceeding.  And so if every part of

24    the petition doesn't meet the requirements of the regulations, then 312(a)

25    says that the petition cannot go forward, the proceeding cannot go forward.

28

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    JUDGE CLEMENTS:  Well, isn't that asking us to rewrite 314(a),

2    which gives the Director authority to institute an inter partes review as long

3    as there's a reasonable likelihood that the Petitioner would prevail with

4    respect to at least one of the claims challenged in the petition.  It doesn't say,

5    reasonable likelihood that the Petitioner would prevail with respect to all of

6    the claims challenged in the petition and on all grounds.  So, that was -- how

7    is your interpretation of 312(a)(4) consistent with 314(a)'s authorization to

8    institute if there's a reasonable likelihood with respect to at least one of the

9    claims challenged?

10    MR. BANNER:  Well, I think the two -- the two sections are not --

11    they are not inconsistent.  I think that if, in this case the -- in a case such as

12    ours, where there were some grounds that probably didn't pass muster, and

13    there was an institution decision that just said, ground 1 claim 1, it looks

14    there's a reasonable likelihood, we are going to go forward, I think that

15    would be within the Board's discretion to do that, under 312(a)(4).

16    Now, the problem is here, you have an expressed ruling on the other

17    grounds, that says those grounds did not comply.  So, I think -- again, like I

18    said, I think that that this case is likely an outlier, and with the practice

19    moving forward, regulations may change or, you know, the Patent Office

20    may figure out how to deal with this, but in the case here where you have an

21    expressed ruling that the regulations were not followed, I don't think you can

22    get out of 312(a) as a plain language by looking at 314.

23    JUDGE FISHMAN:  Counselor, just to clarify.  If our decision on

24    institution had been an example as you've suggested, saying, claim 1 or

25    ground 1, has a reasonable likelihood, and that's the end of the commentary,

26    and then the final decision says that claim 1 ground 3 is insufficient under

29

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   104(b)(4) or 104(b)(3), in your interpretation of the statute would that be

2   properly authorized?

3         In other words, the final decision could say the petition is insufficient

4   under some rule or regulation, 104(b) for example, but the decision on

5   institution does not make that reference.  That won't just be a partial

6   institution.  Am I understanding you correctly?

7         MR. BANNER:  I think that would be the case, Your Honor.  Yes.

8         JUDGE FISHMAN:  Okay.  Let me ask you a further question.  The

9   statute in your argument (section 312) speaks to considering a petition.  In

10   your understanding, is there a difference between considering the petition,

11   and instituting versus denying a review?  What does it mean to consider the

12   petition?

13         MR. BANNER:  In my view that means considering it to the extent of

14   instituting a review of the petition.  So, just like if someone doesn't pay a

15   fee, the Board can look to see if they paid the fee, and determine that they

16   hadn't paid the fee, and then decide that the proceeding won't proceed.  So,

17   the same way with 312(a)(4), the Board can look to see if the regulations had

18   been met, and if they haven't then, you know, the institution decision has to

19   be no.

20         JUDGE FISHMAN:  Is there a difference in that statute considering

21   only ministerial issues, such as a fee payment, or the number of words, or

22   number of pages?  Is there a difference there, versus considering the

23   substance of a petition, or the substance of a motion?  It's fairly rare, for

24   example, that a panel considers anything about the fee payment, that's done

25   at a ministerial level, at a staff level.  So, do you see any difference in that

26   regard?

30

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1      MR. BANNER:  I don't see any difference in that regard.  I think that

2    312(a) includes, expressly includes ministerial activities such as fee

3    payment, it also includes substantive decisions such as 312(a)(3), and

4    312(a)(4) I guess for that matter, based on the regulations that are

5    established by the Director.

6      JUDGE FISHMAN:  Thank you.

7      JUDGE CLEMENTS:  Counsel, as to the regulation, it's just a

8    regulation, right?  I mean 42.5(b) gives us the right to waive or suspend the

9    regulations.  So, why isn't this sort of deficiency in some grounds of the

10   petition something we could waive or suspend in order to get to the good

11   grounds within the petition?

12     MR. BANNER:  I'm not sure I have an answer for that.  I mean I think

13   that in the future going forward, that may be the case, but I think here where

14   there's a holding, that the regulations weren't followed, I don't think that

15   42.5(b) would give discretion to then sort of go back and change that, you

16   know, ex post facto.

17     So, you know, in the future that may be a way that the Board

18   determines to handle cases like that.  You know, I haven't looked at that

19   extensively, but that seems like it could potentially be a reasonable

20   approach.

21     JUDGE CLEMENTS:  Okay.  Thank you.

22     MR. BANNER:  So, I'm going to move on to some more of the merits

23   discussion.  And I'd like to start off with claim 10 of these patents.  The

24   patentability of claim 10 of the each of the patents should be confirmed in

25   the final written decision.  Claim 10 was challenged under grounds 1, and 5,

31

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   and 6, and the Board's institution decision found the Petitioner failed to

2   show claim 10 invalid under any of these grounds.

3       The reason provided in institution decision should be confirmed.  In

4   particular, there is no dispute that the petition failed to provide the

5   information required by statute as to grounds 5 and 6.  I don't think that's at

6   issue today, so 5 and 6 do not render claim 10 unpatentable.

7       Now, ground 1 relates to the Furukawa reference which was discussed

8   at length previously by Petitioner, and that's Exhibit 1002.  This was also, as

9   you know, the subject of -- part of the post-SAS briefing that was allowed in

10  these proceedings.

11      Let's jump to slide 8, of the demonstratives.  The reason claim 10

12  should be affirmed is because the Furukawa reference does not anticipate

13  any of the claims for the 243 or the 708 patents.

14      Slide 9: The Board correctly determined in both the institution

15  decision and in its order denying the rehearing request filed by Petitioner

16  that Furukawa does not either expressly or inherently disclose concurrent

17  USB connections between the plurality of USB host in one USB peripheral

18  device.  That was the institution decision and in an order denying request for

19  rehearing. The petition does not identify any express disclosure in Furukawa

20  of Furukawa's USB hub alternating access without re-enumerating or

21  reconfiguring.

22      Now we've heard today a lot of discussion about Furukawa, and the

23  Petitioner is continuing to do what it did in its briefing, which is make a lot

24  of assumptions, and fill a lot of holes in Furukawa, that simply aren't there.

25  The Board correctly found that these features of the claims are not expressly

26  disclosed anywhere in Furukawa.

32

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1       Now, Petitioner stated today that they are not arguing inherency, they

2   never had argued inherency so that's not surprising.

3       Slide 10 of the demonstratives, the Board actually has already

4   determined, and said on multiple occasions, that Petitioner has not presented

5   any argument that the recited concurrent connections would have been

6   inherent in the teachings of Furukawa.

7       So, Petitioner is not -- again has represented today that it is not

8   arguing inherency, and so the question becomes: where is the express

9   disclosure in Furukawa of these features of the claims?

10      They are simply not there.  The Board got it right the first time,

11  Petitioner has kind of argued today about, you know, what certain things in

12  Furukawa mean, about the desire to not have to reload device drivers, but

13  there's nothing in Furukawa that says, that that desire leads to a system

14  where there are concurrent connections, and no re-enumeration or

15  reconfiguration.

16      Slide 11: Delphi's post-SAS supplemental briefing in evidence does

17  not overcome the Board's finding that Furukawa fails to disclose these

18  feature of the claims.

19      And this is key, slide 12.  And this was discussed by Petitioner earlier.

20  Furukawa says that insofar as there is no redundancy in the request

21  destination, a plurality of host PCs can access the peripheral devices

22  simultaneously, and that comes from Exhibit 1002, at paragraph 10.

23      Again, as we explained in our supplemental response, this disclosure

24  of Furukawa confirms that the simultaneous access to peripherals only

25  occurs when two hosts request access to different request destinations.  If

26  you search through Furukawa, and you look for the word simultaneous, this

33

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    is the only sentence that talks about simultaneous access to peripheral

2    devices.  And it's this sentence that makes it clear that the only time

3    simultaneously access to two peripheral devices occurs is when there is no

4    redundancy in the request destination.

5          What that means is the two hosts, they are simultaneously accessing

6    two peripheral devices are actually accessing different peripheral devices.

7    This confirms, as the Board already finds, that the simultaneous access is

8    limited to a first host connected to a first peripheral device concurrent with

9    the second host connected to a second peripheral device.

10         Now, Petitioner made a point earlier, or attempted to make a point

11   about the sentence here on slide 12, that it was only the second half of a

12   sentence in paragraph 10.  I'm going to pull up the actual Furukawa

13   reference, and we'll look at that paragraph, Furukawa paragraph 10.

14         So, for the remote Judges, here it is on the screen, paragraph 10.  So,

15   this quote comes from the last sentence of paragraph 10, where it actually

16   states: that the connection that is set up is a one-to-one connection between

17   the host PC that is the source of the request, and the peripheral device that is

18   the destination of the request.

19         And then it goes on to that portion of the sentence that I have in the

20   slide.  Now, the first half of the sentence makes clear what the Board already

21   found.  These connections that Furukawa is setting up and releasing are one-

22   to-one connections between the host and a peripheral device.  There simply

23   are no concurrent USB connections anywhere in Furukawa, and evidence on

24   which Petitioner relies confirms that fact.

25         The Petitioner had no explanation for why that would be the case,

26   Furukawa does not disclose these features as the Board already found, and

34

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    so the Board should confirm the patentability of claim 10 of each of the

2    patents, and confirm that Furukawa does not anticipate any claims of either

3    of the patents.

4          JUDGE FISHMAN:  Counselor, this is Judge Fishman.  Do you have

5    any response to the Petitioner's assertion that if the FIFO contains data,

6    stores data from multiple hosts, that the only way that can happen is if there

7    are simultaneous connections without having to reconfigure.  Do you have

8    any response to that?

9          MR. BANNER:  Yes, Your Honor.  So, Furukawa discusses

10   connections that are established and released.  And so one way to understand

11   what is happening with those FIFOs is that one host is attempting -- you

12   know, one host attempts to access the peripheral device.  A connection is

13   established, so a USB attach event occurs, and that first host starts to

14   communicate with that peripheral device.

15         During that transmission a second host attempts to connect to that

16   same peripheral device.  Now that connection request is stored in the FIFO,

17   and NAKs are sent back to that host to tell it, hey, it's not ready for a

18   connection yet.  Or some signaling is sent back to that host saying it's not

19   ready for a connection yet.

20         Now I think this is confirmed, easily confirmed by paragraph 10 --

21   sorry -- paragraph 14 of Furukawa where, it talks about this hub repeater,

22   that's what's responsible for setting up the connections, you know, and

23   releasing the connections, and looking for attach and detach.  The hub

24   repeater is a standard USB component.

25         Petitioner submitted a translation of this other Japanese patent that's

26   referenced by Furukawa, and that's at Exhibit 1052 and, you know, that

35

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   patent as well talks about this hub repeater, and that the hub repeater is, you

2   know, responsible for establishing connections, disconnect, detach and

3   attach.

4        So, what Furukawa was talking about in paragraph 14, releasing and

5   establishing connections, it says, hey, I'll go ask the hub repeater to do this,

6   that's a standard USB component, and that is doing these detaching and

7   attach connections.  So, it's okay to -- I mean so Furukawa is saying, yes, the

8   second host can attempt to connect here while the peripheral device is still

9   busy, but I'll just hold off that host and I'll wait, and I'll store that data in a

10  FIFO until the connection -- the first connection is done and released.

11       If there are no more questions about Furukawa, I'd like t move on to

12  the Dickens reference.

13       JUDGE CLEMENTS:  There is a description in paragraphs 13, 14 and

14  15 of Furukawa.  So, the description here starts with data being transmitted

15  from host PCs 21 through 24 to a peripheral device 25, and you -- just go

16  down to paragraph 15, it says, you know: if peripheral 25 is available, hub

17  repeater 13 sets up the connection between host 21 and peripheral  25.

18       So the connection being set up there, isn't that just the actual data

19  transfer connection?  If not, if it's the enumeration -- you know, recognizing

20  the USB device by the PC -- then how in the world did PC 24 transmit data

21  to peripheral device 25 in the first place back in paragraph 13?

22       MR. BANNER:  Well, I think -- I think what you hit on, is there's a

23  problem in Furukawa, and that it has this goal of doing something, and I

24  don't think it's actually achieving it.  And so what happens here is, when you

25  go through enumeration, host one is going to try to enumerate, let's just take

26  the printer, and enumeration includes setting the address of the printer on the

36

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    bus, host 1 says, hey, printer, I'm going to give you address number one, and

2    so every time I issue a command or, you know, a package to address number

3    one, the printer is going to be the destination of that address.

4          Now, if you have host number two, and you don't have a mechanism

5    like Furukawa doesn't for -- you know, having this non-reenumeration

6    scheme, host number two is going to attempt to attach to that printer, and it

7    will likely try to assign that printer with whatever address it wants to assign

8    it to.  So, there's no guarantee that it will be the same address.  And in fact, it

9    likely won't the same address because different printers or different hosts

10   have -- you know, controllers are looking at different buses.

11         So, there's a big hole in Furukawa as to how the heck this even works,

12   because now if I have host one who is trying to address whatever host is

13   successfully enumerated and configured that printer, will have an assigned

14   address.  And the second host that comes along and tries to assign a different

15   address, if it's successful, now the first host can't actually send packets to

16   that printer.   So, there's some contention here.

17         And Furukawa doesn't explain how that's actually achieved.  And so

18   the only way to understand Furukawa is actually working as if these

19   connections that are released and established are actually detached and

20   attached connections.

21         Technically that's the only way that this can work, and so this idea that

22   they are storing data in a FIFO, you know, I think there could be some

23   signaling that Furukawa might be doing that if -- you know, if it gets a

24   request for this printer, and it needs to then reattach it, perhaps it can drive

25   some kind of other USB signaling to make that detached -- attach happen in

37

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    a manner that would actually let that data in the FIFO come through

2    eventually.

3         So, Furukawa is deficient on many grounds including how this

4    actually works.  The only way it can work is with the standard hub repeater

5    that's releasing and establishing connections, as Furukawa expressly states.

6    And that would include enumeration and configuration at those juncture

7    points.

8         Again, if you look at the expressed teaching of Furukawa, it only talks

9    about simultaneous access when there are different host destinations for

10   those hosts.  And so it really isn't talking about the simultaneously access,

11   where there is this FIFO, where two hosts are trying to access the same

12   device.  That's just not disclosed and, you know, I think that the Petitioner is

13   reading a lot into Furukawa, and trying to rewrite Furukawa for its needs.

14       JUDGE CLEMENTS:  Okay.  Thank you.

15       MR. BANNER:  So, moving on to slide 13.  I'm going to dig into

16   Dickens here.  There are at least two independent reasons to find the

17   challenge claim patentable over Dickens.  First, Dickens does not anticipate,

18   because the elements in Dickens are not arranged as in the claims.

19       And second, Dickens does not anticipate, because it does not disclose

20   the concurrent USB connections, or the concurrent dedicated USB

21   connections that are required by the independent claims of the 243 and 708

22   patents.

23       Slide 15 of the demonstratives.  I'll talk a little bit about the Dickens

24   technology and what Dickens is.  And this comes from the Patent Owner

25   response, supported by Exhibit 2007, which is expert declaration, and this

26   paragraph 75, where this figure, annotated figure is provided.

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1        So, what is Dickens?  What is Dickens doing?  Dickens is a system

2    that includes at least five separate USB buses that are identified here.  So,

3    you can see in the figure, this is Figure 2 of Dickens, you have USB bus, the

4    first USB bus at the top left, and that includes the first host PC there 105,

5    USB connection cable 106, and device controller 150.  That's the USB bus

6    on its own.  Next to that you have a second USB bus, that's the other host PC

7    105, as well as the USB cabling 106, actually USB hub 107, and another

8    device controller 150.

9        Down at the bottom of Dickens, there are three more USB buses, one

10    per peripheral set.   So, USB bus number 3 includes the host controller 154,

11    to cabling to 109, and the speaker is 180.

12        USB bus number 4 has host controller 156 as its host and as -- again,

13    the cabling, the USB cabling 109, and the printer 182 as the device on that

14    bus.

15        The fifth USB bus is made of up of the host controller 158, is where

16    that was -- USB cabling 109, and USB hub 107, and then the keyboard and

17    mouse there at the center of the page.

18        So, why is this important?  Well, this is a completely different system

19    than what's described and claimed in Bohm's patent.  This is a complex

20    switch that uses emulation and multiple buses, multiple devices, multiple

21    hosts to accomplish a certain goal.

22        It's important, moving to slide 16, each USB device controller here at

23    the top of the figure, 150, is a unique USB device on its respective USB bus,

24    so it makes up a terminus or a leaf of that USB bus.

39

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    Slide 17: It's important because Dickens does not disclose the device

2    that has a function, and a controller as required by claims 1, 3, 7 and 23, and

3    then, which also for claim 1 has two upstream ports.

4    The petition is taking Dickens, this complex system that has multiple

5    USB buses, multiple host controllers, device controllers, printers and other

6    peripheral devices down at the bottom, and the Petitioner improperly

7    attempts to combine portions of all these separate USB devices to conclude

8    that the claims of the 243 and 708 patents are anticipated.

9    JUDGE FISHMAN:  Counsel, this is Judge Fishman.

10   MR. BANNER:  Yes.

11   JUDGE FISHMAN:  Can you point us to the language in your claim

12   that will preclude multiple USB buses?  I understand your point, but your

13   argument is there must be a device that has two upstream ports and a

14   downstream port, all on the same USB bus, essentially.  I'm not sure I've

15   seen that in the claims.

16   MR. BANNER:  Sure.  Let me pull up claim 7 of the 708 Patent.   So

17   what do we have here, what are we claiming?  And this is exemplary.  It's a

18   USB device, that's what the claim is directed to, a USB device, and what

19   does it comprise: It has a function block in the USB device, it has a multi-

20   host device controller in the USB device, and that controller does a number

21   of things.

22   Sets up these -- it allows -- it's operable to establish these concurrent

23   respective USB connections between the USB function block that is in the

24   USB device, and the plurality of hosts, to allow those plurality of hosts to

25   simultaneously enumerate and configure the USB device, to simultaneously

40

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    access the USB device, and alternately access the USB function block,

2    without any of the plurality of hosts reconfiguring the USB device.

3          So, the claim language itself is directed to a USB device, and that

4    preamble gives life, meaning, and vitality to these claims, because it tells the

5    reader what is being claimed.  It's a single USB device that has these

6    features in it.

7          Now, how do we know that?

8          JUDGE FISHMAN:  You certainly can draw a dashed line around the

9    figure that we are looking at in Dickens that shows those elements, shows

10   the upstream ports and the downstream port and a function block?

11         MR. BANNER:  That is certainly possible, Your Honor, to draw a

12   dashed line to pick and choose from different devices that are present on the

13   different USB buses in Dickens, and sort of modify Dickens to say, hey, I'm

14   just going to merge this all together, and say it's one big device.

15         Now, that's not anticipation.  And I think the law is clear on what

16   anticipation is.  And if you go back to the slide, this is slide 18, what does

17   the Federal Circuit in the Net MoneyIN case from 2008, "Anticipation

18   requires a reference to disclose each element of the claimed invention,

19   arranged as in the claim, without treating the claims as mere catalogues of

20   separate parts and disregard the part-to-part relationship set forth in the

21   claims, and that give the claims their meaning."

22         The Court went on to say, "It is not enough that prior art includes

23   multiple distinct teachings that the artisan might somehow combine to

24   achieve the claimed invention.  That's not anticipation, and that's what this

25   case stands for, that's what Patent Owner argued in its Patent Owner

26   response, and that is the legal test that precludes what is going on here in the

41

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   petition, which is just line drawing, choosing this function from the printer

2   down at the bottom, which is a separate device, choosing the ports up here,

3   from Dickens data router controller, that is a separate, a completely separate

4   device.

5        I mean both of those ports are actually on different -- you know,

6   different physical switch, which is Dickens data router controller, so --

7        JUDGE FISHMAN:  Excuse me.  Is a USB hub, or USB switch a

8   USB device in your interpretation?

9        MR. BANNER:  Is a USB hub a USB device?  I --

10       JUDGE FISHMAN:  Correct.  Or a USB switch, is that a USB device,

11  within the scope of your claims?

12       MR. BANNER:  I think that the claims -- I think that the patent makes

13  the distinction between USB devices and hubs.  And so while a device is -- a

14  hub is, in USB 2.0 would be considered as a class of devices, it's a separate

15  kind of device.  But that's not what this claim is about.  This claim is about a

16  device, a peripheral device, or a device that is not a hub, because it's a device

17  that has, as one of its components, a function.

18       And so with that understanding of what the claim requires, now I

19  know there is a claim construction debate between the parties about whether

20  that USB device preamble is limiting.  We believe it is for the reasons

21  discussed in our brief, which is the sur reply that we were allowed to file

22  after the reply.

23       And with that understanding that the preamble is limiting, that the

24  USB device and the multi-host USB device that are recited in each of the

25  claims, is limiting.  The petition is improperly combining, and I'm on slide

42

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    19, Dickens data routing device 100 with the printer 182, to read on the

2    claim multi-host device.

3         There's been no suggestion that anything other than printer 182 or one

4    of the peripherals connected to Dickens data router, is the function as

5    claimed, and so it's clear based on this line-drawing exercise, that the

6    petition is simply treating the claims as a catalogue of parts that is contrary

7    to the law, contrary to the Federal Circuit holding in Net MoneyIN.

8         And for that reason, that's the first independent reason, that Dickens

9    does not anticipate these claims, any claims, 708 or 243 patent.

10        Moving on to slide 20 of the demonstratives: the second independent

11   reason that Dickens does not anticipate these claims is that Dickens does not

12   disclose the concurrent respective USB connections recited in the 708 patent

13   claims, or the concurrent respective dedicated USB connections recited in

14   the 243 patent claims.

15        The first part of this, which is argued at the Patent Owner's response,

16   pages 25 to 31 in the 861 response.  Dickens does not disclose a USB

17   connection, and at slide 21 of the demonstratives there is a figure which

18   comes from Exhibit 2004, which is Dickens' marked up by Petitioner's

19   expert witness.  His testimony is on the top there, and you can see in blue in

20   Figure 2, Petitioner's expert highlighted the PCI bus in Dickens.  And he

21   agreed, one of ordinary skill in the art would not understand that blue section

22   in this figure to be a USB connection.

23        Now, this is important when you look at, you know, what the Patent

24   Owner has -- the Patent Owner's expert has described, and what we just went

25   through with the technology, there's all these separate USB buses in

26   Dickens, and the device controllers that are -- the 150 there at the top, the

43

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   top-left of the page, those device controllers are a leaf or a terminus of those

2   particular USB buses at the top.

3       And so that's the point where the USB connection terminates, and

4   what happens from there is a PCI bus with a Pentium processor doing things,

5   moving data around, choosing when it wants to, you know, let that -- let

6   transactions go through or not.  And as Patent Owner's expert, and as the

7   Petitioner's expert agree, that whole section of Dickens is not a USB

8   connection.

9       And to treat it otherwise, to say that, well, you know, connecting all

10  those buses up by a PCI connection, just really this rates the requirement of

11  the claims that this be a USB connection.

12      If the patentee had just wanted any connection to suffice, the patentee

13  would have said, just for establishing a connection, and would not have said,

14  a USB connection; and so because Dickens has this intervening PCI, non-

15  USB connection, this is not a USB connection, and it does not satisfy the

16  language of the claims.

17      Moving to slide 22: Dickens does not disclose concurrent USB

18  connections, so in the line-drawing exercise which I still submit is improper,

19  the petition circles the printer down at the bottom of the Dickens Figure 2 as

20  corresponding to the USB device block of the claims, but there are no

21  connections between the two hosts at the top of the figure and the USB

22  device block, that operate or occur at the same time.

23      That printer, the only alleged concurrent connections are between the

24  host 105 at the top, and the data router 130, which, again, terminates with

25  the device controllers 150.  If I can go back to slide 21, we can see that again

26  in this figure -- actually let go to slide 15.  Again, there's a USB bus at the

44

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    top, and the host controller, or device controller 150 on each of those buses

2    on the top, that's where the USB bus terminates, and so while the Patent

3    Owner agrees that the two connections there to the two different device

4    controllers, are concurrent, there are no two connections that make it all the

5    way down to the peripheral device, the printer down at the bottom.

6          And that's the point that we are making here, is that because the claim

7    language requires -- again, back to slide 22, the claim language requires

8    these connections be between hosts and the USB device block which has

9    been identified as the printer.  And no two concurrent connections, such as

10   those, such as recited, exist in Dickens.

11         Data router 130 is not the USB device block, the printer is, there's

12   only a single connection to Dickens' printer, and so to find that Dickens

13   anticipates would read this concurrent limitation right out of the claims.

14         Finally, slide 23: Dickens does not disclose more than one dedicated

15   USB connection between hosts that the USB-device block.  Now this

16   argument only relates to the 243 patent, because the 243 patent claims all of

17   the independent claims recite dedicated, concurrent USB connections, that

18   708 patents do not have this term in the claims.

19         But claim 3 is illustrative, and shows you why this actually means

20   something.  Claim 3 has the multi-host device controllers configured to

21   establish a first dedicated USB connection between the first host and the

22   USB device block, and a second dedicated USB connection between the

23   second host and the USB device block.

24         Again, when you look at -- when you look at the figure of Dickens,

25   and you look at the printer down at the bottom, there's one USB cable

26   between data router and the printer.  That USB connection is a shared

45

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    connection.  If host one and host two want to talk to the printer, all of those

2    transactions have to go through cable 109, down at the bottom to the printer.

3         That's not a dedicated connection from a host to a peripheral.  It's not

4    a first one, and it's not a second one.  And the claims require two dedicated,

5    concurrent USB connections, which simply don't exist in Dickens.

6         While Patent Owner has provided other arguments for patentability of

7    certain independent -- independent claims -- I can see I'm getting low on

8    time, so I'm happy to rest on the briefing on those, unless there are any

9    questions?

10        JUDGE FISHMAN:  Counsel, Judge Fishman here.  I'm looking at the

11   USB spec, and the term "USB device," per se, is not defined, it's defined as

12   classes of devices.   So if "USB device" is broadly defined, and I'm allowed

13   to draw my imaginary dashed line around elements in Dickens, which of

14   your arguments still stand in your opinion?  Did some of your arguments go

15   away if a dashed-line drawn around elements of Dickens is interpreted to be

16   a "USB device"?

17        MR. BANNER:  Hmm?

18        JUDGE FISHMAN:  So, let me be precise; looking at your slide 23;

19   that you just had up.

20        MR. BANNER:  Twenty-one with the figures?

21        JUDGE FISHMAN:  Slide 23, for example.

22        MR. BANNER:  Okay.

23        JUDGE FISHMAN:  If I draw a dash line, I can show a USB device

24   in Dickens that has first and second dedicated USB connections between

25   first and second hosts?  So, does that argument still hold, you know, if I am

26   allowed to draw such a dashed line?

46

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1       MR. BANNER:  I think if you circle all of Dickens, then the

2 components, yes, are there.  Is that what the question is?

3       JUDGE FISHMAN:  Essentially, yes.  So, if I draw a line around all

4 of the selected elements of Dickens that are relevant to your claims, which

5 of your arguments still hold in your opinion?

6       MR. BANNER:  Oh.  Which of the arguments still hold?  Well, okay,

7 I'm going -- I'm going to assume that we are still talking about the printer or

8 the peripheral that's at the end down at the bottom of the -- that is included in

9 that dashed-drawn line.  Is that correct?

10       JUDGE FISHMAN:  Yes.

11       MR. BANNER:  Okay.

12       JUDGE FISHMAN:  Those are hypotheticals.

13       MR. BANNER:  Okay.  So, I think that the concurrent -- that there are

14 still no concurrent connections, USB connections, I think all of the USB

15 connection arguments still hold.  It's not a USB connection, because in

16 making that dashed-drawn line -- sorry -- dashed drawing you have to

17 include the PCI bus which is not a USB connection.  I think that also the

18 concurrent USB connections do not exist, because the concurrent USB

19 connections must be between the host and the USB device block which is

20 the printer at the bottom.

21       And the only connections that can satisfy concurrency in Dickens, are

22 the connections on that, so USB buses 1 and 2 that are -- you know, have

23 slide 15, those are concurrent but they don't connect the host to the device

24 block itself, the printer.  The same reason goes for the dedicated first and

25 second connections that must exist between the host and the USB device

26 block.

47

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    You can draw that line around there, but there's still only one USB

2    connection to that printer, which is the device block, and so you don't have

3    dedicated connections there either.

4        JUDGE CLEMENTS:  Counselor, I have a question.  In Figure 3, I'm

5    looking at the 708 patent– and I think the 243 patent is the same, and, you

6    know, it shows the peripheral with two upstream ports, two physical ports, is

7    that what makes them dedicated?  You need to be -- you need to have a

8    separate physical port to be dedicated?  Is that the argument?

9        MR. BANNER:  Yes.  That's correct.

10       JUDGE CLEMENTS:  Okay.

11       MR. BANNER:  That's what this invention is about. It's about

12   providing a peripheral, peripheral device that two hosts can connect up to.

13   That's why all the claims -- claim 1 says, you know, it has two ports, claims,

14   and all the other independent claims say -- you know, the Figure 2,

15   established connections to two hosts, that's all in the device itself, and that's

16   what this patent is about.

17       JUDGE CLEMENTS:  Okay.  So, do any of the claims actually recite

18   the device has to have two physical ports?

19       MR. BANNER:  Claim 1 does, for sure.  If you look at claim of the

20   708 patent, it claims USB multi-host device comprising -- and it has first and

21   second upstream ports, configured to couple to corresponding first and

22   second hosts.  Claim 1 of each of patents has that language in it.  The other

23   independent claims do not.

24       JUDGE CLEMENTS:  And so what are we to make of that

25   distinction?  I mean isn't the logical conclusion that the other independent

26   claims don't require two upstream ports?

48

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1        MR. BANNER:  I think they don't require two upstream ports.  Yeah,

2    I think that's correct.  But I don't understand -- maybe I don't understand the

3    question.

4        JUDGE CLEMENTS:  Well, my question is, why should we read a

5    requirement for two ports into those claims just because they say dedicated?

6    When the patentee clearly knew how to claim two upstream ports as it did in

7    claim 1 of both patents?

8        MR. BANNER:  I'm not advocating for reading anything into the

9    other claims.  I think those claims stand on their own and -- for example, we

10   could look at claim 3 again, where claim 3 -- apologies -- claim 3 requires

11   the multi-host USB device to have a function block, and it also has to have

12   the controller that couples the USB function block to a first host and a

13   second host.

14       So, that's the language we are looking at.  I don't think we are reading

15   anything into the claims there, we are just saying that the controller has to be

16   able to connect those hosts, the first and the second hosts, and it tells you

17   how that's done, wherein the device controller is configured to establish a

18   first USB connection, between the first host and the USB function block,

19   and a second USB connection between the second host and the USB

20   function block.

21       Wherein, those first USB connection and second USB connection are

22   concurrent.  So, it's all there, it's all stated in the claims.  We are not

23   suggesting that a port is required in those claims, but the controller has to be

24   able to set up, has to be able to do what the claims says, it has to be able to

25   establish these types of connections that are described in the claim.

49

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    JUDGE CLEMENTS:  So, it's possible -- is it possible to have a first

2  dedicated USB connection and a second dedicated USB connection in a

3  multi-host device that has only one physical port?

4    MR. BANNER:  I don't think that's possible, no.

5    JUDGE CLEMENTS:  That was (crosstalk 00:55:20)?

6    JUDGE McNAMARA:  That would not be concurrent?  Is that right?

7  You wouldn't be able to get that concurrent?

8    MR. BANNER:  Right.

9    JUDGE McNAMARA:  Is that right?

10    MR. BANNER:  That's correct.

11    JUDGE FISHMAN:  Counselor, Judge Fishman again.  I'm hung up

12  on your definition of USB connection as precluding that intermediate PCI

13  bus.  Can you point to any evidence of record that the phrase "USB

14  connection" must preclude and intermediate non-USB connection?

15    MR. BANNER:  Yes, Your Honor.  So, at the sur reply that Patent

16  Owner filed, that's in the 861 proceeding; that's paper 30, pages 3 through 9.

17  In that argument we discussed, for example, the -- and I'm sorry, I'm citing

18  to the 243 patent at column 1, paragraph -- I'm sorry, lines 32 to 36, where it

19  discusses the connections between, I'll quote here, "A connection between

20  the USB device and the host may be established via digital interconnect such

21  as Interchip USB, ULPI, UTMI, etc., or via a four wire interface that

22  includes a power line, a ground line, and a pair of data lines D+ and D-."

23    And so the specification gives us examples of what types of

24  connections, USB connections are, and in each case, all of these connections

25  that it provides examples of, are connections that conform to the

26  requirements of the USB specs.  So, the inner-chip USB, the ULPI, the

50

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   UTMI, those are all USB-defined interfaces, defined by different sort of

2   working groups within USB, and sort of outside the USB foundation, but

3   they all are interfaces provided to connect USB things together.

4        PCI is a completely separate interface, it's a completely different

5   interface that does not comply with the USB's specification, you know, and

6   it's a generic interface.  And so when the Patent Owner described n the

7   specification what types of connections USB connections are, it listed all of

8   these connections, which are USB -- they followed the rules of USB.

9        JUDGE FISHMAN:  So, the USB connection must be a contiguous

10  four-wire connection, compliant with USB specs from one endpoint to the

11  other and nothing in between?  Is that your understanding?

12       MR. BANNER:  So, with a little bit of a caveat there.  So you all -- so

13  the four wires is one of the examples given.  ULPI, UTMI, Interchip USB,

14  those actually break up the signaling into sort of more than four wires, but

15  they still conform to the USB specifications with respect to timing and, you

16  know, how they work.  So, yes, to the extent you are asking, does the USB

17  connection have to sort of be from  -- you know, from its beginning to its

18  end, sort of USB.  Yes.  That's our position.

19       JUDGE FISHMAN:  What then, do you mean --

20       MR. BANNER:  If it's not, it would just be any connection, it

21  wouldn't be a USB connection.

22       JUDGE FISHMAN:  Well, the point is that, in Dickens the host is a

23  USB connection, the peripheral device printer is a USB connection, and your

24  definition precludes anything in between that is not USB?

25       MR. BANNER:  Correct.

26       JUDGE FISHMAN:  Okay.  Thank you.

51

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    MR. BANNER:  I see I'm almost out of time.  So, for the reasons

2    discussed here and in the briefs, we believe that all of the claims of the 243

3    patent, and the 708 patent, should be confirmed as patentable.  Thank you.

4    JUDGE McNAMARA:  Thank you.  All right, Counsel, proceed.

5    You have 23 minutes.

6    MR. McKEOWN:  Thank you.  I'll try to be brief. I don't think I need

7    even half that.  Let's start with USB connection, because it's relevant to the

8    discussion in the first half; and we just heard from Patent Owner, rather.

9    And what you see in Figure 3 first and foremost, this is a logical block

10   diagram, as I explained before, it's not a hardware diagram, these aren't

11   wires, but you see that language USB endpoint in those blocks there, and so

12   just keep that in mind, and let's go back to Exhibit 1014, which is probably

13   slide 6 or 7, and look at what was argued in the prosecution history, relative

14   to those dedicated connections, right there.  I think that's it.

15   JUDGE FISHMAN:  Excuse me, what exhibit are you looking at?

16   MR. McKEOWN:  This is Exhibit 1014, and it's right in sort of the 20

17   percent down the page there [(Ex. 1014, 14)], "Accordingly, Applicant

18   respectfully resubmits that the embodiments disclosed in Fig. 3 clearly

19   shows concurrent respective dedicated connections," it's talking about USB

20   connections, established between the host device controller, and the

21   upstream ports, and through the buffers.  That's the USB connection,

22   according to the applicant, it's not wires that go from point source to point

23   destination.

24   It's simply, the USB connection to the device which gets to my earlier,

25   point, these connections are logical connections that are available to two

26   different hosts to a single peripheral when you want to set up the signaling,

52

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    you go end-to-end.  So this argument that somehow needs a special kind of

2    wire that goes from the host to the peripheral, it's just not supported in the

3    specification. The exact opposite is argued in the prosecution history.  Figure

4    3 is a logical block diagram which shows an endpoint, it's just not there.

5         So, going back to Dickens, the fact that there's a PCI interconnect is

6    irrelevant.  The patent, as pointed out by Patent Owner, contemplates

7    interconnects. Their argument is basically, well, PCI isn't mentioned in the

8    standard, it's interconnect.  And like I said, even independent of not being

9    excluded in the claims, the proper construction of the USB connection is

10   simply the host connecting, as the applicant argued, to set up that

11   addressable buffer arrangement.  That's what's argued in the prosecution

12   history, that's what's explicitly stated in the specification.

13        So, that's the Dickens issues.  Just jumping, sort of in reverse order, to

14   Furukawa, a couple of arguments were made by Patent Owner, particularly

15   to claim 10; it's not in the briefing discussions of hub repeaters, big holes in

16   Furukawa.  If there were big holes in Furukawa then the Patent Owner

17   should have submitted some evidence from a declarant explaining those big

18   holes.  They should have cross-examined our declarant that found no such

19   holes, and explained to him why he got that whole thing wrong.

20        None of that was done, and the reason that wasn't done is because

21   these arguments are pure attorney speculation, so that's what we have in the

22   supplemental briefing, as to Furukawa.

23        Going through Furukawa there was this focus on the claim term

24   "simultaneously", while the word simultaneously may only be there once,

25   there's no discussion of shared, there is no discussion of why a FIFO would

53

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    store a request for signaling, when that same paragraph describes a not-

2    acknowledged signal.

3           If you are signaling and something isn't available, you send the NAK

4    signal back, you don't store the request, you store data, that's why we have

5    the FIFOs.

6           So, as to Furukawa, all we've really seen is doubling down on that half

7    sentence in paragraph 10, that can't prevail here in the face of declaration

8    evidence that stands unrebutted, and any chance to rebut that evidence was

9    waived, not once but twice.

10          So, that's my rebuttal on the technical issues.  I'd like to just briefly

11   address the statutory argument, because mostly I'd like to --

12          JUDGE FISHMAN:  If I could interrupt you?

13          MR. McKEOWN:  Sure.

14          JUDGE FISHMAN:  The Patent Owner was asserting that Petitioner

15   has never argued inherency, and still does not argue inherency.  Are you

16   arguing inherency, or are you not arguing inherency?

17          MR. McKEOWN:  We did not present inherency in the petition.  The

18   word inherency, I think first appeared in the rehearing decisions.  Our

19   position is enumeration reconfiguration is disclosed in Furukawa for the

20   same reasons it's disclosed in Bohm.  Going back to that prosecution history,

21   when you're explaining enumeration and configuring is necessarily there,

22   because there's two hosts transmitting at once, and because they transmit at

23   once, they don't have to be re-enumerated, we are entitled to that same

24   technical basis as they are.  That's what they argued.

25          In addition to that, and as I pointed out earlier, enumeration

26   configuration relates to the loading of drivers, that's not in dispute, that's on

54

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    the Petitioner page 34 though 35; Furukawa explicitly explains that it's

2    avoiding switching overhead. It's avoiding the loading the drivers, and even

3    in the USB context it's able to share a peripheral.

4         Based upon the testimonial evidence we have in the record, our

5    declarant has taken the position that enumeration and all of the features of

6    these claims are in the reference.  We are not saying, by the way, if you

7    enumerate, you have to do this other step that's nowhere discussed, and

8    that's inherent, we are not arguing that.  We are saying, it's in there. The

9    word "enumeration" is just not used, instead, they describe it as switching

10   drivers, et cetera.

11        JUDGE FISHMAN:  Okay.  I understand that, and understanding that

12   it is not in -- (inaudible).  As concisely as possible can you point me to the

13   phrase, the sentence, at least a paragraph that discloses non-enumeration and

14   non-reconfiguration?

15        MR. McKEOWN:  I don't have it at my fingertips, Your Honor, but I

16   would submit to you it's in the briefing, particularly where we are talking

17   about drivers, and the ability to share the peripheral.  I just don't have the

18   record in front of me.

19        JUDGE FISHMAN:  Okay.  Thank you.

20        MR. McKEOWN:  So, just going back to the statutory argument.  I'd

21   just like to make a couple points there, because I'd like to avoid the briefing

22   there if possible just because, frankly, I think it's frivolous.  You know, these

23   slides point out that 312(a) is a statute. Certainly it's a statute -- paying of

24   fees is a statutory requirement.  312(a)(4) is an enabling statute, it doesn't

25   prohibit anything, it enables the Director to promulgate regulations.  As

26   Judge Clements point out, regulations of course can be waived.

55

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    And the arguments also turn SAS on its head, which I think was also

2    appreciated by the Panel.  If one claim meets the statutory requirements, and

3    passes that threshold -- reasonable likelihood of prevailing -- then the

4    petition goes forward to trial.  That's what SAS stood for.

5    SAS does not say, you have to go through every last claim, and every

6    last requirement, and suddenly every regulation is a statute.  I mean, taking

7    this to its logical extent as argued, you know, ground 3 was sort of pointed to

8    42.63, that's a general formatting regulation.

9    So, according to the Patent Owner, if you submit a Certificate of

10   Service that misses an attorney name, if you submit a piece of paper that's

11   the wrong size, if the margins are wrong, the Board, by statute has to dismiss

12   that petition.  That's just simply absurd.

13   So, again, this isn't about a statute, and one of the slides said that, you

14   know, there's 312 -- or 312(a)(4) prohibits by statute -- the 312(a)(4) is not a

15   statute.  We have to appreciate the difference between a regulation and a

16   statute.  There's a number of cases before the Agency right now, where there

17   were estopped claims, there were claims that violated 112,

18   So, all of these things weren't instituted under the Patent Owner's

19   theory -- now all of these cases, which is the vast majority of the SAS cases

20   before the Agency, are somehow, you know, statutorily prohibited, and we

21   have to dismiss them all.

22   This is not a corner case, this is no different from any other SAS case.

23   So, what we are talking about here really is, a petition that was already

24   considered, 312(a)(4) talks about considering of petition, this is not about the

25   trial, and grounds that we've already requested adverse judgment on, so no

56

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1    one has wasted any time or effort on these, and they point to ground 3 as

2    somehow still being in violation.

3         Ground 3 was instituted.  The fact that the Board pointed out that

4    some paragraphs in the declaration weren't relied upon, but there was other

5    explanation in the petition, ground 3 went forward.  So, there's just no issue

6    here.

7         So, with that I'd just like to encourage the Board not to issue a briefing

8    on this, again, just because I think it's a waste of the party's resources.  This

9    is a very straightforward issue of a regulation, and as SAS points out, if one

10   claim is met, that's all that's required.

11        JUDGE McNAMARA:  Just a quick comment, Counsel, because I

12   don't know if you misspoke or I didn't hear it right.  I thought you said

13   312(a)(4) was not a statute, but the reference is to 35 U.S.C. 312(a)(4) .

14        MR. McKEOWN:  312(a)(4), that particular aspect of the statute is an

15   enabling statute.  So, the statute enables the Director to promulgate rules, it

16   doesn't automatically mean that every last rule that the Director comes up

17   with is suddenly a statutory requirement.

18        JUDGE McNAMARA:  I understand your point, it just seemed a little

19   bit -- kind of a --

20        MR. McKEOWN:  Sure.  Well, if I was unclear it is -- 312(a)(4) is a

21   statute, but it's not a statute that's prohibiting anything that's going on here.

22        JUDGE McNAMARA:  I think I understand your point.  Thank you.

23        MR. McKEOWN:  So, unless there are any further questions I will

24   rest.

25        JUDGE FISHMAN:  Nothing from me.

26        JUDGE McNAMARA:  Nothing from me.

57

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1       JUDGE CLEMENTS:  Nothing from me either.  I do have one

2    question for Patent Owner's Counsel where it relates to Petitioner's request

3    to upload the email; does Patent Owner's Counsel oppose that request by

4    Petitioner to upload email correspondence that they referred to?

5       MR. BANNER:  I don't actually know.  This is the first I heard of this

6    proposal.  I proposed, you know, sort of stipulation.  I'd like to look at what

7    the email says, just because I don't know -- it's just very one-sided, then I

8    might, you know, I might object to that.  But probably -- it's probably going

9    to be okay, but again, I would like to see what email Petitioner's Counsel is

10   even referring to before I, you know, agree to that.

11      JUDGE CLEMENTS:  Okay.  I just wanted to confirm.  Then just

12   contact us about the request by email, if you are in agreement.

13      MR. BANNER:  Sure.

14      MR. McKEOWN:  Thanks, Your Honor.

15      JUDGE McNAMARA:  I'm sorry.  Go ahead.  Was there another

16   question from someone?

17      JUDGE CLEMENTS:  No, nothing further from me.

18      JUDGE McNAMARA:  Okay.  I did want to clarify with respect to

19   the Petitioner again, would you prefer not to have a response to the request

20   for rehearing?

21      MR. McKEOWN:  Yeah .  (Pause)  If the Board would find it helpful,

22   I'm happy to provide a response, I just -- when I say I'm hoping to avoid

23   briefing I just -- it seems to be a very straightforward issue.

24      JUDGE McNAMARA:  Okay.  Thank you.

25      MR. McKEOWN:  All right.

58

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

1   JUDGE McNAMARA:  Okay.  If there are no other questions we will

2 take the case under advisement.  And stand adjourned.  Thank you all very

3 much.

4   (Whereupon, the proceedings at 2:58 p.m. were concluded.)

59

Case IPR2017-00861 (Patent 7,627,708 B2)
Case IPR2017-00864 (Patent 7,523,243 B2)

PETITIONER:

Scott McKeown
James L. Davis, Jr.
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
james.l.davis@ropesgray.com

PATENT OWNER:

Bruce Slayden
Brian Banner
Truman Fenton
Jerry Suva
R. Beard
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
bbanner@sgbfirm.com
tfenton@sgbfirm.com
jsuva@sgbfirm.com
wbeard@sgbfirm.com

60

Trials@uspto.gov                                                         Paper No. 63
571-272-7822                                            Entered: August 28, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

DELPHI TECHNOLOGIES, LLC[1],
Petitioner,

v.

MICROCHIP TECHNOLOGY INC.,
Patent Owner.
_____

Case IPR2017-00861
Patent 7,627,708 B2
_____

Before BRIAN J. McNAMARA, DANIEL N. FISHMAN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

FISHMAN, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*
*and*
DECISION DENYING PATENT OWNER'S MOTION TO EXCLUDE
*37 C.F.R. § 42.64*

_____

[1] Petitioner filed a notice of its name change from "Delphi Technologies, Inc." to "Delphi Technologies, LLC."  Paper 53, 1–2.

IPR2017-00861
Patent 7,627,708 B2

## I.     INTRODUCTION

Delphi Technologies, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–25 (hereinafter the "challenged claims") of U.S. Patent No. 7,627,708 B2 (Ex. 1001, "the '708 patent") pursuant to 35 U.S.C. §§ 311–319.  Microchip Technology Inc. ("Patent Owner") filed a Patent Owner Preliminary Response (Paper 11, "Prelim. Resp.").  On August 29, 2017, based on the record before us at that time, we instituted an *inter partes* review of *only* claims 1–9 and 11–25.  Paper 14 ("Decision" or "Dec."), 2, 43.

Patent Owner filed a Patent Owner Response[2] (Paper 23, "Response" or "PO Resp.") and Petitioner filed a Corrected Reply (Paper 32, "Pet. Reply").  The Petition relies on Declarations of John Garney (Exs. 1023, 1053) and Patent Owner relies on Declaration of Geert Knapen (Ex. 2007).

In accordance with our authorizing order (Paper 29), Patent Owner filed a Sur-Reply addressing various claim construction issues (Paper 30, "PO Sur-Reply") and Petitioner filed a Sur-Sur-Reply responsive to Patent Owner's claim constructions (Paper 31, "Pet. Sur-Sur-Reply")

Responsive to the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018), we issued an Order modifying our Decision to institute review of all claims and all grounds.  Paper 38 ("*SAS* Order").  We authorized additional briefing to address issues relating to claims and grounds that were denied initially in our Decision on Institution.  Paper 40.  Petitioner filed an authorized Supplemental Reply (Paper 42, "Supp.

---

[2] Patent Owner improperly attempts to incorporate by reference portions of its Preliminary Response into its Response.  PO Resp. 16 n.5; *see also* 37 C.F.R. § 42.6(a)(3).  We disregard the improperly incorporated material.

IPR2017-00861
Patent 7,627,708 B2

Reply"), Patent Owner filed an authorized Supplemental Response (Paper 45, "Supp. Resp."), and Petitioner filed an authorized Sur-Reply (Paper 46).

Oral Argument was conducted on June 14, 2018, and a transcript of that hearing is of record.  Paper 57 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  The Petitioner has the burden of proving unpatentability by a preponderance of the evidence.  *See* 35 U.S.C. § 316(e); *see also* 37 C.F.R. § 42.1(d).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons expressed below, we conclude that Petitioner has shown by a preponderance of the evidence that claims 1, 3–5, 7–9, 11–14, 18–21, 23, and 25 are unpatentable.  Petitioner has not persuaded us by a preponderance of the evidence that claims 2, 6, 10, 15–17, 22, and 24 are unpatentable.

> *A.     Real Parties in Interest and Related Matters*

The Petition identifies Delphi Technologies, Inc. and Delphi Automotive Systems, LLC as real parties in interest.  Pet. 1.  Petitioner filed a notice indicating that Delphi Technologies, Inc. had changed its name to Delphi Technologies, LLC and indicating that Delphi Automotive Systems, LLC had changed its name to Aptiv Services US, LLC.  Paper 53, 1–2.  Both Petitioner and Patent Owner identify a related litigation matter captioned *Microchip Technology Inc. v. Delphi Automotive Systems, LLC.*, Case No. 2:16-cv-02817-DJH, filed in the U.S. District Court for the District of Arizona.  Pet. 2; Paper 12, 1.  Petitioner also identifies two related petitions for *Inter Partes* Review as IPR2017-00864 and IPR2017-00970.  Paper 3, 1; Paper 5, 1.

IPR2017-00861
Patent 7,627,708 B2

### *B.    The '708 Patent*

According to the '708 patent, the Universal Serial Bus ("USB") allows coupling of a variety of peripheral devices to a computer system.  Ex. 1001, 1:23–24.  To satisfy consumers' desire to share peripheral devices, such as printers, scanners, etc., prior solutions provided switching devices that allow a peripheral device to be switchably shared among multiple USB host computer systems.  *Id.* at 1:59–63.  Each time a USB peripheral device is switched (disconnected and re-connected) from one USB host to another, the USB host must reconfigure the peripheral device before data exchanges may ensue.  *Id.* at 1:63–2:5.  Such configuration or reconfiguration includes bus enumeration—a step that, *inter alia*, assigns an address to each peripheral device on the bus used by the host on that bus to access each peripheral device.  *See* Ex. 1004, 47–48.[3]  This reconfiguration causes, among other problems, loss of state information relevant to the previously connected host.  Ex. 1001, 1:67–2:5.

The '708 patent purports to resolve this problem by allowing sharing of a USB device among multiple USB hosts without requiring such reconfiguration.  Ex. 1001, 2:12–15.  Specifically, according to the '708 patent, a multi-host capable device is disclosed and claimed that includes separate buffers for each of multiple host connections and maintains a dedicated address and configuration for each host.  *Id.* at 2:36–38.

Figure 1, reproduced below, depicts an exemplary system according to the '708 patent.

---

[3] Citations are to Petitioner's page numbering added in the footer of the Exhibit, as opposed to the original page numbering of the document.

IPR2017-00861
Patent 7,627,708 B2



*FIG. 1*

Figure 1 depicts a system including hosts 102 and 104, both coupled with multi-host device 106, which, in turn, includes USB multi-host device controller.  *Id.* at 3:49–53.

      Figure 3, reproduced below, depicts additional exemplary details of multi-host device 106 of Figure 1.



*FIG. 3*

IPR2017-00861
Patent 7,627,708 B2

Figure 3 depicts USB multi-host device 106 comprising upstream ports 302 and 304, each configured to couple with a corresponding host system. *Id.* at 3:63–4:2.  Upstream ports 302 and 304 are coupled with USB endpoint & status buffers 306 and 308, respectively, "to buffer data and control reads and writes to/from each respective host corresponding to PHY 302 and PHY 304 and/or peripheral device/function 312 coupled to USB multi-host device controller 108." *Id.* at 4:18–21.  The '708 patent further discloses:

> In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.  The selection of the specific mechanism used may be configured according to the specific USB device type that is being shared.  In one set of embodiments, the bandwidth from shared peripheral device/function 312 to each host may be reduced in order to allow each host equal access.  In other embodiments, the bandwidth may not be reduced if the bandwidth of the peripheral function exceeds the bandwidth of the host.

*Id.* at 4:22–36.

### C.    *Illustrative Claim*

Claims 1, 3, 7, 18, and 23 are the independent claims of the '708 patent.  Independent claim 1, reproduced below, is exemplary of the challenged claims (with some formatting changes for readability):

1. A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding first and second hosts;

IPR2017-00861
Patent 7,627,708 B2

a USB function block; and

a multi-host device controller coupling the USB function block to the first and second upstream ports,

wherein the multi-host device controller is configured to establish concurrent respective USB connections between the USB function block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously enumerate and configure the USB multi-host device;

simultaneously access the USB multi-host device; and

alternately access the USB function block without reconfiguring and/or re-enumerating the USB multi-host device before each access.

### D.    *Alleged Grounds of Unpatentability*

The Petition sets forth the following asserted grounds of

unpatentability:

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Furukawa[4] | 102(b) | 1–8, 10, 11, 15–20, and 22–25 |
| Dickens[5] | 102(b) | 1–8, 11, 15–20, and 22–25 |
| (Furukawa or Dickens) and Chen[6] | 103(a) | 9, 11–14, and 21 |

---

[4] Japanese Patent Application Publication P2003-256351A.  Ex. 1002 ("Furukawa").  Exhibit 1002 includes an English translation of the Japanese publication, a certification by the translator, and the original Japanese language version of the publication.

[5] U.S. Patent No. 6,549,966 B1.  Ex. 1003 ("Dickens").

[6] U.S. Patent No. 7,073,010 B2.  Ex. 1005 ("Chen").

IPR2017-00861
Patent 7,627,708 B2

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| (Furukawa or Dickens) and USB 2.0[7] | 103(a) | 9, 11–14, and 21 |
| Wurzburg,[8] Osakada,[9] and (Furukawa or Dickens)[10] | 103(a) | 1–25 |
| (Furukawa or Dickens), USB 2.0, APA[11], and "other art cited herein" (Pet. 4) | 103(a) | 1–25 |

## II.   ANALYSIS

### A.   *General Principles*

#### *1.   Anticipation*

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Each element of the challenged claim must be found, either expressly or inherently, in the single prior art reference.  *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).  While the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).  Furthermore, "a

---

[7] Universal Serial Bus Specification Rev. 2.0 April 27, 2000.  Ex. 1004 ("USB 2.0").
[8] U.S. Patent Publication No. 2006/0059293 A1.  Ex. 1026 ("Wurzburg").
[9] U.S. Patent No. 6,308,239 B1.  Ex. 1027 ("Osakada").
[10] We note Petitioner's harmless error in misidentifying the Osakada reference as Exhibit 1026 ("E1026").  Pet. 4.
[11] Petitioner identifies Admitted Prior Art ("APA") as disclosure at column 1, line 19 through column 2, line 2 of Exhibit 1001.  Pet. 7–9.

reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *In re Petering*, 301 F.2d 676, 681 (CCPA 1962)).  Still further, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).

### 2.   *Obviousness*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter[,] as a whole[,] would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 3.   *Level of Ordinary Skill in the Art*

Petitioner argues a person of ordinary skill in the art related to the '708 patent would have a Bachelor's Degree in electrical engineering,

IPR2017-00861
Patent 7,627,708 B2

computer science, or the equivalent, and would also have "a few to many" years of experience in the design of USB devices as well as familiarity with the USB specifications and protocols.  Pet. 6 (citing Ex. 1023 ¶¶ 53–58). Petitioner further argues (*id.* at 7) that Patent Owner admitted the level of ordinary skill when, in prosecution of the parent application of the '708 patent,[12] Patent Owner asserted:

> Applicant further submits that *one skilled in the art (i.e. having appropriate understanding of basic USB design principles as set forth in at least the USB 2.0 specification)* would therefore be enabled by Applicant's specification as detailed above, to build a USB multi-host device controller that enables multiple hosts to access the USB device function without the USB device having to be reconfigured and/or re-enumerated each time a different host accesses the USB device function.

Ex. 1014, 15 (emphasis added).  Patent Owner further asserted in prosecution of the parent patent application that "one skilled in the art to which the present application pertains would be well informed and well aware of the USB 2.0 specification."  Ex. 1014, 41.

In its Response, Patent Owner does not address the level of ordinary skill in the art.  *See* PO Resp. *passim.*  Furthermore, Mr. Knapen testifies, one of ordinary skill at the time of the '708 patent (1) would be familiar with these industry-standard interconnect interfaces; (2) would be familiar with the circuit-level design and implementation of a standard USB device (because Figure 3 of the '708 patent does not disclose the internal structure

---

[12] The parent patent application of the '708 patent is application serial number 11/425,613 issued as U.S. Patent Number 7,523,243 ("the '243 patent").  The claims of the '243 patent are nearly identical to the claims of the '708 patent to such an extent that, in prosecution, the '708 patent was subject only to a non-statutory double patenting rejection. Ex 1012, 10–11.

IPR2017-00861
Patent 7,627,708 B2

of its various blocks); (3) will have also been exposed to the various
interconnect options for connecting USB hosts and USB devices; and (4)
would have a bachelor's degree in electrical or computer engineering (or
similar), and at least five years of industry experience in computer peripheral
device design.  Ex. 2007 ¶¶ 44–46.  Mr. Knapen then concludes, "I agree the
Board's determination of the level of ordinary skill in the art is consistent
with my assessment, and my opinions consider the level of skill in the art as
determined by the Board."  *Id.* ¶ 47.

    We are persuaded by Petitioner's definition of the level of ordinary
skill in the art and we find this definition is commensurate with the level of
ordinary skill in the art as reflected in the prior art.  *See Okajima v.
Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("[T]he absence of specific
findings on the level of skill in the art does not give rise to reversible error
where the prior art itself reflects an appropriate level and a need for
testimony is not shown.") (internal quotation marks omitted); *In re GPAC
Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  The parties' respective experts
(Mr. Garney and Mr. Knapen) substantially agree regarding the education
and experience of persons of ordinary skill at the time of the '708 patent.
The parties' experts specifically agree that the person of ordinary skill in the
art would have had familiarity with the USB 2.0 specification and
experience in the design of USB devices.

    Based on the complete record of this trial, we discern no reason to
alter our preliminary determination of the level of ordinary skill in the art.
Therefore, we define the level of ordinary skill in the art, at the time of the
'708 patent, to include at least a Bachelor's degree in electrical engineering,
computer engineering, computer science, or equivalent fields as well as

IPR2017-00861
Patent 7,627,708 B2

familiarity with the USB 2.0 specifications to the extent of having designed a USB device. This definition is reflected in the prior art of record and is consistent with the testimony of both parties' experts and consistent with Patent Owner's admissions during prosecution of the '708 patent.

### 4.    *Claim Construction*

As a step in our analysis of patentability, we determine the meaning of the claims for this Decision. In an *inter partes* review, a claim in an unexpired patent, as is the case here, shall be given its broadest reasonable construction in light of the specification of the patent in which it appears. 37 C.F.R. § 42.100(b); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–46 (2016) (upholding the use of the broadest reasonable interpretation standard).

Under the broadest reasonable construction standard, claim terms are generally given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). "[A] claim construction analysis must begin and remain centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). "Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy. *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355,

IPR2017-00861
Patent 7,627,708 B2

1361 (Fed. Cir. 2011); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Aside from the following terms we interpret, we determine that it is unnecessary to construe any other claim terms.

    *a.*    *"Function" / "Function Block" / "Shared USB Function"*

Each independent apparatus claim (1, 3, 7, and 23) includes a recitation of a "function block" element of the apparatus. Independent method claim 18 recites a method step for establishing a connection with "a shared USB function comprised in the USB device."

The parties substantially agree that a *function block* is "a segment of a USB device that performs a USB function." Pet. 31; PO Resp. 16, 18. Patent Owner argues the '708 patent uses the term "block" to refer to a segment of a USB device. PO Resp. 16 (citing Ex. 1001, 2:41–42; Ex. 2002 ¶ 62). The abstract of the '708 patent refers to a "shared function block" by disclosing that "[t]he USB device may include a shared USB function block, and a multi-host controller configured to establish concurrent respective USB connections between the shared USB function block and two or more USB hosts." Ex. 1001, Abstract. Aside from the above reference, the Specification of the '708 patent does not use the term "function block." The Specification also discloses that a USB device may have three blocks, the third of which "may comprise the 'Peripheral Function' itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc." *Id.* at 2:20–53.

The USB specification defines *function* more broadly as "[a] USB device that provides a capability to the host, such as an ISDN connection, a

13

IPR2017-00861
Patent 7,627,708 B2

digital microphone, or speakers."  Ex. 1004, 34.  Thus, according to the USB specification, a "function" is a type of "USB device."

As discussed further below, the parties raise arguments relating to the packaging or integration of a *function* or *function block* within the claimed device.  However, these arguments, directed to packaging and integration of the claimed elements, do not change our understanding of the terms *function* or *function block*.

We adopt the parties' proposed interpretation of "function" and "function block" as meaning "a segment of a USB device that performs a USB function."

Patent Owner argues "shared USB function comprised in the USB device," as recited in method claim 18, means "a USB function that is in a USB device and shared by two or more USB hosts."  PO Resp. 18 (citing Ex. 2007 ¶ 66).  Fundamentally, Patent Owner's interpretation is focused on packaging and integration of the function block with other components of the claims—an issue discussed further below.  Other than the implied arguments regarding packaging or integration of the function within a device, we further determine that the "shared USB function" recited in claim 18 is synonymous with "function" and "function block."

   b.   *"Device" / "USB Device" / "USB Multi-Host Device"*

The parties disagree as to the proper interpretation of the term *device*.  Each independent apparatus claim (1, 3, 7, and 23) recites a "device."  Specifically, the preambles of claims 1 and 3 recite a "USB multi-host device" and the preambles of claims 7 and 23 recite a "USB device."  The parties disagreement, in essence, centers around packaging—specifically,

14

IPR2017-00861
Patent 7,627,708 B2

whether a "device," as claimed, must be integral/unitary in that the recited components are physically housed within the claimed device or can be a collection of physically separate, distinct components operating together to provide the recited functions.

Petitioner argues "device" means "both hubs and functions, in a single one or a collection of hardware components." Pet. 33 (citing Ex. 1023 ¶ 67); *see also* Ex. 1004, 32. Patent Owner's Response does not specifically construe the term "device." However, its Response argues Dickens does not disclose the devices of claims 1, 3, 7, and 23 because the Petition merely identifies separate elements disclosed in Dickens rather than *a* device (i.e., an integral device comprising recited components). PO Resp. 19–20. Implied in Patent Owner's Response regarding Dickens is a construction of "device" as a single, integral, device as distinct from a collection of separate, distinct, components.

> The USB specification provides a definition of "device" as follows:
>
> A logical or physical entity that performs a function. *The actual entity described depends on the context of the reference*. At the lowest level, device may refer to a single hardware component, as in a memory device. At a higher level, it may refer to a collection of hardware components that perform a particular function, such as a USB interface device. At an even higher level, device may refer to the function performed by an entity attached to the USB; for example, a data/FAX modem device. *Devices may be physical, electrical, addressable, and logical*.
>
> When used as a non-specific reference, a USB device is either a hub or a function.

Ex. 1004, 32 (emphasis added). Thus, the USB specification defines "device" relative to the context of the reference—lowest level, higher level, even higher level. Furthermore, we understand that the broadest reasonable

IPR2017-00861
Patent 7,627,708 B2

interpretation of a term must be consistent with the specification of the patent. *SuperGuide*, 358 F.3d at 875. Therefore, for the reasons discussed below, the '708 patent Specification does not require a "device" to be a unitary, integral device. The USB specification provides further evidence, consistent with the Specification, that a skilled artisan would have understood the term "device" to encompass either a "single hardware component" or "a collection of hardware components that perform a particular function." Ex. 1004, 32.

Patent Owner presents arguments regarding construction of "device" as follows:

### 1.    *Preamble Is Not Limiting*

Patent Owner argues the preamble of the claims limits the understanding of "device" because it recites a "particular structure that is highlighted as important by the Specification" and because the preamble "provides antecedent basis for a claim limitation." PO Sur-Reply 1 (citing *Catalina Mktg. Int'l v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002) and *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012)). Petitioner contends the preamble recitation of "device" supports an important highlight of the Specification because the Abstract of the '708 patent discloses the invention as a "single device"[13] and the Specification further distinguishes the invention over "a combination of a standalone switch and another USB device." *Id.* at 2 (citing Ex. 1001, 1:61–2:5).

_____

[13] Referring to the claimed "device" as a "single device" sheds no useful light on construing the term "device" any more than a reference to "a" device or "the" device.

16

IPR2017-00861
Patent 7,627,708 B2

Petitioner argues the distinction over a prior art switch in combination with a USB device is a distinction based on the function of the switch requiring reconfiguration of the USB device for each switch between hosts rather than the physical distinction of a combination of separate components. Pet. Sur-Sur-Reply 3 (quoting Ex. 1001, 1:61–67 ("the device can generally be configured and accessed by only a single host at any given time")).  We are persuaded by Petitioner's argument.  The '708 patent does not distinguish the prior art combination of a switch and a separate USB device based on its physical packaging.

Furthermore, the mere fact that "device" in the preamble provides an antecedent basis for the same recitation in the claim elements in no way further defines the proper construction of "device."  Patent Owner's reliance on *Deere* is inapposite.  *Deere* also holds "if the body of the claim describes a structurally complete invention, a preamble is not limiting where it 'merely gives a name' to the invention, extols its features or benefits, or describes a use for the invention").  *Deere*, 703 F.3d at 1358 (quoting *Catalina*, 289 F.3d at 809).  Here, use of the term "device" provides no structural limitation but, instead, the body of the claim sufficiently defines a complete structure and the preambles merely provide a name for the claimed structures.

For the above reasons, we determine the preamble of the claims does not limit the claim elements to an integral, unitary, physical packaging of the device as Patent Owner alleges.

IPR2017-00861
Patent 7,627,708 B2

    2.    *The Claimed Device May Encompass An "Off-The-Shelf Item"*

    Petitioner argues Patent Owner's limiting definition of "device" would require the function block and the controller be located "within a single unitary housing." Pet. Reply 4. However, Petitioner argues, the '708 patent Specification discloses that "Peripheral Device/Function 312" "may be a standard off-the-shelf item." *Id.* (quoting Ex. 1001, 4:8–12). Petitioner contends that, if the "off-the-shelf" function 312 is, for example, a mass storage device, "[i]t could not be a standard off-the shelf item if the inventive multi-host device controller were already embedded inside." *Id.*

    Patent Owner argues the disclosure of an "off-the-shelf" item merely refers to the function being a standard function such as an Ethernet controller or a mass storage device. PO Sur-Reply 2. Instead, Patent Owner emphasizes that the '708 patent Specification clearly refers to the function as one of three segments or blocks within a USB device as support for its contention that the claimed USB device is an integral, unitary structure. *Id.*

    We are persuaded by Petitioner's arguments. Figure 3 of the '708 patent (reproduced above) depicts an embodiment of USB multi-host device 106 comprising, *inter alia*, USB multi-host device controller 108 and device/function 312. Ex. 1001, 4. The Specification's disclosure that device/function 312 may be a standard off-the-shelf item such as an Ethernet controller or mass storage device clearly describes a typical device that may be common and commercially available—not an item that is already physically integrated with the inventive features of the invention (the other elements shown within box 106 of Figure 3).

    For the above reasons, we determine the Specification's exemplary embodiment incorporating an "off-the-shelf" item aids in understanding

IPR2017-00861
Patent 7,627,708 B2

"device" to encompass a combination of hardware components (including "off-the-shelf" items) and, thus, would not limit the claim elements as to integral, unitary, physical packaging of the device as Patent Owner alleges.

    3.    *"Device" Encompasses "A Collection Of Hardware Components"*

    Patent Owner further argues the USB specification definition of a device as encompassing a "collection of hardware components" is not the same as encompassing a collection of separate devices. PO Sur-Reply 3. We discern no support for Patent Owner's assertion that there is a difference between a collection of hardware components and a collection of devices. This assertion merely shifts the focus of the discussion to defining another term ("hardware components") as somehow distinct from "devices."

    Furthermore, Patent Owner's expert, Mr. Knapen, agrees with the definition of "device" as provided in the USB specification. Ex. 1049, 40:9–16 ("Q. Do you agree or disagree that a person of ordinary skill in USB matters in 2006 would consider the word 'device' to potentially refer to a collection of hardware components that perform a particular function? A. Yes. . . ."). In addition, Patent Owner's counsel and Mr. Garney (Petitioner's expert) engage in a lengthy colloquy in which Mr. Garney explains a variety of types of devices defined by the USB specification all within the scope of "device," regardless of physical packaging constraints, as ordinary skilled artisans would understand the USB specification. *See* Ex. 2006, 67:9–74:15.

    For the above reasons, we determine that an ordinarily skilled artisan would understand "device" in the context of the '708 patent Specification and in the context of the USB specification to encompass devices that

IPR2017-00861
Patent 7,627,708 B2

comprise the recited "collection of hardware components" without imposing particular physical packaging constraints.

### 4. *Conclusion Regarding Construction of "Device"*

Accordingly, we construe "device," in accordance with the USB specification and in accordance with the '708 patent Specification discussion of Figure 3, to, at least, encompass any collection of hardware components that perform a USB function.

### c. *"USB Connections"*

All claims recite USB connections between the first host (or upstream port) and the function block and between the second host (or upstream port) and the function block. The USB specification does not expressly define the term "USB connection" but uses the term only in reference to the electrical signaling standard (the type of cable) used in various speeds of connectivity. *See* Ex. 1004, 147, 152, 157. The '708 patent Specification does not expressly define the term "USB connection." The term appears in the Abstract ("a multi-host controller configured to establish concurrent respective USB connections between the shared USB function block and two or more USB hosts") and at column 2, lines 38–40 ("Each host may therefore establish a dedicated USB connection with the sharing device."). These passages offer little aid in understanding the term and only indicate that a "USB connection" is something established by a multi-host controller

20

IPR2017-00861
Patent 7,627,708 B2

between hosts and a function block or is something established by each host with a "sharing device[14]."

Neither the Petition nor the Patent Owner's Response provide a definition of "USB connection." Patent Owner argues in its Response, in essence, that Dickens does not disclose the claimed USB connections because Dickens discloses that, internal to its routing device 100, all exchanges are performed over a PCI bus (or another non-USB bus). PO Resp. 25–31. Implied in Patent Owner's argument is that the claimed "USB connections" would be understood to exclude the use of any non-USB busses or protocols in the path between, e.g., a host and a peripheral.

In response to Patent Owner's argument, Petitioner proffers an express construction of "USB connection" in its Reply. Specifically, Petitioner argues "'USB connection' means 'direct and indirect connection, both with and without intervening interconnect, using USB protocols.'" Reply 11. Petitioner further argues the '708 patent Specification teaches that the USB connections may include digital interconnects such as "Interchip USB," "ULPI," and "UTMI" and contends Mr. Knapen (Patent Owner's expert) testified that connections within multi-host device 106 of the '708 patent are likely such digital interconnects which, Petitioner contends, are not "USB signals." *Id.* at 5–6 (citing Ex. 2007 ¶¶ 44–47; Ex. 1049, 62:13–62:25). Thus, under Petitioner's proffered construction, a "USB connection" may include intervening digital interconnections that are not USB compliant.

---

[14] "Sharing device" is not used again in the Specification. We presume it may have been a typographic error that was intended to refer to a "shared device," a term that is somewhat consistent with the context of that paragraph. Our analysis is not affected by the apparent error.

IPR2017-00861
Patent 7,627,708 B2

Patent Owner responds, "The phrase 'USB connection' should be given its plain and ordinary meaning.  One of ordinary skill would know that a 'USB connection' is one that conforms to the requirements of the USB specification."  PO Sur-Reply 3.  Patent Owner argues its interpretation is consistent with the '708 patent Specification because the interconnects discussed in the Specification, including serial USB cables, Interchip USB, ULPI, and UTMI standards, *are* compliant with the USB specification.  *Id.* at 3–4.  Patent Owner further argues Petitioner's proffered construction includes non-USB intervening elements and, thus, does not conform to the USB specification.  *Id.* at 4–5.

We are persuaded by Petitioner's arguments that a "USB connection" need not be compliant with the USB specification throughout the entire signaling path between a USB host and a USB device and may include intervening, non-USB connections.

First, we disagree with Patent Owner that the disclosed digital interconnections of the '708 patent (Interchip USB, ULPI, and UTMI) are "compliant with the USB specification."  These standards are apparently useful in conjunction with USB applications for high speed parallel bus communications between integrated circuits[15] but these interconnect standards appear nowhere in the USB specification and, thus, while useful in USB device designs, cannot be said to be "compliant" with the USB specification of record as Exhibit 1004.

---

[15] Patent Owner provides a footnote alleging these digital interconnects conform to the USB specification.  *See* PO Sur-Reply 4 n.1.  The cited websites, not of record as evidence in this case, suggest that these standards define parallel bus structures useful in implementing USB devices with inter-chip connections.

IPR2017-00861
Patent 7,627,708 B2

Furthermore, Mr. Knapen testifies, and we agree, "the inner-workings of the invention's USB multi-host device controller (e.g., element 108 of Figure 3) is not described at the circuit level." Ex. 2007 ¶ 45. Mr. Knapen further testifies, in reference to internal connections within controller 108 of the '708 patent, that connections within multi-host device 106 of the '708 patent are likely digital interconnects (e.g., Interchip USB, ULPI, UMTI) rather than "USB signals" on a USB serial bus (i.e., a USB cable). Ex. 1049, 76:19–78:24. Thus, interconnections within multi-host device 106 are not compliant with the USB specification of record (Ex. 1004) as alleged by Patent Owner. Instead, Figure 3 of the '708 patent, in conjunction with the disclosure of digital interconnects and Mr. Knapen's testimony, discloses a "USB connection" that comprises a USB serial bus (i.e., a USB cable) coupling a USB host with an upstream port (302/304) and digital interconnects ("Host 1" and "Host 2") coupling the upstream port (302/304) to a corresponding endpoint & status element (306/308) within device 106.[16] Thus, according to Mr. Knapen, the above-described "USB connection" includes intervening digital interconnections that are not compliant with the USB specification of record.

---

[16] Other un-labeled interconnects within device 106, such as those between USB endpoint & status elements 306/308 and USB Multi-Host Device Controller 108, may also be digital interconnection that are not compliant with the USB specification of record.

23

IPR2017-00861
Patent 7,627,708 B2

Furthermore, we observe that the '708 patent Specification, although sparse regarding any internal structure of controller 108,[17] discloses that controller 108 may include an arbitration mechanism:

> In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example-to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.

Ex. 1001, 4:22–29.  Neither party identifies, nor do we discern, any disclosure in the USB specification describing a capability to arbitrate among multiple host requests—indeed that is the very essence of the invention (the alleged "point of novelty") of the '708 patent.  Thus, controller 108 provides non-USB functionality (an arbitration mechanism), intervening within the USB connection between hosts and a function block, to arbitrate among multiple USB requests.

For the above reasons, we are persuaded by Petitioner's arguments that "USB connection," as used in the '708 patent, does not require an end-to-end communication path that is, at all times and all points, compliant with the USB specification of record.  Instead, we adopt Petitioner's proffered

---

[17] In general, we find the '708 patent Specification unusually sparse regarding design details.  It may be enabling for the ordinarily skilled artisan with knowledge of the USB specification and experience in the design of a USB device.  By comparison, the prior art of record, in particular Dickens, is substantially more verbose in exemplary embodiment design details.  To whatever extent the '708 patent is insufficient under 35 U.S.C. § 112 is not an issue before us in an *inter partes* review.

IPR2017-00861
Patent 7,627,708 B2

construction that a "USB connection" means "direct and indirect connection, both with and without intervening interconnect, using USB protocols."

#### d.  *Concurrent and Simultaneous*

All challenged claims recite establishment of "concurrent" connections between the function block and a plurality of USB hosts and some aspect of "simultaneous" operations—e.g., "simultaneous enumerate and configure" (claims 1, 7), "simultaneously access" (claims 1, 3, 7), "receive and respond to simultaneous respective USB access requests" (claim 23), etc.  The Specification of the '708 patent does not provide a specific definition of either term.

Petitioner does not provide a specific interpretation of either term but argues what is *not* meant by each term.  Specifically, Petitioner argues references to "simultaneous" in the claims do "not require simultaneous data transfer from two or more computers to a peripheral such as a printer" but instead encompasses transfer of data from one computer at a time to the peripheral—a mode Petitioner refers to as "data switching" as distinguished from "connection switching" in which a connection is established and disconnected to allow another computer to connect to a peripheral.  Pet. 18–19 (citing Ex. 1001, 2:28–37).[18]  Petitioner asserts this requirement is consistent with the USB specification.  *Id.* at 19.

Petitioner similarly argues connections are "concurrent" to the extent they allow the recited functionality, for example, in claim 1, to allow for

---

[18] We are unclear of the relevance of the cited portion of Exhibit 1001 to Petitioner's understanding of "simultaneous" other than it is one of the few uses of the word in the Specification of the '708 patent.

IPR2017-00861
Patent 7,627,708 B2

simultaneous enumeration and configuration, allow for simultaneous access, and allow for alternating access without reconfiguring or re-enumerating. *Id.* at 19.

Patent Owner presented arguments regarding interpretation of these terms in its Preliminary Response. Prelim Resp. 15–28. In our Decision on Institution, consistent with the Specification and with the plain and ordinary meaning, we adopted Patent Owner's dictionary-based definition of *concurrent* to mean "operating or occurring at the same time" and adopted the dictionary-based definition of *simultaneous* to mean "at the same time." Dec. 13.

Patent Owner does not address the construction of these terms in its Response. Although we find merit in Petitioner's suggestions that there are aspects of USB operations that are excluded when interpreting these terms in the context of USB protocols, Petitioner has not provided a proposed interpretation as to what *is* within the scope of a proper interpretation of these terms.

Thus, we perceive no reason on the complete record to change this construction.

### C.    *Anticipation by Furukawa*

The Petition asserts claims 1–8, 10, 11, 15–20, and 22–25 are anticipated by Furukawa. Pet. 38–54. For the reasons discussed below, we remain unpersuaded that Furukawa anticipates any of claims 1–8, 10, 11, 15–20, and 22–25.

26

IPR2017-00861
Patent 7,627,708 B2

### 1.    *Furukawa (Ex. 1002)*

According to Furukawa, sharing a USB peripheral device has been difficult because a USB interface permits only a single host to connect with a peripheral device.  Ex. 1002 ¶ 3.  Prior solutions provided a switching circuit that allowed a different host to connect with the shared peripheral. *Id.*  However, such switches required a series of operations each time the host on the USB was switched and, typically, required the host system to load or unload a device driver for the shared peripheral newly connected or re-connected to the host.  *Id.*

Furukawa purports to have resolved the above problems by disclosing a USB hub providing: dedicated ports for each of multiple USB hosts, dedicated ports for each of multiple USB peripheral devices, and a controlling circuit coupled between the host ports and the device ports such that overhead to load and unload devices drivers is obviated.  *Id.* ¶ 4.

IPR2017-00861
Patent 7,627,708 B2

Figure 1 of Furukawa, reproduced below, depicts an exemplary embodiment of Furukawa's invention.



Figure 1 depicts a plurality of USB hosts 21–24 coupled to hub 1 via corresponding ports 2-1 through 2-4 (collectively ports 2) and depicts a plurality of USB peripheral devices 25–28 coupled to hub 1 via ports 3-1 through 3-4 (collectively ports 3). *Id.* ¶¶ 7–8. Hub 1 comprises FIFO memories 11-1 through 11-4 (collectively FIFO memories 11) and 17-1

IPR2017-00861
Patent 7,627,708 B2

through 17-4 (collectively FIFO memories 17) corresponding to ports 2 and 3, respectively. *Id.* Controlling circuit C of hub 1 controls transmissions between hosts 21–24 via bus 12 through FIFO memories 11 and peripheral devices 25–28 via bus 16 through FIFO memories 17. *Id.* ¶¶ 10–11. When an exchange is required between a host and a peripheral device, controlling circuit C sets up a connection between the host and the peripheral device and releases the connection when the exchange is completed. *Id.*

> ### 2. *Independent Claims 1, 3, 7, 18, and 23*

Independent apparatus claims 1, 3, 7, and 23 generally recite a USB device comprising a controller that enables multiple hosts to share access to a USB device. Independent method claim 18 generally recites steps providing multiple hosts with shared access to a USB device.

Regarding claim 1, Petitioner argues the recited USB multi-host device reads on hub 1 of Furukawa and the claimed first and second upstream ports read on any two of ports 2-1 through 2-4 of Furukawa. *Id.* at 38–39. Petitioner further argues the claimed "USB function block" reads on any one of Furukawa's USB peripheral devices 25–28 and asserts the claimed multi-host device controller reads on Furukawa's controlling circuit C within hub 1. *Id.* at 39–40.

The "wherein" clause of claim 1 requires that the controller be configured to "establish concurrent respective USB connections between the USB function block and the first and second upstream ports" to enable certain recited functions. Petitioner argues controlling circuit C of Furukawa connects to multiple hosts concurrently "through bus 12, FIFO memories 11, and connecting ports 2." Pet. 40 (citing Ex. 1002 ¶¶ 9–10). Petitioner

IPR2017-00861
Patent 7,627,708 B2

further argues elements 13–15 within controller circuit C allow the circuit "to simultaneously process data transmissions between the hosts and peripheral devices."  Pet. 40–41 (citing Ex. 1002 ¶ 11).  More specifically, Petitioner argues:

> As Furukawa explains, "The connection that is set up is a one-to-one connection between the host PC that is the source of the request and the peripheral device that is the destination of the request, and insofar as there is no redundancy in the request destination, a plurality of host PCs can access the peripheral devices simultaneously."  F-¶0010.  Furukawa's controlling circuit thereby discloses "concurrence."  Garney-¶¶81-82.

*Id.*[19]

Patent Owner' Preliminary Response disputed Petitioner's contentions arguing, in essence, that Furukawa does not disclose multiple hosts concurrently accessing the same peripheral device.  *See* Prelim. Resp. 35–39.

Based on the preliminary record at the time of our Decision on Institution, we were not persuaded Furukawa expressly discloses concurrent USB connections between a plurality of USB hosts and *one* USB peripheral device (a "function block" as claimed).  Although identity of terminology is not required, the Petition had not presented sufficiently persuasive argument and evidence that Furukawa expressly discloses such concurrency.  The Petition's reliance on Furukawa's disclosure that "a plurality of host PCs can access the peripheral devices simultaneously" (Ex. 1002 ¶ 10) does not sufficiently disclose concurrent connections between multiple USB hosts

---

[19] Petitioner's notation "F-¶0010" is a reference to Ex. 1002 ¶ 10 and the notation "Garney-¶¶81-82" is a reference to Ex. 1023 ¶¶ 81–82.  *See* Pet. 1 n.1.

IPR2017-00861
Patent 7,627,708 B2

and *the same* shared USB peripheral device.  As we discussed in our
Decision on Institution, this disclosure of Furukawa may reasonably be
understood to disclose that one USB host is accessing a first USB peripheral
device while simultaneously a second USB host is accessing a different USB
peripheral device—e.g., Furukawa's host 21 may access device 25 while
host 22, simultaneously, accesses device 26.  Thus, in our Decision on
Institution, we were not persuaded that Furukawa expressly discloses
establishing concurrent connections between multiple hosts and one shared
peripheral device and we observed Petitioner had not presented any
argument that the recited concurrent connections would have been inherent
in the teachings of Furukawa.  Dec. 21–22.  For those reasons based on the
preliminary record, we were not persuaded Furukawa discloses, expressly or
inherently, the concurrent connections by multiple hosts to one peripheral
device as recited in independent claim 1 and as similarly recited in each
other independent claim (3, 7, 18, and 23) for which Petitioner presented
similar arguments (*see* Pet. 46–51).

Petitioner filed a Request for Rehearing of our Decision on Institution.
Paper 17 ("Req." or "Request").  In that Request, Petitioner argued that
Furukawa's disclosure that a peripheral device may be coupled to multiple
hosts with "no switching operations" teaches that the connections are made
without a need for reconfiguration or re-enumeration as required by the
claims.  Req. 10 (quoting Ex. 1002 ¶ 3).  Petitioner argued that because
Furukawa shows switching between USB connections without any physical
switches and still obviates the need to unload and reload drivers when
switching connections, Furukawa must be using "data switching" rather than
physical "disconnection switching" as the Petitioner defined those terms in

IPR2017-00861
Patent 7,627,708 B2

its Petition.  *Id.*; *see also* Pet. 19.  We emphasized in our Decision Denying

Petitioner's Request for Rehearing that our Decision on Institution was

based on lack of *express* disclosure in Furukawa of establishing/maintaining

multiple concurrent USB connections that enable alternate access to a shared

function block "without reconfiguring and/or re-enumerating" as required by

the claims.  Paper 20, 5 (citing Dec. 21–22).

Following entry of our *SAS* Order (adding previously denied claims

and grounds into the trial), the parties submitted supplemental briefs

addressing the claims and grounds for which we had initially denied review.

We emphasize, as discussed above, that Petitioner does not argue that

Furukawa inherently discloses any of the claimed features.  Instead, the

Petition and Petitioner's Supplemental Reply argue only that Furukawa

*expressly* teaches the features of claims 1–8, 10, 11, 15–20, and 22–25.  At

oral argument, Petitioner's counsel confirmed that the Petition is not relying

on inherent disclosures of Furukawa.

> JUDGE FISHMAN: The Patent Owner was asserting that
> Petitioner has never argued inherency, and still does not argue
> inherency.  Are you arguing inherency, or are you not arguing
> inherency?

> MR. McKEOWN: We did not present inherency in the
> petition.  The word inherency, I think first appeared in the
> rehearing decisions.  Our position is enumeration reconfiguration
> is disclosed in Furukawa for the same reasons it's disclosed in
> Bohm.  Going back to that prosecution history, when you're
> explaining enumeration and configuring is necessarily there,
> because there's two hosts transmitting at once, and because they
> transmit at once, they don't have to be re-enumerated, we are
> entitled to that same technical basis as they are.  That's what they
> argued.

> In addition to that, and as I pointed out earlier,
> enumeration configuration relates to the loading of drivers, that's

32

IPR2017-00861
Patent 7,627,708 B2

> not in dispute, that's on the Petitioner page 34 th[r]ough 35;
> Furukawa explicitly explains that it's avoiding switching
> overhead. It's avoiding the loading the drivers, and even in the
> USB context, it's able to share a peripheral.
>
> Based upon the testimonial evidence we have in the
> record, our declarant has taken the position that enumeration and
> all of the features of these claims are in the reference. We are
> not saying, by the way, if you enumerate, you have to do this
> other step that's nowhere discussed, and that's inherent, we are
> not arguing that. We are saying, it's in there. The word
> "enumeration" is just not used; instead, they describe it as
> switching drivers, et cetera.

Tr. 54:14–55:10.

In its Supplemental Reply, Petitioner argues Furukawa discloses that
its FIFO buffers (11 and 17) temporarily store packet data "to prevent
collisions of data from multiple hosts." Supp. Reply 4 (citing Ex. 1002 ¶¶ 6,
17). Petitioner then contends "collisions of data would not even be a
concern if Furukawa disclosed that a peripheral could *only* be
configured/enumerated with one host at a time." *Id.* Furthermore, Petitioner
contends our Decision on Institution is inconsistent with the explicit
disclosure in Furukawa of a "system in which multiple hosts simultaneously
access a single peripheral." *Id.* Specifically Petitioner contends Furukawa
discloses problems of prior art switches used to share a peripheral device
among multiple hosts in that "the switching circuit must be operated in a
series of operations" each time a different host is switchably connected. *Id.*
at 5 (quoting Ex. 1002 ¶ 3). Petitioner quotes a portion of paragraph 3 of
Furukawa and summarizes these teachings as, "the prior art switching is
undesirable because it involves a series of operations, and drivers for the one
peripheral device must be loaded and unloaded each time the switching from

33

IPR2017-00861
Patent 7,627,708 B2

one connected host to another connected host is performed." *Id.* at 5–6.
Petitioner then contends that loading and unloading of drivers is a
"conventional" operation of USB hubs and controllers and further contends
enumeration of a USB device is similarly a conventional switching operation
of USB hubs and controllers. *Id.* at 6. Petitioner further contends
Furukawa's proposed solution is "to provide a USB hub that enables **a**
peripheral device to be shared by a **plurality** of computers, and which
requires **no [conventional USB] switching operations**." *Id.* (quoting Ex.
1002 ¶ 3 with the words "conventional USB" added by Petitioner). Based
on the above disclosures, Petitioner contends:

> As noted above, switching operations include the loading and
> unloading of the drivers for the peripheral device and take
> extensive time. By eliminating switching operations,
> Furukawa's invention—described at the same level of detail as
> the '708 patent—results in persistent simultaneous connections
> between the peripheral device and a plurality of hosts (because
> the connections do not have to be setup each time), such that
> "there is **no overhead and having to load and unload the
> device driver** sequentially **each time** . . . a connection is
> established or released." (Ex. 1002 ¶ 5; emphasis added.) Thus,
> with the peripheral's drivers always loaded, the simultaneously
> connected hosts are always in a ready state to send data to, or
> receive data from, a given peripheral. Indeed, Furukawa's
> description of its FIFO memory exchanges is indisputable
> evidence of this simultaneous access.

*Id.* at 6–7.

In response, Patent Owner argues Furukawa discloses only a "one-to-
one" connection between one host and one device and discloses that
"simultaneous access to peripherals only occurs when two hosts request
access to different 'request destination[s]' (i.e., two different peripherals)."
Supp. Resp. 1–2. Patent Owner further argues, "Furukawa's use of FIFOs

34

does not change that it only establishes one-to-one connections." *Id.* at 2. Contrary to Petitioner's argument, Patent Owner contends collisions could arise even in such a one-to-one connection system in which one host at a time connects to the device and then another host can connect to the same device but only after the first connection is released. *Id.* at 3. Therefore, Patent Owner argues, by virtue of each connection being "released" before a next connection is allowed, enumeration and configuration would occur at each switch between hosts—contrary to the recitations of the claims. *Id.* at 3–4.

We remain unpersuaded by Petitioner's supplemental arguments. We agree with Petitioner that Furukawa is directed to solving the same problem as the '708 patent—eliminating overhead of switching between hosts sharing a USB device. Supp. Reply 6 (citing Ex. 1002 ¶ 3 ("The present invention was created in contemplation of the problem areas described above, and the object is to provide a USB hub that *enables a peripheral device to be shared by a plurality of computers, and which requires no switching operation*.") (emphasis added)). Furukawa discloses a problem of prior art switches in that "the switching circuit must be operated in a series of operations" for each switch between connected hosts. Ex. 1002 ¶ 3. Furthermore, Furukawa discloses one such operation asserting that in the prior art "the device driver for the peripheral device must be loaded and unloaded" for each switch between connected hosts. *Id.* However, the only switching operation overhead expressly eliminated in Furukawa is the overhead of loading and unloading devices drivers on the hosts each time a switch is made between two hosts sharing a USB device. *Id.* ¶ 5. Furukawa never expressly discusses elimination of any other type of switching operation

IPR2017-00861
Patent 7,627,708 B2

overhead by its invention.  In particular, we discern no express disclosure in Furukawa that re-enumeration and/or reconfiguration of the peripheral device is eliminated when switching between hosts as required by the independent claims (1, 3, 7, 18, and 23).

Petitioner asserts that the ordinarily skilled artisan would recognize that Furukawa's disclosed "series of operations" or "switching operations" encompasses all overhead operations and, thus, would have understood these operations to include enumeration when a switch is made between connected hosts because such enumeration "is a conventional switching operation of USB hubs" as evidenced by another Japanese patent.  Supp. Reply 6 (citing Ex. 1052[20] ¶¶ 4, 17).  Mr. Garney testifies,

> Furukawa's entire invention is directed to avoiding the conventional USB switching operations of prior art USB hubs. In light of the whole technical disclosure of Furukawa, a [person of ordinary skill in the art] could not understand Furukawa to describe that "normal enumeration and configuration" still takes place when a host "connection" is released.  To take that position does great violence to the disclosure of Furukawa.  Significant portions of Furukawa's disclosure would be rendered superfluous, and the expressed design goals could not be met— e.g., the need to eliminate processing time and overhead each time a host is switched. Patent Owner's unsupported attorney arguments lack any technical basis and completely ignore the functionality of Furukawa's controlling circuit, FIFOs, and NAK packets.

Ex. 1053 ¶ 23.

---

[20] Exhibit 1052 is an English translation of Japanese Unexamined Application 2001-51939.

IPR2017-00861
Patent 7,627,708 B2

We remain unpersuaded by this argument.  Initially, we note Mr. Garney's testimony in this regard is unsupported by any facts or data and, thus, is deserving of little weight.[21]  37 C.F.R. § 42.65(a).  Like the Petition, Mr. Garney's Reply Declaration (Ex. 1053) still fails to identify any express disclosure in Furukawa of eliminating re-enumeration processing in switching between connections.

As previously noted, there is no mention of enumeration (or re-enumeration) anywhere in Furukawa.  There may be reasons Furukawa is silent in this respect.  It may be the case that Furukawa determined, for its purpose, elimination of the overhead of loading and unloading drivers on the host was a sufficient improvement over prior art switches and it need not address other elements of overhead processing such as re-enumeration.  In fact, we find it notable that Furukawa's use of its FIFO stores data *and an address* of the USB device to which the data is destined and uses that address to determine what host is presently connected to the device (i.e., what host presently has set the address for the device—which as presently enumerated the device).  *See* Ex. 1002 ¶¶ 13–15.  In Furukawa's invention, it may be that controlling circuit C (comprising hub repeater 13, hub controller 14, and CPU 15) uses the stored address from the FIFO to perform a re-enumeration or reconfiguration on the destination device because a prior connected host used a different address and a different configuration.  *See id.* ¶ 15.  However, we need not speculate about how Furukawa deals with the

---

[21] Mr. Garney's reliance on paragraphs 4 and 17 of Exhibit 1052 provide no support for his assertion that enumeration is among the "conventional" operations that must be performed for each switch between connected hosts. The word "enumeration" never appears in Exhibit 1052.

IPR2017-00861
Patent 7,627,708 B2

overhead processing of re-enumeration.  It suffices in this case that we are not persuaded that Furukawa expressly discloses that re-enumeration and reconfiguration processing is eliminated, and that Petitioner does not persuasively argue that such a disclosure is inherent in Furukawa.

Independent apparatus claims 3, 7, and 23 and independent method claim 18 include similar recitations to those of claim 1 and Petitioner presents similar arguments for these claims.  Pet. 46–51.

Accordingly, we are not persuaded by a preponderance of the evidence that Furukawa anticipates any of independent claims 1, 3, 7, 18, and 23.

3.      *Dependent Claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25*

Dependent claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claim. Because we are not persuaded Furukawa discloses, expressly or inherently, concurrent connections by multiple hosts to one peripheral device, as recited in each independent base claim from which these dependent claims depend, we also are not persuaded by a preponderance of the evidence that Furukawa discloses every limitation of these claims.

4.      *Conclusion Regarding Anticipation by Furukawa*

For the above reasons, we are not persuaded Petitioner has established by a preponderance of the evidence that any of claims 1–8, 10, 11, 15–20, and 22–25 are unpatentable as anticipated by Furukawa.

IPR2017-00861
Patent 7,627,708 B2

### E.    *Anticipation by Dickens*

The Petition asserts claims 1–8, 11, 15–20, and 22–25 are anticipated by Dickens.  Pet. 55–63.  For the reasons discussed below, we are persuaded that Dickens anticipates claims 1, 3–5, 7, 8, 11, 15, 18–20, 23, and 25.

### 1.    *Dickens (Ex. 1003)*

According to Dickens, prior techniques for sharing a USB peripheral device include use of an Ethernet local area network or switching devices that utilize complex wiring.  Ex. 1003, 1:31–39.  Dickens discloses a data routing device to share a USB peripheral device among a plurality of USB hosts.  *Id.* at 1:45–49.  Figure 1, a version of which is reproduced below,[22] is a schematic illustration of a system using the inventive data routing device.  *Id.* at 5:8–9.



FIG.    1

---

[22] Figures in the Dickens US Patent (Ex. 1003) are hand-drawn and, although understandable, are difficult to view.  The same patent application was filed in Great Britain (GB 2 350 212 A – Exhibit 3001) and Figures 1 and 2 therein are substantively identical but easier to view.  Thus, we reproduce here the Dickens' Figures 1 and 2 from the substantively identical patent application filed in Great Britain.

Figure 1 depicts a system 100 including data routing device 130 coupled with multiple USB host computers 105 through respective USB busses 106 and data converters 110. *Id.* at 5:26–37. Data routing device 130 also is coupled with a plurality of USB peripheral devices 108 through respective USB busses 109 and data converters 120. *Id.* at 5:66–6:11. Data converters 110 and 120 use USB protocols in exchanges with hosts 105 and devices 108, respectively. *Id.* at 5:33–37, 6:9–11. Data converters 110 include emulation functions to emulate the presence of each USB peripheral device 108 in system 100 so that each USB host 105 will detect the peripheral devices as present and configure themselves accordingly. *Id.* at 5:38–43. Data converters 120 include emulation functions to emulate the presence of a USB host on each USB bus 109 associated with each USB peripheral device 108 causing the peripheral devices to communicate with data router 130 through a corresponding converter 120 as though it is connected to a USB host. *Id.* at 6:12–17.

Figure 2 of Dickens, reproduced below[23], is a schematic illustration of elements within the data routing system of Figure 1. *Id.* at 5:9–11

---

[23] This Figure, like the version of Figure 1 reproduced above, is from GB 2 350 212 A.

IPR2017-00861
Patent 7,627,708 B2



FIG. 2

Figure 2 depicts data router 130 (the largest rectangle also labelled as system 100) comprising microprocessor-based controller 140 and PCI bus 132 for coupling to other components within data router 130. *See id.* at 6:29–50. Data router 130 is coupled to two USB host devices 105 through respective data converters each comprising USB device controller 150 and PCI bus interface 152. *Id.* at 6:51–54. Data router 130 is also coupled with USB peripheral devices 180, 182, 184, and 186 via USB busses 109 and corresponding USB host controllers 154, 156, and 158 coupled with PCI bus 132. *Id.* at 6:57–7:8. In particular, USB host controller 156 serves to couple router 130 to printer 182.

In operation, data router 130 of Dickens receives a request for exchange from any host 105 via corresponding data converter 150 and emulates operation of each of the peripheral devices (180, 182, 184, and 186) coupled with router 130. *See id.* at 7:36–45. Information to or from a peripheral device is moved between data router 130 and the peripheral

41

IPR2017-00861
Patent 7,627,708 B2

device via the emulated USB host provided by a corresponding USB host controller 154, 156, or 158. *See id.* at 8:16–41. In other words, data router 130 emulates each attached USB peripheral device for each attached USB host and emulates a requesting USB host for each attached peripheral device.

### 2. *Independent Claims 1, 3, 7, 18, and 23*

Petitioner identifies the recited USB multi-host device as reading on data router 130 of Dickens and the recited first and second upstream ports as reading on data converters 110 (or equivalently 150 of Fig. 2). Pet. 55–56.[24] Petitioner further identifies the recited "USB function block" as reading on any one of Dickens' USB peripheral devices including, for example, printer 182 and identifies the recited multi-host device controller as reading on Dickens' routing controller 140 within data router 130—the routing controller being coupled with two upstream ports (converters 110/150 coupled with USB busses 106) and coupled with the function block (e.g., printer 182). *Id.* at 55–56.

The "wherein" clause of claim 1 requires that the controller be configured to "establish concurrent respective USB connections between the USB function block and the first and second upstream ports" to enable certain recited functions. Petitioner argues Dickens meets this limitation in that controller 140 maintains USB connections with host computers 105 through respective device controllers 150 (upstream ports) and maintains

---

[24] Petitioner quotes a disclosure of Dickens and erroneously cites column 2, lines 12–13 thereof for that quote. The quoted text appears at column 5, lines 29–31 of Dickens. We find the incorrect citation to be harmless error.

IPR2017-00861
Patent 7,627,708 B2

USB connections with printer 182 (a function block) through USB controller 156.  Pet. 57.

Regarding the function of simultaneous enumeration and configuration, Petitioner argues:

> Dickens discloses a USB multi-host device which is simultaneously USB-connected through computer data converters 110 and USB connections 106 to first and second hosts. . . .  The computer data converters 110 include emulation function means that emulate the presence of a keyboard, mouse, printer, and set of speakers on each USB bus connection 106 to the hosts. . . .  This causes each USB host computer to detect the emulated peripherals and configure the emulated peripherals as a matter of configuring the computer data converters 110 of the multi-host device.

Pet. 57–58 (citing Ex. 1003, 5:26–43).  Petitioner contends Dickens' express disclosure of each USB host configuring its corresponding data converter's USB device emulation (110) discloses both configuring and enumerating the peripheral device because enumerating was well-known to be a required step of such initial configuration of a peripheral device by a USB host.  Pet. 58.

Petitioner further contends the recited simultaneous access by multiple USB hosts and the recited alternating access to the function block read on Dickens' disclosure of simultaneous access by multiple USB hosts to printer 182 via data router 130 such that data to be printed may be received simultaneously by router 130 from any two USB hosts (the recited simultaneous access) but data from the second USB host will be buffered while the data from the first host is being transmitted from data router 130 to printer 182 (the recited alternating access).  Pet. 58–60 (citing Ex. 1003, 9:21–27).

IPR2017-00861
Patent 7,627,708 B2

Notwithstanding Patent Owner's arguments, which we have considered and which we address below, we are persuaded by Petitioner's showing, which we adopt as our own findings and conclusions, that independent claims 1, 3, 7, 18, and 23 are anticipated by Dickens.

### a.    *Dickens Discloses the Claimed "Device"*

Patent Owner argues Dickens does not anticipate claim 1 because "Petitioner improperly attempts to combine portions of separate USB devices to conclude the claims of the '708 Patent are anticipated" and, thus, the elements of Dickens are not arranged as in the claim.  PO Resp. 19. Specifically, Patent Owner agues the Petition improperly combines two separate pieces of hardware in Dickens to read on the claimed multi-host device—namely data routing device 100 and printer 182.  *Id.* at 20 (citing *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008). By contrast, based on its proffered construction of "device" (Paper 30, 1–3), Patent Owner contends claim 1 is directed to **_a_** device—*i.e.,* an integral device—that comprises the recited structures within the device and provides the recited functionality.  *Id.*

Petitioner argues that Patent Owner's arguments are based on an incorrect interpretation of "device," as claimed, as limited to an integral, unitary device comprising the recited elements.  Reply 16.

We agree with Petitioner.  Patent Owner's argument is not persuasive because it is based upon an overly narrow construction of "device," which we decline to adopt for the reasons discussed above.

Therefore, we are persuaded by Petitioner's arguments that the claimed "device" is disclosed by Dickens as the combination of routing

IPR2017-00861
Patent 7,627,708 B2

device 100 (including controller 140 read as the recited multi-host
controller) and printer 182 (read as the recited function block).

### b.     "USB Connections"

Patent Owner argues Dickens does not disclose the claimed "USB
connections" because, although Dickens' routing device 100 establishes a
USB connection between it and the host computers and between it and the
peripheral devices, all exchanges are converted to PCI bus exchanges within
the routing device.  PO Resp. 25–26.

We agree that Dickens converts all USB exchanges between an
attached USB host and an attached USB peripheral from USB protocols to a
PCI bus (or other non-USB processor bus) and its associated non-USB
protocols.  Patent Owner's argument is not persuasive, however, because it
is based upon an overly narrow construction of "USB connection," which
we decline to adopt for the reasons discussed above.

Therefore, we are persuaded by Petitioner's arguments that the
claimed "USB connections" are disclosed by Dickens in that, as discussed
*supra*, controller 140 maintains USB connections with host computers 105
through respective device controllers 150 (upstream ports) and maintains a
USB connection with printer 182 (a function block) through USB controller
156.  Pet. 57.  Thus, all exchanges to and from an attached host 105 are over
a USB bus 106 using USB protocols and all exchanges to and from an
attached peripheral (printer 182) are over a USB bus 109 using USB
protocols.  Any intervening non-USB exchanges, such as over a PCI bus, are
transparent to host 105 and printer 182 and, therefore, are within the scope
of a "USB connection" as we have construed the term ("direct and indirect

IPR2017-00861
Patent 7,627,708 B2

connection, both with and without intervening interconnect, using USB
protocols.").

<p style="text-align:center"><em>c.      "Concurrent USB Connections"</em></p>

All claims require two concurrent USB connections—a first between
a first host (or upstream port) and the function block, and a second between
a second host (or upstream port) and the function block.  In accordance with
our construction of "concurrent," the two USB connections must be
"operating or occurring at the same time."

Based on the preliminary record in our Decision on Institution, we
were persuaded Dickens anticipates independent claim 1.  Dec. 32.
Dickens' data router 130 comprises a plurality of data converters 110 (each
converter comprising 150 USB device controller), each data converter 110 is
coupled with a corresponding USB host 105 via a corresponding USB bus
106.  Ex. 1003, 5:14–37, Fig. 1; *see also id.* at 7:31–49, Fig. 2; Pet. 57.
Thus, Dickens provides concurrent USB connections between data router
130 and USB hosts 105 via corresponding "upstream ports" (the converter
associated with each USB host through the corresponding USB bus).
Dickens further discloses data router 130 comprises a data converter 120
(comprising USB device controller 156) coupled with a corresponding USB
peripheral device (printer 182) via a corresponding USB bus 109.  Ex. 1003,
5:66–6:28, Fig. 1; *see also id.* at 8:4–41, Fig. 2, Pet. 57.  Data router 130,
therefore, maintains concurrent USB connections with multiple USB hosts
105 and a USB connection with a USB peripheral device printer 182 (a USB
"function block")—all such connections operable at the same time in accord
with our interpretation of "concurrent."  Thus, multiple USB hosts (105) are

<div style="text-align:center">46<br>Appx_824</div>

IPR2017-00861
Patent 7,627,708 B2

concurrently connected with a shared printer (182) using USB protocols, as required by claim 1.  Data router 130 is an intervening element in the concurrent USB connections in which USB exchanges between the USB hosts and the shared printer are converted between USB protocols and another non-USB structure/protocol for use within data router 130.  As discussed *supra*, in view of our interpretation of "USB connection," claim 1 does not preclude such an intervening element that converts between USB protocols and other formats/protocols.

After considering the issue anew based on the parties' evidence submitted at trial, a preponderance of the evidence leads us to the same conclusion.  Patent Owner argues "[t]he fact that there is only a single connection to Dickens' printer (the claimed 'USB function block') precludes a finding of anticipation."  PO Resp. 33.  Patent Owner further argues,

> Indeed, one of ordinary skill in the art would understand that the single USB connection to Dickens' printer 182 only allows print data from one host at a time.  Knapen ¶ 98; *see also* [Ex. 1003], 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis.  Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

*Id.* at 34.

We disagree.  Patent Owner's argument conflates the USB connections with the ability to transfer data concurrently or simultaneously.  Petitioner argues, and we agree, "Figure 3 of the '708 Patent is no different: one arrow between the '708 Patent controller and device/function is the only way data is transferred, and data must necessarily communicate over this depicted-as-single arrow from each of the illustrated hosts."  Reply 16.

IPR2017-00861
Patent 7,627,708 B2

There is only a single physical connection between Dickens' routing device 100 and any one peripheral device (e.g., printer 182) in exactly the same manner as in the '708 patent in which there is a single physical connection between multi-host controller 108 and device/function 312 in Figure 3. Through that single physical connection in the '708 patent, data may be exchanged alternately (as clearly expressed in the claim and as discussed further below). *See* Ex. 1001, 2:64–3:1 ("The internal arbitration mechanism may enable each host to access the shared Peripheral Function by either interleaving host accesses, or by using a common request/grant structure, which may hold-off one host while another host completes a data transfer to/from the shared device."). A switch of data transfer with two hosts is performed in Dickens in precisely the same manner. *See* Ex. 1003, 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

While the data transfers may switch between hosts in Dickens and in the '708 patent, the USB connections from any two USB hosts 105 in Dickens to printer 182 are established and remain established regardless of whether data is presently being transferred. Dickens' routing controller 140 within data router 130, like multi-host controller 108 in the '708 patent, arbitrates or alternates data transmissions in accordance with any desired algorithm (an algorithm that is unspecified by the '708 patent Specification and claims). *See, e.g.,* Ex. 1003, 9:1–34 (audio alarms states from two computers are monitored and a printer is shared between established host connection based on a timeout period).

48

IPR2017-00861
Patent 7,627,708 B2

Thus, USB connections in Dickens between two hosts 105 (or upstream ports) and the printer 182 are established and remain so as data exchanges may alternate among the two hosts and, hence, operate *or occur* at the same time once established.

> d.     *Simultaneous Access, Enumeration, and Configuration*

Patent Owner argues,

> The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously enumerate or configure printer 182. Knapen ¶ 108. In other words, printer 182 is enumerated and configured, if at all, by one and only one host—host controller 156. *Id.* ¶ 109.

PO Resp. 35. Patent Owner further argues "Petitioner's expert conceded at deposition that there would be no configuration of Dickens' emulated printers." *Id.* Patent Owner further argues "emulated printers are separate devices implemented in the data routing device 100" and, thus are not the device to be simultaneously enumerated. *Id.* at 36. Patent Owner contends, "[t]he emulated printers are enumerated independently from printer 182, the device that includes the 'USB function block.'" *Id.* (citing Ex. 2007 ¶ 110).

We disagree. Initially, we observe the claims refer to enumeration and configuration of the USB multi-host device (or USB device), not the function block or peripherals physically coupled to the device. The emulated peripheral devices (converters 110) are clearly a part of routing device 100—converters 110 provide emulation of the various peripheral devices. Each host 105, operable independent of other hosts, interacts with its corresponding converter 110 to enable simultaneous enumeration and configuration. Thus, contrary to Patent Owner's assertions, enumerating and

IPR2017-00861
Patent 7,627,708 B2

configuring the emulated printers (converters 110) within routing device 100 clearly discloses simultaneous enumerating and configuring the routing device (the claimed USB multi-host device or USB device).

The concurrent USB connections disclosed by Dickens allow the functions required by claim 1—namely, simultaneous enumeration and configuration of the multi-host device, simultaneous access to the multi-host device, and alternating access to the USB function block. Dickens' data router 130 (the recited multi-host device) provides emulation functions in each converter 110 coupled with a corresponding USB host 105 to emulate the presence of each USB peripheral device coupled with the router for each of multiple USB hosts coupled through the converters. Pet. 57–58 (citing Ex. 1003, 5:26–41). Thus, each USB host, coupled through its respective data converter, senses the emulated presence of each USB peripheral device (e.g., printer 182) and performs standard USB configuration and enumeration of the emulated peripheral devices. Ex. 1003, 5:41–47 ("This causes each of the USB host computers to detect the presence of each of these peripherals and configure themselves accordingly. Once configured[,] the computers communicate with the computer data converter circuits as if they were connected to a USB peripheral bus that is attached to a USB keyboard, mouse, printer and set of speakers.").[25] Thus, each USB host configures and enumerates the multi-host device (data router 130) by configuring and enumerating the emulated printer provided by the corresponding data converter coupling the USB host to the router. Because

---

[25] The "configuration" referred to (when a USB host first senses the presence of a USB peripheral device) is known to include configuration and enumeration of the sensed device. Pet. 58; Ex. 1023 ¶ 109.

IPR2017-00861
Patent 7,627,708 B2

each USB host 105 is coupled through a respective converter 110, exchanges between one USB host and the router to configure and enumerate its emulated printer proceed independent of exchanges between another USB host and the router to configure and enumerate its respective emulated printer. Thus, two USB hosts configure and enumerate the multi-host device simultaneously.

Such simultaneous configuration and enumeration also meets the limitation of simultaneous access by multiple hosts to the multi-host device because multiple USB hosts (105) can simultaneously access the multi-host device (router 130) by configuring and enumerating the emulated USB printer provided by the corresponding data converter (110) coupling the router to the host. Furthermore, Dickens discloses that multiple USB hosts may access router 130 (the multi-host device) to send data to printer 182 such that the data from one USB host will be forwarded to the printer while data from the other host(s) will be buffered until the transfer of the first host completes. Pet. 59 (citing Ex. 1003, 9:21–27). Thus, multiple USB hosts are simultaneously accessing data router 130 to send data to printer 182, meeting the function required by claim 1.

Dickens further discloses enabling the alternating access to the function block without reconfiguring or re-enumerating as recited in claim 1. As above, Dickens discloses that data from a second USB host destined for the USB printer will be buffered while data from a first USB host is being forwarded through router 130 to printer 182. Pet. 59 (citing Ex. 1003, 9:23–27). Thus, when the data from the first USB host completes its transfer or encounters a pause, router 130 will alternate to forwarding data buffered from another USB host to the printer and need not reconfigure or re-

51

IPR2017-00861
Patent 7,627,708 B2

enumerate the USB connection because each USB connection remains connected.  Pet. 59–60 (citing Ex. 1003, 3:23–24, 9:20–30; Ex. 1023 ¶ 112). In other words, the connection between the emulated USB host within converter 156 and printer 182 and the connections between USB hosts 105 and the respective emulated printer devices within corresponding converters 110 remain connected as the data transfer alternates between the first host connection and the second host connection.

> e.    *Conclusion Regarding Anticipation of Independent claims 1, 3, 7, 18, and 23*

For the above reasons, we are persuaded by a preponderance of the evidence that independent claim 1 is unpatentable as anticipated by Dickens.

Petitioner contends independent claims 3, 7, 18, and 23 are anticipated by Dickens for the same reasons as claim 1.  Pet. 60.  Patent Owner argues the Petition fails to establish anticipation of claims 3, 7, 18, and 23 for the same reasons as claim 1.  *See* PO Resp. 19–37.  Thus, for the same reasons as claim 1, we are persuaded by a preponderance of the evidence that independent claims 3, 7, 18, and 23 are unpatentable as anticipated by Dickens.

3.    *Dependent Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25*

Dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claims.  Petitioner identifies the further limitation of each of dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 in the disclosures of Dickens.  Pet. 60–63.

IPR2017-00861
Patent 7,627,708 B2

a.      *Claims 2, 6, and 16*

Claims 2, 6, and 16 depend, directly or indirectly, from claims 1, 3, and 7, respectively, and each recites endpoint buffers positioned between respective upstream ports and the controller (e.g., endpoint & status 306 and 308 between upstream ports 302 and 304, respectively, and controller 108 in Figure 3 of the '708 patent).  The Petition contends, in Dickens, "DRAM memory 144 is coupled between the upstream ports and Dickens' device's data routing controller 140" thereby meeting the claim limitation.  Pet. 60.

As drawn in Dickens' Figure 2, DRAM memory 144 is not positioned physically between controller 140 and upstream ports (e.g., USB controllers 150).  Patent Owner argues precisely this physical difference contending DRAM memory 144 is not between controller 140 and the upstream ports, instead, "DRAM 144 is actually inside the multi-host device controller (i.e., routing controller 140)."  PO Resp. 38.

Petitioner argues "coupled between" should be construed to include "directly or indirectly connected" as coupled is defined in the '780 patent. Reply 12 (quoting Ex. 1001, 3:40–41).  Petitioner supports this assertion citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310–11 (Fed. Cir. 2005) (A "'connection' can occur between . . . two devices regardless of whether they are housed separately or together.  Indeed, the two components could be connected . . . and still be located in the same housing or even on the same circuit board.").  Reply 12.  Petitioner concludes that "coupled between" should be understood to mean "directly or indirectly connected with or without physical separation from what is connected."  *Id.*

IPR2017-00861
Patent 7,627,708 B2

Patent Owner argues that, although "coupled" is defined in the '708 patent as directly or indirectly connected, "between" should have its plain and ordinary meaning and, thus, "one of ordinary skill would understand the endpoint buffer 'coupled between' the upstream port and the multi-host device controller is directly or indirectly connected in the middle of those two structures."  PO Sur-Reply 9.

We are not persuaded by Petitioner's argument and we agree with Patent Owner that, based on the plain and ordinary meaning of "coupled between," Dickens DRAM memory 144 is not "coupled between" controller 140 and upstream ports.  "Between" provides a specific structural limitation in these claims that cannot be ignored.  Thus, we are not persuaded that claims 2, 6, and 16 are anticipated by Dickens.

### b.      Claim 25

Claim 25 depends from claim 23 and recites, *inter alia*, that the controller comprises USB interface circuits that enable the USB device to exchange data over a USB bus.  The Petition identifies Dickens' host controller circuits 150 as the recited USB interface circuits.  Pet. 61.  Patent Owner argues circuits 150 are not within controller 140 of Dickens, identified as the recited controller of claim 25.  PO Resp. 38.

Petitioner argues the transition phrase "comprising" means an element is essential but does not require the element be located inside a particular housing.  Reply 13 (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003)).

Patent Owner contends the recitation that controller "comprises . . . USB interface circuits" means "the respective interface circuits are essential

54

IPR2017-00861
Patent 7,627,708 B2

to or included in the controller" and that the record does not support Petitioner's contentions that the recitation is met regardless of "whether [the USB interface circuits are] located inside or outside a housing with the controller." PO Sur-Reply 10.

Petitioner reiterates that the transition phrase "comprising" does not necessarily mean "included in" the recited structure. Pet. Sur-Sur-Reply 12–13.

We are persuaded by Petitioner's arguments. The '708 patent Specification does not discuss the claimed "USB interface circuits" let alone where such circuits physically reside. Whereas "between," as discussed above, provides a specific structural limitation, as discussed *supra* with respect to construing the term "device," the '708 patent is not about packaging or integration of the elements of the claims—it is directed to alleged new features to enable sharing of a USB device by multiple hosts.

Dickens does not require interface circuits 150 physically reside inside or outside the dashed line box that represents controller 140. Indeed, as Petitioner argues (Pet. Sur-Sur-Reply 14), Dickens specifically discloses, "The data router includes a data routing controller 140. Aspects of the data routing controller are distributed [throughout] the data router 130." Ex. 1003, 6:39–41. Just as a dashed line may be drawn around distinct components of Dickens Figure 2 to identify the claimed "device" (*see* section II.A.4.b), we can redraw the dashed line in Dickens' Figure 2 to include host controllers 150 within controller 140. An ordinarily skilled artisan would reasonably infer such a configuration from Dickens. *See Preda*, 401 F.2d at 826. The recited USB interface circuits may be packaged with or packaged separately from the circuits that perform the recited

IPR2017-00861
Patent 7,627,708 B2

functions of the multi-host controller in claim 23, from which claim 25
depends.  The ordinarily skilled artisan, with experience in USB device
design, would "at once envisage" both such physical packaging options
based on the express disclosures of Dickens' Figure 2, its express disclosure
that elements of its controller 140 may be distributed throughout router 130,
and the lack of any limiting description of the claimed "USB interface
circuits" in the '708 patent Specification.  *See Kennametal,* 780 F.3d at
1381.  The Federal Circuit has similarly held that "comprising" need not
require the claimed element be physically "inside" the element in which it is
"comprised":

> The district court incorrectly interpreted the term "comprising"
> in claim 15 of the '543 patent to require that all six elements must
> be contained inside a single enclosure.  We have recognized that
> 'comprising' is a term of art that means "including but not
> limited to."  *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356,
> 1360 (Fed. Cir. 2007).  The use of the word "comprising" only
> means that the plugstrip must have at least all six of the claimed
> elements, but not that all six elements must be contained in a
> single enclosure.

*Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 F. App'x 1030, 1034
(Fed. Cir. 2016).  We agree.

Thus, we are persuaded by a preponderance of the evidence that claim
25 is unpatentable as anticipated by Dickens.

### c.   *Claims 17, 22, and 24*

Claims 17, 22, and 24 depend, directly or indirectly, from claims 7,
18, and 23, respectively, and further recite that the controller maintains
address, configuration, and response ("ACR") information for each
connected host.  The Petition argues, "Dickens thereby discloses that the

56

IPR2017-00861
Patent 7,627,708 B2

multi-host device controller allows the hosts to alternately access the USB function block without reconfiguring and/or re-enumerating the USB multi-host device each time the hosts alternate accessing the USB function block that is the Dickens printer."  Pet. 62 (citing Ex. 1023 ¶ 119).

> Patent Owner argues:
>
> Petitioner fails to explain or identify any disclosure in Dickens where routing controller 140 "maintain[s] respective dedicated address, configuration, and response information for each of the plurality of hosts."  Rather, Petitioner merely rehashes the "non-re-configuration and non-re-enumerating" argument of Claim 1 without specifically identifying in Dickens where the additional limitations of these dependent claims are allegedly found. Petition at 61–62.  The only Dickens passage Petitioner cites is column 9, lines 20–35.  *See id.*  Neither this passage—nor anything else in Dickens—expressly discloses the multi-host device controller (i.e., routing controller 140) maintaining address, configuration, and response information for each of the hosts.  And to the extent, Dickens might maintain address, configuration, and response information, it might do so outside of the "multi-host device controller."  Dickens does not, therefore, anticipate Claims 17, 22, and 24.

PO Resp. 39.

Petitioner argues "maintaining" the recited ACR information equates with "establishing a dedicated connection 'without needing [the device] to be re-configured or re-enumerated . . . .'"  Reply 14 (quoting Ex. 1001, 2:12–15).

We are not persuaded by Petitioner's argument.  We agree with Patent Owner that the Petition fails to identify where Dickens teaches that the controller maintains the recited ACR information.  Petitioner's argument in its Reply attempts to construe the recited element so as to coincide with the Petition's arguments directed to re-enumeration and reconfiguration.  We

IPR2017-00861
Patent 7,627,708 B2

discern no need for construction of the recited element beyond its plain meaning—namely that the control maintains the recited ACR information. Although the recitation may be inherent or suggested in Dickens, the Petition simply fails to identify an express teaching of this feature in Dickens. Thus, we are not persuaded by a preponderance of the evidence that claims 17, 22, and 24 are anticipated by Dickens.

> d.  *Claims 4, 5, 8, 11, 15, 19, and 20*

The Petition identifies the features of these dependent claims in Dickens (Pet. 61–63) and Patent Owner does not rebut these assertions (*see* PO Resp.). We are persuaded by a preponderance of the evidence that claims 4, 5, 8, 11, 15, 19, and 20 are anticipated by Dickens.

### F.  *Obviousness over Either Furukawa or Dickens, and Chen*

The Petition asserts dependent claims 9, 11–14, and 21 are unpatentable as obvious over either Furukawa or Dickens, in combination with Chen. Pet. 64–70. Claims 9 and 11–14 depend (directly or indirectly) from claim 7, and claim 21 depends from claim 18. Claims 9, 11, 12, and 21 recite limitations relating to interleaving processing of requests received from USB hosts. Claims 13 and 14 recite limitations relating to distribution of bandwidth in processing of requests from multiple USB hosts. Petitioner relies on Chen, in combination with either Furukawa or Dickens, for disclosing the interleaving and bandwidth related limitations. *Id.*

In view of our findings *supra* regarding Furukawa, we do not further consider the alternative of Furukawa in combination with Chen because the

IPR2017-00861
Patent 7,627,708 B2

Petition does not rely on Chen for any deficiency of Furukawa discussed *supra*.

### 1.   Chen (Ex. 1005)

According to Chen, USB flash memory devices that operate as disk drives to a personal computer ("PC") are each assigned a drive letter by the PC operating system software. Ex. 1005, 1:47–57. Chen further discloses that several such flash memory USB drives may be added to a PC using USB hubs to expand the number of USB devices accessible to the PC. *Id.* at 1:19–20. However, according to Chen, the number of such flash memory drives could exceed the number of possible drive letters in the PC operating system. *Id.* at 1:58–67. Chen purports to resolve this problem by providing an enhanced USB hub capable of operating as a standard USB hub or, in a "single-endpoint mode" of operation, as an enhanced hub that aggregates downstream USB flash memory disk drives into one logical USB endpoint as detected by the PC operating system and hence as a single device or drive letter. *Id.* at 2:53–64.

Chen's Figure 2, reproduced below, is a block diagram of a USB switch that aggregates multiple flash memory endpoints coupled thereto into a single endpoint for the USB host (PC). *Id.* at 2:13–14.

IPR2017-00861
Patent 7,627,708 B2



## FIG. 2

Figure 2 depicts USB switch 30 coupled with USB host 10 through USB controller 12 to receive and process requests over USB bus 18. *Id.* at 2:53–57. Mode logic 26 controls switch 30 to selectively operate in the single-endpoint mode. *Id.* at 2:59–61.

When operating in single-endpoint mode, USB switch **30** acts as the final USB endpoint for transactions on USB bus **18** to host **10**. USB switch **30** generates USB transactions on hidden USB buses **28** to USB flash storage blocks **22, 23, 24**. USB flash storage blocks **22, 23, 24** respond to USB switch **30** over hidden USB buses **28** with USB switch **30** acting as the USB host on hidden USB buses **28**. USB switch **30** then forwards data to host

IPR2017-00861
Patent 7,627,708 B2

> **10** by acting as the endpoint.  Thus[,] USB flash storage blocks
> **22, 23, 24** are hidden from host **10** when mode logic **26** activates
> the single-endpoint mode.

*Id.* at 3:5–14.

Chen further discloses that, when operating in the single-endpoint
mode to aggregate multiple flash memory drives into a single endpoint,
transaction packets may be re-ordered.  *Id.* at 3:63–66.  For example,
"Rather than have all packets for a first transaction complete before the next
transaction begins, packets for the next transaction can be re-ordered by
USB switch **30** and sent to the memory devices before completion of the
first transaction."  *Id.* at 4:2–6.  Chen's Figure 5 shows exemplary re-
ordering of transaction packets and Chen discloses that "[d]ata throughput
can be improved using such packet re-ordering."  *Id.* at 5:49–50.

### 2. *Motivation to Combine Dickens and Chen*

Petitioner identifies motivation for the proposed combination by
referring to "MPEP [Chapter 2143] rationales (C) and (G) as stated in detail
by Garney ¶¶124-149."  Pet. 67.  As discussed in our Decision on
Institution, to the extent that arguments are found only in the Declaration of
Mr. Garney, we determine those arguments are improperly incorporated by
reference (37 C.F.R. § 42.6(a)(3)), and we decline to consider them.

However, Petitioner also argues that the ordinarily skilled artisan
would have been motivated to combine Chen's interleaving with Dickens'
system because Chen's known techniques of interleaving USB host
transactions would improve throughput in the similar system of Dickens in a
similar manner and because Chen specifically teaches its interleaving
technique improves data throughput.  Pet. 67–68.  Specifically, Petitioner

IPR2017-00861
Patent 7,627,708 B2

contends it would have been obvious to improve throughput for any or all of multiple USB hosts sending transactions to USB peripheral devices in Dickens by adding Chen's interleaving features to Dickens' data router.  *Id.* Petitioner further contends the ordinarily skilled artisan would have recognized that "interleaving transactions from two or more hosts is not different than interleaving transactions from one host."  *Id.* at 68.

Patent Owner argues the ordinarily skilled artisan would not have been motivated to combine Dickens and Chen because "1) Dickens expressly teaches away from a combination with Chen, 2) combining Chen with Dickens would render Dickens inoperable, and 3) Petitioner's proposed combination does not improve Dickens, does not apply Chen's 'improvement' technique in the same way as it is used in Chen, and does not result in predictable results."  PO Resp. 40–41.  We address each argument in turn.

a.   *Dickens Does Not Teach Away From Chen's Interleaving*

Patent Owner argues Dickens teaches sharing a printer among multiple hosts relying on a timeout period to determine when to switch between host requests and, thus, teaches away from Chen's interleaving of print data from multiple hosts.  PO Resp. 42–43.

Petitioner argues Dickens teaches connecting a plurality of hosts to any number of peripheral devices.  Reply 22.  Although a printer as an exemplary peripheral device is discussed with respect to other aspects of the Petition, Petitioner argues the combination with Chen was proposed based on a mass storage device, such as in Chen and as identified in the '708 patent, as the shared peripheral.  *Id.* (citing Ex. 1001, 2:26–27, 4:10).

IPR2017-00861
Patent 7,627,708 B2

Petitioner correctly argues that a teaching away must clearly discredit or discourage the proposed combination.  Reply 21; *see In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *see also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed . . . .").  Dickens does not clearly discredit Chen's interleaving approach.  The timeout features to switch between host print jobs is disclosed in Dickens only for sharing of a printer peripheral device.  Other peripheral devices, such as speakers 180, need not use timeouts.  Mr. Garney, Petitioner's expert, testifies that Chen's interleaving may be beneficially used to interleave multiple hosts sending transactions to other types of peripheral devices such as Dickens' speakers 180.  Ex. 2006, 135:7–22.  Mr. Garney further testifies that Chen's interleaving may be beneficially applied to interleave print jobs for certain types of printer generating a small volume of printed output such as a label printer.  *Id.* at 136:16–25.

Thus, we are persuaded that Dickens' exemplary use of a printer as a shared peripheral device does not discredit or discourage use of Chen's interleaving and, thus, does not teach away from the proposed combination.

b.     *Combination Does Not Render Dickens Inoperable*

Patent Owner argues combining Chen with Dickens renders Dickens inoperable because Chen teaches interleaving transactions (that comprise multiple packets) by interleaving the multiple packets of multiple transactions, each destined to different downstream device—i.e., a different downstream memory device.  PO Resp. 44.  Patent Owner argues this is only

IPR2017-00861
Patent 7,627,708 B2

because, in Chen, each downstream memory device would receive packets destined to the device in the proper sequence. *Id.* By contrast, Patent Owner argues, where the destination is a single device, the interleaving of packets from different host transactions (such as multiple hosts sharing a single peripheral device as in Dickens) would risk packets arriving out of sequence, thus, violating USB protocols and rendering the combination inoperable. *Id.* at 44–45.

Petitioner argues Patent Owner's arguments are based on a hypothetical out of order sequence of interleaved packets but Chen does not disclose such a sequence. *See* Reply 24.

We are persuaded by Petitioner's arguments. Chen's Figure 5 depicts an exemplary sequence of re-ordering received packets for two transaction from one host. The description of Figure 5 explains a carefully designed sequence of operations to enable interleaving of packets of a transaction in a manner that precludes out of order packets. *See* Ex. 1005, 4:62–5:54. This specific sequence need not be applied by rote in the proposed combination with Dickens and, thus, Patent Owner's hypothetical inoperability arises from rote bodily incorporation of the references. "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements. . . . Rather, the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." *In re Mouttet*, 686 F.3d 1322, 1332–33 (Fed. Cir. 2012); *see also MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 (Fed. Cir. 2015) ("[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference" (citation

IPR2017-00861
Patent 7,627,708 B2

omitted)), *cert. denied*, 137 S. Ct. 292 (2016).  We are persuaded by
Petitioner's arguments that the ordinarily skilled artisan, with knowledge of
the USB specification and experience in the design of USB devices, would
have understood how to apply the suggestions of Chen to interleave
transactions in the context of Dickens' multiple hosts accessing a shared
peripheral device.

<div align="center">

*c.*    *Combining Chen With Dickens Improves Dickens*
</div>

Patent Owner argues the proposed combination does not improve
Dickens because the combination renders Dicken inoperable.  PO Resp. 46.
For the reasons discussed *supra*, we disagree.  The proposed combination
does not render Dickens inoperable.

Patent Owner further argues the Petition fails to explain how Chen's
interleaving improves Dickens because "Chen's system is fundamentally
different."  *Id.*  Patent Owner argues, "Chen is a switch between a single
host and multiple downstream devices whereas Dickens' is a switch between
multiple hosts and a single device."  *Id.*  Patent Owner contends, "[t]o the
extent one of ordinary skill could find some way to make the combination
operable, it would have to be in some way other than as described in Chen."
*Id.* at 47.

Petitioner argues the alleged fundamental difference is incorrect
because Chen discloses a single device made up of blocks.  Reply 25.

We are persuaded by Petitioner's arguments.  Figure 5 of Chen
describes the interleaving of packets for multiple transactions when
operating in its disclosed "single-endpoint" mode of operation in which the
host sees the multiple memory devices as a single USB device.  *See* Ex.

<div align="center">

65

Appx_843
</div>

IPR2017-00861
Patent 7,627,708 B2

1005, 2:59–3:4. As above, an ordinarily skilled artisan, with knowledge of
the USB specification and experience designing USB devices, would have
understood that Chen's two interleaved transactions could be two
transactions from two separate hosts as in Dickens. Thus, we are persuaded
that the proposed combination would have been operable and that the
improvements of Chen's interleaving would have been suggested to the
ordinarily skilled artisan to improve throughput of multiple transactions
from multiple hosts directed to a shared, single-endpoint, peripheral device.

   d.   *Conclusion Regarding Motivation To Combine Dickens and Chen*

   For the reasons discussed below, we are persuaded Petitioner has
provided a sufficient reason/motivation for the combination of Chen's
interleaving with Dickens' device to improve throughput based on rational
underpinnings.

   3.   *Claims 9, 11–14, and 21 Obvious Over Dickens and Chen*

   Patent Owner does not respond to Petitioner's substantive arguments
regarding obviousness of claims 9, 11–14, and 21. Thus, we are persuaded
by a preponderance of the evidence that claims 9, 11–14, and 21 would have
been obvious over the combination of Dickens and Chen.

   G.   *Obviousness over Either Furukawa or Dickens and USB 2.0*

   In this asserted ground, Petitioner argues, in its entirety:

      Just as either Furukawa or Dickens in view of Chen
   invalidates claims 9, 11–14, and 21, as in ground 3, either
   Furukawa or Dickens in view of USB 2.0 invalidates claims 9,
   11–14, and 21. USB 2.0 also has interleaving, as does Chen.
   Garney-¶¶ 20, 143-149. The combination invalidates under

IPR2017-00861
Patent 7,627,708 B2

MPEP rationales (D) and (G).  *Id.  See also* Garney '190 E1019-1:52-2:7.

Pet. 71.

Contrary to our rules, Petitioner's assertions in this ground improperly incorporate by reference discussion from MPEP and Mr. Garney's Declaration.  37 C.F.R. § 42.6(a)(3).  We do not consider such improperly incorporated arguments from another document.  The arguments presented within the Petition are inadequate to identify where each element is taught or suggested in the prior art.  *See* 37 C.F.R. § 42.104(b)(4) ("[t]he petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon").

Thus, Petitioner has not shown, by a preponderance of the evidence, that claims 9, 11–14, and 21 are unpatentable as obvious over either Furukawa or Dickens in combination with USB 2.0

### H.    *Obviousness over Wurzburg, Osakada, and Either Furukawa or Dickens*

For this ground, the Petition asserts, "Bohm claims 1-25 are invalid for obviousness over *Wurzburg in view of Osakada, as in prosecution*, in view of either Furukawa or Dickens."  Pet. 71 (emphasis added).  We observe Wurzburg and Osakada were not asserted as a combination during prosecution of this patent application or in prosecution of the parent patent application.  In the last Office Action before allowance of the parent patent application, Wurzburg was applied as an anticipatory reference to claims 1, 3–5, 7–9, 11, 12, 15, and 17–24 and applied in a single reference

IPR2017-00861
Patent 7,627,708 B2

obviousness rejection for dependent claims 2, 6, 16, and 25.[26]  *See* Ex. 1014, 12, 25–30.  In an earlier Office Action in the parent patent application's prosecution, Osakada was applied in both an anticipation rejection and a single reference obviousness rejection.  *Id.* at 51–56.  Even if such prior Office Actions were properly incorporated by reference, Petitioner has not identified, nor do we discern, anywhere in the record where Wurzburg and Osakada have been previously applied in combination for an obviousness rejection.  Thus, the Petition fails to "specify where each element of the claim is found in the prior art patents or printed publications relied upon" as required by our rules.  37 C.F.R. § 42.104(b)(4).

Petitioner further argues the combination of Wurzburg and Osakada "lacked only concurrent connections as opposed to non-concurrent connections, simultaneous access instead of non-simultaneous access, and non-reconfiguring during access, as opposed to configuring during access."  Pet. 71.  Petitioner then asserts Furukawa teaches these missing features.  *Id.*  As discussed *supra*, we are not persuaded that Furukawa expressly or inherently teaches these features.[27]

For at least the above reasons, we are not persuaded by a preponderance of the evidence that claims 1–25 are unpatentable as obvious over Wurzburg in view of Osakada, and either Furukawa or Dickens.

---

[26] As noted *supra*, the claims of the parent patent application are nearly identical to those of the '708 patent.

[27] Petitioner is silent in this ground with respect to specific teaching in Dickens to be added to the proposed combination of Wurzburg and Osakada. Petitioner does not even attempt to incorporate by reference, however improper, earlier arguments regarding teachings of Dickens to be added to the proposed combination.

IPR2017-00861
Patent 7,627,708 B2

I.      *Obviousness over Either Furukawa or Dickens, Chen, and
Other Art*

Petitioner's argument for this ground, in its entirety, reads:

> To any extent Bohm's owner asserts lack of anticipation
> of claims by Furukawa or Dickens, the claims are invalid for
> obviousness under 35 U.S.C. §103 from either Furukawa or
> Dickens, Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and
> all other cited art.  Both Furukawa and Dickens disclose a multi-
> host USB device with a USB multi-host device and controller,
> their structures, and associated connections and functionalities,
> that provide connections to USB devices by multiple hosts
> without re-enumeration and reconfiguration of the devices by the
> hosts.  To any extent the Bohm patent owner disagrees in any
> detail as to any of the independent and dependent claims, the
> disagreement will surely be as to known ("known") USB system
> structures   and   functionalities   ("technology"),   and   then
> Furukawa, Dickens, Chen, Wurzburg, Osakada, APA, Adder,
> USB 2.0, Lou, Fujita, and all the other cited art overcome the
> disagreement and teach and/or make obvious the owner-
> referenced technology.   USB 2.0 is especially thorough in
> explaining known USB system technology in all details of the
> Bohm claims.   It even states that it provides "architecture
> upgradeable to support multiple USB Host Controllers in a
> system," thereby suggesting multiple hosts.  U-14-upgrade-path.
> Strong motivation to combine as necessary to provide what
> Bohm sought to provide, i.e., access of USB hosts in plural to
> USB device(s) without disconnection switching that caused
> device reconfiguration, B-1:65-2:5, was provided by Furukawa
> and Dickens, and also USB 2.0, Lou, and Fujita.  Wurzburg and
> Adder disclosed devices just short of the Bohm claims by
> requiring switching, which was replaced in Furukawa and
> Dickens.   Moving forward the next step as in all of Bohm,
> Furukawa and Dickens was strongly motivated by Furukawa,
> Dickens, Fujita, Ulenas, and Lou.  No dependent claims of Bohm
> add patentable merit to any independent claim.

Pet. 72–73.

IPR2017-00861
Patent 7,627,708 B2

To the extent this ground is asserting obviousness over any combination with Furukawa, as discussed *supra*, we are not persuaded Furukawa expressly or inherently teaches the features of the '708 patent for which Petitioner relied on it earlier in the Petition.

To the extent this ground is asserting the combination of Dickens and Chen, that combination is addressed above.

To the extent this ground is asserting any combinations other than those addressed above, the analysis in this ground is inadequate to meet the requirements of our rules regarding the level of detail required.  37 C.F.R. § 104(b)(4).

Thus, Petitioner has not shown by a preponderance of the evidence that claims 1–25 are unpatentable as obvious over the above-proposed combinations.

### J.     Conclusion

For the reasons discussed *supra*, we are persuaded by a preponderance of the evidence that claims 1, 3–5, 7–9, 11–15, 18–21, 23, and 25 of the '708 patent are unpatentable.  Petitioner has not shown, by a preponderance of the evidence, that claims 2, 6, 10, 16, 17, 22, or 24 are unpatentable.

IPR2017-00861
Patent 7,627,708 B2

### III.    MOTION TO EXCLUDE

Patent Owner timely objected (Paper 50) to Petitioner's Exhibit 1053 (Mr. Garney's Reply Declaration) and filed a Motion to Exclude (Paper 54, "Mot." or "Motion") moving to exclude Exhibit 1053 and Petitioner's Sur-Reply.  Patent Owner argues the Sur-Reply and Exhibit 1053 raise new arguments directed to inherency in the alleged anticipation of certain challenged claims by Furukawa.  *See* Mot.

We are not persuaded by Patent Owner's argument.  As is discussed *supra*, we expressly found, and Petitioner confirmed, that it is not arguing inherency in its anticipation arguments but, instead, relies solely on what Petitioner argues are express disclosures of Furukawa.

Patent Owner further argues Petitioner's Sur-Reply should be excluded because, by incorporating portions of Exhibit 1053, the Sur-Reply attempts to circumvent the five-page limit as ordered when authorizing the Sur-Reply filing.

We remain unpersuaded by Patent Owner's argument.  The Sur-Reply cites to various portions of Mr. Garney's Reply Declaration (Ex. 1053) to support its arguments but does not attempt to incorporate the entirety of that declaration into its Sur-Reply.

For the above reasons, we are not persuaded that Petitioner's Sur-Reply or Exhibit 1053 should be excluded, and for the foregoing reasons, Patent Owner's Motion to Exclude is *denied*.

IPR2017-00861
Patent 7,627,708 B2

### III.   ORDER

After due consideration of the record before us, and for the foregoing reasons, it is:

ORDERED that claims 1, 3–5, 7–9, 11–15, 18–21, 23, and 25 of U.S. Patent No. 7,627,708 B2 are held *unpatentable*;

FURTHER ORDERED that claims 2, 6, 10, 16, 17, 22, and 24 of U.S. Patent No. 7,627,708 B2 have *not* been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Petitioner's Sur-Reply (Paper 46) and Exhibit 1053 is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00861
Patent 7,627,708 B2

PETITIONER:

Scott A. McKeown
James L. Davis, Jr.
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
james.l.davis@ropesgray.com

PATENT OWNER:

Bruce W. Slayden II
Brian C. Banner
R. William Beard, Jr.
Truman H. Fenton
Jerry F. Suva
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
bbanner@sgbfirm.com
wbeard@sgbfirm.com
tfenton@sgbfirm.com
jsuva@sgbfirm.com

73

# Universal Serial Bus Specification

**Compaq**

**Hewlett-Packard**

**Intel**

**Lucent**

**Microsoft**

**NEC**

**Philips**

**Revision 2.0**

**April 27, 2000**

DELPHI EXHIBIT 1004

**Universal Serial Bus Specification Revision 2.0**

**Scope of this Revision**

The 2.0 revision of the specification is intended for product design.  Every attempt has been made to ensure a consistent and implementable specification.  Implementations should ensure compliance with this revision.

**Revision History**

| Revision | Issue Date | Comments |
|---|---|---|
| 0.7 | November 11, 1994 | Supersedes 0.6e. |
| 0.8 | December 30, 1994 | Revisions to Chapters 3-8, 10, and 11.  Added appendixes. |
| 0.9 | April 13, 1995 | Revisions to all the chapters. |
| 0.99 | August 25, 1995 | Revisions to all the chapters. |
| 1.0 FDR | November 13, 1995 | Revisions to Chapters 1, 2, 5-11. |
| 1.0 | January 15, 1996 | Edits to Chapters 5, 6, 7, 8, 9, 10, and 11 for consistency. |
| 1.1 | September 23, 1998 | Updates to all chapters to fix problems identified. |
| 2.0 (draft 0.79) | October 5, 1999 | Revisions to chapters 5, 7, 8, 9, 11 to add high speed. |
| 2.0 (draft 0.9) | December 21, 1999 | Revisions to all chapters to add high speed. |
| 2.0 | April 27, 2000 | Revisions for high-speed mode. |

**Universal Serial Bus Specification**
**Copyright © 2000, Compaq Computer Corporation,**
**Hewlett-Packard Company, Intel Corporation, Lucent Technologies Inc,**
**Microsoft Corporation, NEC Corporation, Koninklijke Philips Electronics N.V.**
**All rights reserved.**

**INTELLECTUAL PROPERTY DISCLAIMER**
**THIS SPECIFICATION IS PROVIDED TO YOU "AS IS" WITH NO WARRANTIES WHATSOEVER,**
**INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR**
**ANY PARTICULAR PURPOSE.  THE AUTHORS OF THIS SPECIFICATION DISCLAIM ALL LIABILITY,**
**INCLUDING LIABILITY FOR INFRINGEMENT OF ANY PROPRIETARY RIGHTS, RELATING TO USE**
**OR IMPLEMENTATION OF INFORMATION IN THIS SPECIFICATION.  THE PROVISION OF THIS**
**SPECIFICATION TO YOU DOES NOT PROVIDE YOU WITH ANY LICENSE, EXPRESS OR IMPLIED,**
**BY ESTOPPEL OR OTHERWISE, TO ANY INTELLECTUAL PROPERTY RIGHTS.**

All product names are trademarks, registered trademarks, or servicemarks of their respective owners.

*Please send comments via electronic mail to techsup@usb.org*
*For industry information, refer to the USB Implementers Forum web page at http://www.usb.org*

ii

# Acknowledgement of USB 2.0 Technical Contribution

The authors of this specification would like to recognize the following people who participated in the USB 2.0 Promoter Group technical working groups.  We would also like to thank others in the USB 2.0 Promoter companies and throughout the industry who contributed to the development of this specification.

## Hub Working Group

| | |
|---|---|
| John Garney | Intel Corporation (Chair/Editor) |
| Ken Stufflebeam | Compaq Computer Corporation |
| David Wooten | Compaq Computer Corporation |
| Matt Nieberger | Hewlett-Packard Company |
| John Howard | Intel Corporation |
| Venkat Iyer | Intel Corporation |
| Steve McGowan | Intel Corporation |
| Geert Knapen | Royal Philips Electronics |
| Zong Liang Wu | Royal Philips Electronics |
| Jim Clee | Lucent Technologies Inc |
| Jim Guziak | Lucent Technologies Inc |
| Dave Thompson | Lucent Technologies Inc |
| John Fuller | Microsoft Corporation |
| Nathan Sherman | Microsoft Corporation |
| Mark Williams | Microsoft Corporation |
| Nobuo Furuya | NEC Corporation |
| Toshimi Sakurai | NEC Corporation |
| Moto Sato | NEC Corporation |
| Katsuya Suzuki | NEC Corporation |

## Electrical Working Group

| | |
|---|---|
| Jon Lueker | Intel Corporation (Chair/Editor) |
| David Wooten | Compaq Computer Corporation |
| Matt Nieberger | Hewlett-Packard Company |
| Larry Taugher | Hewlett-Packard Company |
| Venkat Iyer | Intel Corporation |
| Steve McGowan | Intel Corporation |
| Mike Pennell | Intel Corporation |
| Todd West | Intel Corporation |
| Gerrit den Besten | Royal Philips Electronics |
| Marq Kole | Royal Philips Electronics |
| Zong Liang Wu | Royal Philips Electronics |
| Jim Clee | Lucent Technologies Inc |
| Jim Guziak | Lucent Technologies Inc |
| Par Parikh | Lucent Technologies Inc |
| Dave Thompson | Lucent Technologies Inc |
| Ed Giaimo | Microsoft Corporation |
| Mark Williams | Microsoft Corporation |
| Toshihiko Ohtani | NEC Corporation |
| Kugao Ouchi | NEC Corporation |
| Katsuya Suzuki | NEC Corporation |
| Toshio Tasaki | NEC Corporation |

iii

Universal Serial Bus Specification Revision 2.0

iv

4

Universal Serial Bus Specification Revision 2.0

# Contents

## CHAPTER 1  INTRODUCTION

1.1   Motivation ............................................................................................................... 1

1.2   Objective of the Specification .................................................................................. 1

1.3   Scope of the Document ............................................................................................ 2

1.4   USB Product Compliance ......................................................................................... 2

1.5   Document Organization ............................................................................................ 2

## CHAPTER 2  TERMS AND ABBREVIATIONS

## CHAPTER 3  BACKGROUND

3.1   Goals for the Universal Serial Bus ......................................................................... 11

3.2   Taxonomy of Application Space ............................................................................. 12

3.3   Feature List ............................................................................................................ 13

## CHAPTER 4  ARCHITECTURAL OVERVIEW

4.1   USB System Description ........................................................................................ 15
    4.1.1   Bus Topology ............................................................................................. 16

4.2   Physical Interface .................................................................................................. 17
    4.2.1   Electrical .................................................................................................... 17
    4.2.2   Mechanical ................................................................................................. 18

4.3   Power ..................................................................................................................... 18
    4.3.1   Power Distribution ...................................................................................... 18
    4.3.2   Power Management ..................................................................................... 18

4.4   Bus Protocol .......................................................................................................... 18

4.5   Robustness ............................................................................................................ 19
    4.5.1   Error Detection .......................................................................................... 19
    4.5.2   Error Handling ........................................................................................... 19

4.6   System Configuration ............................................................................................ 19
    4.6.1   Attachment of USB Devices ...................................................................... 20
    4.6.2   Removal of USB Devices .......................................................................... 20
    4.6.3   Bus Enumeration ....................................................................................... 20

v

Universal Serial Bus Specification Revision 2.0

**4.7    Data Flow Types** ..........................................................................................................**20**
    4.7.1    Control Transfers ...........................................................................................21
    4.7.2    Bulk Transfers ...............................................................................................21
    4.7.3    Interrupt Transfers .........................................................................................21
    4.7.4    Isochronous Transfers ....................................................................................21
    4.7.5    Allocating USB Bandwidth ............................................................................21

**4.8    USB Devices** ............................................................................................................**22**
    4.8.1    Device Characterizations ................................................................................22
    4.8.2    Device Descriptions .......................................................................................22

**4.9    USB Host:  Hardware and Software** .......................................................................**24**

**4.10   Architectural Extensions** .......................................................................................**24**

## CHAPTER 5  USB DATA FLOW MODEL

**5.1    Implementer Viewpoints** ........................................................................................**25**

**5.2    Bus Topology** ..........................................................................................................**27**
    5.2.1    USB Host ......................................................................................................27
    5.2.2    USB Devices .................................................................................................28
    5.2.3    Physical Bus Topology ...................................................................................29
    5.2.4    Logical Bus Topology ....................................................................................30
    5.2.5    Client Software-to-function Relationship .........................................................31

**5.3    USB Communication Flow** ......................................................................................**31**
    5.3.1    Device Endpoints ...........................................................................................33
    5.3.2    Pipes ............................................................................................................34
    5.3.3    Frames and Microframes ................................................................................36

**5.4    Transfer Types** .......................................................................................................**36**
    5.4.1    Table Calculation Examples ............................................................................37

**5.5    Control Transfers** ..................................................................................................**38**
    5.5.1    Control Transfer Data Format .........................................................................38
    5.5.2    Control Transfer Direction ..............................................................................39
    5.5.3    Control Transfer Packet Size Constraints .........................................................39
    5.5.4    Control Transfer Bus Access Constraints .........................................................40
    5.5.5    Control Transfer Data Sequences ....................................................................43

**5.6    Isochronous Transfers** ............................................................................................**44**
    5.6.1    Isochronous Transfer Data Format ..................................................................44
    5.6.2    Isochronous Transfer Direction .......................................................................44
    5.6.3    Isochronous Transfer Packet Size Constraints ..................................................44
    5.6.4    Isochronous Transfer Bus Access Constraints ..................................................47
    5.6.5    Isochronous Transfer Data Sequences ..............................................................47

**5.7    Interrupt Transfers** ................................................................................................**48**
    5.7.1    Interrupt Transfer Data Format .......................................................................48
    5.7.2    Interrupt Transfer Direction ............................................................................48
    5.7.3    Interrupt Transfer Packet Size Constraints .......................................................48
    5.7.4    Interrupt Transfer Bus Access Constraints .......................................................49
    5.7.5    Interrupt Transfer Data Sequences ..................................................................52

vi

6

Universal Serial Bus Specification Revision 2.0

5.8    **Bulk Transfers** ................................................................................................................. **52**
    5.8.1   Bulk Transfer Data Format ....................................................................................... 52
    5.8.2   Bulk Transfer Direction ............................................................................................ 52
    5.8.3   Bulk Transfer Packet Size Constraints ..................................................................... 53
    5.8.4   Bulk Transfer Bus Access Constraints ...................................................................... 53
    5.8.5   Bulk Transfer Data Sequences .................................................................................. 55

5.9    **High-Speed, High Bandwidth Endpoints** ....................................................................... **56**
    5.9.1   High Bandwidth Interrupt Endpoints ....................................................................... 56
    5.9.2   High Bandwidth Isochronous Endpoints ................................................................. 57

5.10   **Split Transactions** ........................................................................................................... **58**

5.11   **Bus Access for Transfers** ................................................................................................. **58**
    5.11.1  Transfer Management ............................................................................................... 59
    5.11.2  Transaction Tracking ................................................................................................ 61
    5.11.3  Calculating Bus Transaction Times .......................................................................... 63
    5.11.4  Calculating Buffer Sizes in Functions and Software ................................................ 65
    5.11.5  Bus Bandwidth Reclamation .................................................................................... 65

5.12   **Special Considerations for Isochronous Transfers** ........................................................ **65**
    5.12.1  Example Non-USB Isochronous Application .......................................................... 66
    5.12.2  USB Clock Model ..................................................................................................... 69
    5.12.3  Clock Synchronization .............................................................................................. 71
    5.12.4  Isochronous Devices ................................................................................................. 71
    5.12.5  Data Prebuffering ..................................................................................................... 80
    5.12.6  SOF Tracking ............................................................................................................ 81
    5.12.7  Error Handling .......................................................................................................... 81
    5.12.8  Buffering for Rate Matching .................................................................................... 82

**CHAPTER 6 MECHANICAL**

6.1    **Architectural Overview** .................................................................................................. **85**

6.2    **Keyed Connector Protocol** ............................................................................................. **85**

6.3    **Cable** ................................................................................................................................. **86**

6.4    **Cable Assembly** ................................................................................................................ **86**
    6.4.1   Standard Detachable Cable Assemblies ................................................................... 86
    6.4.2   High-/full-speed Captive Cable Assemblies ............................................................ 88
    6.4.3   Low-speed Captive Cable Assemblies ..................................................................... 90
    6.4.4   Prohibited Cable Assemblies .................................................................................... 92

6.5    **Connector Mechanical Configuration and Material Requirements** ................................ **93**
    6.5.1   USB Icon Location .................................................................................................... 93
    6.5.2   USB Connector Termination Data ............................................................................ 94
    6.5.3   Series "A" and Series "B" Receptacles .................................................................... 94
    6.5.4   Series "A" and Series "B" Plugs .............................................................................. 98

Universal Serial Bus Specification Revision 2.0

**6.6    Cable Mechanical Configuration and Material Requirements** ....................................................**102**
    6.6.1    Description ...............................................................................................................102
    6.6.2    Construction .............................................................................................................103
    6.6.3    Electrical Characteristics .........................................................................................105
    6.1.4    Cable Environmental Characteristics .......................................................................106
    6.1.5    Listing .....................................................................................................................106

**6.7    Electrical, Mechanical, and Environmental Compliance Standards** ...........................**106**
    6.7.1    Applicable Documents ..............................................................................................114

**6.8    USB Grounding** .........................................................................................................**114**

**6.9    PCB Reference Drawings**............................................................................................**114**

# CHAPTER 7  ELECTRICAL

**7.1    Signaling** ....................................................................................................................**119**
    7.1.1    USB Driver Characteristics ......................................................................................123
    7.1.2    Data Signal Rise and Fall, Eye Patterns .................................................................129
    7.1.3    Cable Skew...............................................................................................................139
    7.1.4    Receiver Characteristics ..........................................................................................139
    7.1.5    Device Speed Identification .....................................................................................141
    7.1.6    Input Characteristics ...............................................................................................142
    7.1.7    Signaling Levels.......................................................................................................144
    7.1.8    Data Encoding/Decoding .........................................................................................157
    7.1.9    Bit Stuffing...............................................................................................................157
    7.1.10   Sync Pattern ............................................................................................................159
    7.1.11   Data Signaling Rate .................................................................................................159
    7.1.12   Frame Interval .........................................................................................................159
    7.1.13   Data Source Signaling .............................................................................................160
    7.1.14   Hub Signaling Timings ............................................................................................162
    7.1.15   Receiver Data Jitter .................................................................................................164
    7.1.16   Cable Delay..............................................................................................................165
    7.1.17   Cable Attenuation....................................................................................................167
    7.1.18   Bus Turn-around Time and Inter-packet Delay........................................................168
    7.1.19   Maximum End-to-end Signal Delay .........................................................................168
    7.1.20   Test Mode Support...................................................................................................169

**7.2    Power Distribution** ....................................................................................................**171**
    7.2.1    Classes of Devices ...................................................................................................171
    7.2.2    Voltage Drop Budget ...............................................................................................175
    7.2.3    Power Control During Suspend/Resume ...................................................................176
    7.2.4    Dynamic Attach and Detach.....................................................................................177

**7.3    Physical Layer** ..........................................................................................................**178**
    7.3.1    Regulatory Requirements .........................................................................................178
    7.3.2    Bus Timing/Electrical Characteristics ......................................................................178
    7.3.3    Timing Waveforms ...................................................................................................191

Universal Serial Bus Specification Revision 2.0

## CHAPTER 8  PROTOCOL LAYER

**8.1     Byte/Bit Ordering** ............................................................................................................. **195**

**8.2     SYNC Field** ...................................................................................................................... **195**

**8.3     Packet Field Formats** ...................................................................................................... **195**
  8.3.1     Packet Identifier Field ................................................................................................. 195
  8.3.2     Address Fields ............................................................................................................ 197
  8.3.3     Frame Number Field ................................................................................................... 197
  8.3.4     Data Field .................................................................................................................... 197
  8.3.5     Cyclic Redundancy Checks ......................................................................................... 198

**8.4     Packet Formats** ................................................................................................................ **199**
  8.4.1     Token Packets ............................................................................................................. 199
  8.4.2     Split Transaction Special Token Packets .................................................................... 199
  8.4.3     Start-of-Frame Packets ............................................................................................... 204
  8.4.4     Data Packets ............................................................................................................... 206
  8.4.5     Handshake Packets ..................................................................................................... 206
  8.4.6     Handshake Responses ................................................................................................ 207

**8.5     Transaction Packet Sequences** ..................................................................................... **209**
  8.5.1     NAK Limiting via Ping Flow Control ............................................................................ 217
  8.5.2     Bulk Transactions ....................................................................................................... 221
  8.5.3     Control Transfers ........................................................................................................ 225
  8.5.4     Interrupt Transactions ................................................................................................. 228
  8.5.5     Isochronous Transactions ........................................................................................... 229

**8.6     Data Toggle Synchronization and Retry** ........................................................................ **232**
  8.6.1     Initialization via SETUP Token .................................................................................... 233
  8.6.2     Successful Data Transactions ..................................................................................... 233
  8.6.3     Data Corrupted or Not Accepted ................................................................................. 233
  8.6.4     Corrupted ACK Handshake ......................................................................................... 234
  8.6.5     Low-speed Transactions ............................................................................................. 235

**8.7     Error Detection and Recovery** ........................................................................................ **236**
  8.7.1     Packet Error Categories .............................................................................................. 236
  8.7.2     Bus Turn-around Timing .............................................................................................. 237
  8.7.3     False EOPs .................................................................................................................. 237
  8.7.4     Babble and Loss of Activity Recovery ......................................................................... 238

ix

Universal Serial Bus Specification Revision 2.0

## CHAPTER 9   USB DEVICE FRAMEWORK

9.1     USB Device States ...................................................................................................................239
    9.1.1     Visible Device States ......................................................................................................239
    9.1.2     Bus Enumeration .............................................................................................................243

9.2     Generic USB Device Operations ............................................................................................244
    9.2.1     Dynamic Attachment and Removal .................................................................................244
    9.2.2     Address Assignment ........................................................................................................244
    9.2.3     Configuration ..................................................................................................................244
    9.2.4     Data Transfer ..................................................................................................................245
    9.2.5     Power Management .........................................................................................................245
    9.2.6     Request Processing ..........................................................................................................245
    9.2.7     Request Error ..................................................................................................................247

9.3     USB Device Requests ..............................................................................................................248
    9.3.1     bmRequestType ...............................................................................................................248
    9.3.2     bRequest ..........................................................................................................................249
    9.3.3     wValue .............................................................................................................................249
    9.3.4     wIndex .............................................................................................................................249
    9.3.5     wLength ...........................................................................................................................249

9.4     Standard Device Requests ......................................................................................................250
    9.4.1     Clear Feature ...................................................................................................................252
    9.4.2     Get Configuration ...........................................................................................................253
    9.4.3     Get Descriptor .................................................................................................................253
    9.4.4     Get Interface ....................................................................................................................254
    9.4.5     Get Status ........................................................................................................................254
    9.4.6     Set Address ......................................................................................................................256
    9.4.7     Set Configuration ............................................................................................................257
    9.4.8     Set Descriptor ..................................................................................................................257
    9.4.9     Set Feature ......................................................................................................................258
    9.4.10    Set Interface ....................................................................................................................259
    9.4.11    Synch Frame ....................................................................................................................260

9.5     Descriptors ...............................................................................................................................260

9.6     Standard USB Descriptor Definitions ...................................................................................261
    9.6.1     Device ..............................................................................................................................261
    9.6.2     Device_Qualifier .............................................................................................................264
    9.6.3     Configuration ..................................................................................................................264
    9.6.4     Other_Speed_Configuration ...........................................................................................266
    9.6.5     Interface ..........................................................................................................................267
    9.6.6     Endpoint ..........................................................................................................................269
    9.6.7     String ...............................................................................................................................273

9.7     Device Class Definitions .........................................................................................................274
    9.7.1     Descriptors ......................................................................................................................274
    9.7.2     Interface(s) and Endpoint Usage ....................................................................................274
    9.7.3     Requests ..........................................................................................................................274

x

Universal Serial Bus Specification Revision 2.0

## CHAPTER 10  USB HOST:  HARDWARE AND SOFTWARE

10.1  **Overview of the USB Host** ................................................................................ **275**
 10.1.1  Overview ............................................................................................... 275
 10.1.2  Control Mechanisms ............................................................................. 278
 10.1.3  Data Flow ............................................................................................. 278
 10.1.4  Collecting Status and Activity Statistics ............................................. 279
 10.1.5  Electrical Interface Considerations ...................................................... 279

10.2  **Host Controller Requirements** ..................................................................... **279**
 10.2.1  State Handling ...................................................................................... 280
 10.2.2  Serializer/Deserializer ......................................................................... 280
 10.2.3  Frame and Microframe Generation ...................................................... 280
 10.2.4  Data Processing .................................................................................... 281
 10.2.5  Protocol Engine .................................................................................... 281
 10.2.6  Transmission Error Handling ............................................................... 282
 10.2.7  Remote Wakeup .................................................................................... 282
 10.2.8  Root Hub ............................................................................................... 282
 10.2.9  Host System Interface ........................................................................... 283

10.3  **Overview of Software Mechanisms** .............................................................. **283**
 10.3.1  Device Configuration ........................................................................... 283
 10.3.2  Resource Management .......................................................................... 285
 10.3.3  Data Transfers ...................................................................................... 286
 10.3.4  Common Data Definitions .................................................................... 286

10.4  **Host Controller Driver** ................................................................................. **287**

10.5  **Universal Serial Bus Driver** ........................................................................ **287**
 10.5.1  USBD Overview .................................................................................... 288
 10.5.2  USBD Command Mechanism Requirements ........................................ 289
 10.5.3  USBD Pipe Mechanisms ....................................................................... 291
 10.5.4  Managing the USB via the USBD Mechanisms .................................... 293
 10.5.5  Passing USB Preboot Control to the Operating System ....................... 295

10.6  **Operating System Environment Guides** ...................................................... **296**

## CHAPTER 11  HUB SPECIFICATION

11.1  **Overview** ........................................................................................................ **297**
 11.1.1  Hub Architecture .................................................................................. 297
 11.1.2  Hub Connectivity .................................................................................. 298

11.2  **Hub Frame/Microframe Timer** ..................................................................... **300**
 11.2.1  High-speed Microframe Timer Range .................................................. 300
 11.2.2  Full-speed Frame Timer Range ............................................................ 301
 11.2.3  Frame/Microframe Timer Synchronization .......................................... 301
 11.2.4  Microframe Jitter Related to Frame Jitter ........................................... 303
 11.2.5  EOF1 and EOF2 Timing Points ............................................................ 303

xi

11

Universal Serial Bus Specification Revision 2.0

**11.3    Host Behavior at End-of-Frame**..............................................................................**306**
    11.3.1  Full-/low-speed Latest Host Packet......................................................................306
    11.3.2  Full-/low-speed Packet Nullification......................................................................306
    11.3.3  Full-/low-speed Transaction Completion Prediction.................................................306

**11.4    Internal Port**........................................................................................................**307**
    11.4.1  Inactive...........................................................................................................308
    11.4.2  Suspend Delay...................................................................................................308
    11.4.3  Full Suspend (Fsus)............................................................................................308
    11.4.4  Generate Resume (GResume)................................................................................308

**11.5    Downstream Facing Ports**.....................................................................................**309**
    11.5.1  Downstream Facing Port State Descriptions............................................................312
    11.5.2  Disconnect Detect Timer......................................................................................315
    11.5.3  Port Indicator.....................................................................................................316

**11.6    Upstream Facing Port**.........................................................................................**318**
    11.6.1  Full-speed.........................................................................................................318
    11.6.2  High-speed........................................................................................................318
    11.6.3  Receiver............................................................................................................318
    11.6.4  Transmitter.......................................................................................................322

**11.7    Hub Repeater**....................................................................................................**324**
    11.7.1  High-speed Packet Connectivity...........................................................................324
    11.7.2  Hub Repeater State Machine.................................................................................327
    11.7.3  Wait for Start of Packet from Upstream Port (WFSOPFU)..........................................329
    11.7.4  Wait for End of Packet from Upstream Port (WFEOPFU)...........................................330
    11.7.5  Wait for Start of Packet (WFSOP).........................................................................330
    11.7.6  Wait for End of Packet (WFEOP)...........................................................................330

**11.8    Bus State Evaluation**..........................................................................................**330**
    11.8.1  Port Error.........................................................................................................330
    11.8.2  Speed Detection................................................................................................331
    11.8.3  Collision............................................................................................................331
    11.8.4  Low-speed Port Behavior.....................................................................................331

**11.9    Suspend and Resume**..........................................................................................**332**

**11.10  Hub Reset Behavior**............................................................................................**334**

**11.11  Hub Port Power Control**......................................................................................**335**
    11.11.1  Multiple Gangs................................................................................................335

**11.12  Hub Controller**..................................................................................................**336**
    11.12.1  Endpoint Organization......................................................................................336
    11.12.2  Hub Information Architecture and Operation.........................................................337
    11.12.3  Port Change Information Processing.....................................................................337
    11.12.4  Hub and Port Status Change Bitmap....................................................................338
    11.12.5  Over-current Reporting and Recovery...................................................................339
    11.12.6  Enumeration Handling......................................................................................340

**11.13  Hub Configuration**.............................................................................................**340**

Universal Serial Bus Specification Revision 2.0

11.14    Transaction Translator ............................................................................................. 342
            11.14.1 Overview ................................................................................................ 342
            11.14.2 Transaction Translator Scheduling ............................................................... 344

11.15 Split Transaction Notation Information ..................................................................... 346

11.16 Common Split Transaction State Machines ................................................................ 349
            11.16.1 Host Controller State Machine .................................................................... 350
            11.16.2 Transaction Translator State Machine ........................................................... 354

11.17 Bulk/Control Transaction Translation Overview ......................................................... 360
            11.17.1 Bulk/Control Split Transaction Sequences ...................................................... 360
            11.17.2 Bulk/Control Split Transaction State Machines ................................................ 366
            11.17.3 Bulk/Control Sequencing ........................................................................... 371
            11.17.4 Bulk/Control Buffering Requirements ........................................................... 372
            11.17.5 Other Bulk/Control Details ........................................................................ 372

11.18 Periodic Split Transaction Pipelining and Buffer Management ........................................ 372
            11.18.1 Best Case Full-Speed Budget ...................................................................... 373
            11.18.2 TT Microframe Pipeline ............................................................................ 373
            11.18.3 Generation of Full-speed Frames .................................................................. 374
            11.18.4 Host Split Transaction Scheduling Requirements .............................................. 374
            11.18.5 TT Response Generation ............................................................................ 378
            11.18.6 TT Periodic Transaction Handling Requirements .............................................. 379
            11.18.7 TT Transaction Tracking ........................................................................... 380
            11.18.8 TT Complete-split Transaction State Searching ............................................... 381

11.19 Approximate TT Buffer Space Required ................................................................... 382

11.20 Interrupt Transaction Translation Overview .............................................................. 382
            11.20.1 Interrupt Split Transaction Sequences ........................................................... 383
            11.20.2 Interrupt Split Transaction State Machines ..................................................... 386
            11.20.3 Interrupt OUT Sequencing ......................................................................... 392
            11.20.4 Interrupt IN Sequencing ............................................................................ 393

11.21 Isochronous Transaction Translation Overview .......................................................... 394
            11.21.1 Isochronous Split Transaction Sequences ....................................................... 395
            11.21.2 Isochronous Split Transaction State Machines ................................................. 398
            11.21.3 Isochronous OUT Sequencing ..................................................................... 403
            11.21.4 Isochronous IN Sequencing ........................................................................ 404

11.22 TT Error Handling ............................................................................................. 404
            11.22.1 Loss of TT Synchronization With HS SOFs ..................................................... 404
            11.22.2 TT Frame and Microframe Timer Synchronization Requirements ........................... 405

11.23 Descriptors ....................................................................................................... 407
            11.23.1 Standard Descriptors for Hub Class .............................................................. 407
            11.23.2 Class-specific Descriptors .......................................................................... 417

11.24 Requests ........................................................................................................... 419
            11.24.1 Standard Requests ................................................................................... 419
            11.24.2 Class-specific Requests ............................................................................. 420

xiii

13

Universal Serial Bus Specification Revision 2.0

# APPENDIX A  TRANSACTION EXAMPLES

A.1   Bulk/Control OUT and SETUP Transaction Examples................................................................439

A.2   Bulk/Control IN Transaction Examples........................................................................................464

A.3   Interrupt OUT Transaction Examples..........................................................................................489

A.4   Interrupt IN Transaction Examples .............................................................................................509

A.5   Isochronous OUT SpAppendix A  Transaction Examples

# APPENDIX B  EXAMPLE DECLARATIONS FOR STATE MACHINES

B.1   Global Declarations.........................................................................................................................555

B.2   Host Controller Declarations.........................................................................................................558

B.3   Transaction Translator Declarations............................................................................................560

# APPENDIX C  RESET PROTOCOL STATE DIAGRAMS

C.1   Downstream Facing Port State Diagram........................................................................................565

C.2   Upstream Facing Port State Diagram............................................................................................567
    C.2.1   Reset From Suspended State .............................................................................................567
    C.2.2   Reset From Full-speed Non-suspended State ...................................................................570
    C.2.3   Reset From High-speed Non-suspended State ..................................................................570
    C.2.4   Reset Handshake ...............................................................................................................570

# INDEX

Universal Serial Bus Specification Revision 2.0

# Figures

Figure 3-1.  Application Space Taxonomy ..................................................................................12

Figure 4-1.  Bus Topology .......................................................................................................16

Figure 4-2.  USB Cable ...........................................................................................................17

Figure 4-3.  A Typical Hub .......................................................................................................23

Figure 4-4.  Hubs in a Desktop Computer Environment...............................................................23

Figure 5-1.  Simple USB Host/Device View ...............................................................................25

Figure 5-2.  USB Implementation Areas.....................................................................................26

Figure 5-3.  Host Composition..................................................................................................27

Figure 5-4.  Physical Device Composition .................................................................................28

Figure 5-5.  USB Physical Bus Topology ...................................................................................29

Figure 5-6.  Multiple Full-speed Buses in a High-speed System ...................................................30

Figure 5-7.  USB Logical Bus Topology .....................................................................................30

Figure 5-8.  Client Software-to-function Relationships .................................................................31

Figure 5-9.  USB Host/Device Detailed View .............................................................................32

Figure 5-10. USB Communication Flow .....................................................................................33

Figure 5-11. Data Phase PID Sequence for Isochronous IN High Bandwidth Endpoints...................57

Figure 5-12. Data Phase PID Sequence for Isochronous OUT High Bandwidth Endpoints.................58

Figure 5-13. USB Information Conversion From Client Software to Bus..........................................59

Figure 5-14. Transfers for Communication Flows ........................................................................62

Figure 5-15. Arrangement of IRPs to Transactions/(Micro)frames .................................................63

Figure 5-16. Non-USB Isochronous Example .............................................................................67

Figure 5-17. USB Full-speed Isochronous Application .................................................................70

Figure 5-18. Example Source/Sink Connectivity..........................................................................77

Figure 5-19. Data Prebuffering .................................................................................................81

Figure 5-20. Packet and Buffer Size Formulas for Rate-matched Isochronous Transfers ..................83

Figure 6-1.  Keyed Connector Protocol ......................................................................................85

Figure 6-2.  USB Standard Detachable Cable Assembly...............................................................87

Figure 6-3.  USB High-/full-speed Hardwired Cable Assembly......................................................89

Figure 6-4.  USB Low-speed Hardwired Cable Assembly .............................................................91

Figure 6-5.  USB Icon..............................................................................................................93

Figure 6-6.  Typical USB Plug Orientation ..................................................................................93

Figure 6-7.  USB Series "A" Receptacle Interface and Mating Drawing...........................................95

Figure 6-8.  USB Series "B" Receptacle Interface and Mating Drawing...........................................96

xv

15

**Universal Serial Bus Specification Revision 2.0**

Figure 6-9.  USB Series "A" Plug Interface Drawing...........................................................................99

Figure 6-10.  USB Series "B" Plug Interface Drawing.......................................................................100

Figure 6-11.  Typical High-/full-speed Cable Construction ..............................................................102

Figure 6-12.  Single Pin-type Series "A" Receptacle........................................................................115

Figure 6-13.  Dual Pin-type Series "A" Receptacle ..........................................................................116

Figure 6-14.  Single Pin-type Series "B" Receptacle........................................................................117

Figure 7-1.  Example High-speed Capable Transceiver Circuit ........................................................120

Figure 7-2.  Maximum Input Waveforms for USB Signaling.............................................................124

Figure 7-3.  Example Full-speed CMOS Driver Circuit (non High-speed capable)...........................125

Figure 7-4.  Full-speed Buffer V/I Characteristics............................................................................126

Figure 7-5.  Full-speed Buffer V/I Characteristics for High-speed Capable Transceiver...................127

Figure 7-6.  Full-speed Signal Waveforms.......................................................................................128

Figure 7-7.  Low-speed Driver Signal Waveforms ...........................................................................128

Figure 7-8.  Data Signal Rise and Fall Time....................................................................................130

Figure 7-9.  Full-speed Load............................................................................................................130

Figure 7-10.  Low-speed Port Loads................................................................................................131

Figure 7-11.  Measurement Planes ..................................................................................................131

Figure 7-12.  Transmitter/Receiver Test Fixture ..............................................................................132

Figure 7-13.  Template 1..................................................................................................................133

Figure 7-14.  Template 2..................................................................................................................134

Figure 7-15.  Template 3..................................................................................................................135

Figure 7-16.  Template 4..................................................................................................................136

Figure 7-17.  Template 5..................................................................................................................137

Figure 7-18.  Template 6..................................................................................................................138

Figure 7-19.  Differential Input Sensitivity Range for Low-/full-speed .............................................140

Figure 7-20.  Full-speed Device Cable and Resistor Connections ...................................................141

Figure 7-21.  Low-speed Device Cable and Resistor Connections ..................................................141

Figure 7-22.  Placement of Optional Edge Rate Control Capacitors for Low-/full-speed...................143

Figure 7-23.  Diagram for High-speed Loading Equivalent Circuit ...................................................143

Figure 7-24.  Upstream Facing Full-speed Port Transceiver ...........................................................146

Figure 7-25.  Downstream Facing Low-/full-speed Port Transceiver................................................146

Figure 7-26.  Low-/full-speed Disconnect Detection........................................................................149

Figure 7-27.  Full-/high-speed Device Connect Detection ...............................................................149

Figure 7-28.  Low-speed Device Connect Detection ........................................................................150

Figure 7-29.  Power-on and Connection Events Timing....................................................................150

Figure 7-30.  Low-/full-speed Packet Voltage Levels.......................................................................152

Figure 7-31.  NRZI Data Encoding...................................................................................................157

**xvi**

Universal Serial Bus Specification Revision 2.0

Figure 7-32.  Bit Stuffing.................................................................................................157
Figure 7-33.  Illustration of Extra Bit Preceding EOP (Full-/low-speed) ................................158
Figure 7-34.  Flow Diagram for Bit Stuffing ........................................................................158
Figure 7-35.  Sync Pattern (Low-/full-speed) .......................................................................159
Figure 7-36.  Data Jitter Taxonomy ...................................................................................160
Figure 7-37.  SE0 for EOP Width Timing ...........................................................................161
Figure 7-38.  Hub Propagation Delay of Full-speed Differential Signals ................................162
Figure 7-39.  Full-speed Cable Delay .................................................................................166
Figure 7-40.  Low-speed Cable Delay .................................................................................166
Figure 7-41.  Worst-case End-to-end Signal Delay Model for Low-/full-speed.......................169
Figure 7-42.  Compound Bus-powered Hub ........................................................................172
Figure 7-43.  Compound Self-powered Hub ........................................................................173
Figure 7-44.  Low-power Bus-powered Function ..................................................................174
Figure 7-45.  High-power Bus-powered Function ................................................................174
Figure 7-46.  Self-powered Function ..................................................................................175
Figure 7-47.  Worst-case Voltage Drop Topology (Steady State) ..........................................175
Figure 7-48.  Typical Suspend Current Averaging Profile .....................................................176
Figure 7-49.  Differential Data Jitter for Low-/full-speed......................................................191
Figure 7-50.  Differential-to-EOP Transition Skew and EOP Width for Low-/full-speed .........191
Figure 7-51.  Receiver Jitter Tolerance for Low-/full-speed...................................................191
Figure 7-52.  Hub Differential Delay, Differential Jitter, and SOP Distortion for Low-/full-speed .................192
Figure 7-53.  Hub EOP Delay and EOP Skew for Low-/full-speed.........................................193
Figure 8-1.  PID Format...................................................................................................195
Figure 8-2.  ADDR Field .................................................................................................197
Figure 8-3.  Endpoint Field .............................................................................................197
Figure 8-4.  Data Field Format .........................................................................................198
Figure 8-5.  Token Format ...............................................................................................199
Figure 8-6.  Packets in a Start-split Transaction ................................................................200
Figure 8-7.  Packets in a Complete-split Transaction ..........................................................200
Figure 8-8.  Relationship of Interrupt IN Transaction to High-speed Split Transaction...................201
Figure 8-9.  Relationship of Interrupt OUT Transaction to High-speed Split OUT Transaction.....................202
Figure 8-10.  Start-split (SSPLIT) Token ...........................................................................202
Figure 8-11.  Port Field....................................................................................................203
Figure 8-12.  Complete-split (CSPLIT) Transaction Token ...................................................204
Figure 8-13.  SOF Packet.................................................................................................204
Figure 8-14.  Relationship between Frames and Microframes ...............................................205
Figure 8-15.  Data Packet Format .....................................................................................206

xvii

17

**Universal Serial Bus Specification Revision 2.0**

Figure 8-16.  Handshake Packet ...........................................................................................206
Figure 8-17.  Legend for State Machines...............................................................................210
Figure 8-18.  State Machine Context Overview .....................................................................211
Figure 8-19.  Host Controller Top Level Transaction State Machine Hierarchy Overview .............211
Figure 8-20.  Host Controller Non-split Transaction State Machine Hierarchy Overview.............212
Figure 8-21.  Device Transaction State Machine Hierarchy Overview ...................................212
Figure 8-22.  Device Top Level State Machine ......................................................................213
Figure 8-23.  Device_process_Trans State Machine...............................................................213
Figure 8-24.  Dev_do_OUT State Machine ............................................................................214
Figure 8-25.  Dev_do_IN State Machine ................................................................................215
Figure 8-26.  HC_Do_nonsplit State Machine........................................................................216
Figure 8-27.  Host High-speed Bulk OUT/Control Ping State Machine..................................218
Figure 8-28.  Dev_HS_ping State Machine ............................................................................219
Figure 8-29.  Device High-speed Bulk OUT /Control State Machine .....................................220
Figure 8-30.  Bulk Transaction Format...................................................................................221
Figure 8-31.  Bulk/Control/Interrupt OUT Transaction Host State Machine ..........................222
Figure 8-32.  Bulk/Control/Interrupt OUT Transaction Device State Machine.......................223
Figure 8-33.  Bulk/Control/Interrupt IN Transaction Host State Machine ..............................224
Figure 8-34.  Bulk/Control/Interrupt IN Transaction Device State Machine...........................225
Figure 8-35.  Bulk Reads and Writes......................................................................................225
Figure 8-36.  Control SETUP Transaction..............................................................................226
Figure 8-37.  Control Read and Write Sequences...................................................................226
Figure 8-38.  Interrupt Transaction Format ............................................................................229
Figure 8-39.  Isochronous Transaction Format.......................................................................229
Figure 8-40.  Isochronous OUT Transaction Host State Machine ..........................................230
Figure 8-41.  Isochronous OUT Transaction Device State Machine .......................................231
Figure 8-42.  Isochronous IN Transaction Host State Machine ..............................................231
Figure 8-43.  Isochronous IN Transaction Device State Machine ...........................................232
Figure 8-44.  SETUP Initialization.........................................................................................233
Figure 8-45.  Consecutive Transactions..................................................................................233
Figure 8-46.  NAKed Transaction with Retry.........................................................................234
Figure 8-47.  Corrupted ACK Handshake with Retry.............................................................234
Figure 8-48.  Low-speed Transaction .....................................................................................235
Figure 8-49.  Bus Turn-around Timer Usage..........................................................................237
Figure 9-1.  Device State Diagram .........................................................................................240
Figure 9-2.  wIndex Format when Specifying an Endpoint .....................................................249
Figure 9-3.  wIndex Format when Specifying an Interface ......................................................249

**xviii**

18

**Universal Serial Bus Specification Revision 2.0**

Figure 9-4.  Information Returned by a GetStatus() Request to a Device ....................................................255

Figure 9-5.  Information Returned by a GetStatus() Request to an Interface................................................255

Figure 9-6.  Information Returned by a GetStatus() Request to an Endpoint ...............................................256

Figure 9-7.  Example of Feedback Endpoint Numbers .................................................................................272

Figure 9-8.  Example of Feedback Endpoint Relationships..........................................................................272

Figure 10-1.  Interlayer Communications Model...........................................................................................275

Figure 10-2.  Host Communications ..............................................................................................................276

Figure 10-3.  Frame and Microframe Creation .............................................................................................281

Figure 10-4.  Configuration Interactions.......................................................................................................284

Figure 10-5.  Universal Serial Bus Driver Structure ....................................................................................288

Figure 11-1.  Hub Architecture......................................................................................................................298

Figure 11-2.  Hub Signaling Connectivity ....................................................................................................299

Figure 11-3.  Resume Connectivity ...............................................................................................................299

Figure 11-4.  Example High-speed EOF Offsets Due to Propagation Delay Without EOF Advancement .......302

Figure 11-5.  Example High-speed EOF Offsets Due to Propagation Delay With EOF Advancement.............302

Figure 11-6.  High-speed EOF2 Timing Point ..............................................................................................304

Figure 11-7.  High-speed EOF1 Timing Point ..............................................................................................304

Figure 11-8.  Full-speed EOF Timing Points................................................................................................304

Figure 11-9.  Internal Port State Machine .....................................................................................................308

Figure 11-10.  Downstream Facing Hub Port State Machine ........................................................................310

Figure 11-11.  Port Indicator State Diagram .................................................................................................317

Figure 11-12.  Upstream Facing Port Receiver State Machine .....................................................................319

Figure 11-13.  Upstream Facing Port Transmitter State Machine .................................................................322

Figure 11-14.  Example Hub Repeater Organization .....................................................................................324

Figure 11-15.  High-speed Port Selector State Machine ...............................................................................326

Figure 11-16.  Hub Repeater State Machine ..................................................................................................328

Figure 11-17.  Example Remote-wakeup Resume Signaling With Full-/low-speed Device .........................333

Figure 11-18.  Example Remote-wakeup Resume Signaling With High-speed Device .................................334

Figure 11-19.  Example Hub Controller Organization...................................................................................336

Figure 11-20.  Relationship of Status, Status Change, and Control Information to Device States ....................337

Figure 11-21.  Port Status Handling Method .................................................................................................338

Figure 11-22.  Hub and Port Status Change Bitmap .....................................................................................339

Figure 11-23.  Example Hub and Port Change Bit Sampling ........................................................................339

Figure 11-24.  Transaction Translator Overview ..........................................................................................342

Figure 11-25.  Periodic and Non-periodic Buffer Sections of TT ................................................................343

Figure 11-26.  TT Microframe Pipeline for Periodic Split Transactions .....................................................344

Figure 11-27.  TT Nonperiodic Buffering .....................................................................................................345

Universal Serial Bus Specification Revision 2.0

Figure 11-28. Example Full-/low-speed Handler Scheduling for Start-splits.................................346
Figure 11-29. Flow Sequence Legend .................................346
Figure 11-30. Legend for State Machines.................................347
Figure 11-31. State Machine Context Overview .................................348
Figure 11-32. Host Controller Split Transaction State Machine Hierarchy Overview .................................349
Figure 11-33. Transaction Translator State Machine Hierarchy Overview .................................350
Figure 11-34. Host Controller.................................350
Figure 11-35. HC_Process_Command .................................351
Figure 11-36. HC_Do_Start.................................352
Figure 11-37. HC_Do_Complete.................................353
Figure 11-38. Transaction Translator .................................354
Figure 11-39. TT_Process_Packet.................................355
Figure 11-40. TT_Do_Start.................................356
Figure 11-41. TT_Do_Complete .................................357
Figure 11-42. TT_BulkSS.................................357
Figure 11-43. TT_BulkCS.................................358
Figure 11-44. TT_IntSS.................................358
Figure 11-45. TT_IntCS .................................359
Figure 11-46. TT_IsochSS.................................359
Figure 11-47. Sample Algorithm for Compare_buffs .................................361
Figure 11-48. Bulk/Control OUT Start-split Transaction Sequence .................................362
Figure 11-49. Bulk/Control OUT Complete-split Transaction Sequence .................................363
Figure 11-50. Bulk/Control IN Start-split Transaction Sequence .................................364
Figure 11-51. Bulk/Control IN Complete-split Transaction Sequence .................................365
Figure 11-52. Bulk/Control OUT Start-split Transaction Host State Machine .................................366
Figure 11-53. Bulk/Control OUT Complete-split Transaction Host State Machine.................................367
Figure 11-54. Bulk/Control OUT Start-split Transaction TT State Machine .................................368
Figure 11-55. Bulk/Control OUT Complete-split Transaction TT State Machine .................................368
Figure 11-56. Bulk/Control IN Start-split Transaction Host State Machine .................................369
Figure 11-57. Bulk/Control IN Complete-split Transaction Host State Machine.................................370
Figure 11-58. Bulk/Control IN Start-split Transaction TT State Machine .................................371
Figure 11-59. Bulk/Control IN Complete-split Transaction TT State Machine .................................371
Figure 11-60. Best Case Budgeted Full-speed Wire Time With No Bit Stuffing.................................373
Figure 11-61. Scheduling of TT Microframe Pipeline.................................374
Figure 11-62. Isochronous OUT Example That Avoids a Start-split-end With Zero Data.................................375
Figure 11-63. End of Frame TT Pipeline Scheduling Example .................................376
Figure 11-64. Isochronous IN Complete-split Schedule Example at L=$Y_6$ .................................377

xx

20

Universal Serial Bus Specification Revision 2.0

Figure 11-65.  Isochronous IN Complete-split Schedule Example at L=$Y_7$ ....................................377

Figure 11-66.  Microframe Pipeline.............................................................................................380

Figure 11-67.  Advance_Pipeline Pseudocode.............................................................................381

Figure 11-68.  Interrupt OUT Start-split Transaction Sequence ...................................................383

Figure 11-69.  Interrupt OUT Complete-split Transaction Sequence ............................................384

Figure 11-70.  Interrupt IN Start-split Transaction Sequence .......................................................385

Figure 11-71.  Interrupt IN Complete-split Transaction Sequence ................................................385

Figure 11-72.  Interrupt OUT Start-split Transaction Host State Machine ....................................386

Figure 11-73.  Interrupt OUT Complete-split Transaction Host State Machine .............................387

Figure 11-74.  Interrupt OUT Start-split Transaction TT State Machine........................................388

Figure 11-75.  Interrupt OUT Complete-split Transaction TT State Machine ................................389

Figure 11-76.  Interrupt IN Start-split Transaction Host State Machine ........................................389

Figure 11-77.  Interrupt IN Complete-split Transaction Host State Machine .................................390

Figure 11-78.  HC_Data_or_Error State Machine ........................................................................391

Figure 11-79.  Interrupt IN Start-split Transaction TT State Machine............................................391

Figure 11-80.  Interrupt IN Complete-split Transaction TT State Machine ....................................392

Figure 11-81.  Example of CRC16 Handling for Interrupt OUT .....................................................393

Figure 11-82.  Example of CRC16 Handling for Interrupt IN .........................................................394

Figure 11-83.  Isochronous OUT Start-split Transaction Sequence..............................................395

Figure 11-84.  Isochronous IN Start-split Transaction Sequence .................................................396

Figure 11-85.  Isochronous IN Complete-split Transaction Sequence..........................................397

Figure 11-86.  Isochronous OUT Start-split Transaction Host State Machine ..............................398

Figure 11-87.  Isochronous OUT Start-split Transaction TT State Machine..................................399

Figure 11-88.  Isochronous IN Start-split Transaction Host State Machine...................................400

Figure 11-89.  Isochronous IN Complete-split Transaction Host State Machine ...........................401

Figure 11-90.  Isochronous IN Start-split Transaction TT State Machine......................................402

Figure 11-91.  Isochronous IN Complete-split Transaction TT State Machine ..............................402

Figure 11-92.  Example of CRC16 Isochronous OUT Data Packet Handling.................................403

Figure 11-93.  Example of CRC16 Isochronous IN Data Packet Handling ....................................404

Figure 11-94.  Example Frame/Microframe Synchronization Events.............................................406

Figure A-1.  Normal No Smash ...................................................................................................441

Figure A-2.  Normal HS DATA0/1 Smash....................................................................................442

Figure A-3.  Normal HS DATA0/1 3 Strikes Smash.....................................................................443

Figure A-4.  Normal HS ACK(S) Smash(case 1) .........................................................................444

Figure A-5.  Normal HS ACK(S) Smash(case 2) .........................................................................445

Figure A-6.  Normal HS ACK(S) 3 Strikes Smash.......................................................................446

Figure A-7.  Normal HS CSPLIT Smash......................................................................................447

xxi

**Universal Serial Bus Specification Revision 2.0**

Figure A-8.  Normal HS CSPLIT 3 Strikes Smash...................................................................448

Figure A-9.  Normal HS ACK(C) Smash .................................................................................449

Figure A-10.  Normal S ACK(C) 3 Strikes Smash ..................................................................450

Figure A-11.  Normal FS/LS DATA0/1 Smash........................................................................451

Figure A-12.  Normal FS/LS DATA0/1 3 Strikes Smash.........................................................452

Figure A-13.  Normal FS/LS ACK Smash ...............................................................................453

Figure A-14.  Normal FS/LS ACK 3 Strikes Smash ...............................................................454

Figure A-15.  No buffer Available No Smash (HS NAK(S)) ...................................................455

Figure A-16.  No Buffer Available HS NAK(S) Smash...........................................................456

Figure A-17.  No Buffer Available HS NAK(S) 3 Strikes Smash ...........................................457

Figure A-18.  CS Earlier No Smash (HS NYET) ....................................................................458

Figure A-19.  CS Earlier HS NYET Smash(case 1) ................................................................459

Figure A-20.  CS Earlier HS NYET Smash(case 2) ................................................................460

Figure A-21.  CS Earlier HS NYET 3 Strikes Smash .............................................................461

Figure A-22.  Device Busy No Smash(FS/LS NAK) ..............................................................462

Figure A-23.  Device Stall No Smash(FS/LS STALL)............................................................463

Figure A-24.  Normal No Smash .............................................................................................466

Figure A-25.  Normal HS SSPLIT Smash ...............................................................................467

Figure A-26.  Normal SSPLIT 3 Strikes Smash .....................................................................468

Figure A-27.  Normal HS ACK(S) Smash(case 1) ..................................................................469

Figure A-28.  Normal HS ACK(S) Smash(case 2) ..................................................................470

Figure A-29.  Normal HS ACK(S) 3 Strikes Smash ...............................................................471

Figure A-30.  Normal HS CSPLIT Smash...............................................................................472

Figure A-31.  Normal HS CSPLIT 3 Strikes Smash ...............................................................473

Figure A-32.  Normal HS DATA0/1 Smash.............................................................................474

Figure A-33.  Normal HS DATA0/1 3 Strikes Smash.............................................................475

Figure A-34.  Normal FS/LS IN Smash ..................................................................................476

Figure A-35.  Normal FS/LS IN 3 Strikes Smash...................................................................477

Figure A-36.  Normal FS/LS DATA0/1 Smash.......................................................................478

Figure A-37.  Normal FS/LS DATA0/1 3 Strikes Smash........................................................479

Figure A-38.  Normal FS/LS ACK Smash ..............................................................................480

Figure A-39.  No Buffer Available No Smash(HS NAK(S)) ...................................................481

Figure A-40.  No Buffer Available HS NAK(S) Smash...........................................................482

Figure A-41.  No Buffer Available HS NAK(S) 3 Strikes Smash ...........................................483

Figure A-42.  CS Earlier No Smash(HS NYET) .....................................................................484

Figure A-43.  CS Earlier HS NYET Smash(case 1) ................................................................485

Figure A-44.  CS Earlier HS NYET Smash(case 2) ................................................................486

**xxii**

22

Universal Serial Bus Specification Revision 2.0

Figure A-45.  Device Busy No Smash(FS/LS NAK)..................................................................487

Figure A-46.  Device Stall No Smash(FS/LS STALL)...............................................................488

Figure A-47.  Normal No Smash(FS/LS Handshake Packet is Done by M+1) ...............................492

Figure A-48.  Normal HS DATA0/1 Smash..............................................................................493

Figure A-49.  Normal HS CSPLIT Smash.................................................................................494

Figure A-50.  Normal HS CSPLIT 3 Strikes Smash..................................................................495

Figure A-51.  Normal HS ACK(C) Smash................................................................................496

Figure A-52.  Normal HS ACK(C) 3 Strikes Smash.................................................................497

Figure A-53.  Normal FS/LS DATA0/1 Smash.........................................................................498

Figure A-54.  Normal FS/LS ACK Smash................................................................................499

Figure A-55.  Searching No Smash .........................................................................................500

Figure A-56.  CS Earlier No Smash(HS NYET and FS/LS Handshake Packet is Done by M+2) ...................501

Figure A-57.  CS Earlier No Smash(HS NYET and FS/LS Handshake Packet is Done by M+3) ...................502

Figure A-58.  CS Earlier HS NYET Smash...............................................................................503

Figure A-59.  CS Earlier HS NYET 3 Strikes Smash................................................................504

Figure A-60.  Abort and Free Abort(FS/LS Transaction is Continued at End of M+3) ...............505

Figure A-61.  Abort and Free Free(FS/LS Transaction is not Started at End of M+3)................506

Figure A-62.  Device Busy No Smash(FS/LS NAK)..................................................................507

Figure A-63.  Device Stall No Smash(FS/LS STALL)...............................................................508

Figure A-64.  Normal No Smash(FS/LS Data Packet is on M+1)..............................................512

Figure A-65.  Normal HS SSPLIT Smash ...............................................................................513

Figure A-66.  Normal HS CSPLIT Smash................................................................................514

Figure A-67.  Normal HS CSPLIT 3 Strikes Smash..................................................................515

Figure A-68.  Normal HS DATA0/1 Smash..............................................................................516

Figure A-69.  Normal HS DATA0/1 3 Strikes Smash ...............................................................517

Figure A-70.  Normal FS/LS IN Smash...................................................................................518

Figure A-71.  Normal FS/LS DATA0/1 Smash.........................................................................519

Figure A-72.  Normal FS/LS ACK Smash................................................................................520

Figure A-73.  Searching No Smash .........................................................................................521

Figure A-74.  CS Earlier No Smash(HS MDATA and FS/LS Data Packet is on M+1 and M+2).....................522

Figure A-75.  CS Earlier No Smash(HS NYET and FS/LS Data Packet is on M+2) .........................523

Figure A-76.  CS Earlier No Smash(HS NYET and MDATA and FS/LS Data Packet is on M+2 and M+3) ...524

Figure A-77.  CS Earlier No Smash(HS NYET and FS/LS Data Packet is on M+3) .........................525

Figure A-78.  CS Earlier HS NYET Smash...............................................................................526

Figure A-79.  CS Earlier HS NYET 3 Strikes Smash................................................................527

Figure A-80.  Abort and Free Abort(HS NYET and FS/LS Transaction is Continued at End of M+3)..............528

Figure A-81.  Abort and Free Free(HS NYET and FS/LS Transaction is not Started at End of M+3)..............529

xxiii

23

Appx_874

**Universal Serial Bus Specification Revision 2.0**

Figure A-82.  Device Busy No Smash(FS/LS NAK) ........................................................530

Figure A-83.  Device Stall No Smash(FS/LS STALL).....................................................531

Figure C-1.  Downstream Facing Port Reset Protocol State Diagram ............................566

Figure C-2.  Upstream Facing Port Reset Detection State Diagram ..............................568

Figure C-3.  Upstream Facing Port Reset Handshake State Diagram.............................569

**xxiv**

**Universal Serial Bus Specification Revision 2.0**

# Tables

Table 5-1.  Low-speed Control Transfer Limits ...................................................................41

Table 5-2.  Full-speed Control Transfer Limits ...................................................................42

Table 5-3.  High-speed Control Transfer Limits ..................................................................43

Table 5-4.  Full-speed Isochronous Transaction Limits .......................................................45

Table 5-5.  High-speed Isochronous Transaction Limits ......................................................46

Table 5-6.  Low-speed Interrupt Transaction Limits ...........................................................49

Table 5-7.  Full-speed Interrupt Transaction Limits ............................................................50

Table 5-8.  High-speed Interrupt Transaction Limits ..........................................................51

Table 5-9.  Full-speed Bulk Transaction Limits ..................................................................54

Table 5-10.  High-speed Bulk Transaction Limits ...............................................................55

Table 5-11.  *wMaxPacketSize* Field of Endpoint Descriptor .............................................56

Table 5-12.  Synchronization Characteristics ......................................................................72

Table 5-13.  Connection Requirements ...............................................................................79

Table 6-1.  USB Connector Termination Assignment ..........................................................94

Table 6-2.  Power Pair .....................................................................................................103

Table 6-3.  Signal Pair .....................................................................................................104

Table 6-4.  Drain Wire Signal Pair ...................................................................................104

Table 6-5.  Nominal Cable Diameter .................................................................................105

Table 6-6.  Conductor Resistance .....................................................................................105

Table 6-7.  USB Electrical, Mechanical, and Environmental Compliance Standards ...........106

Table 7-1.  Description of Functional Elements in the Example Shown in Figure 7-1 ...........122

Table 7-2.  Low-/full-speed Signaling Levels ....................................................................145

Table 7-3.  High-speed Signaling Levels ...........................................................................147

Table 7-4.  Full-speed Jitter Budget ..................................................................................164

Table 7-5.  Low-speed Jitter Budget ..................................................................................165

Table 7-6.  Maximum Allowable Cable Loss .....................................................................167

Table 7-7.  DC Electrical Characteristics ...........................................................................178

Table 7-8.  High-speed Source Electrical Characteristics ....................................................180

Table 7-9.  Full-speed Source Electrical Characteristics .....................................................181

Table 7-10.  Low-speed Source Electrical Characteristics ...................................................182

Table 7-11.  Hub/Repeater Electrical Characteristics ..........................................................183

Table 7-12.  Cable Characteristics (Note 14) ......................................................................185

Table 7-13.  Hub Event Timings .......................................................................................186

Table 7-14.  Device Event Timings ...................................................................................188

xxv

25

**Universal Serial Bus Specification Revision 2.0**

Table 8-1.  PID Types.................................................................................................................196

Table 8-2.  Isochronous OUT Payload Continuation Encoding.............................................203

Table 8-3.  Endpoint Type Values in Split Special Token.....................................................204

Table 8-4.  Function Responses to IN Transactions .............................................................208

Table 8-5.  Host Responses to IN Transactions ...................................................................208

Table 8-6.  Function Responses to OUT Transactions in Order of Precedence....................209

Table 8-7.  Status Stage Responses.......................................................................................227

Table 8-8.  Packet Error Types .............................................................................................236

Table 9-1.  Visible Device States..........................................................................................241

Table 9-2.  Format of Setup Data..........................................................................................248

Table 9-3.  Standard Device Requests ...................................................................................250

Table 9-4.  Standard Request Codes......................................................................................251

Table 9-5.  Descriptor Types .................................................................................................251

Table 9-6.  Standard Feature Selectors .................................................................................252

Table 9-7.  Test Mode Selectors............................................................................................259

Table 9-8.  Standard Device Descriptor.................................................................................262

Table 9-9.  Device_Qualifier Descriptor ..............................................................................264

Table 9-10.  Standard Configuration Descriptor....................................................................265

Table 9-11.  Other_Speed_Configuration Descriptor ...........................................................267

Table 9-12.  Standard Interface Descriptor ...........................................................................268

Table 9-13.  Standard Endpoint Descriptor ...........................................................................269

Table 9-14.  Allowed wMaxPacketSize Values for Different Numbers of Transactions per Microframe .........273

Table 9-15.  String Descriptor Zero, Specifying Languages Supported by the Device ...................273

Table 9-16.  UNICODE String Descriptor.............................................................................274

Table 11-1.  High-speed Microframe Timer Range Contributions ........................................300

Table 11-2.  Full-speed Frame Timer Range Contributions ..................................................301

Table 11-3.  Hub and Host EOF1/EOF2 Timing Points ........................................................303

Table 11-4.  Internal Port Signal/Event Definitions..............................................................308

Table 11-5.  Downstream Facing Port Signal/Event Definitions...........................................311

Table 11-6.  Automatic Port State to Port Indicator Color Mapping ....................................316

Table 11-7.  Port Indicator Color Definitions........................................................................317

Table 11-8.  Upstream Facing Port Receiver Signal/Event Definitions.................................320

Table 11-9.  Upstream Facing Port Transmit Signal/Event Definitions.................................323

Table 11-10.  High-speed Port Selector Signal/Event Definitions.........................................326

Table 11-11.  Hub Repeater Signal/Event Definitions...........................................................329

Table 11-12.  Hub Power Operating Mode Summary ............................................................341

Table 11-13.  Hub Descriptor ................................................................................................417

**xxvi**

26

**Universal Serial Bus Specification Revision 2.0**

Table 11-14.  Hub Responses to Standard Device Requests ...................................................419

Table 11-15.  Hub Class Requests ...................................................................................420

Table 11-16.  Hub Class Request Codes .........................................................................421

Table 11-17.  Hub Class Feature Selectors .....................................................................421

Table 11-18.  wValue Field for Clear_TT_Buffer ...........................................................424

Table 11-19.  Hub Status Field, *wHubStatus* ..............................................................425

Table 11-20.  Hub Change Field, *wHubChange* ...........................................................426

Table 11-21.  Port Status Field, *wPortStatus* ...............................................................427

Table 11-22.  Port Change Field, *wPortChange* ...........................................................431

Table 11-23.  Format of Returned TT State .....................................................................432

Table 11-24.  Test Mode Selector Codes .........................................................................436

Table 11-25.  Port Indicator Selector Codes ...................................................................437

**xxvii**

Universal Serial Bus Specification Revision 2.0

xxviii

Appx_879

Universal Serial Bus Specification Revision 2.0

# Chapter 1
# Introduction

## 1.1  Motivation

The original motivation for the Universal Serial Bus (USB) came from three interrelated considerations:

- **Connection of the PC to the telephone**
  It is well understood that the merge of computing and communication will be the basis for the next generation of productivity applications. The movement of machine-oriented and human-oriented data types from one location or environment to another depends on ubiquitous and cheap connectivity. Unfortunately, the computing and communication industries have evolved independently. The USB provides a ubiquitous link that can be used across a wide range of PC-to-telephone interconnects.

- **Ease-of-use**
  The lack of flexibility in reconfiguring the PC has been acknowledged as the Achilles' heel to its further deployment. The combination of user-friendly graphical interfaces and the hardware and software mechanisms associated with new-generation bus architectures have made computers less confrontational and easier to reconfigure. However, from the end user's point of view, the PC's I/O interfaces, such as serial/parallel ports, keyboard/mouse/joystick interfaces, etc., do not have the attributes of plug-and-play.

- **Port expansion**
  The addition of external peripherals continues to be constrained by port availability. The lack of a bi-directional, low-cost, low-to-mid speed peripheral bus has held back the creative proliferation of peripherals such as telephone/fax/modem adapters, answering machines, scanners, PDA's, keyboards, mice, etc. Existing interconnects are optimized for one or two point products. As each new function or capability is added to the PC, a new interface has been defined to address this need.

The more recent motivation for USB 2.0 stems from the fact that PCs have increasingly higher performance and are capable of processing vast amounts of data. At the same time, PC peripherals have added more performance and functionality. User applications such as digital imaging demand a high performance connection between the PC and these increasingly sophisticated peripherals. USB 2.0 addresses this need by adding a third transfer rate of 480 Mb/s to the 12 Mb/s and 1.5 Mb/s originally defined for USB. USB 2.0 is a natural evolution of USB, delivering the desired bandwidth increase while preserving the original motivations for USB and maintaining full compatibility with existing peripherals.

Thus, USB continues to be the answer to connectivity for the PC architecture. It is a fast, bi-directional, isochronous, low-cost, dynamically attachable serial interface that is consistent with the requirements of the PC platform of today and tomorrow.

## 1.2  Objective of the Specification

This document defines an industry-standard USB. The specification describes the bus attributes, the protocol definition, types of transactions, bus management, and the programming interface required to design and build systems and peripherals that are compliant with this standard.

The goal is to enable such devices from different vendors to interoperate in an open architecture. The specification is intended as an enhancement to the PC architecture, spanning portable, business desktop, and home environments. It is intended that the specification allow system OEMs and peripheral developers adequate room for product versatility and market differentiation without the burden of carrying obsolete interfaces or losing compatibility.

1

**Universal Serial Bus Specification Revision 2.0**

### 1.3  Scope of the Document

The specification is primarily targeted to peripheral developers and system OEMs, but provides valuable information for platform operating system/ BIOS/ device driver, adapter IHVs/ISVs, and platform/adapter controller vendors.  This specification can be used for developing new products and associated software.

### 1.4  USB Product Compliance

Adopters of the USB 2.0 specification have signed the USB 2.0 Adopters Agreement, which provides them access to a reciprocal royalty-free license from the Promoters and other Adopters to certain intellectual property contained in products that are compliant with the USB 2.0 specification.  Adopters can demonstrate compliance with the specification through the testing program as defined by the USB Implementers Forum. Products that demonstrate compliance with the specification will be granted certain rights to use the USB Implementers Forum logo as defined in the logo license.

### 1.5  Document Organization

Chapters 1 through 5 provide an overview for all readers, while Chapters 6 through 11 contain detailed technical information defining the USB.

- Peripheral implementers should particularly read Chapters 5 through 11.

- USB Host Controller implementers should particularly read Chapters 5 through 8, 10, and 11.

- USB device driver implementers should particularly read Chapters 5, 9, and 10.

This document is complemented and referenced by the *Universal Serial Bus Device Class Specifications*. Device class specifications exist for a wide variety of devices.  Please contact the USB Implementers Forum for further details.

Readers are also requested to contact operating system vendors for operating system bindings specific to the USB.

**2**

Universal Serial Bus Specification Revision 2.0

# Chapter 2
# Terms and Abbreviations

This chapter lists and defines terms and abbreviations used throughout this specification.

| | |
|---|---|
| **ACK** | Handshake packet indicating a positive acknowledgment. |
| **Active Device** | A device that is powered and is not in the Suspend state. |
| **Asynchronous Data** | Data transferred at irregular intervals with relaxed latency requirements. |
| **Asynchronous RA** | The incoming data rate, $F_{s_i}$, and the outgoing data rate, $F_{s_o}$, of the RA process are independent (i.e., there is no shared master clock). See also rate adaptation. |
| **Asynchronous SRC** | The incoming sample rate, $F_{s_i}$, and outgoing sample rate, $F_{s_o}$, of the SRC process are independent (i.e., there is no shared master clock). See also sample rate conversion. |
| **Audio Device** | A device that sources or sinks sampled analog data. |
| **AWG#** | The measurement of a wire's cross section, as defined by the American Wire Gauge standard. |
| **Babble** | Unexpected bus activity that persists beyond a specified point in a (micro)frame. |
| **Bandwidth** | The amount of data transmitted per unit of time, typically bits per second (b/s) or bytes per second (B/s). |
| **Big Endian** | A method of storing data that places the most significant byte of multiple-byte values at a lower storage address. For example, a 16-bit integer stored in big endian format places the least significant byte at the higher address and the most significant byte at the lower address. See also little endian. |
| **Bit** | A unit of information used by digital computers. Represents the smallest piece of addressable memory within a computer. A bit expresses the choice between two possibilities and is typically represented by a logical one (1) or zero (0). |
| **Bit Stuffing** | Insertion of a "0" bit into a data stream to cause an electrical transition on the data wires, allowing a PLL to remain locked. |
| **b/s** | Transmission rate expressed in bits per second. |
| **B/s** | Transmission rate expressed in bytes per second. |
| **Buffer** | Storage used to compensate for a difference in data rates or time of occurrence of events, when transmitting data from one device to another. |
| **Bulk Transfer** | One of the four USB transfer types. Bulk transfers are non-periodic, large bursty communication typically used for a transfer that can use any available bandwidth and can also be delayed until bandwidth is available. See also transfer type. |
| **Bus Enumeration** | Detecting and identifying USB devices. |

3

**Universal Serial Bus Specification Revision 2.0**

| | |
|---|---|
| **Byte** | A data element that is eight bits in size. |
| **Capabilities** | Those attributes of a USB device that are administrated by the host. |
| **Characteristics** | Those qualities of a USB device that are unchangeable; for example, the device class is a device characteristic. |
| **Client** | Software resident on the host that interacts with the USB System Software to arrange data transfer between a function and the host.  The client is often the data provider and consumer for transferred data. |
| **Configuring Software** | Software resident on the host software that is responsible for configuring a USB device.  This may be a system configurator or software specific to the device. |
| **Control Endpoint** | A pair of device endpoints with the same endpoint number that are used by a control pipe.  Control endpoints transfer data in both directions and, therefore, use both endpoint directions of a device address and endpoint number combination.  Thus, each control endpoint consumes two endpoint addresses. |
| **Control Pipe** | Same as a message pipe. |
| **Control Transfer** | One of the four USB transfer types.  Control transfers support configuration/command/status type communications between client and function.  See also transfer type. |
| **CRC** | See Cyclic Redundancy Check. |
| **CTI** | Computer Telephony Integration. |
| **Cyclic Redundancy Check (CRC)** | A check performed on data to see if an error has occurred in transmitting, reading, or writing the data.  The result of a CRC is typically stored or transmitted with the checked data.  The stored or transmitted result is compared to a CRC calculated for the data to determine if an error has occurred. |
| **Default Address** | An address defined by the USB Specification and used by a USB device when it is first powered or reset.  The default address is 00H. |
| **Default Pipe** | The message pipe created by the USB System Software to pass control and status information between the host and a USB device's endpoint zero. |
| **Device** | A logical or physical entity that performs a function.  The actual entity described depends on the context of the reference.  At the lowest level, device may refer to a single hardware component, as in a memory device.  At a higher level, it may refer to a collection of hardware components that perform a particular function, such as a USB interface device.  At an even higher level, device may refer to the function performed by an entity attached to the USB; for example, a data/FAX modem device.  Devices may be physical, electrical, addressable, and logical.

When used as a non-specific reference, a USB device is either a hub or a function. |
| **Device Address** | A seven-bit value representing the address of a device on the USB.  The device address is the default address (00H) when the USB device is first powered or the device is reset.  Devices are assigned a unique device address by the USB System Software. |

4

**Universal Serial Bus Specification Revision 2.0**

| | |
|---|---|
| **Device Endpoint** | A uniquely addressable portion of a USB device that is the source or sink of information in a communication flow between the host and device.  See also endpoint address. |
| **Device Resources** | Resources provided by USB devices, such as buffer space and endpoints.  See also Host Resources and Universal Serial Bus Resources. |
| **Device Software** | Software that is responsible for using a USB device.  This software may or may not also be responsible for configuring the device for use. |
| **Downstream** | The direction of data flow from the host or away from the host.  A downstream port is the port on a hub electrically farthest from the host that generates downstream data traffic from the hub.  Downstream ports receive upstream data traffic. |
| **Driver** | When referring to hardware, an I/O pad that drives an external load.  When referring to software, a program responsible for interfacing to a hardware device, that is, a device driver. |
| **DWORD** | Double word.  A data element that is two words (i.e., four bytes or 32 bits) in size. |
| **Dynamic Insertion and Removal** | The ability to attach and remove devices while the host is in operation. |
| **E$^2$PROM** | See Electrically Erasable Programmable Read Only Memory. |
| **EEPROM** | See Electrically Erasable Programmable Read Only Memory. |
| **Electrically Erasable Programmable Read Only Memory (EEPROM)** | Non-volatile rewritable memory storage technology. |
| **End User** | The user of a host. |
| **Endpoint** | See device endpoint. |
| **Endpoint Address** | The combination of an endpoint number and an endpoint direction on a USB device.  Each endpoint address supports data transfer in one direction. |
| **Endpoint Direction** | The direction of data transfer on the USB.  The direction can be either IN or OUT.  IN refers to transfers to the host; OUT refers to transfers from the host. |
| **Endpoint Number** | A four-bit value between 0H and FH, inclusive, associated with an endpoint on a USB device. |
| **Envelope detector** | An electronic circuit inside a USB device that monitors the USB data lines and detects certain voltage related signal characteristics. |
| **EOF** | End-of-(micro)Frame. |
| **EOP** | End-of-Packet. |
| **External Port** | See port. |
| **Eye pattern** | A representation of USB signaling that provides minimum and maximum voltage levels as well as signal jitter. |
| **False EOP** | A spurious, usually noise-induced event that is interpreted by a packet receiver as an EOP. |

5

**Universal Serial Bus Specification Revision 2.0**

| | |
|---|---|
| **Frame** | A 1 millisecond time base established on full-/low-speed buses. |
| **Frame Pattern** | A sequence of frames that exhibit a repeating pattern in the number of samples transmitted per frame.  For a 44.1 kHz audio transfer, the frame pattern could be nine frames containing 44 samples followed by one frame containing 45 samples. |
| **Fs** | See sample rate. |
| **Full-duplex** | Computer data transmission occurring in both directions simultaneously. |
| **Full-speed** | USB operation at 12 Mb/s.  See also low-speed and high-speed. |
| **Function** | A USB device that provides a capability to the host, such as an ISDN connection, a digital microphone, or speakers. |
| **Handshake Packet** | A packet that acknowledges or rejects a specific condition.  For examples, see ACK and NAK. |
| **High-bandwidth endpoint** | A high-speed device endpoint that transfers more than 1024 bytes and less than 3073 bytes per microframe. |
| **High-speed** | USB operation at 480 Mb/s.  See also low-speed and full-speed. |
| **Host** | The host computer system where the USB Host Controller is installed.  This includes the host hardware platform (CPU, bus, etc.) and the operating system in use. |
| **Host Controller** | The host's USB interface. |
| **Host Controller Driver (HCD)** | The USB software layer that abstracts the Host Controller hardware.  The Host Controller Driver provides an SPI for interaction with a Host Controller.  The Host Controller Driver hides the specifics of the Host Controller hardware implementation. |
| **Host Resources** | Resources provided by the host, such as buffer space and interrupts.  See also Device Resources and Universal Serial Bus Resources. |
| **Hub** | A USB device that provides additional connections to the USB. |
| **Hub Tier** | One plus the number of USB links in a communication path between the host and a function.  See Figure 4-1. |
| **Interrupt Request (IRQ)** | A hardware signal that allows a device to request attention from a host.  The host typically invokes an interrupt service routine to handle the condition that caused the request. |
| **Interrupt Transfer** | One of the four USB transfer types.  Interrupt transfer characteristics are small data, non-periodic, low-frequency, and bounded-latency.  Interrupt transfers are typically used to handle service needs.  See also transfer type. |
| **I/O Request Packet** | An identifiable request by a software client to move data between itself (on the host) and an endpoint of a device in an appropriate direction. |
| **IRP** | See I/O Request Packet. |
| **IRQ** | See Interrupt Request. |
| **Isochronous Data** | A stream of data whose timing is implied by its delivery rate. |
| **Isochronous Device** | An entity with isochronous endpoints, as defined in the USB Specification, that sources or sinks sampled analog streams or synchronous data streams. |

6

**Universal Serial Bus Specification Revision 2.0**

| | |
|---|---|
| **Isochronous Sink Endpoint** | An endpoint that is capable of consuming an isochronous data stream that is sent by the host. |
| **Isochronous Source Endpoint** | An endpoint that is capable of producing an isochronous data stream and sending it to the host. |
| **Isochronous Transfer** | One of the four USB transfer types. Isochronous transfers are used when working with isochronous data. Isochronous transfers provide periodic, continuous communication between host and device. See also transfer type. |
| **Jitter** | A tendency toward lack of synchronization caused by mechanical or electrical changes. More specifically, the phase shift of digital pulses over a transmission medium. |
| **kb/s** | Transmission rate expressed in kilobits per second. |
| **kB/s** | Transmission rate expressed in kilobytes per second. |
| **Little Endian** | Method of storing data that places the least significant byte of multiple-byte values at lower storage addresses. For example, a 16-bit integer stored in little endian format places the least significant byte at the lower address and the most significant byte at the next address. See also big endian. |
| **LOA** | Loss of bus activity characterized by an SOP without a corresponding EOP. |
| **Low-speed** | USB operation at 1.5 Mb/s. See also full-speed and high-speed. |
| **LSb** | Least significant bit. |
| **LSB** | Least significant byte. |
| **Mb/s** | Transmission rate expressed in megabits per second. |
| **MB/s** | Transmission rate expressed in megabytes per second. |
| **Message Pipe** | A bi-directional pipe that transfers data using a request/data/status paradigm. The data has an imposed structure that allows requests to be reliably identified and communicated. |
| **Microframe** | A 125 microsecond time base established on high-speed buses. |
| **MSb** | Most significant bit. |
| **MSB** | Most significant byte. |
| **NAK** | Handshake packet indicating a negative acknowledgment. |
| **Non Return to Zero Invert (NRZI)** | A method of encoding serial data in which ones and zeroes are represented by opposite and alternating high and low voltages where there is no return to zero (reference) voltage between encoded bits. Eliminates the need for clock pulses. |
| **NRZI** | See Non Return to Zero Invert. |
| **Object** | Host software or data structure representing a USB entity. |
| **Packet** | A bundle of data organized in a group for transmission. Packets typically contain three elements: control information (e.g., source, destination, and length), the data to be transferred, and error detection and correction bits. |
| **Packet Buffer** | The logical buffer used by a USB device for sending or receiving a single packet. This determines the maximum packet size the device can send or receive. |

7

**Universal Serial Bus Specification Revision 2.0**

| | |
|---|---|
| **Packet ID (PID)** | A field in a USB packet that indicates the type of packet, and by inference, the format of the packet and the type of error detection applied to the packet. |
| **Phase** | A token, data, or handshake packet.  A transaction has three phases. |
| **Phase Locked Loop (PLL)** | A circuit that acts as a phase detector to keep an oscillator in phase with an incoming frequency. |
| **Physical Device** | A device that has a physical implementation; e.g., speakers, microphones, and CD players. |
| **PID** | See Packet ID. |
| **Pipe** | A logical abstraction representing the association between an endpoint on a device and software on the host.  A pipe has several attributes; for example, a pipe may transfer data as streams (stream pipe) or messages (message pipe). See also stream pipe and message pipe. |
| **PLL** | See Phase Locked Loop. |
| **Polling** | Asking multiple devices, one at a time, if they have any data to transmit. |
| **POR** | See Power On Reset. |
| **Port** | Point of access to or from a system or circuit.  For the USB, the point where a USB device is attached. |
| **Power On Reset (POR)** | Restoring a storage device, register, or memory to a predetermined state when power is applied. |
| **Programmable Data Rate** | Either a fixed data rate (single-frequency endpoints), a limited number of data rates (32 kHz, 44.1 kHz, 48 kHz, …), or a continuously programmable data rate.  The exact programming capabilities of an endpoint must be reported in the appropriate class-specific endpoint descriptors. |
| **Protocol** | A specific set of rules, procedures, or conventions relating to format and timing of data transmission between two devices. |
| **RA** | See rate adaptation. |
| **Rate Adaptation** | The process by which an incoming data stream, sampled at $Fs_i$, is converted to an outgoing data stream, sampled at $Fs_o$, with a certain loss of quality, determined by the rate adaptation algorithm.  Error control mechanisms are required for the process.  $Fs_i$ and $Fs_o$ can be different and asynchronous.  $Fs_i$ is the input data rate of the RA; $Fs_o$ is the output data rate of the RA. |
| **Request** | A request made to a USB device contained within the data portion of a SETUP packet. |
| **Retire** | The action of completing service for a transfer and notifying the appropriate software client of the completion. |
| **Root Hub** | A USB hub directly attached to the Host Controller.  This hub (tier 1) is attached to the host. |
| **Root Port** | The downstream port on a Root Hub. |
| **Sample** | The smallest unit of data on which an endpoint operates; a property of an endpoint. |
| **Sample Rate (Fs)** | The number of samples per second, expressed in Hertz (Hz). |

8

**Universal Serial Bus Specification Revision 2.0**

| | |
|---|---|
| **Sample Rate Conversion (SRC)** | A dedicated implementation of the RA process for use on sampled analog data streams.  The error control mechanism is replaced by interpolating techniques. |
| **Service** | A procedure provided by a System Programming Interface (SPI). |
| **Service Interval** | The period between consecutive requests to a USB endpoint to send or receive data. |
| **Service Jitter** | The deviation of service delivery from its scheduled delivery time. |
| **Service Rate** | The number of services to a given endpoint per unit time. |
| **SOF** | See Start-of-Frame. |
| **SOP** | Start-of-Packet. |
| **SPI** | See System Programming Interface. |
| **Split transaction** | A transaction type supported by host controllers and hubs. This transaction type allows full- and low-speed devices to be attached to hubs operating at high-speed. |
| **SRC** | See Sample Rate Conversion. |
| **Stage** | One part of the sequence composing a control transfer; stages include the Setup stage, the Data stage, and the Status stage. |
| **Start-of-Frame (SOF)** | The first transaction in each (micro)frame.  An SOF allows endpoints to identify the start of the (micro)frame and synchronize internal endpoint clocks to the host. |
| **Stream Pipe** | A pipe that transfers data as a stream of samples with no defined USB structure. |
| **Synchronization Type** | A classification that characterizes an isochronous endpoint's capability to connect to other isochronous endpoints. |
| **Synchronous RA** | The incoming data rate, $Fs_i$, and the outgoing data rate, $Fs_o$, of the RA process are derived from the same master clock.  There is a fixed relation between $Fs_i$ and $Fs_o$. |
| **Synchronous SRC** | The incoming sample rate, $Fs_i$, and outgoing sample rate, $Fs_o$, of the SRC process are derived from the same master clock.  There is a fixed relation between $Fs_i$ and $Fs_o$. |
| **System Programming Interface (SPI)** | A defined interface to services provided by system software. |
| **TDM** | See Time Division Multiplexing. |
| **TDR** | See Time Domain Reflectometer. |
| **Termination** | Passive components attached at the end of cables to prevent signals from being reflected or echoed. |
| **Time Division Multiplexing (TDM)** | A method of transmitting multiple signals (data, voice, and/or video) simultaneously over one communications medium by interleaving a piece of each signal one after another. |
| **Time Domain Reflectometer (TDR)** | An instrument capable of measuring impedance characteristics of the USB signal lines. |

9

**Universal Serial Bus Specification Revision 2.0**

| | |
|---|---|
| **Timeout** | The detection of a lack of bus activity for some predetermined interval. |
| **Token Packet** | A type of packet that identifies what transaction is to be performed on the bus. |
| **Transaction** | The delivery of service to an endpoint; consists of a token packet, optional data packet, and optional handshake packet.  Specific packets are allowed/required based on the transaction type. |
| **Transaction translator** | A functional component of a USB hub. The Transaction Translator responds to special high-speed transactions and translates them to full/low-speed transactions with full/low-speed devices attached on downstream facing ports. |
| **Transfer** | One or more bus transactions to move information between a software client and its function. |
| **Transfer Type** | Determines the characteristics of the data flow between a software client and its function.  Four standard transfer types are defined:  control, interrupt, bulk, and isochronous. |
| **Turn-around Time** | The time a device needs to wait to begin transmitting a packet after a packet has been received to prevent collisions on the USB.  This time is based on the length and propagation delay characteristics of the cable and the location of the transmitting device in relation to other devices on the USB. |
| **Universal Serial Bus Driver (USBD)** | The host resident software entity responsible for providing common services to clients that are manipulating one or more functions on one or more Host Controllers. |
| **Universal Serial Bus Resources** | Resources provided by the USB, such as bandwidth and power.  See also Device Resources and Host Resources. |
| **Upstream** | The direction of data flow towards the host.  An upstream port is the port on a device electrically closest to the host that generates upstream data traffic from the hub.  Upstream ports receive downstream data traffic. |
| **USBD** | See Universal Serial Bus Driver. |
| **USB-IF** | USB Implementers Forum, Inc. is a nonprofit corporation formed to facilitate the development of USB compliant products and promote the technology. |
| **Virtual Device** | A device that is represented by a software interface layer.  An example of a virtual device is a hard disk with its associated device driver and client software that makes it able to reproduce an audio .WAV file. |
| **Word** | A data element that is two bytes (16 bits) in size. |

10

**Universal Serial Bus Specification Revision 2.0**

# Chapter 3
# Background

This chapter presents a brief description of the background of the Universal Serial Bus (USB), including design goals, features of the bus, and existing technologies.

## 3.1    Goals for the Universal Serial Bus

The USB is specified to be an industry-standard extension to the PC architecture with a focus on PC peripherals that enable consumer and business applications.  The following criteria were applied in defining the architecture for the USB:

- Ease-of-use for PC peripheral expansion

- Low-cost solution that supports transfer rates up to 480 Mb/s

- Full support for real-time data for voice, audio, and video

- Protocol flexibility for mixed-mode isochronous data transfers and asynchronous messaging

- Integration in commodity device technology

- Comprehension of various PC configurations and form factors

- Provision of a standard interface capable of quick diffusion into product

- Enabling new classes of devices that augment the PC's capability

- Full backward compatibility of USB 2.0 for devices built to previous versions of the specification

**11**

Universal Serial Bus Specification Revision 2.0

## 3.2     Taxonomy of Application Space

Figure 3-1 describes a taxonomy for the range of data traffic workloads that can be serviced over a USB. As can be seen, a 480 Mb/s bus comprehends the high-speed, full-speed, and low-speed data ranges. Typically, high-speed and full-speed data types may be isochronous, while low-speed data comes from interactive devices. The USB is primarily a PC bus but can be readily applied to other host-centric computing devices. The software architecture allows for future extension of the USB by providing support for multiple USB Host Controllers.

| PERFORMANCE | APPLICATIONS | ATTRIBUTES |
|---|---|---|
| **LOW-SPEED**<br>• Interactive Devices<br>• 10 – 100 kb/s | Keyboard, Mouse<br>Stylus<br>Game Peripherals<br>Virtual Reality Peripherals | Lowest Cost<br>Ease-of-Use<br>Dynamic Attach-Detach<br>Multiple Peripherals |
| **FULL-SPEED**<br>• Phone, Audio, Compressed Video<br>• 500 kb/s – 10 Mb/s | POTS<br>Broadband<br>Audio<br>Microphone | Lower Cost<br>Ease-of-Use<br>Dynamic Attach-Detach<br>Multiple Peripherals<br>Guaranteed Bandwidth<br>Guaranteed Latency |
| **HIGH-SPEED**<br>• Video, Storage<br>• 25 – 400 Mb/s | Video<br>Storage<br>Imaging<br>Broadband | Low Cost<br>Ease-of-Use<br>Dynamic Attach-Detach<br>Multiple Peripherals<br>Guaranteed Bandwidth<br>Guaranteed Latency<br>High Bandwidth |

**Figure 3-1.  Application Space Taxonomy**

12

Universal Serial Bus Specification Revision 2.0

## 3.3 Feature List

The USB Specification provides a selection of attributes that can achieve multiple price/performance integration points and can enable functions that allow differentiation at the system and component level. Features are categorized by the following benefits:

**Easy to use for end user**

- Single model for cabling and connectors
- Electrical details isolated from end user (e.g., bus terminations)
- Self-identifying peripherals, automatic mapping of function to driver and configuration
- Dynamically attachable and reconfigurable peripherals

**Wide range of workloads and applications**

- Suitable for device bandwidths ranging from a few kb/s to several hundred Mb/s
- Supports isochronous as well as asynchronous transfer types over the same set of wires
- Supports concurrent operation of many devices (multiple connections)
- Supports up to 127 physical devices
- Supports transfer of multiple data and message streams between the host and devices
- Allows compound devices (i.e., peripherals composed of many functions)
- Lower protocol overhead, resulting in high bus utilization

**Isochronous bandwidth**

- Guaranteed bandwidth and low latencies appropriate for telephony, audio, video, etc.

**Flexibility**

- Supports a wide range of packet sizes, which allows a range of device buffering options
- Allows a wide range of device data rates by accommodating packet buffer size and latencies
- Flow control for buffer handling is built into the protocol

**Robustness**

- Error handling/fault recovery mechanism is built into the protocol
- Dynamic insertion and removal of devices is identified in user-perceived real-time
- Supports identification of faulty devices

**Synergy with PC industry**

- Protocol is simple to implement and integrate
- Consistent with the PC plug-and-play architecture
- Leverages existing operating system interfaces

13

**Universal Serial Bus Specification Revision 2.0**

**Low-cost implementation**

- Low-cost subchannel at 1.5 Mb/s
- Optimized for integration in peripheral and host hardware
- Suitable for development of low-cost peripherals
- Low-cost cables and connectors
- Uses commodity technologies

**Upgrade path**

- Architecture upgradeable to support multiple USB Host Controllers in a system

14

**Universal Serial Bus Specification Revision 2.0**

# Chapter 4
# Architectural Overview

This chapter presents an overview of the Universal Serial Bus (USB) architecture and key concepts. The USB is a cable bus that supports data exchange between a host computer and a wide range of simultaneously accessible peripherals. The attached peripherals share USB bandwidth through a host-scheduled, token-based protocol. The bus allows peripherals to be attached, configured, used, and detached while the host and other peripherals are in operation.

Later chapters describe the various components of the USB in greater detail.

## 4.1  USB System Description

A USB system is described by three definitional areas:

- USB interconnect

- USB devices

- USB host

The USB interconnect is the manner in which USB devices are connected to and communicate with the host. This includes the following:

- Bus Topology:  Connection model between USB devices and the host.

- Inter-layer Relationships:  In terms of a capability stack, the USB tasks that are performed at each layer in the system.

- Data Flow Models:  The manner in which data moves in the system over the USB between producers and consumers.

- USB Schedule:  The USB provides a shared interconnect. Access to the interconnect is scheduled in order to support isochronous data transfers and to eliminate arbitration overhead.

USB devices and the USB host are described in detail in subsequent sections.

15

Universal Serial Specification Revision 2.0

### 4.1.1  Bus Topology

The USB connects USB devices with the USB host.  The USB physical interconnect is a tiered star topology.  A hub is at the center of each star.  Each wire segment is a point-to-point connection between the host and a hub or function, or a hub connected to another hub or function.  Figure 4-1 illustrates the topology of the USB.

Due to timing constraints allowed for hub and cable propagation times, the maximum number of tiers allowed is seven (including the root tier).  Note that in seven tiers, five non-root hubs maximum can be supported in a communication path between the host and any device.  A compound device (see Figure 4-1) occupies two tiers; therefore, it cannot be enabled if attached at tier level seven.  Only functions can be enabled in tier seven.



**Figure 4-1.  Bus Topology**

### 4.1.1.1  USB Host

There is only one host in any USB system.  The USB interface to the host computer system is referred to as the Host Controller.  The Host Controller may be implemented in a combination of hardware, firmware, or software.  A root hub is integrated within the host system to provide one or more attachment points.

Additional information concerning the host may be found in Section 4.9 and in Chapter 10.

16

Universal Serial Bus Specification Revision 2.0

### 4.1.1.2  USB Devices

USB devices are one of the following:

- Hubs, which provide additional attachment points to the USB
- Functions, which provide capabilities to the system, such as an ISDN connection, a digital joystick, or speakers

USB devices present a standard USB interface in terms of the following:

- Their comprehension of the USB protocol
- Their response to standard USB operations, such as configuration and reset
- Their standard capability descriptive information

Additional information concerning USB devices may be found in Section 4.8 and in Chapter 9.

## 4.2  Physical Interface

The physical interface of the USB is described in the electrical (Chapter 7) and mechanical (Chapter 6) specifications for the bus.

### 4.2.1  Electrical

The USB transfers signal and power over a four-wire cable, shown in Figure 4-2.  The signaling occurs over two wires on each point-to-point segment.

There are three data rates:

- The USB high-speed signaling bit rate is 480 Mb/s.
- The USB full-speed signaling bit rate is 12 Mb/s.
- A limited capability low-speed signaling mode is also defined at 1.5 Mb/s.

USB 2.0 host controllers and hubs provide capabilities so that full-speed and low-speed data can be transmitted at high-speed between the host controller and the hub, but transmitted between the hub and the device at full-speed or low-speed.  This capability minimizes the impact that full-speed and low-speed devices have upon the bandwidth available for high-speed devices.

The low-speed mode is defined to support a limited number of low-bandwidth devices, such as mice, because more general use would degrade bus utilization.

The clock is transmitted, encoded along with the differential data.  The clock encoding scheme is NRZI with bit stuffing to ensure adequate transitions.  A SYNC field precedes each packet to allow the receiver(s) to synchronize their bit recovery clocks.



**Figure 4-2.  USB Cable**

17

Universal Serial Specification Revision 2.0

The cable also carries VBUS and GND wires on each segment to deliver power to devices. VBUS is nominally +5 V at the source. The USB allows cable segments of variable lengths, up to several meters, by choosing the appropriate conductor gauge to match the specified IR drop and other attributes such as device power budget and cable flexibility. In order to provide guaranteed input voltage levels and proper termination impedance, biased terminations are used at each end of the cable. The terminations also permit the detection of attach and detach at each port and differentiate between high/full-speed and low-speed devices.

### 4.2.2  Mechanical

The mechanical specifications for cables and connectors are provided in Chapter 6. All devices have an upstream connection. Upstream and downstream connectors are not mechanically interchangeable, thus eliminating illegal loopback connections at hubs. The cable has four conductors: a twisted signal pair of standard gauge and a power pair in a range of permitted gauges. The connector is four-position, with shielded housing, specified robustness, and ease of attach-detach characteristics.

## 4.3  Power

The specification covers two aspects of power:

- Power distribution over the USB deals with the issues of how USB devices consume power provided by the host over the USB.

- Power management deals with how the USB System Software and devices fit into the host-based power management system.

### 4.3.1  Power Distribution

Each USB segment provides a limited amount of power over the cable. The host supplies power for use by USB devices that are directly connected. In addition, any USB device may have its own power supply. USB devices that rely totally on power from the cable are called bus-powered devices. In contrast, those that have an alternate source of power are called self-powered devices. A hub also supplies power for its connected USB devices. The architecture permits bus-powered hubs within certain constraints of topology that are discussed later in Chapter 11.

### 4.3.2  Power Management

A USB host may have a power management system that is independent of the USB. The USB System Software interacts with the host's power management system to handle system power events such as suspend or resume. Additionally, USB devices typically implement additional power management features that allow them to be power managed by system software.

The power distribution and power management features of the USB allow it to be designed into power-sensitive systems such as battery-based notebook computers.

## 4.4  Bus Protocol

The USB is a polled bus. The Host Controller initiates all data transfers.

Most bus transactions involve the transmission of up to three packets. Each transaction begins when the Host Controller, on a scheduled basis, sends a USB packet describing the type and direction of transaction, the USB device address, and endpoint number. This packet is referred to as the "token packet." The USB device that is addressed selects itself by decoding the appropriate address fields. In a given transaction, data is transferred either from the host to a device or from a device to the host. The direction of data transfer is specified in the token packet. The source of the transaction then sends a data packet or indicates it has no

18

Universal Serial Bus Specification Revision 2.0

data to transfer.  The destination, in general, responds with a handshake packet indicating whether the transfer was successful.

Some bus transactions between host controllers and hubs involve the transmission of four packets.  These types of transactions are used to manage the data transfers between the host and full-/low- speed devices.

The USB data transfer model between a source or destination on the host and an endpoint on a device is referred to as a pipe.  There are two types of pipes:  stream and message.  Stream data has no USB-defined structure, while message data does.  Additionally, pipes have associations of data bandwidth, transfer service type, and endpoint characteristics like directionality and buffer sizes.  Most pipes come into existence when a USB device is configured.  One message pipe, the Default Control Pipe, always exists once a device is powered, in order to provide access to the device's configuration, status, and control information.

The transaction schedule allows flow control for some stream pipes.  At the hardware level, this prevents buffers from underrun or overrun situations by using a NAK handshake to throttle the data rate.  When NAKed, a transaction is retried when bus time is available.  The flow control mechanism permits the construction of flexible schedules that accommodate concurrent servicing of a heterogeneous mix of stream pipes.  Thus, multiple stream pipes can be serviced at different intervals and with packets of different sizes.

## 4.5  Robustness

There are several attributes of the USB that contribute to its robustness:

- Signal integrity using differential drivers, receivers, and shielding
- CRC protection over control and data fields
- Detection of attach and detach and system-level configuration of resources
- Self-recovery in protocol, using timeouts for lost or corrupted packets
- Flow control for streaming data to ensure isochrony and hardware buffer management
- Data and control pipe constructs for ensuring independence from adverse interactions between functions

### 4.5.1  Error Detection

The core bit error rate of the USB medium is expected to be close to that of a backplane and any glitches will very likely be transient in nature.  To provide protection against such transients, each packet includes error protection fields.  When data integrity is required, such as with lossless data devices, an error recovery procedure may be invoked in hardware or software.

The protocol includes separate CRCs for control and data fields of each packet.  A failed CRC is considered to indicate a corrupted packet.  The CRC gives 100% coverage on single- and double-bit errors.

### 4.5.2  Error Handling

The protocol allows for error handling in hardware or software.  Hardware error handling includes reporting and retry of failed transfers.  A USB Host Controller will try a transmission that encounters errors up to three times before informing the client software of the failure.  The client software can recover in an implementation-specific way.

## 4.6  System Configuration

The USB supports USB devices attaching to and detaching from the USB at any time.  Consequently, system software must accommodate dynamic changes in the physical bus topology.

19

Universal Serial Specification Revision 2.0

### 4.6.1  Attachment of USB Devices

All USB devices attach to the USB through ports on specialized USB devices known as hubs. Hubs have status bits that are used to report the attachment or removal of a USB device on one of its ports. The host queries the hub to retrieve these bits. In the case of an attachment, the host enables the port and addresses the USB device through the device's control pipe at the default address.

The host assigns a unique USB address to the device and then determines if the newly attached USB device is a hub or a function. The host establishes its end of the control pipe for the USB device using the assigned USB address and endpoint number zero.

If the attached USB device is a hub and USB devices are attached to its ports, then the above procedure is followed for each of the attached USB devices.

If the attached USB device is a function, then attachment notifications will be handled by host software that is appropriate for the function.

### 4.6.2  Removal of USB Devices

When a USB device has been removed from one of a hub's ports, the hub disables the port and provides an indication of device removal to the host. The removal indication is then handled by appropriate USB System Software. If the removed USB device is a hub, the USB System Software must handle the removal of both the hub and of all of the USB devices that were previously attached to the system through the hub.

### 4.6.3  Bus Enumeration

Bus enumeration is the activity that identifies and assigns unique addresses to devices attached to a bus. Because the USB allows USB devices to attach to or detach from the USB at any time, bus enumeration is an on-going activity for the USB System Software. Additionally, bus enumeration for the USB also includes the detection and processing of removals.

## 4.7  Data Flow Types

The USB supports functional data and control exchange between the USB host and a USB device as a set of either uni-directional or bi-directional pipes. USB data transfers take place between host software and a particular endpoint on a USB device. Such associations between the host software and a USB device endpoint are called pipes. In general, data movement though one pipe is independent from the data flow in any other pipe. A given USB device may have many pipes. As an example, a given USB device could have an endpoint that supports a pipe for transporting data to the USB device and another endpoint that supports a pipe for transporting data from the USB device.

The USB architecture comprehends four basic types of data transfers:

- Control Transfers: Used to configure a device at attach time and can be used for other device-specific purposes, including control of other pipes on the device.

- Bulk Data Transfers: Generated or consumed in relatively large and bursty quantities and have wide dynamic latitude in transmission constraints.

- Interrupt Data Transfers: Used for timely but reliable delivery of data, for example, characters or coordinates with human-perceptible echo or feedback response characteristics.

- Isochronous Data Transfers: Occupy a prenegotiated amount of USB bandwidth with a prenegotiated delivery latency. (Also called streaming real time transfers).

A pipe supports only one of the types of transfers described above for any given device configuration. The USB data flow model is described in more detail in Chapter 5.

20

**Universal Serial Bus Specification Revision 2.0**

### 4.7.1  Control Transfers

Control data is used by the USB System Software to configure devices when they are first attached.  Other driver software can choose to use control transfers in implementation-specific ways.  Data delivery is lossless.

### 4.7.2  Bulk Transfers

Bulk data typically consists of larger amounts of data, such as that used for printers or scanners.  Bulk data is sequential.  Reliable exchange of data is ensured at the hardware level by using error detection in hardware and invoking a limited number of retries in hardware.  Also, the bandwidth taken up by bulk data can vary, depending on other bus activities.

### 4.7.3  Interrupt Transfers

A limited-latency transfer to or from a device is referred to as interrupt data.  Such data may be presented for transfer by a device at any time and is delivered by the USB at a rate no slower than is specified by the device.

Interrupt data typically consists of event notification, characters, or coordinates that are organized as one or more bytes.  An example of interrupt data is the coordinates from a pointing device.  Although an explicit timing rate is not required, interactive data may have response time bounds that the USB must support.

### 4.7.4  Isochronous Transfers

Isochronous data is continuous and real-time in creation, delivery, and consumption.  Timing-related information is implied by the steady rate at which isochronous data is received and transferred.  Isochronous data must be delivered at the rate received to maintain its timing.  In addition to delivery rate, isochronous data may also be sensitive to delivery delays.  For isochronous pipes, the bandwidth required is typically based upon the sampling characteristics of the associated function.  The latency required is related to the buffering available at each endpoint.

A typical example of isochronous data is voice.  If the delivery rate of these data streams is not maintained, drop-outs in the data stream will occur due to buffer or frame underruns or overruns.  Even if data is delivered at the appropriate rate by USB hardware, delivery delays introduced by software may degrade applications requiring real-time turn-around, such as telephony-based audio conferencing.

The timely delivery of isochronous data is ensured at the expense of potential transient losses in the data stream.  In other words, any error in electrical transmission is not corrected by hardware mechanisms such as retries.  In practice, the core bit error rate of the USB is expected to be small enough not to be an issue.  USB isochronous data streams are allocated a dedicated portion of USB bandwidth to ensure that data can be delivered at the desired rate.  The USB is also designed for minimal delay of isochronous data transfers.

### 4.7.5  Allocating USB Bandwidth

USB bandwidth is allocated among pipes.  The USB allocates bandwidth for some pipes when a pipe is established.  USB devices are required to provide some buffering of data.  It is assumed that USB devices requiring more bandwidth are capable of providing larger buffers.  The goal for the USB architecture is to ensure that buffering-induced hardware delay is bounded to within a few milliseconds.

The USB's bandwidth capacity can be allocated among many different data streams.  This allows a wide range of devices to be attached to the USB.  Further, different device bit rates, with a wide dynamic range, can be concurrently supported.

The USB Specification defines the rules for how each transfer type is allowed access to the bus.

21

Universal Serial Specification Revision 2.0

## 4.8  USB Devices

USB devices are divided into device classes such as hub, human interface, printer, imaging, or mass storage device.  The hub device class indicates a specially designated USB device that provides additional USB attachment points (refer to Chapter 11).  USB devices are required to carry information for self-identification and generic configuration.  They are also required at all times to display behavior consistent with defined USB device states.

### 4.8.1  Device Characterizations

All USB devices are accessed by a USB address that is assigned when the device is attached and enumerated.  Each USB device additionally supports one or more pipes through which the host may communicate with the device.  All USB devices must support a specially designated pipe at endpoint zero to which the USB device's USB control pipe will be attached.  All USB devices support a common access mechanism for accessing information through this control pipe.

Associated with the control pipe at endpoint zero is the information required to completely describe the USB device.  This information falls into the following categories:

- Standard:  This is information whose definition is common to all USB devices and includes items such as vendor identification, device class, and power management capability.  Device, configuration, interface, and endpoint descriptions carry configuration-related information about the device.  Detailed information about these descriptors can be found in Chapter 9.

- Class:  The definition of this information varies, depending on the device class of the USB device.

- USB Vendor:  The vendor of the USB device is free to put any information desired here.  The format, however, is not determined by this specification.

Additionally, each USB device carries USB control and status information.

### 4.8.2  Device Descriptions

Two major divisions of device classes exist:  hubs and functions.  Only hubs have the ability to provide additional USB attachment points.  Functions provide additional capabilities to the host.

#### 4.8.2.1  Hubs

Hubs are a key element in the plug-and-play architecture of the USB.  Figure 4-3 shows a typical hub.  Hubs serve to simplify USB connectivity from the user's perspective and provide robustness at relatively low cost and complexity.

Hubs are wiring concentrators and enable the multiple attachment characteristics of the USB.  Attachment points are referred to as ports.  Each hub converts a single attachment point into multiple attachment points.  The architecture supports concatenation of multiple hubs.

The upstream port of a hub connects the hub towards the host.  Each of the downstream ports of a hub allows connection to another hub or function.  Hubs can detect attach and detach at each downstream port and enable the distribution of power to downstream devices.  Each downstream port can be individually enabled and attached to either high-, full- or low-speed devices.

A USB 2.0 hub consists of three portions:  the Hub Controller, the Hub Repeater, and the Transaction Translator.  The Hub Repeater is a protocol-controlled switch between the upstream port and downstream ports.  It also has hardware support for reset and suspend/resume signaling.  The Host Controller provides the communication to/from the host.  Hub-specific status and control commands permit the host to configure a hub and to monitor and control its ports.  The Transaction Translator provides the mechanisms that support full-/low-speed devices behind the hub, while transmitting all device data between the host and the hub at high-speed.

22

Universal Serial Bus Specification Revision 2.0



**Figure 4-3.  A Typical Hub**

Figure 4-4 illustrates how hubs provide connectivity in a typical desktop computer environment.



**Figure 4-4.  Hubs in a Desktop Computer Environment**

23

**Universal Serial Specification Revision 2.0**

### 4.8.2.2  Functions

A function is a USB device that is able to transmit or receive data or control information over the bus.  A function is typically implemented as a separate peripheral device with a cable that plugs into a port on a hub.  However, a physical package may implement multiple functions and an embedded hub with a single USB cable.  This is known as a compound device.  A compound device appears to the host as a hub with one or more non-removable USB devices.

Each function contains configuration information that describes its capabilities and resource requirements.  Before a function can be used, it must be configured by the host.  This configuration includes allocating USB bandwidth and selecting function-specific configuration options.

Examples of functions include the following:

- A human interface device such as a mouse, keyboard, tablet, or game controller

- An imaging device such as a scanner, printer, or camera

- A mass storage device such as a CD-ROM drive, floppy drive, or DVD drive

## 4.9  USB Host:  Hardware and Software

The USB host interacts with USB devices through the Host Controller.  The host is responsible for the following:

- Detecting the attachment and removal of USB devices

- Managing control flow between the host and USB devices

- Managing data flow between the host and USB devices

- Collecting status and activity statistics

- Providing power to attached USB devices

The USB System Software on the host manages interactions between USB devices and host-based device software.  There are five areas of interactions between the USB System Software and device software:

- Device enumeration and configuration

- Isochronous data transfers

- Asynchronous data transfers

- Power management

- Device and bus management information

## 4.10  Architectural Extensions

The USB architecture comprehends extensibility at the interface between the Host Controller Driver and USB Driver.  Implementations with multiple Host Controllers, and associated Host Controller Drivers, are possible.

24

# Chapter 5
# USB Data Flow Model

This chapter presents information about how data is moved across the USB. The information in this chapter affects all implementers. The information presented is at a level above the signaling and protocol definitions of the system. Consult Chapter 7 and Chapter 8 for more details about their respective parts of the USB system. This chapter provides framework information that is further expanded in Chapters 9 through 11. All implementers should read this chapter so they understand the key concepts of the USB.

## 5.1  Implementer Viewpoints

The USB provides communication services between a host and attached USB devices. However, the simple view an end user sees of attaching one or more USB devices to a host, as in Figure 5-1, is in fact a little more complicated to implement than is indicated by the figure. Different views of the system are required to explain specific USB requirements from the perspective of different implementers. Several important concepts and features must be supported to provide the end user with the reliable operation demanded from today's personal computers. The USB is presented in a layered fashion to ease explanation and allow implementers of particular USB products to focus on the details related to their product.



**Figure 5-1.  Simple USB Host/Device View**

Figure 5-2 shows a deeper overview of the USB, identifying the different layers of the system that will be described in more detail in the remainder of the specification. In particular, there are four focus implementation areas:

- USB Physical Device: A piece of hardware on the end of a USB cable that performs some useful end user function.

- Client Software: Software that executes on the host, corresponding to a USB device. This client software is typically supplied with the operating system or provided along with the USB device.

- USB System Software: Software that supports the USB in a particular operating system. The USB System Software is typically supplied with the operating system, independently of particular USB devices or client software.

- USB Host Controller (Host Side Bus Interface): The hardware and software that allows USB devices to be attached to a host.

There are shared rights and responsibilities between the four USB system components. The remainder of this specification describes the details required to support robust, reliable communication flows between a function and its client.

**Universal Serial Bus Specification Revision 2.0**



**Figure 5-2.   USB Implementation Areas**

As shown in Figure 5-2, the simple connection of a host to a device requires interaction between a number of layers and entities.  The USB Bus Interface layer provides physical/signaling/packet connectivity between the host and a device.  The USB Device layer is the view the USB System Software has for performing generic USB operations with a device.  The Function layer provides additional capabilities to the host via an appropriate matched client software layer.  The USB Device and Function layers each have a view of logical communication within their layer that actually uses the USB Bus Interface layer to accomplish data transfer.

The physical view of USB communication as described in Chapters 6, 7, and 8 is related to the logical communication view presented in Chapters 9 and 10.  This chapter describes those key concepts that affect USB implementers and should be read by all before proceeding to the remainder of the specification to find those details most relevant to their product.

To describe and manage USB communication, the following concepts are important:

- Bus Topology:  Section 5.2 presents the primary physical and logical components of the USB and how they interrelate.

- Communication Flow Models:  Sections 5.3 through 5.8 describe how communication flows between the host and devices through the USB and defines the four USB transfer types.

- Bus Access Management:  Section 5.11 describes how bus access is managed within the host to support a broad range of communication flows by USB devices.

- Special Consideration for Isochronous Transfers:  Section 5.12 presents features of the USB specific to devices requiring isochronous data transfers.  Device implementers for non-isochronous devices do not need to read Section 5.12.

26

Universal Serial Bus Specification Revision 2.0

## 5.2  Bus Topology

There are four main parts to USB topology:

- Host and Devices:  The primary components of a USB system

- Physical Topology:  How USB elements are connected

- Logical Topology:  The roles and responsibilities of the various USB elements and how the USB appears from the perspective of the host and a device

- Client Software-to-function Relationships:  How client software and its related function interfaces on a USB device view each other

## 5.2.1  USB Host

The host's logical composition is shown in Figure 5-3 and includes the following:

- USB Host Controller

- Aggregate USB System Software (USB Driver, Host Controller Driver, and host software)

- Client



**Figure 5-3.  Host Composition**

The USB host occupies a unique position as the coordinating entity for the USB.  In addition to its special physical position, the host has specific responsibilities with regard to the USB and its attached devices.  The host controls all access to the USB.  A USB device gains access to the bus only by being granted access by the host.  The host is also responsible for monitoring the topology of the USB.

For a complete discussion of the host and its duties, refer to Chapter 10.

27

Universal Serial Bus Specification Revision 2.0

## 5.2.2  USB Devices

A USB physical device's logical composition is shown in Figure 5-4 and includes the following:

- USB bus interface
- USB logical device
- Function

USB physical devices provide additional functionality to the host.  The types of functionality provided by USB devices vary widely.  However, all USB logical devices present the same basic interface to the host. This allows the host to manage the USB-relevant aspects of different USB devices in the same manner.

To assist the host in identifying and configuring USB devices, each device carries and reports configuration-related information.  Some of the information reported is common among all logical devices.  Other information is specific to the functionality provided by the device.  The detailed format of this information varies, depending on the device class of the device.

For a complete discussion of USB devices, refer to Chapter 9.



Figure 5-4.  Physical Device Composition

28

**Universal Serial Bus Specification Revision 2.0**

## 5.2.3  Physical Bus Topology

Devices on the USB are physically connected to the host via a tiered star topology, as illustrated in Figure 5-5.  USB attachment points are provided by a special class of USB device known as a hub.  The additional attachment points provided by a hub are called ports.  A host includes an embedded hub called the root hub.  The host provides one or more attachment points via the root hub.  USB devices that provide additional functionality to the host are known as functions.  To prevent circular attachments, a tiered ordering is imposed on the star topology of the USB.  This results in the tree-like configuration illustrated in Figure 5-5.



**Figure 5-5.  USB Physical Bus Topology**

Multiple functions may be packaged together in what appears to be a single physical device.  For example, a keyboard and a trackball might be combined in a single package.  Inside the package, the individual functions are permanently attached to a hub and it is the internal hub that is connected to the USB.  When multiple functions are combined with a hub in a single package, they are referred to as a compound device.  The hub and each function attached to the hub within the compound device is assigned its own device address.  A device that has multiple interfaces controlled independently of each other is referred to as a composite device.  A composite device has only a single device address.  From the host's perspective, a compound device is the same as a separate hub with multiple functions attached.  Figure 5-5 also illustrates a compound device.

29

Universal Serial Bus Specification Revision 2.0



**Figure 5-6.  Multiple Full-speed Buses in a High-speed System**

The hub plays a special role in a high-speed system.  The hub isolates the full-/low-speed signaling environment from the high-speed signaling environment.  Figure 5-6 shows a hub operating in high speed supporting a high-speed attached device.  The hub also allows USB1.1 hubs to attach and operate at full-/low-speed along with other full-/low-speed only devices.  The host controller also directly supports attaching full-/low-speed only devices.  Chapter 11 describes the details of how the hub accomplishes the isolation of the two signaling environments.

Each high-speed operating hub essentially adds one (or more) additional full-/low-speed buses; i.e., each hub supports additional (optionally multiple) 12 Mb/s of USB full-/low-speed bandwidth.  This allows more full-/low-speed buses to be attached without requiring additional host controllers in a system.  Even though there can be several 12 Mb/s full-/low-speed buses, there are only at most 127 USB devices attached to any single host controller.

### 5.2.4  Logical Bus Topology

While devices physically attach to the USB in a tiered, star topology, the host communicates with each logical device as if it were directly connected to the root port.  This creates the logical view illustrated in Figure 5-7 that corresponds to the physical topology shown in Figure 5-5.  Hubs are logical devices also but are not shown in Figure 5-7 to simplify the picture.  Even though most host/logical device activities use this logical perspective, the host maintains an awareness of the physical topology to support processing the removal of hubs.  When a hub is removed, all of the devices attached to the hub must be removed from the host's view of the logical topology.  A more complete discussion of hubs can be found in Chapter 11.



**Figure 5-7.  USB Logical Bus Topology**

30

Universal Serial Bus Specification Revision 2.0

### 5.2.5  Client Software-to-function Relationship

Even though the physical and logical topology of the USB reflects the shared nature of the bus, client software (CSw) manipulating a USB function interface is presented with the view that it deals only with its interface(s) of interest.  Client software for USB functions must use USB software programming interfaces to manipulate their functions as opposed to directly manipulating their functions via memory or I/O accesses as with other buses (e.g., PCI, EISA, PCMCIA, etc.).  During operation, client software should be independent of other devices that may be connected to the USB.  This allows the designer of the device and client software to focus on the hardware/software interaction design details.  Figure 5-8 illustrates a device designer's perspective of the relationships of client software and USB functions with respect to the USB logical topology of Figure 5-7.



**Figure 5-8.  Client Software-to-function Relationships**

### 5.3  USB Communication Flow

The USB provides a communication service between software on the host and its USB function.  Functions can have different communication flow requirements for different client-to-function interactions.  The USB provides better overall bus utilization by allowing the separation of the different communication flows to a USB function.  Each communication flow makes use of some bus access to accomplish communication between client and function.  Each communication flow is terminated at an endpoint on a device.  Device endpoints are used to identify aspects of each communication flow.

Figure 5-9 shows a more detailed view of Figure 5-2.  The complete definition of the actual communication flows of Figure 5-2 supports the logical device and function layer communication flows.  These actual communication flows cross several interface boundaries.  Chapters 6 through 8 describe the mechanical, electrical, and protocol interface definitions of the USB "wire."  Chapter 9 describes the USB device programming interface that allows a USB device to be manipulated from the host side of the wire.  Chapter 10 describes two host side software interfaces:

- Host Controller Driver (HCD):  The software interface between the USB Host Controller and USB System Software.  This interface allows a range of Host Controller implementations without requiring all host software to be dependent on any particular implementation.  One USB Driver can support different Host Controllers without requiring specific knowledge of a Host Controller implementation. A Host Controller implementer provides an HCD implementation that supports the Host Controller.

- USB Driver (USBD):  The interface between the USB System Software and the client software.  This interface provides clients with convenient functions for manipulating USB devices.

31

Universal Serial Bus Specification Revision 2.0



**Figure 5-9.  USB Host/Device Detailed View**

A USB logical device appears to the USB system as a collection of endpoints.  Endpoints are grouped into endpoint sets that implement an interface.  Interfaces are views to the function.  The USB System Software manages the device using the Default Control Pipe.  Client software manages an interface using pipe bundles (associated with an endpoint set).  Client software requests that data be moved across the USB between a buffer on the host and an endpoint on the USB device.  The Host Controller (or USB device, depending on transfer direction) packetizes the data to move it over the USB.  The Host Controller also coordinates when bus access is used to move the packet of data over the USB.

32

Universal Serial Bus Specification Revision 2.0

Figure 5-10 illustrates how communication flows are carried over pipes between endpoints and host side memory buffers.  The following sections describe endpoints, pipes, and communication flows in more detail.



**Figure 5-10.   USB Communication Flow**

Software on the host communicates with a logical device via a set of communication flows.  The set of communication flows are selected by the device software/hardware designer(s) to efficiently match the communication requirements of the device to the transfer characteristics provided by the USB.

## 5.3.1  Device Endpoints

An endpoint is a uniquely identifiable portion of a USB device that is the terminus of a communication flow between the host and device.  Each USB logical device is composed of a collection of independent endpoints.  Each logical device has a unique address assigned by the system at device attachment time.  Each endpoint on a device is given at design time a unique device-determined identifier called the endpoint number.  Each endpoint has a device-determined direction of data flow.  The combination of the device address, endpoint number, and direction allows each endpoint to be uniquely referenced.  Each endpoint is a simplex connection that supports data flow in one direction:  either input (from device to host) or output (from host to device).

An endpoint has characteristics that determine the type of transfer service required between the endpoint and the client software.  An endpoint describes itself by:

- Bus access frequency/latency requirement

- Bandwidth requirement

- Endpoint number

- Error handling behavior requirements

- Maximum packet size that the endpoint is capable of sending or receiving

- The transfer type for the endpoint (refer to Section 5.4 for details)

- The direction in which data is transferred between the endpoint and the host

Endpoints other than those with endpoint number zero are in an unknown state before being configured and may not be accessed by the host before being configured.

33

Universal Serial Bus Specification Revision 2.0

### 5.3.1.1  Endpoint Zero Requirements

All USB devices are required to implement a default control method that uses both the input and output endpoints with endpoint number zero.  The USB System Software uses this default control method to initialize and generically manipulate the logical device (e.g., to configure the logical device) as the Default Control Pipe (see Section 5.3.2).  The Default Control Pipe provides access to the device's configuration information and allows generic USB status and control access.  The Default Control Pipe supports control transfers as defined in Section 5.5.  The endpoints with endpoint number zero are always accessible once a device is attached, powered, and has received a bus reset.

A USB device that is capable of operating at high-speed must have a minimum level of support for operating at full-speed.  When the device is attached to a hub operating in full-speed, the device must:

- Be able to reset successfully at full-speed

- Respond successfully to standard requests: set_address, set_configuration, get_descriptor for device and configuration descriptors, and return appropriate information

The high-speed device may or may not be able to support its intended functionality when operating at full-speed.

### 5.3.1.2  Non-endpoint Zero Requirements

Functions can have additional endpoints as required for their implementation.  Low-speed functions are limited to two optional endpoints beyond the two required to implement the Default Control Pipe.  Full-speed devices can have additional endpoints only limited by the protocol definition (i.e., a maximum of 15 additional input endpoints and 15 additional output endpoints).

Endpoints other than those for the Default Control Pipe cannot be used until the device is configured as a normal part of the device configuration process (refer to Chapter 9).

### 5.3.2  Pipes

A USB pipe is an association between an endpoint on a device and software on the host.  Pipes represent the ability to move data between software on the host via a memory buffer and an endpoint on a device.  There are two mutually exclusive pipe communication modes:

- Stream:  Data moving through a pipe has no USB-defined structure

- Message:  Data moving through a pipe has some USB-defined structure

The USB does not interpret the content of data it delivers through a pipe.  Even though a message pipe requires that data be structured according to USB definitions, the content of the data is not interpreted by the USB.

Additionally, pipes have the following associated with them:

- A claim on USB bus access and bandwidth usage.

- A transfer type.

- The associated endpoint's characteristics, such as directionality and maximum data payload sizes.  The data payload is the data that is carried in the data field of a data packet within a bus transaction (as defined in Chapter 8).

The pipe that consists of the two endpoints with endpoint number zero is called the Default Control Pipe. This pipe is always available once a device is powered and has received a bus reset.  Other pipes come into existence when a USB device is configured.  The Default Control Pipe is used by the USB System Software to determine device identification and configuration requirements and to configure the device.  The Default Control Pipe can also be used by device-specific software after the device is configured.  The USB System

34

Universal Serial Bus Specification Revision 2.0

Software retains "ownership" of the Default Control Pipe and mediates use of the pipe by other client software.

A software client normally requests data transfers via I/O Request Packets (IRPs) to a pipe and then either waits or is notified when they are completed. Details about IRPs are defined in an operating system-specific manner. This specification uses the term to simply refer to an identifiable request by a software client to move data between itself (on the host) and an endpoint of a device in an appropriate direction. A software client can cause a pipe to return all outstanding IRPs if it desires. The software client is notified that an IRP has completed when the bus transactions associated with it have completed either successfully or due to errors.

If there are no IRPs pending or in progress for a pipe, the pipe is idle and the Host Controller will take no action with regard to the pipe; i.e., the endpoint for such a pipe will not see any bus transactions directed to it. The only time bus activity is present for a pipe is when IRPs are pending for that pipe.

If a non-isochronous pipe encounters a condition that causes it to send a STALL to the host (refer to Chapter 8) or three bus errors are encountered on any packet of an IRP, the IRP is aborted/retired, all outstanding IRPs are also retired, and no further IRPs are accepted until the software client recovers from the condition (in an implementation-dependent way) and acknowledges the halt or error condition via a USBD call. An appropriate status informs the software client of the specific IRP result for error versus halt (refer to Chapter 10). Isochronous pipe behavior is described in Section 5.6.

An IRP may require multiple data payloads to move the client data over the bus. The data payloads for such a multiple data payload IRP are expected to be of the maximum packet size until the last data payload that contains the remainder of the overall IRP. See the description of each transfer type for more details. For such an IRP, short packets (i.e., less than maximum-sized data payloads) on input that do not completely fill an IRP data buffer can have one of two possible meanings, depending upon the expectations of a client:

- A client can expect a variable-sized amount of data in an IRP. In this case, a short packet that does not fill an IRP data buffer can be used simply as an in-band delimiter to indicate "end of unit of data." The IRP should be retired without error and the Host Controller should advance to the next IRP.

- A client can expect a specific-sized amount of data. In this case, a short packet that does not fill an IRP data buffer is an indication of an error. The IRP should be retired, the pipe should be stalled, and any pending IRPs associated with the pipe should also be retired.

Because the Host Controller must behave differently in the two cases and cannot know on its own which way to behave for a given IRP; it is possible to indicate per IRP which behavior the client desires.

An endpoint can inform the host that it is busy by responding with NAK. NAKs are not used as a retire condition for returning an IRP to a software client. Any number of NAKs can be encountered during the processing of a given IRP. A NAK response to a transaction does not constitute an error and is not counted as one of the three errors described above.

## 5.3.2.1 Stream Pipes

Stream pipes deliver data in the data packet portion of bus transactions with no USB-required structure on the data content. Data flows in at one end of a stream pipe and out the other end in the same order. Stream pipes are always uni-directional in their communication flow.

Data flowing through a stream pipe is expected to interact with what the USB believes is a single client. The USB System Software is not required to provide synchronization between multiple clients that may be using the same stream pipe. Data presented to a stream pipe is moved through the pipe in sequential order: first-in, first-out.

A stream pipe to a device is bound to a single device endpoint number in the appropriate direction (i.e., corresponding to an IN or OUT token as defined by the protocol layer). The device endpoint number for the opposite direction can be used for some other stream pipe to the device.

35

Universal Serial Bus Specification Revision 2.0

Stream pipes support bulk, isochronous, and interrupt transfer types, which are explained in later sections.

## 5.3.2.2  Message Pipes

Message pipes interact with the endpoint in a different manner than stream pipes.  First, a request is sent to the USB device from the host.  This request is followed by data transfer(s) in the appropriate direction.  Finally, a Status stage follows at some later time.  In order to accommodate the request/data/status paradigm, message pipes impose a structure on the communication flow that allows commands to be reliably identified and communicated.  Message pipes allow communication flow in both directions, although the communication flow may be predominately one way.  The Default Control Pipe is always a message pipe.

The USB System Software ensures that multiple requests are not sent to a message pipe concurrently.  A device is required to service only a single message request at a time per message pipe.  Multiple software clients on the host can make requests via the Default Control Pipe, but they are sent to the device in a first-in, first-out order.  A device can control the flow of information during the Data and Status stages based on its ability to respond to the host transactions (refer to Chapter 8 for more details).

A message pipe will not normally be sent the next message from the host until the current message's processing at the device has been completed.  However, there are error conditions whereby a message transfer can be aborted by the host and the message pipe can be sent a new message transfer prematurely (from the device's perspective).  From the perspective of the software manipulating a message pipe, an error on some part of an IRP retires the current IRP and all queued IRPs.  The software client that requested the IRP is notified of the IRP completion with an appropriate error indication.

A message pipe to a device requires a single device endpoint number in both directions (IN and OUT tokens).  The USB does not allow a message pipe to be associated with different endpoint numbers for each direction.

Message pipes support the control transfer type, which is explained in Section 5.5.

## 5.3.3  Frames and Microframes

USB establishes a 1 millisecond time base called a frame on a full-/low-speed bus and a 125 µs time base called a microframe on a high-speed bus.  A (micro)frame can contain several transactions.  Each transfer type defines what transactions are allowed within a (micro)frame for an endpoint.  Isochronous and interrupt endpoints are given opportunities to the bus every N (micro)frames.  The values of N and other details about isochronous and interrupt transfers are described in Sections 5.6 and 5.7.

## 5.4  Transfer Types

The USB transports data through a pipe between a memory buffer associated with a software client on the host and an endpoint on the USB device.  Data transported by message pipes is carried in a USB-defined structure, but the USB allows device-specific structured data to be transported within the USB-defined message data payload.  The USB also defines that data moved over the bus is packetized for any pipe (stream or message), but ultimately the formatting and interpretation of the data transported in the data payload of a bus transaction is the responsibility of the client software and function using the pipe.  However, the USB provides different transfer types that are optimized to more closely match the service requirements of the client software and function using the pipe.  An IRP uses one or more bus transactions to move information between a software client and its function.

Each transfer type determines various characteristics of the communication flow including the following:

- Data format imposed by the USB
- Direction of communication flow
- Packet size constraints

36

**Universal Serial Bus Specification Revision 2.0**

- Bus access constraints

- Latency constraints

- Required data sequences

- Error handling

The designers of a USB device choose the capabilities for the device's endpoints.  When a pipe is established for an endpoint, most of the pipe's transfer characteristics are determined and remain fixed for the lifetime of the pipe.  Transfer characteristics that can be modified are described for each transfer type.

The USB defines four transfer types:

- Control Transfers:  Bursty, non-periodic, host software-initiated request/response communication, typically used for command/status operations.

- Isochronous Transfers:  Periodic, continuous communication between host and device, typically used for time-relevant information.  This transfer type also preserves the concept of time encapsulated in the data.  This does not imply, however, that the delivery needs of such data is always time-critical.

- Interrupt Transfers:  Low-frequency, bounded-latency communication.

- Bulk Transfers:  Non-periodic, large-packet bursty communication, typically used for data that can use any available bandwidth and can also be delayed until bandwidth is available.

Each transfer type is described in detail in the following four major sections.  The data for any IRP is carried by the data field of the data packet as described in Section 8.3.4.  Chapter 8 also describes details of the protocol that are affected by use of each particular transfer type.

## 5.4.1  Table Calculation Examples

The following sections describe each of the USB transfer types.  In these sections, there are tables that illustrate the maximum number of transactions that can be expected to be contained in a (micro)frame. These tables can be used to determine the maximum performance behavior possible for a specific transfer type.  Actual performance may vary with specific system implementation details.

Each table shows:

- The protocol overhead required for the specific transfer type (and speed)

- For some sample data payload sizes:

  o The maximum sustained bandwidth possible for this case

  o The percentage of a (micro)frame that each transaction requires

  o The maximum number of transactions in a (micro)frame for the specific case

  o The remaining bytes in a (micro)frame that would not be required for the specific case

  o The total number of data bytes transported in a single (micro)frame for the specific case

A transaction of a particular transfer type typically requires multiple packets. The protocol overhead for each transaction includes:

- A SYNC field for each packet:  either 8 bits (full-/low-speed) or 32 bits (high-speed)

- A PID byte for each packet:  includes PID and PID invert (check) bits

- An EOP for each packet:  3 bits (full-/low-speed) or 8 bits (high-speed)

- In a token packet, the endpoint number, device address, and CRC5 fields (16 bits total)

37

65

- In a data packet, CRC16 fields (16 bits total)
- In a data packet, any data field (8 bits per byte)
- For transaction with multiple packets, the inter packet gap or bus turnaround time required.

For these calculations, there is assumed to be no bit-stuffing required.

Using the low speed interrupt OUT as an example, there are 5 packets in the transaction:

- A PRE special packet
- A token packet
- A PRE special packet
- A data packet
- A handshake packet

There is one bus turnaround between the data and handshake packets. The protocol overhead is therefore:

5 SYNC, 5 PID, Endpoint + CRC5, CRC16, 5 EOPs and interpacket delay (one bus turnaround, 1 delay between packets, and 2 hub setup times).

## 5.5  Control Transfers

Control transfers allow access to different parts of a device.  Control transfers are intended to support configuration/command/status type communication flows between client software and its function.  A control transfer is composed of a Setup bus transaction moving request information from host to function, zero or more Data transactions sending data in the direction indicated by the Setup transaction, and a Status transaction returning status information from function to host.  The Status transaction returns "success" when the endpoint has successfully completed processing the requested operation.  Section 8.5.3 describes the details of what packets, bus transactions, and transaction sequences are used to accomplish a control transfer.  Chapter 9 describes the details of the defined USB command codes.

Each USB device is required to implement the Default Control Pipe as a message pipe.  This pipe is used by the USB System Software.  The Default Control Pipe provides access to the USB device's configuration, status, and control information.  A function can, but is not required to, provide endpoints for additional control pipes for its own implementation needs.

The USB device framework (refer to Chapter 9) defines standard, device class, or vendor-specific requests that can be used to manipulate a device's state.  Descriptors are also defined that can be used to contain different information on the device.  Control transfers provide the transport mechanism to access device descriptors and make requests of a device to manipulate its behavior.

Control transfers are carried only through message pipes.  Consequently, data flows using control transfers must adhere to USB data structure definitions as described in Section 5.5.1.

The USB system will make a "best effort" to support delivery of control transfers between the host and devices.  A function and its client software cannot request specific bus access frequency or bandwidth for control transfers.  The USB System Software may restrict the bus access and bandwidth that a device may desire for control transfers.  These restrictions are defined in Section 5.5.3 and Section 5.5.4.

### 5.5.1  Control Transfer Data Format

The Setup packet has a USB-defined structure that accommodates the minimum set of commands required to enable communication between the host and a device.  The structure definition allows vendor-specific extensions for device specific commands.  The Data transactions following Setup have a USB-defined structure except when carrying vendor-specific information.  The Status transaction also has a USB-defined structure.  Specific control transfer Setup/Data definitions are described in Section 8.5.3 and Chapter 9.

38

Universal Serial Bus Specification Revision 2.0

## 5.5.2  Control Transfer Direction

Control transfers are supported via bi-directional communication flow over message pipes.  As a consequence, when a control pipe is configured, it uses both the input and output endpoint with the specified endpoint number.

## 5.5.3  Control Transfer Packet Size Constraints

An endpoint for control transfers specifies the maximum data payload size that the endpoint can accept from or transmit to the bus. The allowable maximum control transfer data payload sizes for full-speed devices is 8, 16, 32, or 64 bytes; for high-speed devices, it is 64 bytes and for low-speed devices, it is 8 bytes.  This maximum applies to the data payloads of the Data packets following a Setup; i.e., the size specified is for the data field of the packet as defined in Chapter 8, not including other information that is required by the protocol.  A Setup packet is always eight bytes.  A control pipe (including the Default Control Pipe) always uses its *wMaxPacketSize* value for data payloads.

An endpoint reports in its configuration information the value for its maximum data payload size.  The USB does not require that data payloads transmitted be exactly the maximum size; i.e., if a data payload is less than the maximum, it does not need to be padded to the maximum size.

All Host Controllers are required to have support for 8-, 16-, 32-, and 64-byte maximum data payload sizes for full-speed control endpoints, only 8-byte maximum data payload sizes for low-speed control endpoints, and only 64-byte maximum data payload size for high-speed control endpoints.  No Host Controller is required to support larger or smaller maximum data payload sizes.

In order to determine the maximum packet size for the Default Control Pipe, the USB System Software reads the device descriptor.  The host will read the first eight bytes of the device descriptor.  The device always responds with at least these initial bytes in a single packet.  After the host reads the initial part of the device descriptor, it is guaranteed to have read this default pipe's *wMaxPacketSize* field (byte 7 of the device descriptor).  It will then allow the correct size for all subsequent transactions.  For all other control endpoints, the maximum data payload size is known after configuration so that the USB System Software can ensure that no data payload will be sent to the endpoint that is larger than the supported size.

An endpoint must always transmit data payloads with a data field less than or equal to the endpoint's *wMaxPacketSize* (refer to Chapter 9).  When a control transfer involves more data than can fit in one data payload of the currently established maximum size, all data payloads are required to be maximum-sized except for the last data payload, which will contain the remaining data.

The Data stage of a control transfer from an endpoint to the host is complete when the endpoint does one of the following:

- Has transferred exactly the amount of data specified during the Setup stage
- Transfers a packet with a payload size less than *wMaxPacketSize* or transfers a zero-length packet

When a Data stage is complete, the Host Controller advances to the Status stage instead of continuing on with another data transaction.  If the Host Controller does not advance to the Status stage when the Data stage is complete, the endpoint halts the pipe as was outlined in Section 5.3.2.  If a larger-than-expected data payload is received from the endpoint, the IRP for the control transfer will be aborted/retired.

The Data stage of a control transfer from the host to an endpoint is complete when all of the data has been transferred.  If the endpoint receives a larger-than-expected data payload from the host, it halts the pipe.

39

Universal Serial Bus Specification Revision 2.0

## 5.5.4  Control Transfer Bus Access Constraints

Control transfers can be used by high-speed, full-speed, and low-speed USB devices.

An endpoint has no way to indicate a desired bus access frequency for a control pipe.  The USB balances the bus access requirements of all control pipes and the specific IRPs that are pending to provide "best effort" delivery of data between client software and functions.

The USB requires that part of each (micro)frame be reserved to be available for use by control transfers as follows:

- If the control transfers that are attempted (in an implementation-dependent fashion) consume less than 10% of the frame time for full-/low-speed endpoints or less than 20% of a microframe for high-speed endpoints, the remaining time can be used to support bulk transfers (refer to Section 5.8).

- A control transfer that has been attempted and needs to be retried can be retried in the current or a future (micro)frame; i.e., it is not required to be retried in the same (micro)frame.

- If there are more control transfers than reserved time, but there is additional (micro)frame time that is not being used for isochronous or interrupt transfers, a Host Controller may move additional control transfers as they are available.

- If there are too many pending control transfers for the available (micro)frame time, control transfers are selected to be moved over the bus as appropriate.

- If there are control transfers pending for multiple endpoints, control transfers for the different endpoints are selected according to a fair access policy that is Host Controller implementation-dependent.

- A transaction of a control transfer that is frequently being retried should not be expected to consume an unfair share of the bus time.

High-speed control endpoints must support the PING flow control protocol for OUT transactions.  The details of this protocol are described in Section 8.5.1.

These requirements allow control transfers between host and devices to be regularly moved over the bus with "best effort."

The USB System Software can, at its discretion, vary the rate of control transfers to a particular endpoint. An endpoint and its client software cannot assume a specific rate of service for control transfers.  A control endpoint may see zero or more transfers in a single (micro)frame.  Bus time made available to a software client and its endpoint can be changed as other devices are inserted into and removed from the system or also as control transfers are requested for other device endpoints.

The bus frequency and (micro)frame timing limit the maximum number of successful control transfers within a (micro)frame for any USB system.  For full-/low-speed buses, the number of successful control transfers per frame is limited to less than 29 full-speed eight-byte data payloads or less than four low-speed eight-byte data payloads.  For high-speed buses, the number of control transfers is limited to less than 32 high-speed 64-byte data payloads per microframe.

Table 5-1 lists information about different-sized low-speed packets and the maximum number of packets possible in a frame.  The table does not include the overhead associated with bit stuffing.

40

Universal Serial Bus Specification Revision 2.0

Table 5-1.  Low-speed Control Transfer Limits

| Protocol Overhead (63 bytes) | | (15 SYNC bytes, 15 PID bytes, 6 Endpoint + CRC bytes, 6 CRC bytes, 8 Setup data bytes, and a 13-byte interpacket delay (EOP, etc.)) | | | | |
|---|---|---|---|---|---|---|
| | Data Payload | Max Bandwidth (bytes/second) | Frame Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/Frame Useful Data |
| | 1 | 3000 | 26% | 3 | 40 | 3 |
| | 2 | 6000 | 27% | 3 | 37 | 6 |
| | 4 | 12000 | 28% | 3 | 31 | 12 |
| | 8 | 24000 | 30% | 3 | 19 | 24 |
| Max | | 187500 | | | | 187 |

For all speeds, because a control transfer is composed of several packets, the packets can be spread over several (micro)frames to spread the bus time required across several (micro)frames.

The 10% frame reservation for full-/low-speed non-periodic transfers means that in a system with bus time fully allocated, all full-speed control transfers in the system contend for a nominal three control transfers per frame.  Because the USB system uses control transfers for configuration purposes in addition to whatever other control transfers other client software may be requesting, a given software client and its function should not expect to be able to make use of this full bandwidth for its own control purposes.  Host Controllers are also free to determine how the individual bus transactions for specific control transfers are moved over the bus within and across frames.  An endpoint could see all bus transactions for a control transfer within the same frame or spread across several noncontiguous frames.  A Host Controller, for various implementation reasons, may not be able to provide the theoretical maximum number of control transfers per frame.

For high-speed endpoints, the 20% microframe reservation for non-periodic transfers means that all high speed control transfers are contending for nominally six control transfers per microframe. High-speed control transfers contend for microframe time along with split-transactions (see Sections 11.15-11.21 for more information about split transactions) for full- and low-speed control transfers.  Both full-speed and low-speed control transfers contend for the same available frame time.  However, high-speed control transfers for some endpoints can occur simultaneously with full- and low-speed control transfers for other endpoints.  Low-speed control transfers simply take longer to transfer.

41

**Universal Serial Bus Specification Revision 2.0**

Table 5-2 lists information about different-sized full-speed control transfers and the maximum number of transfers possible in a frame.  This table was generated assuming that there is one Data stage transaction and that the Data stage has a zero-length status phase.  The table illustrates the possible power of two data payloads less than or equal to the allowable maximum data payload sizes.  The table does not include the overhead associated with bit stuffing.

**Table 5-2.  Full-speed Control Transfer Limits**

| Protocol Overhead (45 bytes) | | (9 SYNC bytes, 9 PID bytes, 6 Endpoint + CRC bytes, 6 CRC bytes, 8 Setup data bytes, and a 7-byte interpacket delay (EOP, etc.)) | | | | |
|---|---|---|---|---|---|---|
| Data Payload | Max Bandwidth (bytes/second) | Frame Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/Frame Useful Data | |
| 1 | 32000 | 3% | 32 | 23 | 32 | |
| 2 | 62000 | 3% | 31 | 43 | 62 | |
| 4 | 120000 | 3% | 30 | 30 | 120 | |
| 8 | 224000 | 4% | 28 | 16 | 224 | |
| 16 | 384000 | 4% | 24 | 36 | 384 | |
| 32 | 608000 | 5% | 19 | 37 | 608 | |
| 64 | 832000 | 7% | 13 | 83 | 832 | |
| Max | | 1500000 | | | | 1500 |

42

Universal Serial Bus Specification Revision 2.0

Table 5-3 lists information about different-sized high-speed control transfers and the maximum number of transfers possible in a microframe. This table was generated assuming that there is one Data stage transaction and that the Data stage has a zero-length status stage. The table illustrates the possible power of two data payloads less than or equal to the allowable maximum data payload size. The table does not include the overhead associated with bit stuffing.

**Table 5-3. High-speed Control Transfer Limits**

| Protocol Overhead (173 bytes) | (Based on 480Mb/s and 8 bit interpacket gap, 88 bit min bus turnaround, 32 bit sync, 8 bit EOP: (9x4 SYNC bytes, 9 PID bytes, 6 EP/ADDR+CRC,6 CRC16, 8 Setup data, 9x(1+11) byte interpacket delay (EOP, etc.)) | | | | |
|---|---|---|---|---|---|
| Data Payload | Max Bandwidth (bytes/second) | Microframe Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/ Microframe Useful Data |
| 1 | 344000 | 2% | 43 | 18 | 43 |
| 2 | 672000 | 2% | 42 | 150 | 84 |
| 4 | 1344000 | 2% | 42 | 66 | 168 |
| 8 | 2624000 | 2% | 41 | 79 | 328 |
| 16 | 4992000 | 3% | 39 | 129 | 624 |
| 32 | 9216000 | 3% | 36 | 120 | 1152 |
| 64 | 15872000 | 3% | 31 | 153 | 1984 |
| Max | 60000000 | | | | 7500 |

## 5.5.5  Control Transfer Data Sequences

Control transfers require that a Setup bus transaction be sent from the host to a device to describe the type of control access that the device should perform. The Setup transaction is followed by zero or more control Data transactions that carry the specific information for the requested access. Finally, a Status transaction completes the control transfer and allows the endpoint to return the status of the control transfer to the client software. After the Status transaction for a control transfer is completed, the host can advance to the next control transfer for the endpoint. As described in Section 5.5.4, each control transaction and the next control transfer will be moved over the bus at some Host Controller implementation-defined time.

The endpoint can be busy for a device-specific time during the Data and Status transactions of the control transfer. During these times when the endpoint indicates it is busy (refer to Chapter 8 and Chapter 9 for details), the host will retry the transaction at a later time.

If a Setup transaction is received by an endpoint before a previously initiated control transfer is completed, the device must abort the current transfer/operation and handle the new control Setup transaction. A Setup transaction should not normally be sent before the completion of a previous control transfer. However, if a transfer is aborted, for example, due to errors on the bus, the host can send the next Setup transaction prematurely from the endpoint's perspective.

43

**Universal Serial Bus Specification Revision 2.0**

After a halt condition is encountered or an error is detected by the host, a control endpoint is allowed to recover by accepting the next Setup PID; i.e., recovery actions via some other pipe are not required for control endpoints.  For the Default Control Pipe, a device reset will ultimately be required to clear the halt or error condition if the next Setup PID is not accepted.

The USB provides robust error detection and recovery/retransmission for errors that occur during control transfers.  Transmitters and receivers can remain synchronized with regard to where they are in a control transfer and recover with minimum effort.  Retransmission of Data and Status packets can be detected by a receiver via data retry indicators in the packet.  A transmitter can reliably determine that its corresponding receiver has successfully accepted a transmitted packet by information returned in a handshake to the packet.  The protocol allows for distinguishing a retransmitted packet from its original packet except for a control Setup packet.  Setup packets may be retransmitted due to a transmission error; however, Setup packets cannot indicate that a packet is an original or a retried transmission.

## 5.6  Isochronous Transfers

In non-USB environments, isochronous transfers have the general implication of constant-rate, error-tolerant transfers.  In the USB environment, requesting an isochronous transfer type provides the requester with the following:

* Guaranteed access to USB bandwidth with bounded latency

* Guaranteed constant data rate through the pipe as long as data is provided to the pipe

* In the case of a delivery failure due to error, no retrying of the attempt to deliver the data

While the USB isochronous transfer type is designed to support isochronous sources and destinations, it is not required that software using this transfer type actually be isochronous in order to use the transfer type.  Section 5.12 presents more detail on special considerations for handling isochronous data on the USB.

### 5.6.1  Isochronous Transfer Data Format

The USB imposes no data content structure on communication flows for isochronous pipes.

### 5.6.2  Isochronous Transfer Direction

An isochronous pipe is a stream pipe and is, therefore, always uni-directional.  An endpoint description identifies whether a given isochronous pipe's communication flow is into or out of the host.  If a device requires bi-directional isochronous communication flow, two isochronous pipes must be used, one in each direction.

### 5.6.3  Isochronous Transfer Packet Size Constraints

An endpoint in a given configuration for an isochronous pipe specifies the maximum size data payload that it can transmit or receive.  The USB System Software uses this information during configuration to ensure that there is sufficient bus time to accommodate this maximum data payload in each (micro)frame.  If there is sufficient bus time for the maximum data payload, the configuration is established; if not, the configuration is not established.

The USB limits the maximum data payload size to 1,023 bytes for each full-speed isochronous endpoint. High-speed endpoints are allowed up to 1024-byte data payloads.  A high speed, high bandwidth endpoint specifies whether it requires two or three transactions per microframe.  Table 5-4 lists information about different-sized full-speed isochronous transactions and the maximum number of transactions possible in a frame.  The table is shaded to indicate that a full-speed isochronous endpoint (with a non-zero *wMaxpacket* size) must not be part of a default interface setting.  The table does not include the overhead associated with bit stuffing.

44

Universal Serial Bus Specification Revision 2.0

Table 5-4.  Full-speed Isochronous Transaction Limits

| Protocol Overhead (9 bytes) | | (2 SYNC bytes, 2 PID bytes, 2 Endpoint + CRC bytes, 2 CRC bytes, and a 1-byte interpacket delay) | | | |
|---|---|---|---|---|---|
| Data Payload | Max Bandwidth(bytes/ second) | Frame Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/Frame Useful Data |
| 1 | 150000 | 1% | 150 | 0 | 150 |
| 2 | 272000 | 1% | 136 | 4 | 272 |
| 4 | 460000 | 1% | 115 | 5 | 460 |
| 8 | 704000 | 1% | 88 | 4 | 704 |
| 16 | 960000 | 2% | 60 | 0 | 960 |
| 32 | 1152000 | 3% | 36 | 24 | 1152 |
| 64 | 1280000 | 5% | 20 | 40 | 1280 |
| 128 | 1280000 | 9% | 10 | 130 | 1280 |
| 256 | 1280000 | 18% | 5 | 175 | 1280 |
| 512 | 1024000 | 35% | 2 | 458 | 1024 |
| 1023 | 1023000 | 69% | 1 | 468 | 1023 |
| Max | | 1500000 | | | 1500 |

45

**Universal Serial Bus Specification Revision 2.0**

Table 5-5 lists information about different-sized high-speed isochronous transactions and the maximum number of transactions possible in a microframe.  The table is shaded to indicate that a high-speed isochronous endpoint must not be part of a default interface setting.  The table does not include the overhead associated with bit stuffing.

Any given transaction for an isochronous pipe need not be exactly the maximum size specified for the endpoint.  The size of a data payload is determined by the transmitter (client software or function) and can vary as required from transaction to transaction.  The USB ensures that whatever size is presented to the Host Controller is delivered on the bus.  The actual size of a data payload is determined by the data transmitter and may be less than the prenegotiated maximum size.  Bus errors can change the actual packet size seen by the receiver.  However, these errors can be detected by either CRC on the data or by knowledge the receiver has about the expected size for any transaction.

**Table 5-5.  High-speed Isochronous Transaction Limits**

| Protocol Overhead | (Based on 480Mb/s and 8 bit interpacket gap, 88 bit min bus turnaround, 32 bit sync, 8 bit EOP: (2x4 SYNC bytes, 2 PID bytes, 2 EP/ADDR+addr+CRC5, 2 CRC16, and a 2x(1+11)) byte interpacket delay (EOP, etc.)) | | | | |
|---|---|---|---|---|---|
| **Data Payload** | **Max Bandwidth (bytes/second)** | **Microframe Bandwidth per Transfer** | **Max Transfers** | **Bytes Remaining** | **Bytes/ MicroFrame Useful Data** |
| 1 | 1536000 | 1% | 192 | 12 | 192 |
| 2 | 2992000 | 1% | 187 | 20 | 374 |
| 4 | 5696000 | 1% | 178 | 24 | 712 |
| 8 | 10432000 | 1% | 163 | 2 | 1304 |
| 16 | 17664000 | 1% | 138 | 48 | 2208 |
| 32 | 27392000 | 1% | 107 | 10 | 3424 |
| 64 | 37376000 | 1% | 73 | 54 | 4672 |
| 128 | 46080000 | 2% | 45 | 30 | 5760 |
| 256 | 51200000 | 4% | 25 | 150 | 6400 |
| 512 | 53248000 | 7% | 13 | 350 | 6656 |
| 1024 | 57344000 | 14% | 7 | 66 | 7168 |
| 2048 | 49152000 | 28% | 3 | 1242 | 6144 |
| 3072 | 49152000 | 41% | 2 | 1280 | 6144 |
| Max | 60000000 | | | | 7500 |

46

74

Universal Serial Bus Specification Revision 2.0

All device default interface settings must not include any isochronous endpoints with non-zero data payload sizes (specified via *wMaxPacketSize* in the endpoint descriptor).  Alternate interface settings may specify non-zero data payload sizes for isochronous endpoints.  If the isochronous endpoints have a large data payload size, it is recommended that additional alternate configurations or interface settings be used to specify a range of data payload sizes.  This increases the chance that the device can be used successfully in combination with other USB devices.

## 5.6.4  Isochronous Transfer Bus Access Constraints

Isochronous transfers can only be used by full-speed and high-speed devices.

The USB requires that no more than 90% of any frame be allocated for periodic (isochronous and interrupt) transfers for full-speed endpoints.  High-speed endpoints can allocate at most 80% of a microframe for periodic transfers.

An isochronous endpoint must specify its required bus access period.  Full-/high-speed endpoints must specify a desired period as $(2^{bInterval-1})$ x F, where bInterval is in the range one to (and including) 16 and F is 125 µs for high-speed and 1ms for full-speed.  This allows full-/high-speed isochronous transfers to have rates slower than one transaction per (micro)frame.  However, an isochronous endpoint must be prepared to handle poll rates faster than the one specified.  A host must not issue more than 1 transaction in a (micro)frame for an isochronous endpoint unless the endpoint is high-speed, high-bandwidth (see below).  An isochronous IN endpoint must return a zero-length packet whenever data is requested at a faster interval than the specified interval and data is not available.

A high-speed endpoint can move up to 3072 bytes per microframe (or 192 Mb/s).  A high-speed isochronous endpoint that requires more than 1024 bytes per period is called a high-bandwidth endpoint.  A high-bandwidth endpoint uses multiple transactions per microframe.  A high-bandwidth endpoint must specify a period of 1x125 µs (i.e., a *bInterval* value of 1).  See Section 5.9 for more information about the details of multiple transactions per microframe for high-bandwidth high-speed endpoints.

Errors on the bus or delays in operating system scheduling of client software can result in no packet being transferred for a (micro)frame.  An error indication should be returned as status to the client software in such a case.  A device can also detect this situation by tracking SOF tokens and noticing a disturbance in the specified bus access period pattern.

The bus frequency and (micro)frame timing limit the maximum number of successful isochronous transactions within a (micro)frame for any USB system to less than 151 full-speed one-byte data payloads and less than 193 high-speed one-byte data payloads.  A Host Controller, for various implementation reasons, may not be able to provide the theoretical maximum number of isochronous transactions per (micro)frame.

## 5.6.5  Isochronous Transfer Data Sequences

Isochronous transfers do not support data retransmission in response to errors on the bus.  A receiver can determine that a transmission error occurred.  The low-level USB protocol does not allow handshakes to be returned to the transmitter of an isochronous pipe.  Normally, handshakes would be returned to tell the transmitter whether a packet was successfully received or not.  For isochronous transfers, timeliness is more important than correctness/retransmission, and, given the low error rates expected on the bus, the protocol is optimized by assuming transfers normally succeed.  Isochronous receivers can determine whether they missed data during a (micro)frame.  Also, a receiver can determine how much data was lost.  Section 5.12 describes these USB mechanisms in more detail.

An endpoint for isochronous transfers never halts because there is no handshake to report a halt condition.  Errors are reported as status associated with the IRP for an isochronous transfer, but the isochronous pipe is not halted in an error case.  If an error is detected, the host continues to process the data associated with the next (micro)frame of the transfer.  Only limited error detection is possible because the protocol for isochronous transactions does not allow per-transaction handshakes.

47

Universal Serial Bus Specification Revision 2.0

## 5.7  Interrupt Transfers

The interrupt transfer type is designed to support those devices that need to send or receive data infrequently but with bounded service periods.  Requesting a pipe with an interrupt transfer type provides the requester with the following:

- Guaranteed maximum service period for the pipe

- Retry of transfer attempts at the next period, in the case of occasional delivery failure due to error on the bus

### 5.7.1  Interrupt Transfer Data Format

The USB imposes no data content structure on communication flows for interrupt pipes.

### 5.7.2  Interrupt Transfer Direction

An interrupt pipe is a stream pipe and is therefore always uni-directional.  An endpoint description identifies whether a given interrupt pipe's communication flow is into or out of the host.

### 5.7.3  Interrupt Transfer Packet Size Constraints

An endpoint for an interrupt pipe specifies the maximum size data payload that it will transmit or receive. The maximum allowable interrupt data payload size is 64 bytes or less for full-speed.  High-speed endpoints are allowed maximum data payload sizes up to 1024 bytes.  A high speed, high bandwidth endpoint specifies whether it requires two or three transactions per microframe.  Low-speed devices are limited to eight bytes or less maximum data payload size.  This maximum applies to the data payloads of the data packets; i.e., the size specified is for the data field of the packet as defined in Chapter 8, not including other protocol-required information.  The USB does not require that data packets be exactly the maximum size; i.e., if a data packet is less than the maximum, it does not need to be padded to the maximum size.

All Host Controllers are required to support maximum data payload sizes from 0 to 64 bytes for full-speed interrupt endpoints, from 0 to 8 bytes for low-speed interrupt endpoints, and from 0 to 1024 bytes for high-speed interrupt endpoints.  See Section 5.9 for more information about the details of multiple transactions per microframe for high bandwidth high-speed endpoints.  No Host Controller is required to support larger maximum data payload sizes.

The USB System Software determines the maximum data payload size that will be used for an interrupt pipe during device configuration.  This size remains constant for the lifetime of a device's configuration. The USB System Software uses the maximum data payload size determined during configuration to ensure that there is sufficient bus time to accommodate this maximum data payload in its assigned period.  If there is sufficient bus time, the pipe is established; if not, the pipe is not established.  However, the actual size of a data payload is still determined by the data transmitter and may be less than the maximum size.

An endpoint must always transmit data payloads with a data field less than or equal to the endpoint's *wMaxPacketSize* value.  A device can move data via an interrupt pipe that is larger than *wMaxPacketSize*. A software client can accept this data via an IRP for the interrupt transfer that requires multiple bus transactions without requiring an IRP-complete notification per transaction.  This can be achieved by specifying a buffer that can hold the desired data size.  The size of the buffer is a multiple of *wMaxPacketSize* with some remainder.  The endpoint must transfer each transaction except the last as *wMaxPacketSize* and the last transaction is the remainder.  The multiple data transactions are moved over the bus at the period established for the pipe.

When an interrupt transfer involves more data than can fit in one data payload of the currently established maximum size, all data payloads are required to be maximum-sized except for the last data payload, which will contain the remaining data.  An interrupt transfer is complete when the endpoint does one of the following:

48

Universal Serial Bus Specification Revision 2.0

- Has transferred exactly the amount of data expected

- Transfers a packet with a payload size less than *wMaxPacketSize* or transfers a zero-length packet

When an interrupt transfer is complete, the Host Controller retires the current IRP and advances to the next IRP. If a data payload is received that is larger than expected, the interrupt IRP will be aborted/retired and the pipe will stall future IRPs until the condition is corrected and acknowledged.

All high-speed device default interface settings must not include any interrupt endpoints with a data payload size (specified via *wMaxPacketSize* in the endpoint descriptor) greater than 64 bytes. Alternate interface settings may specify larger data payload sizes for interrupt endpoints. If the interrupt endpoints have a large data payload size, it is recommended that additional configurations or alternate interface settings be used to specify a range of data payload sizes. This increases the chances that the device can be used successfully in combination with other USB devices.

## 5.7.4  Interrupt Transfer Bus Access Constraints

Interrupt transfers can be used by low-speed, full-speed, and high-speed devices. High-speed endpoints can be allocated at most 80% of a microframe for periodic transfers. The USB requires that no more than 90% of any frame be allocated for periodic (isochronous and interrupt) full-/low-speed transfers.

The bus frequency and (micro)frame timing limit the maximum number of successful interrupt transactions within a (micro)frame for any USB system to less than 108 full-speed one-byte data payloads, or less than 10 low-speed one-byte data payloads, or to less than 134 high-speed one-byte data payloads. A Host Controller, for various implementation reasons, may not be able to provide the above maximum number of interrupt transactions per (micro)frame.

Table 5-6 lists information about different low-speed interrupt transactions and the maximum number of transactions possible in a frame. Table 5-7 lists similar information for full-speed interrupt transactions. Table 5-8 lists similar information for high-speed interrupt transactions. The shaded portion of Table 5-8 indicates the data payload sizes of a high-speed interrupt endpoint that must not be part of a default interface setting. The tables do not include the overhead associated with bit stuffing.

**Table 5-6.  Low-speed Interrupt Transaction Limits**

| Protocol Overhead (19 bytes) | (5 SYNC bytes, 5 PID bytes, 2 Endpoint + CRC bytes, 2 CRC bytes, and a 5-byte interpacket delay) | | | | |
|---|---|---|---|---|---|
| Data Payload | Max Bandwidth (bytes/second) | Frame Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/Frame Useful Data |
| 1 | 9000 | 11% | 9 | 7 | 9 |
| 2 | 16000 | 11% | 8 | 19 | 16 |
| 4 | 32000 | 12% | 8 | 3 | 32 |
| 8 | 48000 | 14% | 6 | 25 | 48 |
| Max | 187500 | | | | 187 |

49

77

**Universal Serial Bus Specification Revision 2.0**

**Table 5-7.  Full-speed Interrupt Transaction Limits**

| Protocol Overhead (13 bytes) | | (3 SYNC bytes, 3 PID bytes, 2 Endpoint + CRC bytes, 2 CRC bytes, and a 3-byte interpacket delay) | | | |
|---|---|---|---|---|---|
| Data Payload | Max Bandwidth (bytes/second) | Frame Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/Frame Useful Data |
| 1 | 107000 | 1% | 107 | 2 | 107 |
| 2 | 200000 | 1% | 100 | 0 | 200 |
| 4 | 352000 | 1% | 88 | 4 | 352 |
| 8 | 568000 | 1% | 71 | 9 | 568 |
| 16 | 816000 | 2% | 51 | 21 | 816 |
| 32 | 1056000 | 3% | 33 | 15 | 1056 |
| 64 | 1216000 | 5% | 19 | 37 | 1216 |
| Max | | 1500000 | | | 1500 |

50

Universal Serial Bus Specification Revision 2.0

Table 5-8.  High-speed Interrupt Transaction Limits

| Protocol Overhead | (Based on 480Mb/s and 8 bit interpacket gap, 88 bit min bus turnaround, 32 bit sync, 8 bit EOP: (3x4 SYNC bytes, 3 PID bytes, 2 EP/ADDR+CRC bytes, 2 CRC16 and a 3x(1+11) byte interpacket delay(EOP, etc.)) | | | | |
|---|---|---|---|---|---|
| Data Payload | Max Bandwidth (bytes/second) | Microframe Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/ Microframe Useful Data |
| 1 | 1064000 | 1% | 133 | 52 | 133 |
| 2 | 2096000 | 1% | 131 | 33 | 262 |
| 4 | 4064000 | 1% | 127 | 7 | 508 |
| 8 | 7616000 | 1% | 119 | 3 | 952 |
| 16 | 13440000 | 1% | 105 | 45 | 1680 |
| 32 | 22016000 | 1% | 86 | 18 | 2752 |
| 64 | 32256000 | 2% | 63 | 3 | 4032 |
| 128 | 40960000 | 2% | 40 | 180 | 5120 |
| 256 | 49152000 | 4% | 24 | 36 | 6144 |
| 512 | 53248000 | 8% | 13 | 129 | 6656 |
| 1024 | 49152000 | 14% | 6 | 1026 | 6144 |
| 2048 | 49152000 | 28% | 3 | 1191 | 6144 |
| 3072 | 49152000 | 42% | 2 | 1246 | 6144 |
| Max | | 60000000 | | | 7500 |

An endpoint for an interrupt pipe specifies its desired bus access period.  A full-speed endpoint can specify a desired period from 1 ms to 255 ms.  Low-speed endpoints are limited to specifying only 10 ms to 255 ms. High-speed endpoints can specify a desired period $(2^{bInterval-1})$x125 µs, where *bInterval* is in the range 1 to (including) 16.  The USB System Software will use this information during configuration to determine a period that can be sustained.  The period provided by the system may be shorter than that desired by the device up to the shortest period defined by the USB (125 µs microframe or 1 ms frame).  The client software and device can depend only on the fact that the host will ensure that the time duration between two transaction attempts with the endpoint will be no longer than the desired period.  Note that errors on the bus can prevent an interrupt transaction from being successfully delivered over the bus and consequently exceed the desired period.  Also, the endpoint is only polled when the software client has an IRP for an interrupt transfer pending.  If the bus time for performing an interrupt transfer arrives and there is no IRP pending, the endpoint will not be given an opportunity to transfer data at that time.  Once an IRP is available, its data will be transferred at the next allocated period.

51

Universal Serial Bus Specification Revision 2.0

A high-speed endpoint can move up to 3072 bytes per microframe (or 192 Mb/s). A high-speed interrupt endpoint that requires more than 1024 bytes per period is called a high-bandwidth endpoint. A high-bandwidth endpoint uses multiple transactions per microframe. A high-bandwidth endpoint must specify a period of 1x125 µs (i.e., a *bInterval* value of 1). See Section 5.9 for more information about the details of multiple transactions per microframe for high-bandwidth high-speed endpoints.

Interrupt transfers are moved over the USB by accessing an interrupt endpoint every specified period. For input interrupt endpoints, the host has no way to determine whether an endpoint will source an interrupt without accessing the endpoint and requesting an interrupt transfer. If the endpoint has no interrupt data to transmit when accessed by the host, it responds with NAK. An endpoint should only provide interrupt data when it has an interrupt pending to avoid having a software client erroneously notified of IRP complete. A zero-length data payload is a valid transfer and may be useful for some implementations.

### 5.7.5  Interrupt Transfer Data Sequences

Interrupt transactions may use either alternating data toggle bits, such that the bits are toggled only upon successful transfer completion or a continuously toggling of data toggle bits. The host in any case must assume that the device is obeying full handshake/retry rules as defined in Chapter 8. A device may choose to always toggle DATA0/DATA1 PIDs so that it can ignore handshakes from the host. However, in this case, the client software can miss some data packets when an error occurs, because the Host Controller interprets the next packet as a retry of a missed packet.

If a halt condition is detected on an interrupt pipe due to transmission errors or a STALL handshake being returned from the endpoint, all pending IRPs are retired. Removal of the halt condition is achieved via software intervention through a separate control pipe. This recovery will reset the data toggle bit to DATA0 for the endpoint on both the host and the device. Interrupt transactions are retried due to errors detected on the bus that affect a given transfer.

## 5.8  Bulk Transfers

The bulk transfer type is designed to support devices that need to communicate relatively large amounts of data at highly variable times where the transfer can use any available bandwidth. Requesting a pipe with a bulk transfer type provides the requester with the following:

- Access to the USB on a bandwidth-available basis
- Retry of transfers, in the case of occasional delivery failure due to errors on the bus
- Guaranteed delivery of data but no guarantee of bandwidth or latency

Bulk transfers occur only on a bandwidth-available basis. For a USB with large amounts of free bandwidth, bulk transfers may happen relatively quickly; for a USB with little bandwidth available, bulk transfers may trickle out over a relatively long period of time.

### 5.8.1  Bulk Transfer Data Format

The USB imposes no data content structure on communication flows for bulk pipes.

### 5.8.2  Bulk Transfer Direction

A bulk pipe is a stream pipe and, therefore, always has communication flowing either into or out of the host for a given pipe. If a device requires bi-directional bulk communication flow, two bulk pipes must be used, one in each direction.

52

Universal Serial Bus Specification Revision 2.0

### 5.8.3  Bulk Transfer Packet Size Constraints

An endpoint for bulk transfers specifies the maximum data payload size that the endpoint can accept from or transmit to the bus.  The USB defines the allowable maximum bulk data payload sizes to be only 8, 16, 32, or 64 bytes for full-speed endpoints and 512 bytes for high-speed endpoints. A low-speed device must not have bulk endpoints. This maximum applies to the data payloads of the data packets; i.e., the size specified is for the data field of the packet as defined in Chapter 8, not including other protocol-required information.

A bulk endpoint is designed to support a maximum data payload size.  A bulk endpoint reports in its configuration information the value for its maximum data payload size.  The USB does not require that data payloads transmitted be exactly the maximum size; i.e., if a data payload is less than the maximum, it does not need to be padded to the maximum size.

All Host Controllers are required to have support for 8-, 16-, 32-, and 64-byte maximum packet sizes for full-speed bulk endpoints and 512 bytes for high-speed bulk endpoints.  No Host Controller is required to support larger or smaller maximum packet sizes.

During configuration, the USB System Software reads the endpoint's maximum data payload size and ensures that no data payload will be sent to the endpoint that is larger than the supported size.

An endpoint must always transmit data payloads with a data field less than or equal to the endpoint's reported *wMaxPacketSize* value.  When a bulk IRP involves more data than can fit in one maximum-sized data payload, all data payloads are required to be maximum size except for the last data payload, which will contain the remaining data.  A bulk transfer is complete when the endpoint does one of the following:

- Has transferred exactly the amount of data expected
- Transfers a packet with a payload size less than *wMaxPacketSize* or transfers a zero-length packet

When a bulk transfer is complete, the Host Controller retires the current IRP and advances to the next IRP. If a data payload is received that is larger than expected, all pending bulk IRPs for that endpoint will be aborted/retired.

### 5.8.4  Bulk Transfer Bus Access Constraints

Only full-speed and high-speed devices can use bulk transfers.

An endpoint has no way to indicate a desired bus access frequency for a bulk pipe.  The USB balances the bus access requirements of all bulk pipes and the specific IRPs that are pending to provide "good effort" delivery of data between client software and functions.  Moving control transfers over the bus has priority over moving bulk transfers.

There is no time guaranteed to be available for bulk transfers as there is for control transfers.  Bulk transfers are moved over the bus only on a bandwidth-available basis.  If there is bus time that is not being used for other purposes, bulk transfers will be moved over the bus.  If there are bulk transfers pending for multiple endpoints, bulk transfers for the different endpoints are selected according to a fair access policy that is Host Controller implementation-dependent.

All bulk transfers pending in a system contend for the same available bus time.  Because of this, the USB System Software at its discretion can vary the bus time made available for bulk transfers to a particular endpoint.  An endpoint and its client software cannot assume a specific rate of service for bulk transfers. Bus time made available to a software client and its endpoint can be changed as other devices are inserted into and removed from the system or also as bulk transfers are requested for other device endpoints.  Client software cannot assume ordering between bulk and control transfers; i.e., in some situations, bulk transfers can be delivered ahead of control transfers.

High-speed bulk OUT endpoints must support the PING flow control protocol.  The details of this protocol are described in Section 8.5.1.

53

Universal Serial Bus Specification Revision 2.0

The bus frequency and (micro)frame timing limit the maximum number of successful bulk transactions within a (micro)frame for any USB system to less than 72 full-speed eight-byte data payloads or less than 14 high-speed 512-byte data payloads.  Table 5-9 lists information about different-sized full-speed bulk transactions and the maximum number of transactions possible in a frame.  The table does not include the overhead associated with bit stuffing.  Table 5-10 lists similar information for high-speed bulk transactions.

**Table 5-9.  Full-speed Bulk Transaction Limits**

| Protocol Overhead (13 bytes) | | (3 SYNC bytes, 3 PID bytes, 2 Endpoint + CRC bytes, 2 CRC bytes, and a 3-byte interpacket delay) | | | |
|---|---|---|---|---|---|
| Data Payload | Max Bandwidth (bytes/second) | Frame Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/Frame Useful Data |
| 1 | 107000 | 1% | 107 | 2 | 107 |
| 2 | 200000 | 1% | 100 | 0 | 200 |
| 4 | 352000 | 1% | 88 | 4 | 352 |
| 8 | 568000 | 1% | 71 | 9 | 568 |
| 16 | 816000 | 2% | 51 | 21 | 816 |
| 32 | 1056000 | 3% | 33 | 15 | 1056 |
| 64 | 1216000 | 5% | 19 | 37 | 1216 |
| Max | 1500000 | | | | 1500 |

54

Universal Serial Bus Specification Revision 2.0

Table 5-10.  High-speed Bulk Transaction Limits

| Protocol Overhead (55 bytes) | | (3x4 SYNC bytes, 3 PID bytes, 2 EP/ADDR+CRC bytes, 2 CRC16, and a 3x(1+11) byte interpacket delay (EOP, etc.)) | | | |
|---|---|---|---|---|---|
| Data Payload | Max Bandwidth (bytes/second) | Microframe Bandwidth per Transfer | Max Transfers | Bytes Remaining | Bytes/ Microframe Useful Data |
| 1 | 1064000 | 1% | 133 | 52 | 133 |
| 2 | 2096000 | 1% | 131 | 33 | 262 |
| 4 | 4064000 | 1% | 127 | 7 | 508 |
| 8 | 7616000 | 1% | 119 | 3 | 952 |
| 16 | 13440000 | 1% | 105 | 45 | 1680 |
| 32 | 22016000 | 1% | 86 | 18 | 2752 |
| 64 | 32256000 | 2% | 63 | 3 | 4032 |
| 128 | 40960000 | 2% | 40 | 180 | 5120 |
| 256 | 49152000 | 4% | 24 | 36 | 6144 |
| 512 | 53248000 | 8% | 13 | 129 | 6656 |
| Max | | 60000000 | | | 7500 |

Host Controllers are free to determine how the individual bus transactions for specific bulk transfers are moved over the bus within and across (micro)frames.  An endpoint could see all bus transactions for a bulk transfer within the same (micro)frame or spread across several (micro)frames.  A Host Controller, for various implementation reasons, may not be able to provide the above maximum number of transactions per (micro)frame.

## 5.8.5  Bulk Transfer Data Sequences

Bulk transactions use data toggle bits that are toggled only upon successful transaction completion to preserve synchronization between transmitter and receiver when transactions are retried due to errors.  Bulk transactions are initialized to DATA0 when the endpoint is configured by an appropriate control transfer. The host will also start the first bulk transaction with DATA0.  If a halt condition is detected on a bulk pipe due to transmission errors or a STALL handshake being returned from the endpoint, all pending IRPs are retired.  Removal of the halt condition is achieved via software intervention through a separate control pipe. This recovery will reset the data toggle bit to DATA0 for the endpoint on both the host and the device.

Bulk transactions are retried due to errors detected on the bus that affect a given transaction.

Universal Serial Bus Specification Revision 2.0

## 5.9  High-Speed, High Bandwidth Endpoints

USB supports individual high-speed interrupt or isochronous endpoints that require data rates up to
192 Mb/s (i.e., 3072 data bytes per microframe).  One, two, or three high-speed transactions are allowed in
a single microframe to support high-bandwidth endpoints.

A high-speed interrupt or isochronous endpoint indicates that it requires more than 1024 bytes per
microframe when bits 12..11 of the *wMaxPacketSize* field of the endpoint descriptor (see Table 5-11) are
non-zero.  The lower 11 bits of *wMaxPacketSize* indicate the size of the data payload for each individual
transaction while bits 12..11 indicate the maximum number of required transactions possible.  See
Section 9.6.6 for restrictions on the allowed combinations of values for bits 12..11 and bits 10..0.

**Table 5-11.  *wMaxPacketSize* Field of Endpoint Descriptor**

| Bits | 15..13 | 12..11 | 10..0 |
|---|---|---|---|
| Field | Reserved, must be set to zero | Number of transactions per microframe | Maximum size of data payload in bytes |

Note:  This representation means that endpoints requesting two transactions per microframe will specify a
total data payload size in the microframe that is a multiple of two bytes.  Also endpoints requesting three
transactions per microframe will specify a total data payload size that is a multiple of three bytes.  In any
case, any number of bytes can actually be transferred in a microframe.

The host controller must issue an appropriate number of high-speed transactions per microframe.  Errors in
the host or on the bus can result in the host controller issuing fewer transactions than requested for the
endpoint.  The first transaction(s) must have a data payload(s) as specified by the lower 11 bits of
*wMaxPacketSize* if enough data is available, while the last transaction has any remaining data less than or
equal to the maximum size specified.  The host controller may issue transactions for the same endpoint one
immediately after the other (as required for the actual data provided) or may issue transactions for other
endpoints in between the transactions for a high bandwidth endpoint.

## 5.9.1  High Bandwidth Interrupt Endpoints

For interrupt transactions, if the endpoint NAKs a transaction during a microframe, the host controller must
not issue further transactions for that endpoint until the next period.

If the endpoint times-out a transaction, the host controller must retry the transaction.  The endpoint specifies
the maximum number of desired transactions per microframe.  If the maximum number of transactions per
microframe has not been reached, the host controller may immediately retry the transaction during the
current microframe.  Host controllers are recommended to do an immediate retry since this minimizes
impact on devices that are bandwidth sensitive.  If the maximum number of transactions per microframe has
been reached, the host controller must retry the transaction at the next period for the endpoint.

A host controller is allowed to issue less than the maximum number of transactions to an endpoint per
microframe only if more than a single memory buffer is required for the transactions within the microframe.

Normal DATA0/DATA1 data toggle sequencing is used for each interrupt transaction during a microframe.

56

Universal Serial Bus Specification Revision 2.0

### 5.9.2  High Bandwidth Isochronous Endpoints

For isochronous transactions, if an IN endpoint provides less than a maximum data payload as specified by its endpoint descriptor, the host must not issue further transactions for that endpoint for that microframe.

For an isochronous OUT endpoint, the host controller must issue the number of transactions as required for the actual data provided, not exceeding the maximum number specified by the endpoint descriptor. The transactions issued must adhere to the maximum payload sizes as specified in the endpoint descriptor.

No retries are ever done for isochronous endpoints.

High bandwidth isochronous endpoints (IN and OUT) must support data PID sequencing. Data PID sequencing provides the required support for the data receiver to detect one or more lost/damaged packets per microframe.

Data PID sequencing for a high-speed, high bandwidth isochronous IN endpoint uses a repeating sequence of DATA2, DATA1, DATA0 PIDs for the data packet of each transaction in a microframe. If there is only a single transaction in the microframe, only a DATA0 data packet PID is used. If there are two transactions per microframe, DATA1 is used for the first transaction data packet and DATA0 is used for the second transaction data packet. If there are three transactions per microframe, DATA2 is used for the first transaction data packet, DATA1 is used for the second, and DATA0 is used for the third. In all cases, the data PID sequence starts over again the next microframe. Figure 5-11 shows the order of data packet PIDs that are used in subsequent transactions within a microframe for high-bandwidth isochronous IN endpoints.



**Figure 5-11.  Data Phase PID Sequence for Isochronous IN High Bandwidth Endpoints**

An endpoint must respond to an IN token for the first transaction with a DATA2 when it requires three transactions of data to be moved. It must respond with a DATA1 for the first transaction when it requires two transactions and with a DATA0 when it requires only a single transaction. After the first transaction, the endpoint follows the data PID sequence as described above.

The host knows the maximum number of allowed transactions per microframe for the IN endpoint. The host expects the response to the first transaction to encode (via the data packet PID) how many transactions are required by the endpoint for this microframe. If the host doesn't receive an error-free, appropriate response to any transaction, the host must not issue any further transactions to the endpoint for that microframe. When the host receives a DATA0 data packet from the endpoint, it must not issue any further transactions to the endpoint for that microframe.

Data PID sequencing for a high-speed, high bandwidth isochronous OUT endpoint uses a different sequence than that used for an IN endpoint. The host must issue a DATA0 data packet when there is a single transaction. The host must issue an MDATA for the first transaction and a DATA1 for the second transaction when there are two transactions per microframe. The host must issue two MDATA transactions and a DATA2 for the third transaction when there are three transactions per microframe. These sequences allow the endpoint to detect if there was a lost/damaged transaction during a microframe. Figure 5-12 shows the order of data packet PIDs that are used in subsequent transactions within a microframe for high-bandwidth isochronous OUT.

57

**Universal Serial Bus Specification Revision 2.0**

**1 transaction, <1024 bytes:**  `DATA0`

**2 transactions, 513-1024 bytes ea.:**  `MDATA`  `DATA1`

**3 transactions, 683-1024 bytes ea.:**  `MDATA`  `MDATA`  `DATA2`

**Figure 5-12.  Data Phase PID Sequence for Isochronous OUT High Bandwidth Endpoints**

If the wrong OUT transactions are detected by the endpoint, all of the data transferred during the microframe must be treated as if it had encountered an error.  Note that for the three transactions per microframe case with a missing MDATA transaction, USB provides no way for the endpoint to determine which of the two MDATA transactions was lost.  There may be application specific methods to more precisely determine which data was lost, but USB provides no method to do so at the bus level.

## 5.10  Split Transactions

Host controllers and hubs support one additional transaction type called split transactions.  This transaction type allows full- and low-speed devices to be attached to hubs operating at high-speed.  These transactions involve only host controllers and hubs and are not visible to devices.  High-speed split transactions for interrupt and isochronous transfers must be allocated by the host from the 80% periodic portion of a microframe.  More information on split transactions can be found in Chapter 8 and Chapter 11.

## 5.11  Bus Access for Transfers

Accomplishing any data transfer between the host and a USB device requires some use of the USB bandwidth.  Supporting a wide variety of isochronous and asynchronous devices requires that each device's transfer requirements are accommodated.  The process of assigning bus bandwidth to devices is called transfer management.  There are several entities on the host that coordinate the information flowing over the USB:  client software, the USB Driver (USBD), and the Host Controller Driver (HCD).  Implementers of these entities need to know the key concepts related to bus access:

- Transfer Management:  The entities and the objects that support communication flow over the USB

- Transaction Tracking:  The USB mechanisms that are used to track transactions as they move through the USB system

- Bus Time:  The time it takes to move a packet of information over the bus

- Device/Software Buffer Size:  The space required to support a bus transaction

- Bus Bandwidth Reclamation:  Conditions where bandwidth that was allocated to other transfers but was not used and can now be possibly reused by control and bulk transfers

The previous sections focused on how client software relates to a function and what the logical flows are over a pipe between the two entities.  This section focuses on the different parts of the host and how they must interact to support moving data over the USB.  This information may also be of interest to device implementers so they understand aspects of what the host is doing when a client requests a transfer and how that transfer is presented to the device.

58

Universal Serial Bus Specification Revision 2.0

### 5.11.1  Transfer Management

Transfer management involves several entities that operate on different objects in order to move transactions over the bus:

- Client Software:  Consumes/generates function-specific data to/from a function endpoint via calls and callbacks requesting IRPs with the USBD interface.

- USB Driver (USBD):  Converts data in client IRPs to/from device endpoint via calls/callbacks with the appropriate HCD.  A single client IRP may involve one or more transfers.

- Host Controller Driver (HCD):  Converts IRPs to/from transactions (as required by a Host Controller implementation) and organizes them for manipulation by the Host Controller.  Interactions between the HCD and its hardware is implementation-dependent and is outside the scope of the USB Specification.

- Host Controller:  Takes transactions and generates bus activity via packets to move function-specific data across the bus for each transaction.

Figure 5-13 shows how the entities are organized as information flows between client software and the USB.  The objects of primary interest to each entity are shown at the interfaces between entities.



**Figure 5-13.  USB Information Conversion From Client Software to Bus**

59

### 5.11.1.1  Client Software

Client software determines what transfers need to be made with a function.  It uses appropriate operating system-specific interfaces to request IRPs.  Client software is aware only of the set of pipes (i.e., the interface) it needs to manipulate its function.  The client is aware of and adheres to all bus access and bandwidth constraints as described previously for each transfer type.  The requests made by the client software are presented via the USBD interface.

Some clients may manipulate USB functions via other device class interfaces defined by the operating system and may themselves not make direct USBD calls.  However, there is always some lowest level client that makes USBD calls to pass IRPs to the USBD.  All IRPs presented are required to adhere to the prenegotiated bandwidth constraints set when the pipe was established.  If a function is moved from a non-USB environment to the USB, the driver that would have directly manipulated the function hardware via memory or I/O accesses is the lowest client software in the USB environment that now interacts with the USBD to manipulate the driver's USB function.

After client software has requested a transfer of its function and the request has been serviced, the client software receives notification of the completion status of the IRP.  If the transfer involved function-to-host data transfer, the client software can access the data in the data buffer associated with the completed IRP.

The USBD interface is defined in Chapter 10.

### 5.11.1.2  USB Driver

The Universal Serial Bus Driver (USBD) is involved in mediating bus access at two general times:

- While a device is attached to the bus during configuration
- During normal transfers

When a device is attached and configured, the USBD is involved to ensure that the desired device configuration can be accommodated on the bus.  The USBD receives configuration requests from the configuring software that describe the desired device configuration:  endpoint(s), transfer type(s), transfer period(s), data size(s), etc.  The USBD either accepts or rejects a configuration request based on bandwidth availability and the ability to accommodate that request type on the bus.  If it accepts the request, the USBD creates a pipe for the requester of the desired type and with appropriate constraints as defined for the transfer type.  Bandwidth allocation for periodic endpoints does not have to be made when the device is configured and, once made, a bandwidth allocation can be released without changing the device configuration.

The configuration aspects of the USBD are typically operating system-specific and heavily leverage the configuration features of the operating system to avoid defining additional (redundant) interfaces.

Once a device is configured, the software client can request IRPs to move data between it and its function endpoints.

### 5.11.1.3  Host Controller Driver

The Host Controller Driver (HCD) is responsible for tracking the IRPs in progress and ensuring that USB bandwidth and (micro)frame time maximums are never exceeded.  When IRPs are made for a pipe, the HCD adds them to the transaction list.  When an IRP is complete, the HCD notifies the requesting software client of the completion status for the IRP.  If the IRP involved data transfer from the function to the software client, the data was placed in the client-indicated data buffer.

IRPs are defined in an operating system-dependent manner.

60

Universal Serial Bus Specification Revision 2.0

### 5.11.1.4  Transaction List

The transaction list is a Host Controller implementation-dependent description of the current outstanding set of bus transactions that need to be run on the bus.  Only the HCD and its Host Controller have access to the specific representation.  Each description contains transaction descriptions in which parameters, such as data size in bytes, the device address and endpoint number, and the memory area to which data is to be sent or received, are identified.

A transaction list and the interface between the HCD and its Host Controller is typically represented in an implementation-dependent fashion and is not defined explicitly as part of the USB Specification.

### 5.11.1.5  Host Controller

The Host Controller has access to the transaction list and translates it into bus activity.  In addition, the Host Controller provides a reporting mechanism whereby the status of a transaction (done, pending, halted, etc.) can be obtained.  The Host Controller converts transactions into appropriate implementation-dependent activities that result in USB packets moving over the bus topology rooted in the root hub.

The Host Controller ensures that the bus access rules defined by the protocol are obeyed, such as inter-packet timings, timeouts, babble, etc.  The HCD interface provides a way for the Host Controller to participate in deciding whether a new pipe is allowed access to the bus.  This is done because Host Controller implementations can have restrictions/constraints on the minimum inter-transaction times they may support for combinations of bus transactions.

The interface between the transaction list and the Host Controller is hidden within an HCD and Host Controller implementation.

## 5.11.2  Transaction Tracking

A USB function sees data flowing across the bus in packets as described in Chapter 8.  The Host Controller uses some implementation-dependent representation to track what packets to transfer to/from what endpoints at what time or in what order.  Most client software does not want to deal with packetized communication flows because this involves a degree of complexity and interconnect dependency that limits the implementation.  The USB System Software (USBD and HCD) provides support for matching data movement requirements of a client to packets on the bus.  The Host Controller hardware and software uses IRPs to track information about one or more transactions that combine to deliver a transfer of information between the client software and the function.  Figure 5-14 summarizes how transactions are organized into IRPs for the four transfer types.  Detailed protocol information for each transfer type can be found in Chapter 8.  More information about client software views of IRPs can be found in Chapter 10 and in the operating system specific-information for a particular operating system.

61

**Universal Serial Bus Specification Revision 2.0**



**Figure 5-14.  Transfers for Communication Flows**

Even though IRPs track the bus transactions that need to occur to move a specific data flow over the USB, Host Controllers are free to choose how the particular bus transactions are moved over the bus subject to the USB-defined constraints (e.g., exactly one transaction per (micro)frame for isochronous transfers).  In any case, an endpoint will see transactions in the order they appear within an IRP unless errors occur.  For example, Figure 5-15 shows two IRPs, one each for two pipes where each IRP contains three transactions. For any transfer type, a Host Controller is free to move the first transaction of the first IRP followed by the first transaction of the second IRP somewhere in (micro)Frame 1, while moving the second transaction of each IRP in opposite order somewhere in (micro)Frame 2.  If these are isochronous transfer types, that is the only degree of freedom a Host Controller has.  If these are control or bulk transfers, a Host Controller could further move more or less transactions from either IRP within either (micro)frame.  Functions cannot depend on seeing transactions within an IRP back-to-back within a (micro)frame nor should they depend on not seeing transactions back-to-back within a (micro)frame.

62

Universal Serial Bus Specification Revision 2.0



**Figure 5-15.  Arrangement of IRPs to Transactions/(Micro)frames**

## 5.11.3  Calculating Bus Transaction Times

When the USB System Software allows a new pipe to be created for the bus, it must calculate how much
bus time is required for a given transaction.  That bus time is based on the maximum packet size
information reported for an endpoint, the protocol overhead for the specific transaction type request, the
overhead due to signaling imposed bit stuffing, inter-packet timings required by the protocol,
inter-transaction timings, etc.  These calculations are required to ensure that the time available in a
(micro)frame is not exceeded.  The equations used to determine transaction bus time are:

KEY:

| | |
|---|---|
| Data_bc | The byte count of data payload |
| Host_Delay | The time required for the host or transaction translator to prepare for or recover from the transmission; Host Controller implementation-specific |
| Floor() | The integer portion of argument |
| Hub_LS_Setup | The time provided by the Host Controller for hubs to enable low-speed ports; measured as the delay from the end of the PRE PID to the start of the low-speed SYNC; minimum of four full-speed bit times |
| BitStuffTime | Function that calculates theoretical additional time required due to bit stuffing in signaling; worst case is (1.6667*8*Data_bc) |

Universal Serial Bus Specification Revision 2.0

High-speed (Input)

    Non-Isochronous Transfer (Handshake Included)
= (55 * 8 * 2.083) + (2.083 * Floor(3.167  + BitStuffTime(Data_bc))) +
Host_Delay

    Isochronous Transfer (No Handshake)
= (38 * 8 * 2.083)  + (2.083 * Floor(3.167  + BitStuffTime(Data_bc))) +
Host_Delay

High-speed (Output)

    Non-Isochronous Transfer (Handshake Included)
= (55 * 8 * 2.083)  + (2.083 * Floor(3.167  + BitStuffTime(Data_bc))) +
Host_Delay

    Isochronous Transfer (No Handshake)
= (38 * 8 * 2.083)  + (2.083 * Floor(3.167  + BitStuffTime(Data_bc))) +
Host_Delay

Full-speed (Input)

    Non-Isochronous Transfer (Handshake Included)
= 9107 + (83.54 * Floor(3.167 + BitStuffTime(Data_bc))) + Host_Delay

    Isochronous Transfer (No Handshake)
= 7268 + (83.54 * Floor(3.167 + BitStuffTime(Data_bc))) + Host_Delay

Full-speed (Output)

    Non-Isochronous Transfer (Handshake Included)
= 9107 + (83.54 * Floor(3.167 + BitStuffTime(Data_bc))) + Host_Delay

    Isochronous Transfer (No Handshake)
= 6265 + (83.54 * Floor(3.167 + BitStuffTime(Data_bc))) + Host_Delay

Low-speed (Input)

= 64060 + (2 * Hub_LS_Setup) +
(676.67 * Floor(3.167 + BitStuffTime(Data_bc))) + Host_Delay

Low-speed (Output)

= 64107 + (2 * Hub_LS_Setup) +
(667.0 * Floor(3.167 + BitStuffTime(Data_bc))) + Host_Delay

The bus times in the above equations are in nanoseconds and take into account propagation delays due to the distance the device is from the host.  These are typical equations that can be used to calculate bus time; however, different implementations may choose to use coarser approximations of these times.

The actual bus time taken for a given transaction will almost always be less than that calculated because bit stuffing overhead is data-dependent.  Worst case bit stuffing is calculated as 1.1667 (7/6) times the raw time (i.e., the BitStuffTime function multiplies the Data_bc by 8*1.1667 in the equations).  This means that there will almost always be time unused on the bus (subject to data pattern specifics) after all regularly scheduled transactions have completed.  The bus time made available due to less bit stuffing can be reused as discussed in Section 5.11.5.

The Host_Delay term in the equations is Host Controller-, Transaction Translator(TT)-, and system-dependent and allows for additional time a Host Controller (or TT) may require due to delays in gaining access to memory or other implementation dependencies.  This term is incorporated into an implementation of these equations by using the transfer management functions provided by the HCD interface.  These equations are typically implemented by a combination of USBD and HCD software working in cooperation.

64

Universal Serial Bus Specification Revision 2.0

The results of these calculations are used to determine whether a transfer or pipe creation can be supported in a given USB configuration.

## 5.11.4  Calculating Buffer Sizes in Functions and Software

Client software and functions both need to provide buffer space for pending data transactions awaiting their turn on the bus.  For non-isochronous pipes, this buffer space needs to be just large enough to hold the next data packet.  If more than one transaction request is pending for a given endpoint, the buffering for each transaction must be supplied.  Methods to calculate the precise absolute minimum buffering a function may require because of specific interactions defined between its client software and the function are outside the scope of this specification.

The Host Controller is expected to be able to support an unlimited number of transactions pending for the bus subject to available system memory for buffer and descriptor space, etc.  Host Controllers are allowed to limit how many (micro)frames into the future they allow a transaction to be requested.

For isochronous pipes, Section 5.12.4 describes details affecting host side and device side buffering requirements.  In general, buffers need to be provided to hold approximately twice the amount of data that can be transferred in 1ms for full-speed endpoints or 125 µs for high-speed endpoints.

## 5.11.5  Bus Bandwidth Reclamation

The USB bandwidth and bus access are granted based on a calculation of worst-case bus transmission time and required latencies.  However, due to the constraints placed on different transfer types and the fact that the bit stuffing bus time contribution is calculated as a constant but is data-dependent, there will frequently be bus time remaining in each (micro)frame time versus what the (micro)frame transmission time was calculated to be.  In order to support the most efficient use of the bus bandwidth, control and bulk transfers are candidates to be moved over the bus as bus time becomes available.  Exactly how a Host Controller supports this is implementation-dependent.  A Host Controller can take into account the transfer types of pending IRPs and implementation-specific knowledge of remaining (micro)frame time to reuse reclaimed bandwidth.

## 5.12  Special Considerations for Isochronous Transfers

Support for isochronous data movement between the host and a device is one of the system capabilities supported by the USB.  Delivering isochronous data reliably over the USB requires careful attention to detail.  The responsibility for reliable delivery is shared by several USB entities:

- The device/function
- The bus
- The Host Controller
- One or more software agents

Because time is a key part of an isochronous transfer, it is important for USB designers to understand how time is dealt with within the USB by these different entities.

Note:  The examples in this section describe USB for an example involving full-speed endpoints.  The general example details are also appropriate for high-speed endpoints when corresponding changes are made; for example, frame replaced with microframe, 1 ms replaced with 125 µs, rate adjustments made between full-speed and high-speed, etc.

All isochronous devices must report their capabilities in the form of device-specific descriptors.  The capabilities should also be provided in a form that the potential customer can use to decide whether the device offers a solution to his problem(s).  The specific capabilities of a device can justify price differences.

65

Universal Serial Bus Specification Revision 2.0

In any communication system, the transmitter and receiver must be synchronized enough to deliver data robustly. In an asynchronous communication system, data can be delivered robustly by allowing the transmitter to detect that the receiver has not received a data item correctly and simply retrying transmission of the data.

In an isochronous communication system, the transmitter and receiver must remain time- and data-synchronized to deliver data robustly. The USB does not support transmission retry of isochronous data so that minimal bandwidth can be allocated to isochronous transfers and time synchronization is not lost due to a retry delay. However, it is critical that a USB isochronous transmitter/receiver pair still remain synchronized both in normal data transmission cases and in cases where errors occur on the bus.

In many systems that deal with isochronous data, a single global clock is used to which all entities in the system synchronize. An example of such a system is the PSTN (Public Switched Telephone Network). Given that a broad variety of devices with different natural frequencies may be attached to the USB, no single clock can provide all the features required to satisfy the synchronization requirements of all devices and software while still supporting the cost targets of mass-market PC products. The USB defines a clock model that allows a broad range of devices to coexist on the bus and have reasonable cost implementations.

This section presents options or features that can be used by isochronous endpoints to minimize behavior differences between a non-USB implemented function and a USB version of the function. An example is included to illustrate the similarities and differences between the non-USB and USB versions of a function.

The remainder of the section presents the following key concepts:

- USB Clock Model: What clocks are present in a USB system that have impact on isochronous data transfers
- USB (micro)frame Clock-to-function Clock Synchronization Options: How the USB (micro)frame clock can relate to a function clock
- SOF Tracking: Responsibilities and opportunities of isochronous endpoints with respect to the SOF token and USB (micro)frames
- Data Prebuffering: Requirements for accumulating data before generation, transmission, and consumption
- Error Handling: Isochronous-specific details for error handling
- Buffering for Rate Matching: Equations that can be used to calculate buffer space required for isochronous endpoints

## 5.12.1  Example Non-USB Isochronous Application

The example used is a reasonably generalized example. Other simpler or more complex cases are possible and the relevant USB features identified can be used or not as appropriate.

The example consists of an 8 kHz mono microphone connected through a mixer driver that sends the input data stream to 44 kHz stereo speakers. The mixer expects the data to be received and transmitted at some sample rate and encoding. A rate matcher driver on input and output converts the sample rate and encoding from the natural rate and encoding of the device to the rate and encoding expected by the mixer. Figure 5-16 illustrates this example.

66

Universal Serial Bus Specification Revision 2.0



Figure 5-16.  Non-USB Isochronous Example

67

**Universal Serial Bus Specification Revision 2.0**

A master clock (which can be provided by software driven from the real time clock) in the PC is used to awaken the mixer to ask the input source for input data and to provide output data to the output sink. In this example, assume it awakens every 20 ms. The microphone and speakers each have their own sample clocks that are unsynchronized with respect to each other or the master mixer clock. The microphone produces data at its natural rate (one-byte samples, 8,000 times a second) and the speakers consume data at their natural rate (four-byte samples, 44,100 times a second). The three clocks in the system can drift and jitter with respect to each other. Each rate matcher may also be running at a different natural rate than either the mixer driver, the input source/driver, or output sink/driver.

The rate matchers also monitor the long-term data rate of their device compared to the master mixer clock and interpolate an additional sample or merge two samples to adjust the data rate of their device to the data rate of the mixer. This adjustment may be required every couple of seconds, but typically occurs infrequently. The rate matchers provide some additional buffering to carry through a rate match.

Note: Some other application might not be able to tolerate sample adjustment and would need some other means of accommodating master clock-to-device clock drift or else would require some means of synchronizing the clocks to ensure that no drift could occur.

The mixer always expects to receive exactly a service period of data (20 ms service period) from its input device and produce exactly a service period of data for its output device. The mixer can be delayed up to less than a service period if data or space is not available from its input/output device. The mixer assumes that such delays do not accumulate.

The input and output devices and their drivers expect to be able to put/get data in response to a hardware interrupt from the DMA controller when their transducer has processed one service period of data. They expect to get/put exactly one service period of data. The input device produces 160 bytes (ten samples) every service period of 20 ms. The output device consumes 3,528 bytes (882 samples) every 20 ms service period. The DMA controller can move a single sample between the device and the host buffer at a rate much faster than the sample rate of either device.

The input and output device drivers provide two service periods of system buffering. One buffer is always being processed by the DMA controller. The other buffer is guaranteed to be ready before the current buffer is exhausted. When the current buffer is emptied, the hardware interrupt awakens the device driver and it calls the rate matcher to give it the buffer. The device driver requests a new IRP with the buffer before the current buffer is exhausted.

The devices can provide two samples of data buffering to ensure that they always have a sample to process for the next sample period while the system is reacting to the previous/next sample.

The service periods of the drivers are chosen to survive interrupt latency variabilities that may be present in the operating system environment. Different operating system environments will require different service periods for reliable operation. The service periods are also selected to place a minimum interrupt load on the system, because there may be other software in the system that requires processing time.

68

Universal Serial Bus Specification Revision 2.0

## 5.12.2  USB Clock Model

Time is present in the USB system via clocks.  In fact, there are multiple clocks in a USB system that must be understood:

- Sample Clock:  This clock determines the natural data rate of samples moving between client software on the host and the function.  This clock does not need to be different between non-USB and USB implementations.

- Bus Clock:  This clock runs at a 1.000 ms period (1 kHz frequency) on full-speed segments and 125.000 μs (8 kHz frequency) on high-speed segments of the bus and is indicated by the rate of SOF packets on the bus.  This clock is somewhat equivalent to the 8 MHz clock in the non-USB example. In the USB case, the bus clock is often a lower-frequency clock than the sample clock, whereas the bus clock is almost always a higher-frequency clock than the sample clock in a non-USB case.

- Service Clock:  This clock is determined by the rate at which client software runs to service IRPs that may have accumulated between executions.  This clock also can be the same in the USB and non-USB cases.

In most existing operating systems, it is not possible to support a broad range of isochronous communication flows if each device driver must be interrupted for each sample for fast sample rates.  Therefore, multiple samples, if not multiple packets, will be processed by client software and then given to the Host Controller to sequence over the bus according to the prenegotiated bus access requirements.  Figure 5-17 presents an example for a reasonable USB clock environment equivalent to the non-USB example in Figure 5-16.

69

Universal Serial Bus Specification Revision 2.0



**Figure 5-17.  USB Full-speed Isochronous Application**

70

Universal Serial Bus Specification Revision 2.0

Figure 5-17 shows a typical round trip path of information from a microphone as an input device to a speaker as an output device. The clocks, packets, and buffering involved are also shown. Figure 5-17 will be explored in more detail in the following sections.

The focus of this example is to identify the differences introduced by the USB compared to the previous non-USB example. The differences are in the areas of buffering, synchronization given the existence of a USB bus clock, and delay. The client software above the device drivers can be unaffected in most cases.

## 5.12.3  Clock Synchronization

In order for isochronous data to be manipulated reliably, the three clocks identified above must be synchronized in some fashion. If the clocks are not synchronized, several clock-to-clock attributes can be present that can be undesirable:

- Clock Drift: Two clocks that are nominally running at the same rate can, in fact, have implementation differences that result in one clock running faster or slower than the other over long periods of time. If uncorrected, this variation of one clock compared to the other can lead to having too much or too little data when data is expected to always be present at the time required.

- Clock Jitter: A clock may vary its frequency over time due to changes in temperature, etc. This may also alter when data is actually delivered compared to when it is expected to be delivered.

- Clock-to-clock Phase Differences: If two clocks are not phase locked, different amounts of data may be available at different points in time as the beat frequency of the clocks cycle out over time. This can lead to quantization/sampling related artifacts.

The bus clock provides a central clock with which USB hardware devices and software can synchronize to one degree or another. However, the software will, in general, not be able to phase- or frequency-lock precisely to the bus clock given the current support for "real time-like" operating system scheduling support in most PC operating systems. Software running in the host can, however, know that data moved over the USB is packetized. For isochronous transfer types, a unit of data is moved exactly once per (micro)frame and the (micro)frame clock is reasonably precise. Providing the software with this information allows it to adjust the amount of data it processes to the actual (micro)frame time that has passed.

Note: For high-speed high-bandwidth endpoints, the data exchanged in the two or three transactions per microframe is still considered to belong to the same "single packet." The large amount of data per packet is split into two or three transactions only for bus efficiency reasons.

## 5.12.4  Isochronous Devices

The USB includes a framework for isochronous devices that defines synchronization types, how isochronous endpoints provide data rate feedback, and how they can be connected together. Isochronous devices include sampled analog devices (for example, audio and telephony devices) and synchronous data devices. Synchronization type classifies an endpoint according to its capability to synchronize its data rate to the data rate of the endpoint to which it is connected. Feedback is provided by indicating accurately what the required data rate is, relative to the SOF frequency. The ability to make connections depends on the quality of connection that is required, the endpoint synchronization type, and the capabilities of the host application that is making the connection. Additional device class-specific information may be required, depending on the application.

Note: The term "data" is used very generally, and may refer to data that represents sampled analog information (like audio), or it may be more abstract information. "Data rate" refers to the rate at which analog information is sampled, or the rate at which data is clocked.

71

cs

Universal Serial Bus Specification Revision 2.0

(micro)frame.  Asynchronous sink endpoints must provide explicit feedback information to an adaptive driver (refer to Section 5.12.4.2).

An example of an asynchronous source is a CD-audio player that provides its data based on an internal clock or resonator.  Another example is a Digital Audio Broadcast (DAB) receiver or a Digital Satellite Receiver (DSR).  Here, too, the sample rate is fixed at the broadcasting side and is beyond USB control.

Asynchronous sink endpoints could be low-cost speakers running off of their internal sample clock.

### 5.12.4.1.2  Synchronous

Synchronous endpoints can have their clock system (their notion of time) controlled externally through SOF synchronization.  These endpoints must slave their sample clock to the 1 ms SOF tick (by means of a programmable PLL).  For high-speed endpoints, the presence of the microframe SOF can be used for tighter frame clock tracking.

Synchronous endpoints may source or sink isochronous data streams at either a fixed data rate (single-frequency endpoints), a limited number of data rates (32 kHz, 44.1 kHz, 48 kHz, …), or a continuously programmable data rate.  If programmable, the operating data rate is set during initialization of the isochronous endpoint.  The number of samples or data units generated in a series of USB (micro)frames is deterministic and periodic.  Synchronous devices must report their programming capabilities in the class-specific endpoint descriptor as described in their device class specification.

An example of a synchronous source is a digital microphone that synthesizes its sample clock from SOF and produces a fixed number of audio samples every USB (micro)frame.  Likewise, a synchronous sink derives its sample clock from SOF and consumes a fixed number of samples every USB (micro)frame.

### 5.12.4.1.3  Adaptive

Adaptive endpoints are the most capable endpoints possible.  They are able to source or sink data at any rate within their operating range.  Adaptive source endpoints produce data at a rate that is controlled by the data sink.  The sink provides feedback (refer to Section 5.12.4.2) to the source, which allows the source to know the desired data rate of the sink.  For adaptive sink endpoints, the data rate information is embedded in the data stream.  The average number of samples received during a certain averaging time determines the instantaneous data rate.  If this number changes during operation, the data rate is adjusted accordingly.

The data rate operating range may center around one rate (e.g., 8 kHz), select between several programmable or auto-detecting data rates (32 kHz, 44.1 kHz, 48 kHz, …), or may be within one or more ranges (e.g., 5 kHz to 12 kHz or 44 kHz to 49 kHz).  Adaptive devices must report their programming capabilities in the class-specific endpoint descriptor as described in their device class specification.

An example of an adaptive source is a CD player that contains a fully adaptive sample rate converter (SRC) so that the output sample frequency no longer needs to be 44.1 kHz but can be anything within the operating range of the SRC.  Adaptive sinks include such endpoints as high-end digital speakers, headsets, etc.

### 5.12.4.2  Feedback

An asynchronous sink must provide explicit feedback to the host by indicating accurately what its desired data rate ($F_f$) is, relative to the USB (micro)frame frequency.  This allows the host to continuously adjust the number of samples sent to the sink so that neither underflow or overflow of the data buffer occurs.  Likewise, an adaptive source must receive explicit feedback from the host so that it can accurately generate the number of samples required by the host.  Feedback endpoints can be specified as described in Section 9.6.6 for the *bmAttributes* field of the endpoint descriptor.

To generate the desired data rate $F_f$ the device must measure its actual sampling rate $F_s$, referenced to the USB notion of time, i.e., the USB (micro)frame frequency.  This specification requires the data rate $F_f$ to be

73

**Universal Serial Bus Specification Revision 2.0**

resolved to better than one sample per second (1Hz) in order to allow a high-quality source rate to be created and to tolerate delays and errors in the feedback loop. To achieve this accuracy, the measurement time $T_{meas}$ must be at least 1 second. Therefore:

$$T_{meas} = 2^K$$

where $T_{meas}$ is now expressed in USB (micro)frames and $K$=10 for full-speed devices (1 ms frames) and $K$=13 for high-speed devices (125 µs microframes). However, in most devices, the actual sampling rate $F_s$ is derived from a master clock $F_m$ through a binary divider. Therefore:

$$F_m = F_s * 2^P$$

where $P$ is a positive integer (including 0 if no higher-frequency master clock is available). The measurement time $T_{meas}$ can now be decreased by measuring $F_m$ instead of $F_s$ and:

$$T_{meas} = \frac{2^K}{2^P} = 2^{(K-P)}$$

In this way, a new estimate for $F_f$ becomes available every $2^{(K-P)}$ (micro)frames. $P$ is practically bound to be in the range [0,K] because there is no point in using a clock slower than $F_s$ ($P$=0), and no point in trying to update $F_f$ more than once per (micro)frame ($P$=K). A sink can determine $F_f$ by counting cycles of the master clock $F_m$ for a period of $2^{(K-P)}$ (micro)frames. The counter is read into $F_f$ and reset every $2^{(K-P)}$ (micro)frames. As long as no clock cycles are skipped, the count will be accurate over the long term.

Each (micro)frame, an adaptive source adds $F_f$ to any remaining fractional sample count from the previous (micro)frame, sources the number of samples in the integer part of the sum, and retains the fractional sample count for the next (micro)frame. The source can look at the behavior of $F_f$ over many (micro)frames to determine an even more accurate rate, if it needs to.

$F_f$ is expressed in number of samples per (micro)frame. The $F_f$ value consists of an integer part that represents the (integer) number of samples per (micro)frame and a fractional part that represents the "fraction" of a sample that would be needed to match the sampling frequency $F_s$ to a resolution of 1 Hz or better. The fractional part requires at least K bits to represent the "fraction" of a sample to a resolution of 1 Hz or better. The integer part must have enough bits to represent the maximum number of samples that can ever occur in a single (micro)frame. Assuming that the minimum sample size is one byte, then this number is limited to 1,023 for full-speed endpoints. Ten bits are therefore sufficient to encode this value. For high-speed endpoints, this number is limited to 3*1,024=3,072 and twelve bits are needed.

In summary, for full-speed endpoints, the $F_f$ value shall be encoded in an unsigned 10.10 ($K$=10) format which fits into three bytes. Because the maximum integer value is fixed to 1,023, the 10.10 number will be left-justified in the 24 bits, so that it has a 10.14 format. Only the first ten bits behind the binary point are required. The lower four bits may be optionally used to extend the precision of $F_f$, otherwise, they shall be reported as zero. For high-speed endpoints, the $F_f$ value shall be encoded in an unsigned 12.13 ($K$=13) format which fits into four bytes. The value shall be aligned into these four bytes so that the binary point is located between the second and the third byte so that it has a 16.16 format. The most significant four bits shall be reported zero. Only the first 13 bits behind the binary point are required. The lower three bits may be optionally used to extend the precision of $F_f$, otherwise, they shall be reported as zero.

An endpoint needs to implement only the number of bits that it effectively requires for its maximum $F_f$

74

**Universal Serial Bus Specification Revision 2.0**

The choice of $P$ is endpoint-specific.  Use the following guidelines when choosing $P$:

- $P$ must be in the range $[0,K]$.

- Larger values of $P$ are preferred, because they reduce the size of the frame counter and increase the rate at which $F_f$ is updated.  More frequent updates result in a tighter control of the source data rate, which reduces the buffer space required to handle $F_f$ changes.

- $P$ should be less than $K$ so that $F_f$ is averaged across at least two frames in order to reduce SOF jitter effects.

- $P$ should not be zero in order to keep the deviation in the number of samples sourced to less than 1 in the event of a lost $F_f$ value.

Isochronous transfers are used to read $F_f$ from the feedback register.  The desired reporting rate for the feedback should be $2^{(K-P)}$ frames. $F_f$ will be reported at most once per update period.  There is nothing to be gained by reporting the same $F_f$ value more than once per update period.  The endpoint may choose to report $F_f$ only if the updated value has changed from the previous $F_f$ value.  If the value has not changed, the endpoint may report the current $F_f$ value or a zero length data payload.  It is strongly recommended that an endpoint always report the current $F_f$ value any time it is polled.

It is possible that the source will deliver one too many or one too few samples over a long period due to errors or accumulated inaccuracies in measuring $F_f$.  The sink must have sufficient buffer capability to accommodate this.  When the sink recognizes this condition, it should adjust the reported $F_f$ value to correct it.  This may also be necessary to compensate for relative clock drifts.  The implementation of this correction process is endpoint-specific and is not specified.

## 5.12.4.3  Implicit Feedback

In some cases, implementing a separate explicit feedback endpoint can be avoided.  If a device implements a group of isochronous data endpoints that are closely related and if:

- All the endpoints in the group are synchronized (i.e. use sample clocks that are derived from a common master clock)

- The group contains one or more isochronous data endpoints in one direction that normally would need explicit feedback

- The group contains at least one isochronous data endpoint in the opposite direction

Under these circumstances, the device may elect not to implement a separate isochronous explicit feedback endpoint.  Instead, feedback information can be derived from the data endpoint in the opposite direction by observing its data rate.

Two cases can arise:

- One or more asynchronous sink endpoints are accompanied by an asynchronous source endpoint.  The data rate on the source endpoint can be used as implicit feedback information to adjust the data rate on the sink endpoint(s).

- One or more adaptive source endpoints are accompanied by an adaptive sink endpoint.  The source endpoint can adjust its data rate based on the data rate received by the sink endpoint.

75

**Universal Serial Bus Specification Revision 2.0**

This specification provides the necessary framework to implement synchronization as described above (see Chapter 9).  However, exactly how the desired data rate $F_j$ is derived from the data rate of the implied feedback endpoint is implementation-dependent.

## 5.12.4.4  Connectivity

In order to fully describe the source-to-sink connectivity process, an interconnect model is presented.  The model indicates the different components involved and how they interact to establish the connection.

The model provides for multi-source/multi-sink situations.  Figure 5-18 illustrates a typical situation (highly condensed and incomplete).  A physical device is connected to the host application software through different hardware and software layers as described in this specification.  At the client interface level, a virtual device is presented to the application.  From the application standpoint, only virtual devices exist.  It is up to the device driver and client software to decide what the exact relation is between physical and virtual device.

76

**Universal Serial Bus Specification Revision 2.0**



**Figure 5-18.  Example Source/Sink Connectivity**

Device manufacturers (or operating system vendors) must provide the necessary device driver software and client interface software to convert their device from the physical implementation to a USB-compliant software implementation (the virtual device).  As stated before, depending on the capabilities built into this software, the virtual device can exhibit different synchronization behavior from the physical device.  However, the synchronization classification applies equally to both physical and virtual devices.  All physical devices belong to one of the three possible synchronization types.  Therefore, the capabilities that have to be built into the device driver and/or client software are the same as the capabilities of a physical device.  The word "application" must be replaced by "device driver/client software."  In the case of a physical source to virtual source connection, "virtual source device" must be replaced by "physical source device" and "virtual sink device" must be replaced by "virtual source device."  In the case of a virtual sink to physical sink connection, "virtual source device" must be replaced by "virtual sink device" and "virtual sink device" must be replaced by "physical sink device."

77

**Universal Serial Bus Specification Revision 2.0**

Placing the rate adaptation (RA) functionality into the device driver/client software layer has the distinct advantage of isolating all applications, relieving the device from the specifics and problems associated with rate adaptation. Applications that would otherwise be multi-rate degenerate to simpler mono-rate systems.

Note: The model is not limited to only USB devices. For example, a CD-ROM drive containing 44.1 kHz audio can appear as either an asynchronous, synchronous, or adaptive source. Asynchronous operation means that the CD-ROM fills its buffer at the rate that it reads data from the disk, and the driver empties the buffer according to its USB service interval. Synchronous operation means that the driver uses the USB service interval (e.g., 10 ms) and nominal sample rate of the data (44.1 kHz) to determine to put out 441 samples every USB service interval. Adaptive operation would build in a sample rate converter to match the CD-ROM output rate to different sink sampling rates.

Using this reference model, it is possible to define what operations are necessary to establish connections between various sources and sinks. Furthermore, the model indicates at what level these operations must or can take place. First, there is the stage where physical devices are mapped onto virtual devices and vice versa. This is accomplished by the driver and/or client software. Depending on the capabilities included in this software, a physical device can be transformed into a virtual device of an entirely different synchronization type. The second stage is the application that uses the virtual devices. Placing rate matching capabilities at the driver/client level of the software stack relieves applications communicating with virtual devices from the burden of performing rate matching for every device that is attached to them. Once the virtual device characteristics are decided, the actual device characteristics are not any more interesting than the actual physical device characteristics of another driver.

As an example, consider a mixer application that connects at the source side to different sources, each running at their own frequencies and clocks. Before mixing can take place, all streams must be converted to a common frequency and locked to a common clock reference. This action can be performed in the physical-to-virtual mapping layer or it can be handled by the application itself for each source device independently. Similar actions must be performed at the sink side. If the application sends the mixed data stream out to different sink devices, it can either do the rate matching for each device itself or it can rely on the driver/client software to do that, if possible.

Table 5-13 indicates at the intersections what actions the application must perform to connect a source endpoint to a sink endpoint.

**78**

106

Universal Serial Bus Specification Revision 2.0

**Table 5-13.  Connection Requirements**

| Sink Endpoint | Source Endpoint | | |
|---|---|---|---|
| | **Asynchronous** | **Synchronous** | **Adaptive** |
| **Asynchronous** | Async Source/Sink RA See Note 1. | Async SOF/Sink RA See Note 2. | Data + Feedback Feedthrough See Note 3. |
| **Synchronous** | Async Source/SOF RA See Note 4. | Sync RA See Note 5. | Data Feedthrough + Application Feedback See Note 6. |
| **Adaptive** | Data Feedthrough See Note 7. | Data Feedthrough See Note 8. | Data Feedthrough See Note 9. |

Notes:

1.  Asynchronous RA in the application.  $Fs_i$ is determined by the source, using the feedforward information embedded in the data stream.  $Fs_O$ is determined by the sink, based on feedback information from the sink.  If nominally $Fs_i = Fs_O$, the process degenerates to a feedthrough connection if slips/stuffs due to lack of synchronization are tolerable.  Such slips/stuffs will cause audible degradation in audio applications.

2.  Asynchronous RA in the application.  $Fs_i$ is determined by the source but locked to SOF.  $Fs_O$ is determined by the sink, based on feedback information from the sink.  If nominally $Fs_i = Fs_O$, the process degenerates to a feedthrough connection if slips/stuffs due to lack of synchronization are tolerable.  Such slips/stuffs will cause audible degradation in audio applications.

3.  If $Fs_O$ falls within the locking range of the adaptive source, a feedthrough connection can be established.  $Fs_i = Fs_O$ and both are determined by the asynchronous sink, based on feedback information from the sink.  If $Fs_O$ falls outside the locking range of the adaptive source, the adaptive source is switched to synchronous mode and Note 2 applies.

4.  Asynchronous RA in the application.  $Fs_i$ is determined by the source.  $Fs_O$ is determined by the sink and locked to SOF.  If nominally $Fs_i = Fs_O$, the process degenerates to a feedthrough connection if slips/stuffs due to lack of synchronization are tolerable.  Such slips/stuffs will cause audible degradation in audio applications.

5.  Synchronous RA in the application.  $Fs_i$ is determined by the source and locked to SOF.  $Fs_O$ is determined by the sink and locked to SOF.  If $Fs_i = Fs_O$, the process degenerates to a loss-free feedthrough connection.

6.  The application will provide feedback to synchronize the source to SOF.  The adaptive source appears to be a synchronous endpoint and Note 5 applies.

7.  If $Fs_i$ falls within the locking range of the adaptive sink, a feedthrough connection can be established.  $Fs_i = Fs_O$ and both are determined by and locked to the source.
    If $Fs_i$ falls outside the locking range of the adaptive sink, synchronous RA is done in the host to provide an $Fs_O$ that is within the locking range of the adaptive sink.

8.  If $Fs_i$ falls within the locking range of the adaptive sink, a feedthrough connection can be established.  $Fs_O = Fs_i$ and both are determined by the source and locked to SOF.
    If $Fs_i$ falls outside the locking range of the adaptive sink, synchronous RA is done in the host to provide an $Fs_O$ that is within the locking range of the adaptive sink.

9.  The application will use feedback control to set $Fs_O$ of the adaptive source when the connection is set up.  The adaptive source operates as an asynchronous source in the absence of ongoing feedback information and Note 7 applies.

79

Universal Serial Bus Specification Revision 2.0

In cases where RA is needed but not available, the rate adaptation process could be mimicked by sample dropping/stuffing.  The connection could then still be made, possibly with a warning about poor quality, otherwise, the connection cannot be made.

### 5.12.4.4.1  Audio Connectivity

When the above is applied to audio data streams, the RA process is replaced by sample rate conversion, which is a specialized form of rate adaptation.  Instead of error control, some form of sample interpolation is used to match incoming and outgoing sample rates.  Depending on the interpolation techniques used, the audio quality (distortion, signal to noise ratio, etc.) of the conversion can vary significantly.  In general, higher quality requires more processing power.

### 5.12.4.4.2  Synchronous Data Connectivity

For the synchronous data case, RA is used.  Occasional slips/stuffs may be acceptable to many applications that implement some form of error control.  Error control includes error detection and discard, error detection and retransmit, or forward error correction.  The rate of slips/stuffs will depend on the clock mismatch between the source and sink and may be the dominant error source of the channel.  If the error control is sufficient, then the connection can still be made.

## 5.12.5  Data Prebuffering

The USB requires that devices prebuffer data before processing/transmission to allow the host more flexibility in managing when each pipe's transaction is moved over the bus from (micro)frame to (micro)frame.

For transfers from function to host, the endpoint must accumulate samples during (micro)frame X until it receives the SOF token for (micro)frame X+1.  It "latches" the data from (micro)frame X into its packet buffer and is now ready to send the packet containing those samples during (micro)frame X+1.  When it will send that data during the (micro)frame is determined solely by the Host Controller and can vary from (micro)frame to (micro)frame.

For transfers from host to function, the endpoint will accept a packet from the host sometime during (micro)frame Y.  When it receives the SOF for (micro)frame Y+1, it can then start processing the data received in (micro)frame Y.

This approach allows an endpoint to use the SOF token as a stable clock with very little jitter and/or drift when the Host Controller moves the packet over the bus.  This approach also allows the Host Controller to vary within a (micro)frame precisely when the packet is actually moved over the bus.  This prebuffering introduces some additional delay between when a sample is available at an endpoint and when it moves over the bus compared to an environment where the bus access is at exactly the same time offset from SOF from (micro)frame to (micro)frame.

80

**Universal Serial Bus Specification Revision 2.0**

Figure 5-19 shows the time sequence for a function-to-host transfer (IN process). Data $D_0$ is accumulated during (micro)frame $F_i$ at time $T_i$ and transmitted to the host during (micro)frame $F_{i+1}$. Similarly, for a host-to-function transfer (OUT process), data $D_0$ is received by the endpoint during (micro)frame $F_{i+1}$ and processed during (micro)frame $F_{i+2}$.



**Figure 5-19.  Data Prebuffering**

## 5.12.6  SOF Tracking

Functions supporting isochronous pipes must receive and comprehend the SOF token to support prebuffering as previously described. Given that SOFs can be corrupted, a device must be prepared to recover from a corrupted SOF. These requirements limit isochronous transfers to full-speed and high-speed devices only, because low-speed devices do not see SOFs on the bus. Also, because SOF packets can be damaged in transmission, devices that support isochronous transfers need to be able to synthesize the existence of an SOF that they may not see due to a bus error.

Isochronous transfers require the appropriate data to be transmitted in the corresponding (micro)frame. The USB requires that when an isochronous transfer is presented to the Host Controller, it identifies the (micro)frame number for the first (micro)frame. The Host Controller must not transmit the first transaction before the indicated (micro)frame number. Each subsequent transaction in the IRP must be transmitted in succeeding (micro)frames (except for high-speed high-bandwidth transfers where up to three transactions may occur in the same microframe). If there are no transactions pending for the current (micro)frame, then the Host Controller must not transmit anything for an isochronous pipe. If the indicated (micro)frame number has passed, the Host Controller must skip (i.e., not transmit) all transactions until the one corresponding to the current (micro)frame is reached.

## 5.12.7  Error Handling

Isochronous transfers provide no data packet retries (i.e., no handshakes are returned to a transmitter by a receiver) so that timeliness of data delivery is not perturbed. However, it is still important for the agents responsible for data transport to know when an error occurs and how the error affects the communication flow. In particular, for a sequence of data packets (A, B, C, D), the USB allows sufficient information such that a missing packet (A, _, C, D) can be detected and will not unknowingly be turned into an incorrect data or time sequence (A, C, D or A, _, B, C, D). The protocol provides four mechanisms that support this: a strictly defined periodicity for the transmission of packets and data PID sequencing mechanisms for high-speed high-bandwidth endpoints, SOF, CRC, and bus transaction timeout.

- Isochronous transfers require periodic occurrence of data transactions for normal operation. The period must be an exact power of two (micro)frames. The USB does not dictate what data is transmitted in each frame. The data transmitter/source determines specifically what data to provide. This regular periodic data delivery provides a framework that is fundamental to detecting missing data errors. For high-speed high-bandwidth endpoints, data PID sequencing allows the detection of missing or damaged

81

Universal Serial Bus Specification Revision 2.0

transactions during a microframe. Any phase of a transaction can be damaged during transmission on the bus.  Chapter 8 describes how each error case affects the protocol.

- Because every (micro)frame is preceded by an SOF and a receiver can see SOFs on the bus, a receiver can determine that its expected transaction for that (micro)frame did not occur between two SOFs. Additionally, because even an SOF can be damaged, a device must be able to reconstruct the existence of a missed SOF as described in Section 5.12.6.

- A data packet may be corrupted on the bus; therefore, CRC protection allows a receiver to determine that the data packet it received was corrupted.

- The protocol defines the details that allow a receiver to determine via bus transaction timeout that it is not going to receive its data packet after it has successfully seen its token packet.

Once a receiver has determined that a data packet was not received, it may need to know the size of the data that was missed in order to recover from the error with regard to its functional behavior.  If the communication flow is always the same data size per (micro)frame, then the size is always a known constant.  However, in some cases, the data size can vary from (micro)frame to (micro)frame.  In this case, the receiver and transmitter have an implementation-dependent mechanism to determine the size of the lost packet.

In summary, whether a transaction is actually moved successfully over the bus or not, the transmitter and receiver always advance their data/buffer streams as indicated by the bus access period to keep data-per-time synchronization.  The detailed mechanisms described above allow detection, tracking, and reporting of damaged transactions so that a function or its client software can react to the damage in a function-appropriate fashion.  The details of that function- or application-specific reaction are outside the scope of the USB Specification.

## 5.12.8  Buffering for Rate Matching

Given that there are multiple clocks that affect isochronous communication flows in the USB, buffering is required to rate match the communication flow across the USB.  There must be buffer space available both in the device per endpoint and on the host side on behalf of the client software.  These buffers provide space for data to accumulate until it is time for a transfer to move over the USB.  Given the natural data rates of the device, the maximum size of the data packets that move over the bus can also be calculated.

Figure 5-20 shows the equations used to determine buffer size on the device and host and maximum packet size that must be requested to support a desired data rate.  These equations are a function of the service clock rate ($F_X$), bus clock rate ($F_{SOF}$), sample clock rate ($F_s$), bus access period (I), and sample size (S). These equations should provide design information for selecting the appropriate packet size that an endpoint will report in its characteristic information and the appropriate buffer requirements for the device/endpoint and its client software.  Figure 5-17 shows actual buffer, packet, and clock values for a typical full-speed isochronous example.

82

**Universal Serial Bus Specification Revision 2.0**



**Figure 5-20.  Packet and Buffer Size Formulas for Rate-matched Isochronous Transfers**

The USB data model assumes that devices have some natural sample size and rate.  The USB supports the transmission of packets that are multiples of sample size to make error recovery handling easier when isochronous transactions are damaged on the bus.  If a device has no natural sample size or if its samples are larger than a packet, it should describe its sample size as being one byte.  If a sample is split across a data packet, the error recovery can be harder when an arbitrary transaction is lost.  In some cases, data synchronization can be lost unless the receiver knows in what (micro)frame number each partial sample is transmitted.  Furthermore, if the number of samples can vary due to clock correction (e.g., for a non-derived device clock), it may be difficult or inefficient to know when a partial sample is transmitted.  Therefore, the USB does not split samples across packets.

Universal Serial Bus Specification Revision 2.0

**84**

US 20060059293A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2006/0059293 A1**
Wurzburg et al. (43) **Pub. Date:** **Mar. 16, 2006**

(54) **UNIVERSAL SERIAL BUS SWITCHING HUB**

(76) Inventors: **Henry Wurzburg**, Austin, TX (US);
**James E. Bowles**, Austin, TX (US);
**Robert E. Hollingsworth**, Smithtown,
NY (US); **Mark R. Bohm**, Village of
Bear Creek, TX (US); **Drew J. Dutton**,
Austin, TX (US)

Correspondence Address:
**MEYERTONS, HOOD, KIVLIN, KOWERT &
GOETZEL, P.C.**
**P.O. BOX 398**
**AUSTIN, TX 78767-0398 (US)**

(21) Appl. No.: **10/940,406**

(22) Filed: **Sep. 14, 2004**

**Publication Classification**

(51) Int. Cl.
*G06F 13/20* (2006.01)
(52) U.S. Cl. .......................................................... **710/313**

(57) **ABSTRACT**

In various embodiments, a USB switching hub may switch
between a first configuration and a second configuration to
switch access between two or more upstream ports on the
hub to at least a subset of downstream ports on the hub. In
some embodiments, the hub may include a downstream
routing controller to switch between the first configuration
and the second configuration. In some embodiments, con-
figurations (e.g., hardwired in the USB switching hub) may
be switched as determined by logic on the USB switching
hub.

DELPHI Exhibit 1005

FIG. 1



*FIG. 2*



*FIG. 3*

4



*FIG. 4a*



FIG. 4b

Case 1:17-cv-01194-JDW   Document 76-1   Filed 11/02/18   Page 971 of 981 PageID #: 2776



**FIG. 5a**



*FIG. 5b*



**FIG. 5c**

9



FIG. 6



Receive a signal signaling the switching hub to switch between a first configuration and a second configuration.
701
Communication between a host coupled to the first upstream port and the first peripheral device coupled to the downstream port may be terminated.
703
The switching hub may switch between the first configuration and the second configuration.
705
The downstream peripheral device may be accessed through the second upstream port.
707

FIG. 7

US 2006/0059293 A1

Mar. 16, 2006

1

## UNIVERSAL SERIAL BUS SWITCHING HUB

### BACKGROUND OF THE INVENTION

[0001]   1. Field of the Invention

[0002]   The present invention relates generally to peripheral device hubs and, more specifically, to Universal Serial Bus (USB) switching hubs.

[0003]   2. Description of the Related Art

[0004]   The Universal Serial Bus (USB) allows coupling of peripheral devices to a computer system. USB is a serial cable bus for data exchange between a host computer and a wide range of simultaneously accessible devices. The bus allows peripherals to be attached, configured, used, and detached while the host is in operation. For example, USB printers, scanners, digital cameras, storage devices, card readers, etc. may communicate with a host computer system over USB. USB based systems may require that a USB host controller be present in the host system, and that the operating system (OS) of the host system support USB and USB Mass Storage Class Devices.

[0005]   USB devices may communicate over the USB bus at low-speed (LS), full-speed (FS), or high-speed (HS). A connection between the USB device and the host may include four wires (a power line, a ground line, and a pair of data lines (D+ and D–). When a USB device connects to the host, the USB device may first pull a D+ line high (the D– line if the device is a low speed device) using a pull up resistor on the D+ line. The host may respond by resetting the USB device. If the USB device is a high-speed USB device, the USB device may "chirp" by driving the D– line high during the reset. The host may respond to the "chirp" by alternately driving the D+ and D– lines high. The USB device may then electronically remove the pull up resistor and continue communicating at high speed. When disconnecting, full-speed devices may remove the pull up resistor from the D+ line (i.e., "tri-state" the line), while high-speed USB devices may tri-state both the D+ and D– lines.

[0006]   A USB hub may be coupled to a USB host controller to allow multiple USB devices to be coupled to the host system through the USB host controller. In addition, other USB hubs may be coupled to the USB hub to provide additional USB device connections to the USB host controller.

[0007]   Some dual role peripheral devices may include a slave controller be capable of communicating with other peripheral devices coupled to them. For example, a dual role USB printer may be able to communicate directly with a USB camera to print pictures from the USB camera. The dual role USB printer may also be accessible (e.g., by a computer system) as a slave peripheral device. If a computer system and dual role peripheral device need to alternately access a peripheral device, the peripheral device may need to be unplugged from one device and coupled to the other. Prior art device switches may not work for high-speed peripheral devices. For example, mechanical switches may introduce too much capacitance or inductance to work with high-speed peripheral devices. High-speed peripheral devices also typically require smooth impedance to prevent ringing (mechanical switches introduce irregularities in the impedance that may cause ringing).

### SUMMARY OF THE INVENTION

[0008]   In various embodiments, a USB switching hub may control access between two or more upstream ports on the USB switching hub and at least a subset of downstream ports on the USB switching hub. The USB switching hub may electronically switch between different configurations (e.g., hardwired or software implemented configurations) for access between the two or more upstream ports and the downstream ports. In an embodiment with two upstream ports and three downstream ports, a USB switching hub may switch between multiple configurations. For example, in a first configuration, the first upstream port may be allowed access to the first two downstream ports and the second upstream port may be allowed access to the third downstream port. In a second configuration, the first upstream port may be allowed to access the third downstream port while the second upstream port may be allowed to access the first two downstream ports. Other configurations are also possible (e.g., in one configuration neither upstream port may be allowed to access any downstream port). The USB switching hub, after receiving a control signal (e.g., from a computer, a different attached device, a person, a sensor, etc.), may switch between the first configuration and the second configuration (or another configuration). The control signal may be generated internal to the USB switching hub (e.g., by logic internal to the USB switching hub). In some embodiments, the USB switching hub may not receive a control signal before switching configurations.

[0009]   In some embodiments, a computer system and a dual role peripheral device (e.g., a dual role USB printer or dual role USB Digital Versatile Disc (DVD) read/write drive, among others) may be coupled to upstream ports of a USB switching hub. Other devices and/or systems (e.g., another computer system) may be coupled to the upstream ports. The dual role peripheral device may interface with other peripheral devices (e.g., downstream peripheral devices) through its host controller and/or may interface with other devices (such as the computer system) as a peripheral device itself.

[0010]   In some embodiments, the upstream ports may be coupled to a downstream routing controller through one or more hub controllers. The downstream routing controller may switch between different configurations for the two or more upstream ports and the downstream ports (e.g., when triggered by a control signal). In some embodiments, the downstream routing controller may be coupled to the downstream ports through transaction translator circuitry. In some embodiments, the peripheral devices (as well as the dual role peripheral device) may be coupled through interfaces (e.g., a USB Physical Layer (PHY) interface, USB Transceiver Macrocell Interface (UTMI), or UTMI plus low pin interface (ULPI), among others) to the downstream ports. In some embodiments, configurations (e.g., hardwired in the USB switching hub) may be switched as determined by logic on the USB switching hub. Other configuration implementations are also contemplated.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0011]   A better understanding of the present invention may be obtained when the following detailed description is considered in conjunction with the following drawings, in which:

[0012]   **FIG. 1** illustrates a USB switching hub, according to an embodiment;

[0013]   **FIG. 2** illustrates a computer system coupled to a USB switching hub, according to an embodiment;

[0014]   **FIG. 3** illustrates a computer system and a dual role peripheral device coupled to a USB switching hub, according to an embodiment;

[0015]   **FIGS. 4***a* and **4***b* illustrate two configurations of the USB switching hub, according to an embodiment;

[0016]   **FIGS. 5***a*, **5***b*, and **5***c* illustrate additional configurations of the USB switching hub, according to an embodiment;

[0017]   **FIG. 6** illustrates unified functions within the USB switching hub, according to an embodiment; and

[0018]   **FIG. 7** illustrates a method for switching access to a downstream port between two upstream ports, according to an embodiment.

[0019]   While the invention is susceptible to various modifications and alternative forms, specific embodiments thereof are shown by way of example in the drawings and will herein be described in detail. It should be understood, however, that the drawings and detailed description therein are not intended to limit the invention to the particular form disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present invention as defined by the appended claims. Note, the headings are for organizational purposes only and are not meant to be used to limit or interpret the description or claims. Furthermore, note that the word "may" is used throughout this application in a permissive sense (e.g., having the potential to or being able to in some embodiments), not a mandatory sense (i.e., must). The term "include", and derivations thereof, mean "including, but not limited to". The term "coupled" means "directly or indirectly connected".

DETAILED DESCRIPTION OF EMBODIMENTS
OF THE INVENTION

[0020]   **FIG. 1** illustrates an embodiment of a USB switching hub. In various embodiments, a USB switching hub **119** may control access between two or more upstream ports **117** on the USB switching hub **119** and at least a subset of downstream ports **121** on the USB switching hub **119**. In some embodiments, the USB switching hub **119** may switch between configurations (e.g., hardwired or software implemented configurations) for access between the two or more upstream ports **117** and the downstream ports **121**. For example, in an embodiment with two upstream ports **117** and four downstream ports **121**, a USB switching hub **119** may switch between multiple configurations. In a first configuration, a first upstream port **117***a* may be allowed access to the first three downstream ports (**121***a*, **121***b*, and **121***c*) and the second upstream port **117***b* may be allowed access to the fourth downstream port **121***d*. In a second configuration, the first upstream port **117***a* may be allowed to access the fourth downstream port **121***d* while the second upstream port **117***b* may be allowed to access the first three downstream ports (**121***a*, **121***b*, and **121***c*). Other configurations are also possible (e.g., in one configuration neither upstream port **117** may be allowed to access any downstream port **121**). In

some embodiments, a USB switching hub **119**, after receiving a control signal (e.g., from a computer, a different attached device, a person, a sensor, a logic internal to the USB switching hub **119**, etc.), may switch between the first configuration and the second configuration (or another configuration). In some embodiments, the USB switching hub **119** may not receive a control signal before switching configurations.

[0021]   **FIG. 2** illustrates an embodiment of a computer system **101** coupled to a USB switching hub **119**. In some embodiments, a computer system **101** (e.g., a personal computer (PC), laptop, server, etc.) may access multiple peripheral devices **125** coupled to a USB switching hub **119**. The computer system **101** may couple to the USB switching hub **119** through an upstream port **117**. The computer system **101** may receive and transmit signals, e.g., USB signals, through a host controller **111** coupled to a device port **115**. The host controller **111**, coupled to a south bridge **113**, may be coupled to other computer components (e.g., the north bridge **105**, central processing unit (CPU) **103**, and system memory **107**) through the peripheral component interconnect (PCI) bus **109**.

[0022]   In some embodiments, the USB switching hub **119** may have multiple downstream ports **121** for coupling to multiple peripheral devices **125**. Peripheral devices **125** may include USB printers, scanners, digital cameras, digital camera docks, consumer audio/video, storage devices, and card readers, among others. In some embodiments the peripheral devices **125** may couple to the USB switching hub **119** through an interface **123**. In some embodiments, the interface **123** may be a PHY interface. Other interfaces may also be used (e.g., UTMI or ULPI). The upstream ports **117** and downstream ports **121** may also have interfaces.

[0023]   **FIG. 3** illustrates an embodiment of two upstream devices (e.g., a computer system **101** and a dual role peripheral device **207**) coupled to the USB switching hub **119**. In some embodiments, the USB switching hub **119** may include a downstream routing controller **201**, coupled to one or more hub controllers **203** (e.g., hub controllers **203***a* and **203***b*). The downstream routing controller **201** may also be coupled to transaction translator circuitry **205**. The transaction translator **205** may be electronically coupled to downstream ports **121**. In some embodiments, the downstream routing controller **201** may switch between two or more configurations. Configurations may be implemented by the downstream routing controller **201** routing communications between the upstream ports **117** and the downstream ports **121** while the communications are in the digital domain (as a result of the interfaces to/from the USB switching hub **119**). In some embodiments, configurations (e.g., hardwired in the USB switching hub) may be switched as determined by logic on the USB switching hub. Other configuration implementations are also contemplated.

[0024]   In some embodiments, a dual role peripheral device **207** may include a dual role USB printer or dual role USB Digital Versatile Disc (DVD) read/write drive, among others. In some embodiments, the dual role peripheral device **207** may be coupled to an upstream port (e.g., upstream port **117**b) of the USB switching hub **119** through device port **210**. The dual role peripheral device **207** may interface through the upstream port **117***b* with other peripheral devices (downstream peripheral devices) coupled to the

US 2006/0059293 A1

Mar. 16, 2006

3

USB switching hub **119** (e.g., using a host controller **209** on the dual role peripheral device **207**). The dual role peripheral device **207** may also interface with other upstream devices (such as the computer system **101**) through a slave controller. For example, the dual role peripheral device **207** may be coupled to the USB switching hub **119** as a slave peripheral device (e.g., through a downstream port **121***c*). In some embodiments, the dual role peripheral device **207**, coupled to the USB switching hub, may simultaneously act as a host to one or more peripheral devices and/or as slave peripheral device to a separate host.

[0025]   In some embodiments, the dual role peripheral device **207** may have an embedded host controller application to operate as a standalone system (e.g., to communicate with another peripheral device, such as a digital camera, without PC intervention). For example, a dual role USB printer may print pictures directly from a digital camera, coupled to a downstream port **121** on the USB switching hub **119**, without PC intervention. In some embodiments, the USB switching hub **119** may alternately allow the computer system **101** or the dual role peripheral device **207** to access one or more downstream devices (e.g., by switching between one or more configurations).

[0026]   FIG. 4*a* illustrates an embodiment of a computer system electronically coupled to multiple peripheral devices. In some embodiments, the USB switching hub **119** may act like a switch coupling multiple internal "hubs" that may share one or more downstream ports. For example, each potential configuration of the USB switching hub may represent an internal "hub". In some embodiments, when the computer system **101** is accessing a peripheral device **125** (e.g., peripheral device **125***a*) coupled to the USB switching hub **119**, communications to/from the peripheral device may be processed through a first "hub" comprised of first upstream port **117***a*, hub controller **203***a*, transaction translator **205**, and at least a subset of the downstream ports **121**. A second "hub" may be comprised of a second upstream port **117***b*, hub controller **203***b*, transaction translator **205**, and at least a subset of the downstream ports **121**. In one configuration, the computer system **101** may connect to downstream ports **121***a* and **121***c* (through the first "hub"), and the dual role peripheral device **207** may connect to downstream ports **121***b* and **121***d* (through the second "hub") (as seen in **FIG. 4***b*). Other configurations are also contemplated. In some embodiments, configuration profiles designating which downstream devices to couple to each upstream port may be hardwired or implemented by software. For example, if implemented by software, configuration profiles for each upstream port (and/or upstream device) may be stored on a memory accessible to the USB switching hub **119**.

[0027]   In some embodiments, the computer system **101** and the dual role peripheral device **125** may communicate through the USB switching hub **119** simultaneously with separate downstream devices. For example, while the computer system **101** communicates with device **125***a* (e.g., through the first "hub"), the dual role peripheral device **207** may communicate with device **125***b* (e.g., through the second "hub"). In some embodiments, while the peripheral device **125***a* is being accessed through the first "hub", a different upstream device may not be able to access peripheral device **125***a* (e.g., dual role peripheral device **207** may not be able to access peripheral device **125***a* while peripheral device **125***a* is being used by computer system **101**). In some

embodiments, a signal (e.g., from an external control block) may trigger the downstream routing controller **201** to switch access for a subset of downstream ports **121** (e.g., downstream port **121***a* and/or **121***c*) on the first "hub" to the second "hub" (i.e., switch configurations).

[0028]   In some embodiments, the dual role peripheral device **207** may send a control signal to the USB switching hub **119**. The USB switching hub may then switch configurations to connect one or more downstream ports to the dual role peripheral device. For example, when a user presses a button on a dual role peripheral device **207** (e.g., a dual role printer), a signal may be sent through mode **211** to the downstream routing controller **201** to switch access of the device **125***a* from the computer system **101** to the dual role peripheral device **207** (i.e., to switch to a second configuration as seen in **FIG. 4***b*). The computer system **101** may continue to communicate with downstream port **121***c* (and/ or other downstream ports as determined by the second configuration).

[0029]   In some embodiments, when activity is no longer detected between the dual role peripheral device **207** and a downstream port (e.g., if the dual role peripheral device **207** is turned off), the downstream routing controller **201** may switch access of the downstream port to the computer system **101** (i.e., switch to a different configuration). In some embodiments, the downstream routing controller **201** may switch access of the downstream port to a different upstream device. In some embodiments, instead of detecting inactivity, a signal from the dual role peripheral device **207** may signal the USB switching hub **119** to switch. Other signals and/or logic may also be used in determining when to switch configurations.

[0030]   In some embodiments, configurations may be software implemented. In some embodiments, a microprocessor coupled to or comprised in the downstream routing controller **201** may dynamically determine, e.g., using a dynamic configuration profile, which downstream ports to electrically couple to each upstream port. For example, the microprocessor may read a stored configuration profile and attempt to connect upstream ports to downstream ports according to the configuration profile. The configuration profiles may be stored on a memory (e.g., an Electronically Erasable Programmable Read-Only Memory (EEPROM)) coupled to the USB switching hub **119**. In some embodiments, hub controllers on the USB switching hub may have access to the configuration profiles.

[0031]   In some embodiments, a priority logic may be used to switch configurations. Priority logic, or other logic used to grant access, may be internal or external to the USB switching hub **119**. In some embodiments, a computer system **101** may be given priority over all of the downstream ports until an external control signal is sent from the dual role peripheral device **207** to switch access of one or more downstream ports to the dual role peripheral device **207**. In some embodiments, different control signals may be sent to trigger different configurations (i.e., to switch access of different downstream ports to the dual role peripheral device **207**).

[0032]   In some embodiments, host negotiation logic may be used to determine which configuration to use. In some embodiments, a default configuration may be used until multiple upstream devices "request" access to the same

14

4

downstream port. Host negotiation logic may be used to determine which configuration to use (i.e., which configuration gives a particular upstream port access to the "requested" downstream port).

[0033] In some embodiments, a microprocessor in the USB switching hub 119 may include a built in algorithm that auto detects downstream peripheral devices and determines how to connect the downstream peripheral devices. For example, instead of assigning a specific downstream port to an upstream port, a configuration profile may specify that the upstream port should have access to a digital camera if one is attached. The built in algorithm may auto-detect the digital camera when it is attached to one of the downstream ports and attach it to the appropriate upstream port (i.e., by switching to an appropriate configuration).

[0034] In some embodiments, when the downstream routing controller 201 switches configurations, and control of a downstream port is switched from the computer system 101 to the dual role peripheral device 207, a connection between the computer system 101 and the respective peripheral device 125 (coupled to the downstream port to be switched) may be terminated by the computer system 101. In some embodiments, communications between the downstream port to be switched and the computer system 101 may be terminated by the USB switching hub 119. The dual role peripheral device 207 may then connect to, enumerate, and communicate with the respective peripheral device 125 coupled to the switched downstream port.

[0035] Upstream devices may see downstream ports that they are not configured to attach to as unattached ports (i.e., active, but with no device connected). In some embodiments, if only a predetermined number of downstream ports is ever going to be attached to a particular upstream port (e.g., a number "x" ports), the upstream device may be signaled that the hub only has x ports. For example, if upstream port 117b is only going to be configured to attach to downstream ports 121c and 121d, a device attached to upstream port 117b may be signaled that the USB switching hub 119 is only a two port hub.

[0036] FIGS. 5a, 5b, and 5c illustrate various embodiments of a computer system 101 and two dual role peripheral devices coupled to the USB switching hub 419. In some embodiments, multiple dual role peripheral devices may be coupled to the USB switching hub 419. For example, a dual role printer 407 may be coupled to the USB switching hub 419 through upstream port 417b and a dual role DVD read/write drive 467 may be coupled to the USB switching hub 419 through upstream port 417c. Computer system 101 may be coupled to the USB switching hub 419 through upstream port 417a. Each of the upstream devices may be coupled to a respective hub controller 403, downstream routing controller 401, and transaction translator 405. Downstream routing controller 401 may configure communications between each of the upstream devices (i.e., the computer system 101, the dual role printer 407, or dual role DVD read/write drive 467) and at least a subset of the peripheral devices 425.

[0037] As seen in FIG. 5a, in one configuration profile, the computer system 101 may be connected to downstream ports 421a, 421b, 421e, and 421f. In an embodiment, the dual role printer 407 may be configured to access downstream port 421c, and the DVD read/write drive 467 may be

configured not to access any downstream port 421. The dual role printer 407 may gain access (i.e., have the configuration switched to give it access) to downstream port 421b through several different methods. For example, a user may press a button on the dual role printer 407. A signal may then be sent through mode 411 to the downstream routing controller 401 in the USB switching hub 419. The downstream routing controller 401 may switch to the configuration seen in FIG. 5b (which allows the dual role printer 407 to access downstream port 421b). In some embodiments, if the dual role printer 407 is turned off or becomes inactive, the downstream routing controller 401 may switch access of downstream port 421b back to the computer system 101 (i.e., switch back to the previous configuration). As seen in FIG. 5c, in one configuration, none of the upstream ports may be allowed to access any of the downstream ports.

[0038] FIG. 6 illustrates an embodiment of unified functions within the USB switching hub. In some embodiments, instead of separate hub controllers, a unified hub controller 503 may be used. For example, instead of separate hub controllers handling communications for their respective upstream port, a unified hub controller may handle communications for each of the upstream ports. Similarly, a unified transaction translator 505 may be used for each respective upstream port. Also, as seen in FIG. 6, in some embodiments, an upstream port switch may be used. For example, the upstream port switch may implement various configurations instead of a downstream routing controller.

[0039] In some embodiments, transaction translator(s) in the USB switching hub (e.g., USB switching hub 419 or USB switching hub 519) may allow upstream ports to communicate at different communication speeds relative to the other upstream ports. For example, one upstream port may be coupled only to high speed devices and, therefore, communicate at high speed, while a separate upstream port may be coupled to only full speed devices and, therefore, communicate at full speed. In some embodiments, upstream ports may be able to communicate with different downstream ports at different speeds because of the transaction translators.

[0040] FIG. 7 shows an embodiment of a method for switching access to a downstream port between two upstream ports on the USB switching hub. It should be noted that in various embodiments of the methods described below, one or more of the elements described may be performed concurrently, in a different order than shown, or may be omitted entirely. Other additional elements may also be performed as desired.

[0041] At 701, the USB switching hub may receive a signal (e.g., an external control signal) signaling the USB switching hub to switch between a first configuration and a second configuration. For example, switching configurations may switch access of a first downstream port from a first upstream port to a second upstream port. In some embodiments, a user may press a button on a dual role peripheral device coupled to the USB switching hub, and the dual role peripheral device may send an external control signal to the USB switching hub to signal the USB switching hub to switch between one or more configurations. In some embodiments, the signal may be internal (e.g., generated by logic internal to the USB switching hub).

[0042] At 703, communication between a host coupled to the first upstream port and the first peripheral device coupled

15

to the first downstream port may be terminated. In some embodiments, communication may be terminated for a subset of the downstream peripheral devices.

[0043]  At **705**, the USB switching hub may switch between the first configuration and the second configuration to give access of the first downstream port to the second upstream port. In some embodiments, the configuration switch may affect access for a subset of the downstream peripheral devices.

[0044]  At **707**, the downstream peripheral device coupled to the first downstream port may be accessed through the second upstream port by the host coupled to the second upstream port. In some embodiments, the second upstream port may communicate with a subset of the downstream peripheral devices. For example, the host may enumerate and then communicate with the switched multiple downstream devices. In some embodiments, access between the first upstream port and a second downstream port may continue.

[0045]  Further modifications and alternative embodiments of various aspects of the invention may be apparent to those skilled in the art in view of this description. Accordingly, this description is to be construed as illustrative only and is for the purpose of teaching those skilled in the art the general manner of carrying out the invention. It is to be understood that the forms of the invention shown and described herein are to be taken as embodiments. Elements and materials may be substituted for those illustrated and described herein, parts and processes may be reversed, and certain features of the invention may be utilized independently, all as would be apparent to one skilled in the art after having the benefit of this description of the invention. Changes may be made in the elements described herein without departing from the spirit and scope of the invention as described in the following claims.

What is claimed is:

  **1**. An apparatus, comprising:

  a USB switching hub, wherein the USB switching hub comprises at least two upstream ports and a plurality of downstream ports;

  wherein the USB switching hub is configured to electronically switch between two or more configurations of access between the upstream ports and at least a subset of the plurality of downstream ports.

  **2**. The apparatus of claim 1, wherein the USB switching hub comprises:

  a downstream controller logic, wherein the downstream controller logic implements a configuration by routing communications between the upstream ports and the downstream ports.

  **3**. The apparatus of claim 1, wherein the USB switching hub is configured to electronically switch between two or more configurations in response to a control signal.

  **4**. The apparatus of claim 3, wherein the control signal originates from a device coupled to one of the upstream ports.

  **5**. The apparatus of claim 3, wherein the control signal originates from logic internal to the USB switching hub.

  **6**. The apparatus of claim 1, wherein the USB switching hub is configured to allow simultaneous access of separate downstream ports through separate upstream ports.

  **7**. The apparatus of claim 1, wherein at least one configuration of the USB switching hub is hardwired or implemented through software.

  **8**. The apparatus of claim 1, further comprising a memory coupled to the USB switching hub, wherein the memory stores a configuration.

  **9**. The apparatus of claim 8, wherein the memory is coupled to a hub controller in the USB switching hub.

  **10**. The apparatus of claim 1, wherein the USB switching hub further comprises a translation translator circuitry.

  **11**. The apparatus of claim 1, wherein at least one of the downstream ports is coupled to a universal serial bus USB device.

  **12**. The apparatus of claim 1, further comprising a computer system coupled to at least one upstream port.

  **13**. The apparatus of claim 1, further comprising a dual role peripheral device coupled to at least one upstream port.

  **14**. The apparatus of claim 1, further comprising a printer with a host controller coupled to at least one upstream port.

  **15**. The apparatus of claim 1, further comprising an interface between a peripheral device and at least one of the downstream ports, wherein the interface converts a signal from the peripheral device into a binary signal.

  **16**. The apparatus of claim 1, wherein the USB switching hub further comprises a hub controller.

  **17**. A USB switching hub, comprising:

  a first upstream port;

  a second upstream port;

  a plurality of downstream ports;

  a downstream routing controller;

  wherein the downstream routing controller is configured to implement a first configuration allowing access between the first upstream port and a first subset of the downstream ports and the second upstream port and a second subset of the downstream ports;

  wherein the downstream routing controller is further configured to switch to a second configuration allowing access between the first upstream port and a third subset of downstream ports and the second upstream port and a fourth subset of the downstream ports.

  **18**. The USB switching hub of claim 17, wherein the USB switching hub allows a first device coupled to the first upstream port to access a first downstream port at the same time the USB switching hub allows a second device coupled to the second upstream port to access a second downstream port.

  **19**. The USB switching hub of claim 17, wherein an external signal signals the downstream routing controller to switch between the first configuration and the second configuration.

  **20**. The USB switching hub of claim 17, further comprising a hub controller.

  **21**. The USB switching hub of claim 17, further comprising transaction translator circuitry.

  **22**. The USB switching hub of claim 20, wherein the transaction translator circuitry allows communication between the first upstream port and one of the plurality of downstream ports to occur at a first speed and communication between the second upstream port and a second one of the plurality of downstream ports to occur at a second speed.

**23**. The USB switching hub of claim 17, wherein at least one of the plurality of downstream ports is coupled to a universal serial bus (USB) 2.0 device.

**24**. The USB switching hub of claim 17, further comprising a computer system coupled to the first upstream port or the second upstream port.

**25**. The USB switching hub of claim 17, further comprising a dual role peripheral device coupled to the first upstream port or the second upstream port.

**26**. The USB switching hub of claim 17, further comprising a printer with a host controller coupled to the first upstream port or the second upstream port.

**27**. The USB switching hub of claim 17, further comprising an interface between a peripheral device and at least one of the plurality of downstream ports, wherein the interface converts a signal from the peripheral device into a binary signal.

**28**. The USB switching hub of claim 17, wherein the first configuration and the second configuration are hardwired.

**29**. The USB switching hub of claim 17, further comprising a memory coupled to the downstream routing controller, wherein the memory stores the first configuration and the second configuration.

**30**. The USB switching hub of claim 29, wherein the downstream routing controller accesses the memory to implement the first configuration or the second configuration.

**31**. A method for determining access to a first downstream peripheral device coupled to a USB switching hub, comprising:

receiving a signal to switch between a first configuration and a second configuration;

switching between the first configuration and the second configuration, wherein switching between the first con-

figuration and the second configuration comprises switching access of the first downstream peripheral device from a first upstream port to a second upstream port; and

allowing communication between the second upstream port and the first downstream peripheral device;

wherein communication between a second downstream peripheral device and the first upstream port continues while the second upstream port accesses the first downstream port.

**32**. The method of claim 31, wherein the signal is an external signal from a USB upstream device coupled to the first upstream port or the second upstream port.

**33**. The method of claim 31, wherein a plurality of peripheral devices are coupled to the USB switching hub, and wherein switching configurations comprises switching access of a subset of the peripheral devices coupled to the USB switching hub.

**34**. The method of claim 31, further comprising:

terminating communications between the first downstream peripheral device and a first device coupled to the first upstream port;

electrically connecting a second device coupled to the second upstream port and the first downstream peripheral device.

**35**. The method of claim 34, further comprising:

enumerating the first downstream peripheral device.

communicating between the first downstream peripheral device and the second device coupled to the second upstream port.

\* \* \* \* \*