**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MICROCHIP TECHNOLOGY INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 17-01194-JDW |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| APTIV SERVICES US, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT APTIV SERVICES US, LLC'S
MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT
OR, IN THE ALTERNATIVE, INVALIDITY**

OF COUNSEL:

Elizabeth R. Brannen
Kenneth J. Halpern
Justin M. Barnes
Jhaniel N. James
Hanna Chandoo
STRIS & MAHER LLP
777 S Figueroa St
Ste 3850
Los Angeles, CA 90017
(213) 995-6800

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendant
Aptiv Services US, LLC*

Dated: December 17, 2019
Public Version Dated:  December 26, 2019

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

SUMMARY OF ARGUMENT ...................................................................................... 2

STATEMENT OF FACTS ............................................................................................. 5

    I.   The Asserted Patents............................................................................................ 5

    II.  The Court's Construction..................................................................................... 7

        A.  The Claims Do Not Permit Concurrent Data Streams From One Periphery To Two Different Hosts. ........................................................................................ 8

        B.  A *Single* Component Must Provide *The Same* Function To Multiple Hosts. ......... 9

        C.  The Shared Device Or Segment Must Provide A USB Function. .......................... 9

    III. The Accused Product. ........................................................................................ 10

    IV. Microchip's Infringement Allegations................................................................ 11

        A.  Microchip Identifies The "EP Bridge" As The Single, Shared USB Device. ...... 11

        B.  Microchip Also Identifies The So-Called "████████ Component Of The EP Bridge" As Providing "A Shared USB Device Block And Function Between Two Hosts." ....................................................................................... 14

ARGUMENT ............................................................................................................... 15

    I.   The Dual Role Hub Does Not Infringe As A Matter of Law......................................... 15

        A.  Data Undisputedly Streams Concurrently To And From Both Hosts.................. 16

        B.  Microchip Has Not Identified A *Single* Shared Component. ............................... 18

        C.  Microchip Has Not Identified Any *USB* Device Or Function That Is Configured By Both Hosts Or That Provides The *Same Shared Function* To Both Hosts. ........................................................................................................ 22

    II.  In The Alternative, The Asserted Claims Are Invalid. .................................................. 24

        A.  If The Accused Product Could Infringe, Ito Invalidates The Asserted Claims. ... 24

        B.  The Asserted Patents Cannot Cover Aptiv's Product Without Failing To Describe Or Enable The Full Scope Of The Claims............................................. 28

CONCLUSION.............................................................................................................. 32

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*01 Communique Lab., Inc. v. Citrix Sys., Inc.*,
    889 F.3d 735 (Fed. Cir. 2018)..................................................................................24

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001)................................................................................28

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)................................................................................28

*Application of Bowen*,
    492 F.2d 859 (Cust. & Pat. App. 1974) ...................................................................31

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010)................................................................................29

*Automated Business Companies v. WebEx Communications, Inc.*
    712 F. Supp. 2d 608 (S.D. Tex. 2010). ....................................................................19

*Bilstad v. Wakalopulos*,
    386 F.3d 1116 (Fed. Cir. 2004)................................................................................31

*GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*,
    744 F.3d 725 (Fed. Cir. 2014)..................................................................................28

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    481 F.3d 1371 (Fed. Cir. 2007)...........................................................................31, 32

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
    687 F.3d 1377 (Fed. Cir. 2012)................................................................................29

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................................15

*Microsoft Corp. v. GeoTag, Inc.*,
    817 F.3d 1305 (Fed. Cir. 2016)................................................................................15

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007)................................................................................19

*Polaroid Corp. v. Eastman Kodak Co.*,
    789 F.2d 1556 (Fed. Cir. 1986)................................................................................24

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008)................................................................................28

*Quest Licensing Corp. v. Bloomberg L.P.*,
   No. 1:14-cv-00561-LPS, 2017 WL 239345 (D. Del. Jan. 19, 2017),
   *aff'd*, 726 Fed. Appx. 819 (Fed. Cir. 2018) ...................................................................2, 18

*Shaw Industries Group, Inc. v. Automated Creel System, Inc.*,
   817 F.3d 1293 (Fed. Cir. 2016)................................................................................24

*Vas–Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991)................................................................................29

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988)................................................................................29

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997)................................................................................15

**Statutes**

35 U.S.C. § 112...................................................................................................1, 2, 5, 28

**Other Authorities**

Federal Rule of Civil Procedure 56 ......................................................................1, 15

Pursuant to Federal Rule of Civil Procedure 56 and the First Amended Scheduling Order, Defendant Aptiv Services US, LLC ("Aptiv") moves for summary judgment of noninfringement or, in the alternative, invalidity.

## NATURE AND STAGE OF PROCEEDINGS

This patent case relates to Universal Serial Bus ("USB") technology. Microchip Technology, Inc. ("Microchip") originally asserted three patents. Complaint, D.I. 1, at 2-3, 7. After claim construction, two remain:[1] U.S. Patent Nos. 7,523,243 (the "'243 Patent") and 7,627,708 (the "'708 Patent") (together, the "Asserted Patents"). Stip. Req. for J. & Order, D.I. 177, at 1-2. The '708 Patent issued as a continuation, '708 Patent, at 1:5-14, and the Asserted Patents share an identical specification. *Compare* '243 Patent, D.I. 1-1, at 1:5-4:50 *with* '708 Patent, D.I. 1-2, at 1:5-4:53. The PTAB completed *inter partes* review ("IPR") in 2018 and found many claims, including nearly every independent claim, unpatentable. While both parties appeal aspects of the IPR decision, this case has proceeded in parallel.

Microchip asserts infringement of the following claims, which survived before the PTAB but are on appeal to the Federal Circuit:[2] claims 2, 6, 10, 16, 17, and 22-25 of the '243 Patent, and claim 6 of the '708 Patent (the "Asserted Claims"). Discovery has closed. Aptiv now asks the Court to find, as a matter of law, that (1) Aptiv's Dual Role Hub (the "Accused Product") does not infringe, or (2) the Asserted Patents are invalid, first, in view of prior art that is identical in relevant respects to the Accused Product, and, second, for failure to satisfy the written description or enablement requirements of 35 U.S.C. § 112.

---

[1]   Microchip requested reconsideration as to one of the three patents. The Court denied Microchip's motion, D.I. 164, and Microchip stipulated to noninfringement. The Court entered the stipulated dismissal of that patent on November 5, 2019. D.I. 177.

[2]   As of August 27, 2019, the appeal was fully briefed. The Federal Circuit has not yet set a date for oral argument. If Aptiv's appeal succeeds, no Asserted Claims will remain patent eligible.

## SUMMARY OF ARGUMENT

The Asserted Claims allow multiple USB hosts to share a single USB device or device segment that provides the same peripheral function to each host. This Court held that the Asserted Claims permit two USB hosts to alternate access between the same USB peripheral device or function, but do not permit that peripheral to send data to both hosts at the same time. It is undisputed, however, that the Accused Product does just that: it sends data to a vehicle's head unit and to an attached iPhone concurrently. Microchip's infringement allegations "fl[y] directly in the face of the court's claim construction." *Quest Licensing Corp. v. Bloomberg L.P.*, No. 1:14-cv-00561-LPS, 2017 WL 239345, at *3 (D. Del. Jan. 19, 2017), *aff'd*, 726 Fed. Appx. 819 (Fed. Cir. 2018). The Court need go no further to find noninfringement.

Beyond that, things only get worse for Microchip. Its contention is that in vehicles that support an Apple offering called CarPlay, the Dual Role Hub literally infringes. In that setup there are two USB hosts in the system: the head unit, located in the vehicle's in-dash display, and the iPhone (in CarPlay mode). But each host configures its own peripheral that the other cannot access. There is no need to arbitrate each host's requests to access any shared peripheral device or function. The claims require a ***single*** USB device or segment of such a device that provides the same function to two hosts. There isn't one—Microchip simply amalgamates multiple components. Nor has Microchip identified any ***USB*** device or function shared by both hosts. For at least these three reasons, no reasonable factfinder could find that the Asserted Claims read on the Accused Product. Summary judgment of noninfringement is warranted.

Microchip's infringement theory also conflicts with the opinions of its validity experts. Its overly broad reading walks the claims directly into prior art and causes them to sweep too broadly to satisfy the requirements of Section 112. Thus, in the alternative, summary judgment of invalidity is warranted.

2

The basic facts underlying this motion are uncontested. Aptiv's Dual Role Hub is a media module. It can be incorporated into cars and other vehicles to become part of their infotainment system. Infotainment systems also include a "head unit," which serves (among other things) as a USB host. Consumers can attach electronic devices such as smartphones to the media module with a USB cable. When they do so, the head unit, as a USB host, communicates with and controls the smartphone as a peripheral. With Aptiv's Dual Role Hub, iPhones, like other smartphones, initially connect as a USB device. But ███████████████████████████████████ ████████████████████

Although the Dual Role Hub allows for both the head unit and the iPhone to act as USB hosts during a CarPlay session, each hosts a different USB device that the other cannot see, let alone share. This illustration, to which Microchip and its infringement expert Mr. Zatkovich repeatedly cite, shows the two **_distinct_** peripherals, USB Device A and USB Device B:



The head unit configures, controls, and communicates over USB with USB Device A (as well as other consumer electronics that may be attached to other user-facing ports on the media module). During CarPlay, the iPhone configures, controls, and communicates over USB only with USB Device B. The iPhone cannot see or request access to, let alone host, USB Device A or any other peripheral attached to a user-facing port. The head unit cannot see, or host, USB Device B.

3

Thus, the only device that the iPhone can host, the head unit cannot see, and the iPhone cannot see any of the devices that the head unit hosts. Moreover, the two different devices perform different functions for their respective hosts. There is no shared peripheral device or function.

To avoid the glaring problem that Device A and Device B are two different devices, Mr. Zatkovich simply draws a box around them. He labels the amalgamation the "EP Bridge" and argues that it is the shared device. Mr. Zatkovich's drawing does not work because, in stark contrast to the Asserted Claims, there is no need for the hosts to alternately access the Accused Product. Data streams from the Dual Role Hub both (1) to and from the head unit, and (2) to and from the iPhone, at the exact same time. As Mr. Zatkovich repeatedly observed, both hosts do not merely **request** access during a CarPlay session—they simultaneously receive **actual access** to what Microchip labels the shared component. This should end the inquiry because, as the Court held: "[t]he claims do not permit concurrent data streams from one periphery to two different hosts." Mem. Op. Regarding Claim Construction, D.I. 113, at 16. Mr. Zatkovich has only one answer to this fatal problem: that somehow the Court's claim construction order did not mean what it said.

Additional differences preclude infringement as a matter of law. As the Court held, the claims require "***a [i.e., one] USB device***" to provide "***the same shared function*** (or functions) to multiple hosts." *Id.* at 20. But there can be no genuine dispute that Microchip's infringement theory entails no such thing. In what Microchip has accused, the two hosts do not establish USB connections with the same USB device or segment. Not only are "USB Device A" and "USB Device B" separate, the green rectangle labeled ███ in the ██████████ diagram is not a singular component. That conceptual block consists of ███████████ ███ ███ ██ █ █ ██ ███ █, through which data passes

4

unidirectionally. The ████████ concededly are not a USB peripheral device or USB function. Nor are they a segment of a single USB device that provides the same shared function to both hosts. Mr. Zatkovich has not identified *any* shared USB peripheral function. Microchip's attempt to cobble together multiple distinct components where the claims require a single component precludes infringement.

Tellingly, to maintain that there is infringement, Mr. Zatkovich has placed himself on an island. His theories contradict those of Microchip's former expert, Mr. Knapen, who informed the PTAB that those of skill in the art would understand that the claims refer to a *USB* function. Mr. Zatkovich is also fundamentally at odds with Microchip's current validity expert, Dr. Levy.[3] As shown below, the claims cannot cover Aptiv's Dual Role Hub without reading squarely on the Ito prior art reference, which discloses host-to-host USB communication using two USB peripherals. Aptiv accordingly moves in the alternative for summary judgment of invalidity on two grounds. First, if read as broadly as Microchip urges, Ito anticipates. Second, in that event the claims also sweep too broadly to satisfy § 112.

## STATEMENT OF FACTS

### I.     The Asserted Patents.

USB is a serial communication standard that allows consumers to connect a variety of peripheral devices (e.g., a printer) to one host (e.g., a computer). Under standard USB prior to the

---

[3]     Mr. Knapen participated in the creation of certain USB standards. Excerpts of Jan. 15, 2018 Tr. of Dep. of Geert Knapen, Ex. 1049 to IPR2017-00861, -00864 (attached as Exhibit A), at 11:25-12:12. Not so for Microchip's new experts. Excerpts of Tr. of Nov. 14, 2019 Dep. of Ivan Zatkovich (attached as Exhibit B), at 26:17-29:25; Excerpts of Tr. of Nov. 21, 2019 Dep. of Dr. John Levy (attached as Exhibit C), at 18:9-19, 33:4-34:23. Mr. Zatkovich has served as an expert 60 or 70 times in the past two decades, in only 3 cases directly pertaining to USB. Ex. B, at 10:18-11:23; 13:8-11. He made no effort to be consistent with Mr. Knapen or Dr. Levy. *Id.* at 10:3-14. Dr. Levy, for his part, has served as an expert over 60 times in the past three decades, in only 2 cases directly pertaining to USB. Ex. C, at 14:14-15:5, 28:5-10. He, too, made no effort to be consistent with Microchip's other experts. *Id.* at 12:7-13:4.

time of the invention (USB Specification 1.0 and 2.0), hosts may simultaneously configure and access multiple devices, but each device may be configured and accessed by only one host at a time. *See*, *e.g.*, Opening Expert Report of Ivan Zatkovich (attached as Exhibit D) ¶ 50; Excerpts of Rebuttal Expert Report of Dr. John Levy (attached as Exhibit G) ¶ 41; Reply Expert Report of Ivan Zatkovich (attached as Exhibit H) ¶ 9.

The claimed invention allows multiple hosts to use the same peripheral device or function without having to reconfigure it each time. But the hosts must still alternate access. The patents disclose a system and method for sharing a single USB device among two or more USB hosts by establishing concurrent USB connections and arbitrating access between the two hosts. D.I. 113, at 15; '243 Patent, at Abstract, 2:9-12, 2:58-67, 4:1-5, 4:19-33; '708 Patent, at Abstract, 2:11-15. Figure 3 "shows a USB multi-host device having two ports connected to a USB multi-host device controller [("MHDC")], which then connects to the USB device/function block":



*FIG. 3*

D.I. 113, at 15 (citing '243 Patent, Fig. 3); *see also* '708 Patent, Fig. 3. The MHDC permits each host "to access shared peripheral function 312 by either interleaving host accesses, or by using a

common request/grant structure that may hold-off one host while another host completes a data transfer . . . ." Peripheral Device/Function 312 may be an off-the-shelf USB device. '243 Patent, at 4:5-9; '708 Patent, at 4:8-12.

A USB device may be divided into three segments or blocks, including a USB interface, "'an Endpoint Buffer Block, which may include the endpoint buffers that are used by the first and third blocks to buffer data and control reads and writes to/from the USB[,]' and 'the 'Peripheral Function' itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc.'" D.I. 113, at 18 n.16 (quoting '243 Patent, at 2:38-50). Peripheral Device/Function 312 corresponds to the third block. Ex. D ¶ 66 (citing '243 Patent, at 2:48-50); *see also* '708 Patent, at 2:50-53, 4:8-12; '243 Patent, at 4:5-9.

The invention permits the hosts to "establish 'concurrent respective dedicated USB connections between the USB device block and the . . . upstream ports'" so that each host can "simultaneously request access to the USB device; and alternately access the USB device block." D.I. 113, at 15 (citing '243 Patent, cl. 1) (emphasis in original); '243 Patent, at 4:57-65; '708 Patent, at 4:11-5:4. All USB connections must be concurrent. '243 Patent, at 4:60-61 (claim 1), 5:18-19 (claim 3), 5:46-47 (claim 7), 6:35-36 (claim 18), 7:1-2 (claim 23), 7:9-10 (claim 24); '708 Patent, at 3:19-20 (claim 3).

## II.    The Court's Construction.

Although the Asserted Claims use slightly different language, they all require the same thing: a ***single*** USB peripheral device or segment of such a device corresponding to a function that is ***shared*** by two or more hosts in the following sense: both hosts establish concurrent dedicated USB connections to that device or function. *See* Chart Summarizing Claim Language (attached as Exhibit I). The Court construed "respective dedicated USB connection/dedicated USB

7

connection," "shared USB device that corresponds to at least one function," and "USB device block" in ways that entirely dispose of Microchip's infringement theory.

### A. The Claims Do Not Permit Concurrent Data Streams From One Periphery To Two Different Hosts.

The Court construed "respective dedicated USB connection/dedicated USB connection," which appears in every asserted claim, to mean "a USB connection that is not shared (except that multiple USB connections may alternate in some manner, communicating across the same shared physical connection)." D.I. 113, at 14. "[A] 'USB connection' must substantially comply with some USB standard." *Id.* at 16. Hosts may "share a physical connection while still maintaining 'dedicated USB connections.'" *Id.* at 15 (quoting '243 Patent, at 4:19-33).

As Microchip assured the Federal Circuit, the Asserted Claims require "concurrent connections between multiple USB hosts and the ***same*** peripheral device." Brief of Cross-Appellant Microchip, Nos. 2019-1537, -1538, -1601, -1603 (Fed. Cir. June 27, 2019) (attached as Exhibit J), at 30. For example, to fall within the Asserted Claims, two hosts must be able to use the same printing function of the same printer.

Critically then, as the Court observed, two hosts can maintain simultaneous connections, but they may not ***access*** the peripheral (whether a device or the peripheral function segment of a device) simultaneously: "The claims do not permit concurrent data streams from one periphery to two different hosts. That is, one packet may be sent to one host and the next packet sent to the other host, and that process may continue to switch back and forth, but it is not the case that packets may be sent to both hosts at the same time." D.I. 113, at 16.[4]

---

[4]   The "periphery" refers either to the USB device, or to the third of the three distinct "segments of a USB device" that the Court identified from the patent disclosure: (1) a USB interface, (2) an Endpoint Buffer Block, and (3) the Peripheral Function. *Id.* at 18, n.16 (citing '243 Patent, at 2:38-50).

### B.  A *Single* Component Must Provide *The Same* Function To Multiple Hosts.

This Court construed "[a] shared USB device . . . that corresponds to at least one function" to mean "a USB device that provides the same shared function (or functions) to multiple hosts." *Id.* at 20. The Court recognized the difference between a shared device and a "compound device":

> Combining multiple USB devices in a single housing does not make the devices "shared" . . . . [O]nly if "*a [(i.e., one)] USB device*" provides "*the same shared/function (or functions) to multiple hosts*" does it become a "shared USB device." As Defendant acknowledges, a POSA would understand that, in the context of the '243 Patent, "shared" devices are different than compound devices. (Id. at 92-93).

*Id.* at 20. Thus, if the shared printer discussed in the Asserted Patents also housed a scanner, one host's use of the printer and a second host's use of the scanner would not qualify.

### C.  The Shared Device Or Segment Must Provide A USB Function.

Some Asserted Claims expressly require a "shared USB device," "shared USB device block," or "a USB function block." *See* Ex. I. The rest require "a USB device block corresponding to at least one function." The Court construed "a USB device block" to mean "a USB device or segment of a USB device that performs a function to provide a capability to a host over USB." D.I. 113, at 18. Mr. Zatkovich believes the segment can be something other than a USB function as long as it "performs at least one USB request," meaning, "[a] request by the host to perform an operation within the context of a USB function." Ex. B, at 66:10-17; *see also* Ex. B, at 48:17-25.

The Court, however, declined to specifically add the word "USB" before the word "function" not because the function could be something *other than* a USB function, but because its inclusion would have been "redundant" and "unnecessary." D.I. 113, at 18-19. In fact, Microchip and its expert advocated for the PTAB to include the word "USB" in its construction of this term. Patent Owner's Response, IPR2017-00864, D.I. 76-1, at Appx_318. As Mr. Knapen repeatedly explained, those of ordinary skill in the art would "understand the 'at least one function'

language to broadly refer to a USB function." Nov. 20, 2017 Decl. of Geert Knapen, Ex. 2007 to IPR2017-00864, D.I. 76-1, ¶¶ 60-64, at Appx_384-Appx_385; Nov. 20, 2017 Decl. of Geert Knapen, Ex. 2007 to IPR2017-00861, ¶¶ 61-64, 67-69, at Appx_680-Appx_683. Microchip similarly argued that the function block is USB-specific. Patent Owner's Response, IPR2017-00864, D.I. 76-1, at Appx_623 ("[T]he term 'function' is ***well known in the USB art and is actually defined in the USB specification***[.]" (emphasis added)); *see also* Patent Owner's Sur-Reply, IPR2017-00864, D.I. 76-1, at Appx_412-Appx_413.

### III.   The Accused Product.

Microchip accuses Aptiv's Dual Role Hub, a media module Aptiv designs and sells to vehicle manufacturers. Ex. D ¶ 82. From the outside, it looks like this:



*Id.* After incorporation into a vehicle, users can attach smartphones or other USB devices through one (or more) user-facing USB ports. *Id.*

In 2013, Apple launched CarPlay. With CarPlay, the head unit's display becomes a simplified interface that the iPhone (rather than the head unit) controls. ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████

The head unit contains hardware and software that Aptiv does not sell. Ex. B, at 142:17-143:6, 144:19-22. When an iPhone initially attaches, the head unit detects and enumerates it as a peripheral device. If certain conditions are satisfied, including that the head unit contains all the necessary software and the iPhone user has enabled CarPlay, the iPhone then reverses roles to become a USB host. Ex. D ¶¶ 86, 104.

## IV.    Microchip's Infringement Allegations.

In relevant respects, the parties do not dispute which components comprise the Accused Product or how it generally works. The Dual Role Hub contains a chip called ████, which, among other items, contains the components Mr. Zatkovich refers to, together, as the "EP Bridge." *Id.* ¶¶ 82, 90-92.

### A.    Microchip Identifies The "EP Bridge" As The Single, Shared USB Device.

Mr. Zatkovich identified what he labeled the "EP Bridge" as the shared component required by every claim, citing the same evidence for each claim element below:[5]

- The "USB device block corresponding to at least one function" of asserted claims 2, 6, 10, 16, 17 of the '243 Patent;

- The "shared USB device" that "corresponds to at least one function" of asserted method claim 22 of the '243 Patent;

- The "shared USB device block" of asserted claims 23-25 of the '243 Patent; and

- The "USB function block" of asserted claim 6 of the '708 Patent.

*See* Ex. I; Ex. D ¶ 119; '243 Claim Chart, Exhibit 3 to Opening Expert Report of Ivan Zatkovich (attached as Exhibit E), at 3-14 (claim 1), 26-37 (claim 3), 51-62 (claim 7), 88-99 (claim 18), 109-122 (claim 23); '708 Claim Chart, Exhibit 4 to Opening Expert Report of Ivan Zatkovich (attached

---

[5]    This further underscores that, for purposes of this motion, there is no meaningful difference in the required elements.

as Exhibit F), at 2-17 (claim 3); *see also* Ex. C, at 88:20-89:9, 90:16-19. Without explaining whether or why it is a USB function or which USB device provides it, he says what he calls "the CarPlay function" is shared, and contends that "[t]he sole purpose of Aptiv's EP Bridge is to allow the two Hosts to exchange data as required by the CarPlay specification." Ex. D ¶ 86.

To support his mischaracterization of the "EP Bridge" as a single shared device, Mr. Zatkovich literally drew a box around two different USB devices:



*Id.* ¶ 92; Ex. E, at 8, 19, 32, 42, 56, 67, 89, 103, 117; Ex. F, at 7, 18.

But the image explicitly shows *two* USB devices: USB Device A and USB Device B. USB Device A connects to the head unit and contains its own USB device controller called UDC_US. *See* Ex. D ¶ 99; Ex. B, at 113:12-18. USB Device B connects to the iPhone and contains its own USB device controller called UDC_DS. *See* Ex. D ¶ 99. The head unit never configures USB Device B, and the iPhone never configures USB Device A. Rebuttal Expert Report of John Garney (attached as Exhibit L) ¶ 147; *see* Ex. B, at 113:4-18. The head unit can enumerate and communicate with USB Device A even when the iPhone has not enumerated Device B. Ex. B, at 130:23-131:3; Ex. D ¶¶ 97, 101-104, 131 (citing deposition testimony of Shyambabu Yeda).

There can be no genuine dispute that Device A and Device B are different USB devices that perform different USB functions. As Aptiv's expert John Garney explained and Mr. Zatkovich did not (and could not) refute, the USB 1.0 and 2.0 Specifications state that, in USB, a "function" is a USB device. Ex. L ¶¶ 68-69. Not everything that provides a capability to a host is a USB function. *See, e.g.*, Excerpts of Tr. of Aug. 6, 2019 Dep. of Mark Bohm (attached as Exhibit M), at 22:17-24:11, 26:7-28:16, 31:1-33:15; Excerpts of Tr. of Aug. 21, 2019 Dep. of Atish Ghosh (attached as Exhibit N), at 18:13-22, 31:16-32:18, 33:20-34:21, 37:1-43:6. Rather, for something to be a USB device or USB function, it must possess certain characteristics and capabilities. Ex. L ¶¶ 70-76. USB devices/functions comprehend USB protocol, and hosts can configure and control them using the correct client software for the function. Ex. L ¶¶ 70, 73; *see also* Ex. B, at 38:7-18, 38:25-39:11 (confirming that host must enumerate USB device for USB communication to occur), 47:11-17. Additional characteristics include having a device address and the ability to report a specific device descriptor, device class, and vendor identification. *Id.* ¶ 70. They all have an "endpoint number zero" or "EP0." *Id.* ¶ 75. These are foundational and uncontroversial requirements of USB that neither Mr. Zatkovich (nor Dr. Levy) attempted to contest. *See generally* Ex. H.

What Mr. Zatkovich states is a single USB device is incorrect. Ex. L ¶¶ 139, 166-176. In fact, Mr. Zatkovich conceded "that the two controllers of the EP Bridge are each associated with their own device descriptors, device class, and vendor identification." Ex. H ¶ 35; *see also* Ex. L ¶¶ 139, 168-176 (explaining that each device identifies and reports itself differently, and that the respective devices perform different USB functions for the host that connects to them); *see also* Ex. B, at 113:22-114:5.

Mr. Zatkovich has not identified any device descriptor, device class, or vendor identification for his amalgamated "EP Bridge," and there is none. Ex. L ¶ 139. His conclusory assertion that the "EP Bridge" is one device cannot create a genuine issue of disputed fact because the Accused Product simply does not contain a single USB device that each host alternately accesses. *Infra* pp. 20-21; *compare* Ex. E, at 12 *with* F, at 13 (showing distinct code segments, one corresponding to Device A and the other corresponding to Device B). As Mr. Zatkovich cannot dispute, each USB device (Device A and Device B) communicates simultaneously with its respective host, and never with the other host. Ex. L ¶¶ 197-203; Ex. D ¶¶ 55-60.

### B. Microchip Also Identifies The So-Called "████████ Component Of The EP Bridge" As Providing "A Shared USB Device Block And Function Between Two Hosts."

Apparently as an alternative infringement theory, Mr. Zatkovich identifies "the ████ ████ component of the EP Bridge" as the part of the Accused Product that "provide[s] a shared USB Device Block and function between two hosts." Ex. H ¶¶ 26, 40-65; *see also* Ex. E, at 3-5, 26-28, 51-53; Ex. F, at 2-4.

A █████████████████████████ stores data packets. Ex. L ¶ 149; *see also* Ex. B, at 132:13-23. In the Accused Product, each device controller contains its own, unidirectional █████████. Ex. B, at 131:4-132:16; Ex. L ¶¶ 149-152. Mr. Zatkovich does not dispute that the █████ are actually part of each device controller. Ex. D ¶ 109, n.15; Ex. B, at 131:19-24. There are no █████████ ███████████████ in the respective device controllers of Device A and Device B. Ex. L ¶ 150.

Data packets flow through each █████████ ███████████████. Ex. L ¶ 149. Once a data packet has entered █████, the only way out is through the other end. *Id.* Any given █████ stores and transmits either inbound or outbound data for *its* device controller. Ex. B, at 122:12-123:3; Ex. L ¶¶ 149-152. Logic between the ███████████ facilitates the transfer of data

14

between the two devices. Ex. B, at 132:5-16; Ex. L ¶ 150. No ████████ is utilized by *both* devices, and the ██████ that transport data from Device B to Device A are not the same ██████ that transport data from Device A to Device B. Ex. L ¶¶ 149-152. ████████ are not part of the peripheral function "segment" of a USB device, nor are they standalone USB devices. *See* Ex. B, at 123:9-125:10. They do not possess any of the characteristics of a USB device or provide a function to any host "over USB," and certainly do not perform any USB function. *Id.* at 122:21-125:21; *see also* Ex. L ¶¶ 149-153. Mr. Zatkovich concedes that the "component" he has identified consisting of the ████████████ is not a USB device or function. Ex. B, at 122:21-125:21.

## ARGUMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). Microchip and its expert have attempted to prove only literal infringement, but cannot possibly do so. To infringe, an accused product must meet every limitation of an asserted claim. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016) ("To establish literal infringement, every limitation . . . must be found in an accused product, exactly[.]" (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995)).

## I.     The Dual Role Hub Does Not Infringe As A Matter of Law.

Unlike the now-dismissed patent, Microchip never requested reconsideration of the *Markman* ruling pertaining to the Asserted Patents. Instead, it served expert reports that simply disregarded aspects of the Court's constructions that rule out infringement. Specifically, the *Markman* ruling recognized the following about the Asserted Claims' scope:

- Data cannot stream concurrently between both hosts and the peripheral because two hosts cannot access a peripheral function at the same time.

- The invention entails *one* shared USB device or segment, not multiple devices packaged together and labeled as one.

- What both hosts configure and use is *the same* shared function of *the same* device (e.g., printing from the same printer).

When incorporated into a complete system, the Accused Product accommodates two USB hosts. But in the Dual Role Hub, each host configures, controls, and communicates over USB with its *own respective USB device*. As such, it exhibits *none* of the behaviors listed above. Because neither peripheral is shared by (or even accessible to) the other host, the hosts need not alternately access their respective devices or interleave their communications. Rather, both hosts concededly can, and testing confirms that both hosts *do*, send and receive simultaneously-transmitted data from the components Microchip identifies as shared. It is thus unnecessary to delve deeply "under the hood" to conclude that the Accused Product is fundamentally different from the Asserted Claims. Microchip also tries to amalgamate multiple components into one. It has not and cannot identify a *single* USB device or segment of such a device that provides the same function to both hosts. Microchip's alternative theory naming "the ▮▮▮▮▮▮ Component of the EP Bridge" as the shared device or function also fails. The ▮▮▮▮ are not shared (by Microchip's expert's own criteria), nor are they a *USB* device or function. There simply isn't one that two hosts share. For at least these three reasons, no reasonable factfinder could find that the Asserted Claims read on Aptiv's product. Summary judgment of noninfringement is warranted.

## A.  Data Undisputedly Streams Concurrently To And From Both Hosts.

The Dual Role Hub concededly and demonstrably does not infringe for a simple reason: the claims do not cover concurrent data streams, yet they are indisputably present. The claim construction ruling places concurrent data streams emanating from a single USB peripheral device

16

or function squarely outside the claim scope: "[t]he claims do not permit concurrent data streams from one periphery to two different hosts." D.I. 113, at 16.

In his opening report, Mr. Zatkovich repeatedly opined not just that both hosts (the head unit and iPhone) *request* simultaneous access to what he identified as the shared component, but that both hosts *actually access* that component simultaneously. As discussed below, *infra* pp. 18-24, that component is not a shared USB peripheral device or functional segment. It is two different USB devices, which separately precludes a finding of infringement. But for purposes of the present argument, the point is that, unlike the Asserted Claims, Aptiv's product allows two hosts to have *actual* access *at the same time*. Regardless of what is happening "under the hood," the fact that Aptiv's product permits simultaneous access and concurrent data streams necessarily means that either the shared peripheral or the MHDC that arbitrates access (or both) are missing.

Mr. Zatkovich repeatedly made clear that both hosts actually use the "EP Bridge" at the exact same time—without any need to arbitrate or alternate access. For example:

- "After the iPhone is connected as a host and completes its enumeration of the EP Bridge device, both the Head Unit and the iPhone are simultaneously connected to, and can both access the EP Bridge device at the same time." Ex. D ¶ 105.

- "The iPhone sends a series of messages by accessing the Bridge to write data. The Head Unit simultaneously accesses the Bridge to poll for the existence of data to be read." Ex. E, at 14.

- "During this audio transfer, both the iPhone and the Head Unit are accessing the EP Bridge simultaneously." Ex. D ¶ 134.

- "This is another example of simultaneous access of requests **and replies** from the iPhone and Head Unit to the Dual Role Hub." *Id.* ¶ 138 (emphasis added).

To demonstrate that this occurs, Mr. Garney captured communications between each host and the Dual Role Hub. His report documents and confirms the presence of simultaneous data transfers from the Dual Role Hub to both the head unit and the iPhone. Ex. L ¶¶ 197-203. In reply,

Mr. Zatkovich did not dispute this. Ex. H ¶¶ 55-60. He implicitly conceded, and it is beyond reasonable dispute, that data packets may be transmitted from the allegedly shared device or segment to the head unit and iPhone concurrently. Whatever the hosts are allegedly "sharing," it cannot be the same USB peripheral device or function.

Mr. Zatkovich's only response is that he does not understand the Court to have imposed a negative limitation on the scope of the claims. *Id.* ¶¶ 56-57. But the Court's holding was unambiguous and accords with the intrinsic record. Mr. Zatkovich's notion that the invention allows concurrent data streams between one peripheral and two hosts eliminates the purported invention. It is a fundamental premise of the Asserted Patents that the hosts must alternate access: the goal of the invention is to enable them to do so without re-configuring and re-enumerating the shared peripheral. '243 Patent, at 2:9-12 (Summary of the Invention), 2:58-67, 4:1-5, 4:19-26 (describing access arbitration mechanism that makes this possible), all Asserted Claims (reciting "alternate[] access" or ability to "respond to simultaneous . . . access requests," not simultaneous *access*). As in *Quest Licensing*, Microchip's infringement position "flies directly in the face of the court's claim construction." 2017 WL 239345, at *3.

## B.  Microchip Has Not Identified A *Single* Shared Component.

The Dual Role Hub does not infringe, as a matter of law, for a second reason: where the Asserted Claims require a single component, Microchip's infringement theories cobble together multiple components and attempt to treat them as one. Mr. Zatkovich has identified two potential shared USB devices/USB device blocks corresponding to at least one function: the "EP Bridge" and the "███████ component of the EP Bridge." *Supra* pp. 11-15; s*ee also* Ex. D ¶¶ 125-128; Ex. H ¶¶ 40-64. Neither of these, however, is a *single* device or segment with which both hosts could establish a USB connection.

18

## 1.  Where Claims Require A Single Device, Multiple Devices (Or Portions of Multiple Devices) Cannot Literally Infringe.

Courts have repeatedly held that, where the claims require a single device, multiple devices (or multiple portions of multiple devices) cannot literally infringe. For example, in *Automated Business Companies v. WebEx Communications, Inc.*, one of the terms at issue was a "remote system controller." 712 F. Supp. 2d 608, 611-12 (S.D. Tex. 2010). The plaintiff advocated for a claim construction allowing a remote system controller to comprise multiple devices. *Id.* at 622. The Court disagreed and construed "remote system controller" to mean **one** computer or controller. *Id.* On summary judgment, the defendant argued that its products did not employ "any single device" that performed both of the functions required by the claims (checking the validity of logon commands and serving as an interface between a local computer and a remote computer). *Id.* at 623. The Court agreed and found noninfringement on the ground that no **single** component qualified. *Id.* The Federal Circuit has adopted similar reasoning. *See, e.g.*, *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 (Fed. Cir. 2007) (affirming jury verdict of no literal infringement where construction required "a device, not a number of devices" to act as a "clutch" and substantial evidence indicated that accused vehicles did not have such a single device).

The facts here mirror *Automated Business Companies*. The Court has already construed "USB device block," "USB function block," and "shared USB device" to require **one** USB device or **one** segment of **one** USB device. But the "EP Bridge" comprises **two** USB devices. Mr. Zatkovich has also accused ▮▮▮ different ▮▮▮▮▮▮ present in **two** USB devices. Microchip's inability to identify a "USB device block," "USB function block," or "shared USB device"—a required element of *every* Asserted Claim—in compliance with the Court's claim construction order is fatal.

### 2. The "EP Bridge": Two Are Not One.

The claims require **one** shared USB device. The Asserted Patents point to a printer (connected to two laptops) as an exemplary "shared USB device." The "EP Bridge" cannot possibly be considered one device:

- As confirmed by the illustration Microchip relies upon as well as the firmware, the "EP Bridge" comprises **two** USB devices. *Supra* pp. 11-14; Ex. L ¶¶ 165, 218, 221.

- Each device contains its own device controller. *Supra* pp. 11-14.

- Each device only communicates with only **one** host, and never the same host as the other device. *Supra* pp. 11-14.

- The device controllers do not share any descriptors. They have different USB interfaces, device descriptors, device class behaviors, vendor identifications, and device addresses. *Supra* pp. 11-14. They even respond to standard USB requests differently. *Supra* pp. 11-14.

- The head unit enumerates USB Device A ███████████████████████████ ████████████████████. Ex. D ¶ 101; Ex. B, at 113:12-18, 130:11-131:3.

- When an iPhone is attached and other conditions are present, (including the presence of software on the head unit that Aptiv does not supply), the head unit controls and causes USB Device A/UDC_US to take action ███████████████████ ████████████████. Ex. D ¶¶ 103-105.

- The head unit enumerates and communicates with USB Device A while the iPhone has separately enumerated and concurrently communicates with USB Device B.

Mr. Zatkovich concedes that "the two controllers of the EP Bridge are each associated with their own device descriptors, device class, and vendor identification." Ex. H ¶ 35; *see also* Ex. C, at 106:11-19 (one can determine whether a component is one device or two by looking at the device descriptors). He also continually cites documents that describe Device A and Device B respectively as "UDC_US device" and "UDC_DS device." *See, e.g.*, Ex. D ¶¶ 122, 123, 126, 128; Ex. H ¶¶ 21, 47, 69, 74-75 (citing DELPHI_0000027, Boston product specification ("Boston Spec.")); *see also* Excerpts of Boston Spec. (attached as Exhibit O), at 82, 84-85, 87. Mr. Zatkovich

also acknowledges that Device A and Device B have separate, distinct functions: "The UDC_US presents a vendor specific function while the UDC_DS presents NCM and iAP2 functions." Ex. H ¶ 48. He further acknowledges that each one presents its distinct function only to its respective host: "Each of the two sides of the bridge has its own instance of this [UDC] performing the USB communication for that side of the bridge." *Id.* ¶ 47; *see also id.* ¶ 35 (acknowledging that head unit enumerates "a vendor specific class device," whereas iPhone enumerates "a standard CarPlay device with iAP2 and NCM interfaces"), ¶ 38 (UDC_US responds to USB requests from the head unit; UDC_DS responds to USB requests from the iPhone).

Despite this mountain of evidence, Mr. Zatkovich simply drew a "box" around two distinct devices and, without citing any support, labeled them as a single, shared USB device. But *two* is not *one*; the "EP Bridge" is not a *single* shared device.[6]

### 3. The "███████████": Many Are Not One.

Perhaps recognizing the futility of grouping two USB devices into one, in reply, Mr. Zatkovich also pointed to "███████████████████" as the shared USB device block/function. Ex. D ¶ 127; Ex. E, at 3-5, 26-28, 51-53, 97-99, 109-114, 122-127; Ex. F, at 2-4. This argument fares no better. It, too, contradicts the Court's construction and the opinions of Dr. Levy. *See, e.g.*, Ex. G ¶ 217. The ██████████ are concededly each part of one or the other device

---

[6]    Because there are two separate USB devices in the Accused Products, there is also no need to arbitrate or interleave access. There is, thus, no component that performs the function of the MHDC. Citing no evidence, Mr. Zatkovich's reply made a conclusory statement that the microcontroller in the EP Bridge performs an "arbitration function" that "includes, when necessary, alternating the execution of . . . simultaneous requests between one host to the other host." Ex. H ¶ 26. But there is indisputably no arbitration or interleaving required for the exchange of data between the two hosts (via their respective USB Devices and ██████████). And Microchip's attempt to identify a MHDC in addition to a shared USB device, or device or function block, necessarily entails double counting that precludes literal infringement. *See, e.g.*,  Ex. L ¶¶ 158-162.

controller. Portions of two devices do not constitute a single device. Microchip repeats the same

mistake: *many* are not *one*.

### C. Microchip Has Not Identified Any *USB* Device Or Function That Is Configured By Both Hosts Or That Provides The *Same Shared Function* To Both Hosts.

Several Asserted Claims expressly require a "USB function block" or "shared USB device"

with which at least two hosts establish USB connections. The remainder require "a USB device

block corresponding to at least one function." Although the Court declined Aptiv's request to

specify that the function is a *USB* function, it did so to avoid redundancy, not because the function

could be something *other than* a USB function. D.I. 113, at 18-19. That requirement is clear from

Microchip's prior representations to the PTAB. *See supra* pp. 9-10. Microchip cannot now broaden

the claims. In any event, the Court also held, and Microchip unequivocally represented, that these

limitations require providing the same shared function to two or more hosts. There is no such USB

device or segment of any such USB device or function in the Accused Product, and Microchip has

not and cannot identify any device or segment of a device that provides the same shared function

to both hosts.

As an initial matter, the "EP Bridge" cannot qualify. Device A and Device B are not merely

separately enumerated; they provide different functions to each host. As explained above, Device

A and Device B are two separate and distinct peripherals with distinct device controllers and

identifiers, which perform differing functions for their respective hosts. *Supra* pp. 11-14, 20-21.

But, as the Court noted, "only if '*a [(i.e., one)] USB device*' provides '*the same shared function*

(or functions) to multiple hosts' does it become a 'shared USB device.'" D.I. 113, at 20. Thus, the

"EP Bridge" does not provide the same shared function to both hosts.

Nor do the ███████████████████. Mr. Zatkovich testified that this "component"

is not a USB device or USB function. Ex. B, at 123:9-125:10; *supra* pp. 14-15. He conceded this

for good reason. The ███████ are distinct components that are part of each UDC. *Supra* pp. 14-15. No USB host controls them, and they do not perform a USB function. *Supra* pp. 14-15. Each temporarily stores and is used to transmit or receive data. *Supra* pp. 14-15. The ████ never receive or perform a USB request from a host, they cannot be seen by either host, and they undisputedly lack device descriptors and every other required characteristic of a USB function. *Supra* pp. 14-15.

Mr. Zatkovich contends that the ████████████████ "participate in" the performance of the USB functions of the EP Bridge as a whole, and therefore qualify as a "segment of a USB device." But the claims do not require mere participation or assistance. Data storage and transmission are basic processes endemic to every computer system. If these components were deemed a "function" merely by virtue of being accessed by a USB device (not a host), every part connected to a USB device, down to a single wire, would perform a "function" and fall within the scope of the claims. In fact, none of these components meet Mr. Zatkovich's own criteria of being able to perform at least one USB request or of receiving a request from a host. Ex. B, at 66:10-17, 48:17-25. His opinion conflicts with Microchip's position before the PTAB and is wholly unsupported by any fair reading of the Asserted Patents and the Court's *Markman* ruling.

In any event, even if the shared function could be something other than a USB function, the same component must, at minimum, provide the *same* shared function to both hosts. The ████ ████ do not. Each indisputably serves a different purpose with respect to the device controller into which it is incorporated and, ultimately, with respect to each host. Mr. Zatkovich acknowledges that "packets sent from the Head Unit are transmitted through one ████████in the direction of the iPhone," and "packets sent from the iPhone are transmitted through another ████ ████ in the direction of the Head Unit." Ex. H ¶ 41. No ████████ ever transmits data into

23

or out of *both* device controllers. *See* Ex. D ¶ 128 (citing Boston product specification); Ex. L ¶¶ 177, 237-238. Thus, even if basic data storage and transmission qualifies as a "function" within the meaning of the claims, any given ███████ in Device B performs a ***different*** "function" than any given ███████ in Device A. No ███████ in Device A provides the ***same*** function to *both* hosts in the way the shared printer in the patent specification does.

## II.    In The Alternative, The Asserted Claims Are Invalid.

If the Asserted Claims are broad enough to cover the Accused Product, they are necessarily invalid in two respects. First, if the Asserted Claims are broad enough to encompass the Dual Role Hub, they also encompass prior art and are therefore anticipated. Second, under Microchip's overly broad reading, the Asserted Patents neither adequately describe nor enable the full scope of the invention.

### A.  If The Accused Product Could Infringe, Ito Invalidates The Asserted Claims.

"[T]hat which infringes if later anticipates if earlier." *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1573 (Fed. Cir. 1986) (*citing Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889)). If the Asserted Claims are broad enough to cover the Accused Product, Japanese Patent Application P2000-194649 ("Ito") invalidates them. *See 01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742 (Fed. Cir. 2018) (explaining that it is permissible to argue that "if a claim term must be broadly interpreted to read on an accused device, then this same broad construction will read on the prior art" and noting that "when an accused product and the prior art are closely aligned, it takes exceptional linguistic dexterity to simultaneously establish infringement and evade invalidity"). Published on July 14, 2000, Ito is not anticipatory under a proper interpretation of the claims.[7] *See* Ito (attached as Exhibit P). But Ito is the same as the Accused Product in relevant

---

[7]    Aptiv could not have reasonably raised any ground based on Ito during IPR. *See Shaw Industries Group, Inc. v. Automated Creel System, Inc.*, 817 F.3d 1293, 1300 (Fed. Cir. 2016)

respects. Under Microchip's incorrect infringement reading, there is no way to avoid invalidity in view of Ito. Aptiv's expert pointed out the relevant similarities; neither Mr. Zatkovich nor Dr. Levy refuted this point, and it is irrefutable.

Ito describes an "electronic device connection device enabling a plurality of USB hosts to share the same USB device." Ex. P, at (57), Abstract, FIG 1 (9a-9d). In a preferred embodiment, Ito also discloses that the plurality of USB hosts can communicate with each other. Ex. P, at [0018]; Excerpts of Opening Expert Report of John Garney (attached as Exhibit Q) ¶ 273. Like the Accused Product, Ito accomplishes host-to-host communication by permitting each host to communicate over USB with different USB functions, 4a or 4b, which, in turn, pass data to each other. Ex. P, at [0023]; Ex. Q ¶¶ 169, 273-275. Data passes between USB functions 4a and 4b, and ultimately to each function's respective host (connected to upstream ports 1a and 1b). Ex. P, at [0023]; Ex. Q ¶¶ 274-275. Ito is thus exactly like what Mr. Zatkovich accused of constituting the shared "EP Bridge:"



(holding that for purposes of 35 U.S.C. § 315(e), *inter partes* review "does not begin until it is instituted," and therefore the estoppel applies only to grounds that the petitioner raised or reasonably could have raised *after* institution). Ito is only relevant and anticipatory under Microchip's overbroad application of the Asserted Claims to ensnare the Accused Product.

Ex. P, at [FIG. 1] (annotation added).

What is inside each of Ito's USB functions 4a and 4b is also just like the Accused Product. *See id.* at [0027]-[0028]; Ex. Q ¶¶ 274-275. Specifically, Ito depicts that each USB function includes FIFO endpoint buffers:



Ex. P, at [FIG. 2]. ███████████████ data is stored in appropriate FIFO buffers and passed between Ito's two USB functions, which enables communication between the respective USB hosts via the USB devices. Ex. P, at [0028], [0051]-[0055]; Ex. Q ¶¶ 274-275, 278.

With respect to the Asserted Claims, Ito is indistinguishable from the Accused Product. Mr. Garney identified how the structures in Ito correspond to the Asserted Claims.[8] Ex. Q ¶¶ 274-276. He opined that Ito would invalidate the Asserted Claims if they are interpreted broadly enough to cover the Accused Product, and identified the structures in Ito that correspond to each limitation.

---

[8]    If the Accused Product has a MHDC, so does Ito. The structure Mr. Zatkovich identifies is present in both. *Compare* '708 Patent, at Fig. 3 *and* Ex. H ¶ 27 (annotating same) *with* Ex. P, at [FIG. 2] *and* Ex. H ¶ 84 (illustrating the composition of the Accused Product's device controllers). And Ito inherently anticipates or renders obvious asserted claim 10 because, like placing endpoint buffers in a specific location, it was a basic, conventional characteristic of USB 1.0 to send not-ready packets (e.g., to "NAK" a host). *See, e.g.*, Ex. M, at 42:16-24, 48:15-20, 61:14-21; Ex. N, at 33:12-16, 78:10-19; Ex. C, at 47:20-48:1; 51:3-20; Ex. B, at 39:12-18; *see also* Ex. Q ¶¶ 98, 245-247; '243 Claim Chart based on Ito, Exhibit E-3 to Opening Expert Report of John Garney (attached as Exhibit R), at 22-28; '708 Claim Chart based on Ito, Exhibit F-3 to Opening Expert Report of John Garney (attached as Exhibit S), at 4-6.

*Id.* ¶¶ 271-289; Ex. R; Ex. S. In particular, Mr. Garney stated that the two USB functions (4a and 4b) operate as the two USB device controllers (UDCs) in the Accused Product to allow two hosts to communicate with each other. Ex. Q ¶ 274. He explained, "In asserting infringement, Microchip appears to argue that somehow these two separate USB devices together constitute a single USB device block corresponding to at least one function, shared by multiple USB hosts. This is not correct, but if it were, Ito's similar arrangement would fit squarely within the '243 and '708 claims as well." *Id.* ¶ 276. Neither of Microchip's current experts responded to or attempted to refute this point.

Instead, the sole basis on which Dr. Levy distinguished Ito squarely contradicts Mr. Zatkovich and necessitates a finding of noninfringement. *See* Ex. G ¶¶ 207-244. Dr. Levy opined that USB functions 4a and 4b are ***separate*** USB device blocks. Ex. G ¶¶ 216-217, 241. Specifically, he stated, "USB functions … 4a, and 4b are separate and distinct USB device blocks that are coupled to the first and second upstream ports, and Mr. Garney concedes that separate and distinct USB device blocks coupled to the first and second upstream ports are not within the scope of the claims. I agree because, at the very least, Claim 1 requires establishing 'respective dedicated USB connections between the USB device block and the first and second upstream ports.' In Ito, each USB device block is connected to only one upstream port." Ex. G ¶ 216 (internal citations omitted). Dr. Levy further cautioned against any assertion that an amalgamation of portions of each USB function can constitute a USB device block: "To the extent Mr. Garney asserts that some portion of USB functions 3a, 3b, 4a, or 4b are the USB device blocks, Ito still does not anticipate Claim 2, because those portions of the USB functions are also separate and distinct USB device blocks." Ex. G ¶ 217.

27

This, however, *is* Microchip's infringement theory. *See supra* pp. 11-15; *see also* Ex. H ¶ 24 (conceding that "EP [B]ridge does have two device controllers and at least two Endpoint Buffers (EP0)"), ¶ 84 (depicting the contents of those controllers); Ex. Q ¶¶ 273-274.

Microchip cannot have it both ways; either the Accused Product does not infringe under Dr. Levy's opinion distinguishing Ito for its distinct USB device blocks, or the patent is invalid under Mr. Zatkovich's opinion treating multiple USB device blocks as a shared device. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) (claim terms must be "construed the same way for both invalidity and infringement"); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a nose of wax, be twisted one way to avoid anticipation and another to find infringement." (citations and internal quotation marks omitted)).

### B. The Asserted Patents Cannot Cover Aptiv's Product Without Failing To Describe Or Enable The Full Scope Of The Claims.

Microchip's attempt to prove infringement necessarily stretches the scope of the Asserted Claims well beyond the patents' disclosure. The short, identical specifications disclose an invention with one objective: to overcome the limitation in then-standard USB communication that a single device may be connected to only one host at a time. This objective differs from accomplishing host-to-host communication, which the Asserted Patents never mention. To read the patents broadly enough to encompass the Accused Product would invalidate them for failure to satisfy the written description and enablement requirements of § 112.

Whether a patent's specification satisfies the written description requirement is a question of fact. *See GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 729 (Fed. Cir. 2014). Nonetheless, the inquiry is amenable to summary judgment. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008). To comply with the written description requirement,

the specification must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession *of the invention*." *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). This "test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharm., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010).

"Enablement is a question of law based on underlying factual findings." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *Id.* at 1380 (internal quotation marks omitted). "Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *Id.* at 1381. In determining whether undue experimentation is needed, courts consider the following factors: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Here, under Microchip's overbroad interpretation of the claims, the Asserted Patents cannot satisfy the written description or enablement requirements. First, nothing in the (identical) specifications conveys to a person of ordinary skill in the art that the inventors were in possession of an invention relating to host-to-host communication. *See* Ex. Q ¶¶ 355-362. Instead, the specifications disclose a system for sharing a single USB device among two or more hosts. *See* Ex. G ¶ 43; Ex. D ¶ 65. The specifications explain that, under the relevant USB standards, a single device may only communicate with one host. *See* Ex. G ¶ 41; Ex. D ¶ 50; *see also* '243 Patent, at

1:54-56; '708 Patent, at 1:57-59. The objective of the Asserted Patents is to overcome this limitation by disclosing a shared USB device that "may be simultaneously configured and accessed by two or more USB hosts by using a multi-host capable device controller." Ex. D ¶¶ 63-65; *see also* '243 Patent, at Abstract, 2:9-12, 35-37, 3:60-62; '708 Patent, at Abstract, 2:11-15, 2:38-40, 3:63-65 (repeatedly referring to the invention as a "sharing device").

This objective is fundamentally different from host-to-host communication. Ex. Q ¶¶ 361-363. Host-to-host communication is a distinct field of technology that requires specialized firmware or hardware, which the Asserted Patents do not describe. Ex. Q ¶¶ 361-363. The Asserted Patents do not contemplate or mention host-to-host communication, and do not mention the word "bridge" anywhere. One of the inventors, Atish Ghosh, acknowledged that ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ Dr. Levy and Mr. Zatkovich, too, implicitly conceded that the Asserted Patents do not describe host-to-host communication. *See* Ex. C, at 141:12-142:2; Ex. G ¶¶ 327-332 (neither discussing nor identifying any disclosure of host-to-host communication in the written description of the Asserted Patents); Ex. H ¶¶ 66-67 (stating in rebuttal that it is irrelevant whether the specifications mention "host-to-host bridge" or host-to-host communication). The undisputed evidence thus establishes that the specification fails to convey to a person of ordinary skill in the art that the inventors were in possession of any means to accomplish host-to-host communication.

Second, nothing in the specification teaches those skilled in the art how to make and use the claimed invention for host-to-host communication without undue experimentation. Because then-standard USB devices provided one or more functions to one host at a time, there is no basis

to speculate, and certainly no evidence to support the notion that an embodiment (such as in Figure 3, in which multiple hosts can *alternately* use a single device or function without reconfiguration) would permit the two hosts to communicate with each other. Those skilled in the art would not readily discern that a system for two or more hosts to share a device would perform similarly to a system for two hosts to communicate with each other. *See Application of Bowen*, 492 F.2d 859, 862 (Cust. & Pat. App. 1974) (single embodiment may enable other predictable, undisclosed embodiments, but not unpredictable ones). No evidence suggests it would have been possible, let alone predictable, to achieve host-to-host communication by allowing multiple hosts to share a given peripheral. Even the supposedly practicing chip that Microchip eventually introduced ██████████████████████████████.

The inventor acknowledged that multiple kinds of host-to-host communication, in the general sense, were well-known in the prior art. Ex. N, at 78:20-79:1, 84:5-11; *see also* Ex. C, at 39:1-8. Yet, neither the inventors nor the patent examiner cited references relating to host-to-host communication for this invention. *See* '243 Patent, at References Cited; '708 Patent, at References Cited; *see also* Ex. M, at 114:7-20, 115:18-25, 117:7-15; Ex. N, at 58:13-59:19, 65:18-23, 83:1-19, 84:5-11, 100:25-101:7, 105:10-106:3. In contrast, references that purport to invent or improve upon means for two USB hosts to communicate with each other, discuss host-to-host communication. *See generally* Ex. P; Ex. Q ¶¶ 360-363 (discussing Aptiv patents and other references). And they accomplish such communication using multiple USB devices, not a shared device and arbitration mechanism. *See Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004) (finding that if a skilled artisan would not readily discern that undisclosed members would perform similarly to the disclosed members then disclosure of more species is necessary to adequately show possession of the entire genus). Microchip's infringement theory stretches the

claims well beyond what the inventors disclosed and enabled. As in *Liebel-Flarsheim*, "[t]he motto, 'beware of what one asks for,' might be applicable." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).

## CONCLUSION

For the foregoing reasons, Aptiv respectfully requests the Court to enter summary judgment of noninfringement or, in the alternative, invalidity.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:   */s/ Philip A. Rovner*

Elizabeth R. Brannen
Kenneth J. Halpern
Justin M. Barnes
Jhaniel N. James
Hanna Chandoo
STRIS & MAHER LLP
777 S Figueroa St
Ste 3850
Los Angeles, CA 90017
(213) 995-6800

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendant*
*Aptiv Services US, LLC*

Dated:  December 17, 2019
Public Version Dated: December 26, 2019