# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **MICROCHIP TECHNOLOGY INCORPORATED,**<br><br>　　*Plaintiff*,<br><br>　　　v.<br><br>**APTIV SERVICES US LLC.,**<br><br>　　*Defendant*. | Case No. 1:17-cv-01194-JDW |

## MEMORANDUM

Aptiv Services US, LLC wants the Court to decide as a matter of law that its Dual Role Hub does not infringe on Microchip Technology, Inc.'s patents, that the patents are invalid, or both. Much of Aptiv's argument asks the Court to conclude that Microchip's experts' opinions are wrong. The Court has no basis to do so at this stage of the proceedings. The questions that Aptiv raises are fact questions reserved to a jury. They are not questions for the Court. The Court will therefore deny Aptiv's motion for summary judgment.

**I.　FACTS**

**　　A.　The Asserted Patents**

There are two patents at issue in this case: U.S. Patent No. 7,523,243 ("'243"), entitled "Multi-Host USB Device Controller;" and U.S. Patent No. 7, 627, 708 ("'708"), entitled "Multi-Host USB Device" (the "Asserted Patents"). Both patents relate to Universal Serial Bus technology, which is a serial communication standard that allows users to connect a variety of peripheral devices, such as a printer or speakers, to a host, such as a computer. When USB hosts connect to peripheral devices, they go through a process called "enumeration." During enumeration, the host identifies the type of device attached to a bus and assigns it a unique address. It allows the host to determine if it can use the device and how it will communicate with the device.

In general, USB standards anticipated a single host connected to many devices. If two hosts tried to connect to a single device (*e.g.*, two computers to a single printer), each host had to enumerate the device each time it displaced the other host. The Asserted Patents disclose a multi-host capable device controller that allows "[a] shared USB device" to be "simultaneously configured and accessed by two or more USB hosts." (D.I. 1, Ex. A (Abstract).) They therefore eliminate the need for re-enumeration. "Since each host has simultaneously enumerated the device, there may be no need to detach and reconfigure the device on the fly. Multiple USB hosts may simultaneously share a single [USB] device/function [block], for example a Gigabit Ethernet controller." (*Id.* at 2:13-16.) Microchip asserts that Aptiv has infringed claims 2, 6, 10, 16, 17, and 22-25 of the '243 Patent, and claim 6 of the '708 Patent (the "Asserted Claims").

**B.     Aptiv's Dual Role Hub**

Microchip accuses Aptiv's Dual Role Hub of infringing the Asserted Claims. The Dual Role Hub is a media module that Aptiv manufactures and sells to automakers, who incorporate it as part of the infotainment system in their cars. The Dual Role Hub allows a user to attach one or more USB peripherals, such as a smartphone, to the Head Unit of the vehicle, which is the host on the USB circuit. But the Dual Role Hub can also perform a more complex function. When the user connects an iPhone to the Dual Role Hub to start an Apple CarPlay session, the Hub detects the iPhone and requests that it re-connect as a host device instead of a peripheral device. When that happens, two hosts--the Head Unit and the iPhone—connect to the same Dual Role Hub. The user can also make use of other hub ports while CarPlay is active (*e.g.*, by connecting an MP3 player), with the Head Unit serving as the host for those other peripheral devices. In the Dual Role Hub, the Hub connects to downstream products such as the car's speakers and screen. When an iPhone initiates a CarPlay session, it communicates with the car's peripherals through the Head Unit.

The Dual Role Hub includes a Multi-Host Device Controller ("MHDC") logic to enable the iPhone and the Dual Role Hub to function as hosts at the same time. Among other things, the MHDC includes a USB device called an "Endpoint Bridge" or "EP Bridge," which permits the iPhone and Head Unit to exchange data. The iPhone and the Head Unit each enumerate the EP Bridge via a different USB connection. The connections are virtual, so there is no physical demarcation.

The EP Bridge contains First In-First Out ("FIFO") Buffers, which permit a host to transmit data into the buffer. The FIFO Buffers store data until the EP Bridge is ready to receive it. The Buffers' logic then transmits the data across the bridge in the order in which it was received. There are two separate FIFO Buffers: one receives data from the Head Unit and holds it until the EP Bridge can transmit the data to the iPhone; the other receives data from the iPhone and holds it until the EP Bridge can transmit data to the Head Unit. Each FIFO Buffer communicates only with its assigned host—not the other host.

During discovery, Microchip served an expert report from Ivan Zatkovich. Mr. Zatkovich opines that the EP Bridge is a single USB device. He also notes that the Asserted Patents disclose a preferred embodiment having two separate Endpoint Buffers and a Multi-host device controller, and he says that the Dual Role Hub does that. He submits that a person having ordinary skill in the art "would understand [that] these features of the USB Multi-Host Device could be implemented using two standard USB Device Controllers (that contain their own EPO Endpoint Buffers)," as is the case with the MHDC in the Dual Role Hub. (D.I. 209-13 at ¶ 24.).

### C. Procedural History

On August 24, 2017, Microchip filed this patent infringement case. On December 19, 2017, the Court stayed discovery while Aptiv pursued IPRs before the Patent and Trademark Appeals

Board. On August 28, 2018, the PTAB issued final written decisions addressing all grounds raised in Aptiv's IPR petitions. The PTAB confirmed the patentability of Claims 2, 6, 10, 16–17, and 22–25 of the '243 Patent and Claims 2, 6, 10, 16–17, 22, and 24 of the '708 Patent.

On June 17, 2019, the Court issued a claim construction Order (D.I. 114). The Order construed "respective dedicated USB connection/dedicated USB connection" to mean "a USB connection that is not shared (except that multiple USB connections may alternate, in some manner, communicating across the same shared physical connection). *Id.* The Court also construed "USB device block" to mean "a USB device or segment of a USB device that performs a function to provide a capability to a host over USB." *Id.*

Discovery has closed. Aptiv has filed this motion seeking summary judgment on the theories that its Dual Role Hub does not infringe the Asserted Patents and that the Asserted Patents are invalid. The Court held oral argument on April 17, 2020.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to

the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### III.   ANALYSIS

#### A.   Non-Infringement

Infringement occurs when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent ...." 35 U.S.C. § 271(a). "Determining infringement requires two steps: construing the claims and comparing the properly construed claims to the accused product." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1316–17 (Fed.

Cir. 2015). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019). Literal infringement is a question of fact. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1130 (Fed. Cir. 2011). As such, it is amenable to summary judgment when no reasonable factfinder could find that the accused product contains every claim limitation. *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1339 (Fed. Cir. 2016). The patentee has the burden of proving infringement by a preponderance of the evidence. *See Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).

### 1. Concurrent data streams

In its claim construction decision, the Court construed the terms "respective dedicated USB connection" and "dedicated USB connection" to mean "a USB connection that is not shared (except that multiple USB connections may alternate, in some manner, communicating across the same shared physical connection)." (D.I. 113 at 14.) In explaining its ruling, the Court addressed the possibility that two hosts might connect to a USB device or device block via a single physical connection: "The specification envisions that, at some point in the signal chain between the hosts and USB device/function block, the hosts may share a physical connection while still maintaining 'dedicated USB connections.'" (*Id.* at 15.) The Court stated, "The claims do not permit concurrent data streams from one periphery to two different hosts. That is, one packet may be sent to one host and the next packet sent to the other host, and that process may continue to switch back and forth, but it is not the case that packets may be sent to both hosts at the same time." (*Id.*)

Aptiv takes this language to mean that any device that permits concurrent data streams cannot infringe the Asserted Patents. The Court disagrees. The Court's decision concludes that permitting the hosts to alternate access to the device, and the device to alternate access to hosts,

6

over a single connection is the same as having two simultaneous connections. To the extent there was any question about the scope of the Court's decision, the Court's full construction of the claim terms resolves it. The core of the Court's construction of these terms is that the USB connection is "not shared." The discussion about concurrent data streams clarifies the parenthetical portion of the construction and explains why alternative access over a single connection is not "sharing." To read it otherwise would elevate the parenthetical portion above the main part of the construction of the claim term.

In addition, the Court's construction focuses on the possibility that there "may" be a single physical connection. (*Id.* at 15.) Nothing in the Court's opinion rules out the possibility of more than one physical connection, or the possibility that there are concurrent data streams on those multiple connections. Instead, the Court's decision just explains how a single physical connection can satisfy the claim limit of concurrent connections—by alternating.

The '243 patent discloses at least one embodiment that would use concurrent data streams: multiple USB hosts sharing a Gigabit Ethernet controller. (D.I. 1., Ex. 1 at 2:15-16.) That embodiment would grant multiple hosts simultaneous internet access and, therefore, envisions concurrent data streams, with a multi-host controller routing data packets to the correct host. "A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct.'" *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) (quoting *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010)). Here, because at least one preferred embodiment appears to envision concurrent data streams, the Court will not interpret the claim construction decision to foreclose such an embodiment.

### 2. Single shared component

Several claims in the Asserted Patents require a "USB device block," "USB function block," or shared "USB device," which the Court construed to mean a single USB device or a segment of a USB device. Aptiv contends that the Dual Role Hub does not satisfy this claim limit. Mr. Zatkovich opines otherwise. He rejects Aptiv's argument that the EP Bridge must be two devices because it contains two USB device controllers with different device descriptors. Instead, in his view, the two device controllers provide the two hosts with shared access to the EP bridge and in conjunction with the Microcontroller Unit—which arbitrates and controls access from the two Hosts to the FIFO buffers—"behave as a single coordinated Multi-Host Device Controller." (D.I. 209, Ex. 13 ¶ 25.) Mr. Zatkovich's opinion creates a factual dispute about whether the Dual Role Hub literally infringes this claim element.

Aptiv takes issue with Mr. Zatkovich's opinion and contends that neither the EP Bridge nor the FIFO buffers constitutes a single device or segment. But the Court has no basis to disregard Mr. Zatkovich's opinion. Aptiv has not filed a motion to exclude Mr. Zatkovich's opinion, and the Court sees no facial problem with it. Nor does the Court have a basis to conclude that Mr. Zatkovich's analysis is wrong as a matter of law. Mr. Zatkovich's opinion therefore creates a disputed issue of material fact that precludes summary judgment. Aptiv tries to avoid this problem by contending that the parties agree on the Dual Role Hub's architecture but have a dispute about how to characterize it. But even the characterization is a question of fact, not a question of law.

### 3. Shared Function

Claim 18 of the '243 Patent requires "a shared USB device" that "corresponds to at least one function." The Court construed this term to mean "a USB device that provides the same shared function (or functions) to multiple hosts." (D.I. No. 114 at 20.) Mr. Zatkovich has opined that the

8

EP Bridge performs the same function for two different hosts, including "performing USB data transfers for communicating information from one host to another." (ECF No. 209-13 at ¶ 53.) Once again, Aptiv disagrees with Mr. Zatkovich's conclusion. And once again, the outcome is the same.

Mr. Zatkovitch's opinion is not just *ipse dixit*; he offers evidence to support his position. First, he disagrees with Aptiv's contention that because the Head Unit and iPhone hosts each access a different set of endpoint buffers and transmit data in a different direction, the buffers cannot be a shared device. Instead, he counters that it is the FIFO buffers as a whole that constitute a shared device, and that "both hosts need the FIFO buffers component as a whole to implement CarPlay." (ECF No. 209-13 at ¶ 42.) He also disputes that the EP Bridge is not a shared device because each host enumerates it with different device classes and descriptors. What matters—he explains—is that the same data is being transmitted across the bridge and that each host uses the same set of data transfers performed in the same way. Aptiv may disagree with Mr. Zatkovitch's conclusions, but that does not change the fact that Microchip's expert has offered sufficient support for his position to create a genuine issue of material fact.

**B.     Invalidity**

Patents issued by the Patent and Trademark Office are presumed valid. 35 U.S.C. § 282 (2002). To overcome this presumption of validity, the party challenging the patent bears the burden of proving invalidity by clear and convincing evidence. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003); *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1036 (Fed. Cir. 2001); *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1359 (Fed. Cir. 1998); *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed. Cir. 1991). On a motion for summary judgment, where the evidence is construed in favor of the nonmovant, "[t]he burden of proving invalidity ...

is high." *Schumer v. Lab. Computer Sys.*, 308 F.3d 1304, 1316 (Fed.Cir.2002). "Prior art is relevant to literal infringement only to the extent that it affects the construction of ambiguous claims. Where the meaning of claim language is clear in light of the specification, however, and properly supported by the patent's disclosure, the situation differs. Fairness and the public notice function of the patent law require courts to afford patentees the full breadth of clear claim language, and bind them to it as well." *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002).

### 1. Ito

Aptiv cannot rely on Ito to invalidate the '243 or the '807 patent. Aptiv cannot rely on Ito in isolation because the Court has ruled that IPR estoppel applies to invalidity arguments based on the Ito reference. (D.I. 246.) Although Aptiv can rely on Ito in combination with certain physical device prior art, Aptiv's argument in support of its Motion does not invoke any combination. It rests on Ito alone, The Court's estoppel ruling precludes that argument.

Even if Aptiv could rely on Ito, its argument would fail. Aptiv does not argue that the Ito reference clarifies ambiguous claim language in either of the Asserted Patents. Instead, Aptiv bases its argument on an opinion from its expert John Garney that, if the Anticipated Patents reach the Dual Role Hub, Ito anticipates them. But Microchip's expert John Levy disagrees with Mr. Garney's assessment. The Court has no legal basis to choose between these expert opinions, particularly given that neither of them is subject to a *Daubert* challenge. The Court recognizes, as Aptiv points out, that there is some tension between Dr. Levy's opinion and Mr. Zatkovich's opinion. But Dr. Levy was analyzing the Ito patent and the Asserted Patents, not the Dual Role Hub. Mr. Zatkovich, on the other hand, analyzed the Dual Role Hub. That difference could provide

10

a basis to reconcile their opinions. To the extent there is tension in their opinions, that tension is fodder for cross-examination at trial, not for a ruling as a matter of law.

### 2. Written Description/ Enablement Requirements

35 U.S.C. § 112 sets forth both the written description and enablement requirements:

> The specification shall contain a written description of the invention, and the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same ….

35 U.S.C. § 112(a). Failure to comply with either of these requirements may result in an invalid patent. It is Aptiv's burden to show by clear and convincing evidence that the Asserted Patents do not satisfy the written description and enablement requirements of Section 112. *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008).

The written description requirement ensures that "the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Resource Mapping, Inc*., 424 F.3d 1336, 1344–45 (Fed. Cir. 2005). "The hallmark of written description is disclosure . . . the test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014). "Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *See Ariad*, 598 F.3d at 1351.

The enablement doctrine, on the other hand, prevents both "inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually

11

invented." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc*., 687 F.3d 1377, 1380–81 (Fed. Cir. 2012). "Enablement is determined as of the effective filing date of the patent's application." *ALZA Corp. v. Andrx Pharm.*, LLC, 603 F.3d 935, 940 (Fed. Cir. 2010). "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *Id.* (quotation omitted). "Enablement is a question of law based on underlying factual findings." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012).

Aptiv does not contend that the Asserted Patents fail these tests on their face. Instead, it contends that they cannot satisfy the written description or enablement requirements **only if** they extend to host-to-host communications because "simultaneous access by two hosts stretches the Asserted Claims beyond what the patents teach or describe . . .." (D.I. 223 at 10.) To support its position, Aptiv stresses that the specification neither mentions nor contemplates the terms "host-to-host communication" and "bridge." The Court disagrees with Aptiv's argument, for two reasons.

First, the Court is not aware of any case that permits a Court to determine that a patent conditionally violates the written description or enablement requirements. That is, there is no basis for the Court to say that if Microchip reads the patents a certain way, then they are invalid, but if Microchip reads them a different way, then they are valid.

Second, Aptiv's argument rests on its own assumption that the patents cannot be read the way that Microchip proposes. The Court rejected that argument in ruling on Aptiv's estoppel motion, and it rejects it again here. Section 112 limits each Asserted Patent to what is claimed: a USB Multi-Host device. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020). The Asserted Patents must describe and enable a multi-host USB device and a method

12

for sharing a device between multiple hosts. Microchip has offered evidence that the Asserted Patents do just that. The Asserted Patents need not describe and enable the accused device. *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1336 (Fed. Cir. 2009) ("An applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.") Even if the Asserted Patents do not describe the exact embodiment of the Dual Role Hub, they still can satisfy the written description and enablement requirements in a way that might cover the Dual Role Hub. Aptiv has not presented undisputed clear and convincing evidence to the contrary.

## IV. CONCLUSION

Aptiv will have an opportunity to argue to a jury that its Dual Role Hub does not infringe on the Asserted Patents. It will also have an opportunity to argue, within the scope of the Court's estoppel ruling, that the Asserted Patents are invalid. The Court will not adopt either ruling as a matter of law, however.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

July 31, 2020