**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **MICROCHIP TECHNOLOGY INC.,** | |
| *Plaintiff*, | Case No. 1:17-cv-01194-JDW |
| v. | |
| **APTIV SERVICES US LLC.,** | |
| *Defendant*. | |

## MEMORANDUM

Both parties in this case advance inconsistent arguments concerning damages.  In seeking lost profits, Microchip Technology argues that the Court should look at the market for chips. But Microchip contends that its expert Dr. Stephen Becker could base his royalty calculation on the Dual Role Hub that Aptiv Services US manufactures and that incorporates those chips. Aptiv flips the script and claims that the relevant market for lost profits is the market for its Dual Role Hub. Then it turns around and argues that the reasonable royalty has to focus on the chip, not the Hub. Given these inconsistencies, it should come as no surprise that the outcome is a split decision. Microchip can seek lost profits, but the Court will not permit Dr. Becker's reasonable royalty analysis because it ignores the smallest salable component and analyzes the profitability of the Dual Rule Hub as a whole.

## I.     FACTS

### A.     The Asserted Patents

There are two patents at issue in this case: U.S. Patent No. 7,523,243 ("'243"), entitled "Multi-Host USB Device Controller;" and U.S. Patent No. 7, 627, 708 ("'708"), entitled "Multi-Host USB Device" (the "Asserted Patents"). Both patents relate to Universal Serial Bus

technology, which is a serial communication standard that allows users to connect a variety of peripheral devices, such as a printer or speakers, to a host, such as a computer.

### B.  Aptiv's Dual Role Hub and Boston Chips

Microchip accuses Aptiv's Dual Role Hub of infringing the Asserted Patents. The Dual Role Hub is a media module that Aptiv manufactures and sells to automakers for incorporation into a car's infotainment system. The Dual Role Hub allows a user to attach one or more USB peripherals, such as a smartphone, to the Head Unit of the vehicle, which is the host on the USB circuit. But the Dual Role Hub can also perform a more complex function. When the user connects an iPhone to the Dual Role Hub to start an Apple CarPlay session, the Hub detects the iPhone and requests that it re-connect as a host device instead of a peripheral device. When that happens, two hosts--the Head Unit and the iPhone—connect to the same Dual Role Hub. The user can also make use of other hub ports while CarPlay is active (*e.g.*, by connecting an MP3 player), with the Head Unit serving as the host for those other peripheral devices. In the Dual Role Hub, the Hub connects to downstream products such as the car's speakers and screen. When an iPhone initiates a CarPlay session, it communicates with the car's peripherals through the Head Unit.

Microchip and its predecessors supplied USB hub chips to Aptiv for years. Aptiv's original USB hub module included a Microchip chip. When Aptiv first conceived of a multi-host USB product, it approached Microchip about securing a chip. However, negotiations with Microchip broke down over pricing. So Aptiv chose to develop its own chip, which it called the "Boston" chip. The original Boston chip, which Aptiv brought to market in 2013, did not include a host-to-host communication technology.

In early 2014, Aptiv developed the Boston 2 chip, which includes a host-to-host bridge functionality, along with other upgrades. By late September 2014, Aptiv was selling the Dual Role

Hub, which contained the Boston 2 chip. General Motors, Ford, and Chrysler all purchased Dual Role Hubs from Aptiv, and Aptiv began shipments of Dual Role Hubs in May 2015.

### C.    Microchip's Sandia Chips

In October 2014, Microchip learned that Chrysler wanted its hubs to have CarPlay functionality. In response, Microchip marketed its Athens chip family, which included the "FlexConnect" solution. However, FlexConnect did not meet Chrysler's requirements that the USB hub have USB data on all ports, even during CarPlay, and that it have one USB lane from the Head Unit to the Media Hub. In other words, Chrysler wanted CarPlay functionality and persistent USB in a single-lane configuration. As a result, in late 2014 and early 2015, neither GM, Ford, nor Fiat Chrysler awarded contracts to Microchip for its Athens chips. Microchip then developed the Sandia chip family, which provided the required CarPlay/persistent USB functionality in a single-lane hub. One of the Sandia chip architectures is a Multi-Host Device Controller ("MHDC"). Microchip claims that the MHDC practices the '243 and '708 patents. Microchip launched its Sandia chips in the second quarter of 2017.

### D.    Procedural History

Microchip filed this action in 2017. The Court stayed the case for IPR proceedings. After those proceedings, the parties resumed discovery. In discovery, Microchip served an expert report from Stephen Becker, Ph.D. In his report, Dr. Becker offers two damages-related opinions. First, he opines that, if Aptiv had not infringed on the Asserted Patents, Microchip would have earned incremental profits of $40.9 million. Second, he determines that Aptiv and Microchip would have agreed to a reasonable royalty of $2 per Dual Role Hub in a hypothetical negotiation prior to Aptiv's infringement of the Asserted Patents.

Aptiv has filed a motion for summary judgment on Microchip's claim of lost profits and a motion *in limine* seeking to exclude Dr. Becker's lost profits and reasonable royalty calculations. The Court held a hearing on April 17, 2020, and took the matter under advisement.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

**B.     *Daubert***

The Court has wide discretion in determining whether to admit or exclude expert testimony. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Federal Rule of Evidence 702 governs the admissibility of qualified expert testimony, providing that an expert witness may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702's requirements establish "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). With regard to the reliability requirement, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993); *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Such testimony should amount to "more than subjective belief or unsupported speculation[,]" and a court's focus

5

in examining this factor must be on "principles and methodology" rather than on the expert's conclusions. *Daubert*, 509 U.S. at 590, 595; *see also Daddio v. Nemours Found.*, 399 F. App'x 711, 713 (3d Cir. 2010). As to the "fit" requirement, it "goes primarily to relevance" as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92 (internal quotation marks and citations omitted); *see also Schneider*, 320 F.3d at 404. The standard for fit, however, is "not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (citations omitted). Rule 702 has a "liberal policy of admissibility." P*ineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

## III.   ANALYSIS

A patentee can seek two, alternative categories of compensation for infringement: lost profits; and the reasonable royalty he would have received through arms-length bargaining. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). A damages theory must be based on "sound economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (citation omitted). The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003); *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1551 (Fed. Cir. 1994); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citation omitted). Microchip seeks both types of damages here, and Aptiv seeks to prevent it from recovering either category.

### A.      Lost Profits

The question of whether lost profits are available is a question of law. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 567 F.3d 1314, 1333 (Fed. Cir. 2009). A party seeking lost profits must show that, but for the infringement, it would have made sales that the infringer made. *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*). One "useful, but non-exclusive" method to establish the patentee's entitlement to lost profits is to satisfy the four-factor *Panduit* test: (a) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit that the patent-holder would have made but for the infringing sales. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017) (quoting *Rite-Hite*, 56 F.3d at 1545); *see also Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2s 1152, 1156 (6th Cir. 1978). Only the patentee can recover lost profits, and only for products that it sells. Related entities and corporate affiliates cannot recover lost profits. *See Mars Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008).

Microchip has evidence to satisfy all four *Panduit* factors. There was demand for its Sandia chips, including demand from Aptiv for chips with a host-to-host bridge capability. Microchip has shown that there was no non-infringing alternative in the market. Microchip had the capability and capacity to manufacture more Sandia chips to meet demand. And Dr. Becker has calculated the amount of profit that Microchip would have realized for those chips. In fact, because Microchip sold chips and tracked the profitability of those chips, neither of Aptiv's arguments to the contrary undermines this conclusion.

*First*, Microchip has evidence that it, and not some corporate affiliate, sold the Sandia chips. At his deposition, Microchip's corporate representative Mitch Oblosky testified that

Microchip sells the Sandia chips. As Aptiv points out, he equivocated on the point, but he has also submitted a declaration confirming that Microchip sells the Sandia chips. Aptiv complains that his declaration "merely re-states his uncorroborated belief" without attaching any documents. (D.I. 218 at 1.) But his declaration is unequivocal, and the Federal Rules of Civil Procedure do not require him to attach corroborating documents. Aptiv also complains that Microchip should have produced documents on which Mr. Oblosky relied. But the Court does not have a discovery motion in front of it. It has no basis to determine whether Microchip complied with its discovery obligations. Aptiv can try to invoke Rule 37 and seek to limit the evidence that Microchip puts forward at trial in due course. But that is not a basis to disregard evidence in the record before the Court at this stage of the proceedings. Aptiv's argument that Microchip lacks standing to seek lost profits therefore fails.

*Second*, Microchip's expert Dr. Becker focused his attention on the market for chips in conducting his lost profits analysis. Aptiv complains that Dr. Becker did not recreate the market for hubs, but that argument misstates the market dynamics here. Microchip markets and sells Sandia chips. Instead of buying chips from Microchip, Aptiv chose to design and manufacture its own chips. (Aptiv actually contracts out the manufacture, but for present purposes, that is neither here nor there.) Aptiv's vertically integrated model does not change the fact that Aptiv has demand for chips that enable host-to-host communication. If Aptiv could not use Boston chips to slake its demand, it would have to purchase them from a third party. And Microchip is the only game in town.

As Aptiv acknowledges, the first *Panduit* factor assumes that the demand for the infringer's and the patent owner's products is interchangeable. *See BIC Leisure Prods., Inc. v. Windsufgind Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir .1993). That is the case here, where the Boston and Sandia

chips are interchangeable. Aptiv tries to avoid this problem by arguing that the market at issue is the market for hubs. It is not. The market for hubs might drive demand for chips that enable host-to-host communications, but it is not the market in which Microchip and Aptiv buy and sell the Boston and Sandia chips. If Aptiv's Boston chip were not on the market, then it is reasonable for Dr. Becker to assume that Microchip would have sold Sandia chips to Aptiv or some other hub manufacture to enable the sale of hubs to fulfill car manufacturers' needs.

### B.   Reasonable Royalty

Reasonable royalty damages are deemed the minimum amount of infringement damages "adequate to compensate for the infringement." 35 U.S.C. § 284. A standard method of determining a reasonable royalty is the hypothetical negotiation approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). One common way to determine a reasonable royalty is through the application of the *Georgia-Pacific* factors. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also Uniloc*, 632 F.3d at 1317 (noting that Federal Circuit has sanctioned use of *Georgia-Pacific* factors to frame reasonable royalty inquiry).

No matter what the form of the royalty, "a patentee must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Virnetx, Inc. v. Cisco Sys., Inc*., 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). "Where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson,*

*Inc. v. D-Link Sys., Inc*., 773 F.3d 1201, 1226 (Fed. Cir. 2014). Thus, where small elements of multi-component products are accused of infringement, "it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 67 (Fed. Cir. 2012). "A patentee may assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Versata Software, Inc. v. SAP Am., Inc*., 717 F.3d 1255, 1268 (Fed. Cir. 2013). These requirements ensure that a reasonably royalty "does not overreach and encompass components not covered by the patent." *LaserDynamics*, 694 F.3d at 70.

Several of the *Georgia-Pacific* factors address apportionment, including (a) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results (factor no. 9); (b) the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention (factor no. 10); and (c) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer (factor no. 13). *Georgia-Pacific*, 318 F. Supp. at 1120.

In his report, Dr. Becker cites and purports to analyze the *Georgia-Pacific* factors. However, much of his analysis focuses on the value of the Dual Role Hub, rather than the Boston chip or the Sandia chip. Microchip tries to defend Dr. Becker's analysis by claiming that he used a cost savings approach. While Dr. Becker might have used a cost savings approach to apportion the value of the various components, he was not permitted to use the Dual Role Hub as the base for his cost-savings analysis. Unless the host-to-host capability of the Boston chip created cost

savings across the Dual Role Hub as a whole, Dr. Becker had to look at the cost savings at the chip level, not the device level.

The reason is simple. In any royalty analysis, there is a risk of awarding damages for non-patented features. The more non-patented features at play, the higher the risk. Narrowing the focus to the smallest patent-practicing unit mitigates that risk. Dr. Becker's use of a cost-savings approach did not excuse him from that obligation. In addition, by focusing on the Dual Role Hub, Dr. Becker brings into his analysis Aptiv's total profit on each Dual Role Hub. By introducing that number, Dr. Becker would raise the jury's eye level in a way that would create a risk of an unfair damages award.

Microchip's opposition brief glosses over these issues. Throughout the brief, Microchip refers to the "patented invention." (*E.g.*, D.I. 206 at 21, 22.) The patented invention here is the host-to-host bridge. That bridge exists on the Sandia and Boston chips. Microchip makes no effort in its brief to explain why the Dual Role Hub is the "patented invention." It is not. Thus, when Microchip contends that *Georgia-Pacific* factor no. 8 required Dr. Becker to examine Aptiv's profitability, it ignores the fact that Dr. Becker had to look at the profitability for the patented invention, not for the whole Dual Role Hub.

Microchip also argued at the hearing that Dr. Becker looked at the profitability of the Dual Role Hub because it was the only data that was available to him. The Federal Circuit has rejected the "excuse that practical and economic necessity compelled [the patentee] to base its royalty on the price of an entire [device.]" *Virnetx*, 767 F.3d at 1329 (quote omitted). Thus, the absence of data is not an excuse. If Dr. Becker lacked data that he needed, he could have noted that no data existed. Or he could have noted the absence of Aptiv-specific data and then used proxies such as Microchip's profitability data. While that approach would have subjected him to criticism, it likely

would have been criticism on cross-examination. Instead, Dr. Becker chose an approach that runs afoul of established legal rules and renders his methodology unreliable.

## IV.     CONCLUSION

Both sides want to have it both ways. Neither can. The Court will permit Microchip to pursue and Dr. Becker to testify about lost profits. The Court will not permit Dr. Becker to present a reasonable royalty analysis based in part on the profitability of the Dual Role Hub. An appropriate Order follows.

**BY THE COURT**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

September 1, 2020