# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MICROCHIP TECHNOLOGY INCORPORATED | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No.: 1:17-CV-01194-LPS |
| | § | |
| APTIV SERVICES US, LLC | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**REPLY REPORT OF STEPHEN L. BECKER, Ph.D. TO SUPPLEMENTAL REBUTTAL**
**EXPERT REPORT OF MICHAEL H. CHASE, CPA**

_____                                 5/21/2021
STEPHEN L. BECKER, Ph.D.                                  DATE

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

chip. As such, even with Mr. Chase's flawed cost comparisons, in the absence of a license, his hypothetical alternatives for Aptiv would result in sales of components that benefit Microchip. Mr. Chase fails to take into account the competitive impact of a license to Aptiv that not only forecloses a portion of the market potential for Sandia once it is launched, but also forecloses a portion of Microchip's market for components other than Sandia that, absent a license to the Patents-in-Suit, Aptiv may have sourced from Microchip if it had been forced to pursue a non-infringing alternative.

62. The table below shows estimated profits for Microchip from sales of the components required for the different non-infringing alternatives proposed by Mr. Chase. [81]

| | Athens With No Switches | Non-Athens with 2 Switches | Single Lane Sandia, No Persistent USB | Dual Lane Sandia |
|---|---|---|---|---|
| Microchip Part Required | USB84602 | USB82512 | USB4715 | USB4925 |
| Price for Part | | | | |
| Estimated Profit Margin | ▬▬ | ▬▬ | ▬▬ | ▬▬ |
| Microchip Profits Per Device | ▬ | ▬ | ▬ | ▬ |

63. I note that the lowest estimate of foregone Microchip profit from the above table is ▬▬, but this estimate does not include an estimated profit for the two USB3740 switches, which would generate revenues of approximately ▬▬.[82]   For each of the other three alternatives, the profits per unit for Microchip exceeds the $1.40 per unit royalty that I determined.   Moreover, all four estimates significantly exceed Mr. Chase's own opinion that the reasonable royalty should be $0.30 per unit.

## VI.  COST APPROACH FULLY APPORTIONS

64. Mr. Chase asserts in his report that my reasonable royalty is not "reconcilable with … a well-reasoned apportionment in this matter."[83]   In support of this assertion, Mr. Chase notes the following:

   a. The royalty I determined represents an "outsized" percentage of the profit for a patent-practicing Sandia chip or Boston 2 chip, as both such chips have many other features beyond those accused;[84] and

---

[81] Exhibit SLB-5B (source for average price of USB 4715 and USB4925), Exhibit SLB-6B (source for average price of USB84602), Exhibit SLB-5A (source of profit margin for Sandia chips), Exhibit SLB-6A (source of profit margin for Athens chip), Microchip_315589-609 at 591-593 (source for average price of USB82512), and Microchip_315573 (source of gross margin for USB82512).

[82] I do not have data informative to the gross margin earned by Microchip for this product.

[83] Chase Supplemental Rebuttal Report, par. 54.

[84] Chase Supplemental Rebuttal Report, pars. 54-63.

Highly Confidential – Attorney's Eyes Only

b.   The cost approach does not address apportionment because of the "numerous flaws" that comprise Mr. Chase's criticisms of those comparisons.[85]

65.   The former point is not relevant at all to the question of whether my reasonable royalty rate is properly apportioned – apportionment cannot be economically assessed or judged based on the size of the royalty relative to the profits of patent-practicing chips.  Courts have affirmed that a fully apportioned royalty can in fact exceed the market price of a patent-practicing product.

66.   With respect to Mr. Chase's latter point, the use of a Cost Approach for establishing a fully apportioned estimate of the benefit derived from use of a patent is well accepted, and Mr. Chase does not dispute this.  Instead, Mr. Chase is claiming that the specific comparisons I made are flawed in a manner that renders the resulting cost savings estimate inflated due to a failure to apportion between patented and non-patented features. As discussed below, I disagree with Mr. Chase.

67.   Mr. Chase suggests that Boston and Sandia both achieved cost-savings via chip integration that he claims is a non-patented feature.  However, it is my understanding from Mr. Zatkovich that the patents expressly contemplate cost savings by integrating what would traditionally require multiple components into a single controller.  The patents use a Gigabit Ethernet controller as an example:[86]

> Multiple USB hosts may simultaneously share a single device/function, for example a Gigabit Ethernet controller. While in most present day implementations each host that is configured to have Ethernet access is implemented with its own Ethernet controller and Ethernet switch, in various embodiments of the present invention the Ethernet switch may be replaced by a less expensive and more compact multi-host USB controller, allowing each host to access the USB device directly. In another set of embodiments, storage media devices may be configured with a multi-host USB controller to provide a USB based Network Attached Storage (NAS) device that can handle storage requests from multiple USB hosts.

68.   I further understand from Mr. Zatkovich that the '243 patent discusses prior "stand-alone" USB switches that, when used, required reconfiguration of the device each time a different host accessed the device.[87]  The invention enabled a single device to be shared by multiple hosts without the need for reconfiguration.[88]  This was achieved by putting all of the control into a single device with multiple host interfaces, which eliminates the need for external switches and other similar external logic.[89]

---

[85] Chase Supplemental Rebuttal Report, par. 63.
[86] U.S. Patent 7,523,243 at 2:15-27.
[87] U.S. Patent 7,523,243 at 1:62-2:2.
[88] U.S. Patent 7,523,243 at 1:62-2:2.
[89] U.S. Patent 7,523,243 at 1:62-2:2.

Highly Confidential – Attorney's Eyes Only

69.    It is also my understanding from Mr. Zatkovich that the Patents-in-Suit themselves enable cost savings via the integration of multiple controllers/switches into a single stand-alone solution and in fact require an integrated solution.  For example, asserted claim 6 of the '708 patent and asserted claim 6 of the '243 patent (among others) recite a USB multi-host device with first and second upstream ports.  Prior to the invention, a USB device could communicate with only one host and, thus, contained only a single upstream port.[90]  Sharing a device among multiple hosts required external switches.[91]  By enabling a device with two upstream ports, the Patents-in-Suit eliminated the need for external switches.

## VII.   IF REQUIRED (WHICH IT IS NOT), THE ENTIRE MARKET VALUE RULE WOULD BE MET

70.    Mr. Chase's report includes a section that takes issue with my contention that, if required for the cost approach to be valid (which I do not opine is necessary), the Entire Market Value Rule ("EMVR") would nonetheless be met by the facts and circumstances of this case.[92]  Mr. Chase argues that the EMVR cannot be satisfied by the facts and circumstances present in this case. As explained in my prior report, and in the section below, I disagree with Mr. Chase on this point.

71.    First, the evidence in this case confirms that the patented invention was integral to the overall performance and success of the accused Aptiv products. The accused products in this case are custom products that are purchased by OEM customers only if the proposed design is selected by the OEM.  The evidence is clear, including from Aptiv's own documents, that the presence of the patented multi-host technology was vital to Aptiv's competitive position in the marketplace and was the driver of Aptiv's ability to win OEM contracts for hubs that enabled CarPlay with persistent USB. The evidence of this was discussed extensively in my prior report. As just one example, Aptiv (Delphi) made it clear that its ability to meet the demand for CarPlay functionality was driven by the chip containing the accused Host-to-Host bridging technology:[93]

---

[90] U.S. Patent 7,523,243 at 1:54-56.
[91] Discussion with Mr. Zatkovich; see also '243 Patent at 1:58-6:2.
[92] Chase Supplemental Rebuttal Report, pars. 73-89.
[93] APTIV_00008447-8454 at -8452.

Highly Confidential – Attorney's Eyes Only

# EXHIBIT 2

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF DELAWARE
 2

 3      MICROSOFT TECHNOLOGY,        )
        INCORPORATED                 )
 4                                   )  CASE NO.
        VS.                          )  1:17-CV-01194-LPS
 5                                   )
        APTIV SERVICES US, LLC       )
 6

 7                   ORAL AND VIDEOTAPED DEPOSITION OF
                         STEPHEN L. BECKER, PH.D.
 8

 9           ORAL AND VIDEOTAPED DEPOSITION OF STEPHEN L.
10      BECKER, PH.D., produced as a witness at the instance of
11      the Defendant and duly sworn, was taken in the above
12      styled and numbered cause on Wednesday, June 16, 2021,
13      from 10:22 a.m. to 4:52 p.m., before Janalyn Elkins,
14      CSR, in and for the State of Texas, reported by
15      computerized stenotype machine, at the offices of
16      Slayden Grubert Beard, 401 Congress Avenue, Suite 1650,
17      Austin, Texas, pursuant to the Federal Rules of Civil
18      Procedure and any provisions stated on the record
19      herein.
20
21
22
23
24
25
                                                        Page 1
```

```
 1    contemporaneous documents tend to talk about that, their
 2    respective ASICs as being their dual-role hub or
 3    multi-host chip.  And so I've used that as the sort of
 4    label to put on that accused infringing chip and on the
 5    microchip's patent practicing chip as the thing that
 6    embodies the invention.
 7         Q.  So what I'm trying to understand is in
 8    conducting your analysis to ensure that you're only
 9    looking at cost savings attributable to employing the
10    patented invention.  To do that, you looked at the --
11    the cost savings that were achievable by employing the
12    dual-role hub capabilities of the products.  And what I
13    want to understand is, does that mean that you
14    considered the dual-role hub capabilities to be
15    coextensive with practicing the patented invention or
16    whether one is a subset of the other?
17                   MR. GRAY:  Objection, vague.
18                   THE WITNESS:  I -- you know, I'm not sure
19    how to answer that.  To some extent, that's a technical
20    question as to whether literally is every circuit is
21    every resistor, transistor inside the Boston 2 chip or
22    inside the patent practicing Sandia chip -- a, you know,
23    in their enumerated in some claim of the asserted claims
24    in this case, I don't know, that's for the technical
25    experts to debate.  I know that the thing that is
```

Page 10

1    accused is the capability that the Boston 2 chip is the

2    smallest salable patent practicing unit.  I think

3    everybody agrees with that.  And the question of whether

4    there are, you know, circuits within that that are or

5    are not specifically enumerated in the claims, I don't

6    know.  That's something for the technical expert.

7         Q.  (BY MR. WIENER)  So you don't know one way or

8    another whether or not all of the dual-role hub

9    capability of the SSPPU is attributable to the patented

10   invention or not?

11              MR. GRAY:  Objection, vague as to all of

12   the dual-role hub capability.

13              THE WITNESS:  Well, the -- it's my

14   understanding that all of the dual-role hub capability

15   is claimed as part of the invention.  It's as part of

16   the asserted invention here.  The -- what -- as to the

17   question of are there other things going on in that chip

18   that are there as part of what the dual-role hub is

19   doing and making work as part of a complete chip to

20   complete, you know, work as a unit to accomplish

21   something, there are switches integrated into the chip

22   that are, you know, I address this in my reply report

23   that Mr. Chase indicated that he didn't think

24   integrating the switches had anything to do with the

25   patented invention.  And I discussed that with

                                        Page 11

```
 1    Microchip's technical expert and he told me, no, there
 2    are elements of these -- of the patent that address the
 3    question of integration.  So to get down and start
 4    parsing out specific circuits within this smallest
 5    salable practicing unit, I haven't done that and that's
 6    not within the scope of my expertise.
 7         Q.  (BY MR. WIENER)  If you didn't to that, how are
 8    you sure that the cost savings that are achieved by the
 9    dual-role hub capabilities as a whole are actually
10    attributable to the patented invention as opposed to
11    some of these other aspects circuits, et cetera, that
12    you're mentioning?
13              MR. GRAY:  Objection, vague as to dual-role
14    hub capabilities.  I don't know what capabilities we're
15    talking about.
16              THE WITNESS:  So the analysis that I've
17    done compares the use of the smallest salable patented
18    practicing unit chips that I have to assume are
19    infringing that Aptiv sold to the next best alternatives
20    that were available and acceptable, at least as
21    articulated by the parties at the time and the evidence
22    clearly indicates that the aspect of the -- what was
23    making the differentiating characteristics of the Boston
24    2 chip was its dual-role hub capability.  And sure, in
25    any circuit you're going to have, you know, there's
```

Page 12

```
 1                    THE WITNESS:  So, I -- typically my reports
 2     have an appendix A, B, and C.  But I think it may be the
 3     case that in this, since those three appendices had been
 4     provided with the original report, they weren't -- they
 5     weren't included here.
 6                    When I went to my system and I printed off
 7     what I think is, quote, my report, it -- it does not
 8     include any appendices.
 9        Q.  (BY MR. WIENER)  I tell you what, let's just go
10     ahead and mark what you were just looking at as your
11     supplemental report as Exhibit 1.
12                    Can I have it for a second just to put on
13     the sticker?
14                    (Exhibit No. 1 was marked.)
15                    MR. GRAY:  Just note for the record that
16     appendix A we corresponded about last week his updated
17     resume, which we provide previously.  And then there was
18     also a reference to an appendix with additional
19     materials considered that was referenced, but not served
20     because any new additional documents were cited in the
21     report itself.
22                    Is that fair?
23        Q.  (BY MR. WIENER)  And when did you speak to
24     Mr. O'Bolsky?
25        A.  I'd -- I'd have to go check my notes to see
```

Page 38

```
 1    when.  It obviously would have been sometime prior to

 2    January 20, 2021.  But my recollection is that I had a

 3    conversation with him in the period of time, probably a

 4    week or two leading up to filing this report.

 5        Q.  A single conversation?

 6        A.  I don't recall.  Probably.

 7        Q.  About how long did you talk to him?

 8        A.  I don't recall specifically.  It wasn't a --

 9    I'm sure it wasn't more than 45 minutes to an hour.  But

10    I don't recall.

11        Q.  Do you recall discussing anything with him that

12    you didn't provide a citation for in your report?

13        A.  No.

14        Q.  You didn't discuss any of the issues relating

15    to your lost profits opinion that were the subject of

16    the court's September 2020 ruling?

17        A.  No.

18        Q.  Did you ask him any questions regarding the

19    entities at Microchip that sell the Sandia products?

20        A.  No.

21        Q.  Generally, what do you recall the topics of

22    that conversation to be with Mr. O'Bolsky?

23        A.  I think most of what I was -- just flipping

24    through the report to look at all the cites, the

25    conversation with Mr. O'Bolsky.  In doing that it looks
```

Page 39

```
 1    like, to a large extent, the cites that I have in here

 2    to my discussions with him would have been discussions

 3    that I had prior to my first report.  The place that I

 4    recall sort of going back to and confirming or at least

 5    having a discussion with Mr. O'Bolsky about relates to

 6    the part of my process that I described earlier where I

 7    wanted to make sure that the components that I'm -- that

 8    I included in the cost analysis were limited to the

 9    components that would be replaced -- that would be the

10    replacement components for Sandia or Boston 2 in the

11    alternative designs.  And whether there are other

12    components identified in these little sort of

13    architecture diagrams, where there are other components,

14    A, I wanted to make sure that the sort of chips that I'm

15    using in the cost comparison are limited only to the

16    sort of footprint of what would reasonably be the

17    substitutes for the Sandia or Boston.  And confirming

18    that had those other chips that are -- that also are

19    sort of reflected in these changed -- or alternate

20    designs, had they been included, the costs would have

21    been higher and the cost difference that I arrived at

22    would have been higher.

23         Q.  Did you ask Mr. O'Bolsky whether the ability to

24    replace certain chips by using the Sandia chip was

25    attributable to the patented invention?
```

Page 40

1        A.  Specifically to the invention -- well, I asked

2    him whether it's attributable to using the patent

3    practicing Sandia chip in the design as opposed to the

4    next best alternative design.  That -- that was the --

5    the question that I asked was what would be -- what of

6    these components that are shown in these designs, the

7    alternative designs, are attributable to using the

8    patent practicing chip as opposed to whatever would have

9    been available to Aptiv or Microchip at the time of the

10   hypothetical negotiation.

11       Q.  But you didn't ask him whether or not the

12   ability to replace certain chips with the patent

13   practicing Sandia chip was enabled by or otherwise

14   attributable to using the patented technology as

15   opposed -- as opposed to some non-patented feature of

16   that Sandia chip?

17       A.  I'm just trying to remember how I framed the

18   discussion.  The discussion was focused on if you take

19   the patent practicing version of Sandia, what chips do

20   you replace out of this design?  And if you don't have

21   the patent practicing chip, what are the things that

22   you -- that -- in the -- a real world solution, you

23   would have had to substitute for those.

24            We didn't go any deeper than that.

25       Q.  Okay.  Did you also talk to Mr. Zatkovich in

Page 41

```
 1   connection with preparing your supplemental report?

 2        A.  Yes.  I think it's -- to maybe shortcut this,

 3   that the -- the discussion -- whenever it occurred, I

 4   don't recall specifically.  It was either all three of

 5   us, Mr. Zatkovich, Mr. O'Bolsky, and myself on the phone

 6   at the same time or around the same time on separate

 7   calls, but the topic, the specific issues that were

 8   discussed were similar with respect to the two -- both

 9   Mr. Zatkovich and Mr. O'Bolsky.

10        Q.  Are you relying on anything you heard from

11   Mr. Zatkovich on those calls in forming your report?

12        A.  I'm certainly relying on discussions with

13   Mr. Zatkovich for a bunch of things in this -- in this

14   report.  Everywhere that I'm relying on Mr. Zatkovich,

15   it's identified in the footnotes to the report.

16             I -- I don't know that sitting right here I

17   can parse out which of those things were specific to the

18   supplemental report as opposed to the original report.

19   I could take the time to go through and compare all

20   those footnotes and see which footnotes are unique to

21   the supplemental report.  But I don't -- other than

22   the -- with respect to the supplemental report, other

23   than the issue of sort of confirming this -- this sort

24   of footprint diagrams that I have in the supplemental

25   report that, I don't think appear.
```

Page 42

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3            I, STEPHEN L. BECKER, Ph.D., do hereby certify
 4    that I have read the foregoing pages and that the same
 5    is a correct transcription of the answers given by me to
 6    the questions therein propounded, except for the
 7    corrections or changes in form or substance, if any,
 8    noted on the attached errata page.
 9
10            _____
               STEPHEN L. BECKER, PH.D.          DATE
11
12
13    THE STATE OF TEXAS    )
                            )
14    COUNTY OF _____)
15
              Before me,                  , on this day
16    personally appeared STEPHEN L. BECKER, Ph.D., known to
      me (or proved to me under oath or through
17
      (description of identity card or other document) to be
18    the person whose name is subscribed to the foregoing
      instrument and acknowledged to me that they executed the
19    same for the purposes and consideration therein
      expressed.
20
              Given under my hand and seal of office this
21    ____ day of _____, _____.
22
                    _____
23                       NOTARY PUBLIC IN AND FOR
                         THE STATE OF
24
25
```

Page 157

1                   REPORTER'S CERTIFICATION

              DEPOSITION OF STEPHEN L. BECKER, PH.D.

2                     TAKEN JUNE 16, 2021

3              I, Janalyn Elkins, Certified Shorthand

4      Reporter in and for the State of Texas, hereby certify

5      to the following:

6                   That the witness, STEPHEN L. BECKER, Ph.D.,

7      was duly sworn by the officer and that the transcript of

8      the oral deposition is a true record of the testimony

9      given by the witness;

10                  That the original deposition was delivered to

11     JOSEPH GRAY;

12                  That a copy of this certificate was served on

13     all parties and/or the witness shown herein on

14     _____.

15                  I further certify that pursuant to FRCP No.

16     30(f)(i) that the signature of the deponent was

17     requested by the deponent or a party before the

18     completion of the deposition and that the signature is

19     to be returned within 30 days from date of receipt of

20     the transcript.  If returned, the attached Changes and

21     Signature Page contains any changes and the reasons

22     therefor.

23                  I further certify that I am neither counsel

24     for, related to, nor employed by any of the parties in

25     the action in which this proceeding was taken, and

                                                Page 158

1  further that I am not financially or otherwise

2  interested in the outcome of the action.

3          Certified to by me this 20th day of June 2021.

4

5

6

7

8

9

10

11

12          JANALYN ELKINS

            Texas CSR 3631

13          Expiration Date 1/31/2023

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 159

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICROCHIP TECHNOLOGY INCORPORATED, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | C.A. No. 17-01194-LPS-CJB |
| v. | ) ) | |
| APTIV SERVICES US, LLC, | ) ) | |
| Defendant. | ) ) | |

**EXPERT REPORT OF IVAN ZATKOVICH
REGARDING INFRINGEMENT**

By: _____

Ivan Zatkovich

Dated:   September 16, 2019

1

never initiate an action on the bus by itself.  For example, a host may request that a USB DVD device retrieve data from its DVD disk.  The device will then begin retrieving that data.  However, the device cannot send the data to the Host until the host specifically asks for it (e.g. using an Interrupt IN or a Bulk IN data transfer request).

# 5   OVERVIEW OF THE ASSERTED PATENTS

## 5.1   Overview of the '243 and '708 Patents

63.     The specification for the '243 and '708 Patents discloses a Multi-Host USB Device. A key function of this device is to overcome the limitation that the USB standard "is structured so that every device is configured and accessed by a single host controller." ['243 1:54-57].

64.     Although the specification mentions prior art that "allow[s] a device to be switched between multiple USB Host controllers" ['243 1:59-60], "[t]hese solutions, however, fail to permit simultaneous access to the USB device" such that when the device is switched from one host to the other "the device must be re-configured, thereby losing internal state information". ['243 2:1-2].

65.     The inventions of the '243 and '708 provide a more flexible and functional USB device that "may be simultaneously configured and accessed by two or more USB hosts by using a multi-host capable device controller." ['243 abstract].  Such a USB device may have two or more upstream ports with each port having a separate 'endpoint' and endpoint buffers.  This would allow the device to "maintain a dedicated address, configuration and response information for each host that it is connected to". ['243 2:34-35].  In other words, the invention allows a single USB device to be connected to two different hosts, be accessed with two separate addresses, and even have two different configurations for each host, at the same time. ['243 3:43-46, 3:60-4:1].

66.     Figure 3 of the '243 Patent (below) depicts a Multi-host USB device that simultaneously communicates with multiple hosts.   Block 312 in the diagram is the USB Device/Function block that represents the "'Peripheral Function' itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc." ['243 2:48-50].



*'243 Patent, Fig. 3*

67.     Block 108, the USB Multi-Host Device Controller, controls both the configuration of the device and function as well as the communication between the device and the multiple hosts ['243 4:1-5].  In this embodiment, two separate upstream ports (302, 304) and two sets of endpoint and status buffers (306, 308) are used in the connections to two hosts (first Host and second Host). ['243 4:10-18].

68.     When two or more hosts are connected to the same multi-host USB device, they may want to communicate with the shared device at the same time.  Therefore, according to one embodiment, an "internal arbitration mechanism may enable each host to access the shared Peripheral Function by either interleaving host accesses, or by using a common request/grant structure, which may hold-off one host while another". [2:61-64].

### 5.1.1   Representative claims

69.     A representative claim of the '243 Patent is as follows:

> 1. A USB multi-host device comprising:
>
>     first and second upstream ports configured to couple to corresponding first and second hosts;
>
>     a USB device block corresponding to at least one function; and
>
>     a multi-host device controller coupling the USB device block to the first and second upstream ports, wherein the multi-host device controller is configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to:
>
>         simultaneously request access to the USB device; and
>
>         alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block each time a different one-of the first and second hosts is given access to the USB device block to use the at least one function.

70.     A representative claim of the '708 Patent is as follows

> 3. A USB multi-host device comprising:
>     a USB function block; and
>
>     a multi-host device controller coupling the USB function block to a first host and a second host, wherein the multi-host device controller is configured to establish a first USB connection between the first host and the USB function block and a second USB connection between the second host and the USB function block, wherein the first USB connection and the

Expert Report of Ivan Zatkovich

second USB connection are concurrent, to allow the first host and the second host to:

> simultaneously access the USB multi-host device; and

> alternately access the USB function block, without either one of the first and second hosts reconfiguring the USB multi-host device each time a different one of the first host and the second host is given access to the USB function block.

71.     Both claims allow that the first and second hosts may simultaneously access (or request access to) a single USB multi-host device.  And both claims allow that the hosts can alternately access the USB device/function block without either one having to reconfigure the device each time a different host is given access to the USB device/function block.

## 5.2   Overview of the '191 Patent

72.     The specification of the '191 Patent discloses a "Method for Automatically Switching USB Peripherals Between USB Hosts".   This patent introduces a device called a "USB Switching Hub", where the "Switching hub may be operable to automatically switch connectivity of the peripheral device(s) from the first host device to the second host device when the second host device is connected to the USB device." ['243 Abstract].  In other words, the USB switching hub manages the connections from one or more hosts to one or more peripheral devices.

73.     The '191 patent teaches a USB Hub which manages connections between USB devices and multiple hosts.  For example, one Host may first establish connections to multiple USB devices through the Hub.  A second Host may then be attached to the Hub and the Hub will allow the second host to connect with one of the devices already connected to the first host.

74.     In typical USB Hubs, the Hub can only connect with one Host at a time.   The Hub then allows the host to connect with multiple USB devices attached to the Hub.  The '191

*[APTIV_00000971 annotated]*

109.    The EP Bridge includes FIFO buffers, similar to what is depicted in the above annotated graphic.[15]  These FIFO buffers are used to transfer data between the iPhone and the Head Unit, such as a bulk data transfer depicted in the diagram, which is a data transfer utilized by the CarPlay functionality.

110.    Specifically, the EP Bridge logic, which includes firmware in the MCU microcontroller, provides management for the movement of control and data packets received on the 2nd device controller (from the iPhone), through the FIFO buffer, to the 1st device controller, and then to the to the Head Unit.  The EP Bridge logic also provides control for the movement of data in the reverse direction (e.g., received from the Head Unit, transferred to the iPhone). "The system implementation appears to both the iPhone and the head unit software as if the Head Unit and iPhone are directly connected to each other." [APTIV_00002424]

# 7   APTIV'S PRODUCT EMBODIES THE ASSERTED PATENTS

## 7.1   Aptiv Dual Role Hub infringes the asserted claims of the '243 and '708 Patents

111.    This section identifies several limitations of the asserted claims of the '243 and '708 Patents, and why the accused Aptiv product infringes those limitations. Specifically, the Dual Role Hub includes all the limitations of the USB Multi-host device disclosed in the asserted '243 and '708 Patent claims.  Additional details as to how the accused Aptiv products meet all of the

---

[15] Mr. Petku indicated in his deposition that the FIFOs in this graphic are actually part of the device controllers, not separate blocks as shown.  [Petku Tr. 104:1-105:9].  He also indicated that the number of FIFOs that are listed is incorrect.  [Petku Tr. 104:1-105:9].

Expert Report of Ivan Zatkovich

asserted claims elements of the '243 and '708 Patents is provided in the attached claim charts, Exhibits 3 and 4.

112.    The following is a representative claim of the '243 Patent.[16]

1. A USB multi-host device comprising:

first and second upstream ports configured to couple to corresponding first and second hosts;

a USB device block corresponding to at least one function; and

a multi-host device controller coupling the USB device block to the first and second upstream ports,

wherein the multi-host device controller is configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously request access to the USB device; and

alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block each time a different one-of the first and second hosts is given access to the USB device block to use the at least one function.

### 7.1.1   Components of a USB Multi-host device present in the Aptiv product

113.    The Aptiv Dual Role Hub is a *USB multi-host device* that contains two upstream ports.

114.    Within the asserted claims of the '243 and '708 patents, the *USB multi-host device* comprises:

a.   The first and second upstream ports configured to couple to corresponding first and second hosts;

b.   a USB device block corresponding to at least one function; and

---

[16] Claim 6 of the '708 Patent includes similar, although not identical, limitations.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICROCHIP TECHNOLOGY INCORPORATED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 17-01194-LPS-CJB |
| APTIV SERVICES US, LLC, | ) | |
| Defendant. | ) ) ) | |

**REPLY FROM EXPERT IVAN ZATKOVICH
TO JOHN GARNEY'S REBUTTAL**

By:  _____

Ivan Zatkovich

Dated:   November  7, 2019

**RESTRICTED - ATTORNEYS' EYES ONLY**

that standard USB devices did not provide, namely, the ability to connect to two hosts simultaneously.

13.  At the same time, the inventors did not rule out that some aspects of their invention would comply with some USB standards.  For example, the claims require "USB connections," which implies the ability to communicate with USB hosts over a USB connection. Similarly, claim 10 requires the "multi-host device controller is operable to send not-ready packets *in a USB specific manner* to hosts whose request was not immediately serviced."  ['243 Patent, 5:64-67 (emphasis added)].

## 2.3   USB standards do not dictate aspects of "Multi-host" components of the inventions

14.  Mr. Garney repeatedly imports requirements from USB standards 1.0 and 2.0 into the asserted claims that are not applicable to the non-standard USB devices, controllers, and functions of the '243 and '708 patents.  Many of the USB standards Mr. Garney imposes on these components actually contradict specific embodiments, characteristics, and requirements defined by the inventions.

15.  The "Multi-host" components disclosed in the '243 and '708 patents did not exist at the time USB 1.0 and 2.0 standards were created.  As such these USB standards could not dictate the behavior of these components.  Specifically,

- USB standards provide no requirements or definition of a Multi-host USB device
- USB standards provide no requirements or definition of a Multi-host device controller
- USB standards provide no requirements or definition of a USB device block / function block that is shared by two different hosts

RESTRICTED - ATTORNEYS' EYES ONLY

Reply Report of Expert Ivan Zatkovich

16.   In fact many features and requirements of the "Multi-host" components and embodiments described and claimed in the '243 and '708 patents are contrary USB standards. This includes:

    a.   A single device having more than one address ['243 3:66-4:1]

    b.   A device is not required to, but may respond within USB specified limits ['243 3:66-4:1]

    c.   A device being connected to more than one upstream port at the same time ['243 Claim 1, '708 Claim 5]

    d.   A device being accessed by two hosts simultaneously ['243 Abstract]

    e.   A device maintaining multiple EP0 endpoints ['243 Fig. 3, Claim 6]

    f.   A device maintaining multiple different configurations as enumerated by different hosts.  ['708 Abstract; '243 Abstract]

    g.   A device alternately processing requests by multiple hosts without re-enumeration/re-configuration by any host. ['243 Claims 1, 3, 7, 18, '708 Claim 3]

    h.   A device sharing a common USB device block / function block with multiple different hosts ['253 Claims 18, 23, 24]

17.   The following are examples of limitations, requirements, or statements from Mr. Garney's report that are improperly applied to the USB multi-host devices of the inventions. Many of these are contrary to the invention's requirements and embodiments just listed above.

    a.   "It has no single USB interface, device descriptor, device class behavior, vendor identification, unique device address, or ability to respond to standard USB requests." [Garney ¶168]

6

RESTRICTED - ATTORNEYS' EYES ONLY

asserted claims for either or both of the two ports of a non-standard USB device (the USB Multi-host device) to require two standardized upstream ports.

80.   Mr. Garney also provides no support that the accused 2nd port does in fact provide power to the port while the iPhone is connected as a host [Zatkovich Infr. Pg. 47].   In addition, there is no dispute the iPhone connects to the accused upstream port when it is configured as a host.   According to the USB 2.0 specification, an upstream port is the one closest to the host [APTIV_00001226], which means the identified port on the Aptiv Dual Role Hub operates as an upstream port even under the USB standard.

## 4.6   Mr. Garney contention:  No support that endpoints are "between" the Upstream ports and the accused Multi-host device controller.

81.   Mr. Garney asserts that there is no support that "endpoint buffers are between what he [Zatkovich] identifies as the multi-host device controller and any upstream port" [Garney ¶218]. He further states:

> What Mr. Zatkovich identifies as the endpoint buffers in the Accused Product—FIFO Buffers, EP0 (IN), and EP0 (OUT)—are inside what Mr. Zatkovich identifies as a portion of the multi-host device controller—UDC_US and UDC_DS. The FIFO Buffers, EP0 (IN), and EP0 (OUT).  [Garney ¶221].

82.   This is not correct.   The language of the representative claims of the'243 and '708 patents is:

> 2. The USB multi-host device of claim 1, further comprising a first endpoint buffer coupled *between* the first upstream port and the multi-host device controller, and a second endpoint buffer coupled between the second upstream port and the multi-host device controller.
>
> ['243 claim 2]

RESTRICTED - ATTORNEYS' EYES ONLY

Reply Report of Expert Ivan Zatkovich

6. The USB multi-host device of claim 5, further comprising a first endpoint buffer coupled ***between*** first upstream port and the multi-host device controller, and a second endpoint buffer coupled ***between*** the second upstream port and the multi-host device controller.

['708 claim 6]

83.    As indicated in my infringement report, EP0 (IN) and EP0 (OUT) are expressly not included in the portions of UDC_US and UDC_DS that make up the multi-host device controller. Specifically, I opined:

.  .  . the UDC_US and UDC_DS have circuitry for (1) interfacing to the microcontroller (MCU); (2) providing that all control channel messages are routed through the microcontroller; (3) allowing the microcontroller to track if the host controller has disconnected or stopped functioning; (4) sending NAKs to the host controller; (5) interrupting the microcontroller when an EP0 data transaction is initiated by the external host controller; and (6) allowing the microcontroller access to the message information (data and length) in the UDC. *See* APTIV_00000019 (UDC_US) and APTIV_00000021 (UDC_DS). The multi-host device controller comprises at least the above UDC circuitry in conjunction with the microcontroller (including any related code in the SRAM/FLASH memory) and the respective interconnect (control and data depicted between MCU BUS (ASIC SIDE) and EP BRIDGE).
[Zatkovich Infr., Ex. 3 at 6-7].

84.    Further, EP0 (IN) and EP0 (OUT) are coupled between the upstream port and the multi-host device controller.  For example, the EP0 buffers are shown at APTIV_00316191:

36

**RESTRICTED – ATTORNEYS' EYES ONLY**

# EXHIBIT 5

ATTORNEYS EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   MICROCHIP TECHNOLOGY              )

     INCORPORATED,                     )

 5              Plaintiff,             )

                                       )

 6       vs.                           )   No. 17-01194-LPS-CJB

                                       )

 7   APTIV SERVICES US, LLC,           )

 8              Defendant.             )

 9   _____)

10

11                  ATTORNEYS' EYES ONLY

12

13         VIDEOTAPED DEPOSITION OF MITCH OBOLSKY

14                    Phoenix, Arizona

15                    August 9, 2019

                        9:06 a.m.

16

17

18

19

20

21   Reported by:

22   SHANNON STEVENSON, RPR, CCR

23   Certificate No. 50461

24   Job No. 3473743

25   Pages 1 - 199
```

Page 1

ATTORNEYS EYES ONLY

```
 1         A    Yeah, 2012 into 2013.  Depending on when it
 2    started and when it closed.
 3         Q    It was that time frame then?
 4         A    Yeah.
 5         Q    So is it right to say that you have a fair
 6    amount of technical understanding about USB?
 7         A    I have some, yeah.
 8         Q    Do you know whether you'll be called to testify
 9    about infringement at trial?
10         A    I don't know.  I was not expecting to.
11         Q    So to take it a step back, you understand this
12    is a patent case; is that right?
13         A    Yes, absolutely.  Yes.
14         Q    And that there are three patents at issue?
15         A    Yeah, at a high level I understand that, yes.
16         Q    Okay.  And I don't know that we'll need to
17    refer to them much but just to get our shorthand out of
18    the way, have you heard to them referred to by the last
19    three digits?
20         A    I have.
21         Q    Okay.  So we have a 191 patent.  Do you
22    remember that?
23         A    Yes, I think so.
24         Q    Okay.  And then the other two are sort of
25    related, and that's the 243 and the 708.  Is that your
```

Page 21

ATTORNEYS EYES ONLY

1    understanding?

2         A     Yeah.  I don't remember the numbers, but yeah.

3         Q     Fair enough.

4         A     I'm aware there are three, and they're not the

5    same, but the content I couldn't explain to you.

6         Q     Okay.  That's part of what I'm trying to get at

7    because I have a whole section of my outline if you are

8    planning to talk about the patents as they compare to the

9    Aptiv products.  But if that's a different witness?

10        A     Yeah, I don't believe that's me.

11        Q     Okay.

12        A     I apologize.  I have 2,000 engineers that

13   generate patents potentially, and I cannot be an expert

14   on all those sources.

15        Q     Absolutely.  And typically on patent cases

16   that's left up to either one engineer or an expert.  It's

17   just helpful to understand that that's not your role --

18        A     No.

19        Q     -- in the case.

20        A     No, that is not my role.

21        Q     Are you familiar with the products of Microchip

22   that practice those patents or have been set forth to

23   Aptiv as practicing?

24        A     Yeah, I think I do.  Yes, I believe I have an

25   understanding.

                                           Page  22

ATTORNEYS EYES ONLY

```
 1    STATE OF ARIZONA       )
                             ) ss
 2    COUNTY OF MARICOPA     )

 3

 4        BE IT KNOWN that the foregoing deposition was taken

 5    before me, SHANNON STEVENSON, a Certified Reporter in and

 6    for the County of Maricopa, State of Arizona; that the
      witness before testifying was duly sworn to testify to

 7    the whole truth; that the questions propounded to the

 8    witness and the answers of the witness thereto were taken

 9    down by me in shorthand and thereafter reduced to

10    computer-aided transcription under my direction; that the

11    foregoing 198 pages are a true and correct transcript of

12    all proceedings had upon the taking of said deposition,
      all done to the best of my skill and ability.

13        I FURTHER CERTIFY that I am in no way related to any

14    of the parties hereto, nor am I in any way interested in

15    the outcome hereof.

16    (   )  Signature was requested.

17    (XXX)  Signature was not requested.

18        DATED at Phoenix, Arizona, this 23rd day of August,

19    2019.

20

21

22

23

          _____

24        SHANNON STEVENSON, CR, RPR
          Certified Reporter

25        Certificate No. 50461
```

Page 199

# EXHIBIT 6

```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF DELAWARE
2

3    MICROCHIP TECHNOLOGY        )      17-CV-1194
     INCORPORATED                )
4                                )
                     Plaintiff   )
5         vs.                    )
                                 )
6    APTIV SERVICES US, LLC      )
                                 )     Philadelphia, PA
7                                )     November 19, 2021
                     Defendant   )     10:06 a.m.
8

9                    DAUBERT MOTION HEARING
            BEFORE THE HONORABLE JOSHUA D. WOLSON
10                UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12

     For the Plaintiff:         JEFF CASTELLANO, ESQUIRE
13                              SHAW KELLER, LLP
                                1105 North Market Street, 12th Fl
14                              Wilmington, DE  19801
                                jcastellano@shawkeller.com
15

16                              BRIAN C. BANNER, ESQUIRE
                                JOSEPH D. GRAY, ESQUIRE
17                              SLAYDEN GRUBERT BEARD, PLLC
                                401 Congress Avenue, Suite 1650
18                              Austin, TX  78701
                                512-402-3550
19

20

21

22

23

24

25
```

```
 1   For the Defendant:          ERIC C. WIENER, ESQUIRE
                                 ANDREW T. JONES, ESQUIRE
 2                               DURIE TANGRI, LLP
                                 217 Leidesdorff Street
 3                               San Francisco, CA  94111
                                 415-362-6666
 4

 5                               PHILIP A. ROVNER, ESQUIRE
                                 POTTER ANDERSON & CORROON, LLP
 6                               Hercules Plaza
                                 P.O. Box 951
 7                               Wilmington, DE  19899
                                 provner@potteranderson.com
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21            SHANNAN GAGLIARDI, RDR, CRR
                  OFFICIAL COURT REPORTER
22     U.S. DISTRICT COURT, EASTERN DISTRICT OF PA
                601 Market Street, Room 2609
23                 Philadelphia, PA  19106
                      (267)299-7254
24

25
```

1    It's just Boston 1 plus some other features to support CarPlay.

2            THE COURT:  So, Mr. Wiener, where is the basis for

3    him to say CarPlay could and would have been added to Boston 1

4    at the time?

5            MR. WIENER:  Yes, Your Honor.  His basis is looking

6    at where the development was of the Boston 1 chip at the time

7    of the hypothetical negotiation.  He cites to the internal

8    documents, the business documents, the specification documents.

9    But most importantly, he spoke to Mr. Voto and Mr. Petku, who

10   were the ones designing the Boston 1 chip, and asked them if,

11   in March 2014, they couldn't have added the host-to-host bridge

12   as the solution to CarPlay, what would they have done.

13           And they said we would have continued with the Boston

14   1 chip, added the downstream switches we needed to flip it

15   around, and would have been able to provide something that was

16   CarPlay compliant, even though it would not be as good as the

17   infringing technology.

18           THE COURT:  So let me just push on that.  My

19   recollection of what he says, there's no actual reference to

20   CarPlay, let alone to any kind of configuration.  There's just

21   a -- Voto kept going and got into whatever we needed to get to,

22   something along those lines, right?  I mean, can you point me

23   to something specific where there's someone saying -- I don't

24   need the exact technical configuration, but someone saying,

25   look, we would have added a couple of switches and enabled

1    CarPlay?

2            MR. WIENER:  Well, he explains that in depth at his

3    deposition when he was asked about the conversation he had with

4    Mr. Voto and Mr. Petku, who were designing that.

5            THE COURT:  Do I have that testimony?

6            MR. WIENER:  Yes, you do, Your Honor.

7            THE COURT:  Point me to it, if you would.

8            MR. WIENER:  Your Honor, I believe it was cited in

9    Microchip's brief, and I think it's at pages 37 through 24.

10   And he explains that he spoke to --

11           THE COURT:  Sorry.  You said 37 through 24.  So tell

12   me those pages again.

13           MR. WIENER:  Sorry.  I think the better citation is

14   at pages 58 to 59 of his deposition.

15           THE COURT:  Deposition is attached to which exhibit?

16           MR. WIENER:  I believe it's Exhibit A to their

17   motion, and he was asked about the conversation he had with the

18   designers and talked about what capabilities they discussed and

19   discussed, you know, that the design change would at a minimum

20   provide single-lane solution for now a next generation USB hub

21   chip that is tremendously cost reduced and allow at least

22   CarPlay, albeit perhaps not persistent USB.

23           And that was the issue, what would they have done to

24   be able to at least meet the CarPlay demand even if they

25   couldn't have done it in a way that they did that allowed the

 1   downstream USB, and that is the Boston alternative we're

 2   talking about here.

 3              THE COURT:  So how much does he have to give you,

 4   Mr. Castellano, to tell you, you know, what is sufficient?  In

 5   other words, he's not a technical expert.  He talked to some

 6   people.  He's relaying to you what he understands what that

 7   would have been.  You know, how much more does he have to do?

 8              MR. BANNER:  Thank you, Your Honor.  And I'm

 9   Mr. Banner.

10              THE COURT:  Oh, I'm sorry.

11              MR. BANNER:  That's okay.  Mr. Castellano is sitting

12   to my right.

13              THE COURT:  You're right.  I'm sorry.  My bad.

14              MR. BANNER:  Just to answer your question, Your

15   Honor, what we believe he has to give us is he has to give us

16   enough details to be able to determine that this is a

17   non-infringing, acceptable, and achievable, you know,

18   non-infringing --

19              THE COURT:  He's not a technical expert, so he can't

20   give you the details on that.  He can tell you I talked to

21   people who told me that this is what they would have done and I

22   rely on that.

23              You know, it's not that different, other than the

24   fact that they're not paid experts, from Dr. Becker relying on

25   Mr. Zatkovitch, right?

1        MR. BANNER:  His reliance on in-house folks at Aptiv,

2  is that the question?

3        THE COURT:  Yes.

4        MR. BANNER:  Okay.  So he's relying on those people

5  to tell them that there's some alternative out there that would

6  be non-infringing, acceptable, and available.

7        THE COURT:  Well, that's either out there or that

8  they could have got.

9        MR. BANNER:  Correct.  So the question is, how much

10  specificity do we need?  Well, I think in order to support, to

11  be a reliable basis for which Mr. Chase can rely on, we need to

12  know those details.  We need to be able to test whether it's

13  non-infringing.  We need to have an expert report that says

14  here's what this non-infringing alternative is and here's why

15  it would be acceptable and available and non-infringing.

16        Mr. Garney takes a lot of -- and he's Aptiv's

17  technical expert.  He actually addresses a number of

18  non-infringing alternatives.  These are also included in

19  Mr. Chase's report.

20        And Microchip is not taking issue with any of those.

21  Those are properly supported.  He has an expert opinion behind

22  him saying these are, in his opinion, non-infringing

23  alternatives.  They were available.  They were acceptable.

24        This unidentified product doesn't have those same

25  safeguards.  It doesn't have a reliable basis for Mr. Chase to

1   rely on.  There's no facts or data there.

2              THE COURT:  I mean, has he given you any work papers,

3   notes, anything like that of the conversation?

4              MR. BANNER:  He did not.

5              THE COURT:  Does he have them, Mr. Wiener?

6              MR. WIENER:  I don't believe so, Your Honor, but I

7   would have to check with him.

8              THE COURT:  I mean, I'm a little troubled at the idea

9   that, you know, it's this conversation.  I mean, I disagree

10  with you, Mr. Banner.  I'm not sure that you need an expert

11  report because the rules say that if you haven't specially

12  engaged someone, Rule 26, if you haven't specially engaged

13  someone to provide an expert opinion, you don't have to give a

14  report.  You do have to disclose them, and I don't know that

15  they've been disclosed, Mr. Wiener, as experts on this subject.

16  So you may have a disclosure issue as well.

17             The problem I have in some respects, though, is what

18  I have in front of me right now is a motion that's directed at

19  Mr. Chase, and if, you know, people in Mr. Chase's field

20  reasonably rely on the technical advice and technical guidance

21  they get from technical experts, including the people in-house,

22  then he can rely on that, right, under the federal rules?  I

23  mean, is that a basis to exclude him?

24             You may have issues with what's been disclosed.  You

25  may have issues with what you've been given access to.  But

1   those discovery issues aren't a basis for me to exclude an

2   opinion under Rule 702, are they?

3          MR. BANNER:  Well, Your Honor, I would disagree with

4   that.  What we're talking about here are fact witnesses who are

5   speculating as to --

6          THE COURT:  They're not fact witnesses, right?

7   They're presumably -- look, I don't know who these people are,

8   but I'm going to assume that they're qualified people who work

9   internally at Aptiv and who can attest to, you know, chip

10  development.

11         They are, by dint of experience, training, et cetera,

12  they would qualify as experts under Rule 702.  And they're not

13  offering testimony as percipient witnesses who were there at

14  the time because the whole exercise is counterfactual by its

15  nature, right?  And so what they're being asked to do is to

16  opine on what could have happened in that counterfactual world.

17  I think you just said, look, an expert can do it.  Well,

18  they're experts.  The only difference is Rule 26(a) accounts

19  for the possibility of experts who haven't been specially

20  engaged, right?  So I think we're in that world.

21         MR. BANNER:  So, Your Honor, my response to that

22  would be I don't disagree with anything you just said except

23  that we are in that world right now.  The reason we're not in

24  that world right now is that these witnesses were never

25  disclosed.

1          THE COURT:  That's my point.  That's a discovery

2     issue which is not exactly what's in front of me.

3          MR. BANNER:  I would suggest that that means that

4     they're presumably fact witnesses, and so they are not experts.

5          THE COURT:  A failure to disclose them doesn't move

6     them into being fact witnesses.  It just means that someone

7     didn't disclose their statuses as experts.  In other words,

8     you've got an expert who says I'm relying on these other

9     people, these other people are experts, and they told me what

10    they think.  Nobody thinks this is fact evidence.  It's just

11    not.  There's no way that it's fact evidence because it is, by

12    definition, counterfactual.

13          So I think what you have is a disclosure violation,

14    potentially.  And the question is -- you know, I don't have a

15    motion in front of me on a discovery issue under Rule 26.  Even

16    if I did, I'm not sure that the appropriate outcome is

17    exclusion of a different expert's testimony.  You know, query

18    what happens down the line if there's no remedy to it, et

19    cetera.

20          But if this is the factual predicate on which he's

21    relying and this factual predicate is reasonable, then isn't

22    that a basis for this expert to testify?

23          MR. BANNER:  Under all those assumptions, if this was

24    actual expert testimony, I would agree that this would be a

25    basis on which Mr. Chase could rely.  But our issue today is

1   that that is not the case.  That is not the world in which

2   we're living in right now.

3          THE COURT:  Why not?

4          MR. BANNER:  Because we've never had a chance to

5   depose Mr. Voto or Mr. Petku as experts on this topic.  We

6   don't know their qualifications for determining

7   non-infringements and whether or not the solution they would

8   present would be non-infringing.

9          THE COURT:  Look, I don't disagree.  You're

10  identifying a host of potential violations under Rule 26.  They

11  are problematic but remediable.  We're six months, five months

12  from trial.  You can go do that.  I don't disagree that what

13  they have offered in this context is an expert opinion.  And I

14  don't disagree that it is an expert opinion that has never been

15  disclosed here.

16         Am I right, Mr. Wiener, it's never been disclosed?

17         MR. WIENER:  Are we talking about the reliance on the

18  technical team?

19         THE COURT:  No.  I'm talking about the technical

20  folks themselves, Mr. Voto and -- I forgot about the other

21  name.

22         MR. WIENER:  Mr. Petku.  They were both deposed in

23  this case.

24         THE COURT:  But they were deposed as fact witnesses.

25         MR. WIENER:  Correct.

1          THE COURT:  You have never given a disclosure under

2     Rule 26 on the deadline to disclose expert witnesses and expert

3     reports.  You didn't send some disclosure that says, by the

4     way, these internal people who were not specially engaged to

5     offer expert analysis and therefore don't require expert

6     reports, will also be offering the following general expert

7     testimony.

8          I mean, if we look at -- I'm just going to get it up

9     in front of me because I know in principle what it says, but I

10    want to have the language.  If we look at Rule 26, and

11    specifically it's going to be 26(a)(3) -- I'm sorry.  Maybe

12    it's not.

13         Okay.  26(a)(2), disclosure of expert testimony, in

14    addition to disclosures required by Rule 26(a)(1), a party must

15    disclose to the other parties the identity of any witness it

16    may use at trial to present evidence under Federal Rules of

17    Evidence 702, 703, or 705.

18         So these two would fall into that category because

19    they're opining about the viability of a solution with CarPlay,

20    and then that was (a)(2)(A).  (a)(2)(B) says unless otherwise

21    stipulated or ordered by the Court, this disclosure must be

22    accompanied by a written report prepared and signed by the

23    witness if the witness is one retained and specially employed

24    to provide expert testimony in the case or one whose duties as

25    the party's employee regularly involve giving expert testimony.

1          So they weren't specially engaged to provide expert

2  testimony in the case, right?

3          MR. WIENER:  Correct.

4          THE COURT:  Assume that their duties for Aptiv do not

5  regularly involve giving expert testimony; is that right?

6          MR. WIENER:  Correct.

7          THE COURT:  They actually have real jobs with real

8  roles, right?

9          MR. WIENER:  Yes.

10          THE COURT:  So they don't, under (a)(2)(B), have to

11  provide a written report, but that doesn't excuse (a)(2)(A),

12  which is that a party must disclose to the other parties the

13  identity of any witness it may use at trial to present evidence

14  under Rule 702.

15          And it goes on.  (a)(2)(C), is unless otherwise

16  stipulated or ordered, if the witness is not required to

17  provide a written report, the disclosure must state the subject

18  matter on which the witness is expected to present evidence and

19  a summary of the facts and opinions to which the witness is

20  expected to testify.  So akin to what you would do in initial

21  disclosures or in response to an interrogatory, right?

22          I think that probably should have happened.  I don't

23  have in front of me, and it's probably not worth our time for

24  me to take up, the exact language I used in my scheduling order

25  as to disclosures.  There are some default timing rules in the

1    absence of a court order, but I would have assumed that those

2    disclosures would be made at the time that other expert

3    disclosures were made under Rule 702.

4            But so to your point, Mr. Banner, I think what we

5    have is a violation of that.  They're certainly not offering

6    fact testimony.  There's a question about, you know, look, if

7    their testimony is admissible and Mr. Chase says I'm relying on

8    it, then I think it's fair game.  But it would seem to me,

9    under Rule of Evidence 106, which is conditional relevance, 104

10   I'm sorry, 104, you would need to come forward with that

11   predicate in order to then get Mr. Chase to testify on this

12   point.

13           And so I think that's where the disconnect is here in

14   some respect because the motion is geared at, you know, there's

15   this clash in the motion about, well, is there a basis or not.

16   And it is a basis.  Whether it's a proper basis is still to be

17   tested, and I think that problem needs to be remedied.

18           I'm telling you all this.  I'm not ruling.  So I'm

19   open to hearing otherwise if you think I'm wrong about where we

20   stand on this.  But, you know, it seems to me that what needs

21   to happen is there needs to be some disclosure made and then an

22   opportunity to go depose them as experts.  I mean, you know,

23   they were deposed once.  Rule 30 might say that you need my

24   leave.  If they're disclosed as experts, you have my leave to

25   redepose them.  I would assume Mr. Wiener is not going to stand

1    in the way of that because that's kind of how things work

2    anyway.  If you disclose someone later as an expert, you get

3    another bite.

4             I'll start with you, Mr. Banner, because it's your

5    motion.  Am I wrong about how this should play out?  Should I

6    still be tackling the question of Mr. Chase's testimony's

7    admissibility anyway?  And I want to come back to a couple of

8    issues, but I think that this is really the nub of the dispute,

9    isn't it, whether he's got a basis to say that this alternative

10   chip design existed?

11            MR. BANNER:  Yeah, I think you're right, Your Honor.

12   That is the nub of the dispute.

13            Now, this wasn't cited in our brief, but I was part

14   of the trial.  This is Judge Alsup out in Northern District of

15   California taking on the very exact same issue.  This was

16   Google v. Oracle a number of years ago.  The same kind of facts

17   presented themselves where there was an expert who relied on

18   testimony from in-house folks who would have been considered

19   experts, but there was no expert disclosure.

20            Judge Alsup had some very scathing wording in his

21   order that this was one of the worst types of discovery

22   violations where an expert takes an undisclosed, you know, what

23   would otherwise be expert testimony is now hearsay and tries to

24   get it into the trial through his testimony.  So Judge Alsup

25   excludes that testimony from the expert who is relying on the

1    undisclosed expert testimony.

2           THE COURT:  Well, let me be clear.  If you guys

3    showed up at trial and just put Mr. Chase on, I think we'd have

4    a problem.  But it would not be uncommon for me to say I'm

5    going to deny -- this is effectively a motion in limine

6    directed at Mr. Chase.  It would not be uncommon for me to say,

7    look, I'm going to deny a motion in limine subject to the party

8    laying the appropriate foundation for admission of the

9    evidence.

10          And so if these two Aptiv witnesses, or even maybe

11   just one of them, show up at trial and offer their opinions,

12   and if we have cured the disclosure issues pretrial so that

13   we're not engaged in some sort of trial by surprise, then I

14   don't have the hearsay problem that Judge Alsup's worried

15   about.

16          And, look, I'm not going to get into sort of

17   scathing -- I don't think this is some nefarious plot to hide

18   the evidence from you because they talk about it pretty

19   extensively.  I think it's one of these provisions in the rules

20   that probably frequently gets overlooked in terms of how it

21   works.  Fortunately for all of us, you know, it's November.

22   Trial is not until April.  We're going to be able to cure that

23   problem.

24          And I do think -- I mean, look, I don't know what

25   they're going to say.  I don't know what their basis is going

1   to be for their opinions, et cetera.  I mean, if it's just,

2   well, I just know how I was thinking, that's a different

3   position than these are things we were considering at the time,

4   this is what was technically feasible, whatever.  I don't want

5   to wade too deep into that before it actually happens, but

6   there are situations where their opinions may never come in.

7   And if they never come in, then Mr. Chase's opinion may fall as

8   well.

9           But if it does come in, I mean, he's told you he's

10  going to rely on what they said, and if their opinions come in,

11  then I guess I'm not sure why he can't rely on it.  Just like,

12  you know, I mean, just like happens in all these cases, you

13  have your damages expert rely on your technical expert.

14          So that's where I am on that.  And, again, I don't

15  want you guys to sit down and say, well, he ruled.  So, you

16  know, I'll invite your comments on that, and then I'll respond.

17  I'll take them under consideration.

18          Mr. Banner, what is your reaction to all this?

19          MR. BANNER:  I guess my reaction is that, I mean, the

20  concept of curing this problem now.  So what Aptiv should have

21  done was they should have disclosed this expert testimony in

22  advance.  I should have been able to talk to these people, pin

23  them down on what this next best Boston would be, and then

24  Chase would rely on what happened after the fact.

25          It's in reverse now.  So now we have Chase stating

1    what his testimony is and what his opinion is.  Now if we try

2    to fix that after the facts, I mean, I don't think anyone's

3    going to be surprised that they're going to come up with some

4    expert testimony that's 100 percent consistent with what

5    Mr. Chase has already testified to.

6          THE COURT:  I think, though, the problem is with that

7    analysis -- I hear what you're saying.  You're trying to get

8    into a prejudice issue.  I think that's important.  The Third

9    Circuit has been pretty clear that courts should not exclude

10   experts if anything can be cured.  And I wrote an opinion

11   actually on this in a different patent case I think earlier

12   this year.

13          But there's still a bit of a presumption in what you

14   just said to me, Mr. Banner, that these are fact witnesses, so

15   you wouldn't have had a chance to pin them down in advance

16   before Mr. Chase opined because this is expert disclosure.  And

17   so they all could have talked and decided what they were going

18   to say, and then you would have gotten a short disclosure from

19   Mr. Wiener, you know, disclosing these witnesses and a longer

20   report from Mr. Chase.  And then you would have gone and done

21   your expert discovery, and you would have deposed all of them.

22          Could there have been some diversions between them?

23   Maybe.  But one would have gone before the other, and I know

24   from when I sat where you're sitting, you're always worried

25   that if one goes before the other, then the other shaves the

1    testimony to mold to what the first one said, right?

2         So I'm not sure that we're in any real different

3    position now than we would have been then.  I agree with you

4    that this should have happened before, but I'm just not sure

5    that there's so much prejudice that it can't be cured with you

6    taking fulsome depositions of these two and finding out what

7    they have to say.

8         Again, I mean, they've got to have a basis.  It can't

9    be ipse dixit.  There's got to be a basis.

10        Mr. Wiener.

11        MR. WIENER:  The one thing I would say and I wanted

12   to add and clarify is that there were aspects of these

13   witnesses' depositions and the conversation in which they were

14   providing some information to Mr. Chase that was of the factual

15   nature, what the status of the development was at the time and

16   sort of -- I hear you that a portion of this is beyond.

17        THE COURT:  Yeah.  It's sort of indivisible I think.

18   They are saying, look, this is where we were and where we would

19   have gone.  And where we were is, by definition, factual, but

20   it's factual predicate for the rest.  So they may have been

21   deposed on what was going on with Boston 1 before when they

22   were deposed as fact witnesses and all that.  But, you know,

23   Microchip had no reason to ask them the hypothetical questions.

24   And, in fact, if it had, they might have gotten answers, but

25   they would have gotten answers only after some lawyer sitting

1    there had said I object, this is hypothetical, it's premature,

2    and it's a request for expert testimony.

3         So, you know, I think that, yeah, there's some fact

4    pieces to it.  That's fine.  That's one of the reasons and the

5    efficiencies you gain by using them as opposed to an

6    independent expert.  It still seems like expert testimony to

7    me.

8         MR. WIENER:  Correct, Your Honor.  I just wanted to

9    draw the distinction that some of Mr. Chase's criticisms of

10   Dr. Becker have to do with the context that Aptiv was already

11   developing a lower cost alternative to the Microchip chip, and

12   that is all just based on fact testimony.

13        I think where we depart from fact testimony and get

14   to expert testimony from these witnesses, based on what you've

15   said and what I understand, is what would the theoretical

16   redesign have been, what would they have done.

17        We hear you loud and clear on that, but I just wanted

18   to flag that not everything Mr. Chase relies on for Mr. Voto

19   and Mr. Petku fall into that bucket.

20        THE COURT:  Okay.  All right.  I think we're all

21   pretty clear about where we're headed on this.  Let me just

22   shift to the apportionment piece of the motion with respect to

23   Mr. Chase.

24        You know, Mr. Banner, given where this is, where

25   things stand on the record with respect to apportionment, what

1  been informed that I did not cite one of the paragraphs of the

2  Zatkovitch report that Becker relies on with respect to

3  integrations, so I just wanted to point that out.  It's Exhibit

4  J, paragraph 121.

5              THE COURT:  Okay.  Give me a little bit of time.  I

6  don't want to keep you guys too long.  Probably some of you

7  have flights to make as well.  But let me go in the back and

8  just see where I stand.  So we'll take a recess.

9              THE DEPUTY CLERK:  All rise.

10                  (Recess taken from 12:34 p.m. to 1:38 p.m.)

11                  (Proceedings adjourned at 1:38 p.m.)

12

13                              CERTIFICATE

14

15  I certify that the foregoing is a correct transcript from the

16  record of proceedings in the above-entitled matter.

17

18

19  *Shannan Gagliardi*  11/26/21

20  Shannan Gagliardi, RDR, CRR

21

22

23

24

25