IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICROCHIP TECHNOLOGY INCORPORATED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 17-1194-JDW |
| APTIV SERVICES US, LLC, | ) ) ) | |
| Defendant. | ) | |

**PROPOSED FINAL JURY INSTRUCTIONS**

Judge Wolson's procedure on jury instructions: "The Court will generally require the parties to submit a joint proposed set of jury instructions. The Court's pretrial order will detail how the parties should present contested jury instructions. Each point for charge and proposed jury interrogatory shall be numbered and on a separate sheet of paper. Each proposed instruction must be submitted with corresponding legal authority. If a model jury instruction is used, then the party submitting it shall state whether the proposed instruction is unchanged or modified. If a party modifies a model instruction, then additions and deletions must be noted."

From the pretrial order: "the Parties may file proposed jury instructions on substantive issues with an electronic copy e-mailed in Word format to Chambers_of_Judge_Wolson@paed.uscourts.gov with "jury instructions" and the case caption in the subject line. Proposed jury instructions should be submitted as a joint submission, and for any instructions on which the Parties do not agree, plaintiff's proposal shall be in italics and defendant's submission shall be in bold, with citations to the sources of law upon which each proposed instruction is based.

# 1    GENERAL INSTRUCTIONS

## 1.1    INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

***Source:*** **Final Jury Instructions, *GlaxoSmithkline v. Teva*, No. 14-878-LPS-CJB, D.I. 440 (hereinafter, "*Glaxo Final*")**

## 1.2     JURORS' DUTIES

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you will see and hear in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way. You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

***Source: Glaxo Final***

### 1.3    EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition transcript testimony that has been played by video or read to you), the exhibits that I allowed into evidence, and the stipulations to which the lawyers agreed.

Certain charts and graphics have been used to illustrate testimony from witnesses. Unless I have specifically admitted them into evidence, these charts and graphics are not themselves evidence, even if they refer to, identify, or summarize evidence, and you will not have these demonstratives in the jury room

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

*Source: Glaxo Final*

## 1.4    DIRECT AND CIRCUMSTANTIAL EVIDENCE

You may have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

***Source: Glaxo Final***

## 1.5    CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

***Source: Glaxo Final***

### 1.6     STATEMENTS OF COUNSEL

A further word about statements of counsel and arguments of counsel. The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented.

If you remember the evidence differently from the way it was described by the attorneys, you should rely on your own recollection.

***Source: Glaxo Final***

### 1.7   CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there is evidence tending to prove that the witness testified falsely about some important fact or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony he or she gave at the trial in person or by deposition testimony played by video or read to you. You have the right to distrust such witness's testimony and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

***Source: Glaxo Final***

### 1.8     NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

***Source: Glaxo Final***

## 1.9     EXPERT WITNESSES

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

***Source: Glaxo Final***

## 1.10   DEPOSITION TESTIMONY

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition. If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony. You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

Deposition testimony is out of court testimony given under oath and is entitled to the same consideration you would give it had the witnesses personally appeared in court.

***Source: Glaxo Final***

### 1.11    RULE 30(b)(6) DEPOSITION TESTIMONY

In this trial, there were certain witnesses identified as ''Rule 30(b)(6) witnesses'' for the parties. These Rule 30(b)(6) witnesses were designated to speak on certain topics on behalf of the parties which designated them as Rule 30(b)(6) witnesses. These witnesses were Mark Bohm and Mitch Obolsky (designated by Microchip) and Robert Voto, Michael Dreon, Craig Petku, and Shyambabu Yeda (designated by Aptiv). Rule 30(b)(6) witnesses are required to testify about information known or reasonably available to the designating party related to those particular topics. For answers within the designated topics, the witness's testimony is treated as an admission. However, that admission can be corrected, supplemented, and explained.

If these witnesses also provided testimony outside of their designated topics based on their personal knowledge in addition to testifying to factual information on behalf of the designating party, the designating party is not bound by answers that provide personal knowledge that is outside of the designated topics.

*Source: Glaxo Final (customized for this case)*

### 1.12   DEMONSTRATIVE EXHIBITS

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The remainder of the exhibits (including charts, PowerPoint presentations and animations) were offered to help illustrate the testimony of the various witnesses. These illustrative exhibits, called "demonstrative exhibits," have not been admitted, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

In some instances, certain charts and summaries may have been received into evidence to illustrate information brought out in the trial. You may use these charts and summaries as evidence, even though the underlying documents and records are not here. You should give them such weight as you think they deserve.

***Source: Glaxo Final***

### 1.13   BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof."  In a patent case such as this, there are two different burdens of proof that are used.  The first is called "preponderance of the evidence."  The second is called "clear and convincing evidence."

As I noted earlier, Microchip contends that Aptiv infringes the '243 Patent and the '708 Patent. Microchip also contends that it is entitled to damages related to '243 Patent and the '708 Patent. A party asserting patent infringement has the burden of proving infringement by a preponderance of the evidence.  A preponderance of the evidence is evidence that, when considered in light of all of the facts, leads you to believe that what that party claims is more likely true than not.  To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting Microchip's infringement claims must make the scales tip somewhat toward its side.  If the scale should remain equal or tip in favor of Aptiv you must find for Aptiv.

If you decide Aptiv infringed, you will then address the additional issue of whether or not Aptiv's infringement was willful.  Microchip has the burden of proving that Aptiv's infringement was willful by a preponderance of the evidence, meaning it is more likely true than not.

Microchip also has the burden to establish the kind of money damages—lost profits or reasonable royalties—and amount of its money damages by a preponderance of the evidence.  If Microchip persuades you that Aptiv has infringed a valid patent, Microchip is entitled to damages in an amount to compensate Microchip for that infringement.

As I noted earlier, in addition to denying that it has infringed, Aptiv contends that the '243 Patent and the '708 Patent are invalid.  A party challenging the validity of a patent has the burden of proving that the patent is invalid by clear and convincing evidence.  Clear and convincing

evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.

Some of you may have heard the phrase "proof beyond a reasonable doubt."  That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one.  You should therefore not consider it in this case.

*Source: Glaxo Final (customized for this case)*

### 1.14   USE OF NOTES

You may use notes taken during trial to assist your memory. However, as I instructed you at the beginning of the case, you should use caution in consulting your notes. There is generally a tendency I think to attach undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

***Source: Glaxo Final***

## 2      THE PARTIES AND THEIR CONTENTIONS

### 2.1      THE PARTIES

I will now review for you the parties in this action, and the positions of the parties that you will have to consider in reaching your verdict.

As I have previously told you, the plaintiff in this case is Microchip Technology Incorporated. I will refer to plaintiff as "Microchip." The defendant in this case is Aptiv Services US, LLC and was formerly known as Delphi Automotive Systems, LLC. In 2014, Delphi purchased a company called Unwired Technology, LLC which initially developed the USB hub product accused of infringement in this case.   I will refer to defendant as "Aptiv" though some evidence may refer to defendant as "Delphi" or "Unwired."

***Source: Glaxo Final (customized for this case)***

## 2.2    THE PARTIES' CONTENTIONS

There are two patents at issue in this case: United States Patent No. 7,523,243 and United States Patent No. 7,627,708. Because these numbers are so long, patents are usually referred to by their last three digits. You may have heard the lawyers and witnesses in this case refer to Microchip's patents as the '243 Patent or the '708 Patent. A copy of the '243 and '708 Patents have been given to you along with these instructions.

Microchip contends that Aptiv directly infringes the '243 Patent and the '708 Patent and that Aptiv induces and contributes to direct infringement by others. Microchip also contends that it is entitled to damages related to the '243 Patent and the '708 Patent. Aptiv denies that it infringes the '243 Patent or the '708 Patent and contends that the '243 Patent and the '708 Patent are invalid. Aptiv also denies that Microchip is entitled to recover any damages related to the '243 Patent or the '708 Patent.

***Source: Glaxo Prelim (customized for this case)***

### 2.3    SUMMARY OF THE PATENT ISSUES

I will now summarize the patent issues that you must decide and for which I will provide instructions to guide your deliberations. Here are the issues you must decide:

1.      Whether Microchip has proven by a preponderance of the evidence that Aptiv infringed one or more asserted claims of the '243 Patent or of the '708 Patent;

2.      If you decide that Microchip has proven that Aptiv infringed one or more claims of the '243 Patent or of the '708 Patent, whether Microchip has proven by a preponderance of the evidence that infringement was willful;

3.      Whether Aptiv has proven by clear and convincing evidence that one or more of the asserted claims of the '243 Patent or of the '708 Patent are invalid;

4.      If you decide that Microchip has proven that Aptiv infringed a valid claim, you will decide the money damages to be awarded to compensate Microchip for that infringement. Microchip has the burden to establish the amount of its damages by a preponderance of the evidence.

I will provide more detailed instructions on each of the issues you must decide elsewhere in these jury instructions.

***Source: Glaxo Final (customized for this case)***

**3      THE PATENT CLAIMS**

**3.1     PATENT LAWS**

At the beginning of the trial, I gave you some general information about patents and the

patent system and a brief overview of the patent laws relevant to this case. I will now give you

more detailed instruction about the patent laws that specifically relate to this case.

***Source: Glaxo Final***

### 3.2    PATENT CLAIMS GENERALLY

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."

The patent claims are the numbered paragraphs at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers.

The claims are intended to define, in words, the bounds of the invention. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage. [**Plaintiff:** *The figures and text in the rest of the patent do not limit the coverage of the claims, unless I determine that they do. In this case, I have not made such a determination.*][1] [**Defendant: *no text necessary*]**[2] Each of the asserted claims must be considered individually.

Each claim of a patent effectively acts as if it were a separate patent, and each claim may cover either more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.

***Source: Glaxo Final (customized for this case)***

---

[1] Plaintiff's support: *Philips v. AWH Corp.*, 415 F.3d 1303, 1323–24 (Fed. Cir. 2005) (en banc); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); D.I. 114, Claim Construction Order.
[2] Defendant's support: *Glaxo* Final Jury Instructions; D.I. 114, Claim Construction Order.

### 3.3    CONSTRUCTION OF THE CLAIMS

It is the Court's duty under the law to define what the patent claims mean. As I instructed you at the beginning of the case, I have made my determinations, and I will now instruct you on the meaning of the claim terms. You must apply the meaning that I give in each patent claim to decide if the claim is infringed or invalid. You must accept my definitions of these words in the claims as being correct. You must ignore any different definitions used by the witnesses or the attorneys.

You are advised that the following definitions for the following terms must be applied:

| Claim Term | Court's Construction |
|---|---|
| **USB multi-host device**<br><br>[claims 2, 5-7, 10, 16-18, and 23-25 of the '243 Patent; claims 3, 5 and 6 of the '708 Patent] | Preamble is not limiting |
| **respective dedicated USB connection / dedicated USB connection**<br><br>[claims 1, 3, 7, 18, 23, and 24 of the '243 Patent] | A USB connection that is not shared (except that multiple USB connections may alternate, in some manner, communicating across the same shared physical connection) |
| **USB device block**<br><br>[claims 1, 3, 7, 23 and 24 of the '243 Patent; claim 3 of the '708 Patent] | a USB device or segment of a USB device that performs a function to provide a capability to a host over USB |
| **A shared USB device ... that corresponds to at least one function**<br><br>[claim 18 of the '243 Patent] | a USB device that provides the same shared function (or functions) to multiple hosts |

For any words in the claim for which I have not provided you with a definition, you should apply the plain and ordinary meaning to a person of ordinary skill in the art, which I will define shortly.

**_Source: Glaxo Final; D.I. 114, Claim Construction Order_**

### 3.4    INDEPENDENT AND DEPENDENT CLAIMS

There are two different types of claims in the patent. The first type is called an "independent claim." An independent claim does not refer to any other claim of the patent. An independent claim is read separately to determine its scope. In this case, claims 1, 3, 7, 18 and 23 of the '243 Patent and claim 3 of the '708 Patent are independent claims. You know this because they mention no other claims.  Accordingly, the words of each independent claim are read by themselves in order to determine what that covers. Independent claim 23 of the '243 Patent is asserted in this case.

The remaining asserted claims of the patents are dependent claims. A "dependent claim" refers to and depends upon at least one other claim in the patent and thus incorporates all of the requirements of the claims to which it refers. Accordingly, to determine what a dependent claim covers, you must read both the dependent claim and the claim to which it refers. Here, for example, claim 5 of the '708 Patent is a dependent claim. You know this because it refers to independent claim 3. Accordingly, the words of claims 3 and 5 are read together in order to determine what claim 5 of the '708 Patent covers. Similarly, claim 6 of the '708 Patent is a dependent claim because it refers to dependent claim 5, which in turn refers to independent claim 3.  Accordingly, the words of claims 3, 5, and 6 are read together in order to determine what claim 6 of the '708 Patent covers.

***Source: Glaxo Final (customized for this case)***

# 4    INFRINGEMENT

## 4.1    INFRINGEMENT GENERALLY

I will now instruct you how to decide whether Microchip has proven by a preponderance of the evidence that Aptiv infringed the asserted claims of the '243 and '708 Patents. Recall that Microchip must prove infringement by a preponderance of the evidence, *i.e.*, that it is more likely than not that infringement has occurred.

You have heard evidence that both sides own other patents relating to the USB technology at issue. As I stated earlier, there are only two patents at issue in this case: the '243 and '708 Patents. Ownership of a patent is not a defense to patent infringement, nor is ownership of other patents evidence of infringement. Aptiv does not contend that any of its patents have any bearing on whether it infringes the patents at issue in this case. Instead, for purposes of infringement, you must only consider the claims of the '243 and '708 Patents.[3]

*Source: Glaxo Final (customized for this case)*

---

[3] The parties agree that this final paragraph is only to be included if the jury learns of Aptiv's patents at trial (whether through an admitted exhibit, opening/closing statements, witness testimony, or otherwise).

### 4.1.1   DIRECT INFRINGEMENT

Microchip alleges that Aptiv directly infringes the '243 and '708 Patents. In order to prove direct infringement, Microchip must prove by a preponderance of the evidence, i.e., that it is more likely than not, that Aptiv made, used, sold, offered to sell, or imported products covered by at least one asserted claim.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision and I have already instructed you as to the meaning of some terms of the asserted patent claims. The second step is to decide whether Aptiv's dual-role hub is covered by an asserted claim.

To decide whether Aptiv's dual-role hub directly infringes an asserted claim, you must compare that product with an asserted patent claim and determine whether every requirement of the claim is met. If so, Aptiv's dual-role hub directly infringes that claim. If not, then the product does not directly infringe that claim.

You must determine, separately for each asserted claim, whether or not there is infringement. There is one exception to this rule. If you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers to that independent claim. On the other hand, if you find that an independent claim has been infringed, you must still, decide, separately, whether the accused product meets additional requirements of any asserted claims that depend on the independent claim, and thus, whether those dependent claims have also been infringed. A dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

***Source: Glaxo Final (customized for this case)***

### 4.2    INDIRECT INFRINGEMENT – INDUCEMENT

In this case, Aptiv is accused of actively inducing automakers to directly infringe Microchip's patent.  To find that Aptiv actively induced infringement, Microchip must prove by a preponderance of the evidence that (1) a single actor is responsible for direct infringement, namely, all of the components of the Dual-Role Hub accused of infringing the patent, and (2) Aptiv actively induced these acts of infringement by automakers.

To prove active inducement, Microchip must establish that it is more likely than not that:

1.    Aptiv aided, instructed, or otherwise acted with the intent to cause acts by automakers that would constitute direct infringement of the patents;

2.    Aptiv knew of the patents, or showed willful blindness to the existence of the patents, at that time;

3.    Aptiv knew, or showed willful blindness, that the actions of the automakers would infringe at least one asserted claim of the patents; and

4.    automakers infringed at least one asserted patent claim.

To find willful blindness (1) Aptiv must have subjectively believed that there was a high probability that a patent existed covering the accused Dual-Role hubs, and (2) Aptiv must have taken deliberate actions to avoid learning of the patent.

***Source: AIPLA Model Patent Jury Instruction, § 3.8 (2020) (customized for this case)***

28

### 4.3    INDIRECT INFRINGEMENT – CONTRIBUTORY INFRINGEMENT

Microchip asserts that Aptiv has contributed to infringement by another person.

To find contributory infringement, you must find that someone other than Aptiv has directly infringed a claimed invention of the patent.

To establish contributory infringement of either asserted patent, Microchip must prove that it is more likely than not that Aptiv had knowledge of the patent and knowledge of direct infringement of that patent. Microchip must prove that each of the following is more likely than not:

1.    someone other than Aptiv has directly infringed an asserted claim of the '243 Patent or the '708 Patent;

2.    Aptiv sold, offered for sale, or imported within the United States a component of an infringing product;

3.    the component is not a staple article or commodity of commerce capable of substantial non-infringing use;

4.    the component constitutes a material part of the claimed invention; and

5.    Aptiv knew that the component was especially made or adapted for use in an infringing product.

A "staple article or commodity of commerce capable of substantial non-infringing use" is something that has uses other than as a part or component of the patented product, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

Aptiv's knowledge that the component was especially made or adapted for use in an infringing product may be shown with evidence of willful blindness where Aptiv consciously ignored the existence of both the patent and direct infringement of that patent. To find willful blindness (1) Aptiv must have subjectively believed that there was a high probability that a patent

29

existed covering the accused product, and (2) Aptiv must have taken deliberate actions to avoid learning of the patent.

***Source: AIPLA Model Patent Jury Instruction, § 3.8 (2020) (customized for this case).***

### 4.4    WILLFUL INFRINGEMENT

If you have decided that Aptiv directly or indirectly infringed any asserted claim of the '243 Patent or the '708 Patent, you must then address the additional issue of whether or not Aptiv's infringement was willful. To prove willful infringement, Microchip must prove by a preponderance of the evidence that Aptiv had knowledge of the infringed patent(s) (that is, the '243 Patent and/or the '708 Patent) before Microchip filed this lawsuit, and that Aptiv's conduct was reckless, willful, wanton, malicious, committed in bad faith, deliberate, consciously wrongful, or flagrant. To determine whether Aptiv acted willfully, consider all of the facts. These may include, but are not limited to:

(1) Whether or not Aptiv intentionally copied the claimed inventions of the '243 Patent or the '708 Patent;

(2) Whether or not Aptiv reasonably believed it did not infringe or that the patents were invalid at or around the time it first learned of the '243 Patent or the '708 Patent;

(3) Whether or not Aptiv made a good-faith effort to avoid infringing the '243 Patent or the '708 Patent, for example, whether Aptiv attempted to design around either patent; and

(4) Whether or not Aptiv tried to cover up its infringement.

If you do decide that there was willful infringement, that decision should not affect any damage award you give in this case.

***Source: Glaxo Final (customized for this case); adding examples from Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc., 946 F.3d 1367, 1377 (Fed. Cir. 2020) (critiquing Federal Circuit Bar Association's National Patent Jury Instruction No. 4.1).***

# 5    INVALIDITY

## 5.1    INVALIDITY GENERALLY

[**Plaintiff:** *The granting of a patent by the United States Patent and Trademark office carries with it the presumption that the patent is valid. The law presumes that the Patent and Trademark Office acted correctly in issuing the patent. Each of the asserted claims is presumed valid independently of the validity of each other claim. This presumption puts the burden on Aptiv of proving invalidity by clear and convincing evidence on a claim-by-claim basis; that is, you must be left with an abiding conviction that each asserted claim of the '243 and '708 Patents is invalid. This burden may be more difficult to meet when the accused infringer attempts to rely on prior art that has been before the Patent Office during examination of the '243 and/or '708 Patents. Patent invalidity is a defense to patent infringement.*

*Even though the Patent Office allowed the claims of a patent, you have the ultimate responsibility for deciding whether the claims of the patent are proven to be invalid. A patent cannot take away from the right of anyone who wants to use what was already known or used by others, or what would have been obvious to those of skill in the art at the time the invention was made. For a patent to be valid, the specification of the patent must also contain a sufficient written description of the claimed invention and enable a person of ordinary skill in the art to make and use the claimed invention. The specification, however, is not required to describe or enable the accused product and is not required to describe every conceivable or possible future embodiment of the invention.*

*Aptiv alleges that the claims 6, 10, and 22-25 of the '243 and claim 6 of the '708 Patents are invalid because:*

1.    *[Aptiv to insert grounds of invalidity after narrowing]*

32

*I will now instruct you in more detail regarding Aptiv's invalidity defense.*][4]

[**Defendant: The granting of a patent by the United States Patent and Trademark office carries with it the presumption that the patent is valid. The law presumes that the Patent and Trademark Office acted correctly in issuing the patent. Each of the asserted claims is presumed valid independently of the validity of each other claim. This presumption puts the burden on Aptiv of proving invalidity by clear and convincing evidence on a claim-by-claim basis; that is, you must be left with an abiding conviction that each asserted claim of the '243 and '708 Patents is invalid. This burden may be more difficult to meet when the accused infringer attempts to rely on prior art that was before the patent examiner during examination of the '243 and/or '708 Patents. Patent invalidity is a defense to patent infringement.**

**Even though the patent examiner allowed the claims of a patent, you have the ultimate responsibility for deciding whether the claims of the patent are proven to be invalid. A patent cannot take away from the right of anyone who wants to use what was already known or used by others, or what would have been obvious to those of skill in the art at the time the invention was made. For a patent to be valid, the subject matter claimed in the individual claims of the patent must be new and non-obvious and the specification of the patent must**

---

[4] Plaintiff's support: Glaxo Final (customized for this case); D.I. 245, Memo. Op., 8; D.I. 246, Order; D.I. 247, Memo. Op., 13; *Pac. Biosciences of California, Inc. v. Oxford Nanopore Techs., Inc.*, C.A. No. 17-1353-LPS-CJB, 2020 WL 954938, at *2 (D. Del. Feb. 27, 2020); *Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284-LPS, 2019 WL 77046, at *1 (D. Del. Jan. 2, 2019); *Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, CA. No. 15-819-LPS-CJB, 2018 WL 2186677, at *1 (D. Del. May 11, 2018); *D&M Holdings Inc. v. Sonos, Inc.*, C.A. No. 16-141-RGA, 2018 WL 1033358, at *12 (D. Del. Feb. 22, 2018); *ART+COM Innovationpool GmbH v. Google Inc.*, C.A. No. 1:14-217-TBD, 2016 WL 11531119, at *2 (D. Del. May 16, 2016); *Interdigital Communications Inc. v. Nokia Corp.*, C.A. No. 13-10-RGA, 2014 WL 8104167, at *1 (D. Del. Sept. 19, 2014).

also contain a sufficient written description of the claimed invention and enable a person of ordinary skill in the art to make and use the full scope of the claimed invention.

The '243 and '708 Patents were subject to proceedings before the Patent Trial and Appeal Board. As a result of those proceedings, the Patent Trial and Appeal Board invalidated claims 1, 3, 5, 7, 8, and 18 of the '243 Patent and claims 3 and 5 of the '708 Patent because it found Dickens taught every limitation in each of those claims. Asserted claim 6 of the '243 Patent depends from invalidated claims 3 and 5. Asserted claim 10 of the '243 Patent depends from invalidated claims 7 and 8. Asserted claim 22 of the '243 Patent depends from invalidated claim 18. Asserted claim 6 of the '708 Patent depends from invalidated claims 3 and 5. The Patent Trial and Appeal Board found that Dickens did not teach the additional limitations in claims 6, 10, and 22 of the '243 Patent and claim 6 of the '708 Patent. During these proceedings, the Patent Trial and Appeal Board could only consider written prior art such as patents and publications, but could not consider product or system prior art.

Aptiv alleges that the claims 6, 10, and 22-25 of the '243 and claim 6 of the '708 Patents are invalid because:

1.   [Aptiv to insert grounds of invalidity after narrowing]

I will now instruct you in more detail regarding Aptiv's invalidity defense.][5]

---

[5] *Glaxo Final* (customized for this case); D.I. 245, Memo. Op., 8; D.I. 247, Memo. Op., 13: *XY v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018); *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013); 35 U.S.C. § 315(b); D.I. 245, Memo. Op., 7-8.

## 5.2     LEVEL OF ORDINARY SKILL

Patent invalidity defenses are evaluated from the perspective of a hypothetical "person of ordinary skill in the art." The hypothetical person of ordinary skill in the art is presumed to be aware of all the prior art at the time of the invention. You are to determine the level of ordinary skill in the art to which the claimed invention pertains at the time the claimed invention was made. In deciding what the level of ordinary skill in the relevant field is, you should consider all the evidence introduced at trial, including but not limited to: the levels of education and experience of other persons actively working in the field at the time of the invention (April 2006).

*Source: Glaxo Final*

### 5.3     ANTICIPATION

In order for someone to be entitled to a patent, the invention must actually be new.   In general, inventions are new when the identical invention as claimed has not been used or disclosed before.  If the claim is not new, we say that it was "anticipated" by prior art.  Prior art is the general body of knowledge in the public domain, such as articles or other patents before the claim was made.  A claim that is "anticipated" by the prior art is not entitled to patent protection.

Anticipation must be proved on a claim-by-claim basis.  In this case, Aptiv alleges that the asserted claims of the '243 and '708 Patents are anticipated by:

1.      the US-98 product alone, or

2.      the Belkin product alone.

Aptiv must convince you of this by clear and convincing evidence, i.e., that the evidence leaves you with an abiding conviction that it is highly probable that the claims are invalid. To anticipate a claim, each and every element in the claim must be present in a single prior art product and arranged or combined in the same way as recited in the claim. You may not combine two or more items of prior art to find anticipation. To determine whether each and every element in the claim is present in a prior art product, you should decide what a person of ordinary skill in the art would have understood to be present in that product.

You should consider not only what is expressly present in a prior art product, but also what is inherently present in that product.  A prior art product anticipates a patent claim if the element or feature missing from that product would necessarily and inevitably result from what is present in that product.

A party asserting anticipation must prove by clear and convincing evidence that the allegedly inherent element was necessarily and inevitably present in that reference.  The fact that it was likely present is not sufficient.  It is not required, however, that a person of ordinary skill

actually recognized or appreciated the inherent disclosure at the time the prior art product was first known or used.  Evidence outside of the prior art reference itself may be used to show that elements that are not expressly disclosed in the reference are inherent in it.

*Source: Glaxo Final (customized for this case); Bio-Rad Labs. v. 10X Genomics, Inc., 15-cv-152-RGA (D. Del.) Final Jury Instructions.*

### 5.4    OBVIOUSNESS—GENERALLY

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made.

Aptiv contends that the asserted claims of the '243 and '708 Patents are invalid for obviousness. Aptiv bears the burden of proving obviousness by clear and convincing evidence. To establish that a patent claim is invalid for obviousness, Aptiv must show, by clear and convincing evidence, that the claimed invention would have been obvious to a person having ordinary skill in the art at the time the invention was made. In determining whether the claimed invention was obvious, you must consider each claim separately. You should not use hindsight, such as by using the '243 and '708 Patents as a roadmap to select from the prior art and retrace the path of the inventors. In other words, you should only consider what was known prior to the invention date, without the benefit of the later '243 and '708 Patents and what those patents teach.

In order to be patentable, an invention must not have been obvious to a person of ordinary skill in the art at the time the invention was made. The issue is not whether the claimed invention would be obvious today to you, as a layperson, to me as a judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the art at the time it was made. The existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art.

You must put yourself in the place of a person of ordinary skill in the art at the time of invention. In addition, you may consider whether there was a reason to combine or modify the prior art references in the fashion claimed by the patent at issue. To find that the prior art rendered a claimed invention obvious, you must find that a person having ordinary skill in the art would have had a reasonable expectation of successfully combining or modifying a prior art product with

one or more patents or publications. [**Plaintiff:** *You may <u>not</u> find any claim invalid as obvious based solely on the teachings of prior art patents or publications, but instead must base your decision on a specified combination of prior art that includes a prior art physical device.*][6] [**Defendant: You must base your decision on prior art that includes a prior art physical device. To show obviousness, the law does not require that the prior art provide proof, to an absolute certainty, that the claimed result would work.**][7] In the context of obviousness, only a reasonable expectation of success is required, not conclusive proof or absolute predictability.

In determining obviousness or non-obviousness of the subject matter of each of the asserted claims, you should take the following steps:

1. Determine the scope and content of the prior art;

2. Identify the differences, if any, between each asserted claim and the prior art;

3. Determine the level of ordinary skill in the pertinent art at the time the invention of the patent was made; and

4. Consider objective factors of non-obviousness.

Against this background, you will then decide whether the subject matter of each asserted claim would have been obvious or nonobvious to a person of ordinary skill in the pertinent art.

***Source: Glaxo Final (customized for this case)***

---

[6] Plaintiff's support: D.I. 245, Memo. Op., 8; D.I. 246, Order; D.I. 247, Memo. Op., 13.
[7] Defendant's support: *Glaxo* Final Jury Instructions; D.I. 245, Memo. Op., 8; D.I. 246, Order; D.I. 247, Memo. Op., 13.

### 5.4.1   SCOPE AND CONTENT OF THE PRIOR ART

As I just instructed you, in deciding whether or not the claimed invention is obvious to one of ordinary skill in the art, you must first determine the scope and content of the prior art. This means that you must determine what prior art is reasonably pertinent to the particular problem with which the inventor was faced.  Prior art is reasonably pertinent if it is in the same field as the claimed invention or is from another field that a person of ordinary skill would look to in trying to solve the problem the named inventor was trying to solve.

**Source: Glaxo Final (customized for this case)**

### 5.4.2   DIFFERENCES BETWEEN THE CLAIMED INVENTION AND PRIOR ART

You should analyze whether there are any relevant differences between the prior art taken as a whole and the asserted claims of the '243 and '708 Patents from the view of a person of ordinary skill in the art as of April 14, 2006. Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the invention as a whole, and not merely some portion of it. Keep in mind that a claim is not proved obvious merely by demonstrating that each of the elements existed in the prior art. Most, if not all, inventions rely on building blocks of prior art. Therefore, you should consider the prior art as a whole and determine whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does.

The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of the problem to be solved, market demand, or common sense. You may also consider whether the problem or need was known, the possible approaches to solving the problem or addressing the need were known and finite, and whether the solution was predictable through use of a known option. Accordingly, you may evaluate whether there was some teaching, suggestion, or motivation to arrive at the claimed invention before the time of the claimed invention although proof of this is not a requirement to prove obviousness. Teachings, suggestions, and motivations may be found in written references including the prior art itself. However, teachings, suggestions, and motivations may also be found within the knowledge of a person with ordinary skill in the art including inferences and creative steps that a person of ordinary skill in the art would employ. Additionally, teachings, suggestions, and motivations may be found in the nature of the problem solved by the claimed invention, or any need or problem known in the field of the invention at the time of and addressed by the invention.

41

In analyzing the relevance of the differences between a claimed invention and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the claimed invention. On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

**Source: Glaxo Final (customized for this case)**

### 5.4.3   LEVEL OF ORDINARY SKILL

I have already given you instructions about how to determine the level of ordinary skill at Instruction 5.2.

***Source: Glaxo Final***

### 5.4.4   OBJECTIVE EVIDENCE OF NONOBVIOUSNESS

You must also take into account any objective evidence (sometimes called "objective indicia" or "secondary considerations") that may shed light on whether the claims were obvious. "Objective indicia" or "secondary considerations" must be considered before a conclusion on obviousness is reached. "Objective indicia" or "secondary considerations" can include:

(A) Whether the invention was commercially successful at least in part as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure, advertising, or similar activities);

(B) Whether the invention satisfied a long-felt need;

(C) Whether others copied the invention;

(D) Whether the invention achieved unexpected results compared to the closest prior art; evidence of unexpected results may be used to rebut a case of obviousness even if that evidence was obtained after the patent's filing or issue date; there is no requirement that an invention's properties and advantages were fully known before the patent application was filed or that the patent application contains all of the work done in studying the invention;

(E) Whether others tried and failed to make the invention;

(F) Whether others in the field praised the invention;

(G) Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

(H) Whether the inventor proceeded contrary to accepted wisdom in the field; and

(I) Whether others invented the invention at roughly the same time.

Microchip has the burden to show evidence of "objective indicia" or "secondary considerations" and to show that there is a connection, sometimes called a "nexus," between the evidence showing any of these factors and the claimed invention, if this evidence is to be given

weight by you in arriving at your conclusion on the obviousness issue. However, Aptiv always maintains the ultimate burden to show obviousness by clear and convincing evidence, taking into account any objective indicia that you may find.

*Source: Glaxo Final (customized for this case)*

### 5.5    WRITTEN DESCRIPTION

[**Plaintiff:** *Aptiv contends that the asserted claims of the '708 and '243 Patents are invalid for failure to satisfy the written description requirement. Aptiv bears the burden of establishing lack of written description by clear and convincing evidence.*

*A patent must contain a written description of the product and method claimed in the patent. The written description requirement helps ensure that the patent applicant actually invented the claimed subject matter. To satisfy the written description requirement, the patent specification must describe each and every limitation of a patent claim, in sufficient detail, although the exact words found in the claim need not be used. When determining whether the specification discloses the invention, the claim must be viewed as a whole.*

*The written description requirement is satisfied if persons of ordinary skill in the field of the invention would recognize, from reading the patent specification, that the inventor possessed the subject matter finally claimed in the patent. The written description requirement is satisfied if the specification shows that the inventor possessed his or her invention as of the effective filing date of the claimed invention, even though the claims themselves may have been changed or new claims added since that time.*

*It is unnecessary to spell out every detail of the invention in the specification, and specific examples are not required; only enough must be included in the specification to convince persons of ordinary skill in the art that the inventor possessed the full scope of the invention. In evaluating whether the specification has provided an adequate written description, you may consider such factors as:*

*1. the nature and scope of the patent claims;*

*2. the complexity, predictability, and maturity of the technology at issue;*

*3. the existing knowledge in the relevant field; and*

46

*4. the scope and content of the prior art.*

*The issue of written description is decided on a claim-by-claim basis, not as to the entire patent or groups of claims.*][8]


**[Defendant: The patent law contains certain requirements for the part of the patent called the specification. The written description requirement is designed to ensure that the inventor was in possession of the full scope of claimed invention as of the patent's effective filing date. Aptiv contends that asserted claims of the '708 and '243 Patents  are invalid because the specification of the patent do not contain an adequate written description of the invention. To succeed, Aptiv must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of the effective filing date of April 14, 2006 would not have recognized that it describes the full scope of the invention as it is finally claimed in the asserted claims of the '708 and '243 Patents. If a patent claim lacks adequate written description, it is invalid.**

**In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent as of the effective filing date. The specification must describe the full scope of the claimed invention, including each element thereof, either expressly or inherently. A claimed element is disclosed inherently if a person having ordinary skill in the field as of the effective filing date would have understood that the element is necessarily present in what the specification discloses. It is not sufficient that the specification discloses only enough to make the claimed invention obvious to the person having ordinary skill.**

---

[8] Plaintiff's support: AIPLA Model Patent Jury Instruction 9.

The written description does not have to be in the exact words of the claim. The requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent specification. Adequate written description does not require either examples or an actual reduction to practice of the claimed invention. However, a mere wish or plan for obtaining the claimed invention is not adequate written description. Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter.][9]

---

[9] Defendant's support: Federal Circuit Bar Association Model Patent Jury Instruction 4.2a.

### 5.6    ENABLEMENT

[**Plaintiff:** *Aptiv contends that the asserted claims of the '708 and '243 Patents are invalid because the patents do not disclose sufficient information to enable one skilled in the field of the invention, at the time the application was filed, to make and use the full scope of the claimed invention. This requirement is known as the enablement requirement, and it is designed to prevent both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented. The purpose of this requirement is to ensure that the public, in exchange for the patent rights given to the inventor, obtains from the inventor a sufficient disclosure of how to carry out the claimed invention. If a patent claim is not enabled, it is invalid. Each claim must be analyzed for compliance with the enablement requirement.*

*In considering whether a patent claim satisfies the enablement requirement, you must keep in mind that patents are written for persons of skill in the field of the invention. Thus, a patent need not expressly state information that skilled persons would be likely to know or could obtain. Aptiv bears the burden of establishing lack of enablement by showing by clear and convincing evidence that a person skilled in the art, upon reading the patent document, would not be able to make the full scope of the claimed invention work without undue experimentation. The fact that some experimentation may be required for a skilled person to make or use the full scope of the claimed invention does not mean that a patent's written description fails to meet the enablement requirement. Factors you may consider in determining whether making the full scope of the claimed invention would require undue experimentation include:*

*1. the quantity of experimentation necessary;*

*2. the amount of direction or guidance disclosed in the patent;*

*3. the presence or absence of working examples in the patent;*

*4. the nature of the invention;*

*5. the state of the prior art;*

*6. the relative skill of those in the art;*

*7. the predictability of the art; and*

*8. the breadth of the claims.*

*If you find that one or more of these claims did not comply with the enablement requirement, you must find each such claim invalid.*][10]

[**Defendant: Aptiv contends that the asserted claims of the '708 and '243 Patents are invalid because the specification does not contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention and that, therefore, the asserted claims are invalid. To be sufficiently full and clear, the description must contain enough information to have allowed a person having ordinary skill in the art to make and use the full scope of the claimed invention at the time of the priority date of the patent claim, which in this case is April 14, 2006. This is known as the "enablement" requirement. If a patent claim is not enabled, it is invalid.**

**In order to be enabling, the patent must permit persons having ordinary skill in the art to make and use the full scope of the claimed invention without having to conduct undue experimentation. However, some amount of experimentation to make and use the invention is allowable. A patent specification need not include the information already known to and available to one or ordinary skill in the art.**

---

[10] Plaintiff's support: *Bio-Rad Labs. v. 10X Genomics, Inc.*, 15-cv-152-RGA (D. Del.) Final Jury Instructions

In deciding whether a person having ordinary skill would have to experiment unduly in order to make and use the invention, you may consider several factors:

(1) The time and cost of any necessary experimentation;

(2) How routine any necessary experimentation is in the field of USB controllers;

(3) Whether the patent discloses specific working examples of the claimed invention;

(4) The amount of guidance presented in the patent;

(5) The nature and predictability of the field of USB controllers;

(6) The level of ordinary skill in the field of USB controllers;

(7) The scope of the claimed invention; and

(8) The state of the prior art.

No one or more of these factors is alone dispositive. Rather, you must make your decision whether or not the degree of experimentation required is undue based upon all of the evidence presented to you. You should weigh these factors and determine whether or not, in the context of this invention and the state of the art at the time of the priority date (April 14, 2006), a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.][11]

---

[11] Defendant's support: *Amgen Inc., et al. v. Sanofi et al.*, 1:14-cv-01317-RGA (D. Del.) Final Jury Instructions.

# 6     PATENT DAMAGES

## 6.1     DAMAGES INTRODUCTION

If you find that Aptiv infringed of any valid claim of the '243 and '708 Patents, you must then consider what amount of damages to award to Microchip. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case on any issue. If you find that each of the asserted claims is either invalid or not infringed then you need not address damages in your deliberations.

The damages you award must be adequate to compensate Microchip for the infringement. Damages are not meant to punish an infringer. Your damages award, if you reach this issue, should put Microchip in approximately the same financial position that it would have been in had the infringement not occurred.

Microchip has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that Microchip establishes that it more likely than not suffered. Microchip need not prove the amount of damages with mathematical precision. You may not award damages that are speculative, damages that are possible but not probable, or damages that are based on guesswork.

There are two different types of damages that Microchip may be entitled to recover. The first is lost profits. The second is a reasonable royalty. Lost profits consist of any actual reduction in business profits Microchip suffered as a result of Aptiv's infringement, while a reasonable royalty is defined as the money amount Microchip and Aptiv would have hypothetically agreed upon as a fee for Aptiv's use of the invention in March 2014. Only one type of damages may be awarded for each infringing unit that Aptiv sold. In this case, Microchip seeks lost profits for Aptiv sales from the second quarter of 2017 to the present. Microchip seeks a reasonable royalty

for all infringing units that you find do not qualify for lost profits damages, including Aptiv's sales prior to the second quarter of 2017.  Aptiv contends it does not infringe any valid claim of the '243 Patent or the '708 Patent and therefore does not owe any damages.  However, if you find that Aptiv has infringed any valid asserted claim of the '243 or '708 patent, it contends a reasonable royalty is the proper measure of damages.

I will now give you more detailed instructions regarding damages, including lost profits and reasonable royalties.

**Source: Glaxo Final (customized for this case)**

### 6.2    DATE DAMAGES BEGIN

Microchip may recover damages starting in the second quarter of 2015, when Aptiv began selling its dual role hub.

***Source: Glaxo Final (customized for this case)***

### 6.3    LOST PROFITS

Microchip is seeking lost profits damages beginning in July 2017. To prove lost profits, Microchip must show a causal relationship between Aptiv's infringement and Microchip's loss of profit. Microchip must show that, but for Aptiv' s infringement, Microchip would have made additional profits through the sale of all or a portion of the sales of dual-role hubs made by Aptiv. Microchip is only seeking lost profits for sales beginning in July 2017, shortly after Microchip began selling the Sandia chip.  Microchip must prove its entitlement to and amount of lost profits by a preponderance of the evidence. Part of your job is to determine what the customers who purchased dual role hubs from Aptiv would have done if the alleged infringement had not occurred. It is important to remember that the profits I have been referring to are the profits allegedly lost by Microchip, not the profits, if any, made by Aptiv on the allegedly infringing sales.

***Source: Glaxo Final (customized for this case)***

### 6.3.1   LOST PROFITS-THE PANDUIT FACTORS

Microchip has proven its entitlement to and amount of, lost profits if you find that, with respect to sales of Aptiv's dual role hub, Microchip has proven each of the following factors by the more likely than not standard:

(1) There was a demand for the patented invention;

(2) The absence of acceptable non-infringing substitutes;

(3) That Microchip itself (or through entities with which it partners) had the manufacturing and marketing ability to make the sales for which Microchip seeks an award of lost profits, in other words, that Microchip was capable of satisfying the demand; and

[**Plaintiff:** *(4) The amount of profit that Microchip Technology Incorporated itself would have made if Aptiv had never sold the accused dual-role hub.*

*If you find that Microchip has satisfied each of the four factors above by a preponderance of the evidence, the burden then shifts to Aptiv to show that Microchip's lost profits claim is unreasonable for some or all of the lost sales.*][12]

[**Defendant: (4) The amount of profit that Microchip Technology Incorporated itself (as opposed to other entities, including related entities) would have made if Aptiv had not infringed the '243 and '708 Patents.**][13]

 I will now explain each of these factors.

---

[12] Plaintiff's support: Glaxo Final (customized for this case); AIPLA Model Jury Instruction 10.2.1.2; *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008); *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2005); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc).

[13] Defendant's support: *Glaxo* Final (customized for this case); AIPLA Model Jury Instruction 10.2.1.2; *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008); *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2005).

*Source: Glaxo Final (customized for this case); AIPLA Model Jury Instruction 10.2.1.2;*

*Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008); *Poly-America, L.P. v.*

*GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2005); *Rite-Hite Corp. v. Kelley Co.,*

*Inc.*, **56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc).**

### 6.3.2   LOST PROFITS-DEMAND

The first factor asks whether there was demand for the patented product in the relevant market. Microchip can prove demand for the patented invention by showing significant sales of Microchip's Sandia product or significant sales of Aptiv's infringing dual-role hub.

*Source: Glaxo Final (customized for this case)*

### 6.3.3   LOST PROFITS-ACCEPTABLE NON-INFRINGING SUBSTITUTES

The second factor asks whether there were non-infringing, acceptable substitutes for the patented products in the marketplace and the impact of such substitute products on the marketplace absent the sale of Aptiv's dual-role hub. If the realities of the marketplace are that competitors other than Microchip would likely have captured some or all of the sales made by Aptiv, even despite a difference in the products, then Microchip is only entitled to lost profits on those sales that it would have captured, not those sales that would have been captured by others.

To be an acceptable substitute, the products must have had one or more of the advantages of the patented invention that were important to the actual buyers of the infringing products, not the public in general. The use of the acceptable substitutes also must not infringe the patent. The acceptable substitutes, in addition, must have been available for Aptiv to purchase during the damages period. [**Plaintiff:** *no text necessary*][14] [**Defendant: An acceptable non-infringing substitute is available if, during the damages period, a competitor or Aptiv had all the necessary equipment, materials, know-how, and experience to design and manufacture the acceptable non-infringing substitute. The substitute need not have actually been sold at that time.**][15] If you determine that some of Aptiv's customers would just as likely have purchased a non-infringing acceptable product, then Microchip has not shown it lost those sales but for Aptiv's sales.

*Source: Glaxo Final (customized for this case)*

---

[14] Plaintiff's support: *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1353–54 (Fed. Cir. 1999); D.I. 311, Order.
[15] Defendant's support: *Glaxo* Final Jury Instructions; *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1350–54 (Fed. Cir. 1999).

### 6.3.4   LOST PROFITS-CAPACITY

The third factor asks whether Microchip, by itself (or through entities with which it partners) had the manufacturing and marketing ability to actually make the sales it allegedly lost due to Aptiv's infringement. Microchip must prove that it could have supplied the Sandia chips needed to make the sales Microchip said it lost. Microchip must also prove that it is more likely than not it had the ability to market and sell the additional Sandia chips.

*Source: Glaxo Final (customized for this case)*

### 6.3.5   LOST PROFITS-AMOUNT OF PROFIT

Microchip may calculate the amount of its lost profits by calculating its lost sales starting in July 2017 and subtracting from that amount any additional costs or expenses that Microchip would have had to pay to make the lost sales. The amount of lost profits cannot be speculative, but it need not be proven with unerring certainty.

***Source: AIPLA Model Patent Jury Instruction 10.2.1.7 (customized for this case)***

### 6.4    REASONABLE ROYALTY

### 6.4.1    REASONABLE ROYALTY GENERALLY

A reasonable royalty is the royalty that would have resulted from a hypothetical negotiation between the patent owner and the alleged infringer just before the infringement began. The parties in this case agree the hypothetical negotiation date is March 2014. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been if they had entered into an agreement at that time, and if they had acted reasonably in the negotiations. You should assume that both parties to the hypothetical negotiation believed the patent to be valid and infringed and that both parties are willing to enter into a license. You should also assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement.

Having that in mind, you may consider any relevant fact in determining the reasonable royalty for the use of a patented invention, including the opinion testimony of experts. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

A reasonable royalty is typically made up of (1) a base and (2) a rate that is applied to that base. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.

[**Plaintiff:** *Post-negotiation information is relevant if it helps determine the true value of a patent. Such information is at its most relevant when the infringer experienced a windfall as a result of its misconduct. Comparatively, post-negotiation information is less relevant when it is being presented by the infringer to emphasize the lack of damages caused by its own infringement.*

*Post-infringement information may be considered to ensure that the patentee will be adequately compensated for infringement.*][16] [**Defendant: \*no text necessary\***][17]

      ***Source: Glaxo Final (customized for this case)***

---

[16] Plaintiff's support: *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 699 (1933); *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004); *On Track Innovations Ltd. V. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 410 (S.D.N.Y. 2015); *Honeywell Intern., Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465 (D. Del. 2005); *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F.Supp.2d 182, 190 (S.D.N.Y. 2002).

[17] Defendant's support: *Glaxo* Final Jury Instructions; AIPLA Model Patent Jury Instruction 10.2.5.2.

### 6.4.2   REASONABLE ROYALTY FACTORS

In determining the reasonable royalty, you should consider all the facts known or available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

1) The royalties received by Microchip for the licensing of the '243 and '708 Patents, proving or tending to prove an established royalty.

2) The rates paid by Aptiv for the use of other patents comparable to the '243 and '708 Patents.

3) The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4) Microchip's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

5) The commercial relationship between Microchip and Aptiv at the time of the hypothetical negotiation, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6) The effect of selling the patented product in promoting sales of other products of Aptiv; the existing value of the invention to Microchip as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

7) The remaining life of the '243 and '708 Patents and the term of the license.

8) The commercial success, current popularity, and established profitability of the product made under the '243 and '708 Patents.

9) The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

10) The nature of the patented invention and the benefits to those who have used the invention.

11) The extent to which Aptiv has made use of the invention; and any evidence probative of the value of that use.

12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13) The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks or significant features or improvements added by Aptiv.

14) The opinion testimony of qualified experts.

15) The amount that a licensor (such as Microchip) and a licensee (such as Aptiv) would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular product embodying the patented invention would have been willing pay as a royalty and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty Aptiv would have been willing to pay and Microchip would have been willing to accept, acting as normally prudent business people.

*Source:* **Final Jury Instructions,** *Idenix Pharm. LLC et al. v. Gilead Sciences, Inc.*, **Case No. 14-846-LPS, D.I. 516 (D. Del.) (***customized for this case***)**

### 6.4.3   REASONABLE ROYALTY – TIMING

The relevant date for the hypothetical reasonable royalty negotiation is at the time infringement began.

**Source: Final Jury Instructions, *Idenix Pharm. LLC et al. v. Gilead Sciences, Inc.*, Case No. 14-846-LPS, D.I. 516 (D. Del.) (*customized for this case*)**

### 6.4.4   REASONABLE ROYALTY – APPORTIONMENT

The amount you find as damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing or advertising, or Aptiv's size or market position. A royalty compensating the patent holder for damages must reflect the value attributable to the infringing features of the product, and no more. The process of separating the value of the patented invention from the value of all other features is called apportionment. When the accused infringing products have both patented and unpatented features, your award must be apportioned so that it is based only on the value patented invention contributed to the accused product and no more.

***Source:  Federal Circuit Bar Association Model Patent Jury Instruction 5.12***

# 7    DELIBERATION AND VERDICT

## 7.1    INTRODUCTION

I have concluded the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. l may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes during deliberations, including me. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished deliberating.

***Source:  Glaxo Final (customized for this case)***

## 7.2     UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review it with you in a moment. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom and my deputy will read aloud your verdict.

It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

***Source:  Glaxo Final***

### 7.3    DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that—your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds. Listen carefully to what the other jurors have to say, and then decide for yourself.

***Source:  Glaxo Final***

**7.4     SOCIAL MEDIA**

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, iPhone, Android phone, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, LinkedIn, YouTube, Instagram, Snapchat or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

*Source:  Glaxo Final*

### 7.5    COURT HAS NO OPINION

Let me finish by repeating something I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

***Source:  Glaxo Final***