EXHIBIT 1

Trials@uspto.gov
571-272-7822

Paper No. 59
Entered: August 28, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

DELPHI TECHNOLOGIES, LLC[1],
Petitioner,

v.

MICROCHIP TECHNOLOGY INC.,
Patent Owner.
————————

Case IPR2017-00864
Patent 7,523,243 B2
————————

Before BRIAN J. McNAMARA, DANIEL N. FISHMAN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

FISHMAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*
*and*
DECISION DENYING PATENT OWNER'S MOTION TO EXCLUDE
*37 C.F.R. § 42.64*

---

[1] Petitioner filed a notice of its name change from "Delphi Technologies, Inc." to "Delphi Technologies, LLC." Paper 49, 1–2.

IPR2017-00864
Patent 7,523,243 B2

# I.   INTRODUCTION

Delphi Technologies, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–25 (hereinafter the "challenged claims") of U.S. Patent No. 7,523,243 B2 (Ex. 1001, "the '243 patent") pursuant to 35 U.S.C. §§ 311–319.  Microchip Technology Inc. ("Patent Owner") filed a Patent Owner Preliminary Response (Paper 11, "Prelim. Resp.").  On August 29, 2017, based on the record before us at that time, we instituted an *inter partes* review of *only* claims 1–8, 11, 15–20, and 22–25.  Paper 12 ("Decision" or "Dec."), 2, 43.

Patent Owner filed a Patent Owner Response[2] (Paper 21, "Response" or "PO Resp.") and Petitioner filed a Reply (Paper 25, "Reply").  The Petition relies on Declarations of John Garney (Exs. 1023, 1053) and Patent Owner relies on a Declaration of Geert Knapen (Ex. 2007).

In accordance with our authorizing order (Paper 27), Patent Owner filed a Sur-Reply addressing various claim construction issues (Paper 28, "PO Sur-Reply") and Petitioner filed a Sur-Sur-Reply responsive to Patent Owner's claim constructions (Paper 29, "Pet. Sur-Sur-Reply")

Responsive to the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018), we issued an Order modifying our Decision to institute review of all claims and all grounds.  Paper 33 ("*SAS* Order").  We authorized additional briefing to address issues relating to claims and grounds that were denied initially in our Decision on Institution.  Paper 36.  Petitioner filed an authorized Supplemental Reply (Paper 38, "Supp.

---

[2] Patent Owner improperly attempts to incorporate by reference portions of its Preliminary Response into its Response.  PO Resp. 17 n.5; *see also* 37 C.F.R. § 42.6(a)(3).  We disregard the improperly incorporated material.

IPR2017-00864
Patent 7,523,243 B2

Reply"), Patent Owner filed an authorized Supplemental Response (Paper 41, "Supp. Resp."), and Petitioner filed an authorized Sur-Reply (Paper 42).

Oral Argument was conducted on June 14, 2018, and a transcript of that hearing is of record. Paper 53 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. The Petitioner has the burden of proving unpatentability by a preponderance of the evidence. *See* 35 U.S.C. § 316(e); *see also* 37 C.F.R. § 42.1(d). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons expressed below, we conclude that Petitioner has shown by a preponderance of the evidence that claims 1, 3–5, 7–9, 11–15, and 18–21 are unpatentable. Petitioner has not persuaded us by a preponderance of the evidence that claims 2, 6, 10, 16, 17, and 22–25 are unpatentable.

## A.   *Real Parties in Interest and Related Matters*

The Petition identifies Delphi Technologies, Inc. and Delphi Automotive Systems, LLC as real parties in interest. Pet. 1. Petitioner filed a notice indicating that Delphi Technologies, Inc. had changed its name to Delphi Technologies, LLC and indicating that Delphi Automotive Systems, LLC had changed its name to Aptiv Services US, LLC. Paper 49, 1–2. Both Petitioner and Patent Owner identify a related litigation matter captioned *Microchip Technology Inc. v. Delphi Automotive Systems, LLC.*, Case No. 2:16-cv-02817-DJH, filed in the U.S. District Court for the District of Arizona. Pet. 2; Paper 9, 1. Petitioner also identifies another related litigation captioned *Microchip Technology Inc. v. Delphi Automotive Systems, LLC.*, Case No. 1:17-cv-01194-LPS, filed in the U.S. District Court

IPR2017-00864
Patent 7,523,243 B2

for the District of Delaware.  Paper 14, 1.  Petitioner also identifies a related petition for *Inter Partes* Review as IPR2017-00970.  Paper 3, 1.

### B.   The '243 Patent

According to the '243 patent, the Universal Serial Bus ("USB") allows coupling of a variety of peripheral devices to a computer system.  Ex. 1001, 1:19–21.  To satisfy consumers' desire to share peripheral devices, such as printers, scanners, etc., prior solutions provided switching devices that allow a peripheral device to be switchably shared among multiple USB host computer systems.  *Id.* at 1:56–60.  Each time a USB peripheral device is switched (disconnected and re-connected) from one USB host to another, the USB host must reconfigure the peripheral device before data exchanges may ensue.  *Id.* at 1:60–2:2.  Such configuration or reconfiguration includes bus enumeration—a step that, *inter alia*, assigns an address to each peripheral device on the bus used by the host on that bus to access each peripheral device.  *See* Ex. 1004, 47–48.[3]  This reconfiguration causes, among other problems, loss of state information relevant to the previously connected host.  Ex. 1001, 1:64–2:5.

The '243 patent purports to resolve this problem by allowing sharing of a USB device among multiple USB hosts without requiring such reconfiguration.  Ex. 1001, 2:9–12.  Specifically, according to the '243 patent, a multi-host capable device is disclosed and claimed that includes separate buffers for each of multiple host connections and maintains a dedicated address and configuration for each host.  *Id.* at 2:33–35.

---

[3] Citations are to Petitioner's page numbering added in the footer of the Exhibit, as opposed to the original page numbering of the document.

IPR2017-00864
Patent 7,523,243 B2

Figure 1, reproduced below, depicts an exemplary system according to the '243 patent.



*FIG. 1*

Figure 1 depicts a system including hosts 102 and 104, both coupled with multi-host device 106, which, in turn, includes USB multi-host device controller. *Id.* at 3:47–51.

Figure 3, reproduced below, depicts additional exemplary details of multi-host device 106 of Figure 1.

IPR2017-00864
Patent 7,523,243 B2



*FIG. 3*

Figure 3 depicts USB multi-host device 106 comprising upstream ports 302 and 304, each configured to couple with a corresponding host system. *Id.* at 3:60–66. Upstream ports 302 and 304 are coupled with USB endpoint & status buffers 306 and 308, respectively, "to buffer data and control reads and writes to/from each respective host corresponding to PHY 302 and PHY

IPR2017-00864
Patent 7,523,243 B2

304 and/or peripheral device/function 312 coupled to USB multi-host device controller 108." *Id.* at 4:15–18.  The '243 patent further discloses:

> In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host-first host 102 and second host 104, for example-to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.  The selection of the specific mechanism used may be configured according to the specific USB device type that is being shared.  In one set of embodiments, the bandwidth from shared peripheral device/function 312 to each host may be reduced in order to allow each host equal access.  In other embodiments, the bandwidth may not be reduced if the bandwidth of the peripheral function exceeds the bandwidth of the host.

*Id.* at 4:19–33.

### C.    *Illustrative Claim*

Claims 1, 3, 7, 18, and 23 are the independent claims of the '243 patent.  Independent claim 1, reproduced below, is exemplary of the challenged claims (with some formatting changes for readability):

> 1. A USB multi-host device comprising:
>
> first and second upstream ports configured to couple to corresponding first and second hosts;
>
> a USB device block corresponding to at least one function[4]; and

---

[4] A Certificate of Correction issued for this patent changing two occurrences in claim 1 of "USB device/function" to "USB device block corresponding to at least one function."  Ex. 1001, 9.

IPR2017-00864
Patent 7,523,243 B2

a multi-host device controller coupling the USB device block corresponding to at least one function to the first and second upstream ports,

wherein the multi-host device controller is configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously request access to the USB device; and

alternately access the USB device block to use the at least one function without either one of the first and second hosts reconfiguring the USB device block each time a different one-of the first and second hosts is given access to the USB device block to use the at least one function.

## D. *Alleged Grounds of Unpatentability*

The Petition sets forth the following asserted grounds of unpatentability:

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Furukawa[5] | 102(b) | 1–8, 10, 11, 15–20, and 22–25 |
| Dickens[6] | 102(b) | 1–8, 11, 15–20, and 22–25 |
| (Furukawa or Dickens) and Chen[7] | 103(a) | 9, 11–14, and 21 |

---

[5] Japanese Patent Application Publication P2003-256351A.  Ex. 1002 ("Furukawa").  Exhibit 1002 includes an English translation of the Japanese publication, a certification by the translator, and the original Japanese language version of the publication.
[6] U.S. Patent No. 6,549,966 B1.  Ex. 1003 ("Dickens").
[7] U.S. Patent No. 7,073,010 B2.  Ex. 1005 ("Chen").

IPR2017-00864
Patent 7,523,243 B2

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| (Furukawa or Dickens) and USB 2.0[8] | 103(a) | 9, 11–14, and 21 |
| Wurzburg,[9] Osakada,[10] and (Furukawa or Dickens)[11] | 103(a) | 1–25 |
| (Furukawa or Dickens), USB 2.0, APA[12], and "other art cited herein" (Pet. 5) | 103(a) | 1–25 |

## II.   ANALYSIS

### A.   *General Principles*

#### 1.   *Anticipation*

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Each element of the challenged claim must be found, either expressly or inherently, in the single prior art reference.  *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).  While the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).  Furthermore, "a

---

[8] Universal Serial Bus Specification Rev. 2.0 April 27, 2000.  Ex. 1004 ("USB 2.0").
[9] U.S. Patent Publication No. 2006/0059293 A1.  Ex. 1026 ("Wurzburg").
[10] U.S. Patent No. 6,308,239 B1.  Ex. 1027 ("Osakada").
[11] We note Petitioner's harmless error in misidentifying the Osakada reference as Exhibit 1026 ("E1026").  Pet. 4.
[12] Petitioner identifies Admitted Prior Art ("APA") as disclosure at column 1, line 19 through column 2, line 2 of Exhibit 1001.  Pet. 7–9.

IPR2017-00864
Patent 7,523,243 B2

reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *In re Petering*, 301 F.2d 676, 681 (CCPA 1962)).  Still further, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).

### 2.     *Obviousness*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter[,] as a whole[,] would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 3.     *Level of Ordinary Skill in the Art*

Petitioner argues a person of ordinary skill in the art related to the '243 patent would have a Bachelor's Degree in electrical engineering,

10

IPR2017-00864
Patent 7,523,243 B2

computer science, or the equivalent, and would also have "a few to many" years of experience in the design of USB devices as well as familiarity with the USB specifications and protocols.  Pet. 6 (citing Ex. 1023 ¶¶ 53–58). Petitioner further argues (*id.* at 7) that Patent Owner admitted the level of ordinary skill when, in prosecution, Patent Owner asserted:

> Applicant further submits that *one skilled in the art (i.e. having appropriate understanding of basic USB design principles as set forth in at least the USB 2.0 specification)* would therefore be enabled by Applicant's specification as detailed above, to build a USB multi-host device controller that enables multiple hosts to access the USB device function without the USB device having to be reconfigured and/or re-enumerated each time a different host accesses the USB device function.

Ex. 1014, 15 (emphasis added).  Patent Owner further asserted in prosecution that "one skilled in the art to which the present application pertains would be well informed and well aware of the USB 2.0 specification."  Ex. 1014, 41.

    In its Response, Patent Owner does not address the level of ordinary skill in the art.  *See* PO Resp. *passim.*  However, Mr. Knapen testifies, one of ordinary skill at the time of the '243 patent (1) would be familiar with these industry-standard interconnect interfaces; (2) would be familiar with the circuit-level design and implementation of a standard USB device (because Figure 3 of the '243 patent does not disclose the internal structure of its various blocks); (3) will have also been exposed to the various interconnect options for connecting USB hosts and USB devices; and (4) would have a bachelor's degree in electrical or computer engineering (or similar), and at least five years of industry experience in computer peripheral device design. Ex. 2007 ¶¶ 44–46.  Mr. Knapen then concludes, "I agree the Board's

11

IPR2017-00864
Patent 7,523,243 B2

determination of the level of ordinary skill in the art is consistent with my assessment, and my opinions consider the level of skill in the art as determined by the Board." *Id.* ¶ 47.

We are persuaded by Petitioner's definition of the level of ordinary skill in the art and we find this definition is commensurate with the level of ordinary skill in the art as reflected in the prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("[T]he absence of specific findings on the level of skill in the art does not give rise to reversible error where the prior art itself reflects an appropriate level and a need for testimony is not shown.") (internal quotation marks omitted); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  The parties' respective experts (Mr. Garney and Mr. Knapen) substantially agree regarding the education and experience of persons of ordinary skill at the time of the '243 patent. The parties' experts specifically agree that the person of ordinary skill in the art would have had familiarity with the USB 2.0 specification and experience in the design of USB devices.

Based on the complete record of this trial, we discern no reason to alter our preliminary determination of the level of ordinary skill in the art. Therefore, we define the level of ordinary skill in the art, at the time of the '243 patent, to include at least a Bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent fields as well as familiarity with the USB 2.0 specifications to the extent of having designed a USB device.  This definition is reflected in the prior art of record and is consistent with the testimony of both parties' experts and consistent with Patent Owner's admissions during prosecution of the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

### 4.    *Claim Construction*

As a step in our analysis of patentability, we determine the meaning of the claims for this Decision.  In an *inter partes* review, a claim in an unexpired patent, as is the case here, shall be given its broadest reasonable construction in light of the specification of the patent in which it appears. 37 C.F.R. § 42.100(b); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–46 (2016) (upholding the use of the broadest reasonable interpretation standard).

Under the broadest reasonable construction standard, claim terms are generally given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  "[A] claim construction analysis must begin and remain centered on the claim language itself."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  "Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim."  *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).  Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy.  *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999).

Aside from the following terms we interpret, we determine that it is unnecessary to construe any other claim terms.

13

IPR2017-00864
Patent 7,523,243 B2

### a.   Concurrent and Simultaneous

Independent claims, 1, 3, 18, and 23 (and their respective dependent claims) recite establishment of "concurrent" connections.  Independent claims 1, 3, 7, and 23 (and their respective dependent claims) recite "simultaneous" requests from hosts and claim 23 recites "simultaneous" configuration of the device by multiple hosts.  The Specification of the '243 patent does not provide an express definition of either term and "concurrent" does not appear in the '243 patent Specification other than in the claims.

Petitioner does not provide a specific interpretation of either term but argues what is *not* meant by each term.  Specifically, Petitioner argues references to "simultaneous" in the claims do "not require simultaneous data transfer from two or more computers to a peripheral such as a printer" but instead encompasses transfer of data from one computer at a time to the peripheral—a mode Petitioner refers to as "data switching" as distinguished from "connection switching" in which a connection is established and disconnected to allow another computer to connect to a peripheral.  Pet. 18–19 (citing Ex. 1001, 2:28–37).  Petitioner asserts this requirement is consistent with the USB specification.  *Id.* at 19.

Petitioner similarly argues connections are "concurrent" to the extent they allow the recited functionality, for example, in claim 1, to allow for simultaneous enumeration and configuration, allow for simultaneous access, and allow for alternating access without reconfiguring or re-enumerating.  *Id.* at 19.

Patent Owner presented arguments regarding interpretation of these terms in its Preliminary Response.  Prelim Resp. 15–28.  Consistent with the

IPR2017-00864
Patent 7,523,243 B2

plain and ordinary meaning and consistent with the Specification, in our Decision on Institution, we adopted Patent Owner's dictionary-based definition of *concurrent* to mean "operating or occurring at the same time" and adopted the dictionary-based definition of *simultaneous* to mean "at the same time." Dec. 15.

Patent Owner does not address the construction of these terms in its Response. Although we find merit in Petitioner's suggestions that there are aspects of USB operations that are excluded when interpreting these terms in the context of USB protocols, Petitioner has not provided a proposed interpretation as to what *is* within the scope of a proper interpretation of these terms.

Thus, we perceive no reason on the complete record to change this construction.

    b.    *"USB Device Block Corresponding To At Least One Function"*

Independent apparatus claim 1, 3, 7, and 18 each include a recitation of a device block "corresponding to at least one function."

Apart from the claims, the '243 patent Specification does not use the phrase "device block corresponding to at least one function" or even the phrase "device block" and, thus, does not expressly define the phrase. To whatever extent "function" is an element of the claims, neither party proffers an express construction of "function" and we discern no express definition in the '243 patent Specification.

The '243 patent Specification discloses a device is made up of blocks or segments:

IPR2017-00864
Patent 7,523,243 B2

> A USB device may be divided into three segments or blocks. The first block may comprise a USB interface that includes the physical (PHY) or digital link, USB Link layer (SIE), and other circuitry necessary to send and/or receive data over the USB. The second block may comprise an Endpoint Buffer Block, which may include the endpoint buffers that are used by the first and third blocks to buffer data and control reads and writes to/from the USB—transferred through the first block—and/or the Peripheral Function—transferred through the third block. The third block may comprise the "Peripheral Function" itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc.

Ex. 1001, 2:38–50.  Nothing in this paragraph (or the rest of the Specification) identifies one of the three segments as a "device block."

The USB specification does not use or define the phrase "device block" but defines "function" broadly as "[a] USB device that provides a capability to the host, such as an ISDN connection, a digital microphone, or speakers."  Ex. 1004, 34.  Thus, according to the USB specification, a "function" is a type of "USB device."

The parties essentially agree to a construction of "USB device block corresponding to at least one function" as meaning "a segment of a device that performs a function."  Pet. 30; PO Resp. 17–18.

Based on the parties' agreed upon construction and within the scope of the broader definition in the USB specification, we determine "USB device block corresponding to at least one function" is equivalent to the term "function" (*see* Pet. 30–31) and we construe these terms to mean "a USB device, or a segment of a USB device, that performs a USB function to provide a capability to a host."

IPR2017-00864
Patent 7,523,243 B2

    *c.*    *"Shared USB Device Block" / "Shared USB Device"*

Claim 23 recites accessing a "function of the shared USB device block."

Based on the above discussion, a "shared USB device block" is, therefore, a "shared" function. As above, neither the phrase "shared USB device block" nor "device block" are used in the Specification of the '243 patent apart from the claims. Patent Owner proffers a construction of this term to mean "a segment of a device . . . shared or accessible by two or more USB hosts." PO Resp. 19–20.

The Specification uses the term "share" (or derivatives thereof) as an or verb to describe a number of objects "shared USB device" (Ex. 1001, Abstract, 2:29); "share a single device/function" (*id.* at 2:15–16); "a single USB device may be shared" (*id.* at 2:9–10); "the USB device that will be shared" (*id.* at 2:56–57); "shared Peripheral Device" (*id.* at 2:62); "the shared device" (*id.* at 2:65); "USB device type that is being shared" (*id.* at 2:67); "shared peripheral function" (*id.* at 3:1); "share devices" (*id.* at 3:45); "printer 120 shared by personal computer (PC) 122 and PC 123" (*id.* at 3:54–55; "shared peripheral function 312" (*id.* at 4:22); "shared device/function 312" (*id.* at 4:25); "USB device type that is being shared" (*id.* at 4:28); and "shared peripheral device/function 312" (*id.* at 4:29). In all cases, the things that are sharing the "shared" objects are multiple hosts (e.g., multiple PCs). However, these various recitations refer to sharing of the "device" as a whole as well as sharing of some portion (e.g., a segment or block) of the device (e.g. "peripheral function," "peripheral function 312," "peripheral device/function 312"). As discussed above, we understand

17

IPR2017-00864
Patent 7,523,243 B2

"device block" to include a block or segment referred to as a "function" or "function block."

Of the above references to shared objects, those that refer to sharing of the "function" or "device/function," in particular block 312 of Figure 3, appear to be consistent with the references in claim 23 to a "shared USB device block."  Thus, we construe "shared USB device block" means a "function" (as discussed above) that is "shared or accessible by two or more USB hosts."

Claim 18 recites "a shared USB device . . . wherein the USB device corresponds to at least one function."  Thus, claim 18 does not refer to a block or segment that is shared but, rather, refers to the entire device as being shared.  The entire device then "corresponds to at least one function," but it is not the "function" that is shared in claim 18—it is the entire device that is shared.

> d.    *"Device" / "USB Device" / "USB Multi-Host Device"*

The parties disagree as to the proper interpretation of the term *device*. The preambles of independent apparatus claims 1, 3, and 23 recite a "USB multi-host device."  The preambles of independent apparatus claim 7 and independent method claim 18 each recite a "device."  Subsequent references in these independent claims and in various dependent claims refer back to the claimed device as a "USB device," "Shared USB device," or simply "device."  The '243 patent Specification similarly uses various of these terms interchangeably.  We view these various terms as synonymous.

The parties disagreement, in essence, centers around packaging—specifically, whether a "device," as claimed, must be integral/unitary in that

18

IPR2017-00864
Patent 7,523,243 B2

the recited components are physically housed within the claimed device or can be a collection of physically separate, distinct components operating together to provide the recited functions.

Petitioner argues "device" means "both hubs and functions, in a single one or a collection of hardware components." Pet. 32 (citing Ex. 1023 ¶ 67); *see also* Ex. 1004, 32. Patent Owner's Response does not specifically construe the term "device." However, its Response argues Dickens does not disclose the devices of claims 1, 3, 7, and 23 because the Petition merely identifies separate elements disclosed in Dickens rather than *a* device (i.e., an integral device comprising recited components). PO Resp. 23–24. Implied in Patent Owner's Response regarding Dickens is a construction of "device" as a single, integral, device as distinct from a collection of separate, distinct, components.

> The USB specification provides a definition of "device" as follows:
>
> A logical or physical entity that performs a function. *The actual entity described depends on the context of the reference.* At the lowest level, device may refer to a single hardware component, as in a memory device. At a higher level, it may refer to a collection of hardware components that perform a particular function, such as a USB interface device. At an even higher level, device may refer to the function performed by an entity attached to the USB; for example, a data/FAX modem device. *Devices may be physical, electrical, addressable, and logical.*
>
> When used as a non-specific reference, a USB device is either a hub or a function.

Ex. 1004, 32 (emphasis added). Thus, the USB specification defines "device" relative to the context of the reference—lowest level, higher level, even higher level. Furthermore, we understand that the broadest reasonable interpretation of a term must be consistent with the specification of the

IPR2017-00864
Patent 7,523,243 B2

patent. *SuperGuide*, 358 F.3d at 875. Therefore, for the reasons discussed below, the '243 patent Specification does not require a "device" to be a unitary, integral device. The USB specification provides further evidence, consistent with the Specification, that a skilled artisan would have understood the term "device" to encompass either a "single hardware component" or "a collection of hardware components that perform a particular function." Ex. 1004, 32.

Patent Owner presents arguments regarding construction of "device" as follows:

### 1. Preamble Is Not Limiting

Patent Owner argues the preamble of the claims limits the understanding of "device" because it recites a "particular structure that is highlighted as important by the Specification" and because the preamble "provides antecedent basis for a claim limitation." PO Sur-Reply 1 (citing *NTP, Inc. v. Research In Motion*, 418 F.3d 1282, 1305 (Fed. Cir. 2005); *Catalina Mktg. Int'l v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002); and *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012)). Petitioner contends the preamble recitation of "device" supports an important highlight of the Specification because the '243 patent Specification discloses a "single USB device . . ." (Ex. 1001, 2:9–12) and distinguishes the invention over "a combination of a standalone switch and another USB device" (Ex. 1001, 1:58–2:2). *Id.* at 1–2.

Petitioner argues the distinction over a prior art switch in combination with a USB device is a distinction based on the function of the switch requiring reconfiguration of the USB device for each switch between hosts

IPR2017-00864
Patent 7,523,243 B2

rather than the physical distinction of a combination of separate components. Pet. Sur-Sur-Reply 3 (quoting Ex. 1001, 1:60–62 ("the device can generally be configured and accessed by only a single host at any given time")). We are persuaded by Petitioner's argument. The '243 patent does not distinguish the prior art combination of a switch and a separate USB device based on its physical packaging.

Furthermore, the mere fact that "device" in the preamble provides an antecedent basis for the same recitation in the claim elements in no way further defines the proper construction of "device." Patent Owner's reliance on *Deere* is inapposite. *Deere* also holds "if the body of the claim describes a structurally complete invention, a preamble is not limiting where it 'merely gives a name' to the invention, extols its features or benefits, or describes a use for the invention"). *Deere*, 703 F.3d at 1358 (quoting *Catalina*, 289 F.3d at 809). Here, use of the term "device" (or the various synonyms noted *supra*) provides no structural limitation but, instead, the body of the claim sufficiently defines a complete structure and the preambles merely provide a name for the claimed structures.

For the above reasons, we determine the preamble of the claims does not limit the claim elements to an integral, unitary, physical packaging of the device as Patent Owner alleges.

## 2. *The Claimed Device May Encompass An "Off-The-Shelf Item"*

Petitioner argues Patent Owner's limiting definition of "device" would require the function block and the controller be located "within a single unitary housing." Reply 4. However, Petitioner argues, the '243 patent Specification discloses that "Peripheral Device/Function 312" "may

IPR2017-00864
Patent 7,523,243 B2

be a standard off-the-shelf item." *Id.* (quoting Ex. 1001, 4:8–12).  Petitioner
contends that, if the "off-the-shelf" function 312 is, for example, a mass
storage device, "[i]t could not be a standard off-the shelf item if the
inventive multi-host device controller were already embedded inside."  *Id.*

Patent Owner argues the disclosure of an "off-the-shelf" item merely
refers to the function being a standard function such as an Ethernet
controller or a mass storage device.  PO Sur-Reply 2.  Instead, Patent Owner
emphasizes that the '243 patent Specification clearly refers to the function as
one of three segments or blocks within a USB device as support for its
contention that the claimed USB device is an integral, unitary structure.  *Id.*

We are persuaded by Petitioner's arguments.  Figure 3 of the '243
patent (reproduced above) depicts an embodiment of USB multi-host device
106 comprising, *inter alia*, USB multi-host device controller 108 and
device/function 312.  The Specification's disclosure that device/function 312
may be a standard off-the-shelf item such as an Ethernet controller or mass
storage device clearly describes a typical device that may be common and
commercially available—not an item that is already physically integrated
with the inventive features of the invention (the other elements shown within
box 106 of Figure 3).

For the above reasons, we determine the Specification's exemplary
embodiment incorporating an "off-the-shelf" item aids in understanding
"device" to encompass a combination of hardware components (including
"off-the-shelf" items) and, thus, would not limit the claim elements as to
integral, unitary, physical packaging of the device as Patent Owner alleges.

   3.      *"Device" Encompasses "A Collection Of Hardware Components"*

   Patent Owner further argues the USB specification definition of a device as encompassing a "collection of hardware components" is not the same as encompassing a collection of separate devices. PO Sur-Reply 3. We discern no support for Patent Owner's assertion that there is a difference between a collection of hardware components and a collection of devices. This assertion merely shifts the focus of the discussion to defining another term ("hardware components") as somehow distinct from "devices."

   Furthermore, Patent Owner's expert, Mr. Knapen, agrees with the definition of "device" as provided in the USB specification. Ex. 1049, 40:9–16 ("Q. Do you agree or disagree that a person of ordinary skill in USB matters in 2006 would consider the word 'device' to potentially refer to a collection of hardware components that perform a particular function? A. Yes. . . ."). In addition, Patent Owner's counsel and Mr. Garney (Petitioner's expert) engage in a lengthy colloquy in which Mr. Garney explains a variety of types of devices defined by the USB specification all within the scope of "device," regardless of physical packaging constraints, as ordinary skilled artisans would understand the USB specification. *See* Ex. 2006, 67:9–74:15.

   For the above reasons, we determine that an ordinarily skilled artisan would understand "device" in the context of the '243 patent Specification and in the context of the USB specification to encompass devices that comprise the recited "collection of hardware components" without imposing particular physical packaging constraints.

IPR2017-00864
Patent 7,523,243 B2

### 4.     Conclusion Regarding Construction of "Device"

Accordingly, we construe "device," in accordance with the USB specification and in accordance with the '243 patent Specification discussion of Figure 3, to, at least, encompass any collection of hardware components that perform a USB function.

### e.     "USB Connections"

With slight variations in phrasing, all independent claims (1, 3, 7, 18, and 23) recite USB connections between the first host (or upstream port) and the function (claims 1, 3, 7, and 23 refer to the "USB device block corresponding to at least one function" and method claim 18 refers to USB connections between the "shared USB device" and a plurality of hosts). The parties disagree over the construction of "USB connection" and then further disagree regarding the construction of "concurrent" and "dedicated" as qualifiers of the "USB connections" (as discussed further below). First we address the construction of "USB connection."

The USB specification does not expressly define the term "USB connection" but uses the term only in reference to the electrical signaling standard (the type of cable) used in various speeds of connectivity. *See* Ex. 1004, 147, 152, 157. The '243 patent Specification does not expressly define the term "USB connection." The term appears in the Abstract and at column 2, lines 35–37 ("[e]ach host may therefore establish a dedicated USB connection with the sharing device"). These passages offer little aid in

24

IPR2017-00864
Patent 7,523,243 B2

understanding the term and only indicate that a "USB connection" is something established between hosts and a "sharing device[13]."

Neither the Petition nor the Patent Owner's Response provide a definition of "USB connection."  Patent Owner argues in its Response, in essence, that Dickens does not disclose the claimed USB connections because Dickens discloses that, internal to its routing device 100, all exchanges are performed over a PCI bus (or another non-USB bus).  PO Resp. 29–35.  Implied in Patent Owner's argument is that the claimed "USB connections" would be understood to exclude the use of any non-USB busses or protocols in the path between, e.g., a host and a peripheral—even intervening connections in the path between a USB host and a USB device.

In response to Patent Owner's argument, Petitioner proffers an express construction of "USB connection" in its Reply.  Specifically, Petitioner argues "'USB connection' means 'direct and indirect connection, both with and without intervening interconnect, using USB protocols.'" Reply 11.  Petitioner further argues the '243 patent Specification teaches that the USB connections may include digital interconnects such as "Interchip USB," "ULPI," and "UTMI" and contends Mr. Knapen (Patent Owner's expert) testified that connections within multi-host device 106 of the '243 patent are likely such digital interconnects, which Petitioner contends are not "USB signals."  *Id.* at 5–6 (citing Ex. 2007 ¶¶ 44–47; Ex. 1049, 62:13–

---

[13] "Sharing device" is not used again in the Specification.  We presume it may have been a typographic error that was intended to refer to a "shared device," a term that is somewhat consistent with the remainder of the Specification and the claims of the '243 patent.  Our analysis is not affected by the apparent error.

25

IPR2017-00864
Patent 7,523,243 B2

62:25).  Thus, under Petitioner's proffered construction, a "USB connection" may include intervening digital interconnections that are not USB compliant.

Patent Owner responds, "The phrase 'USB connection' should be given its plain and ordinary meaning.  One of ordinary skill would know that a 'USB connection' is one that conforms to the requirements of the USB specification."  PO Sur-Reply 3.  Patent Owner argues its interpretation is consistent with the '243 patent Specification because the interconnects discussed in the Specification, including serial USB cables, Interchip USB, ULPI, and UTMI standards, *are* compliant with the USB specification.  *Id.* at 3–4.  Patent Owner further argues Petitioner's proffered construction includes non-USB intervening elements and, thus, does not conform to the USB specification.  *Id.* at 4–5.

We are persuaded by Petitioner's arguments that a "USB connection" need not be compliant with the USB specification throughout the entire physical signaling path between a USB host and a USB device and may include intervening, non-USB connections.

First, we disagree with Patent Owner that the disclosed digital interconnections of the '243 patent (Interchip USB, ULPI, and UTMI) are "compliant with the USB specification."  These standards may be useful in conjunction with USB circuit design applications for high speed parallel bus communications between integrated circuits,[14] but these interconnect standards appear nowhere in the USB specification of record and, thus,

---

[14] Patent Owner provides a footnote alleging these digital interconnects conform to the USB specification.  *See* PO Sur-Reply 4 n.1.  The cited websites, not of record as evidence in this case, suggest that these standards define parallel bus structures useful in implementing USB devices with inter-chip connections.

IPR2017-00864
Patent 7,523,243 B2

cannot be said to be "compliant" with the USB specification of record as
Exhibit 1004.

Furthermore, Mr. Knapen testifies, and we agree, "the inner-workings
of the invention's USB multi-host device controller (i.e., element 108 of
Figure 3) is not described at the circuit level." Ex. 2007 ¶ 45. Mr. Knapen
further testifies, in reference to internal connections within controller 108 of
the '243 patent, that connections within multi-host device 106 of the '243
patent are likely digital interconnects (e.g., Interchip USB, ULPI, UMTI)
rather than "USB signals" on a USB serial bus (i.e., a USB cable). Ex. 1049,
76:19–78:24. Thus, interconnections within multi-host device 106 are not
compliant with the USB specification of record (Ex. 1004) as alleged by
Patent Owner. Instead, Figure 3 of the '243 patent, in conjunction with the
disclosure of digital interconnects and Mr. Knapen's testimony, discloses a
"USB connection" that comprises a USB serial bus (i.e., a USB cable)
coupling a USB host with an upstream port (302/304) and digital
interconnects ("Host 1" and "Host 2") coupling the upstream port (302/304)
to a corresponding endpoint & status buffer (306/308) within device 106.[15]
Thus, according to Mr. Knapen, the above-described "USB connection"
between a host and function 312 in Figure 3 includes intervening digital
interconnections that are not compliant with the USB specification of record.

---

[15] Other un-labeled interconnects within device 106, such as between buffers
306/308 and controller 108, may also be digital interconnections that are not
compliant with the USB specification of record.

IPR2017-00864
Patent 7,523,243 B2

Furthermore, we observe that the '243 patent Specification, although sparse regarding any internal structure of controller 108,[16] discloses that controller 108 may include an arbitration mechanism:

> In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.

Ex. 1001, 4:19–26. Neither party identifies, nor do we discern, any disclosure in the USB specification describing a capability to arbitrate among multiple host requests—indeed adding such a feature is at the heart of the purported invention of the '243 patent (i.e., the "point of novelty"). Thus, controller 108 provides non-USB functionality (an arbitration mechanism), intervening within the USB connection between hosts and a function block, to arbitrate among multiple USB requests.

For the above reasons, we are persuaded by Petitioner's arguments that "USB connection," as used by the ordinarily skilled artisan in the '243 patent, does not require an end-to-end communication path that is, at all times and all points, compliant with the USB specification of record. Instead, we adopt Petitioner's proffered construction that a "USB connection" means "direct and indirect connection, both with and without intervening interconnect, using USB protocols."

---

[16] In general, we find the '243 patent Specification to be more sparse regarding design details than the prior art of record, in particular Dickens.

IPR2017-00864
Patent 7,523,243 B2

### f.    *"Dedicated" USB Connections*

All independent claims, with slight variations in phrasing, refer to the USB connections as "dedicated." Initially, we determine a "dedicated" USB connection is first and foremost a "USB connection" as defined above ("direct and indirect connection, both with and without intervening interconnect, using USB protocols"). What structure makes the connections "dedicated" is a point of disagreement between the parties.

Neither the Petition nor the Patent Owner Response expressly define "dedicated USB connections." Patent Owner's Response, in arguing that Dickens does not teach "dedicated USB connections," implies a construction that requires there must be two distinct, separate, physical communications paths from each of two hosts through to the function block (i.e., no segment of the communication path of the first "dedicated" USB connection is shared with the other "dedicated" USB connection). PO Resp. 40–43.

Petitioner disagrees with Patent Owner's implied construction arguing that the '243 patent Specification supports a construction that allows for some shared physical communication segments in a "dedicated USB connection." Reply 11–12. Specifically, Petitioner proffers a construction of "dedicated USB connections" as meaning "a form of connection, with a communication channel that is assigned to two or more locations, and which may include a shared connection." Reply 12. In support of this interpretation, Petitioner points to Figure 3 of the '243 patent that shows a single arrow connecting controller 108 to function block 312 suggesting a single shared physical communication path. *Id.*

In supplemental briefing, Patent Owner reiterates its position that the plain meaning of "dedicated" connections requires that there be two distinct,

IPR2017-00864
Patent 7,523,243 B2

separate, physical communication paths with no shared segments because an interpretation including a shared segment would eviscerate the term "dedicated" in the claims.  PO Sur-Reply 10.  Responsive to Petitioner, Patent Owner argues Figure 3 of the '243 patent is a "logic diagram" and, thus, the single arrow Petitioner points to connecting controller 108 with function block 312 is not a single shared physical communication link.  *Id.* (quoting Ex. 1001, 3:20–21).  Petitioner responds "[c]laim 3 also does not speak to the physical, but the schematic, *i.e.*, functional; the whole of the patent's disclosure is schematic."  Pet. Sur-Sur-Reply 10.  Petitioner contends "dedicated" does not mean physically separate and, therefore, does not preclude a shared segment in the "dedicated USB connection" path.  *Id.*

We are persuaded by Petitioner's position as supported by the disclosed embodiments of the '243 patent—specifically, the only embodiment disclosed in particular in Figure 3.  The '243 patent Specification provides some insight, disclosing:

> In various embodiments, by using a multi-host capable device controller, a shared USB device may be simultaneously configured and accessed by two or more USB hosts.  The multi-host capable device may include separate buffers for each host, and may be configured with the capability to respond to USB requests from more than one host.  The device may maintain a dedicated address, configuration and response information for each host.  Each host may therefore establish a dedicated USB connection with the sharing device.

Ex. 1001, 2:28–37.  Thus, in at least some embodiments, "dedicated USB connections" include USB connections in which the USB multi-host device "includes separate buffers for each host" and "maintains dedicated address, configuration and response information for each host."  Furthermore, in prosecution of the '243 patent, Patent Owner argued "the embodiment

IPR2017-00864
Patent 7,523,243 B2

disclosed in Fig. 3 clearly shows concurrent <u>respective dedicated connections established between USB multi-host device controller 108 and upstream ports 302 and 304</u> through buffers 306 and 308, respectively."  Ex. 1014, 10.  Figure 3 of the '243 patent is reproduced below with our red annotation added to highlight the above-identified "dedicated" USB connection.



*FIG. 3*

Figure 3 of the '243 patent, above, is annotated with a red box highlighting two communication paths Patent Owner identified during prosecution as "dedicated" USB connections—one from the first host through upstream port 302 and USB endpoint & status 306 to controller 108 and a second from the second host through upstream port 304 and USB endpoint & status 308 to controller 108.  These two communication paths,

IPR2017-00864
Patent 7,523,243 B2

according to the prosecution history (Ex. 1014, 10), establish two dedicated connections up to controller 108.  From those two dedicated connections from two hosts to controller 108, there is shown a single arrow (outside our annotated red box identifying the dedicated connections), suggesting a single connection from controller 108 to function block 312—a single connection shared by the two highlighted dedicated connections to extend the connections to function block 312.

The above-highlighted, exemplary, "dedicated" USB connections fit within the scope of Petitioner's proffered construction of "dedicated USB connections" in that they may include a shared segment or portion of the communication path that extends the dedicated connection to the function block.  These exemplary "dedicated" USB connections are also within the scope of the '243 patent Specification in that each of the two dedicated connections "includes separate buffers for each host" (endpoint buffers 306 and 308) and "maintains dedicated address, configuration and response information for each host" (within endpoint buffers 306 and 308).  *See* Ex. 1001, 4:10–18.[17]

Finally, independent claim 1 is the only claim that requires two physical ports.  Every other independent claim recites multiple "dedicated" connections, but does not recite multiple physical ports.  This suggests these claims are broad enough to encompass multiple "dedicated" connections over a single physical port and, therefore, provides further support for

---

[17] The '243 patent Specification does not expressly describe what information is stored in buffers 306 and 308.  However, we are persuaded the ordinarily skilled artisan with knowledge of the USB specification would likely presume the address, configuration, and response information is stored in these buffers.

IPR2017-00864
Patent 7,523,243 B2

Petitioner's position that "dedicated," as used in the '243 patent, does not require an entirely separate physical communication path.

For the above reasons, we construe a "dedicated USB connection" to mean "a USB connection that may include some shared physical communication path and includes a buffer for maintaining dedicated address, configuration and response information for the connection."

### g.    *"Concurrent" USB Connections*

All independent claims, with slight variations in phrasing, refer to the USB connections as "concurrent."  Initially, we determine each "concurrent" USB connection is first and foremost a "USB connection" as defined above ("direct and indirect connection, both with and without intervening interconnect, using USB protocols").  We have construed "concurrent" above to mean "operating or occurring at the same time."  Thus, we construe "concurrent USB connections" to be "USB connections that operate or occur at the same time."

### C.    *Anticipation by Furukawa*

The Petition asserts claims 1–8, 10, 11, 15–20, and 22–25 are anticipated by Furukawa.  Pet. 37–53.  For the reasons discussed below, we remain unpersuaded that Furukawa anticipates any of claims 1–8, 10, 11, 15–20, and 22–25.

### 1.    *Furukawa (Ex. 1002)*

According to Furukawa, sharing a USB peripheral device has been difficult because a USB interface permits only a single host to connect with

IPR2017-00864
Patent 7,523,243 B2

a peripheral device.  Ex. 1002 ¶ 3.  Prior solutions provided a switching circuit that allowed a different host to connect with the shared peripheral.  *Id.*  However, such switches required a series of operations each time the host on the USB was switched and, typically, required the host system to load or unload a device driver for the shared peripheral newly connected or re-connected to the host.  *Id.*

Furukawa purports to have resolved the above problems by disclosing a USB hub providing dedicated ports for each of multiple USB hosts, dedicated ports for each of multiple USB peripheral devices, and a controlling circuit coupled between the host ports and the device ports such that overhead to load and unload devices drivers is obviated.  *Id.* ¶ 4.

IPR2017-00864
Patent 7,523,243 B2

Figure 1 of Furukawa, reproduced below, depicts an exemplary embodiment of Furukawa's invention.



Figure 1 depicts a plurality of USB hosts 21–24 coupled to hub 1 via corresponding ports 2-1 through 2-4 (collectively ports 2) and depicts a plurality of USB peripheral devices 25–28 coupled to hub 1 via ports 3-1 through 3-4 (collectively ports 3). *Id.* ¶¶ 7–8.  Hub 1 comprises FIFO memories 11-1 through 11-4 (collectively FIFO memories 11) and 17-1

IPR2017-00864
Patent 7,523,243 B2

through 17-4 (collectively FIFO memories 17) corresponding to ports 2 and 3, respectively. *Id.* Controlling circuit C of hub 1 controls transmissions between hosts 21–24 via bus 12 through FIFO memories 11 and peripheral devices 25–28 via bus 16 through FIFO memories 17. *Id.* ¶¶ 10–11. When an exchange is required between a host and a peripheral device, controlling circuit C sets up a connection between the host and the peripheral device and releases the connection when the exchange is completed. *Id.*

2.    *Independent Claims 1, 3, 7, 18, and 23*

Independent apparatus claims 1, 3, 7, and 23 generally recite a USB device comprising a controller that enables multiple hosts to share access to a USB device. Independent method claim 18 generally recites steps providing multiple hosts with shared access to a USB device.

Regarding claim 1, Petitioner argues the recited USB multi-host device reads on hub 1 of Furukawa and the claimed first and second upstream ports read on any two of ports 2-1 through 2-4 of Furukawa. *Id.* at 38–39.

Petitioner argues the recited "USB device block corresponding to at least one function" reads on any of Furukawa's peripheral devices. *Id.* at 39 (citing Ex. 1002 ¶ 9, Fig. 1). In further analysis we may refer to "USB device block corresponding to at least one function" as simply "function" or "function block."

Petitioner further argues the claimed multi-host device controller reads on Furukawa's controlling circuit C within hub 1. *Id.* at 39.

The "wherein" clause of claim 1 requires that the controller be configured to "establish concurrent respective dedicated USB connections

IPR2017-00864
Patent 7,523,243 B2

between the [function block] and the first and second upstream ports" to enable certain recited functions.  Petitioner argues controlling circuit C of Furukawa connects to multiple hosts concurrently "through bus 12, FIFO memories 11, and connecting ports 2."  Pet. 40 (citing Ex. 1002 ¶¶ 9–10).  Petitioner further argues elements 13–15 within controller circuit C allow the circuit "to simultaneously process data transmissions between the hosts and peripheral devices."  Pet. 40–42 (citing Ex. 1002 ¶ 11).  More specifically, Petitioner argues:

> As Furukawa explains, "The connection that is set up is a one-to-one connection between the host PC that is the source of the request and the peripheral device that is the destination of the request, and insofar as there is no redundancy in the request destination, a plurality of host PCs can access the peripheral devices simultaneously."  F-¶0010.  Furukawa's controlling circuit thereby discloses "concurrence."  Garney-¶¶81-82.

*Id.*[18]

Patent Owner' Preliminary Response disputed Petitioner's contentions arguing, in essence, that Furukawa does not disclose multiple hosts concurrently accessing the same peripheral device.  *See* Prelim. Resp. 35–40.

Based on the preliminary record at the time of our Decision on Institution, we were not persuaded Furukawa expressly discloses concurrent USB connections between a plurality of USB hosts and *one* USB peripheral device (a "USB device block . . ." as claimed).  Although identity of terminology is not required, the Petition had not presented sufficiently

---

[18] Petitioner's notation "F-¶0010" is a reference to Ex. 1002 ¶ 10 and the notation "Garney-¶¶81-82" is a reference to Ex. 1023 ¶¶ 81–82.  *See* Pet. 1 n.1.

IPR2017-00864
Patent 7,523,243 B2

persuasive argument and evidence that Furukawa expressly discloses such concurrency.  The Petition's reliance on Furukawa's disclosure that "a plurality of host PCs can access the peripheral devices simultaneously" (Ex. 1002 ¶ 10) does not sufficiently disclose concurrent connections between multiple USB hosts and *the same* shared USB peripheral device.  As we discussed in our Decision on Institution, this disclosure of Furukawa may reasonably be understood to disclose that one USB host is accessing a first USB peripheral device while simultaneously a second USB host is accessing a different USB peripheral device—e.g., Furukawa's host 21 may access device 25 while host 22, simultaneously, accesses device 26.  Thus, in our Decision on Institution, we were not persuaded that Furukawa expressly discloses establishing concurrent connections between multiple hosts and one shared peripheral device and we observed Petitioner had not presented any argument that the recited concurrent connections would have been inherent in the teachings of Furukawa.  Dec. 22–23.  For those reasons based on the preliminary record, we were not persuaded Furukawa discloses, expressly or inherently, the concurrent connections by multiple hosts to one peripheral device as recited in independent claim 1 and as similarly recited in each other independent claim (3, 7, 18, and 23) for which Petitioner presented similar arguments (*see* Pet. 45–53).

Petitioner filed a Request for Rehearing of our Decision on Institution. Paper 15 ("Req." or "Request").  In that Request, Petitioner argued that Furukawa's disclosure that a peripheral device may be coupled to multiple hosts with "no switching operations" teaches that the connections are made without a need for reconfiguration or re-enumeration as required by the claims.  Req. 10 (quoting Ex. 1002 ¶ 3).  Petitioner argued that because

IPR2017-00864
Patent 7,523,243 B2

Furukawa shows switching between USB connections without any physical switches and still obviates the need to unload and reload drivers when switching connections, Furukawa must be using "data switching" rather than physical "disconnection switching" as the Petitioner defined those terms in its Petition. *Id.*; *see also* Pet. 18–19.  We emphasized in our Decision Denying Petitioner's Request for Rehearing that our Decision on Institution was based on lack of *express* disclosure in Furukawa of establishing/maintaining multiple concurrent USB connections that enable alternate access to a shared function block without reconfiguring as required by the claims.  Paper 18, 5–6 (citing Dec. 23).

Following entry of our *SAS* Order (adding previously denied claims and grounds into the trial), the parties submitted supplemental briefs addressing the claims and grounds for which we had initially denied review. We emphasize, as discussed above, that Petitioner does not argue that Furukawa inherently discloses any of the claimed features.  Instead, the Petition and Petitioner's Supplemental Reply argue only that Furukawa *expressly* teaches the features of claims 1–8, 10, 11, 15–20, and 22–25.  At oral argument, Petitioner's counsel confirmed that the Petition is not relying on inherent disclosures of Furukawa.

> JUDGE FISHMAN: The Patent Owner was asserting that Petitioner has never argued inherency, and still does not argue inherency.  Are you arguing inherency, or are you not arguing inherency?

> MR. McKEOWN: We did not present inherency in the petition.  The word inherency, I think first appeared in the rehearing decisions.  Our position is enumeration reconfiguration is disclosed in Furukawa for the same reasons it's disclosed in Bohm.  Going back to that prosecution history, when you're explaining enumeration and configuring is necessarily there,

IPR2017-00864
Patent 7,523,243 B2

> because there's two hosts transmitting at once, and because they
> transmit at once, they don't have to be re-enumerated, we are
> entitled to that same technical basis as they are.  That's what they
> argued.
>
> In addition to that, and as I pointed out earlier,
> enumeration configuration relates to the loading of drivers, that's
> not in dispute, that's on the Petitioner page 34 th[r]ough 35;
> Furukawa explicitly explains that it's avoiding switching
> overhead.  It's avoiding the loading the drivers, and even in the
> USB context, it's able to share a peripheral.
>
> Based upon the testimonial evidence we have in the
> record, our declarant has taken the position that enumeration and
> all of the features of these claims are in the reference.  We are
> not saying, by the way, if you enumerate, you have to do this
> other step that's nowhere discussed, and that's inherent, we are
> not arguing that.  We are saying, it's in there.  The word
> "enumeration" is just not used; instead, they describe it as
> switching drivers, et cetera.

Tr. 54:14–55:10.

In its Supplemental Reply, Petitioner argues Furukawa discloses that
its FIFO buffers (11 and 17) temporarily store packet data "to prevent
collisions of data from multiple hosts."  Supp. Reply 4 (citing Ex. 1002 ¶¶ 6,
17).  Petitioner then contends "collisions of data would not even be a
concern if Furukawa disclosed that a peripheral could *only* be
configured/enumerated with one host at a time."  *Id.*  Furthermore, Petitioner
contends our Decision on Institution is inconsistent with the explicit
disclosure in Furukawa of a "system in which multiple hosts simultaneously
access a single peripheral."  *Id.*  Specifically Petitioner contends Furukawa
discloses problems of prior art switches used to share a peripheral device
among multiple hosts in that "the switching circuit must be operated in a
series of operations" each time a different host is switchably connected.  *Id.*

40

IPR2017-00864
Patent 7,523,243 B2

at 5 (quoting Ex. 1002 ¶ 3).  Petitioner quotes a portion of paragraph 3 of
Furukawa and summarizes these teachings as, "the prior art switching is
undesirable because it involves a series of operations, and drivers for the one
peripheral device must be loaded and unloaded each time the switching from
one connected host to another connected host is performed."  *Id.* at 5–6.
Petitioner then contends that loading and unloading of drivers is a
"conventional" operation of USB hubs and controllers and further contends
enumeration of a USB device is similarly a conventional switching operation
of USB hubs and controllers.  *Id.* at 6.  Petitioner further contends
Furukawa's proposed solution is "to provide a USB hub that enables **a**
peripheral device to be shared by a **plurality** of computers, and which
requires **no [conventional USB] switching operations**."  *Id.* (quoting Ex.
1002 ¶ 3 with the words "conventional USB" added by Petitioner).  Based
on the above disclosures, Petitioner contends:

> As noted above, switching operations include the loading and
> unloading of the drivers for the peripheral device and take
> extensive time.   By eliminating switching operations,
> Furukawa's invention—described at the same level of detail as
> the '243 patent—results in persistent simultaneous connections
> between the peripheral device and a plurality of hosts (because
> the connections do not have to be setup each time), such that
> "there is **no overhead and having to load and unload the
> device driver** sequentially **each time** . . . a connection is
> established or released." (Ex. 1002 ¶ 5; emphasis added.)  Thus,
> with the peripheral's drivers always loaded, the simultaneously
> connected hosts are always in a ready state to send data to, or
> receive data from, a given peripheral.   Indeed, Furukawa's
> description of its FIFO memory exchanges is indisputable
> evidence of this simultaneous access.

*Id.* at 6–7.

41

IPR2017-00864
Patent 7,523,243 B2

In response, Patent Owner argues Furukawa discloses only a "one-to-one" connection between one host and one device and discloses that "simultaneous access to peripherals only occurs when two hosts request access to different 'request destination[s]' (i.e., two different peripherals)." Supp. Resp. 1–2. Patent Owner further argues, "Furukawa's use of FIFOs does not change that it only establishes one-to-one connections." *Id.* at 2. Contrary to Petitioner's argument, Patent Owner contends collisions could arise even in such a one-to-one connection system in which one host at a time connects to the device and then another host can connect to the same device but only after the first connection is released. *Id.* at 3. Therefore, Patent Owner argues, by virtue of each connection being "released" before a next connection is allowed, enumeration and configuration would occur at each switch between hosts—contrary to the recitations of the claims. *Id.* at 3–4.

We remain unpersuaded by Petitioner's supplemental arguments. We agree with Petitioner that Furukawa is directed to solving the same problem as the '243 patent—eliminating overhead of switching between hosts sharing a USB device. Supp. Reply 6 (citing Ex. 1002 ¶ 3 ("The present invention was created in contemplation of the problem areas described above, and the object is to provide a USB hub that *enables a peripheral device to be shared by a plurality of computers, and which requires no switching operation*.") (emphasis added)). Furukawa discloses a problem of prior art switches in that "the switching circuit must be operated in a series of operations" for each switch between connected hosts. Ex. 1002 ¶ 3. Furthermore, Furukawa discloses one such operation asserting that in the prior art "the device driver for the peripheral device must be loaded and unloaded" for

42

IPR2017-00864
Patent 7,523,243 B2

each switch between connected hosts. *Id.* However, the only switching operation overhead expressly eliminated in Furukawa is the overhead of loading and unloading devices drivers on the hosts each time a switch is made between two hosts sharing a USB device. *Id.* ¶ 5. Furukawa never expressly discusses elimination of any other type of switching operation overhead by its invention. In particular, we discern no express disclosure in Furukawa that reconfiguration of the peripheral device is eliminated when switching between hosts as required by the independent claims (1, 3, 7, 18, and 23).

Petitioner asserts that the ordinarily skilled artisan would recognize that Furukawa's disclosed "series of operations" or "switching operations" encompasses all overhead operations and, thus, would have understood these operations to include enumeration when a switch is made between connected hosts because such enumeration "is a conventional switching operation of USB hubs" as evidenced by another Japanese patent. Supp. Reply 6 (citing Ex. 1052[19] ¶¶ 4, 17). Mr. Garney testifies,

> Furukawa's entire invention is directed to avoiding the conventional USB switching operations of prior art USB hubs. In light of the whole technical disclosure of Furukawa, a [person of ordinary skill in the art] could not understand Furukawa to describe that "normal enumeration and configuration" still takes place when a host "connection" is released. To take that position does great violence to the disclosure of Furukawa. Significant portions of Furukawa's disclosure would be rendered superfluous, and the expressed design goals could not be met— e.g., the need to eliminate processing time and overhead each time a host is switched. Patent Owner's unsupported attorney arguments lack any technical basis and completely ignore the

_____

[19] Exhibit 1052 is an English translation of Japanese Unexamined Application 2001-51939.

IPR2017-00864
Patent 7,523,243 B2

> functionality of Furukawa's controlling circuit, FIFOs, and NAK
> packets.

Ex. 1053 ¶ 23.

We remain unpersuaded by this argument.  Initially, we note Mr.
Garney's testimony in this regard is unsupported by any facts or data and,
thus, is deserving of little weight.[20]  37 C.F.R. § 42.65(a).  Like the Petition,
Mr. Garney's Reply Declaration (Ex. 1053) still fails to identify any express
disclosure in Furukawa of eliminating re-enumeration processing in
switching between connections.

As previously noted, there is no mention of reconfiguration anywhere
in Furukawa.  There may be reasons Furukawa is silent in this respect.  It
may be the case that Furukawa determined, for its purpose, elimination of
the overhead of loading and unloading drivers on the host was a sufficient
improvement over prior art switches and it need not address other elements
of overhead processing such as re-enumeration.  In fact, we find it notable
that Furukawa's use of its FIFO stores data *and an address* of the USB
device to which the data is destined and uses that address to determine what
host is presently connected to the device (i.e., what host presently has set the
address for the device—which as presently enumerated the device).  *See* Ex.
1002 ¶¶ 13–15.  In Furukawa's invention, it may be that controlling circuit C
(comprising hub repeater 13, hub controller 14, and CPU 15) uses the stored
address from the FIFO to perform a re-enumeration or reconfiguration on the
destination device because a prior connected host used a different address

---

[20] Mr. Garney's reliance on paragraphs 4 and 17 of Exhibit 1052 provide no
support for his assertion that enumeration is among the "conventional"
operations that must be performed for each switch between connected hosts.
The word "enumeration" never appears in Exhibit 1052.

IPR2017-00864
Patent 7,523,243 B2

and a different configuration. *See id.* ¶ 15. However, we do not speculate about how Furukawa deals with the overhead processing of re-enumeration. It suffices in this case that we are not persuaded that Furukawa expressly discloses that re-enumeration and reconfiguration processing is eliminated, and that Petitioner does not persuasively argue that such a disclosure is inherent in Furukawa.

Independent apparatus claims 3, 7, and 23 and independent method claim 18 include similar recitations to those of claim 1 and Petitioner presents similar arguments for these claims. Pet. 45–53.

Accordingly, we are not persuaded by a preponderance of the evidence that Furukawa anticipates any of independent claims 1, 3, 7, 18, and 23.

3. *Dependent Claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25*

Dependent claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claim. Because we are not persuaded Furukawa discloses, expressly or inherently, concurrent connections by multiple hosts to one peripheral device, as recited in each independent base claim from which these dependent claims depend, we also are not persuaded by a preponderance of the evidence that Furukawa discloses every limitation of these claims.

IPR2017-00864
Patent 7,523,243 B2

### 4.    Conclusion Regarding Anticipation by Furukawa

For the above reasons, we are not persuaded Petitioner has established by a preponderance of the evidence that any of claims 1–8, 10, 11, 15–20, and 22–25 are unpatentable as anticipated by Furukawa.

### E.    Anticipation by Dickens

The Petition asserts claims 1–8, 11, 15–20, and 22–25 are anticipated by Dickens.  Pet. 54–62.  For the reasons discussed below, we are persuaded that Dickens anticipates claims 1, 3–5, 7, 8, 11, 15, and 18–20.  We are not persuaded claims 2, 6, 16, 17, and 22–25 are anticipated by Dickens.

### 1.    Dickens (Ex. 1003)

According to Dickens, prior techniques for sharing a USB peripheral device include use of an Ethernet local area network or switching devices that utilize complex wiring.  Ex. 1003, 1:31–39.  Dickens discloses a data routing device to share a USB peripheral device among a plurality of USB hosts.  *Id.* at 1:45–49.  Figure 1, a version of which is reproduced below,[21] is a schematic illustration of a system using the inventive data routing device. *Id.* at 5:8–9.

---

[21] Figures in the Dickens US Patent (Ex. 1003) are hand-drawn and, although understandable, are difficult to view.  The same patent application was filed in Great Britain (GB 2 350 212 A – Exhibit 3001) and Figures 1 and 2 therein are substantively identical but easier to view.  Thus, we reproduce here the Dickens' Figures 1 and 2 from the substantively identical patent application filed in Great Britain.

IPR2017-00864
Patent 7,523,243 B2



FIG.   1

Figure 1 depicts a system 100 including data routing device 130 coupled
with multiple USB host computers 105 through respective USB busses 106
and data converters 110.  *Id.* at 5:26–37.  Data routing device 130 also is
coupled with a plurality of USB peripheral devices 108 through respective
USB busses 109 and data converters 120.  *Id.* at 5:66–6:11.  Data converters
110 and 120 use USB protocols in exchanges with hosts 105 and devices
108, respectively.  *Id.* at 5:33–37, 6:9–11.  Data converters 110 include
emulation functions to emulate the presence of each USB peripheral device
108 in system 100 so that each USB host 105 will detect the peripheral
devices as present and configure themselves accordingly.  *Id.* at 5:38–43.
Data converters 120 include emulation functions to emulate the presence of
a USB host on each USB bus 109 associated with each USB peripheral
device 108 causing the peripheral devices to communicate with data router

IPR2017-00864
Patent 7,523,243 B2

130 through a corresponding converter 120 as though it is connected to a
USB host.  *Id.* at 6:12–17.

Figure 2 of Dickens, reproduced below[22], is a schematic illustration of
elements within the data routing system of Figure 1.  *Id.* at 5:9–11



Figure 2 depicts data router 130 (the largest rectangle also labelled as system
100) comprising microprocessor-based controller 140 and PCI bus 132 for
coupling to other components within data router 130.  *See id.* at 6:29–50.
Data router 130 is coupled to two USB host devices 105 through respective
data converters each comprising USB device controller 150 and PCI bus
interface 152.  *Id.* at 6:51–54.  Data router 130 is also coupled with USB
peripheral devices 180, 182, 184, and 186 via USB busses 109 and
corresponding USB host controllers 154, 156, and 158 coupled with PCI bus

---

[22] This Figure, like the version of Figure 1 reproduced above, is from GB 2
350 212 A.

IPR2017-00864
Patent 7,523,243 B2

132.  *Id.* at 6:57–7:8.  In particular, USB host controller 156 serves to couple router 130 to printer 182.

In operation, data router 130 of Dickens receives a request for exchange from any host 105 via corresponding data converter 150 and emulates operation of each of the peripheral devices (180, 182, 184, and 186) coupled with router 130.  *See id.* at 7:36–45.  Information to or from a peripheral device is moved between data router 130 and the peripheral device via the emulated USB host provided by a corresponding USB host controller 154, 156, or 158.  *See id.* at 8:16–41.  In other words, data router 130 emulates each attached USB peripheral device for each attached USB host and emulates a requesting USB host for each attached peripheral device.

### 2.    *Independent Claims 1, 3, and 7*

Petitioner identifies the recited USB multi-host device as reading on data router 130 of Dickens and the recited first and second upstream ports as reading on data converters 110 (or equivalently 150 of Fig. 2).  Pet. 54–55.[23] Petitioner further identifies the function block ("USB device corresponding . . .") as reading on any one of Dickens' USB peripheral devices including, for example, printer 182 and identifies the recited controller as reading on Dickens' routing controller 140 within data router 130—the routing controller being coupled with two upstream ports

---

[23] Petitioner quotes a disclosure of Dickens and erroneously cites column 2, lines 12–13 thereof for that quote.  The quoted text appears at column 5, lines 29–31 of Dickens.  We find the incorrect citation to be harmless error.

IPR2017-00864
Patent 7,523,243 B2

(converters 110/150 coupled with USB busses 106) and coupled with the
function block (e.g., printer 182). *Id.* at 55.

The "wherein" clause of claim 1 requires that the controller be
configured to "establish concurrent respective dedicated USB connections
between the [function block] and the first and second upstream ports" to
enable certain recited host functions be performed by the device. Petitioner
argues Dickens meets this limitation in that controller 140 maintains USB
connections with host computers 105 through respective device controllers
150 (upstream ports) and maintains USB connections with printer 182 (a
function block) through USB controller 156. Pet. 57.

One of the recited host functions provided by the controller's
concurrent dedicated USB connections is allowing hosts to "simultaneously
request access to the USB device." Petitioner contends the recited
simultaneous access by multiple USB hosts reads on Dickens' disclosure of
simultaneous access by multiple USB hosts to emulated devices provided by
each host's corresponding data converter 110 of data router 130, including
simultaneous enumerating and configuring the emulated devices. Pet. 56–57
(citing Ex. 1003, 5:26–43; Ex. 1023 ¶ 107). Petitioner further argues
Dickens provides simultaneous access by two hosts when the hosts
simultaneously attempt to send data to a shared function block (e.g., printer
182) such that data to be printed may be received simultaneously by router
130 from any two USB hosts. *Id.* at 57–58.

The other recited host function provided by the controller's concurrent
dedicated USB connections is allowing hosts to alternately access the
function without reconfiguring the function on each switch between hosts.
Petitioner contends data from the second USB host will be buffered while

50

IPR2017-00864
Patent 7,523,243 B2

the data from the first host is being transmitted from data router 130 to printer 182 (the recited alternating access). *Id.* at 57–59 (citing Ex. 1003, 9:21–27). In particular, Petitioner contends Dickens discloses that the hosts remain connected to their respective emulated devices (provided by corresponding data converters 110) and, thus, would not require reconfiguration as ordinarily skilled artisans with knowledge of the USB specification would have known. *Id.* at 58–59 (citing Ex. 1003, 3:23–24, 9:20–30; Ex. 1023 ¶ 111).

Notwithstanding Patent Owner's arguments, which we have considered and which we address below, we are persuaded by Petitioner's showing, which we adopt as our own findings and conclusions, that independent claims 1, 3, and 7 are anticipated by Dickens.

### a. *Dickens Discloses the Claimed "Device"*

Patent Owner argues Dickens does not anticipate claim 1 because "Petitioner improperly attempts to combine portions of separate USB devices to conclude the claims of the '243 Patent are anticipated" and, thus, the elements of Dickens are not arranged as in the claim. PO Resp. 23. Specifically, Patent Owner agues the Petition improperly combines two separate pieces of hardware in Dickens to read on the claimed multi-host device—namely data routing device 100 and printer 182. *Id.* (citing *Net MoneyIN*, 545 F.3d at 1370. By contrast, based on its proffered construction of "device" (Paper 28, 1–3), Patent Owner contends claim 1 is directed to *__a__* device—i.e., an integral device—that comprises the recited structures within the device and provides the recited functionality. *Id.* at 24.

IPR2017-00864
Patent 7,523,243 B2

Petitioner argues that Patent Owner's arguments are based on an incorrect interpretation of "device," as claimed, as limited to an integral, unitary device comprising the recited elements.  Reply 17–18.

We agree with Petitioner.  Patent Owner's argument is not persuasive because it is based upon an overly narrow construction of "device," which we decline to adopt for the reasons discussed above.

Therefore, we are persuaded by Petitioner's arguments that the claimed "device" is disclosed by Dickens as the combination of routing device 100 (including controller 140 read as the recited multi-host controller) and printer 182 (read as the recited function block).

### b.   *"Concurrent Dedicated USB Connections"*

With slight variations in phrasing, all claims refer to concurrent dedicated USB connections.  Patent Owner argues Dickens does not teach "USB connections."  PO Resp. 29–35.  Patent Owner further argues Dickens fails to teach "concurrent" USB connections (*id.* at 35–39) and fails to teach "dedicated" USB connections (*id.* at 39–43).

### i.   *"USB Connection"*

We first address Arguments directed to "USB connections" in general.

Patent Owner argues Dickens does not disclose the claimed "USB connections" because, although Dickens' routing device 100 establishes a USB connection between it and the host computers and between it and the peripheral devices, all exchanges are converted to PCI bus exchanges within the routing device.  PO Resp. 29–31.  We agree that Dickens converts all USB exchanges between an attached USB host and an attached USB

IPR2017-00864
Patent 7,523,243 B2

peripheral from USB protocols to a PCI bus (or other non-USB processor
bus) and its associated non-USB protocols. Patent Owner's argument is not
persuasive, however, because it is based upon an overly narrow construction
of "USB connection," which we decline to adopt for the reasons discussed
above.

As further evidence that Dickens fails to disclose the recited "USB
connection," Patent Owner argues that "installing a specific driver on any
host 105 for a specific device will not allow the user to plug that specific
device into a downstream port of Dicken's [sic] data routing device 100
without also upgrading the software running on data routing device 100."
PO Resp. 31 (citing Ex. 2007 ¶¶ 88, 107). We are not persuaded because the
selection of a device driver is unrelated to the establishment of a "USB
connection" as we construe the term. The claims are not limited to USB
connections that support particular devices or even particular types of
devices and their associated drivers.

Patent Owner contends "the Board's conclusion that Dickens' PCI bus
can make up a USB connection misunderstands the Dickens system"
because "Dickens' data router includes multiple distinct USB buses." PPO
Resp. 32. Patent Owner then redraws Dickens' Figure 2 with annotations
identifying five different USB busses—one each connected to each of two
hosts (105) and three more connected to each of three exemplary peripheral
devices (180, 182, and 184). PO Resp. 32–35. We are not persuaded by
Patent Owner's argument. Our construction of "USB connection" does not
encompass a PCI bus alone as within the scope of "USB connection."
Instead, we interpret "USB connection" as including intervening segments
or portions that may be non-USB—such as Dickens' intervening PCI bus

IPR2017-00864
Patent 7,523,243 B2

132 or the digital interconnections described within the '243 patent's multi-host device 106. *See* section II.A.4.e. Furthermore, Petitioner argues, and we agree, that, similar to Dickens' device 100, multi-host device 106 of the '243 patent uses three USB busses—one each connected to two hosts and one connecting controller 108 to function block 312 (the third UBS bus may also be implemented as a digital interconnect). The structures of Dickens' device 100 and multi-host device 106 are essentially identical with respect the use of multiple USB serial busses.

Therefore, we are persuaded by Petitioner's arguments that the claimed "USB connections" are disclosed by Dickens in that, controller 140 maintains USB connections with host computers 105 through respective device controllers 150 (upstream ports) and maintains a USB connection with printer 182 (a function block) through USB controller 156. Pet. 56. Thus, all exchanges to and from an attached host 105 are over a USB bus 106 using USB protocols and all exchanges to and from an attached peripheral (printer 182) are over a USB bus 109 using USB protocols. Any intervening non-USB exchanges, such as over a PCI bus, are transparent to host 105 and printer 182 and, therefore, are within the scope of a "USB connection" as we have construed the term ("direct and indirect connection, both with and without intervening interconnect, using USB protocols.").

ii.     *"Concurrent USB Connections"*

All claims also require the USB connections be "concurrent." In accordance with our construction of "concurrent," the two USB connections must be "operating or occurring at the same time."

54

IPR2017-00864
Patent 7,523,243 B2

After considering the issue anew based on the parties' evidence submitted at trial, a preponderance of the evidence leads us to the same conclusion. Patent Owner argues "[t]he fact that there is only a single connection to Dickens' printer (the claimed 'USB function block') precludes a finding of anticipation." PO Resp. 33. Patent Owner further argues,

> Indeed, one of ordinary skill in the art would understand that the single USB connection to Dickens' printer 182 only allows print data from one host at a time. Knapen ¶ 95; *see also* [Ex. 1003], 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

*Id.* at 34.

We are not persuaded by Patent Owner's argument. Patent Owner's argument conflates the USB connections with the ability to transfer data concurrently or simultaneously. Petitioner argues, and we agree, "Figure 3 of the '243 Patent is no different: one arrow between the '243 Patent controller and device/function is the only way data is transferred, and data must necessarily communicate over this depicted-as-single arrow from each of the illustrated hosts." Reply 12. There is only a single physical connection between Dickens' routing device 100 and any one peripheral device (e.g., printer 182) in exactly the same manner as in the '243 patent in which there is a single physical connection between multi-host controller 108 and device/function 312 in Figure 3. Through that single physical connection in the '243 patent, data may be exchanged alternately (as clearly expressed in the claim and as discussed further below). *See* Ex. 1001, 2:61–65 ("The internal arbitration mechanism may enable each host to access the

IPR2017-00864
Patent 7,523,243 B2

shared Peripheral Function by either interleaving host accesses, or by using a common request/grant structure, which may hold-off one host while another host completes a data transfer to/from the shared device."). A switch of data transfer between two hosts is performed in Dickens in essentially the same manner (though potentially based on different switching criteria). *See* Ex. 1003, 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

While the data transfers may switch between hosts in Dickens and in the '243 patent, the USB connections from any two USB hosts 105 in Dickens to printer 182 are established and remain established regardless of whether data is presently being transferred. Each host 105 in Dickens remains connected to Dickens' routing controller 140 within data router 130 through its respective interface 150 and data converter 110. Like multi-host controller 106 in the '243 patent, Dickens controller 140 switches (arbitrates or alternates) data transmissions to/from different hosts in accordance with a desired algorithm. *See, e.g.,* Ex. 1003, 9:1–34 (audio alarms states from two computers are monitored and a printer is shared between established host connection based on a timeout period).

Patent Owner also argues Dickens' does not teach two concurrent USB connections because there is only a single connection between printer 182 (the claimed function block) and hosts 105. PO Resp. 35–39. Patent Owner reproduces an annotated version of Figure 2 of the '243 patent which is reproduced below.

IPR2017-00864
Patent 7,523,243 B2



*FIG. 2*

Figure 2 of the '243 patent, annotated by Patent Owner and reproduced above, shows two concurrent USB connections highlighted in yellow—one between PC 122 and printer 120 and a second between PC 123 and printer 120.  PO Resp. 37.

We are not persuaded by Patent Owner's argument.  The '243 patent discloses that printer 120 of Figure 2 is one example of multi-host device 106, including its controller 108.  *See* Ex. 1001, 2:51–59.  Figure 3 of the '243 patent further details the structure of multi-host device 108.  As discussed *supra*, device 106 in Figure 3 shows a single connection from its controller 106 to function block 312 essentially the same as Dickens' single USB bus 109 coupling device 100 to printer 182.  In other words, the concurrent USB connections of the '243 patent terminate at a single connection to the function block 312 just as the concurrent USB connections in Dickens terminate at a single connection to a peripheral device (e.g., printer 182).

IPR2017-00864
Patent 7,523,243 B2

Thus, USB connections in Dickens between both of two hosts 105 (or upstream ports) and the printer 182 are established and remain so as data exchanges may alternate among the two hosts and, hence, are "concurrent USB connections" because they "operate or occur at the same time once established."

### iii.   *"Concurrent Dedicated USB Connections"*

As discussed *supra*, we construe a "dedicated" USB connection to be "a USB connection that may include some shared physical communication path and includes a buffer for maintaining dedicated address, configuration and response information for the connection."  Patent Owner argues the Petition fails to show "dedicated" USB connections in Dickens because printer 182 (identified in the Petition as an exemplary function block) "has only one connection to the data router, i.e., 'USB connection 109.'"  PO Resp. 40 (citing Ex. 1003, 6:66–67).  By contrast, Patent Owner argues the "dedicated" connections of the '243 patent require two separate, distinct, physical connections from each of two hosts to the single function block. and again provides the same annotated version of its Figure 2, reproduced and discussed *supra*, to explain the difference.  *Id.* at 41–43.  Therefore, Patent Owner contends there are no "dedicated" connections in Dickens because the single path 109 is a shared portion of the connection used for both hosts to communicate with printer 182 and, thus, there is no dedicated USB connection between each host and the function block (e.g., printer 182).  *Id.* at 42–43.

IPR2017-00864
Patent 7,523,243 B2

We are persuaded by Petitioner's arguments.  Petitioner contends, and we agree, Patent Owner's arguments are based on an incorrect understanding of "dedicated" connection.  Reply. 17–18.

To clarify Petitioner's position, Petitioner provides two side-by-side annotated figures (Pet. Sur-Sur-Reply 10) that we reproduce below.[24]



The figure on the left is Figure 3 of the '243 patent with red and purple annotations added by Patent Owner showing two alleged "dedicated USB connections"—a first highlighted in red from the first host to device/function block 312 and a second highlighted in purple from the second host to block 312.  PO Sur-Reply 9.  On the right above, Petitioner

---

[24] Petitioner provided the annotated side-by-side figures in rebutting Patent Owner's arguments regarding "concurrency" of the USB connections.  See Sur-Sur-reply 9–10.  However, we find the figures instructive in helping to explain Petitioner's arguments regarding all aspects of "concurrent dedicated USB connections."

IPR2017-00864
Patent 7,523,243 B2

provides a similarly highlighted portion of Figure 2 from Dickens showing a
first dedicated USB connection, highlighted in red, from a first host to
printer 182 and a second dedicated USB connection, highlighted in purple,
from a second host to printer 182.[25]  Pet. Sur-Sur-Reply 9–10.

The annotations highlight that both the '243 patent and Dickens
provide two "dedicated" USB connections from corresponding two hosts to
a function block both ending in a single shared communication path to the
function block.  Thus, the USB connections of Dickens meet the first portion
of our interpretation "a USB connection that may include some shared
physical communication path."

Additionally, as discussed further below, Dickens' controller 140
include DRAM memory 144 used as a buffer for the connections in
accordance with the second portion of our construction of a "dedicated"
connection "includes a buffer for maintaining dedicated address,
configuration and response information for the connection."

Accordingly, we are persuaded that Dickens teaches that its
concurrent USB connections are "dedicated" concurrent USB connections
within the scope of our interpretation of "dedicated" connections.

---

[25] We note the red and purple highlighted path move off the figure to the
right to, and back from, Dickens' controller 140 in its Figure 2 but Petitioner
has excerpted only the portion relevant to demonstrating dedicated
connections similar to those of the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

### c.     Conclusion Regarding Independent Claims 1, 3, and 7

For the reasons discussed above, we are persuaded by a preponderance of the evidence that independent claims 1, 3, and 7 are anticipated by Dickens.

### 3.     Claim 23

Claim 23 recites, "a shared USB device block operable to be simultaneously configured by two or more USB hosts."  Patent Owner argues the Petition fails to identify where this element is taught in Dickens and, instead, merely treats claim 1 as representative of all the independent claims.  PO Resp. 43 (citing Pet. 59).  However, Patent Owner argues claim 23's recitation of "a shared USB device block operable to be simultaneously configured by two or more USB hosts" is a substantive difference over claim 1.  *Id.*  Each host 105 in Dickens is coupled with a corresponding converter 110 to emulate all peripheral device coupled to routing device 100.  *See* Ex. 1003, 5:26–53.  Patent Owner argues our reliance on the emulated printers as being configured simultaneously is misplaced.  *Id.* at 44 (citing Dec. 31–32).  Patent Owner contends the emulated devices are separate from the physical peripheral devices (e.g., printer 182 in Dickens) that are relied upon as the recited "shared device block" of claim 23.  *Id.*  Patent Owner further contends the emulated printers provided to each host 105 of Dickens by corresponding converters 110 are "enumerated, thus configured, independently from printer 182."  *Id.* (citing Ex. 2007 ¶ 110).

Petitioner argues in its Reply that hosts 105 enumerate/configure emulated printers and "host controller" 156 enumerates/configures printer 182.  Reply 18–19.  Specifically, Petitioner contends, "[H]aving configured

IPR2017-00864
Patent 7,523,243 B2

the emulated printer, insofar as the host can sense, it has configured the printer, emulated and actual/physical.  Put another way permitted by 23's language, hosts have, by emulation, configured the printer."  *Id.* at 19.

We are persuaded by Patent Owner's arguments.  Even if Petitioner's arguments in its Reply are persuasive, Patent Owner correctly observes that the Petition did not present any arguments specific to the substantive differences between claim 23 and claim 1—namely that the function block need be operable to be "simultaneously configured by two or more hosts." PO Resp. 43.

Furthermore, we are not persuaded by Petitioner's arguments in its Reply.  In essence, Petitioner appears to be arguing that hosts 105, configuring their respective emulated printers (through emulation by translators 110), are unaware whether they are configuring emulated printers or the actual/physical printer 182.  Accepting that as true, it is not the case that two such host are actually configuring the physical printer 182 (read as the shared function block) simultaneously.  They may configure the emulated printers simultaneously but we have insufficient persuasive evidence that that is the same as configuring the shared function block (physical printer 182) simultaneously.

Accordingly, we are not persuaded by a preponderance of the evidence that independent claim 23 is unpatentable as anticipated by Dickens.

### 4.    *Claim 18*

Patent Owner argues the "shared USB device" is construed in our Decision on Institution as "a USB device that may be simultaneously

IPR2017-00864
Patent 7,523,243 B2

configured and accessed by two or more USB hosts" and that further must have "three blocks, the third of which is a function block." PO Resp. 45–46; *see also* Dec. 11. Patent Owner further argues the only function block the Petition identified in Dickens is printer 182. *Id.* Patent Owner then contends, "The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously configure and access printer 182. Knapen ¶ 108. As discussed above, enumeration of the emulated printers are separate activities from the enumeration of printer 182." *Id.* Therefore, Patent Owner argues claim 18 is not anticipated "because Dickens does not have 'a USB device that may be simultaneously configured and accessed by two or more USB hosts,' as required by the Board's construction of 'shared USB device.'"

We are not persuaded by Patent Owner's argument. Initially, we observe that claim 18 does not require that the function block be simultaneously configured or enumerated, or even simultaneously accessed. Instead, it recites the step of receiving requests to the shared USB device (the "device" not the "function block" per se) and the step of processing those requests without any of the hosts needing to reconfigure the USB device each time (again referring to eh "device" rather than the function block). Other than the recitation that the shared USB device corresponds to a function, there is no reference to accessing the function. As discussed *supra*, we construe "shared USB device" in claim 18 to refer to the device rather than the function. *See* section II.A.4.c.

We are persuaded by a preponderance of the evidence that independent method claim 18 is unpatentable as anticipated by Dickens.

IPR2017-00864
Patent 7,523,243 B2

5.   *Dependent Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25*

Dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claims.  Petitioner identifies the further limitations of each of dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 in the disclosures of Dickens.  Pet. 60–63.

a.   *Claims 2, 6, 16, and 25*

Claims 2, 6, and 16, depend, directly or indirectly, from claims 1, 3, and 7, respectively, and each recites endpoint buffers positioned between respective upstream ports (or hosts) and the controller (e.g., endpoint & status 306 and 308 between upstream ports 302 and 304, respectively, and controller 108 in Figure 3 of the '243 patent).  Claim 25, dependent from claim 23, recites such buffers but does not recite their being positioned in any particular relationship to the hosts and controller.

The Petition contends, in Dickens, "DRAM memory 144 is coupled between the upstream ports and Dickens' device's data routing controller 140" thereby meeting the claim limitation.  Pet. 59.

As drawn in Dickens' Figure 2, DRAM memory 144 is not positioned physically between controller 140 and upstream ports (e.g., USB controllers 150).  Patent Owner argues precisely this physical difference contending DRAM memory 144 is not between controller 140 and the upstream ports, instead, "DRAM 144 is actually inside the multi-host device controller (i.e., routing controller 140)."  PO Resp. 46–47.

Petitioner argues "coupled between" should be construed to include "directly or indirectly connected" as coupled is defined in the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

Reply 13 (quoting Ex. 1001, 3:36–38). Petitioner supports this assertion citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310–11 (Fed. Cir. 2005) (A "'connection' can occur between . . . two devices regardless of whether they are housed separately or together. Indeed, the two components could be connected . . . and still be located in the same housing or even on the same circuit board."). Reply 13. Petitioner concludes that "coupled between" should be understood to mean "directly or indirectly connected with or without physical separation from what is connected." *Id.*

Patent Owner argues that, although "coupled" is defined in the '243 patent as directly or indirectly connected, "between" should have its plain and ordinary meaning and, thus, "one of ordinary skill would understand the endpoint buffer 'coupled between' the upstream port and the multi-host device controller is directly or indirectly connected in the middle of those two structures." PO Sur-Reply 11.

We are not persuaded by Petitioner's argument and we agree with Patent Owner that, based on the plain and ordinary meaning of "coupled between," Dickens DRAM memory 144 is not "coupled between" controller 140 and upstream ports. "Between" provides a specific structural limitation in these claims that cannot be ignored. Thus, we are not persuaded that claims 2, 6, and 16 are anticipated by Dickens.

Although claim 25 does not require the buffers be "coupled between" any other elements, for the reasons discussed *supra* regarding claim 23 from which claim 25 depends, we are not persuaded claim 25 is anticipated by Dickens.

IPR2017-00864
Patent 7,523,243 B2

c.     *Claims 4, 17, 22, and 24*

Claims 4, 17, 22, and 24 depend, directly or indirectly, from claims 1, 7, 18, and 23, respectively.  Claim 4 generally recites that the function is not re-enumerated each time a switch is made between hosts.  Claims 17, 22, and 24 further recite that the controller maintains address, configuration, and response ("ACR") information for each connected host.

The Petition asserts claims 4, 17, 22, and 24 "repeat in various phrasings the non-re-configuring and non-reenumerating of claim 1." Although claim 4 may relate to this feature, claims 17, 22, and 24 include no such recitations.  The Petition argues, "Dickens thereby discloses that the multi-host device controller allows the hosts to alternately access the USB function block without reconfiguring and/or re-enumerating the USB multi-host device each time the hosts alternate accessing the USB function block that is the Dickens printer" Pet. 61 (citing Ex. 1023 ¶ 118).

> Patent Owner argues:
>
> Petitioner fails to explain or identify any disclosure in Dickens where routing controller 140 "maintain[s] respective dedicated address, configuration, and response information for each of the plurality of hosts."  Rather, Petitioner merely rehashes the "non-re-configuration and non-reenumerating" argument of Claim 1 without specifically identifying in Dickens where the additional limitations of these dependent claims are allegedly found. Petition at 60–61.  The only Dickens passage Petitioner cites is column 9, lines 20–35.  *See id.*  Neither this passage—nor anything else in Dickens—expressly discloses the multi-host device controller (i.e., routing controller 140) maintaining address, configuration, and response information for each of the hosts.  And to the extent, Dickens might maintain address, configuration, and response information, it might do so outside of the "multi-host device controller."   Dickens does not, therefore, anticipate Claims 17, 22, and 24.

IPR2017-00864
Patent 7,523,243 B2

PO Resp. 48.

Petitioner argues "maintaining" the recited ACR information equates with "establishing a dedicated connection 'without needing [the device] to be re-configured or re-enumerated . . . .'" Reply 15 (quoting Ex. 1001, 2:33–37).

We are not persuaded by Petitioner's argument. Regarding claims 17, 22, and 24, we agree with Patent Owner that the Petition fails to identify where Dickens teaches that the controller maintains the recited ACR information. Petitioner's argument in its Reply attempts to construe the recited element so as to coincide with the Petition's arguments directed to re-enumeration and reconfiguration. We discern no need for construction of the recited element beyond its plain meaning—namely that the control maintains the recited ACR information. Although the recitation may be inherent or suggested in Dickens, the Petition simply fails to identify an express teaching of this feature in Dickens. Thus, we are not persuaded by a preponderance of the evidence that claims 17, 22, and 24 are anticipated by Dickens.

Regarding claim 4, we are persuaded by a preponderance of the evidence that the claim is unpatentable as anticipated by Dickens.

### d. Claims 5, 8, 11, 15, 19, and 20

The Petition identifies the features of these dependent claims in Dickens (Pet. 61–62) and Patent Owner does not rebut these assertions (*see* PO Resp.). We are persuaded by a preponderance of the evidence that claims 5, 8, 11, 15, 19, and 20 are anticipated by Dickens.

IPR2017-00864
Patent 7,523,243 B2

F.  *Obviousness over Either Furukawa or Dickens, and Chen*

The Petition asserts dependent claims 9, 11–14, and 21 are unpatentable as obvious over either Furukawa or Dickens, in combination with Chen.  Pet. 63–69.  Claims 9 and 11–14 depend (directly or indirectly) from claim 7, and claim 21 depends from claim 18.  Claims 9, 11, 12, and 21 recite limitations relating to interleaving processing of requests received from USB hosts.  Claims 13 and 14 recite limitations relating to distribution of bandwidth in processing of requests from multiple USB hosts.  Petitioner relies on Chen, in combination with either Furukawa or Dickens, for disclosing the interleaving and bandwidth related limitations.  *Id.*

In view of our findings *supra* regarding Furukawa, we do not further consider the alternative of Furukawa in combination with Chen because the Petition does not rely on Chen for any deficiency of Furukawa discussed *supra*.

1.  *Chen (Ex. 1005)*

According to Chen, USB flash memory devices that operate as disk drives to a personal computer ("PC") are each assigned a drive letter by the PC operating system software.  Ex. 1005, 1:47–57.  Chen further discloses that several such flash memory USB drives may be added to a PC using USB hubs to expand the number of USB devices accessible to the PC.  *Id.* at 1:19–20.  However, according to Chen, the number of such flash memory drives could exceed the number of possible drive letters in the PC operating system.  *Id.* at 1:58–67.  Chen purports to resolve this problem by providing an enhanced USB hub capable of operating as a standard USB hub or, in a "single-endpoint mode" of operation, as an enhanced hub that aggregates

IPR2017-00864
Patent 7,523,243 B2

downstream USB flash memory disk drives into one logical USB endpoint as detected by the PC operating system and hence as a single device or drive letter. *Id.* at 2:53–64.

Chen's Figure 2, reproduced below, is a block diagram of a USB switch that aggregates multiple flash memory endpoints coupled thereto into a single endpoint for the USB host (PC). *Id.* at 2:13–14.



FIG. 2

Figure 2 depicts USB switch 30 coupled with USB host 10 through USB controller 12 to receive and process requests over USB bus 18. *Id.* at 2:53–

IPR2017-00864
Patent 7,523,243 B2

57.  Mode logic 26 controls switch 30 to selectively operate in the single-endpoint mode.  *Id.* at 2:59–61.

> When operating in single-endpoint mode, USB switch **30** acts as the final USB endpoint for transactions on USB bus **18** to host **10**.  USB switch **30** generates USB transactions on hidden USB buses **28** to USB flash storage blocks **22, 23, 24**.  USB flash storage blocks **22, 23, 24** respond to USB switch **30** over hidden USB buses **28** with USB switch **30** acting as the USB host on hidden USB buses **28**.  USB switch **30** then forwards data to host **10** by acting as the endpoint.  Thus[,] USB flash storage blocks **22, 23, 24** are hidden from host **10** when mode logic **26** activates the single-endpoint mode.

*Id.* at 3:5–14.

Chen further discloses that, when operating in the single-endpoint mode to aggregate multiple flash memory drives into a single endpoint, transaction packets may be re-ordered.  *Id.* at 3:63–66.  For example, "Rather than have all packets for a first transaction complete before the next transaction begins, packets for the next transaction can be re-ordered by USB switch **30** and sent to the memory devices before completion of the first transaction."  *Id.* at 4:2–6.  Chen's Figure 5 shows exemplary re-ordering of transaction packets and Chen discloses that "[d]ata throughput can be improved using such packet re-ordering."  *Id.* at 5:49–50.

## 2.  *Motivation to Combine Dickens and Chen*

Petitioner identifies motivation for the proposed combination by referring to "rationales (D) and (G) of MPEP 2143."  Pet. 63 (citing Ex. 1023 ¶¶ 123–141).  As discussed in our Decision on Institution, to the extent that arguments are found only in the Declaration of Mr. Garney, we

70

IPR2017-00864
Patent 7,523,243 B2

determine those arguments are improperly incorporated by reference
(37 C.F.R. § 42.6(a)(3)), and we decline to consider them.

However, Petitioner also argues that the ordinarily skilled artisan
would have been motivated to combine Chen's interleaving with Dickens'
system because Chen's known techniques of interleaving USB host
transactions would improve throughput in the similar system of Dickens in a
similar manner and because Chen specifically teaches its interleaving
technique improves data throughput. Pet. 66–67. Specifically, Petitioner
contends it would have been obvious to improve throughput for any or all of
multiple USB hosts sending transactions to USB peripheral devices in
Dickens by adding Chen's interleaving features to Dickens' data router. *Id.*
Petitioner further contends the ordinarily skilled artisan would have
recognized that "interleaving transactions from two or more hosts is not
different than interleaving transactions from one host." *Id.* at 67.

Patent Owner argues the ordinarily skilled artisan would not have
been motivated to combine Dickens and Chen because "1) Dickens
expressly teaches away from a combination with Chen, 2) combining Chen
with Dickens would render Dickens inoperable, and 3) Petitioner's proposed
combination does not improve Dickens, does not apply Chen's
'improvement' technique in the same way as it is used in Chen, and does not
result in predictable results." PO Resp. 49–50. We address each argument
in turn.

> a.   *Dickens Does Not Teach Away From Chen's Interleaving*

Patent Owner argues Dickens teaches sharing a printer among
multiple hosts relying on a timeout period to determine when to switch

71

IPR2017-00864
Patent 7,523,243 B2

between host requests and, thus, teaches away from Chen's interleaving of print data from multiple hosts.  PO Resp. 51–52.

Petitioner argues Dickens teaches connecting a plurality of hosts to any number of peripheral devices.  Reply 24.  Although a printer as an exemplary peripheral device is discussed with respect to other aspects of the Petition, Petitioner argues the combination with Chen was proposed based on a mass storage device, such as in Chen and as identified in the '243 patent, as the shared peripheral.  *Id.* (citing Ex. 1001, 2:23–24, 4:7).

Petitioner correctly argues that a teaching away must clearly discredit or discourage the proposed combination.  Reply 23; *see In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *see also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed . . . .").  Dickens does not clearly discredit Chen's interleaving approach.  The timeout features to switch between host print jobs is disclosed in Dickens only for sharing of a printer peripheral device.  Other peripheral devices, such as speakers 180, need not use timeouts.  Mr. Garney, Petitioner's expert, testifies that Chen's interleaving may be beneficially used to interleave multiple hosts sending transactions to other types of peripheral devices such as Dickens' speakers 180.  Ex. 2006, 135:7–22.  Mr. Garney further testifies that Chen's interleaving may be beneficially applied to interleave print jobs for certain types of printer generating a small volume of printed output such as a label printer.  *Id.* at 136:16–25.

IPR2017-00864
Patent 7,523,243 B2

Thus, we are persuaded that Dickens' exemplary use of a printer as a shared peripheral device does not discredit or discourage use of Chen's interleaving and, thus, does not teach away from the proposed combination.

### b.      *Combination Does Not Render Dickens Inoperable*

Patent Owner argues combining Chen with Dickens renders Dickens inoperable because Chen teaches interleaving transactions (that comprise multiple packets) by interleaving the multiple packets of multiple transactions, each destined to different downstream device—i.e., a different downstream memory device.  PO Resp. 53.  Patent Owner argues this is only because, in Chen, each downstream memory device would receive packets destined to the device in the proper sequence.  *Id.*  By contrast, Patent Owner argues, where the destination is a single device, the interleaving of packets from different host transactions (such as multiple hosts sharing a single peripheral device as in Dickens) would risk packets arriving out of sequence, thus, violating USB protocols and rendering the combination inoperable.  *Id.* at 53–54.

Petitioner argues Patent Owner's arguments are based on a hypothetical out of order sequence of interleaved packets but Chen does not disclose such a sequence.  *See* Reply 25–26.

We are persuaded by Petitioner's arguments.  Chen's Figure 5 depicts an exemplary sequence of re-ordering received packets for two transaction from one host.  The description of Figure 5 explains a carefully designed sequence of operations to enable interleaving of packets of a transaction in a manner that precludes out of order packets.  *See* Ex. 1005, 4:62–5:54.  This specific sequence need not be applied by rote in the proposed combination

IPR2017-00864
Patent 7,523,243 B2

with Dickens and, thus, Patent Owner's hypothetical inoperability arises from rote bodily incorporation of the references.  "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements. . . . Rather, the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art."  *In re Mouttet*, 686 F.3d 1322, 1332–33 (Fed. Cir. 2012); *see also MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 (Fed. Cir. 2015) ("[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference" (citation omitted)), *cert. denied*, 137 S. Ct. 292 (2016).  We are persuaded by Petitioner's arguments that the ordinarily skilled artisan, with knowledge of the USB specification and experience in the design of USB devices, would have understood how to apply the suggestions of Chen to interleave transactions in the context of Dickens' multiple hosts accessing a shared peripheral device.

> c.    *Combining Chen With Dickens Improves Dickens*

Patent Owner argues the proposed combination does not improve Dickens because the combination renders Dicken inoperable.  PO Resp. 55. For the reasons discussed *supra*, we disagree.  The proposed combination does not render Dickens inoperable.

Patent Owner further argues the Petition fails to explain how Chen's interleaving improves Dickens because "Chen's system is fundamentally different."  *Id.*  Patent Owner argues, "Chen is a switch between a single host and multiple downstream devices whereas Dickens' is a switch between

IPR2017-00864
Patent 7,523,243 B2

multiple hosts and a single device."  *Id.*  Patent Owner contends, "[t]o the extent one of ordinary skill could find some way to make the combination operable, it would have to be in some way other than as described in Chen."  *Id.* at 56.

Petitioner argues the alleged fundamental difference is incorrect because Chen discloses a single device made up of blocks.  Reply 27.

We are persuaded by Petitioner's arguments.  Figure 5 of Chen describes the interleaving of packets for multiple transactions when operating in its disclosed "single-endpoint" mode of operation in which the host sees the multiple memory devices as a single USB device.  *See* Ex. 1005, 2:59–3:4.  As above, an ordinarily skilled artisan, with knowledge of the USB specification and experience designing USB devices, would have understood that Chen's two interleaved transactions could be two transactions from two separate hosts as in Dickens.  Thus, we are persuaded that the proposed combination would have been operable and that the improvements of Chen's interleaving would have been suggested to the ordinarily skilled artisan to improve throughput of multiple transactions from multiple hosts directed to a shared, single-endpoint, peripheral device.

  d.    *Conclusion Regarding Motivation to Combine Dickens and Chen*

For the reasons discussed below, we are persuaded Petitioner has provided a sufficient reason/motivation for the combination of Chen's interleaving with Dickens' device to improve throughput based on rational underpinnings.

IPR2017-00864
Patent 7,523,243 B2

> 3.    *Claims 9, 11–14, and 21 Obvious Over Dickens and Chen*

Patent Owner does not respond to Petitioner's substantive arguments regarding obviousness of claims 9, 11–14, and 21.  We are persuaded by a preponderance of the evidence that claims 9, 11–14, and 21 would have been obvious over the combination of Dickens and Chen.

> G.    *Obviousness over Either Furukawa or Dickens and USB 2.0*

In this asserted ground, Petitioner argues, in its entirety:

> Just as either Furukawa or Dickens in view of Chen invalidates claims 9, 11–14, and 21, as in ground 3, either Furukawa or Dickens in view of USB 2.0 invalidates claims 9, 11–14, and 21.  USB 2.0 also has interleaving, as does Chen. Garney-¶¶ 20, 142-148.  See also Garney '190 E1019-1:52-2:7.

Pet. 70.

Contrary to our rules, Petitioner's assertions in this ground improperly incorporate by reference discussion from Mr. Garney's Declaration.  37 C.F.R. § 42.6(a)(3).  We do not consider such improperly incorporated arguments from another document.  The arguments presented within the Petition are inadequate to identify where each element is taught or suggested in the prior art.  *See* 37 C.F.R. § 42.104(b)(4) ("[t]he petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon").

Thus, Petitioner has not shown, by a preponderance of the evidence, that claims 9, 11–14, and 21 are unpatentable as obvious over either Furukawa or Dickens in combination with USB 2.0

IPR2017-00864
Patent 7,523,243 B2

>    H.    *Obviousness over Wurzburg, Osakada, and*
>          *Either Furukawa or Dickens*

For this ground, the Petition asserts, "Bohm claims 1-25 are invalid for obviousness over *Wurzburg in view of Osakada, as in prosecution*, in view of either Furukawa or Dickens."  Pet. 70 (emphasis added).  We observe Wurzburg and Osakada were not asserted as a combination during prosecution of this patent application or in prosecution of the parent patent application.  In the last Office Action before allowance of the parent patent application, Wurzburg was applied as an anticipatory reference to claims 1, 3–5, 7–9, 11, 12, 15, and 17–24 and applied in a single reference obviousness rejection for dependent claims 2, 6, 16, and 25.[26]  *See* Ex. 1014, 12, 25–30.  In an earlier Office Action in the parent patent application's prosecution, Osakada was applied in both an anticipation rejection and a single reference obviousness rejection.  *Id.* at 51–56.  Even if such prior Office Actions were properly incorporated by reference, Petitioner has not identified, nor do we discern, anywhere in the record where Wurzburg and Osakada have been previously applied in combination for an obviousness rejection.  Thus, the Petition fails to "specify where each element of the claim is found in the prior art patents or printed publications relied upon" as required by our rules.  37 C.F.R. § 42.104(b)(4).

Petitioner further argues the combination of Wurzburg and Osakada "lacked only concurrent connections as opposed to non-concurrent connections, simultaneous access instead of non-simultaneous access, and non-reconfiguring during access, as opposed to configuring during access."

---

[26] As noted *supra*, the claims of the parent patent application are nearly identical to those of the '243 patent.

IPR2017-00864
Patent 7,523,243 B2

Pet. 70.  Petitioner then asserts Furukawa teaches these missing features.  *Id.*
As discussed *supra*, we are not persuaded that Furukawa expressly or
inherently teaches these features.[27]  *Id.*

For at least the above reasons, Petitioner has not shown, by a
preponderance of the evidence that claims 1–25 are unpatentable as obvious
over Wurzburg in view of Osakada, and either Furukawa or Dickens.

## I.   *Obviousness over Either Furukawa or Dickens, Chen, and Other Art*

Petitioner's argument for this ground, in its entirety, reads:

> To any extent Bohm's owner asserts lack of anticipation
> of claims by Furukawa or Dickens, the claims are invalid for
> obviousness under 35 U.S.C. §103 from either Furukawa or
> Dickens, Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and
> all other cited art.  Both Furukawa and Dickens disclose a multi-
> host USB device with a USB multi-host device and controller,
> their structures, and associated connections and functionalities,
> that provide connections to USB devices by multiple hosts
> without re-enumeration and reconfiguration of the devices by the
> hosts.  To any extent the Bohm patent owner disagrees in any
> detail as to any of the independent and dependent claims, the
> disagreement will surely be as to known ("known") USB system
> structures and functionalities ("technology"), and then
> Furukawa, Dickens, Chen, Wuraburg [sic], Osakada, APA,
> Adder, USB 2.0, Lou, Fujita, and all the other cited art overcome
> the disagreement and teach and/or make obvious the owner-
> referenced technology.  USB 2.0 is especially thorough in
> explaining known USB system technology in all details of the
> Bohm claims.  It even states that it provides "architecture

---

[27] Petitioner is silent in this ground with respect to specific teaching in
Dickens to be added to the proposed combination of Wurzburg and Osakada.
Petitioner does not even attempt to incorporate by reference, however
improper, earlier arguments regarding teachings of Dickens to be added to
the proposed combination.

> upgradeable to support multiple USB Host Controllers in a system," thereby suggesting multiple hosts. U-14-upgrade-path. Strong motivation to combine as necessary to provide what Bohm sought to provide, i.e., access of USB hosts in plural to USB device(s) without disconnection switching that caused device reconfiguration, B-1:65-2:5, was provided by Furukawa and Dickens, and also USB 2.0, Lou, and Fujita. Wurzburg and Adder disclosed devices just short of the Bohm claims by requiring switching, which was replaced in Furukawa and Dickens. Moving forward the next step as in all of Bohm, Furukawa and Dickens was strongly motivated by Furukawa, Dickens, Fujita, and Lou. No dependent claims of Bohm add patentable merit to any independent claim.

Pet. 71–72.

To the extent this ground is asserting obviousness over any combination with Furukawa, as discussed *supra*, we are not persuaded Furukawa expressly or inherently teaches the features of the '243 patent for which Petitioner relied on it earlier in the Petition.

To the extent this ground is asserting the combination of Dickens and Chen, that combination is addressed above.

To the extent this ground is asserting any combinations other than those addressed above, the analysis in this ground is inadequate to meet the requirements of our rules regarding the level of detail required. 37 C.F.R. § 104(b)(4).

Thus, Petitioner has not shown, by a preponderance of the evidence that claims 1–25 are unpatentable as obvious over the above-proposed combinations.

IPR2017-00864
Patent 7,523,243 B2

## J.    Conclusion

For the reasons discussed *supra*, we are persuaded by a preponderance of the evidence, that claims 1, 3–5, 7–9, 11–15, and 18–21 of the '243 patent are unpatentable.  Petitioner has not shown, by a preponderance of the evidence, that claims 2, 6, 10, 16, 17, and 22–25 are unpatentable.

## III.    MOTION TO EXCLUDE

Patent Owner timely objected (Paper 46) to Petitioner's Exhibit 1053 (Mr. Garney's Reply Declaration) and filed a Motion to Exclude (Paper 50, "Mot." or "Motion") moving to exclude Exhibit 1053 and Petitioner's Sur-Reply.  Patent Owner argues the Sur-Reply and Exhibit 1053 raise new arguments directed to inherency in the alleged anticipation of certain challenged claims by Furukawa.  *See* Mot.

We are not persuaded by Patent Owner's argument.  As is discussed *supra*, we expressly found, and Petitioner confirmed, that it is not arguing inherency in its anticipation arguments but, instead, relies solely on what Petitioner argues are express disclosures of Furukawa.

Patent Owner further argues Petitioner's Sur-Reply should be excluded because, by incorporating portions of Exhibit 1053, the Sur-Reply attempts to circumvent the five-page limit as ordered when authorizing the Sur-Reply filing.

We remain unpersuaded by Patent Owner's argument.  The Sur-Reply cites to various portions of Mr. Garney's Reply Declaration (Ex. 1053) to support its arguments but does not attempt to incorporate the entirety of that declaration into its Sur-Reply.

IPR2017-00864
Patent 7,523,243 B2

For the above reasons, we are not persuaded that Petitioner's Sur-Reply or Exhibit 1053 should be excluded, and for the foregoing reasons, Patent Owner's Motion to Exclude is *denied*.

IPR2017-00864
Patent 7,523,243 B2

III.   ORDER

After due consideration of the record before us, and for the foregoing reasons, it is:

ORDERED that claims 1, 3–5, 7–9, 11–15, and 18–21 of U.S. Patent No. 7,523,243 B2 are held *unpatentable*;

FURTHER ORDERED that claims 2, 6, 10, 16, 17, and 22–25 of U.S. Patent No. 7,523,243 B2 have *not* been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Petitioner's Sur-Reply (Paper 42) and Exhibit 1053 is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00864
Patent 7,523,243 B2

PETITIONER:

Scott A. McKeown
James L. Davis, Jr.
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
james.l.davis@ropesgray.com


PATENT OWNER:

Bruce W. Slayden II
Brian C. Banner
R. William Beard, Jr.
Truman H. Fenton
Jerry F. Suva
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
bbanner@sgbfirm.com
wbeard@sgbfirm.com
tfenton@sgbfirm.com
jsuva@sgbfirm.com

EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICROCHIP TECHNOLOGY INCORPORATED, | § § § | |
| Plaintiff, | § | C.A. No. 17-1194-LPS-CJB |
| | § | |
| vs. | § | JURY TRIAL DEMANDED |
| | § | |
| APTIV SERVICES US, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## REBUTTAL EXPERT REPORT OF JOHN LEVY, PH.D.

## RELATED TO VALIDITY OF

### U.S. Patent No. 7,532,243
### U.S. Patent No. 7,627,708

Dated: October 18, 2019

REBUTTAL EXPERT REPORT OF JOHN LEVY, PH.D.

## IX.  General Observations About the Garney Report

73.    Mr. Garney's report offers many opinions that are conclusory and fail to point out with specificity the facts on which he bases his opinion.

74.    In addition, he offers a misleading characterization of USB in his Technological Background section.  In particular, he states:

"A USB hub is a device that provides additional connections to the serial bus and permits USB communications between **one or more host computers** and multiple peripheral devices."

Garney report at ¶75 (emphasis added).

The footnoted reference confirms the definition given later in his report: "**The standard contemplates only one host for each serial bus.**" (emphasis added)

75.    Mr. Garney also provides misleading and mistaken characterizations of the alleged prior art.  I address each of those below.

## X.  The Art Mr. Garney Cites Does Not Anticipate or Render Obvious Any Claim of the '243 Patent

76.    In his summary of prior art section, Mr. Garney states:

"Dickens teaches that in an aspect of the invention, the USB hub may provide simultaneous connectivity between a plurality of host computers and one or more of a plurality of peripheral devices." [Garney Rpt. ¶ 154].

77.    The citation [Dickens at 4:24-63] discloses that converted computer data from the computer data converter and converted peripheral data from the peripheral data converter flow "as though" they were directly connected by a USB bus.  This does not represent "simultaneous connectivity" of the hosts and peripherals as Mr. Garney represents.  The data flow is via the PCI bus.

### A.  Dickens Fails to Disclose Every Element of the '243 Patent Claims

78.    Paragraphs 248-257 of Mr. Garney's report, and Exhibit E-1 thereto, are directed to a comparison of claims 2, 6, 10, 16, 17, 22, 23, and 25 of the '243 Patent ("'243 Asserted Claims") with U.S. Patent No. 6,549,966 ("Dickens").

79.    Mr. Garney indicates in a footnote on page 7 of his report his opinion that Dickens alone anticipates or renders obvious the '243 Asserted Claims.  In the same footnote, Mr. Garney indicates he has not been asked to present such opinions.  However, it appears Mr. Garney does, in fact, present such opinions, for example, at paragraphs 248-257 and Exhibit E-1 of his report.

80.    Counsel for Microchip has informed me that Aptiv (and Mr. Garney) cannot challenge the validity of the '243 Asserted Claims based on Dickens alone under 35 U.S.C. § 102

REBUTTAL EXPERT REPORT OF JOHN LEVY, PH.D.

(anticipation) or § 103 (obviousness,) or based on Dickens alone in view of the knowledge of a POSITA under § 103 (obviousness). Accordingly, I do not rebut Mr. Garney's opinions on those grounds. I reserve the right to supplement this report to address those grounds in the event Mr. Garney or Aptiv are allowed to present those grounds at trial.

81.     In order to prove the '243 Asserted Claims invalid under 35 U.S.C. § 103 in view of Dickens and other art, Mr. Garney and Aptiv must (1) analyze the differences between the '243 Asserted Claims and Dickens and other art; and based on those differences, (2) show by clear and convincing evidence that the '243 Asserted Claims, as a whole, would have been obvious to a POSITA at the time the invention was made.

82.     For the reasons discussed below, I disagree with Mr. Garney that Dickens in combination with other alleged prior art renders the '243 Asserted Claims obvious.

> **i.      Mr. Garney Fails to Prove that Dickens Discloses "Concurrent Respective Dedicated USB Connections Between the USB Device Block and the First and Second Upstream Ports" (Claim 2)**

83.     Claim 2 of the '243 Patent depends from Claim 1 and therefore includes all of the limitations found in both Claim 1 and Claim 2. Claim 1 requires a "multi-host device controller . . . configured to establish concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports . . . ."

84.     Mr. Garney's analysis of this limitation of Claim 1 is found only at pages 4-7 of Exhibit E-1 to his report. Mr. Garney quotes various passages in Dickens, but does not expressly identify the "concurrent respective dedicated USB connections between the USB device block and the first and second upstream ports." For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens combined with other prior art renders Claim 2 obvious.

85.     Mr. Garney appears to identify Dickens' "device controllers 150" as the claimed "upstream ports." [Garney Rpt., Ex. E-1 at 3-4]. I disagree with Mr. Garney's conclusion because device controllers are not upstream ports. Dickens confirms this fact by disclosing a "Lucent Technologies USS-820 is a suitable USB device controller." [APTIV_00001922, 6:54-55]. A POSITA would recognize this device controller as a discrete chip that implements a device interface (as defined by the USB specification). Thus, it is my opinion that device controllers 150 are not upstream ports. For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens combined with other prior art renders Claim 2 obvious.

86.     Mr. Garney identifies Dickens' "printer 182 and any of the other shared peripheral devices" as the claimed "USB device block." [Garney Rpt., Ex. E-1 at 4].

87.     To have Dickens read on Claim 1 of the '243 Patent, Mr. Garney must show the presence in Dickens (or obviousness) of "concurrent respective dedicated USB connections" between the printer 182 (or other shared peripherals) (Mr. Garney's "USB device block") and device controllers 150 (Mr. Garney's "upstream ports"). Mr. Garney does not present an

obviousness argument for this limitation.  Thus, I assume he concludes it is expressly disclosed in Dickens.  I disagree.

88.     Dickens does not disclose "concurrent respective dedicated USB connections" between the printer 182 (or other shared peripherals) (Mr. Garney's "USB device block"), and device controllers 150 (Mr. Garney's "upstream ports").  As discussed above at ¶¶45-64, Dickens' PCI bus 132 is a required path for data transmitted between Host 1 (and associated device controller 150) and peripheral devices 180, 182, 184, 186.  Similarly, Dickens' PCI bus 132 is a required path for data transmitted between Host 2 (and associated device controller 150) and peripheral devices 180, 182, 184, 186.

89.     As noted above at ¶ 13, the Court construed "respective dedicated USB connection" in Claim 1 of the '243 Patent as "a USB connection that is not shared (except that multiple USB connections may alternate in some manner communicating across the same shared physical connection)."  In its Memorandum Opinion on claim construction, the Court held "that a 'USB connection' must substantially comply with some USB standard."  [Docket No. 113 at 16].  Dickens' PCI bus is not a "respective dedicated USB connection" under the Court's construction because a PCI bus 132 is not a USB bus and a PCI bus does not substantially comply with some USB standard. For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens alone or combined with other prior art anticipates or renders Claim 2 obvious.

90.     Dickens expressly states "[t]he microprocessor 142 converts incoming computer data from the USB host computers 105 into a format that is independent of the USB protocol and stores it in DRAM 144.  It also performs the reverse task on data that is flowing in the opposite direction."  [APTIV_00001023, 7:45-49].  "Any data received from the printer 180 and speakers 182 is converted by the peripheral data converters into a converted peripheral data format that is independent of the USB protocol and stored in the DRAM 144 ready for processing by the microprocessor 142 of the routing controller 140."  [APTIV_00001023, 8:37-41].  These passages in Dickens make it clear that microprocessor 142 converts and handles in a non-USB format data transmitted between peripherals 180, 182, 184, 186 and external hosts 105.  One of ordinary skill in the art would understand this manner of transmitting data does not substantially comply with a USB standard.

91.     Further, Dickens does not disclose "*concurrent* respective dedicated USB connections" between a USB device block (such as printer 182) and first and second upstream ports, because there is only one upstream port connected to printer 182.  Specifically, the USB 2.0 Specification defines "[a]n upstream port [as] the port on a device electrically closest to the host that generates upstream data traffic from the hub.  Upstream ports receive downstream data traffic."  [APTIV_00001226].  The USB 2.0 Specification further states "[a]ll devices have an upstream connection."  [APTIV_00001234].  As discussed above at ¶¶45-64, a POSITA would understand that Host 4 is the host that generates upstream data traffic related to Dickens' printer 182.  Thus, the only "upstream port" on USB Bus 4 is the port on Dickens' printer 182, as shown in the annotation below:

REBUTTAL EXPERT REPORT OF JOHN LEVY, PH.D.



[APTIV_00001019 (annotated)].

92.     I understand Claim 1 (and thus, Claim 2) of the '243 patent to require "concurrent respective dedicated USB connections" between the USB device block and two upstream ports. Mr. Garney identifies printer 182 as the USB device block.  [Garney Rpt., Ex. E-1 at 4].  Yet printer 182 is connected to only one upstream port.  This cannot satisfy the "concurrent respective dedicated USB connections" claim language because a POSITA would understand that language to require more than one dedicated USB connection.   Indeed, the Court confirmed this understanding when discussing the construction of "respective dedicated USB connections": "[The Court's construction] does not upset the claims' requirement that the connection be 'concurrent.'  When sharing a physical connection, *a plurality* of dedicated USB connections may exist concurrently (e.g., the peripheral device has been enumerated by each host and has available buffer memory), but each USB connection alternates communicating across the shared physical connection."  [Docket 113 at 16 (emphasis added)].

93.     Printer 182 has only one USB connection to Host 4, and that connection is through a single upstream port.  Indeed, Dickens discloses that "[e]ach peripheral device can have a USB connection by which it is connected to *a respective one* of the plurality of peripheral data converters."   [APTIV_00001022, 5:2-4 (emphasis added)].  Accordingly, Dickens does not disclose a plurality of dedicated USB connections between two upstream ports and printer 182 that "operate or occur at the same time" (i.e., are "concurrent").  For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens combined with other prior art renders Claim 2 obvious.

31

REBUTTAL EXPERT REPORT OF JOHN LEVY, PH.D.

      **ii.**      **Mr. Garney Fails to Prove that Dickens Discloses "a Multi-Host Device Controller Coupling the USB Device Block to a First Host and a Second Host, Wherein the Multi-Host Device Controller is Configured to Establish a First Dedicated USB Connection Between the First Host and the USB Device Block and a Second Dedicated USB Connection Between the Second Host and the USB Device Block, Wherein the First Dedicated USB Connection and the Second Dedicated USB Connection are Concurrent" (Claims 3 and 6)**

94.     Mr. Garney apparently concludes Dickens alone or combined with other alleged prior art discloses "a multi-host device controller coupling the USB device block to a first host and a second host, wherein the multi-host device controller is configured to establish a first dedicated USB connection between the first host and the USB device block and a second dedicated USB connection between the second host and the USB device block, wherein the first dedicated USB connection and the second dedicated USB connection are concurrent." [Garney Rpt., Ex. E-1 at p. 25]. I disagree. The evidence Mr. Garney cites does not support his conclusion.

95.     Mr. Garney identifies Dickens' "printer 182 and any of the other shared peripheral devices" as the claimed "USB device block." [Garney Rpt., Ex. E-1 at 4].

96.     To have Dickens read on Claim 3 of the '243 Patent, Mr. Garney must show the presence in Dickens (or obviousness) of "[first and second] dedicated USB connections" between the printer 182 (or other shared peripherals) (Mr. Garney's "USB device block") and host PCs 105. Mr. Garney does not present an obviousness argument for this limitation. Thus, I assume he concludes it is expressly disclosed in Dickens. I disagree.

97.     Dickens does not disclose first and second (concurrent) "dedicated USB connections" between the printer 182 (or other shared peripherals) (Mr. Garney's "USB device block"), and host PCs 105. As discussed above at ¶¶45-64, Dickens' PCI bus 132 is a required path for data transmitted between Host 1 and peripheral devices 180, 182, 184, 186. Similarly, Dickens' PCI bus 132 is a required path for data transmitted between Host 2 and peripheral devices 180, 182, 184, 186.

98.     As noted above ¶ 13, the Court construed "respective dedicated USB connection" in Claim 3 of the '243 Patent as "a USB connection that is not shared (except that multiple USB connections may alternate in some manner communicating across the same shared physical connection)." In its Memorandum Opinion on claim construction, the Court held "that a 'USB connection' must substantially comply with some USB standard." [Docket No. 113 at 16]. Dickens' PCI bus is not a "dedicated USB connection" under the Court's construction because a PCI bus 132 is not a USB bus and a PCI bus does not substantially comply with some USB standard. For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens alone or combined with other prior art anticipates or renders Claim 6 obvious.

99.     Dickens expressly states "[t]he microprocessor 142 converts incoming computer data from the USB host computers 105 into a format that is independent of the USB protocol and stores it in DRAM 144. It also performs the reverse task on data that is flowing in the opposite

REBUTTAL EXPERT REPORT OF JOHN LEVY, PH.D.

direction." [APTIV_00001023, 7:45-49]. "Any data received from the printer 180 and speakers 182 is converted by the peripheral data converters into a converted peripheral data format that is independent of the USB protocol and stored in the DRAM 144 ready for processing by the microprocessor 142 of the routing controller 140." [APTIV_00001023, 8:37-41]. These passages in Dickens make it clear that microprocessor 142 converts and handles in a non-USB format data transmitted between peripherals 180, 182, 184, 186 and external hosts 105. One of ordinary skill in the art would understand this manner of transmitting data does not substantially comply with a USB standard.

100.    Further, Dickens does not disclose first and second "dedicated USB connections" that are *concurrent* between a USB device block (such as printer 182) and host PCs 105 because there is only one host connected to printer 182. As discussed above at ¶¶45-64, a POSITA would understand that Host 4 is the only host that is connected via a USB connection to Dickens' printer 182, as shown in the annotation below:



[APTIV_00001019 (annotated)].

101.    I understand Claim 3 (and thus, Claim 6) of the '243 patent to require first and second "dedicated USB connections" that are "concurrent" between the USB device block and two hosts. Mr. Garney identifies printer 182 as the USB device block. [Garney Rpt., Ex. E-1 at 4]. Yet printer 182 is connected to only one host. This cannot satisfy the "concurrent" first and second "dedicated USB connections" claim language because a POSITA would understand that language to require more than one dedicated USB connection. Indeed, the Court confirmed this

33

understanding when discussing the construction of "respective dedicated USB connections": "[The Court's construction] does not upset the claims' requirement that the connection be 'concurrent.' When sharing a physical connection, *a plurality* of dedicated USB connections may exist concurrently (e.g., the peripheral device has been enumerated by each host and has available buffer memory), but each USB connection alternates communicating across the shared physical connection." [Docket 113 at 16 (emphasis added)].

102.    Printer 182 has only one USB connection to Host 4.  Indeed, Dickens discloses that "[e]ach peripheral device can have a USB connection by which it is connected to *a respective one* of the plurality of peripheral data converters." [APTIV_00001022, 5:2-4 (emphasis added)]. Accordingly, Dickens does not disclose first and second dedicated USB connections between two hosts and printer 182 that "operate or occur at the same time" (i.e., are "concurrent").  For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens combined with other prior art renders Claim 6 obvious.

### iii.    Mr. Garney Fails to Prove that Dickens Discloses "Concurrent Respective Dedicated USB Connections Between the USB Device Block and the Plurality of Hosts" (Claims 7, 8, 10, and 17)

103.    Asserted Claims 10 and 17 depend from Claim 7, which recites "a multi-host device controller . . . operable to establish concurrent respective dedicated USB connections between the USB device block and the plurality of hosts."  Mr. Garney argues this limitation is found in Dickens and other prior art. [Garney Rpt., Ex. E-1 at p. 29]. I disagree.  The evidence Mr. Garney cites does not support his conclusion.

104.    My analysis above with respect to Claim 6 (Section X.A.ii) applies equally to Claims 10 and 17 because Claim 7 (from which Claims 10 and 17 depend) requires "concurrent respective dedicated USB connections between the USB device block and the plurality of hosts," which is similar to the first and second "dedicated USB connections" that are "concurrent" in Claim 3.  For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens combined with other prior art renders Claims 10 and 17 obvious.

### iv.    Mr. Garney Fails to Prove that Dickens Discloses "Establishing Concurrent Respective Dedicated USB Connections Between a Shared USB Device and a Plurality of Hosts, Wherein the USB Device Corresponds to at Least One Function" (Claims 18 and 22)

105.    Asserted Claim 22 depends from Claim 18, which recites "establishing concurrent respective dedicated USB connections between a shared USB device and a plurality of hosts, wherein the USB device corresponds to at least one function . . ."  Mr. Garney argues this limitation is found in Dickens and other prior art. [Garney Rpt., Ex. E-1 at p. 39]. I disagree.  The evidence Mr. Garney cites does not support his conclusion.

106.    My analysis above with respect to Claim 6 (Section X.A.ii) applies equally to Claim 22 because Claim 18 (from which Claim 22 depends) requires "concurrent respective dedicated USB connections between a shared USB device and a plurality of hosts," which is similar (as to the "respective dedicated USB connections") to the first and second "dedicated USB connections"

that are "concurrent" in Claim 3. For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens combined with other prior art renders Claim 22 obvious.

> **v.**   **Mr. Garney Fails to Prove that Dickens Discloses "a Shared USB Device Block Operable to Be Simultaneously Configured by Two or More USB Hosts" (Claim 23)**

107.   Mr. Garney argues "Dickens discloses a shared USB device block operable to be simultaneously configured by two or more USB hosts . . . expressly or inherently," but does not disclose where in Dickens this limitation is found or why it would be inherent. [Garney Rpt., Ex. E-1 at p. 40]. Accordingly, it appears that Mr. Garney does not rely on Dickens disclosing this feature of Claim 23. Instead, Mr. Garney appears to rely on a combination of Dickens with Ito '649 or with the USB 1.0 Specification (or perhaps Furukawa) as rendering this limitation obvious. [Garney Rpt., Ex. E-1 at p. 40-42]. I address Mr. Garney's obviousness argument below (Section X.A.vii).

> **vi.**   **Mr. Garney Fails to Prove that Dickens Discloses "a Controller Configured to Establish Concurrent Respective Dedicated USB Connections Between the Shared USB Device Block and the Two or More USB Hosts" (Claim 23)**

108.   Asserted Claim 23 recites "a controller configured to establish concurrent respective dedicated USB connections between the shared USB device block and the two or more USB hosts." Mr. Garney argues this limitation is found in Dickens and other prior art. [Garney Rpt., Ex. E-1 at p. 42-43]. I disagree.

109.   My analysis above with respect to Claim 6 (Section X.A.ii) applies equally to Claim 23 because Claim 23 requires "concurrent respective dedicated USB connections between the shared USB device block and the two or more USB hosts," which is similar (as to the "respective dedicated USB connections") to the first and second "dedicated USB connections" that are "concurrent" in Claim 3. For this reason alone, it is my opinion that Mr. Garney has failed to show by clear and convincing evidence that Dickens combined with other prior art renders Claim 23 obvious.

110.   In addition, Mr. Garney fails to identify what specific feature or structure of Dickens reads on the "controller" or "shared USB device block" of Claim 23. He merely quotes large passages of Dickens without providing any analysis. Thus, the above rebuttal is merely a guess based on what appears to be an incomplete opinion. I reserve the right to provide additional rebuttal in the event Mr. Garney is allowed to supplement his report.

> **vii.**   **Rebuttal to Obviousness Opinions – Dickens in View of POSITA Knowledge and/or Other Cited Art**

111.   In this section, I rebut the various obviousness arguments advanced by Mr. Garney at paragraphs 248-257 and Exhibit E-1 to his report.

Rebuttal Expert Report of John Levy, Ph.D.

## XV.    Oath and Signature

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 18, 2019

John Levy, Ph.D

# EXHIBIT 3

Trials@uspto.gov
571-272-7822

Paper No. 63
Entered: August 28, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

DELPHI TECHNOLOGIES, LLC[1],
Petitioner,

v.

MICROCHIP TECHNOLOGY INC.,
Patent Owner.
————————

Case IPR2017-00861
Patent 7,627,708 B2
————————

Before BRIAN J. McNAMARA, DANIEL N. FISHMAN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

FISHMAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*
*and*
DECISION DENYING PATENT OWNER'S MOTION TO EXCLUDE
*37 C.F.R. § 42.64*

---

[1] Petitioner filed a notice of its name change from "Delphi Technologies, Inc." to "Delphi Technologies, LLC."  Paper 53, 1–2.

IPR2017-00861
Patent 7,627,708 B2

## I.   INTRODUCTION

Delphi Technologies, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–25 (hereinafter the "challenged claims") of U.S. Patent No. 7,627,708 B2 (Ex. 1001, "the '708 patent") pursuant to 35 U.S.C. §§ 311–319.  Microchip Technology Inc. ("Patent Owner") filed a Patent Owner Preliminary Response (Paper 11, "Prelim. Resp.").  On August 29, 2017, based on the record before us at that time, we instituted an *inter partes* review of *only* claims 1–9 and 11–25. Paper 14 ("Decision" or "Dec."), 2, 43.

Patent Owner filed a Patent Owner Response[2] (Paper 23, "Response" or "PO Resp.") and Petitioner filed a Corrected Reply (Paper 32, "Pet. Reply").  The Petition relies on Declarations of John Garney (Exs. 1023, 1053) and Patent Owner relies on Declaration of Geert Knapen (Ex. 2007).

In accordance with our authorizing order (Paper 29), Patent Owner filed a Sur-Reply addressing various claim construction issues (Paper 30, "PO Sur-Reply") and Petitioner filed a Sur-Sur-Reply responsive to Patent Owner's claim constructions (Paper 31, "Pet. Sur-Sur-Reply")

Responsive to the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018), we issued an Order modifying our Decision to institute review of all claims and all grounds.  Paper 38 ("*SAS* Order").  We authorized additional briefing to address issues relating to claims and grounds that were denied initially in our Decision on Institution.  Paper 40. Petitioner filed an authorized Supplemental Reply (Paper 42, "Supp.

---

[2] Patent Owner improperly attempts to incorporate by reference portions of its Preliminary Response into its Response.  PO Resp. 16 n.5; *see also* 37 C.F.R. § 42.6(a)(3).  We disregard the improperly incorporated material.

IPR2017-00861
Patent 7,627,708 B2

Reply"), Patent Owner filed an authorized Supplemental Response (Paper 45, "Supp. Resp."), and Petitioner filed an authorized Sur-Reply (Paper 46).

Oral Argument was conducted on June 14, 2018, and a transcript of that hearing is of record.  Paper 57 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  The Petitioner has the burden of proving unpatentability by a preponderance of the evidence.  *See* 35 U.S.C. § 316(e); *see also* 37 C.F.R. § 42.1(d).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons expressed below, we conclude that Petitioner has shown by a preponderance of the evidence that claims 1, 3–5, 7–9, 11–14, 18–21, 23, and 25 are unpatentable.  Petitioner has not persuaded us by a preponderance of the evidence that claims 2, 6, 10, 15–17, 22, and 24 are unpatentable.

## A.    *Real Parties in Interest and Related Matters*

The Petition identifies Delphi Technologies, Inc. and Delphi Automotive Systems, LLC as real parties in interest.  Pet. 1.  Petitioner filed a notice indicating that Delphi Technologies, Inc. had changed its name to Delphi Technologies, LLC and indicating that Delphi Automotive Systems, LLC had changed its name to Aptiv Services US, LLC.  Paper 53, 1–2.  Both Petitioner and Patent Owner identify a related litigation matter captioned *Microchip Technology Inc. v. Delphi Automotive Systems, LLC.*, Case No. 2:16-cv-02817-DJH, filed in the U.S. District Court for the District of Arizona.  Pet. 2; Paper 12, 1.  Petitioner also identifies two related petitions for *Inter Partes* Review as IPR2017-00864 and IPR2017-00970.  Paper 3, 1; Paper 5, 1.

3

IPR2017-00861
Patent 7,627,708 B2

## B.     The '708 Patent

According to the '708 patent, the Universal Serial Bus ("USB")
allows coupling of a variety of peripheral devices to a computer system.  Ex.
1001, 1:23–24.  To satisfy consumers' desire to share peripheral devices,
such as printers, scanners, etc., prior solutions provided switching devices
that allow a peripheral device to be switchably shared among multiple USB
host computer systems.  *Id.* at 1:59–63.  Each time a USB peripheral device
is switched (disconnected and re-connected) from one USB host to another,
the USB host must reconfigure the peripheral device before data exchanges
may ensue.  *Id.* at 1:63–2:5.  Such configuration or reconfiguration includes
bus enumeration—a step that, *inter alia*, assigns an address to each
peripheral device on the bus used by the host on that bus to access each
peripheral device.  *See* Ex. 1004, 47–48.[3]  This reconfiguration causes,
among other problems, loss of state information relevant to the previously
connected host.  Ex. 1001, 1:67–2:5.

The '708 patent purports to resolve this problem by allowing sharing
of a USB device among multiple USB hosts without requiring such
reconfiguration.  Ex. 1001, 2:12–15.  Specifically, according to the '708
patent, a multi-host capable device is disclosed and claimed that includes
separate buffers for each of multiple host connections and maintains a
dedicated address and configuration for each host.  *Id.* at 2:36–38.

Figure 1, reproduced below, depicts an exemplary system according
to the '708 patent.

---

[3] Citations are to Petitioner's page numbering added in the footer of the
Exhibit, as opposed to the original page numbering of the document.

IPR2017-00861
Patent 7,627,708 B2



*FIG. 1*

Figure 1 depicts a system including hosts 102 and 104, both coupled with multi-host device 106, which, in turn, includes USB multi-host device controller. *Id.* at 3:49–53.

Figure 3, reproduced below, depicts additional exemplary details of multi-host device 106 of Figure 1.



*FIG. 3*

5

IPR2017-00861
Patent 7,627,708 B2

Figure 3 depicts USB multi-host device 106 comprising upstream ports 302 and 304, each configured to couple with a corresponding host system. *Id.* at 3:63–4:2. Upstream ports 302 and 304 are coupled with USB endpoint & status buffers 306 and 308, respectively, "to buffer data and control reads and writes to/from each respective host corresponding to PHY 302 and PHY 304 and/or peripheral device/function 312 coupled to USB multi-host device controller 108." *Id.* at 4:18–21. The '708 patent further discloses:

> In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example—to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312. The selection of the specific mechanism used may be configured according to the specific USB device type that is being shared. In one set of embodiments, the bandwidth from shared peripheral device/function 312 to each host may be reduced in order to allow each host equal access. In other embodiments, the bandwidth may not be reduced if the bandwidth of the peripheral function exceeds the bandwidth of the host.

*Id.* at 4:22–36.

### C.    *Illustrative Claim*

Claims 1, 3, 7, 18, and 23 are the independent claims of the '708 patent. Independent claim 1, reproduced below, is exemplary of the challenged claims (with some formatting changes for readability):

> 1. A USB multi-host device comprising:
>
> first and second upstream ports configured to couple to corresponding first and second hosts;

IPR2017-00861
Patent 7,627,708 B2

a USB function block; and

a multi-host device controller coupling the USB function block to the first and second upstream ports,

wherein the multi-host device controller is configured to establish concurrent respective USB connections between the USB function block and the first and second upstream ports, to allow the corresponding first and second hosts to:

simultaneously enumerate and configure the USB multi-host device;

simultaneously access the USB multi-host device; and

alternately access the USB function block without reconfiguring and/or re-enumerating the USB multi-host device before each access.

## D.    *Alleged Grounds of Unpatentability*

The Petition sets forth the following asserted grounds of unpatentability:

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Furukawa[4] | 102(b) | 1–8, 10, 11, 15–20, and 22–25 |
| Dickens[5] | 102(b) | 1–8, 11, 15–20, and 22–25 |
| (Furukawa or Dickens) and Chen[6] | 103(a) | 9, 11–14, and 21 |

---

[4] Japanese Patent Application Publication P2003-256351A.  Ex. 1002 ("Furukawa").  Exhibit 1002 includes an English translation of the Japanese publication, a certification by the translator, and the original Japanese language version of the publication.
[5] U.S. Patent No. 6,549,966 B1.  Ex. 1003 ("Dickens").
[6] U.S. Patent No. 7,073,010 B2.  Ex. 1005 ("Chen").

IPR2017-00861
Patent 7,627,708 B2

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| (Furukawa or Dickens) and USB 2.0[7] | 103(a) | 9, 11–14, and 21 |
| Wurzburg,[8] Osakada,[9] and (Furukawa or Dickens)[10] | 103(a) | 1–25 |
| (Furukawa or Dickens), USB 2.0, APA[11], and "other art cited herein" (Pet. 4) | 103(a) | 1–25 |

## II.   ANALYSIS

### A.   *General Principles*

#### 1.   *Anticipation*

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Each element of the challenged claim must be found, either expressly or inherently, in the single prior art reference.  *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).  While the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).  Furthermore, "a

---

[7] Universal Serial Bus Specification Rev. 2.0 April 27, 2000.  Ex. 1004 ("USB 2.0").
[8] U.S. Patent Publication No. 2006/0059293 A1.  Ex. 1026 ("Wurzburg").
[9] U.S. Patent No. 6,308,239 B1.  Ex. 1027 ("Osakada").
[10] We note Petitioner's harmless error in misidentifying the Osakada reference as Exhibit 1026 ("E1026").  Pet. 4.
[11] Petitioner identifies Admitted Prior Art ("APA") as disclosure at column 1, line 19 through column 2, line 2 of Exhibit 1001.  Pet. 7–9.

IPR2017-00861
Patent 7,627,708 B2

reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *In re Petering*, 301 F.2d 676, 681 (CCPA 1962)). Still further, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).

## 2.   *Obviousness*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter[,] as a whole[,] would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

## 3.   *Level of Ordinary Skill in the Art*

Petitioner argues a person of ordinary skill in the art related to the '708 patent would have a Bachelor's Degree in electrical engineering,

9

IPR2017-00861
Patent 7,627,708 B2

computer science, or the equivalent, and would also have "a few to many" years of experience in the design of USB devices as well as familiarity with the USB specifications and protocols.  Pet. 6 (citing Ex. 1023 ¶¶ 53–58). Petitioner further argues (*id.* at 7) that Patent Owner admitted the level of ordinary skill when, in prosecution of the parent application of the '708 patent,[12] Patent Owner asserted:

> Applicant further submits that *one skilled in the art (i.e. having appropriate understanding of basic USB design principles as set forth in at least the USB 2.0 specification)* would therefore be enabled by Applicant's specification as detailed above, to build a USB multi-host device controller that enables multiple hosts to access the USB device function without the USB device having to be reconfigured and/or re-enumerated each time a different host accesses the USB device function.

Ex. 1014, 15 (emphasis added).  Patent Owner further asserted in prosecution of the parent patent application that "one skilled in the art to which the present application pertains would be well informed and well aware of the USB 2.0 specification."  Ex. 1014, 41.

In its Response, Patent Owner does not address the level of ordinary skill in the art.  *See* PO Resp. *passim*.  Furthermore, Mr. Knapen testifies, one of ordinary skill at the time of the '708 patent (1) would be familiar with these industry-standard interconnect interfaces; (2) would be familiar with the circuit-level design and implementation of a standard USB device (because Figure 3 of the '708 patent does not disclose the internal structure

---

[12] The parent patent application of the '708 patent is application serial number 11/425,613 issued as U.S. Patent Number 7,523,243 ("the '243 patent").  The claims of the '243 patent are nearly identical to the claims of the '708 patent to such an extent that, in prosecution, the '708 patent was subject only to a non-statutory double patenting rejection.  Ex 1012, 10–11.

IPR2017-00861
Patent 7,627,708 B2

of its various blocks); (3) will have also been exposed to the various
interconnect options for connecting USB hosts and USB devices; and (4)
would have a bachelor's degree in electrical or computer engineering (or
similar), and at least five years of industry experience in computer peripheral
device design. Ex. 2007 ¶¶ 44–46. Mr. Knapen then concludes, "I agree the
Board's determination of the level of ordinary skill in the art is consistent
with my assessment, and my opinions consider the level of skill in the art as
determined by the Board." *Id.* ¶ 47.

> We are persuaded by Petitioner's definition of the level of ordinary
skill in the art and we find this definition is commensurate with the level of
ordinary skill in the art as reflected in the prior art. *See Okajima v.
Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("[T]he absence of specific
findings on the level of skill in the art does not give rise to reversible error
where the prior art itself reflects an appropriate level and a need for
testimony is not shown.") (internal quotation marks omitted); *In re GPAC
Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). The parties' respective experts
(Mr. Garney and Mr. Knapen) substantially agree regarding the education
and experience of persons of ordinary skill at the time of the '708 patent.
The parties' experts specifically agree that the person of ordinary skill in the
art would have had familiarity with the USB 2.0 specification and
experience in the design of USB devices.

> Based on the complete record of this trial, we discern no reason to
alter our preliminary determination of the level of ordinary skill in the art.
Therefore, we define the level of ordinary skill in the art, at the time of the
'708 patent, to include at least a Bachelor's degree in electrical engineering,
computer engineering, computer science, or equivalent fields as well as

IPR2017-00861
Patent 7,627,708 B2

familiarity with the USB 2.0 specifications to the extent of having designed a USB device.  This definition is reflected in the prior art of record and is consistent with the testimony of both parties' experts and consistent with Patent Owner's admissions during prosecution of the '708 patent.

### 4.    Claim Construction

As a step in our analysis of patentability, we determine the meaning of the claims for this Decision.  In an *inter partes* review, a claim in an unexpired patent, as is the case here, shall be given its broadest reasonable construction in light of the specification of the patent in which it appears. 37 C.F.R. § 42.100(b); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–46 (2016) (upholding the use of the broadest reasonable interpretation standard).

Under the broadest reasonable construction standard, claim terms are generally given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  "[A] claim construction analysis must begin and remain centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  "Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).  Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy.  *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355,

IPR2017-00861
Patent 7,627,708 B2

1361 (Fed. Cir. 2011); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Aside from the following terms we interpret, we determine that it is unnecessary to construe any other claim terms.

a. *"Function" / "Function Block" / "Shared USB Function"*

Each independent apparatus claim (1, 3, 7, and 23) includes a recitation of a "function block" element of the apparatus. Independent method claim 18 recites a method step for establishing a connection with "a shared USB function comprised in the USB device."

The parties substantially agree that a *function block* is "a segment of a USB device that performs a USB function." Pet. 31; PO Resp. 16, 18. Patent Owner argues the '708 patent uses the term "block" to refer to a segment of a USB device. PO Resp. 16 (citing Ex. 1001, 2:41–42; Ex. 2002 ¶ 62). The abstract of the '708 patent refers to a "shared function block" by disclosing that "[t]he USB device may include a shared USB function block, and a multi-host controller configured to establish concurrent respective USB connections between the shared USB function block and two or more USB hosts." Ex. 1001, Abstract. Aside from the above reference, the Specification of the '708 patent does not use the term "function block." The Specification also discloses that a USB device may have three blocks, the third of which "may comprise the 'Peripheral Function' itself, which may include the circuitry necessary for the specific USB device function, for example an Ethernet Controller, printer, Video Camera, etc." *Id.* at 2:20–53.

The USB specification defines *function* more broadly as "[a] USB device that provides a capability to the host, such as an ISDN connection, a

IPR2017-00861
Patent 7,627,708 B2

digital microphone, or speakers." Ex. 1004, 34. Thus, according to the USB specification, a "function" is a type of "USB device."

As discussed further below, the parties raise arguments relating to the packaging or integration of a *function* or *function block* within the claimed device. However, these arguments, directed to packaging and integration of the claimed elements, do not change our understanding of the terms *function* or *function block*.

We adopt the parties' proposed interpretation of "function" and "function block" as meaning "a segment of a USB device that performs a USB function."

Patent Owner argues "shared USB function comprised in the USB device," as recited in method claim 18, means "a USB function that is in a USB device and shared by two or more USB hosts." PO Resp. 18 (citing Ex. 2007 ¶ 66). Fundamentally, Patent Owner's interpretation is focused on packaging and integration of the function block with other components of the claims—an issue discussed further below. Other than the implied arguments regarding packaging or integration of the function within a device, we further determine that the "shared USB function" recited in claim 18 is synonymous with "function" and "function block."

> b. *"Device" / "USB Device" / "USB Multi-Host Device"*

The parties disagree as to the proper interpretation of the term *device*. Each independent apparatus claim (1, 3, 7, and 23) recites a "device." Specifically, the preambles of claims 1 and 3 recite a "USB multi-host device" and the preambles of claims 7 and 23 recite a "USB device." The parties disagreement, in essence, centers around packaging—specifically,

IPR2017-00861
Patent 7,627,708 B2

whether a "device," as claimed, must be integral/unitary in that the recited components are physically housed within the claimed device or can be a collection of physically separate, distinct components operating together to provide the recited functions.

Petitioner argues "device" means "both hubs and functions, in a single one or a collection of hardware components." Pet. 33 (citing Ex. 1023 ¶ 67); *see also* Ex. 1004, 32. Patent Owner's Response does not specifically construe the term "device." However, its Response argues Dickens does not disclose the devices of claims 1, 3, 7, and 23 because the Petition merely identifies separate elements disclosed in Dickens rather than <u>a</u> device (i.e., an integral device comprising recited components). PO Resp. 19–20. Implied in Patent Owner's Response regarding Dickens is a construction of "device" as a single, integral, device as distinct from a collection of separate, distinct, components.

> The USB specification provides a definition of "device" as follows:
>
> A logical or physical entity that performs a function. *The actual entity described depends on the context of the reference*. At the lowest level, device may refer to a single hardware component, as in a memory device. At a higher level, it may refer to a collection of hardware components that perform a particular function, such as a USB interface device. At an even higher level, device may refer to the function performed by an entity attached to the USB; for example, a data/FAX modem device. *Devices may be physical, electrical, addressable, and logical*.
>
> When used as a non-specific reference, a USB device is either a hub or a function.

Ex. 1004, 32 (emphasis added). Thus, the USB specification defines "device" relative to the context of the reference—lowest level, higher level, even higher level. Furthermore, we understand that the broadest reasonable

IPR2017-00861
Patent 7,627,708 B2

interpretation of a term must be consistent with the specification of the patent. *SuperGuide*, 358 F.3d at 875. Therefore, for the reasons discussed below, the '708 patent Specification does not require a "device" to be a unitary, integral device. The USB specification provides further evidence, consistent with the Specification, that a skilled artisan would have understood the term "device" to encompass either a "single hardware component" or "a collection of hardware components that perform a particular function." Ex. 1004, 32.

Patent Owner presents arguments regarding construction of "device" as follows:

### 1.    Preamble Is Not Limiting

Patent Owner argues the preamble of the claims limits the understanding of "device" because it recites a "particular structure that is highlighted as important by the Specification" and because the preamble "provides antecedent basis for a claim limitation." PO Sur-Reply 1 (citing *Catalina Mktg. Int'l v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002) and *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012)). Petitioner contends the preamble recitation of "device" supports an important highlight of the Specification because the Abstract of the '708 patent discloses the invention as a "single device"[13] and the Specification further distinguishes the invention over "a combination of a standalone switch and another USB device." *Id.* at 2 (citing Ex. 1001, 1:61–2:5).

---

[13] Referring to the claimed "device" as a "single device" sheds no useful light on construing the term "device" any more than a reference to "a" device or "the" device.

16

IPR2017-00861
Patent 7,627,708 B2

Petitioner argues the distinction over a prior art switch in combination with a USB device is a distinction based on the function of the switch requiring reconfiguration of the USB device for each switch between hosts rather than the physical distinction of a combination of separate components. Pet. Sur-Sur-Reply 3 (quoting Ex. 1001, 1:61–67 ("the device can generally be configured and accessed by only a single host at any given time")). We are persuaded by Petitioner's argument. The '708 patent does not distinguish the prior art combination of a switch and a separate USB device based on its physical packaging.

Furthermore, the mere fact that "device" in the preamble provides an antecedent basis for the same recitation in the claim elements in no way further defines the proper construction of "device." Patent Owner's reliance on *Deere* is inapposite. *Deere* also holds "if the body of the claim describes a structurally complete invention, a preamble is not limiting where it 'merely gives a name' to the invention, extols its features or benefits, or describes a use for the invention"). *Deere*, 703 F.3d at 1358 (quoting *Catalina*, 289 F.3d at 809). Here, use of the term "device" provides no structural limitation but, instead, the body of the claim sufficiently defines a complete structure and the preambles merely provide a name for the claimed structures.

For the above reasons, we determine the preamble of the claims does not limit the claim elements to an integral, unitary, physical packaging of the device as Patent Owner alleges.

IPR2017-00861
Patent 7,627,708 B2

2.    *The Claimed Device May Encompass An "Off-The-Shelf Item"*

Petitioner argues Patent Owner's limiting definition of "device" would require the function block and the controller be located "within a single unitary housing." Pet. Reply 4. However, Petitioner argues, the '708 patent Specification discloses that "Peripheral Device/Function 312" "may be a standard off-the-shelf item." *Id.* (quoting Ex. 1001, 4:8–12). Petitioner contends that, if the "off-the-shelf" function 312 is, for example, a mass storage device, "[i]t could not be a standard off-the shelf item if the inventive multi-host device controller were already embedded inside." *Id.*

Patent Owner argues the disclosure of an "off-the-shelf" item merely refers to the function being a standard function such as an Ethernet controller or a mass storage device. PO Sur-Reply 2. Instead, Patent Owner emphasizes that the '708 patent Specification clearly refers to the function as one of three segments or blocks within a USB device as support for its contention that the claimed USB device is an integral, unitary structure. *Id.*

We are persuaded by Petitioner's arguments. Figure 3 of the '708 patent (reproduced above) depicts an embodiment of USB multi-host device 106 comprising, *inter alia*, USB multi-host device controller 108 and device/function 312. Ex. 1001, 4. The Specification's disclosure that device/function 312 may be a standard off-the-shelf item such as an Ethernet controller or mass storage device clearly describes a typical device that may be common and commercially available—not an item that is already physically integrated with the inventive features of the invention (the other elements shown within box 106 of Figure 3).

For the above reasons, we determine the Specification's exemplary embodiment incorporating an "off-the-shelf" item aids in understanding

IPR2017-00861
Patent 7,627,708 B2

"device" to encompass a combination of hardware components (including "off-the-shelf" items) and, thus, would not limit the claim elements as to integral, unitary, physical packaging of the device as Patent Owner alleges.

   3.   *"Device" Encompasses "A Collection Of Hardware Components"*

Patent Owner further argues the USB specification definition of a device as encompassing a "collection of hardware components" is not the same as encompassing a collection of separate devices.  PO Sur-Reply 3. We discern no support for Patent Owner's assertion that there is a difference between a collection of hardware components and a collection of devices. This assertion merely shifts the focus of the discussion to defining another term ("hardware components") as somehow distinct from "devices."

Furthermore, Patent Owner's expert, Mr. Knapen, agrees with the definition of "device" as provided in the USB specification.  Ex. 1049, 40:9–16 ("Q. Do you agree or disagree that a person of ordinary skill in USB matters in 2006 would consider the word 'device' to potentially refer to a collection of hardware components that perform a particular function? A. Yes. . . .").  In addition, Patent Owner's counsel and Mr. Garney (Petitioner's expert) engage in a lengthy colloquy in which Mr. Garney explains a variety of types of devices defined by the USB specification all within the scope of "device," regardless of physical packaging constraints, as ordinary skilled artisans would understand the USB specification.  *See* Ex. 2006, 67:9–74:15.

For the above reasons, we determine that an ordinarily skilled artisan would understand "device" in the context of the '708 patent Specification and in the context of the USB specification to encompass devices that

19

IPR2017-00861
Patent 7,627,708 B2

comprise the recited "collection of hardware components" without imposing particular physical packaging constraints.

### 4.    Conclusion Regarding Construction of "Device"

Accordingly, we construe "device," in accordance with the USB specification and in accordance with the '708 patent Specification discussion of Figure 3, to, at least, encompass any collection of hardware components that perform a USB function.

### c.    "USB Connections"

All claims recite USB connections between the first host (or upstream port) and the function block and between the second host (or upstream port) and the function block.  The USB specification does not expressly define the term "USB connection" but uses the term only in reference to the electrical signaling standard (the type of cable) used in various speeds of connectivity. *See* Ex. 1004, 147, 152, 157.  The '708 patent Specification does not expressly define the term "USB connection."  The term appears in the Abstract ("a multi-host controller configured to establish concurrent respective USB connections between the shared USB function block and two or more USB hosts") and at column 2, lines 38–40 ("Each host may therefore establish a dedicated USB connection with the sharing device.").  These passages offer little aid in understanding the term and only indicate that a "USB connection" is something established by a multi-host controller

IPR2017-00861
Patent 7,627,708 B2

between hosts and a function block or is something established by each host with a "sharing device[14]."

Neither the Petition nor the Patent Owner's Response provide a definition of "USB connection."  Patent Owner argues in its Response, in essence, that Dickens does not disclose the claimed USB connections because Dickens discloses that, internal to its routing device 100, all exchanges are performed over a PCI bus (or another non-USB bus).  PO Resp. 25–31.  Implied in Patent Owner's argument is that the claimed "USB connections" would be understood to exclude the use of any non-USB busses or protocols in the path between, e.g., a host and a peripheral.

In response to Patent Owner's argument, Petitioner proffers an express construction of "USB connection" in its Reply.  Specifically, Petitioner argues "'USB connection' means 'direct and indirect connection, both with and without intervening interconnect, using USB protocols.'"  Reply 11.  Petitioner further argues the '708 patent Specification teaches that the USB connections may include digital interconnects such as "Interchip USB," "ULPI," and "UTMI" and contends Mr. Knapen (Patent Owner's expert) testified that connections within multi-host device 106 of the '708 patent are likely such digital interconnects which, Petitioner contends, are not "USB signals."  *Id.* at 5–6 (citing Ex. 2007 ¶¶ 44–47; Ex. 1049, 62:13–62:25).  Thus, under Petitioner's proffered construction, a "USB connection" may include intervening digital interconnections that are not USB compliant.

---

[14] "Sharing device" is not used again in the Specification.  We presume it may have been a typographic error that was intended to refer to a "shared device," a term that is somewhat consistent with the context of that paragraph.  Our analysis is not affected by the apparent error.

IPR2017-00861
Patent 7,627,708 B2

Patent Owner responds, "The phrase 'USB connection' should be given its plain and ordinary meaning.  One of ordinary skill would know that a 'USB connection' is one that conforms to the requirements of the USB specification."  PO Sur-Reply 3.  Patent Owner argues its interpretation is consistent with the '708 patent Specification because the interconnects discussed in the Specification, including serial USB cables, Interchip USB, ULPI, and UTMI standards, *are* compliant with the USB specification.  *Id.* at 3–4.  Patent Owner further argues Petitioner's proffered construction includes non-USB intervening elements and, thus, does not conform to the USB specification.  *Id.* at 4–5.

We are persuaded by Petitioner's arguments that a "USB connection" need not be compliant with the USB specification throughout the entire signaling path between a USB host and a USB device and may include intervening, non-USB connections.

First, we disagree with Patent Owner that the disclosed digital interconnections of the '708 patent (Interchip USB, ULPI, and UTMI) are "compliant with the USB specification."  These standards are apparently useful in conjunction with USB applications for high speed parallel bus communications between integrated circuits[15] but these interconnect standards appear nowhere in the USB specification and, thus, while useful in USB device designs, cannot be said to be "compliant" with the USB specification of record as Exhibit 1004.

---

[15] Patent Owner provides a footnote alleging these digital interconnects conform to the USB specification.  *See* PO Sur-Reply 4 n.1.  The cited websites, not of record as evidence in this case, suggest that these standards define parallel bus structures useful in implementing USB devices with inter-chip connections.

IPR2017-00861
Patent 7,627,708 B2

Furthermore, Mr. Knapen testifies, and we agree, "the inner-workings of the invention's USB multi-host device controller (e.g., element 108 of Figure 3) is not described at the circuit level." Ex. 2007 ¶ 45. Mr. Knapen further testifies, in reference to internal connections within controller 108 of the '708 patent, that connections within multi-host device 106 of the '708 patent are likely digital interconnects (e.g., Interchip USB, ULPI, UMTI) rather than "USB signals" on a USB serial bus (i.e., a USB cable). Ex. 1049, 76:19–78:24. Thus, interconnections within multi-host device 106 are not compliant with the USB specification of record (Ex. 1004) as alleged by Patent Owner. Instead, Figure 3 of the '708 patent, in conjunction with the disclosure of digital interconnects and Mr. Knapen's testimony, discloses a "USB connection" that comprises a USB serial bus (i.e., a USB cable) coupling a USB host with an upstream port (302/304) and digital interconnects ("Host 1" and "Host 2") coupling the upstream port (302/304) to a corresponding endpoint & status element (306/308) within device 106.[16] Thus, according to Mr. Knapen, the above-described "USB connection" includes intervening digital interconnections that are not compliant with the USB specification of record.

---

[16] Other un-labeled interconnects within device 106, such as those between USB endpoint & status elements 306/308 and USB Multi-Host Device Controller 108, may also be digital interconnection that are not compliant with the USB specification of record.

IPR2017-00861
Patent 7,627,708 B2

Furthermore, we observe that the '708 patent Specification, although sparse regarding any internal structure of controller 108,[17] discloses that controller 108 may include an arbitration mechanism:

> In one set of embodiments, USB multi-host device controller 108 may be configured with an internal arbitration mechanism that may permit each host—first host 102 and second host 104, for example-to access shared peripheral function 312 by either interleaving host accesses, or by using a common request/grant structure that may hold-off one host while another host completes a data transfer to/from shared device/function 312.

Ex. 1001, 4:22–29. Neither party identifies, nor do we discern, any disclosure in the USB specification describing a capability to arbitrate among multiple host requests—indeed that is the very essence of the invention (the alleged "point of novelty") of the '708 patent. Thus, controller 108 provides non-USB functionality (an arbitration mechanism), intervening within the USB connection between hosts and a function block, to arbitrate among multiple USB requests.

For the above reasons, we are persuaded by Petitioner's arguments that "USB connection," as used in the '708 patent, does not require an end-to-end communication path that is, at all times and all points, compliant with the USB specification of record. Instead, we adopt Petitioner's proffered

---

[17] In general, we find the '708 patent Specification unusually sparse regarding design details. It may be enabling for the ordinarily skilled artisan with knowledge of the USB specification and experience in the design of a USB device. By comparison, the prior art of record, in particular Dickens, is substantially more verbose in exemplary embodiment design details. To whatever extent the '708 patent is insufficient under 35 U.S.C. § 112 is not an issue before us in an *inter partes* review.

IPR2017-00861
Patent 7,627,708 B2

construction that a "USB connection" means "direct and indirect connection, both with and without intervening interconnect, using USB protocols."

### d.    Concurrent and Simultaneous

All challenged claims recite establishment of "concurrent" connections between the function block and a plurality of USB hosts and some aspect of "simultaneous" operations—e.g., "simultaneous enumerate and configure" (claims 1, 7), "simultaneously access" (claims 1, 3, 7), "receive and respond to simultaneous respective USB access requests" (claim 23), etc.  The Specification of the '708 patent does not provide a specific definition of either term.

Petitioner does not provide a specific interpretation of either term but argues what is *not* meant by each term.  Specifically, Petitioner argues references to "simultaneous" in the claims do "not require simultaneous data transfer from two or more computers to a peripheral such as a printer" but instead encompasses transfer of data from one computer at a time to the peripheral—a mode Petitioner refers to as "data switching" as distinguished from "connection switching" in which a connection is established and disconnected to allow another computer to connect to a peripheral.  Pet. 18–19 (citing Ex. 1001, 2:28–37).[18]  Petitioner asserts this requirement is consistent with the USB specification.  *Id.* at 19.

Petitioner similarly argues connections are "concurrent" to the extent they allow the recited functionality, for example, in claim 1, to allow for

---

[18] We are unclear of the relevance of the cited portion of Exhibit 1001 to Petitioner's understanding of "simultaneous" other than it is one of the few uses of the word in the Specification of the '708 patent.

IPR2017-00861
Patent 7,627,708 B2

simultaneous enumeration and configuration, allow for simultaneous access, and allow for alternating access without reconfiguring or re-enumerating. *Id.* at 19.

Patent Owner presented arguments regarding interpretation of these terms in its Preliminary Response. Prelim Resp. 15–28. In our Decision on Institution, consistent with the Specification and with the plain and ordinary meaning, we adopted Patent Owner's dictionary-based definition of *concurrent* to mean "operating or occurring at the same time" and adopted the dictionary-based definition of *simultaneous* to mean "at the same time." Dec. 13.

Patent Owner does not address the construction of these terms in its Response. Although we find merit in Petitioner's suggestions that there are aspects of USB operations that are excluded when interpreting these terms in the context of USB protocols, Petitioner has not provided a proposed interpretation as to what *is* within the scope of a proper interpretation of these terms.

Thus, we perceive no reason on the complete record to change this construction.

### C.   *Anticipation by Furukawa*

The Petition asserts claims 1–8, 10, 11, 15–20, and 22–25 are anticipated by Furukawa. Pet. 38–54. For the reasons discussed below, we remain unpersuaded that Furukawa anticipates any of claims 1–8, 10, 11, 15–20, and 22–25.

IPR2017-00861
Patent 7,627,708 B2

### 1.   *Furukawa (Ex. 1002)*

According to Furukawa, sharing a USB peripheral device has been difficult because a USB interface permits only a single host to connect with a peripheral device.  Ex. 1002 ¶ 3.  Prior solutions provided a switching circuit that allowed a different host to connect with the shared peripheral.  *Id.*  However, such switches required a series of operations each time the host on the USB was switched and, typically, required the host system to load or unload a device driver for the shared peripheral newly connected or re-connected to the host.  *Id.*

Furukawa purports to have resolved the above problems by disclosing a USB hub providing: dedicated ports for each of multiple USB hosts, dedicated ports for each of multiple USB peripheral devices, and a controlling circuit coupled between the host ports and the device ports such that overhead to load and unload devices drivers is obviated.  *Id.* ¶ 4.

IPR2017-00861
Patent 7,627,708 B2

Figure 1 of Furukawa, reproduced below, depicts an exemplary embodiment of Furukawa's invention.

## FIG. 1



Figure 1 depicts a plurality of USB hosts 21–24 coupled to hub 1 via corresponding ports 2-1 through 2-4 (collectively ports 2) and depicts a plurality of USB peripheral devices 25–28 coupled to hub 1 via ports 3-1 through 3-4 (collectively ports 3). *Id.* ¶¶ 7–8. Hub 1 comprises FIFO memories 11-1 through 11-4 (collectively FIFO memories 11) and 17-1

28

IPR2017-00861
Patent 7,627,708 B2

through 17-4 (collectively FIFO memories 17) corresponding to ports 2 and 3, respectively. *Id.* Controlling circuit C of hub 1 controls transmissions between hosts 21–24 via bus 12 through FIFO memories 11 and peripheral devices 25–28 via bus 16 through FIFO memories 17. *Id.* ¶¶ 10–11. When an exchange is required between a host and a peripheral device, controlling circuit C sets up a connection between the host and the peripheral device and releases the connection when the exchange is completed. *Id.*

### 2. *Independent Claims 1, 3, 7, 18, and 23*

Independent apparatus claims 1, 3, 7, and 23 generally recite a USB device comprising a controller that enables multiple hosts to share access to a USB device. Independent method claim 18 generally recites steps providing multiple hosts with shared access to a USB device.

Regarding claim 1, Petitioner argues the recited USB multi-host device reads on hub 1 of Furukawa and the claimed first and second upstream ports read on any two of ports 2-1 through 2-4 of Furukawa. *Id.* at 38–39. Petitioner further argues the claimed "USB function block" reads on any one of Furukawa's USB peripheral devices 25–28 and asserts the claimed multi-host device controller reads on Furukawa's controlling circuit C within hub 1. *Id.* at 39–40.

The "wherein" clause of claim 1 requires that the controller be configured to "establish concurrent respective USB connections between the USB function block and the first and second upstream ports" to enable certain recited functions. Petitioner argues controlling circuit C of Furukawa connects to multiple hosts concurrently "through bus 12, FIFO memories 11, and connecting ports 2." Pet. 40 (citing Ex. 1002 ¶¶ 9–10). Petitioner

IPR2017-00861
Patent 7,627,708 B2

further argues elements 13–15 within controller circuit C allow the circuit
"to simultaneously process data transmissions between the hosts and
peripheral devices."  Pet. 40–41 (citing Ex. 1002 ¶ 11).  More specifically,
Petitioner argues:

> As Furukawa explains, "The connection that is set up is a
> one-to-one connection between the host PC that is the source of
> the request and the peripheral device that is the destination of the
> request, and insofar as there is no redundancy in the request
> destination, a plurality of host PCs can access the peripheral
> devices simultaneously."   F-¶0010.   Furukawa's controlling
> circuit thereby discloses "concurrence."  Garney-¶¶81-82.

*Id.*[19]

Patent Owner' Preliminary Response disputed Petitioner's contentions
arguing, in essence, that Furukawa does not disclose multiple hosts
concurrently accessing the same peripheral device.  *See* Prelim. Resp. 35–
39.

Based on the preliminary record at the time of our Decision on
Institution, we were not persuaded Furukawa expressly discloses concurrent
USB connections between a plurality of USB hosts and *one* USB peripheral
device (a "function block" as claimed).  Although identity of terminology is
not required, the Petition had not presented sufficiently persuasive argument
and evidence that Furukawa expressly discloses such concurrency.  The
Petition's reliance on Furukawa's disclosure that "a plurality of host PCs can
access the peripheral devices simultaneously" (Ex. 1002 ¶ 10) does not
sufficiently disclose concurrent connections between multiple USB hosts

---

[19] Petitioner's notation "F-¶0010" is a reference to Ex. 1002 ¶ 10 and the
notation "Garney-¶¶81-82" is a reference to Ex. 1023 ¶¶ 81–82.  *See* Pet. 1
n.1.

IPR2017-00861
Patent 7,627,708 B2

and *the same* shared USB peripheral device.  As we discussed in our
Decision on Institution, this disclosure of Furukawa may reasonably be
understood to disclose that one USB host is accessing a first USB peripheral
device while simultaneously a second USB host is accessing a different USB
peripheral device—e.g., Furukawa's host 21 may access device 25 while
host 22, simultaneously, accesses device 26.  Thus, in our Decision on
Institution, we were not persuaded that Furukawa expressly discloses
establishing concurrent connections between multiple hosts and one shared
peripheral device and we observed Petitioner had not presented any
argument that the recited concurrent connections would have been inherent
in the teachings of Furukawa.  Dec. 21–22.  For those reasons based on the
preliminary record, we were not persuaded Furukawa discloses, expressly or
inherently, the concurrent connections by multiple hosts to one peripheral
device as recited in independent claim 1 and as similarly recited in each
other independent claim (3, 7, 18, and 23) for which Petitioner presented
similar arguments (*see* Pet. 46–51).

Petitioner filed a Request for Rehearing of our Decision on Institution.
Paper 17 ("Req." or "Request").  In that Request, Petitioner argued that
Furukawa's disclosure that a peripheral device may be coupled to multiple
hosts with "no switching operations" teaches that the connections are made
without a need for reconfiguration or re-enumeration as required by the
claims.  Req. 10 (quoting Ex. 1002 ¶ 3).  Petitioner argued that because
Furukawa shows switching between USB connections without any physical
switches and still obviates the need to unload and reload drivers when
switching connections, Furukawa must be using "data switching" rather than
physical "disconnection switching" as the Petitioner defined those terms in

its Petition. *Id.*; *see also* Pet. 19. We emphasized in our Decision Denying Petitioner's Request for Rehearing that our Decision on Institution was based on lack of *express* disclosure in Furukawa of establishing/maintaining multiple concurrent USB connections that enable alternate access to a shared function block "without reconfiguring and/or re-enumerating" as required by the claims. Paper 20, 5 (citing Dec. 21–22).

Following entry of our *SAS* Order (adding previously denied claims and grounds into the trial), the parties submitted supplemental briefs addressing the claims and grounds for which we had initially denied review. We emphasize, as discussed above, that Petitioner does not argue that Furukawa inherently discloses any of the claimed features. Instead, the Petition and Petitioner's Supplemental Reply argue only that Furukawa *expressly* teaches the features of claims 1–8, 10, 11, 15–20, and 22–25. At oral argument, Petitioner's counsel confirmed that the Petition is not relying on inherent disclosures of Furukawa.

> JUDGE FISHMAN: The Patent Owner was asserting that Petitioner has never argued inherency, and still does not argue inherency. Are you arguing inherency, or are you not arguing inherency?

> MR. McKEOWN: We did not present inherency in the petition. The word inherency, I think first appeared in the rehearing decisions. Our position is enumeration reconfiguration is disclosed in Furukawa for the same reasons it's disclosed in Bohm. Going back to that prosecution history, when you're explaining enumeration and configuring is necessarily there, because there's two hosts transmitting at once, and because they transmit at once, they don't have to be re-enumerated, we are entitled to that same technical basis as they are. That's what they argued.

> In addition to that, and as I pointed out earlier, enumeration configuration relates to the loading of drivers, that's

IPR2017-00861
Patent 7,627,708 B2

> not in dispute, that's on the Petitioner page 34 th[r]ough 35;
> Furukawa explicitly explains that it's avoiding switching
> overhead.  It's avoiding the loading the drivers, and even in the
> USB context, it's able to share a peripheral.
>
> Based upon the testimonial evidence we have in the
> record, our declarant has taken the position that enumeration and
> all of the features of these claims are in the reference.  We are
> not saying, by the way, if you enumerate, you have to do this
> other step that's nowhere discussed, and that's inherent, we are
> not arguing that.  We are saying, it's in there.  The word
> "enumeration" is just not used; instead, they describe it as
> switching drivers, et cetera.

Tr. 54:14–55:10.

In its Supplemental Reply, Petitioner argues Furukawa discloses that its FIFO buffers (11 and 17) temporarily store packet data "to prevent collisions of data from multiple hosts."  Supp. Reply 4 (citing Ex. 1002 ¶¶ 6, 17).  Petitioner then contends "collisions of data would not even be a concern if Furukawa disclosed that a peripheral could *only* be configured/enumerated with one host at a time."  *Id.*  Furthermore, Petitioner contends our Decision on Institution is inconsistent with the explicit disclosure in Furukawa of a "system in which multiple hosts simultaneously access a single peripheral."  *Id.*  Specifically Petitioner contends Furukawa discloses problems of prior art switches used to share a peripheral device among multiple hosts in that "the switching circuit must be operated in a series of operations" each time a different host is switchably connected.  *Id.* at 5 (quoting Ex. 1002 ¶ 3).  Petitioner quotes a portion of paragraph 3 of Furukawa and summarizes these teachings as, "the prior art switching is undesirable because it involves a series of operations, and drivers for the one peripheral device must be loaded and unloaded each time the switching from

33

IPR2017-00861
Patent 7,627,708 B2

one connected host to another connected host is performed." *Id.* at 5–6.
Petitioner then contends that loading and unloading of drivers is a
"conventional" operation of USB hubs and controllers and further contends
enumeration of a USB device is similarly a conventional switching operation
of USB hubs and controllers. *Id.* at 6. Petitioner further contends
Furukawa's proposed solution is "to provide a USB hub that enables **a**
peripheral device to be shared by a **plurality** of computers, and which
requires **no [conventional USB] switching operations**." *Id.* (quoting Ex.
1002 ¶ 3 with the words "conventional USB" added by Petitioner). Based
on the above disclosures, Petitioner contends:

> As noted above, switching operations include the loading and
> unloading of the drivers for the peripheral device and take
> extensive time. By eliminating switching operations,
> Furukawa's invention—described at the same level of detail as
> the '708 patent—results in persistent simultaneous connections
> between the peripheral device and a plurality of hosts (because
> the connections do not have to be setup each time), such that
> "there is **no overhead and having to load and unload the
> device driver** sequentially **each time** . . . a connection is
> established or released." (Ex. 1002 ¶ 5; emphasis added.) Thus,
> with the peripheral's drivers always loaded, the simultaneously
> connected hosts are always in a ready state to send data to, or
> receive data from, a given peripheral. Indeed, Furukawa's
> description of its FIFO memory exchanges is indisputable
> evidence of this simultaneous access.

*Id.* at 6–7.

In response, Patent Owner argues Furukawa discloses only a "one-to-
one" connection between one host and one device and discloses that
"simultaneous access to peripherals only occurs when two hosts request
access to different 'request destination[s]' (i.e., two different peripherals)."
Supp. Resp. 1–2. Patent Owner further argues, "Furukawa's use of FIFOs

does not change that it only establishes one-to-one connections." *Id.* at 2. Contrary to Petitioner's argument, Patent Owner contends collisions could arise even in such a one-to-one connection system in which one host at a time connects to the device and then another host can connect to the same device but only after the first connection is released. *Id.* at 3. Therefore, Patent Owner argues, by virtue of each connection being "released" before a next connection is allowed, enumeration and configuration would occur at each switch between hosts—contrary to the recitations of the claims. *Id.* at 3–4.

We remain unpersuaded by Petitioner's supplemental arguments. We agree with Petitioner that Furukawa is directed to solving the same problem as the '708 patent—eliminating overhead of switching between hosts sharing a USB device. Supp. Reply 6 (citing Ex. 1002 ¶ 3 ("The present invention was created in contemplation of the problem areas described above, and the object is to provide a USB hub that *enables a peripheral device to be shared by a plurality of computers, and which requires no switching operation*.") (emphasis added)). Furukawa discloses a problem of prior art switches in that "the switching circuit must be operated in a series of operations" for each switch between connected hosts. Ex. 1002 ¶ 3. Furthermore, Furukawa discloses one such operation asserting that in the prior art "the device driver for the peripheral device must be loaded and unloaded" for each switch between connected hosts. *Id.* However, the only switching operation overhead expressly eliminated in Furukawa is the overhead of loading and unloading devices drivers on the hosts each time a switch is made between two hosts sharing a USB device. *Id.* ¶ 5. Furukawa never expressly discusses elimination of any other type of switching operation

IPR2017-00861
Patent 7,627,708 B2

overhead by its invention.  In particular, we discern no express disclosure in Furukawa that re-enumeration and/or reconfiguration of the peripheral device is eliminated when switching between hosts as required by the independent claims (1, 3, 7, 18, and 23).

Petitioner asserts that the ordinarily skilled artisan would recognize that Furukawa's disclosed "series of operations" or "switching operations" encompasses all overhead operations and, thus, would have understood these operations to include enumeration when a switch is made between connected hosts because such enumeration "is a conventional switching operation of USB hubs" as evidenced by another Japanese patent.  Supp. Reply 6 (citing Ex. 1052[20] ¶¶ 4, 17).  Mr. Garney testifies,

> Furukawa's entire invention is directed to avoiding the conventional USB switching operations of prior art USB hubs. In light of the whole technical disclosure of Furukawa, a [person of ordinary skill in the art] could not understand Furukawa to describe that "normal enumeration and configuration" still takes place when a host "connection" is released.  To take that position does great violence to the disclosure of Furukawa.  Significant portions of Furukawa's disclosure would be rendered superfluous, and the expressed design goals could not be met— e.g., the need to eliminate processing time and overhead each time a host is switched. Patent Owner's unsupported attorney arguments lack any technical basis and completely ignore the functionality of Furukawa's controlling circuit, FIFOs, and NAK packets.

Ex. 1053 ¶ 23.

---

[20] Exhibit 1052 is an English translation of Japanese Unexamined Application 2001-51939.

36

IPR2017-00861
Patent 7,627,708 B2

We remain unpersuaded by this argument. Initially, we note Mr. Garney's testimony in this regard is unsupported by any facts or data and, thus, is deserving of little weight.[21] 37 C.F.R. § 42.65(a). Like the Petition, Mr. Garney's Reply Declaration (Ex. 1053) still fails to identify any express disclosure in Furukawa of eliminating re-enumeration processing in switching between connections.

As previously noted, there is no mention of enumeration (or re-enumeration) anywhere in Furukawa. There may be reasons Furukawa is silent in this respect. It may be the case that Furukawa determined, for its purpose, elimination of the overhead of loading and unloading drivers on the host was a sufficient improvement over prior art switches and it need not address other elements of overhead processing such as re-enumeration. In fact, we find it notable that Furukawa's use of its FIFO stores data *and an address* of the USB device to which the data is destined and uses that address to determine what host is presently connected to the device (i.e., what host presently has set the address for the device—which as presently enumerated the device). *See* Ex. 1002 ¶¶ 13–15. In Furukawa's invention, it may be that controlling circuit C (comprising hub repeater 13, hub controller 14, and CPU 15) uses the stored address from the FIFO to perform a re-enumeration or reconfiguration on the destination device because a prior connected host used a different address and a different configuration. *See id.* ¶ 15. However, we need not speculate about how Furukawa deals with the

---

[21] Mr. Garney's reliance on paragraphs 4 and 17 of Exhibit 1052 provide no support for his assertion that enumeration is among the "conventional" operations that must be performed for each switch between connected hosts. The word "enumeration" never appears in Exhibit 1052.

IPR2017-00861
Patent 7,627,708 B2

overhead processing of re-enumeration.  It suffices in this case that we are not persuaded that Furukawa expressly discloses that re-enumeration and reconfiguration processing is eliminated, and that Petitioner does not persuasively argue that such a disclosure is inherent in Furukawa.

Independent apparatus claims 3, 7, and 23 and independent method claim 18 include similar recitations to those of claim 1 and Petitioner presents similar arguments for these claims.  Pet. 46–51.

Accordingly, we are not persuaded by a preponderance of the evidence that Furukawa anticipates any of independent claims 1, 3, 7, 18, and 23.

3.      *Dependent Claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24,*
*and 25*

Dependent claims 2, 4–6, 8, 10, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claim. Because we are not persuaded Furukawa discloses, expressly or inherently, concurrent connections by multiple hosts to one peripheral device, as recited in each independent base claim from which these dependent claims depend, we also are not persuaded by a preponderance of the evidence that Furukawa discloses every limitation of these claims.

4.      *Conclusion Regarding Anticipation by Furukawa*

For the above reasons, we are not persuaded Petitioner has established by a preponderance of the evidence that any of claims 1–8, 10, 11, 15–20, and 22–25 are unpatentable as anticipated by Furukawa.

IPR2017-00861
Patent 7,627,708 B2

### E.    Anticipation by Dickens

The Petition asserts claims 1–8, 11, 15–20, and 22–25 are anticipated by Dickens.  Pet. 55–63.  For the reasons discussed below, we are persuaded that Dickens anticipates claims 1, 3–5, 7, 8, 11, 15, 18–20, 23, and 25.

### 1.    Dickens (Ex. 1003)

According to Dickens, prior techniques for sharing a USB peripheral device include use of an Ethernet local area network or switching devices that utilize complex wiring.  Ex. 1003, 1:31–39.  Dickens discloses a data routing device to share a USB peripheral device among a plurality of USB hosts.  *Id.* at 1:45–49.  Figure 1, a version of which is reproduced below,[22] is a schematic illustration of a system using the inventive data routing device. *Id.* at 5:8–9.



FIG.   1

---

[22] Figures in the Dickens US Patent (Ex. 1003) are hand-drawn and, although understandable, are difficult to view.  The same patent application was filed in Great Britain (GB 2 350 212 A – Exhibit 3001) and Figures 1 and 2 therein are substantively identical but easier to view.  Thus, we reproduce here the Dickens' Figures 1 and 2 from the substantively identical patent application filed in Great Britain.

IPR2017-00861
Patent 7,627,708 B2

Figure 1 depicts a system 100 including data routing device 130 coupled with multiple USB host computers 105 through respective USB busses 106 and data converters 110. *Id.* at 5:26–37. Data routing device 130 also is coupled with a plurality of USB peripheral devices 108 through respective USB busses 109 and data converters 120. *Id.* at 5:66–6:11. Data converters 110 and 120 use USB protocols in exchanges with hosts 105 and devices 108, respectively. *Id.* at 5:33–37, 6:9–11. Data converters 110 include emulation functions to emulate the presence of each USB peripheral device 108 in system 100 so that each USB host 105 will detect the peripheral devices as present and configure themselves accordingly. *Id.* at 5:38–43. Data converters 120 include emulation functions to emulate the presence of a USB host on each USB bus 109 associated with each USB peripheral device 108 causing the peripheral devices to communicate with data router 130 through a corresponding converter 120 as though it is connected to a USB host. *Id.* at 6:12–17.

Figure 2 of Dickens, reproduced below[23], is a schematic illustration of elements within the data routing system of Figure 1. *Id.* at 5:9–11

---

[23] This Figure, like the version of Figure 1 reproduced above, is from GB 2 350 212 A.

IPR2017-00861
Patent 7,627,708 B2



FIG. 2

Figure 2 depicts data router 130 (the largest rectangle also labelled as system 100) comprising microprocessor-based controller 140 and PCI bus 132 for coupling to other components within data router 130. *See id.* at 6:29–50. Data router 130 is coupled to two USB host devices 105 through respective data converters each comprising USB device controller 150 and PCI bus interface 152. *Id.* at 6:51–54. Data router 130 is also coupled with USB peripheral devices 180, 182, 184, and 186 via USB busses 109 and corresponding USB host controllers 154, 156, and 158 coupled with PCI bus 132. *Id.* at 6:57–7:8. In particular, USB host controller 156 serves to couple router 130 to printer 182.

In operation, data router 130 of Dickens receives a request for exchange from any host 105 via corresponding data converter 150 and emulates operation of each of the peripheral devices (180, 182, 184, and 186) coupled with router 130. *See id.* at 7:36–45. Information to or from a peripheral device is moved between data router 130 and the peripheral

41

IPR2017-00861
Patent 7,627,708 B2

device via the emulated USB host provided by a corresponding USB host controller 154, 156, or 158. *See id.* at 8:16–41. In other words, data router 130 emulates each attached USB peripheral device for each attached USB host and emulates a requesting USB host for each attached peripheral device.

### 2.    *Independent Claims 1, 3, 7, 18, and 23*

Petitioner identifies the recited USB multi-host device as reading on data router 130 of Dickens and the recited first and second upstream ports as reading on data converters 110 (or equivalently 150 of Fig. 2). Pet. 55–56.[24] Petitioner further identifies the recited "USB function block" as reading on any one of Dickens' USB peripheral devices including, for example, printer 182 and identifies the recited multi-host device controller as reading on Dickens' routing controller 140 within data router 130—the routing controller being coupled with two upstream ports (converters 110/150 coupled with USB busses 106) and coupled with the function block (e.g., printer 182). *Id.* at 55–56.

The "wherein" clause of claim 1 requires that the controller be configured to "establish concurrent respective USB connections between the USB function block and the first and second upstream ports" to enable certain recited functions. Petitioner argues Dickens meets this limitation in that controller 140 maintains USB connections with host computers 105 through respective device controllers 150 (upstream ports) and maintains

---

[24] Petitioner quotes a disclosure of Dickens and erroneously cites column 2, lines 12–13 thereof for that quote. The quoted text appears at column 5, lines 29–31 of Dickens. We find the incorrect citation to be harmless error.

IPR2017-00861
Patent 7,627,708 B2

USB connections with printer 182 (a function block) through USB controller 156.  Pet. 57.

Regarding the function of simultaneous enumeration and configuration, Petitioner argues:

> Dickens discloses a USB multi-host device which is simultaneously USB-connected through computer data converters 110 and USB connections 106 to first and second hosts. . . .  The computer data converters 110 include emulation function means that emulate the presence of a keyboard, mouse, printer, and set of speakers on each USB bus connection 106 to the hosts. . . .  This causes each USB host computer to detect the emulated peripherals and configure the emulated peripherals as a matter of configuring the computer data converters 110 of the multi-host device.

Pet. 57–58 (citing Ex. 1003, 5:26–43).  Petitioner contends Dickens' express disclosure of each USB host configuring its corresponding data converter's USB device emulation (110) discloses both configuring and enumerating the peripheral device because enumerating was well-known to be a required step of such initial configuration of a peripheral device by a USB host.  Pet. 58.

Petitioner further contends the recited simultaneous access by multiple USB hosts and the recited alternating access to the function block read on Dickens' disclosure of simultaneous access by multiple USB hosts to printer 182 via data router 130 such that data to be printed may be received simultaneously by router 130 from any two USB hosts (the recited simultaneous access) but data from the second USB host will be buffered while the data from the first host is being transmitted from data router 130 to printer 182 (the recited alternating access).  Pet. 58–60 (citing Ex. 1003, 9:21–27).

43

IPR2017-00861
Patent 7,627,708 B2

Notwithstanding Patent Owner's arguments, which we have considered and which we address below, we are persuaded by Petitioner's showing, which we adopt as our own findings and conclusions, that independent claims 1, 3, 7, 18, and 23 are anticipated by Dickens.

a.    *Dickens Discloses the Claimed "Device"*

Patent Owner argues Dickens does not anticipate claim 1 because "Petitioner improperly attempts to combine portions of separate USB devices to conclude the claims of the '708 Patent are anticipated" and, thus, the elements of Dickens are not arranged as in the claim.  PO Resp. 19. Specifically, Patent Owner agues the Petition improperly combines two separate pieces of hardware in Dickens to read on the claimed multi-host device—namely data routing device 100 and printer 182.  *Id.* at 20 (citing *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008). By contrast, based on its proffered construction of "device" (Paper 30, 1–3), Patent Owner contends claim 1 is directed to **_a_** device—*i.e.,* an integral device—that comprises the recited structures within the device and provides the recited functionality.  *Id.*

Petitioner argues that Patent Owner's arguments are based on an incorrect interpretation of "device," as claimed, as limited to an integral, unitary device comprising the recited elements.  Reply 16.

We agree with Petitioner.  Patent Owner's argument is not persuasive because it is based upon an overly narrow construction of "device," which we decline to adopt for the reasons discussed above.

Therefore, we are persuaded by Petitioner's arguments that the claimed "device" is disclosed by Dickens as the combination of routing

IPR2017-00861
Patent 7,627,708 B2

device 100 (including controller 140 read as the recited multi-host controller) and printer 182 (read as the recited function block).

### b.      *"USB Connections"*

Patent Owner argues Dickens does not disclose the claimed "USB connections" because, although Dickens' routing device 100 establishes a USB connection between it and the host computers and between it and the peripheral devices, all exchanges are converted to PCI bus exchanges within the routing device.  PO Resp. 25–26.

We agree that Dickens converts all USB exchanges between an attached USB host and an attached USB peripheral from USB protocols to a PCI bus (or other non-USB processor bus) and its associated non-USB protocols.  Patent Owner's argument is not persuasive, however, because it is based upon an overly narrow construction of "USB connection," which we decline to adopt for the reasons discussed above.

Therefore, we are persuaded by Petitioner's arguments that the claimed "USB connections" are disclosed by Dickens in that, as discussed *supra*, controller 140 maintains USB connections with host computers 105 through respective device controllers 150 (upstream ports) and maintains a USB connection with printer 182 (a function block) through USB controller 156.  Pet. 57.  Thus, all exchanges to and from an attached host 105 are over a USB bus 106 using USB protocols and all exchanges to and from an attached peripheral (printer 182) are over a USB bus 109 using USB protocols.  Any intervening non-USB exchanges, such as over a PCI bus, are transparent to host 105 and printer 182 and, therefore, are within the scope of a "USB connection" as we have construed the term ("direct and indirect

45

IPR2017-00861
Patent 7,627,708 B2

connection, both with and without intervening interconnect, using USB protocols.").

*c.*      *"Concurrent USB Connections"*

All claims require two concurrent USB connections—a first between a first host (or upstream port) and the function block, and a second between a second host (or upstream port) and the function block. In accordance with our construction of "concurrent," the two USB connections must be "operating or occurring at the same time."

Based on the preliminary record in our Decision on Institution, we were persuaded Dickens anticipates independent claim 1. Dec. 32. Dickens' data router 130 comprises a plurality of data converters 110 (each converter comprising 150 USB device controller), each data converter 110 is coupled with a corresponding USB host 105 via a corresponding USB bus 106. Ex. 1003, 5:14–37, Fig. 1; *see also id.* at 7:31–49, Fig. 2; Pet. 57. Thus, Dickens provides concurrent USB connections between data router 130 and USB hosts 105 via corresponding "upstream ports" (the converter associated with each USB host through the corresponding USB bus). Dickens further discloses data router 130 comprises a data converter 120 (comprising USB device controller 156) coupled with a corresponding USB peripheral device (printer 182) via a corresponding USB bus 109. Ex. 1003, 5:66–6:28, Fig. 1; *see also id.* at 8:4–41, Fig. 2, Pet. 57. Data router 130, therefore, maintains concurrent USB connections with multiple USB hosts 105 and a USB connection with a USB peripheral device printer 182 (a USB "function block")—all such connections operable at the same time in accord with our interpretation of "concurrent." Thus, multiple USB hosts (105) are

46

IPR2017-00861
Patent 7,627,708 B2

concurrently connected with a shared printer (182) using USB protocols, as required by claim 1.  Data router 130 is an intervening element in the concurrent USB connections in which USB exchanges between the USB hosts and the shared printer are converted between USB protocols and another non-USB structure/protocol for use within data router 130.  As discussed *supra*, in view of our interpretation of "USB connection," claim 1 does not preclude such an intervening element that converts between USB protocols and other formats/protocols.

   After considering the issue anew based on the parties' evidence submitted at trial, a preponderance of the evidence leads us to the same conclusion.  Patent Owner argues "[t]he fact that there is only a single connection to Dickens' printer (the claimed 'USB function block') precludes a finding of anticipation."  PO Resp. 33.  Patent Owner further argues,

> Indeed, one of ordinary skill in the art would understand that the single USB connection to Dickens' printer 182 only allows print data from one host at a time.  Knapen ¶ 98; *see also* [Ex. 1003], 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis.  Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

*Id.* at 34.

   We disagree.  Patent Owner's argument conflates the USB connections with the ability to transfer data concurrently or simultaneously.  Petitioner argues, and we agree, "Figure 3 of the '708 Patent is no different: one arrow between the '708 Patent controller and device/function is the only way data is transferred, and data must necessarily communicate over this depicted-as-single arrow from each of the illustrated hosts."  Reply 16.

IPR2017-00861
Patent 7,627,708 B2

There is only a single physical connection between Dickens' routing device 100 and any one peripheral device (e.g., printer 182) in exactly the same manner as in the '708 patent in which there is a single physical connection between multi-host controller 108 and device/function 312 in Figure 3. Through that single physical connection in the '708 patent, data may be exchanged alternately (as clearly expressed in the claim and as discussed further below). *See* Ex. 1001, 2:64–3:1 ("The internal arbitration mechanism may enable each host to access the shared Peripheral Function by either interleaving host accesses, or by using a common request/grant structure, which may hold-off one host while another host completes a data transfer to/from the shared device."). A switch of data transfer with two hosts is performed in Dickens in precisely the same manner. *See* Ex. 1003, 2:48–52 ("Data activity from each of the computers can be monitored and routed through to the printer on a first come first served basis. Switchover between the data sources can occur when a break in data transmission greater than a defined timeout period has been detected.").

While the data transfers may switch between hosts in Dickens and in the '708 patent, the USB connections from any two USB hosts 105 in Dickens to printer 182 are established and remain established regardless of whether data is presently being transferred. Dickens' routing controller 140 within data router 130, like multi-host controller 108 in the '708 patent, arbitrates or alternates data transmissions in accordance with any desired algorithm (an algorithm that is unspecified by the '708 patent Specification and claims). *See, e.g.,* Ex. 1003, 9:1–34 (audio alarms states from two computers are monitored and a printer is shared between established host connection based on a timeout period).

48

IPR2017-00861
Patent 7,627,708 B2

Thus, USB connections in Dickens between two hosts 105 (or upstream ports) and the printer 182 are established and remain so as data exchanges may alternate among the two hosts and, hence, operate *or occur* at the same time once established.

> d.    *Simultaneous Access, Enumeration, and Configuration*

Patent Owner argues,

> The mere fact there is a single USB connection to printer 182 means it is impossible for two hosts to simultaneously enumerate or configure printer 182.  Knapen ¶ 108.  In other words, printer 182 is enumerated and configured, if at all, by one and only one host—host controller 156.  *Id.* ¶ 109.

PO Resp. 35.  Patent Owner further argues "Petitioner's expert conceded at deposition that there would be no configuration of Dickens' emulated printers."  *Id.*  Patent Owner further argues "emulated printers are separate devices implemented in the data routing device 100" and, thus are not the device to be simultaneously enumerated.  *Id.* at 36.  Patent Owner contends, "[t]he emulated printers are enumerated independently from printer 182, the device that includes the 'USB function block.'"  *Id.* (citing Ex. 2007 ¶ 110).

We disagree.  Initially, we observe the claims refer to enumeration and configuration of the USB multi-host device (or USB device), not the function block or peripherals physically coupled to the device. The emulated peripheral devices (converters 110) are clearly a part of routing device 100—converters 110 provide emulation of the various peripheral devices. Each host 105, operable independent of other hosts, interacts with its corresponding converter 110 to enable simultaneous enumeration and configuration.  Thus, contrary to Patent Owner's assertions, enumerating and

IPR2017-00861
Patent 7,627,708 B2

configuring the emulated printers (converters 110) within routing device 100
clearly discloses simultaneous enumerating and configuring the routing
device (the claimed USB multi-host device or USB device).

The concurrent USB connections disclosed by Dickens allow the
functions required by claim 1—namely, simultaneous enumeration and
configuration of the multi-host device, simultaneous access to the multi-host
device, and alternating access to the USB function block.  Dickens' data
router 130 (the recited multi-host device) provides emulation functions in
each converter 110 coupled with a corresponding USB host 105 to emulate
the presence of each USB peripheral device coupled with the router for each
of multiple USB hosts coupled through the converters.  Pet. 57–58 (citing
Ex. 1003, 5:26–41).  Thus, each USB host, coupled through its respective
data converter, senses the emulated presence of each USB peripheral device
(e.g., printer 182) and performs standard USB configuration and
enumeration of the emulated peripheral devices.  Ex. 1003, 5:41–47 ("This
causes each of the USB host computers to detect the presence of each of
these peripherals and configure themselves accordingly.  Once configured[,]
the computers communicate with the computer data converter circuits as if
they were connected to a USB peripheral bus that is attached to a USB
keyboard, mouse, printer and set of speakers.").[25]  Thus, each USB host
configures and enumerates the multi-host device (data router 130) by
configuring and enumerating the emulated printer provided by the
corresponding data converter coupling the USB host to the router.  Because

---

[25] The "configuration" referred to (when a USB host first senses the presence
of a USB peripheral device) is known to include configuration and
enumeration of the sensed device.  Pet. 58; Ex. 1023 ¶ 109.

IPR2017-00861
Patent 7,627,708 B2

each USB host 105 is coupled through a respective converter 110, exchanges between one USB host and the router to configure and enumerate its emulated printer proceed independent of exchanges between another USB host and the router to configure and enumerate its respective emulated printer. Thus, two USB hosts configure and enumerate the multi-host device simultaneously.

Such simultaneous configuration and enumeration also meets the limitation of simultaneous access by multiple hosts to the multi-host device because multiple USB hosts (105) can simultaneously access the multi-host device (router 130) by configuring and enumerating the emulated USB printer provided by the corresponding data converter (110) coupling the router to the host. Furthermore, Dickens discloses that multiple USB hosts may access router 130 (the multi-host device) to send data to printer 182 such that the data from one USB host will be forwarded to the printer while data from the other host(s) will be buffered until the transfer of the first host completes. Pet. 59 (citing Ex. 1003, 9:21–27). Thus, multiple USB hosts are simultaneously accessing data router 130 to send data to printer 182, meeting the function required by claim 1.

Dickens further discloses enabling the alternating access to the function block without reconfiguring or re-enumerating as recited in claim 1. As above, Dickens discloses that data from a second USB host destined for the USB printer will be buffered while data from a first USB host is being forwarded through router 130 to printer 182. Pet. 59 (citing Ex. 1003, 9:23–27). Thus, when the data from the first USB host completes its transfer or encounters a pause, router 130 will alternate to forwarding data buffered from another USB host to the printer and need not reconfigure or re-

51

IPR2017-00861
Patent 7,627,708 B2

enumerate the USB connection because each USB connection remains connected.  Pet. 59–60 (citing Ex. 1003, 3:23–24, 9:20–30; Ex. 1023 ¶ 112).  In other words, the connection between the emulated USB host within converter 156 and printer 182 and the connections between USB hosts 105 and the respective emulated printer devices within corresponding converters 110 remain connected as the data transfer alternates between the first host connection and the second host connection.

> ### e.   Conclusion Regarding Anticipation of Independent claims 1, 3, 7, 18, and 23

For the above reasons, we are persuaded by a preponderance of the evidence that independent claim 1 is unpatentable as anticipated by Dickens.

Petitioner contends independent claims 3, 7, 18, and 23 are anticipated by Dickens for the same reasons as claim 1.  Pet. 60.  Patent Owner argues the Petition fails to establish anticipation of claims 3, 7, 18, and 23 for the same reasons as claim 1.  *See* PO Resp. 19–37.  Thus, for the same reasons as claim 1, we are persuaded by a preponderance of the evidence that independent claims 3, 7, 18, and 23 are unpatentable as anticipated by Dickens.

### 3.   *Dependent Claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25*

Dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 depend, directly or indirectly, from one of independent claims 1, 3, 7, 18, and 23 and, thus, incorporate the limitations of their respective base claims.  Petitioner identifies the further limitation of each of dependent claims 2, 4–6, 8, 11, 15–17, 19, 20, 22, 24, and 25 in the disclosures of Dickens.  Pet. 60–63.

IPR2017-00861
Patent 7,627,708 B2

#### a.     Claims 2, 6, and 16

Claims 2, 6, and 16 depend, directly or indirectly, from claims 1, 3, and 7, respectively, and each recites endpoint buffers positioned between respective upstream ports and the controller (e.g., endpoint & status 306 and 308 between upstream ports 302 and 304, respectively, and controller 108 in Figure 3 of the '708 patent).  The Petition contends, in Dickens, "DRAM memory 144 is coupled between the upstream ports and Dickens' device's data routing controller 140" thereby meeting the claim limitation.  Pet. 60.

As drawn in Dickens' Figure 2, DRAM memory 144 is not positioned physically between controller 140 and upstream ports (e.g., USB controllers 150).  Patent Owner argues precisely this physical difference contending DRAM memory 144 is not between controller 140 and the upstream ports, instead, "DRAM 144 is actually inside the multi-host device controller (i.e., routing controller 140)."  PO Resp. 38.

Petitioner argues "coupled between" should be construed to include "directly or indirectly connected" as coupled is defined in the '780 patent.  Reply 12 (quoting Ex. 1001, 3:40–41).  Petitioner supports this assertion citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310–11 (Fed. Cir. 2005) (A "'connection' can occur between . . . two devices regardless of whether they are housed separately or together.  Indeed, the two components could be connected . . . and still be located in the same housing or even on the same circuit board.").  Reply 12.  Petitioner concludes that "coupled between" should be understood to mean "directly or indirectly connected with or without physical separation from what is connected."  *Id.*

IPR2017-00861
Patent 7,627,708 B2

Patent Owner argues that, although "coupled" is defined in the '708 patent as directly or indirectly connected, "between" should have its plain and ordinary meaning and, thus, "one of ordinary skill would understand the endpoint buffer 'coupled between' the upstream port and the multi-host device controller is directly or indirectly connected in the middle of those two structures."  PO Sur-Reply 9.

We are not persuaded by Petitioner's argument and we agree with Patent Owner that, based on the plain and ordinary meaning of "coupled between," Dickens DRAM memory 144 is not "coupled between" controller 140 and upstream ports.  "Between" provides a specific structural limitation in these claims that cannot be ignored.  Thus, we are not persuaded that claims 2, 6, and 16 are anticipated by Dickens.

### b.    *Claim 25*

Claim 25 depends from claim 23 and recites, *inter alia*, that the controller comprises USB interface circuits that enable the USB device to exchange data over a USB bus.  The Petition identifies Dickens' host controller circuits 150 as the recited USB interface circuits.  Pet. 61.  Patent Owner argues circuits 150 are not within controller 140 of Dickens, identified as the recited controller of claim 25.  PO Resp. 38.

Petitioner argues the transition phrase "comprising" means an element is essential but does not require the element be located inside a particular housing.  Reply 13 (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003)).

Patent Owner contends the recitation that controller "comprises . . . USB interface circuits" means "the respective interface circuits are essential

IPR2017-00861
Patent 7,627,708 B2

to or included in the controller" and that the record does not support
Petitioner's contentions that the recitation is met regardless of "whether [the
USB interface circuits are] located inside or outside a housing with the
controller." PO Sur-Reply 10.

Petitioner reiterates that the transition phrase "comprising" does not
necessarily mean "included in" the recited structure. Pet. Sur-Sur-Reply 12–
13.

We are persuaded by Petitioner's arguments. The '708 patent
Specification does not discuss the claimed "USB interface circuits" let alone
where such circuits physically reside. Whereas "between," as discussed
above, provides a specific structural limitation, as discussed *supra* with
respect to construing the term "device," the '708 patent is not about
packaging or integration of the elements of the claims—it is directed to
alleged new features to enable sharing of a USB device by multiple hosts.

Dickens does not require interface circuits 150 physically reside
inside or outside the dashed line box that represents controller 140. Indeed,
as Petitioner argues (Pet. Sur-Sur-Reply 14), Dickens specifically discloses,
"The data router includes a data routing controller 140. Aspects of the data
routing controller are distributed [throughout] the data router 130." Ex.
1003, 6:39–41. Just as a dashed line may be drawn around distinct
components of Dickens Figure 2 to identify the claimed "device" (*see*
section II.A.4.b), we can redraw the dashed line in Dickens' Figure 2 to
include host controllers 150 within controller 140. An ordinarily skilled
artisan would reasonably infer such a configuration from Dickens. *See
Preda*, 401 F.2d at 826. The recited USB interface circuits may be packaged
with or packaged separately from the circuits that perform the recited

55

IPR2017-00861
Patent 7,627,708 B2

functions of the multi-host controller in claim 23, from which claim 25 depends.  The ordinarily skilled artisan, with experience in USB device design, would "at once envisage" both such physical packaging options based on the express disclosures of Dickens' Figure 2, its express disclosure that elements of its controller 140 may be distributed throughout router 130, and the lack of any limiting description of the claimed "USB interface circuits" in the '708 patent Specification.  *See Kennametal,* 780 F.3d at 1381.  The Federal Circuit has similarly held that "comprising" need not require the claimed element be physically "inside" the element in which it is "comprised":

> The district court incorrectly interpreted the term "comprising" in claim 15 of the '543 patent to require that all six elements must be contained inside a single enclosure.  We have recognized that 'comprising' is a term of art that means "including but not limited to."  *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007).  The use of the word "comprising" only means that the plugstrip must have at least all six of the claimed elements, but not that all six elements must be contained in a single enclosure.

*Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 F. App'x 1030, 1034 (Fed. Cir. 2016).  We agree.

Thus, we are persuaded by a preponderance of the evidence that claim 25 is unpatentable as anticipated by Dickens.


c.      *Claims 17, 22, and 24*

Claims 17, 22, and 24 depend, directly or indirectly, from claims 7, 18, and 23, respectively, and further recite that the controller maintains address, configuration, and response ("ACR") information for each connected host.  The Petition argues, "Dickens thereby discloses that the

IPR2017-00861
Patent 7,627,708 B2

multi-host device controller allows the hosts to alternately access the USB function block without reconfiguring and/or re-enumerating the USB multi-host device each time the hosts alternate accessing the USB function block that is the Dickens printer."  Pet. 62 (citing Ex. 1023 ¶ 119).

> Patent Owner argues:
>
> Petitioner fails to explain or identify any disclosure in Dickens where routing controller 140 "maintain[s] respective dedicated address, configuration, and response information for each of the plurality of hosts."  Rather, Petitioner merely rehashes the "non-re-configuration and non-re-enumerating" argument of Claim 1 without specifically identifying in Dickens where the additional limitations of these dependent claims are allegedly found. Petition at 61–62.  The only Dickens passage Petitioner cites is column 9, lines 20–35.  *See id.*  Neither this passage—nor anything else in Dickens—expressly discloses the multi-host device controller (i.e., routing controller 140) maintaining address, configuration, and response information for each of the hosts.  And to the extent, Dickens might maintain address, configuration, and response information, it might do so outside of the "multi-host device controller."  Dickens does not, therefore, anticipate Claims 17, 22, and 24.

PO Resp. 39.

Petitioner argues "maintaining" the recited ACR information equates with "establishing a dedicated connection 'without needing [the device] to be re-configured or re-enumerated . . . .'"  Reply 14 (quoting Ex. 1001, 2:12–15).

We are not persuaded by Petitioner's argument.  We agree with Patent Owner that the Petition fails to identify where Dickens teaches that the controller maintains the recited ACR information.  Petitioner's argument in its Reply attempts to construe the recited element so as to coincide with the Petition's arguments directed to re-enumeration and reconfiguration.  We

IPR2017-00861
Patent 7,627,708 B2

discern no need for construction of the recited element beyond its plain meaning—namely that the control maintains the recited ACR information. Although the recitation may be inherent or suggested in Dickens, the Petition simply fails to identify an express teaching of this feature in Dickens. Thus, we are not persuaded by a preponderance of the evidence that claims 17, 22, and 24 are anticipated by Dickens.

### d. Claims 4, 5, 8, 11, 15, 19, and 20

The Petition identifies the features of these dependent claims in Dickens (Pet. 61–63) and Patent Owner does not rebut these assertions (*see* PO Resp.). We are persuaded by a preponderance of the evidence that claims 4, 5, 8, 11, 15, 19, and 20 are anticipated by Dickens.

### F. Obviousness over Either Furukawa or Dickens, and Chen

The Petition asserts dependent claims 9, 11–14, and 21 are unpatentable as obvious over either Furukawa or Dickens, in combination with Chen. Pet. 64–70. Claims 9 and 11–14 depend (directly or indirectly) from claim 7, and claim 21 depends from claim 18. Claims 9, 11, 12, and 21 recite limitations relating to interleaving processing of requests received from USB hosts. Claims 13 and 14 recite limitations relating to distribution of bandwidth in processing of requests from multiple USB hosts. Petitioner relies on Chen, in combination with either Furukawa or Dickens, for disclosing the interleaving and bandwidth related limitations. *Id.*

In view of our findings *supra* regarding Furukawa, we do not further consider the alternative of Furukawa in combination with Chen because the

IPR2017-00861
Patent 7,627,708 B2

Petition does not rely on Chen for any deficiency of Furukawa discussed *supra*.

### 1.   *Chen (Ex. 1005)*

According to Chen, USB flash memory devices that operate as disk drives to a personal computer ("PC") are each assigned a drive letter by the PC operating system software.  Ex. 1005, 1:47–57.  Chen further discloses that several such flash memory USB drives may be added to a PC using USB hubs to expand the number of USB devices accessible to the PC.  *Id.* at 1:19–20.  However, according to Chen, the number of such flash memory drives could exceed the number of possible drive letters in the PC operating system.  *Id.* at 1:58–67.  Chen purports to resolve this problem by providing an enhanced USB hub capable of operating as a standard USB hub or, in a "single-endpoint mode" of operation, as an enhanced hub that aggregates downstream USB flash memory disk drives into one logical USB endpoint as detected by the PC operating system and hence as a single device or drive letter.  *Id.* at 2:53–64.

Chen's Figure 2, reproduced below, is a block diagram of a USB switch that aggregates multiple flash memory endpoints coupled thereto into a single endpoint for the USB host (PC).  *Id.* at 2:13–14.

IPR2017-00861
Patent 7,627,708 B2



FIG. 2

Figure 2 depicts USB switch 30 coupled with USB host 10 through USB
controller 12 to receive and process requests over USB bus 18. *Id.* at 2:53–
57. Mode logic 26 controls switch 30 to selectively operate in the single-
endpoint mode. *Id.* at 2:59–61.

> When operating in single-endpoint mode, USB switch **30**
> acts as the final USB endpoint for transactions on USB bus **18** to
> host **10**. USB switch **30** generates USB transactions on hidden
> USB buses **28** to USB flash storage blocks **22, 23, 24**. USB flash
> storage blocks **22, 23, 24** respond to USB switch **30** over hidden
> USB buses **28** with USB switch **30** acting as the USB host on
> hidden USB buses **28**. USB switch **30** then forwards data to host

IPR2017-00861
Patent 7,627,708 B2

**10** by acting as the endpoint.  Thus[,] USB flash storage blocks **22, 23, 24** are hidden from host **10** when mode logic **26** activates the single-endpoint mode.

*Id.* at 3:5–14.

Chen further discloses that, when operating in the single-endpoint mode to aggregate multiple flash memory drives into a single endpoint, transaction packets may be re-ordered.  *Id.* at 3:63–66.  For example, "Rather than have all packets for a first transaction complete before the next transaction begins, packets for the next transaction can be re-ordered by USB switch **30** and sent to the memory devices before completion of the first transaction."  *Id.* at 4:2–6.  Chen's Figure 5 shows exemplary re-ordering of transaction packets and Chen discloses that "[d]ata throughput can be improved using such packet re-ordering."  *Id.* at 5:49–50.

### 2.    *Motivation to Combine Dickens and Chen*

Petitioner identifies motivation for the proposed combination by referring to "MPEP [Chapter 2143] rationales (C) and (G) as stated in detail by Garney ¶¶124-149."  Pet. 67.  As discussed in our Decision on Institution, to the extent that arguments are found only in the Declaration of Mr. Garney, we determine those arguments are improperly incorporated by reference (37 C.F.R. § 42.6(a)(3)), and we decline to consider them.

However, Petitioner also argues that the ordinarily skilled artisan would have been motivated to combine Chen's interleaving with Dickens' system because Chen's known techniques of interleaving USB host transactions would improve throughput in the similar system of Dickens in a similar manner and because Chen specifically teaches its interleaving technique improves data throughput.  Pet. 67–68.  Specifically, Petitioner

IPR2017-00861
Patent 7,627,708 B2

contends it would have been obvious to improve throughput for any or all of multiple USB hosts sending transactions to USB peripheral devices in Dickens by adding Chen's interleaving features to Dickens' data router.  *Id.* Petitioner further contends the ordinarily skilled artisan would have recognized that "interleaving transactions from two or more hosts is not different than interleaving transactions from one host."  *Id.* at 68.

Patent Owner argues the ordinarily skilled artisan would not have been motivated to combine Dickens and Chen because "1) Dickens expressly teaches away from a combination with Chen, 2) combining Chen with Dickens would render Dickens inoperable, and 3) Petitioner's proposed combination does not improve Dickens, does not apply Chen's 'improvement' technique in the same way as it is used in Chen, and does not result in predictable results."  PO Resp. 40–41.  We address each argument in turn.

a.   *Dickens Does Not Teach Away From Chen's Interleaving*

Patent Owner argues Dickens teaches sharing a printer among multiple hosts relying on a timeout period to determine when to switch between host requests and, thus, teaches away from Chen's interleaving of print data from multiple hosts.  PO Resp. 42–43.

Petitioner argues Dickens teaches connecting a plurality of hosts to any number of peripheral devices.  Reply 22.  Although a printer as an exemplary peripheral device is discussed with respect to other aspects of the Petition, Petitioner argues the combination with Chen was proposed based on a mass storage device, such as in Chen and as identified in the '708 patent, as the shared peripheral.  *Id.* (citing Ex. 1001, 2:26–27, 4:10).

62

IPR2017-00861
Patent 7,627,708 B2

Petitioner correctly argues that a teaching away must clearly discredit or discourage the proposed combination.  Reply 21; *see In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *see also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed . . . .").  Dickens does not clearly discredit Chen's interleaving approach.  The timeout features to switch between host print jobs is disclosed in Dickens only for sharing of a printer peripheral device.  Other peripheral devices, such as speakers 180, need not use timeouts.  Mr. Garney, Petitioner's expert, testifies that Chen's interleaving may be beneficially used to interleave multiple hosts sending transactions to other types of peripheral devices such as Dickens' speakers 180.  Ex. 2006, 135:7–22.  Mr. Garney further testifies that Chen's interleaving may be beneficially applied to interleave print jobs for certain types of printer generating a small volume of printed output such as a label printer.  *Id.* at 136:16–25.

Thus, we are persuaded that Dickens' exemplary use of a printer as a shared peripheral device does not discredit or discourage use of Chen's interleaving and, thus, does not teach away from the proposed combination.

### b.    *Combination Does Not Render Dickens Inoperable*

Patent Owner argues combining Chen with Dickens renders Dickens inoperable because Chen teaches interleaving transactions (that comprise multiple packets) by interleaving the multiple packets of multiple transactions, each destined to different downstream device—i.e., a different downstream memory device.  PO Resp. 44.  Patent Owner argues this is only

63

IPR2017-00861
Patent 7,627,708 B2

because, in Chen, each downstream memory device would receive packets destined to the device in the proper sequence. *Id.* By contrast, Patent Owner argues, where the destination is a single device, the interleaving of packets from different host transactions (such as multiple hosts sharing a single peripheral device as in Dickens) would risk packets arriving out of sequence, thus, violating USB protocols and rendering the combination inoperable. *Id.* at 44–45.

Petitioner argues Patent Owner's arguments are based on a hypothetical out of order sequence of interleaved packets but Chen does not disclose such a sequence. *See* Reply 24.

We are persuaded by Petitioner's arguments. Chen's Figure 5 depicts an exemplary sequence of re-ordering received packets for two transaction from one host. The description of Figure 5 explains a carefully designed sequence of operations to enable interleaving of packets of a transaction in a manner that precludes out of order packets. *See* Ex. 1005, 4:62–5:54. This specific sequence need not be applied by rote in the proposed combination with Dickens and, thus, Patent Owner's hypothetical inoperability arises from rote bodily incorporation of the references. "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements. . . . Rather, the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." *In re Mouttet*, 686 F.3d 1322, 1332–33 (Fed. Cir. 2012); *see also MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 (Fed. Cir. 2015) ("[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference" (citation

IPR2017-00861
Patent 7,627,708 B2

omitted)), *cert. denied*, 137 S. Ct. 292 (2016).  We are persuaded by Petitioner's arguments that the ordinarily skilled artisan, with knowledge of the USB specification and experience in the design of USB devices, would have understood how to apply the suggestions of Chen to interleave transactions in the context of Dickens' multiple hosts accessing a shared peripheral device.

> c.      *Combining Chen With Dickens Improves Dickens*

Patent Owner argues the proposed combination does not improve Dickens because the combination renders Dicken inoperable.  PO Resp. 46. For the reasons discussed *supra*, we disagree.  The proposed combination does not render Dickens inoperable.

Patent Owner further argues the Petition fails to explain how Chen's interleaving improves Dickens because "Chen's system is fundamentally different."  *Id.*  Patent Owner argues, "Chen is a switch between a single host and multiple downstream devices whereas Dickens' is a switch between multiple hosts and a single device."  *Id.*  Patent Owner contends, "[t]o the extent one of ordinary skill could find some way to make the combination operable, it would have to be in some way other than as described in Chen." *Id.* at 47.

Petitioner argues the alleged fundamental difference is incorrect because Chen discloses a single device made up of blocks.  Reply 25.

We are persuaded by Petitioner's arguments.  Figure 5 of Chen describes the interleaving of packets for multiple transactions when operating in its disclosed "single-endpoint" mode of operation in which the host sees the multiple memory devices as a single USB device.  *See* Ex.

65

IPR2017-00861
Patent 7,627,708 B2

1005, 2:59–3:4.  As above, an ordinarily skilled artisan, with knowledge of the USB specification and experience designing USB devices, would have understood that Chen's two interleaved transactions could be two transactions from two separate hosts as in Dickens.  Thus, we are persuaded that the proposed combination would have been operable and that the improvements of Chen's interleaving would have been suggested to the ordinarily skilled artisan to improve throughput of multiple transactions from multiple hosts directed to a shared, single-endpoint, peripheral device.

> d.    *Conclusion Regarding Motivation To Combine Dickens and Chen*

For the reasons discussed below, we are persuaded Petitioner has provided a sufficient reason/motivation for the combination of Chen's interleaving with Dickens' device to improve throughput based on rational underpinnings.

> 3.    *Claims 9, 11–14, and 21 Obvious Over Dickens and Chen*

Patent Owner does not respond to Petitioner's substantive arguments regarding obviousness of claims 9, 11–14, and 21.  Thus, we are persuaded by a preponderance of the evidence that claims 9, 11–14, and 21 would have been obvious over the combination of Dickens and Chen.

> G.    *Obviousness over Either Furukawa or Dickens and USB 2.0*

In this asserted ground, Petitioner argues, in its entirety:

> Just as either Furukawa or Dickens in view of Chen invalidates claims 9, 11–14, and 21, as in ground 3, either Furukawa or Dickens in view of USB 2.0 invalidates claims 9, 11–14, and 21.  USB 2.0 also has interleaving, as does Chen. Garney-¶¶ 20, 143-149.  The combination invalidates under

IPR2017-00861
Patent 7,627,708 B2

> MPEP rationales (D) and (G).  *Id.  See also* Garney '190 E1019-
> 1:52-2:7.

Pet. 71.

Contrary to our rules, Petitioner's assertions in this ground improperly incorporate by reference discussion from MPEP and Mr. Garney's Declaration.  37 C.F.R. § 42.6(a)(3).  We do not consider such improperly incorporated arguments from another document.  The arguments presented within the Petition are inadequate to identify where each element is taught or suggested in the prior art.  *See* 37 C.F.R. § 42.104(b)(4) ("[t]he petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon").

Thus, Petitioner has not shown, by a preponderance of the evidence, that claims 9, 11–14, and 21 are unpatentable as obvious over either Furukawa or Dickens in combination with USB 2.0

### H.   *Obviousness over Wurzburg, Osakada, and Either Furukawa or Dickens*

For this ground, the Petition asserts, "Bohm claims 1-25 are invalid for obviousness over *Wurzburg in view of Osakada, as in prosecution*, in view of either Furukawa or Dickens."  Pet. 71 (emphasis added).  We observe Wurzburg and Osakada were not asserted as a combination during prosecution of this patent application or in prosecution of the parent patent application.  In the last Office Action before allowance of the parent patent application, Wurzburg was applied as an anticipatory reference to claims 1, 3–5, 7–9, 11, 12, 15, and 17–24 and applied in a single reference

IPR2017-00861
Patent 7,627,708 B2

obviousness rejection for dependent claims 2, 6, 16, and 25.[26]  *See* Ex. 1014, 12, 25–30.  In an earlier Office Action in the parent patent application's prosecution, Osakada was applied in both an anticipation rejection and a single reference obviousness rejection.  *Id.* at 51–56.  Even if such prior Office Actions were properly incorporated by reference, Petitioner has not identified, nor do we discern, anywhere in the record where Wurzburg and Osakada have been previously applied in combination for an obviousness rejection.  Thus, the Petition fails to "specify where each element of the claim is found in the prior art patents or printed publications relied upon" as required by our rules.  37 C.F.R. § 42.104(b)(4).

Petitioner further argues the combination of Wurzburg and Osakada "lacked only concurrent connections as opposed to non-concurrent connections, simultaneous access instead of non-simultaneous access, and non-reconfiguring during access, as opposed to configuring during access."  Pet. 71.  Petitioner then asserts Furukawa teaches these missing features.  *Id.*  As discussed *supra*, we are not persuaded that Furukawa expressly or inherently teaches these features.[27]

For at least the above reasons, we are not persuaded by a preponderance of the evidence that claims 1–25 are unpatentable as obvious over Wurzburg in view of Osakada, and either Furukawa or Dickens.

---

[26] As noted *supra*, the claims of the parent patent application are nearly identical to those of the '708 patent.

[27] Petitioner is silent in this ground with respect to specific teaching in Dickens to be added to the proposed combination of Wurzburg and Osakada. Petitioner does not even attempt to incorporate by reference, however improper, earlier arguments regarding teachings of Dickens to be added to the proposed combination.

IPR2017-00861
Patent 7,627,708 B2

I.     *Obviousness over Either Furukawa or Dickens, Chen, and Other Art*

Petitioner's argument for this ground, in its entirety, reads:

To any extent Bohm's owner asserts lack of anticipation of claims by Furukawa or Dickens, the claims are invalid for obviousness under 35 U.S.C. §103 from either Furukawa or Dickens, Chen, Wurzburg, Osakada, APA, Adder, USB 2.0 and all other cited art.  Both Furukawa and Dickens disclose a multi-host USB device with a USB multi-host device and controller, their structures, and associated connections and functionalities, that provide connections to USB devices by multiple hosts without re-enumeration and reconfiguration of the devices by the hosts.  To any extent the Bohm patent owner disagrees in any detail as to any of the independent and dependent claims, the disagreement will surely be as to known ("known") USB system structures and functionalities ("technology"), and then Furukawa, Dickens, Chen, Wurzburg, Osakada, APA, Adder, USB 2.0, Lou, Fujita, and all the other cited art overcome the disagreement and teach and/or make obvious the owner-referenced technology.  USB 2.0 is especially thorough in explaining known USB system technology in all details of the Bohm claims.  It even states that it provides "architecture upgradeable to support multiple USB Host Controllers in a system," thereby suggesting multiple hosts. U-14-upgrade-path. Strong motivation to combine as necessary to provide what Bohm sought to provide, i.e., access of USB hosts in plural to USB device(s) without disconnection switching that caused device reconfiguration, B-1:65-2:5, was provided by Furukawa and Dickens, and also USB 2.0, Lou, and Fujita.  Wurzburg and Adder disclosed devices just short of the Bohm claims by requiring switching, which was replaced in Furukawa and Dickens.  Moving forward the next step as in all of Bohm, Furukawa and Dickens was strongly motivated by Furukawa, Dickens, Fujita, Ulenas, and Lou.  No dependent claims of Bohm add patentable merit to any independent claim.

Pet. 72–73.

69

IPR2017-00861
Patent 7,627,708 B2

To the extent this ground is asserting obviousness over any combination with Furukawa, as discussed *supra*, we are not persuaded Furukawa expressly or inherently teaches the features of the '708 patent for which Petitioner relied on it earlier in the Petition.

To the extent this ground is asserting the combination of Dickens and Chen, that combination is addressed above.

To the extent this ground is asserting any combinations other than those addressed above, the analysis in this ground is inadequate to meet the requirements of our rules regarding the level of detail required.  37 C.F.R. § 104(b)(4).

Thus, Petitioner has not shown by a preponderance of the evidence that claims 1–25 are unpatentable as obvious over the above-proposed combinations.

## J.    Conclusion

For the reasons discussed *supra*, we are persuaded by a preponderance of the evidence that claims 1, 3–5, 7–9, 11–15, 18–21, 23, and 25 of the '708 patent are unpatentable.  Petitioner has not shown, by a preponderance of the evidence, that claims 2, 6, 10, 16, 17, 22, or 24 are unpatentable.

IPR2017-00861
Patent 7,627,708 B2

### III.   MOTION TO EXCLUDE

Patent Owner timely objected (Paper 50) to Petitioner's Exhibit 1053 (Mr. Garney's Reply Declaration) and filed a Motion to Exclude (Paper 54, "Mot." or "Motion") moving to exclude Exhibit 1053 and Petitioner's Sur-Reply.  Patent Owner argues the Sur-Reply and Exhibit 1053 raise new arguments directed to inherency in the alleged anticipation of certain challenged claims by Furukawa.  *See* Mot.

We are not persuaded by Patent Owner's argument.  As is discussed *supra*, we expressly found, and Petitioner confirmed, that it is not arguing inherency in its anticipation arguments but, instead, relies solely on what Petitioner argues are express disclosures of Furukawa.

Patent Owner further argues Petitioner's Sur-Reply should be excluded because, by incorporating portions of Exhibit 1053, the Sur-Reply attempts to circumvent the five-page limit as ordered when authorizing the Sur-Reply filing.

We remain unpersuaded by Patent Owner's argument.  The Sur-Reply cites to various portions of Mr. Garney's Reply Declaration (Ex. 1053) to support its arguments but does not attempt to incorporate the entirety of that declaration into its Sur-Reply.

For the above reasons, we are not persuaded that Petitioner's Sur-Reply or Exhibit 1053 should be excluded, and for the foregoing reasons, Patent Owner's Motion to Exclude is *denied*.

IPR2017-00861
Patent 7,627,708 B2

## III.   ORDER

After due consideration of the record before us, and for the foregoing reasons, it is:

ORDERED that claims 1, 3–5, 7–9, 11–15, 18–21, 23, and 25 of U.S. Patent No. 7,627,708 B2 are held *unpatentable*;

FURTHER ORDERED that claims 2, 6, 10, 16, 17, 22, and 24 of U.S. Patent No. 7,627,708 B2 have *not* been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Petitioner's Sur-Reply (Paper 46) and Exhibit 1053 is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00861
Patent 7,627,708 B2

PETITIONER:

Scott A. McKeown
James L. Davis, Jr.
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
james.l.davis@ropesgray.com

PATENT OWNER:

Bruce W. Slayden II
Brian C. Banner
R. William Beard, Jr.
Truman H. Fenton
Jerry F. Suva
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
bbanner@sgbfirm.com
wbeard@sgbfirm.com
tfenton@sgbfirm.com
jsuva@sgbfirm.com

# EXHIBIT 4

US009460037B2

(12) **United States Patent**
Voto et al.

(10) Patent No.: **US 9,460,037 B2**
(45) **Date of Patent:** **Oct. 4, 2016**

(54) **FLEXIBLE MOBILE DEVICE CONNECTIVITY TO AUTOMOTIVE SYSTEMS WITH USB HUBS**

(71) Applicant: **Delphi Technologies, Inc.**, Troy, MI (US)

(72) Inventors: **Robert Voto**, Clarkston, MI (US); **Shyambabu Yeda**, Rochester Hills, MI (US); **Craig Petku**, Clarkston, MI (US)

(73) Assignee: **Delphi Technologies, Inc.**, Troy, MI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/487,947**

(22) Filed: **Sep. 16, 2014**

(65) **Prior Publication Data**

US 2015/0089092 A1 Mar. 26, 2015

**Related U.S. Application Data**

(60) Provisional application No. 61/882,915, filed on Sep. 26, 2013.

(51) **Int. Cl.**
*G06F 13/38* (2006.01)
*G06F 13/40* (2006.01)

(52) **U.S. Cl.**
CPC ......... *G06F 13/385* (2013.01); *G06F 13/4022* (2013.01); *G06F 13/4045* (2013.01); *G06F 2213/0042* (2013.01); *G06F 2213/4004* (2013.01)

(58) **Field of Classification Search**
CPC ..................... G06F 13/385; G06F 2213/3812; G06F 13/4022; G06F 13/4045; G06F 2213/4004; G06F 2213/0042
USPC ......................................................... 710/15
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,130,656 B2 | 10/2006 | Okagaki et al. |
| 7,280,802 B2 | 10/2007 | Grady |
| 7,478,191 B2 | 1/2009 | Wurzburg et al. |
| 7,502,878 B1 * | 3/2009 | Wright ................ G06F 13/4022 710/37 |

(Continued)

OTHER PUBLICATIONS

Al-Ani, Tarik et al.; Android-based In-Vehicle Infotainment System (AIVI); IS PGD 2010, Oct. 26, 2010, Dunedin, New Zealand.

(Continued)

*Primary Examiner* — Ernest Unelus
(74) *Attorney, Agent, or Firm* — Robert J Myers

(57) **ABSTRACT**

A system which is configured to enable a vehicle's embedded USB Host system to connect to multiple mobile devices through a USB Hub, regardless of whether the mobile devices are configured to act as USB Hosts or USB Devices, without the need to add or provide OTG controllers in the system or additional vehicle wiring, or inhibiting the functionality of any consumer devices operating in USB Device mode connected to a vehicle system Hub while another consumer device connected to the same Hub operates in USB Host mode. Preferably, the system is configured to provide that no additional cabling is required, and no hardware changes are required to be made to the HU. The system can be employed between a vehicle's embedded USB Host, USB Hub and at least one consumer accessible USB port. In the case where the consumer device is acting as a USB Host, signals between the consumer device and the vehicle's embedded USB Host are processed through a bridge, thereby rendering the consumer device compatible with the vehicle's embedded USB Host.

**17 Claims, 8 Drawing Sheets**



US 9,460,037 B2

Page 2

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

|  |  |  |  |
|---|---|---|---|
| 8,447,598 | B2 | 5/2013 | Chutorash et al. |
| 8,447,890 | B1 | 5/2013 | LeTourneur et al. |
| 2003/0167345 | A1* | 9/2003 | Knight et al. ............... 709/249 |
| 2006/0056401 | A1 | 3/2006 | Bohm et al. |
| 2006/0227759 | A1* | 10/2006 | Bohm ................ G06F 13/4022 |
|  |  |  | 370/351 |
| 2007/0086724 | A1 | 4/2007 | Grady et al. |
| 2007/0156293 | A1* | 7/2007 | Kellzi et al. ...................... 701/1 |
| 2008/0005262 | A1 | 1/2008 | Wurzburg et al. |
| 2009/0117890 | A1 | 5/2009 | Jacobsen et al. |
| 2010/0260350 | A1 | 10/2010 | Chutorash et al. |
| 2011/0054721 | A1 | 3/2011 | Goodrich et al. |
| 2011/0124300 | A1 | 5/2011 | Sinai |
| 2012/0134506 | A1 | 5/2012 | DeBiasio et al. |
| 2012/0191811 | A1 | 7/2012 | Ng et al. |
| 2012/0290859 | A1 | 11/2012 | Saladin et al. |
| 2013/0053003 | A1 | 2/2013 | King, II |
| 2013/0106750 | A1 | 5/2013 | Kurosawa |

OTHER PUBLICATIONS

Al-Ani, Tarik; Android In-Vehicle Infotainment System (AIVI); Jun. 2011, Dunedin, New Zealand.
Ellis, Brian; USB in Automotive: Not Just for PCs Anymore; Cypress Semiconductor Corp.; Sep. 7, 2006.
Koch, Niels; The Car Entertainment System; InTech; 2011.

* cited by examiner

Figure 1



Figure 2



Figure 3



Figure 4



Figure 5



Figure 6



Figure 7



Figure 8



US 9,460,037 B2

1

## FLEXIBLE MOBILE DEVICE CONNECTIVITY TO AUTOMOTIVE SYSTEMS WITH USB HUBS

### RELATED APPLICATION

#### Priority Claim

This application claims the benefit of U.S. Provisional Application Ser. No. 61/882,915, filed on Sep. 26, 2013, which is hereby incorporated herein by reference in its entirety.

### BACKGROUND

The present invention generally relates to Universal Serial Bus ("USB") connectivity between, for example, mobile consumer devices and vehicle electronic systems. More specifically, the present invention relates to a system which is configured to provide that consumer devices that act as either USB host or USB device can connect to a vehicle's embedded USB host that does not have On the Go ("OTG") capability through an embedded USB hub in the vehicle.

Historically, mobile consumer devices such as media players, smart phones, tablets and the like have relied on connections to other devices, such as laptop or desktop personal computers ("PC's") to acquire content, exchange data, and charge the device's internal battery. For many years now, that has been accomplished through USB ports on each device. The use of USB technology is suitable for such needs since it is commonly available, familiar to the end user, cost effective and ubiquitous. USB protocols require a point-to-point connection in which one end is the USB Host or master, and the other end is a USB Device or slave. In this way, the flow of messages between the two devices is managed and controlled, whereby the USB Device responds to messages initiated by the USB Host. Historically, PC's have provided USB Host ports for connection to simpler USB Devices such as printers, memory sticks, mobile phones, etc. The USB Host has a greater burden of software and hardware requirements than a USB Device, so it has made sense to designate the PC as the USB Host in such systems.

In vehicle systems that employ USB connections, the same concepts apply. In such systems, the vehicle is typically the USB Host. The USB Host function is often embedded into a component of the vehicle infotainment system, such as into the radio or other control module. Typically, multiple USB ports are strategically designed into the vehicle in locations convenient for the driver and passengers to connect their consumer devices. Once a consumer device is connected to one of the ports, the device begins charging and the vehicle infotainment system can access content on the consumer device. This is useful to enable features such as streaming music, video and other services the device may provide.

Such a system requires that each of the USB ports be physically connected to the vehicle's USB Host in a manner suitable for USB data flow. This is accomplished through electrical cabling which is embedded in the vehicle, and which connects each of the ports to the USB Host. Since there can be many USB ports in a vehicle, and each port requires a cable to connect the port to the USB Host, it is desirable to share cabling when possible to minimize cost and mass of the vehicle. This is accomplished through the use of USB Hubs. USB Hubs allow a single USB Host to connect to multiple USB Devices over a single cable

2

between the USB Host and the USB Hub. As shown in FIGS. **1** and **2**, a single USB Hub can connect one USB Host to several USB Devices. Specifically, FIG. **1** illustrates a system wherein a self-powered USB Hub having a plurality of USB ports connects to a plurality of USB Devices (via a plurality of consumer-facing USB ports), while FIG. **2** illustrates a system wherein a self-powered USB Hub provides not only a plurality of USB ports which are in communication with a plurality of consumer-facing USB ports, but also a Secure Digital ("SD") card reader which is connected to a consumer-facing SD card connector. Other portions of FIGS. **1** and **2**, such as Power Management, are standard in the industry and self-explanatory upon viewing FIGS. **1** and **2**.

Furthermore, as shown in FIG. **3**, multiple USB Hubs can be tiered, such that USB Hubs connect to other USB Hubs. Specifically, FIG. **3** illustrates a vehicle system architecture that includes a central vehicle microcontroller (also referred to as the Head Unit or "HU"). Connected to the Head Unit are components or systems such as displays, the audio system, entertainment system and the driver controls. The Head Unit may be architected as a single module encompassing all functions or distributed such that various functions are managed by individual modules. The Head Unit includes a Root USB Hub which is typically connected to one or more downstream USB Hubs distributed throughout the vehicle. Each USB Hub has a plurality of downstream ports (at least one of which may be an SD reader or USB audio device), thereby providing that each USB Hub port in the vehicle has a connection to the USB Host or Head Unit. In FIG. **3**, for example, the Root Hub is embedded in the radio, and is connected to four (4) self-powered USB Hubs, wherein one is in the vehicle's center console, one is in the vehicle's center stack, and two are in the vehicle's rear seats.

Recently, mobile devices such as smart phones have gained in popularity. This is, in part, due to their usefulness as standalone computing devices. With advances in consumer electronic technology and increases in the speed of mobile networks, these devices are no longer reliant on being connected to PCs to access content. These smart mobile devices now have many of the same hardware resources, connectivity and software operating systems that only PCs had in past years. As has been the case with desktop PCs, accessories for these mobile devices have become available to aid in their ease of use. These accessories have included devices such as keyboards, mice, displays, touchscreen, audio systems, and other interface devices. These accessories commonly connect via a USB connection. By way of established convention in the consumer electronics market, these accessories are typically low cost and limited in USB capability to act only as a USB Device. To connect them to a smart phone, the smart phone must be the USB Host. Therefore, leading mobile device manufacturers and system designers have begun designing their mobile device products (i.e. smart phones, tablets, etc) to support both USB Host and USB Device roles. In other words, the phone may configure itself such that it can function as a USB Device when it needs to be, or as a USB Host when it needs to be. Recently, the system level design thinking has shifted towards viewing smart phones as the USB Host, and any device connecting thereto as the USB Device. Again, this is not surprising since this is exactly how laptops and PCs work today. Extending this trend into the future, it can be predicted that the smart phone will act

US 9,460,037 B2

**3**

primarily as the USB Host, and will rarely or never act as a USB device. This presents some problems for automotive systems.

As explained previously, automotive systems have a USB Host and require USB Devices to connect to it. If a phone acts as a USB Host, then the system will not function since by USB convention, two USB Hosts cannot directly connect with each other. Automotive manufacturers desire compatibility with smart phones and are therefore motivated to adapt to this changing technology. A redesign of the USB architecture in the vehicle is thus necessary such that the vehicle can act either as the USB Host (when necessary to connect to USB Devices such as memory sticks, thumb drives, etc.) or USB Device (when necessary to connect to USB Hosts, such as a smart phone which demands to be USB Host rather than USB Device).

The USB organization has added a standard that addresses the need for devices to act as either USB Host or USB Device and as such can be considered a "dual role" USB controller. It is referred to in USB nomenclature as "On The Go" or "OTG" for short. Any device that meets the OTG standard can act as either USB Host or USB Device and can change roles dynamically. Therefore, one possible approach to modifying the vehicle USB architecture to support all use cases is to upgrade the vehicle's USB Host to USB OTG. This solution addresses the issue but has some disadvantages. First, USB Hubs do not support OTG and can no longer be used in the system. Each consumer accessible USB port that supports OTG must have a dedicated wire link to a dedicated OTG controller in the Head Unit thus negating the wiring savings associated with use of USB Hubs. As a result several costly cables may need to be added to the vehicle's electrical system. Second, there may not be enough OTG controllers available in the Head Unit to connect to each of the vehicle's user accessible USB ports. This then forces the vehicle designer to choose a limited number of the many USB ports in the vehicle to support the OTG function and run dedicated USB cables to them. This can lead to user confusion and dissatisfaction since only certain consumer ports support the required functionality. Also, ports that support OTG may be co-located with other physically identical ports that do not. If the user chooses the wrong one, the applications they desire to run from the consumer device that requires USB Host mode won't work.

Another possible solution is to implement custom USB hubs wherein the USB Hub is able to dynamically swap its upstream port with one it's downstream ports when commanded to do so. System solutions built with this concept still require OTG controllers in the head unit but benefit from the fact that no additional wires need to be installed in the car. The existing USB cable between the USB OTG Host and the USB Hub can facilitate the necessary USB communications between the USB OTG controller in the Head Unit (HU) and a consumer device in USB Host (such as a smart phone). This solution also has some disadvantages however. For example, when the USB Hub is commanded to swap it's upstream port with a downstream port, all other downstream ports of the USB Hubs lose their data connection with the Head Unit. While in this mode the Head Unit access to the other downstream ports of the hub cease. This may prevent use of certain vehicle system functions such as navigation or audio playback that may need consistent access to the other downstream ports of the hub to function. Furthermore, it requires the HU to have an available USB OTG port and a signaling path to control the hub upstream/downstream port configuration.

**4**

## SUMMARY

An object of an embodiment of the present invention is to provide a system which is configured to enable a vehicle's embedded USB Host system to connect to mobile devices through a USB Hub, regardless of whether the mobile devices are configured to act as USB Hosts or USB Devices, without the need to provide OTG or dual role controllers in the head unit and without the need to provide additional cabling in the vehicle. Preferably, no hardware changes are required to be made to the USB Host circuits in the HU.

An embodiment of the present invention provides a system which can be employed between a vehicle's embedded USB Host and at least one, but preferably multiple, consumer facing USB ports provided in the vehicle for connection to consumer devices. The system is configured to recognize and control whether the consumer device is required to be connected to each USB port as a USB Host or as a USB Device. Further, the system is able to dynamically switch the device connection between USB Device mode and USB Host mode when desired. In the case where the consumer device is acting as a USB Device, signals are routed normally through a USB Hub to the Head Unit. In the case where the consumer device is acting as a USB Host, signals between the consumer device and the vehicle's embedded USB Host are routed and processed through a USB Host to Host Bridge which is connected to the USB Hub, thereby rendering the consumer device compatible with the vehicle's embedded USB Host.

The present invention is capable of being implemented in several different embodiments. For example, an embodiment of the present invention comprises a USB Hub Module having a USB Hub, USB Bridge, and USB routing switches implemented as discrete devices. The USB Hub upstream port is configured to be connected to a vehicle's embedded USB Host (such as a USB Host in a Head Unit). The USB Hub Module also includes a switching device (such as USB analog multiplexing switches for example) that is configured to route each consumer port to either the Bridge or the Hub. The USB Bridge is configured to effectively control the switching device. The USB Bridge is configured, based on signals from the Head Unit, whether the consumer device which is connected to the USB port is acting as USB Host or USB Device. In the case where the consumer device is acting as USB Host, the USB Bridge controls the switching device to route the USB port to the Bridge. The Bridge processes the signals from the consumer device and provides them to the USB Hub, thereby rendering the consumer device compatible with the vehicle's embedded USB Host. In the case where the consumer device is acting as USB Device, the USB Bridge controls the switching device such that the switching device provides the signals to the USB Hub, effectively bypassing the Bridge.

Still another embodiment of the present invention provides that the USB routing logic, USB Bridge, and USB Hub are integrated in a single combination USB Hub/USB Bridge Integrated Circuit (IC).

Still other embodiments are entirely possible, some of which are described and illustrated herein. For example, the concept can be extended to include additional embedded USB Device functions such as USB HID and USB Audio. Further it is also envisioned that all consumer facing USB ports of the Hub Module can emulate or otherwise support dual role USB capability provided that each downstream port has a Bridge to support USB Host mode for the connected device and a direct connection to the USB Hub to

US 9,460,037 B2

5

support USB Device mode. In all cases, compliance to USB protocols and architectures is preferably maintained.

BRIEF DESCRIPTION OF THE DRAWINGS

The organization and manner of the structure and operation of the invention, together with further objects and advantages thereof, may best be understood by reference to the following description taken in connection with the accompanying drawings wherein like reference numerals identify like elements in which:

FIG. 1 illustrates a system wherein a multiple port self-powered USB Hub functions to connect a single USB Host to a plurality of USB ports;

FIG. 2 illustrates a system wherein a self-powered USB Hub provides not only a plurality of USB ports, but also a Secure Digital ("SD") card reader;

FIG. 3 illustrates a vehicle infotainment system structure wherein multiple USB Hubs are connected together or tiered, such that USB Hubs feed other USB Hubs;

FIG. 4 illustrates a system which is in accordance with an embodiment of the present invention, wherein a USB Hub, USB Bridge and a switching device are provided as discrete components;

FIG. 5 illustrates a system which is in accordance with an alternative embodiment of the present invention, wherein USB routing/switching logic and a USB Bridge are integrated with a USB Hub in a combination USB Hub/USB Bridge Integrated Circuit (IC);

FIG. 6 illustrates the different components of the combination USB Hub/Bridge IC shown in FIG. 5;

FIG. 7 illustrates one possible endpoint configuration of the USB Bridge shown in FIGS. 5 and 6; and

FIG. 8 illustrates an example implementation of a Head Unit Software Architecture.

DESCRIPTION OF ILLUSTRATED EMBODIMENTS

While this invention may be susceptible to embodiment in different forms, there are specific embodiments shown in the drawings and will be described herein in detail, with the understanding that the present disclosure is to be considered an exemplification of the principles of the invention, and is not intended to limit the invention to that as illustrated.

FIG. 4 illustrates a system which is in accordance with an embodiment of the present invention. The system is configured to effectively render a vehicle's embedded USB Host compatible with consumer devices which are configured to also act as USB Host or USB Device. The system is in the form of a self-powered USB Hub Module having a USB, a USB Bridge, and a switching device implemented as discrete devices. The USB Hub is preferably provided in the form of an integrated circuit (IC), and is configured (via an upstream USB port) connected to a vehicle's embedded USB Host (such as a USB Host in a Head Unit) via vehicle internal wiring, such as, in one embodiment, via a single USB data cable between the Head Unit and USB Hub. The USB Hub also includes a plurality of downstream USB ports, at least one of which is connected to a USB Bridge (which also is preferably provided in the form of an integrated circuit (IC)). At least one downstream USB port of the USB Hub is connected to a switching device (such as USB analog multiplexing switches, for example). The switching device is configured to be connected to at least one USB port in the vehicle for connection to a consumer device. The USB Bridge is configured to effectively control the

6

switching device although other control mechanisms are envisioned. The USB Hub Module is configured such that signals received from at least one USB port are received by the switching device, and the switching device routes the signals to the USB Bridge or the USB Hub. In the case where the consumer device is acting as USB Host, the USB Bridge processes the USB packets from the consumer port and provides them to the USB Hub, thereby rendering the consumer device compatible with the vehicle's embedded USB Host. In the case where the consumer device is acting as USB Device, the USB Bridge controls the switching device such that the switching device provides the USB signaling directly to the USB Hub, bypassing the Bridge.

As shown in FIG. 4, the system also includes Power Management structure, as well as some other conventional structure not specifically shown in FIG. 4, but which would be readily assumed to be present by one having ordinary skill in the art.

In use, the Head Unit controls the switching device via the USB Bridge hardware or any other convenient means of control. The HU software application may choose to enable, for example, a phone on any one of the consumer USB ports, by requesting, commanding or otherwise knowing the phone is required to be in USB Host mode and commanding the routing of the specific USB port the phone is attached to the USB Bridge. Once routed to the USB Bridge, the phone will detect a USB Device is connected and the phone will begin the standard USB enumeration sequence. The detection and enumeration processes are defined by USB standards and not explained here in detail. However, for purposes of describing the operation of the invention, a general understanding is provided herein. The enumeration process follows a strict sequence of USB descriptor requests from the USB Host and USB descriptor responses from the USB Device that allow the Host to determine the capabilities and functions of the Device and configure the USB Device for operation. Once the complete set of device descriptors are known the USB Host will then load the appropriate USB driver(s) and applications to support in the functionality that the USB Device provides. In the scope of this invention it is envisioned that the responses to the descriptor requests made by the phone (USB Host) are either answered locally by the Bridge or preferably, the requests are forwarded through the Bridge to the Head Unit where its device drivers process the request and return the response. The descriptor responses from the device driver are conveyed to the USB Bridge, which then, in turn, passes them to the phone. By passing descriptor request to the Head Unit drivers and returning the responses from the Head Unit drivers back to the consumer device, the Bridge appears as a transparent component in the USB system architecture. The system capabilities are controlled by the Head Unit and the system remains flexible without need for changes to the Bridge firmware or hardware when the system designer requires changes to the descriptor responses. Once the consumer device completes the enumeration process, the Head Unit's USB functional capabilities are known to the consumer device and the consumer device may enable use of those functions over USB communication. At this point, the consumer device or the Head Unit may begin activating any number of supported services such as data connections, streaming audio and streaming video to and from the vehicle via the USB Bridge.

Another embodiment of the present invention can be provided, wherein the bridge is configured to act as an OTG port thus negating the need for switches and/or routing logic. In this case there would exist one Bridge functional block for

US 9,460,037 B2

7

each downstream port. This embodiment would effectively be a more generalized case of the example illustrated in FIG. 4. FIG. 4 shows just one Bridge that any one of the consumer USB ports can be routed to. With just one bridge, only one consumer USB port can be connected to a USB host at a time. However, if each downstream port of the Hub has a dedicated Bridge, then multiple consumer ports can support connection to USB Host devices at the same time. Thus, any consumer port can be in either USB Host or USB Device mode at any time independently of the others.

FIG. 5 illustrates an alternative embodiment wherein the switching device comprises USB routing logic, and both the USB routing logic and the USB Bridge are integrated with the USB Hub in a combination USB Hub/USB Bridge Integrated Circuit (IC). This configuration has cost and size advantages over building it with discrete components connected together on a printed circuit board.

FIG. 6 illustrates the internal components of the USB Hub/USB Bridge Integrated Circuit (IC) shown in FIG. 5. As shown, preferably the components of the USB Bridge include a bridge controller as well as endpoint buffers. While the exact configuration of endpoints is effectively up to the system designer to choose for a particular need, a specific example of one possible endpoint configuration is shown in FIG. 7; however, many others are possible.

As shown in FIG. 7, the endpoints of the Bridge may be designed to support multiple pipes of Bulk USB data connections between the Host A (Head Unit) and Host B (consumer device). In the Bridge, the IN endpoints of Device A are connected to the OUT endpoints of Device B and the OUT endpoints of Device A are connected to the IN endpoints of Device B. The design of the Bridge may be such that the data flow between the endpoints may be direct or buffered. For example, in the case of direct connection, once a USB packet is received from Host A on a Device A OUT endpoint, the internal logic of the Bridge moves to packet to the Device B IN endpoint if it is available. If Device B IN endpoint is full or otherwise not available then subsequent attempts of Host A to send more packets to Device A in the Bridge will be rejected until such time that the Device B IN endpoint is clear and the contents of the Device A OUT buffer is moved to it. Alternatively, there may exist a local buffer in the Bridge between the endpoints of Device A and B. For example, packets received on an OUT endpoint of Device A are placed in a local memory device for temporary storage until Device B IN endpoint is ready for them. The OUT endpoints are thus capable of receiving multiple packets from the Host until the buffer is full. Likewise the IN endpoints may, at times, transmit multiple packets until the buffer is empty. Such buffers are not required, but are envisioned, to improve system throughput performance in certain circumstances where one of the USB Hosts is occasionally busy and not keeping up with USB transactions at the same rate as the other USB Host. Regardless of the buffer configuration, the Bridge hardware has IN and OUT endpoints on Device A mapped to OUT and IN endpoints respectively on Device B, thus forming a bidirectional bridge that passes USB traffic between two USB Hosts with bandwidth sufficient to support the application requirements of the system.

Also shown in FIG. 7, Device A and Device B provide a bidirectional Control endpoint connected to their respective USB Hosts. Control endpoints are required per USB standard to support USB defined control messages between the Host and Device both during and after the enumeration sequence. Optionally, USB endpoints may also be utilized per USB standard to employ messages intended to control

8

user defined custom device specific behavior, referred to as Vendor Specific messages. As can be seen in FIG. 7, the Control endpoints are mapped to the Bridge Controller (BC). The BC logic may be implemented in hardware or preferably software. The BC provides the capability to send, receive and process USB standard Control endpoint messages as well as vendor specific messages essential to the control and operation of the Bridge. At system startup, the A Host requests and receives descriptors from the BC via the Control endpoint. Once complete, Host A then loads the Bridge Driver in its software stack and configures the custom Bridge hardware for operation. Host A can then control the functions of the Bridge, such as USB switch routing control. The system is now ready to accept connection with USB Host mode consumer devices on the B Device of the Bridge. When such a connection is made, the BC will notify the Bridge Driver in Host A by sending a message on the control endpoint to Host A. Further, Host B will begin sending descriptor requests on the control endpoint to Device B in Bridge. The BC receives these requests, encapsulates them with information that identifies them as descriptor requests from Host B and passes them to the Bridge Driver on Host using the control endpoint. Host A Bridge Driver receives these requests, identifies them as descriptor requests and passes the requests on to other software components in Host A system and waits for the descriptor responses. The descriptor responses are encapsulated by the Bridge driver to indicate they are descriptor responses that are to be forwarded to Host B. The response is then sent to the BC via the control endpoint. The BC receives them, identifies them as descriptor responses that should be forwarded to Device B and places them on the control endpoint for Device B. This process of receiving and forwarding messages back and forth between the two hosts continues until the enumeration process is complete with Host B. From that point on the two hosts may begin to use the IN and OUT endpoints to transfer application data and services over the bulk endpoints.

FIG. 8 illustrates one possible configuration of the system architecture including software components in the Head Unit interfacing with the Bridge/Hub. There are multiple ways that the operating system and software architecture can be constructed to support the functions of the USB Bridge/ Hub. In FIG. 8, a typical Linux implementation is shown including the Bridge/Hub Module and the Head Unit. The system design utilizes standard Linux Kernel components and configurations and should be familiar to those skilled in the art. The Head Unit USB Host Controller hardware is driven by the Host Controller Driver. The Host Controller Driver is connected to the USB Core. The USB Core connects the HCD with the standard USB Linux Device Drivers and the custom Bridge Driver. The Bridge Driver is configured to optionally connect directly to the User Space Application software or to the USB Gadget Driver depending on system architecture. The custom Bridge Driver plays a dual role of both controlling the functions of the Bridge hardware as well as providing a data path between the gadget device drivers and applications running on the Head Unit. The architecture illustrated is capable of handling both the operation and data paths associated with the Bridge and the Hub at the same time, thus allowing concurrent operation of consumer devices operating in USB Device mode with consumer devices operating in USB Host mode. In one embodiment, the Hub/Bridge supports simultaneous active USB data connections between the Head Unit and multiple consumer devices, at least one of which being in host mode while the others are in device mode. In another embodiment,

US 9,460,037 B2

9

the Hub/Bridge supports simultaneous active USB data connections between the Head Unit and some combination of embedded and consumer USB devices along with at least one device being in host mode. While it is understood that the software functions of the head unit are essential to building a complete system, the designs of which can vary significantly and this example is provided only as a means of demonstrating one way to utilize the functionality of the present invention.

What is claimed is:

1. A system disposed within a vehicle, comprising:
an embedded Universal Serial Bus (USB) Host system;
a USB Hub having a plurality of USB Ports and interconnected to the embedded USB Host system, said USB Hub configured to simultaneously broadcast data from the embedded USB Host system to each USB Port in the plurality of USB Ports and to transmit data from each USB Port to the embedded USB Host system;
a USB Bridge interconnected to the USB Hub and configured to connect the embedded USB Host system to a second USB Host; and
a USB routing switch interconnected to the USB Bridge, the USB Hub, and the plurality of USB Ports, wherein the USB routing switch is configured to connect a first USB Port of the plurality of USB Ports to the USB Hub through the USB Bridge when a consumer device connected to the first USB Port is the second USB Host and is configured to initiate bidirectional communication with the embedded USB Host, and wherein the USB routing switch is configured to connect the first USB Port directly to the USB Hub when the consumer device connected to the first USB Port is configured to only respond to communication from the embedded USB Host, thereby rendering the consumer device compatible with the embedded USB Host system.

2. A system as recited in claim 1, wherein the USB routing switch is configured to connect the first USB Port to the USB Hub through the USB Bridge when a first consumer device connected to the first USB Port is the second USB Host, and wherein the USB routing switch is configured to simultaneously connect a second USB Port of the plurality of USB Ports directly to the USB Hub when a second consumer device connected to the second USB Port is the USB Device, thereby rendering the first and second consumer devices compatible to function simultaneously with the embedded USB Host system.

3. A system as recited in claim 1, wherein the system is configured to recognize whether the consumer device connected to the USB Port is the second USB Host or the USB Device and control the USB routing switch accordingly.

10

4. A system as recited in claim 1, wherein the USB Hub, the USB Bridge, and the USB routing switch system are disposed within a USB Hub Module.

5. A system as recited in claim 1, wherein the system further comprises an infotainment system containing the embedded USB Host system.

6. A system as recited in claim 4, wherein the system is configured to dynamically switch operation of USB Ports connected to the USB Hub Module between USB Device mode and USB Host mode.

7. A system as recited in claim 4, wherein the USB Hub Module is connected to the embedded USB Host system and the plurality of USB Ports connected to a plurality of consumer devices.

8. A system as recited in claim 7, wherein the USB routing switch is configured to connect each consumer device of the plurality of consumer devices to either the USB Bridge or the USB Hub based on whether each consumer device attached to each USB Port in the plurality of USB Ports is the USB Host or the USB Device.

9. A system as recited in claim 1, wherein the USB routing switch comprises a plurality of USB analog multiplexing switches.

10. A system as recited in claim 1, wherein the USB Bridge is configured to control the USB routing switch.

11. A system as recited in claim 1, wherein the USB routing switch comprises digital routing logic.

12. A system as recited in claim 1, wherein the USB Bridge comprises a bridge controller as well as endpoint buffers.

13. A system as recited in claim 12, wherein the endpoint buffers are configured to support a USB data connection pipe between an infotainment system and the consumer device.

14. A system as recited in claim 1, wherein the system further comprises an infotainment system with the embedded USB Host which is electrically connected to the USB Hub via a single USB data connection.

15. A system as recited in claim 1, wherein the system further comprises an infotainment system, wherein the system is configured to support simultaneous active USB data connections between the infotainment system and multiple consumer devices, at least one of which is the second USB Host while others are USB Devices.

16. A system as recited in claim 1, wherein the system further comprises an infotainment system, wherein the system is configured to support simultaneous active USB data connections between the infotainment system and some combination of embedded devices and consumer devices that are USB Devices along with at least one that is the second USB Host.

17. A system as recited in claim 11, wherein the USB Hub, the USB Bridge, and the USB routing switch system are integrated in an Integrated Circuit (IC).

* * * * *

EXHIBIT 5

US009619420B2

(12) **United States Patent**
Voto et al.

(10) Patent No.: **US 9,619,420 B2**
(45) Date of Patent: *****Apr. 11, 2017**

(54) **FLEXIBLE MOBILE DEVICE CONNECTIVITY TO AUTOMOTIVE SYSTEMS WITH USB HUBS**

(71) Applicant: **DELPHI TECHNOLOGIES, INC.,** Troy, MI (US)

(72) Inventors: **Robert M. Voto**, Clarkston, MI (US); **Shyambabu Yeda**, Rochester Hills, MI (US); **Craig Petku**, Clarkston, MI (US)

(73) Assignee: **Delphi Technologies, Inc.**, Troy, MI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/268,728**

(22) Filed: **Sep. 19, 2016**

(65) **Prior Publication Data**

US 2017/0004103 A1   Jan. 5, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/487,947, filed on Sep. 16, 2014, now Pat. No. 9,460,037.

(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 13/16* | (2006.01) |
| *G06F 13/40* | (2006.01) |
| *G06F 13/38* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *G06F 13/4022* (2013.01); *G06F 13/385* (2013.01); *G06F 13/4045* (2013.01)

(58) **Field of Classification Search**
CPC ............. G06F 13/4022; G06F 13/4045; G06F 13/385; G06F 13/387; G06F 13/366;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,073,188 A | 6/2000 | Fleming |
| 6,732,219 B1 | 5/2004 | Broyles |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2003256351 A | 9/2003 |
| TW | 470887 B | 1/2002 |

OTHER PUBLICATIONS

"FFI Rapport—A Study of Computer Interfaces for Soldier Systems", Lars Erik Olsen & Joakin Flathagen, Norwegian Defence Research Establishment, Oct. 10, 2005.

(Continued)

*Primary Examiner* — Ernest Unelus
(74) *Attorney, Agent, or Firm* — Robert J. Myers

(57) **ABSTRACT**

A system which is configured to enable a vehicle's embedded USB Host system to connect to multiple mobile devices through a USB Hub, regardless of whether the mobile devices are configured to act as USB Hosts or USB Devices, without the need to add or provide OTG controllers in the system or additional vehicle wiring, or inhibiting the functionality of any consumer devices operating in USB Device mode connected to a vehicle system Hub while another consumer device connected to the same Hub operates in USB Host mode. Preferably, the system is configured to provide that no additional cabling is required, and no hardware changes are required to be made to the HU. The system can be employed between a vehicle's embedded USB Host, USB Hub and at least one consumer accessible USB port. In the case where the consumer device is acting as a USB Host, signals between the consumer device and the vehicle's embedded USB Host are processed through a bridge, thereby rendering the consumer device compatible with the vehicle's embedded USB Host.

**20 Claims, 8 Drawing Sheets**



## US 9,619,420 B2

Page 2

### Related U.S. Application Data

(60) Provisional application No. 61/882,915, filed on Sep. 26, 2013.

(58) **Field of Classification Search**
CPC ............. G06F 13/4068; G06F 13/4282; G06F 13/4027; G06F 2213/0042
See application file for complete search history.

### (56) References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,934,793 | B2 | 8/2005 | Ying et al. |
| 6,957,287 | B2 | 10/2005 | Lou et al. |
| 7,130,656 | B2 | 10/2006 | Okagaki et al. |
| 7,280,802 | B2 | 10/2007 | Grady |
| 7,478,191 | B2 | 1/2009 | Wurzburg et al. |
| 7,523,243 | B2 | 4/2009 | Bohm et al. |
| 7,627,708 | B2 | 12/2009 | Bohm et al. |
| 8,447,598 | B2 | 5/2013 | Chutorash et al. |
| 8,447,890 | B1 | 5/2013 | LeTourneur et al. |
| 2003/0167345 | A1 | 9/2003 | Knight et al. |
| 2006/0056401 | A1 | 3/2006 | Bohm et al. |
| 2007/0067553 | A1 | 3/2007 | Chang |
| 2007/0086724 | A1 | 4/2007 | Grady et al. |
| 2007/0156293 | A1 | 7/2007 | Kellzi et al. |
| 2008/0005262 | A1 | 1/2008 | Wurzburg et al. |
| 2009/0117890 | A1 | 5/2009 | Jacobsen et al. |
| 2011/0054721 | A1 | 3/2011 | Goodrich et al. |
| 2011/0124300 | A1 | 5/2011 | Sinai |
| 2011/0208891 | A1* | 8/2011 | Meyers ................. G06F 13/385 710/313 |
| 2011/0208892 | A1* | 8/2011 | Meyers ............... G06F 13/4226 710/313 |
| 2012/0134506 | A1 | 5/2012 | DeBiasio et al. |
| 2012/0191811 | A1 | 7/2012 | Ng et al. |
| 2012/0290859 | A1 | 11/2012 | Saladin et al. |
| 2013/0053003 | A1 | 2/2013 | King, II |
| 2013/0106750 | A1 | 5/2013 | Kurosawa |
| 2016/0132448 | A1* | 5/2016 | Maung ................. G06F 13/366 710/104 |

### OTHER PUBLICATIONS

"USB 2.0 Autoswitch User's Manual", Lindy Electronics Limited & Lindy-Elektronic GMBH, Sep. 2002.

"APC USB 2.0 Host Controller—Device Driver Download", http://www.liutilities.com/devicedriver/apcusb20hostcontroller/, Jul. 2002.

"Peripheral-Sharing Hardware Suits Education's Needs to a 'T'", Terian Tyre, T H E Journal (Technological Horizons in Education), Oct. 1988.

* cited by examiner



Figure 1



Figure 2

# Figure 3





Figure 4



Figure 5



Figure 6



Figure 7



Figure 8

US 9,619,420 B2

1

**FLEXIBLE MOBILE DEVICE
CONNECTIVITY TO AUTOMOTIVE
SYSTEMS WITH USB HUBS**

RELATED APPLICATIONS

This application is a continuation application and claims
benefit under 35 U.S.C. §120 of U.S. patent application Ser.
No. 14/487,947, filed Sep. 16, 2014, which claimed benefit
under 35 U.S.C. §119(e) of U.S. Provisional Patent Appli-
cation No. 61/882,915, filed on Sep. 26, 2013, the entire
disclosure of each of which are hereby incorporated herein
by reference.

BACKGROUND

The present invention generally relates to Universal Serial
Bus ("USB") connectivity between, for example, mobile
consumer devices and vehicle electronic systems. More
specifically, the present invention relates to a system which
is configured to provide that consumer devices that act as
either USB host or USB device can connect to a vehicle's
embedded USB host that does not have On the Go ("OTG")
capability through an embedded USB hub in the vehicle.

Historically, mobile consumer devices such as media
players, smart phones, tablets and the like have relied on
connections to other devices, such as laptop or desktop
personal computers ("PC's") to acquire content, exchange
data, and charge the device's internal battery. For many
years now, that has been accomplished through USB ports
on each device. The use of USB technology is suitable for
such needs since it is commonly available, familiar to the
end user, cost effective and ubiquitous. USB protocols
require a point-to-point connection in which one end is the
USB Host or master, and the other end is a USB Device or
slave. In this way, the flow of messages between the two
devices is managed and controlled, whereby the USB
Device responds to messages initiated by the USB Host.
Historically, PC's have provided USB Host ports for con-
nection to simpler USB Devices such as printers, memory
sticks, mobile phones, etc. The USB Host has a greater
burden of software and hardware requirements than a USB
Device, so it has made sense to designate the PC as the USB
Host in such systems.

In vehicle systems that employ USB connections, the
same concepts apply. In such systems, the vehicle is typi-
cally the USB Host. The USB Host function is often
embedded into a component of the vehicle infotainment
system, such as into the radio or other control module.
Typically, multiple USB ports are strategically designed into
the vehicle in locations convenient for the driver and pas-
sengers to connect their consumer devices. Once a consumer
device is connected to one of the ports, the device begins
charging and the vehicle infotainment system can access
content on the consumer device. This is useful to enable
features such as streaming music, video and other services
the device may provide.

Such a system requires that each of the USB ports be
physically connected to the vehicle's USB Host in a manner
suitable for USB data flow. This is accomplished through
electrical cabling which is embedded in the vehicle, and
which connects each of the ports to the USB Host. Since
there can be many USB ports in a vehicle, and each port
requires a cable to connect the port to the USB Host, it is
desirable to share cabling when possible to minimize cost
and mass of the vehicle. This is accomplished through the
use of USB Hubs. USB Hubs allow a single USB Host to

2

connect to multiple USB Devices over a single cable
between the USB Host and the USB Hub. As shown in
FIGS. 1 and 2, a single USB Hub can connect one USB Host
to several USB Devices. Specifically, FIG. 1 illustrates a
system wherein a self-powered USB Hub having a plurality
of USB ports connects to a plurality of USB Devices (via a
plurality of consumer-facing USB ports), while FIG. 2
illustrates a system wherein a self-powered USB Hub pro-
vides not only a plurality of USB ports which are in
communication with a plurality of consumer-facing USB
ports, but also a Secure Digital ("SD") card reader which is
connected to a consumer-facing SD card connector. Other
portions of FIGS. 1 and 2, such as Power Management, are
standard in the industry and self-explanatory upon viewing
FIGS. 1 and 2.

Furthermore, as shown in FIG. 3, multiple USB Hubs can
be tiered, such that USB Hubs connect to other USB Hubs.
Specifically, FIG. 3 illustrates a vehicle system architecture
that includes a central vehicle microcontroller (also referred
to as the Head Unit or "HU"). Connected to the Head Unit
are components or systems such as displays, the audio
system, entertainment system and the driver controls. The
Head Unit may be architected as a single module encom-
passing all functions or distributed such that various func-
tions are managed by individual modules. The Head Unit
includes a Root USB Hub which is typically connected to
one or more downstream USB Hubs distributed throughout
the vehicle. Each USB Hub has a plurality of downstream
ports (at least one of which may be an SD reader or USB
audio device), thereby effectively providing that each USB
port in the vehicle has a connection to the USB Host or Head
Unit. In FIG. 3, for example, the Root Hub is embedded in
the radio, and is connected to four (4) self-powered USB
Hubs, wherein one is in the vehicle's center console, one is
in the vehicle's center stack, and two are in the vehicle's rear
seats.

Recently, mobile devices such as smart phones have
gained in popularity. This is, in part, due to their usefulness
as standalone computing devices. With advances in con-
sumer electronic technology and increases in the speed of
mobile networks, these devices are no longer reliant on
being connected to PCs to access content. These smart
mobile devices now have many of the same hardware
resources, connectivity and software operating systems that
only PCs had in past years. As has been the case with
desktop PCs, accessories for these mobile devices have
become available to aid in their ease of use. These acces-
sories have included devices such as keyboards, mice,
displays, touchscreen, audio systems, and other interface
devices. These accessories commonly connect via a USB
connection. By way of established convention in the con-
sumer electronics market, these accessories are typically low
cost and limited in USB capability to act only as a USB
Device. To connect them to a smart phone, the smart phone
must be the USB Host. Therefore, leading mobile device
manufacturers and system designers have begun designing
their mobile device products (i.e. smart phones, tablets, etc.)
to support both USB Host and USB Device roles. In other
words, the phone may configure itself such that it can
function as a USB Device when it needs to be, or as a USB
Host when it needs to be. Recently, the system level design
thinking has shifted towards viewing smart phones as the
USB Host, and any device connecting thereto as the USB
Device. Again, this is not surprising since this is exactly how
laptops and PCs work today. Extending this trend into the
future, it can be predicted that the smart phone will act

US 9,619,420 B2

3

primarily as the USB Host, and will rarely or never act as a USB device. This presents some problems for automotive systems.

As explained previously, automotive systems have a USB Host and require USB Devices to connect to it. If a phone acts as a USB Host, then the system will not function since by USB convention, two USB Hosts cannot directly connect with each other. Automotive manufacturers desire compatibility with smart phones and are therefore motivated to adapt to this changing technology. A redesign of the USB architecture in the vehicle is thus necessary such that the vehicle can act either as the USB Host (when necessary to connect to USB Devices such as memory sticks, thumb drives, etc.) or USB Device (when necessary to connect to USB Hosts, such as a smart phone which demands to be USB Host rather than USB Device.

The USB organization has added a standard that addresses the need for devices to act as either USB Host or USB Device and as such can be considered a "dual role" USB controller. It is referred to in USB nomenclature as "On the Go" or "OTG" for short. Any device that meets the OTG standard can act as either USB Host or USB Device and can change roles dynamically. Therefore, one possible approach to modifying the vehicle USB architecture to support all use cases is to upgrade the vehicle's USB Host to USB OTG. This solution addresses the issue but has some disadvantages. First, USB Hubs do not support OTG and can no longer be used in the system. Each consumer accessible USB port that supports OTG must have a dedicated wire link to a dedicated OTG controller in the Head Unit thus negating the wiring savings associated with use of USB Hubs. As a result several costly cables may need to be added to the vehicle's electrical system. Second, there may not be enough OTG controllers available in the Head Unit to connect to each of the vehicle's user accessible USB ports. This then forces the vehicle designer to choose a limited number of the many USB ports in the vehicle to support the OTG function and run dedicated USB cables to them. This can lead to user confusion and dissatisfaction since only certain consumer ports support the required functionality. Also, ports that support OTG may be co-located with other physically identical ports that do not. If the user chooses the wrong one, the applications they desire to run from the consumer device that requires USB Host mode won't work.

Another possible solution is to implement custom USB hubs wherein the USB Hub is able to dynamically swap its upstream port with one it's downstream ports when commanded to do so. System solutions built with this concept still require OTG controllers in the head unit but benefit from the fact that no additional wires need to be installed in the car. The existing USB cable between the USB OTG Host and the USB Hub can facilitate the necessary USB communications between the USB OTG controller in the Head Unit (HU) and a consumer device in USB Host (such as a smart phone). This solution also has some disadvantages however. For example, when the USB Hub is commanded to swap its upstream port with a downstream port, all other downstream ports of the USB Hubs lose their data connection with the Head Unit. While in this mode the Head Unit access to the other downstream ports of the hub cease. This may prevent use of certain vehicle system functions such as navigation or audio playback that may need consistent access to the other downstream ports of the hub to function. Furthermore, it requires the HU to have an available USB OTG port and a signaling path to control the hub upstream/downstream port configuration.

4

SUMMARY

An object of an embodiment of the present invention is to provide a system which is configured to enable a vehicle's embedded USB Host system to connect to mobile devices through a USB Hub, regardless of whether the mobile devices are configured to act as USB Hosts or USB Devices, without the need to provide OTG or dual role controllers in the head unit and without the need to provide additional cabling in the vehicle. Preferably, no hardware changes are required to be made to the USB Host circuits in the HU.

An embodiment of the present invention provides a system which can be employed between a vehicle's embedded USB Host and at least one, but preferably multiple, consumer facing USB ports provided in the vehicle for connection to consumer devices. The system is configured to recognize and control whether the consumer device is required to be connected to each USB port as a USB Host or as a USB Device. Further, the system is able to dynamically switch the device connection between USB Device mode and USB Host mode when desired. In the case where the consumer device is acting as a USB Device, signals are routed normally through a USB Hub to the Head Unit. In the case where the consumer device is acting as a USB Host, signals between the consumer device and the vehicle's embedded USB Host are routed and processed through a USB Host to Host Bridge which is connected to the USB Hub, thereby rendering the consumer device compatible with the vehicle's embedded USB Host.

The present invention is capable of being implemented in several different embodiments. For example, an embodiment of the present invention comprises a USB Hub Module having a USB Hub, USB Bridge, and USB routing switches implemented as discrete devices. The USB Hub upstream port is configured to be connected to a vehicle's embedded USB Host (such as a USB Host in a Head Unit). The USB Hub Module also includes a switching device (such as USB analog multiplexing switches for example) that is configured to route each consumer port to either the Bridge or the Hub. The USB Bridge is configured to effectively control the switching device. The USB Bridge is configured, based on signals from the Head Unit, whether the consumer device which is connected to the USB port is acting as USB Host or USB Device. In the case where the consumer device is acting as USB Host, the USB Bridge controls the switching device to route the USB port to the Bridge. The Bridge processes the signals from the consumer device and provides them to the USB Hub, thereby rendering the consumer device compatible with the vehicle's embedded USB Host. In the case where the consumer device is acting as USB Device, the USB Bridge controls the switching device such that the switching device provides the signals to the USB Hub, effectively bypassing the Bridge.

Still another embodiment of the present invention provides that the USB routing logic, USB Bridge, and USB Hub are integrated in a single combination USB Hub/USB Bridge Integrated Circuit (IC).

Still other embodiments are entirely possible, some of which are described and illustrated herein. For example, the concept can be extended to include additional embedded USB Device functions such as USB HID and USB Audio. Further it is also envisioned that all consumer facing USB ports of the Hub Module can emulate or otherwise support dual role USB capability provided that each downstream port has a Bridge to support USB Host mode for the connected device and a direct connection to the USB Hub to

US 9,619,420 B2

5

support USB Device mode. In all cases, compliance to USB protocols and architectures is preferably maintained.

BRIEF DESCRIPTION OF THE DRAWINGS

The organization and manner of the structure and operation of the invention, together with further objects and advantages thereof, may best be understood by reference to the following description taken in connection with the accompanying drawings wherein like reference numerals identify like elements in which:

FIG. **1** illustrates a system wherein a multiple port self-powered USB Hub functions to connect a single USB Host to a plurality of USB ports;

FIG. **2** illustrates a system wherein a self-powered USB Hub provides not only a plurality of USB ports, but also a Secure Digital ("SD") card reader;

FIG. **3** illustrates a vehicle infotainment system structure wherein multiple USB Hubs are connected together or tiered, such that USB Hubs feed other USB Hubs;

FIG. **4** illustrates a system which is in accordance with an embodiment of the present invention, wherein a USB Hub, USB Bridge and a switching device are provided as discrete components;

FIG. **5** illustrates a system which is in accordance with an alternative embodiment of the present invention, wherein USB routing/switching logic and a USB Bridge are integrated with a USB Hub in a combination USB Hub/USB Bridge Integrated Circuit (IC);

FIG. **6** illustrates the different components of the combination USB Hub/Bridge IC shown in FIG. **5**;

FIG. **7** illustrates one possible endpoint configuration of the USB Bridge shown in FIGS. **5** and **6**; and

FIG. **8** illustrates an example implementation of a Head Unit Software Architecture.

DESCRIPTION OF ILLUSTRATED EMBODIMENTS

While this invention may be susceptible to embodiment in different forms, there are specific embodiments shown in the drawings and will be described herein in detail, with the understanding that the present disclosure is to be considered an exemplification of the principles of the invention, and is not intended to limit the invention to that as illustrated.

FIG. **4** illustrates a system which is in accordance with an embodiment of the present invention. The system is configured to effectively render a vehicle's embedded USB Host compatible with consumer devices which are configured to also act as USB Host or USB Device. The system is in the form of a self-powered USB Hub Module having a USB, a USB Bridge, and a switching device implemented as discrete devices. The USB Hub is preferably provided in the form of an integrated circuit (IC), and is configured (via an upstream USB port) connected to a vehicle's embedded USB Host (such as a USB Host in a Head Unit) via vehicle internal wiring, such as, in one embodiment, via a single USB data cable between the Head Unit and USB Hub. The USB Hub also includes a plurality of downstream USB ports, at least one of which is connected to a USB Bridge (which also is preferably provided in the form of an integrated circuit (IC)). At least one downstream USB port of the USB Hub is connected to a switching device (such as USB analog multiplexing switches, for example). The switching device is configured to be connected to at least one USB port in the vehicle for connection to a consumer device. The USB Bridge is configured to effectively control the

6

switching device although other control mechanisms are envisioned. The USB Hub Module is configured such that signals received from at least one USB port are received by the switching device, and the switching device routes the signals to the USB Bridge or the USB Hub. In the case where the consumer device is acting as USB Host, the USB Bridge processes the USB packets from the consumer port and provides them to the USB Hub, thereby rendering the consumer device compatible with the vehicle's embedded USB Host. In the case where the consumer device is acting as USB Device, the USB Bridge controls the switching device such that the switching device provides the USB signaling directly to the USB Hub, bypassing the Bridge.

As shown in FIG. **4**, the system also includes Power Management structure, as well as some other conventional structure not specifically shown in FIG. **4**, but which would be readily assumed to be present by one having ordinary skill in the art.

In use, the Head Unit controls the switching device via the USB Bridge hardware or any other convenient means of control. The HU software application may choose to enable, for example, a phone on any one of the consumer USB ports, by requesting, commanding or otherwise knowing the phone is required to be in USB Host mode and commanding the routing of the specific USB port the phone is attached to the USB Bridge. Once routed to the USB Bridge, the phone will detect a USB Device is connected and the phone will begin the standard USB enumeration sequence. The detection and enumeration processes are defined by USB standards and not explained here in detail. However, for purposes of describing the operation of the invention, a general understanding is provided herein. The enumeration process follows a strict sequence of USB descriptor requests from the USB Host and USB descriptor responses from the USB Device that allow the Host to determine the capabilities and functions of the Device and configure the USB Device for operation. Once the complete set of device descriptors are known the USB Host will then load the appropriate USB driver(s) and applications to support in the functionality that the USB Device provides. In the scope of this invention it is envisioned that the responses to the descriptor requests made by the phone (USB Host) are either answered locally by the Bridge or preferably, the requests are forwarded through the Bridge to the Head Unit where its device drivers process the request and return the response. The descriptor responses from the device driver are conveyed to the USB Bridge, which then, in turn, passes them to the phone. By passing descriptor request to the Head Unit drivers and returning the responses from the Head Unit drivers back to the consumer device, the Bridge appears as a transparent component in the USB system architecture. The system capabilities are controlled by the Head Unit and the system remains flexible without need for changes to the Bridge firmware or hardware when the system designer requires changes to the descriptor responses. Once the consumer device completes the enumeration process, the Head Unit's USB functional capabilities are known to the consumer device and the consumer device may enable use of those functions over USB communication. At this point, the consumer device or the Head Unit may begin activating any number of supported services such as data connections, streaming audio and streaming video to and from the vehicle via the USB Bridge.

Another embodiment of the present invention can be provided, wherein the bridge is configured to act as an OTG port thus negating the need for switches and/or routing logic. In this case there would exist one Bridge functional block for

US 9,619,420 B2

7                                    8

each downstream port. This embodiment would effectively be a more generalized case of the example illustrated in FIG. 4. FIG. 4 shows just one Bridge that any one of the consumer USB ports can be routed to. With just one bridge, only one consumer USB port can be connected to a USB host at a time. However, if each downstream port of the Hub has a dedicated Bridge, then multiple consumer ports can support connection to USB Host devices at the same time. Thus, any consumer port can be in either USB Host or USB Device mode at any time independently of the others.

FIG. 5 illustrates an alternative embodiment wherein the switching device comprises USB routing logic, and both the USB routing logic and the USB Bridge are integrated with the USB Hub in a combination USB Hub/USB Bridge Integrated Circuit (IC). This configuration has cost and size advantages over building it with discrete components connected together on a printed circuit board.

FIG. 6 illustrates the internal components of the USB Hub/USB Bridge Integrated Circuit (IC) shown in FIG. 5. As shown, preferably the components of the USB Bridge include a bridge controller as well as endpoint buffers. While the exact configuration of endpoints is effectively up to the system designer to choose for a particular need, a specific example of one possible endpoint configuration is shown in FIG. 7; however, many others are possible.

As shown in FIG. 7, the endpoints of the Bridge may be designed to support multiple pipes of Bulk USB data connections between the Host A (Head Unit) and Host B (consumer device). In the Bridge, the IN endpoints of Device A are connected to the OUT endpoints of Device B and the OUT endpoints of Device A are connected to the IN endpoints of Device B. The design of the Bridge may be such that the data flow between the endpoints may be direct or buffered. For example, in the case of direct connection, once a USB packet is received from Host A on a Device A OUT endpoint, the internal logic of the Bridge moves to packet to the Device B IN endpoint if it is available. If Device B IN endpoint is full or otherwise not available then subsequent attempts of Host A to send more packets to Device A in the Bridge will be rejected until such time that the Device B IN endpoint is clear and the contents of the Device A OUT buffer is moved to it. Alternatively, there may exist a local buffer in the Bridge between the endpoints of Device A and B. For example, packets received on an OUT endpoint of Device A are placed in a local memory device for temporary storage until Device B IN endpoint is ready for them. The OUT endpoints are thus capable of receiving multiple packets from the Host until the buffer is full. Likewise the IN endpoints may, at times, transmit multiple packets until the buffer is empty. Such buffers are not required, but are envisioned, to improve system throughput performance in certain circumstances where one of the USB Hosts is occasionally busy and not keeping up with USB transactions at the same rate as the other USB Host. Regardless of the buffer configuration, the Bridge hardware has IN and OUT endpoints on Device A mapped to OUT and IN endpoints respectively on Device B, thus forming a bidirectional bridge that passes USB traffic between two USB Hosts with bandwidth sufficient to support the application requirements of the system.

Also shown in FIG. 7, Device A and Device B provide a bidirectional Control endpoint connected to their respective USB Hosts. Control endpoints are required per USB standard to support USB defined control messages between the Host and Device both during and after the enumeration sequence. Optionally, USB endpoints may also be utilized per USB standard to employ messages intended to control

user defined custom device specific behavior, referred to as Vendor Specific messages. As can be seen in FIG. 7, the Control endpoints are mapped to the Bridge Controller (BC). The BC logic may be implemented in hardware or preferably software. The BC provides the capability to send, receive and process USB standard Control endpoint messages as well as vendor specific messages essential to the control and operation of the Bridge. At system startup, the A Host requests and receives descriptors from the BC via the Control endpoint. Once complete, Host A then loads the Bridge Driver in its software stack and configures the custom Bridge hardware for operation. Host A can then control the functions of the Bridge, such as USB switch routing control. The system is now ready to accept connection with USB Host mode consumer devices on the B Device of the Bridge. When such a connection is made, the BC will notify the Bridge Driver in Host A by sending a message on the control endpoint to Host A. Further, Host B will begin sending descriptor requests on the control endpoint to Device B in Bridge. The BC receives these requests, encapsulates them with information that identifies them as descriptor requests from Host B and passes them to the Bridge Driver on Host using the control endpoint. Host A Bridge Driver receives these requests, identifies them as descriptor requests and passes the requests on to other software components in Host A system and waits for the descriptor responses. The descriptor responses are encapsulated by the Bridge driver to indicate they are descriptor responses that are to be forwarded to Host B. The response is then sent to the BC via the control endpoint. The BC receives them, identifies them as descriptor responses that should be forwarded to Device B and places them on the control endpoint for Device B. This process of receiving and forwarding messages back and forth between the two hosts continues until the enumeration process is complete with Host B. From that point on the two hosts may begin to use the IN and OUT endpoints to transfer application data and services over the bulk endpoints.

FIG. 8 illustrates one possible configuration of the system architecture including software components in the Head Unit interfacing with the Bridge/Hub. There are multiple ways that the operating system and software architecture can be constructed to support the functions of the USB Bridge/Hub. In FIG. 8, a typical Linux implementation is shown including the Bridge/Hub Module and the Head Unit. The system design utilizes standard Linux Kernel components and configurations and should be familiar to those skilled in the art. The Head Unit USB Host Controller hardware is driven by the Host Controller Driver. The Host Controller Driver is connected to the USB Core. The USB Core connects the HCD with the standard USB Linux Device Drivers and the custom Bridge Driver. The Bridge Driver is configured to optionally connect directly to the User Space Application software or to the USB Gadget Driver depending on system architecture. The custom Bridge Driver plays a dual role of both controlling the functions of the Bridge hardware as well as providing a data path between the gadget device drivers and applications running on the Head Unit. The architecture illustrated is capable of handling both the operation and data paths associated with the Bridge and the Hub at the same time, thus allowing concurrent operation of consumer devices operating in USB Device mode with consumer devices operating in USB Host mode. In one embodiment, the Hub/Bridge supports simultaneous active USB data connections between the Head Unit and multiple consumer devices, at least one of which being in host mode while the others are in device mode. In another embodiment,

US 9,619,420 B2

9                                                    10

the Hub/Bridge supports simultaneous active USB data connections between the Head Unit and some combination of embedded and consumer USB devices along with at least one device being in host mode. While it is understood that the software functions of the head unit are essential to building a complete system, the designs of which can vary significantly and this example is provided only as a means of demonstrating one way to utilize the functionality of the present invention.

What is claimed is:

1. A Universal Serial Bus (USB) hub module, comprising:
a first USB port configured to be connected to a USB host;
a second USB port configured to be connected to a consumer device;
a USB hub interconnected to the first USB port and the second USB port;
a USB bridge interconnected to the USB hub; and
a USB routing switch interconnected to the first USB port, the USB hub, and the second USB port, wherein the USB routing switch is configured to connect the second USB port to the first USB port through the USB bridge, thereby providing bidirectional initiation of communication between the USB host and the consumer device when the consumer device connected to the second USB port is in a USB host mode and wherein the USB routing switch is configured to connect the second USB port directly to the first USB port through the USB hub, thereby only responding to communication initiated by the USB Host when the consumer device connected to the second USB port is in a USB device mode.

2. The USB hub module according to claim 1, wherein the USB routing switch is configured to connect the second USB port to the first USB port through the USB bridge thereby providing bidirectional initiation of communication between the USB host and the consumer device when the consumer device connected to the second USB port is in the USB host mode and wherein the USB routing switch is configured to simultaneously connect another second USB port directly to the first USB port through the USB hub, thereby only responding to communication initiated by the USB Host when another consumer device connected to the another second USB port is in the USB device mode.

3. The USB hub module according to claim 1, wherein the USB hub module is configured to recognize whether the consumer device connected to the second USB port is in the USB host mode or in the USB device mode and control the USB routing switch accordingly.

4. The USB hub module according to claim 1, wherein the USB hub module is configured to dynamically switch operation of the second USB port between supporting the consumer device in the USB device mode or the USB host mode.

5. The USB hub module according to claim 1, wherein the USB routing switch is configured to connect the consumer device to either the USB bridge or the USB hub based on whether the consumer device attached to the second USB port is configured to act as the USB host or a USB device.

6. The USB hub module according to claim 1, wherein the USB bridge is configured to control the USB routing switch.

7. An integrated circuit, comprising:
a USB hub configured to be interconnected to a first USB port connected to a USB host and a second USB port connected to a consumer device;
a USB bridge interconnected to the USB hub; and
a USB routing switch interconnected to the USB bridge, the USB hub, and the second USB port, wherein the USB routing switch is configured to connect the second

USB port to the first USB port through the USB bridge thereby providing bidirectional initiation of communication between the USB host and the consumer device when the consumer device connected to the second USB port is in a USB host mode and wherein the USB routing switch is configured to connect the second USB port directly to the first USB port through the USB hub, thereby only responding to communication initiated by the USB Host when the consumer device connected to the second USB port is in a USB device mode.

8. The integrated circuit according to claim 7, wherein the USB routing switch is configured to connect the second USB port to the first USB port through the USB bridge thereby providing bidirectional initiation of communication between the USB host and the consumer device when the consumer device connected to the second USB port is in the USB host mode and wherein the USB routing switch is configured to simultaneously connect another second USB port directly to the first USB port through the USB hub, thereby only responding to communication initiated by the USB Host when another consumer device connected to the another second USB port is in the USB device mode.

9. The integrated circuit according to claim 7, wherein the integrated circuit is configured to recognize whether the consumer device connected to the second USB port is in the USB host mode or in the USB device mode and control the USB routing switch accordingly.

10. The integrated circuit according to claim 7, wherein the integrated circuit is configured to dynamically switch operation of the second USB port between supporting the consumer device in the USB device mode or the USB host mode.

11. The integrated circuit according to claim 7, wherein the USB routing switch is configured to connect the consumer device to either the USB bridge or the USB hub based on whether the consumer device attached to the second USB port is configured to act as the USB host or a USB device.

12. The integrated circuit according to claim 7, wherein the USB bridge is configured to control the USB routing switch.

13. A method of operating a USB hub module having a USB hub configured to be interconnected to a first USB port connected to a USB host and a second USB port connected to a consumer device, a USB bridge interconnected to the USB hub, and a USB routing switch interconnected to the USB bridge, the USB hub, and the second USB port, said method comprising the steps of:
determining when the consumer device is operating in a USB host mode and in a USB device mode;
connecting the consumer device via the second USB port to the USB hub via the first USB port through the USB routing switch and the USB bridge, thereby providing bidirectional initiation of communication between the USB host and the consumer device when the consumer device is determined to be in the USB host mode; and
connecting the consumer device via the second USB port to the USB hub via the first USB port through the USB routing switch and the USB hub thereby bypassing the USB bridge to only respond to communication initiated by the USB host when the consumer device is determined to be in the USB device mode.

14. The method according to claim 13, wherein the step of determining if when the consumer device is operating in the USB host mode or in the USB device mode is performed by the USB routing switch.

15. A Universal Serial Bus (USB) connectivity module, comprising:

US 9,619,420 B2

11

12

a first USB port;

a second USB port;

a USB host-to-host bridge connected to said first USB port;

a USB routing switch connected to said first USB port, said second USB port and said USB host-to-host bridge, wherein said USB routing switch is configured to provide a communication link between said first USB port and said second USB port through said USB host-to-host bridge, thereby providing bidirectional initiation of communication between the USB host and the consumer device when a first consumer device connected to said second USB port is operating in a USB host mode and wherein said USB routing switch is configured to provide another communication link between said first USB port and said second USB port that bypasses said USB host-to-host bridge, thereby only responding to communication initiated by the USB host when the first consumer device connected to said second USB port is operating in a USB device mode.

16. The USB connectivity module according to claim 15, further comprising a third USB port, wherein said USB routing switch is configured to provide a first communication link between said first USB port and said second USB port through said host host-to-host bridge, thereby providing bidirectional initiation of communication between the USB host and the consumer device when the first consumer device connected to said second USB port is operating in the USB host mode and wherein said USB routing switch is configured to provide simultaneously provide a second communication link between said first USB port and said third USB port that bypasses said USB host-to-host bridge, thereby only responding to communication initiated by the USB Host when a second consumer device connected to said third USB port is operating in the USB device mode.

17. The USB connectivity module according to claim 15, further comprising a third USB port, wherein said USB routing switch is further connected to the third USB port, wherein said USB routing switch is configured to provide a first communication link between said first USB port and said second USB port through said USB host-to-host bridge, thereby providing bidirectional initiation of communication between the USB host and the consumer device when the first consumer device connected to said second USB port is operating in the USB host mode, and wherein said USB routing switch is configured to provide a second communication link between said first USB port and said third USB

port that bypasses said USB host-to-host bridge, thereby only responding to communication initiated by the USB host when a second consumer device connected to said third USB port is operating in the USB device mode without interrupting the first communication link between said first USB port and said second USB port.

18. A communication system, comprising:

a USB hub including a first USB port and a second USB port;

a central vehicle microcontroller connected to said first USB port;

a first consumer device connected to said second USB port;

a USB host-to-host bridge connected to said first USB port;

a USB routing switch providing a first communication path between said second USB port and said USB host-to-host bridge and a second communication path between said second USB port and said first USB port that bypasses said USB host-to-host bridge, wherein said USB routing switch connects said first communication path when the first consumer device is connected to said second USB port and is operating in a USB host mode, thereby providing bidirectional initiation of communication between the USB host and the consumer device and wherein said USB routing switch connects said second communication path, thereby only responding to communication initiated by the USB host when the first consumer device is connected to said second USB port and is operating in a USB device mode.

19. The communication system according to claim 18, further comprising a second consumer device, wherein the USB hub includes a third USB port and wherein the USB routing switch further connects a third communication path between said third USB port and said first USB port that bypasses said USB host-to-host bridge, thereby only responding to communication initiated by the USB Host when the second consumer device is connected to said third USB port and is operating in the USB device mode.

20. The communication system according to claim 19, wherein said USB routing switch is configured to simultaneously provide the second communication path between said first USB port and said third USB port without interrupting the first communication path between said first USB port and said second USB port.

*    *    *    *    *

EXHIBIT 6

Robert Voto - 8/6/2019

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MICROCHIP TECHNOLOGY
INCORPORATED,

     Plaintiff,           C.A. No.  17-01194-LPS-CJB

    -vs-

APTIV SERVICES US, LLC,

     Defendant.
_____/

***CONFIDENTIAL***
ATTORNEYS EYES ONLY

DEPOSITION OF ROBERT VOTO


Taken on Tuesday, August 6, 2019, at

38550 Garfield Road, Suite A,

Clinton Township, Michigan.

Robert Voto - 8/6/2019

2

1    APPEARANCES:

2         SLAYDEN GRUBERT BEARD PLLC
          By:  Darryl J. Adams, Esq.
3         401 Congress Avenue
          Suite 1650
4         Austin, Texas  78701
          (512) 402-3550
5         DAdams@sgbfirm.com
          Appearing on behalf of Plaintiff
6
          STRIS & MAHER LLP
7         By:  Kenneth J. Halpern, Esq.
          725 S. Figueroa Street
8         Suite 1830
          Los Angeles, California  90017
9         (213) 995-6800
          Ken.Halpern@strismaher.com
10        Appearing on behalf of Defendant

11

12   Also present:  Jason Skinder, on behalf of Aptiv

13                  Lauren Luzod, video technician

14

15

16

17

18

19

20   REPORTED BY:  Kelly Bonheim, CSR 8167
                   Certified Shorthand Reporter
21

22

23

24

25

Robert Voto - 8/6/2019

3

1                    T A B L E   O F   C O N T E N T S

2  Witness                                                    Page

3  ROBERT VOTO

4          Examination by Mr. Adams                             5
           Examination by Mr. Halpern                         110
5          Re-Examination by Mr. Adams                        111
           Re-Examination by Mr. Halpern                      116
6          Re-Examination by Mr. Adams                        117

7

8

9                    E X H I B I T   I N D E X

10  Exhibit    Description                                    Page

11    2       Deposition notice                                 8

12    25      Defendant Aptiv Services US, LLC's               11
              corrected first supplemental objections
13            and responses to Plaintiff Microchip
              Technology Incorporated's first set of
14            interrogatories, numbers 1 through 5

15    26      January 12, 2015, letter                         14

16    27      Information disclosure statement                 33
              submitted to the patent office in
17            January of 2015

18    27-A    US patent number 9460037                         42

19

20

21

22

23

24

25

14

1           Is there any new information that you, as
2      Aptiv's representative, would like to add?
3  A.   No.
4  Q.   Okay.  So let's take this one piece at a time.
5      The first statement is that -- and I'll
6      paraphrase, that Aptiv believes it first learned
7      of the 243 and 708 patents in a letter from
8      Microchip dated January 12th, 2015.
9           Do you see that?
10 A.   Yeah, I see that.
11          (At 9:17 a.m., Exhibit No. 26 marked.)
12 BY MR. ADAMS:
13 Q.   I've handed you a document that's labeled
14      Exhibit 26.  Do you -- is this the letter to which
15      Interrogatory No. 1 was referring, the January
16      12th, 2015, letter from Microchip?
17 A.   Yes, it is.
18 Q.   And this letter was sent to a Mr. Mark Davis, at
19      least on this letter is titled intellectual
20      property council; is that correct?
21 A.   Could you rephrase that question?
22 Q.   I'm sorry.  My bad.  That was from Mr. Davis.
23          This letter was -- was directed to you,
24      Mr. Rob Voto; is that correct?
25 A.   That is correct.

Robert Voto - 8/6/2019

15

1    Q.    Okay.  And at the time you had the title of vice
2          president of engineering.  Was that accurate at
3          that time?
4    A.    Yes, it was.
5    Q.    Okay.  And you did receive this letter, correct,
6          Mr. Voto?
7    A.    I did receive the letter.
8    Q.    Okay.  And what did you do in response to
9          receiving this letter?
10   A.    After receiving this letter I contacted Delphi
11         internal legal department.
12   Q.    Okay.  And who at Delphi internal legal
13         department?
14   A.    His name is Craig Baldwin.
15   Q.    Okay.  Did you have any other interactions -- is
16         that -- let me start again, please.
17              Did you do anything else in regards to
18         receiving this letter?
19   A.    Yes, I also shared this letter with my boss at the
20         time, who was Stephanie Pennell.
21   Q.    Could you spell Pennell for the record?
22   A.    I'm not exactly sure.  I think it's P-e-n-n-e-l-l.
23         Sounds good.  It's close.
24   Q.    Okay.  Those double Ns and double Ls are tough.
25   A.    Yeah.

Robert Voto - 8/6/2019

16

```
 1    Q.    I have trouble with them too.
 2                 Did you do anything else in -- in regards
 3          to this letter?
 4    A.    I think those are the two significant things that
 5          I did with the letter.
 6    Q.    Okay.  Were you asked to look at -- by anybody
 7          were you asked to look at the patents that are
 8          referenced here?
 9    A.    I don't recall if somebody asked me to look at
10          them.  But I can tell you that I did along with
11          people like Craig.
12    Q.    Okay.
13    A.    We wanted -- we wanted to -- to understand if --
14          if we felt that there was a basis to this.  All
15          right.  We wanted to understand that.
16    Q.    Okay.
17    A.    So we looked at it.
18    Q.    All right.  So my previous question was, did you
19          do anything else other than giving it to
20          Mr. Baldwin and Pennell.  It sounds like at some
21          point in addition you looked at the patents; is
22          that correct?
23    A.    That's -- that's right.  So what I'm trying to say
24          is that the first thing we did was contact legal,
25          contact my boss.
```

22

1    Q.    I understand.  And I understand there was

2          different stages before we came -- before you came

3          to provide this response.  So one of those steps

4          was you and Mr. Petku looking at the patent as I

5          understand it.  Now legal was looking at the

6          patent maybe separately but my understanding from

7          your testimony was you and Mr. Petku got copies of

8          the patents and did some kind of an analysis based

9          on -- is that accurate?

10               MR. HALPERN:  Objection, mischaracterizes

11         testimony.  Perhaps pose it as a question.

12               MR. ADAMS:  Okay.  I -- I think I did in

13         the end by saying "is that correct?"  But -- but

14         I'll rephrase it so we're -- so we're all on the

15         same page.

16    BY MR. ADAMS:

17    Q.    Is it correct that you and Mr. Petku did an

18          analysis of these two patents?  Period.

19               MR. HALPERN:  Are you asking if they did

20         an analysis without the lawyers?

21               MR. ADAMS:  Thank you.  I'll -- I'll

22         rephrase it one more time.

23    BY MR. ADAMS:

24    Q.    Did you and Mr. Petku look at the 243 and 708

25          patents without the lawyers?

Robert Voto - 8/6/2019

23

1   A.   Yes.

2   Q.   Okay.  And I'll call that the analysis for the

3        purposes of this -- of these questions.  Is that

4        understandable?

5   A.   The analysis means we looked at the patents, yeah.

6   Q.   Okay.  Actually I'll --

7   A.   I understand.

8   Q.   I'll call -- make it more clear, I'll call it the

9        Voto/Petku analysis, okay?  Referring to you and

10       Mr. Petku looking at the patents without

11       counsel -- without counsel.

12  A.   Yeah, I just wouldn't call it an analysis.

13  Q.   Okay.

14  A.   Okay.

15  Q.   What -- how would you characterize it?

16  A.   Reading and comprehending the material.

17  Q.   Okay.

18  A.   All right.

19  Q.   All right.  When you and Mr. Petku read -- read

20       and comprehended the material, the material being

21       the 243 and 708 patents; is that correct?

22  A.   Yes.

23  Q.   Okay.  When you and Mr. Petku reviewed and

24       comprehended the material, how did you determine

25       what the scope of the patent was?

Robert Voto - 8/6/2019

24

1  A.   I think it's pretty clear by reading it what

2       the -- what the -- maybe I don't understand your

3       word "scope."

4  Q.   Well, I believe you have some patents under your

5       name; is that correct?

6  A.   Sure.

7  Q.   How many approximately do you have, Mr. Voto?

8  A.   About ten.

9  Q.   About ten.  There are -- a patent's a legal

10      document.  You understand that, correct?

11 A.   I do.

12 Q.   And there's different parts of a patent.  You

13      understand that, correct?

14 A.   Yes.

15 Q.   Okay.  And a patent, there's certain parts of a

16      patent that have legal ramifications.  Okay.  Did

17      you have the understanding of what the -- of how

18      to analyze a patent to determine its scope?

19 A.   I think you're --

20 Q.   I mean, I don't --

21 A.   I think you're just looking for information to see

22      if I know how to read a patent?

23 Q.   More specifically, do you know how to read the 243

24      and 708 patents, yes.  What was your -- yes,

25      what --

Robert Voto - 8/6/2019

25

```
 1   A.    I -- I can't speculate on exactly what my thoughts
 2         were at that time when we -- when we looked at
 3         those patents.  But I -- the -- the methodology is
 4         to look at the -- to claims that are in the
 5         patent, to read the body of the patent, to -- to
 6         help, you know, provide the context for those
 7         claims.  And then to, you know, compare what it is
 8         saying relative to what our own chip does.
 9   Q.    Okay.
10   A.    And the conclusion that we both came to was they
11         are very different.
12   Q.    Okay.  So at the time you -- you did this reading
13         and comprehending, you read the claims; --
14   A.    Yes.
15   Q.    -- is that correct?
16   A.    That's right.
17   Q.    Okay.  So based on your experience with patents,
18         do you have an understanding that the claims
19         define the scope of the patent?  Is -- I don't
20         want to put words in your mouth.
21              MR. HALPERN:  Objection, calls for a
22         legal conclusion.
23              THE WITNESS:  No, I wouldn't say that I
24         understand that the claims define the scope.
25   BY MR. ADAMS:
```

26

1   Q.   Okay.  What -- at the time of the reading and

2        comprehension, what did you think defined the

3        scope of the claim -- of the patent?

4                  MR. HALPERN:  Objection, vague.

5                  THE WITNESS:  Yeah, I'm not understanding

6        what you're asking me.

7   BY MR. ADAMS:

8   Q.   Okay.  Do you understand that a patent has a

9        scope?

10  A.   As defined by the claims?  Yes.  You -- you mean

11       the way that the claims are worded limits its

12       applicability or its -- its -- the breadth of

13       its -- what its base, so to speak?

14  Q.   Correct.

15  A.   Yes, I understand that.

16  Q.   Okay.  So I think my question before was, when you

17       determined the scope -- well, I won't try to go

18       back to what my question was.

19                  But at the time of your reading and

20       comprehension, you understood that the claims

21       defined the scope, correct?

22  A.   Okay.

23                  MR. HALPERN:  Objection, vague.

24                  THE WITNESS:  It -- it -- I'm struggling

25       with your questions because I read the claims and

Robert Voto - 8/6/2019

27

1      I looked at our own part and I saw them not

2      covering each other.  I did not see the scope of

3      the patent covering what we had done with our own

4      part.

5   BY MR. ADAMS:

6   Q.   Okay.  Do you recall what -- what in the claims

7      didn't cover your part?

8              MR. HALPERN:  Objection, vague, calls for

9      a legal conclusion.

10             THE WITNESS:  I don't know how to answer

11      that.

12   BY MR. ADAMS:

13   Q.   Okay.  Did you make a conclusion that something in

14      the scope of the claims of the 243 patent did not

15      cover Aptiv's products?

16             MR. HALPERN:  Objection, calls for a

17      legal conclusion, vague.

18             THE WITNESS:  Again, I don't know how to

19      say it any clearer.  I read the patent claims and

20      did not see a case where that was covering what we

21      were doing in our own part.

22   BY MR. ADAMS:

23   Q.   Okay.  And what was -- what in the claims

24      indicated to you that it was not covering what you

25      did in your part?

28

 1              MR. HALPERN:  Objection, calls for a
 2         legal conclusion.
 3              THE WITNESS:  So I don't remember exactly
 4         which patent is which, but basically they were
 5         describing scenarios for -- for patents that were
 6         written in I believe the 2005, 2006 timeframe
 7         describing inventions such as two computers
 8         sharing a printer.  And I didn't see that as being
 9         applicable to what we had done with our solution.
10    BY MR. ADAMS:
11    Q.   Okay.  Do you recall anything specific about those
12         patents that you -- that you focused on?
13    A.   It's been a long time since I've read the patents,
14         so I can't give you all the specifics of it.  But
15         the general essence of it was that one of the
16         patents was requiring device sharing, USB device
17         sharing, which -- which we -- I didn't see in my
18         own judgment as -- as something that -- that we
19         had done in our product.  Another one was
20         automatic switching of devices from one host to
21         another host when the second host is attached.
22         Which again seemed not applicable to what we were
23         doing.
24    Q.   And going back to your reference to device sharing
25         and you used the example earlier of a printer.

29

1          Did you understand a device sharing meant sharing

2          a USB device such as a printer?

3    A.   Yes.

4    Q.   Anything else you can recall about this reading

5          and comprehension of the patents?

6               MR. HALPERN:  Objection, vague.

7               THE WITNESS:  No.

8    BY MR. ADAMS:

9    Q.   Did you share your conclusions from the reading

10         and comprehension with the legal department?

11              MR. HALPERN:  Objection to the extent it

12         calls for attorney-client privilege communication.

13              THE WITNESS:  Yes.

14   BY MR. ADAMS:

15   Q.   All right.  Looking back at the response to

16         Interrogatory No. 1, which is in plaintiff --

17         excuse me -- in Exhibit 25.  Moving to the next

18         sentence which -- which begins with Aptiv believes

19         it first learned of the -- and I'll paraphrase --

20         191 patent.  Would you just read those sentences

21         to yourself?

22   A.   Okay.

23   Q.   It refers to an information disclosure statement

24         related to the 9460037 patent.  Do you see that?

25   A.   I do.

Robert Voto - 8/6/2019

122

1        STATE OF MICHIGAN )
                          )   ss
2        COUNTY OF OAKLAND )

3                    I, Kelly Bonheim, a CSR and Notary

4        Public acting in the County of Macomb, State of

5        Michigan, do hereby certify that this transcript,

6        consisting of 122 pages was taken before me in the

7        above-entitled matter, was by me duly sworn at the

8        aforementioned time and place; that the testimony

9        given by said witness was stenographically taken

10       in the presence of said witness and that the said

11       deposition is a full, true, and correct transcript

12       of the testimony given by the witness.  I further

13       certify that I am not connected by blood or

14       marriage with any of the parties or their

15       attorneys, and that I am not an employee of either

16       of them, nor financially interested in the action.

17

18                    Kelly Bonheim, CSR-8167
                      Notary Public: Oakland County, Michigan
19                    My commission expires: 11/1/2020
                      The Legal Connection, Inc.
20                    7103 Oak Meadow Drive, Suite A
                      Austin, Texas  78736
21                    CRB Firm No. 656
                      P: 512.892.5700; F: 512.892.5703
22

23

24

25